# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414 |
| **WARDEN OF USP TERRE HAUTE**, | **)** | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone:  (785) 979-3672
Email: rewlaw@outlook.com

Michelle M. Law, MO bar no. 45487*
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org
*to be admitted pro hac vice

Dated: August 27, 2019

*Counsel for Petitioner*

## I.    INTRODUCTION

Wesley Ira Purkey is a death-sentenced inmate housed at the United States Penitentiary in Terre Haute. Mr. Purkey moves to vacate his conviction and sentence because both court-appointed trial counsel and post-conviction counsel were constitutionally ineffective, and rendered Mr. Purkey's trial and post-conviction proceedings fundamentally and structurally unfair in ways never scrutinized by any court.

The basis for Mr. Purkey's motion is grounded in fundamental concepts of reliability and what it means to have a fair trial in a capital case. It is also grounded in the unacceptability of leaving challenges to the fairness of Mr. Purkey's trial and fundamental legality of his death sentence un-reviewed by any court because the prior court appointed lawyers charged with protecting Mr. Purkey's constitutional rights failed to do so.

Mr. Purkey was appointed a lead trial lawyer who is responsible for more individuals on federal death row than any other lawyer in America. That lawyer, instead of obtaining a qualified mitigation specialist to conduct an adequate investigation of Mr. Purkey's life history, hired a friend who had been terminated from his previous employment in the public defender office for serious misconduct and incompetency as a *fact* investigator, and against whom his prior bosses at the public defender office had to obtain protective orders after he stalked, assaulted,

and threatened them following his termination. The lawyer then lied to the trial court judge about his friend's qualifications in order to obtain funding for mitigation services in Mr. Purkey's case, and later repeated the lie to the same judge in Mr. Purkey's § 2255 proceedings.

Mr. Purkey's lawyer then presided over a dysfunctional trial team that failed to conduct an investigation of Mr. Purkey's background and life history consistent with their professional and constitutional obligations in a capital case. Had they conducted an appropriate investigation, they would have uncovered the vast and readily available information of Mr. Purkey's lifelong, extraordinary trauma history and mental impairments that would have given the jury a meaningful understanding of the constellation of symptoms suffered by Mr. Purkey throughout his life and the connection of those symptoms to his behavior that would have helped explain to the jury why he committed the crime that led to his federal conviction. The information uncovered by Mr. Purkey's current counsel was readily available to both trial and post-conviction counsel through extensive records as well as family members and friends, who would have been more than willing to provide relevant, detailed information about Mr. Purkey to prior counsel if they had been asked. Had Mr. Purkey's jurors heard this information, at least one of them might have voted for a life sentence.

As it was, trial counsel collected only partial and incomplete records, and contacted only a few people from Mr. Purkey's life. Even then, trial counsel and his investigator treated the witnesses rudely, dismissively, and ineptly. For example, trial counsel showed up with his teenage son to interview Mr. Purkey's brother, who, it turns out, possessed sensitive and crucial information relating to Mr. Purkey's trauma history that trial counsel never obtained. Trial counsel and his investigator sought to interview Mr. Purkey's daughter by crashing her wedding. The investigator showed up to interview Mr. Purkey's ex-wife by kicking her door and yelling at her. Predictably, trial counsel secured only the most rudimentary information from witnesses. Mr. Purkey's § 2255 counsel cast a slightly wider net of witnesses than trial counsel did, and were certainly more polite in their interviews than was trial counsel. Nevertheless, post-conviction counsel also failed to conduct an adequate investigation into Mr. Purkey's life history and mental health, in part because they were denied the funding that would have enabled them to conduct the constitutionally-requisite investigation that trial counsel failed to do.

Mr. Purkey's trial counsel also failed to protect his client's fundamental rights to a fair trial and impartial jury. Counsel allowed a presumptively biased juror to sit on Mr. Purkey's jury, ignorant of the fact that the juror had disclosed on her questionnaire that she had been the victim of an attempted rape when she was 16 years old, substantially similar to the underlying facts of the charge against Mr.

Purkey. The juror even bore the same first name as the alleged victim. Mr. Purkey's § 2255 counsel was also ignorant of the presumptively biased juror, and the matter was never brought to any prior court's attention.

At the penalty phase, the jury returned a special verdict form for death that left blank the section on mitigating factors that would allow courts to understand the reasons for sentencing Mr. Purkey to death. Yet when the trial judge offered to send the jury back for further deliberations, Mr. Purkey's trial lawyer acquiesced to the Government's opposition. While the issue of the blank verdict form was presented in Mr. Purkey's § 2255 petition, post-conviction counsel never interviewed the jurors who deliberated on Mr. Purkey's case, and thus never presented to the court necessary information to establish the significance of the blank verdict form and its prejudice to Mr. Purkey. This failure to investigate permitted the courts reviewing the § 2255 petition to misinterpret the blank verdict form as a finding of no mitigating factors and to deny an evidentiary hearing.

To make matters even worse, in denying an evidentiary hearing the § 2255 trial judge relied on a 117-page affidavit submitted to the court by Mr. Purkey's trial counsel. The sworn statement of trial counsel not only amounted to an unethical brief against his former client, but investigation by current counsel shows that the affidavit contained material falsehoods constituting a fraud on the court, submitted for no other purpose than to interfere with the administration of justice

4

and the § 2255 court's impartial adjudication of those claims of ineffective

assistance of trial counsel that *were* raised in Mr. Purkey's § 2255 petition.

As set forth in detail below, this petition is properly brought under 28 U.S.C.

§ 2241 and under the law of this Circuit, because there is no mechanism under 28

U.S.C. § 2255 to consider the fundamental issues presented. Absent review

pursuant to § 2241, no court will have had the opportunity to review them. Mr.

Purkey should not be executed without full and fair review of the important and

fundamental challenges to the legality of his conviction and death sentence

presented in this petition.[1]

## II.    JURISDICTION

Mr. Purkey has not had a reasonable opportunity to obtain a reliable judicial

determination of the fundamental legality of his conviction and sentence. As this

petition shows, current counsel's investigation of this case has uncovered

voluminous evidence establishing violations of Mr. Purkey's constitutional rights,

particularly the rights to counsel, due process, and freedom from cruel and unusual

punishment. Although Mr. Purkey (through prior counsel) has previously filed one

§ 2255 motion containing certain claims of ineffective assistance of trial counsel,

because § 2255 counsel failed to investigate the case, counsel did not raise the

---

[1] Counsel for Mr. Purkey will file an Appendix to accompany this Petition. However, because of
the size of the Appendix, counsel will be required to format the Appendix for electronic filing
purposes, which will take some time. Counsel will attempt file the Appendix electronically

ineffective assistance of trial counsel claims included in this petition. Accordingly, no court has ever determined whether, in light of this new evidence, Mr. Purkey's conviction or sentence violate his constitutional rights.

Due to the structure of § 2255 review, § 2255 is inadequate or ineffective for providing redress of these substantial ineffective-assistance-of-trial-counsel claims. Federal courts have no established procedure for developing ineffective assistance claims in direct appeal proceedings, which means that a petitioner's "first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255." *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015). Because a motion under § 2255 is a petitioner's first opportunity to present such a claim, § 2255 counsel's failure to present a claim (due to § 2255 counsel's ineffective assistance) does not prevent federal review of such a claim and provides cause for federal courts to do so. *Id.* at 853-54. However, Mr. Purkey cannot meet the requirements for filing a successive petition under § 2255 review. *See* 28 U.S.C. § 2255(h) (stating that a second or successive motion must be based on: 1) newly discovered evidence that would establish actual innocence, or 2) a new rule of constitutional law, previously unavailable, made retroactive to cases on collateral review by the Supreme Court of the United States).

Under these circumstances, the "saving clause" in § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims.  The "saving clause" states as follows:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(e).

In *Webster v. Daniels*, the Seventh Circuit considered the meaning of § 2255(e)'s "inadequate or ineffective" language, and the court held that "whether § 2255 is inadequate or ineffective depends on whether it allows the petitioner 'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (*en banc*) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)) (permitting § 2241 relief on claim asserting that petitioner's intellectual disability made him constitutionally ineligible for the death penalty where additional evidence of disability was discovered after the denial of his § 2255 motion). Based on its review of Seventh Circuit precedent regarding § 2255's savings clause, the *Webster* court found that "that there must be some kind of structural problem with section 2255 before section 2241 becomes available." *Id*.

"In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Id*.

The *Webster* court identified one type of "something more" as a circumstance in which the operation of the successive petition rules absolutely prevent a petitioner from having a meaningful opportunity to raise a challenge to the legality of his sentence. *Id*. at 1136-37.  The court explained that the case of *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), provides an example of "something more":

> In *Garza,* we found that "something more" in the form of an intervening decision of an international tribunal. Juan Garza had been sentenced to death in federal court under 18 U.S.C. § 848(e). After exhausting both his direct appeals and his opportunity for collateral relief under section 2255, Garza filed a petition with the Inter–American Commission on Human Rights. After reviewing the case, the Commission concluded that the introduction of evidence of murders in Mexico—crimes for which Garza had never been charged but which were necessary predicates to his death sentence—violated Garza's rights under the American Declaration of the Rights and Duties of Man. Shortly after the Commission issued its report, Garza filed a habeas corpus petition under section 2241 in the Southern District of Indiana, the place of his incarceration. He argued in that petition that the United States was bound by treaty to abide by the Commission's decision. Construing Garza's petition as an unauthorized effort to file a successive motion under section 2255, the district court held that it lacked jurisdiction to decide the case and dismissed the action.
>
> Garza appealed that unfavorable ruling to this court. We identified two issues that had to be resolved: first, whether Garza qualified for section 2255's savings clause, thereby enabling him to bring a petition under section 2241; and second, if 2241 was available, whether he was entitled to relief. We began by recognizing that "the mere fact

that Garza's petition would be barred as a successive petition under §
2255 ... is not enough to bring the petition under § 2255's savings
clause; otherwise, the careful structure Congress has created to avoid
repetitive filings would mean little or nothing." *Garza,* 253 F.3d at
921. We concluded, however, that in rare circumstances "the
operation of the successive petition rules [would] absolutely prevent[ ]
the petitioner from ever having an opportunity to raise a challenge to
the legality of his sentence." *Id.* at 922. Garza presented such a case,
we concluded. On the merits, we decided that the Commission's report
was advisory only and thus did not support the relief Garza sought.

*Id.*

In the present case, due to the structure of § 2255 relief itself as well as §

2255's successive petition rules, Mr. Purkey has not had a meaningful opportunity

to present the ineffective assistance of trial counsel claims included in this petition.

Because the federal courts have no established procedure for developing

ineffective assistance claims in direct appeal proceedings, Mr. Purkey did not have

a reasonable opportunity to present his claims at that time. Similarly, because §

2255 counsel failed to investigate the case adequately, counsel were not aware of

these claims, and Mr. Purkey accordingly was unable to obtain judicial review of

them during his initial-review § 2255 proceeding.

Like the petitioners in *Garza* and *Davenport*, Mr. Purkey now is

procedurally barred from raising these substantial claims in a successive § 2255

petition. *See* 28 U.S.C. § 2255(h). Thus, as in *Webster* and *Garza* and *Davenport*,

operation of the successive petition rules absolutely prevent Mr. Purkey from ever

having an opportunity to raise these challenges to the legality of his sentence.

Mr. Purkey's case similarly presents a "something more": the development

of the *Martinez-Trevino* doctrine and the Seventh Circuit's application of it to

initial-review collateral proceedings under § 2255. Since AEDPA's enactment, the

United States Supreme Court has decided two intervening cases centering on a

petitioner's right for a judicial determination of ineffective assistance of trial

counsel claims that post-conviction counsel failed to investigate and present. In

*Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court of the United States held

that where initial-review collateral proceedings provide the first occasion for a

petitioner to raise an ineffective assistance of trial counsel claim, courts must hear

substantial—though procedurally defaulted—constitutional claims of ineffective

assistance of trial counsel if the petitioner can establish that counsel in the initial-

review collateral proceeding caused the default by providing ineffective assistance.

566 U.S. at 9-10. "When an attorney errs in initial-review collateral proceedings,"

the Court explained, "it is likely that no state court at any level will hear the

prisoner's claim." *Id.* at 10.  The Court thus concluded that "if, in the [State's]

initial-review collateral proceeding, there was no counsel *or counsel in that

proceeding was ineffective*," procedural default will not "bar a federal habeas court

from hearing a substantial claim of ineffective assistance at trial." *Id.* at 17

(emphasis added). A year later, in *Trevino v. Thaler*, 569 U.S. 413 (2013), the

Court held that based on the principles of *Martinez*, courts can excuse procedural

default even in a jurisdiction that does not require ineffective assistance claims to be raised on initial collateral review.

The Seventh Circuit has recognized that "[t]hose two decisions . . . have changed how courts should view claims of ineffective assistance of counsel at initial-review collateral proceedings." *Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018).[2] Furthermore, the Seventh Circuit has recognized that the circumstances justifying judicial review of claims defaulted due to the failures of post-conviction counsel are identical to the situation described in *Trevino*. *Ramirez*, 799 F.3d at 853 ("[T]he federal courts have no established procedure . . . to develop ineffective assistance claims for direct appeal," so "the situation of a federal petitioner is the same as the one the Court described in *Trevino*."). Accordingly, the Seventh Circuit applies the *Martinez-Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255. *See*, *e.g.*, *Brown v. Brown*, 847 F.3d 502, 509-10 (7th Cir. 2017); *Ramirez*, 799 F.3d at 854; *Choice Hotels Intern., Inc. v. Grover*, 792 F.3d 753, 755 (7th Cir. 2015).

Given that (1) the Seventh Circuit applies the *Martinez-Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255; (2) initial-review collateral counsel's failure to investigate and present substantial

---

[2] To the extent that the Seventh Circuit recognizes a prisoner's constitutional right to effective counsel in collateral proceedings providing the first occasion to raise a claim of ineffective assistance at trial, this recognition further entitles Mr. Purkey to a judicial determination of his claims under section 2241.

claims of ineffective assistance of trial counsel prevented Mr. Purkey from meaningful judicial review of these claims; and (3) the operation of the successive petition rules absolutely prevents Mr. Purkey from ever having an opportunity to raise these challenges to the legality of his conviction or sentence; the saving clause of § 2255(e) is available to Mr. Purkey. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

The principles of due process, reliability, and fundamental fairness undergirding post-conviction review, all of which are particularly important when a petitioner's life is at stake, support the application of the saving clause to the circumstances of this case. The writ of habeas corpus has always been "a bulwark against convictions that violate fundamental fairness." *Engle v. Isaac*, 456 U.S. 107, 126 (1982). Ultimately, the writ of habeas corpus is an equitable remedy. *Gomez v. U.S. District Court*, 503 U.S. 653, 653-54 (1992). Thus, the application of § 2255(e) is this case is not only consistent with the statutory language of the provision but also the principles supporting the provision's inclusion in § 2255 in the first place. *See Webster*, 784 F.3d at 1136.

Because Mr. Purkey presents new, substantial constitutional claims challenging the legality of his conviction and sentence but § 2255 is structurally "inadequate or ineffective to test the legality" of his conviction and sentence in light of these claims, Mr. Purkey properly has requested relief in this original habeas petition under 28 U.S.C. § 2241. This Court has jurisdiction to hear the merits of those claims and grant all legal and equitable relief to which Mr. Purkey is entitled.

## III.    WES PURKEY'S SOCIAL AND FAMILY HISTORY

### A. Wes's family history is marked by hardship and resilience, long-undisclosed narratives of traumatic exposure to multiple generations of family members, and susceptibility to mental illness and neurodegenerative disease.

Now a 67-year-old man with dementia, Wesley Ira Purkey ("Wes") was born on January 6, 1952 to Jack Wesley Purkey and Velma Johnson, then in their second marriage. The Purkey and Johnson families, prior to and following Wes's birth, primarily lived in and around Wichita, Kansas, having migrated westward from Missouri in the preceding decades. Their family histories are marked by hardship and resilience, and long-undisclosed narratives of traumatic exposure to multiple generations of family members.

When Wes's mother Velma was born to Susana ("Bobbie Sue") Haberthier on June 21, 1925, Velma's father, Ernie Johnson, was no longer present in the household because he and Bobbie Sue had divorced less than two months earlier

13

due to Ernie's "gross neglect." App. 1 at 1; App. 2 at 2. Little else is known of Ernie Johnson. In September 1940 Velma listed her father as deceased when she started high school. App. 3 at 4. Bobbie Sue's older sister, Carrie Burke, would become Wes's guardian years later.

Several members of Bobbie Sue's family suffered from neurogenerative diseases as they aged. Carrie Burke had "organic brain syndrome" at the time of her death. App. 4 at 6. A brother, William Haberthier, suffered from Parkinson's Disease. App. 5 at 7. Their mother, Anna Haberthier, developed "senility" in 1948, and in 1949 was found incompetent by doctors. Anna's daughter, Carrie Burke, was appointed her guardian. App. 6 at 8; App. 7 at 9.

Bobbie Sue raised her daughter Velma in the Catholic Church, and Velma went to Catholic schools, first attending St. Joseph's Catholic School, and later Mt. Carmel Academy and Cathedral High School for her secondary education. App. 3 at 4. For much of high school, Velma was a well-below average student, although she did ultimately receive her diploma in May 1943. App. 3 at 4.

Throughout her life, Velma struggled with anxiety and depression, which she self-medicated by misusing prescription drugs and alcohol. App. 8 at 15. Velma was often tense, nervous, unable to sleep, and she suffered chronic headaches, panic attacks, and episodes of dizziness and feeling faint. App. 9 at 30;

App. 10 at 46; App. 13 at 201; App 11 at 71; App. 10 at 46; App. 8 at 15; App. 12 at 73.

Velma's struggles with anxiety and depression and all their accompanying symptoms left her fragile and broken. She was admitted at least five times to the psychiatric ward at St. Francis Hospital, staying there over three months total. App. 10 at 46; Ap. 13 at 201; App. 14 at 218; App. 8 at 15; App. 15 at 240. During her psychiatric in-patient treatments, doctors interpreted Velma's symptoms as exhibiting characteristics consistent with personality disorganization. App. 10 at 46. She was described as manipulative, distrustful of others, self-centered and critical, and prone to projecting blame onto others. App. 16 at 264.

Wes's father, Jack Wesley Purkey, was born on Halloween in 1923 to Ira and Opal Purkey in Wichita, Kansas. App. 18 at 323. Jack was the seventh of eight siblings, two of who died shortly after birth. App. 19 at 324.

Jack's mother Opal was quite stern and strict. App. 20 at 333. She became even stricter after having "a deep religious experience" in her middle age. App. 20 at 333. Opal's new strong religious beliefs clashed with Ira, a Mason, and also a smoker and coffee drinker, which caused increasing tension within their marriage. App. 20 at 333; App. 19 at 324.

Jack's father Ira Purkey was the authoritarian type, who would put his children in fear of physical violence so they wouldn't misbehave. App. 20 at 333.

15

Jack's sister Marguerite would be terrified of her father's warning that he would "box her ears" if she did not do what he said, because she knew he would do it if she did not obey. Ira had been a prize fighter, and Marguerite saw him beat on her brothers Jack and Russell. App. 20 at 333.

Ira's physical violence rubbed off on his children. Jack's brother Russell would literally have fistfights with Ira. Jack and his siblings used violence to resolve conflicts between them, and between others. App. 20 at 333; App. 19 at 324. Russell Prothero, who later married Jack's sister Marguerite's daughter Debbie, recalls that it was the Purkey family's nature to be unhappy, always struggling, and always having problems that they could never resolve. They especially struggled in their relationships with one another. Russell Prothero admits that his own family had their struggles and difficulties, too, but they could still have a good time and drink together and enjoy each other's company. App. 21 at 341. Not so with the Purkeys. Any time the family got together it would end up with people arguing loudly and fighting with each other, often physically. App. 21 at 341; App. 20 at 333.

The violence in the family also included sexual violence. For example, Jack's brother Russell sexually abused his sisters Irene, Eloise, and Marguerite. Russell would come to the house drunk and then sexually abuse them. App. 19 at

324; App. 20 at 333. Due to few informants still living, it is unknown if Jack Purkey was also a victim of family sexual violence.

The violence imbued by Ira profoundly impacted future generations of the Purkey family. Ira's sons Russell and Jack beat their own children. Russell was App. 19 at 324; App. 20 at 333. Many of Ira's daughters entered abusive, volatile relationships. For instance, Pauline's marital home was so full of conflict and abuse that it got to the point where Pauline's husband pushed her against a wall and put a knife to her throat. Pauline begged her husband to kill her, telling him she would rather die because living with him was unbearable. App. 19 at 323; App. 20 at 333. There was always yelling in the household of Marguerite and her husband, Guy. Marguerite tolerated her husband's physical abuse of her son because she grew up with the same type of discipline. App. 20 at 333.

Outside the home, Jack Purkey attended school regularly through elementary and middle school. He was an average student. App. 22 at 344. High school was much the same, with Jack graduating in the lower third of his class in May 1942. App. 22 at 344.

After graduation, in July 1942, Jack enlisted in the U.S.S. Coast Guard. By November 1942, Jack was sent to Honolulu, just before the bombing of Pearl Harbor. Jack's military records indicate little about his duties during his enlistment. What is known is that his service in the Coast Guard was cut short because of

17

frequent, debilitating headaches caused by a depressed skull fracture he had suffered previously in a car accident in Wichita at age sixteen. App. 24 at 356; App. 20 at 333; App. 25 at 416. During his military service, Jack's suffering was exacerbated by the steel helmet he had to wear and standing long watches that caused almost daily headaches. App. 24 at 356. Jack was honorably discharged from the U.S.S. Coast Guard in March 1943, less than a year after his enlistment. App. 24 at 356. Many years later, Jack confided to his sister Marguerite that he shot and killed a Japanese Prisoner of War in the line of duty. Jack could never forgive himself for this act. App. 19 at 324; App. 20 at 333.

Jack continued to suffer debilitating headaches the rest of his life, even though he had surgery in 1946 to insert a metal plate on his skull. App. 25 at 416; App. 26 at 451; App. 27 at 469. Jack's personality and behavior changed with his suffering. Jack became withdrawn and generally absent, and rarely smiled. App. 20 at 333.

Like Wes's mother Velma, his father Jack also struggled throughout much of his life with anxiety.[3] The earliest known incidence occurred circa 1953 when he was diagnosed with a "nervous spasm." App. 25 at 416. Jack was admitted to the hospital twice within four years for recurring chest pains. During the first of these

---

[3] It is believed by current counsel that Jack Purkey at some point during his early adulthood was admitted to Larned State Hospital for mental health treatment. The specifics are unknown to date as legal counsel for the hospital has declined to release his records to counsel, despite authorizations from both of Mr. Purkey's heirs, without a court order. These records were available at the time of trial.

two admissions, it was noted that Jack showed "some degree of apprehension", his breathing exacerbated the pain, and his pulse rate was elevated above normal. His physical examinations were inconclusive for any heart-related ailment. App. 28 at 564; App. 29 at 576. The symptoms Jack experienced during these visits are consistent with that of a panic attack. App. 30 at 603. He had also become an alcoholic. In 1971, after being admitted to in-patient care due to his chronic alcoholism, Jack admitted to his treating physician that "[h]e is always nervous and worrying about something," and he was formally diagnosed with "Anxiety Syndrome". App. 25 at 416.

For years Jack struggled to hold his life together, but as he aged, his health deteriorated quite significantly. In September 1978 Jack suffered a heart attack, and by March of 1980 he needed a coronary bypass. App. 27 at 469. Alone and destitute, Jack committed suicide in 1984 at the age of 60. Jack was found sitting in an overstuffed chair, his body beginning to decompose, with a bullet hole behind his right ear and a revolver nearby. App. 31 at 607.

In taking his life when he did, Jack did avoid the family affliction of dementia. Like Velma's family, many of Jack's family members suffered from neurodegenerative diseases, including his uncle, Roy Purkey, his paternal grandmother, Nancy Ida Purkey, and his sisters, Marguerite Hotchkiss and Irene Bartlett. App. 32 at 612; App. 33 at 613; App. 34 at 614; App. 20 at 333.

19

**B. Wes's father Jack married his mother Velma against the wishes of Jack's family, and their first marriage ended in divorce after just six months. Velma re-married, but after two of her three sons born during that marriage died shortly after childbirth, she divorced again and then married Jack a second time, and Wes was born.**

Because so many family members have died, little is known about the courtship of Velma Johnson and Jack Purkey. Less than a year after Velma graduated from high school, and about 14 months after Jack was discharged from the military, Velma and Jack were married on May 5, 1944 in Wichita, Kansas. App. 35 at 616. Jack was 21 years old, and Velma was 18. App. 36 at 623. From the start, Jack's family, especially his mother Opal, was not happy about her son's marriage to Velma. App. 20 at 333. Citing Velma's "gross neglect of duty and extreme cruelty" towards him, Jack petitioned for divorce on November 15, 1944 after barely six months of marriage. App. 35 at 616.

A year after her divorce from Jack, Velma married Milo Hamilton on December 17, 1945 in Bartlesville, Oklahoma. App. 37 at 624. Of the three sons born to the marriage, only the middle child survived. The other two died a few days after birth, one from unknown causes and the other from a congenital heart defect. App. 12 at 73; App. 38 at 645.

The death of two infant sons haunted Velma for the rest of her life. She struggled to cope, and would give voice to her sorrow only when drunk. Velma and Milo's surviving son Gary remembers that his "Momma would get drunk and

20

talk about these babies" but otherwise would not talk about them. When she was drunk, she "cried and cried" and would tell him there were "two little angels watching over" him. When Gary was a teenager, he found two little cushions when he was looking for money in his momma's drawer, and inside the cushions were two photographs of babies in caskets. App. 39 at 646.

Within a year of the death of her third son with Milo, Velma divorced petitioned Milo Hamilton due to "gross neglect of duty and extreme cruelty," She was granted primary custody of her then two-year-old son, Gary, and the small laundry business they had was sold to split between Milo and her. App. 37 at 624. Milo died in 2013 (App. 40 at 652), and was never interviewed by prior counsel, so it is unknown whether the stress of having lost another son may have too much to bear for Velma and Milo and led to the divorce.

Alone, dealing with the recent loss of a second son, and raising her surviving young son Gary on her own, Velma returned to the person she knew, Jack Purkey. Velma and Jack remarried on May 28, 1951, eight months after Velma's divorce from Milo. App. 41 at 653. Wes Purkey was born seven months later, on January 6, 1952. App. 42 at 654. Because prior counsel never investigated it, and due to the destruction of medical records and a lack of surviving family members since, at this time it is unknown if Wes was born prematurely or if his conception was the reason Velma and Jack married a second time.

**C. Born into a chaotic family environment of alcoholic, violent parents who were ill-equipped to provide love or support, Wes suffered unspeakable physical, emotional, and sexual violence at the hands of both of his parents, which left Wes in constant fear of being targeted for abuse and unable to trust other people.**

From his earliest moments in life, Wes struggled to communicate. He did not speak until he was six years old. His Aunt Marguerite observed that "[a]ll [Wes] could do was point and grunt" and "there was something very wrong." If anyone tried to hug baby Wes, "he'd scream and run away." App. 43 at 655.

Once Wes did begin to speak at age six, he stuttered very badly. App. 43 at 655. From the beginning "everyone knew he would need to be in a hospital or somewhere that would help him." App. 43 at 655. Wes inherited this brain abnormality from his father's side. Jack Purkey, as well as several of his siblings, also stuttered. App. 43 at 655; App. 20 at 333.

Wes's parents were ill-equipped to offer the patience, care and support that he needed during his developmental years. Instead, Wes was born and raised in an "extremely chaotic" family environment. App. 44 at 657; App. 45 at 669. Velma and Jack's house was a mess, and smelled of liquor and cigarettes. They constantly yelled at the kids, and expressed little love for them. App. 43 at 655. Velma was known more as a party girl than as a loving, supportive mother. She would often drop Wes and Gary off at her mother's house. Velma did not like being there

because her mother would not let her smoke or drink, so her mother was often left to watch the boys. App. 43 at 655.

Velma began drinking excessively in 1952, the same year Wes was born. App. 12 at 73; App. 16 at 264, and only worsened from there. She mostly drank hard liquor like scotch, vodka, or bourbon, consuming anywhere from a pint to a fifth per day. App. 16 at 264. Velma's first admission to in-patient detoxification for her alcoholism was in December 1973. App. 14 at 218. She was admitted again in 1975. App. 15 at 240. During this latter stint, it was suggested she receive continued treatment from a halfway house for alcoholics, but she did "not fully accept the plan proposed." App. 15 at 240. Velma was admitted a third time around 1978, and yet again in 1980, but she was inconsistent with her treatment, often leaving and returning several times. App. 16 at 264. Velma did not stop her heavy drinking until she began noticing increasing nausea, vomiting, and abdominal pain and was admitted for a final time in January 1981. Velma died in February of that year of pancreatic cancer. App. 12 at 73; App. 17 at 322; App. 46 at 673.

Like Velma, Jack Purkey was also an alcoholic. App. 25 at 416; App. 43 at 655. Wes's brother Gary described his step-father as always being drunk, and that Jack "was a mean drunk." App. 47 at 691. Jack's niece Debbie Prothero remembers that her uncle "drank a lot" and "never said more than two words at family gatherings" but "kept to himself." App. 20 at 333. Jack tried to overcome his

chronic alcoholism numerous times throughout his life, but could never succeed. App. 26 at 451; App. 25 at 416; App. 48 at 694.

As chronic alcoholics so often do, Jack and Velma directed much of their agitation, anger, and aggression at each other and their family. *See* App. 49 at 697. (noting Velma's aunt, Carrie Burke, reported following an incident in which Velma had been drinking and driven home by her older son, that Velma "called her a 'son-of-a-bitch" and a "god-damned liar"). Some of this anger and aggression was aimed at Wes problems with speech. According to Wes's brother Gary, Velma and Jack ridiculed Wes for his stuttering. App. 47 at 691. Velma would throw drinks in Wes's face when he stuttered. App. 20 at 333; App. 50 at 699.  One Thanksgiving when he stuttered while trying to ask for the mashed potatoes, his father threw a bowl full of jelly in his face. App. 51 at 711. This left Wes unable to ask for things he needed as a child and in constant fear that he would be targeted for abuse for behaviors he could not control. App. 46 at 673.

Beyond the ridicule and humiliation for his stuttering, Wes's home environment was also marked by horrific violence. Though Jack Purkey would often retreat to his parents' home because his alcoholism rendered him unable to provide for his family and he and Velma fought constantly as a result, other times Jack terrorized Velma in front of their sons. Gary described the home as "always violent," and remembered he and Wes stood

24

there watching one time when Jack punched at Velma so hard that he punched a hole in the wall when she ducked. Another time, Jack slammed Velma's arm in a door and kept slamming the door until her arm broke. App. 43 at 655. Another time, Wes watched his father drag his naked mother down the hallway by her hair as she screamed for help after trying to escape. App. 52 at 761; App. 46 at 673. These beatings occurred several times a week, and caused Wes to fear for his mother's life. App. 46 at 673. When Wes tried to stop him, his father turned his rage against Wes. App. 52 at 761.

Wes was singled out by his father for beatings, using his open hands, fists, and whippings with a belt. App. 46 at 673; App. 56 at 835. These beatings were severe enough to cause intense pain, bruises and even bleeding. App. 46 at 673. During one of these beatings, when Wes was six years old, his head was battered through a wall. App. 46 at 673. Wes could only endure these beatings, even when he screamed at his father to leave him alone, because there was no one there to help him. His mother just stood by and watched. From the ages of five through ten, in addition to the beatings, Wes endured humiliation and verbal threats of physical violence from his father that left him afraid for his life and in constant worry and anticipation of brutal attacks.

It was during these most formative years of development that Wes learned he was alone in this world and could not rely on or trust others, especially those who were supposed to care for and protect him to do so.

When Jack and Velma were married, extended family members such as Grandma Opal and Grandpa Ira and Aunt Marguerite tried to shelter Wes from his parentsby having him and Gary come over to their houses to escape the chaos and violence of home temporarily. App. 43 at 655; App. 39 at 646.

However, even these minimal supports vanished when Jack and Velma divorced. In July 1961, when Wes was nine years old, Velma filed for divorce from Jack, and she was granted a restraining order to prevent Jack from interacting with her or their sons. App. 53 at 763. Over the ensuing months while the divorce was pending, the court granted a succession of restraining orders, preventing Jack from seeing Velma and limiting his time with his sons. App. 53 at 763.

After the divorce, Jack and his extended family distanced themselves from Velma and the boys. Visits to Grandma Opal and Grandpa Ira came to an end. App. 39 at 646. While Grandma Purkey and Aunt Marguerite tried to help Wes during the moments they had with him, their reach was limited because they did not have that much time with him. App. 20 at 333. The last time Wes's cousin Debbie recalled seeing the boys was at Christmas 1964, which was also Grandma and Grandpa Purkey's 50th wedding anniversary. App. 19 at 324; App. 20 at 333.

Wes's father Jack went into a tailspin after the divorce. Having nowhere to live, Jack went from sibling to sibling, but each time he was asked to leave, even from jobs they had given him. App. 19 at 324; App. 20 at 333. Essentially homeless, Jack failed to pay his child support obligations, despite being ordered to do so numerous times by the Sedgwick County courts. At one point, Jack was found guilty of contempt for nonpayment, and placed on probation for 30 days in September 1966. App. 53 at 763.

Velma allowed Jack to see Wes occasionally after the divorce, which permitted the beatings to continue until Wes was about twelve years old. In addition to the physical violence that left Wes injured in many ways, Jack also forced his son to have sex with prostitutes. Jack would command the prostitutes to molest Wes by climbing on top of him, stimulate his genitals and perform fellatio. Wes would pretend to be asleep when this happened. As a child, this made Wes feel unsafe, in danger, and fearful of assault and sexual abuse. App. 46 at 673.

In the meantime, Wes's mother Velma began behaving ever more erratically. Velma had been gainfully employed from 1952 through 1963 with Boeing in Wichita. By 1964, however, when Wes had just turned twelve years old, Velma had no stable, consistent employment for the remainder of Wes's childhood and adolescence. Instead, Velma bounced from one low-wage job to another, often working no more than a few months at a time. App. 54 at 819.

