# LOGAN & PETERSON, P.C.

Forensic, Adolescent, and Adult Psychiatry

911 MAIN, SUITE 2330

KANSAS CITY, MISSOURI 64105-2009

(816) 842-2500

FAX (816) 842-9980

WILLIAM S. LOGAN, M.D.
STEPHEN E. PETERSON, M.D.

KANSAS OFFICE

4117 S. WOODBURY
TOPEKA, KS 66606-2147

## DIAGNOSTIC INTERVIEW REPORT

### Wesley Purkey
### 92-CR-2202

**INTRODUCTION AND PURPOSE:**
Mr. Wesley Ira Purkey is a 48-year-old ██████ ███████ married, Leavenworth, Kansas resident. He was charged with one count First Degree Murder in Wyandotte County Kansas for the October 28, 1998 bludgeoning death of 80-year-old Mary Ruth Bales (DOB: 4/14/26).

On August 17, 1999, Aline Pryor, defense attorney for Mr. Purkey, requested psychiatric evaluation for her client. The evaluation was to focus on presence or absence of mental disease at the time of the charge offense, and whether Mr. Purkey had the requisite state of mind. Attorney Pryor gathered numerous records for review. In February 2000, John M. Duma, took over the representation of Mr. Purkey. Attorney Duma forwarded additional information for review. Mr. Duma requested that this evaluation address issues relevant to sentencing such as mitigation, required mental state, and diagnosis.

**DESCRIPTION OF THE EVALUATION:**
Mr. Wesley I. Purkey was psychiatrically evaluated at the Wyandotte County Jail. This evaluation consisted of 9.0 hours of face-to-face psychiatric assessment, plus the completion of three paper-and-pencil psychologic tests (PAI-2, Shipley Institute of Living Scale, and MMPI-2). The interview sessions were divided in to 3.0 hours on December 7, 1999, 3.75 hours on March 15, 2000, and 2.25 hours on March 17, 2000. Mr. Purkey completed the PAI-2 and Shipley Institute of Living Scale on December 7, 1999. He completed the MMPI-2 on March 15, 2000.

Throughout, Mr. Purkey understood the usual doctor-patient relationship did not apply to this evaluation during a criminal court procedure. He had no questions about the lack of confidentiality, understanding that we would meet two or three times, that numerous records would be considered, that law enforcement records would be considered, and that anything learned during the evaluation would be communicated directly to his attorney. He also understood that if a report was generated, anything learned during the evaluation could be recorded in this report, the report could be reviewed by the prosecuting attorney, and any aspect of the evaluation information could be discussed in open court.

Mr. Purkey also understood he could refuse to answer any question with prejudice. Questions about the evaluation were welcomed at any time. Mr. Purkey was encouraged to speak with his attorney at any time.

000428

Diagnostic Interview Report
Wesley Purkey
Page 2


The records reviewed during this psychiatric evaluation are listed in the
Index of Material.  A selected review of material is included in the report.
Due to the large number of psychiatric and law enforcement documents
regarding Mr. Purkey, additional records may be received after this report
and may be integrated into the overall opinion by way of selected addenda.


INDEX OF MATERIAL:
A.    Larned State Hospital (LSH) medical records –
1.    December 29, 1972 through February 4, 1999 Core History Update
      completed by George Strobel, LBSW.
2.    January 12, 1973 Summary of Hospitalization.
3.    May 4, 1973 Release Summary.
4.    February 1999 Medication/Treatment Record.
5.    February 4, 1999 Physical and Neurological Examination
6.    February 4, 1999 Integrated Psychiatric Intake Assessment.
7.    February 4 through March 24, 1999 Physicians Orders.
8.    February 5, 1999 Biophsychosocial Assessment completed by J.L.
      Fernando, MD-Team Leader.
9.    February 4 and March 11, 1999 Integrated Treatment Plans.
10.   March 5, 1999 Psychological Information record completed by Robert
      Huerter, LMLP.
11.   March 23, 1999 letter from Dara Johnson, MD to The Honorable R. Wayne
      Lampson and Forensic Evaluation Report completed by J.L.L. Fernando,
      MD.
B.    Kansas City, Kansas Police Department (KCK PD) records –
1.    October 28, 1998 (11:15) Offense Report completed by Officer S.W.
      Isaacson et al.
2.    October 28, 1998 (1145 hours) Investigative Addendum/Clearance
      Narrative completed by Lt. John Cosgrove.
3.    October 28, 1998 (1145 hours) Investigative Addendum/Clearance
      Narrative completed by Det. Howard.
4.    October 28, 1998 Investigative Addendum/Clearance Narrative completed
      by Det. R. Eskina.
5.    October 28, 1998 (1245 hours) Investigative Addendum/Clearance
      Narrative completed by Det. M. Shomin.
6.    October 28, 1998 Investigative Addendum/Clearance Narrative completed
      by Det. R. Eskina.
7.    October 28, 1998 (1344 hours) Witness Statement of Jessie Kueck.
8.    October 28, 1998 (1348 hours) Witness Statement of Betty Colston.
9.    October 28, 1998 Witness Statement of Phyllis Mallard.
10.   October 28, 1998 (1900 hours) Investigative Addendum/Clearance
      Narrative completed by Et. M. Shomin.
11.   October 28, 1998 (2300 hours) Investigative Addendum Clearance
      Narrative completed by Det. W.L. Howard.
12.   October 28, 1998 (2325 hours) KCK PD Consent to Search signed by
      Jeanette Purkey.
13.   October 28, 1998 Wyandotte County, Kansas Autopsy Report completed by
      Erik Krag Mitchell, MD.
14.   October 28, 1998 Regional Criminalistics Laboratory Physical evidence
      Inventory Report completed by Det. W.L. Howard, Jr.
15.   October 29, 1998 (0647 hours) Witness Statement of Jeanette Purkey.
16.   October 29, 1998 (1000 hours) Investigative Addendum/Clearance
      Narrative completed by Dr. W.L. Howard.
17.   October 29, 1998 (1025 hours) Interrogation:  Advice of Rights signed
      by Jeanette Purkey.
18.   October 29, 1998 (1029 hours) Suspect Statement of Jeanette Purkey

000429

Diagnostic Interview Report
Wesley Purkey
Page 3

19.   October 29, 1999 (1055 hours) Witness Statement of Tammy Sue Sanders.
20.   October 29, 1998 (1145 am) Miranda Warning signed by Claire Guida.
21.   October 29, 1998 (1145 am) Suspect Statement of Claire Guida.
22.   October 29, 1998 (1147 )Interrogation:  Advice of Rights signed by Wes Purkey.
23.   October 29, 1998 (12:00 pm) State of Kansas, Wyandotte County Affidavit for Application for Warrant signed by Det. Mike Shomin KCK PD.
24.   October 29, 1998 Witness Statement of Laura Holly.
25.   October 29, 1998 Metro Squad Investigation Report completed by Detectives R. Eskina and W. Howard.
26.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Wall and Eskina.
27.   October 29, 1998 Metro Squad Investigation Report completed  by Detectives M. Casson and J. Rollwagen.
28.   October 29, 1998 Metro Squad Investigation Report completed by Detectives B. Howard and D. Tennis.
29.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
30.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Thompson and Boyer.
31.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
32.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Eskina and Wall.
33.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Rollwagen and Casson.
34.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
35.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Boyer and Thompson.
36.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
37.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Casson and Rollwagen.
38.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
39.   October 29, 1998 Metro Squad Investigation Report completed by Det. Holbert.
40.   October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
41.   October 29, 1998 Property Reports (recovered from 956 S 75th, Dodge Aries, Trash Dumpster, 6500 Kaw Drive, 646 Tenny, 303 Montana Court, Leavenworth, KS, 16876 Michaels Road, Leavenworth, KS, etc.
42.   October 29, 1998 Platte County Sheriff's Department report completed by Deputy Luther Solomon.
43.   October 29, 1998 Leavenworth County Sheriff Department Investigative Report Assist Outside Agency completed by R.H. Ewert.
44.   Search Warrant signed by Thomas Boeding Judge of the District Court.
45.   October 30, 1998 (0645 hours) Crime Stoppers Greater Kansas City Fact Sheet.
46.   October 29, 1998 Property Reports, crime scene, trash dumpster, Super 8 Motel.
47.   October 30, 1998 (0745 hours) Leavenworth County Sheriff Department Investigative Report (5 pages).
48.   October 29, 1998 (1:27 am) State of Kansas, County of Wyandotte Affidavit for Search Warrant signed by Randy Eskina, Det. KCK PD.

000430

Diagnostic Interview Report
Wesley Purkey
Page 4

49.   October 29, 1998 1:27 am) District Court of Wyandotte County, Kansas
50.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Thompson and Boyer.
51.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Tennis and Howard.
52.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Bill Wall and Randy Eskina.
53.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Smith and Beger.
54.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Casson and Rollwagen.
55.   October 30, 1998 (1020 hours) Metro #268 Interrogation Advice of Rights
      signed by Tammie Sanders.
56.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Howard and Tennis.
57.   October 30, 1998 (1:03 pm) Affidavit for Search Warrant signed by
      Christopher I. Schneider, Assistant District Attorney.
58.   October 30, 1998 (1:04 pm) District Court of Wyandotte County, Kansas
      Search Warrant.
59.   October 30, 1998 State of Kansas, County of Wyandotte, Affidavit for
      Application for Warrant signed by Lt. John Cosgrove KCK PD.
60.   October 30, 1998 District court of Wyandotte County, Kansas Warrant
      (The State of Kansas to Any Sheriff of the State of Kansas).
61.   October 30, 1998 KCK PD  Arrest Reports for Wesley I. Purkey, Tammie
      Sanders, and Jeanette Purkey.
62.   October 30, 1998 (0944 hours) Lenexa, Kansas PD Consent to Search (773
      Miami, Leavenworth, Kansas).
63.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Berger and Smith.
64.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Howard and Eskina.
65.   October 30, 1998 Metro Squad Investigation Report completed by
      Detectives Casson and Rollwagen.
66.   October 31, 1998 (1102 hours) Suspect Statement of Wesley I. Purkey
      signed by Mr. Purkey.
67.   October 31, 1998 (re-initiated 1045 hours) Interrogation:  Advice of
      Rights signed by Wes Turkey.
68.   November 3, 1998 Synopsis of Crime.
69.   November 4, 1998 Field Investigation Report Identification Unit
      (Alandon Tow Lot) completed by Officer Stubler and Property Report
      (Dodge KS.LV.MCP297 (recovered cigarettes and baseball bat).
70.   November 10, 1998 Additional Information Prosecution Report (Request
      for Laboratory Analysis #1, #2, and Faxed Reports from Platte County
      Sheriff's Department #3).
71.   November 10, 1998 Regional Criminalistics Laboratory Report of Findings
      reported by Stephen C. Warlen Forensic Science Specialist.
C.    **Kansas Department of Corrections –**
1.    May 15, 1981 Kansas State Reception and Diagnostic Center Report of
      Clinical Evaluation completed by Karl K. Targownik, MD, FAPA, Clinical
      Director, KRDC.
2.    May 19, 1981 Kansas State Reception and Diagnostic Center Psychological
      Report completed by John Thomas, Psychologist.
3.    June 17, 1981 Kansas State Reception and Diagnostic Center Evaluation
      Summary completed by Charles R. Huddleston, MD.
4.    July 25, 1982 through October 20, 1993 Administrative Segregation
      Reports.

000431

Diagnostic Interview Report
Wesley Purkey
Page 5

5.  August 11, 1982, November 16, 1982, July 13, 1984, November 1984 Disciplinary Reports.
6.  January 8, 1985 and January 24, 1985 Disposition of Disciplinary Case reports.
7.  March 15, 1985 and April 4, 1985 Disposition of disciplinary Case reports.
8.  April 12, 1985, March 5, 1986, May 15, 1985, May 28, 1985, March 5, 1986, April 15, 1986 Disciplinary Reports.
9.  1990 through 1997 DOC emergency health services reports, progress notes, patient notes/physician orders.
10. March 6, 1991, July 7, 1991 July 23, 1991, Disposition of Disciplinary Case reports.
11. July 7, 1992 Summary Judgment Citation.
12. December 17, 1994 Disciplinary Report.
13. April 8, 1996 through November 21, 1996 DOC Mental Health Services Progress Notes.
D.  **Providence Medical Center –**
1.  September 16, 1998 Emergency room record completed by Glen D. Georger, MD, and Emergency room nursing assessment.
E.  **Heartspring (formerly Institute of Logopedics) –**
1.  August 13, 1982 Handwritten letter by Mr. Purkey to Institute of Logopedics (requesting speech evaluation).
2.  September 28, 1982 Cathy Schlaiker letter to Mr. Purkey (evaluation).
3.  October 10, 1982 Handwritten letter by Mr. Purkey to Cathy Schlaiker.
4.  August 31, 1982 Case History:  Adult Form completed by Mr. Purkey.
F.  **Wesley Medical Center received 12/14/99 –**
1.  August 29, 1969 Outpatient record (sutures removed).
2.  February 15, 1976 (1250) Outpatient record (overdose).
3.  February 15, 1976 Admit note (handwritten by Dr. Murray).
4.  February 15-17, 1976 Physical Exam-Progress Notes.
5.  February 15-25, 1976 laboratory reports, EKG.
6.  February 16-17, 1976 Nurses progress notes.
7.  February 16, 1976 Report of Consultation (handwritten).
8.  February 17-25, 1976 Discharge Summary completed by R.D. Murray, MD.
G.  **University of Kansas Medical Center –**
1.  September 13, 1998 Record of Admission (Face Sheet).
2.  September 13, 1998 Emergency Treatment Record.
3.  September 13, 1998 Handwritten evaluation note completed by Michael Leeson, MD.
4.  September 13, 1998 Case Summary completed by David Meyers, MD
5.  September 13, 1998 ECG.
6.  September 13-14, 1998 History, Physical Examination and Progress Notes.
7.  September 14, 1998 EKG.
8.  September 14, 1998 Cardiovascular Stress Test Report completed by David B. Wilson, MD.
9.  September 14, 1998 Exercise Treadmill Informed Consent signed by Mr. Purkey.
10. October 30, 1998 Emergency Treatment Record and flow sheet.
H.  **Correspondence from Mr. Purkey (received 12/9/99) –**
1.  Undated District Court of Wyandotte County Motion of In-Limine submitted by Aline Pryor.
2.  Undated District Court of Wyandotte County Motion to Dismiss Amended Complaint (S) submitted by Aline Pryor.
3.  Undated District Court of Wyandotte County Defendant's Motion for Relief of Court Appointed Counsel submitted by Aline Pryor.
4.  October 28, 1998 Handwritten letter from Mr. Purkey to "Darling."

000432

Diagnostic Interview Report
Wesley Purkey
Page 6

5.    October 28, 1998 Handwritten letter from Mr. Purkey to "Sweetheart."
6.    Undated Handwritten letter (marked received 12/5/99) from Mr. Purkey to Albert Grauberger.
7.    December 26, 1998 Handwritten letter from Mr. Purkey to Albert Grauberger.
8.    April 12, 1999 Mr. Purkey letter to Albert Grauberger.
9.    April 29, 1999 Mr. Purkey letter to Albert Grauberger.
10.   June 2, 1999 Handwritten letter from Mr. Purkey to Albert Grauberger.
11.   June 26, 1999 Handwritten letter from Mr. Purkey to Albert Grauberger.
12.   July 15, 1999 Mr. Purkey letter to Albert Grauberger.
13.   July 30, 1999 Mr. Purkey letter to Albert Grauberger.
14.   August 27, 1999 Mr. Purkey letter to Aline Pryor.
15.   September 14, 1999 Mr. Purkey letter to Aline Pryor.
16.   December 27, 1999 Mr. Purkey letter to Aline Pryor.


**SELECTED REVIEW OF MATERIAL:**
October 28, 1998 (1115 hours) KCPD report by Officer S.W. Isaacson responded to a call of a possible burglary that had just occurred. A white male suspect wearing a plaid shirt and blue jeans was seen leaving the scene on foot. Suspect was carrying two white bags. The suspect had left by the rear door of the house. The rear porch exterior poor was open (rear porch was enclosed). The rear door was unlocked and closed and the rear kitchen inside door was ajar about six inches. Upon entering the house, the victim was found lying on the floor in a fetal position on her side facing east, covered by two blankets except for her sandled feet sticking out of the blanket. Blood had pooled by her feet. There were no signs of breaking in the rear door and the front door was locked. Time of death was not clear.

October 28, 1998 (1115 hours) KCPD report by Officer Keith recorded that a neighbor (Betty Colston) stated the victim was seen in the front yard around 0900 hours on October 27, 1998, Reddi-Root'r was at the residence at approximate hours of 1300 through 1600 hours, a taxi cab was in front of the victim's residence at 2100 hours, that the lights were on all night, and she observed a white male exit the back porch carrying two white bags. Suspect was last seen northbound on 10th. This was when she phoned police. Suspect was wearing a long plaid shirt, blue jeans, approximately 30-40 years of age, tall and thin in build. Phyllis Mallard advised she observed a male walking northbound on 10th, and had long blonde hair. Another neighbor had also observed the lights on all night, which was unusual.

October 28, 1998 (1140 hours) KDPD Narrative was completed by Lt. John Cosgrove. The victim's head had been covered prior to being discovered. A pipewrench was located at the rear of the residence under a water spicket outside. Relatives said the victim was having trouble with her kitchen faucets. The victim had given the individual $70.00 to purchase a faucet. The kitchen sink was still dripping and it did not appear any repairs had been made to the faucet. Water traps for the sinks were checked for possible blood and the area did appear to have been cleaned up. There were several smoked cigarettes (Maverick brand). The victim did not smoke. There were signs of drug activity. A pen appeared to have been used to fashion a crackpipe known as a straight shooter. K.B.I. agents surmised there were two areas of the beating, one appeared next to the doorway and the other in the area of where the victim's head rested.

000433

Diagnostic Interview Report
Wesley Purkey
Page 7

The lieutenant proceeded to 965 S. 75th and talked to Ms. Purkey.  She stated her husband had been missing since 7:00 am the previous day, 10/27/98.  He had gone to his job at Reddi-Root'r and she had not heard from him since. she had reported him as a missing person.  While there, a phone call came from the Super 8 Motel in Leavenworth.  Suspicion arose that Ms. Purkey might know more than she was saying and upon further questioning stated she had actually seen her husband since the previous morning.  She had taken a taxi to "look on Central Avenue," then stated, "Okay, I went to 2211 South 10th to meet my husband." She volunteered she had been lying and in fact had gone there and seen her husband who was dressed only in his socks and underwear when she arrived.  He had called and asked her to bring him pants, a shirt, cigarettes and a lighter.  He smoked Maverick cigarettes.  The phone rang again, now from a tavern in Leavenworth, and again it was a female.  Ms. Purkey stated the female was the suspect's ex-wife who was in Leavenworth for a court date for driving while intoxicated.  Ms. Purkey emphatically denied that her husband was with his ex-wife.  Later in the interview, Ms. Purkey received a call from a female known as "Mandy" who said she was in jail.

Lt. Cosgrove then contacted the Platte County PD, then talked with "Mandy" on the phone.  She stated that she knew about the homicide and that her ex-husband had admitted to her that he killed an old woman.  She further stated that Ms. Purkey knew about this.  Additionally she stated the three of them, Mr. and Ms. Purkey and Mandy had driven past the victim's home while the police were there.  Mandy would be willing to give a statement.  At this point, Ms. Purkey stated she wanted to be "completely truth and helpful," said she knew where the Reddi-Root'r van had been ditched, could show police where the bloody clothes were, and would give a full account of everything she knew.

Det. Howard, Lt. Cosgrove and Ms. Purkey proceeded to a dumpster behind a small gas station on K-32 where they retrieved a black trash bag.  Inside the bag were a pair of tennis shoes, a bloody uniform shirt, and uniform pants with the name Reddi-Root'r on the shirt, a hammer which appeared to have some blood and possibly hair on it, a piece of mail from the victim's address. Some syringes were also located in the bag. The items were photographed and recovered.  Further down the road, two white grocery-style trash bags were found.  Prior to finding the white bags in the trash can behind Bill's West Bar, Ms. Purkey informed officers that inside the bags should be several empty Coke cans and a purse.  One bag contained several empty Coke cans and the other bag held a woman's purse.

Ms. Purkey stated she would show officers how she drove her husband on Wednesday, the day after the homicide, to the victim's residence so he could "clean up some of the evidence."  They had purchased gasoline as her husband had wanted to burn down the residence to destroy evidence.  They had tried to find the Reddi-Root'r van her husband had let a prostitute drive away from the crime scene.  She took them by the prostitute's residence in the 900 block of Tenny.  Her husband told her what had occurred in the house and he had indicated to her he had gone to do a repair but that he had been smoking crack cocaine and told the older woman he needed money to buy a faucet.  The older woman gave him $70.00 cash.  Ms. Purkey further stated her husband had bought crack, picked up a prostitute off Central Avenue and gone to a motel. After the money ran out, her husband returned to the residence with the prostitute and went inside to get more money.  Her husband said he did not want to kill the lady but that she was screaming.  He only intended to rob

000434

Diagnostic Interview Report
Wesley Purkey
Page 8

her and was going to tie her up.  Duct tape was located on the bed next to
the victim, but she had not been bound.

Mr. Purkey was taken into custody in Leavenworth County at approximately 0900
hours on 10/30/98.  He was taken into custody without incident. He understood
his Miranda rights and was willing to talk to detectives, though not in great
detail as he wanted to talk to his lawyer before going into any detail.  They
took that to be an invocation of his rights and attempted to clarify that.
Mr. Purkey did not wish to give a formal statement.  A search warrant had
been obtained and he was transported to KU Medical Center for body fluids and
hair samples.

October 28, 1998 (1145 hours) KCPD Investigative Addendum Clearance was
completed by Det. Howard.  An 80-year-old white female was found inside the
bedroom beaten to death.  Neighbors called police at 1100 hours to report a
burglary in progress. It the appeared victim had been dead 10 to 24 hours. On
a table next to a recliner chair was the shell to an ink pen, a wire push
rod, and several tiny plastic baggies in an ashtray all suggesting the
possibility of narcotics.  Eleven cigarette butts (unknown brand) were found
A mashed Maverick cigarette package was also found.  An empty Marlboro Light
cigarette package was found in the bathroom.  A cigarette butt was in the
stool.  All items were collected.

The victim had an obvious head wound to the top of her skull. Her skull
appeared to have been crushed or caved in.  A puddle of blood surrounded the
victim's head. The victim wore a red flannel shirt, black slacks, socks and
sandals.  A large puddle of blood was near her feet.  No injuries could be
found to her lower torso.  Blood spatter was evident near the pool of blood
by the feet.  Blood had spattered on the bed and under the bed next to the
victim.  Above her head an aluminum cane was found which appeared to have
blood near the handle and base.  Next to the cane was a pair of eyeglasses.
A roll of duct tape with blood smears was found on the bed.  On the door jam
a blood smear was found that appeared to be a palm print.  Bloodstains on the
floor had dried and hardened.  Closer examination revealed a deep wound to
her right cheek.  Wounds on her hands appeared to be defensive and from a
blunt object.  Her right wrist appeared bruised and possibly broken.

The mail carrier was interviewed and noted the prior day on her regular
delivery at approximately 1:25 pm she did not see the victim seated in her
usual location.  She did, however, observe an unknown white male crouching or
bending next to the victim's chair by a table where the ashtray was found.
Blood spatter experts were called to analyze the evidence and a canine
handler was requested to search the surrounding wooded area. Due to the rain,
the officer indicated he would return at a later date.  A vehicle had driven
past the crime scene several times while police were there.  The vehicle
appeared to be a 1970 model Oldsmobile, two-door painted pink with the Kansas
tag NEG-223 or 233.

October 28, 1998 (1157 hours) Investigative Addendum/Clearance was completed
by Det. R. Eskina.  Det. Eskina did a neighborhood canvas. A white male with
blonde stringy hair had been seen leaving the residence carrying two white
plastic bags.  Betty Colston, a neighbor, had observed an unknown white male
wearing a tan or brownish plaid long sleeve shirt and blue jeans exit the
victim's back door that morning at approximately 10:45.  She saw that same
individual go in the same door at approximately 10:30.  She indicated this
might be the same individual she saw the day before in a Reddi-Root'r truck

000435

Diagnostic Interview Report
Wesley Purkey
Page 9

at the victim's house.  Ms. Colston stated the truck was observed on 10/27/98 for several hours.  The individual on 10/28/98 observed going into the residence came out approximately 15 minutes later and was wearing a ballcap, and carrying two sacks white in color.  That individual walked away from the residence.  Phyllis Mallard noted a cab at approximately 9:00 p.m. in front of the victim's house on 10/27/98.  She did not see anyone leave the cab or enter the residence, but did hear the cab door shut and saw the cab pull away.

Det. Eskina then spoke to personnel at Strasser's Hardware.  He was provided invoices of receipts from 10/27/98 charged to Reddi-Root'r.  None were for Mr. Purkey.

Det. Eskina returned 2211 S 10th and spoke with James W. Bales, Jr. grandson of the victim.  She kept very little person property in the home, suffered from polio and other health problems, and lived a very frugal lifestyle.  Mr. Bales stated the victim had a watch that belonged to his grandfather, wore a wedding ring, and kept bank account books and other items on the TV tray next to her chair in the front room of the residence.  She usually could be found resting in bed or in the chair in the front room.  She was known to keep money hidden in different locations of the residence.

October 28, 1998 (1245 hours) KCPD Investigative Addendum/Clearance was completed by Det. M. Shomin.  Det. Shomin talked with Orlin Kueck and Jessie Kueck.  Jessie Kueck is the niece of the victim.  The Kueck's were caretakers for the victim, doing yard work, transportation errands, etc.  They did not talk every day, but Ms. Kueck talked with the victim on October 26 and was advised by her aunt that she was having problems with a kitchen sink faucet in that it ran continually.  Ms. Kueck further stated she advised her aunt to call Strasser Hardware for referral to a reputable plumber.  The victim did call Strasser Hardware and they gave the name of a person by the name of Mr. Clay.  The victim contacted Mr. Clay who stated he would respond to the residence the afternoon of 10/26/98.  Ms. Kueck received a phone call from the victim at approximately 2100 hours in the evening stating that the party, Mr. Clay, had just arrived.  Ms. Kueck was somewhat concerned that he had arrived so late in the evening.  The individual told her aunt she needed new faucets and he did not have the cash to buy them.  At this time he requested money from the victim for the faucets.  Ms. Kueck believed the suspect returned the following morning, 10/27/98.  Ms. Kueck stated the victim told her she gave the suspect $69.00 cash to buy new faucets.  Ms. Kueck advised her aunt this was not the right thing to do, but the aunt replied the same individual had done work for her in the past and she trusted him.  Ms. Kueck stated this conversation took place at about 10:00 to 11:00 am on 10/27/98.  The last conversation she had with the victim was that the victim was waiting for the individual to return to repair the faucets.  Ms. Kueck attempted to contact her aunt on the evening of 10/27/98 between 1800 and 1830 hours.  The victim did not answer the phone but this was not totally out of the ordinary as the victim sometimes retired early and would not answer her phone after that.  Ms. Kueck also attempted to contact the victim today at approximately 10:00 or 11:00 am(10/28/98) but was unable to do so.  Ms. Kueck later received a phone call advising her of the situation at the victim's residence.  She stated that the victim did not smoke or drink.

October 28, 1998 Witness Statement of Phyllis Mallard was taken by Det. R. Eskina.  She described a 5'7" white male, who wore jeans, shirt, had shoulder-length blonde hair, and long-sleeved shirt leaving the neighborhood

Diagnostic Interview Report
Wesley Purkey
Page 10

carrying two white plastic bags.  The individual was walking north.  She thought she could identify the individual.  She had observed a Reddi-Root'r truck at about 11:00 or 11:30 on the previous day parked at 2211 S. 10th.  The last time she recalled seeing the truck was about 3:00 p.m.  It was right around 11:00 am when she was the individual walking north on 10th Street today (10/28/98).

