USE OF THIS INFORMATION REGULATED BY LAW

(Uniform Crime Reporting) INDEXED

POLICE DEPARTMENT — WICHITA, KANSAS

CRIME: SIMPLE ASLT

CASE NO. O 39699

CLASSIFICATION: AB&W. 0810

P.C.S. ENTERED
0-39699

| Case Heading | | Address | | Phone |
|---|---|---|---|---|
| VELAM L PURKEY 49w/fe | | ██ █ ████ | | 943-1603 |
| Reported By | | Address | | Phone |
| abv | | | | |
| Where Committed | When Committed | | Time Reported | |
| there | 2330 5/2/75 | | 0095 5/3/75 | |

How Committed:

abv reprs being aslted by O.L. DARLING 64 w/m same address at the abv time and place.

UNFOUNDED _____ DATE _____

CLEARED-Arr, ___ (Other)

Age 64   Sex M
Race W   Date 5/3/7?

| Officers Assigned | Beat | Detail | Section Assigned | Connecting Case |
|---|---|---|---|---|
| R.E. ARBOGAST 744 t1 5.3.75 | 19 | 3 | vulgamore | |

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 42 43 44 45 46

INFORMATION RELEASED TO Laura E O'Sullivan
DATE JUN 1 3 2003 BY Patsy G. Smith N647

This will certify this to be a true copy of the original record on file at Wichita Police Dept.
Patsy G. Smith N647
Record and Identification Section

000908

WP_PC00009154

JUN 1 3 2003

POLICE DEPARTMENT - WICHITA, KANSAS

CASE NO. 39699

(32-047)

OFFENSE REPORT

Preliminary ✓    Supplemental _____    COPY TO Records/Sgt. SECTION    Juv. Offender _____
Whitgomore

| Crime | Simple Assault | AB & W | Classification & Code |
| --- | --- | --- | --- |

| Victim | Age | Race | Sex | Address | Phone # |
| --- | --- | --- | --- | --- | --- |
| Velma L. Purkey | 49 | W | F | 122 N. Sedgwick | 943-1603 |

| Business Name | | Address | | | Phone # |
| --- | --- | --- | --- | --- | --- |
| unemployed | | | | | |

| Where Committed | Time/Date Committed | Time/Date Reported |
| --- | --- | --- |
| 122 N. Sedgwick | PRIOR TO 2330HRS/5-2-75 | 0005/5-3-75 |

| Reported By | Age | Race | Sex | Address | Phone # |
| --- | --- | --- | --- | --- | --- |
| Victim | | | | | |

OTHER PERSONS INVOLVED

| Name | Age | Race | Sex | Address | Phone # |
| --- | --- | --- | --- | --- | --- |
| D.L. Darling | 64 | W | m | 122 N. Sedgwick | 943-1603 |
| Name | | | | Address | Phone # |
| Name | Age | Race | Sex | Address | Phone # |

| Point of entry or stolen from where | Tools used |
| --- | --- |
| N/A | Hands |

Type of weapons or threats, gestures, etc. of assailant
N/A

Physical description of assailant (include clothing, scars, marks, amputations, speech, etc)
N/A

Vehicle used (color, year, make, type, license number, etc.)
N/A

DESCRIPTION OF PROPERTY STOLEN

| Article | Description | Serial # |
| --- | --- | --- |

N/A

| Cash | Furs | Jewelry | Clothes | Auto | Misc. | Total |
| --- | --- | --- | --- | --- | --- | --- |
| $ | $ | $ | $ | $ | $ | $ |

If actual cash loss is undetermined, indicate loss as UNDER $50, $50-$200, $200 and over.
DO NOT SHOW A LOSS OF UNKNOWN OR UNDETERMINED

OFFICER R.E. Arbogast    USE REVERSE SIDE IF NARRATIVE IS NEEDED.    ID# 744 BEAT 19 DETAIL 3rd TIME 0015 hrs DATE 5-3-75

This will certify this to be a true copy of the original record on file at Wichita Police Dept.
Patsy A. Juril V647
Record and Identification Section

000909

WP_PC00009155

Narrative

The above reprts having a fight with O.L. Darling 64W/m at 122 N. Sedgewick & kicking her out of the house on the above time.

Mrs. Purkey said she lived with Mr. Darling who was (I believe) her step father. She said that they got into an argument and Mr. Darling bit her in the arm after a brief verbal encounter. He then forced her to leave the house & locked the door from inside to prevent her from coming back in. She then went to 134 N. Charles where she called police. She said she wanted to get some medicine & some personal belonging from the house so I returned with her to 122 N. Sedgwick. Mr. Darling gave us no problem as she got what she needed. She was then taken back to 134 N. Charles to her Aunts House.

This is all the information I have.

(rev. 11-73)

000910

WP_PC00009156

USE OF THIS INFORMATION REGULATED BY LAW

Uniform Crime Reporting

POLICE DEPARTMENT — WICHITA, KANSAS

INDEXED

CRIME: SIMPLE ASSAULT

CASE NO. L 84965

CLASSIFICATION: ASSAULT BEAT AND WOUND 0810

| Case Heading VELMA L. PURKEY WF 45 | Address ▉▉▉▉ | Phone WH3 1603 |
|---|---|---|
| Reported By VICT | Address | Phone |

| Where Committed there | When Committed 610Pm 4-20-71 | Time Reported 621Pm 4-20-71 |
|---|---|---|

How Committed:

THE ABOVE ASSAULTED BY OLIVER L. DARLING WM 60 same address

| Officers Assigned M. HIBNER #640 j1 1133PM 4-20-71 | Beat 2 | Detail 2 | Section Assigned VULGA MORE | Connecting Case |
|---|---|---|---|---|

INFORMATION RELEASED TO Laura C. O'S____

DATE JUN 1 3 2003 BY Patsy A ____ #647    000911

This will certify this to be a true copy of the original record on file at Wichita Police.Dept.    WP_PC00009150

32-CJS

# MINOR COMPLAINT AND REPORT FORM

CASE NO. L 8496t

Use only for classification listed below — Print or write in black ink.  CHECK ONE:

| | | | | |
|---|---|---|---|---|
| ___ Dis. Cond. | ___ Larc A. Access. | ___ Lost Prop. | ___ Found Animal | ___ Home Acciden |
| ___ Vio. RDL | ___ Misc. Offenses | ___ Lost Animal | ___ Sick Cared | ___ Occup Accider |
| ___ Pking Vio. | ___ Att. Suicide | ___ Found Person | ___ Susp. Char. | ___ Animal Bite |
| ___ Other Traf. | ___ Lost Person | ___ Found Prop. | ___ Pub. Acc. | ___ Misc. Public |
| X Simple Asslt. | | | ___ Vagrancy | ___ Vandalism |

EXPEDITE COPY TO Records ___ Section/Unit

Case Heading  Velma L Purkey    Age 45  Sex FE  Race ~~

Home Add [redacted]    Phone WA 3-16 C

Bus. Address  12000 W Kellogg    Phone Wkn

When Commit  610 PM 4-20-71    Where Commit 122 W Sedg.

Reported by  Victum    Age ___ Sex ___ Race ___ Phone ___

Address ___    Time Rep'td  621 PM 4-20-71

Others Involved  Oliver L Darling 60 w/m
122 W Sedgwich   WH3-1603

Description of Property (Include Imp. Auto) ___

Cash Value Loss $ ___

## DETAILS (INCLUDE DISPOSITION OF PERSONS, PROPERTY AND ACTION TAKEN)

The above Rpts Oliver L Darling 6 w/m asst her At The above Time, Place + Date,

I Rec a call at 621 pm 4-20-71 of a Dist at 122 N Sedgwick on arr There 2 was Contacted by A Miss Purkey which stated that she came home from work and advised her step father, Mr Darling That she was going out To Play some cards with friends at work, at this time Mr Darling was Too have lost his Temper and she stated cussing him at Which Time he Slapped her in The face, and Told her Too get out and stay out 2 feel That They both were in the Whong and That Neather wanted to admit it.

Is further investigation needed?  Yes ___  No X    Approved: ___

Officer: M L Hosner    No CFO  Beat: 2  Detail 2  Unit ___ Time M 17th  Date: 4-20-71

This will certify this to be a true copy of the original record on file at Wichita Police Dept.

Patsy G. ___ V647
Record and Identification Section

If further space is needed, use the reverse side or call in rep.

000912

WPL_PC00009751113

USE OF THIS INFORMATION REGULATED BY LAW

INFORMATION RELEASED TO _Laura C. O'Sullivan_

DATE _JUN 16 2002_ BY _Patsy A. Turiel V6 47_

'JUN 1 3 2003

USE OF THIS INFORMATION REGULATED BY LAW

This will certify this to be a true copy of the original record on file at Wichita Police Dept.

_Patsy G. Turiel V6 47_
Record and Identification Section

iiform Crime Reporting)

INDEXED    POLICE DEPARTMENT — WICHITA, KANSAS    P. C. S. ENTERED

CRIME:    MISC    REPORT

CASE NO. M 97820

CLASSIFICATION:    MISC PUBLIC 6100

| Case Heading | | Address | | Phone |
|---|---|---|---|---|
| VELMA L PURKEY 47 wfe | | ▮▮▮ S ▮▮▮▮ | | 264 2902 |
| Reported By | | Address | | Phone |
| Above | | | | |
| Where Committed | When Committed | | | Time Reported |
| There | 1900  1-19-73 | | | 2111 1-19-73 |

How Committed:

The above reports her step-father O. L. DARLING 62 wm , 122 N Sedgwick, visited her and that he does not like her ex-husband JACK PURKEY, 49 wm, unk address. (Caseheading intoxicated)

| Officers Assigned | Beat | Detail | Section Assigned | Connecting Case |
|---|---|---|---|---|
| D RICE #0574  0809 1-20-73 mc | 6 | 2 | Sgt Vulgamore | |

**000913**

WP_PC00009228

2111
2115
(32-047)

POLICE DEPARTMENT - WICHITA KANSAS

CASE NO. M-97820

OFFENSE REPORT

Preliminary **X**    Supplemental _____    COPY TO _Rec_ SECTION    Juv. Offender _____

Crime _MISC. REPT_    Classification & Code _MISC. PUBLIC. (6100)_

| Victim | Age | Race | Sex | Address | Phone # |
|---|---|---|---|---|---|
| VELMA L. PURKEY | 47 | W | FE | 427 S. HIRAM | 264-29e |

| Business Name | Address | Phone # |
|---|---|---|
| NONE | — | — |

| Where Committed | Time/Date Committed | Time/Date Reported |
|---|---|---|
| 427 S. HIRAM | 1900 HRS 1-19-73 | 2111 Hrs 1-19-7 |

| Reported By | Age | Race | Sex | Address | Phone # |
|---|---|---|---|---|---|
| CASE | | | | | |

OTHER PERSONS INVOLVED

| Name | Age | Race | Sex | Address | Phone # |
|---|---|---|---|---|---|
| O. L. DARLING | 62 | W | M | 122 N. SEDGWICK | WH3-160 |
| JACK W. PURKEY | 49 | W | M | UNK | UNK |
| | | | | | |

Point of entry or stolen from where _N/A_    Tools used _N/A_

Type of weapons or threats, gestures, etc. of assailant _N/A_

Physical description of assailant (include clothing, scars, marks, amputations, speech, etc. _N/A_

Vehicle used (color, year, make, type, license number, etc.) _N/A_

DESCRIPTION OF PROPERTY STOLEN

| Article | Description | Serial # |
|---|---|---|
| N/A | | |

| Cash | Furs | Jewelry | Clothes | Auto | Misc. | Total |
|---|---|---|---|---|---|---|
| $ | $ | $ | $ | $ | $ | $ |

If actual cash loss is unable to be determined, indicate loss as UNDER $5, $5-$50, over $50
DO NOT SHOW A LOSS OF UNKNOWN OR UNDETERMINED

USE REVERSE SIDE IF NARRATIVE IS NEEDED.

OFFICER _David E. Rice_ ID# _574_    BEAT _6_    DETAIL _2_    TIME _2140 Hrs_    DATE _1-19-73_

INFORMATION RELEASED TO _Dana E. O'Sullivan_
DATE JUN 1 3 2003 BY _Patsy A. Furr_ V647

This will certify this to be a true copy of the original
record on file at Wichita Police Dept.
_Patsy A. Furr_ #647
Record and Identification Section

**000914**

## Narrative

ARR. 2125 Hrs & CONTACTED VICTIM WHO WAS QUITE INTOXICATED. SHE SAID THAT HE STEP-FATHER, MR. DARLING VISITED HER THIS EVENING, & THAT HE DOES NOT LIKE HER X-HUSBAND, MR. PURKEY.

MR. PURKEY HAD VISITED VICTIM THIS AFTERNOON ALSO. VICTIM SAID SHE WAS IN BATH-TUB WHILE BOTH MEN TALKED, HOWEVER COULD NOT SEE OR HEAR THEM.

