marriage[67, p. 2; 37, p.5]. His daughter, Angie Genail was married on March 9, 2002, and has given birth to a son Mattie, age 3, and a one year old daughter [Dietz exam, pp. 39-40].

While incarcerated in 1993, Mr. Purkey married Jeannette Purkey. They met her through a friend while she was working in a jail program at a local courthouse. They have subsequently divorced and remarried. Although Jeannette Purkey has three sons, none is the offspring of their marriage [37, p. 5]. Mr. Purkey became obviously angry about a delay in their remarriage ceremony [74].

Educational History

Mr. Purkey attended parochial school through the eighth grade. It is reported that his grades ranged from average to far below average. Mr. Purkey began "skipping school" when he was in the eight grade. He said his grades began dropping and he lost his focus about the eight grade [Dietz exam, p. 37]. After entering the eighth grade, he "began experiencing behavioral problems." His "truancy and antisocial behavior" along with his complaints of headaches and dizziness caused him to be referred to the Wichita Psychiatric Center for evaluation. The next year, the defendant transferred from parochial school to public school despite the interest shown by Bishop Carol in Wichita of having Mr. Purkey play ball for them [Dietz exam, p. 38]. He quit school prior to completing ninth grade at Allison Junior High School [1, p. 531].

Mr. Purkey described a fighting incident that occurred while he was in the eighth grade. He said:

> I got into a fight with a Cuban there on the school yard, and I can't even remember if I started it. I think it was over a girl, and I ended up getting my ass kicked, nose broke, but I wasn't even drinking then. [Dietz exam, p. 35.]

The defendant briefly attended vocational training at the Wichita Auto Mechanics School, but he terminated his training [1, p. 531].

Purkey told interviewers that he achieved his General Equivalency Diploma in the Kansas Department of Corrections and also an Associate of Science degree while incarcerated in the Oregon Department of Corrections [37, p. 4].

001003

## Employment History

He was employed at Wesley Hospital, Wichita, Kansas, as a housekeeping technician from January 6, 1970, to January 20, 1970. It was reported that "he terminated his job as he did most jobs by simply not reporting for work." During his interviews at the Larned State Hospital, Purkey indicated his employment history consisted of working as a busboy, herding cattle, pipeline laying, construction, roofing, and as a plumber [33, p. 1197].

Following his parole release in January of 1974, Mr. Purkey worked in construction. He was sentenced back to prison on July 2, 1974 [22, pp. 3999-4000].

After his parole in December of 1975, Mr. Purkey worked as a cook for three days in February of 1976. During this period he also worked at a car wash and other short-term labor jobs. He commented to evaluators about his brief employments that "outside jobs require entirely different work habits, and I didn't know what they were" [22, p. 4000].

After leaving Lansing in the 1980s, he obtained his first job with Clarks Mechanical as an Industrial Plumber but according to Mr. Purkey, he was fired as he "needed to learn more." He then worked at C.J. Plumbing, which had the added benefit of C.J.'s wife being a Larned Correctional facility counselor [40, p. 41].

He left C.J. Plumbing allegedly because he did not get a raise of $2.00 per hour. He was a self-employed plumber, working for $12 to $15 an hour for a period of approximately three months [40, pp. 41-42].

Roto Rooter hired Mr. Purkey on February 11, 1998, as a plumber. He was fired on March 22, 1998, after they found his Roto Rooter service truck parked near a building unlocked with the keys inside [60, p. 1252].

Mr. Purkey worked as a plumber for Reddi Root'r from September 21, 1998, until his arrest on October 30, 1998, for the murder of Mary Bales [68, p. 1].

In October of 1997, Mr. Purkey told Dr. Peterson he worked at a Union company earning $26.00 per hour. He quit after an unspecified period because "he hated the pipe fitting union because he wasn't going to be a "pipe monkey." He also said he was employed at Lee's Summit

working 12 to 14 hours per day and some hours on the weekends [40, p. 44].

## Religious Affiliation

According to Mr. Purkey, he was baptized a Catholic and attended church throughout his childhood and early teenage years. However, he reportedly discontinued his attendance [1, p. 532].

## Military History

Mr. Purkey did not serve in any branch of the Armed Services [69, p. 500].