27

As her employment waned, Velma's erratic drinking behavior increased. She hung around after-hours clubs drinking and dancing. Velma began taking her young teenage son Gary with her. App. 47 at 691; *see also* App. 55 at 830.

Velma engaged in increasingly risky behaviors, both for her and her sons. App. 44 at 657. She brought home various men with whom she would have sex. Many of these partners abused her in front of Wes, some of whom left her with black eyes. In this insecure environment, Wes learned not to ask what had happened. App. 56 at 835. He felt abandoned by his mother. App. 57 at 888; App. 58 at 892. One of Velma's lovers was even suspected of raping a young girl. App. 59 at 897.

Velma's struggles with healthy sexual relationships extended beyond the interactions she had with various men. Velma also sexualized both of her sons. When Velma began taking her son Gary to clubs, she also began using him for sexual stimulation. She would take Gary into the bathroom stalls at the bars. At home, she would force him to watch her shower. App. 47 at 691.

Velma began molesting Wes when he was around nine years old, and it did not end until he was about twenty-two. App. 60 at 899; App. 52 at 761; App. 61 at 901; App. 56 at 835; App. 62 at 903. The sexual abuse initially included his mother inappropriately touching his genitals, having Wes sleep with her and manually stimulate her sexually or penetrate her with a hairbrush. As Wes grew older, the

abuse included his mother forcing him to perform cunnilingus on her and engage in sexual intercourse with her. App. 46 at 673. Wes was ashamed of the abuse and hated that his home life was so horrible. Whenever he tried to talk about it he would become very emotional and stuttered badly. App. 60 at 899; App. 52 at 761.

Wes and Gary were taken advantage of sexually by other family members as well. On the weekends that they spent with their maternal grandmother, Bobbie Sue, which were rotated between Wes and Gary, she did some of the same things to them that Velma had. Gary recounts his grandmother walking around the house naked, making him watch her shower, standing naked in front of a mirror in the bedroom, and staring at him in her bed while he pretended to be asleep. App. 47 at 691.

Sharon Fisher, Gary's ex-wife, recalls numerous instances of Velma's odd sexual behaviors and discussions between Gary and Wes about the sexual abuse they suffered. Once when Gary and Wes were drinking, Sharon heard them "talking about how Velma, their mom, used to play with them, like molested them, as kids, and taught them how to give oral sex and do other sexual acts" and Velma talked about how she had sex with some of their friends, too. Another time, Sharon heard Wes remark that "momma, she screwed us into good grades." App. 63 at 908. She doesn't recall seeing Velma without a drink nearby, and Velma was always drunk. The first time

Sharon ever went to Velma's house to meet Gary there, the door to house was open, and when she walked in she could see all the way to the back bedroom, where Velma, naked on the bed, was giving Gary oral sex while Gary stood next to her. Before Sharon finally left Gary a few months later, he brought her over to Velma's house "so they could get to know each other better." Velma was already drunk. Gary's mother sat on the arm of the couch, practically in Gary's lap, and "[w]hile she talked, she stroked his hair like a lover does." When Sharon yelled at Gary that his mom "was acting like a whore," Gary was furious and "started yelling at me that we were in her house and how dare I say something like that." Gary told her to leave, so she did. "Gary chose her over me." App. 63 at 908.

**D. As a young child, Wes's only escape from the relentless violence he experienced at home was among his friends and their families in the neighborhood.**

Though he was generally quiet as a young child, Wes tended to be a jokester amongst his friends and "seemed really happy when he was outside". App. 64 at 914. Unlike in his house, outside with his friends he did not feel like he had to try to hide his stutter. App. 64 at 914. Wes played sports, including basketball, baseball, and football. He rode bikes, and played "Red Rover" and "Hide n' Seek" with all the neighborhood kids. App. 64 at 914. In the fourth and fifth grades, Wesley participated in a select group of ten to twelve neighborhood children that

went caroling at Christmas time. Wes's childhood friend James Haggard remembers that "Wes sang well . . . like the country singer, Mel Tillis." Wes "couldn't get five words out without stuttering, but he could sing real well." App. 65 at 920.

Wes did not speak to his childhood friends about the abuse and violence he experienced at home, but his friends did sense that something was off. James Haggard would often go to Wes's house after school to invite him out to play, but Wes "didn't come out much" and often said he couldn't, but never said why. "He did come out sometimes, but it got less and less as we got older." App. 65 at 920. Garry Monty remembers that the boys in the neighborhood "seldom ever went to Wes's house; I couldn't have gone there more than a handful of times in all the years I knew him." App. 64 at 914. Wes's friend Don Aaron particularly remembers how little involved Wes's parents were, and that when any of Wes's caretakers were present, the mood and atmosphere was palpably uncomfortable:

> In 6th grade we played organized baseball against other parishes. Several boys including me and Wes played on the team. The mom's used to organize a carpool to and from the games and practices because we played at another Catholic school outside of our neighborhood. Wes was part of the carpool, but his mom never drove us. I do remember an older man picked us up a couple of times with Wes. As a little kid I thought it was Wes's dad. I know it was someone who watched Wes, maybe his grandfather.[4] Those car rides were very different than the norm. Typically we laughed and joked

---

[4] The man who Don Aaron remembers was O.L. Darling, Wesley's step-grandfather.

31

together during the rides, but during those car rides we were silent. No one spoke, not even Wes. It was very strange.

App. 66 at 925. Garry Monty's family stepped in for a time, becoming somewhat of

a surrogate family for Wes:

> Because Wes didn't have a reliable family, Wes spent a lot of time at my house when we were young. He did homework with me sometimes, but we mostly played in the neighborhood. He ate dinner with us, too. He was very polite to my parents and grateful to get a hot meal. It always seemed like Wes never wanted to go back to his house, which makes sense to me; he had nothing to go home to. His mom was hardly around and when she was I don't think it was easy because of her drinking.

App. 64 at 914. Garry's aunt, Armeline Monty, took particular interest in Wes and

for a brief time even provided him with academic support he desperately needed

during the 6th grade, the one time he would ever receive such assistance from an

adult during his early life:

> In 6th grade Wes and some other boys were at my house. My Aunt Armeline - we called her Army for short - was asking all of us about our science fair projects. That year St. Joe's held a science fair in which all the 6th grade students had to participate. We were talking about our ideas with my aunt. When she asked Wes, he kind of shook his head. He avoided the question. Aunt Army told him that she had the perfect project for him. She worked at Boeing for many years before retiring from there. At that time she had something to do with training pilots, so she had one of their survival kits. It had a few things in it like a tin cup and plastic. From that day until the science fair, Wes was at my house every day after school working with Aunt Army on the project. He used the survival kit to make water from air. He got first or second place in that fair. Me and all the boys were jealous of his project. It was really cool. After that science project, my Aunt

Army took an interest in Wes. Whenever he was over she made sure
to always ask Wes how he was doing. She really took a liking to him.

App. 64 at 914. This project was the single instance of Wes thriving academically

in school.

**E. For Wes, school provided no safety or respite from the violence at home, because he was ridiculed by the nuns for his stuttering, and subjected to ongoing sexual abuse by the parish priest, leaving him feeling increasingly alone, isolated, and vulnerable.**

Wes attended local parochial schools for elementary and middle school -- at

Christ the King for first grade, and then at St. Joseph's Catholic School for grades

two through eight. App. 67 at 930; App. 68 at 932. Wes struggled academically,

and neither school offered the supportive, caring environment that Wes needed.

Indeed, it turns out that the schools only added to Wes's trauma.

St. Joseph's Catholic School, or "St. Joe's" as it was commonly known, did

not offer any academic assistance for struggling students or for students needing

extra attention, and the nuns did not offer any extra help after school. App. 66 at

925; App. 70 at 955; App. 65 at 920. As Garry Monty puts it, "Students had to

learn it on their own, or get help at home." App. 64 at 914. James Haggard credits

his own parents as the reason for his turnaround when he was struggling

academically at St. Joe's. They had the financial means to find James a private

tutor. App. 65 at 920. Wes's family did not have such means so he was left to do

the best he could on his own.

Moreover, the environment at St. Joe's was downright oppressive, with violence directed at its students. The nuns who taught and ran the school were a part of the Sisters of Charity of the Blessed Virgin Mary ("BVM") order of Catholic nuns, which claimed core values of freedom, education, charity and justice. The BVM nuns focus their works of charity on causes of social justice and education.[5] Unfortunately, for Wes and some of his fellow students, these nuns did not practice the virtues of patience, understanding, and temperance. The nuns inspired fear in their students, often inflicting corporal punishment on the kids who needed the most help. Students were afraid of the nuns and referred to them as "Black Veiled Monsters." App. 66 at 925. The nuns at St. Joe's were "real mean" and inflicted corporal punishment, "sometimes even pulling students out of Sunday church to discipline them." App. 66 at 925. They inflicted corporal punishment and "pulled hair," "hit students' knuckles with a pointer," and "sometimes smacked students in the face." App. 65 at 920. Students were also sent to sit on the trash barrel in the corner of the classroom, and the student would have to balance themselves on the edge of the barrel for as long as the nun wanted. "If we tipped the barrel or fell off, we got in even more trouble." App. 64 at 914.

Some students got it worse than others. App. 64 at 914. For instance, Garry Monty remembers one student who struggled to tie his shoes. Instead of helping

---

[5] *See* http://www.bvmcong.org/about.cfm

him or taking the time to teach him, the nuns made him take off his shoes and stand on paper plates, and then they tied the plates around his feet with pink ribbon and "[h]e had to walk around school all day until he learned to tie his shoes. I'll never forget it; I felt terrible for him." App. 64 at 914. Monty remembers another boy in the second or third grade who frequently raised his to go to the bathroom. The nuns refused to let him go, and he wet himself several times in the classroom. "The nuns probably thought they were teaching him to hold it. All they did was make it worse." App. 64 at 914.

The nuns were not trained to recognize academic struggles was due to disability or other condition. Instead, the nuns ascribed it as the student purposely performing poorly. Edward Ring recalls that the nuns responded to his poor performance in school by slapping his wrists and pulling his ears. He later learned he had dyslexia, and "[l]ooking back it is clear to me that the nuns didn't care to try to help me when I was struggling. They seemed to think that I was doing something I could control and hitting me was the way to get me to learn." App. 70 at 955.

One of the nuns at St. Joe's, Sister Gertrudis, was particularly mean-spirited and abusive towards her students. Both Wes and Garry Monty had Sister Gertrudis for sixth grade. Garry describes her as "a horrible person" and "[f]or many years after I had a hard time getting over her treatment towards me and other students."

For some reason, she called him "Pie Face" instead of calling him by his real name. It made him so angry that one day "I stood up in the middle of class and yelled at her to call me by my real name." Sister Gertrudis yelled back at him. She said that she would call him what she wanted, and would be calling his father, but "[a]fter she and my father met, she never called me Pie Face again." App. 64 at 914. Another time that same year when Garry had broken his ankle playing basketball, his father went with him to school that first day back and spoke to Sister Gertrudis about the need for Garry to keep his ankle elevated. Sister Gertrudis agreed with Garry's father that Garry could use a second chair to keep it elevated while he sat at his desk, "[b]ut after my dad left, Sister Gertrudis walked away" and didn't let him use the chair. When Garry asked her about it, "all she did was snap at me that I didn't need it." App. 64 at 914.

Though Garry Monty describes his personal, painful memories of Sister Gertrudis and her treatment towards him, he acknowledges she singled out other students besides him, but he does not remember who they were any more because "I was so overwhelmed by her treatment towards me that I just don't remember specifics of what she did to others that year." App. 64 at 914.

Wes struggled mightily in Sister Gertrudis's sixth grade class. It was his poorest academic performance in any grade. He received six failing

36

grades that year. App. 73 at 975. Even though he tried to avoid the nuns' ire

of the as best he could by keeping quiet, keeping his head down, and

speaking little, he was still a target. App. 66 at 925; App. 64 at 914. Wes

"was one of those who got it worse the most." App. 65 at 920. Wes's

classmate Don Aaron remembers that, during their 6th or 7th grade year, a

rumor began floating around the school that BVM actually stood for "Black

Veiled Monster" and the nuns blamed Wes for starting the rumor. One day a

nun came and pulled Wes out of the classroom, and when Wes returned, his

face was red and he was holding his hand over his face and looked like he

had been crying. "It was obvious that the nun had whacked him in the face."

App. 66 at 925.

After the incident where Wes had been pulled from class, Wes was

made to stand in front of the whole school following morning Mass and tell

the students what "BVM" stood for:

> It was painful to watch. Wes couldn't get the words out. I remember
> hearing his stutter, Bl Bl Bl Blessed V V V Virgin ... The longer it
> went the more Wes stuttered. He could barely get the words out of his
> mouth. I felt so bad for him, horrible really. I was in my seat cringing
> the whole time. The nuns knew Wes had a stutter; Wes stuttered all
> the time, but on stage in front of everyone it was really awful. App. __

App. 66 at 925.

This form of punishment brought upon Wes was not one meant to correct

poor behavior, but instead sought pointless retribution through embarrassment and

shaming. The nuns were aware that Wes would struggle to enunciate the words in front of the entire student body.

Wes's life St. Joe's worsened still further in the seventh grade. He was taught by Sister Andrienne, considered to be the "worst of all the nuns". App. 65 at 920. Though Wesley's academic grades improved over the course of the year from those he achieved in the sixth grade, Wes continued to be singled out for gratuitous punishment. James Haggard remembers Sister Andrienne being especially brutal towards Wes:

> For one thing, she didn't believe that Wes couldn't control his stuttering. She singled him out all the time. A lot of students had to recite poetry or read in the middle of class, but she called on Wes more than others. He had to stand at his desk and read aloud to the class. Wes wasn't a good reader to begin with, so he always looked embarrassed and that made his stuttering worse. Once he started stuttering he couldn't stop. Sister Mary Adrienne made Wes continue to stand and read even as the stuttering got worse and worse. It was really awful.

App. 65 at 920.

Sister Andrienne's methods only damaged Wes more. This sort of humiliation reinforced and deepened the great anxiety, emotional stress, shame and embarrassment Wes felt because of his stuttering, which played an important role in Wes's inability to maintain attendance in school, ultimately leading him to drop out. App. 46 at 673.

Though Wes had some friends, many students were not kind to him. Wes was made fun of for the way he looked, and for the way he spoke. He got teased by other students at St. Joe because of his large front teeth, and because of his stutter. App. 70 at 955. Wes's brother Gary recalls that,

> When Wesley was a kid he could barely speak his stutter was so bad. He couldn't get words out of his mouth. Kids made fun of him at school. They also made fun of him for his big buck teeth. They were real bucked as a kid. Kids used to call him Bucky the Beaver cause of those teeth.

App. 39 at 646.

Wes's experience of abuse at St. Joe's coincided with his family were becoming more ostracized in the community around them. Following his parents' divorce, Wes, Gary, and their mother Velma were not as welcome at St. Joseph's Catholic Church as they once had been. People in the Church talked poorly about Velma's behavior. Gary recalls that "[t]hey wanted to kick her out from the church cause she wasn't married and had a lot of boyfriends. They called her a slut and a drunk. It hurt me then and it still hurts me now." App. 39 at 646.

The talk and judgment extended to the parents of Wes's childhood buddies, too. Sometimes Wes's friends would hear these conversations. Garry Monty overheard adults in his family talking about Wes's mother sleeping around with a

lot of men. Garry never talked about it with Wes, "[b]ut Wes has to know because people gossiped." App. 46 at 673.

Sex offenders know who the easiest targets are within a community and this was especially true of the parish priest at St. Joe's who molested Wes. Like many young, pre-adolescent boys raised in the Catholic Church, Wes became an altar server at St. Joseph's Catholic Church around the 5th grade. Wes served Sunday Mass as well as some weddings and funerals. App. 65 at 920.

Wes was sexually molested by a parish priest on many occasions over a three-year period, from the ages of eleven to thirteen. Wes "felt very alone when this happened," and "[h]e did not feel comfortable telling his parents because he assumed one, or both of them would smack him around and blame him for it." App. 69 at 940. Psychologist Dr. Frederic Sautter's 2018 report of his evaluation of Wes describes that the sexual abuse by the priest was one of the experiences that elicited the most intense emotions from Wes. App. 46 at 673.

Wes was just a child and could discern that there was no safe person to tell. He was already a victim of severe violence and abuse in his home, and knew if he disclosed the assault to either of his parents they'd blame him. He couldn't go to the members of his church because, more than likely, they would protect the priest, not him. And his teachers at school were off limits, not only because they were

affiliated with this priest, but they too were using Wes's vulnerabilities against him. All Wes could do was push these experiences deep within him.

**F. Finding no safety, comfort or security either at home or school, Wes began to turn to alcohol and drugs, and fell in with a group of rough boys in the neighborhood.**

Beginning in the fifth grade, but more so in the sixth grade, Wes's absences from school increased. In sixth grade Wes missed 20 days of school, followed by 20 ½ days in the seventh grade, and 25 ½ days during the eighth grade. His grades, as noted previously, were at their worst in the sixth grade while he was being shamed and humiliated by Sister Gertrudis, but his grades improved little during the seventh and eighth grades. App. 73 at 975.

Around the seventh grade, Wes started spending less time with people, even his friends with whom he had felt a semblance of comfort and safety. James Haggard recalls that "[s]tarting towards the end of the 7th grade I saw less and less of Wes, in school and outside of school," which he attributed "in part to Sister Mary Adrienne's treatment of Wes and the embarrassment it caused him." App. 65 at 920.

Making new friends had its challenges for Wes. As Wes's brother Gary's friend Stephen Seely observed, "[o]ther kids were often cruel towards Wesley, so much so that sometimes Gary and I had to protect him." Sometimes it took Wes two to three minutes to say one sentence, and if Stephen or anyone else said the

41

word Wes was trying to say, it made it worse. Wes just got frustrated and stuttered

more, so they had to be patient and let him try. But other kids called Wes names

and teased him:

> Some boys asked him questions so they could then make fun of him when he
> spoke. Gary and I stepped in when those same boys pushed Wesley to the
> ground. Sometimes Wesley fought back. It would come out of nowhere, but
> he'd become very upset and emotional and tackle the other boy to the
> ground. Gary and I didn't intervene in those instances because we thought
> those other boys got what they deserved for antagonizing Wesley.

App. 71 at 958. Wes would sometimes tag along with Stephen and Gary to Friday

night dances for kids in the neighboring area, Wes didn't talk to or dance with any

girls because "[h]e was too afraid to stutter." App. 71 at 958.

Wes gravitated towards his older brother Gary, and Gary's friends, in part

because they stepped in to protect him when possible. Wes had always looked up

to Gary, and like many older brothers, Gary had undue influence over Wes. App.

66 at 925. Wes tried to follow Gary around, but he was too young to hang out with

them. App. 71 at 958. Wes idolized Gary. App. 39 at 646. Over time, Wes's

idolization of his older brother would have serious negative consequences for Wes,

as Gary succumbed to his own personal trauma and struggles, and while doing so,

modeled inappropriate behavior for Wes.

Gary survived much of the same traumatic exposure and victimization that

Wesley did as a child. A key difference is that Wes had a stutter that made him a

target for shaming and abuse by his mother, teachers, students, and other children,

to which Gary was not exposed. But like Wes, Gary was abandoned by his father, survived Jack Purkey's assaults, and became witness to and a victim of his mother's and maternal grandmother's sexual abuse. These traumatic exposures, as with Wes, impacted Gary's mental health, influencing his behavior and setting up a life of substance abuse.

Gary began drinking alcohol as a young child. By the age of thirteen he was drinking in bars and getting drunk with friends. App. 71 at 958; App. 57 at 888. Gary escalated quickly to marijuana and LSD. App. 71 at 958. Even though Gary and Wes did spent limited time together (*see* App. 57 at 888), Gary was slowly introducing Wesley to alcohol and drugs. Wes looked up to Gary and wanted to be just like him, so when Gary started drinking, Wes started drinking. Once when Gary and his friends took Wes out and got him drunk, Wes got really sick, and they thought it would end there, but it only escalated, and Wes never stopped. App. 47 at 691. Wes would have been eleven or twelve years old at that time. Gary's friend Lee Hatfield remembers the strong influence Gary had on Wes. App. 58 at 892. Around this time, Wes was sexually abused by Gary's friend "Hup," who would come into Wes's bedroom at night and perform fellatio on him. App. 46 at 673.

Although Wes looked up to Gary and mimicked his behavior, Wes's friends from St. Joe's recognized that Gary was trouble. Gary slicked his hair back and

rolled up his sleeves. He had a reputation as a tough guy, associated with an older crowd from other neighborhoods in Wichita, and everyone knew not to mess with him. App. 66 at 925; App. 64 at 914.

Gary struggled academically, too, and never performed well in school. He ended up being kicked out of Allison Junior High in the ninth grade for skipping school and getting into fights. He took preliminary steps to enroll in another school, but did not follow through and dropped out. App. 39 at 646; App. 71 at 958.

As Gary entered late adolescence and early adulthood, he began using whatever substances he could get his hands on -- pills like Quaaludes and other downers were easily gotten from doctors in Wichita. Gary's addiction to pills turned into a heavy heroin addiction. App. 71 at 958; App. 58 at 892.

In addition to pills and heroin, Gary also huffed Tolio, (App. 63 at 908; App. 58 at 892), also known as Toluene, a common ingredient in paint thinner that causes a high. App. 72 at 963.

Gary committed burglaries, most often of pharmacies, in order to get drugs. A common one was to break into pharmacies. According to Stephen Seely, back then pharmacies did not have alarm systems, so Gary and another friend would break through the roofs and lower themselves down to obtain pills for their own consumption. App. 71 at 958. Gary would also drop Wes through the hole in the

ceiling to steal the drugs. App. 21 at 341. Gary and his friends were also known to burglarize houses in their neighborhood, and commit thefts against local business owners, particularly those selling alcohol. App. 74 at 978; App. 75 at 1014.

Gary did periodically receive treatment for his drug addiction. Following his arrest for reckless driving in April of 1969, Gary's attorney referred him to a local psychologist. App. 76 at 1038. For a time, Gary began to show some improvement. App. 76 at 1038. However, the improvement did not last. Gary's treatment with Dr. Henderson ended in January of 1970 when he was committed to the Kansas State Penitentiary for committing felony forgery and uttering, and served nearly 20 months there. App. 77 at 1066.

Following his release from prison, Gary attempted to straighten out his life. In August 1972 Gary married Sharon Fisher in Wichita, Kansas. App. 79 at 1079. In less than a year, though, Sharon sought a divorce from Gary, alleging "gross neglect, non-support and being an habitual drunkard." App. 79 at 1079. Gary rarely had a job, and partied all night, every night. On top of that, he physically abused and assaulted Sharon. Just prior to filing for a divorce, Gary threw her out of a second story window when he came in to their apartment, drunk and angry. After that, Sharon knew she had to leave. They were divorced in July 1973. App. 63 at 908; App. 79 at 1079.

In 1974, at age twenty-five, Gary voluntarily admitted himself to Larned State Hospital with the assistance of his probation officer. He entered the Addiction Unit because of his heroin dependence, only after he overdosed and nearly died. App. 80 at 1086. Gary remained at Larned State Hospital for six weeks. His treatment was ultimately terminated because of his positive motivation for rehabilitation. App. 80 at 1086.

In the ensuing years, Gary has continued to struggle with addiction. In 1977 he was sent to the Central Plains Drug Treatment Center by a Sedgwick County Court for an evaluation following his conviction for felony theft. App. 81 at 1094. Gary continued using cocaine throughout the 1980s. He overcame an addiction to methamphetamines around 2013. App. 211 at 2832. During the 1990s he was diagnosed with bi-polar disorder and was prescribed various medications for his mood disorder, including Amitriptyline, Librium, Lithium, and Elavil. App. 212 at 2837; App. 39 at 646. Gary married his second wife Becky, whom he met when they were both patients at Larned State Hospital. Although he was devastated when she died in 2007, Gary credits Becky for "teaching me what love was" and getting him out of Wichita and "away from everything." App. 39 at 646.

Since Wes was younger than Gary and, according to Stephen Seely, "lived in his own fantasy world" (App. 71 at 958), Wes did not hang out with Gary

frequently as a pre-adolescent. Instead, Wes fell in with a group of rougher neighborhood boys.

One of these boys was Bobby Bentley, who grew up in Wes's neighborhood but did not attend St. Joe's. Bobby was widely known because of his rough attitude and penchant for bullying and fighting other neighborhood kids. As James Haggard describes, "Even though Bobby was smaller, he was the ringleader of his group of friends." App. 65 at 920. There were always lots of parties and fights at Bobby's house, and Bobby and his friends were often drunk. Don Aaron "avoided walking past the front of the house because often times Bobby or one of the others came out of the house to pick a fight." Bobby punched Don in the face one time, so he and other kids went out of their way to walk down other streets "just to avoid being harassed or beaten up." App. 66 at 925.

James Haggard and Don Aaron both started seeing Wes hanging out with Bobby and his group of friends in the eighth grade. App. 65 at 920; App. 66 at 925. Wes and Bobby met through their older brothers, who were friends. Bobby recalls that he and Wes bonded over music. They both liked to play the bass guitar, and they played music with other friends. App. 57 at 888. They ended up hanging out together most days, and they spent so much time together Wes hardly attended school. App. 57 at 888.

47

Wes really started sustained drinking when he became friends with Bobby. There were half a dozen bars within walking distance from their houses, and they would walk through the back door and buy beer. Even though the bar owners did not want thirteen and fourteen year old boys hanging out in the bar, "they sold us beer and we went on our way." App. 57 at 888. They drank at friends' houses or in a local cemetery, and thought they were cool. Bobby remembers Wes "drank a couple 3-quarts of beer at a time." App. 57 at 888.

Many of Wes's friends from this time period, including Bobby, would eventually end up in prison or die young because of drugs or drug-related crimes. App. 71 at 958; App. 57 at 888. Gary's friend Stephen Seely laments that "[i]t would have been very hard for someone like Wes[] to get out of that situation without some help"  since Wes "wasn't as capable as Gary and because of his stutter was usually more isolated." App. 71 at 958.

**G. After graduating from St. Joe's, Wes's is sent to a local public high school with no resources for struggling students and a reputation for being rough and violent. Wes dropped out of school altogether in the ninth grade. After that Wes began to experience distinct physical and psychological symptoms that were never meaningfully treated, suffered two serious head injuries, and he became dependent on alcohol and drugs.**

Wes graduated from St. Joe's in the spring of 1966. App. 73 at 975. Many of Wes's male classmates went on to attend Bishop Carroll High School ("Bishop Carroll") a Catholic high school in Wichita well-regarded for its supportive environment. App 65 at 920; App. 64 at 914; App. 66 at 925. For a brief, fleeting

moment, it looked like Wes might be able to attend, too. Garry Monty's aunt pleaded with the Christian Brothers to let Wes go to Bishop Carroll. All of his St. Joe friends wanted him there. Garry does not know what happened except that "Wes didn't end up going to Bishop Carroll." All he knows is that "my aunt was very upset after Wes wasn't able to attend." App. 64 at 914.

Instead, Wes enrolled at the local public school, Allison Junior High. Like St. Joe's, no resources were allocated at for struggling students. The teachers at Allison provided waivers to struggling students so they would be exempt from certain tests. App. 70 at 955. It was common for Allison students to drop out of school altogether. App. 65 at 920.

Allison had a reputation as a rough school. App. 70 at 955; App. 66 at 925; App. 65 at 920. Fights were the norm there. Edward Ring was jumped on his first day there when he was just walking down the sidewalk. App. 70 at 955. Wes's older brother Gary had been kicked out of Allison for fighting a few years earlier. App. 39 at 646.

In this environment, Wes did not receive the services and structure he needed, particularly as he began exhibiting behavior symptoms associated with severe trauma exposure, and employed coping mechanisms such as alcohol and drug use. App. 46 at 673. Wes stopped attending school shortly after his enrollment in 1966. App. 58 at 892. Wes dropped out of Allison in September

1968, while still enrolled in the ninth grade. App. 73 at 975. After dropping out of

Allison, Wes did enroll for a time in the Wichita Auto Mechanics School to learn a

trade, but he only attended for a short period of time. App. 44 at 657.

From 1966 to 1968, Wes began experiencing numerous physical and

psychological symptoms, and exhibiting behavior very different from times past.

He was arrested three times in short order by local police beginning in September

1966 and was declared a "miscreant." He wanted to show his brother Gary and

Gary's friends that he could fit in. Stephen Seely observes that even when Wes got

in trouble for the first time, he was embarrassed of his stutter. Seely describes an

incident when Wes, at age thirteen or fourteen, tried to steal from a neighborhood

convenience store. The owner of the store knew Wes well because Wes had been

buying candy there for years. Wes walked in with his hand in his jacket pocket as

if he had a gun, and put a piece of paper that said "robbery" on the countertop. Wes

"wouldn't have been able to say the word without stuttering," and the owner

wrestled Wes to the ground and held him down until police arrived. App. 71 at

958.

Following his second arrest in October 1966, at age fourteen, Wes was

released to the temporary custody of his great aunt Carrie Burke, i.e., Gaga.[6] App.

---

[6] Nearly three years earlier, on January 20, 1964, Gary Purkey's biological father, Milo
Hamilton, petitioned a Sedgwick County Court to grant custody him custody so that he could
move Gary to North Little Rock, Arkansas. Gary was age 15 at the time. Milo's grounds for the

83 at 1114. Aunt Gaga subsequently petitioned for and was appointed Wes's guardian, against his mother Velma's wishes, because of Velma's abusive treatment of Wes. Velma had always objected to either Wes or Gary having any psychiatric care, and one hospital noted that their mother was a "very rejecting and ill person emotionally." Gaga wanted to get Wes into treatment. App. 213 at 2839. At the time, Wes's father Jack Purkey's whereabouts were unknown. App. 44 at 657.

At the time she became Wes's guardian and took him into her custody, Gaga was already 72 years old. App. 4 at 6. Despite her age, though, Gaga provided a much safer living environment for Wes than he had experienced with his mother Velma. Though her home was small and austere, and she did not have much money, Gaga loved Wes and Gary, and gave them as much as she could. App. 57 at 888; App. 58 at 892; App. 63 at 908.

Having adolescent boys around her house was difficult for Gaga given her age. She likely could not appreciate the full extent of their problems. App. 84 at 1115; App. 71 at 958; App. 63 at 908. At times, Gaga did have Wes admitted to the hospital with the intent getting him medicated and treated for various physical and mental ailments.

---

petition was that Gary "has expressed a desire to reside with the defendant [Milo Hamilton]…that at the present time the said minor child is not passing in school" and that Gary "is in need of parental guidance of a father". Milo's witnesses in support of his petition were Carrie Burke, Ira Purkey, and Opal Purkey. His petition ultimately was unsuccessful. App __ (Velma Hamilton vs. Milo Hamilton, Divorce A33420).

For example, on December 29, 1966 Wesley was admitted to St. Francis Hospital in Wichita due to ongoing severe headaches, blackout spells, and dizziness. App. 85 at 1117; App. 44 at 657. He had previously acquired a prescription for nerve pills, but he needed additional medical attention. App. 85 at 1117. Wes was admitted for in-patient care and remained at the hospital until January 11, 1967. His admitting diagnosis was "headaches" and notations were made that he suffered possibly from a "tumor" or "temporal lobe syndrome". App. 85 at 1117.

During the two weeks Wes received in-patient care at St. Francis, he was treated with Librium, an anti-anxiety drug, and showed "mild depression of cortical activity in the left frontal and temporal regions" on an EEG, suggestive of brain impairment in those regions. App. 85 at 1117; App. 87 at 1169. It was also noted that he showed depressive symptoms and at one point "apparently hit fist on wall because of family situation." App. 85 at 1117. The records of this admission reveal no suggested follow-up with Wes about this incident, his symptoms, and his admitted feelings. The only thing the treating physician appears to have inquired about is whether Wes is a homosexual because he has "[l]ong hair even tho[ough] makes him look like a girl". App. 85 at 1117.

Wes was again admitted to St. Francis Hospital on February 9, 1967, this time through a juvenile court order requiring that Wes be evaluated at Larned State

Hospital because of his family's inability to pay for private treatment. App. 88 at 1180. While there, Wes was treated with Placidyl and discharged nine days later at the behest of physicians who informed the court that Larned State Hospital likely would not be able to offer meaningful treatment to someone of Wes's age. Wes was released without a treatment plan. App. 88 at 1180. The court, accepting the opinions of the physicians, dismissed Wes's case. App. 83 at 1114.

Simultaneous to these early hospitalizations for anxiety, depression, and headaches, Wes's alcohol consumption increased exponentially. Though Wes had already started drinking with his friend Bobby Bentley, and had gotten drunk with his brother, Gary in his pre-adolescent years, by his mid-adolescence Wes was alcohol-dependent. He and his friends bought alcohol from the back of liquor stores and local taverns. The alcohol helped Wes to try to ease and regulate his nerves. Lee Hatfield describes that "[i]t seemed like he couldn't control his fits" and that "Wes yelled and sometime threw stuff." Every time Lee was at his house, "Wes walked out of the house to look for beer or liquor." App. 58 at 892. In one of Wes's hospital admissions at St. Francis, they had to give Wes his whiskey to get him back. App. 213 at 2839. These incidents led to additional juvenile arrests, and at one point, a juvenile court judge included "stay out of taverns" as a special condition to Wes's probation. App. 83 at 1114; App. 89 at 1195.

Adding to the profound and complex trauma resulting from Wes's early life exposure to extreme physical and sexual violence inside the home and at school, Wes suffered several car accidents resulting in serious head injuries.

The first was on March 7, 1968, when a semi-trailer truck ran a red light and plowed into Wes's car. Wes was rendered unconscious, and glass from the window went into Wes's throat and face. He vomited blood in the emergency room. App. 90 at 1204; App. 91 at 1237; App. 58 at 892.

Wes was in St. Joseph Hospital in Wichita for several days. His injuries included multiple lacerations to his face and other body parts. He also suffered a cerebral concussion, loss of memory, headaches and light-headedness. App. 90 at 1204. He was discharged from the hospital after a week of close observation. App. 90 at 1204.