October 28, 1998 Witness Statement of Betty Colston was taken by Det. R. Eskina.  Ms. Bolston lived at 2215 S 10th Street. She saw a man get out of the van, she wasn't sure if he wore a uniform, but thought so.  He was a white male and was taking plumbing equipment into the residence.  Ms. Colston had also seen a taxi in front of 2211 the previous night.  She had last seen Ms. Bales the previous morning around 8:00 or 8:30.

October 28, 1998 Witness Statement of Jessie Kueck was taken by Det. M. Shomin.  Ms. Kueck and her husband were retired and lived in Independence. Mary Ruth Bales was her aunt. The Kuecks looked after Ms. Bales, did yard work, ran errands, etc.  Ms. Bales "couldn't get around well," as she had polio.  Ms. Kueck called Ms. Bales on a daily basis at around the same time each day.  Ms. Kueck called Ms. Bales the previous day to inquire about her plumbing problems, it was between 10:00 and 10:00 am.  The kitchen sink faucets would not turn off.  Ms. Bales reported a man with the last name of "Clay" was going to do her plumbing.  Ms. Bales said it was the same guy who had done work for her before.  Ms. Kueck said this work by Mr. Clay would have been done "years before."  Ms. Kueck attempted to call Ms. Bales back in the evening but was unsuccessful.  Neighbors reported that unusually the lights had been on all night at Ms. Bales residence.  Ms. Bales did not smoke, she did not have many visitors.

Ms. Kueck had discussed the leaking faucets with Ms. Bales on Friday and Mr. Kueck mentioned the water would have to be shut off downstairs in the basement.  The plumber was supposed to come on Monday.  He did not arrive until after 9:00 that evening (Monday) and wanted to see what kind of a job he had to do.  She was referring to the man named Mr. Clay.  Ms. Kueck stated that Ms. Bales told her the plumber said she needed a whole new faucet, that he didn't have money for the faucet, and needed $69.00 to buy one.  Ms. Bales gave the plumber cash. When Ms. Kueck talked to Ms. Bales the next morning (Tuesday) between 10:00 and 11:00 am the plumber had not yet returned, but she was expecting him.

October 28, 1998 (1900 hours) KCPD autopsy Narrative was completed by Det. M. Shomin.  There was a large amount of blood on the bottom of the sole of the left sandal and a slight amount of blood on the sole of the right sandal. Around the victim's neck was a blue, white and green plaid western-style shirt, which was not tied.  The two ends actually lapped together as if to form a type of ligature.

Cause of death was homicide.  Findings showed multiple skin laceration, contusions and abrasions.  There were cerebral contusions and lacerations, calvarial fracture, laryngeal fracture, and contusions of the neck.  These were from a blunt instrument and a possible asphyxial component.  There were defensive wounds.  Bruises and lacerations were listed as A-PP, totaling 42.

October 28, 1998 (2300 hours) KCPD Narrative was completed by Det. W.L. Howard. At first, Ms. Purkey was very evasive but upon learning her husband's ex-wife talked to police, decided to cooperate with the investigation.  She

000437

Diagnostic Interview Report
Wesley Purkey
Page 11

took them to 6700 Kaw Drive where a dumpster was found to contain a bag the suspect had dumped in the trash container. The bag contained the suspect's clothing which appeared to be covered in blood, a hammer which apparently had blood and grey hairs on it, mail belonging to the victim, needles and syringes, white low-cut tennis shoes with blood on them and, a sliver crack pipe. Ms. Purkey explained that her husband had attempted to stage a crime scene, making himself the victim. She had reported him missing and the plan was to make it appear as though he had been a victim of a kidnapping and robbery. She advised Mr. Purkey had poured bleach over the dash and steering column of the Reddi-Root'r van and parked it between two trees off an alley, ransacked the vehicle, and thrown his pager inside the vehicle to make it appear as though he were missing.

They next went to the scene and located the vehicle which appeared as though it had been ransacked, the suspect's pager was on the passenger seat. Her husband had given the van to a prostitute at the scene of the crime. When he "sobered up" the next morning he asked his wife to help him find the van. The vehicle was located in the 900 block of Tenny. Ms. Purkey helped him attempt to cover up the crime scene. She took Mr. Purkey to the victim's house after 10:00 am, dropped him off and parked around the corner. He returned a short time later carrying two plastic trash bags. She was aware Mr. Purkey had told his ex-wife, Claire Gaida, "Mandy" about what he had done and was enlisting her help in cleaning up the crime scene. He planned to burn down the house.

Later in the afternoon, all three went to a gas station at 67th and Kaw Drive and obtained gasoline, which they put in the trunk of Mr. Purkey's vehicle, a Dodge Aries. At that time, the suspect allegedly retrieved the black plastic bag out of the trunk containing his clothing from the crime scene and murder weapon and put it in the back dumpster at 67th and Kaw.

Ms. Purkey had arrived home at around 4:45 pm on 10/27/98. At that time she received a phone call from Mr. Purkey and he appeared to be saying goodbye to her and sounded suicidal. She discerned the suspect had, "Messed up and done something really bad." She spoke with him several times on the phone and he had been calling her since 1:45 pm. He wanted her to bring him clothes, cigarettes and a lighter to 2211 S 10th. He needed her assistance in leaving the crime scene and a change of clothes. She attempted to locate the address, could not, and returned home where she phoned for a cab. Upon arrived at 2210 S 10th, she followed his instructions, went into the home, noted he was wearing a pair of blue sweat pants and no shirt. He went into the front bedroom and changed clothing. Ms. Purkey returned to the cab and waited for her husband. He came out of the residence carrying a white tool bucket that contained tools, and his clothing. Mr. Purkey then went back to the front door where he retrieved some mail from the victim's mailbox. When they arrived home, Mr. Purkey confessed about the murder and they set off to cover up the crime scene.

October 29, 1998 Det. Luther Solomon of the Platte County Sheriff's Department noted he had talked with Claire Gaida and realized she had information about Wesley Purkey and a murder in Kansas City. She was interviewed by Lt. Cosgrove from Kansas City, Kansas. While watching television, she and Mr. Purkey saw stories on the news related to the crime. Mr. Purkey stated, "They know. They know it was me." He wanted to know if Ms. Gaida had a gun to which she replied, "I have one, but it is not with me. I am not going to tell you where it is at either." She stated the gun was at

000438

Diagnostic Interview Report
Wesley Purkey
Page 12

her home in Wichita.  Mr. Purkey then insisted on leaving the area and they drove into Missouri.  While driving, Ms. Gaida was stopped, arrested for DUI, and Mr. Purkey was allowed to drive the vehicle from the scene.

October 29, 1998 Leavenworth County Sheriff's Department Investigative Report recorded they had been advised Mr. Purkey had spent 18 years in the Federal prison system for kidnapping, aggravated assault and armed robbery. Mr. Purkey told Ms. Purkey he killed the woman in the house, gave the woman with him $200.00 and told her to leave in the van.  Ms. Purkey said Mr. Purkey's hair and mustache were now gray and "his hair is shot."  She last saw him at their home in Kansas City on 10/28/98 at about 1900 hours.  He said he was thinking of going to Wichita or Tulsa, Oklahoma.

October 29, 1998 KCPD Investigation Report was completed by Det. R. Eskina and Det. W. Howard.  321-TAXI had made a round trip fare call to the victim's address on 10/27/98 in the evening hours.  A 321-TAXI driver picked up a white female at 965 S 75th St. on 10/27/98 and driven her to 2211 S 10th in the evening hours.  He related she had taken some clothing with her, took the clothing into 2210 S 10th and came out a short time later.  After that a white male joined her in the cab and they were transported back to 965 S 75th.  The officers then questioned Jeanette Purkey at 965 S 75th.  She began to cry, breath heavily, was noticeably shaken and nervous, and made statements that implicated Wesley Purkey in the crime at 2211 S 10th.  A Consent to Search form for her residence was given her which she willing signed, and stated authorities would have her full cooperation.

While at 965 75th, officers received information that a Claire Gaida had been detained for DWI.  She informed officers Mr. Purkey had been with her when she was stopped, had not been detained, and drove away in her vehicle.  Mr. Gaida is Mr. Purkey's ex-wife.  Ms. Gaida and Ms. Purkey were both implicating Mr. Purkey as the person who killed Mary Ruth Bales at 2211 S 10th.  A search warrant was obtained to search 965 75th St. and items relevant to the investigation were recovered.  Ms. Purkey was taken to headquarters where an interview was conducted.

October 29, 1998 KCPD Investigation Report was completed by Det. Wall and Det. Eskina.  Officers interviewed Claire Gaida at the Platte County Jail. She provided a complete tape-recorded statement.

October 29, 1998 KCPD Investigation Report was completed by Det. Casson and Det. J. Rollwagen.  They contacted Danny Gravatt of Reddi-Root'r and were informed that Wesley Purkey had been working there since September 21, 1998. He had passed a drug screen.  The call to Mary Bales' residence at 2211 S 10th was received by telephone and was for kitchen faucet repair.  The call was on Monday, 10/26/98 at 1:45 p.m. and dispatched at 8:54 pm on 10/26/98.  It was called in as completed at 9:30 pm. on 10/26/98.  They reviewed Mr. Purkey's personnel file and informed that on 10/27/98, Mr. Purkey came to Reddi-Root'r to get his work radio re-programmed.  This was in the morning and Mr. Purkey had not been seen since by Reddi-Root'r employees.

October 29, 1998 KCPD Investigation Report was completed by Det. B. Howard and Det. D. Tennis.  They received a lead to locate an unknown female prostitute at 656 Tenny.  This person was alleged with the suspect at the victim's home.  The female, Tammie Sanders, agreed to accompany officers to the KCPD for an interview.  She was a prostitute and picked up by the suspect in the earning morning hours of 10/27/98.  They spent the day smoking crack

000439

Diagnostic Interview Report
Wesley Purkey
Page 13

and engaging in acts of prostitution.  She identified the suspect as Wesley
Purkey, driver of the Reddi-Root'r truck.  They went to the victim's house on
south 10th as he needed to get money from a friend.  While she waited in the
van, he obtained $70.00 from a person unknown to her.  They went back a
second time at about 1:30 pm to get more money.  They parked in front of the
house and she waited about 15 minutes in the van.  Finally, she went inside
the house and discovered the suspect was stripped down to his underwear.
While in the house, they smoked Maverick cigarettes and crack cocaine.  She
was in the house three hours and never saw the victim, but did find the
suspect's bloody clothes in the bathroom.  She panicked and attempted to
leave but was restrained and had bruises on her arms.  The suspect had acted
jumpy earlier when a postal carrier dropped off mail.  The suspect called his
wife several times.  Eventually, she was given the keys to the Reddi-Root'r
van and told she could leave.  She remembered biting his fingers when he
covered her mouth to keep her from screaming.  The suspect told her he had
fought with the guy who lived there and the guy bloodied his nose.  She took
the van home and saw the suspect the next morning when he came by for it.
The suspect said everything turned out okay and not to worry.  Officers
recovered a dark blue/gray man's coat "Red Kap" brand with a tag sewn inside
that said "Property of Walker Uniforms 14H-05-07 W. Purkey 0998 Reddi-Root'r.

October 29, 1998 KCPD Investigation Report completed by Det. Thompson and
Det. Boyer recorded they contacted the Super 8 Motel in Leavenworth, Kansas.
The front desk attendant had not seen Mr. Purkey, but did have an invoice for
Claire Gaida.  William Judd, a custodian at the motel, knew Mr. Purkey but
had not seen him for two weeks.  Jennifer Broyles, head housekeeper was
familiar with Mr. Purkey and his wife, Jeanette, but had not seen Wesley
Purkey for approximately two weeks. Officers searched Room 203 registered to
Ms. Gaida.  The front desk attendant verified phone calls from Room 302 to
Wesley's Purkey's residence.

October 29, 1998 KCPD Investigation Report completed by was an interview of
Rock Pennington the 321-TAXI driver.  He picked up a white female at 965 S 7th
at 8;14 pm on 10/27/98 for a round trip fare to 2211 S. 10th.  The female
stated she had to pick up her husband and bring him some clothes. She
couldn't find the address so her husband said to call a cab as they would
know address.  She repeated the conversation several times and he thought it
strange. Upon arrival, the white female went into the house carrying pants
(unknown color) and plaid shirt possibly blue or tan.  After about 5 to 7
minutes, the white female and a white male came out of the house.  The male
was carrying a gym bag.  They returned to 965 S 75th.  While driving back the
female was not talking as she did before, and the  male whispered, so the
driver couldn't hear what he was saying.

October 29, 1998 KCPD Investigation Report noted Det. Rollwagen and Det.
Casson went to 2211 S. 10th . A two liter 7-up bottle was found behind the
front, blue pants found on the couch, no sweatpants.  No kitchen knife was
found.

October 29, 1998 KCPD Investigation Report by Det. Smith and Det. Berger
reported they interviewed persons at Strasser's Hardware.  Receptionist Paula
Shaeffler remembered an elderly lady calling on 10/27/98 at 1000-1100 hours
for a faucet repair.  She transferred the lady to the plumbing department.
The clerk in the plumbing department did not remember any calls from an
elderly lady and would not have referred anyone to Reddi-Root'r for service
work.  Strassers would recommend contracts John Monteil or Gene Underwood.

000440

Diagnostic Interview Report
Wesley Purkey
Page 14

No one at Strassers knew anyone named Clay who worked for them or bought supplies from the store. Reddi-Root'r had an account at Strassers. Two purchases were made by Reddi-Root'r personnel on 10/27/98. One was made at 1000 hours by Don Smith and the other at 1237 hours by Nelson Sanguinett. Invoices of the transactions were received.

October 29, 1998 KCPD Investigation Report by Det. Smith and Det. Berger reported an interview with Claire Gaida. She was asked if the suspect (W.P.) had any friends or relatives in the KC or Leavenworth area. Mr. Purkey said he'd drive to a friend's house in Enid, Oklahoma to "hide out" as he had already talked to his friend staying there. Ms. Gaida did not know the address. She advised Mr. Purkey also had a brother, Gary Purkey, living in Nebraska.

October 29, 1998 KCPD Investigation Report by Det. Casson and Det. Rollwagen reported interview with Patti Patel at the Relax In Motel. She had a registration card for Tammy Sanders at 737 Tenny in Kansas City, Kansas. Tammy Sanders checked in at 9:00 am and left about 11:30 am accompanied by a white male in a white Reddi-Root'r truck. The male was described as 6' tall, 180 pounds and about 45 years old.

October 29, 1998 KCPD Investigation Report completed by Det. Holbert noted he contacted Maurice Holman, Mr. Purkey's parole officer. Mr. Purkey transferred to this area from Wichita and gave his home address and phone number. Mr. Holman reported Mr. Purkey had a brother, Gary, whom he did not talk to much. Gary Purkey believed Wesley Purkey raped their mother.

October 29, 1998 Witness Statement of Laura Holly was taken by Det. Landon and Holbert. Ms. Holly was a letter carrier. She delivered mail to 2211 S. 10th and waved to Ms. Bales every day to make sure she was okay. That was usually between 1:00 and 1:30 pm. On October 27, 1998 there was a Reddi-Root'r truck parked outside the residence. When Ms. Holly looked in the door she did not see Ms. Bales but did see a man kneeling behind her chair and assumed he was working for Ms. Bales. Ms. Holly did not see anyone else in the house. She thought the man seemed to have brown hair, short, maybe to his shoulders, a thin man, she didn't see his face. She stated the man was wearing pants and a shirt, dark color, maybe dark blue. It could have been a uniform. Ms. Holly described the Reddi-Root'r van was white with red writing and maybe blue writing.

October 29, 1998 Suspect Statement of Claire Gaida was taken in the Detective Bureau of the Kansas City Police Department. Ms. Gaida was from Wichita, Kansas, and lived with her husband, Steve. She had been employed as a LPN for two years. She was acquainted with Wesley Purkey, they had had a common law marriage. There was one child from that marriage, they were now divorced. Ms. Gaida was also acquainted with Jeanette Purkey, wife of Wesley Purkey. Ms. Gaida arrived at the Purkey home in the Kansas City area on Wednesday at about 1:30 p.m. She was going to stay at their home before going to a court appearance the next morning. When she got to the home "things were just real weird and Jeanette was smoking one cigarette after another, she don't even smoke usually and they was just acting strange, the kids was acting strange and she was in a hurry to get the kids out of the house." Ms. Gaida did not realize Mr. Purkey was home because the Reddi-Root'r van was not parked at the residence. Ms. Gaida asked why Mr. Purkey was there and Jeanette indicated he was not feeling well. When Mr. Purkey came out of the bedroom he looked "real hard…like he had been out partying

000441

Diagnostic Interview Report
Wesley Purkey
Page 15

all night or something…that kind of look." Mr. Purkey had "got into some of that stupid shit last night." He did not want to tell Ms. Gaida what had happened but eventually did, stating he hurt someone pretty bad last night. He then explained he had "It was over drugs…I hit her in the mouth and I beat her with a hammer…pretty bad…there's no way I can even get rid of it." He was talking about "blowing up and burning up" the house, but said the bones would have been crushed so bad they still would be found. Ms. Gaida asked, "She is that bad?" and Mr. Purkey stated, "That bedroom is a mess."

Ms. Gaida stated Mr. Purkey said there was blood all over the bedroom. He had a job there two days ago, which would explain his fingerprints being there, but would not explain why his fingerprints were in the bedroom. He was worried about evidence still at the house and he had gone back to the house to get cigarette butts, pop cans and the hammer and stuff. He and Jeanette returned to the house and entered the back door. He wanted Jeanette to go to the house and clean it up and wondered if she could handle being there with the body. She indicated she could, "I don't have a choice." They discussed the missing person report as the only way Ms. Purkey could not get him in trouble. Mr. Purkey discussed setting the house on fire but that it was raining and would put the fire out. He did not ask Ms. Gaida to help clean up the crime scene, and she indicated she would have refused had he asked. Mr. Purkey, Ms. Purkey and Ms. Gaida drove to the crime scene but drove on by as they saw the yellow ribbon around the house. They eventually found the van and Mr. Purkey was "real scared," went to the van, and wiped all prints off the inside with bleach. He reported some of his tire tools were missing and hoped someone would come back and make it look like he was missing. He stated, "Oh no, I forgot the blinker and the steering wheel column." Ms. Gaida said, "So what, its your truck, it's automatically gonna have your prints on it." Mr. Purkey then stated, "No, they're hers." Ms. Gaida thought he was referring to the lady he killed.

Mr. Purkey said he struck the woman in the face or teeth with his fist and beat her to death with a hammer. Discussion followed among the three of them about where to go. They eventually went to a tavern to drink beer. Ms. Gaida went into the tavern to use the restroom and when she came outside the Purkeys were coming from a field where a dumpster was parked. They stated, "We had to get rid of the purse and the stuff that we had in the trunk of that girls." Once again, Ms. Gaida thought they were referring to the dead woman.

They returned to the Purkey residence and decided that Ms. Gadia and Mr. Purkey would leave the residence. Ms. Gaida and Mr. Purkey went to a friend's house around 8:00 pm, and eventually decided to go to Leavenworth. Ms. Gaida did not have much money, but Mr. Purkey said for her to use what she had and he would get more money for her the next day for her return to Wichita. They rented a room at the Super 8 Motel in Leavenworth. Once in the room, Ms. Gaida wanted to rest, but Mr. Purkey said they should go to a bar across the parking lot where he could watch for the police. They phoned Ms. Purkey from the motel and from the bar, discovering the police were at Ms. Purkey's home. Mr. Purkey at some point decided to leave Leavenworth and they drove into Missouri. Ms. Gaida was frightened of Mr. Purkey and decided to try to get stopped by the police, which she did by speeding. The officer arrested Ms. Gaida and indicated to Mr. Purkey he could leave in the vehicle, which he did.

Diagnostic Interview Report
Wesley Purkey
Page 16

Ms. Gaida felt Mr. Purkey was "incarcerated, institutionalized…he's done 17 years…plus he's been in four or five times before that since he's been a teenager." In Wichita she reported that Mr. Purkey "got hold of Jeanett's kid's Ritalin and was shooting it up…" Ms. Purkey had told her Mr. Purkey took her to the garage and almost killed her. Ms. Purkey had never indicated to Ms. Gaida that she had been bound in any way, but a girlfriend came to the Purkey house who was shooting drugs with Mr. Purkey. He duct-taped her in a Jacuzzi and had a syringe he was going to shoot in her juggler vein with. The girlfriend got scared and left.

Ms. Gaida knew of no other taping incidents. Ms. Gaida stated that Mr. Purkey beat his children and wife. He had been hospitalized one night in Wichita for shooting drugs and he thought chemicals were spraying out of his ceiling. Ms. Gaida stated Mr. Purkey called the KBI on himself saying drug dealers were trying to kill him and chemicals were coming through the vents and ceiling and had planted something in his chest and were using remote things to increase it. He was "way flipped out and that's how he gets when he gets on them drugs…he stays the same when he doesn't have nothing in his system." Mr. Purkey believed, "Jeanette and them tried to kill him."

Mr. Purkey did not want to return to prison, "Because they will have to kill me first." After Ms. Gaida talked to Ms. Purkey from the motel, Mr. Purkey realized the police were "on to me." Ms. Gaida did not know what type of drugs Mr. Purkey was on but he usually did Ritalin. He had taken three bottles of nitroglycerin after the murder to kill himself. Ms. Gadia guessed it came from the lady's house, but Mr. Purkey would not admit that.

Mr. Purkey had expressed remorse for what he had done. Ms. Gaida noted he said, "I'm not worth nothing…I can't believe I did this…etc." "I've already tried to take three bottles of nitroglycerine but they didn't work. I woke back up." Mr. Purkey indicated to Ms. Gadia the reason for the murder was drugs. Ms. Gaida feared for her life and, "You don't snitch on him…he will kill you…I know he is very capable of that and I know too much on him and he knows that."

October 29, 1998 (0647) statement by Jeanette Purkey recorded that Wes "hallucinates when he shoots Ritalin."

October 29, 1998 (1029 hours) Suspect Statement of Jeannette Purkey was taken in the Detective Bureau of the Kansas City Police Department. She and Wesley had been married for nine years. She became aware he was involved in a criminal incident on 10/27/98 in the evening hours. She had not been completely honest and forthright in her initial contact with police, "Cause I was scared, cause Wes threatened me." He had hurt her before. Wes asked her to pick him up on Tuesday evening the 27th and she went by cab and took clothing. She eventually found out he had killed someone after he had not gone to work, had picked up another girl, and bought drugs. He also asked her to assist him in covering up that murder. She was supposed to wipe everything down with bleach and get rid of everything, cigarette butts, etc. There was also talk of doing something else to the house, "he was gonna burn the house down first." Jeannette bought the gas and they went back by the house. Wesley went by the house and got a purse and some cans out of the house. He wanted to get rid of those items from the house to cover that he had broken in the entrance of the lady's house. Jeanette helped Wes dispose of clothes he had on, and the purse in cans on K-32 behind Woody's grocery. Items were disposed of at more than one location. Claire Gata also had

000443

Diagnostic Interview Report
Wesley Purkey
Page 17

knowledge of the killing. She was Wes's ex-wife and was also known as Mandy. She was present in attempts to cover the crime. While Wes wiped the van down, Mandy and Jeannette stayed in the car. The van was on 9th street in an alley. Wes moved the van from another location and Jeannette was aware this van was connected to a criminal investigation. She made a false missing person report on her husband because he told her to do it. Wes told her to delete the ID calls on her phone. She did it because she was afraid of Wes. They went to the crime scene at 8:30 Tuesday evening (27th). She did not see the victim in the house. While in the house, she gave Wes the clothes, etc. He lit a cigarette. The bathroom light was on. He sat on the bed and took the sweats off and got dressed. She did not know where the sweats he wore were but thought they were still in the house at 2211 S 10th. Next, she got in the cab, Wes brought out his bucket, went back and took mail out of the mailbox. Wes only told Jeannette that he had hurt someone real bad, he finally said he hit somebody and he killed someone. Later, Wes told Mandy he yelled and killed someone. He said this in Jeannette's presence. After this, Wes, Mandy and Jeannette entered a conspiracy to try to cover the crime. The bleach came from their trailer house. Jeannette thought Mandy was a willing participant. Mandy said they just might as well burn the house, it would be easier. The suggestion did not come from Mandy originally, but from Wes; Mandy agreed to it.

Regarding the van, Wes "went in and clean it out and wiped it down with bleach." Wes drove the van from its original location on Wednesday morning. He indicated a girl had been with him, Jeanette did not know the girl, but provided officers with information about where she might be located. Wes wanted to sabotage the van to make it look like he was robbed, and that someone took him. Jeannette stated this was a part of the actions she took in concert with Wes. She told his employers she had not heard from him. Jeanette asked Wes what he was doing at the house and he said he was supposed to put in a kitchen sink. He got $70.00 from her to buy the sink, but bought drugs instead. With the initial amount of money he got from the lady he purchased illicit drugs. Wes told her he later went back to the house, they were going to rob her and take some more money, about $200.00, he told the girl he was going to take the van and "get the hell out of there." Jeanette was not sure if he completed this robbery. Wes later told Jeannette he took $200.00 and gave it to the girl he was with. He told the girl to take the van. He told Jeanette the van was stolen at 2211 S 10th St. Wes told Jeanette he gave the keys for the van to the girl. Jeanette was able to later help Wes locate the van in the downtown area.

October 29, 1998 (1055 hours) Witness Statement of Tammy Sue Sanders was made to Det. Howard of the KCPD. Ms. Sanders lived at 646 Tenny with Heather and Rick Cook. She was self-employed as a prostitute. She came to Kansas City three months ago with her finance who was a truck driver. After a disagreement, he left her at a truck stop, she had been here since that time. She met a driver of a Reddi-Root'r truck at 7th and Center on October 27, 1998 at approximately 10:30 or 11:00 am. He was tall, skinny, had grayish hair, tattoos, a scar on the left side of his face by his chin, a mustache and a beard. She called him "hun" and thought his name was Steve. She would recognize him again. He was wearing a pair or blue jeans and a white t-shirt.

Ms. Sanders stated he was waiting for his company to page him. There were several pages which he did not answer, she told him to "Call dispatch," but

000444

Diagnostic Interview Report
Wesley Purkey
Page 18

he never did. He finally shut the pager off, as "all he did was try to get a hold of his wife."

They went to the Relax Inn Motel on State. He paid $26.00 for the room. Before going to the motel they "picked up some dope." They got crack cocaine and paid $30.00. "Steve" paid for the crack cocaine. She went to get sodas and when she returned he had the dope out, they took a couple hits, she went down on him on oral sex but he couldn't get an erection. They tried having sex with a condom but were unsuccessful.

Ms. Sanders thought they checked in around 10:00 am and checked out around 12:30. They checked in under Ms. Sanders' name. After leaving the motel they went to South 10th, she was not sure of the address. They had trouble finding the house. He actually had trouble finding the house both times they went to it. When they arrived at the residence, "Steve" went in the house and picked up some money, he was in the residence approximately five minutes. They were parked out front in the van. She heard a lady's voice say they were "at the wrong house." He told her to move the van up and she parked in front of another person's house. Ms. Sanders described the house as white with a screened in porch. She said he got, "$50.00 but later I learned he had more," about $20.00 more. The suspect told Ms. Sanders he was going to the house to borrow some money until he got his paycheck that afternoon. He bought crack cocaine with that money. Next, they went back to South 10th "to them people house" where he borrowed money. Ms. Sanders thought it was approximately 1:30 when they arrived. The suspect went inside and Ms. Sanders stayed in the van for about 15 or 20 minutes. He then called for her to come to the door. When Ms. Sanders went into the house, the suspect had no clothes on except his underwear and he was "sweating in a down pour of sweat." "He started smoking crack and some lady stepped on the porch." "I was sitting on the floor and as soon as he seen the lady step on the porch he ran into the bedroom." Ms. Sanders thought the lady on the porch was a post lady. Ms. Sanders asked why he was in his underwear and he said he was going to take a shower. He never did take a shower. Next, he asked Ms. Sanders to find him a shirt. He put on some blue sweat pants. Ms. Sanders did not locate a shirt. While in the bathroom looking for a shirt, she found a pair of jeans on the floor and "they were all bloody." She asked, "What's all this blood doing on your pants?" He said, "That's from me and him scuffling." Ms. Sanders knew "all the blood didn't come from a nose. The pants were like almost soaked."