M. E. Rice 574

Name of Juvenile Defendant: _____

| Mother | Father |
|---|---|
| Name | Name |
| Address | Address |
| Phone | Phone |

OFFENDER

DB:_____    School_____    Disposition_____

port to Juv. (Time/Date)_____    Other Agency_____

peater:  Yes [   ]  No [   ]    Petitioned _____    Yes [   ]  No [   ]
(Follow fficer's signature)

000915    WP_PC00009230

KANSAS DEPARTMENT OF CORRECTIONS                                    Page   2
INMATE DATA SUMMARY

Admitting Facility: Topeka Correctional Facility - RDU          Report date:  8/08/2001
Type of admission: Parole viol - new sentence                  Date admitted:  5/ 4/2000

Commitment Name (LAST, First, Middle, Suffix)       KDOC Number:
PURKEY,WESLEY,I                                      Social Security No.:

---------------------------------------Indeterminate-------------------------------------

|  | Mo Da Year | Mo Da Year |  | Yrs Mos Dys |
|---|---|---|---|---|
| Sent Begins - Min: | Max: |  | Jail Credit Minimum: |  |
| Controlling - Min: | Max: |  | Jail Credit Maximum: |  |
| Cond Rel Dt - Prj: | Cur: |  | Prior Penal Credit: |  |
| Parole Elig - Cur: | Lst: |  | Escape Time: |  |
| * Parole Elig - Prj: 07 00 2010 | Ear: 07 00 2010 |  | Del Time on Rel: |  |
|  |  |  | Forfeited Good Time: |  |
|  |  |  | Maximum Sent Credit: |  |
| Cont ID - Min:   Max: | IGT/MGT Earned: | Contr Term - Min: | Max: |  |

--------------------------------------------------------------------------------------

CONVICTION DATA

| Offense | Att/ Con/ Sol | Description | Offense Date | Cts | CS/ CC | ID | Sentence Min | Max |
|---|---|---|---|---|---|---|---|---|
| Case No.: CC6635 | | County: Sedgwick | | | | | | |
| 21 3715 | | | 08/08/1969 | 1 | CC | B | 010/00 | 021/00 |
| Case No.: CR10018 . | | County: Sedgwick | | | | | | |
| Fel  21 3715 | | Burglary | 04/23/1974 | 1 | CC | D | 001/00 | 010/00 |
| Case No.: CR12683 | | County: Sedgwick | | | | | | |
| Fel  21 3426 | | Robbery | 04/14/1976 | 1 | CC | A | 001/00 | 020/00 |
| Fel  21 3701 | | Theft ($100 or more) | 04/14/1976 | 1 | CC | C | 001/00 | 010/00 |
| Case No.: 78CR733 | | County: Shawnee | | | | | | |
| Fel  21 3810 | | Aggravated escape from custody | 05/26/1978 | 1 | CC | E | 001/00 | 005/00 |
| Case No.: 80CR1368 | | County: Sedgwick | | | | | | |
| Fel  21 3426 | | Robbery | 07/21/1980 | 1 | CC | K | 005/00 | 020/00 |
| Fel  21 42041 | | Criminal possession of firearms | 07/21/1980 | 1 | CC | L | 003/00 | 010/00 |
| Case No.: 80CR1427. | | County: Sedgwick | | | | | | |
| Fel  21 3427 | | Aggravated robbery | 08/03/1980 | 1 | CC | I | 015/00 | 999/99 |
| Fel  21 42041 | | Criminal possession of firearms | 08/03/1980 | 1 | CC | J | 003/00 | 010/00 |
| Case No.: 80CR1701. | | County: Sedgwick | | | | | | |
| Fel  21 3420 | | Kidnapping | 08/03/1980 | 1 | CC | F | 015/00 | 999/99 |
| Fel  21 3427 | | Aggravated robbery | 08/03/1980 | 1 | CC | G | 015/00 | 999/99 |
| Fel  21 3414 | | Aggravated battery | 08/03/1980 | 1 | CC | H | 005/00 | 020/00 |
| Case No.: 98CR2202 | | County: Wyandotte | | | | | | |
| Fel  21 3401 | | Murder in the first degree | 10/27/1998 | | CS | M | | Life |

 * Parole Eligibilty date to be established by KPB at Parole Revocation hearing.

(Continued)

000916

KSP .60  EXAMINATIONS OF INMATES ON SEGREGATION UNITS DAILY

Starting date _12-24_

Ending date _12-24_

NAME _PERKEY_

DATE OF ADMISSION _12-24-78_ NUMBER _23451_    Disc. Seg._____  Adm. Seg._____  P.C._____

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| TUESDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| WEDNESDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| THURSDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| FRIDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| SATURDAY Date | 0600–1400 | | | | | | | | |
| | 1400–2200 | | | | | | | | |
| | 2200–0600 | | | | | | | | |
| SUNDAY Date | 0600–1400 | S | ✓ | BL | No | _Schoup_ | | | Confined 0 940 hrs. |
| | 1400–2200 | S | ✓ | P.T | N/o | _Jeffrie_ | | | |
| | 2200–0600 | S | — | GR | No | _Kilburn_ | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M__ T__ W__ T__ F__ S__ S__  IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M__ T__ W__ T__ F__ S__ S__  IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M__ T__ W__ T__ F__ S__ S__  IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES__ NO__  IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when man is placed in segregation
Original and (2) Copy            Ad.—Comments on back            Copy retained in A&T

000917

KSP .60　　NAME _Perkuy_

EXAMINATIONS — INMATES IN SEGREGATION UNIT DAILY　　Starting date _12-25_

Ending date _____

DATE OF ADMISSION _12-24-78_　NUMBER _23451_

Disc. Seg. _____　Adm. Seg. _____　P.C. _____

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Signature | Escort Imfir. | Signature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | √√ | Qua | No | Diуглу | | | |
| | 1400-2200 | S | √ | D.T | No | Taylor | | | |
| | 2200-0600 | S | — | CJW | No | Di Buono | | | |
| TUESDAY Date | 0600-1400 | S | √√ | Qua | No | Diугу | | | |
| | 1400-2200 | S | √ | NGW | No | Cure | | | |
| | 2200-0600 | S | — | E.S | no | Spundy | | | |
| WEDNESDAY Date | 0600-1400 | S | √√ | Affe | no | Graley | | | |
| | 1400-2200 | S | √ | NGW | no | Cure | | | |
| | 2200-0600 | S | — | CS | no | Depro | | | |
| THURSDAY Date | 0600-1400 | S | √√ | HH | NO | Kirby | | | |
| | 1400-2200 | S | √ | Fua | N | Kirby | | | |
| | 2200-0600 | S | √ | E.S | no | Spundy | | | |
| FRIDAY Date | 0600-1400 | S | √√ | BJ | No | Schaaf | | | |
| | 1400-2200 | S | √ | RT | No | Taylor | | | |
| | 2200-0600 | S | — | CJW | No | Di Buono | | | |
| SATURDAY Date | 0600-1400 | S | √√ | HH | NO | Kirby | | | |
| | 1400-2200 | S | √ | RT | No | Taylor | | | |
| | 2200-0600 | S | — | CJW | no | Di Buono | | | |
| SUNDAY Date | 0600-1400 | S | √√ | JD | no | Oley | | | |
| | 1400-2200 | S | √ | LW | NO. | Wardlaw | | | |
| | 2200-0600 | S | — | RT | No | Taylor | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W___ T___ F___ S√os S___　IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___　IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___　IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___　IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when a man is placed in segregation
Original and (2) Copy　　　　Ad.—Comments on back　　　　Copy retained in A&T

000918

Case 2:19-cv-00414-JPH-DLP   Document 23-20   Filed 09/12/19   Page 12 of 76 PageID #: 4359

KSP .60   EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY   Starting date 1-1-79

NAME _Purkey_   Ending date _____

DATE OF ADMISSION _12-24-78_   NUMBER _23451_   Disc. Seg. _____   Adm. Seg. _____   P.C. _____

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | ⌴⌴ | CB | No | ~ | | | |
| | 1400-2200 | S | ✓ | | NS | | | | |
| | 2200-0600 | S | — | Bcl | No | | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | | no | | | | |
| | 1400-2200 | S | ✓ | LV | No | Carney | | | |
| | 2200-0600 | S | — | E.d | no | | | | |
| WEDNESDAY Date | 0600-1400 | S | // | | no | | ○ | | |
| | 1400-2200 | S | ✓ | WR7 | DO | | | | |
| | 2200-0600 | S | | CS | no | | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | | NO | Kirby | | | |
| | 1400-2200 | | | | | | | | |
| | 2200-0600 | | | | | | | | |
| FRIDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | | | | | | | | |
| | 2200-0600 | | | | | | | | |
| SATURDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | | | | | | | | |
| | 2200-0600 | | | | | | | | |
| SUNDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | | | | | | | | |
| | 2200-0600 | | | | | | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W_X_ T___ F___ S___ S___   IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD;   DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___   IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when men is placed in segregation
Original and (2) Copy                    Ad.-Comments on back                    Copy retained in A&T

000919

KSP .60    EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY

NAME **Purkey**

DATE OF ADMISSION **May/7/79** NUMBER **26457**

Starting date _____

Ending date _____

Disc. Seg. _____   Adm. Seg. _____   P.C. ✓

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Signature | Escort Imfir. | Signature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | ✓ | ✓ | Pue | no | Pue | | | *High* |
| | 2200-0600 | S | None | Cm | no | Cm | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | CB | – | Berger | | | |
| | 1400-2200 | S | ✓ | CB | no | | | | |
| | 2200-0600 | S | | BC | no | Clerie | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | CB | – | | | | |
| | 1400-2200 | S | ✓ | new | no | | | | |
| | 2200-0600 | S | | BC | no | Clerie | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | CB | – | Berger | | | |
| | 1400-2200 | S | ✓ | CB | no | Autor | | | |
| | 2200-0600 | S | – | ES | no | Spurs | | | |
| FRIDAY Date | 0600-1400 | S | ✓✓ | CB | – | Berger | | | |
| | 1400-2200 | S | ✓ | LH | NO | Greenwood | | | |
| | 2200-0600 | S | – | ES | no | Spurs | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | CB | – | Baneon | | | *Rewrapped them* |
| | 1400-2200 | S | | CB | no | CB | | | |
| | 2200-0600 | S | | Rmm | no | MM | | | |
| SUNDAY Date | 0600-1400 | S | ✓✓ | CB | No | Bam | | | |
| | 1400-2200 | S | ✓ | LT | no | Tom | | | |
| | 2200-0600 | S | – | BL | no | Burd | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W✓ T___ F___ S✓ S___ IF NOT STATE WHY; _____

INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___ IF NOT STATE WHY; _____

INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___ IF NOT STATE WHY; _____

SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____

PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___ IF NOT, WHY; _____

ORIGINAL TO THE DIRECTOR

COPY TO DEPUTY DIRECTOR O

2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty

0600-1400 shift turn in copies each Monday 0800

A segregation report will be made out by the shift on duty when a man is placed in segregation

Original and (2) Copy      Ad.—Comments on back      Copy retained in A&T

000920

KSP .60    EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY    Starting date 5-14-79

NAME _Purkey_    Ending date _____

DATE OF ADMISSION _5-7-79_ NUMBER _26451_    Disc. Seg.____  Adm. Seg.____  P.C. ✓

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | vv | ∠ | yes | Lol | | | |
| | 1400-2200 | S | v | IR7 | no | Fryne | | | |
| | 2200-0600 | S | none | am | no | Gm | | | |
| TUESDAY Date | 0600-1400 | S | vv | Of | no | Enfu | | | |
| | 1400-2200 | S | v | RB | no | Aufey | | | |
| | 2200-0600 | S | – | ES | no | Snyns | | | |
| WEDNESDAY Date | 0600-1400 | S | // | BS | no | Phepse | | | |
| | 1400-2200 | S | v | Pla | no | Anton | | | |
| | 2200-0600 | S | – | ES | no | Spnk | | | |
| THURSDAY Date | 0600-1400 | S | vv | EB | – | Burgu | | | |
| | 1400-2200 | S | v | nGW | no | cur | | | |
| | 2200-0600 | S | – | ES | no | Spks | | | |
| FRIDAY Date | 0600-1400 | S | vv | GB | NO | Nckrew | | | |
| | 1400-2200 | S | v | F.V | NO | Vssskg | | | |
| | 2200-0600 | S | | RMM | NO | Mulak | | | |
| SATURDAY Date | 0600-1400 | S | vv | ∠ | bn | Lol | | | |
| | 1400-2200 | S | v | LN | NO | Uy | | | |
| | 2200-0600 | S | – | ES | no | Spnks | | | |
| SUNDAY Date | 0600-1400 | S | vv | ∠ | bn | wl | | | |
| | 1400-2200 | S | v | nGW | no | Cum | | | |
| | 2200-0600 | S | – | nv | no | Bn Hst | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M__  T__  W✓  T__  F__  S✓  S__    IF NOT STATE WHY; _____