## Drug Abuse History

Mr. Purkey reported to Dr. Christina Pietz his initial consumption of alcohol began at age 8. By age 14, he said, he consumed alcohol daily. At the age of 17, Mr. Purkey considered himself an alcoholic. He admitted illicit drug usage to Dr. Pietz beginning at age 14. He said he sniffed glue on a regular basis and also used Quaaludes and marijuana [37, p. 5].

Mr. Purkey said his initiation into the drug world came through his brother, Gary at age 14. He claimed the introduction included "crystal, Desoxin, preludes, Quaaludes, Nembutals, congratols, Seconals, heroin, and opium" [Dietz exam, p. 32].

On March 21, 2002, Dr. Christine Scronce reported Mr. Purkey's "long history of severe substance dependence" that started at an early age. Mr. Purkey reported to Dr. Scronce his IV drug usage at age 14 or 15. Dr. Scronce reported that Mr. Purkey told her he was using methamphetamine and Ritalin IV daily, in addition to smoking crack cocaine, by the time of his arrest in October of 1998 [38, p. 3].

Mr. Purkey was admitted to the Wesley Medical Center on February 25, 1976, with a tentative diagnosis of "overdose." He was unable to give any history prior to admission. His wife thought her husband had overdosed. R.D. Murray, M.D., reported that Mr. Purkey was known to have taken some unknown amount of alcohol, 5 tablets of Tranzene, and an unknown amount of Tylenol #3. According to Dr. Murray's report, "It took approximately 18 hours for the patient to wake up" [45, pp. 129-130].

Mr. Purkey said while incarcerated he was able to access drugs.  He described the drugs he obtained while housed at Arizona Correctional Facility at Florence as plentiful and "real good drugs down there."  He stated that his usage was "mostly opiates.  Mostly serious narcotics" [Dietz exam, p. 126].  Mr. Purkey recounted his drug activity saying [Dietz exam, p. 127],

> I sold a lot of weed to supplement my income.  Had a bunch of teeth pulled to supplement my drugs.  Because for every tooth you had pulled you got sixteen Tylenol 4's and I was strung right out on that methadone, and the guy I was getting methadone from died and left me hanging.  So I ended up getting like eight teeth pulled.

When asked if he was using drugs while incarcerated in Oregon, Mr. Purkey responded, "Oh shit.  That's the meth capital."  He admitted to using drugs, saying, "Oh I was using" [Dietz exam, p. 129].

Rex M. Newton, Ph.D., Oregon State Hospital, conducted an assessment of Mr. Purkey on December 30, 1986.  The defendant described his prior alcohol and drug problems.  Dr. Newton noted Mr. Purkey's experimentation with drugs at age 14 and an addiction to heroin by age 19.  Mr. Purkey told Dr. Newton about his alcohol abuse, saying "I drank to blackout things."  Mr. Purkey gave his primary drug of choice as heroin [24, p. 921].

Sometime after May 7, 1988, but before July 15, 1988 (incident date is not discernable), Mr. Purkey was in contact with the prison medical staff for a "possible overdose."  He was received in an agitated state and told the staff he "injected something 3 days ago and is getting a rush" [48, p. 1068].

A log entry in the progress notes for July 15, 1988, notes that Captain Barth, Watch Commander, requested the assistance of medical personnel to evaluate inmate Purkey who was "acting strange."  Purkey advised the medical staff that he injected "crank" three days ago.  He said other inmates at SI were spraying him with poison spray.  Officers reported Mr. Purkey engaged in bizarre behavior, "throwing water into the shower on tier in front of cell; reportedly to keep poison out so I can breathe" [48, p. 1069].

During a hearing at the Oregon State Penitentiary, Mr. Purkey admitted intravenously injecting himself on June 23, 1990, with

001006

amphetamines on four occasions with a hypodermic needle [71, p. 1007].