Less than two months later, on April 29, 1968, Wes sustained injuries in another car accident and was admitted to St. Joseph again. This time, Wes's injuries included multiple abrasions and contusions to his face and a large abrasion to his left elbow. App. 92 at 1251. He was discharged from the hospital the same night as the accident, despite evidence of a slipped vertebrae in his spine that was on the bone below it. App. 92 at 1251.

In November that same year, Wes was admitted to in-patient treatment at St. Francis Hospital in Wichita at Gaga's request due to changes

in his behavior. When Wes arrived at the hospital, he was "[d]isheveled and dirty – shaking and nervous" but "cooperative." He was treated with Thorazine while on the ward and dismissed to the custody of his aunt Gaga only four days after this admittance. App. 93 at 1253.

Despite these hospitalizations and other care Wes received from local hospitals, including prescription medication and occasional in-patient treatment, his symptoms never resolved. Wes continued to suffer blackouts. According to Gary, there were times when Wes would wake up in the morning in someone else's house and didn't know where he was. Wes would get out and come home and tell Gary that "he just came to in someone's house and he couldn't remember how he got there." App. 39 at 646. Wes also continued to lack the capacity to effectively regulate his internal emotional state and impulsivity. Lee Hatfield remembers that Wes was about 15 or 16 when he started having his uncontrollable "fits" of yelling and getting upset when he was not able to get something he needed. That's when Wes would go out to look for beer or liquor. Wes would typically get drunk after one of these fits. App. 58 at 892.

Wes was again admitted to St. Francis Hospital on November 5, 1969, at a time when his interaction with law enforcement increased and he demonstrated "periods of amnesia [and] impulsive" behavior. Aunt Gaga,

together with the juvenile court, had Wes hospitalized for treatment there for a period of time to "offer structure [and] initiate prescription for them to try on out-patient." App. 213 at 2839.

Even after a month at St. Francis, and treatment with the prescription drugs Sparine and Mellaril, Wes complained of dizziness and anxiety, and he did not yet feel confident in being able to handle his impulses. App. 213 at 2839. Nevertheless, the hospital discharged Wes while he was still being medicated with Mellaril, a drug used to treat schizophrenia.

It was around this time that Wes began experimenting with drugs. As with alcohol, Wes's brother Gary was one of the first to introduce Wes to drugs, including heroin and acid. App. 47 at 691. Wes started using drugs often. As Lee Hatfield explains, "Whatever Gary did, Wes followed. That included shooting up heroin, huffing, and taking pills." 58 at 892.

As Wes became more and more dependent on drugs and alcohol to reduce his symptoms, the environs in which he sought relief became increasingly more dangerous. A house where Wes and Lee Hatfield had bought alcohol since they were teenagers began selling Quaaludes, LSD, speed, and other drugs as Wes and Lee got older. There were lots of nights where they would stay up all through the night, running around town, drinking and doing drugs. App. 58 at 892. Wichita

was a dry city then, but they were still able to buy plenty of alcohol on Sunday at an old seedy hotel in downtown Wichita. 58 at 892.

In spite of this significant period of upheaval and change in Wes's life, he still often took time to say hello and catch up with his old friends from St. Joe's whenever he saw them. Garry Monty remembers bumping into Wes sometimes around the neighborhood in the first couple of years after St. Joe's. He and Wes always talked, but that was it; they never would hang out or meet up. App. 64 at 914. Don Aaron recalls times when his group of friends scuffled with Bobby Bentley's group of friends. Wes would always be there, but in the back. Don and Wes often stepped aside from these scuffles to catch up, and Wes "always seemed interested to hear how I was doing at Bishop Carroll." App. 66 at 925. James Haggard viewed Wes as more of a follower in Bobby Bentley's group. Wes always said hello and talked to James. App. 65 at 920.

Had a different set of events unfolded during this period of Wes's adolescence, his life would have been much different. Instead of having early interactions with law enforcement and running with a rougher crowd, with a more supportive environment Wes might have been able develop positive life skills; but no one in close proximity to Wes was looking out for him. Bobby Bentley puts it this way: "Wes didn't have a head start at life. He had no anchor and no one was watching out for him other than himself. It's hard to make good decisions or good

57

choices with no direction and no guidance" App. 57 at 888. Ending up at Allison instead of Bishop Carroll, Wesley went to a school much less safe and supportive than many of his classmates from St. Joe's experienced. Had Wesley been afforded the opportunity to attend Bishop Carroll, he would have had supports that he did not otherwise have. The Christian Brothers at Bishop Carroll were disciplined and tough on students, but they also knew how to assist struggling students or to get help for them. Garry Monty experienced this first hand when the brothers sat him down and told him he wasn't doing well, but also encouraged him by talking to him about how he could do better with their help. App. 64 at 914. James Haggard believes that Wes's life could have been different if Wes had been able to go to Bishop Carroll, which was a more supportive place but expensive to attend. James recalls a student who stuttered like Wes, and the brothers helped the student to get into a good regional vocational school. That student "has since become a renowned machinist, one of the best in the country. It is hard not to think that Wes's life would have been different if only he also had some kind of support." App. 65 at 920.

Unfortunately for Wes, this kind of help or intervention did not materialize. While many of his classmates and friends from St. Joe's went on to develop successful professional careers as small business owners, and a well-respected high school football coach and teacher, Wes spiraled. Lacking positive, caring supports,

Wes could not address the outcomes of the untreated complex PTSD from which he suffered after the many years of physical and sexual abuse, abandonment, and neglect.

**H. Despite his difficulties, into adulthood Wes attempted to create a meaningful life for himself through work and sought treatment for his symptoms and his substance use when he could, but he could not overcome the extreme trauma he suffered growing up, and the addictions that resulted.**

Entering into adulthood, Wes continued to struggle emotionally and mentally, and exhibit bizarre behavior. App. 94 at 1266; App. 44 at 657. He was diagnosed multiple times with depressive symptoms or a depressive disorder. App. 94 at 1266; App. 44 at 657; App. 95 at 1291.

Exacerbating these symptoms, and intensifying the negative effects of Wes's earlier head injuries, were two more serious blunt traumas to his head. In August 1972 Wes was admitted to St. Joseph Hospital with "[m]ultiple lacerations, face and forehead…[and an] acute cerebral concussion" following a major motor vehicle accident. App. 94 at 1266. Wes was working on repairs under the hood of a vehicle late at night when the car when the vehicle was rear-ended by another vehicle, causing the hood to slam down on Wes's head. As he had in earlier accidents, Wes lost consciousness for some time. App. 94 at 1266. Then in May 1976, following an altercation with Wichita police, Wesley sustained significant injuries to the left side of his face that required medical treatment. App. 96 at 1294.

It was during this admittance to St. Francis Hospital that x-rays showed evidence of an old greenstick skull fracture from prior injuries. App. 96 at 1294.[7]

Despite these extreme adversities, Wes still tried to build a meaningful life for himself. When given the opportunity, he took advantage of mental health treatment. He took medication for his nerves, and he sought psychiatric treatment. App. 94 at 1266; App. 97 at 1300. In December 1972 Wes voluntarily entered Larned State Hospital at the suggestion of the Kansas Parole Board. App. 44 at 657. Wes received treatment at Larned for nearly four-and-a-half months, and was eventually released to Dodge City, Kansas, not Wichita, with full employment with the Mayrath Company. App. 44 at 657; App. 98 at 1301. Wes's parole officer requested that Wes not be returned to Wichita, stating that Wes "gets along better away from his mother."  App. 44 at 657; App. 94 at 1266. He continued efforts to cope with the wounds he suffered as a child at the hands of his mother, the extreme anxiety produced by the trauma, and the feelings of abandonment, loneliness, and hopelessness underlying it. App. 84 at 1115; App. 100 at 1315; App. 99 at 1311.

While in the community, Wes maintained consistent employment, and got himself up for work. App. 63 at 908. He demonstrated a strong work ethic even when he didn't particularly like the work he was doing. App. 44 at 657. During this

---

[7] A greenstick fracture occurs when a bone bends and cracks, instead of breaking completely into multiple pieces. App. 87 at 1169.

time his jobs consisted mainly of construction work, including welding and roofing. App. 98 at 1301.

Wes was also caring for and protecting his sister-in-law, Sharon Fisher. Sharon describes Wes as "a very caring person for you if you knew each other." Wes was like a big brother to her. App. 63 at 908. In particular, Wes formed a bond with Sharon's baby son, who he called "Little Buddy," and Wes was very good to her son even though he was often drunk or high. App. 63 at 908. And when Wes was around, he would always step in to protect Sharon from Gary's abuse. App. 63 at 908.

Even so, Wes continued to confront many hardships and setbacks stemming from the ongoing struggles of the damaging relationship with his mother and substance abuse. In addition to intermittent psychiatric treatment, Wes continued to self-medicate with drugs and alcohol the same way he had done as an adolescent years. Sharon Fisher recalls that Wes and Gary drank quarts of whiskey and 30 packs of beer every day, and they huffed Tolio in her walk-in closet. She only knew them when they were drunk or high. App. 63 at 908; App. 44 at 657; App. 101 at 1316; App 99 at 1311. Wes used to such excess that he experienced hallucinations; he overdosed on prescription drugs and alcohol. App. 99 at 1311; App. 101 at 1316. Wes didn't realize what his consumption of drugs and alcohol would do to him; all he wanted was to get high.  App. 101 at 1316. Wes's drug use

was so excessive that he spent two full days at the hospital and needed 18 hours to recover and regain coherence. App. 101 at 1316. This was not Wes's only drug overdose. It happened five or six times. App. 99 at 1311.

As Wes struggled with substance abuse, his mother Velma not only provided no support to him. Worse, she actively encouraged Wes to get high as a way to continue her sexual and psychological control over him. App 99 at 1311. The day after Chrismas 1972, Velma brought liquor to Wes's house and convinced him to drink. App. 44 at 657; App. 102 at 1353. As the drinking ensued and everyone became more and more drunk, the incident turned violent. Wes was finished with his mother sexually abusing him and Gary. Sharon Fisher, who by then had withdrawn her divorce petition against Gary, describes the events:

> Wesley came over to my parents' house one night. I was staying there for a little while trying to figure things out. He was beating on the door. My dad wasn't too happy that Wesley was there, but he liked Wesley so he let him in. My dad hated Gary. Wes had blood on his clothing. He told me and my dad that he had just beaten Velma up because she made Gary do sexual acts on her. Wesley was trying to protect Gary. I offered Wesley a place to stay in the house, but he chose to stay in his car outside. After Wesley went outside my dad and I talked and we decided it best to call the police. We didn't want them to start looking for Wesley and then find him on their own. He could turn himself in. I went outside to tell Wesley what my dad and I had discussed and he was okay with it. When the cops came he turned himself in. Velma alleged that Wesley raped her that night, too, but I never believed that. I saw Wesley out on the streets a couple days later, so the charges must have been dropped.

App. 63 at 908.

Velma went to the hospital and, while there, accused her son of raping her. App. 103 at 1360; App. 44 at 657. Velma was quite inebriated at the time of her accusation; her blood alcohol was at 0.212. App. 103 at 1360. When police arrived at the hospital to question Velma, the responding officer noted "she was very intoxicated and also appeared to have a mental problem" and was "very uncooperative." App. 102 at 1353. Upon investigation there was no evidence to confirm Velma's accusation was truthful, and the doctor on duty advised that in his professional opinion he did not believe she had been sexually assaulted. App. 102 at 1353. Velma later retracted her accusation. App. 44 at 657, and no charges were pursued. The prosecution recognized that Velma had serious mental health issues of her own. App. 102 at 1353.

It is not surprising that Wes responded under threat the way he did towards Velma, not only because of the trauma he had experienced from her since he was a young child, but also considering the lack of guidance and positive modeling he had from the few men in his life. Both Wes's father Jack and Wes's brother Gary expressed their emotions by violently brutalizing the women in their lives.

Another negative male caregiver of Wes's was O.L. Darling, his step-grandfather. O.L. Darling was the second husband to Wes's maternal grandmother Bobbie Sue. O.L. was the only grandpa Wes knew on his mother's side of the family. O.L. Darling was a womanizer, and made sexual advances on any woman

he could. This included Bobbie Sue's widowed sister-in-law, whose husband had been Wes's godfather, and both of Wes's brother Gary's wives. App. 39 at 646. It was well-known that O.L. Darling also used his relative wealth and privilege to carry on a sexual relationship with his step-daughter and Wes's mother, Velma, who lived with O.L. off and on. While Bobbie Sue was still alive, Velma stayed in the back apartment of their house, and O.L. would pay nighttime visits to Velma. App. 47 at 691. At one point Velma lived in a duplex that O.L. owned, and she drove a nice tan car that O.L. had bought for her. Everyone knew she was sleeping with her step-father then, too. App. 63 at 908.

The times when Velma refused to go along with O.L.'s sexual advances, O.L. turned violent. The police were called more than once. App. 104 at 1378; App. 105 at 1380; App. 106 at 1383. O.L. was known to be the jealous type, and he would beat any man he perceived to be a threat to his relationship with Velma. Wes's brother Gary recounts an incident at Gaga's funeral, when the family was all gathered at Velma's house. O.L. came over and was furious with Velma because she was living with her boyfriend Dick, and tried to grab her. App. 47 at 691. When Jack Purkey was still alive, O.L. did not like him, either. A police report describes an incident in which O.L. came to Velma's house when Jack was there, and Velma was in the bathtub while both men talked, though she could not see or hear them. App. 107 at 1385.

**I. The institutionalization from being incarcerated for much of his adult life, combined with his untreated trauma symptoms, left Wes ill-equipped to adjust to the outside world or to foster healthy relationships after he was released on parole in 1997, despite his best efforts and his deep love for his young daughter.**

Wes had been incarcerated most of his adult life. He spent much of the decade of the 1970s going in and out of the Kansas prison system. From 1970 through 1979 he spent a little over seven years in prison.[8] His convictions during that time were primarily for robbery, theft, and burglary, as well as parole violations. App. 108 at 1388.

During his incarceration in the 1970s, Wes spent at least several months of solitary confinement in the windowless Adjustment and Treatment ("A & T") building at Lansing State Penitentiary in Leavenworth, Kansas.[9] App. 109 at 1389; App. 57 at 888. Even a few months in A & T at Lansing is significant, because A & T was known to be one of the most debilitating, draconian, and torturous prison units in the country at that time. Its conditions were detrimental to both inmates and staff, and staff that worked at Lansing then "know only too well the emotional and physical injuries inflicted upon inmates and staff who spend any considerable

---

[8] During the decade of the 1970s Wes spent less than three years living in society. He was incarcerated in the Kansas State Prison System from 07/29/1970 to 07/18/1972, 05/15/1973 to 01/28/1974, 08/02/1974 to 12/08/1975, and 10/11/1976 until 07/15/1980. App. 214 at 2904. These figures do not include Wesley's time in local county jails and detention centers in which he awaited hearings and trials.

[9] It is likely that Wesley spent more time in segregation in the A&T Building as it appears his segregation log records are incomplete.

time in this bleak windowless building with continuous echoing noises." App. 110 at 1401.

The A & T unit was known as the "Agony & Torture" unit among inmates and staff at Lansing. Bobby Bentley, who spent in the A & T unit, described the unit as "like a penitentiary within a penitentiary." App. 57 at 888.  Many inmates reached their breaking point and suffered mental health breakdowns, self-mutilated or committed suicide. The Kansas Ombudsman for Corrections concluded that the A & T unit made some persons confined there worse than when they entered: " Regression and deterioration has been observed in the forms of adjustment difficulties when released to general population, violence, bitterness, self-mutilation, suicide and general mental health deterioration, including psychosis." App. 110 at 1401. The unit was like a "concrete tomb" with complete deprivation, little interaction between inmates, and only basic necessities. The prisoners there ate in their cells and they were hosed down for showers. Several parts of the A & T had standing sewer water up to the ankles. If an officer felt disrespected by an inmate, they would beat the inmate down. Many men self-mutilated in the hope of getting transferred off the unit; others committed suicide. App. 57 at 888. Wes self-mutilated twice when he was in the A & T. App. 111 at 1411.

Wes also experienced desegregation of the Kansas prison system in the 1970s, a particularly volatile time that included numerous prison riots. Wes and his

friend Lee Hatfield experienced the riots first hand. The older guys in the prison opposed desegregation and had planned a riot in the jailhouse to protest. When the riot started, the guards began separating prisoners and locking them down. Wes and Lee were escorted to another unit and put in the "hole," where they spent several days. The guards didn't even let them put on their shoes. App. 58 at 892.

During the less than three years Wes was not in prison during that decade, he met Claire Berry. Like Wesley, Claire was born and raised in Wichita. From an early age, Claire exhibited serious behavioral problems. At her father's funeral she had to be pulled off her dad's casket. After that, Claire started sneaking out of the house and doing whatever she wanted. Claire screamed and kicked and cussed at her mother when she tried to get Claire out of bed, and Claire often hit her mother. App. 112 at 1412. Like Wes, Claire began using drugs at an early age, which were introduced to her by her brothers. They huffed Tolio or whatever they could get their hands on. App. 112 at 1412. Claire's substance abuse led to multiple interactions with law enforcement and the need for treatment. App. 113 at 1416.

Wes and Claire eventually established a common-law marriage. App. 114 at 1418. At that time they declared their marriage, Claire already had a child from a previous relationship. Wes recognized early in his relationship with Claire that she was not a positive influence in his life. App. 99 at 1311. Claire was untrustworthy and openly cheated on Wes, including with one of Wes's friends. App. 39 at 646.

Yet, to his detriment, Wes returned to Claire when he was released from prison in 1980. Wes's release coincided with the death of his beloved great aunt Gaga, the one consistent caregiver he had in his life. Gaga died four days prior to his release. App. 4 at 6. Her wake was held the night of Wes's release from prison. App. 115 at 1428. Wes returned to Wichita to attend Gaga's service, and in doing so, Wes returned to Claire. App. 116 at 1436. In great despair, the only joy in Wes's return to Wichita was seeing his infant daughter, Angie, who had been born on March 3, 1979. App. 117 at 1438.

Wes's fears about returning to Claire materialized when, less than three weeks with her, he relapsed into substance abuse and criminal behavior. App. 116 at 1436. On August 4, 1980, Wes was arrested for aggravated assault and possession of a firearm after felony conviction. App. 118 at 1439. He eventually pled guilty to these charges plus kidnapping, aggravated robbery, and aggravated battery. App. 108 at 1388. Wes would not be freed from prison again until March 1, 1997. App. 119 at 1440.

Claire influenced Wes's every step. She too was arrested and later convicted and sentenced to prison. A few nights before her arrest, Claire left their baby Angie with her brother Pat. Angie was less than a year old. Pat called his sister Becky for help because he didn't know what to do. Claire had not even left any diapers or milk for Angie. Fortunately, Angie was taken in and raised by Becky and her

husband, Mike Hornecker. App. 112 at 1412. The love and care of Becky and Mike was a godsend because Claire hadn't even wanted Angie in the first place, something she stated regularly. Claire used drugs and huffed Tolio during her pregnancy with Angie, and even tried to abort Angie with a coat hanger. App. 112 at 1412. Claire later told Angie herself that she had tried to abort her with a coat hanger, as well as by throwing herself down a flight of stairs during her pregnancy. App. 50 at 699.

While incarcerated, Claire filed for divorce from Wes. Their divorce became final on September 18, 1981. App. 114 at 1418. Claire's sole reason for divorcing Wes was so that she could manipulate the parole system to gain an early release, and it worked. App. 50 at 699.

Instead of thanking her sister and brother-in-law for raising Angie, Claire's first instinct after her release from prison was to kidnap four-year-old Angie and threaten her sister and brother-in-law. App. 50 at 699. Claire told Becky and Mike that she wanted to take Angie out for ice cream. They were hesitant, but Angie wanted to go so they reluctantly agreed. Claire's boyfriend at the time was hiding in the back seat of the car. He gagged Angie so she wouldn't scream, and they took her to their home. Angie remembers Claire "kicking open the front door and saying that this was where I was living now." App. 50 at 699. Claire called Becky and Mike later that night and told them Angie was her child and she wasn't bringing her

back. A few weeks later Angie got real sick. Becky and Mike went to Claire's home. When they got there, Claire stepped out of the house and pulled a gun on them. Claire put the gun in Mike's face and yelled at them to leave or she'd shoot them. They called the police, but the police said there was nothing they could do. App. 112 at 1412. Claire's reaction stands in stark contrast to the genuine gratitude that Wes expressed to the Horneckers for raising Angie. Years later, after Angie began visiting Wes, the Horneckers received a card from Wes wishing them Merry Christmas and thanking them for raising Angie and looking after her over the years. App. 112 at 1412.

Claire was incapable of being a loving parent. App. 50 at 699. Instead, she exposed Angie to levels of violence Angie had not fathomed. Angie remembers that, during a meal when she was at Claire's house, she was eating potatoes and saw a bunch of blood spurt across her plate. Angie got up and walked away from it, but Claire's boyfriend Steve lifted her up and put her back in her seat. The rule in Claire's house was that no one left the table until they were finished eating. When Angie looked at Steve she saw blood pouring out of his chest. Claire had stabbed him several times. App. 50 at 699. Claire and Steve had a lot of violent fights. Sometimes the violence was directed at Angie, as when they were driving down the highway and Claire stopped the car at an overpass and tried to throw Angie and her half-sister Carri out of the car. Claire finally concluded she did not

want to raise her daughter and returned her to the Horneckers, who became Angie's legal guardians. App. 112 at 1412.

While Claire was exposing their young daughter to horrific levels of violence and abuse, Wes was trying to avoid death threats in prison. He was transferred to protective custody, which was located in the A & T unit. App. 120 at 1441. This time, Wes spent at least 409 days in the A & T. App. 109 at 1389. It remained just as depraved and inhumane as it had always been. In 1989, the Kansas Attorney General condemned the deplorable conditions at the A & T unit, citing inadequate hearing and ventilation, sanitation problems, threat to life in the event of a fire (a not infrequent occurrence), daily plumbing repairs, inadequate electrical system, and the fact that some inmates are housed there for years, "particularly inmates with mental conditions who need treatment which cannot be provided by A & T." App. 121 at 1442. The A & T building at Lansing was eventually closed, and torn down.

The threats against Wes's life were real. When Wes was not having to endure the inhumanity of the A & T unit, he was exposed to numerous attempts on his life. Such attacks resulted in stabbings to Wes's abdomen and neck, and being hit on the head with a led pipe, which resulted in a visible bump and permanent scarring. App. 122 at 1456. As a result, Wes had to be transferred multiple times to serve his time in other state prisons, including Iowa, Arizona, and Oregon.

It was during his time away from Kansas that Wes began to take advantage of the positive programming that the other states' institutions afforded inmates. He sought counseling services and began to address the sexual and physical violence inflicted upon him as a child and adolescent. App. 61 at 901. Having previously completed his GED during his incarceration in the 1970s, App. 123 at 1458, Wes enrolled in community college classes while in the Oregon State Penitentiary. He took classes on Anger Management, General Psychology, Alcohol and Other Drugs, Principles of Economics, Typing, Introduction to Poetry, and Algebra, and earned a cumulative GPA of 3.13 with 86 total credits. App. 124 at 1459. He was awarded an Associate of Science Degree in Literature in 1989. App. 125 at 1460. This was no small achievement; when Wes began these studies, he was at a sixth grade reading level. It took hard work and dedication for Wes to earn his degree. Given structure, Wes was able to thrive academically, something he never could accomplish as a child surrounded by chaos.

Wes also continued to focus his efforts on drug rehabilitation and positive mental health. App. 125 at 1460. He enhanced his job skills as a welder and plumber through various community programs, including "6 ½ months at the county jail program," during which "[h]e received exceptional evaluations while there," living in residence at the jail. App. 125 at 1460. Because of his positive

development, Wes would eventually be paroled on March 1, 1997. App. 119 at 1440.

Wes's involvement in programming coincided with his developing relationship with his daughter, Angie. When Angie was 13, she wanted to meet her biological father so she began visiting Wes regularly with Claire at Hutchinson Correctional Facility. App. 112 at 1412; App. 50 at 699. Angie enjoyed these early visits, when she and her dad could sit outside in the sun, and buy snacks and sodas from the vending machines. Having her father in her life meant a lot to Angie, so much so that for the first several months, she began visiting him every weekend and wrote to him during the week. App. 50 at 699.

Difficulties remained, however. Wes had married Jeanette Broyles in 1993, around the same time he and his daughter Angie were getting to know each other. App. 126 at 1461. Jeanette was struggling to maintain custody of her three sons, who had been taken by the state after one of them set their trailer home on fire. Two of the sons were put into foster care, and the third was sent to a mental hospital. Wes was helping Jeanette get through this period of her life by listening to her and sending her sweet cards and letters of encouragement. App. 126 at 1461. Jeanette was also monopolizing Wes's time, though, often cutting into his visits with Angie. This caused ongoing friction between Claire and Jeanette, and Angie often ended up in the middle. As Angie describes it, "Claire was obsessed with my

dad. She had me fight with Jeanette because I was a juvenile and wouldn't go to jail." App. 50 at 699. Despite the tension, Wes and his daughter continued to build and strengthen their relationship up to his parole on March 1, 1997.

Upon his parole, Wes moved into Jeanette's parents' house in Leavenworth, Kansas with Jeanette and her sons. Jeanette had been in public housing, but it did not allow ex-felons so they had to live with Jeanette's parents initially. App. 126 at 1461; App. 50 at 699. Wes was given no time to adjust to life outside of prison. Instead, Wes became instantly responsible for the well-being of Jeanette and her sons. Up to that point Jeanette and the boys had been living on food stamps, and she told Wes he needed to feed her boys for a month. Wes told Jeanette not to worry about it; he would feed them. App. 126 at 1461. Wes recognized that these circumstances would compound the stress and anxiety he already felt outside of prison, so he sought support from the guidance counselor who had been assigned to Jeanette to address her problems with past drug use and parenting issues. App. 128 at 1553. Wes also developed a regular work-out to help alleviate some of the stress. App. 126 at 1461. Jeanette remembers his work-out routine was very important to Wes, and he would get upset if his routine was interrupted or if he wasn't able to exercise. App. 126 at 1461.

Despite his coping strategies and search for support, the transition was difficult for Wes; all those years surviving in prison came with a lot of institutional

baggage. Wes's parole officer noted that Wes was trying. App. 128 at 1553. The situation with Jeanette and her boys was more difficult than Wes anticipated, and Jeanette had her own difficult past. Wes's daughter Angie observed that "Jeanette is a troubled person and I don't think that she would have been able to be supportive to dad when he was struggling with being on the outside and with [his] own issues." App. 50 at 699.

During the early months of Wes's transition, he and Jeanette were fighting with Kansas's Department of Children and Families (formerly Social and Rehabilitation Services, or SRS) for Jeanette to regain custody her son, who was at Kaw Valley, which consisted of Kaw Valley Center, a home for children in need, or the Kaw Valley Psychiatric Hospital, dedicated to children and adolescents with significant behavioral problems. Wes and Jeanette had to prove their ability to handle the son, who had attention deficit disorder (ADD) issues. App. 128 at 1153.

While trying to be the best father figure and husband he could during this time, Wes also was forced to navigate his relationship with Claire. After Wes's release from prison, Claire would regularly drive the three hours from Wichita to Leavenworth just to iron Wes's clothes. Although Jeanette did not seem to mind and it appeared that Jeanette and Claire were close friends, her dad was having a relationship with both women, and each was very demanding of his time. App. 50 at 699. Claire had never overcome her own struggles with drugs and mental health

issues. She was a bad influence on Wes, both because she was very unstable and because connections with Claire returned Wes to spending time with people he knew before he went to prison. App. 126 at 1461. At the same time, Wes was trying to be a supportive, loving father to his teenage daughter Angie, who had gotten into trouble with the law was having some of her own legal problems around the time of his release from prison. App. 129 at 1558. (Kansas vs. Angela Purkey, 98CR00176, Complaint); App. 126 at 1461.

Wes wanted so much to be there for Angie, to help her and support her. Angie recalls that, after she was arrested, her dad came to Wichita to try to help. It was important to her that "[h]e showed up and was caring." App. 50 at 699. Angie knew that this was another source of stress for her dad; he tried hard but "didn't know how to help me and he wanted to." App. 50 at 699. As a teenager, Angie also was not ready for her dad to be in her life consistently. She loved her dad, but it was a hard transition for her, too, and she did not know how to have him in her life every day. No one really prepares family members for the homecoming of someone who has been incarcerated. Experiencing her own troubles and being immature, Angie ignored Wes for a little while after he got out and when he came to Wichita, she took off for Leavenworth. App. 50 at 699.

It did not take too long before the numerous stressors overcame Wes's fragile coping skills. He became overwhelmed, and started having flashbacks of traumatic events he suffered as a child. App. 50 at 699; App. 126 at 1461.

In time, Wes self-medicated his stress and anxiety. First, he began drinking in bars. App. 50 at 699; App. 126 at 1461. Wes eventually turned back to drugs, and would disappear for days at a time. App. 126 at 1461.

As Wes's alcohol and drug use increased, his wife Jeanette did the unthinkable: she poisoned Wes, not just once, but repeatedly. Wes was behaving bizarrely, so, scared and worried for him, Jeanette started slipping rat poison into her husband's food. She thought it would make Wes sick and "then he would have go to the hospital to finally get help." App. 126 at 1461. The combination of the poison and drugs only made Wes's anxiety and paranoia much worse. App. _50 at 699.

**J. To this day Wes maintains a close bond with his daughter Angie and his grandchildren, and continues to provide all the love and support he can to his family from prison.**

Wes's relationship with his daughter Angie has only grown stronger during his most recent period of incarceration. Wes meets with his Buddhist monk, Dale Hertkmeyer (Dharma name "Seigen"), every month for spiritual guidance. Seigen reports that every time he visits, Wes "always reports the newest news about his daughter and grandkids. He is very proud of his daughter and how she has

77

managed to live her life despite her parents." Wes "loves his family very much." App. 69 at 649. Wes telephones Angie frequently to make sure they are all doing alright. App. 50 at 699. Any chance he is given, Wes supports his daughter both financially and emotionally. Wes gave to Angie most of the settlement money he obtained from a lawsuit against Leavenworth prison for having been severely beaten during his pretrial confinement at the CCA (Corrections Corporation of America) facility in Leavenworth. App. 50 at 699. Wes encourages Angie to pursue her education. Angie struggled in school just like him, and dropped out in the 9th grade. She eventually obtained her GED, and her dad encourages her to go back to school because "[h]e sees my potential and wants the best for me." App. 50 at 699.

When Angie's son Matthew ("Matty") passed away as a child in 2007, Wes was ever-present, supporting his daughter. He continues to provide emotional support to his daughter each year at the anniversary of Matty's death. Angie is grateful for her dad being "one of the few people in my life who remembers that time of year and offers me support and encouragement." App. 50 at 699. When Angie lost her beloved dog in 2017, Wes consoled her, and sent her a drawing of the dog. She keeps the picture in her family room of her house so that it is always close. App. 50 at 699.

Wes loves his grandchildren, too, and they love him. App. 50 at 699. According to Wes's spiritual advisor Seigen, "his face lights up when he talks about his grandchildren." App. 69 at 649. Wes sends care packages to his grandchildren, and makes gifts for them on their birthdays. App. 50 at 699. When Wes's grandson Michael struggled with a stutter early on in his life, Wes advised Angie to be patient with Michael, that sometimes it would just take a little longer for the words to get out, but he would get there. "It is a very sensitive topic for my dad because he was ridiculed so much for his stuttering." App. 50 at 699.

Wes has expanded his family beyond his biological relations. For many years Wes has corresponded with a group of pen pals. He has supported these friends and encouraged them through some of their darkest times. For example, when Seigen's mother passed away in 2013, "Wesley showed me great care and support, given the limitations of his circumstances. He offered encouraging words at our visits and took the time to offer his condolences soon after he learned of her passing." App. 69 at 649. Wes is very close to some of his pen pals, too, and he often reaches out to people when they are in need. Seigen describes an instance when Wes had not heard from a pen pal in Minnesota in a while, and Wes became genuinely concerned for her well being. "It's Wesley's goodheartedness." App. 69 at 649. Wes's good-heartedness extends even to strangers. During Seigen's visits, if Wes learns of friends of his that are going through tough times, "he has always

79

asked that I pass along his support to them." Seigen's friend Tony is a good example: "Even though Wesley and Tony have never met, Wesley always inquires of how Tony is doing and passes along his well wishes." App. 69 at 649.

Wes's care and concern for others has been enhanced over the years by his ongoing practice of Zen Buddhism. He practices Soto, a specific branch of Zen, which is "about being present to everything, observing one's own mind and body." App. 69 at 649. He first began practicing during the early 2000s, not long after his conviction, and his practice has continued to the present through the guidance of Seigen, who met Wes in 2009 and has visited him regularly since 2013. App. 69 at 649.

Wes's quest for self-education also continues to this day. He has learned Spanish with the help of Seigen, who also happens to be a Spanish teacher. App. 69 at 649. Wes initiated the lessons on his own and has created a structured learning environment, despite having no classroom setup or structure. App. 69 at 649. According to Seigen, Wes's ability to learn Spanish has been remarkable because Wes had no previous basis to understand a second language. As they began to study together, "it also became apparent that Wesley didn't even know what a noun or verb was so I had to teach him that." And even though Wes became frustrated at times, he stayed with it. Wes continues to be an active learner,

collecting questions and bringing them to his visits with Seigen, who is impressed with Wes's initiative and dedication. App. 69 at 649.

When Wes is not practicing Zen, corresponding with his family and pen pals, or practicing Spanish, he is a prolific writer, both for the magazine *Compassion* and as a litigator of internal prison issues on behalf of himself and other inmates on death row at Terre Haute. App. 86 at 1143. Though it creates additional problems for himself at times, Wes feels compelled to help others that he perceives as being unjustly treated. It is the same care and concern he shows for his family and friends that motivates him to protect his neighbors. As Seigen explains: "He sticks up for others whose rights are being ignored. It's very powerful. Wesley feels he has to fight, to be the antagonist, when people around him are being unjustly treated because no one else will. Wesley can be vehement in his views; at times they can be sharp and edgy, and may instigate Wesley's own problems, but given the gravity of his situation and the environment in which he lives, I appreciate and understand his actions. It is all a part of Wesley's sense of wanting to help others." App. 69 at 649.