At this point, Ms. Sanders stated she got scared and wanted to leave but he would not let her. When she would try to leave, he would slam the door and grab her arm. She started screaming there was a whole bunch of money. She didn't know where he got it, but kept trying to "stuff it in my mouth." When she pulled away he kept "doing this with his hands over my face and mouth and his fingers were going in my mouth…I would bite him but it didn't do any good." She finally got away and he told her to keep quiet or the police were going to come. Ms. Sanders stated she wished the police would come. "I kept telling him I wanted to go because I was screaming. He didn't start acting like this until he started smoking that crack. Every time he would take a hit it would get worse. When he wouldn't mess with it he would be normal but he would take a hit and go violent."

Ms. Sanders did finally leave the house. The suspect had been walking around the house with a meat cleaver. She did not see him injure himself with the

000445

Diagnostic Interview Report
Wesley Purkey
Page 19

knife, he told her it was not for her. He stated "If it's for anybody, it's for me."

Ms. Sanders did not go into any of the bedrooms.  When she tried to go into a bedroom where the door was shut to see if she could find a shirt he said, "Don't go in there, somebody is asleep."  Shortly after that was when Ms. Sanders started screaming and when nobody came out she said, "There ain't nobody up in this house otherwise they would have already been out here." The suspect shook his head but she never got the door open enough to see anything.

The room she was referring to was almost to the back of the house close to the kitchen.  Ms. Sanders thought she was probably in the residence about three hours.  They did drugs the entire time she was there, and smoked cigarettes (Maverick).  She carried GPC cigarettes.  She thought they smoked a pack and extinguished the cigarettes in an ashtray.  They were smoking the Reddi-Root'r man's cigarettes.  She did see some plastic lids that looked like Pringle lids next to the ashtray.

The suspect tried to reach his wife by phone but was unsuccessful.  He wanted to tell his wife goodbye.  Ms. Sanders finally left after the suspect told her she could take the van.  She next saw the suspect when he came to pick up the van the next morning.  He was sorry about what happened and everything was okay, yet  "He grabbed the keys and ran."  Ms. Sanders was able to identify the suspect from a six-man photo lineup.

October 30, 1998 KCPD Investigation Report was by Det. Bill Wall and Det. Randy Eskina.  At approximately 0900 hours on 9/30/98 they telephoned Ms. Gadia in Wichita.  Wesley Purkey had called her residence. She further stated that on 10/29/98 at 0920 hours her caller ID indicated Irvin Linck called. Ms. Gadia's daughter, Angie Purkey, age 19, called the number back and spoke with Linck.  He stated Mr. Purkey was no longer at that residence.  Ms. Gaida she received another call, put the officer on hold, and came back saying the other call was from Wesley Purkey who was going to turn himself in, but wanted to speak with Jeanette Purkey first.

October 30, 1998 KCPD Investigation Report by Det. Smith and Det. Berger indicated an interview with Irvin L. Linck in Atchison, Kansas.  Mr. Purkey had come to his residence on 10/29/98 at about 0900-0930 hours.  They generally visited, no mention was made of a homicide or anything serious. Mr. Purkey said he "got into a jam" in Kansas City and wanted to get his wife out of there.  He asked for Mr. Linck's son's addressed in Nevada.  Mr. Linck reported Mr. Purkey did not seem nervous, and that Mr. Purkey said he was going to Troy, Kansas to pick up some money from an individual.

October 30,1998 KCPD Investigation Report by Det. Casson and Det. Rollwagen reported contact Danny Gravatt of Reddi-Root'r.  He said he would hold Mr. Purkey's paycheck and inform them if he came to pick it up.  Mr. Gravatt had met with all his employees and asked them to inform him if they were contacted by or saw Mr. Purkey.  Mr. Gravatt denied having any employees named Clay.

October 30, 1998 KCPD Investigation Report was by Det. Howard and Det. Tennis.  They re-contacted Tammy Sanders and it was decided she would be arrested for aiding a felon.  She voluntarily agreed to accompany them to the KCPD for an interview where she was told she was under arrest.  She was

000446

Diagnostic Interview Report
Wesley Purkey
Page 20

advised of her rights and interviewed. While pacing inside the house, the suspect said things like, "my life is destroyed," "I made my family ashamed," "I have nothing to live for," "I did a bad thing," "I've done too many bad things."  She said he also removed something from the back of the van prior to going inside.

Tammy stated she knew the suspect had been in prison as he told her that was where he got his tattoos.  He said he was in prison 16 years.  Photographs were taken of her arms of her injuries she said she received from Mr. Purkey. She was also fingerprinted and stated she had been released from jail in New York three months ago.

October 30, 1998 KCPD Investigation Report stated the suspect was apprehended and transported to the Investigative Division for possible interview/statement.  The suspect was interviewed.  He made some remarks after being advised of his rights and signing the rights form indicating a knowledgeable waiver.  He remarked, "If I'm found guilty of this crime, I want the death penalty imposed."  The suspect made other remarks indicating he wanted to confer with legal counsel before proceeding further.  No further questioning occurred.

October 31, 1998 KCPD Narrative was completed by Det. R. Eskina.  On 10/28/98 a Witness Statement was obtained from Betty Colston and Phyllis Mallard who lived on S. 10th Street.  On 10/29/98 a Witness Statement was also obtained from Jeanette L. Purkey in which she stated among other things that she had initiated a Missing Persons Report for Wesley Purkey to cover the crime.  She stated she had assisted him and had knowledge of a continuing plan to help Mr. Purkey not only coverup, but potentially destroy evidence of the crime.

October 30, 1998 (0745 hours) Sgt. Schermbeck of the Leavenworth County Sheriff's Department returned a call to Edward Wiley, Sr.  Mr. Purkey had called him asking where Ms. Purkey was.  Mr. Wiley would not say, and advised Mr. Purkey to turn himself in. Mr. Purkey stated he was thinking about doing this.  At approximately 0900 hours on 10/30/98 officers responded to 773 Miami, Leavenworth, Kansas and located a car Mr. Purkey was believed to be driving in the alley behind the address.  At approximately 0930 hours Mr. Purkey was observed moving the car, was stopped, ordered out of his vehicle, and transported to the Leavenworth County Jail.  Mr. Purkey was driving a 1983 Oldsmobile Cutlass Supreme.

On October 31, 1998 (1045 hours) Wesley Purkey was re-advised of his rights via an Interrogation Advice of Rights Form in the Wayndotte County District Attorney's office.  He signed the form and gave knowledge waiver of his rights.  He stated he had written a letter to his wife and wanted the district attorney as well as the press to be afforded a copy of the letter. He stated the letter in his words "significantly characterizes the occurrence of the crime."  He stated he did not want to talk about certain aspects of the murder except to say there were absolutely no sexual overtones with the victim.  He stated he would discuss other aspects of the crime before and after the murder occurred.  He then gave a detailed account of how he came to the victim's residence subsequent to a plumbing work order.  He further stated that at one point he took a prostitute, Tammie Sue Sanders, to the victim's residence and that both he and Sanders "came in contact with each other," and were crack cocaine.  He said he had used money he obtained from the victim to purchase some of this crack cocaine he and Tammie Sanders shared.  He stated he had been at the victim's residence on more than one

000447

Diagnostic Interview Report
Wesley Purkey
Page 21

occasion during the last few days. He stated the actual murder took place on 10/27/98 while the prostitute was in his work van outside the residence. Just prior to the murder he went into the victim's residence and smoked a "big hunk of rock right there in the bathroom." When he came out of the bathroom, the attack on the victim took place. Sometime after this, Tammie Sanders entered the residence and took custody of some currency that belonged to the victim prior to leaving the scene in Wesley Purkey's van. Mr. Purkey then remained inside the residence until later in the eyeing when hs wife, Jeanette Purkey, came to the residence in a taxicab and brought him a change of clothes. He and Ms. Purkey then returned to 956 S 76th.

October 31, 1988 (1102 hours) Suspect Statement of Wesley Purkey was taken at the Wyandotte District Attorney's office. He had been employed at Reddi-Root'r approximately 10 weeks. He understood his rights and could stop talking at any time he wished and could have a lawyer. He signed the waiver form. He had made a brief statement the day before invoking his rights and today had indicated he wished to re-initiate contact and requested an interview. He had no alcohol or drugs in the past 24 hours and desired to talk without counsel at this time.

He discussed Tuesday October 27, stating he got up at around 6:00, and had gotten to bed the night before around 1:00. He had worked a 14-hour day and had to be at work by 7:00 am to have the radio in his van changed out. He dressed in his regular clothes, not his uniform. He went to work around 7:00, had not used drugs or alcohol to that point, nor the prior night. He had communicated with his supervisor by pager throughout the day. He was going to see about (no time stated) getting an extension on a ticket he had received, for $141.00. He was on his way to city hall in the Reddi-Root'r van, and had around $120.00. On his way, he met the prostitute, stopped and picked her up, and asked her if she could find some "smoke." They did get drugs at 600 Tenny, he did not go in the house. He and the prostitute shared the crack and smoked it with a pipe she had. Mr. Purkey usually shot drugs. His main drug choice was meth or Ritalin. He described the sensations as euphoric, came on fast, and built up in a few minutes. He and the prostitute had smoked three rocks of crack and it was still morning.

He had received a call the prior day from 2211 South 10th, and visited. It was probably one of the last calls of that day. He talked to a lady there, went to the basement to find a shut-off valve in the basement. He worked on commission at Reddi-Root'r and intended to "cut a deal with the lady" for the work. They decided he would return at approximately 11:00 the next day. Mr. Purkey said she had not paid him any money to this point. They did not discuss that she lived alone.

He was asked to discuss the time frame of having smoked 3 rocks with Tammie till the time he returned to 2211 S 10th. Mr. Purkey wanted to make it clear he had not eaten since the night before at around 12:00. This was unusual as he always ate breakfast. He felt that could have been a contributing factor in how the drug effected him. They got another rock and went to the Relax Inn, smoked two more rocks and then left. He did not remember the room, but paid $26.00 for the room. They left the motel and went to the victim's house on 10th. He thought he went to the victim's house the first time at about 11:00 in the morning. He parked out front, walked in and said he needed money for the faucet. He thought he had about $20.00 at the time but "things weren't real accurate then." The victim gave him $50.00. He was there about 10 or 15 minutes and Tammie was with him in the van. The victim gave him

000448

Diagnostic Interview Report
Wesley Purkey
Page 22

tens and twenties and he did not know where she retrieved the money. He stated, "I guess I was just trying to be a plumber and I was too damn high, I was still going through the motions of being a plumber."

At this point he intended to replace the faucet and was going to purchase them at Stan's near K-32. He had told Tammie what he was doing and that he had to change a faucet at 2211 10th. He thought he told Tammie some guy lived there who owed him money, he told her "all kinds of shit." Mr. Purkey did not go to Stan's for the faucet. Mr. Purkey continued discussing what was going through his mind, "crazy things going through your head." "We went back, she went back to pick up some more rock, I think we got 5."

After a break, Mr. Purkey continued discussing from the time he left the residence at S 10th to what happened, stating, "No, I never made it to Stan's, went back to the crackhouse, picked up 5 more rocks, left there, smoked one of them on the way back to 2211 S 10th." He thought probably an hour had passed before he returned to the residence at 2211 S 10th. On the way back to the residence they smoked a rock. He decided to go back to let the lady know he was doing some work, not just "trying to fuck her off." When they arrived he parked one house down he thought. He went inside and took his tools, which were in his tool bucket. He walked to the front door, the victim answered the door. He asked to use the bathroom. He went to the bathroom and "smoked a big time rock right there…I was so damn high going in there I came back out, picked up my tools, we was talking about price and stuff…I think at this point here I just prefer to wait.

Mr. Purkey was asked if at sometime in this time frame the victim was killed and he said yes. He said he was responsible for the killing. The prostitute was not in the home at that time. He thought approximately 15 minutes had passed. He was asked about what happened then and said, "Yeah, un I was probably getting my clothes stained." He stated he was wearing his Reddi-Root'r shirt, Levi blue jeans, and white low-cut tennis shoes when questioned about it. He stated he was in his underwear, was totally spaced out, and described his jeans were saturated with blood. He disrobed in the bathroom and washed in the sink. He then got Tammie's attention and she came into the house. He said he had gotten in a fight and been hit in the nose. She seemed to have no reaction to that and they did not discuss the homeowner or anything up to that point. They "got to smoking more of that rock, hit after hit, hit after hit, until that was gone." They did smoke cigarettes, Marverick brand. They were extinguished in an ashtray and on the floor, he did not remember any plastic lids. He stated the mail lady did come by, he didn't know if she saw him or not, but thought she saw Tammi. She came by probably an hour or hour and a half after the killing. When asked what he was thinking at this point, Mr. Purkey said he was, "I wanted to die." He couldn't grasp why this happened, "that's why I took that rock out and just started smoking, smoking, smoking, I was hoping for a god damn heart attack." He stated he had probably four or five bottles of nitroglycerin, which he emptied and took. There were knife pokes in his belly where he held a knife to his gut. Tammie had not seen the knife that he knew of. He had attempted to harm himself with a knife, but did not wish to discuss that now. When asked if Tammie was aware something unusual had happened in the house, he thought she was. She did not try to go into the locked bedroom as far as he knew. He could not remember stopping her from going in the bedroom. He was not sure if Tammie saw anything that would cause her to believe or disbelieve his story about a fight with a guy. She did see his clothes and he told her he had a fight and said he needed to put his clothes back on and they could

000449

Diagnostic Interview Report
Wesley Purkey
Page 23

leave.  At this point they had been in the house a couple of hours.  Later, Mr. Purkey tried to reach his wife by phone to tell her he loved her and Tammie asked if he was seeing about getting more rock.  At this time no money had been taken from the victim.  However, there was a purse in the chair, which Mr. Purkey was not aware of as it had a blanket over it.  He sat in the chair, guessed Tammie sat in the same chair, the blanket came down, he didn't know how, and "by some process I opened the purse and there was probably three 20s and another envelope with another six or eight 20s someplace like that, total was about $200.00.  I laid the money on top of a little newspaper stand…."

Mr. Purkey's main concern at that point was, "the fact I had done this shit." Mr. Purkey was questioned about what Tammie may have known and he wasn't sure.  She did take the money.  At this point Mr. Purkey explained he was "wigging out", thought the cops were there, etc.  Tammie wanted to leave and get more rock.  Mr. Purkey said he was hallucinating and was very paranoid.

Mr. Purkey stated he struggled some with Tammie, didn't use force on her, might have grabbed her wrists, etc.  He told her he just wanted to talk to his wife and told her some things she could tell his wife.  Tammie never screamed but she yelled at him.  He told her to be quiet, and put his hand over her mouth, he did not recall if she bit his middle finger.  He did not explain the bite on his finger.  Tammie did eventually leave, they walked to the back door and he indicated he was staying at the residence.  He gave her the keys to the vehicle.  She took the money on the newspaper stand.  When asked if he was ever angry with Tammie, Mr. Purkey stated he probably just wanted her to stay and talk.  He denied stuffing $20.00 in her mouth or dress.

Mr. Purkey stated there was no sexual activity with the victim and it was not his original intention to rape the woman, or to rob her.  Tammie went out the back door, he gave her the keys to the van, had no idea where the van was going to be and didn't really care.  Mr. Purkey did not want to discuss contacting his wife.  He stated he took responsibility for the lady being dead by the results of his hands.  No one else was in the house at the time of the homicide.  He did not want to talk about other parts right now.

Mr. Purkey learned plumbing in prison.  At some point he disposed of the murder weapon and the clothes.  He put them in a dumpster at the Total Station near his home.  He disposed of a pair of jeans, a shirt, a pair of shoes, a crackpipe, and some syringes, which were from days gone by.  He also disposed of a hammer and mail from the victim's house.  He disposed of some items across the bridge on Kansas Avenue…"those days are pretty hazy." When asked if those items were the two plastic bags he was seen carrying from the house he said yes.  He admitted he was the one who covered up the body, because he didn't want to see what he had done.

Mr. Purkey admitted he did not want to go back to jail.  His wife and ex-wife advised him to turn himself in, he knew he had hurt a lot of people.  When asked what should happen to him as a result of this case, he stated, "I think the death penalty should be implemented.  I didn't even realize what was going on, but I still know what the results were."  He would like to tell the victim's family he was deeply sorry, deeply sorry.  He had written to his wife and asked her to turn the letters over to the police.  These were forms of admission.  "I just trying to rectify them in some way, shape or form,

000450

Diagnostic Interview Report
Wesley Purkey
Page 24

that it was not intentional, because it's a night, I mean it…" He had been having nightmares about this and was having trouble dealing with it.

November 10, 1998 Regional Criminalistics Laboratory report was completed by Stephen C. Warlen, Forensic Science Specialist. There was no evidence of sexual assault. The pubic hair was from Ms. Bales.

November 14, 1998 KCPD Field Investigation Report noted a 1983 Oldsmobile Cutlass Supreme Blue over Silver and a 1986 Dodge Aries Gray 2-door were involved in a homicide. The vehicles were dusted for fingerprints; prints were recovered but did not have enough points of value for a comparison. A package of Maverick cigarettes and a wood baseball bat were recovered from the Dodge Aries. A key on yellow key ring, empty package of Maverick cigarettes and a multi-color bath towel with possible bloodstains were recovered from the Cutlass.

**MEDICAL RECORDS**
December 29, 1972 LSH Summary of Hospitalization recorded that 20-year-old Mr. Purkey was admitted because of problems refraining from illegal activity. LSH was the alternative to vocational training or incarceration. He had been arrested for burglary and attempted rape in August 1969; for burglary and larceny in March 1970; for burglary and attempted rape in April 1970, and for kidnap and attempted rape in July 1970. He was admitted to the KSRDC April 1, 1971 where the diagnosis was Schizophrenic Reaction, Schizoaffective Type, Depressed, Superimposed upon a pre-existing antisocial personality characterized by selfishness, callousness, irresponsibility, impulsiveness, and inability to feel guilt or learn from experience and punishment.

Mr. Purkey's parole officer hoped he would receive vocational training. The family background was extremely chaotic. Both parents were alcoholics. His mother was openly promiscuous. His employment history was not stable. Mr. Purkey had never been married and would like to join the military. He denied excessive use of alcohol, but alcohol could become a problem. He admitted to drug use. In eighth grade he was admitted to Wichita Psychiatric Center due to truancy and antisocial behavior. He was subsequently admitted to St. Francis for psychosexual problems and a serious personality disorder. He had a head injury in 1968. When he drinks it can be a problem. His parole officer hoped Mr. Purkey would not be returned to Wichita. On Christmas Eve 1972, Mr. Purkey's mother brought a bottle of whiskey to his residence. She talked him into drinking with her until he passed out. She then went to the hospital and accused Mr. Purkey of raping her. The police talked with Mr. Purkey but did not pursue the matter as the mother denied it when sober.

Mr. Purkey had the usual childhood diseases. He reported having meningitis when he was 4 years old, a history of being unconscious two times for short periods of time, and had a high fever when he was a child.

Psychiatric examination revealed a 20-year-old with a ninth grade education who was admitted on a voluntary basis because of drinking and acting in a bizarre way. He was cooperative on admission. He was oriented to time, place and person. He was of average IQ but had poor reading skills. His thought content centered on his problems with the law. He was somewhat depressed. He was a very dependent individual who evidenced poor judgment, had difficulty accepting responsibility, and was very immature.

000451

Diagnostic Interview Report
Wesley Purkey
Page 25

He was placed on Sinequan 25 mg tid, Thorazine 100 mg q6h prn for agitation, Thorazine IM prn once a day AM or PM if patient refused his regular medication. Diagnosis was Passive Aggressive Personality with Depressive Features.

January 12, 1973 LSH Summary of Hospitalization noted that Mr. Purkey attended his assignments regularly. He was quiet and cooperative but did not socialize with other patients and could be considered a loner. Staff opined he seemed to be an immature dependent individual who had difficulty accepting responsibility. He had a long record of inappropriate and illegal behavior. He would be referred for vocational rehabilitation. Diagnosis was Passive Aggressive Personality with Depressive Features.

February 15, 1976 through February 17, 1976 Wesley Medical Center hospitalization was for an overdose. Mr. Purkey had taken an overdose of Tranxene and Tylenol #3. Laboratory data showed his drug screen was positive for 96 mg percent blood alcohol, Meprobamate and salicylate. It was believed he had taken Tranxene. With supportive treatments he came to full alertness in approximately 18 hours. Mr. Purkey believed he had been exposed to hepatitis approximately four to five weeks earlier, but his hepatitis screen was negative. During the waking up process he was confused at times and hallucinated (2/17 at 12:00 pm).

May 15, 1981 KSRDC Report of Clinical Evaluation was completed by Karl Targownik, MD. Mr. Purkey's parents first marriage lasted one month. His mother remarried a second time, was divorced, and remarried Mr. Purkey's father in 1951. They divorced a second time in 1962. Mr. Purkey has a half-brother, Gary. Ms. and Ms. Purkey were described as having problems with alcohol. Mr. Purkey and his half-brother were taken care of a lot of the time by an aunt, Ms. Burk. Ms. Purkey did not always assume responsibility for the children and was often promiscuous, bringing male friends to the home. Due to the mother's inappropriate behavior in Ms. Burke's home, she was asked to leave. Ms. Purkey took Wesley with her, but left Gary in the care of Ms. Burk. In eighth grade, Mr. Purkey was evaluated at Wichita Psychiatric Center because of truancy and antisocial behavior. On December 19, 1966 he was admitted to St. Francis Hospital in Wichita where psychological evaluation revealed he was experiencing a serious personality disorder centered on psychosexual problems of identification. He was viewed as needing institution care and treatment, but this was never carried out. He was in outpatient psychotherapy from for an undefined period of time until his arrest in 1970. Mr. Purkey used drugs and alcohol heavily when not incarcerated.

Mr. Purkey conveyed a general impression of friendliness and apprehension. He was alert and oriented in all spheres. Attention, concentration and memory were unimpaired. At times in his inability to speak out his mind he "whispers at the same time he makes efforts to let himself be heard." He whispered in an entirely different conversation from what he was talking aloud. His judgment was characterized by wanting immediate satisfaction, inability to learn from past experiences and no common sense. He could come across as quite blasé and without feelings of guilt. He tended to blame others for his problems. He tried hard to hide his emotions. His memories of childhood were generally quite painful. His mother was quite critical and often shut him up in front of others and he grew up without forming lasting relationships. Mr. Purkey could be seen as quite manipulative, to have a

000452

Diagnostic Interview Report
Wesley Purkey
Page 26

need to appease for secondary gain, and was somewhat incorrigible.  No
diagnosis was rendered.

May 19, 1982 Kansas State Reception and Diagnostic Center Psychological
Report was completed by John Thomas, psychologist.  Mr. Purkey experienced
occasional stammering.  He volunteered information about his drug use and the
events which precipitated this incarceration.  Testing estimated Mr. Purkey
to function with the average range of intelligence.  An MMPI suggested he
might be highly rebellious and non-conforming, as well as unreliable.  He
might be moody and resentful, liable to make a good impression at first, and
yet sometimes give evidence of great insight.  A non-internalization of
recognized social conventions may be a dynamic of such an individual.
Excessive use of alcohol and drugs may be associated with Mr. Purkey as well
as defects in judgment.  No diagnosis was rendered.


August 31, 1982 Institute of Logopedics speech-language services were
requested by Mr. Purkey.  Mr. Purkey had received treatment at that facility
about 20 years earlier. Mr. Purkey could not make and October 8 appointment
as he was incarcerated.

September 13, 1998 University of Kansas Hospital Discharge Summary completed
by David Myers, MD was for atypical chest pain, drug-induced anxiety,
polysubstance drug abuse, rule out myocardial infarction.  Mr. Purkey had a
history of IV drug abuse, polysubtance abuse and multiple tattoos.  He had
been shooting 100-140 mg crushed Ritalin per day, and an unknown amphetamine
intravenously one hour earlier. Mr. Purkey was an IV drug user and requested
help with "addiction issues."  He had been off drugs for 10 years but started
using in last six months.  Recent use had interfered with his work.  He
denied depression and paranoia.  Contact with social services was recommended
to arrange for rehab program.

September 14, 1998 psychiatric consult was signed by Michael Leeson, MD.  Mr.
Purkey was identified as having had a serious intravenous drug habit. In the
previous months, after 10 years of sobriety, probably because he was in
prison, he had restarted using Ritalin at up to 140 mg per day.  He usually
binged about one day.  He had difficulty stopping drug use once he started.
Symptoms included use all day, tolerance, significant losses, long desire to
quit, drug cravings, and drug dreams.  He denied depression but appeared
anhedonic.  He was not paranoid but when using he had notable distortions in
his thinking.

September 16, 1998 Providence Medical Center Emergency Department record
noted Mr. Purkey presented with a complaint of drug abuse.  He had been seen
at KU Medical Center four days earlier for chest pain.  While the patient
assessment advocate was working on placing Mr. Purkey, he left AMA and did
not sign out or receive discharge instructions.

October 10, 1998 University of Kansas Hospital Emergency Treatment Record was
for evidence collection.

February 4, 1999 Larned State Hospital Release Summary diagnosed Mr. Purkey
with Cocaine Dependence in a Controlled Environment, Depressive Disorder NOS,
and Antisocial Personality Disorder (Principal Diagnosis).  Psychological
screening for neuropsychological impairment revealed no indication of gross
dysfunction.  Staff concluded there was no functioning which would indicate

000453

Diagnostic Interview Report
Wesley Purkey
Page 27

that during the time period in discussion on 10/27/98 he acted in a demented manner or had experienced symptoms of a psychotic process (delusions or hallucinations) which impaired his ability to know the nature and quality of his acts or distinguish right and wrong.  He was judged not to lack the required mental state.  Effects of cocaine were not mentioned.  Prognosis was poor due to previous criminal history, antisocial activities, and drug dependence.

March 5, 1999 Psychological information report was completed by Mr. Robert Heuter.  His screening report had a recounting of the crime, nearly copied verbatim into Dr. Fernando's report.  Full scale IQ was in the average range without screening evidence of neuropsychologic dysfunction.  Mr. Purkey feigned severe psychiatric illness in contradiction to his ward behavior.

March 16, 1999 LSH Forensic Evaluation Report completed by J.L. Fernando, MD noted Mr. Purkey reported "his parents were drunk most of the time,"  his parents were divorced and remarried, and mother became sexually promiscuous. When Mr. Purkey was 14 yeas of age, his aunt was appointed as his legal guardian, whereabouts of his father were unknown.  He attended school making average or below average grades.  He was evaluated at Wichita Psychiatric Center because of truancy,  antisocial behavior, and physical complaints of dizziness with headaches for which no organic basis could be found.  His work experience consisted of short-term and odd jobs which he mostly terminated by simply not reporting for work.  An evaluation at St. Francis Hospital in Wichita revealed a serious personality disorder centering on a psychosexual problem of identification.  Mr. Purkey was admitted for the first time at LSH on a voluntary basis while on parole.  He was placed on temporary visit status from LSH on March 17, 1973 to begin work as a welder in Kansas City. He was discharged from temporary visit status on April 13, 1973.  Diagnosis at that time was Passive Aggressive Personality with Depressive Features.

Mr. Purkey gave a history of extensive substance abuse with Ritalin, methamphetamine crack, and cocaine.  He began using substances at age 15.  He was admitted to KU Medical Center for drug overdose of Ritalin and cocaine.