INMATE RECEIVED CLOTHES; M__  T__  W__  T__  F__  S__  S__    IF NOT STATE WHY; _____

INMATE RECEIVED RECREATION; M__  T__  W__  T__  F__  S__  S__    IF NOT STATE WHY; _____

SEEN BY THE SEGREGATION REVIEW BOARD;  DATE _____

PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES__  NO__    IF NOT, WHY; _____

ORIGINAL TO THE DIRECTOR

COPY TO DEPUTY DIRECTOR O

2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty

0600-1400 shift turn in copies each Monday 0800

A segregation report will be made out by the shift on duty when man is placed in segregation

Original and (2) Copy          Ad.-Comments on back          Copy retained in A&T

000921

KSP .60

NAME __Purkey__

DATE OF ADMISSION __5-7-79__  NUMBER ▮▮▮▮

EXAMINATIONS OF INMATE IN SEGREGATION UNIT DAILY

Disc. Seg. _____  Adm. Seg. _____  P.C. __✓__

Starting date __5-7-79__
Ending date _____

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | ✓ | w | | hu | | | | |
| | 1400-2200 | S | ✓ | | no | Anton | | | |
| | 2200-0600 | 5 | None | Cm | no | Cm | | | |
| TUESDAY Date | 0600-1400 | S | k✓ | | no | | | | |
| | 1400-2200 | S | ✓ | | no | | | | |
| | 2200-0600 | S | — | | no | | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | | — | Berger | | | |
| | 1400-2200 | S | ✓ | | no | | | | |
| | 2200-0600 | S | | | no | | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | | — | Bryan | | | |
| | 1400-2200 | S | ✓ | | no | | | | |
| | 2200-0600 | S | — | | no | Spires | | | |
| FRIDAY Date | 0600-1400 | S | w | | — | | | | |
| | 1400-2200 | S | ✓ | | no | Anton | | | |
| | 2200-0600 | S | — | | — | | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | | — | Berger | | | |
| | 1400-2200 | S | ✓ | | N/o | | | | |
| | 2200-0600 | S | — | | no | Spires | | | |
| SUNDAY Date | 0600-1400 | S | ✓✓ | | — | | | | |
| | 1400-2200 | S | ✓ | | no | Anton | | | |
| | 2200-0600 | S | — | | no | | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W_✓_ T___ F___ S_✓ S___  IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___  IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___  IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD: DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___  IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when man is placed in segregation
Original and (2) Copy          Ad.—Comments on back          Copy retained in A&T

000922

KSP .60    EXAMINATIONS  OF INMATES IN SEGREGATION UNITS DAILY    Starting date_5-7-79_

NAME__Purkey_____

DATE OF ADMISSION ___5-7-79___ NUMBER ▮▮▮▮    Disc. Seg.____  Adm. Seg.____   P.C. ✓    Ending date_____

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | ✓✓ | | No | | | | |
| | 1400-2200 | S | ✓ | B | No | Aiken | | | |
| | 2200-0600 | S | None | am | No | am | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | W | No | Dickerson | | | |
| | 1400-2200 | S | ✓ | M. | No | Penn | | | |
| | 2200-0600 | S | — | ES | no | Sparks | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | no | Penn | | | |
| | 2200-0600 | S | | BC | No | Olive | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | Mcw | no | win | | | |
| | 2200-0600 | S | — | ES | no | Sparks | | | |
| FRIDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M. | — | Penn | | | |
| | 2200-0600 | S | — | ES | — | Sparks | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | RD. | — | arling | | | |
| | 2200-0600 | S | | RMM | NO | Marshall | | | |
| SUNDAY Date | 0600-1400 | S | ✓✓ | JB | No | B | | | |
| | 1400-2200 | | | | | | | | |
| | 2200-0600 | S | — | B | No | Bolet | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W___ T___ F___ S ✓ S___  IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___  IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___  IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD;  DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___  IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when man is placed in segregation
Original and (2) Copy          Ad.—Comments on back          Copy retained in A&T

000923

KSP .60

EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY

Starting date **4 JUN 79**

Ending date _____

NAME **PURKEY**

DATE OF ADMISSION **5-7-79**    NUMBER ▮▮▮

| | Disc. Seg. ___ | Adm. Seg. ___ | P.C. ✓ |

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | ✓ | Cff. | yes | Conley | | | |
| | 1400-2200 | S | ✓ | RCW | no | | | | |
| | 2200-0600 | S | | any | no | any | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | RCW | no | | | | |
| | 2200-0600 | S | | AC | no | | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓ | Cff. | no | | | | |
| | 1400-2200 | S | ✓ | M | no | | | | |
| | 2200-0600 | S S | | RC | no | | | | |
| THURSDAY Date | 0600-1400 | S S | ✓✓ | CB | ✓ | Berger | | | |
| | 1400-2200 | S | ✓ | RCW | no | | | | |
| | 2200-0600 | S | ✓ | El | no | Point | | | |
| FRIDAY Date | 0600-1400 | S S | ✓✓ | | | | | | |
| | 1400-2200 | S | ✓ | | | | | | |
| | 2200-0600 | S S | — | El | no | | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | | no | | | | |
| | 1400-2200 | S | ✓ | M | no | | | | |
| | 2200-0600 | S | — | El | no | | | | |
| SUNDAY Date | 0600-1400 | S | ✓ | aff. | yes | | | | |
| | 1400-2200 | S | ✓ | RCW | no | | | | |
| | 2200-0600 | S | ✓ | R | no | | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W ✓ T___ F___ S ✓ S___   IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD;  DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___  IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when man is placed in segregation
Original and (2) Copy                    Ad.-Comments on back                    Copy retained in A&T

000924

KSP .60    EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY    Starting date _6-11-79_

NAME _Purkey_      Ending date _____

DATE OF ADMISSION _5-7-79_ NUMBER ▮▮▮▮    Disc. Seg. _____   Adm. Seg. _____   P.C. _✓_

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | OK | v v | HW | no | _sig_ | | | |
| | 1400-2200 | S | v | NGW | no | _sig_ | | | |
| | 2200-0600 | S | | CS | no | _sig_ | | | |
| TUESDAY Date | 0600-1400 | S | v v | EB | — | Beyer | | | |
| | 1400-2200 | S | v | M | — | _sig_ | | | |
| | 2200-0600 | S | | BC | no | _sig_ | | | |
| WEDNESDAY Date | 0600-1400 | S | v v | CB | — | Beyer | | | |
| | 1400-2200 | S | v | NGW | no | _sig_ | | | |
| | 2200-0600 | S | — | ES | no | _sig_ | | | |
| THURSDAY Date | 0600-1400 | S | v v | CB | — | Beyer | | | |
| | 1400-2200 | S | v | PA | — | _sig_ | | | |
| | 2200-0600 | S | — | ES | — | _sig_ | | | |
| FRIDAY Date | 0600-1400 | S | v v | EN | — | Beyer | | | |
| | 1400-2200 | S | v | WE | — | _sig_ | | | |
| | 2200-0600 | S | — | ES | — | _sig_ | | | |
| SATURDAY Date | 0600-1400 | S | v v | EB | — | Beyer | | | |
| | 1400-2200 | S | v | DL | — | _sig_ | | | |
| | 2200-0600 | S | — | ES | — | Spink | | | |
| SUNDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | S | v | PA | — | _sig_ | | | |
| | 2200-0600 | S | — | BO | — | _sig_ | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W_✓_ T___ F___ S_✓_ S___ IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___ IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___ IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___ IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when man is placed in segregation
Original and (2) Copy      Ad.—Comments on back      Copy retained in A&T

000925

KSP .60     EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY     Starting date **6-18-79**

NAME **Purkey**                                               Ending date _____

DATE OF ADMISSION **5-7-79**    NUMBER ▮▮▮▮    Disc. Seg. _____   Adm. Seg. _____   P.C. ✓

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | ✓✓ | | Yes | | | | |
| | 1400-2200 | S | ✓ | | No | | | | |
| | 2200-0600 | S | | | No | | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | ncw | no | | | | |
| | 2200-0600 | S | ✓ | ES | S.D. | Spinks | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | CB | ✓ | Berger | | | |
| | 1400-2200 | S | ✓ | D.A. | — | | | | |
| | 2200-0600 | S | — | ES | — | Spinks | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | | | | |
| | 2200-0600 | S | — | ES | — | Spinks | | | |
| FRIDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | | | | |
| | 2200-0600 | S | — | KC | — | | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | | | | |
| | 2200-0600 | S | | FC | — | | | | |
| SUNDAY Date | 0600-1400 | | | | | | | | |
| | 1400-2200 | S | ✓ | WE | — | | | | |
| | 2200-0600 | S | — | | — | | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T___ W ✓ T___ F___ S ✓ S___   IF NOT STATE WHY; _____

INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____

INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____

SEEN BY THE SEGREGATION REVIEW BOARD: DATE _____

PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___   IF NOT, WHY; _____

ORIGINAL TO THE DIRECTOR

COPY TO DEPUTY DIRECTOR O

2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty

0600-1400 shift turn in copies each Monday 0800

A segregation report will be made out by the shift on duty when a man is placed in segregation

Original and (2) Copy        Ad.—Comments on back        Copy retained in A&T

000926

KSP .60      EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY    Starting date 6-25-79

NAME _Purkey_        Ending date ____

DATE OF ADMISSION _5-9-79_   NUMBER ▓▓▓▓

| | | Disc. Seg. ____ | Adm. Seg. ____ | P.C. ✓ |
|---|---|---|---|---|

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Sign-ature | Escort Imfir. | Sign-ature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | S | ~ | Qfe | no | Purkey | | | |
| | 1400-2200 | S | ✓ | | no | | | | |
| | 2200-0600 | S | | SP | no | Peters | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | new | no | | | | |
| | 2200-0600 | S | | SP | no | Peters | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | RA | — | | | | |
| | 2200-0600 | S | — | WB | — | Bennett | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | | | | |
| | 2200-0600 | S | — | KC | — | | | | |
| FRIDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | FC | — | | | | |
| | 2200-0600 | S | — | KC | — | | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | | no | | | | |
| | 2200-0600 | S | — | M | no | | | | |
| SUNDAY Date | 0600-1400 | S | ✓✓ | CB | — | Berger | | | |
| | 1400-2200 | S | ✓ | new | no | | | | |
| | 2200-0600 | S | — | M | no | Butts | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M___ T ✓ W ✓ T___ F___ S___ S___   IF NOT STATE WHY; _____

INMATE RECEIVED CLOTHES; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____

INMATE RECEIVED RECREATION; M___ T___ W___ T___ F___ S___ S___   IF NOT STATE WHY; _____

SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____

PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES___ NO___   IF NOT, WHY; _____

ORIGINAL TO THE DIRECTOR

COPY TO DEPUTY DIRECTOR O

2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty

0600-1400 shift turn in copies each Monday 0800

A segregation report will be made out by the shift on duty when man is placed in segregation

Original and (2) Copy      Ad.-Comments on back    **000927**    Copy retained in A&T

KSP .60   EXAMINATIONS OF INMATES IN SEGREGATION UNITS DAILY   Starting date _7-2-79_

NAME _PURKEY_   Ending date _____

DATE OF ADMISSION _5-7-79_   NUMBER ▮▮▮   Disc. Seg. ____   Adm. Seg. ____   P.C. ✓

| MENTAL & PHYSICAL CONDITION | | CONDUCT | MEALS | INITIAL | MEDICAL CHECK | Signature | Escort Imfir. | Signature | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| MONDAY Date | 0600-1400 | 5 | // | BF | No | Fields | | | |
| | 1400-2200 | S | ✓ | | — | Sam | | | |
| | 2200-0600 | S | | am | No | Miller | | | |
| TUESDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | Kim | | | |
| | 2200-0600 | S | — | EB | — | Sparks | | | |
| WEDNESDAY Date | 0600-1400 | S | ✓✓ | EB | — | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | Kim | | | |
| | 2200-0600 | | | | | | | | |
| THURSDAY Date | 0600-1400 | S | ✓✓ | D.T. | — | Thompson | | | |
| | 1400-2200 | S | ✓ | M | — | Kim | | | |
| | 2200-0600 | S | — | KS | — | Dennis | | | |
| FRIDAY Date | 0600-1400 | S | ✓✓ | EB | ✓ | Berger | | | |
| | 1400-2200 | S | ✓ | M | — | Kim | | | |
| | 2200-0600 | S | | 8 | — | Peterson | | | |
| SATURDAY Date | 0600-1400 | S | ✓✓ | EF | — | Fisher | | | |
| | 1400-2200 | S | ✓ | Don | — | | | | |
| | 2200-0600 | S | | Ronny | NO | | | | |
| SUNDAY Date | 0600-1400 | S | ✓✓ | EF | — | Fisher | | | |
| | 1400-2200 | S | ✓ | FB | no | Autor | | | |
| | 2200-0600 | S | | | | | | | |

ADDITIONAL COMMENTS AS TO THE INMATES BEHAVIOR OR PHYSICAL CONDITION; _____

INMATE RECEIVED SHOWER; M__ T__ W_✓ T__ F__ S_✓ S__   IF NOT STATE WHY; _____
INMATE RECEIVED CLOTHES; M__ T__ W__ T__ F__ S__ S__   IF NOT STATE WHY; _____
INMATE RECEIVED RECREATION; M__ T__ W__ T__ F__ S__ S__   IF NOT STATE WHY; _____
SEEN BY THE SEGREGATION REVIEW BOARD; DATE _____
PLACED IN ADMINISTRATIVE SEGREGATION AND REVIEWED IN (7) DAYS; YES__ NO__   IF NOT, WHY; _____
ORIGINAL TO THE DIRECTOR
COPY TO DEPUTY DIRECTOR O
2200-0600 shift make out all new report sheets each Monday AM for the upcoming week prior to going off duty
0600-1400 shift turn in copies each Monday 0800
A segregation report will be made out by the shift on duty when a man is placed in segregation
Original and (2) Copy          Ad.-Comments on back          Copy retained in A&T

000928

If you have issues viewing or accessing this file contact us at NCJRS.gov.