David Meyers, M.D., attended to Mr. Purkey on September 13, 1998 after his admission to the University of Kansas Hospital for complaints of upper chest pressure with tingling in the left arm accompanied by anxiety and dyspnea.  It was noted that Mr. Purkey's complaint resulted from "shooting intravenously crushed Ritalin and an unknown amphetamine" [49, p. 7].  Mr. Purkey claimed he'd been off drugs for 10 years but used drugs three times in the past 6 months.  He told Dr. Meyers he used Ritalin, which he called "speed."  Dr. Meyers noted "he states he uses 120-130 mg/20 hours . . . the binges usually last n/day [night and day] . . . his use is all IV shared needles" [49, p. 29].

Prison medical staff was called to Segregation on August 1, 2000, to address Mr. Purkey's chest pain.  He reportedly told medical personnel he was not suffering from chest pain, rather "they have been spraying chemicals in his cell."  He said his "heart is going to pound out of his chest."  Mr. Purkey reported headache, stomach cramps, and "every time I close my eyes I feel like I'm trippin."  According to medical records a urine sample was received for drug screen analysis.  The drug screen profile report was negative for "amphetamine, barbiturate, benzodiazepine, cannabinoid, cocaine metabolite, phencyclindine, methadone, and propoxphene" [43, pp. 977-978, 2283].

Tammy Sue Sanders, a prostitute, was with Mr. Purkey on the day he murdered Ruth Bales.  She admitted smoking crack cocaine with Mr. Purkey several times prior to and after the homicide [70, pp. 3-7].

During an FBI interview on January 15, 1999, Jeannette Purkey recounted living with the defendant in Clearwater, Kansas, when he began using drugs on a regular basis.  She recalled his hallucinating and reported that on a number of occasions, he stole her son's Ritalin.  According to Mrs. Purkey, her husband would "shoot it up."  While under the influence of drugs, Mr. Purkey believed she and her sons were attempting to kill him by spraying him with some kind of insecticide [61, p. 1153].

## PSYCHIATRIC HISTORY

Psychiatric Treatment History

The defendant was admitted to the St. Francis Hospital on December 30, 1966, for a "brief physical because of headaches and dizziness

apparently associated with mild sociopathic behavior." R.V. Erken, M.D., reported "guardian feels his behavioral difficulties are related to these severe h.a. [headaches]." He further noted patient is "crass doesn't care what he does or what he says" [3, pp. 411, 402]. Dr. Erken noted that Mr. Purkey's complaints included severe h.a.'s [headaches], vomiting, and fatigue. He said the patient has also "had some black-out spells and dizziness" [3, p. 402]. An x-ray of the Mr. Purkey's skull revealed no abnormality. A brain scan with a scintillation counter determined "there is no evidence of a brain tumor or other abnormality." H.D. Riordan, M.D., noted "this is a borderline electroencephalogram for the age suggestive of possible mild depression of cortical activity in the left frontal and temporal regions. A repeat tracing in 7 to 10 days would be helpful to clarify this finding." On January 9, 1967, a second electroencephalogram was "within normal limits for the age. The previously seen slowing of activity in the frontal and anterior temporal regions is not present during this tracing" [3, pp. 409-410]. The defendant's progress log at St. Francis Hospital noted "no h.a.'s or dizziness since hospital admission." On January 11, 1967, Mr. Purkey was discharged. The progress log listed the defendant's diagnosis by Dr. R.V. Erken as "Passive-aggressive Personality severe, prog (prognosis) poor, Rx – none" [3, p. 411].

On February 9, 1967, the defendant was admitted to St. Francis Hospital from Probate Court. Dr. Erken noted "15 yr old w/m recently dismissed after brief psychiatric and neurological evaluation with rec for placement at Boys Industrial School thru juvenile court for residential treatment." Juvenile court ordered Mr. Purkey for admission to Larned State Hospital. Dr. Erken consulted with Mr. Purkey on February 14, 1967, and talked with his guardian, Mrs. Burke. She was "mystified as to why the boy is here now and slated to go to Larned." Dr. Erken's February 17, 1967, progress note stated, "Dr. Newsome feels as pessimistic as I do that patient could get any worthwhile help at Larned. Will suggest to juvenile court that he be kept at Lake Afton as long as possible. Mr. Purkey was dismissed on the following day, and Dr. Erken recorded that the court order was dropped by juvenile officers "at our suggestion" [3, pp. 394, 386, 39?, 39?].