Apart from these pursuits in prison, age continues to take a toll on Wes. Like several of his relatives before him, Wes was diagnosed in 2017 as "suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia," most likely Alzheimer's disease, "considering his multiple risk factors and current

symptoms." App. 87 at 1169. Wes's current symptoms include "significant learning and memory deficits," "relative motor weakness on the non-dominant side indicating possible right hemispheric deficits as well as mild impairments on some measures of executive functioning," and "significant declines" in memory since testing in 2003 as well as executive functioning. App. 87 at 1169. The average life expectancy after diagnosis, under normal circumstances, is eight to ten years, but in some cases, as short as three years. App. 87 at 1169.

## IV.    FACTS AND PROCEDURAL HISTORY OF THIS CASE

### A.  The Crime

Wes Purkey was convicted by a federal jury in the Western District of Missouri of one count of interstate kidnapping resulting in death. Western District of Missouri (WDMO) Case No. 01-CR-00308-FJG (Dkt. 433). At the close of the penalty trial, the jury returned a verdict for death, and a sentence of death was subsequently imposed by United States District Judge Fernando J. Gaitan, Jr. *Id*. (Dkt. 461, 487 and 505).

Mr. Purkey originally confessed to the crime in December 1998 to local authorities in Kansas, where he was incarcerated in the county jail awaiting trial for the murder of an elderly woman, Mary Ruth Bales, to which he had also confessed and, ultimately, pled guilty. Mr. Purkey sent a note to Kansas City, Kansas police detective Bill Howard, stating he wanted to speak to him

about a kidnapping and homicide that had occurred earlier that year. Mr. Purkey told Detective Howard that he also wanted to speak to an FBI agent about the crime, because he knew that he was facing a life sentence in the Kansas Department of Corrections, and would rather serve a life sentence in federal prison. Mr. Purkey had several subsequent meetings with Detective Howard and FBI Special Agent Dirk Tarpley, in which he expressed his intent to plead guilty in the Kansas case and promised to confess to the murder of a 16-year old woman who had disappeared in January 1998 in exchange for a life sentence in federal prison. Detective Howard and Agent Tarpley promised to take whatever Mr. Purkey had to say to the United States Attorney (USA) in Kansas.

Mr. Purkey then confessed to Howard and Tarpley that, nine months earlier, he had kidnapped a young woman named Jennifer (later identified as Jennifer Long) in Kansas City, Missouri, and transported her to his home in Lansing, Kansas, where he raped and murdered her, then dismembered her dead body with a chain saw, placed the body parts in plastic bags mixed with leaves from his backyard, burned the body parts in his fireplace, bagged up the ashes, and disposed of the bags a few months later by throwing them into a septic pond on property in Kansas where Mr. Purkey

and his family had rented a mobile home. Mr. Purkey promised his further cooperation if he received assurances from the USA in Kansas that the case would be federally prosecuted. The same day, Howard and Tarpley met with the USA in Kansas, who indicated he might be willing to prosecute the case if Mr. Purkey fully cooperated and provided the location of the body's remains.

Mr. Purkey fulfilled his end of the proposed deal, took Howard and Tarpley to the crime scene, and showed them the pond where he had disposed of Jennifer's remains. Over the course of several days, Howard and Tarpley met with Mr. Purkey multiple times, during which Mr. Purkey gave additional handwritten and oral confessions, and identified Jennifer's photo from a lineup. Howard and Tarpley denied they ever made any promises to Mr. Purkey of a life sentence in a federal penitentiary.

In 2001, after Mr. Purkey entered a guilty plea in the Kansas case, federal charges were filed against him for Jennifer's murder, not in Kansas, but in Missouri, and the government filed notice that it would seek to impose the death penalty.

**B. The Trial Defense Team**

Mr. Purkey was represented at his trial by court-appointed lead counsel Fred Duchardt, Jr., and co-counsel Laura O'Sullivan. Mr. Duchardt has the dubious distinction of having more clients on federal death row than any other lawyer in the United States. *See* App. 133 at 1625 (David Rose, "Death Row: the lawyer who keeps losing," The Guardian, Nov. 24, 2016). Laura O'Sullivan had significant litigation experience in Missouri state courts, but she had no significant federal court experience and no capital case experience at the time of Mr. Purkey's trial. She thought she could gain such experience by joining Mr. Purkey's trial team. App. 134 at 1638.

Mr. Duchardt hired his friend, Michael ("Mic") Armstrong, initially as a fact investigator in Mr. Purkey's case. In his initial budget request, Mr. Duchardt requested separate funding for an investigator and a mitigation specialist, and he secured $35,000 in funding for Armstrong as an investigator. App. 135 at 1645. Mr. Duchardt never hired a mitigation specialist for Mr. Purkey's case, despite repeated entreaties to do so from his co-counsel. App. 186 at 2585. Instead, Mr. Duchardt presented a supplemental budget request to the court asking for additional funds for Mr. Armstrong so he could serve in the dual role of both fact investigator and mitigation specialist, under the guise of "budgetary savings." App. 136 at 1649.

At the time he requested and obtained funding to hire Mic Armstrong for the "dual role" of both fact investigator and mitigation specialist in Mr. Purkey's case, Mr. Duchardt knew facts about Mr. Armstrong that disqualified him.

Indeed, Mr. Duchardt and Michael Armstrong had a long-standing business relationship.  In May of 1985, eighteen years before Mr. Purkey's trial, Mr. Duchardt hired Mr. Armstrong to work as an investigator in the Missouri State Public Defender (MSPD) office located in Liberty, Missouri, an office managed by Mr. Duchardt in his role as the District Defender. App. 137 at 1654. During his entire tenure at MSPD, Mr. Armstrong was employed as a criminal investigator. He was never a mitigation specialist, by training or experience. If a case required mitigation work, lawyers at MSPD would use either an in-house Alternative Sentencing Specialist, or an outside mitigation specialist. App. 138 at 1660. Armstrong's job responsibilities at MSPD consisted mostly of serving subpoenas. App. 138 at 1660.

Mr. Armstrong's performance of even basic investigative tasks was severely criticized by lawyers who worked directly with him in the Liberty office. The complaints centered on Mr. Armstrong's failure to complete investigative tasks in a timely manner, and his demeanor with witnesses. For example, there were instances when an MSPD lawyer, relying on Armstrong's assurances that he had served witness subpoenas, would announce to the court at a docket call the

Thursday before trial that they were ready for trial, only to learn from Armstrong just before trial the next Monday that the subpoenas had actually not been served and the witnesses would not be present. App. 138 at 1660; App. 139 at 1665. There were also complaints that Mr. Armstrong had an angry and aggressive way of dealing with people, including potential friendly witnesses, which would sometimes result in a lawyer having to apologize to a witness repelled by Armstrong's behavior. App. 139 at 1665. It was known around the MSPD office that Mr. Armstrong had a prior conviction of misdemeanor assault resulting from a fight at a local bar. App. 139 at 1665; App. 140 at 1670. Despite Armstrong's incompetence, lawyers in the Liberty office felt that Mr. Duchardt was very protective of Mr. Armstrong, and that Armstrong was insulated from any adverse action as long as Mr. Duchardt had supervisory authority over the office. App. 138 at 1660; App. 139 at 1665.

Mr. Armstrong was fired from his employment with the MSPD in September of 1995, just two months after Mr. Duchardt left the MSPD system to pursue the private practice of law. App. 137 at 1654; App. 176 at 2256. Katherine Ladesh, who was then the district defender in the Liberty office, terminated Mr. Armstrong's employment upon learning of another instance where Armstrong had failed to serve witness subpoenas after representing that he had done so. App. 138 at 1660.

87

In his private practice after leaving MSPD, Mr. Duchardt continued to employ Mr. Armstrong as an investigator on cases assigned to him under a contract with the MSPD, even though Armstrong never obtained a private investigator's license. *See* App. 142 at 1910; App. 143 at 1911. Duchardt was subsequently informed by MSPD that it would be inappropriate to pay Armstrong as an investigator on public defender cases after being terminated from MSPD. Duchardt agreed to seek the services of a new investigator in his pending cases. App. 141 at 1740.

After he was prohibited from working on MSPD cases, Mr. Armstrong lashed out at those he deemed responsible.  Armstrong stalked and harassed both Katherine Ladesh, his former supervisor, and Anita Burns, an assistant public defender in the Liberty office. App. 140 at 1671; App. 144 at 1912. In one instance, Armstrong followed Ms. Burns to the grocery store in Liberty where, in public and in front of other people, he threatened to kill her. In another instance, Armstrong threatened Katherine Ladesh, in front of her children, that he would kill her, and he threw a brick through the plate glass front door of her home in Gladstone, Missouri. App. 140 at 1670; App. 144 at 1912. Both women obtained full protective orders against Mr. Armstrong. The incident against Anita Burns led to an assault charge against Armstrong, but he was acquitted at trial on a technical error of the inexperienced special prosecutor relating to amendment of the

complaint. App. 140 at 1670; App. 144 at 1912; 177 at 2257. Even after the trial, however, both Anita Burns and Katherine Ladesh obtained extensions of their full protective orders against Armstrong. App. 140 at 1670; App. 144 at 1912.

Two years after he was fired from the MSPD, and while the full orders of protection were in effect, Michael Armstrong sued the MSPD, and Katherine Ladesh individually, for wrongful termination. App. 141 at 1740. In his lawsuit, Mr. Armstrong claimed that, even though he was an "at will" employee of the MSPD, at the time he was hired Mr. Duchardt made promises that he could not be terminated except for cause. The complaint stated that he had dedicated his life "to the defense of the clients of the Missouri State Public Defender System based on the representations of [Fred] Duchardt that Plaintiff should give up his business and come to work for the System and Plaintiff could retire from the System and enjoy the various benefits of the System and would not be fired but for cause and that the System was set up to resolve disputes between personnel as the System recognizes the investment in its employees and desires to keep those employees[]" describing the arrangement with Duchardt as "an express contract." App. 141 at 1740.

Mr. Armstrong's lawsuit was dismissed on January 5, 2001 for failure prosecute, over three years after it was filed. App. 141 at 1740. Later the same year, when Mr. Duchardt was assembling the defense team in Mr. Purkey's case,

Duchardt petitioned the district court for funds to hire Mr. Armstrong as the fact

investigator *and* mitigation specialist, without disclosing Armstrong's troubled past

and poor investigative work history.

### C. The Trial

Mr. Purkey's defense at the guilt phase was that he falsely confessed to an

interstate kidnapping of Jennifer Long because he was trying to make her unsolved

disappearance a federal offense, thereby presenting a situation where he could

negotiate a life sentence in a federal prison instead of the Kansas Department of

Corrections. The Government countered this defense by eliciting testimony from

the lead investigative agent that "right before trial" was the first time he had ever

heard that Mr. Purkey claimed that no kidnapping occurred. App. 145 at 1967.

However, this testimony of an eleventh hour recantation was undermined by facts

that were known or should have been known to defense counsel Mr. Duchardt, but

the jury never heard them.

Mr. Duchardt must have been aware that, two years before trial, FBI Agent

Tarpley interviewed a prison inmate named Michael Speakman, who had shared a

jail cell with Mr. Purkey. Speakman told the agent that Mr. Purkey had told him

"[the] girl was with him partying," "[he] did not snatch [her]" and "[it was] not

forcible with the girl." Further, Mr. Duchardt knew that Stephen E. Peterson, M.D.,

an expert that Duchardt hired to evaluate Mr. Purkey, recalled that Mr. Purkey told

him during his evaluation that he did not kidnap Jennifer Long, that she went with him voluntarily, and that he confessed to interstate kidnapping only because he wanted to serve a life sentence in federal prison instead of the Kansas Department of Corrections. Yet Mr. Duchardt did not offer this readily available evidence to refute the Government's contention that Mr. Purkey recanted the kidnapping only on the eve of trial in his effort to avoid the death penalty.

Mr. Purkey's defense was further complicated by his testimony during the hearing on his Motion to Suppress Statements, a motion based on his contention that his original statements to law enforcement were not voluntary because they were made in exchange for a promise of a life sentence in a federal prison. Mr. Purkey testified during the hearing, and on cross-examination without objection of Mr. Duchardt. Mr. Purkey testified that one of his pre-indictment confessions to kidnapping was in fact true. Mr. Duchardt failed to file a motion to exclude the use of Mr. Purkey's statements during the government's case-in-chief at the guilt phase despite having a legal basis to do so.[10] This was problematic because, at trial, the government used Mr. Purkey's suppression testimony to not only impeach his claim that he did not kidnap Jennifer Long, but to also argue the truthfulness of the statement itself with no objection from Mr. Duchardt.

---

[10] *See generally Simmons v. United States*, 390 U.S. 377 (1968)(Supreme Court recognized in the context of a suppression hearing that "when a defendant testifies in support of a motion to suppress on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt).

Mr. Duchardt went on to argue to the jury that both the defense and the government "are absolutely dependent on [Mr. Purkey]'s credibility and believability in this case[.]" App. 151 at 1982. The jury returned a verdict finding Mr. Purkey guilty as charged.

Even though he was hired for the role, Michael Armstrong did not provide input into Mr. Purkey's mitigation case, but simply found some witnesses and gathered some records. The witness interviews that he participated in were unproductive. For instance, when Mr. Armstrong and Mr. Duchardt went to conduct an in-person interview of Mr. Purkey's daughter, Angie Genail, with whom Mr. Purkey had and still has a very close and loving relationship, they showed up unannounced at her wedding and tried to interview her in front of her guests. App. 185 at 2576. The inappropriate manner in which Mr. Armstrong dealt with witnesses while he was at the MSPD became apparent in Mr. Purkey's case as well. Mr. Purkey's ex-wife, Jeanette (Purkey) Broyles, described Mr. Armstrong's behavior as "real aggressive" when he came to visit with her and her oldest son. Instead of ringing the doorbell or knocking, he would kick the front door until someone answered. Mr. Duchardt's own treatment of her was similar. App. 126 at 1461.

When Dr. Cunningham, one of the trial defense experts, identified possible childhood sexual abuse against Mr. Purkey by his mother as a red flag for further investigation, the defense team never followed through. Although Mr. Purkey's brother Gary could have provided valuable information about their mother's sexual abuse, Mr. Duchardt took his teenage son with him to interview Gary, and never asked him about family sexual abuse. Neither Gary nor any of the other lay witnesses who testified at the penalty phase addressed the question of whether Mr. Purkey had been sexually abused by his mother.

While defense experts Dr. Peterson and Dr. Cunningham each testified at the penalty trial that Mr. Purkey had reported to them he had been sexually abused by his mother, the defense presented no evidence that Mr. Purkey had ever reported the abuse before he had been charged and was facing the death penalty in this case, even though there were an abundant number of readily available witnesses who could have done so if defense counsel had located and interviewed them. Consequently, both Dr. Peterson and Dr. Cunningham were forced to concede on cross-examination that the sexual abuse could not be confirmed, and that there was nothing in the records to indicate that Mr. Purkey had reported the sexual abuse to anyone else. App. 155 at 1994.

The state's expert, Dr. Park Dietz, subsequently testified that, while there are records from Mr. Purkey's adolescence showing promiscuous behavior by his mother and that Mr. Purkey had some unidentified psychosexual problem, "up until he's facing capital murder charges, that's all that was in the record." Trial Tr. 2192. Dietz agreed that Mr. Purkey "might" have been abused by his mother, but it was a matter in dispute. Trial Tr. 2193. On the other hand, "If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute." Trial Tr. 2194. When defense counsel proposed to Dietz that it would not be in the interest of a person in prison to report that he was sexually abused by his mother, Dr. Dietz responded, "[i]t is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation." Trial Tr. 2194.[11] The prosecution went on to paint the evidence as "a fairy tale" and "the old abuse excuse" under the theory that Mr. Purkey had recently fabricated the allegation of abuse in order to avoid the death penalty. App. 157 at 1999.

At the close of the penalty trial, the jury was instructed to complete a special verdict form and record its findings with respect to six statutory and four

---

[11] In his report, Dr. Dietz left open the possibility of changing his opinion "through additional information that may be forthcoming." App. 127 at 1466.

non-statutory aggravating circumstances in Parts I-IV, and with respect to mitigating circumstances in Part V. Part V of the special verdict form listed 27 mitigating circumstances, each containing an adjacent blank space, and instructed the jury to enter the "number of jurors who so find" in the blank spaces. App. 158 at 2001. The trial judge twice instructed the jurors that they were required to record their findings as to mitigating circumstances on the special verdict form. App. 159 at 2011. The jury deliberated for approximately eleven hours over two days. App. 160 at 2012; App. 161 at 2013; App. 162 at 2014. When the special verdict form recommending a death sentence was returned, the jury had completed Parts I-IV, but Part V was left blank. App. 158 at 2001. Following defense counsel's objection, the trial judge offered to send the jury back to complete the form "if the government wants," noting that it would have been preferable for the jury to make the requisite findings. However, after government counsel responded, "Absolutely no," Mr. Duchardt said nothing and the judge accepted the jury's verdict. App. 163 at 2015.

The Court of Appeals for the Eighth Circuit affirmed Mr. Purkey's conviction and sentence on direct appeal, and the Supreme Court denied *certiorari*. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied sub nom. Purkey v. United States*, 549 U.S. 975 (2006).

### C. The § 2255 Proceeding

In 2007, Mr. Purkey filed a petition under 28 U.S.C. § 2255. Mr. Purkey was represented by Teresa Norris, a lawyer with significant capital litigation experience in state and federal courts, and Gary Brotherton, an attorney who, at the time he represented Mr. Purkey, was licensed in the State of Missouri, but who has since been suspended from the practice of law by the Missouri Supreme Court. App. 164 at 2016.

Mr. Purkey's § 2255 petition alleged various claims, including claims that his trial counsel was ineffective in violation of the Sixth Amendment at both the guilt and penalty phases of his trial. App. 165 at 2018. In response to the § 2255 petition, the government secured a 117-page sworn statement from Mr. Duchardt, in which he, *inter alia*: falsely claimed that § 2255 counsel had not objected to his statement before he sent it to the government; made false claims about Mic Armstrong's qualifications; disparaged his co-counsel, Laura O'Sullivan and made false statements about her prior experience; purported to interview witnesses who were never contacted; revealed unrelated confidential information learned in the course of representing his former client; and affirmatively advocated against Mr. Purkey's claims, arguing that they were without legal or factual support. App. 166 at 2074. The government's response to Mr. Purkey's claims relied almost

exclusively on the contents of Mr. Duchardt's statement, which was nearly double the size of the government's response brief. App. 183 at 2393.

The district court denied the § 2255 motion without an evidentiary hearing. In its order denying the motion, the extent of the court's finding on the ineffective assistance of counsel claims was as follows:

> The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy.  The Court finds that Mr. Duchardt's actions did not fall below an objective standard of reasonableness. Additionally, even if Duchardt's actions were considered to fall below the standard of reasonableness, movant has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland [v. Washington]*, 466 U.S. [668], []694 [(1984)].

App. 184 at 2570. The district court further found that no evidentiary hearing was necessary, stating that, even if Mr. Purkey's allegations are true and Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, he would not be entitled to relief because "no jurors voted for a single mitigating factor." App. 184 at 2570.

The Eighth Circuit subsequently affirmed, and *certiorari* was denied by the Supreme Court. *Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

## GROUNDS FOR RELIEF

**CLAIM I:** **Trial counsel was constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer.**

The Sixth Amendment guarantees a criminal defendant the right to be tried by impartial and unbiased jurors. *See Morgan v. Illinois*, 504 U.S. 719 (1992). Among the most essential responsibilities of defense counsel is to protect his or her client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense. *See Miller v. Francis*, 269 F.3d 609 (6th Cir. 2001). The primary purpose of *voir dire* is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel. *See Rosales-Lopez v. United States*, 451 U.S. 182 (1981) (voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored) *and Mu'Min v. Virginia*, 500 U.S. 415 (1991) (*voir dire* serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges).

In her questionnaire completed at the courthouse prior to jury selection, Juror 13, whose name is Jennifer, responded to a question about whether she or her

spouse, relative, or close friend had ever been the victim of a crime that she had been the victim of an attempted rape in 1991, when she would have been about 16 years old.[12] She further disclosed that she had assisted law enforcement with the investigation, that the man who attached her was going to court for other rapes, and that she was subpoenaed but did not end up testifying. App. 167 at 2191. The district court judge read the charge against Mr. Purkey, which included an allegation that he forcibly raped 16-year old girl named Jennifer. App. Trial Tr. at 39. Juror 13 was present when the judge read the charge. Trial Tr. at 30 (judge explaining that the only missing venire members are venirepersons 49 and 16).

Disclosure of such information by Juror 13 provided a valid basis for a challenge for cause. *See English v. Berguis*, 900 F.3d 804, 818 (6th Cir. 2018). It is well established that implied bias may be found on the basis of similarities between the juror's own experiences and the facts giving rise to trial. *Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (citing *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992) ("courts have presumed bias in cases where the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial)). Similarities must inherently create in a juror a "substantial emotional involvement, adversely affecting impartiality." *Gonzales*, 99 F.3d at 989 (citing

---

[12] At the time she completed her questionnaire, Juror 13 wrote that she was 27 years old. Given that her attempted rape occurred in 1991, and Mr. Purkey's trial was twelve years later in 2003, Juror 13 could have been 15 years old at the time of her attempted rape.

*United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991), *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988) (inquiring whether "it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances")). Because the right to an impartial jury is part of the basic structure underlying the fundamental right to a fair trial, "[d]oubts regarding bias must be resolved against the juror." *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting *Burton*, 948 F.2d at 1158). *See also United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) (explaining that a juror who belongs to a class presumed biased "may well be objective in fact, but the relationship is so close that the law errs on the side of caution").

Juror 13's disclosure was a red flag that her personal experience as a teenaged attempted rape victim made her biased against Mr. Purkey, given that the facts of his case included an allegation that he raped and killed a teenaged girl named Jennifer. Despite this red flag, Mr. Purkey's trial counsel did not question Juror 13 about her disclosure during *voir dire*, and did not move to strike Juror 13 for cause or through the use of a peremptory challenge. Juror 13 thus became a member of the petit jury that convicted Mr. Purkey and sentenced him to death.

The normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury is a post-trial hearing at which the movant

has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred. *Gonzales v. Thomas*, *supra*, 99 F.3d at 985 (citing *McDonough Power Equip., Inc., v. Greenwood*, 464 U.S. 548, 555 (1984) (emphasis added). Here, though, the issue of Juror 13's actual or implied bias based on her disclosure of a similar experience of attempted rape as a teenager has never been heard by any previous court because Mr. Purkey's prior counsel never presented it.

In fact, it is evident that trial counsel missed Juror 13's disclosure completely. No effort at all was made to question or remove Juror 13 despite the obvious specter of bias her disclosure presented, nor was the disclosure ever mentioned by trial counsel. Juror 13 did not bring it to the attention of the parties or the court during *voir dire*, and neither the trial court nor the Government mentioned the disclosure or asked Juror 13 any questions about it. The only questions Fred Duchardt, Mr. Purkey's lead trial counsel who conducted *voir dire*, individually asked of Juror 13, aside from her views on the death penalty, were whether the fact that she had a young son would present a potential problem for her to serve on a jury for an extended period of time. App. 169 at 2226.

Trial counsel Duchardt and his co-counsel, Laura O'Sullivan, reviewed the jury questionnaires together prior to trial at Mr. Duchardt's office. Despite their review, Ms. O'Sullivan had no knowledge of Juror 13's disclosure before she was

made aware of it by Mr. Purkey's current counsel. O'Sullivan now believes that she completely missed Juror 13's disclosure, because she has no recollection of Juror 13's disclosure despite its obvious significance. and because no effort was made to question or exclude Juror 13 even though the disclosure presented an obvious bias issue. Juror 13's disclosure presented a situation where the juror's experience was so similar to the facts of Mr. Purkey's case that she would have "wanted to make sure that this juror did not sit on the jury." Lead counsel Mr. Duchardt neither mentioned the disclosure nor raised it during *voir dire*. O'Sullivan believes the district court would have sustained a motion to strike Juror 13 for cause, even if Juror 13 would have insisted she could be fair and impartial, because of the similarity of Juror 13's experience with the facts of Mr. Purkey's case. App. 134 at 1638.

That trial counsel did not notice Juror 13's disclosure is supported by the trial record. First, prior to the commencement of *voir dire*, trial counsel did not file a pretrial motion to have Juror 13 struck for cause based on her questionnaire disclosure, despite moving pretrial to strike other jurors for cause based on personal experiences disclosed on their questionnaires, motions to strike that were sustained by the district court.[13] Second, during *voir dire*, Mr. Duchardt failed to

---

[13] Based on Juror 13's questionnaire responses to Questions 82 and 83, Mr. Duchardt could have moved to strike her from the venire panel even before voir dire began. *See* App. 170 at 2228. In fact, Mr. Duchardt moved to strike two other potential jurors before voir dire began based in part

ask Juror 13 any questions about her attempted rape experience.  Mr. Duchardt did

not inquire about her experience as an attempted rape victim, despite knowing

enough about her questionnaire disclosures to know that she was the mother of a

young son. Further, Mr. Duchardt made no effort to conduct individual *voir dire* of

Juror 13, an option available to him based on his own pretrial motion request to

have individual *voir dire* available in order to question potential jurors about

"matters which, due to their personal/private nature, might need to be taken up

individually." App. 172 at 2237.

Significantly, during *voir dire*, Mr. Duchardt was aware that a mere

allegation of child rape evoked emotions strong enough to exclude a juror for cause

(even if the juror had no personal experience as a rape victim), because he moved

to strike for cause a potential juror for disclosing such emotions. Venireperson 103

disclosed the firmly held opinion that any adult who "violates a child" does not

deserve to live, and that a 16-year-old teenager would be considered a child in her

view. App. 173 at 2244. Mr. Duchardt moved to strike Venireperson 103 for cause,

and with agreement of the Government, the district court removed that prospective

juror. App. 174 at 2245. Yet Mr. Duchardt asked no relevant questions and made

on their answers to questions 82 and 83, strikes that were ultimately sustained by the district
court. *See* App. 131 at 1565 (Dkt. #s 370 and 371). Mr. Duchardt failed, however, to make an
identical motion to exclude Juror 13 for cause based on her questionnaire responses that she had
been the victim of an attempted rape as a teenager, and as a result, Juror 13 was included in the
group of jurors reporting to the courthouse for *voir dire*.

no motion to strike Juror 13 based on her *actual* experience as a teenage attempted rape victim.

Trial counsel's failure to request removal of Juror 13 cannot be strategic or reasonable when counsel was unaware of the disclosure on her jury questionnaire that provided a valid basis for her removal. *See Strickland v. Washington*, 466 U.S. 668, 690-691 (1984). *See*, *e.g.*, *Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) (an attorney's ignorance of the law that is fundamental to his case and failure to perform basic research on the point is quintessentially unreasonable performance under *Strickland*) (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000)). Indeed, counsel's failure to request the removal of Juror 13 was objectively *unreasonable* because Juror 13's disclosure was the kind of experience so similar to the one at issue in Mr. Purkey's trial that rendered her presumptively biased. *See id.*, 466 U.S. at 688 (question regarding deficient performance is whether counsel's representation "fell below an objective standard of reasonableness"). *See also United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011) (an attorney's failure to question jurors regarding possible bias can constitute deficient performance); *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) (absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel). Under these circumstances, trial counsel's failure to request Juror 13's removal is presumptively prejudicial. *See*

*United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000)(the seating of a biased juror who should have been dismissed for cause requires reversal of the conviction); *Wolfe v. Brigano*, 232 F.3d 499, 502-03 (6th Cir. 2000) (failure to remove biased jurors taints the entire trial, and therefore conviction must be overturned); *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992)(the presence of a biased juror is no less a fundamental structural defect than the presence of a biased judge, and such a defect defies analysis by harmless error standards (citing *Arizona v. Fulminante*, 499 U.S. 279 (1991)).

Trial counsel's failure to remove Juror 13 constitutes a substantial claim of ineffective assistance of counsel, yet Mr. Purkey's § 2255 counsel admittedly did not know of Juror 13's disclosure, and consequently, no ineffective assistance of trial counsel claim based on trial counsel's failure to adequately *voir dire* or move to strike Juror 13 was raised in the § 2255 petition. App. 175 at 2246. Nor did § 2255 counsel raise any claim that the trial court had a duty to adequately *voir dire* Juror 13 and that this failure resulted in a deprivation of Mr. Purkey's Sixth Amendment right to a fair and impartial jury. Section 2255 counsel's plainly deficient performance establishes cause for the default of this substantial ineffective assistance of counsel claim under the *Martinez-Trevino* doctrine, *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), and Mr. Purkey is entitled to present his substantial claim here. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502,

509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

**CLAIM 2:    Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments.**

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). This individualization doctrine is rooted in the notion that, in determining whether to fix the ultimate punishment at death, the process must not exclude from consideration "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.* At stake is the "reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305. This means that the sentencer in a capital case must "'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett
v. Ohio*, 438 U.S. 586, 604 (1978)) (emphasis in original). Accordingly, it is firmly
established that a defendant has a constitutional right, not only to place before the
sentencer any relevant evidence in mitigation of punishment (*Hitchcock v. Dugger*,
481 U.S. 393 (1987); *Skipper v. South Carolina*, 476 U.S. 1 (1986)), but to have
the sentencer meaningfully consider and give effect to all relevant mitigating
circumstances. *Abdul-Dabir v. Quarterman*, 530 U.S. 223 (2007).

In order to ensure that these constitutional requisites under the Eighth
Amendment are fully realized, defense counsel has an obligation to thoroughly
investigate his or her client's background for mitigating evidence. *See Williams v.
Taylor*, 529 U.S. 362, 396 (2000). Investigations by defense counsel into
mitigating evidence "'should comprise efforts to discover *all reasonably available*
mitigating evidence and evidence to rebut any aggravating evidence that may be
introduced by the prosecutor,'" and "among the topics counsel should consider
presenting are medical history, educational history, employment and training
history, *family and social history*, prior adult and juvenile correctional experience,
and religious and cultural influences.'" *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)
(quoting ABA Guidelines for the Appointment and Performance of Counsel in
Death Penalty Cases, Guideline 11.4.1(C), p. 93 (1989)) (emphasis in original).
The fact that some evidence was introduced in mitigation at trial does not

"foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010). *See also Porter v. McCollum*, 558 U.S. 30, 40-44 (2009) (Sixth Amendment was violated under *Strickland v. Washington*, 466 U.S. 668 (1984), even where trial counsel presented a superficially reasonable mitigation theory during the penalty phase but had failed to discover other significant mitigating evidence that came to light only during post-conviction proceedings).

In Mr. Purkey's case, an investigation conducted by his current habeas counsel, and by a qualified mitigation specialist under the supervision of current counsel, has revealed extensive, relevant, and compelling evidence that was available to both his trial and § 2255 counsel but was either inadequately investigated or not investigated at all, and thus was never presented. This new, non-cumulative evidence establishes, not only that trial counsels' prejudicial failure to conduct a thorough mitigation investigation was foreordained by lead counsel Fred Duchardt's conscious and knowing decision to hire an unqualified, untrained individual to act as the "mitigation investigator," but that, as a result of trial counsel's failure to investigate, Mr. Purkey's jury never heard the readily available evidence of Mr. Purkey's extensive history of profound physical, emotional, and sexual abuse and other trauma, and the resulting complex PTSD that Mr. Purkey suffers, that would have given the jury compelling reasons to spare his life.

Because this new evidence forms the basis for this substantial claim of ineffective assistance of Mr. Purkey's trial counsel, § 2255 counsel's own ineffective assistance in failing to investigate and present this evidence establishes cause for the procedural default of this substantial claim and entitles Mr. Purkey to present his new claim in this § 2241 petition. *Webster v. Daniels*, 784 F.3d 1123, 1124-25 (7th Cir. 2015) (§ 2241 is the appropriate avenue of relief where petitioner challenges the "fundamental legality" of his or her sentence); *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017); *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015).

### A. Trial counsels' failure to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team.

Mr. Duchardt did not hire a qualified mitigation specialist to work on the defense team, even though he represented to the trial court in his original funding motion that he would do so, and he requested funding for that purpose. App. 135 at 1645. Instead, he hired Mic Armstrong, a friend whom Duchardt knew was unqualified.

While Mr. Purkey's § 2255 counsel argued that Mr. Duchardt was ineffective for failing to hire a mitigation specialist despite his co-counsel's entreaties to do so, App. 165 at 2018, § 2255 counsel themselves never conducted the investigation that would have exposed *why* Duchardt's substitution of Mic

Armstrong in the role of mitigation investigator was so prejudicial to Mr. Purkey's defense. Had § 2255 counsel investigated the matter, they would have learned that Mr. Armstrong was uniquely unsuited and unqualified to assume the role of a mitigation investigator, let alone fact investigator, in a capital case.

What the evidence uncovered by Mr. Purkey's current counsel clearly shows is that, in obtaining additional funding for Mr. Armstrong to assume the "dual role" of fact investigator and mitigation investigator under the guise of "budgetary savings" App. 136 at 1649, Mr. Duchardt was not acting in Mr. Purkey's best interests, or in accord with prevailing professional standards, which insist on a trained mitigation specialist as "an indispensable member of the defense team throughout all capital proceedings" because "they possess clinical and information-gathering skills and training that most lawyers simply do not have." ABA Guidelines, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev.Ed. 2003), Guideline 4.1, Commentary, 31 HOFSTRA L. REV. 913, 959 (2003). *See also id*., Guidelines 4.1(A)(1) (defense team "should consist of *no fewer* that two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist") (emphasis added). Instead, he was simply doing a favor for a friend.

In fact, Mr. Duchardt advocated against hiring a mitigation specialist, App. 186 at 2585, deciding instead that the work of a mitigation specialist could be

accomplished by himself and his fact investigator, Mr. Armstrong. And, new evidence proves that at the time Mr. Duchardt hired Mic Armstrong as an investigator in Mr. Purkey's case, Duchardt knew that Armstrong had none of the specialized qualifications and experience required of a mitigation investigator in a death penalty case, and was unqualified for the role.