Mental Status showed no evidence of a thought disorder or delusions.  His mood was considered labile and his affect considered appropriate.  Mr. Purkey admitted to poor impulse control.  He denied suicidal or homicidal ideation. His memory was within the normal range.  Staff noted Mr. Purkey got angry easily, but in general presented no management problems.  The Wechsler Adult Intelligence Scale-Revised revealed a Verbal IQ of 95, Performance IQ of 85, and Full Scale IQ of 89.  Mr. Purkey's speech was goal directed and he gave no indication of defensiveness toward the examiner.  He denied hallucinations or delusions.  "Without seemingly making an attempt to rationalize his behavior or to manipulate this examiner, Mr. Purkey cried while talking about the victim of his crime."

However, in contrast to the attitude displayed during interviews, he did make an attempt to feign rather severe psychiatric symptoms on personality testing.
Thus, "For an individual of average intelligence, it would seem he could have made a more sophisticated attempt to manipulate the test data.  However, he exaggerated a degree of psychopathology to such a degree as to render both personality tests invalid."

000454

Diagnostic Interview Report
Wesley Purkey
Page 28

LSSH diagnoses included Antisocial Personality Disorder; Cocaine Dependence; Nicotine Dependence and Depressive Disorder NOS. He complained of a dysthymic mood. Mr. Purkey discussed the events of the crime scene in a very organized and narrative manner on several occasions. Staff concluded Mr. Purkey's functioning didn't indicate he acted in a demented manner or experienced symptoms of a psychotic process which impaired his ability to know right from wrong. He was suffering cocaine-induced agitation and a fear of being caught.

**BACKGROUND INFORMATION FROM INTERVIEW OF THE PATIENT:**
**Introductory information –**
Mr. Wesley Purkey had been residing at Riveroaks Apartment, 965 75th Street in Kansas City, Kansas, 66101. He had been living there for three months after moving from Wichita with his wife, Jeanette, and three stepsons.

He wanted Jeanette contacted in an emergency at 700 Spruce in Leavenworth, Kansas. She was working at Taco Bell and raising her three sons, 14-year-old John, 12-year-old Terry, and 11-year-old Israel. She miscarried one biologic child while he was locked up in Lansing during 1996.

Mr. Purkey had another child, 21-year-old Angie, by Claire Gaida. Both Jeanette Purkey and Claire Gaida are co-defendants.

At the time of the charged offense, Mr. Purkey was working as a Reddi-Root'r plumber. He had learned these skills at Lansing State Prison in Hutchinson Correctional Facility. He had not yet passed the Master Plumber exam, failing it the first time by one point.

Prior to the interview, Mr. Purkey was quite certain he had killed Mary Ruth Bales and felt quite guilty about it. He had spoken with Jeanette about a possible life sentence. He also spontaneously offered that between October 28 and October 30, 1998, he had written two suicide notes. One was written at the rest area near St. Joseph, Missouri when he was "directionless" and the second when he was near the Kansas City International Airport and was feeling suicidal. He is not certain why he did not kill himself at that time. These notes were reviewed and showed despair but no clear suicidal intent.

Prior to John Duma, Mr. Purkey had two previous attorneys. The first was Al Grauberger whom he did not develop a trusting relationship with. The second was Aline Pryor, with whom he developed disagreements over the progression of his defense. At that the time of this writing, Mr. Purkey's relationship with Attorney Duma was intact.

**Past medical history –**
Mr. Purkey had no known drug, mold, or food allergies. He was not being treated with any medications. In approximately 1978 while at Lansing Prison, he was treated with Valium and Tegretol. Valium decreased his anxiety level "when he didn't abuse it," and Tegretol "lengthened his anger fuse" so he was not as volatile.

Mr. Purkey had fractured the fourth finger of his left hand, and left ribs 9, 10, and 11 playing football in high school. He had been knocked out when his 1957 Chevy was hit by an 18-wheeler and wrapped around the front of the truck. He was hospitalized at St. Joseph Hospital in Wichita, Kansas,

000455

Diagnostic Interview Report
Wesley Purkey
Page 29

required intensive care monitoring, and suffered a "U-shaped" laceration on his left forehead.  He suffered headaches and blurred vision.

He had been in other motor vehicle accidents but was never severely injured. In four or five he "totaled the car," with one of them during a robbery in 1980.  He had been injured on a motorcycle, also in Wichita, Kansas during which his ex-wife bruised her leg but he was "high on ludes…number 714…or perhaps it was Desoxin."

In addition, he had been knocked out during a fight at Kansas Reception and Diagnostic Center in 1971.  He thinks he was out cold for 5 to 10 minutes but there were no consequences.  Interestingly, he recalled having been interviewed by Dr. Karl Menninger at that time.

Mr. Purkey denied having a seizure disorder.  However, he had "over amped" on methamphetamine in 1988 and suffered a drug-induced seizure.

Mr. Purkey had never had any major surgeries.  He suffered gonorrhea in 1968. He never had a positive HIV test.  He suffered Hepatitis B one time with the chief symptom being abdominal pain.  He learned of it when he and his wife gave blood during August 1998 "when the money was tight."  In retrospect, Mr. Purkey had been using intravenous drugs since 1968, when he was age 16.

Mr. Purkey had about 40 tattoos.  The first was a flower design on his left hand that he received in 1977 while in Lansing Prison.  The last was a 1986 "touch up" on his back of the "Aryan Brotherhood" tattoo.  The Aryan Brotherhood tattoo was only for self-protection at Lansing Prison.  He denied ever having been an active member there.

He had six ear piercings. The first two were before March 1987 and the latter four after then when he was at Osawatomie State Hospital.  He had no other piercings.  He had never been made ill from tattoos or piercings.

Mr. Purkey had participated in high-risk sexual activities.  These included sex with four or five different prostitutes whom he never lived with or married.  He had never served as a prostitute himself.  He denied bisexual sex.  He had no current homosexual contact, though while in the penitentiary "even though he regrets it now" he had participated in some due to loneliness.  He described himself as fully heterosexual and noted that five or six years earlier he would have denied the activity in the penitentiary. He revealed the penitentiary sexual activity because, "He did not want to be a game player now, and he was going to be more honest than before."

Mr. Purkey rated his health as good.  He was seeking inner peace and to understand why he had killed Mary Ruth.  Mr. Purkey believed that on September 27, 1998, he was treated at Kansas University Medical center for a mild heart attack.  This was actually September 13, 1998. He was certain that heart attack had been induced by "using Ritalin and methamphetamine on the same day, plus that his wife laced his drugs with pesticide."  Mr. Purkey maintained that his wife had been using pesticide for a while before then. In particular at KU, the hospital indicated he was going into shock.  A toxicologic drug screen showed only that Mr. Purkey was dehydrated.  He went into shock because his "top heart was beating twice as fast as the bottom." Mr. Purkey maintained that the "bizarre part" of the case had to do with the poisoning which caused "stinking-thinking" when he went to Ms. Bales' house. He really wanted the Kansas University records looked over closely.

000456

Diagnostic Interview Report
Wesley Purkey
Page 30


Mr. Purkey did not feel he had any other medical problems.  He had recovered from childhood asthma.

Mr. Purkey was first treated at age 14 in Wichita, Kansas for psychiatric difficulties.  He does not remember what his diagnosis was but his aunt admitted him for being a "wild kid."  There may have been a few other admissions at that hospital.

In 1982, at age 30, he was admitted to the Institute of Logopedics for speech therapy.  Twenty years earlier, he had found this very helpful because of his stuttering.  Stuttering was increased when he was anxious or scared.

**Social history –**
By the second appointment, Mr. Purkey was now in shackles and handcuffs.  He had been placed in solitary for a month after apparently refusing to transfer from one pod to the other.  He believed there was truly no reason for the shackles and handcuffs.  He had filed three lawsuits against Wyandotte County Department of Corrections.  These were for forcing him to shower in handcuffs, for not properly supervising other inmates given that five black inmates jumped him, and for denial of appropriate medical care.  In particular, medicines had been discontinued and he had not received a biopsy of left shoulder tumor.

**Family history –**
Mr. Purkey is the youngest of four children born to Velma Louise Purkey.  Mr. Purkey's oldest brother was 51-year-old Gary.  He had two older brothers, Laren and Garen, who died respectively one and two days after birth.  Mr. Purkey had not known about these brothers until he was an adult.

Velma Louise Purkey died in 1980 at age 49 of pancreatic cancer.  Before the cancer was discovered it had "spread like wildfire" throughout her body.  Mr. Purkey had always known his mother as being an alcoholic with drinking binges, passing out, and abusing medicines.  He learned from a KRDC report that his mother had two newborn deaths. After learning about his own daughter's miscarriage, he began to understand the agony his mother must have gone through.  He attributed her alcoholism to those causes.

When his mother was sober, she was a good person.  However, when intoxicated she was unpredictable.  Her moods could range from tearfulness to "being as mad as hell."  There were many times when he did not understand his mother's mood shifts.

She was also treated by a doctor with Valium and with pain pills.  When he was a pre-teenager, he borrowed a couple of her Valiums and a couple "Fiorinal."  Together they gave him a warm feeling, relieving his sense of dread.  Velma never used street drugs.

Velma always worked when he was young.  Before he started school, she worked at Boeing.  After his parents' divorce, Velma worked as a cocktail waitress.  During those times there was no one to watch him so he lived with his maternal great-aunt.

When his mother was angry she would "go ballistic," meaning she lost control of her anger.  However, she never became suicidal or attempted to kill herself.

000457

Diagnostic Interview Report
Wesley Purkey
Page 31

Three days before her death, Mr. Purkey and his mother reconciled.  He was 28 years old.  She was able to say to him that she was at peace with her life and that he "had the hard part."  He believed he mourned his mother's death but still cursed her at times for dying too early.

Mr. Purkey could not identify any very positive strengths about his mother. Tearfully he stated that his mother's weaknesses included that she was "a woman who wasn't sure who she was and didn't have time to find out."  He never believed she provided any role guidance to him.  Some of the negative things she foisted upon him included her drunken behavior.  For example, when he was 7 or 8 years old she threw a glass of Gin in his face because he stuttered.  It humiliated him that this happened in front of 15 or 20 people who were attending a party.  He is not sure if the family ever went on vacation after the divorce, however remembered his father took them to the Grand Canyon.

Mr. Purkey was not sure if his mother praised him regularly.  When sober, she assured him that she loved him.  She praised him by going to some of his baseball games.

Mr. Purkey's mother slapped or yelled or belittled him for discipline.  He was not sure what would make her do this except "wrong behavior" especially if she was drunk.  She harshly slammed him with a belt on the legs or the stomach.  He is not certain the number of time but she left welts without bruises.  His father did this also and belittled him during that saying, "Stop doing that shit."

His mother never received mental health care.  She never went through substance abuse treatment.  She never received pastoral care or family counseling.

Mr. Purkey's father left when Wesley was 8 or 9 years old.  He remembered little about his father, except that he "beat the shit out of mother."  In one particular incident he remembered his father beating his mother in the hallway of their home.  Mr. Purkey tried to get between them and was shoved aside.  This made him feel ashamed, that he wanted to change his parents' relationship, and yet he felt powerless to stop the beating.  After being totally out of their life for two years, Mr. Purkey's father came back to the family for a short time.  During an alcohol-induced fight between his father and mother, Mr. Purkey finally had enough.  When his father was hitting his mother, Mr. Purkey swung a fifth of whiskey at his dad.  It hit and hurt his father who then "threw me across the room."  At that point, Mr. Purkey's father withdrew and never apologized.

Mr. Purkey's father had been in numerous fights with his mother.  There were probably "dozens."  His mother fought back with slaps and hits.

Mr. Purkey's father worked at Boeing Corporation until he "drank too much and was fired."  At that point, Mr. Purkey's father moved to the West Coast and worked in Seattle at the Boeing plant there.  He thought his father was a strange man, especially since he knew very little about him.  Occasionally, Mr. Purkey's father came back with a woman to Mr. Purkey's mother's house. There were drinking parties that included Mr. Purkey's mother and her second spouse.  At these parties there was usually drinking, then fighting, and then passing out.  At one point, his father gave him money to go have a "good time," meaning paid sex with a woman.

000458

Diagnostic Interview Report
Wesley Purkey
Page 32

After Mr. Purkey's father left the family, no one stepped in for his dad. The major positive parental model was Mr. Purkey's maternal great-aunt who had raised his mother. Mr. Purkey knew little about his grandparents and little about his family history. The only thing he knew was that Sue and Bill Darling, his maternal grandparents, did not drink. Sue was a particularly critical person who had only two ways of doing things, "her way and the wrong way." Again, he had little knowledge of them until he was locked up at Lansing Prison. His maternal grandfather, Bill, died in 1989 from complications of diabetes. Velma was their only child. Mr. Purkey did not believe his mother experienced sexual, physical, or emotional abuse during childhood. He believed his mother was lonely, was hurting, needed love, and needed support.

Velma married Chuck when Mr. Purkey was approximately 16 or 17 years old. Velma was widowed two years later after Chuck was killed by a truck spring that hit him in the chest. Chuck was also an alcoholic. Velma mourned Chuck's death. Mr. Purkey was not close enough to mourn Chuck, but felt sorry for his mother. Chuck had never threatened or injured Mr. Purkey or his mother.
After that, Mr. Purkey's mother had several other live-in relationships with men.

Prior to and after Chuck, Mr. Purkey had been introduced to alcohol at age 13 by "an Oklahoma cowboy" who dated his mother. Some of these men gave his mother "black eyes." Because of her lifestyle, Mr. Purkey learned not to ask what had happened. He tried to stay out of his mother's life, especially when she had "different men in her bedroom." He hid his concerns from her and lied to his friend's parents when they asked whom she was dating. He never recalled a comfortable time with his mother or father. He believed his life had been truly disrupted since age 8 or 9 years old.

Mr. Purkey never slept with his mother. Initially, he denied ever having sex with her, his older brother, or any of his mother's significant others.

Mr. Purkey is not certain why his parents broke up but thinks they were never happy. He knows there were some separations when he was 7 or 8 years old. Those separtions may have contributed to her having thrown a glass of Gin at him during a Thanksgiving dinner. Mom suspected affairs but none of them were confirmed.

During some of the parties with his mother, her partner, his father, and his partner, Mr. Purkey recalled being fondled but there was no oral sex or intercourse. His parents never spoke about this. Initially he did not believe it "played a role in who he is today." He believed there were no consequences. He thought he didn't need to talk about those things because he actively suppressed them. Prior to this evaluation, he had only spoken to his wife about it because "he felt like it mattered to her." Also, she had experienced sexual abuse herself and he felt she was a sympathetic listener.

Then, Mr. Purkey revealed that his mother's girlfriend took him to the bathroom and washed or fondled him when he was 8 to 11 years old. She also took a shower with him. Mr. Purkey then tearfully revealed that this was actually his mother who had done these things with him when she was intoxicated. This lasted about two years, after which he developed fantasies of having sex with women. Eventually, he began to read True Detective magazines that had showed pictures of women being attacked. Though he

000459

Diagnostic Interview Report
Wesley Purkey
Page 33

minimized this, he found those stories sexually exciting and when old enough began to masturbate to the thoughts. He thinks there were other women also that he was sexually involved with at that age. However, he specifically remembered that his mother anally stimulated him and taught him to anally stimulate or vaginally stimulate her. For many years, he thought this was his fault but learned later during therapy in prison that he had been victimized also. Mr. Purkey also replayed some of these experiences with his wife, Jeanette. In retrospect, he believed these were horrible experiences, however, often minimized them. He minimized them because in group therapy while incarcerated, he heard of much more trauma to other men. Thus, he did not feel his experiences counted.

Mr. Purkey then re-clarified that his having showered with his mother was not all that happened. He felt shame and guilt for what happened, reasserting this was with his mother and not his mother's girlfriend. It began during his youth when she bathed him and ended when he was about 22 years old. The sexual contact started when he was 9 or 10 years old, starting with her teaching him how to perform oral sex on her. There was no oral sex of him. He thinks his mother was lonely and felt unloved, especially when he was a teenager. He felt responsible for her teaching him about the sex. The sexual relationship continued off and on until he was age 22 and attempted to kill himself by cutting his wrist with a straight razor. This was after their very last sexual interlude when both were drunk and he was angry.

Mr. Purkey's father was a Boeing salesman. When drinking, he was "violent on whoever was there." He was unpredictable, prone to corporal punishment with a belt, and very loud. His father never apologized for whipping or beating him. His father's best strengths were that he paid the bills, took them on their only vacation, and left them better off when he went to California.

Mr. Purkey had not spoken with anyone at LSSH about these experiences because "no one asked." He offered that Dr. Fernando, the evaluating psychiatrist at LSSH, saw him for two interview periods of approximately 20 minutes each. Dr. Fernando clearly stated that he would "do the best report he could in the time he had."

When Mr. Purkey was beaten by his father, he just endured it. He tearfully recalled that "there was no one there to help you," especially when his mother just stood by and watched. This was even when Mr. Purkey screamed for his father to "leave me alone." The beatings stopped after Mr. Purkey hit his father in the head with a whiskey bottle. This was about the same time Mr. Purkey thought about killing his dad for "what he did to me and my mom."

At about age 14, Mr. Purkey was taken into custody by the juvenile court and sent to live with his maternal great-aunt until he reached age 18. His maternal great-aunt's house was peaceful and safe. Unfortunately, Mr. Purkey believed that he was "there too late." This was despite his aunt never criticizing him, always supportively listening to him, and giving him good advice. He also thinks it was too late because his older brother was already into drugs at that point and the aunt could not stop him. His brother taught him how to do burglaries and gave him his first intravenous injection of Preludes, then taught him how to use heroin.

Mr. Purkey's maternal great-aunt died one day after he was paroled from Lansing Prison in 1980. He still mourns her death and often talks with her

000460

Diagnostic Interview Report
Wesley Purkey
Page 34

at times.  It is very hard for him to believe that his entire family has died.

After his maternal great-aunt's death, he "did several robberies."  In retrospect, he is not sure why he did this because he always had great jobs and yet did burglaries and robberies for extra money.  The very first robbery after his maternal grandmother's death was when he "acted as a gas man." When he started the robbery, he intended to tie up the female victim, steal from her, and leave.  However, two girls came home with their kids and Mr. Purkey's plan was thwarted.  He managed to steal guns and money.  While leaving the premises he told the three women, "Tell them there will be many more of these…"  Two days later, he got back with his ex-wife.

Mr. Purkey never told his wife but his maternal great-aunt knew.  Mr. Purkey forgave his mother and believed she would have never acted sexually toward him unless "really pickled."

**Alcohol and drug use –**
Mr. Purkey was given alcohol by his mother at age 9 or 10.  Usually she gave him a little bit of beer in a jigger.  His first drunk was at age 13 with his brother.  He drank the better part of a pint of Cherry Vodka but it made him "sick as a dog."  He became a regular drinker by age 15.  He experienced his first alcohol-induced blackout at age 15 when he woke up in the alley behind a bar just a block from his house.  He apparently awoke after sleeping in the alley all night.  He had been at the back of the bar to drink and sell stolen cigarettes.

Before age 18 he drank with his parents "whenever they drank."  After he reached age 14, they really didn't care how much he drank, even buying beer for him when he was age 15.  Someone would announce, "I have Coors for the house."  Mr. Purkey really didn't think much of this drinking pattern until he "awoke in prison at age 14 after joy riding."  He went through the juvenile court process and was placed in the care of his maternal aunt.

Despite all the drinking and some court contact, Mr. Purkey never went through substance abuse treatment.  He thinks he woke up at age 16 or 15 "in detox at a Wichita hospital."  He was not in restraints but had somehow been admitted to a group treatment room.  Before that, drinking always got him in trouble.  He felt he never was in trouble when sober.  Other than the hospitalization, no one tried to help him with his drinking.  For example, even though he went to Catholic Church with his maternal great-aunt and was an altar boy, he drank communion wine, "everyone drank," and "even the priest got drunk at his house."

As an adult, Mr. Purkey had no outpatient substance abuse treatment except when incarcerated at Lansing State penitentiary in Kansas.  That ADAPT program was in 1991 or 1990.  In that program, he learned to control his attitude, found it hard to accept that he was an alcoholic, and learned that for a long time he did not know how to function unless he was high or drunk.

Mr. Purkey believed he was still addicted to alcohol and other drugs.  He cannot even look at an injection needle without desiring to use drugs.

At age 13, Mr. Purkey's brother taught him to intravenously inject crushed up Preludin.  This was "the greatest day of his life" because the euphoria felt really good.  In fact, that was the first time he had felt happy since age 7

000461

Diagnostic Interview Report
Wesley Purkey
Page 35

or 8. There had never been a high that good although some were nearly as good. Even so, the intravenous drugs use were a trap and he tried to drown himself at age 15 because he didn't know who he was, didn't have any goals, and didn't know how to achieve them.

Mr. Purkey used heroin for the first time at age 15. He never contracted Hepatitis. At age 19 he was just a few days out of Hutchinson Correctional Facility and he overdosed on heroin when "attempting to get high and kill himself." To that point he had been "steeped in the dope culture," using "script" doctors to obtain pharmaceutical drugs. He would then sell them for illicit drugs. By 1986 he knew his habit was "too bad" as he was using up to a quarter gram of heroin a day.

Mr. Purkey used intravenous crystal methamphetamine for the first time in 1973. This caused a warm euphoria but became "bad real quick," and he was intensely paranoid. He kept thinking others were talking about him, especially during the second day of being high. At that first high on crystal methamphetamine, he found his shotgun and pistol and went to the attic. He was looking for the police. He accused his wife of locking him in the attic, even though he just had forgotten how to open the ceiling trap door. Eventually he became dehydrated because of the heat, shot through the ceiling a few times, and came down. His wife gave him Quaalude's to calm him down.

Mr. Purkey last used methamphetamine mixed with Ritalin on "September 26, 1998." He knows he overdosed and was treated at Kansas University Medical Center. The meth was illegal and the Ritalin was from his son's ADHD supply. He was absolutely certain that despite a negative toxicological report, he was being poisoned by his wife and malicious others. He was certain the poisoning was not a side effect of his chronic methamphetamine use.

For example, before the KU overdose he was using one-half to three-quarters gram methamphetamine every few days to every few weeks. The week before going to KU he had used drugs heavily on two occasions. This included that he had smoked three rocks of crack cocaine, which was a lot for him. He also used one-half to three-quarters gram of methamphetamine and 30 to 40 pills of Ritalin taken from his son's supply. He thinks they were 10 mg Ritalin. He used a little alcohol and no downers. Mr. Purkey was taken to KU by his wife after he felt as though he was dying. He also thought she was doing some of the poisoning.

Back then, he concluded that he was being poisoned. He believed it began when his wife's girlfriend and ex-wife and wife gave him drugs "while he slept." This was shortly after he had been discharged from the DOC. He also was using Tequila, marijuana, beer, and whiskey during that period. There was one party in which his wife went to bed and he began to mess with Beth, having sex on the couch when "both were high."

Soon after, Mr. Purkey began to use Ritalin from his son's supply. These were Ritalin pills from both Terry and Izzie's prescriptions. Mr. Purkey needed 4 or 5 of these to get going in the morning. He knows the poisoning started because he felt as though he was under the influence of a pesticide and "they were exchanging pills for pesticide." In particular, one girl who was helping his ex-wife and he even tied up his ex-wife to get her to tell the truth about the poisoning. Eventually she confessed while tied up with rope and an extension cord. She did not confess until he had her tied up for

000462

Diagnostic Interview Report
Wesley Purkey
Page 36

one-half to three-quarters of an hour and threatened to shoot her in the jugular vein with Ritalin. During that time he was high on Ritalin and methamphetamine. After he let his ex-wife go, he feels she almost killed him and was "involved in this poisoning shit."

Mr. Purkey never had any hard information that his drugs were poisoned. He believed that once he mixed up batch of Ritalin his ex-wife and others switched them. He also found bent needles and that meant someone was trying to keep him from using drugs. He also felt punished by his ex-wife who often appeared angry.

Eighteen months before going to KU, he called the KBI and told them of the potential poisoning. He went to Wesley Hospital in Wichita, Kansas for symptoms he thought were poisoning. He first went to St. Francis Hospital but left because he thought they were too slow to provide his care and feared his heart would explode before they got to him. While at the Wesley emergency room, he went to the stall of another patient. This patient had some kind of device in her purse that he thought would "explode his heart." Wesley staff admitted him for an overnight stay and gave him a shot to put him to sleep. He saw the doctor the next day that he did not tell about the poisoning. The doctor threatened to send him to Larned. Mr. Purkey admitted to the doctor he had been using methamphetamine, stated he'd gotten "bad stuff," and wanted to go home so he could keep his job. The doctor let him go.

Also during this time, Mr. Purkey used methamphetamine and Ritalin every two days to every two weeks, coming down with Jack Daniels. He never reported the poisoning to any doctors. He resented being poisoned. He couldn't control his anger at his wife for participating in the poisoning.

In June or July 1998, Claire Gaida, his ex-wife, threatened to call SRS because Mr. Purkey was using his son's Ritalin. Mr. Purkey told Claire to leave their property. It was around that time Mr. Purkey decided to move to Topeka from Wichita. He told his parole officer that he needed to move and he was using drugs. He could not recall the name of that parole officer but certain there would be a record somewhere. His wife was there and they all agreed he should transfer to Leavenworth as soon as the school year was over. Mr. Purkey also told his parole office, Mike Gibbons, who had heard from the KBI that Mr. Purkey was still using. Mike Gibbons wanted Wesley to go the Kansas City office for drug rehabilitation treatment in Kansas City, Missouri. Mr. Purkey did that and spoke with a Chris Langston. On September 28, 1998, Mr. Purkey could not be admitted to Mirror as he needed a direct referral from the Kansas City parole office. Referral from the Wichita office apparently was insufficient. After that, Mr. Purkey went to St. Johns, then St. Lukes, and then Providence for emergency help. He was repeatedly told that if he had been high they could help him. Apparently his wife admitted to poisoning him with pesticides but that didn't get him into the hospital either because they could offer no services as he was on parole. He also was attending an EAP program, Employee Assistance Program, supported by Reddi-Root'r located at Penn Towers in Kansas City, Missouri. This was entitled Alternatives and has since closed its doors.

Once in Kansas City, he went every two weeks to Alternatives and they helped him develop a relapse prevention chart. He only used once between the KU hospitalization and Mary Ruth Bales' killing. This one episode was of smoking three rocks of cocaine with one of the "Central street girls," prostitutes who would use drugs with him when his wife would not. After that cocaine

Diagnostic Interview Report
Wesley Purkey
Page 37

use, Mr. Purkey had satisfactory sex with his wife that night.  He was also using alcohol and hiding it from his wife by keeping it in the back of his Reddi-Root'r truck.

Jeanette could tell that he was high because after the first one-half or three-quarters hour of ecstasy he "turns bad."  That is he "gets down on himself" or had been feeling ashamed of his weaknesses and used drugs.  The drugs helped him feel better.  On that particular instance Jeanette said, "We're not going through that shit again…paranoia and alcohol."  By this she meant she wasn't going to go through his marked increase in sex drive because he was high.  When not high, his sex drive is not dependent on pornographic movies, handcuffs, or sex toys.  Jeanette apparently voluntarily went along with "is interest in handcuffs" because of the "joint fantasies" he had after having been incarcerated.

**Marital history –**
Mr. Purkey was first married to Claire Gaida in a common-law marriage during 1974.  She was "quite a manipulator" but at that time they enjoyed the same madnesses.  They broke up when he was sentenced to prison.  Also, she was his fall partner for a gun dealership robbery and drug deal.  They stayed linked together because of their now 21-year-old daughter, Angie.  They enjoyed cocaine.  Claire was on bond and they had had no contact except when he was at Larned State Security Hospital.  He feels she manipulated him.