# STATE OF KANSAS
# OMBUDSMAN FOR CORRECTIONS



# SECOND ANNUAL REPORT

*to the*
## CITIZEN'S ADVISORY BOARD ON CORRECTIONS

NCJRS

as required by
K.S.A. 1975 Supp. 75-5231
(As amended by 1976 Session Laws, Chapter 399)

*For the Period*
## JULY 1, 1976 THROUGH JUNE 30, 1977

Office of the Ombudsman for Corrections
503 Kansas Avenue, Suite 539
Topeka, Kansas 66603

Phone: (913) 296-5295

000929

PRESENT MEMBERS OF THE CITIZENS' ADVISORY BOARD ON CORRECTIONS

    Dr. James W. McKenney, Chairman
    Mr. Bill Larson, Vice Chairman
    Mrs. Jane F. Sieverling, Secretary

    Senator Paul Bud Burke
    Mrs. Barbara Byrd, R.N.
    Mrs. Lillian R. Harrison
    Mr. Dean E. Hoffman
    Mr. Burton L. Lohmuller
    Mrs. Barbara A. Owensby, R.N., Member, Executive Committee
    Mr. Herbert A. Rogg
    Rev. Dean E. Rose
    Professor David L. Ryan
    Dr. Alan Steinbach, Member, Executive Committee
    Mr. Robert E. Tilton
    Mr. Clarence E. Wesley

PAST MEMBERS OF THE CITIZENS' ADVISORY BOARD ON CORRECTIONS

    Mr. Jim Buchele
    Mr. Lynn Cole
    Mr. Charles Durfee
    Mr. Pete Farabi, II
    Mr. James B. Kent
    Senator Billy McCray
    Senator Jan Meyers
    Mr. Joseph Charles Plumb, Jr.
    Mr. Thomas Regan
    Professor Paul E. Wilson
    Senator Wint Winter

STAFF OF THE OFFICE OF THE OMBUDSMAN FOR CORRECTIONS

    Mr. Preston N. Barton, II
    Ombudsman

    Mr. Philip A. Ringstrom
    Ombudsman Representative

    Miss Jan M. Laidler
    Administrative Assistant

    Ms. Bernadine J. Ferrell
    Staff Assistant

    Mr. David R. Jensen
    Graduate Student

    Ms. Wanda L. Bean
    Typist

000930

State of Kansas

Ombudsman for Corrections

SECOND ANNUAL REPORT

to the

Citizens' Advisory Board on Corrections

as required by

K.S.A. 1976 Supp. 75-5231

For the Period

July 1, 1976 through June 30, 1977

Office of the Ombudsman for Corrections
503 Kansas Avenue, Suite 539
Topeka, Kansas   66603
Phone:  (913) 296-5295

000931

FORWARD

On behalf of the Citizens' Advisory Board to the Secretary of Corrections, I am pleased to accept the Second Annual Report of the Kansas Ombudsman for Corrections.  Although the primary purpose of this report is to comply with Kansas Statutes Annotated 1976 Supplement 75-5231, it clearly performs other functions as well.  Briefly, these functions are the following:

First, the report enhances public awareness of this new and important component of the Kansas correctional system.  Although Ombudsmanry originated in Europe more than 150 years ago, it is still an unfamiliar concept to most Kansans.  Thus, it is important that Ombudsmen operate in unique ways to handle individual complaints before they evolve into more serious problems such as riots or prison disturbances.  For example, it should be more apparent after reading the report that an Ombudsman relies on his ability to clarify issues and facilitate communications rather than any ability to impose an arbitrary solution on parties to a conflict.  In addition, the report may serve to familiarize both staff and inmates of the correctional system with the Ombudsman program and its potential for dealing with their problems and complaints.

Second, the report informs both the public and their elected representatives of the scope and variety of correctional problems that come before the Ombudsman.  This information function is critical if we are to have the knowledgeable officials in our government who can develop the necessary policies and programs for assuring an effective correctional system. Furthermore, as this report shows, the Ombudsman has initiated broadbased studies of critical areas within the correctional system in order to anticipate potential problems.  Recommendations emerging from these studies will contribute significantly to improved correctional policies in the years ahead.

Third, the report demonstrates that the Ombudsman has fulfilled a critical need within the Kansas correctional system.  As this report shows, the number and variety of complaints which come before the Ombudsman and his staff each year are increasing in magnitude.  The value of an Ombudsman to resolve the majority of these problems before they become more serious is difficult to estimate, but it seems apparent that it is worthwhile if it forstalls a single riot or saves a single life.

Finally, the report provides a source of data for government officials and other observers of the Ombudsman institution.  As a new and relatively untested mechanism, the Kansas Ombudsman for Corrections shall be watched closely by these individuals in an effort to evaluate it efficacy in resolving problems arising out of administrative policies, procedures and actions that may infringe upon individual rights.  The success or failure of the Ombudsman for Corrections may ultimately determine whether similar institutions are established in other areas of Kansas government.

The Citizens' Advisory Board deeply appreciates the very thorough and competent efforts of the Corrections Ombudsman, Preston Barton, and his staff in the compilation of this report.

James W. McKenney, PhD., Chairman
Citizens' Advisory Board on Corrections
November 29, 1977

000932

# TABLE OF CONTENTS

ABOUT THE STAFF ............................................... 1

I.   INTRODUCTION ............................................. 6
     A.  Description of Program
     B.  Development During the Second Year

II.  ARTICLE FROM THE TOPEKA CAPITAL-JOURNAL .................. 10

III. EXAMPLES OF COMPLAINTS .................................. 16

IV.  POLICY RECOMMENDATIONS TO THE SECRETARY OF CORRECTIONS ... 28

V.   RECORDING PROCEDURES FOR COMPLAINTS ..................... 35
     A.  Categories of Complaints
     B.  Assessments of Complaints
     C.  Dispositions of Complaints
     D.  Highest Management Level Within the Department of Corrections
         at Which Complaint is Resolved

VI.  STATISTICAL PRESENTATION ............................... 41

VII. STATISTICAL TABLES ..................................... 46

VIII. STATUTORY CITATIONS ................................... 55

000933

with a staff member.  Although some events had occurred which required explanation, an investigation found that there was no fraud involved.

### Recommendations

7.    It is recommended that Section 2 of Administrative Procedure #507 be rescinded.  The effect of this procedure is to direct that "savings accounts derived from work release" be controlled jointly by the "institution head" and inmate.
*Response from Secretary of Corrections:  None*
          (However, this recommendation was accepted with the publication of the Policy and Procedure Manual, effective on February 1, 1977.)

8.    It is recommended that Administrative Procedure #503 be revised so as to clearly indicate that joint checking or savings accounts between work release inmates and Department of Corrections staff members are not authorized.  Alternative procedures will need to be established to insure the proper control for funds of work release inmates, so as to be in compliance with K.S.A. 1976, Supp. 75-5231.
*Response from Secretary of Corrections:  None*
          (However, this recommendation appears to have been partially accepted in the Policy and Procedure Manual, effective on February 1, 1977.)


## The Adjustment and Treatment Building at the Kansas State Penitentiary

Submitted to Secretary of Corrections:  April 4, 1977

### Conclusion

The Adjustment and Treatment Building has been of continuous concern for staff as well as inmates.  Few of the findings and recommendations of this study are expected to be of surprise to staff members; indeed, many of them have been brought to our attention by staff members themselves.  The report is an attempt to consolidate information concerning A & T and to focus concern on it.  Staff know only too well the emotional and physical injuries inflicted upon inmates and staff who spend any considerable time in this bleak windowless building with continuous echoing noises.  By staff and inmate reports and our own observations, the Adjustment and Treatment Building in the Kansas corrections system has made some persons confined in it "worse" than they were when they entered it.  Regression and deterioration has been observed in the forms of adjustment difficulties when released to the general population, violence, bitterness, self-mutilation, suicide and general mental health deterioration, including psychosis.

The problem areas reported in this study are real.  The recommended changes, however, are far from being final solutions.  Indeed, some of them may well create new problems, although hopefully less aggravated.  While most of the recommendations have been developed in close collaboration with staff and inmates, it is expected that full implementation may not be feasible.

000934

The utilization of A & T for short term punitive measures is not seen as inappropriate. However, continuous and extended confinement in A & T for protective custody and mental health reasons is inappropriate. We know of one inmate who has spent approximately seven years in A & T for protective custody. (And we know of staff who have been assigned there for even longer periods of time.) At the present time neither the institution nor the Department as a whole has any alternatives available to provide care and custody to these inmates.

The Department of Corrections is on record as having recommended the construction of a psychiatric treatment facility in Topeka. Were this recommendation followed, many of the inmates currently held in A & T could be moved out, thus minimizing continued regression on their part and a considerable number of the problems created by them in A & T. We applaud this recommendation and regret that it is not being followed at this time.

It is hoped that the Department of Corrections will develop a recommendation for alternative facilities for the 100 to 125 inmates held in protective custody at KSP and KSIR. The approximately 60 protective custody inmates in A & T are held in a facility clearly designed for providing punishment as well as a higher degree of security. The majority of these men could function in a less restricted setting. Such a facility, along with one for psychiatric treatment, would make it possible to remove those inmates from A & T who are not otherwise serving disciplinary time or pending a disciplinary hearing.

The KSP administration is commended for its efforts to reduce the number of inmates in A & T and for its continual review of the usage of this facility. The recent implementation of a weekly Administrative Segregation Review Board has contributed significantly to this. KSP, also, has made efforts to find alternatives to A & T for protective custody inmates but can do so only on a limited and individual basis due to the lack of facilities and programs.

A state which has long been known for its achievements in the field of mental health, Kansas has the expertise available to rectify the existing conditions in the Adjustment and Treatment Building at the Kansas State Penitentiary. Correction of these conditions needs to become a legislative mandate, as well as a priority for the utilization of existing resources within the Penitentiary and the Department of Corrections.

Recommendations

Store

9.    Concerning the 24-hour appeal procedure established to rectify errors made in filling store orders, there needs to be written provisions stating that the period be extended during official holidays and that an inmate may utilize it when he has not received a substitute item after noting he would accept a substitute brand.
      *Response from Secretary of Corrections: None*
      *Response from KSP Director:* * *"Recommendation is current policy."*

---

* Mr. Kenneth G. Oliver, Director of the Kansas State Penitentiary, submitted a three page response, dated May 25, 1977, to the Ombudsman's report on the A & T Building. In conformance with the present summary format, his response is presented only in part; his complete response is available upon request to this Office.