Mr. Purkey was again admitted to St. Francis Hospital on November 5, 1969, for evaluation and treatment. A patient history form contained notations from attending physician J. Chris (last name not discernable), but it is unclear if the physician's notations were recorded from discussions with Mr. Purkey or with his guardian, Mrs.

001008

Carrie Burke, or from a review of hospital records. Under past history, it was recorded, "car accident two years ago with brain concussion, unconsciousness 2 days, no operations, no history of diabetes besides one uncle" [3, p. 287]. Under chief complaint and present illness, someone wrote [3, p. 287]:

> Pt and friend entered a house trying to rape a girl. Police miscond of joyriding. Stole a chicken from a counter having money in his pocket. Behavior changed after car accident. Periods of amnesia, impulsive, immature. Does things very careless as if want to be apprehended. Mother always objected to pt or brother having psychiatric care. M. very (not discernable) & ill person emotionally. Great aunt took guardianship of pat through court against mother's wishes.

Noteworthy entries in the progress notes include [3, pp. 311-314]:

> 11-12-69   adjusting well. Cooperative no behavioral problems good contact. Mainted on psychotherapy with Dr. Murphy.
>
> 11-17-69   First angry and hostile for being restricted after talk he became more accepting and understanding of need for controls and structure.
>
> 12-5-69   knowing about coming hearing that he might be sent to penitentiary. Still gets anxious. Afraid to leave hosp. doesn't feel too confident in handling his impulses. He wants to try this weekend to test his controls. Handling structure fairly well. Will try him on home visit again.
>
> 12-26-69   Apparently no trouble yesterday during pass with family. Patient says he drank a drink that his grandmother gave him; he denied intoxication. Will give additional privileges as before to reward good behavior; patient understands consequences of abuse of privileges.
>
> 1-10-70   Patient adjusted fairly well to hosp, several acting out episodes where he got drunk while on trial visit but handled restrictions well. Showed good motivation but poor impulse control, easily suggested by others. Diagnosis noted adolescent personality disorder antisocial.

001009

A November 13, 1969, nursing note states [3, pp. 337-338]:

> Pts Aunt phoned and said she forgot to tell us about a fight. States "That happened between our house and neighbors." Girlfriend on extension phone said "He probably cut his hand when he broke my car window when we were bringing him back. Aunt said "He was fighting a 60 yr. old neighbor." Then states "He went into house to get a knife but he didn't get a chance to use it" "We hurried Wesley into car, I had to give him his whiskey to get him back."

During the course of this hospitalization, Mr. Purkey received the following medications

> Mellaril 25 mg
> Drixol
> Fulvicin 250 mg
> Preludin End 75 mg
> Noctec 500 mg
> Noludar 300 mg
> Polysporin Oint to left hand
> Valisone cream .1%
> Tinactin cream

A May 11, 1971, counseling report stated that Mr. Purkey was first received at the Kansas State institution in October of 1970. Upon his return in April of 1971, he was administered the GATB and the MMPI. The test results estimated Mr. Purkey functions in the Lower Portion of the average range of intelligence with his performance skills assessed at a slightly higher level of development over his verbal skills. His math and reading skill level was assessed at approximately the 9th grade level [4, p. 535].

Gertrude M. McIvor, counseling psychologist, wrote a May 11, 1971, note stating Mr. Purkey was "experiencing concentrational and attentional difficulties which would make it difficult for him to participate in a classroom setting." She recommended against his participation in educational programs until he became "more emotionally stable" [4, p. 535]. McIvor found Purkey's vocational aptitude scores indicative of low average development regarding his general intellectual ability with "some impairment seen in his verbal reasoning ability." His numerical reasoning ability and his spatial aptitude were reported as adequately developed. According to test

17

results, Mr. Purkey's perceptional skills and overall manual skills were satisfactorily developed with no impairments seen in these areas. McIvor noted that his performance on "these subtests is somewhat surprising in view of the apathetic, depressed manner in which he presented himself during the counseling interview" [4, p. 535].