Mr. Duchardt had hired Mr. Armstrong in May 1985 as an investigator in the Liberty, Missouri office of the Missouri State Public Defender ("MSPD") office of Clay County, Missouri, when Duchardt was employed as the district defender there. Duchardt later became a regional director for MSPD, and served in that capacity until 1994, when he returned to an assistant public defender position with MSDP due to the elimination of all regional defender positions. Duchardt left the MSPD in June 1995. App. 176 at 2256.

Mr. Armstrong was employed as a criminal case investigator during his entire tenure at MSPD. He was not a mitigation investigator, either by training or experience. If a case required mitigation work, lawyers at MSPD would use either an in-house Alternative Sentencing Specialist, or an outside mitigation specialist. App. 138 at 1660; App. 139 at 1665. Armstrong's job responsibilities while at MSPD consisted mostly of serving subpoenas. App. 138 at 1660.

During his tenure at MSPD, Mr. Armstrong's performance of investigative tasks was severely criticized by lawyers who worked directly with him in the

Liberty office. The complaints centered on Mr. Armstrong's failure to complete investigative tasks in a timely manner, and his demeanor with witnesses. For example, there were instances when an MSPD lawyer, relying on Armstrong's assurances that he had served the witness subpoenas, would announce to the court at a docket call the Thursday before trial that they were ready for trial, only to learn from Armstrong just before trial the next Monday that the subpoenas had actually not been served and the witnesses would not be present. App. 138 at 1660; App. 139 at 1665. There were also complaints that Mr. Armstrong had an angry and aggressive way of dealing with people, including potential friendly witnesses, which would sometimes result in a lawyer having to apologize to a witness repelled by Armstrong's behavior. App. 139 at 1665. It was known around the MSPD office that Mr. Armstrong had a prior conviction of misdemeanor assault resulting from a fight at a local bar. App. 139 at 1665.

By all accounts, lawyers in the Liberty office felt that Mr. Duchardt was very protective of Mr. Armstrong, and that Armstrong was insulated from any adverse action as long as Duchardt had supervisory authority over the office. App.138 at 1660; App. 139 at 1665. In September 1995, a few months after Mr. Duchardt left MSPD, Katherine Ladesh, who was then the district defender in the Liberty office, fired Mic Armstrong upon learning of another instance where

Armstrong had failed to serve witness subpoenas after representing that he had done so. App. 138 at 1660; 141 at 1740.

After he was fired from MSPD, Mic Armstrong stalked and harassed both Katherine Ladesh, his former supervisor, and Anita Burns, an assistant public defender in the Liberty office. App. 140 at 1670; 144 at 1912. In one instance, Armstrong followed Ms. Burns to the grocery store in Liberty where, in public and in front of other people, he threatened to kill her. In another instance, Armstrong threatened Katherine Ladesh, in front of her children, that he would kill her, and he threw a brick through the plate glass front door of her home in Gladstone, Missouri. App. 140 at 1670; App. 144 at 1912. Both women obtained full protective orders against Mr. Armstrong. The incident against Anita Burns led to an assault charge against Armstrong, but he was acquitted at trial on a technical error of the inexperienced special prosecutor relating to amendment of the complaint. App. 139 at 1665; App. 177 at 2257. Even after the trial, however, both Anita Burns and Katherine Ladesh obtained extensions of their full protective orders against Armstrong. App. 140 at 1670; App. 144 at 1912.

Armstrong subsequently sued the MSPD, and Katherine Ladesh individually, for wrongful termination. App. 141 at 1740. In the complaint, Mr. Armstrong stated that he had dedicated his life "to the defense of the clients of the Missouri State Public Defender System based on the representations of [Fred]

113

Duchardt that Plaintiff should give up his business and come to work for the System and Plaintiff could retire from the System and enjoy the various benefits of the System and would not be fired but for cause and that the System was set up to resolve disputes between personnel as the System recognizes the investment in its employees and desires to keep those employees[]" describing his arrangement with Duchardt as "an express contract." App. 141 at 1740. The lawsuit was dismissed in January 2001. App. 141 at 1740.

In his private practice after leaving MSPD, Mr. Duchardt continued to employ Armstrong as an investigator on cases assigned to him under a contract with the MSPD. Duchardt was subsequently informed by MSPD that it would be inappropriate to pay Armstrong as an investigator on public defender cases in light of his termination from MSPD. Duchardt agreed to seek the services of a new investigator in cases then pending. App. 141 at 1740.

It was later in 2001, when Mr. Duchardt was assembling the defense team in Mr. Purkey's *federal* death penalty case, that Duchardt petitioned the district court for funds to hire Mr. Armstrong as the fact investigator *and* mitigation specialist, without disclosing Armstrong's troubled past and poor investigative work history. The actions of Mr. Duchardt in hiring a wholly unqualified individual to play the role of mitigation specialist in Mr. Purkey's federal capital trial not only violated the most basic standards of competent capital representation, but it brought the

same investigative incompetence into Mr. Purkey's case that Armstrong had shown in his work for MSPD, directly contributing to the failure to conduct a constitutionally-requisite mitigation investigation that, properly investigated, would have produced a wealth of readily available mitigating evidence that might have caused at least one juror to vote for life. *See Wiggins v. Smith*, 539 U.S. at 537; *see also Rompilla v. Beard*, 545 U.S. 374 (2005).

**B. Trial counsel was ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction.**

Given the volume of evidence uncovered by current counsel in investigating Mr. Purkey's life history with the assistance of a highly qualified mitigation specialist, set forth in Part III of this petition, there is a "reasonable probability" that the result of his penalty trial would have been different if trial counsel had thoroughly investigated and presented this evidence. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Trial counsel's failure to do so was objectively unreasonable, as "a competent attorney, aware of this history, would have introduced it at sentencing." *Wiggins v. Smith*, 539 U.S. at 537. This failure clearly prejudiced Mr. Purkey because, had his trial counsel been able to place such evidence on the mitigating side of the scale, "there is a reasonable probability that at least one juror would have struck a different balance of aggravating and mitigating circumstances." *Id*. at 537.

The vast information of Mr. Purkey's extraordinary trauma history and its effect on his behavior was readily available to trial counsel through extensive records and through Mr. Purkey's family members and other witnesses who were more than willing to provide the information, had they been asked. Yet trial counsel failed to investigate beyond obtaining limited records and talking to a few people from Mr. Purkey's life. Even then, Mr. Armstrong and Mr. Duchardt mistreated the witnesses they did interview, and thus obtained only superficial information about Mr. Purkey.

For instance, Mr. Purkey's ex-wife, Jeanette (Purkey) Broyles, experienced the same kind of aggressive tactics from Mr. Armstrong that he had displayed during his tenure at the MSPD. When Mr. Armstrong came to visit with her and her eldest son, Armstrong was "real aggressive," and instead of ringing the doorbell or knocking, he would kick the front door until someone answered. Mr. Duchardt was just as rude and agressive -- Ms. Broyles described Duchardt as "a mean person" who "kept saying over and over that I was lying to him." App. 126 at 1461. Had they listened to her, they would have learned that Jeanette witnessed multiple episodes consistent with Mr. Purkey's trauma exposure during the time she and Mr. Purkey were married. App. 126 at 1461. Mr. Duchardt and Mr. Armstrong sought to interview Mr. Purkey's beloved daughter Angie by crashing her wedding and trying to interview her in front of her guests. App. 50 at 699. Mr.

116

Duchardt took his teenage son with him to interview Mr. Purkey's brother Gary,

who, as current counsel's investigation shows, possessed crucial information about

their family and Mr. Purkey's traumatic experiences that Mr. Duchardt never

obtained. App. 47 at 691.

Even one of the state's witnesses could have provided crucial

mitigating evidence had trial counsel bothered to investigate and interview

him. Michael Speakman, who testified for the Government at the guilt

phase, was Mr. Purkey's former cellmate at the Correction Corporation of

America (CCA) facility in Leavenworth, Kansas where Mr. Purkey was

housed pretrial. Had trial counsel asked Mr. Speakman about his memories

and experiences of living with Mr. Purkey, they would have learned about

some of Mr. Purkey's positive attributes, including his neatness and

cleanliness, his unwavering pursuit of fair treatment for all inmates, and his

apologetic nature. App. 178 at 2289. More crucially, they also would have

learned key details about Mr. Purkey's mental health functioning leading up

to and during his capital trial:

> Purkey was a light sleeper. He woke up at most noise. Whenever
> Purkey heard something he sat up and looked around. Sometimes I
> saw him; other times I felt his bunk shake. Purkey went back to sleep
> after a few minutes, but if there was more noise he woke back up.
>
> * * *

Some days Purkey was real quiet. He hardly talked. He might not even get out of his bunk on those days. He just stared at the ceiling or the wall all day long. In retrospect, it reminds me of my son, who is autistic. Purkey went into his own world some days. Other days he was much more active. It was a day-to-day thing with Purkey.

* * *

Purkey ranted and raved a lot. When he was set off, he just went on and on. It could happen at any time. I never knew when it was going to happen. It was nerve-wracking sometimes. His face changed. It was like he was a different person. Purkey just stood at the door yelling and hollering. It could last ten minutes, it could last a lot longer. The other Purkey was gone until the ranting ended. It stopped as abruptly as it started.

App. 178 at 2289.

Trial counsel failed to interview extended family members, anyone from the neighborhood where Mr. Purkey grew up, or the schools and church he attended. They only collected a two-page document from the Wichita Unified School District showing Wesley's grades during elementary and high school. Trial counsel thus did not elicit the crucial descriptions of Mr. Purkey's symptomology and behavior consistent with his trauma exposure, without which they themselves could not have any understanding of the long-term consequences and effects of his trauma exposure and its connection to his behavioral issues that would have helped explain to the jury why he committed the crime that led to his federal conviction.

Trial counsel were on notice that Mr. Purkey's trauma history needed to be investigated, because two of their defense experts had flagged the issue. Mr. Duchardt retained psychiatric expert Dr. Stephen Peterson, who had conducted an

earlier evaluation of Mr. Purkey when he was facing non-capital Kansas charges in the Mary Ruth Bales case. In his April 2000 report in the Bales case, Dr. Peterson identified some of Mr. Purkey's childhood emotional, physical, and sexual abuse by his parents and other family members, and the likely effect such trauma would have in terms of child and adult anger control problems, a lack of understanding of the boundaries between children and adults, and problems of psychosexual identity. App. 56 at 835. When Mr. Duchardt contacted Dr. Peterson in 2001 to evaluate Mr. Purkey in this case, Duchardt informed Dr. Peterson that he was well aware of Peterson's prior report in the Bales case and that duplication of his prior assessment "was to be avoided." App. 213 at 2839; App. 147 at 1971. Dr. Peterson's August 2003 report contained little detail from his previous report, although the report did note Mr. Purkey's chaotic home life, that "his intoxicated mother engaged him in sexual activity" as a child and that a hospital report in 1968 judged him to have "severe psychosexual problems." App. 213 at 2839.

Mr. Duchardt retained Mark Cunningham for the purpose of rebutting future dangerousness, and Cunningham generated a report for that purpose just before trial in October 2003. App. 190 at 2615; App. 192 at 2629. In a letter Dr. Cunningham wrote to Mr. Duchardt in December 2002, however, Cunningham listed various emerging "mitigation themes/hypotheses and associated investigation needs" based on his interviews with Mr. Purkey and the records he

had reviewed, identifying numerous red flags and the need to conduct investigation into Mr. Purkey's multi-generational family history and genetic predisposition to substance dependence and mental illness, family violence, physical and emotional abuse, traumatic sexual exposure, childhood speech impediment and social avoidance, peer isolation and alienation, corruptive influence of Mr. Purkey's brother, childhood onset psychological disorders, and neuropsychological deficits, among other things. App. 154 at 1987.

Trial counsel simply ignored these significant red flags, and failed to follow up. *See Rompilla*, 545 U.S. at 391 (trial counsel ineffective for failing to follow up on "red flags" in school, medical, and prison records, and to follow up on findings in those records and obtain additional records).

Moreover, had trial counsel undertaken the constitutionally-requisite mitigation investigation at the time, not only would they have been able to locate and interview the classmates and neighborhood friends that current counsel interviewed, but they would also have been able to interview five nuns that taught at St. Joseph's Catholic School during the time period that Mr. Purkey attended. The nuns would have provided firsthand and insightful details about the school and parish communities, and likely would have been able to offer descriptions of Mr. Purkey's older brother, mother and father. Unfortunately, current counsel has confirmed that the nuns have since died. App. 179 at 2294.

120

There can be no reasonable strategic decision for failing to thoroughly investigate and present this substantial, powerful mitigating evidence at Mr. Purkey's trial. As established in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." In light of what the evidence now reveals about the extent of Mr. Purkey's trauma history and its long-term consequences and effects on his behavior leading up to the federal crime for which he has been sentenced to death, trial counsel's failure to investigate clearly "fell below an objective standard of reasonableness." *Id*. at 688. *See also Wiggins*, 539 U.S. at 527-28 ("In light of what the [family and social history] records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

Section 2255 counsel's investigation was also unreasonably limited. Like trial counsel, § 2255 counsel failed to investigate Mr. Purkey's childhood family, neighborhood, school, and religious environments. They only interviewed one childhood friend, Peggy Noe. *See* App. 60 at 899. Indeed, § 2255 counsel's investigation was limited to showing that Mr. Purkey had reported being sexually abused by his mother to others -- namely, Peggy Noe, and Dr. Rex Newton, the prison psychologist with the Oregon Department of Corrections -- prior to being

charged in this case. *See* App. 60 at 899; App. 61 at 901. While that limited investigation produced enough new evidence to demonstrate trial counsel's deficient performance in failing to follow leads in Mr. Purkey's prior reports that would have rebutted the government's argument at the penalty phase that Mr. Purkey fabricated the sexual abuse only after he was facing the death penalty and dismissal of the evidence as "the old abuse excuse" (Trial Tr. 2267-2268), the reviewing courts found that the evidence was merely cumulative of the evidence of sexual abuse presented at trial, and did not establish prejudice. App. 184 at 2570; *see also Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013). Like trial counsel before them, § 2255 counsel ignored the obvious leads to Mr. Purkey's extraordinary, horrific trauma history that went far beyond sexual abuse by his mother. Had § 2255 counsel pursued those leads, they would have uncovered the extensive evidence of Mr. Purkey's trauma history set forth in Part III of this petition that *does* establish the prejudice from trial counsel's failure to investigate.

Unlike trial counsel, § 2255 counsel's unreasonably limited mitigation investigation was due in part to seriously inadequate funding. Although they retained a qualified mitigation specialist, the court authorized only $7,500 for her services, and an additional $1,300 for travel expenses. The court denied a supplementary budget request to cover the costs of an investigation trip and to

cover cost overages. The additional travel expenses denied by the court were covered out-of-pocket by § 2255 counsel. App. 180 at 2295; App. 175 at 2246.

Nevertheless, § 2255 counsel failed to hire the mitigation specialist in a timely manner, employing her in August 2007, only two months prior to the October 2007 filing deadline for the § 2255 motion. App. 180 at 2295. Under these circumstances, an adequate mitigation investigation was impossible. Moreover, if § 2255 counsel had not waited eight months from the date of their appointment to begin the mitigation investigation, they could have interviewed the lone surviving nun from Mr. Purkey's time at St. Joseph's Catholic School, Sister Ann Corita, who died in July of 2007. App. 179 at 2294.

Perhaps most disconcerting was § 2255 counsel's failure to work with and communicate productively with their client throughout the period of the § 2255 proceedings. Though she was involved in the case for barely two months, the mitigation specialist sensed almost immediately that § 2255 counsel had a strained relationship with their client, whom she knew to have serious mental health issues. In her past experience with cases involving clients with severe mental health issues, experts had been hired to assist the defense team in building a relationship with the clients, but "[g]iven the funding issues in this case, that was not possible." App. 180 at 2295. There appeared to have been a real breakdown in the attorney-client relationship. App. 180 at 2295; App. 175 at 2246.

Though prior counsel presented some limited, isolated aspects of Mr. Purkey's trauma history, trial and § 2255 counsel each failed, for different reasons, to uncover the readily available evidence set forth in this petition that provides a detailed, accurate description of the long-term consequences and lifelong effects of the emotional, physical, and sexual trauma experienced by Mr. Purkey throughout his childhood and adolescence. *See Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010); *Porter v. McCollum*, 558 U.S. 30, 40-44 (2009). This evidence is quantitatively and qualitatively different than the evidence presented to Mr. Purkey's trial jury or to the court in the § 2255 proceedings, and none of his prior counsel investigated the extensive, multi-generational family history of alcoholism and devastating levels of emotional, physical, and sexual abuse that reveals Mr. Purkey's "genetic and familial vulnerability to PTSD, substance abuse and addiction, and a propensity for violence when experiencing co-occurring posstraumatic stress and intoxication." App. 82 at 1100. *See, e.g.*, *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006) (forensic psychologist noting "four generations of alcoholism and physical abuse and emotional abuse"); *Bloom v. Calderon*, 132 F.3d 1267, 1273 (9th Cir. 1997) (trial counsel failed to discover, among other mitigation, that Bloom was "born into a family plagued by generations of mental illness and domestic abuse"). *See also* ABA Guidelines (Rev. Ed. 2003), Guideline 10.7, Commentary, 31 HOFSTRA L. REV. at 1025 ("A multi-generational investigation

extending as far as possible vertically and horizontally frequently discloses

significant patterns of family dysfunction and may help establish or strengthen a

diagnosis or underscore the hereditary nature of a particular impairment").

### C. Trial counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime.

Because trial failed to conduct a thorough investigation of Mr. Purkey's life

history that would have revealed the extent of his lifelong trauma, and failed to

learn about the constellation of Mr. Purkey's behavioral and psychological

symptoms that are the long-term consequences of those experiences, trial counsel

also failed to identify and engage appropriate mental health experts to reliably

evaluate his trauma symptomology and explain its impact on Mr. Purkey's

development, personality and behavior throughout his life and leading up to and

including the crime.

Trial counsel's failure to identify and locate appropriate experts to evaluate

Mr. Purkey in this case is a function of Mr. Duchardt's ineffective assistance in

failing to obtain a qualified mitigation specialist. It is the mitigation specialist who

compiles the comprehensive and well-documented psycho-social history of the

client based on an exhaustive investigation, analyzes the significance of that

information in terms of impact on development, personality, and behavior,

identifies the need for expert assistance, assists in locating appropriate experts, and

provides social history information to experts to enable them to conduct competent and reliable evaluations. ABA Guidelines, Guideline 4.1, Commentary, 31 HOFSTRA L. REV. at 959. None of that happened in Mr. Purkey's case.

Indeed, Mr. Duchardt put the proverbial cart before the horse by hiring neuropsychologist Dr. Bruce Leeson soon after he was appointed to represent Mr. Purkey. Dr. Leeson was asked by Mr. Duchardt only to assess his client for brain damage, specifically focusing on various head injuries Mr. Purkey had sustained. Based on the tests he administered, and the few records he was provided by Mr. Duchardt, Dr. Leeson concluded that Mr. Purkey had damage to his frontal lobes, most likely from a motor vehicle accident in 1968, and that Mr. Purkey's behavioral deficits were reflective of the frontal lobe damage. App. 215 at 2905. The government countered Dr. Leeson's opinion at trial by getting him to agree on cross-examination that Mr. Purkey showed a high correlation with anti-social personality disorder, and by presenting their own mental health experts, Dr. Martell and Dr. Dietz, both of whom disagreed with Dr. Leeson's conclusion of frontal lobe damage. Dr. Martell, who did not examine Mr. Purkey, even suggested that although he found no problems with Dr. Leeson's raw data, Dr. Leeson had blown his testing results out of proportion to show brain damage. Dr. Dietz conducted his own evaluation and testing of Mr. Purkey, App. 127 at 1466, and testified he found no evidence that Mr. Purkey suffered from frontal lobe damage.

Dr. Leeson did note during his testimony that his testing showed Mr. Purkey had a significantly elevated level of anxiety associated with traumatic stress that one would not expect to see simply as a function of anticipating a prison sentence or some other punishment. In addition, he testified that Mr. Purkey showed a high correlation for major depression and PTSD, but he did not further elaborate. Significantly, the government's expert, Dr. Dietz, stated in his report that, although he found no evidence of mental disease or defect affecting either criminal responsibility, or in mitigation of punishment based on neglect, psychological and physical abuse during childhood, and the possibility that Mr. Purkey was the victim of sexual abuse, Dietz reserved the right to change his opinion regarding mitigation "through additional information that may be forthcoming." App. 127 at 1466. That information never came, because trial counsel never investigated it.

Therein lies the problem. Because of trial counsel's narrow, incomplete investigation of Mr. Purkey's life history, the mental health experts trial counsel retained came to erroneous or incomplete conclusions, and simply could not accurately assess Mr. Purkey's underlying psychological condition. In *Rompilla*, the Supreme Court found that trial counsel was ineffective for precisely the same reasons: Trial counsel failed to follow up on red flags in the records that pointed to the need for further mental health testing, failed to follow up on findings in those records and obtain additional records, and limited their investigation to

127

interviewing a few family witnesses. As a result of their narrow, incomplete investigation, the mental health experts retained by Rompilla's trial counsel concluded, erroneously, that Mr. Rompilla was anti-social and did not suffer from any mental disease. A later, thorough investigation produced evidence establishing that Rompilla suffered from Fetal Alcohol Syndrome, borderline intellectual disability, and possibly schizophrenia and PTSD. *Rompilla*, 545 U.S. at 391.

Similarly here, the investigation conducted by current counsel for Mr. Purkey shows that the mental health experts retained by Mr. Purkey's trial counsel failed to accurately assess Mr. Purkey's underlying symptoms of complex PTSD, and thus could not adequately explain Mr. Purkey's traumatic exposure and describe its ongoing deleterious effects on Mr. Purkey's behavior throughout his life up to and including the commission of his crime. As Dr. Fred Sautter, a clinical psychologist and recognized expert in PTSD retained by current counsel explains:

> Individuals who are exposed to high levels of trauma throughout their childhood often develop "complex" forms of PTSD that are characterized by an inability to regulate their emotions, high levels of substance abuse, self-injurious and suicidal behavior, interpersonal violence, interpersonal deficits and pervasive problems with relationships, and dissociative symptoms that appear to be psychotic-like to those that are not trained in the assessment of complex PTSD. These individuals are prone to addictions and destructive behavior and their complex presentation of symptoms may not be recognized by professionals without high levels of expertise in posttraumatic stress.

App. 82 at 1100. In addition,

Children exposed to high levels of traumatic stress have been shown in countless scientific studies to be vulnerable to damage of their developing brains. This damage may sensitize their HPA axis and increase their vulnerability to posttraumatic stress while damaging their executive functions and decreasing their complex reasoning abilities and their capacity to regulate their emotions and their behaviors. The impact of these potential abnormalities would be expected to interact with any possible traumatic brain injuries suffered by Mr. Purkey to decrease his ability to control his emotional behaviors and posttraumatic stress.

App. 82 at 1100.

Even though the assessments of both trial defense experts Dr. Leeson and Dr. Peterson "showed many of the chronic psychological problems (posttraumatic stress, depression, and alcohol and substance abuse) that are associated with childhood trauma exposure[,]" the assessments "did not report that Mr. Purkey met DSM-IV-TR criteria for PTSD even though the PTSD contained in the testing instruments showed Mr. Purkey's scores surpassed the cut-off for a PTSD diagnosis[.]" App. 82 at 1100. This was a significant omitted finding, in light of the now-available information of Mr. Purkey's extensive and extraordinary emotional, physical, and sexual trauma history. App. 82 at 1100. Further, "[d]espite reports that Mr. Purkey had experienced high levels of childhood adversity and traumatic stress not one of these reports included the use of a specialized PTSD assessment instrument to assess PTSD." App. 82 at 1100.

Nor did the government's expert, Dr. Dietz, conduct a trauma or PTSD assessment of Mr. Purkey that employed any of the instruments considered the

"best practices" of trauma experts. Moreover, Dr. Sautter notes that the unstructured clinical interview Dr. Dietz conducted with Mr. Purkey is not optimal for evaluating PTSD because "[p]eople with trauma histories and PTSD seldom volunteer information related to their trauma, especially when their trauma involves early sexual abuse" and Dr. Dietz avoided necessary questions required to accurately assess PTSD. App. 82 at 1100.

Dr. Sautter conducted a trauma and PTSD assessment based on the evidence current counsel's psycho-social history investigation of Mr. Purkey. The trauma assessment revealed several risk factors for PTSD:

**Mr. Purkey's Family History of Psychiatric Disorder:** "Family history information indicates that Mr. Purkey's first- and second-degree relatives show a preponderance of alcoholism, domestic violence, and child abuse. This is important because alcohol intoxication increases risk for domestic violence. Both of Mr. Purkey's parents were alcohol dependent individuals who committed acts of domestic violence and child abuse with regularity; this couple directed violent behavior toward each other and toward their children as their alcohol intoxication fueled their aggression and violence. This familial pattern of alcoholism and domestic violence and psychiatric disorder in a family was associated with familiar depression as Mr. Purkey's mother, half-brother (maternal), and daughter have all been treated for major depression. Because the presence of domestic violence and psychiatric disorder in a family is associated with an increased risk for posttraumatic stress, we may infer from this family information data that Mr. Purkey was vulnerable to developing PTSD and that his victimization to extensive physical, emotional, and sexual abuse, and observed abuse in others, would further increase his risk for PTSD and trauma-related disorders like alcohol abuse and dependence and depression."

**Identification of Childhood Adversity:** "Childhood adversity was assessed because it has been established that both childhood adversity and childhood trauma exposure increase a child's risk for developing PTSD and trauma-

related exposures as an adult. This is relevant for this assessment because the examiner had learned there was a likelihood that Mr. Purkey was exposed to high levels of psychological adversity as a child and adult. This childhood adversity is important because early life adversity affects a child's brain development thus increasing the child's vulnerability to developing mental disorders and posttraumatic stress while limiting the child's intellectual development and coping skills."

App. 46 at 673. Dr. Sautter found several adversities that Mr. Purkey had been

exposed to as a child:

- Economic deprivation that affected Mr. Purkey's opportunities for education and "limited Mr. Purkey's access to the kinds of mental health and special education programs that might have identified some of his early problems and secured remediation and therapy that would have allowed him to overcome some of his early life brain and behavior deficits"

- Lack of acceptable medical and mental health care "was damaging to Mr. Purkey who was confronted with a range of mental health and medical challenges as a child and young person[,]" including signs of Fetal Alcohol Effects and polio as a young child, and traumatic brain injuries from serious motor vehicle accidents between the ages of sixteen and twenty, reports of neurological tests indicating deficits in his brain functioning as early as his teenage years, all of which "suggests that Mr. Purkey may have experienced life-changing benefits if he had received more intensive diagnostic testing and treatments during childhood and early adolescence"

- Despite records documenting Mr. Purkey's early life depression and trauma exposure, " he was never provided an evidence-based treatment for depression (e.g., Cognitive Behavioral Therapy for Depression) nor did he ever, as a child or as an adult, receive a trauma assessment or an evidence-based PTSD treatment (e.g., Prolonged Exposure (PE), Cognitive Processing Therapy (CPT))," the lack of which has "had a significant negative impact on his psychological functioning"

- "Mr. Purkey grew up in a family environment that modeled alcohol abuse, sexual exploitation and aggression, thus exposing him to

131

models that normalize those unhealthy behaviors and increase
tolerance of behaviors that increase his risk of developing
psychological problems and self-destructive coping mechanisms" and
he "lacked exposure to healthy adult male role models that would
have taught him to avoid alcohol and drugs and unhealthy sexual
behaviors and would have encouraged him to engage in healthy
prosocial behaviors"

- Mr. Purkey's family system "consisted of multiple generations of
  alcoholism, mood disorder, violence, and child emotional, physical,
  and sexual abuse" and most of these mental health problems occurred
  within a family system lacking social structures "that reinforced the
  importance of psychological boundaries, emotional self-control, and
  the desirability of responsible behavior"

- Mr. Purkey was raised by parents who had no knowledge of parenting
  practices "that encourage offspring behavioral self-control and
  emotional self-regulation" but instead engaged in parenting practices
  that "encouraged sexual incest and domestic violence and promoted
  attitudes and behaviors that promote mental illness, pathological adult
  relationships, and domestic violence"

- The Purkey family never modeled the "ability to disclose and discuss
  emotions, vulnerabilities, and challenging life experiences with
  another human being" and the fact his mother sexually abused him
  from a young age into his young adult life "prevented him from
  disclosing his personal psychological history and his uncomfortable
  emotions to other people" which meant he could never ask for mental
  health treatment or receive help in trying to confront his own trauma
  issues

- Mr. Purkey's stuttering "made him an easy target of frequent ridicule
  and abuse from others, including adults" that "left him constantly
  fearing that he would be targeted for abuse" and "was a source of
  great anxiety and emotional distress and played an important role in
  his inability to maintain attendance in school, ultimately leading him
  to drop out in the ninth grade"

- Research has shown that "[p]eople who have endured trauma and
  adversity often suffer damage to their beliefs about how the world
  works that undermine their ability to maintain good mental health and
  leave them unable to believe that life will treat them fairly" and "[t]he

> emotional, physical, and sexual abuse suffered by Mr. Purkey when he was victimized by his mother and priest dampened his expectations of safety, trust, and loyalty making it difficult for him to experience hope about his future"

App. 46 at 673.

Dr. Sautter administered testing to determine whether Mr. Purkey was exposed to traumatic life events that meet the DSM-IV-TR PTSD Criteria A for trauma, which is a necessary condition for the development of PTSD. Dr. Sautter found eleven major traumatic life events in Mr. Purkey's family and social history that meet the DSM criteria:

- Physical assault from his father from the approximate age of five to twelve that included "beatings with the father's open hands, fists, and whipping with his belt" that "were of sufficient severity as to cause Mr. Purkey intense pain and often left bruises or caused bleeding"

- Observing his father commit physical assaults on his mother during the same time he suffered his father's beatings, that included throwing furniture and household objects at his wife as he threatened to kill her, chased her as she tried to escape his threats, one time dragging her down the hall by her hair as she screamed for help; these assaults often occurred several times a week and "were of sufficient severity as to cause Mr. Purkey to fear for his mother's life"

- Humiliation and verbal threats from his father during this same age range that "left Mr. Purkey afraid for his life as he worried that brutal physical attacks that could cause him bodily harm might be forthcoming in the future"

- Witnessing his father direct intense verbal threats of violence to his mother almost daily during the same age range

- Sexual abuse from his mother from ages nine through twenty-two

- Sexual abuse by a priest from his church on many occasions over a three-year period, which "was devastating because the priest was an authority

133

figure who was revered by everyone in the community" and "the memory of this abuse remains one of the most upsetting trauma-related memories that even today intrude into Mr. Purkey's conscious mind daily"

- Sexual abuse by his older half-brother's friend "Hup" when Mr. Purkey was eleven years old

- At twelve years old, Mr. Purkey's father on several occasions "commanded prostitutes to molest him as they climbed on top of him as he pretended to lay asleep in bed" that "made him feel unsafe and 'in danger' as he was a small boy that feared assault and sexual abuse"

- Being physically beaten by his older half-brother who severely beat him and bloodied him on several occasions between the ages of ten and twelve

- Two motor vehicle accidents between the ages of sixteen and twenty that resulted in a loss of consciousness and may have caused traumatic brain injury, especially the accident at age sixteen that was reported to have left him unconscious for two days

- Emotional and physical abuse from the nuns who taught at St. Joseph Catholic School that Mr. Purkey attended from ages seven through fourteen, for his stuttering and for perceived transgressions under the guise of corporal punishment, that left Mr. Purkey feeling that his physical integrity was in danger and that he might suffer permanent physical injury

App. 46 at 673. Dr. Sautter's testing also shows that Mr. Purkey meets all of the other criteria for a PTSD diagnosis, which includes "intrusive memories of his trauma, distressing dreams, flashbacks of his trauma, and high levels of emotional stress and physiological reactivity when exposed to trauma-reminders" (Criteria B), "avoidance of trauma reminders and emotional numbing as he reported avoiding trauma-related thoughts and emotions, traumatic forgetting, loss of interest in significant activities when reminded of trauma, and feelings of

detachment and emotional numbing associated with trauma-related stimuli" (Criteria C), "the presence of insomnia, irritability, concentration problems, hyper-vigilance in addition to hyper-startle responses to trauma-related cues" (Criteria D), experiencing the PTSD symptoms "over periods of time that far exceeded one month" (Criteria E), and the PTSD symptoms "elicited extremely high levels of distress" (Criteria F). Dr. Sautter concluded that Mr. Purkey meets all of the diagnostic criteria for PTSD. App. 46 at 673. The testing administered to Mr. Purkey further yielded a "lifetime" diagnosis of PTSD that met the criteria for PTSD over the month preceding the commission of the crime in this case, and that he suffered from increased PTSD at the time of the homicide. App. 46 at 673. Extreme elevations on the avoidance scale support the hypothesis that "Mr. Purkey's drug abuse functions to help him avoid trauma-related emotions and memories, suggesting his drug use is secondary to PTSD." App. 46 at 673. The pattern of scores on Dr. Sautter's testing show that Mr. Purkey's symptoms of posttraumatic stress as a result of his childhood trauma are characteristic of complex PTSD. These are important findings "because they are consistent with his history of emotion regulation problems and intoxication and Mr. Purkey's long-standing history of emotionally fueled aggression and self-destructive behavior." App. 46 at 673. Mr. Purkey's frontal lobe deficits -- reaffirmed through neuropsychological testing conducted by Dr. Robert Ouaou, an expert

neuropsychologist retained by current counsel, App. 87 at 1169, further limit Mr. Purkey's capacity to regulate his thoughts, emotions and behavior. App. 46 at 673.

In addition to Mr. Purkey's lifetime PTSD, Dr. Sautter also concluded from his testing that Mr. Purkey meets the lifetime criteria of Axis I Major Depressive Disorder, secondary to his PTSD "as the onset of his major depression did not occur until after his onset of PTSD and his depressive episodes typically occur after he has experienced an increase in re-experiencing symptoms." App. 46 at 673.