Mr. Purkey's second marriage was to Jeanette Purkey whom he met in 1989 while on a state maintenance Work Release program at the Lansing, Kansas courthouse.  Back then, he was in "decent physical shape" and she liked his appearance.  Eventually, she asked someone about him and then started to visit him in the Leavenworth County Jail. While he was still a trustee and still in Work Release at the Lansing Court house, they had sex for the first time under the dense branches of a pine tree next to the court house. Jeanette was now 37 years old and they had been together for about 12 years. She had prior drug and alcohol abuse problems.  They had no contact since he was at LSSH.  While he was there, they exchanged 10 or 12 calls per week and three visits.

Jeanette told "Donnie" about the pesticides that Claire and Steve had put in Wesley's drugs.  Even so, Jeanette insisted "pesticides didn't make you kill Mary."  Mr. Purkey remained quite skeptical because two of his dogs were poisoned and he was told that poison had been put in their food.  Even though one of Mr. Purkey's prior attorneys learned that Jeanette denied the poisoning, he was certain it had happened.  He believed that many details had been left out of the murder because he was "blacked out."  As he read more of the police reports, much more came into focus.

**Legal history –**
Mr. Purkey was certain that much was wrong in his legal record as printed in his papers.

**Miscellaneous –**
During the assessment, Mr. Purkey believed he experienced a great deal of self-learning.  He learned he had gone through life often "ending badly after good starts" on various activities.  He had always felt misunderstood and this contributed to his anger when his attempts to get help were thwarted. He often said he didn't care about things when in actuality he really did. He felt he had come to terms about not knowing exactly how he killed Mary

000464

Diagnostic Interview Report
Wesley Purkey
Page 38

Ruth Bales. There had been another matter the year before which he wanted to discuss. Since the interview was not psychotherapy and his attorney had advised he not discuss those events, he declined. Mr. Purkey was particularly angry with deaths of his friends in the DOC due to poor medical care or abuses they received at Lansing Prison. He thought those were separate from his childhood experiences. In part, he engaged in litigation to find purpose for his life.

**DISCUSSION OF EVENTS RELATED TO THE CURRENT LEGAL SITUATION:**
Mr. Purkey believed his wife was coerced into lying. He believed the police coerced her to say that he intended to rob Mary Ruth Bales. While Mr. Purkey did not specifically remember what he told his wife that night, he knows the job at Mary Ruth Bales' was a side job and he was only there to work for the money. He "totally did not believe" his wife said he had done it with premeditated intent. He was absolutely certain this was not a killing for $200.00. He believed his wife had been coerced because her confession had been taped by the law enforcement officers. He wanted those tapes reviewed, because he was certain the confession would not reflect her own phraseology, thus indicating influence by the police. His wife was not a good storyteller and could tell the same story five different ways, believing each version to be true. He thinks his wife lied because the cops threatened her with a First-Degree Murder charge unless she agreed with what they said. He did not begrudge her and just felt sad for the injustice done to her and him.

Mr. Purkey did not believe his wife's statements that she was frightened of him were accurate. For example, the day after he killed Mary Ruth Bales, Jeanette and Wesley had good sex. Even so, there were some problems such as one time he awoke from sleep while choking Jeanette, surprising himself that he would ever do that to her because he loved her.

Twenty days before October 28, 1998, Mr. Purkey was heavily into methamphetamine and Ritalin use. He was suffering marital distress because he believed his wife was participating in poisoning him. He was feeling terrible anger, but there were no physical fights. Usually they argued about whether he was being poisoned. This was when he was off drugs. He also wasn't eating because he thought they were poisoning his food. He even thought they were poisoning his spaghetti and would not eat it. He was going to leave Jeanette because she was poisoning him and "he was not paranoid." He even made Jeanette have sex with him at the American Inn located at I-70 and 78th Street, just so he could be away from the home where the poisoning was taking place.

Between the times he used methamphetamine, cocaine, and Ritalin he felt better. He was getting good plumbing side jobs and had lots of energy.

The day before going to Mary Ruth Bales, he landed a $400.00 Reddi-Root'r job. He was working twelve to fourteen hours per day for Reddi-Root'r, five to six days per week. He tended to side jobs on his days off or over his lunch period.

Prior to moving to Kansas City, there had been physical fights with Jeanette. One was in a garage of a Wichita bar. She was trying to get him to go home and he threw her down. There was another fight after he was discharged from KU. He grabbed her, accused her of poisoning him, and accused her of poisoning his St. Bernard.

000465

Diagnostic Interview Report
Wesley Purkey
Page 39


Ten days to two weeks before October 28, 1998, Mr. Purkey went to K-Mart to pick up toiletries, which he used between plumbing jobs. While there he picked up two or three bags of insulin syringes from the pharmacy. In retrospect he knows he was setting himself up to use. He was also "getting ready for" his son's Ritalin prescriptions which were due to be refilled and because he was "tired of smoking crack." Mr. Purkey did not make crack or methamphetamine at his home. To keep the syringes secret, he kept them in his extra work boots, so Jeanette would not see them. She would have challenged him if she found them. In those ten days to two weeks before October 28, 1998, Mr. Purkey made up batches of "Ritalin and crack." Usually he dissolved ten to fifteen Ritalin pills with some crack cocaine and make up small bottles to use later. He had some small pill bottles, or merely left it in tablespoons. He was certain that batches were being poisoned because the formerly clear liquid would turn iodine colored. Also during this time, he came home one day and the entertainment center was pulled eight inches out from the wall. This convinced him that someone was messing with his home. Even so, he tried Ritalin contaminated iodine anyway to see if it effected him differently. In all honesty, his judgement was impaired because "he was messed up anyway on Ritalin and crack."

Some time after discharge from KU Med Center his wife and her "ex old man" sprayed something on him, which was poison. He knows "they gave him drugs to kill him when he was unconscious." He knows they gave him shock treatment to stimulate him to stop using drugs. He knows they lied about what they were doing. He knows they poisoned his two Labrador Retrievers, because they were dead on September 29, 1998, after he was discharged from KU.

October 25, 1998 was the day Mr. Purkey rediscovered the syringes in his boot. He made a big show to Tammy of throwing them out, but as soon as she left he rescued them from the trash, as he "planned to use them."

On October 26, 1998 Mr. Purkey tried to get counseling for him through his parole officer. He wanted one-to-one counseling and this was scheduled for alternatives at Penn Towers on September 28, 1998. Mr. Purkey had not met with Claire or Tammy that day.

On October 26, 1998 Mr. Purkey worked a ten to twelve hour shift. He was not using drugs or alcohol and actually had been at Mary Ruth Bales home that day. He had a second job across Kansas City assigned to him late in the day. He knows his logbooks would reflect both the first visit to Mary Bales and the other visit across town. At that cross-town visit he had to "pull a stool, run the main line, and it was messy." The homeowner was very pleased. That night he did not eat, but grabbed a beer, smoked some cigarettes, and went to bed.

On October 27, 1998, Jeanette and Mr. Purkey were together. He believed she was poisoning his cigarettes. He knew she poisoned him because she bought them out of his sight.

On October 27, 1998 Mr. Purkey planned to go into the shop early because his radio needed work. Even though he had gone to bed around 1:00 a.m., he awoke early enough to get to the shop by 6:15. While his truck was being worked on, he attempted to catch up on his invoices, especially the $400.00 job. After taking his truck in he had breakfast with Jeanette, borrowed $40.00 from her, and planned to combine it with $30.00 of his to buy a faucet for the Bales' home. Jeanette told him this was the only money he had until

000466

Diagnostic Interview Report
Wesley Purkey
Page 40

payday. When Mr. Purkey went back to Mary Bales' home on a Reddi-Root'r call, he had trouble finding it because of the rain and the darkness. Upon entering her home, he smelled gas right away, found a leak in the basement gas line union, hustled her out of the house and told her, "She was lucky she wasn't dead." After that was secure, Mr. Purkey examined the 25 to 28-year-old kitchen faucet. Because she was older and likely on a fixed income, he thought about what to do. He knew because there was no shut-off value at the faucet it would be an expensive job. He advised her the faucet would cost between $140.00 and $150.00. If Reddi-Root'r supplied it and labor would bring the total to about $300.00. However, he offered to purchase a $50.00 or $60.00 faucet and install it for $50.00 or $60.00 "labor on the side." He told her this would be a non-charge call. Non-charge calls were common. Mary Bales agreed.

He left about 10:45 am. He was angry and tired because of the rain, but not high. He wanted to go home rather do the cross-town Reddi-Root'r job but he eventually did. This was when he ran the main line after pulling the stool in the bathroom. No cause for the plug could be found and so Mr. Purkey "warned the guy on the line" that it was not just roots. He was certain his invoice would show this and the times. He finished that cross-town job at about 12:30 am on October 28, 1998. He then went home and did not have any money from Mary Bales to purchase a faucet for her.

When he got home he may have had a beer but did not use any drugs. He went to bed immediately and woke up about 6:15 am. He really did not want to be up but hugged his kids, told them he would see them after work that night, and left without breakfast. He had the $70.00. He really wanted drug counseling that day, Wednesday. The $70.00 made him consider whether to use drugs the night before. That morning he drove around, went to work by 6:15, had his radio changed, and went to Circle K for coffee. He really wanted to go home because of his early hours, and told Danny he was tired. He was crowded out of line at Reddi-Root'r so took time to get parts for the $400.00 Reddi-Root'r job.

Mr. Purkey left the Reddi-Root'r shop about 8:45 of 9:00 am. He took Cleveland to the light. This was a T-intersection and he could go "left toward the job" or "right toward the dope house." At the last second he turned right. Instead of taking some of the $70.00 and paying on a $120.00 ticket, he bought a few rocks of cocaine. He chose to buy the drugs because he "didn't feel right, didn't have any Ritalin, and his syringes were at home." He also had reached a point with Jeanette he knew he needed counseling and knew they were in trouble. Somehow, he made it to eighth and Central where he saw a prostitute named Tammy at the Gazebo. When he pulled up to her, he really wanted to smoke cocaine. She asked if he was a cop. He offered to give her half a rock of cocaine if he could purchase three $20.00 rocks for $50.00, "a volume discount." She did, and they smoked in the van near 18th Street. A customer saw them in the Reddi-Root'r van but did not see Tammy. Mr. Purkey then drove Tammy to the Relax Inn Motel and smoked another rock. She attempted sex on him but it didn't work so they smoked more crack. After an hour and a half to two hours at the Relax Inn costing $23.00 an hour, Mr. Purkey and Tammy went back to Mary Bales' home. On the way, he felt disoriented, got lost, and made Tammy stay in the van. He needed money for the faucet so asked Mary Bales for $70.00. He promised he would be right back. She asked him if she needed to clean up under the sink to help him. Instead of buying a faucet, he bought five more rocks for $70.00, picked up Tammy's girlfriend in exchange for a quarter rock, and they smoked more crack

000467

Diagnostic Interview Report
Wesley Purkey
Page 41

together.  He liked to smoke crack with the prostitutes because his wife wouldn't smoke crack with him.

With the five rocks in hand, Mr. Purkey and two women smoked cocaine at the 18th Street location.  At about 11:30 am "without a faucet," and no money, he considered calling his wife to "borrow some more money."  Even so, he parked at Mary's house and went inside with his tools neatly arranged in a tool bucket.  He took in a chisel and other tools to prepare the copper mounts. He went into the bathroom and then asked if he could go to the basement to turn off the gate valve and make sure the water was off.  When the shutoff didn't work, he told Mary he had to shut off the water main.  He went back to the bathroom and smoked "a big rock" then set another one to smoke later. However, after that big rock "he couldn't breathe, decided to try and leave, grabbed his tools, and slipped or blacked out with the crack pipe in his hand."  He thinks this happened in the living room.  He next felt Mary Bales leaning over him, felt attacked, and still felt desperate to breathe.  He fought with her, pushed her into the bedroom, and saw himself standing over her with a claw hammer in his right hand.  She was face down. He walked out of the bedroom saying to himself, "Now what?"  He took the hammer to the kitchen sink and washed it.  He returned to the bedroom to check Mary's pulse but saw her head was crushed with hair embedded in her skull.  He panicked, saying to himself, "What the fuck happened…" and put a blanket over her head. He did it so she could have some dignity.  He was still very high and his heart was racing "15,000 miles an hour."  He couldn't stop the rising panic and called his wife from the kitchen phone.  She was not home and he immediately felt "he was soaked," meaning he would be incarcerated again.  He picked up his tools but the bucket was now in disarray, smoked another rock of cocaine, and took off all his bloody clothes.  He yelled for Tammy who had been sitting in the truck for about one-half hour.  Tammy came in, saw him in his shorts, and heard him say he was going to take a shower.  Mr. Purkey then heard someone on the porch and "darted out of the front room chair."  Tammy was smoking crack and kneeling by the chair.  They did not have sex.  Whoever was on the porch left.  Tammy asked for Mary's purse and found an envelope that had $10.00 and $20.00 bills in it.  Mr. Purkey did not want it because he "hadn't earned it" by doing a plumbing job.  He put the purse on a coffee table in the kitchen and they smoked more crack cocaine.  He told Tammy to leave because he wanted to be alone.  He knows Tammy kept Mary Bales' money because he flung it at her, grabbed some and then "stuck it in her mouth to shut her up."  Mr. Purkey was in a "time warp."  He felt he would not go back to the penitentiary and wanted to tell Jeanette that he loved her.  He smoked "back to back crack" and hoped for death.  He also told Tammy again to call Jeanette.  He thinks Tammy never saw Mary Bales' body because he had closed the bedroom door.

Mr. Purkey then told Tammy to leave and he'd stay behind.  He gave her the keys to his van and she drove away.  He gave Tammy a note to give to Jeanette that effectively said, "I love you, I'm sorry, forgive me…"

Mr. Purkey the rummaged through the medicine cabinet and found three bottles of Nitroglycerin.  He took all three of the bottles and felt his head would burst.  He didn't die but kept trying to call his wife and tell her "something bad happened."  When talking to her, he admitted to smoking crack. He gave her directions but she couldn't find the place, eventually needing a cab.  Jeanette brought him clothes and he dressed in the bathroom. While waiting for Jeanette, he cleaned up some of the blood in the front room, grabbed Mary Bales' mail and put it in his toolbox.   The next day he

000468

Diagnostic Interview Report
Wesley Purkey
Page 42


rediscovered this mail and put it in the dumpster.  Once Wesley and Jeanette
left the Bales' home, he told her the next day what had happened.  He told
her everything about the prostitutes and what happened with Mary Bales.  He
was absolutely certain this had not been a robbery.  Jeanette reacted very
angrily because she now understood why he had not wanted to look for a house
as he really just wanted to use crack cocaine the day before.  That next
morning they made a plan together to clean up the Bales' home, to make it
look like a house burglary, and to burn the house.  On the way there, they
took two white trash bags from their home.  They placed Mary Bales' purse and
watches as well as a few pop cans in the bags.  They cleaned up a few
cigarette butts from the house and wiped off some things such as the phone or
whatever he thought he had touched.  They tried to find Tammy to get the
Reddi-Root'r van back and found her but all his tools were missing.  The only
thing left was his large auger.  He didn't tell his boss, Danny what had
happened.

That morning he gave his kids a hug, felt very guilty about what he had done,
and said to himself that they deserved better.  Jeanette had called in a
Missing Persons report the night before.  He felt as though he had given
himself a death sentence because he felt so bad about taking Mary Bales'
life.

Claire Gaida came over on October 29 and he told her what he did.  She
offered to burn Mary Bales' home.  She even helped cover up what happened
because they drove by the residence and the police were there.  They bought
gasoline to burn the house but didn't.

Mr. Purkey knows he didn't wake up that day intending to kill anyone.  He had
every intention of buying a new house, continuing side jobs, and getting back
into drug treatment.  He feels a kinship with Mary Bales, hopes for her inner
peace, and asks her for guidance.  He believes she is at peace.

When not high, he has a very powerful anger response.  He can "lose it" and
snap.  For example, the last time he fought was when he was at "the Walls."
He quickly accelerated from a mere fight to wanting to kill the other inmate.
He advised that at the Walls, Lansing State Penitentiary, to hurt someone
only insured that they would come back at you, so "to fight was to kill."  He
had been beaten and stabbed several times, so knew this to be true.

Mr. Purkey's anger cycle began when he felt his heart start to speed up.
Soon after that, he was "on fire" and it was "fight or flight."  He could
become very easily angered if he was stressed or pressured.  During that time
"small shit" could cause him to flash and to anger.

Prior to October 28, 1998, Mr. Purkey feared he was not meeting the goals set
by Reddi-Root'r.  However, his job assessments were good and he really was in
no danger of being fired.

Mr. Purkey has several lawsuits against the State of Kansas, believing "all
lawsuits arise from his anger."  The night before the last day of assessment,
he laid there repeatedly asking himself why he had been put in the hole. He
fantasized that the officers were wrong.  He also felt a measure of relief to
redress the abuses against himself and other inmates by filing lawsuits.  He
continues to have a high level of anger "all the time."  He feels guilty
because of all the bills Jeanette has to pay off on her own.

000469

Diagnostic Interview Report
Wesley Purkey
Page 43

## SUMMARY OF PSYCHOLOGIC TESTING:

Mr. Purkey completed the PAI-2 (Personality Assessment Inventory-2; a general personality assessment with proposed diagnoses and validity scales, as well as structure different than the MMPI-2) and the Shipley Institute of Living (SILS; a rapid IQ test correlated to the WAIS-R) on December 7, 1999.  Mr. Purkey completed the MMPI-2 on March 15, 2000.  The MMPI-2 (Minnesota Multiphasic Personality Inventory-2; a general personality assessment with validity scales and well established normative populations) was somewhat separated in time, but Mr. Purkey's psychiatric state had not appreciably changed between December and March.  He easily understood directions for both tests and maintained a positive mood. Thus, the PAI-2 and MMPI-2 were considered similarly accurate representations of Mr. Purkey's functioning. The testing was used as a complimentary perspective on his face-to-face interview.  Both were used within the bounds of clinical psychiatry.  That is, both tests were correlated with face-to-face interview and not used in isolation.

The Shipley Institute of Living Scale, judged that Mr. Purkey's IQ was in the average range.  This meant his IQ measured at 99.  One hundred full scale IQ points plus or minus 10 is the normal range.  There was no evidence of cognitive impairment.  This IQ correlated well with his diction, grammar, education, and demeanor during the assessment.

The MMPI-2 was valid, indicating Mr. Purkey probably felt the need to discuss his problems even though he was somewhat self-depreciating.  The latter portions of the MMPI-2 were answered in an exaggerated manner, so had less clinical utility.  Overall diagnostic considerations generated by the MMPI-2 were that Mr. Purkey suffered from a paranoid or passive-aggressive personality disorder.  Symptoms of a paranoid disorder were prominent, as were extremely high scores for addiction proneness.

The MMPI-2 computer-generated symptomatic patterns indicated Mr. Purkey was chronically maladjusted with immature, self-indulgent, and manipulative acts toward others.  He could be obnoxious, hostile, and aggressive.  He may have had an exaggerated or grandiose idea of his own capacity or self-worth, with a tendency to hedonism and overuse of alcohol or drugs.  He appeared "quite impulsive," and he may act out against others without considering the consequences."  Suspiciousness, aloofness, and unapproachability were quite likely for him.  Paranoid features and blame externalization were likely present.

The profile frequency for the MMPI-2 was normed on a very rare 46/64 configuration, occurring in less than 1% of a normative sample of men. Specific scales for substance abuse indicated a strong propensity for it. The profile was of high definition and likely would retain its structure at a later date.

Interpersonally, Mr. Purkey was likely to have difficulty in interpersonal relationships.  He was likely to have an uncompromising interpersonal style with manipulative and self-serving behavior, causing great difficulty for those close to him.  He may "go into a rage because of his poor impulse control and low frustration tolerance."  He could potentially threaten or physically abuse his wife when frustrated.  His marital situation was likely problematic.

000470

Diagnostic Interview Report
Wesley Purkey
Page 44

Visual inspection of the computer-generated MMPI-2 report was facilitated by referring to *MMPI-2: Assessment Personality and Psychopathology, Second Edition* by John R. Graham added a number of features. Validity scales L, F, and K suggested a number of elements. First, Mr. Purkey answered frankly and self-confidently. Second, he manifested an answer style consistent for socially deviant convictions and severe neurotic or psychotic disorder. Third, he was socially skilled but could be characterized as cynical, caustic, disbelieving, and quite suspicious of others. Highest elevations of the basic scales are for Scale 4 and Scale 6, suggesting Mr. Purkey is an immature, narcissistic and self-indulgent person who will make excessive demands on others for attention and sympathy but resent even mild demands. Socially, such persons do not get along well with others, are suspicious of others' motivations, and avoid deep emotional involvement. Repressed hostility and anger are characteristic, as is resentment of authority and a derogatory attitude toward authority figures. Unrealistic and grandiose self-appraisal was common. Diagnoses for such persons are equally divided between passive-aggressive personality and Paranoid Schizophrenia. As Scale 6 becomes higher than Scale 4 (which is the case in this profile), a pre-psychotic disorder becomes more likely.

Elevation of MAC-R, ATS, AAS, and PK scales are strongly consistent with substance abuse difficulties. Given that the F(B) is markedly elevated, the content scales and supplementary scores are not considered.

The PAI-2 was valid with no clinical evidence of either malingering or defensiveness. Highest correlations were for self-mutilation, borderline personality, suicide history, current suicide, schizoaffective, cluster 4, assault history, major depression, Dysthymia, and rapists. Further valid validity scales showed some idiosyncratic responses, which suggested the interpretation be viewed cautiously. However, Mr. Purkey did not attempt to present an unrealistic impression that was either more negative or more positive than the clinical picture warranted. Overall, the PAI-2 suggested psychoactive substance dependence, major depressive episode, Post-traumatic Stress Disorder, and Paranoid Personality Disorder. Rule out diagnoses, that is potential diagnoses to be considered, were Intermittent Explosive Disorder, Borderline Personality Disorder, an Antisocial Personality Disorder.

The PAI-2 clinical feature section showed a broad range of answers consistent with multiple diagnoses and association with marked stress and severe impairment in functioning. Substance abuse, stress, and anxiety were prominent. He had likely experienced a disturbing traumatic event during his past. There was significant depressive experience, discomforting anxiety or tension, uncertainty about major life issues, potential for very unstable sense of what he desires, intense short-lived relationships, suspiciousness to the point that he was likely to harbor feelings of resentment as a result of perceived slights and insults. Mr. Purkey was quicker than most to feel he was being treated inequitably and could often hold grudges against others even if the perceived affront was unintentional. There was no self-report of alcohol abuse or dependence, antisocial behavior, empathy problems, mood changes, or problems with health of physical functioning.

The PAI-2 self-concept section indicated Mr. Purkey's mood fluctuations were not extreme and comparable to those experienced by most adults.

Diagnostic Interview Report
Wesley Purkey
Page 45

PAI-2 treatment considerations indicated Mr. Purkey had experience recurrent suicidal thoughts. His anger management was such that he was potentially prone to "more extreme displays of anger, including damage to property and threats to assault others." These outbursts could be unexpected and take others by surprise. It was also likely that others might be intimidated by his temper and potential for violence. Even so, his motivation for treatment was typical of those being seen in a treatment setting. His responses suggested an acknowledgement of important problems with the perception of a need for help. He reported a positive attitude toward personal change, the value of therapy, and the importance of personal responsibility. Even so, treatment would be fairly challenging.

PAI-2 Cluster 4 was characterized by extreme elevations in drug dependence and personality disorder scales. The pattern suggested a history of acting out both in substance abuse and behaviors. Substance abuse likely led to severe impairment and inability to maintain social role expectations, and recklessness and probably alienated most of those who were once close to him. Anger, even though constantly present, would not be expressed unless disinhibited by alcohol or drugs. Physical violence could be expected under such circumstances. Impulsivity and thrill seeking, as well as attention and concentration problems, further impair already suspect judgment. The vast majority had prior treatment, had a history of assaultive behavior, had an arrest for assault, or had other criminal behaviors. These persons tended to be viewed as manipulative. Fifty-six percent of such persons were diagnosed with alcohol dependence, twenty-five percent with drug dependence, and thirteen percent with antisocial personality.

Taken together, the psychologic testing strongly indicated that Mr. Purkey has an average IQ, has intact written language skills, has very severe substance abuse difficulties, and has a high degree of serious psychopathology. The psychopathology takes the form of severely disordered interpersonal functioning with potential for discreet episodes of impulsive severe violent physical acting out, especially if intoxicated by drugs or alcohol. When in distress, marked paranoia not unlike a pre-psychotic state is possible.

There was some disparity in the testing. For example, the PAI-2 does not indicate any antisocial or substance abuse difficulties. This may be because the PAI-2 questions are more obvious than the empirically derived MMPI-2 questions regarding substance abuse. In addition, the MMPI-2 does not mention Intermittent Explosive Disorder as a possible diagnoses, however, the clinical description is not inconsistent with that mental health difficulty, especially with intoxication.

**MENTAL STATUS EXAMINATION:**
The primary Mental Status Examination was completed on December 7, 1999. His functioning did not change significantly over the period, and so the mental status was considered representative of Mr. Purkey's functioning throughout the three-month period of evaluation. Mr. Purkey was neatly dressed, cleanly coifed, and had good eye contact. He spoke with a confident tone of voice. He described a deeply morbid and reflective mood since he had killed Mary Ruth Bales. At times he felt depressed because of what he had done to Mary Ruth Bales and felt supported only by his relationship with his family and his Christian faith.

000472

Diagnostic Interview Report
Wesley Purkey
Page 46

He had adequate appetite and used commissary.  His wife sent him money for commissary.  His weight was stable and he did not restrict his intake.

Mr. Purkey felt fatigued most of the time, felt it was difficult to get going during the day, often battled hopelessness, and often felt helpless.  He had turbulent sleep, finding himself tearful when alone, and regretted what he had done to Ms. Bales.  He also felt regretful for his own family.  At times he had bad dreams and nightmares about the killing which had increased over time.  These events were getting clearer.  He had not written any of these dreams down, however reading the law enforcement document's helped reinforce his recall of the events.  Reading the reports made the remembrances about the killing more vivid, as did the autopsy report.  He felt quite disturbed by these and tried to counteract his recall with prayer and diverting his attention.

Mr. Purkey did not feel certain about his future.  He attempted to avoid thinking about the reality of his future, and "buried himself in his work." His sex drive was not very good, even though normally it would have been quite strong.

Mr. Purkey had no plans to kill himself and no ultimate-out plans.  Even so, he had been suicidal for the first time at age 14 when he "was not able to find happiness and felt empty."  Some of that was counteracted by a good relationship with his maternal great-aunt.  Because of his Catholic-Christian beliefs, he would not kill himself, however he prayed to have "another heart attack."

Mr. Purkey denied homicidal ideas at the present time.  When he had been incarcerated in Oregon and then at Lansing, he often felt threatened so had homicidal plans then.  They were primarily defensive to counter disagreements. and that he had been stabbed in the stomach while at Lansing. He was stabbed by another inmate that he was collecting a drug debt from.  In Oregon he was stabbed "by a crazy guy."

At times, Mr. Purkey felt homicidal ideas to various "people on the street," and to other detainees.  It helped him to pray, to stay to himself, to avoid trouble, and to think about his boys' welfare.  He also hoped to cope well because he did not want to hurt anyone anymore.  At times, his homicidal ideas had been worsened due to intoxication.  For example in June 1997, he became intoxicated after his release from prison.  After drinking five or six beers, he "got angry" and couldn't stop himself.

Mr. Purkey functioned in the average range of intelligence based on his grammar, diction, and his writings.  His fund of knowledge was in the average range.