-31-

**000935**

10. It is recommended that any purchased item damaged or lost during transfer from the store to an inmate in A & T be replaced at no expense to the inmate.
*Response from Secretary of Corrections:* None
*Response from KSP Director: "Recommendation is current policy."*

11. If recommendations 9 and 10 above do not eliminate existing problems, it is recommended that store personnel deliver purchases directly to each inmate in A & T. Implementation of this procedure could require a manpower increase for the store and a possible up-grading of existing positions.
*Response from Secretary of Corrections:* None
*Response from KSP Director:* Rejected

12. It is recommended that the store stock coffee and Tang in paper or plastic bag containers for use in A & T.
*Response from Secretary of Corrections:* None
*Response from KSP Director: "Recommendation is currently in practice."*

Security and Operations

13. Direct and close supervision of inside and outside exercise yards is seen as mandatory for protection and quality of human life.
*Response from Secretary of Corrections:* None
*Response from KSP Director: "Recommendation is current practice."*

14. A barrier should be erected around the outside of the south exercise yard to keep general population inmates from having direct contact with the wall.
*Response from Secretary of Corrections:* None
*Response from KSP Director:* Rejected

15. Support is given to a continued program of inspection and repair of the screen covering the south exercise yard to insure that it is not vulnerable to the entry of contraband items.
*Response from Secretary of Corrections:* None
*Response from KSP Director: Response indicated this was current practice and described it.*

16. A group of specially trained correctional officers needs to be developed for regular assignment to A & T.
*Response from Secretary of Corrections:* None
*Response from KSP Director: Response does not address issue of special training, although it does describe a system of assigning "specially selected officers" to A & T. The mental health needs of A & T staff are also discussed.*

17. A permanent duty post needs to be established in each of the three wings of A & T to be manned by correctional officers during the two daytime shifts.
*Response from Secretary of Corrections:* None
*Response from KSP Director: "Concur with the recommendation which will require budget action."*

-32-

000936

18. In addition to a full-time Correctional Supervisor I, and a Correctional Counselor I or II, six correctional officers need to be assigned to A & T during each of the two daytime shifts.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *"Concur with the recommendation which will require budget action."*

19. The officer in charge of the A & T Building should be paid at salary range 20 (10,596 - 13,392) which is equivalent to a Correctional Supervisor II, or be paid at salary range 21 (11,100 - 14,042) which is equivalent to a Unit Team Supervisor of any other unit in the institution.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *"Concur with the recommendation which will require position upgrading...."*

20. A Correctional Officer II (Sergeant) position needs to be allocated to the 6:00 a.m. to 2:00 p.m. shift in A & T.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *"Concur with the recommendation which will require budget action."*

21. It is recommended that each shift hold a formal roll call in A & T, on state time.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *Response concurred with recommendation, while pointing out need for budgetary action and clarification of definitions of terms.*

22. A "hand-out" describing the rules, expected routine and resources of A & T should be provided to each inmate upon arrival at A & T.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *"Recommendation is current practice."*

23. The rules governing inmate behavior on each wing in A & T need to be posted in a conspicuous manner on that wing.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *"This recommendation must be met by means of a hand-out rather than posting in the wing...."*

24. Inmate porters should not be used for performing the "official" business of A & T, including: transferring store items, serving meals, and acting as A & T clerk.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *Response indicated practice would have to be continued on a limited basis, until A & T is fully staffed.*

25. It is recommended that criteria be established for the selection of inmate porters in A & T.
    *Response from Secretary of Corrections:* None
    *Response from KSP Director:* *Rejected*

000937

26.  It is necessary to increase recreation and yard time, for inmates not serving disciplinary time, in order to decrease the mental health hazards of isolation.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  Rejected, in favor of creating more work opportunities, which would require budgetary action.*

Programs

27.  It is suggested that the recent effort to provide inc·eased mental health services in A & T be continued.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  "...Mental health services will be continued as available in light of other priorities."*

28.  A mental health prevention program with a mental health professional designated as project director needs to be established in A & T.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  "Concur with the recommendation which will require budget action."*

29.  It is recommended that a limited educational program be made available to protective custody inmates and other long-term inmates in Administrative Segregation.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  Rejected*

30.  It is suggested that library services for A & T inmates be better developed.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  Rejected*

31.  It is recommended that a means be found to keep the institutional library open in the event of the librarian's absence.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  Rejected*

32.  It is suggested that religious services be made available to protective custody inmates held on the east wing.
*Response from Secretary of Corrections:*  None
*Response from KSP Director:  Rejected*

000938

KSP 205A                           KANSAS STATE PENITENTIARY
(Rev. 2-1-78)                  REHABILITATION PLAN TIME TABLE
                                       90 DAY REVIEW         Date____3 Apr 79__

Name__Purkey, Wesley_____ No.____███████ Domicile___ACH_____

Offense__Agg Escape, Robb, Theft, Burg, Burg____Sentence____10-20_____

Current Custody Status__Maximum____ Date Received Custody 12 Dec 78_____

Projected KAA Date_____Jan 80 pass Employment__Unassigned (PC)_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PMC ACTION RECOMMENDED__Priority Transfer To LSH_____

Recommend_____days IGT awarded for period___NA_____thru_____

Program Review: Since seeing the Jan 79 KAA and passed to Jan 80, Mr
      Purkey has self-mutilated twice, the last being 29 Mar.
      UT sees a disorganization that could culminate in a more
      successful self-destructive effort. There is some evidence
      that family problems, stemming from the KAA pass, may well
      be the cause of his actions since Jan.

      UT is recommending priority transfer to LSH as a pallative
      measure.

Next Review By__3 Jul 79_____ /s/ Resident__in A&T_____

                                        /s/ Unit Team_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PRELIMINARY PMC ACTION:              Date__APR 1 3 1979_____

Defer one week for additional information from_____

_____Refer to MHU for testing

_____Refer for field investigation

_____Defer pending resolution for disciplinary report

_____Other_____

FINAL PMC ACTION: Transfer to LSH - priority

BASIS FOR PMC ACTION: _____

APPROVED FOR PMC: _____ Date__4-13-79.__

APR 19 1979

000939

## DECLARATION OF ROBERT MICHAEL HORNECKER

I, Robert Michael Hornecker, declare and state the following:

1. My name is Robert Michael Hornecker. People call me Mike. I am a resident of Sedgwick County, Kansas. I am 66 years old.

2. I was married to Rebecca Hornecker for 43 years until she passed away in December 2013. I call her Bec. Bec and I are Wes Purkey's sister- and brother-in-law, respectively. Wes Purkey was married to Claire Gaida, Bec's sister. They have a daughter, Angie Genail. Bec and I raised Angie.

3. Claire and Bec were two of six kids growing up. Their biological dad died when they were young. Bec was 16 years old, so Claire was about 13. He died of cirrhosis of the liver. He drank himself to death. He was pretty young when he died. At the funeral Claire had to be pulled off her dad's casket. Claire went squirrelly after that. She started sneaking out of the house and doing whatever she wanted. When her mom tried to get her out of bed in the mornings for school, Claire kicked and screamed and cussed at her. Claire often hit her mom. Over the years Claire's mom Corlette Sooter used to say that she should have gotten Claire treatment after her father died. This was before Claire started using drugs. Drugs just made her worse.

4. Bec and Claire's twin brothers, Pat and Paul, used drugs and alcohol, too. They introduced Claire to drugs at an early age. They all huffed together. They used Tolio or whatever they could get their hands on.

5. During the 1970s, Claire and Wes did some robberies together. They both got locked up and went to prison. A few nights before Claire was arrested, she left Angie with Pat. Pat called

1 | P a g e                                                          (Initial)

000940

Bec for help because he didn't know what to do. Claire didn't leave any diapers or milk, or anything else for Angie. Bec picked up Angie. Bec and I raised Angie as our own. Angie was no more than a year old when we took her in.

6. Claire was in prison for about three years. After she got out, she wanted to have a relationship with Angie. She asked Bec and me if she could take Angie out to get ice cream. We reluctantly agreed. We were concerned because Claire was and still is unstable and liable to do something bad. Our worry was confirmed. Claire snatched Angie from us. She called us later that night and told us that Angie was her child and wasn't bringing her back.

7. Losing Angie so suddenly was very painful for me and Bec. Two weeks before Claire took Angie, Bec and I lost a child. We had been trying for 13 years. Bec's water broke at six months; the baby only lived an hour. We were devastated. Claire knew what happened to us. That's what kind of person Claire is. She knew taking Angie would devastate Bec and I even more than we already were.

8. A few weeks after Claire snatched Angie, Pat called Bec because Angie got real sick. Bec and I went to Claire's home. When we got there Claire stepped out of her home and pulled a gun on me. She put it in my face. She was yelling at me that Angie was her daughter and told me to leave or she'd shoot me. She was going crazy. I called the cops and they came out, but didn't do anything, even though Claire had just gotten out of prison and was in possession of a gun. They told us we should just leave because there was nothing they could do. We had to leave Angie with Claire. I'm still stunned about this to this day. It wasn't until a month or two later that Claire gave up Angie. She didn't want to raise her. Claire signed papers giving guardianship of Angie to me and Bec.

2 | P a g e                                                                                    *MH* (Initial)

000941

9. When we got Angie back from Claire, she wasn't doing well. She was having a hard time. She had witnessed a lot of bad with Claire. For example, she told us that at breakfast one morning Claire stabbed her husband Steve Gaida several times. Angie was right there eating. Blood went everywhere. Claire just stabbed him out of the blue. It didn't take anything to set Claire off. Anything could. It just happens on a drop of a dime. It is the same to this day.

10. I never understood why Claire took Angie back in the first place. When she was pregnant with Angie she used drugs and huffed Tolio during her pregnancy. Claire said she was trying to have a miscarriage. Claire went so far as to stick a hanger up inside her to try to cause one.

11. I haven't seen Claire in over 10 years now. About 10 years before my wife, Bec, passed, she and Claire had a falling out. Bec cut off the relationship because she was tired of Claire's unpredictable behavior. She wanted nothing more to do with Claire.

12. Angie talks to Claire infrequently now. Claire used to get on Angie about how Angie's kids called me and Bec grandpa and grandma. Claire didn't like that. She resented it and told Angie that Angie needs to tell the kids "the truth". Claire used to yell and scream at Angie about it. She yelled at me and Bec about it, too.

13. When Angie was about 13 years old she wanted to meet her biological father. I found out he was at Hutchinson Prison. After that Angie would go with Claire to see him every other week.

14. I only met Wes Purkey once, even though I raised his daughter. Wes has spent most of his life in prison. It must have been hard for him to be away from his daughter. He wrote did write Bec and me a letter once. It was a Christmas card. We were shocked to get it. It was years ago, sometime after Angie started visiting Wes. The card wished us a merry Christmas

3 | P a g e                                                                                                 (Initial)

000942

and thanked us for raising Angie so well and looking after her all the years. He was very thankful of us and our role in Angie's life. It was real gratitude.

15. I have not previously been asked by attorneys for Wes Purkey to share my thoughts and memories with them, as I have done so above. If I had been asked previously, I would have been open to talking to them about this information. If Bec was still alive, she could have shared even more stories about Claire's childhood and troubles, especially her relationship with Wes, as well as Angie's childhood. I wish she had the chance.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this __9th__ day of August, 2016.

Robert Michael Hornecker

4 | Page                                                                    (Initial)

000943

THOMAS M. WARNER, Jr.
WILSON, WARNER & SKINNER
Attorneys at Law
934 North Water
Wichita, Kansas  67203
Telephone: (316) 263-4200

IN THE EIGHTEENTH JUDICIAL DISTRICT
DISTRICT COURT, SEDGWICK COUNTY, KANSAS
TRAFFIC DEPARTMENT

STATE OF KANSAS,          )
                Plaintiff,  )
                          )
                          )
vs.                       )     Case No. 86 TR 19256
                          )
                          )
CLAIRE L. BERRY,          )
                Defendant.  )

MOTION FOR MODIFICATION
OF SENTENCE OR PROBATION

COMES NOOW the Defendant and by and through her Attorney, Thomas M. Warner, Jr. of Wilson, Warner & Skinner and respectfully moves the Court for an Order modifying her sentence or in the alternative granting this Defendant probation from the confinement portion of the sentence imposed on January 14, 1987.  In support of said Motion, Defendant shows the Court as follows:

1.  That Defendant was convicted of her second D.U.I. on or about January 14, 1987.

2.  The Court sentenced the Defendant to one (1) year in jail and a one thousand dollar ($1,000.00) fine.

3.  The Court ordered that the Defendant submit to an B.A.T. immediately after sentencing and that in the event that she passed the B.A.T. then the Defendant would be eligible to be placed in an appropriate treatment facility.

4.  That Defendant's B.A.T. proved negative.

000944

5. That the Defendant has spend approximately two (2) weeks in the County jail.

6. That Paralax has advised this Defendant's Attorney that she is eligible and acceptable into the Paralax Inpatient Drug Treatment Program.

7. That it would be in the interest of justice for this Defendant to be paroled from the confinement portion of her sentence and placed in inpatient treatment with Paralax for at least thirty (30) days.

WHEREFORE and by reason of the foregoing, Defendant respectfully prays for an Order granting her probation from the confinement portion of her sentence and allowing her to be an inpatient at the Paralax Drug Treatment Facility.

Respectfully submitted,

THOMAS M. WARNER, Jr.
Attorney for Defendant

## NOTICE OF HEARING

This matter will be heard at 9:00 o'clock a.m. on the 12th day of February, 1987 in Position 2 of the District Court of Sedgwick County, Kansas or as soon thereafter as the same may be reached.

THOMAS M. WARNER, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February, 1987, a true and correct copy of the above and foregoing Motion and Notice of Hearing was mailed, postage prepaid and properly addressed to **Julie Orr**, of the District Attorney's Office, Sedgwick County Courthouse, Second Floor – Annex, 535 North Main, Wichita, Kansas 67203.

THOMAS M. WARNER, Jr.