Paul G. Murphy, Ph.D., directed a letter to Bob J. Williams, M.A., Chief Psychologist, Industrial Reformatory on January 24, 1972. He stated that he had consulted with Mr. Purkey "fairly regularly while he was in the hospital a couple of years ago." Dr. Murphy wrote "I am convinced that there is a sociopathic element in his makeup that makes it very difficult for him to gear into, and continue with any rehabilitative program for any length of time" [5, p. 823].

Bob J. Williams, M.A., wrote a special progress report, April 10, 1972, noting "Wesley referred himself for individual counseling and has been seen on an off and on basis from 10-6-71 – 2-22-72." Williams wrote that Purkey was evaluated at "KRDC in May/71" and was diagnosed as a "Schizo-affective psychosis superimposed on an anti-social personality." He advised that during a series of interviews with Purkey, his "affect tended to be flat, but he was exhibiting no overt psychiatric symptoms" [6, p. 824].

Mohammed BenAmmar, Staff Psychologist, Psychiatric Unit, KSIR, filed a parole board report on June 12, 1972. He referenced a May 24, 1971, evaluation of Mr. Purkey wherein he was diagnosed as Schizo-affective psychosis superimposed on an antisocial personality. In September the Parole Board recommended Purkey attend therapy, which he had attended regularly since October 1971. BenAmmar wrote "under the therapy of the undersigned Mr. Purkey does not show at the present time the psychiatric picture previously described at KRDC." According to BenAmmar's observations, Mr. Purkey gained insight and projects his future realistically [7, p. 825].

Gertrude M. McIver prepared a counseling report, September 26, 1974, documenting group test scores of the defendant. She reports his group test scores indicate a slight improvement in his overall intellectual functioning since his last evaluation at KRDC in October 1970 and April 1971. She attributed some of this to possible familiarity with the test material but noted that he appeared more organized. His academic achievement tests demonstrated functioning at the eleventh grade level in both reading comprehension and mathematics. Vocational aptitude scores indicated satisfactory development of his general intellectual ability, adequate spatial

001011

reasoning, and good development of his finger and manual dexterity abilities [8, p. 1025].

Karl K. Targownik, M.D., Clinical Director, issued a psychiatric examination report of the defendant on October 16, 1974. He stated that the defendant received a sentence on July 2, 1971, of one to ten years following his conviction of one count of burglary and theft. His total controlling sentence was ten to 21 years as parole was revoked on a prior offense of burglary in the first degree. Dr. Targownik noted the defendant's version of the present offense [9, p. 1026]:

> I walked in the back of an open restaurant and stole a case of meat. I was out partying that night and I know a couple of guys who done it and got away with it. I got caught.

Dr. Targownik observed the defendant to be of average intelligence, appropriately oriented, and speaking logically and coherently. He recorded "There is no evidence of loss of reality testing." He said Mr. Purkey "has not invested himself in relationships with people, has not invested himself in a vocational pursuit . . . He is goalless and copes with life by trying to make it one continual party, this being a way of ignoring the deprivation he experienced in his youth" [9, pp. 1026-1027].

Dr. Targownik recorded the diagnostic category "anti-social personality" as most representative of Mr. Purkey's behavior. He stated that the defendant "cannot function in society without structure" [9, p. 1027].

Steve Schlageck, M.S., KSIR Clinical Services prepared a psychological summary of the defendant on November 25, 1975. He noted that Mr. Purkey functions in the "Dull Normal Ranges" as indicated by his score of 86 on the Shipley Institute of Living Scale. During his interview of Purkey, he noted his thinking is rational, but fairly concrete. He found "no delusions or hallucinations elicited during the interview." Mr. Schlageck described Mr. Purkey as impulsive with testing indicating a dependent individual who uses poor judgment in making important decisions. According to Mr. Schlageck, the defendant displays a "tendency to resolve problems in a very [sic] showing disregard for social rules and customs." He further noted that "testing also indicates signs of organic deterioration." Diagnostically, Mr. Schlageck reported "he is seen as a passive dependent personality APA 301.89 with features of alcohol dependency. He also viewed the defendant as a poor adjustment risk in society [10, p. 745].