It cannot be understated just how detrimental the physical, emotional, and sexual abuse was on Mr. Purkey. This severe childhood trauma is at the heart of Mr. Purkey's diagnosable complex PTSD, which, as Dr. Sautter's testing shows, had a profound influence on Mr. Purkey's behavioral problems beginning in his adolescence and continuing throughout his adulthood, including at the time of the crime that led to his federal conviction. App. 46 at 673.

Trial counsel never obtained comprehensive, appropriate or meaningful assessments from their experts because counsel never investigated, and the experts were never provided, a comprehensive family and psycho-social history of Mr. Purkey that was essential to an accurate assessment of Mr. Purkey's symptomology, and Mr. Duchardt never utilized even the lay witnesses who did testify to shed any light on Mr. Purkey's symptomology. He could not, because he did not ask. Mr. Purkey's jury thus never heard a detailed, accurate presentation of

the long-term consequences and effects of Mr. Purkey's multi-generational family history or the extent of his childhood adversity and traumatic life events that would have explained Mr. Purkey's behavioral difficulties and how his crime happened that, although certainly not excusing his crime, would have given the jury a compelling reason to return a life sentence. Placing this substantial evidence before Mr. Purkey's jury "might well have influenced the jury's appraisal of [Mr. Purkey's] moral culpability," *Wiggins*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 398 (2000)), and "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694)).

Section 2255 counsel did not hire any new experts to evaluate Mr. Purkey, and instead relied on Dr. Peterson and obtained a declaration from him. App. 62 at 903. Because § 2255 counsel also failed to conduct the comprehensive investigation that was necessary to an accurate mental health assessment of Mr. Purkey, Dr. Peterson had nothing new to offer about what Mr. Purkey's symptoms actually mean. Rather, Dr. Peterson's declaration, along with Dr. Cunningham's, was used in the § 2255 proceedings primarily to refute Mr. Duchardt's affidavit claiming that he had actually hired Dr. Peterson and Dr. Cunningham to serve as mitigation specialists. App. 166 at 2074. Both experts made clear that they were

137

hired as experts, not mitigation specialists, that they were not even qualified as mitigation specialists, and that they were never provided a social history to review that should have been provided by a qualified mitigation specialist. App. 62 at 903; App. 191 at 2618. Beyond that, § 2255 counsel's mitigation-related ineffective assistance claim against trial counsel focused on the fact that Mr. Purkey had reported that he had been sexually abused by his mother years earlier to his friend Peggy Noe and Dr. Rex Newton at the Oregon Department of Corrections, which would have countered the government's accusation at trial that Mr. Purkey fabricated the claim of sexual abuse only after he was charged and facing the death penalty. App. 165 at 2018.

For all of the reasons set forth above, Mr. Purkey has stated a substantial claim of ineffective assistance of his trial counsel that no court has ever had the opportunity to review. The ineffective assistance of Mr. Purkey's § 2255 counsel establishes cause for the default of this substantial ineffective assistance of counsel claim under the *Martinez-Trevino* doctrine, *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), and Mr. Purkey is entitled to present his substantial claim here. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

**CLAIM 3:    Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief.**

"[T]he inherent power of federal courts to vacate a fraudulently obtained judgment -- even years after the judgment was entered -- has long been recognized by the Supreme Court." *In re Bressman*., 874 F.3d 142, 149 (3rd Cir. 2017) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248-249 (1944)). *See also Cleveland Demolition Co., Inc. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) ("district courts may entertain an independent action in equity to set aside a judgment for fraud on the court").

The power of a federal court to set aside "fraudulently begotten judgments" is based on a firmly established rule of equity rooted in English practice predating the founding of the American Republic. *Hazel-Atlas*, *supra*, 322 U.S. at 245. Fraud on the court embraces "'that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of [adjudging] cases that are presented for adjudication.'" *Konigsberg v. Security Nat. Bank*, 66 F.R.D. 439, 442 (1975) (quoting 7 J. Moore Federal Practice ¶60.33 at 515 (2nd ed. 1974); *id*. (citing *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699 (2nd Cir.),

*cert. denied* 409 U.S. 883, *reh'g denied* 409 U.S. 1029 (1972)). *See also Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985) (en banc); *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009); *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2nd Cir. 1988); *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 79 (5th Cir.), *cert. denied* 399 U.S. 927 (1970); *Drobny v. Commissioner*, 113 F.3d 670, 677-78 (7th Cir. 1997). As explained by the Supreme Court in *Hazel-Atlas*, "[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." 322 U.S. at 246.

In his § 2255 petition, Mr. Purkey raised claims that his trial attorney, Fred Duchardt, rendered constitutionally ineffective assistance of counsel at trial. App. 165 at 2018; App. 181 at 2301. Many of these claims centered around Duchardt's failure to hire a mitigation specialist, and his related failure to investigate and present certain mitigating evidence to the jury at Mr. Purkey's penalty trial.[14]

After Mr. Purkey's § 2255 petition was filed, the government filed a motion for an order requiring Mr. Duchardt to prepare an affidavit in response to the allegations of ineffective assistance of counsel, App. 182 at 2385, and the district court subsequently issued an order directing Duchardt to provide the affidavit. Mr.

---

[14] Although, for the reasons set forth elsewhere in this petition, § 2255 counsel were ineffective because they, too, failed to adequately investigate. *See, e.g.*, Claims 1 and 2.

Duchardt subsequently prepared and submitted a 117-page signed and notarized statement, replete with irrelevant confidential information he learned in the course of representing Mr. Purkey, and in which he purported to interview witnesses who were never contacted, disparaged other witnesses proffered by Mr. Purkey's habeas counsel, claimed to possess certain evidence refuting some of the ineffective assistance of counsel claims while simultaneously claiming he had turned over his entire file to habeas counsel, opined as to the strength of Mr. Purkey's habeas claims, and directly advocated against those claims, arguing that the claims were without factual and legal support. App. 166 at 2074.[15]

The government's response to Mr. Purkey's § 2255 petition relied almost exclusively on the contents of Duchardt's statement. App. 183 at 2393. In denying the habeas petition without an evidentiary hearing, the district court also relied on Duchardt's statement in finding that Mr. Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy." App. 184 at 2570.

---

[15] Lawrence Fox, an ethics expert from Yale, submitted an affidavit in Mr. Purkey's § 2255 proceedings expressing his opinion that Mr. Duchardt's statement was unethical, in breach of his continuing duty of loyalty to his client. App. 196 at 2768. Duchardt's statement was also the subject of an academic law review article as a prime example of unethical behavior of a lawyer towards his former client in the face of allegations of ineffective assistance of counsel. *See* Tigran W. Eldred, "Motivation Matters: Guideline 10.13 and Other Mechanisms for Preventing Lawyers From Surrendering to Self-Interest in Responding to Allegations of Ineffective Assistance in Death Penalty Cases," 42 HOFSTRA L. REV. 473 (2013).

But Mr. Duchardt's statement to the court is more than an unethical brief against his former client. In fact, investigation by current counsel shows that Mr. Duchardt's statement amounted to a fraud on the court, perpetrated with intent to interfere with the administration of justice and the court's impartial adjudication of Mr. Purkey's claims of ineffective assistance of counsel in his § 2255 petition. The statement sets forth materially false and misleading assertions that could have had no other purpose than to deceive the court and thereby interfere with the court's impartial task of adjudicating Mr. Purkey's claims. For example:

1. The very first paragraph of Fred Duchardt's sworn statement asserted that, "[N]o objections have been interposed by Mr. Purkey or his Counsel." App. 166 at 2074. In fact, Mr. Purkey's § 2555 counsel had objected to the statement. Mr. Duchardt e-mailed his 117-page "draft" statement to Mr. Purkey's counsel just before noon on May 7, 2008, ostensibly to give counsel an opportunity to object. At the same time, Duchardt informed counsel that if there were no objections he would forward the statement to government counsel that afternoon. Though given little time to review the statement, Mr. Purkey's counsel quickly did so, and, just before 2:00 p.m. on May 7, counsel e-mailed Mr. Duchardt to object that the statement was inappropriate and crossed ethical boundaries. However, Mr. Duchardt ignored counsel's objection and forwarded the statement that same afternoon to government counsel, who asked him to notarize and formally submit

the statement. The next day, May 8, Mr. Duchardt mailed a copy of his statement to Mr. Purkey, and told his former client the statement was being provided to him because no objections had been interposed by his counsel, even though Duchardt knew that counsel had objected the previous day. Mr. Duchardt executed his sworn statement the following day, on May 9, 2008. App. 185 at 2576. Clearly, the false statement was intended to deceive the district court into believing that Mr. Purkey's § 2255 counsel, by voicing no initial objection to the statement, had acquiesced to its contents, making later objections by § 2255 counsel in moving to strike the statement more difficult to sustain.

2. Mr. Duchardt's co-counsel, Laura O'Sullivan, provided a declaration that Mr. Purkey's § 2255 counsel attached to his federal habeas petition. App. 186 at 2585. In that declaration, Ms. O'Sullivan stated, among other things, that Mr. Duchardt as lead counsel never provided her with any clearly-defined role in the case, that she had no involvement in many of the issues and decisions made in the case, that while she and Mr. Duchardt had telephone discussions they did not meet in person on a weekly or even monthly basis throughout the case, that Mr. Duchardt was taking actions in the case that she was not aware of, and that she was concerned that Mr. Duchardt was actively undermining her relationship with Mr. Purkey which caused her to consider the possibility of withdrawing from the case.

Ms. O'Sullivan stated she had virtually no involvement with the retained mental health experts. App. 186 at 2585.

In his sworn statement, Mr. Duchardt did not dispute the specific statements in Ms. O'Sullivan's declaration. Instead, Duchardt sought to justify sidelining Ms. O'Sullivan in the case by suggesting that she was simply not up to the task, either because of her "lack of initiative" or because she "deferr[ed] too much to my greater experience in cases of this sort," which required him to take over the tasks himself. App. 166 at 2074. Mr. Duchardt stated that, from the beginning, he expected to and did "take on the lion's share" of duties with respect to mental health matters in the case "because of my extensive experience with capital and mental health case practice," and asserted that Ms. O'Sullivan "had never before tried a case involving the death penalty or a mental defense." App. 166 at 2074.

While it was true that Ms. O'Sullivan had never tried a case involving the death penalty -- a fact that Mr. Duchardt and Ms. O'Sullivan both acknowledged App. 166 at 2074; App. 186 at 2585  -- Mr. Duchardt's assertion that Ms. O'Sullivan had never tried a case involving a mental defense was simply false. By the time Ms. O'Sullivan was appointed as co-counsel on Mr. Purkey's case, she had represented many clients with mental health issues. Her prior cases included litigating a trial where a client's frontal lobe damage was a key issue, negotiating an NGRI (not guilty by reason of insanity) plea on behalf of a client, litigating

144

another trial involving Battered Women's Syndrome, and many other cases involving issues of incompetency where clients had to undergo mental health evaluations. App. 186 at 2585. In fact, Mr. Duchardt never even bothered to ask Ms. O'Sullivan about her prior experience with cases involving mental health issues. App. 186 at 2585. Duchardt's false assertion that Ms. O'Sullivan had never before tried a mental defense case was made either in willful ignorance or willful disregard of the truth, and was clearly made in an effort to deceive the court into discrediting Ms. O'Sullivan's declaration in favor of his own false and misleading sworn statement to shift blame from himself against allegations of deficient performance.

3. Mr. Duchardt asserted in his sworn statement that he chose Mic Armstrong from the beginning to serve in the dual role of both investigator and mitigation specialist "because of his extensive experience and training." App. 166 at 2074. Mr. Duchardt further asserted that Mic Armstrong was his lead investigator during the time Duchardt was employed as a supervising Missouri Public Defender, where Armstrong "had performed very successfully for me in the dual role of fact and mitigation investigator" in four capital cases Duchardt tried during that time, and that Armstrong "availed himself of training opportunities which subsequently served him well in discharging both of these dual roles." App. 166 at 2074. Mr. Duchardt stated that he "rekindled" his professional relationship

145

with Mic Armstrong after being appointed to a federal capital case in 2000, where, he again asserted, "as in the previous state cases, Mr. Armstrong distinguished himself in both aspects of his dual investigator role," and because of Armstrong's "success in these five previous cases in the dual investigator role, I believed that he could successfully handle this dual role in the *Purkey* case." App. 166 at 2074. Duchardt's statement asserted further that Mic Armstrong "has the skill set to, by himself, both locate and interview [mitigation] witnesses." App. 166 at 2074.

Aside from violating the most basic standard of care for capital defense, these sworn statements from Mr. Duchardt about Mic Armstrong's qualifications for mitigation investigation are at turns both false and misleading. First of all, Duchardt's statements are contradicted by his own budget requests to the district court. The initial proposed budget submitted to the court on January 29, 2002, requested separate funding for an investigator *and* a mitigation specialist, requesting $35,000 for an investigator, and $45,000 for a mitigation specialist. App. 187 at 2593. At the time the initial proposed budget was submitted, Duchardt had already submitted a separate request to hire Mic Armstrong as an investigator, which he noted in the proposed budget to the court. App. 165 at 2018; App. 187 at 2593. In that separate request, submitted on January 25, 2002, Duchardt asked for an initial payment of $2,500 for Mr. Armstrong while he awaited necessary approval for the expenditure of funds in excess of $7,500. App. 135 at 1645.

146

In a later request for supplemental funds for Mr. Armstrong filed on August 20, 2003, Mr. Duchardt confirmed to the court that his original request for $35,000 in funding for Mr. Armstrong, which had been approved by the district court in April 2002, was for Armstrong's appointment as an investigator, and that the request was "based on the assumption that a mitigation specialist would be hired." App. 136 at 1649. It was here that Mr. Duchardt requested additional funds for Mr. Armstrong to serve in place of a mitigation specialist, at a rate of $45 per hour. In this supplemental request, Duchardt asserted that he had "learned" since his initial budget request that the cost for a mitigation specialist had increased from $45,000 to $80,000, and that he "determined that the services of a mitigation specialist could be dispensed with, and budgetary savings realized, by reassigning to the investigator and to counsel the investigative work traditionally done by a mitigation specialist." App. 136 at 1649; App. 135 at 1645.[16] Duchardt requested

---

[16] Mr. Duchardt made similar statements about dispensing with the need for a mitigation specialist in requests for additional funding for experts Dr. Peterson and Dr. Cunningham, who charged $225 per hour and $240 per hour, respectively. App. 188 at 2604; App. 189 at 2609. Drs. Peterson and Cunningham each submitted a declaration in the § 2255 proceeding stating they neither performed the work of a mitigation specialist in Mr. Purkey's case, nor did they have the training and experience to do so. App. 62 at 903; App. 191 at 2618.

In his initial request for the services of those two experts, Duchardt claimed he had hired a separate mitigation specialist in a previous death penalty case, *United States v. German Sinisterra*, 00-395-02-CR-W-GAF. App. 193 at 2696. This too was false. In a sworn statement strikingly similar to that in the present case, submitted by Mr. Duchardt in Mr. Sinisterra's § 2255 proceedings, Duchardt stated that he had hired another investigator to perform the "dual role" of fact investigator and mitigation specialist, at an increased rate of $45 per hour from the $35 per hour normally paid to fact investigators in the Western District of Missouri. App. 194 at 2734. Like Mic Armstrong, the investigator Mr. Duchardt hired in the Sinisterra case had no training or experience that qualified him to be a mitigation specialist. App. 195 at 2758.

an additional $10,000 for Mr. Armstrong, bringing the total for Armstrong's services to $45,000, App. 136 at 649, the amount, it so happens, that Duchardt had originally budgeted for a mitigation specialist. The request provided no support for Duchardt's claim that the cost of a mitigation specialist had nearly doubled, from $45,000 to $80,000, nor did the request set forth any information suggesting that Mr. Armstrong had the skills and training to conduct a qualified mitigation investigation.

Second, new evidence proves that Mic Armstrong was uniquely *unqualified* to assume the role of a mitigation specialist, which Mr. Duchardt would have known at the time he made his sworn statement in this case. The relevant facts from Claim 2-A are incorporated here.

Given these facts, there are only two alternative interpretations of Mr. Duchardt's sworn statement submitted in Mr. Purkey's case regarding Mic Armstrong, each of which demonstrates a fraud on the court: 1) If, as he stated in his sworn statement, Duchardt in fact *did* intend from the beginning of the case for Mic Armstrong to serve a dual role as both fact investigator and mitigation specialist, then his assertions to the court in his budget requests were made to manipulate the process toward that end by deceiving the court into approving more money for Mr. Armstrong under the guise of saving money by dispensing with the

---

need for a mitigation specialist, knowing that Armstrong was unqualified to serve as a mitigation specialist; or 2) his sworn statement that he intended from the beginning of the case for Armstrong to serve the dual role of fact investigator and mitigation specialist was itself false, and was made to deceive the court into believing that Mic Armstrong was, and had always been, a qualified mitigation specialist who could easily assume that role in Mr. Purkey's case.

In *Bressman*, *supra*, the Third Circuit Court of Appeals affirmed a lower bankruptcy court's determination that the attorney for plaintiffs on an adversary complaint against the debtor committed fraud on the court. The court found that the attorney intentionally deceived the court by submitting an affidavit that failed to mention a multi-million dollar settlement obtained by plaintiffs in a separate civil action for securities fraud and RICO claims against the adversary's co-defendants in that case. In explicit reliance on the attorney's affidavit, the bankruptcy court entered a default judgment and RICO judgment plus attorneys' fees against plaintiffs' adversary. It was not until over ten years later that the debtor's attorney learned of the settlement. The debtor moved to vacate the default judgment and RICO judgment based upon the plaintiffs attorney's fraud on the court. The bankruptcy court agreed, and vacated the judgments. The judgment was affirmed by the district court. 874 F.3d at 145-48.

Upholding the lower court's judgments on appeal, the Third Circuit found that, while "direct evidence of intent will rarely be available," the attorney's intent to deceive the bankruptcy court into awarding an unjustified recovery could be inferred from the surrounding circumstances, and so his intent to commit fraud on the court was clear from his failure to disclose the settlement. The Court recognized "an important distinction between perjury that is committed by a witness and fraudulent conduct that is directed at the court by one of its own officers." *Id*. at 152. In a case involving the latter, there is "a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers." *Id*. The fraud on the court was committed by "a licensed attorney who exploited his privilege to practice before the courts by not revealing the details of a relevant settlement payment" and was a "deceit [that] maximized his client's recovery and, in turn, his fee." *Id*.

The seminal fraud on the court case of *Hazel-Atlas*, *supra*, itself involved an affidavit procured by an attorney with the intent to deceive the court. In that case, plaintiff Hartford filed a patent infringement suit against the defendant Hazel, based on a patent obtained through a published article ostensibly written by a disinterested expert, but actually written by attorneys and other officials of Hartford. 322 U.S. at 240-241. The suit was dismissed in the district court, but Hartford appealed. On appeal, one of the attorneys who had played a part in getting

the bogus article prepared for publication quoted the article at length in the appellate brief. The Circuit Court of Appeals reversed the district court's judgment. *Id*. at 241.

In the meantime, Hazel had heard rumors that Hartford's attorney was the true author of the article, and began to investigate the matter after the Court of Appeals' opinion was issued, hoping to secure an affidavit from the expert who had signed the article to confirm the article was written by Hartford's attorney, but the expert refused to sign an affidavit. Hartford learned about the investigation, and a representative of Hartford subsequently procured an affidavit from the expert stating that the expert had signed the article and released it for publication. Shortly after, Hazel agreed to pay a settlement to Hartford and enter into certain licensing agreements.

The true facts surrounding the bogus article were brought to light years later in discovery produced through an anti-trust lawsuit against Hartford. *Id*. at 243. Hazel brought an action against Hartford for fraud on the court. The Circuit Court refused to grant relief, stating that the fraud was not newly discovered and, in any event, was not the primary basis of the Court's earlier decision. *Id*. at 243-44. The U.S. Supreme Court reversed, finding that the case "demands the exercise of the historic power of equity to set aside fraudulently begotten judgments," and that the evidence demonstrated a "deliberately planned and executed scheme to defraud not

only the Patent Office but the Circuit Court of Appeals." *Id*. at 245. The Supreme Court concluded further that relief was required even if the bogus article was not the primary basis for the Court of Appeals' ruling. "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than injury to a single litigant [. . .] It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id*. at 246.

In Mr. Purkey's case, the evidence shows that Fred Duchardt, an officer of the court, tampered with the administration of justice through a sworn statement containing false and misleading statements intended to deceive the court to rule against Mr. Purkey on his ineffective assistance of counsel allegations in his § 2255 petition. Duchardt made false statements, not only about 2255 counsel's objection to his statement and his co-counsel's professional experience, but about Mic Armstrong's qualifications for mitigation investigation, the truth of which, known but concealed by Mr. Duchardt at the time, and only now known by Mr. Purkey's counsel, shows Armstrong to have been supremely unqualified to perform in the role of a mitigation specialist. Mr. Duchardt's fraudulent assertions about Mr. Armstrong's qualifications likely played a significant role in the denial of Mr. Purkey's ineffective assistance of counsel claims, which were centered around Duchardt's failure to hire a mitigation specialist and the consequent failure to

conduct constitutionally-requisite mitigation investigation in Mr. Purkey's case. Had the truth of Mic Armstrong's background been disclosed, his claims of ineffective assistance of counsel would have been cast in a completely different light. By relying on Mr. Duchardt's sworn statement to successfully argue to the court against relief for Mr. Purkey, the government was complicit in Mr. Duchardt's fraud on the court. The judgment against Mr. Purkey was the result of an intentional deceit "perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of [adjudging] cases that are presented for adjudication.'" *Konigsberg v. Security Nat. Bank*, 66 F.R.D. 439, 442 (1975) (quoting 7 J. Moore Federal Practice ¶60.33 at 515 (2nd ed. 1974). *See also Bressman*, *supra,* at 150 ("As officers of the court, attorneys are required 'to conduct themselves in a manner compatible with the role of courts in the administration of justice[]' [. . .]When, however, counsel has failed to act with candor, preservation of the integrity of the judicial process may require courts to depart from their usual adherence to the principle that final judgments should be left undisturbed [. . .]We confront such situation here" (quoting *In re Snyder*, 472 U.S. 634, 644-645 (1985)).

**CLAIM 4:** **Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment.**

Because of the qualitative difference between death and life imprisonment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976) (plurality opinion). Under the Eighth Amendment, a sentencer in a capital case "'must . . . be able to consider and give effect to [mitigating] evidence in imposing sentence.'" *Penry v. Johnson*, 532 U.S. 782, 788 (2001) ("*Penry II*") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Penry *I*")). Just as a sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), "[t]he corollary that 'the sentencer may not refuse to consider *or be precluded from considering* "any relevant evidence"' is equally 'well-established.'" *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). A sentencer must be allowed to give full consideration and full effect to mitigating circumstances to fulfill the twin requirements of "measured,

consistent application and fairness to the accused" under the Eighth Amendment. *Eddings*, 455 U.S. at 111. In regard to a death sentence, the Eighth Amendment demands greater certainty that the jury's conclusions rested on proper grounds. *Mills*, 486 U.S. at 376 (citing *Lockett*, 438 U.S. at 605; *Andres v. United States*, 333 U.S. 740, 752 (1948)). "[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands" of the Eighth Amendment. *Lockett*, *supra*.

At the close of the penalty trial in Mr. Purkey's case, the jury was instructed to complete a "Special Verdict Form" and record its findings with respect to six statutory and four non-statutory aggravating circumstances in Parts I-IV, and with respect to mitigating circumstances in Part V. Part V of the special verdict form listed 27 mitigating circumstances, each containing an adjacent blank space for "number of jurors who so find." App. 158 at 2001. Instruction 34 of the trial court's penalty phase jury instructions told the jury, in Part V, to "identify any mitigating factors that any one of you finds has been proved by a preponderance of the evidence" in Part V of the form. App. 197 at 2778. Instruction 38 instructed the jury that: "Section I of the Special Verdict Form contains space to record your findings on defendant's age; Section II contains space to record your findings on the requisite mental state; and Section IV contains space to record your findings on

nonstatutory aggravating factors. Section V of the Special Verdict Form contains space to record your findings on mitigating factors." App. 191 at 2782.

The jury deliberated for approximately eleven hours over two days. App. 199 at 2783; App. 200 at 2784; App. 201 at 2785. When the special verdict form was returned recommending a death sentence for Mr. Purkey, the jury had completed Parts I-IV of the form, but Part V was left blank. App. 158 at 2001. Following defense counsel's objection, the trial judge offered to send the jury back to complete the form "if the government wants," noting that it would have been preferable for the jury to make the requisite findings. Nevertheless, after government counsel responded, "Absolutely no," Mr. Duchardt said nothing and the judge accepted the jury's verdict. App. 202 at 2786. In all federal capital cases except this one, the jury has memorialized their findings on mitigating factors.

One possible interpretation from the blank Part V of the special verdict form is that the jury simply refused to follow its instructions to complete that part of the form, in which case it is impossible to know one way or the other whether the jurors actually considered the evidence in mitigation, and the trial judge should have followed its own advice and sent the jury back into deliberations to complete the form instead of deferring to the government on the matter. *Cf. Penry v. Johnson*, 532 U.S. 782, 798-799 (2001) (jurors are presumed to follow their instructions); *Soltys v. Costello*, 520 F.3d 727, 744 (7th Cir. 2008) (same). The

other possibility, however, is that jurors understood from the instructions that they had to unanimously agree as to the existence of a particular mitigating factor in order to consider it, and blank spaces on the special verdict form represented a failure to reach unanimous agreement on the existence of the mitigating factors. That this was a substantial probability in Mr. Purkey's case is borne out by new evidence from the jurors themselves. The evidence shows that the jurors did discuss the mitigating factors, but in doing so they understood they had to reach unanimous agreement on each of the factors. App. 203 at 2787; App. 204 at 2790; App. 205 at 2793; App. 206 at 2798.[17] According to one juror, they "got stuck on a few factors for a long time, and when that happened, the jury foreman moved us along and sometimes we circled back." App. 206 at 2798. Part V of the special verdict form only required the jurors to register a positive decision that a particular mitigating factor existed. App. 158 at 2001. If the jurors believed they had to reach unanimous agreement as to the existence of a mitigating factor, a blank space next

---

[17] The juror declarations are not prohibited by *Warger v. Shauers*, 135 S.Ct. 521 (2014), a non-capital, non-criminal personal injury case. *See also* FRE Rule 606(b)(2) (exception to rule prohibiting inquiry into validity of verdict where the inquiry goes to the verdict's accuracy in capturing what the jurors had agreed upon). In capital cases, the Eighth Amendment imposes a heightened requirement for accuracy and reliability in the determination that death is an appropriate punishment. *See Woodson*, *supra*, at 304-05. *See also Williams v. Norris*, 612 F.3d 941, 956 (8th Cir. 2010) (evidence that a jury was precluded from considering mitigating circumstances or that it was mistaken about its ability to do violates the Eighth Amendment). Indeed, the Supreme Court's decision in *Pena-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017) is more apt, where the Court reiterated its earlier cautions that "the no-impeachment rule might recognize exceptions 'in the gravest and most important cases' where exclusion of juror affidavits might well violate 'the plainest principles of justice.'" *Id.* at 864 (quoting *McDonald v. Pless*, 238 U.S. 264, 269 (1915) (internal quotation omitted)).

to the factor could mean that the jurors either unanimously agreed that the mitigating factor had not been proven, *or* that they had failed to agree unanimously that a mitigating factor existed. The latter possibility was real, since the jurors "moved on" and only "sometimes . . . circled back" when they got "stuck" on a mitigating factor. App. 206 at 2798.

This is strikingly similar to the scenario under which a death sentence was found to be unconstitutional in *Mills v. Maryland*, *supra*, 486 U.S. 367. In *Mills*, the Supreme Court addressed the constitutionality of a death sentence imposed under Maryland's then-existing capital sentencing scheme as explained to the jury by the instructions and verdict form. On the verdict form provided to the jury, the jury was permitted to mark "yes" or "no" in the blank space beside each mitigating circumstance. The jury marked "no" beside each referenced mitigating circumstance and returned a sentence of death. *Id*. at 370. Mills argued that his sentence was unconstitutional because it was reasonably possible that a "no" answer on the verdict form represented a failure to find unanimously the existence of a mitigating circumstance. Thus, for example, if eleven jurors agreed that there were six mitigating circumstances, the result would be that no mitigating circumstance is found and there would be nothing to weigh against aggravating circumstances found. Even if all twelve jurors agreed that some mitigating circumstance were present, and even that those mitigating circumstances were

significant enough to outweigh the aggravating circumstances found to exist, unless all twelve jurors could agree that a mitigating circumstance was present, again there would be nothing to weigh in the weighing process. *Id.* at 373-74. Under this interpretation, "a jury that does not unanimously agree on the existence of any mitigating circumstances may not give any mitigating evidence any effect whatsoever, and must impose a sentence of death." *Id.* at 375.

The Supreme Court in *Mills* found that the cause of the barrier to the sentencer's consideration of all mitigating evidence, whether interposed by statute, the sentencing court, or by evidentiary ruling, is irrelevant. If Mills' interpretation of the sentencing process was correct, then whatever the cause, the conclusion was the same: "'Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand this case for resentencing.'" *Id.* (quoting *Eddings*, *supra*, 455 U.S. at 117 n. (O'Connor, J., concurring)). The Court acknowledged the "plausible" alternative explanation, but concluded it must remand for resentencing because it could not rule out the "substantial possibility" that the jury may have rested its verdict on the improper ground. *Id.* at 377.

The same result is required here. There is not merely a possibility, but a substantial probability that the blank spaces in Part V of the verdict form represented a failure to find unanimously the existence of a mitigating

circumstance, and precluded jurors from giving effect to any of Mr. Purkey's mitigating evidence. Nor were jurors in Mr. Purkey's case free to consider the mitigating evidence at the weighing stage of the sentencing process, because, as was the case in *Mills*, Part VI of the verdict form instructed jurors to weigh against the aggravating circumstances only those mitigating circumstances that were found to exist. App. 158 at 2001. Jurors may well have thought they were precluded from considering any mitigating evidence unless all twelve of them agreed on the existence of a particular circumstance. Consequently, "[the] jury following the instructions set out in the verdict form could be 'precluded from considering, *as a mitigating factor*, [an] aspect of [Mr. Purkey's] character or record [or a] circumstance[e] of the offense that [Mr. Purkey] preferred as a basis for a sentence less than death,' *Skipper v. South Carolina*, 476 U.S. at 4, if even a single juror adhered to the view that such a factor should not be so considered." *Mills*. at 380.

Mr. Purkey must be granted a new penalty trial. As the Supreme Court stated in *Mills*:

> The decision to exercise the power of the [government] to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case. The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing.

*Id.* at 383-84.

**CLAIM 5:   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death.**

In *Hurst v. Florida*, the Supreme Court of the United States held that "[t]he Sixth Amendment requires a jury, not a judge, to find *each fact necessary* to impose a sentence of death." 136 S.Ct. at 619 (emphasis added). In so holding, the Court went beyond *Ring*'s "tightly delineated" claim that concerned only a judge-made finding of aggravating circumstances and did not assert a Sixth Amendment right to ultimate sentencing by the jury or argue against a judicial finding on the relative weights of aggravating and mitigating circumstances. *Ring*, 536 U.S. at 597 n. 4.

Indeed, the Court in *Hurst* rejected the State's assertion that the Sixth Amendment was satisfied once the jury implicitly found a statutory aggravating circumstance beyond a reasonable doubt. The Court noted that, to the contrary, a defendant was not eligible for the death penalty under Florida law until further factual findings were made "that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances." 136 S.Ct. at 622. *Hurst*'s holding also included a proof requirement that was not present in *Ring*. *See Hurst*, 136 S.Ct. at 621 ("The Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . .' This right, in

161

conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt") (citing *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156 (2013)). *See also Apprendi v. New Jersey*, 530 U.S. 466, 484-485 (2000) (citing *In Re Winship*, 397 U.S. 358 (1970)); *Jones v. United States*, 526 U.S. 227(1999). Unlike *Ring*, which was limited to the jury trial right (*see* 536 U.S. at 588), *Hurst* went further by specifying that if any finding of fact is necessary as a pre-condition to a death sentence, the Sixth and Fourteenth Amendments require that finding to be made by a jury beyond a reasonable doubt.

The Supreme Courts of Florida and Delaware have each declared their capital sentencing schemes unconstitutional based on *Hurst*, interpreting *Hurst* as requiring proof beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstances (as in Florida) or that the aggravating circumstances outweigh the mitigating circumstances (as in Delaware). *See Perry v. State*, 210 So.3d 630, 639 (Del. 2016) (in light of *Hurst* and following remand from Supreme Court of the United States, construing Florida's sentencing statute "to require the penalty phase jury to unanimously find beyond a reasonable doubt that each aggravating factor exists, that sufficient aggravating factors exist to impose death, and that they outweigh the mitigating circumstances found to exist"); *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016).

The Federal Death Penalty Act (FDPA) conditions the imposition of a death sentence on certain factual findings by the jury. The jury must first find the existence of at least one of four statutory *mens rea* requirements. 18 U.S.C. § 3591(a)(2). The jury must then find the existence of at least one statutory aggravating circumstance. 18 U.S.C. § 3592(c). Finally, the jury must weigh the aggravating factors, both statutory and non-statutory, against any mitigating factors to determine whether the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death. 18 U.S.C. § 3593(e). Without the necessary factual findings by a jury, the maximum sentence Mr. Purkey could receive was life imprisonment without the possibility of parole.

The jury in this case was instructed that it must find an aggravating factor, both statutory and non-statutory, beyond a reasonable doubt. App. 207 at 2801; App. 208 at 2805; App. 158 at 2001.  However, jurors were not instructed that they must find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. App. 209 at 2807; App. 158 at 2001 (jury instructed that "if you unanimously conclude that the aggravating factor of factors found to exist sufficiently outweigh any mitigating factor or factors which any of you found to exist to justify a sentence of death, and that therefore death is the appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed in Section VI on page 17 of the Special Verdict Form"). The

jury's instructions assigned no burden of proof to this inquiry, which – considering the instruction expressly requiring proof beyond a reasonable doubt of the *existence* of aggravating factors – suggested that no such burden applied to the weighing analysis.