Mr. Purkey denied experiencing auditory hallucinations.  At Larned State Security Hospital he answered that he experienced auditory hallucinations as a way to express that he was experiencing a self-narrative that seemed like three or four different personalities.  His disagreed that he was attempting to manipulate their testing.  He experienced visual hallucinations such as images that he saw in prayer or felt comforted by.  These were usually images of his maternal great-aunt and of Mary Bales.  Thinking about those two people made him very tearful.  He wanted them to forgive him.  Some of these images felt very real to him.  They ranged from peacefulness to replaying the killing and to replaying other violent events in his life.  The switch from

000473

Diagnostic Interview Report
Wesley Purkey
Page 47

peaceful to violent acts often came when he remembered seeing his father beat his mother.  This was when he was age 5 or 6 and it still infuriated him. His mother was beaten beginning when Mr. Purkey was age 6 and it did not stop until he was 12 or 13.  That stopped at age 13 when Mr. Purkey's drunken father started to beat him, and Mr. Purkey "beat the shit out of his dad." Thereafter, there were no additional beating episodes.

Mr. Purkey denied experiencing tactile or gustatory hallucinations.  He denied any alcohol-induced tactile hallucinations.  However, he reported olfactory hallucinations such as smelling the blood of a woman who had died at the Wichita Woolworth store.  He can still smell the death experience. While there were no particular triggers, he experienced this only three to five weeks prior to the first day of evaluation.  There were no ideas of reference, no thought insertion or withdrawal, no dissociative episodes, no alternative identity, no manic episodes, no unbridled elation, and no extrasensory perceptive abilities.

Mr. Purkey completed his GED when age 19 or 20 at Kansas State Industrial Reformatory.  Prior to that he had dropped out of school in ninth grade.  In 1989 he earned his Associates Arts Degree in Literature when he was incarcerated in Salem, Oregon.  He was not more comfortable in jail but believed he knew how to live through such an experience.  He had already completed 26 or 30 bachelor hours from a junior college.  He intended to continue that education.

Mr. Purkey's attention and concentration as assessed by having him serially subtract 7 from 100 and serially subtract 3 from 20 and spell two words in reverse order were normal.  His memory, as assessed by having him recall three objects immediately, at one minute, and at five minutes was somewhat faulty.  That is, he could immediately repeat three or three words, however, by one minute he lost track of one of the words and perseverated.  By five minutes he could recall only one of the three words.

His categorical reasoning (similarities) was rapid and cogent.  His social judgment in hypothetical situations was normal.  His abstract reasoning (proverb interpretation) was slightly over personalized and suggested that he was quite needful.  For example, to the proverb, "Squeaky wheel gets the grease…" he answered, "A closed mouth doesn't get fed."  To the proverb, "Don't cry over spilled milk…" he answered, "You have to deal with the consequences of your actions."  To the  proverb, "A rolling stone gathers no moss…" he answered, "Keep moving and your troubles won't catch up with you."

His digit span, a clinical test for organic brain damage or cognitive impairment, was slightly abnormal.  That is, he could repeat 6 of 6 digits forward but only 4 digits reversed.  His spontaneous sentence was, "What are we going to have for supper?"  He correctly drew a clock face and set it to 4:30 pm but omitted the numbers, suggesting impulsive actions are possible. He correctly drew intersecting pentagons.

Mr. Purkey endorsed some repeating thoughts.  These were phrases or single words.  These few words were like "rambunctious" but there were no rituals.

At the end of the Mental Status Examination on the first day of interviewing, Mr. Purkey was smiling and happy. He thanked this writer for treating him with respect.

000474

Diagnostic Interview Report
Wesley Purkey
Page 48


DIAGNOSTIC FORMULATION:
The following Diagnostic Formulation is offered on the basis of review of
extensive records, detailed background interview, psychologic testing,
discussion of the events of the current legal situation, and Mental Status
Examination.  The current diagnostic convention is the DSM-IV.

Axis I:      292.11 Cocaine Induced Psychotic Disorder with Delusions.
             300.4  Dysthymic Disorder, Early Onset.
             304.80 Polysubstance Dependence (stimulants, alcohol, and
             hallucinogens).

Axis II:     301.9 Personality Disorder Not Otherwise Specified (with
             antisocial, obsessive-compulsive, and paranoid features).

Axis III:    Reported history of closed-head injury during high school with
             subsequent headache and blurred vision; amphetamine induced
             seizure in 1988, history of intravenous drug use since age 16 (32
             years); history of drug-induced anxiety attacks.


Cocaine Induced Psychotic Disorder with Delusions is diagnosed when a cocaine
or other stimulant (Ritalin) user demonstrates prominent delusions,
historical evidence of substance intoxication, and these experiences are not
better accounted for by a different psychotic disorder or delirium.

Mr. Purkey demonstrated no less than a one-month history of delusional ideas
directly due to abuse of his son's Ritalin, use of rock cocaine, and
methamphetamine.  On October 28, 1998, Mr. Purkey had been out of the Kansas
Penitentiary system for three to four months.  In the weeks before Mary
Bales' death, his Ritalin and cocaine use had accelerated to the point he had
lost control of his drug use.  In addition to the high induced by the
stimulants, he developed delusions that his wife and ex-wife and others were
poisoning him with the drugs he was using.  The intensity of these beliefs
grew to the point that he called the Kansas Bureau of Investigation to report
that not only he was using, but that he was being poisoned.  He also was
admitted to Kansas University Medical Center on September 13, 1998 with a
stimulant-induced anxiety disorder, which he thought was a heart attack.
Even though he continued to believe he was being poisoned, he still used
Ritalin and crack cocaine.  His insight during this period was so poor that
he did no realize the depth of his dependency even though others readily
observed this.

Claire Gaida reported Wesley developed drug-induced delusions in Wichita.
Wesley thought drugs were being sprayed from the ceiling and someone planted
something in his chest.  Jeanette stated Ritalin made Wesley hallucinate.

On the day of the offense, Tammy reported Wesley became violent after he
smoked crack.  Wesley stated he was "too dam high to be a plumber," felt
totally spaced out, and wanted to die.

Now that Mr. Purkey has been drug free, there is no evidence of drug-induced
persisting delusions.  His unconfirmed certainty that he was poisoned, the
MMPI-2 showing risk for pre-psychotic decompensation especially when in
distress, and the PAI-2 for intense suspiciousness as well as risk for
surprise violence strongly indicated that under the influence of cocaine or

000475

Diagnostic Interview Report
Wesley Purkey
Page 49

other drugs, he was at high risk for unintended violent act or violent loss of control.

Dysthymia, Early Onset, is diagnosed when a person shows depressed mood, or if they are an adolescent, irritability, with some symptoms of depression but no evidence of Major Depressive Disorder. Now that Mr. Purkey is drug free, he demonstrated considerable evidence for early onset, meaning before age 21, Dysthymia. That is, he frequently feels dysphoric, is easily irritable, tends to snatch defeat from the jaws of victory, shows some MMPI-2 and PAI-2 evidence of Dysthymia, and expresses an ongoing high level of anger. He has had some symptoms of Major Depression but eschewed antidepressant medication in favor of attempting self-control.

Polysubstance Dependence is diagnosed when a person demonstrates at least a 12-month period of repeated use of substances from at least three different drug groups. While Mr. Purkey's primary drug of choice has been psychostimulants such as cocaine or Ritalin (methylphenidate), he has also had a well-documented and severe intravenous drug habit and a very serious alcohol dependency. His intravenous drug use has included hallucinogens, stimulants, and sedative-hypnotics. Currently his drug-free state is maintained likely only because he is in a controlled environment.

Both Mr. Purkey's parents were severe alcohol users. Thus, he inherited genetic predisposition to serious alcohol dependency and risk for illicit drug dependencies. His family environment fostered drug dependency. His mother gave him sips of beer and other alcohols by age 9 or 10, he consumed alcohol for the first time at age 13, and after age 14, and his parents included him in adult drinking parties to the point they supplied him with beer. During some of these alcohol parties, his intoxicated father offered him money for prostitutes even though Mr. Purkey was only 14 or 15 years old, suggesting an extremely permissive and chaotic homelife. In addition, his intoxicated mother engaged him in sexual activity when he was age 8 through age 11. In 1986 he was judged at St. Francis Hospital to have severe psychosexual problems. There was some continued sexual activity even up through age 22 with his mother.

Mr. Purkey knew that by age 14 drinking would get him in trouble. He went through detoxification for the first time when in juvenile custody at age 14. He also passed out from alcohol intoxication at age 15. There was no record available indicating any substance abuse treatment during adolescence, though Mr. Purkey reported adult substance abuse treatment when he was incarcerated in the Kansas DOC.

In 1972, SRDC said alcohol could cause him problems. In February 1976 e overdosed on Tranxene, a sedative. In 1982, SDRC recorded that he had severe drug problems. The MMPI back then showed very similar defects in judgment to the recent MMPI-2.

Mr. Purkey was introduced to intravenous drugs at a very early age by his older brother who gave him his first injection of Preludin. Given Mr. Purkey's Dysthymia, this was the first time he felt happy in his childhood. Later, he used intravenous amphetamines as a teenager even though they induced paranoia and a psychotic state. Similarly, he diverted Ritalin intended for his two sons for his own use so much so that by September 1998, he thought he was being poisoned by family members and went to the hospital with a drug-induced anxiety state. He also thought his food was poisoned,

000476

Diagnostic Interview Report
Wesley Purkey
Page 50

family was putting iodine into his Ritalin/methamphetamine concoctions, that family was giving him shock treatments when he slept, and his wife was poisoning his cigarettes.

His own recollection of his drug use, and the MMPI-2 strongly indicate evidence for severe risk for substance abuse even now.  The PAI-2 did not indicate any risk for substance abuse.  The PAI-2 has very obvious questions addressing substance abuse, so it can under-report substance abuse in someone who is sophisticated enough to recognize the question.  In contrast, the MMPI-2 is empirically derived so risk for substance abuse questions are not easily discerned.

The Personality Disorder NOS with obsessive-compulsive, antisocial, and dependent features describes Mr. Purkey's severe personality fragmentation. Personality Disorder NOS is used to described someone whose personality characteristics overlap several areas so that no one personality disorder fully describes their difficulties.

Mr. Purkey presented a constellation of life experiences, maladaptive responses, and personality organization that overlapped at least three areas of personality disorder.  For example, he clearly described himself as having been the victim of physical abuse by both parents, emotional neglect by both parents, sexual abuse by his mother, witness to promiscuous sexual activity his mother had with numerous lovers, early introduction to alcohol by some of his mother's lovers, very intense anger response sometimes even with the slightest provocation, preoccupation with compliance with rules, inflexibility regarding his ethics, inability to refrain from illegal activity, participating in illegal acts out of shame or desire for vengeance, considerable victim empathy, alternating between identification with authority and rebelling against it, and short-lived mood swings.

Together, these constitute obsessive-compulsive, antisocial, and dependent personality features.  The obsessive-compulsive features include that Mr. Purkey rigidly adheres to a course of action he believes to be true.  For example, he has produced more than 100 pages of neatly written obsessively reasoned treatises on many aspects of his case.  At times he has believed that despite his not being trained in law, his knowledge regarding legal matters superceded those of his attorney, especially his second one.  When that attorney did not comply with his wishes regarding a deposition, Mr. Purkey was reported to have flown into an intense short-lived rage totally consistent with an Intermittent Explosive Disorder.  However, Intermittent Explosive Disorder is not diagnosed for Mr. Purkey because his over-riding symptoms are more consistent with personality disorder of longstanding nature.  Second, Mr. Purkey has demonstrated antisocial personality features with some key exceptions.  First, he has considerable problems confirming to social norms since age 15.  It should be noted, however, that he came from an abusive awash in alcohol and porous for adult-child boundaries.  Those conditions were a set up for his adopting abnormal behavior patterns. Second, he participated in stealing and drug use early on in childhood, in part due to the influence of his older brother who was heavily addicted to intravenous drugs.  He has also demonstrated consistent adult behavior of being unable to refrain from illegal acts and spent considerable time incarcerated.  However, in contrast to all this he has demonstrated considerable victim empathy and openness to interpersonal change, rather inconsistent with a pure antisocial position. He wants to somehow right the wrongs of his life through betterment while incarcerated.

Diagnostic Interview Report
Wesley Purkey
Page 51


In particular, his own words speak of the internal contradiction that he has felt. That is, when he was taken from his parents' custody and sent to live with his maternal aunt, he felt her support, love, and non-punitive interventions were wonderful but probably were "too late for him." He certainly believed they were too late for his older brother. Mr. Purkey has also shown some characteristics inconsistent with pure antisocial personality. These have included his concern for his wife's welfare, for his boys' welfare, and remorse for having killed Ms. Bales.

Third, Mr. Purkey demonstrates ongoing developmental evidence of dependent personality features. The primary aspect of those features has included his belief that his parents never provided adequate nurturance that they were emotionally and physically unavailable to him, and this has left him with deep-seated anger. This is separate from the sexual contact with his mother. Both may account for the reference to PTSD, Post-traumatic Stress Disorder, by the PAI-2. It has also left him to a certain extent unable to fully commit to a particular person such as his wife. This may also account for his intense physical anger toward his wife.

Mr. Purkey is also at extremely high risk for substance-induced medical difficulty. For example, he has used intravenous drugs very heavily since age 16, with his only hiatus during a 10-year incarceration. Mr. Purkey responded very positive to the group psychotherapy available to him in the Lansing correctional facility.

**DISCUSSION:**
The original consultation questions addressed presence of mental disease at the time of the charged offense, that is lack of the required mental state, diagnostic understanding, and discussion of mitigation elements for sentencing. More than sufficient information was developed to answer these questions.

**1.    Presence of mental disease-lack of required mental state –**
At the time of the charged offense, October 28, 1998, Mr. Purkey was a severe cocaine, Ritalin, alcohol, and other drug abuser. His drug dependence had reached the point that despite good intentions, he borrowed money from his wife for plumbing repair supplies but used it on crack cocaine, money for a ticket was used for crack cocaine, and he was diverting Ritalin intended for his sons' attention deficit disorders to a stock of intravenous Ritalin mixed with cocaine. In addition, he was feeling heavy temptation to use cocaine rather than go to work, even though he was doing well at work. He was working, at least sometimes, under the influence of psychostimulants. He was working 12 to 14 hours per day and not perceiving the calamity of his plight in a way that he could find alternatives. He also delusionally believed that his wife and ex-wife and others were poisoning him. Punctuating these drug difficulties were that he was trying to make the adjustment from incarceration to a life of freedom, was having marital/sex difficulty because of his drug use, was engaging prostitutes for the purpose of oral sex and sharing drugs, was having tremendous difficulty in normal commitment to his wife, and felt the tension within him.

In addition to the acute drug dependent and drug intoxicated state, Mr. Purkey had never been treated for his childhood experiences of physical abuse, emotional neglect, and sexual abuse. Such experiences can saddle young children with anger control problems, no understanding of the

000478

Diagnostic Interview Report
Wesley Purkey
Page 52

boundaries between children and adults, and severe problems with anger control especially as adults.  These were all superimposed on his dysthymic view of life.  He reported attempts to obtain drug counseling prior to the charged offense.

Thus, at the time of the charged offense, Mr. Purkey was laboring under the effects of severe personality fragmentation, was heavily intoxicated from the use of crack cocaine/Ritalin, was feeling tremendous distress in trying to adjust to life outside the Kansas DOC, then savagely beat Ms. Bales totally out of context for the level of threat she posed to him.  That brutal overreaction had its roots in his untreated severe psychiatric difficulties.

There were some contradictions in statements regarding his intent for going to the Bales' home.  Tammy, Claire, and Jeanette all offered he was going there to rob Ms. Bales so he could obtain more cocaine.  None of them indicate that his intent was to kill her and he adamantly denied any intent to kill her when he went to the Bales' home.

Long before he killed Ms. Bales, Mr. Purkey had experienced drug-induced delusional ideas and extreme anxiety state.  This behavior and thinking was consistent with a diminished mental capacity due to the heavy intoxication, and adjustment difficulties he was having. Mr. Purkey recovered quickly enough to attempt a coverup strongly indicating his functioning was intermediate between full responsibility and lack of required mental state. That is, he was laboring under such a weight of serious personality disorder, untreated substance intoxication, and untreated traumatic experience as a child, that he was deprived of a normal ability to refrain, and acted violently.  He quickly grasped what he had done once he cooled down.

2.    Psychiatric diagnosis –
At the time of the charged offense, Mr. Purkey was suffering mental disease. This took the form of severe cocaine dependence with delusions, untreated childhood physical/sexual/emotional abuse difficulties, extremely disordered anger response, untreated severe polysubstance dependence, and personality disorder not otherwise specified.

3.    Elements relevant to mitigation of sentence –
A number of elements relevant to mitigation are as follows.  They are listed in no order of priority.

   a.    At the time of the charged offense, Mr. Purkey was acutely intoxicated on crack cocaine.  In the weeks prior to the charged offense, Mr. Purkey suffered Ritalin-induced delusions that he was being poisoned, plotted against, and maligned.  These rose to the point that he called the K.B.I. to report himself and the poisoning, as well as went to Kansas University Medical Center for a Ritalin-induced panic attack that he thought was a heart attack, etc.  When no cardiac symptoms were discovered, Mr. Purkey fessed up to the intense drug dependency.  Mr. Purkey also offered anecdotal evidence that he was seeking drug treatment because he knew he couldn't control his drug use on his own.

   b.    The brutality and viciousness of the attack on Mary Ruth Bales strongly indicated disinhibition induced by drug use.  In particular, psychologic testing, face-to-face interview, and

000479

Diagnostic Interview Report
Wesley Purkey
Page 53

chronologic history very clearly indicated Mr. Purkey was vulnerable to pre-psychotic and psychotic decompensation with intense outbursts of anger. These outbursts of anger would be short lived, unpredictable, and much more likely if he was intoxicated on alcohol or other drugs. Recall that those behaviors were modeled by both of his parents for his entire upbringing. Notably, during the psychologic testing section, Mr. Purkey did not present malingered symptoms or underreported symptoms. This was in contrast to the Larned State Hospital evaluation during which he was somewhat defensive, felt not enough time was available for him to be heard, and the evaluating psychiatrist actually spent less than an hour with him. Mr. Purkey remains intensely angry but is channeling it to grievances now that he is drug free and in better control of himself.

c.    Mr. Purkey demonstrated significant victim empathy, sadness for his own family, and assumption of responsibility for his actions.

d.    When previously incarcerated, Mr. Purkey demonstrated significant improvement in his anger control with Tegretol and Valium. This suggested some biologic basis for his loss of anger control over and above the cocaine-induced intoxication. He has some significant history showing closed-head injury and potential brain damage. These include the headache and dizziness after the car accident in high school and drug-induced seizures. Neither is well documented but could have left him with irreversible personality changes.

Stephen E. Peterson, MD
Diplomate, American Board of Psychiatry and Neurology 1992
ABPN Subspecialty in Forensic Psychiatry 1994

Date Signed:    4/19/00
SEP/ns

000480

## DECLARATION OF ROBERT D. BENTLEY

I, Robert D. Bentley, declare and state the following:

1. My name is Robert D. Bentley. I am a resident of Calhoun County, Illinois. I am 63 years old.

2. I grew up in Wichita, Kansas on Martinson Street. It was in a lower income neighborhood. There were several bars, a couple of pawnshops, and a liquor store. It was a rougher neighborhood back then. There were fights and people got beat down. Wes Purkey lived in the same neighborhood, on either Charles Street or Clarence Street. I met Wes when I was about 12 or 13 years old. Wes is a year older than me. Most of the guys we came up with in Wichita did time in prison. A lot died young from drugs or violence.

3. I met Wes through our older brothers. They were real close. When Wes and I first met we bonded over music. We both liked to play the bass guitar. We played music with other friends. I don't think Wes was going to school much because we hung out together most every day, playing music and hanging out around the neighborhood. We went to the roller rink, drive-ins, and pool halls. We sometimes played music at Wes's house.

4. Wes was always a real quiet kid. He never had a lot to say. It might have been because he stuttered. When Wes got upset, he spoke slower and had a hard time getting his words out, but he eventually could say what he needed. But Wes always

1 | P a g e                                                                    *RB*(Initial)

**000481**

seemed unhappy to me. He lived with his aunt, who Wes called Gaga, the whole time that I knew him, but he stayed gone a lot.

5. Gaga's house was simple. It was small. I spent most of my time in the basement where Wes had a bed and kept his music instruments, a guitar and drum set. Wes's brother, Gary, had his own bedroom off the side of the house and Gaga slept behind a curtain off the living room. The house didn't feel homey at all. It was dark and silent. I don't ever remember the lights being turned on, except for when we were in the basement. Gaga loved Wes and Gary, and she did what she could for them, but she was too frail to care for young, teenage boys and she was not their mother. Her home felt like an empty, lonely place.

6. Gary was a few years older than Wes. Gary was around even less. He was a real party guy. He dressed like the characters in Grease. He wore his hair in a ducktail, wore pointy-toed black shoes with a short heel, and carried his cigarettes in his rolled up shirt sleeves. Gary drank a lot, too. He and my older brother drank a lot together. Gary's drink of choice was a cheap red wine like Ripple. He drank it like water. Wes and I sometimes saw Gary and my brother in passing, but that's all it was. We might say hi, but just go our own ways. They did their thing; we did our thing. Gary didn't pay Wes much attention at all.

7. Wes and I started drinking together. Back then there were about six or seven bars in walking distance from our houses. We used to walk in the back door and buy beer. People paid us no mind. They didn't want 13 and 14 year old boys hanging out in the bar, but they sold us beer and we went on our way. We drank at friends' houses and in

2 | P a g e                                                        _R.B_(Initial)

000482

a local cemetery. We thought we were cool. Wes drank a couple 3-quarts of beer at a time. He would be drunk.

8. Wes never talked about his dad. Gary didn't either. I just assumed the dad wasn't around. Wes first mentioned his mom after I knew Wes for almost two years. Wes told me she dated a lot of different guys and didn't have anything to do with him. Wes told me he felt abandoned by her. That's why he lived with his Aunt Gaga.

9. I last saw Wes as a kid when I was about 14 years old. Wes was 15, or maybe just turned 16 years old. I started getting in trouble and spent some time at juvenile facilities. I didn't see Wes again until we were grown men and in the custody of the Kansas Department of Corrections.

10. During the late 1970s I was housed at the Kansas State Penitentiary in Lansing, Kansas. For nearly five years I lived in what was known as the Adjustment & Treatment (A&T) building. It was 'the hole'. It was like a penitentiary within a penitentiary. Many of the inmates that spent time in the A&T called it the Agony & Torture building. I saw Wes Purkey there as an adult through bars that separated the three wings of the A&T.

11. The A&T was like a concrete tomb. Inmates lived in single cells on the unit and had little interaction with each other. There were no windows, only a few skylights that shed light on the very upper level, but not in any cells. We were only afforded basic necessities like exercise and reading light if the correctional officers (COs) chose to give them to us. We ate in our cells and were hosed down for showers. There was standing sewer water up to our ankles in several parts of the A&T. The COs had a

3 | P a g e                                                                    *R.B* (Initial)

000483

zero tolerance policy. If they felt disrespected by an inmate, they beat that inmate down. It was complete deprivation. It would have driven an animal insane, let alone a man. Many men self-mutilated in the hope that the COs would transfer them off the unit; there were ~~several~~ Many _R.B._ suicides during that time, too.

12. Wes was a close friend when we were kids. He was real loyal and had a nice heart even though he didn't have a head start at life. He had no anchor and no one was watching out for him other than himself. It's hard to make good decisions or good choices with no direction and no guidance. I still care for him as a friend and think fondly of our time together. Had someone from Wes's defense team spoken with me before his trial, I would have shared these stories. I would have liked to have had the opportunity to help Wes then, but this is the first time I have been approached by any of his defense team.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this _15_ day of June, 2016.

_Robert D. Bentley_
Robert D. Bentley

4 | Page                                                          _R.B._ (Initial)

**000484**

## DECLARATION OF LEE HATFIELD

I, Lee Hatfield, declare and state the following:

1. My name is Lee Hatfield. I am a resident of Sedgwick County, Kansas. I am 65 years old.

2. Wes Purkey and I were friends for many years growing up. I first met Wes when we went to school together at Allison Junior High School in Wichita, Kansas. We met in the 9th grade. I immediately liked Wes. He was nice to me and invited me to hang out. We were in different classes in school, but we started to hang out after school a lot. We lived near each other, within walking distance. Wes had a little band with other friends. They jammed together. It was for fun. I liked to go listen and hang out. Wes played the bass.

3. When I met Wes, he was living with his aunt on N. Charles Street. People called her Gaga. She practically raised Wes and his brother, Gary. Wes's mom lived nearby in Wichita, but rarely ever came around. I saw her a few times when she dropped by Gaga's house, but it was rare. Wes always got upset when she came around cause she wanted nothing to do with him or Gary. She was a drunk and chose not to be around her kids. Wes felt abandoned by her. Gary had more contact with her than Wes, but he still called her a bitch and a drunk.

4. I never met nor heard anything about Wes's dad. I don't know if he was dead or what. Neither Wes nor Gary ever spoke of him.

1 | P a g e

_L H_ (Initial)

000485

5. Gaga provided what she could for Wes and Gary. She wasn't rich or anything, but she did what she could for them. Her house was small and simple. I remember there were times that Wes became really upset when he wasn't able to get something he needed. When that happened Wes had a fit. It seemed like he couldn't control his fits. Wes yelled and sometimes threw stuff. Every time I was there, Wes walked out of the house to look for beer or liquor. He always found some. Wes and I stayed gone for a while after those fits. Wes always got drunk after. Wes was about 15 or 16 when I first remember witnessing the fits.

6. Wes stopped going to school pretty soon after I met him and eventually stopped going all together. I dropped out after him. I started hanging out at Gaga's house more and more. We mostly hung out around town and drank a lot. There was a strip of bars and liquor stores between our houses. Wes, me, and some other friends bought beer and liquor from these stores and bars. Even though we were underage, we could buy beer out the back of the stores. We weren't allowed to sit in the bars, but we could walk in and buy beer from them. As long as we had money, they sold to us. We were 15 when we started doing that.

7. Gary was around, but did his own thing. When I first met Wes, Gary was about 18 years old. He had jobs and hung out with other people, including my older brothers. Wes and I hung out with him some, too. As Gary got older, he got more and more into drugs. He did everything, including pain pills and heroin. Gary huffed Tolio, too. There were times I saw Gary and his nose and lips were all red from huffing. His room reeked of it. Gary did it a lot.

2 | P a g e                                                                    _____ (Initial)

000486

8. As Wes and I got older, we drank more and more. Wes always needed a drink. Back then on Sundays, Wichita was a dry city, but there were places that if you really needed a drink it could be found. There was a hotel downtown that Wes and I went to buy alcohol on Sundays. We had to walk into the lobby and take an elevator upstairs. Wes knew the black guy that controlled access. We then went to a specific room where there was lots of liquor for sale. Wes always bought Johnnie Walker whiskey. Wes drank a lot of Johnnie Walker.

9. Wes started using drugs, too. Gary was really bad into drugs and Wes followed Gary into it. Besides Gaga, Gary was all Wes had. Gary had a strong influence on Wes, more than just a typical older brother relationship. I'm close with my older brothers, but Wes and Gary had an even stronger bond. Gary pulled Wes into drugs. I sometimes tried stuff, but Wes started using drugs often. Whatever Gary did, Wes followed. That included shooting up heroin, huffing, and taking pills.

10. There was a house off of Douglas Avenue near where Wes and I lived that would be called a crack house nowadays. It was run by black guys. They were bootleggers. Wes and I bought alcohol there since we were teenagers. The guys started selling drugs as we got older. They sold Quaaludes, LSD, speed, and other drugs. Wes started buying speed and Quaaludes. Lots of nights Wes and I stayed up all through the night, running around town, drinking and doing drugs. We stayed gone for two to three days at a time. We spent some of those nights at the crack house, otherwise we just drove around town. We only went home when we were overly exhausted. On those days we went home, slept, showered, and then met up later to do it all over again.