000945

-2-

FILED
DISTRICT COURT
SHAWNEE CO. KS

JUN 12   2 14 PM '81

*Lorene Webb*

CHIEF CLERK

IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS

_____ DIVISION

CLAIRE L. PURKEY,                )
                                 )
              Plaintiff,         )
                                 )
      vs.                        )        Case No. 81-D-798
                                 )
WESLEY I. PURKEY,                )
                                 )
              Defendant.         )
_____)

PETITION FOR DIVORCE

(Pursuant to K.S.A. 60)

Comes now the plaintiff and for her cause of action against the defendant, alleges and states:

1.   That plaintiff is now and has been for more than sixty days preceding the filing of this action an actual resident of the State of Kansas, Shawnee County.

2.   That the defendant may be served at the Kansas Reception & Diagnostic Center, P. O. Box 1558, Topeka, Kansas 66601.

3.   That plaintiff and defendant established a common law marriage in 1977 and have been since that time and are now husband and wife.

4.   That one child has been born to these parties during the course of their marriage, namely, Angie C. Purkey, born ████████

5.   That plaintiff be given custody of the minor child, subject to reasonable visitation rights for the defendant.

6.   That the defendant be ordered to pay a reasonable amount of child support for the minor child of the parties.

7.   That plaintiff alleges incompatibility as the grounds for this divorce.

8.   That the plaintiff's maiden name of Berry be restored to her.

000946

9.  Plaintiff requests the Court to award to her her own personal property and effects, free and clear of any right, title or interest of the defendant.

10.  That defendant be awarded his own personal property.

WHEREFORE, plaintiff prays for an absolute divorce from the defendant; that custody of their minor child be given to the plaintiff, subject to reasonable visitation rights for the defendant; that the defendant be ordered to pay a reasonable amount of child support for the minor child of the parties; that plaintiff's maiden name, Berry, be restored to her; that plaintiff be awarded her personal property and effects; that defendant be awarded his personal property and effects; and for such other and further relief as the Court may deem just and equitable in the premises.

Albert D. Keil, Director
Legal Services for Prisoners, Inc.
P. O. Box 829, 5600 W. 6th
Topeka, Kansas 66601
(913) 272-4522
Attorney for Plaintiff

VERIFICATION

STATE OF KANSAS      )
                     )SS.
COUNTY OF SHAWNEE    )

CLAIRE L. PURKEY, of lawful age, being first duly sworn upon her oath, states:

That she is the plaintiff in the above-entitled action; that she has read the above and foregoing petition for divorce, knows the contents thereof; that the statements contained therein are true and correct to the best of her knowledge; and that because of her poverty, she is unable to pay the costs of this action.

CLAIRE L. PURKEY

SUBSCRIBED AND SWORN TO before me this 11th day of June, 1981.

NOTARY PUBLIC

My Appointment Expires:

My Appointment Expires March 1, 1982

SUMMONS

FOR CLERKS USE ONLY

FILED
DISTRICT COURT
SHAWNEE CO. KANSAS

JUN 18  6 3: AM '81

*Frances Wells*
CHIEF CLERK

## Copy to Attorney

In the District Court of Shawnee County, Kansas

SHAWNEE COUNTY SHERIFF'S DEPT

Jun 15  11 21 AM '8

CLAIRE L. PURKEY

_____

_____

_____ Plaintiff

vs.

WESLEY I. PURKEY

% Kansas Reception & Diagnostic Center

PO Box 1558

Topeka, Kansas

_____ Defendant

No. 81-D- 798

Division No. ____ 4

# SUMMONS

To the above-named Defendant:

You are hereby summoned to defend an action brought in the District Court for Shawnee County, and required to serve upon ___Albert D. Keil, Legal Services for Prisoners___, plaintiff's attorney, whose address is _PO Box 829, 5600 W. Sixth, Topeka, Kansas_, according to the petition which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition. Your pleading also must be filed with the court in Shawnee County. As provided in section 60-213 (a), your answer must state as a counterclaim any related claim which you may have against the plaintiff, or you will thereafter be barred from making such claim in any other action.

(Seal of the Court)

LORENE WELLS
Chief Clerk of Said District Court

Dated___June 12, 1981___    By _____ Margaret Hofwolt _____ Deputy.
Margaret Hofwolt

## RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served the within summons:

(1) By delivering on the ___16th___ day of ___June___, 19_81_, a copy of the summons,

copy of the petition, and a copy of_____

to each of the within-named defendants____Wesley I. Purkey personally at KRDC.____

_____

_____

(2) By leaving on the_____day of_____, 19___, for each of the within-

named defendants_____

_____

_____

A copy of the summons, a copy of the petition, and_____
at the respective dwelling place or usual place of abode of said defendants with some person of his or her family of suitable age and discretion.

(3) After diligent search and inquiry was unable to find the within-named defendant_____

_____

on the_____day of_____, 19_____.

All done in_____SHAWNEE_____County, Kansas.

| Sheriff's fees: | |
|---|---|
| Summons | |
| Not Found | |
| Mileage | |
| Total | |

*Ed Ritchie*

Sheriff of_____SHAWNEE_____County, Kansas.

By_____ Deputy.

12/76

000948

CHIEF CLERK

IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS
DIVISION 4

CLAIRE L. PURKEY,                    )
                                     )
                    Plaintiff,       )
                                     )
        -vs-                         )        Case No. 81-D-798
                                     )
WESLEY I. PURKEY,                    )
                                     )
                    Defendant.       )
_____)

ORDER TO ALLOW ANSWER OUT OF TIME

Now on this 2X day of July, 1981, the above matter comes on before the Court upon defendant's oral motion for an Order allowing him to answer or otherwise plead to plaintiff's Petition. Defendant appears by and through his attorney, John H. House. Plaintiff appears by and through her attorney, Albert D. Keil. There are no other appearances.

Whereupon, the parties each inform the Court that they have no objection to defendant's motion being sustained.

WHEREFORE, the Court does sustain defendant's motion, and orders that defendant should have ten days from this date to file his Answer to plaintiff's Petition or to otherwise plead.

_____
Judge of the District Court

APPROVED BY:

_____
ALBERT D. KEIL
Attorney for Plaintiff
Legal Services for Prisoners, Inc.
P. O. Box 829
Topeka, KS 66601

_____
JOHN H. HOUSE
Attorney for Defendant
Legal Aid Society of Topeka, Inc.
112 West 6th
Topeka, KS 66603
(913) 354-8531

000949

FILED

JUL 28   4 25 PH '81

*Lorene Willis*
CHIEF CLERK

IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS
DIVISION 4

CLAIRE L. PURKEY,                    )
                                     )
                    Plaintiff,       )
                                     )
        -vs-                         )        Case No. 81-D-798
                                     )
WESLEY I. PURKEY,                    )
                                     )
                    Defendant.       )
_____)

### ANSWER

Comes now the defendant and for his Answer to plaintiff's Petition, alleges and states:

1. That defendant admits Paragraphs No. 1, 2, 3 and 4 of plaintiff's Petition.

2. That defendant admits that the parties are incompatible and that by reason thereof the Court may properly enter a Decree of Divorce in this matter, as may be indicated by Paragraph No. 7 of plaintiff's Petition.

3. That defendant interprets Paragraph Nos. 5, 6, 8, 9, and 10 of plaintiff's Petition to be in the nature of prayers for relief, and not as matters of fact, and so neither denies nor admits the truth of any matters contained in said paragraphs.

WHEREFORE, defendant prays the Court that an appropriate Order be entered, that the custody of the minor child of the parties be placed in the plaintiff, that the personal property of the parties be equitably divided, and for such other and further relief as the Court may deem just and equitable in the premises.

JOHN H. HOUSE
Attorney for Defendant
Legal Aid Society of Topeka, Inc.
112 W. 6th
Topeka, KS 66603
(913) 354-8531

000950

CERTIFICATE OF SERVICE

John H. House, attorney for defendant, hereby certifies that on the 26th day of July, 1981, he deposited a true and correct copy of the above and foregoing Answer in the United States mail, first class postage prepaid, addressed to: Albert D. Keil, Legal Services for Prisoners, Inc., P. O. Box 829, Topeka, KS 66601, attorney for plaintiff.

JOHN H. HOUSE
Attorney for Defendant

000951

CHIEF CLERK

IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS
FOURTH DIVISION

CLAIRE L. PURKEY,                )
                                 )
                Plaintiff,       )
                                 )
    vs.                          )        Case No. 81 D 798
                                 )
WESLEY I. PURKEY,                )
                                 )
                Defendant.       )
_____)

JOURNAL ENTRY

NOW, on this 18th day of September, 1981, this matter comes regularly on for hearing. The plaintiff appears in person and by her attorney, Albert D. Keil. The defendant appears by his attorney, John H. House.

The Court after hearing the evidence, statements of counsel, and being fully advised in the premises, finds:

1. That plaintiff and defendant established a common law marriage in 1977 and have been since that time husband and wife.

2. That plaintiff has been a bona fide resident of Kansas for more than sixty (60) days prior to filing this petition.

3. That there has been personal service on the defendant.

4. That the case has been on file sixty (60) days, the Court has jurisdiction of the parties and the subject matter, and the case is ready for hearing.

5. That because of irreconcilable differences, the parties are incompatible and should be granted an absolute divorce.

6. That one child has been born to these parties during the course of their marriage, namely, Angie C. Purkey, born ████████

7. That the plaintiff be given custody of the minor child, subject to reasonable visitation rights for the defendant.

8. That the defendant be ordered to pay Seventy-five ($75.00) Dollars per month as child support for the minor child of the parties, said child support to commence thirty (30) days after the

000952

defendant is released from the custody of the Secretary of Corrections.

9.    That the plaintiff should be awarded the personal property in her possession, free and clear of any right, title or interest of the defendant.

10.    That the defendant should be awarded the personal property in his possession, free and clear of any right, title or interest of the plaintiff.

11.    That the plaintiff should have her maiden name, Berry, restored to her.

12.    That the costs in this action should be waived.

IT IS THEREFORE BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED that the plaintiff is hereby granted an absolute divorce from the defendant.

IT IS FURTHER BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED that the above findings should be and they are hereby made the order of this Court.

IT IS FURTHER BY THE COURT ORDERED that the plaintiff's maiden name, Berry, be restored to her.

IT IS FURTHER BY THE COURT ORDERED, ADJUDGED AND DECREED that the parties hereto are prohibited from contracting marriage with any other person until thirty (30) days after the entry of the decree, unless an appeal is taken, and then until receipt of mandate is issued in accordance with sub-section (C) of K.S.A. 60-2106. Any marriage contracted before the expiration of that period shall be null and void, and any agreement to waive the right of appeal shall not be effective to shorten such period of time.

IT IS FURTHER BY THE COURT ORDERED that the court costs in this action be waived.

ADRIAN J. ALLEN
District Judge

- 2 -

000953

Approved by:

_____

Albert B. Keil
Legal Services for Prisoners, Inc.
P. O. Box 829, 5600 W. 6th
Topeka, Kansas 66601
(913) 272-4522
    Attorney for Plaintiff


_____

John H. House
Legal Aid Society of Topeka, Inc.
112 West Sixth
Topeka, Kansas 66603
(913) 354-8531
    Attorney for Defendant

- 3 -

000954

NOTICE OF ASSIGNMENT

IN THE DISTRICT COURT OF
SHAWNEE                          COUNTY, KANSAS

CLAIRE L. PURKEY, NOW BERRY, PET.
VS
WESLEY T. PURKEY, RESPONDENT

NOTICE OF ASSIGNMENT

TO THE CLERK OF THE DISTRICT COURT/COURT TRUSTEE:

1.   Pursuant to K.S.A. 39-709 and/or 39-756, any and all accrued, present,
and future rights to support (including medical support) in behalf of the
person(s) listed below have been assigned to the Secretary of Social and
Rehabilitation Services:   CLAIRE L. BERRY
ANGIE C. PURKEY                    03/03/79

2.   Until further notice, this case is:  IV-D ADC.

3.   This assignment of support rights is in full force and effect until
further notice and applies to all monies now in hand or which may be received
in payment of assigned support.  Upon receipt of this notice, the clerk of
the district court and/or court trustee shall forward all assigned support
payments to:

                    CSE RECEIVABLES UNIT
                    P.O. BOX 2637

                    TOPEKA, KS   66601

Date: 07/06/95

Recipient or Participant:  CLAIRE L. BERRY

Date Child Support Enforcement case opened or reopened: 06/22/95

Distribution    ( X ) Clerk of Court    (   ) Court Trustee

                ( X ) C.S.E. File       (   ) Other:

IVD-Case number: A000208629-04

000955



Downing & Lahey

MORTUARY

6555 East Central

WICHITA, KANSAS

John Morris                    Jack Morris

Thomas Lahey

000956



*A*lone,

all things come back to me.

In silence,

the pain is eased.