001012

On November 16, 1976, the evaluation team at the Kansas State Reception and Diagnostic Center (KRDC) completed their assessment of the defendant. They reported that after completing his evaluation at KRDC in 1974, he was transferred to Kansas State Industrial Reformatory (KSIR) where he stayed until April, 1975. He was placed in the Toronto Honor Camp for approximately five months before he was sent back to KSIR in September, 1975, for violating the rules of drinking intoxicants. He was paroled in December, 1975 [11, p. 520].

The report noted that "although Mr. Purkey claims that he has earned some academic credits through the Hutchinson Junior College; the record shows that he withdrew from all the courses" [11, p. 521].

The report stated "few significant changes from previous evaluations are noted." An interview of Purkey reported "not the least hint of remorse about his offense as he insists he was simply going to help a girlfriend collect a debt and they simply took a car because they needed transportation." The interviewer found a complete lack of responsibility with little regard for either property or feelings of others. It was reported that at no time did abnormalities in orientation, perceptions, thought processes or reality testing present themselves. Mr. Purkey admitted during interview to having auditory and visual hallucinations in the past related to his use of speed, amphetamines but denied their presence at other times [11, p. 521].

Emotionally, Mr. Purkey presented himself as calm with a consistent detachment during the interview. It was also apparent during the interview that he "has many underlying feelings of abandonment, loneliness, and hopelessness." The evaluation noted that Mr. Purkey "usually associates with people of his same antisocial tendencies." He was reported to have low self-esteem, a sense of being victimized, but being "unable to see his own participation in the things he finds himself involved in." Mr. Purkey admitted to occasional self-destructive ruminations, saying he "has overdosed about five or six times but with no conscious thought of committing suicide" [11, p. 523].

Mr. Purkey required medical attention on four separate occasions for treatment of what was described as self-inflicted injuries during the first six months of 1979. The dates of these injuries were January 13, 1979, January 22, 1979, March 29, 1979, and May 3, 1979. (The extent of these injuries is described in the medical section of this report, below). During his medical intake January 13, 1979, Mr.

001013

Purkey said he injured himself "because I got another year on my board and other things" [12, p. 769]. On January 22, 1997 he said he injured himself "because I wanted to do myself in. I wish I hadn't come around then maybe it would have happened" [13, p. 768]. He gave no comment for the other two incidents [12, 13, 14, 15].

Mr. Purkey was seen on May 19, 1979, from R. Hemaya, M.D., Staff Psychiatrist. He noted that Purkey reported he cut himself in the last part of April because he "felt depressed" at that time. He denied to Dr. Hemaya that he had any ideas to kill himself at that time. Mr. Purkey gave Dr. Hemaya three reasons for cutting himself: "getting attention, experiencing bitterness and harming or killing self." Dr. Hemaya noted Mr. Purkey was taking Sinequan [16, p. 733].

Dr. Hemaya consulted with Mr. Purkey on June 10, 1979, and reported that Mr. Purkey had seven cuts on his body and some scratches on his abdomen. Dr. Hemaya noted "he is able now to control his impulses and realizes that it is better not to cut himself" [17, p. 734].

Dr. Hemaya consulted with Mr. Purkey on June 22, 1979, and July 14, 1979. His consultation of June 22, 1979, was unremarkable. On July 14, 1979, Mr. Purkey advised he "wants to forget about self-mutilation, he wants to go to a positive attitude and direction" [18, 19, p. 736].

Dr. Hemaya consulted with Mr. Purkey on August 4, 1979, when Mr. Purkey admitted cutting himself three times. He told Dr. Hemaya at times he was thinking of killing himself. The last time he admitted cutting himself was in March. Mr. Purkey expressed how "he feels mad that he tried to hurt himself" [20, p. 737].

Sayed S. Jehan, M.D., Clinical Director, Sedgwick County Department of Mental Health completed a psychiatric evaluation on September 24, 1980, for the benefit of the Sedgwick County District Court. The Court was interested in the competency of Mr. Purkey in understanding the nature and purpose of the proceedings against him and his ability to assist his counsel. Mr. Purkey told Dr. Jehan he "does not belong in jail and he is badly in need of help." Dr. Jehan noted that Mr. Purkey "does not accept any responsibility for his legal problems and blames law enforcement authorities for his legal problems." He also claimed to Dr. Jehan that he was handicapped by mental and emotional problems [21, p. 4118].

001014