Under *Hurst* as applied to the FDPA, a constitutional death sentence requires a jury to find, as a fact necessary to impose a sentence of death, that aggravating factors sufficiently outweigh mitigating factors, and such finding must be made beyond a reasonable doubt. *Hurst*, 136 S.Ct. at 621-22; *Perry*, 2016 WL 6036982 at *7; *Rauf*, 145 A.3d at 434.[18] Mr. Purkey's death sentence cannot stand because his jury did not make this necessary finding.

**CLAIM 6: Imposition of the Death Penalty under the Federal Death Penalty Act (FDPA) Constitutes Cruel and Unusual Punishment in Violation of Eighth Amendment**

Since the Supreme Court last addressed the *per se* constitutionality of the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), a number of factors have

---

[18] *United States v. Con-ui*, 2017 WL 1393485 (M.D. Pa. 2017) is not to the contrary. There, the issue was whether the penalty-phase consideration and weighing of aggravating factors under the FDPA is an essential "element" of the offense that was constitutionally required to be charged in the indictment and submitted to a grand jury. The burden of proof of facts necessary to impose a death sentence was not at issue in *Con-ui*. The court noted, for instance, that non-statutory aggravating factors did not need to be charged in the indictment and submitted to a grand jury. *Id.* at *2-*3. Nevertheless, the government is required to prove non-statutory aggravating factors to the jury beyond a reasonable doubt under the FPDA. In *United States v. Sampson*, 2016 WL 3102003 (D. Mass 2016) (not reported), the court opined that the constitution did not mandate application of a beyond-a-reasonable-doubt standard to the weighing determination under the FPDA, but the court's opinion is mere *dicta* in light of the fact that Sampson's jury *was* instructed to apply a reasonable doubt standard to the weighing process and the final determination of whether death was justified, and the government consented.

coalesced such that it can no longer be said this severe punishment comports with our standards of decency. *See Trop v. Dulles*, 356 U.S. 86 (1958). These factors apply with equal force in the states and in the federal system. *United States v. Fell*, 224 F.Supp.3d 327 (2016). Mr. Purkey's death sentence violates the Eighth Amendment to the United States Constitution.

In *Fell*, the presiding federal district court judge held an evidentiary hearing and heard extensive evidence on the question of whether the FDPA is unconstitutional under the Eighth Amendment, in light of Justice Breyer's dissenting opinion in *Glossip v. Gross*, 136 S.Ct. 2726, 2755 (2016), joined by Justice Ginsburg, "calling for full briefing on a more basic question: whether the death penalty violates the Constitution." The district court in *Fell* concluded from the evidence that "[t]he time has surely arrived to recognize that the reforms introduced by *Gregg* [*v. Georgia*, *supra*] and subsequent decisions have largely failed to remedy the problems identified in *Furman* [*v. Georgia*, 408 U.S. 238 (1972),]" 224 F.Supp.3d at 359, but ultimately determined that "[i]nstitutional authority to change this body of law is reserved to the Supreme Court." *Id*.

This Court has inherent jurisdiction to declare the FDPA unconstitutional. *See United States v. Raines*, 362 U.S. 17, 20-21 (1960) ("The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly

before them . . . .") (citing *Marbury v. Madison*, 1 Cranch 137, 177-180 (1803). Because it is now clear that the FDPA does not comport with "evolving standards of decency" and is a disproportionate punishment under the Eighth Amendment, this Court should declare the FDPA unconstitutional. At minimum, the Court should address the issue, and allow evidence to be presented in support of the claim so that Mr. Purkey can preserve the issue for further review.

In his dissenting opinion in *Glossip*, Justice Breyer identified several constitutional defects in the administration of the death penalty in the United States that call into question the constitutionality of that punishment: "(1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose[,]" along with the fact that "most places within the United States have abandoned its use." 135 S.Ct. at 2755-56.

Indeed, the trend in the United States against the death penalty is clear. Nine states have repealed their death penalty statutes in recent years, four others are currently under a moratorium, and over the last decade the death penalty's use has been negligible in several more states and the federal government. The result is that the death penalty is now actively practiced in just a handful of jurisdictions. New death sentences have consistently trended downward, as have executions, recently reaching all-time lows. Prominent professional and religious groups are

increasingly questioning the fairness and utility of the punishment. And, the death penalty has now been abandoned by most of the rest of the world. Empirical evidence now demonstrates that heightened protections have not achieved the reliability needed to eliminate wrongful executions; the guided discretion formula established by *Gregg v. Georgia*, 428 U.S. 153 (1976), has not significantly limited arbitrariness, and operation of the system of capital punishment is plagued by bias and caprice. It can only be concluded that our standards of decency have evolved to the point where the FDPA, on its face and as applied, is unconstitutional.

## A.      The death penalty is a disproportionate punishment

Recent trends and events have coalesced, marking the steady and progressive abandonment of capital punishment throughout the country such that it can now be fairly concluded that the death penalty is a disproportionate punishment, even for the gravest and most heinous of offenses.

### 1.      The death penalty is being increasingly rejected throughout the country

The Supreme Court has recognized that "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia,* 536 U.S. 304, 312 (2002) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)). But the Court has consistently looked to *actual* practices, rather than simply whether the punishment was legislatively *authorized*, when assessing constitutionality. *See Atkins*, 536 U.S. 304, 316 (2002)

("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry*."); *Roper v. Simmons*, 543 U.S. 551, 564-65 (2005) (noting that although twenty states authorized death for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, those sentences are most infrequent."); *Miller v. Alabama*, 132 S. Ct. 2455, 2459 (2012) ("[S]imply counting legislative enactments can present a distorted view. . . .").

Across the country, each passing year has seen an increasing rejection of the death penalty. The starkest attribute of this trend is its unwavering progression toward disuse, thus forming a reliable metric of contemporary standards of decency in the United States. In 2004, a time when 38 states still authorized the punishment, the New York Court of Appeals declared a portion of the state's death penalty law unconstitutional and invalidated the sentencing portion of the law.

*People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004).[19] In 2007, the court reaffirmed the unconstitutionality of the law and ruled that its prior holding applied to the last remaining person on the state's death row. *People v. Taylor*, 878 N.E.2d 969, 971 (N.Y. 2007). New Jersey repealed its death penalty in 2007,[20] and New Mexico followed suit in 2009.[21] Illinois was next in 2011, a few years after concerns about fairness and wrongful convictions prompted the governor to commute all death sentences in the state.[22] In 2012, Connecticut repealed the death penalty prospectively, and in 2015, the state's highest court subsequently declared the death penalty unconstitutional under its state constitution for all those on Connecticut's death row. *State v. Santiago*, 122 A.3d 1, 81-85 (2015). In 2013,

---

[19] The state legislature subsequently has voted down attempts to restore the death penalty statute. Michael Powell, *In N.Y., Lawmakers Vote Not to Reinstate Capital Punishment*, THE WASHINGTON POST, April 13, 2005, http://www.washingtonpost.com/wp-dyn/articles/A47871-2005Apr12.html.

[20] Jeremy W. Peters, *Death Penalty Repealed in New Jersey*, THE NEW YORK TIMES, Dec. 17, 2007, http://www.nytimes.com/2007/12/17/nyregion/17cnd-jersey.html?_r=0; *Death Penalty Is Repealed in New Mexico*, THE NEW YORK TIMES, Mar. 18, 2009, http://www.nytimes.com/2009/03/19/us/19execute.html.

[21] The New Mexico repeal was not retroactive and left two people on the state's death row. On June 28, 2019, the New Mexico Supreme Court held that the sentences of these two prisoners were disproportionate to the penalties imposed and similar cases and remanded the prisoners' cases to the lower court for resentencing to life in prison. *Fry v. Lopez*, No. S-1-SC-34372, 2019 WL 2710810, at *1 (N.M. June 28, 2019).

[22] John Schwartz & Emma G. Fitzsimmons, *Illinois Governor Signs Capital Punishment Ban*, THE NEW YORK TIMES, Mar. 9, 2011, http://www.nytimes.com/2011/03/10/us/10illinois.html.

Maryland abolished its death penalty.[23] In 2016, in *Rauf v. State*, 145 A.3d 430 (Del. 2016), the Delaware Supreme Court struck down that state's death penalty law under *Hurst v. Florida*, 136 S.Ct. 616 (2016) and then applied its decision retroactively in *Powell v. Delaware*, 153 A.3d 69 (2016), effectively clearing the state's death row. The Delaware Attorney General did not seek review of the rulings. On October 11, 2018, the Washington Supreme Court declared the state's death penalty statute unconstitutional because its application was arbitrary and racially discriminatory. *State v. Gregory*, 427 P.3d 621, 627 (Wa. 2018). In May 2019, the New Hampshire legislature voted to abolish the death penalty.[24] Moratoria on the death penalty remain in place in four other states: Oregon, Colorado, Pennsylvania, and California.[25]

Currently, the federal government and 29 states legally authorize the death penalty,[26] but its infrequency in practice tells a larger story. Although the federal government recently scheduled five executions, it has not carried out any

---

[23] *Maryland: Governor Signs Repeal of the Death Penalty*, THE NEW YORK TIMES, May 2, 2013, http://www.nytimes.com/2013/05/03/us/maryland-governor-signs-repeal-of-the-death-penalty.html.

[24] Bill Chappell, *New Hampshire Abolishes Death Penalty As Lawmakers Override Governor's Veto*, https://www.npr.org/2019/05/30/728288240/new-hampshire-abolishes-death-penalty-as-lawmakers-override-governors-veto. The repeal was not retroactive and left one person on death row. *Id.*

[25] DPIC, States With and Without the Death Penalty – 2019, https://deathpenaltyinfo.org/states-and-without-death-penalty.

[26] *Id.*

executions since 2003,[27] and the military authorities have not since 1961.[28] Ten current or former death penalty states have not executed anyone during the last ten years: California, Colorado, Kansas, Kentucky, Montana, Nevada, New Hampshire, Oregon, Pennsylvania, and Wyoming.[29] Four more have carried out only one execution in the last ten years: Indiana, Louisiana, Nebraska, and Utah (and in one of these cases, Louisiana, the prisoner abandoned his appeal).[30]

In only ten states have executions averaged more than one per year over the last ten years: Alabama, Arizona, Florida, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Texas, and Virginia. These ten states accounted for 93% of all executions (330/354) over this time period, with a single state, Texas, responsible for 38% (135/354).[31]

Even those states still routinely employing the death penalty have seen a marked drop in executions, as reflected in a consistent decline nationally. The high came in 1999 when 98 offenders were executed. The last ten years have shown a steady decline in executions: 2009(56); 2010(46); 2011(43); 2012(43); 2013(39);

---

[27] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[28] DPIC, The U.S. Military Death Penalty, http://www.deathpenaltyinfo.org/us-military-death-penalty

[29] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[30] *Id.*

[31] *Id.*

2014(35); 2015(28); 2016(20); 2017(23); 2018(25)).[32] 2018 was the fourth year in

a row with fewer than 30 executions.[33] Just eight states carried out executions in

2018, and Texas accounted for more than half of all executions (13) for the year.[34]

In 2018, "there were fewer executions in the rest of the country than in any year

since 1991."[35]

The decline in new death sentences is just as stark. The year 1996 saw 315

new death sentences, which was more than halved by 2004 (138), nearly halved

again by 2014 to 73, plummeted to 49 in 2015 and to 31 in 2016, the lowest total

since the death penalty was declared unconstitutional in *Furman v. Georgia*, 408

U.S. 238 (1972).[36] The 39 new death sentences imposed in 2017 represented the

second lowest number since *Furman*, and down more than 90% from the peak year

of 1996.[37]

---

[32] DPIC, Executions By Year, http://www.deathpenaltyinfo.org/executions-year. The high in 2009 reflects the end of the stays of execution issued pending *Baze v. Rees*, 553 U.S. 35 (2008).

[33] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report. "Before 2015, 1991 was the last year with fewer than 30 executions." *Id.*

[34] *Id.*

[35] *Id.*

[36] DPIC, Death Sentences in the United States From 1977 By State and By Year, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008.

[37] DPIC, Year-End Report at 3, https://deathpenaltyinfo.org/documents/2017YrEnd.pdf.

Although in 2018 the number of new death sentences rose to 43, 2018 marked the fourth consecutive year with fewer than 50 death sentences.[38] Moreover, for the first time in the modern era of the death penalty (after the U.S. Supreme Court struck down all death penalty statutes in 1972), no county imposed more than two death sentences.[39] 56% of the 43 sentences came from just four states: Texas and Florida (both with seven) and California and Ohio (both with five).[40]

Questions of fairness continue to undermine the death penalty. Even forty years after *Gregg*, some states statutes still fail to meet minimal constitutional standards. *Hurst v. Florida*, *supra* (Florida's death penalty statute violates Sixth Amendment right to trial by jury); *Gregory*, *supra*, at 633 (concluding that "[t]t is now apparent that Washington's death penalty is administered in an arbitrary and

---

[38] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report; DPIC, 2018 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county.

[39] *Id*.

[40] DPIC, 2018 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county. This same geographic clustering occurred in 2016 as well, with just four states accounting for over half of the new death sentences in that year: (California (9), Ohio (4), Texas (4), Alabama (3), and Florida (2)). DPIC, The Death Penalty in 2016: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2016-year-end-report. In 2017, "fewer than one-tenth of 1% of counties in the U.S. accounted for more than 30% of all the death sentences imposed in the United States in 2017. Three outlier counties—Riverside, California; Clark County, Nevada, and Maricopa, Arizona—imposed 12 [of 39] death sentences." DPIC, 2017 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county/2017-death-sentences-by-name-race-and-county.

racially biased manner."); *Hurst v. State*, 202 So.3d 40, 53 (Fla. 2016), *cert. denied* 137 S.Ct. 2161 (2017) (declaring Florida's statute unconstitutional on remand from *Hurst v. Florida*); *Rauf v. State*, *supra* ("Delaware's current death penalty statute violates the Sixth Amendment role of the jury as set forth in *Hurst*."). Moreover, in 2018, "[m]ore than 70% of the people executed showed evidence of serious mental illness, brain damage, intellectual impairment, or chronic abuse and trauma, and four were executed despite substantial innocence claims."[41]

Several states that still authorize the death penalty have expressed reservations about its continued use. The legislatures in California, Oklahoma, Pennsylvania, and Tennessee have commissioned reports on their state's death penalties. Louisiana has established a Capital Punishment Fiscal Commission to investigate the cost of the death penalty, and Oklahoma created a bipartisan Oklahoma Death Penalty Review Commission to conduct a comprehensive review of that state's death penalty. Significantly, four states that have recently joined the abolitionist ranks, New Jersey, Illinois, Connecticut, Maryland, and New Hampshire, all commissioned reports before approving bills abolishing the death penalty. The executive branches of multiple states have signaled their concerns

---

[41] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report.

over the fairness of the death penalty as well. Governors of California,[42]
Colorado,[43] Oregon,[44] and Pennsylvania,[45] have declared official moratoriums on
executions. And public support for the death penalty has reached a 45-year low.[46]

Over 40 years ago, when the death penalty was in far greater favor than
today, one Justice of the Supreme Court commented: "The progressive decline in,
and the current rarity of, the infliction of death demonstrate that our society
seriously questions the appropriateness of this punishment today." *Furman v.
Georgia*, 408 U.S. at 299 (Brennan, J., concurring). In *Fell*, the district court,

---

[42] Scott Shafer and Marisa Lagos, *Gov. Gavin Newsom Suspends Death Penalty In California*, March 12, 2019, https://www.npr.org/2019/03/12/702873258/gov-newsom-suspends-death-penalty-in-california.

[43] Exec. Order No. D 2013-006, at 2 (Colo. May 22, 2013), *available at* http://www.cofpd.org/docs-dun/governor-executive-order.pdf.

[44] William Yardley, *Oregon Governor Says He Will Block Executions*, THE NEW YORK TIMES, Nov. 22, 2011,http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html.

[45]Gov. Tom Wolf, Death Penalty Moratorium Declaration (Feb. 13, 2015), *available at* https://www.scribd.com/doc/255668788/Death-Penalty-Moratorium-Declaration.

[46] Niraj Chokshi, *Death Penalty Loses Majority Support for First Time in 45 Years*, THE NEW YORK TIMES, October 3, 2016, *available at* http://www.nytimes.com/2016/10/04/us/death-penalty-loses-majority-support-for-first-time-in-45-years.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0 (only 49 percent of Americans support capital punishment, down from a peak of 80 percent in 1994); *see also* DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report ("The 2018 Gallup poll found that fewer than half of Americans (49%) now believe that the death penalty is 'applied fairly.' This was the lowest level since Gallup began asking the question in 2000. Overall support for the death penalty remained essentially unchanged from 2017's 45-year low.").

[47] Amnesty International, Death Sentences and Executions: 2014, 2, 62 (2015), https://www.amnestyusa.org/pdfs/DeathSentencesAndExecutions2014_EN.pdf

although finding that "public opinion is turning against the death penalty and state legislatures have done so as well," found that "the change is insufficiently broad to meet the *Atkins* requirement of consensus at this time." 224 F.Supp.3d at 356. Under *Atkins*, however, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." 536 U.S. at 315. Contrary to the district court's conclusion in *Fell*, the evidence now is compelling; capital punishment is infrequently practiced, save for in a handful of states, and new death sentences are rapidly and consistently in decline. Its infrequent use relative to the number of death eligible offenders renders the death penalty "truly unusual" and thus it can now be concluded that a "national consensus has developed against it." *Atkins,* 536 U.S. at 316.

### 2.    The death penalty is excessive

The Eighth Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins*, 536 U.S. at 311, n.7 (2002). *Gregg* made clear that to be constitutional "punishment must not involve the *unnecessary* and wanton infliction of pain." *Gregg*, 428 U.S. at 173. *See also Furman*, 408 U.S. at 325 (Marshall, J., concurring) ("The Court [in *Weems v. United States*, 217 U.S. 349 (1910)] made it plain beyond any reasonable doubt that excessive punishments were as objectionable as those that were

inherently cruel"). It must now be concluded that the death penalty is an excessive

punishment, even for the gravest of offenses.

The traditional goals of punishment—deterrence, retribution, incapacitation,

and rehabilitation—form the baseline for analyzing excessiveness. *Graham v.*

*Florida*, 560 U.S. 48, 71 (2010) (discussing "penological justifications" relevant to

the Eighth Amendment analysis). The death penalty fails to further these goals in

any measurable degree over life imprisonment. *See, e.g.*, Justin F. Marceau &

Hollis A. Whitson, *The Cost of Colorado's Death Penalty*, 3 U. DENV. CRIM. L.

REV. 145, 162 (2013) ("[S]ocial scientists increasingly agree that the deterrence

benefits of the death penalty are entirely speculative"); Michael L. Radelet & Traci

L. Lacock, *Do Executions Lower Homicide Rates?: The Views Of Leading*

*Criminologists*, 99 J. CRIM. LAW & CRIMINOLOGY 489, 489-90 (2013); *Ring v.*

*Arizona*, 536 U.S. 584, 615 (2002) (Breyer, J., concurring) (concluding that

"[s]tudies of deterrence are, at most, inconclusive") (citation omitted); *Glossip v.*

*Gross*, 135 S. Ct. 2726, 2767 (2015) (Breyer, J., dissenting) ("Capital punishment

by definition does not rehabilitate. It does, of course, incapacitate the offender. But

the major alternative to capital punishment—namely, life in prison without

possibility of parole—also incapacitates"); *id.* at 2269 ("[W]hatever interest in

retribution might be served by the death penalty as currently administered, that

interest can be served almost as well by a sentence of life in prison without parole . . . .").

The court in *Fell* declined to make any finding as to whether the FDPA undermined the penological purpose of deterrence, on the ground that the evidence was inconclusive either way. 224 F.Supp.3d at 349. Nevertheless, if the death penalty fails to measurably promote any of the principal penological goals over life imprisonment, it is excessive, and violates the Eighth Amendment. *Furman*, 408 U.S. at 279 (Brennan, J, concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive.") (internal citation omitted.).

> ### 3. The United States is out of step with the international community's consensus against the death penalty

The United States has historically been the world's principal champion of human rights, yet it stubbornly retains the use of capital punishment for its own citizens. This country had 35 executions in 2014.[47] Only China, Iran, Saudi Arabia,

---

[47] Amnesty International, Death Sentences and Executions: 2014, 2, 62 (2015), https://www.amnestyusa.org/pdfs/DeathSentencesAndExecutions2014_EN.pdf

and Iraq had more.[48] In 2016, the United States ranked seventh, behind only China, Iran, Saudi Arabia, Iraq, Pakistan, and Egypt.[49]

106 countries have abolished the death penalty for all crimes.[50] Another seven countries have abolished the death penalty for ordinary crimes such as murder, and another 29 countries are abolitionist in practice as they have not executed anyone during the last ten years and are understood to have an established policy or practice of not carrying out executions.[51] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[52]

---

[48] *Id.*

[49] Amnesty International, The Death penalty in 2016: Facts and figures, https://www.amnesty.org/en/latest/news/2017/04/death-penalty-2016-facts-and-figures/.

[50] DPIC, Abolitionist and Retentionist Countries, https://deathpenaltyinfo.org/policy-issues/international/abolitionist-and-retentionist-countries. Two countries did so in 2016. Amnesty International, The Death penalty in 2016: Facts and figures, https://www.amnesty.org/en/latest/news/2017/04/death-penalty-2016-facts-and-figures/. In 2017, "[t]wo countries abolished the death penalty for all crimes and a third country became abolitionist for ordinary crimes such as murder." Amnesty International, Death Sentences and Executions 2017, *available at* https://www.amnesty.org/download/Documents/ACT5079552018ENGLISH.PDF.

[51] DPIC, Abolitionist and Retentionist Countries, https://deathpenaltyinfo.org/policy-issues/international/abolitionist-and-retentionist-countries; Amnesty International, Death Sentences and Executions 2017, *available at* https://www.amnesty.org/download/Documents/ACT5079552018ENGLISH.PDF.

[52] G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2014), *available at* http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186.

But the death penalty finds its greatest opposition among European states, whose social and political interests most closely align with those of the United States. Article 2(2) of the *Charter of Fundamental Rights of the European Union* prohibits the use of capital punishment.[53] In 1982, the Council of Europe adopted *Protocol No. 6 to the European Convention on Human Rights*, the first legally binding instrument calling for the abolition of the death penalty in peacetime, and ratification is a prerequisite to membership in the Council of Europe.[54]

The United States Supreme Court has routinely taken into account the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham*, 560 U.S. at 80 (the Court may look "beyond our nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual"); *Roper v. Simmons*, 543 U.S. 551, 575 (2005) ("[F]rom the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

---

[53] Charter of Fundamental Rights of the European Union, Art. 2 (2) (2000 OJ C364/1) ("No one shall be condemned to the death penalty, or executed.").

[54] Council of Europe—Human Rights Law and Policy: Abolition of the Death Penalty, http://www.coe.int/t/dghl/standardsetting/hrpolicy/Others_issues/Death_Penalty/. *See also* Protocol No. 13 to the European Convention on Human Rights (providing for the total abolition of the death penalty in *all* circumstances). Amnesty International, Death Sentences and Executions: 2014, 67 (2015), *available at* http://www.amnestyusa.org/pdfs/ DeathSentencesAndExecutions2014_EN.pdf.

**B.    *Gregg* has failed to significantly further the goals of reliability, consistency, and equal justice**

The many procedural protections imposed post-*Furman* have not eliminated wrongful executions, and the process remains plagued by arbitrariness, discrimination, and excessive delay. In practice the death penalty, even with the post-*Gregg* modifications, has failed to meet the minimal constitutional requirements of rationality and fairness.

**1.    The Death Penalty is Unreliable**

Despite the constitutional guarantees of competent counsel and a fair trial, the system remains insufficiently reliable to justify retaining the death penalty. Today, there have been at least 166 exonerations in capital cases[55] in comparison to the 1,490 executions since *Gregg*.[56] The state of Missouri, for example, has executed 88 prisoners in the post-*Gregg* era, but four of its death-sentenced prisoners have been exonerated: Clarence Dexter, Eric Clemmons, Joseph Amrine, and Reginald Griffin.[57] A fifth, Lloyd Schlup, pleaded guilty to a lesser offense

---

[55] DPIC, Innocence By the Numbers, https://deathpenaltyinfo.org/policy-issues/innocence/innocence-by-the-numbers.

[56] DPIC, Executions by State and Region Since 1976, https://deathpenaltyinfo.org/executions/executions-overview/number-of-executions-by-state-and-region-since-1976.

[57] *Id.*

during his retrial in order to avoid the death penalty.[58] Researchers have estimated that nearly one in twenty (4.1%) of those sentenced to death are actually innocent,[59] an unacceptably high error rate by any measure. *See also Fell*, 224 F.Supp.3d at 331.

## 2.    The death penalty is arbitrary

As the court in *Fell* concluded from the factual record, the FDPA "falls short of the standard required in *Furman v. Georgia*, 408 U.S. 238 (1972), and in *Gregg* for identifying defendants who meet objective criteria for imposition of the death penalty." 224 F.Supp.3d at 329. Thus, "[l]ike the state statutes enacted after *Furman*, the FDPA operates in an arbitrary manner in which chance and bias play a leading role." *Id. See Gregg*, *supra*, 428 U.S. at 189 (stating the central mandate of *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

The *Fell* court agreed with updated social science expert research on juries produced by the process of "death-qualification," which results in capital juries

---

[58] DPIC, Additional Innocence Information, https://www.deathpenaltyinfo. org/additional-innocence-information

[59] *See* Gross, O'Brien, Hu, & Kennedy, *Rate of False Conviction of Criminal Defendants Who are Sentenced to Death* (2014), https://www.law.umich.edu/ newsandinfo/Documents/Gross_ProceedingsNationalAcademyofSciences_Exonerations.pdf.

that are biased in favor of the prosecution and more likely to impose a death sentence. *Fell*, 224 F.Supp.3d at 332-38 (citing studies and testimony of Dr. Craig Haney). The court found that, "[w]ith respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society." *Id*. at 333. Capital jury studies have shown that death-qualified jurors are also biased in favor of imposing the death penalty, that a majority of such jurors make up their minds about the death penalty before completing the guilt phase of trial, and that jurors demonstrate a consistent inability to understand and apply the court's instructions concerning the guilt and penalty phases of trial, the different burdens of proof for aggravating and mitigating circumstances. *Id*. at 335-36 (citing testimony of Dr. Wanda Foglia). Substantial numbers of such jurors also believe that a death sentence is mandatory if aggravating circumstances are present, believe that others actors are responsible for the death decision, that race played a role in jurors death penalty decision, that jurors frequently do not understand or believe that defendants sentenced to life without parole will not be released in the future. *Id*. at 336-37. The capital jury studies also show that, if there are three or fewer who favor a life sentence on the first vote, the ultimate decision is almost always for death, that jurors employ

unpredictable and unguided, subjective factors in their decisionmaking, uncertainty over potential mitigating circumstances, such as mental illness or neurological deficits, that can support mitigation but can also be understood to support future dangerousness, which is an additional source of arbitrariness. *Id*. at 338 (citing testimony of Scott Sundby). The court thus found that the social science studies since 1980 "have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*[,]" *id*. at 338, and the FDPA "remains inherently unreliable as it seeks to identify those cases in which death is the just outcome." *Id*. at 340.

The court in *Fell* also heard testimony from Kevin McNally of the Federal Death Penalty Resource Counsel Project about the application of the FDPA, and specifically, the effects of race, geography, and the absence of discernable standards for the determination of who is sentenced to life imprisonment and who is sentenced to death. Mr. McNally's testimony showed that, based on the number of cases potentially subject to the death penalty and the number in which the death penalty was actually sought by the government, and the few number of the latter in which the death penalty was imposed, "the extreme rarity of the imposition of the death penalty and actual executions has been present since the enactment of the FDPA." 224 F.Supp.3d at 340.

184

Moreover, through a comparison of federal death penalty cases, the court in *Fell* found that the decision to impose death "is subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary." *Id*. at 341. This is because "[w]hen large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions between the groups." *Id*. at 345. Consequently, "[t]he imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence." *Id*.

Indeed, factors of geography and race remain unmistakable and primary predictors of whether a death sentence will be imposed on federal defendants. As the court noted in *Fell*, federal death penalty cases since 1988 have been concentrated in just three states -- Virginia, Texas, and Missouri – "in a pattern consistent with the concentration of state death penalty cases." *Id*. Thus, whether a federal death sentence will be imposed depends greatly on geography, and the evidence showed that "the state in which a crime occurs is the strongest predictor of whether a death sentence will result." *Id*. at 345. Mr. Purkey was sentenced to death in Missouri.

In addition, the court in *Fell* heard statistical evidence establishing unequivocally that, in federal death penalty cases, "[a] defendant charged with

185

killing a white female victim was 2.7 times more likely to be sentenced to death than a defendant charged with killing a victim of another race." *Id*. at 342. Mr. Purkey is one of these defendants, and is among a group that is overrepresented among federal death sentenced defendants, findings that were "highly unlikely to be explained by other variables or conditions." *Id*. Thus, "[w]hether the murder victim is white is also a significant predictor" of the likelihood that a federal defendant will be sentenced to death. *Id*. at 345.

The Eighth Amendment mandate to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, *California v. Brown*, 479 U.S. 538, 541 (1987) ("[D]eath penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion"), and a capital defendant's right to individualized sentencing. *Lockett v. Ohio,* 438 U.S. 586, 605 (1978) (plurality opinion) ("The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.").

Experience has shown these competing goals, each indispensable to a constitutional system, are irreconcilable. *Walton v. Arizona*, 497 U.S. 639, 664-65 (1990) (Scalia, J., concurring in part and concurring in judgment) ("The latter requirement quite obviously destroys whatever rationality and predictability the

former requirement was designed to achieve."); *Callins v. Collins*, 510 U.S. 1141, 1144-45 (1994) (Blackmun, J., dissenting) ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death can never be achieved without compromising an equally essential component of fundamental fairness—individualized sentencing.") (internal citation omitted). Today, these conflicting goals are still "in search of a unifying principle." *Kennedy v. Louisiana*, 554 U.S. 407, 435-37 (2008).

And there are significant, as yet unaddressed, concerns. For example, *Simmons* and *Atkins* recognized that certain classes of offenders are on average sufficiently lacking in culpability so as to render their execution unconstitutional. Yet, the severely mentally ill, whose illness may defy ready categorization but who nevertheless occupy the less-culpable end of the spectrum, remain subject to the death penalty.[60] Indeed, there is growing evidence that the categorical approach to death penalty exclusions exemplified in *Simmons* and *Atkins* may have missed the larger picture, and even introduced unintended arbitrariness.[61] It is estimated that

---

[60] *See, e.g.*, *Corcoran v. State*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("[T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill . . . ."); American Bar Association, Recommendation 122A (recommending "prohibit[ing] execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/2006_am_122a.authcheckdam.pdf.

[61] *Graham*, 560 U.S. at 75 (acknowledging that "[c]ategorical rules tend to be imperfect . . . ."); Stephen B. Bright, *The Role of Race, Poverty, Intellectual Disability, and Mental Illness in the*

as many as 25% of the approximately 3,000 inmates on death row have a serious mental illness,[62] and even this number may significantly underestimate its prevalence.[63] There is a troubling randomness in excluding some groups of less-culpable defendants from execution while allowing the execution of others whose culpability is equally reduced.

There are also wide disparities in the quality of capital counsel and the resources provided for capital defense, also introducing arbitrariness. *See Fell*, 224 F.Supp.3d at 343-345 (citing testimony on the quality of counsel and effect of defense costs on federal death sentences, evidencing geographical disparity and correlation between higher levels of death sentences and lower levels of defense expenditure); *id.* at 344 (citing testimony of Scott Sundby that his research "led him to conclude that many defense attorneys in capital cases 'do just enough to get

*Decline of the Death Penalty*, 49 U. RICH. L. REV. 671, 687-88 (2015) ("Another reason for arbitrariness is the impossibility of measuring the mental state or level of intellectual functioning of a person accused of a capital crime.").

[62] Rebecca Covarrubias, *Lives in Defense Counsel's Hands: The Problems and Responsibilities of Defense Counsel Representing Mentally Ill or Mentally Retarded Capital Defendants*, 11 SCHOLAR: ST MARY'S LAW REVIEW ON MINORITY ISSUES 413, 416 (2009); DPIC, Death Row Inmates by State and Size of Death Row by Year, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year?scid=9&did=188#year

[63] *Id.* at 440 (noting that mentally ill defendants often mask their symptoms because of the enduring stigma associated with mental illness; counsel often fail to recognize their clients' mental health problems; and lack of funding, before and after conviction, often precludes thorough mental health examinations). *See also* Robert J. Smith, *Forgetting Furman*, 100 IOWA L. REV. 1149, 1153 (2015) ("Juvenile offenders and the intellectually disabled are categorically exempt from capital punishment due to their insufficient culpability; yet, most of the last hundred people executed in America possessed functional impairments that rivaled or outpaced those endured by the typical adolescent or intellectually disabled person.").

their client executed.'"). This is far from rare. *See* Cory Isaacson, *How Resource Disparity Makes the Death Penalty Unconstitutional: An Eighth Amendment Argument Against Structurally Imbalanced Capital Trials*, 17 Berkeley J. Crim. L. 297, 300 (2012) ("An inadequately resourced defense, when pitted against a much better resourced prosecution, yields distorted capital trials and a consequential risk of arbitrary sentencing outcomes."); *Commonwealth v. McGarrell*, 87 A.3d 809, 810 (Pa. 2014) (Saylor, J., dissenting, with Todd, J., and McCaffery, J., joining) ("During my tenure on the Court I have been dismayed by the deficient performance of defense counsel in numerous Pennsylvania death-penalty cases."). Lack of resources and lack of quality counsel are still endemic in capital proceedings.

Notwithstanding the Supreme Court's efforts, the fact remains we have achieved nothing close to the consistency the Constitution requires. *See Glossip*, 135 S. Ct. at 2760 (Breyer, J., dissenting) ("Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, *i.e.*, without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands."). Unacceptable levels of arbitrariness persist, and the problem appears to be growing, not abating.