3 | P a g e                                                              ___ ___ (Initial)

000487

11. Wes was in a very serious car accident when he was a teenager. Before the accident, he was supposed to pick me up and we were going to hang out, but I had to help my brother-in-law with some cars. My brother-in-law worked on cars. Wes was making a turn in his car when he got hit by a semi-truck. The truck failed to stop and crashed right into Wes's side of the car. It happened at the corner of Kellogg and Vine. Wes spent many days in the hospital after the accident. I saw Wes when he got out of the hospital. He had a really big scar in the shape of a "3" on his neck. Glass from the window went right into Wes's throat. Wes felt real lucky after that accident.

12. I started doing burglaries as a young adult, in my early twenties. Wes and I often got drunk at night and after we parted ways I sometimes wandered into a house or broke into a store. I eventually got caught and sent to the reformatory in Hutchinson. Gary and Wes were already there on different cases. I worked in the kitchen giving out food. Wes was in the laundry. At first we lived in single cells and were let out only for meals and work. Wes and I were eventually moved to 4-man rooms. The doors to those cells were open all the time during the day. Anyone could walk in and out. While we lived in the 4-man cell together that's when the reformatory got de-segregated. Until then, blacks and whites were housed separate. The older guys didn't like the mixing; they planned a riot in the jailhouse as a form of protest. When it went down, the guards started separating and locking people down. Wes and I were escorted to another unit and put in the hole. The guards didn't even let us put on our shoes. We both spent several days in the hole next to each other. It was horrible. I hated it. Word spread around that every night guards were sending more men up to

4 | P a g e                                                                              𝓛𝓱 (Initial)

000488

Lansing, the penitentiary. I was really afraid that Wes and I might be sent there. Lansing was a real hard place. At the reformatory there were programs like school – I took classes while there. Wes had encouraged me to get involved. Lansing was known to be very violent. I feel very fortunate to this day that we didn't get transferred there.

13. After Wes and I got out of prison, we drank for several days straight together. It was a bender. We were just so happy to be out of the reformatory. After that I began losing touch with Wes and Gary. I met a young woman and settled down. She and I eventually married. Wes kept doing a lot of drinking and drugs, and running around Wichita. He went back to prison. Over the years we lost touch.

14. To this day I think about Wes and hope only the best for him. He was always a very loyal and caring friend. He looked out for me and others he was close to. This is the first time I have been approached by lawyers representing Wes. Had they approached me in the past I would have been more than willing to share these stories with them as I have done above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this ___9___ day of August, 2016.


_Lee Hatfield_
Lee Hatfield

5 | P a g e                                                                    _ℒℋ_ (Initial)

000489

USE OF THIS INFORMATION REGULATED BY LAW

## POLICE DEPARTMENT — WICHITA, KANSAS

CRIME: MISC REPORT

INDEXED

CLASSIFICATION: SUSPICIOUS CHARACTER (OTHER)  6410

CASE NO.  I 87057

| Case Heading VELMA L. PURKEY   40 wfe | Address ████ █ ██████ | Phone WH 31668 |
|---|---|---|
| Reported By VICTIM | Address | Phone |

| Where Committed THERE | When Committed 12:10 am 7-17-65 | Time Reported 12:34 am 7-17-65 |
|---|---|---|

How Committed:

The above repts unk person knocking on her back door above time and place.

| Officers Assigned. FLOYD # 379   4:50 am 7-17-65   MD | Beat 2 | Detail 3 | Section Assigned det | Connecting Case |
|---|---|---|---|---|

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45 46

32-015—50M—6-64

INFORMATION RELEASED TO _Laura E. O'Sullivan_
DATE _JUN 1 3 2003_ BY _Patsy A. Lewis V647_

This will certify this to be a true copy of the original record on file at Wichita Police Dept.

_Patsy A. Lewis V647_
Record and Identification Section

000490

WP_PC00009152

32-005

JUN 1 3 2003     I-87057

## MINOR COMPLAINT AND REPORT FORM

Use only for classification listed below — Print or write in black ink. CHECK ONE:

| | | | | |
|---|---|---|---|---|
| ___Dis. Cond. | ___Larc A. Access. | ___Lost Prop. | ___Found Animal | ___Home Accident |
| ___Vio. RDL | ___Misc. Offenses | ___Lost Animal | ___Sick Cared | ___Occup. Accident |
| ___Pking Vio. | ___Att. Suicide | ___Found Person | _X_Susp. Char. | ___Animal Bite |
| ___Other Traf. | ___Lost Person | ___Found Prop. | ___Pub. Acc. | ___Misc. Public |
| ___Simple Asslt. | | | | |

EXPEDITE COPY TO _Records_ Section/Unit

Case Heading _Velma L. Purkey_          Age _40_ Sex _Fe_ Race _U_

Home Address ████ 3█ █████ ███ ███          Phone _WH 3166_

Bus. Address _None_          Phone _____

When Commit. _12:10 Am 7-17-65_     Where Commit. ████ █ █ ████████

Reported by _Victim_          Age ___ Sex ___ Race ___ Phone ___

Address _____          Time Rep'td _12:34 Am 7-17-65_

Others Involved _L. E. (initials only) Carter 38 w/m . on Quail St._

Description of Property (Include Imp. Auto)_____

_____ Cash Value Loss $_____

## DETAILS (INCLUDE DISPOSITION OF PERSONS, PROPERTY AND ACTION TAKEN)

The above reports she was awaken by some one knocking at her rear door. Mrs. Purkey stated she asked who it was and turned on the front porch lights and the knocking stopped. Mrs. Purkey advised she heard or saw no one leave the area of her house. Mrs. Purkey stated she thought the person might have been a w/m who tried to pick her up at the recess lounge. She did not know his name but that her boyfriend did who is L.E. Carter and said the man was talked to by some of the dects. When they talked to her and Carter about Carter Raping a young girl.

Is further investigation needed? Yes___ No _379_ Approved:_____

Officer: _HK Floyd_     No _379_ Beat: _2_ Detail: _Hcl_ Unit: _23_ Time _5 30AM_ Date: _7-17_

If further space is needed, use the reverse side or call in report.

This will certify this to be a true copy of the original record on file at Wichita Police Dept.

WP_PC00009153

000491

Patsy G. _Jurei 1/6 47_

Declaration

My name is Margaret Ann Noe. My maiden name was Martenay. My friends and family call me Peggy. I am an adult resident of Davidson County, Tennessee.

I have known Wes Purkey since I was in the second grade. We attended St. Joseph Catholic School in Wichita, Kansas. I became close friends with Wes when I was 20 or 21 years old. Wes is approximately two years older then I am. I remember that Wes attended special classes after school for his stuttering.

Soon after we became close friends, Wes confided in me that he had been sexually abused by his mother for a long time. He told me that she had done things to him and had made him to do things to her. He couldn't go into a lot of details or he would start stuttering really bad, to the point that he couldn't even talk. Wes was ashamed of the abuse and hated that his home life was so horrible.

Wes reluctantly took me to meet his mom at an apartment where she lived. He told me that his mother was an alcoholic. He only wanted to stay for a minute because he didn't know what to expect. When we went in, his mother was in the bed in her nightgown, either drunk or hungover, although it was early afternoon. We left quickly, because Wes was ashamed of her condition.

For awhile Wes lived with his Aunt Carrie, who everyone called GaGa. GaGa was very protective of Wes and didn't want her Wes' mom around Wes.

When Wes' mother's mother died, Wes' mom went to live with her mother's husband. It was obvious that Wes' mom was living with her step-father as man and wife. Wes took me to their house one time and it was obvious to me. Wes was very ashamed about the situation. He knew it was wrong and felt horrible about it. His step-grandfather seemed to rub it in his face. Wes was very embarrassed.

Wes saved my life one time. I took drugs for a short time in my 20's. I had a bad reaction to some drugs that I took while in a house with several people. I passed out and was sick. Wes came to the house and tried to wake me up, but couldn't. No one in the house would help me, but Wes took me to my brother's house. My brother took care of me until I was better. I did not find out that Wes had helped me until much later.

Once when Wes was in his mid-twenties, we went with a group of friends to visit the grave of another friend. We stayed in a motel overnight. When Wes woke up in the morning he realized he had wet the bed. He was embarrassed and ashamed and quietly told me about what happened. I went out to the vehicle and got him a change of clothes and we turned the mattress over and no one else knew. Wes told me he had a problem with bed wetting ever since he could remember.

000492

Although Wes and I were never romantically involved and he treated me almost like the younger sister he never had, he took a special interest in my daughter, Evette, who was born in 1973, and always encouraged her to do her best.

I would have been more then willing to have told anyone from Wes' trial defense team all of what I have said here. I could have been easily located because my daughter and I have stayed in contact with Wes off and on through the years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Margaret A. Noe

Margaret A. Noe

November 6, 2007.

000493

## Declaration of Dr. Rex Newton

I received my Ph.D. in Counseling Psychology from the University of Oregon in 1971. I was hired as a Prison Psychologist by the Oregon Department of Corrections in January of 1973. I helped create and became the director of the Cornerstone Alcohol and Drug Residential Treatment Program in 1976. Cornerstone was a residential treatment program where both male and female inmates with histories of addictions came to spend the last year of their incarceration preparing to re-enter free society. I remained as the director of Cornerstone for five years, during which time the program was designated a "National Model Program" by the National Institute of Drug Abuse (NIDA). In 1983 I became a Mental Health Consultant to the Oregon Department of Corrections, a position I held until my retirement in June of 2007, after more than thirty-three years in the Oregon Prison System.

I recall meeting Wesley Purkey in my capacity of Mental Health Consultant at the Oregon State Penitentiary in 1987. Mr. Purkey was remarkable to me because he had embraced a racist organization in prison, complete with tattoos indicating his allegiance to the group, and then found himself at odds with their purpose and philosophy. He had a belief that the direction in which his life was going was not a direction he truly believed in or wanted to continue. He knew he wanted a different life, but did not know how to make a life-change to something better. He was adamant about getting into therapy, continuing to make requests to the Counseling Unit until he could not be ignored.

Mr. Purkey presented as a young man in his early thirties who had been sexually abused for years as a child, then incarcerated for the first time as an adolescent, followed by many years of adult prison time. He had spent more time locked up than in free society, and he stated he felt "institutionalized" and "fearful" of returning to the community because he "didn't know how to act". His demeanor was a combination of free-floating anger occasionally turning into rage and, at times, was pleasant, thoughtful and sensitive. His stated goal for being in therapy was to "get his head on right and get rid of the prison mentality".

Mr. Purkey displayed behaviors and characteristics common among many men in prison who started life being sexually abused by family members during many years of their childhood. The sexual abuse made Mr. Purkey feel dirty and unworthy inside, feelings that were validated for him in the form of rejection from his own parents (the abusers) and main stream society. Those feelings turned to anger and rage in his adolescence when he became intellectually mature enough to understand how he was victimized. He soon discovered he could numb the rageful turmoil he was feeling with alcohol and drugs, which would eventually lead him into the criminal justice system. Some social scientists call this the "throw away kid" syndrome where children are born to parents who do not want them, who use them for their own pleasures and then discard them into the nation's system of social services.

Clearly, Mr. Purkey wanted something different for his life when I met him in 1987. However, without the benefit of any mentor or family role model, he had no idea how to

000494

make the life-changes he wanted to make. He seemed deeply ashamed of his tattoos, always wearing long sleeved shirts to keep them covered. He did, on one occasion, reluctantly remove his shirt for me to see the basis of his dilemma. The ink on his body signaled a lifestyle that was the exact opposite of the core values I believe Mr. Purkey held most dear, a life style in which he and people around him were happy, where he could trust others and live a productive life. He had transferred from the Kansas Prison System to Oregon in hopes of getting a fresh start where people did not know him or have pre-conceived, negative judgments about him. However, those around him quickly made their opinions based primarily on the message written on his skin, a message he did not believe and was trying desperately to distance himself from. As I came to know Mr. Purkey through the therapy sessions we had, I began to see a frightened little boy underneath the anger and bravado he used to keep people away from him, complete with a serious speech impediment (stuttering) created during the times of peak stress and anxiety of living in a family of predators.

Wesley Purkey has done horrific things. One could argue that horrific things were done to Wesley Purkey throughout his childhood that sent him on a life-path so filled with rage that it practically guaranteed his ending up in prison. There are no justifications for what he has done, and he must be held accountable for his actions to the fullest extent of the law. However, it seems prudent that the law should consider the dire circumstances from which the defendant came that shaped his ability to function in free society. Mr. Purkey wanted help to deal with the demons inside him. He actively sought help from this writer and others during his life to find a better way to live. However, in the final analysis, he received very little assistance to overcome the huge emotional barriers that were created for him in early childhood by his own family, and he fell through the proverbial cracks of all our social services.

 Mr. Purkey's trial attorney never contacted me. If he had, I would have told him everything that I said here. I would have come to court and testified on behalf of Wesley Purkey, had he asked me to. I am currently available to testify to the court under oath if that would be productive in the court's considerations of this case.

I declare, under penalty of perjury, that the foregoing declaration is true and correct to the best of my knowledge.

Signed this ___15th___ day of October, 2007.

Rex M Newton Ph.D.

000495

## Declaration of Stephen E. Peterson, M.D.

I am a Board Certified Forensic and General psychiatrist, licensed in Kansas and Missouri. I was first retained to evaluate Wesley Purkey by Aline Pryor in late 1999. Ms. Pryor had been appointed to represent him on the Mary R. Bales case then pending in Wyandotte County, Kansas. I knew at that time that Mr. Purkey had also confessed to the rape and murder of Jennifer Long and would likely face a capital charge in the federal court system.

I evaluated Mr. Purkey for the Bales case in December 1999 and March 2000. I issued a report on April 19, 2000. In that report I discussed extensive loss of interpersonal boundaries, physical abuse within the family, tremendous family disruption, his extensive sexual abuse, and extreme abnormal sexual training of Wes Purkey. Some of the topics included that Mr. Purkey learned not to ask why men punched his mother in the face, why she had different men in her bedroom, learned to lie about whom his mother dated, never felt comfortable with his mother or his father, and felt his life had been truly disrupted since age 8 or 9 years old. Initially, he denied any sexual involvement with his mother, preferring to state it was his mother's girlfriend, then tearfully clarified that his mother began sexual contact with him when he was 9 or 10 years old and it did not end until he was 22 years old. He felt great shame and guilt for what happened. She bathed him, taught him how to perform oral sex on her, and seemed to feel lonely and unloved. He took on the belief that he was responsible for her sexual activity with him and eventually angrily tried to kill himself by cutting his wrist with a straight razor after a drunken sexual encounter with his mom. He endured beatings by his father and eventually hit his own father over the head with a whiskey bottle for abusing him and his mother. In addition, others within the family circle fondled Mr. Purkey when he was a preteen. These were other women. His mother taught him to anally stimulate himself and her as well as vaginally stimulate her. For a time, these became abnormal obsessive self-stimulation behaviors for him. He often tried to minimize his own horrible experiences, especially in group therapy while incarcerated, because other men reported much more severe traumas. In this way, he errantly discounted his own experiences, a common consequence of severe sexual abuse.

In late 2001, after Mr. Purkey was indicted in federal court and it was clear that the government would seek the death penalty, I was contacted in late December 2001 by Fred Duchardt, who had been appointed to represent him. The focus of the assessment for the new legal mater was to be structured around the previous assessment of Mary Bales. Of note, reports of his having been poisoned, prior head trauma, and "severe upbringing" were to be eventually revisited. Duplication of prior assessments was to be avoided. While I consulted with Mr. Duchardt and reviewed some information, I did not actually examine Mr. Purkey again until late 2002. During most of the defense team effort to represent Mr. Purkey, Mr. Duchardt and co-counsel, Laura O'Sullivan, had great difficulty effectively consistently communicating with Mr. Purkey. During large portions of pre-trial evaluation and preparation, Mr. Purkey was not effectively treated with proper psychiatric medications and needed to be. Substantial efforts were put forth by Mr. Duchardt and this writer to obtain effective psychiatric medication treatment for Mr. Purkey.

My last examination of Mr. Purkey prior to his capital trial was in December 2002, even

1

000496

though the trial did not occur until approximately a year later. My final report was submitted on August 13, 2003. In that report, I clearly referenced prior records that I had reviewed, including specific records from the Oregon Department of Corrections that referenced Mr. Purkey's report of being sexually abused between the ages of 6 and 10. I also included a finding of longstanding sexual abuse by his mother.

With respect to the sexual abuse, most of the information Mr. Purkey provided to me on this topic was done in connection with the Bales case. I was surprised when I looked back at my report in this case that I did not include more graphic narrative history regarding the sexual abuse. I certainly thought at the time and included in my discussion that the physical and sexual abuse of Mr. Purkey shaped his behavior very dramatically and contributed to the events of both offenses. In retrospect, I did not emphasize the pivotal role of sexual abuse enough with Mr. Purkey in this case where it was pertinent mitigation evidence. Even so, I believed I had made a strong case for emotional, sexual, and physical abuse as causative in shaping his extremely damaged psychological development.

I do not recall now why I did not specifically explain individual topics of emotional, physical, and sexual abuse more graphically in my report or testimony, except that Mr. Duchardt had asked me to not reduplicate information available from the Bales report. Normally, a comprehensive summary of social history and background interviews, along with all the prior records would have been be done by a mitigation specialist and provided to me and the other mental health experts to assist us in digesting such an enormous amount of information. That was not done in this case. Instead, I was provided with approximately 3,500 pages of records and only a brief index of those records.

I was not aware, that prior to trial, Mr. Duchardt informed the court he had been able to dispense with the hiring of a mitigation specialist, in part due to my work. I have worked with mitigation specialists previously in capital cases.

Mitigation specialists are typically social workers that are trained in interviewing people to obtain sensitive information and gather records and other information concerning a defendant's entire life history and background. Mitigation specialists conduct necessary interviews, review all of the records obtained, and then prepare a comprehensive well-documented psychosocial history that is then provided to other mental health experts, such as me, to assist us in conducting competent and reliable evaluations. In essence, all of this information can be mitigating in its own right, but it is also necessary for mental health experts to have full and complete information in order to ensure reliable diagnoses and information.

I did not perform the work of a mitigation specialist in Mr. Purkey's case and am not trained in the area of social work or this specialized field. I did not gather any records on my own. All of the records that I reviewed were provided to me by Ms. Pryor, Mr. Duma (who had replaced Ms. Pryor as court-appointed counsel in the Bales case), and Mr. Duchardt. All of the information concerning background interviews was also provided to me by Mr. Duchardt. I did not personally interview anyone other than Mr. Purkey.

2

000497

I was aware prior to trial that Mr. Duchardt had retained other experts. I had been provided with reports from Dr. Leeson and Dr. Preston, but I did not talk with or consult with them. I did not consult with Dr. Cunningham or see his report, if one was written. This was unusual in my experience because normally when multiple mental health experts are retained, defense counsel will generally have them exchange reports and consult together at some point.

I believe it would have been very helpful to consult with the other experts in this case. For example, I am now aware that Mr. Purkey discussed with Dr. Cunningham the details of his sexual abuse and other traumatic exposures to sexual events during his childhood. As I did, Dr. Cunningham also clearly found that these events were significant in shaping Mr. Purkey's development and mental state. If we had discussed these matters beforehand, I likely would have highlighted this more in my report and preparation for my testimony.

Instead, when I testified during sentencing, I provided only general testimony about the extensive sexual abuse in the context that Mr. Purkey was severely sexually, physically, and emotionally abused in childhood so developed extremely abnormal psychosexual ideas. The only detail I included in my testimony was that Mr. Purkey had reported pervasive sexual abuse by his mother from age six to 14 and witnessed her sexual involvement with her boyfriends after his father left. I also mentioned his father's paying for prostitutes for him at a young age and how each of these things resulted in Mr. Purkey having substantial difficulties with emotional attachment to women. I also mentioned his prior diagnosis of psychosexual problems of identification. I did not include any of the raw details of what had happened to Mr. Purkey, such that the jury could really envision what had happened to Mr. Purkey as a child. During my testimony, I felt that I had made it clear that he had experienced a number of very severe childhood traumas that had a pervasive negative impact on his psychological development that was relevant to his degree of criminal responsibility.

Despite the reference in my own report to the Oregon Department of Corrections records in the Index and Review of Material sections, when I testified on cross-examination, I had forgotten about that report. Thus, I testified that the only prior report of sexual contact with his mother was her 1972 report that he raped her. I also testified that I was the only one Mr. Purkey told about sexual abuse in detail because I was the only one to ask. At that point, I was unaware of the details of Dr. Cunningham's assessment of Mr. Purkey. I was not aware then that Dr. Cunningham could also testify that Mr. Purkey had been exposed so such things as observing his mother having sexual intercourse with a man. In addition, as early as age eight, his mother began inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse.

I do not know why this lapse of memory occurred on my part at the time during cross-examination. Clearly, Mr. Purkey had previously reported sexual abuse to the psychologist he saw in

the Oregon Department of Corrections and I had reviewed those documents as background for my own assessment of Mr. Purkey. I do not know why Mr. Duchardt did not object to the government's questions on this point or direct me to the records or my own report in redirect to clarify this point.

This is one specific example where I believe that the presence of a mitigation specialist in the defense team would have made a significant difference. In every other capital case for which I have been the defense expert, except for one, the defense retained a mitigation specialist. Had there been a mitigation specialist, the defense team would not have failed to bring the Oregon records in front of the jury. Nor would they have failed to contact Dr. Rex Newton. Because of the absence of a mitigation specialist, however, the government was able to impeach the reports of sexual abuse to me by implying that Mr. Purkey fabricated them to me in order to avoid the death penalty. This was clearly incorrect since he had reported it to Dr. Newton at the Oregon State Penitentiary in 1987. Nonetheless, the jury did not hear the truth on this point and I believe this was very damaging to Mr. Purkey's case.

The extensive sexual abuse that Wes Purkey suffered, with the subsequent prolonged intense loss of personal security and safety, helps clarify one of the very important life traumas that caused his psychological development to become extremely fragmented and intermixed with mood swings, extreme anxiety, severe substance abuse, and rage attacks. As a pre-adolescent, he would have been much more vulnerable to and shaped by his family environment due to his tender years. These extreme losses of interpersonal boundaries within his family lasted until he was 22 years old, thus encompassing nearly all of his tender developmental years and then were never effectively treated by any mental health practitioner. Very often as a consequence of such prolonged psychological traumas, there is a higher incidence of disordered behavior, acting-out behavior and criminal activity in persons, especially men, who have suffered extensive emotional, sexual, and physical abuse. Mr. Purkey's abuse experience started at such a young age by the hands of those he needed to protect him. He was powerless to protect himself and unable to prevent the tragic impact on his psyche as well as how he views the world. As recently as this month, October 2007, he still is virtually unable to discuss the details of the abuse. Such reluctance is extremely common for abused boys who grow into manhood. He feels as though, when he does talk about it, that he is betraying his mother. He feels that it does not alleviate his responsibility and he does not want to use the abuse as a crutch. He errantly feels he must protect his mother, and defend her from what she did. These feelings are indicative of a person who was sexually abused as a child. He seems to defend his mother, to protect the few good memories he actually has from his childhood. He expresses that telling people about his abuse is not very masculine. He has a hyper-masculine mindset, such that men are expected to be strong protectors of their families and themselves. Thus, to focus on being a sexual abuse victim is counterintuitive for his personality style and against his psychological defense mechanisms, which protect his view of himself and his mother. Despite this front of emotional competence, he still experiences nightmares of the abuse. Mostly what he can remember is the anger that he felt. As a child, he withdrew from normal personal contacts, as it was emotionally less frightening. The anger is most likely a combination of reaction to childhood powerlessness, loss of personal physical safety, and amorphous rage, as he incorrectly believes he should have been able to protect himself from his chaotic parental environment. Mr. Purkey's abuses and mental health problems are not resolved but

4

000499

he ineffectively acts the role of a fully capable adult. These are roles that he thinks important for a man to act, such as strong, tough, without need to share his feelings, and loyal even to his abusive mother. In therapy groups, he could not talk about his sexual abuse in front of other men. He was protecting himself, and he was playing a role. In therapy, he was trying to find out something about himself.

As a child, he could not confide in anyone about the abuse. But there were people who knew. His Aunt Carrie Burke was aware that something sexual was going on with him and his mother. His history reflects that others knew of the abuse or believed his maternal relationship was toxic. For example, in 1967 he was admitted to St. Francis. Hospital notes show that the hospital would not permit his mother to visit him. He reported that this was because his Aunt Carrie Burke, GaGa, told the hospital that his mother was sexually abusing him, that she had seen her molesting him, and had actually kicked her out of the house. His aunt had also seen Mr. Purkey's mother and father naked, physically fighting one another, and witnessed his mother with other men in front of him, naked and very sexual. Mr. Purkey reported that when he was young, the nuns at school frequently asked him what was wrong and what was going on at home. However, he never felt that he could open up to them.

Mr. Purkey was comfortable in opening up to Dr. Newton in the Oregon Department of Corrections. He was trying to improve himself then, and was involved in group therapy called the "State Raised" group. To become a member, a prisoner had to be incarcerated for at least 12 years. There were between 10 and 15 inmates involved in each therapy session. It was called State Raised because the group members were literally raised by the state in confinement. The focus was about prisoners trying to identify what they had felt throughout their lives and create ways to change their life direction. Dr. Newton also had individual therapy sessions with him and he was able to share with him some of the history of abuse.

Finally, I had consulted with Mr. Duchardt prior to trial concerning the possibility of my testifying in the guilt-or-innocence phase of the trial. I do not know why he chose not to call me during the trial. My opinion did not really support a defense to the charges. Even so, Mr. Purkey had told me on numerous occasions that he did not kidnap Ms. Long, which I believe was the focus of the defense during the trial. After Mr. Purkey testified during the trial, I do not recall Mr. Duchardt calling me again about the possibility of calling me to testify during the trial itself. Our discussions after that time were all related to sentencing issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This the 15TH day of October 2007.

_Stephen E. Peterson_

Stephen E. Peterson, M.D

5

000500

## DECLARATION OF SHARON FISHER

I, Sharon Fisher, declare and state the following:

1.  My name is Sharon Fisher. I am a resident of Butler County, Kansas and am 65 years old. I was married to Wesley Purkey's brother, Gary for a short while in the 1970s.

2.  I met Gary in 1974 in Wichita, not long after my oldest son was born in April. We met one night at a club. I was out socializing with my friends. Gary came up to me and started flirting. At first I wasn't that impressed. He was tall, but too skinny. I told him that. But Gary was persistent. He kept trying to talk to me that night, so I gave in. He seemed sweet enough and he was showing me a lot of attention. We started dating not long after that night. Gary and I officially married in August, 1972.

3.  I met Gary's younger brother, Wesley, not long before me and Gary married. Gary, me, and their aunt, Gaga, drove out to a prison to pick him up from prison. Gary drove us in Gaga's station wagon. Gary didn't have his own car. After we picked up Wesley and were driving back to Wichita, Wesley asked Gary if he had anything to smoke. Gary gave Wesley marijuana. Wesley was high before we even got back to Wichita.

4.  Wesley and Gary both lived with Gaga in Wichita. She was a little old lady. She was very sweet and used to cook and clean for the boys. She was their rock.

5.  However, when it came to what Gary and Wesley did or were involved in, Gaga turned a blind eye. For instance, I rented the apartment upstairs in Gaga's house and the day I finally left Gary, I brought all his clothes down to her unit from mine. She asked me what was wrong, so I told her I was leaving Gary. She was really surprised, which surprised me. She didn't

1 | P a g e                                                                    _____ (Initial)

000501

understand why I would leave him even though she saw me with black eyes and bruises more than once.

6. The apartment I rented above Gaga was small. It had a little kitchen and sitting area, a bathroom, bedroom, and walk-in closet. Even after Gary and I married, we didn't live together. I lived in the apartment and he lived in Gaga's section of the house. Even though Gary and Wesley lived downstairs, they hung out a lot in my apartment. They drank and did a lot of drugs in those years. They drank mostly quarts of whiskey and 30 packs of beer. They drank that much every day. I really only knew them when they were drunk or high. They used my walk-in closet whenever they huffed their Tolio. Gary was shooting heroin a lot in those days, too.