In reflection,

I feel you with me

and am comforted.

000957

## In Memory Of

CARRIE ANNA BURKE

### Born



Sherman, Texas
Place

### Passed On

July 11, 1980
Date

Wichita, Kansas
Place

### Age

| 85 | 11 | 21 |
|---|---|---|
| Years | Months | Days |

**000958**

## Family Record

Father     Anthony Haberthier

Born            Died

Mother     Annie Hess

Born            Died

## Other Members of the Family

Velma Purkey

Gary Purkey

Wesley Purkey

Tanya Purkey

Angie Purkey

In solitude,
all things return.
In silence,
the heart is heard.
In reflection,
the shadows lift,
The meaning of this time
shines clear.

000959



Evening Service

Downing & Lahey East Mortuary
Held at

Tuesday, July 15, 1980, 7:30 P.M.
Date                              Hour

Led by

The Reverend Charles Bueche

Music for the Mass

Organ

Vocal

000960

*Mass of Christian Burial*

St. Joseph Church
Church

Wednesday, July 16, 1980

10:00 A. M.

Time                    Date

*Officiating*

The Reverend Charles Bueche

*Sermon by*

The Reverend Charles Bueche

*Light* –

it changes the day,

it breaks into this moment,

it gives and takes away

with such quiet power.

It is the soul of everything,

and the source of all faith.

How fragile a thing,

that lifts us into hope.

000961



Walter Busch

Leo Culhane

John Knowles

Leon Rucker

Francis Schwartzman

Bill Schwarz

000962



*Final Resting Place*

*Ceremonies by*

The Reverend John Mullen

*Interment in*

St. Teresa Cemetery
Name of Cemetery

_____

_____ Section

_____ Block

_____ Lot

Hutchinson
City

Reno
County

Kansas
State

*Laid to Rest*

12 Noon        Wednesday,        July 16, 1980
Hour-Day-Month

*Grant me the quietness to see*

*in the things of this world,*

*however small or large,*

*however violent or calm,*

*the grace and blessedness*

*of Your design.*

000963

Kansas Department of Corrections

Division of Community Correctional Services

Date __Aug.__12,__1980__

# - Case Report -

TO:

XXXXXX Central Office    Attn:  P.A. Ramos

_____ Reg. Supvr. _____

_____ P.O. _____

_____ Judge _____ County

_____ Compact Administrator, _____ (3)

Name __PURKEY, Wesley I.__    Number ███████ _____

Address __Sedgwick County Jail__    Employer __N/A_____
            __Wichita, KS.__

TYPE OF REPORT:            __ARREST REPORT__

The subject parolee was arrested by officers of the Wichita
Police Department on 8/4/80.  He is charged with Robbery,
Agg. Robbery and 2 counts of Unlawful Possession of Fire-
arm.  Purkey has been arraigned and bond was sent at $50,000.
He remains in custody.

Det. Henderson, WPD, is seeking a third state warrant against
Purkey and Martin Foster, KSIR #25784, discharged 10/15/79.
He claims they were involved in Agg. Kidnapping, Agg. Assault
and Unlawful Possession of Firearms.  The accused allegedly
abducted an employee from a Town and Country convenience mar-
ket and drove him to the far west side of the city, where
the employee was shot twice.  The victim is seriously wounded
but is expected to live.  Foster is believed to have actually
done the kidnapping and shooting apparently for the victims
car and to keep him from identifying them.

Purkey was interviewed on 8/8/80.  He claims that he called a
friend, Ms. Peggy Martini, in Wichita, from the bus depot
in Kansas City.  He says that Ms. Martini told him his aunt,
Ms. Carrie Burke, had passed away.  I have not been able to
verify this.  Purkey stated that he felt very close to this
aunt and decided that he should attend the funeral.  He came
to Wichita without trying to get permission from a state
(cont. on back)

Submitted by P.O. _Richard D. Fletcher_
                   Richard D. Fletcher

cc: file

DATE _____ FORWARDED TO _____ By _____

000964

P-246                                                    DC/cs-5 (Rev. 11-77)

parole officer.  Purkey claims that he joined his wife Clair at her residence , 709 Bayley, Wichita.  He stated that because he believed that he had no hope of being allowed to stay on parole he reverted to drugs and began doing criminal acts.  He would not be more specific.  Purkey told the medical personnel at the jail that he is going through withdrawal from heroin and hallucinogenic drugs.  One of the medical staff claimed that he observed needle "tracks" on Purkey.  He is now receiving Valium by order of the staff physician.

Purkey indicated that he plans to cooperate with the police in an effort to minimize the number and nature of the charges.  He is hoping to work out a deal which will place him on probation and allow him to obtain the drug treatment he claims he needs.

We have received the parole violation warrant and pictures.  The man in custody definitely is Wesley Purkey.  The information supplied by the Sedgwick County Sheriff's Dept. Warrant Office relative to a California warrant for auto theft was a mistake. The clerk in the records section was responsible for the confusion.

The proceedings will be monitored and you will be advised of the progress.

000965



# Wesley Medical Center
## Wichita, Kansas

This Certifies that _ANGIE COLETTE PURKEY_

was born to _Claire Leanne and Wesley Ira Purkey_

in this Hospital at _5:27_ o'clock _P._ m. on _Saturday_

the

In Witness Whereof the said Hospital has caused this Certificate to be signed by its duly authorized officer and its Official Seal to be hereunto affixed.

_Pauline K. Elson, R. N._
Registered Nurse

_____
Attending Physician

_____
Administrator

MR41

000966



KPB 1
(9-5-90)
P-641

**KANSAS PAROLE BOARD**
TOPEKA, KANSAS



## Certificate of Parole

KNOW ALL PERSONS BY THESE PRESENTS:

It having been made to appear to the Kansas Parole Board that

WESLEY PURKEY _____, No. ____ ▮▮▮ _____

an inmate of the KANSAS DEPARTMENT OF CORRECTIONS, is eligible to be PAROLED, and that there is reasonable probability that said inmate is able and willing to fulfill the obligations of a law-abiding citizen.

IT IS ORDERED that the inmate be paroled on or after _____ MARCH 1, 1997 _____ when plans are approved, pursuant to K.S.A. 22-3717 and 75-5216, and that said parolee remain within the limits fixed by said Parole Board and the Secretary of Corrections or its authorized agent until _____ Life _____, the date of expiration of the maximum term or terms of sentence, unless Certificate of Discharge is issued by the Parole Board prior thereto.

Release under this Certificate is dependent upon agreement by the parolee to the conditions set forth on the reverse side of this Certificate.

Given this ___ 4TH ___ day of _____ FEBRUARY 1997

TLS:ag
CC:SUBJECT
DOC
LCF SU
PO
FILE

KANSAS PAROLE BOARD

By _____
                                Director

---

DEPARTMENT OF CORRECTIONS
Division of Community Correctional services

The above-named inmate was released on _____ 3-1-97 _____ at _6:30_ (a.m.), p.m.
                                                    (Date)

Transportation by _AUTO_____ to destination at _LEAVENWORTH, KS_____
        (Train, bus, auto, sheriff, etc.)                                      (Location)

Should reach destination on or about _____ 3-1-97 _____ 9:30A _____
                                                (Date and Hour)

_____          _____
    (institutional Official)                            (Title)

000968

## ADMINISTRATIVE SEGREGATION REVIEW

Initial_____    7-Day_____    30-Day_____    Special  X  

Name    PURKEY, WESLEY _____    Number ▉▉▉___    Date   4/17/86  

Date Placed in Segregation  4-17-86   Recommended Date of Release   NA  

Date of Medical Check    -  NA        Name  of Medical Personnel    NA  

Did the Inmate appear before the Board?_____    YES  

---

### RECOMMENDATION OF THE BOARD:

Change in Status_____                    No Change in Status  X  

    Return to General Population_____Domicile Unit

Transfer to C-Cellhouse Segregation Unit_____

Transfer to A-Cellhouse Segregation Unit_____

Other (Specify)  IMPLEMENT 44-14-307 MORE RESTRICTED AREA.  

Intervene in Disciplinary Process (See Remarks)_____

---

The following is a review of the Inmate's confinement in Administrative Segregation:

    PURKEY HAS BEEN TRANSFERRED TO A&T IN ACCORDANCE WITH RULE 44-14-307 TRANSFER TO A MORE RESTRICTED AREA AFTER INFORMATION WAS RECEIVED INDICATING THAT HE WAS IN DANGER WHILE ASSIGNED TO CCH. HE REMAINS ASSIGNED TO A&T UNDER 44-14-302(a) PROTECTIVE CUSTODY AND THE BOARD RECOMMENDS THAT HE REMAIN IN A&T AS LONG AS THE THREAT IN CCH CONTINUES. THIS REVIEW SATISFIES THE REQUIREMENT IN 44-14-307, WITHIN 24 HOURS OF PLACEMENT THE INMATE WAS INTERVIEWED AND VOICED NO OBJECTION TO HIS PLACEMENT IN A&T.

Approved  /   Disapproved_____    *Leslie L. Hemphill*
                                   Clinical Staff Member

Approved  /   Disapproved_____    *[signature]*
                                   Security Staff Member

Approved  V   Disapproved_____    *[signature]*
                                   Chairman of the Board

Approved  /   Disapproved_____    *[signature]*
                                   Herb Maschner, Director

Comments:_____

**000969**



STATE OF KANSAS

OFFICE OF THE ATTORNEY GENERAL

2ND FLOOR, KANSAS JUDICIAL CENTER, TOPEKA 66612-1597

ROBERT T. STEPHAN
ATTORNEY GENERAL

MAIN PHONE: (913) 296-2215
CONSUMER PROTECTION: 296-3751
TELECOPIER: 296-6296

Statement of Attorney General

Robert T. Stephan

Before the Legislative Coordinating Council

Re:  <u>Arney, et al., v. Hayden, et al.</u>, No. 77-3045

February 23, 1989

I am grateful for this opportunity to talk with you today about an issue which has presented a huge challenge to the citizens of this state and to its lawmakers for many years.  That issue is the improvement of conditions in our prison facilities.

I have been asked to give my opinion on whether the state should appeal the tentative order recently issued by Judge Richard Rogers or ask the judge to modify certain portions of the order. To understand the basis for my conclusion, it is important to review in some detail the history of this litigation.

The case of <u>Arney, et al. v. Hayden, et al.</u>, was filed in 1977 by eight inmates incarcerated at Kansas State Penitentiary.  The original party in the lawsuit was former Governor Robert Bennett who was in office at the time the suit was filed.  In 1980, a consent decree was entered into between the parties and was approved by the Court on May 2, 1980.

The consent decree provided, among other things, for accreditation according to standards set forth by the American

000970

Correctional Association.  The ACA is an organization composed of people who work in the corrections field.  It is funded by the United States Department of Justice and the Law Enforcement Assistance Administration.

It is important to note that the consent decree applied only to the Kansas State Penitentiary at Lansing and to no other institution.  However, many other institutions in our state are ACA accredited and in many instances call for the same type of procedures that were present at the time of the decree.

Periodically since 1980, the plaintiffs have notified the Department of Corrections of alleged violations of the consent decree.  However, no complaints were raised with the Court until the case was reopened by the plaintiffs in January, 1988.

Before the plaintiffs reopened the case, they requested that the U.S. Department of Justice intervene.  In June of 1986, the Justice Department sent two consultants to the penitentiary.  Their reports were then provided to the Department of Corrections a year later, in June of 1987.

The Justice Department concluded that unconstitutional conditions existed at the penitentiary.  A demand was made that the Department of Corrections remedy the deficiencies by entering into another consent decree.  Since more than a year had passed since the consultants conducted their evaluations, the DOC requested a reevaluation.  This was done.  The Justice Department again concluded that conditions at the penitentiary were unconstitutional.  Again a demand was made for the Department of Corrections to enter into a Consent Decree.  The DOC refused.

000971

Page 3

A short time later, the plaintiffs filed to reopen the case and the 1980 consent decree. In doing so, the plaintiffs sought not only to enforce the consent decree but also to seek relief from other unconstitutional conditions of confinement.

In mid-March, 1988, a four-day hearing was conducted on the plaintiffs motion for a preliminary injunction. The plaintiffs largely based their case on the findings of the two Justice Department investigations. It's important to note that the Department of Corrections contested all allegations of the plaintiffs in regard to enforcement of the consent decree and other relief sought.

On April 1, 1988, Judge Rogers ordered the penitentiary's population to be reduced by 400 inmates by September 1, 1988. The reductions took place as ordered. Following a hearing in early September, the Court ordered the population at KSP to be reduced by another 200 inmates to not more than 1,871 inmates by December 31, 1988. This order was also met by the defendants.

In the meantime, the Court in July permitted inmates at Kansas Correctional Institution at Lansing and Kansas State Industrial Reformatory to intervene in the case. The plaintiffs filed a motion for preliminary injunction with respect to both facilities. The parties agreed that no more than 158 inmates would be confined at KCIL and renovations of the admissions area where newly admitted inmates were confined, would take place. The Court signed the order regarding KCIL on December 27, 1988.