189

### 3.    The death penalty causes excessive delays and results in cruel conditions of confinement

There can be no question that delay and the attendant uncertainty as to when the execution may come is cruel[64] and otherwise diminishes the utility of the punishment.[65] Yet these delays, often in excess of twenty years[66] ultimately produce an extraordinarily high rate of reversal in capital cases.

In *Fell*, the court agreed with evidence demonstrating that excessive delay between conviction and execution, along with the extreme rarity of executions, and especially the appalling effects of solitary confinement, raised substantial Eighth Amendment concerns. With respect to excessive delay, the court recognized that "the process was choked with delay . . . in virtually all cases brought under the FDPA," but that the reasons for delay are generally a result of the painstaking process required of death penalty cases. 224 F.Supp.3d at 345.

The *Fell* court was more troubled by the evidence of severe psychological harm caused by solitary confinement of federal death row prisoners. The evidence heard by the court focused on USP-Terre Haute, where Mr. Purkey is incarcerated,

---

[64] *In re Medley*, 134 U.S. 160, 172 (1890) ("Nor can we withhold our conviction of the proposition that when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it . . . as to the precise time when his execution shall take place.").

[65] *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., respecting denial of certiorari) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.")

[66] DPIC, Time on Death Row, http://www.deathpenaltyinfo.org/time-death-row

where isolation is particularly heightened by the manner in which prisoners are housed. Not only are death row inmates at Terre Haute confined to their cells in the Secure Housing Unit (SCU) for 23 out of every 24 hours, but the SCU is set up to minimize contact by prisoners with others. There is no view to the outside, and even the one-hour of exercise only permits a view of the sky. This severe isolation produces trauma, distress, high rates of depression, and social withdrawal. The psychological distress experienced by these prisoners is heightened by uncertainty about their fate. Of the 62 prisoners on federal death row, more than half, including Mr. Purkey, have been there over 10 years, and ten have been there 18 years or longer. *Id*. at 346-347 (citing testimony of Dr. Haney).

When over half of capital convictions suffer from a constitutional infirmity,[67] delay seems to be not only unavoidable, but indispensable. It is a system that forces a defendant to sacrifice one right in order to secure another, a conflict the Supreme Court has found to be unacceptable. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another").

---

[67] James S. Liebman, Jeffrey Fagan, & Valerie West, *A Broken System: Error Rates in Capital Cases 1973-1995*, COLUM. L. SCH., PUBLIC LAW RESEARCH PAPER NO. 15, 8-9 (2000), *available at* www2.law.columbia.edu/instructionalservices/liebman/ (fixing the overall error rate in capital cases between 1973 and 1995 at 68%); *Capital Punishment 1998*, U.S. Department of Justice Bureau of Justice Statistics, Dec. 1999, NCJ 179012, 12-13 (confirming results of Liebman study, finding that of all death sentences imposed in 1989, state and federal courts overturned 76% of the cases); *Whitmore v. Arkansas*, 495 U.S. 149, 170 (1990) (Marshall, J., dissenting) ("The high percentage of capital cases reversed on appeal vividly demonstrates that appellate review is an indispensable safeguard").

For all of the foregoing reasons, this Court should find that the FDPA is unconstitutional in violation of the Eighth Amendment.

**CLAIM 7:   The Eighth Amendment categorically prohibits a death sentence for people who, like Mr. Mr. Purkey, suffer from severe mental illness.**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of the mentally retarded. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). *See also Hall v. Florida*, 134 S.Ct. 1986 (2014) (substituting the term "intellectual disability"). The Court's rationale in *Atkins* applies with equal force to persons with severe mental illness.

**A.     Infliction of capital punishment upon individuals who were severely mentally ill at the time of the offense makes no measurable contribution to the acceptable goals of punishment.**

*Gregg v. Georgia*, 428 U.S. 153, 183 (1976), set out two purposes for the death penalty: retribution and deterrence. "Unless the imposition of the death penalty . . . 'measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment.'" *Atkins v. Virginia*, 536 U.S. 304, 319 (2002), citing *Enmund v. Florida*, 458 U.S. 782, 798 (1982).

The Court's reasoning in *Atkins* dictates that capital punishment inflicted on individuals who were mentally ill at the time of the offense is nothing more than

the purposeless and needless imposition of pain and suffering. It makes no measurable contribution to the acceptable goals of punishment and fails to serve any legitimate penal purpose more effectively than a less severe penalty. *See* American Bar Association Recommendation 122A, adopted by the House of Delegates on August 7-8, 2006. *Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (2006) (specifically listing schizophrenia, psychotic disorders, and major depressive disorder as illnesses which, along with "significant impairment" ought to exclude a person from execution). Because there is no legitimate penological objective in executing a person with severe mental illness, like Mr. Purkey, his death sentence is cruel and unusual in violation of the Eighth Amendment.

Intellectually disabled people are less culpable because of their "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318. Children are less culpable because of their lack of maturity, natural recklessness, susceptibility to peer pressure, and less static character. *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

People with severe mental illness share extremely similar qualities. Offenders with the most serious, "Axis I" diagnoses commonly have "delusions

(fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory and perception of the environment." ABA Recommendation Number 122A at 670. In summary, they have problems perceiving the world correctly and responding appropriately.

> Punishing people with severe mental illness does not further the retributive goals of the punishment because this population simply does not have the requisite moral culpability as their illness can impair their ability to interpret reality accurately, to comprehend fully the consequences of their actions, and to control their actions.

American Bar Association Death Penalty Due Process Review Project White Paper, *Severe Mental Illness and the Death Penalty*, 25, (2016) (hereinafter "ABA *Severe Mental Illness*").

With regard to deterrence, the *Atkins* Court found that the same cognitive and behavioral impairments that make intellectually disabled people less personally culpable also did not measurably further the goal of deterrence. 536 U.S. at 320. The same applies to the severely mentally ill. Moreover, as the *Roper* Court said—precisely because of their diminished culpability—the likelihood that such a person "'has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent.'" *Roper*, 543 U.S. at 572.

In *Atkins*, the Court stated that "[t]he risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty' . . . is enhanced," in part, "by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation…." *Atkins*, 536 U.S. at 320 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). "Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins*, 536 U.S. at 320.

Moreover, intellectual disability as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be considered a future danger by the jury. *Id.* at 321. This concern also applies to mentally ill defendants:

> Juries and judges, like people generally, harbor hostile attitudes toward people with mental disability. Numerous studies document that capital sentencing juries tend to devalue evidence of significant mental disorder, often treating it as an aggravating circumstance rather than a mitigating one. And prosecutors routinely play to this bias.

Christopher Slobogin, *Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations*, 54 Cath. U. L. Rev. 1133, 1150-51 (2005); *see also* John Parry, *The Death Penalty and Persons with Mental Disabilities:  A Lethal Dose of Stigma, Sanism, Fear of Violence, and Faulty Predictions of Dangerousness*, 29 Mental & Physical Disability L. Rep. 667, 667

& n.7 (2005) (criticizing the "misconception that persons with mental illness are inherently violent and are generally dangerous to themselves or others") (citing John Monahan & Jean Arnold, *Violence by People with Mental Illness: A Consensus Statement by Advocates and Researchers*, 19 Psychiatric Rehabilitation J. 67 (1996); Patrick W. Corrigan *et al.*, *Implications of Educating the Public on Mental Illness, Violence, and Stigma*, 55 Psychiatric Services 577 (2004); John Junginger & Lynanne McGuire, *Psychotic Motivation and the Paradox of Current Research on Serious Mental Illness and Rates of Violence*, 30 Schizophrenia Bull. 21 (2004)). See ABA *Severe Mental Illness* at 15, 17 (noting the prevalence of bias against the mentally ill in the criminal justice system and the general criminalization of mental illness).

The Supreme Court has noted that a state may not attach the aggravating label "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The Court cited *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979). The risk that a jury will treat evidence of mental illness as an aggravating factor based on a misunderstanding of future dangerousness, due

process, and the Eighth Amendment requires that such decisions be removed from the purview of the jury.

## B. There is a national consensus against executing the mentally ill.

Taken together, *Atkins* and *Roper* stand for the idea that there is a broad trend against executing people who, because of something about themselves they did not cause and cannot change, are less culpable for their crimes, which, logically, must include the mentally ill.

### 1. Our refusal to execute intellectually disabled people and children logically shows a consensus against executing the severely mentally ill.

In addition to focusing on conditions that render a person less culpable and less amenable to deterrence, *Atkins* and *Roper* had another thing in common—both focused on characteristics that people have no control over and cannot change. While *Atkins* did not set out a specific definition for intellectual disability, it suggested "subaverage intellectual functioning" and adaptive deficits that manifest before age 18 as reasonable benchmarks. 536 U.S. at 318. Those benchmarks recognize that intellectual disability is a condition people do not choose to have and cannot change. Age is a result of the number of years since a person was born. It is a number people do not choose and cannot change.

Neither does a person choose to have a mental illness. *See* ABA *Severe Mental Illness* at 26 ("People with mental illness did not choose their condition").

In that respect, in addition to lowered culpability and unamenability to deterrence, there is no distinction between mental illness and intellectual disability or age.

Underlying both *Atkins* and *Roper* is the idea that the condition that lowers culpability and renders one unamenable to deterrence is a condition that the person did not choose. As such, both decisions should be considered together as establishing a consensus against executing people who likewise have lowered culpability and unamenability to deterrence. Those with mental illness also fit in that category, and, thus, by extension, there is a broad national consensus against their execution.

### 2. There is a consensus specifically against executing the mentally ill.

In finding that there was no national consensus against executing the mentally ill, *Kleypas* and *Kahler* focused on the fact that no state had yet passed legislation barring the practice. *Kahler*, 410 P.3d at 128-30; *Kleypas*, 305 Kan. at 332-35. But *Hall v. Florida*, 134 S.Ct. at 1996-99, makes it clear that this is not the correct approach to consensus.

In *Hall v. Florida*, the Supreme Court considered whether a strict IQ cutoff of 70 was tolerable under *Atkins*. *Hall*, 134 S.Ct. at 1990. In looking at legislative consensus against a strict cutoff, however, the court found that all of the states that have abolished the death penalty entirely counted against the practice. *Id*. at 1997 ("In those States, of course, a person in Hall's position could not be executed [at

198

all].”), *citing Roper*, 543 U.S. at 574 (“[The] Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty”.) *Hall* also included in the calculus of national consensus states that still have the death penalty but do not carry out executions. *Id*.

Currently, the federal government and 29 states legally authorize the death penalty,[68] but its infrequency in practice tells a larger story. Although the federal government recently scheduled five executions, it has not carried out any executions since 2003,[69] and the military authorities have not since 1961.[70] Ten current or former death penalty states have not executed anyone during the last ten years: California, Colorado, Kansas, Kentucky, Montana, Nevada, New Hampshire, Oregon, Pennsylvania, and Wyoming.[71] Four more have carried out only one execution in the last ten years: Indiana, Louisiana, Nebraska, and Utah (and in one of these cases, Louisiana, the prisoner abandoned his appeal).[72] visited May 8, 2018). Thus, only 18 states and the federal government realistically permit a mentally ill person to be executed.

---

[68] *Id.*

[69] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[70] DPIC, The U.S. Military Death Penalty, http://www.deathpenaltyinfo.org/us-military-death-penalty

[71] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[72] *Id.*

At least eight states have proposed legislation in the past three years that would bar the death penalty for the severely mentally ill. Thus, even though no state has passed a bill, yet, about two-thirds of the fifty states do not execute the mentally ill, and of those remaining, almost half are considering change. See H.B. 136, 133rd Gen. Assem. (Ohio 2019); S.B. 1137, Gen. Assem. (Va. 2019); H.B. 1123, 93rd Gen. Assem. (S.D. 2018); S.B. 107, 2018 Gen. Assem. (Ky. 2018); S.B. 0378, 2018 Gen. Assem. (Tn. 2018); H.B. 3080 2018 Leg. (Tx. 2017); S.B. 155, 2017 Gen. Assem. (Ind. 2017); H.B. 2170 91st Gen. Assem. (Ark. 2017); S.B. DRS35276-MM-69-E, 2017 Gen. Assem. (N.C. 2017).

"Consensus is not dispositive" (see *Kennedy v. Louisiana*, 554 U.S. 407, 421 [2008]), but rather, it is "the consistency of the direction of change" that is significant. *Atkins*, 536 U.S. at 315.

For all of the foregoing reasons, this Court should find that executing the mentally ill is a categorically disproportionate punishment barred by the Eighth Amendment.

**CLAIM 8:** **Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true.**

Except for his pre-indictment statements and his motion to suppress testimony affirming his pre-indictment statements, Mr. Purkey has consistently maintained that he did not kidnap Jennifer Long – she voluntarily went with him from Kansas City, Missouri, to his home in Lansing, Kansas. From the beginning of the case, Mr. Purkey told his lead trial attorney, Fred Duchardt, that he did not kidnap Jennifer Long. Supp.Tr. at 3-5. Mr. Purkey also told other people, including government witnesses Michael Speakman and Dr. Park Dietz, and defense expert witness Dr. Peterson, well before trial that he did not kidnap Jennifer Long.

Accordingly, Mr. Purkey's trial defense was that because Jennifer Long voluntarily went with Mr. Purkey and he did not kidnap her, no federal jurisdiction existed. Federal courts recognize this defense because, in order to secure a conviction for the federal offense of kidnapping, the government must prove that the victim was *involuntarily* transported in interstate commerce. *See United States v. Hernandez-Orozco*, 151 F.3d 866, 869 (8th Cir. 1998); *United States v. Wright*, 340 F.3d 724, 730-31 (8th Cir. 2003).

Unfortunately for Mr. Purkey, trial counsel committed several acts that contradicted the defense, and failed to present known facts or take actions that supported it. Some of these specific actions (or inactions) occurred during the hearing on Mr. Purkey's motion to suppress his inculpatory pre-indictment statements made to law enforcement. The basis of the motion to suppress was that

Mr. Purkey's statements were involuntary because he made them in exchange for the promise of a federal life sentence, a promise on which the government later reneged.[73] Prior to Mr. Purkey's indictment (and prior to appointment of counsel on the federal case), Mr. Purkey made statements to Agent Tarpley and Detective Howard indicating that he took Jennifer Long against her will from an area in Kansas City, Missouri, to his home in Lansing, Kansas, where he raped and killed her. Mr. Purkey contended that although he in fact *did not* take Jennifer Long against her will, he nonetheless told the agents he did so in the hope of securing a life sentence in federal prison instead of the Kansas Department of Corrections.

During the suppression hearing, the court ruled that the government could question Mr. Purkey about the substance of the criminal allegation for purposes of that hearing. The court made this ruling because it found that Mr. Purkey had placed at issue his recollection regarding what transpired during his meetings with Agent Tarpley and Detective Howard, the meetings during which Mr. Purkey claimed that law enforcement made the promise of a life sentence.[74] However,

---

[73] FBI Agent Tarpley and Wyandotte County Detective Howard did not record their interviews of Mr. Purkey.

[74] On direct examination during the motion to suppress testimony, Mr. Purkey testified that after each meeting with Agent Tarpley and Detective Howard, he went back to his jail cell and made notes about the substance of their conversation, including the details of what he believed was a promise for a life sentence in federal court. He testified that he kept those notes as part of the legal materials kept in his jail cell at the federal pretrial detention facility, Community Corrections of America (CCA), in Leavenworth, Kansas. Mr. Purkey testified that his notes were the best evidence of what transpired during the conversations, but that his notes were destroyed

when the government elicited cross-examination testimony from Mr. Purkey

endorsing the truth of his pre-indictment written statement indicating that he

kidnapped Jennifer Long, Mr. Duchardt failed to object or direct his client not to

answer. The written statement, dated December 17, 1998, was a handwritten

confession to the interstate kidnapping of Jennifer Long, and the cross-examination

exchange was particularly damaging because of Mr. Purkey's endorsement:

Q:  Is that the document – or a copy of the document you wrote out?

A:  Yes.

Q:  You signed that on the back page. Is that right?

A:  That's correct.

Q:  Dated it 12/17/98?

A:  That's correct.

Q:  And then it was witnessed by Agent Tarpley and Detective

Howard?

A:  That's correct.

Q:  And did you write that down in your own handwriting?

A:  Yes, I did.

Q:  And did you tell the truth when you wrote this?

---

by CCA staff during a shakedown of his jail cell.  Mr. Purkey testified that because his notes
were destroyed and discarded, his best recollection of what transpired during his interviews with
Tarpley and Howard was lost.

A:  Yes, I did.

Q:  And that is a confession to the kidnapping, rape and murder of this young lady, correct?

A.  That's correct.

Supp.Tr. at 59.

After Mr. Purkey endorsed the truth of his prior written statement, Mr.

Duchardt recognized that the endorsement would have damaging consequences at

trial. Mr. Duchardt stated:

> Let me explain my concern, Judge, and maybe we can end run my concerns with a concession by the Government.  What I don't want to hear come time of trial, if, for the sake of argument, that the Court would overrule our motion and that Judge Gaitan would affirm the ruling, is that Mr. Purkey has separately in these proceedings affirmed the content of admissions that are purportedly in these documents at a separate hearing that was conducted at this time.  If that is not the Government's intentions, I won't have a problem with Mr. Whitworth asking any of these questions of Mr. Purkey.

Supp.Tr. at 62.

> With all due respect, I think what's happening is that, what the Government wishes to do, is have Mr. Purkey reaffirm the statements that were made to the officers for potential use at the time of trial.  I am objecting to that and I am specifically directing Mr. Purkey not to answer because, quite honestly, that's the only purpose behind this questioning.

Supp.Tr. at 64. Mr. Duchardt's objection, however, came too late to prevent Mr.

Purkey's damaging endorsement.

The government admitted that they intended to use Mr. Purkey's admissions

made during the hearing against him at trial. The suppression court indicated that

204

"what happens down the line to this testimony is, I think, totally outside this Court's purview, and some other court then, would have to decide how that testimony can be used [.]"  Supp.Tr. at 71.[75]

Despite the government's stated intent to use Mr. Purkey's endorsements made during the hearing against him at trial, Mr. Duchardt did not rehabilitate Mr. Purkey on redirect examination by asking him to clarify his testimony regarding the admission and endorsements. Supp. Tr. at 89. Even though Mr. Duchardt knew that (1) from the beginning of the case, Mr. Purkey disavowed the kidnapping, (2) the reason Mr. Purkey lied to investigators regarding the kidnapping was to secure a federal life sentence, and (3) Mr. Purkey's endorsements during the motion to suppress could devastate the defense. Mr. Duchardt's only question on redirect concerned the reason why Mr. Purkey did not ask for counsel during the interrogations. Supp.Tr. at 89-90.

Similarly, despite knowing that the motion court had not made any rulings regarding the admissibility of Mr. Purkey's suppression testimony at trial and despite concerns that the government would try to use the motion to suppress testimony at trial, Mr. Duchardt failed to take any action prior to trial to exclude the motion to suppress statements.

---

[75] United States Magistrate Judge Sarah Hays conducted the hearing on the motion to suppress, but rulings regarding the admissibility of evidence at trial would have been ultimately made by the trial judge, United States District Court Judge Fernando Gaitan.

As Mr. Duchardt feared, the government did in fact use Mr. Purkey's suppression testimony against him during trial. The government first used Mr. Purkey's testimony to impeach his direct examination testimony that he did not kidnap Jennifer Long:

> Q:  Now, all throughout December in the four times you met with the agents you said you had kidnapped Jennifer Long, right?
>
> A:  Right.
>
> Q:  You wrote it down on paper in the note you sent and in the written confession that you wrote out yourself, that you had kidnapped Jennifer Long?
>
> A.  Right.
>
> Q:  And you even testified under oath on October 25, 2002, that that was true, that you had kidnapped Jennifer Long, right?
>
> A:  Right.
>
> Q:  And now you want this jury to believe that you never kidnapped her; is that your testimony?
>
> A:  That is my testimony.

Trial Tr. at 1035.

Trial counsel did not object to the use of the suppression testimony in this manner.  On redirect, co-counsel Laura O'Sullivan did try to rehabilitate Mr. Purkey's testimony by attempting to clarify that his motion to suppress answers were not admissions to kidnapping but instead were merely acknowledgements

that he originally told Agent Tarpley and Detective Howard that he kidnapped

Jennifer Long in order to create a federal case:

REDIRECT EXAMINATION BY MS. O'SULLIVAN

Q:  Mr. Purkey, in October of 2002, the testimony that Mr. Whitworth was asking you about, you weren't asked whether or not – let me put it to you this way:  The question was whether that was a confession to kidnapping, rape and murder of the young lady, right?

A.  That's right.

Q:  And in the written statement, that is what the written statement said, right?

A:  That's true.

Q:  And basically most of the questions you were talking about had to do with the deal that you had with the police, is that fair?

A:  That's a fair statement.

Q:  And there's no doubt that you lied to the police when you said that you kidnapped Jennifer Long, right?

A:  No doubt at all.

Q:  Because what would happen – what was your understanding of what would happen if you told the truth and told that there was no kidnapping?

A:  If I did that, it would have turned into a state jurisdiction case.

Q:  And that would have been what state?

A:  Kansas.

Trial Tr. at 1035-1036.  However, these questions did not address Mr. Purkey's

reason for his suppression testimony.

207

On re-cross, the government again sought to use Mr. Purkey's admission from the suppression hearing against him.  The government specifically confronted Mr. Purkey with the transcript of his testimony from the motion to suppress hearing:

> Q:  (By Mr. Whitworth) Are you with me on line 19?
>
> A:  Uh-huh.
>
> Q:  And I asked you the question, "And did you tell the truth when you wrote this?  And you responded, "Yes, I did."
>
> A:  That's what I responded.

App. 149 at 1977. Again, Ms. O'Sullivan did not ask Mr. Purkey *why* he endorsed the December 17, 1998, statement as the truth during the motion to suppress hearing.

The government also used Mr. Purkey's suppression testimony during closing arguments to undermine his trial defense that he did not kidnap Jennifer Long.  Moreover, the government argued that Mr. Purkey's claim that he did not kidnap Jennifer Long was a recent fabrication made to avoid the death penalty:

> The guy even testified in federal court on October 25, 2001, under oath, that everything that he had said about the kidnapping was the truth.  Now, what could possibly be better evidence than that?  All right.  Do you follow me?
>
> Now, the defendant created this new story because he knew the only way he could get out of this is if he could try to convince a jury that there was no federal jurisdiction.  But, you know, it's too late because he put everything on paper.  He testified to it.

Trial Tr. at 1129-1130.

Even though he was aware of evidence indicating that Mr. Purkey's recantation of the kidnapping was not recent, Mr. Duchardt did not offer such evidence to refute the government's claim of recent fabrication. As a result of Mr. Duchardt's failure to elicit this evidence, the jury did not hear any evidence other than Mr. Purkey's trial testimony suggesting that Mr. Purkey in fact did not kidnap Jennifer Long.

Trial counsel's failure to prevent the jury from hearing Mr. Purkey's suppression hearing endorsement or otherwise explain it violated Mr. Purkey's rights to counsel, protection from self-incrimination, due process, and freedom from cruel and unusual punishment. Counsel knew that Mr. Purkey's motion to suppress testimony could eviscerate the defense, but counsel nonetheless failed to take reasonable steps to prevent the use of the suppression testimony at trial or mitigate the damage of its use. Because of these failures, the government was able to impeach Mr. Purkey with the admission made under oath during the suppression hearing, argue that Mr. Purkey's sworn admission was consistent with his prior written statements, argue that Mr. Purkey's admission was proof that he in fact took Jennifer Long against her will, and convince the jury to convict and recommend a sentence of death.

Mr. Purkey's trial defense was in such conflict with his motion to suppress testimony that it begs two important questions:  (1) why would Mr. Purkey endorse as the truth his prior written statement that he kidnapped Jennifer Long, when he told his trial counsel from the beginning that he did not kidnap Jennifer Long, and (2) knowing that the government had obtained this suppression testimony and intended to use it to establish Mr. Purkey's guilt, why would counsel fail to employ available methods of excluding the suppression testimony at trial?

As to the first question, Mr. Purkey contends that he endorsed his written statement as the truth during the motion to suppress hearing based on Mr. Duchardt's advice, given to him just prior to his motion to suppress testimony, to maintain his previous story in order to preserve the chance of a plea offer for a life sentence.  Mr. Purkey understood Mr. Duchardt to mean that the best chance of securing a life-sentence plea offer was to be cooperative and persist in original statements made to law enforcement that he kidnapped Jennifer Long.  Mr. Purkey followed the advice and perpetuated the truthfulness of his prior statements. However, the government denied ever contemplating such a plea offer, and the government never did extend such an offer.

As to the second question, the only plausible answer is that trial counsel failed to investigate and request enforcement of the law barring the use of suppression statements in this manner.  Clearly established federal law prohibits

the use of a defendant's suppression testimony to establish guilt: "[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Thus, although trial counsel could have prevented the government from using Mr. Purkey's suppression testimony at trial, counsel instead – by failing to object – *ensured* that the jury would hear the suppression testimony.

Counsel's performance regarding the suppression hearing constituted ineffective assistance of counsel. A violation of the defendant's Sixth Amendment rights occurs when (1) trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 – 94 (1984). Trial counsel have a duty to investigate both the law and facts relevant to the case. *Strickland,* 466 U.S. at 690 -91. Choices "resulting from lack of diligence in preparation and investigation [are] not protected by [a] presumption in favor of counsel. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991); *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003)("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision. Rather, a

reviewing court must consider the reasonableness of the investigation said to support that strategy" (citing *Strickland*, 466 U.S. at 691)). Attorneys also have a duty to be ethical. *See Strickland* at 688 (basing analysis on "prevailing professional norms" of practice as reflected in the American Bar Association Standard and the like as guides to determining what is reasonable); ABA Standards for Criminal Justice 4-4.1(b)(4th ed. 2015)("[I]n any case a lawyer should always read and comply with the rules of professional conduct and other authorities that are binding in the specific jurisdiction or matter, including choice of law principles that may regulate the lawyer's ethical conduct").

To establish prejudice, a petitioner need only demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694.

Under the circumstances of this case, reasonable counsel would not have advised Mr. Purkey – who was in the process of challenging the voluntariness of his prior statement – to admit that the prior statement was in fact true. Any purported belief that such testimony would further plea negotiations was unreasonable in light of the fact that the government had not shown any willingness to forego the death penalty in exchange for a guilty plea. In fact,

during the suppression hearing, the government explicitly disputed Mr. Purkey's claim that it previously had made such an offer.

Moreover, any advice suggesting that Mr. Purkey perpetuate what he insisted to be a lie would have been a violation of the Missouri Rules of Professional Conduct. The rules in effect at the time prescribed that a lawyer shall not: (1) counsel or assist a witness to testify falsely; (2) knowingly offer evidence the lawyer knows to be false; or (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentations, or engage in conduct that is prejudicial to the administration of justice. *See* MO. SUP. CT. R. 4-3.3(a)(3)(b)(a lawyer shall not knowingly fail to disclose a material act necessary to avoid assisting a fraudulent act by the client), 4-3.3(a)(3)(a lawyer shall not offer evidence the lawyer knows to be false); 4-3.4(b)(a lawyer shall not counsel or assist a witness to testify falsely); 4-8.4(c)(a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and 4-8.4(d)(a lawyer shall not engage in conduct prejudicial to the administration of justice)(1986). Violations of these rules in the context of advising witnesses to testify falsely results in disbarment. *See e.g. In re Ver Dught*, 825 S.W.2d 847, 851 (Mo. banc 1992) (attorney advice to lie about status of marriage in administrative hearing, and asking questions eliciting answers he knew to be false, violated Missouri Rules of Professional Conduct, even though status of marriage was not material to administrative determination, resulting in

disbarment for six months); *In re Storment*, 873 S.W.2d 227, 230 (Mo. banc 1994) (disbarment is appropriate because lawyer with intent to deceive advised a witness to make a false statement, submitted a false document and withheld material information causing a serious injury to a party with a significant adverse effect on the legal proceeding); *In re Krigel*, 480 S.W.2d 294, 299 (Mo. banc 2016) (attorney eliciting testimony while technically truthful, but misleading through omission violated ethical rule that lawyer shall not knowingly offer evidence the lawyer knows to be false resulting in disbarment for six months and two years' probation). A reasonably competent attorney would not intentionally violate ethical rules.

Regardless of whether Mr. Duchardt's plan was for Mr. Purkey to testify falsely at the suppression hearing, a reasonably competent attorney would have investigated the law regarding the use of defendant's suppression testimony as evidence of guilty and recognized that the law prohibits such use (assuming the defendant objects to it). *Simmons,* 390 U.S. at 394. In *Armstrong v. Kemna*, the Eighth Circuit considered a similar failure-to-investigate-applicable-law questions. 534 F.3d 857, 865 (8th Cir. 2008). Part of the defense in Armstrong involved the testimony of three out-of-state witnesses. *Id.* at 859, 861, 865. The law relevant to subpoenaing out-of-state witnesses provided a mechanism for counsel to subpoena effectively the out-of-state witnesses. *Id.* at 863. However, because defense

counsel failed to investigate adequately the law relevant to subpoenaing out-of-state witnesses, counsel decided not to subpoena the out-of-state witnesses. *Id.* at 865. Thus, the testimonies of the witnesses were not included as part of the defense. *Id.* at 861-62.

The court concluded that counsel failed to investigate the law relevant to the defense: "Evaluating the reasonableness of trial counsel's conduct from her perspective before and during the trial, we cannot say trial counsel satisfied her duty to investigate thoroughly and diligently the law relevant to subpoenaing the out-of-state witnesses." *Id.* at 863. Given trial counsel's familiarity with Missouri's out-of-state witness procedures, awareness of some similar procedure in the other state in question, and the importance of the witnesses to the defense, the court found that a reasonably competent attorney would have researched the law and determined that it provided trial counsel the ability to subpoena the out-of-state witnesses. *Id.* at 863.

In the present case, defense counsel knew that the government intended to use the suppression hearing testimony against Mr. Purkey. Defense counsel further knew that whether Jennifer Long voluntarily went with Mr. Purkey was the central issue of the defense and therefore the importance to the defense of preventing the jury from hearing the suppression testimony endorsement. However, defense counsel failed to investigate the applicable law regarding the use of defendant's

215

suppression testimony. Had defense counsel done so, counsel could have prevented the jury from considering the suppression testimony evidence as evidence of guilt. *Simmons*, 390 U.S. at 394. Under the circumstances of the case, a reasonably competent attorney would have researched the law relevant to the central issue of the defense and prevented the government from using the suppression testimony to establish the disputed element of the crime. As in Armstrong, this failure to investigate constituted deficient performance under *Strickland*.

Mr. Duchardt's advice in this case, combined with his failure to investigate the law regarding the admission of Mr. Purkey's suppression testimony at trial, fundamentally discredited the trial defense. Having Mr. Purkey go along with his original statements in order to preserve the hope of a presently non-existent life-sentence plea offer was not reasonable, and once the government obtained the suppression statement and made clear that it intended to use the testimony against Mr. Purkey at trial, counsel's failure to rely on applicable law preventing the government's use of the testimony at trial was egregiously unreasonable. *See Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) (an attorney's ignorance of the law that is fundamental to his case and failure to perform basic research on the point is quintessentially unreasonable performance under *Strickland*).

In the event the evidence nonetheless came in during trial, reasonably competent counsel at least would have asked Mr. Purkey to explain why he

testified inconsistently at the suppression hearing.  Furthermore, given that counsel possessed evidence indicating that Mr. Purkey's disavowal of his pre-indictment statements was not new, reasonably competent counsel would have presented such evidence and prevented the government from arguing that the disavowal was not a "new story."  Because of counsel's failures, the jury heard that Mr. Purkey admitted the central element of his defense but did not hear the reason for his inconsistent testimony – that his trial counsel advised him to perpetuate the truthfulness of his written statements in order to optimize the chance of a life-sentence plea offer.  Moreover, the jury had no reason to believe that Mr. Purkey's disavowal was not a "new story" concocted for the purpose of the trial. Particularly because trial counsel's deficient performance related to the central issue in the case, the deficient performance prejudiced Mr. Purkey.

Courts have described confessions as "the most compelling possible evidence of guilt . . ." *Miranda v. Arizona*, 384 U.S. 436, 466 (1966)(quoting *Mapp v. Ohio*, 367 U.S. 643, 685 (1961)(Harlan, J., dissenting)).  As explained above, defense counsel could have prevented the jury from hearing Mr. Purkey's suppression testimony confession at all.  However, because of trial counsel's deficient performance, the government was able to argue to the jury that (1) Mr. Purkey's admission made under oath at the motion to suppress hearing that his pre-indictment confession was in fact true and (2) his trial testimony was a recent

recantation of the kidnapping made to avoid the death penalty. Given that the only evidence establishing how Jennifer Long got from Missouri to Kansas came from Mr. Purkey's statements, a reasonable probability exists that had the jury not heard Mr. Purkey's endorsement of his initial confession or at least heard the explanation for the endorsement, at least one juror would have assessed differently whether a reasonable doubt existed as to whether Jennifer Long voluntarily went with Mr. Purkey.

Either Mr. Duchardt's advice or his failure to investigate the law regarding the admission of Mr. Purkey's suppression testimony at trial, or the combination of these two errors, constituted ineffective assistance of counsel and rendered Mr. Purkey's trial fundamentally unfair. Section 2255 counsel's failure to present this substantial claim of ineffective assistance of counsel in Mr. Purkey's federal post-conviction proceedings establishes cause for the procedural default of the issue under the *Martinez-Trevino* doctrine, and entitles Mr. Purkey to present his new claim in this § 2241 petition. *Webster v. Daniels*, 784 F.3d 1123, 1124-25 (7th Cir. 2015); *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017); *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015).

## REQUEST FOR RELIEF

For all of the foregoing reasons, and based upon the full record of this matter, Petitioner requests that the Court provide the following relief:

1. That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

2. That leave to amend this Petition, if necessary, be granted;

3. That Respondents be Ordered to respond to this Petition;

4. That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

5. That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

6. That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

/s/Michelle M. Law*
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
michelle_law@fd.org
* to be admitted pro hac vice

Counsel for Petitioner