7. Gary rarely if ever had a job. When he did have one I had to push him out the door in the mornings to go to work. Otherwise, he might lay in bed all day. He partied all night, every night, so he just wanted to stay in bed all day. There were nights Gary didn't come home because he was too messed up. Wesley usually had more work than Gary. Wesley partied just as hard as Gary, but he got himself up for work. There were mornings I had to push him out too, but they were less frequent.

8. Even though Wesley was often drunk or high, he was very good with my baby son. He called him "Little Buddy." Every time Wesley called "Little Buddy" my son went to him. They played together. It was really sweet.

9. Wesley was a very protective person when someone was his friend. To me, he was like a big brother, even though he was younger than me. When we were out socializing, he used to introduce me as his older sister. Gary pushed me around and beat me up a lot in those years. He put the fear of God in me. When Wesley was around, he stepped in to protect me from

2 | P a g e                                                                                      __ (Initial)

Gary. He was a very caring person for you if you knew each other. No one was going to abuse you if Wesley was around.

10. When Wesley and Gary were drinking around my apartment they sometimes talked about their childhood. They did a lot of "hey, remember when." Gary did that a lot, and Wesley had loose lips when he drank. I remember vividly one time that they were talking to each other. They must have thought I was in the bedroom or the bathroom, but I was standing just behind the doorway out of view listening. They were talking about how Velma, their mom, used to play with them, like molested them, as kids, and taught them how to give oral sex and do other sexual acts. Another time, Wesley said, "momma, she screwed us into good grades." They talked about how she had sex with some of their friends, too.

11. I met Velma only a few times, but my first impression of her was that she was a real slut. If she wasn't already drunk, she started drinking when she woke up. That was every day. I don't think I ever saw her without a drink nearby. When there were men around, including her sons, she was all up on them. Once dusk came she was like a wolf on a hound. She tried to get someone, anyone, to have sex with her.

12. The first time I ever went to her house, a duplex off of West 2nd on the west side of Wichita, I was meeting Gary there to then go out with him. When I got there the door was open, so I walked in without knocking. I couldn't believe what I saw. I still can't believe it sometimes. It was a small apartment that was like a shotgun. From the front I could see all the way into the back bedroom because of how the mirrors were arranged. Velma was naked on the bed. She was giving Gary oral sex while he stood next to her. I was so confused. I didn't know what to do. I felt humiliated and disgusted. I walked into the kitchen, called my dad to come pick me up, and then sat down. Before I walked out of the house I picked up one of the chairs

3 | P a g e                                                    _____ (Initial)

000503

around the table and threw it at Gary and Velma. They hardly responded to me. Gary just waived me off.

13. When my dad arrived I told him what happened. He wanted to go inside and set things straight with Gary, but I begged him not to. It wasn't his business. That's when my dad started on me to leave Gary. I did file papers to divorce Gary in November of 1972, but I withdrew them that time. I decided to give it another shot because that's what wives did back then. I was raised to be subservient to my husband, so I tried to block it out. But I wasn't naïve. That's not the type of thing that happens out-of-the-blue. I know it had been going on for years.

14. Not long after I withdrew my petition for divorce, Wesley came over to my parents' house one night. I was staying there for a little while trying to figure things out. He was beating on the door. My dad wasn't too happy that Wesley was there, but he liked Wesley so he let him in. My dad hated Gary. Wes had blood on his clothing. He told me and my dad that he had just beaten Velma up because she made Gary do sexual acts on her. Wesley was trying to protect Gary. I offered Wesley a place to stay in the house, but he chose to stay in his car outside. After Wesley went outside my dad and I talked and we decided it best to call the police. We didn't want them to start looking for Wesley and then find him on their own. He could turn himself in. I went outside to tell Wesley what my dad and I had discussed and he was okay with it. When the cops came he turned himself in. Velma alleged that Wesley raped her that night, too, but I never believed that. I saw Wesley out on the streets a couple days later, so the charges must have been dropped.

15. Velma was sleeping with her stepdad then, too. His name was Darling. He owned her duplex. He had money from owning a construction company. Although the inside of Velma's house

4 | P a g e                                                                                    _____ (Initial)

000504

didn't have much she drove a real nice tan little car that Darling bought too. It was well known that Velma was sleeping with him. Gaga was the first person to tell me. I asked her once why she went to church so much. She went every day. She told me that she had to go to pray for Velma because Velma was sleeping with her stepdad.

16. Gary and I last only a few months after I walked in on him and Velma. Before I left him, Gary brought me back to Velma's home one night so we could talk and get to know each other better. The visit was weird. When we got there Velma was already drunk. She sat on the arm of the couch next to Gary, practically in Gary's lap. While she talked, she stroked his hair like a lover does. That infuriated me. I was never one to mince words, so I yelled at Gary that his mom was acting like a whore. Gary was furious. He started yelling at me that we were in her house and how dare I say something like that. He told me to leave, so I did. Gary chose her over me.

17. The final straw happened shortly thereafter. I was in my apartment above Gaga's unit when Gary came in all drunk and angry. He roughed me up real badly and then threw me out of the second story window. By the grace of God my dad was driving past the house when it happened. He later told me he was worried about me and looking after me. He helped me up and got me into his car. After I healed up, he told me it was time I leave Gary. He told me I had to do it for my son, otherwise my dad was going to take him away from me. That convinced me to leave Gary. I didn't want to lose my son. My dad helped me get the papers together. That was in March 1973. Gary and I were officially divorced in July. Gary wasn't happy about any of it, but he accepted it. Although I never heard from him again after it I was afraid of him for some time.

(Initial)

18. The last I heard of Wesley was in the late 1990s. I had just moved back to Wichita from Louisiana. That is where I have lived ever since. My mom asked me one day if I saw the news and saw Wesley. I hadn't. When I saw soon after that the police were looking for a missing woman at Wesley's trailer, I was shocked. I couldn't believe Wesley did that. I knew that years and years ago he had attempted to kill someone, so I thought he was always in prison.

19. This is the first time I've been contacted by anyone working on Wesley's case. Had previous defense teams contacted me, I would have shared these same experiences with them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 12 day of January, 2017.


Sharon Fisher

(Initial)

000506

## DECLARATION OF GARRY J. MONTY

I, Garry Monty, declare and state the following:

1. My name is Garry Monty. I am a resident of Dallas County, Texas. I am 64 years old. I have lived in the Dallas area for approximately 40 years since I graduated from college in Wichita, Kansas. I am originally from Wichita.

2. I met Wes as a young boy when we both went to St. Joseph's Catholic School. Everyone calls it St. Joe's. We were very close, best of friends. We hung out in school and after school. We lived in the same neighborhood, too, just north of Douglas Avenue behind St. Joe's. We played a lot of sports together in the neighborhood. We rode bikes up to the dirt trails in Oak Park. That was across the river from our neighborhood, heading east towards downtown Wichita. We played Red Rover and Hide n' Seek at night, too. The neighborhood had a lot of kids in it. There were big families like the Aarons. Boys and girls played together. Most the time we spent at my house, the Aarons, or playing out in the neighborhood. We seldom ever went to Wes's house; I couldn't have gone there more than a handful of times in all the years I knew him.

3. Outside of school Wes was a jokester. He seemed really happy when he was outside. That was very different than from school. He joked around with people, including the girls. He didn't try to hide his stutter.

4. Wes never had a chance. He didn't have a good, supportive home life. His mom wasn't around much; she didn't give Wes much attention. She was what people today might call a slut. She slept around with a lot of men in the area. I heard about it from the adults in my family. They talked about it in their own way. They didn't talk about it with me specifically,

1 | P a g e

⟨signature⟩ (Initial)

000507

but there were times I was in earshot and overheard my dad or aunt talking about Wes's mom with others. It was well-known. I never talked about it with Wes. Neither one of us ever brought it up. But Wes had to know because people gossiped.

5.  I never met or saw Wes's dad. He was never around. I didn't know if his dad was dead or just out of the picture. Wes never talked about him.

6.  Wes did have an older brother named Gary. Although he was around Wes some of the time he tended to be focused on himself. He associated with an older crowd from other neighborhoods in Wichita. He had a reputation as a tough guy. He wasn't the type of person to mess with because he would fight you. I heard years ago he got in trouble with the police and went to prison. He was never mean towards me because I was friends with Wes. But Gary was just the type of person to avoid.

7.  Because Wes didn't have a reliable family, Wes spent a lot of time at my house when we were young. He did homework with me sometimes, but we mostly played in the neighborhood. He ate dinner with us, too. He was very polite to my parents and grateful to get a hot meal. It always seemed like Wes never wanted to go back to his house, which makes sense to me; he had nothing to go home to. His mom was hardly around and when she was I don't think it was easy because of her drinking.

8.  I remember St. Joe's fondly because of the kids I met there, like Wes. The teachers, though, were different. Most were nuns. Some were nice, but there were real mean ones. In the second grade there was a student who really struggled to tie his shoes. He didn't know how to. Rather than help him tie his shoes, or take their time to teach him, the nuns made him take off his shoes and stand on paper plates. They then tied the plates around his feet using pink ribbon. He had to walk around school all day until he learned to tie his shoes. I'll never forget

*GM* (Initial)

000508

it; I felt terrible for him. There was another boy in the 2nd or 3rd grade that wet himself quite a bit. He always· raised his hand, asking to go to the bathroom. The nuns didn't let him go. They made him sit there. There were several days that he wet himself in the classroom. The nuns probably thought they were teaching him to hold it. All they did was make it worse.

9. The nuns also slapped students' hands with rulers. If we didn't do our homework right, or talked in class, we often got hit. They sent students to the corner of the classroom to sit on the trash barrel. We had to balance ourselves on the edge of the barrel for as long as the nun wanted us to. If we tipped the barrel or fell off, we got in even more trouble.

10. In the 6th grade Wes and I had Sister Gertrudis. She was a horrible person. For many years after I had a hard time getting over her treatment towards me and other students. For some reason, she decided not to call me by my real name. Instead, she called me Pie Face. It lasted about six or seven months. It made me so angry that I eventually snapped. One day I stood up in the middle of class and yelled at her to call me by my real name. She yelled back at me that she will call me what she wants and that she was going to call my father. After she and my father met, she never called me Pie Face again.

11. Earlier in the same year I broke my ankle playing basketball. I had to use crutches. My father went into school that first day and spoke to Sister Gertrudis about my need to keep my ankle elevated. I was there for the conversation. She agreed that I could use a second chair to keep it elevated while I sat at my desk. But after my dad left, Sister Gertrudis walked away. She didn't get a chair. I asked her about it and all she did was snap at me that I didn't need it.

12. Sister Gertrudis singled out other students that year besides me, but I don't remember who they were any more. I was so overwhelmed by her treatment towards me that I just don't remember specifics of what she did to others that year.

3 | P a g e                                                                 6.M. (Initial)

000509

13. In 6th grade Wes and some other boys were at my house. My Aunt Armeline – we called her Army for short – was asking all of us about our science fair projects. That year St. Joe's held a science fair in which all the 6th grade students had to participate. We were talking about our ideas with my aunt. When she asked Wes, he kind of shook his head. He avoided the question. Aunt Army told him that she had the perfect project for him. She worked at Boeing for many years before retiring from there. At that time she had something to do with training pilots, so she had one of their survival kits. It had a few things in it like a tin cup and plastic. From that day until the science fair, Wes was at my house every day after school working with Aunt Army on the project. He used the survival kit to make water from air. He got first or second place in that fair. Me and all the boys were jealous of his project. It was really cool. After that science project, my Aunt Army took an interest in Wes. Whenever he was over she made sure to always ask Wes how he was doing. She really took a liking to him.

14. For students who struggled at St. Joe's, there were no additional supports. The nuns didn't offer any extra help during school. It didn't seem like they ever offered anything before or after school either. Students had to learn it on their own, or get help at home. Wes seemed to be one of those struggling students. He was very quiet in the classroom. He never volunteered to do anything in class and kept his head down at his desk.

15. At St. Joseph's, Wes and I played organized football and basketball. The school had teams in 7th and 8th grade. In basketball, 6th graders could try out for the team. If they were good enough, they could play with one of the teams; otherwise they had to wait until 7th grade to play. Wes was a tough football player. He was already big in the 7th grade. He played on the line. He wasn't like a lineman, more like a tight end and defensive end. He was strong and real tough. He could get after it. Other kids had a hard time blocking him. If he had a chance

**4** | P a g e                                                                 ⟨signature⟩ (Initial)

000510

to attend Bishop Carroll, he could have been a really good football player. He might have been able to play in college, maybe not a big school, but he could have had a chance.

16. Wes was okay at basketball. He wasn't a smooth player. He played down low near the basket. He was more like a bull in a china shop; what made him really good at football worked against him in basketball.

17. I lost touch with Wes after we graduated from St. Joe's. I went to Bishop Carroll and Wes went to Allison Junior High. Aunt Army did everything she could to try to get Wes into Bishop Carroll. She was over there pleading with the Christian Brothers to let him attend. All the boys were encouraging Wes to try to go too. We all wanted him there. I don't know what happened other than Wes didn't end up going to Bishop Carroll. I don't know if it was the money – it cost a few hundred dollars a year to go, which was a lot of money for a family like Wes's who didn't have much.  There was an entrance exam that all applicants had to take. Wes always struggled in school so it is possible that he did poorly on it.  All I know is that my aunt was very upset after Wes wasn't able to attend.

18. The first couple of years after St. Joe's I ran into Wes around the neighborhood sometimes. We always hit it off and talked, but that was it. We didn't ever hang out together or meet up. In the 10th grade my dad moved us out of the neighborhood and closer to Bishop Carroll. I became very serious about football and spent all my time training and practicing as I got older so I could play in college. At some point I never saw Wes again. Towards the end of high school I started hearing that Wes was getting in trouble around Wichita. He was running with rougher kids.

19. I wish Wes had a better outcome. If Wes had been able to go to Bishop Carroll his life would have been much different. The Christian Brothers were very disciplined and tough on

5 | P a g e

*G. M.* (Initial)

000511

students, but they also knew when to sit down and talk with us if we were struggling or to get us the right help. I had those conversations a couple times with different brothers. They sat me down and told me I wasn't doing well – we then talked out how I could do better with their help. The brothers cared a lot about the students – a whole lot more than the nuns at St. Joe's. They also had more resources than public schools to help us.

20. At high school reunions I still see friends from St. Joe's sometimes. Over the years we have reminisced about our childhood and Wes, in particular. I still think fondly of Wes and still consider him a very close childhood friend. I wish that past defense teams had visited me here in Texas, but they never did. This is the first time I have spoken to any of his defense team and been able to share my memories of Wes. I would have been happy to have done so previously if given the opportunity.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this _17_ day of November, 2016.

_Garry J. Monty_ (signature)

Garry J. Monty

6.M. (Initial)

000512

## DECLARATION OF JAMES HAGGARD

I, James Haggard, declare and state the following:

1.  My name is James Haggard. I go by Jim. I am a resident of Sedgwick County, Kansas. I am 64 years old.

2.  I met Wesley Purkey while growing up in Wichita, Kansas. We lived in the same neighborhood and attended the same Catholic school, St. Joseph's Catholic School, or St. Joe's as we call it. Growing up, I lived on the 100 block of N Clarence and Wes grew up on the 200 block of N Clarence. When I knew Wes he lived with his mom and older brother. I met his mom a few times. I remember her being tall and blonde. She mostly kept to herself. I didn't ever see her interact with my parents, or hear about it either. I never saw Wes's dad. I don't know if he even knew who his father was. Wes never talked about him.

3.  Wes and I hung out together after school and in the neighborhood. He was one of the neighborhood boys. He came over my house sometimes. Whenever he did, he often wanted something to eat. My mom might make Wes a sandwich or give him some leftovers. Wes was very polite to her and my dad when he was at my house.

4.  Growing up Wes's hair was always meticulous. His clothes were pressed very nice and neat. He stood out in that way amongst the other kids. But Wes's family wasn't as well off as other families in the neighborhood. His house was smaller than most in the neighborhood. Most houses were bungalows with basements, a front porch, and many had garages. Wes's house was an A-frame. There was a room upstairs, but it was only a single room, not a full second floor. There was no front porch, only a couple of steps up to the front door. There was no garage and no basement either.

1 | P a g e

*JH* (Initial)

000513

5. My family attended St. Joseph's Catholic Parish. In about the 5th grade, I became an altar boy. Wes was one, too. Wes and I served Mass, weddings and funerals together. Wes served about a year. That stands out to me because most boys served longer than that. Apart from serving together, I don't recall seeing Wes or his family at church. My family and I attended almost every Sunday without fail.

6. Every Christmas one of the families from the neighborhood organized neighborhood kids to go around Christmas caroling. It was a big deal. A month before, the neighborhood kids started practicing and the parents made a program. There were 10 to 12 kids. It was more like a choir. We went from house to house in the neighborhood. Wes did it when we were in the 4th and 5th grades. Even though he spoke with a stutter, Wes sang well. He was like the country singer, Mel Tillis. He couldn't get five words out without stuttering, but he could sing real well.

7. Wes and I attended St. Joe's Catholic School together for several years. In 4th grade that's when sports become a big deal for us boys. That's when I started playing organized sports on the playground and after school in the neighborhood. Wes was quiet and not the outgoing type. After school I often went to Wes's house to invite him to come out and play with me and other boys. I knocked on the door to the house. Wes didn't come out much. He often told us he couldn't, but he never said why. He did come out sometimes, but it got less and less as we got older.

8. St. Joe's was like a neighborhood Catholic School. It wasn't too big. It was run by nuns called the Blessed Virgin Marys. They were real mean women. They always treated the girls better than the boys. If a boy played sports he was better off than if he didn't play. The boys that didn't play got it the worst. Wes was one of those boys. Wes didn't play enough sports to

2 | P a g e                                                                    _(Initial)

000514

satisfy the nuns, so he got it pretty bad from them. They used corporal punishment. They pulled hair; hit students' knuckles with a pointer. I think a couple of my knuckles are probably still messed up from the times I got hit. The nuns sometimes smacked students in the face. Lots of people got it, but some worse than others. Wes was one of those who got it worse than most.

9. In the 7th grade Wes and I had Sister Mary Adrienne as our teacher. She had lived in Chicago previously and almost every day she told us the same story about how she threw a bunch of children out of a window at a school there to save them from a fire. She really did save a lot of children, but she was terribly mean. She was the absolute worst of all the nuns. For one thing, she didn't believe that Wes couldn't control his stuttering. She singled him out all the time. A lot of students had to recite poetry or read in the middle of class, but she called on Wes more than others. He had to stand at his desk and read aloud to the class. Wes wasn't a good reader to begin with, so he always looked embarrassed and that made his stuttering worse. Once he started stuttering he couldn't stop. Sister Mary Adrienne made Wes continue to stand and read even as the stuttering got worse and worse. It was really awful.

10. St. Joe's had no support for struggling students. We couldn't stay after school for help. There was no extra help during school either. For example, in the 6th grade I really struggled with math, but I was fortunate because my parents could afford to get me a private tutor. I went after school a few days a week. If students' parents couldn't afford to pay someone outside of school to help, like my parents could, there was no assistance from St. Joe's.

11. Starting towards the end of the 7th grade I saw less and less of Wes, in school and outside of school. I believe it had to do, at least in part to Sister Mary Adrienne's treatment of Wes and the embarrassment it caused him. I started seeing Wes hanging out more with Bobby Bentley

3 | P a g e                                                                 (Initial)

000515

and Bobby's group of friends starting in the 8th grade. Bobby lived in our neighborhood, but didn't go to St. Joe's. He was a bad influence. Even as a little kid Bobby was real trouble. He got in a lot of fights. He walked down the railroad tracks in our neighborhood and picked fights with any kids he saw. He threw rocks at cars as they drove past. Even though Bobby was smaller, he was the ring leader of his group of friends. When I saw Wes with them, he was more a follower in the group. Wes was still nice to me. He always said hi and talked to me.

12. I rarely saw Wes after we graduated from St. Joe's. I went on to Bishop Carroll High School with most of the other boys from our class. Wes went to Allison Middle School, a public school that went up to 9th grade then. It was not a good school. It was known to be rough and a lot of students dropped out of school there.

13. I believe that life could have been different for Wes if he had been able to attend Bishop Carroll High School. It was a more supportive place although it was expensive to attend. I remember a student at Bishop Carroll who stuttered like Wes. The brothers at Bishop Carroll helped him get into a good regional vocational school. His strengths were in math and he was very good with his hands. He has since become a renowned machinist, one of the best in the country. It is hard not to think that Wes's life would have been different if only he also had some kind of support.

14. During the 9th grade my family moved out of the neighborhood and into a nicer, middle class neighborhood. After that I never saw Wes again in person.

15. Every few years a group of us that went to St. Joe's and Bishop Carroll get together and go to our high school reunions. We always talk about Wes. We often ask ourselves what we could have done differently or how we could have helped him. We were all friends and remember

4 | P a g e

_(Initial)_

000516

Wes fondly during those years growing up together. I was shocked when I heard on the news about what Wes was involved in. I still struggle with it. I hope that he gets to live the rest of his life in prison; I don't think Wes should be put to death.

16. Wes's defense teams never approached me prior to now. Had they, I would have shared these stories with them. I would have liked to have had the opportunity to help Wes earlier in his case, but this is the first time I have been approached by any of the members of his defense teams.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this __9__ day of August, 2016.

_James Haggard_
James Haggard

(Initial)

000517

## DECLARATION OF DON RICHARD AARON

I, Don Aaron, declare and state the following:

1. My name is Don Aaron. I am a resident of Sedgwick County, Kansas. I am 63 years old.

2. Wes and I became good friends in the 6th grade. We lived a few blocks from each other in the same neighborhood on the west side of Wichita, but it was in school that I came to know Wes well. We both attended St. Joseph's Catholic School, or St. Joe's as we call it. St. Joe's was a neighborhood parochial school the children of families that attended St. Joseph's Parish. It was mostly staffed by nuns while Wes and I attended. The school's resources were limited. It only offered sports for older students, but no academic help for struggling students. There weren't separate classes or breakouts for students who struggled or needed extra attention. I could have used the assistance because I struggled academically during those years, but I didn't have access while at St. Joe's. My parents would have had to get me help from somewhere else.

3. Even though Wes and Wes's older brother, Gary, attended St. Joe's, I don't ever remember seeing them at church on Sundays. I never saw or met their mom or dad. My family and I attended church most Sundays at St. Joseph's Parish when I was growing up.

4. Wes was always very quiet in class. He rarely spoke and always sat in the back of the classroom if he could. The only times I recall him not sitting in the back were in

1 | P a g e                                                          〜ᴶᴬ (Initial)

000518

classes that had assigned seating. On the playground Wes was different. He told jokes and tried to make people laugh. People seemed to like him and he got along with everyone.

5. I got to know Wes well when we started playing baseball and basketball in the 6th grade together. We played on the playground and in the neighborhood. In 6th grade we played organized baseball against other parishes. Several boys including me and Wes played on the team. The mom's used to organize a carpool to and from the games and practices because we played at another Catholic school outside of our neighborhood. Wes was part of the carpool, but his mom never drove us. I do remember an older man picked us up a couple of times with Wes. As a little kid I thought it was Wes's dad. I know it was someone who watched Wes, maybe his grandfather. Those car rides were very different than the norm. Typically we laughed and joked together during the rides, but during those car rides we were silent. No one spoke, not even Wes. It was very strange.

6. Wes and I also played for the school's basketball team in 7th or 8th grade. Wes played baseball when he was younger, but by 7th grade he had stopped playing. At that time all the games and practices were held at Christ the King school.

7. The nuns at St. Joe's were of the Blessed Virgin Mary order, or BVM for short. During our 6th or 7th grade year a rumor started floating around the school that BVM actually stood for 'Black Veiled Monster.' The nuns were real mean. They whacked students during school and sometimes even pulled students out of Sunday church to discipline them. That happened to me one Sunday. The nuns could be real nasty.

2 | P a g e

_____ (Initial)

000519

That's why the nickname spread. The nuns blamed Wes for starting the rumor. I remember during class one day a nun pulled him out of our classroom. When he returned to the classroom after what seemed like quite a while, Wes's face was red. He held his hand over his face and it looked like he had been crying. It was obvious that the nun had whacked him in the face.

8. Every morning at the start of school we had Mass. It started at 8 a.m. All students were expected to be there. Students who were late got in big trouble. At the end of Mass announcements were made. Not long after Wes had been pulled out of class because of the BVM rumor, the nuns made Wes stand in front of the whole school and tell all the students and teachers what BVM stood for. It was painful to watch. Wes couldn't get the words out. I remember hearing his stutter, Bl Bl Bl Blessed V V V Virgin… The longer it went the more Wes stuttered. He could barely get the words out of his mouth. I felt so bad for him, horrible really. I was in my seat cringing the whole time. The nuns knew Wes had a stutter; Wes stuttered all the time, but on stage in front of everyone it was really awful.

9. Wes's older brother, Gary, was about 3-4 years older than Wes and me. At the time, Gary slicked back his hair, rolled up his sleeves, and dressed like a character in the movie, Grease. He was real edgy and quiet, too. He was the type of person that wanted to know why you were there and always questioned you. He was not the type of person I, or anybody, messed with. People knew not to mess with Gary. Like any younger brother, Wes looked up to Gary. Wes talked about Gary a lot. He was proud

3 | P a g e                                                                    _____ (Initial)

of his brother. It was obvious that Gary had a lot of influence on Wes because of how much Wes looked up to him.

10. During 8th grade Wes started hanging out with Bobby Bentley. I don't know how they met, but I saw them around our neighborhood together. Bobby was from the neighborhood, but never attended St. Joe's. Even as a little kid, Bobby was troubled. He often hung out with an older group of guys, high school guys, in the neighborhood, but Bobby always seemed like he was the ring leader. They were a rough group. I can't even count how many times I saw Bobby in a fight – it was often. Another guy in that group was named Clinesmith. My ~~cousin~~ was friends with him. Because Clinesmith knew who I was, I had less trouble with those guys than did others in the neighborhood.

11. Bobby lived in a house at Burton St. and Charles St. in our neighborhood. ~~His sister, Twyla lived there, too~~. There were always lots of parties and fights at the house. There had to have been lots of alcohol because Bobby and his friends were often drunk. I avoided walking past the front of the house because often times Bobby or one of the others came out of the house to pick a fight. One time Bobby punched me in the face. I went out of my way to walk down other streets, as did other kids in the neighborhood just to avoid being harassed or beaten up.

12. As an adult, Bobby did a lot of time in prison. He was in the news quite a bit. He even escaped from the Sedgwick County Jail and years later broke out of Lansing Prison. Bobby was notorious.

4 | Page                                                                      _____ (Initial)

000521

13. After Wes and I graduated from St. Joe's at the end of 8th grade, I went to Bishop Carroll High School and Wes went to Allison Junior High School. Allison was known to be a rough school. That's the school where Bobby and his friends went. Allison is still considered a rougher school today. That's when I saw Wes with Bobby Bentley even more. There were times that my group of friends scuffled with Bobby's group of friends. Wes was there, but always in the back. He and I often stepped aside from the scuffles and caught up. He always seemed interested to hear how I was doing at Bishop Carroll.

14. The last time I remember seeing Wes was during high school. Because we attended different schools and had different friends, we lost touch. The last I remember hearing about Wes was years later in the news. It was after he was arrested for the murder of the older woman near Kansas City. I was shocked to learn about it. I couldn't believe it was the Wes that I knew. Wes and I were good friends and I still think fondly of our time together as young boys. In the past, Wes's defense teams never approached me. In 2003, I was living in Wichita, Kansas. Had Wes's defense contacted me, I would have happily shared these stories with them as I have done so above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this ___7th___ day of ~~July~~ August, 2016.

_____
Don Aaron

5 | Page

_____ (Initial)

000522