The defendants contested the motion for a preliminary injunction regarding KSIR. As a result, a three-day hearing was

held in late October.  On December 23, 1988, the Court ordered the inmate population at KSIR to be reduced to not more than 1,303 inmates by April 1, 1989.

In February of this year, the case was submitted to the Court based on evidence presented at the earlier preliminary injunction hearings.  This preceded the Court's order of February 15, 1989.

This case is now 12 years old.  Nine years have passed since the consent decree was signed in 1980.  The U.S. Department of Justice has investigated and cited the state for unconstitutional conditions of confinement.  Final relief in the February 15th order is two and a half years away -- almost 15 years from the time the case was filed, and 11 years after the consent decree was entered.

Before addressing particular points in the tentative order, it is important to understand that the Federal courts have virtually unlimited power to assume the day to day operations of a state prison.  The courts may appoint a special master, order the release of inmates, or order the immediate closing of an institution.  A Federal judge may even personally take over and manage the operation and construction of correction or penal institutions in the state.

Under any of these circumstances, the operation, conduct and procedure of penal or correctional institutions is removed from state control and if the state does not comply with the orders of the court, the court can cite the state in contempt for defying its order.  The courts have, in some instances, levied a fine for every day a state does not comply with an order.  In Rhode Island, for

000973

example, the state was fined $50 per day, per inmate over the maximum until it came into compliance with a court order. If the same fine were applied to Kansas, the state would be paying out $40,000 per day.

At this time, I would like to review with the you Judge Rogers' Tentative Order to assess not only its legal and factual basis but also the advisability of requesting a rehearing for modification of the order or filing a Notice of Appeal. Every possible objection to the court's order was analyzed, and I would like to address those possible objections.

First, the court has ordered the elimination of double-celling even though double-celling is permissible under the U.S. Constitution. Let me point out that double-celling did not occur at KSP when the consent decree was signed in 1980. However, double-celling was contemplated as a result of cellhouse renovation. The consent decree allowed for double-celling only when no other housing alternative was available and stated that if double-celling occurred it should be in effect for the shortest possible period of time. Double-celling persists today in all areas of KSP, nine years after the consent decree was signed.

While it is true that double-celling is not per se unconstitutional, many Federal courts have held double-celling to be unconstitutional when viewed in conjunction with other factors such as available living space, time spent out of the cell, etc. In the Oklahoma case of Battle V. Anderson, the 10th Circuit Court of Appeals, which encompasses Kansas, affirmed the finding

Page 6

that double-celling in a 35-40 square foot cell was constitutionally offensive.

In this case, the court has determined that the double-celling at KSP, KCIL and KSIR is unconstitutional. This finding had nothing to do with the 1980 consent decree. Some members of the legislature seem to focus on the 1980 consent decree indicating that it was the basis of the courts decision. Nothing could be further from the truth. The court based its judgement on conditions as they now exist and not as they existed in 1980. As a matter of fact, if the consent decree had been complied with, we wouldn't be here today.

The second provision of the order is that the Adjustment and Treatment Building, known as A & T, and two outside dormitories at KSP may not be used to house inmates after July, 1991. The Adjustment and Treatment building is a solid concrete structure with no windows. It has inadequate heating and ventilation and poses sanitation problems. The building constitutes a threat to life in the event of a fire, which is not an infrequent occurrence. The plumbing requires daily repairs and the electrical system is inadequate. Some inmates have been housed there for years, particularly inmates with mental conditions who need treatment which cannot be provided by A & T. The two outside dormitories, R and S, which hold minimum security inmates, are in an unsanitary state of disrepair and are located on a flood plain. During times of high water the two structures are cut off from the main institution.

000975

Another  provision requires the Department of Corrections to provide inmates work assignments or program alternatives.  This is already required by state law and is less stringent than the 1980 consent decree which provided that all inmates be assigned to work programs or other activities for 40 hours per week.  Evidence presented to the court reflected an extensive inmate idleness situation at both KSP and KSIR which resulted in in-cell time of up to 23 hours per day.

The court's order also sets specific population caps at KSP, KCIL and KSIR.  In 1986, under then Secretary of Corrections Richard Mills, the DOC prepared a Capacity Report for the entire penal system.  The population caps adopted by the court merely adopted the figures contained in the report.  The degrees of overcrowding that exist at KSP, KCIL, and KSIR are comparable to or surpass the overcrowding found unconstitutional by the 10th Circuit in the Oklahoma case, where prison population was over capacity.

In regard to the court's order imposing ACA accreditation standards, I would like to point out that five of the 17 penal institutions in Kansas are already accredited by the ACA.  El Dorado Honor Camp, Toronto Honor Camp, Forbes Correctional Facility, the Wichita Work Release Center and the Kansas Correctional-Vocational Training Center are all operating in compliance with ACA standards.  There has never been any objection by the legislature or any other person in regard to these standards.  In fact, new construction already authorized and funded

000976

by the legislature, is designed to meet ACA standards. The use of these standards in Kansas is nothing new.

My office contacted the Director of Corrections in Oklahoma, Gary Maynard, regarding ACA accreditation. Thirteen institutions in Oklahoma are accredited, some for the second or third time. Mr. Maynard indicated that the institutions in his state are not "country clubs" and are not air conditioned. He further indicated that any new, secure, well designed facility will likely meet accreditation standards.

The budgetary impact of achieving and retaining accredited status has not been excessive. In fact, Mr. Maynard said that it would probably be difficult to separate items from his budget which were attributable to accreditation from those which would have been included anyway. Mr. Maynard stated that he would appear before this or any other committee by telephone if that would be helpful.

The 10th Circuit has specifically held that the ACA standards are a factor to be considered in determining the constitutional adequacy of prisons, as has the Federal District Court for Kansas in the Sedgwick County Jail Case. The use of ACA standards and accreditation alleviates the need for the appointment of a special master to monitorthe case, which is clearly within the authority of the Court.

As to the courts' interfering with the legislatures' policy-making authority and imposing oppressive budgetary demands, I believe the court showed restraint considering its broad equitable powers in these matters. It is well-established that lack of funds or the economic cost of alleviating unconstitutional

000977

conditions does not justify the denial of relief. The court in its December 1988 order clearly stated that it would not intend at this time to usurp the discretion of authority of state officials by appointing a special master. It chose not to do so because of the good faith efforts made on behalf of the state.

The court's provision which adopts standards of the National Commission on Correctional Health Care does not require the state to do anything that it is not already doing. Since December 18, 1988, the DOC has contracted with Correctional Medical Services. As part of CMS' contract with the state, CMS must obtain the accreditation required by the court's order. No additional expenditures above the contract amount are required to meet these standards. In light of the evidence of poor medical care provided to prisoners in the past, it cannot be successfully argued that the court's findings of unconstitutional medical care were erroneous.

Another objection to the order is that it imposes overly broad requirements for programs associated with parole eligibility. Yet, in his order, Judge Rogers merely borrows legislation already adopted by the state last year and makes it applicable to all inmates. House Bill 3079 provided that the DOC enter into an agreement with each inmate regarding the programs the inmate is expected to complete during his incarceration. If completed, the Secretary of Corrections certifies compliance with the agreement to the parole board, which then determines whether the inmate should be paroled. The court simply applied a standard which the legislature itself found to be necessary to address problems related to parole.

000978

The order pertaining to the "safety and comfort of inmates" and to recreational facilities reaffirms provisions of the 1980 consent decree. The order doesn't provide inmates with air-conditioned comfort. It simply requires the provision of adequate weather protective clothing; procedures for processing claims regarding loss of inmate property; procedures for the issuance and exchange of bed linens; guidelines for determining custody levels and cell assignments; a prohibition against requiring inmates who are waiting to receive medication to wait outside; the requirement that cell house guards walk each run at least once every hour between 9:00 p.m.and 6:00 a.m.; and the requirement that inmates who are going to or leaving the recreation yard pass through a metal detector.

A final provision of the order requires all new construction or renovation to comply with ACA standards. This is not unreasonable. Compliance with ACA standards is far preferable to the prospect of being monitored by a special master. Far from being blueprints for "country club" prisons, these standards require fundamental accommodations such as: a toilet above the floor; natural light; a wash basin with running water; a bed and a chair or stool.

It would be far better to have a set of standards promulgated by a responsible organization, than for a state to never be sure what a judge would require. That's why ACA standards are preferable. We'll know how to plan and we won't be surprised by changes at the whim of any other judge who might take over the case and look at the situation.

000979

The court order only requires accreditation of KSIR, KSP and KCIL. You have been given a list of facilities in the United States that have receive ACA accreditation. The new construction authorized by the 1988 legislature was designed in accordance with ACA standards.

If this case were appealed, the Circuit Court would view the evidence in the light most favorable to the plaintiffs and the findings of the trial judge would not be set aside unless they were clearly erroneous. Judge Rogers' finding are factual in nature and based upon figures we cannot dispute: In 1987 and 1988, KSP was operating at 224% of its capacity; KSIR was operating at 212% of its capacity; and KCIL was operating at 170% of its capacity.

In Battle v. Anderson, from Oklahoma, the 10th Circuit held that overcrowding at a level of 191% of capacity constituted cruel and unusual punishment in violation of the Eighth Amendment.

To stay the court's order, it will be necessary to establish that the state is likely to prevail on appeal; that it will suffer irreparable harm if a stay in not granted; that the plaintiffs will not suffer substantial harm; and that the public interest would best be served by granting a stay. All of these factors must be met. Yet, none of these criteria can be met in this case. The likelihood of prevailing on appeal is practically non-existent because Judge Rogers' finding are firmly grounded on the evidence presented.

I would like to point out several significant hazards that could occur in appealing this order. During the nine years of continued violation of the consent decree, the court has displayed

000980

remarkable restraint in electing not to appoint a special master over the state's penal institutions. If an appeal is filed, the two year grace period provided by Judge Rogers will be wasted, and the state will have no choice but to release felons to comply with the order. In addition, the state's continued defiance of the consent decree and subsequent court order will only enhance the plaintiffs' position with the court while testing the court's patience with the state.

In Texas, the court appointed a special master who now holds, for all intents and purposes, the role of Secretary of Corrections for the State of Texas. The cost to Texas has totalled more than $800,000 per year since 1981. The state has also been saddled with attorneys' fees in the amount of $9.7 million. Unlike Judge Rogers' order, which provides that the court will relinquish jurisdiction six months after obtaining accreditation, there is no end in sight to the control exerted by the special master in Texas. In spite of this unconscionable waste of taxpayer dollars, the State of Texas is still subject to every significant provision of the original court order including population caps at 95% of the institution's capacity.

In Colorado, the court appointed a limited special master and ordered the state to submit a plan to bring a prison into compliance even though the prison was scheduled to be closed. The state was denied a stay during its appeal, and the 10th Circuit, affirmed nearly all of the substantive aspects of the District Court's order. The 10th Circuit, in its opinion, noted that the ACA standards are factors to be considered in determining

contemporary standards of decency for the treatment of inmates. It also specifically found that 60 square feet of living space per inmate was the minimum amount of square footage which the Eighth and Fourteenth Amendments required to be provided to an inmate. (At KSIR, inmates are double-celled in 40 to 45 square foot cells.) After ten years, monitoring by the Federal court continues, and the state has paid plaintiffs $1.2 million in attorneys' fees. The intangible cost has been the political turmoil created by the decision to appeal the case.

These examples have not been chosen for their shock value; they are typical of the experiences in nearly 30 states where prisons are operated under court order or consent decrees. Presently, in nine states the entire prison systems are under court order or consent decree. In 28 states, including Kansas, major penal institutions are under court order or consent decree. Special master or mediators have been appointed in 18 states. Five states under court order are under present citations for contempt.

In conclusion, I want you to take a close look at Judge Rogers' orders. Facts are facts. The bottom line is that we've got too many people in too little space.

The Department of Justice and a Federal District Court judge have both found that the state of Kansas is operating some of its penal or correctional facilities in an unconstitutional manner. Once there is a determination of unconstitutionality, the authority of the Federal courts is extensive and there is very little that cannot be done to correct an unconstitutional problem. That is what the judge is doing in this situation. There would be many

000982

more options for the state to consider if there had hadn't been findings of unconstitutionality. But you cannot violate the constitution of the United States of America with impunity and that is what the state has done. Once the state has violated constitutional rights of individuals, and it doesn't matter whether they're prisoners within a penal facility or law-abiding citizens, our constitution guarantees that people are entitled to certain basic rights and in effect the state has violated those rights and we're being called to task for it.

There is no legal basis for an appeal, there is no legal basis to seek a modification of the order and there is no legal basis for a stay. If we delay any longer, we will be forced to release prisoners and to relinquish control of our penal system to a special master. Worst of all, the state will be left holding a bill of astronomical proportions.