attended weekly on a volunteer basis since April 15, 1996. Kirchhefer noted how Purkey "seems to have used his period of incarceration to rebuild his life." She found him to be more patient and less impulsive in his everyday situations. According to Kirchhefer, Purkey's prognosis "appears to be positive if he continues to build on his coping skills, prevent relapse, and increases his stress management abilities" [31, p. 2500].

Purkey's wife brought the defendant to the Via Christi Regional Medical Center in Wichita, Kansas on May 2, 1998, because "he was getting out of control because of agitation, anxious, and paranoid behavior. During the intake interview, Mr. Purkey stated that he had "probably used crank a week ago or so." Hamid Q Sial, M.D., noted "it seemed to me that the wife is minimizing or concealing things about his past or current history of substance abuse." Dr. Sial described Mr. Purkey as anxious, agitated, and pacing up and down, making it difficult to curtail him in the emergency room. He further described the presence of paranoid delusions, visual hallucinations, and somatic hallucinations. During the interview, Mr. Purkey stated "they are spraying me with their mist." He would rub his skin vigorously as he stated he could feel the thin layer of mist penetrating his skin and entering his blood stream. Purkey's physical exam at the emergency room was unremarkable but Dr. Sial noted the presence of "psychosis, not otherwise specified, rule out substance abuse psychosis, crack cocaine." Purkey was admitted and routine lab work to include "UDS, blood alcohol, etc, will be done" [32, pp. 161-162].

During interview, Mr. Purkey admitted to "IV drug use 4 days ago." Purkey reportedly fell asleep within 10 minutes of admission. He was reported to be alert, oriented and presented no distorted thoughts. The physician's 5/3/98 progress notes stated "pt. not psychotic." During his hospitalization, Purkey received Haldol 2-5 mg, Ativan 1 mg, and Cogentin .5-1 mg. Mr. Purkey was discharged from the hospital on May 3, 1998. Discharge records note that the patient planned to call Dr. Bharati to discuss past drug use and attend counseling there. Purkey was encouraged to attend "AA/CA several times a week." The drug urine screen was negative for cocaine, opiates, benzodiazepine, cannabinoids, and barbiturates [32, pp. 440, 444, 445, 448].

Mr. Purkey was referred to the Larned State Security Hospital for the second time on February 4, 1999, by the Wyandotte County District Court. At issue was a determination of Mr. Purkey's competency to stand trial and an opinion regarding his mental status at the time of

001021

the alleged crime.  On March 16, 1999, J.L.L. Fernando, M.D., reported the results of his examination of Mr. Purkey.  Mr. Purkey's first admission to the Larned State Hospital was on December 29, 1972. He was discharged from temporary visit status on April 13, 1973.  At that time, his final psychiatric diagnosis was "Passive Aggressive Personality with Depressive Features" [33, pp. 1190-1193].

Mr. Purkey gave a history of extensive substance abuse of Ritalin, methamphetamine, crack, and cocaine.  He admitted to starting his drug usage at age 15 and used them intermittently most of the time intravenously.  He stated that he used about a gram to one and one half grams a day of methamphetamine.  Mr. Purkey told the interviewer he was admitted one time to the Kansas University Medical Center for a drug overdose of Ritalin and cocaine [33, p. 1193].

During the mental health examination, Mr. Purkey showed no evidence of a thought disorder and content of thought showed no evidence of delusions.  It was reported that memory in the areas of immediate recall, recent memory, and remote memory were well within normal ranges.  During his stay at State Security Hospital, nursing personnel indicated Purkey gets angry easily.  However, there were no management or behavioral problems reported on the unit.  Dr. Fernando reported no symptoms or signs indicative of acute psychosis or mood disorder that needed psychotropic medication.  Dr. Fernando wrote:

> On several occasions, Mr. Purkey explained that his problems were due to his chaotic and unsettling life he had experienced previously, and because of cocaine and methamphetamine being laced by chemicals and pesticides.  [33, p. 1200.]

Robert Huerter, a licensed masters level psychologist, provided psychological testing information to Dr. Fernando.  According to the Weschler Adult Intelligence Scale-Revised, Mr. Purkey scored a Verbal I.Q. of 95, average; a Performance I.Q. of 85, low average; and a Full-Scale I.Q. of 89, low average.  Mr. Huerter's psychological screening for "neuropsychological types of impairment revealed no indication of gross dysfunction" [33, p. 1200].

Robert Huerter reported that during his interview, Mr. Purkey "made an attempt to feign rather severe psychiatric symptoms on personality testing."  Huerter's observations noted by Dr. Fernando stated Purkey [33, p. 1201]

001022

> . . . exaggerated a degree of psychopathology to such a degree so as to render both personality tests as invalid. Ironically as much as the patient made efforts to make himself appear high emotionally distressed on testing, he does not present as an individual who, in the opinion of his examiner, does present as being emotionally distraught. He does not impress this examiner as being an individual who possesses an ongoing psychotic process but his longitude and general history reflects he has been exposed to a number of potentially traumatizing events in his life . . . Even when symptoms of depression and drug seeking behaviors are not present, his core character traits which are antisocial in nature do rise to a new set of problems which make it difficult for him to function while in society.

Dr. Fernando stated based upon longitudinal and general history and available clinical data (including interviews), he diagnosed Mr. Purkey as: Antisocial Personality Disorder; Cocaine Dependence; Nicotine Dependence; and Depressive Disorder, Not Otherwise Specified. Dr. Fernando reported Purkey's extensive substance abuse history and stated "it is difficult to separate his substance abuse history from the dysthymic mood as to which one caused the other. Dr. Fernando reported to the District Court that Mr. Purkey "fulfills the criteria to be considered competent to stand trial" [33, p. 1202].

With respect to the murder of Mary Ruth Bales, Mr. Purkey explained in several interviews in a "very organized and narrative manner that he purchased and smoked crack cocaine in the hours just prior to going to the home of the victim." After arriving at Bales' home, he admitted to smoking crack cocaine in her bathroom. Dr. Fernando stated [33, p. 1203]

> . . . it is the opinion of the staff that Mr. Purkey was manifesting symptoms of cocaine induced agitation and a fear of being caught during the time period in question. Thus the staff concluded after reviewing all available data, there is no description of or description about Mr. Purkey's functioning which would indicate that during the time period in question on 10-27-98 he acted in a demented manner or had experienced symptoms of a psychotic process (delusions or hallucinations) which impaired his ability to know the nature and quality of his acts or distinguish between right and wrong.

30

During February of 1999, the medication log at Larned State Hospital indicated Mr. Purkey received Paxil 10 mg [33, p. 1238].

Mr. Purkey was interviewed on May 5, 2000, during a health screening admission process at the Kansas Department of Corrections. When asked if he was taking any psychotropic medication, he responded Atarax, for "sleep and stress" [29, pp. 23640 and 2475]. During his intake interview, Mr. Purkey admitted to "attempting suicide following the murder he is currently serving time for." He stated he took 3 bottles of nitroglycerin [29, 2475].

On May 18, 2000, Mr. Purkey received an evaluation summarized in an Evaluation and Classification Report. On May 9, 2000, he was administered a test to measure his level of intelligence. The type of test was not indicated. The results listed his verbal I.Q. at 96, his performance I.Q. at 91, and his full scale I.Q. at 93. His scaled score on his reading competency was 251 and his math competency score was scaled at 239 [34, p. 500].

During a May 18, 2000, evaluation interview, Mr. Purkey's mood was mildly dysphoric and his affect appropriate. He was on no medications. His memory appeared intact for immediate, recent, and remote recall. Purkey's MMPI-2 scores were scored and "reflected a significant amount of emotional distress, but he also reported current feelings of mild depression and upset relating to his new charge." The report stated "his elevated scores are likely reflective of both chronic pathology as well as some acute exacerbation." Purkey's results on the Bender-Gestalt test were thought to be "suggestive of possible organic dysfunction, likely secondary to chronic substance abuse" [34, pp. 503-505]. Purkey demonstrated some insight into his problems, but he "tends to downplay his actions and displace the blame to his substance abuse." It was noted that he will likely try to manipulate the system to get what he wants and be manipulative of others. He was diagnosed on May 18, 2000:

| | | |
|---|---|---|
| Axis I: | 304.80 | |
| Title: | Polysubstance Dependence, with physiological dependence, in a controlled environment | |

| | | |
|---|---|---|
| Axis II: | 301.70 | |
| Title: | Antisocial Personality Disorder  [34, p. 506.] | |

The evaluation "does not indicate a need for further psychiatric

neurological evaluation." Purkey advised he "is not interested in counseling at this time, though he may seek treatment later" [34, p. 506].

On a Kansas Department of Corrections Mental Health Services form dated May 24, 2000, it was noted that a new mental health level and justification for level change was required for the defendant. The form had checked a box indicating "evidence of mental illness, mental retardation, or organic impairment requiring periodic mental health follow-up to maintain in general population." Justification included a "change in diagnosis to Adjustment Disorder with M.E.J. and P.T.S.D. by Dr. Foster on 11-3-00." Purkey was placed on Crisis Level I on December 23, 2000 [29, p. 2359].

Between May and August of 2000, Mr. Purkey had periodic contact with Mental Health Services that was unremarkable. On October 2, 2000, Beverly A. Vestring, M.E., completed an individual treatment plan for Mr. Purkey. Her plan focused on Purkey learning from past mistakes, learn to forgive himself, and beginning to heal [29, p. 2455].

Purkey consulted with Vestring and other mental health staff members 11 times between October 2, 2000, and December 29, 2000. During these sessions he discussed the Bales homicide, saying, "she was a nice lady, and didn't deserve to be beaten to death with a hammer." He reported he was "high on crack, but would not use that as an excuse" [29, p. 2452]. He discussed problems with anger control, frustrations, and disgust at himself and his deeds [29, p. 2450]. Purkey described his difficulty sleeping and the presence of nightmares but was reluctant to take medicine on a regular basis due to his past substance abuse history [29, p. 2447]. He discussed his family poisoning him "for his own good" and how gang members at LCF were poisoning him, "I getting sicker each day" [29, pp. 2442-2443].

On November 3, 2000, Mr. Purkey met with Dr. Foster to discuss his problem of controlling his anger and subsequent restless sleep. He reported to Dr. Foster that he was "beginning to have nightmares, flashbacks, and intrusive thoughts that are coming back about his killing a woman." Mr. Purkey declined medication but agreed to ask for help if his symptoms worsened. Dr. Foster noted his affect as animated, but no delusions were elicited. Dr. Foster wrote "Adjustment DO MEF PTSD" [43, p. 970].

Purkey continued his mental health contacts in 2001. On January 4, 2001, Purkey consulted with Vestring who noted "he let me know he's

001025

at the point of requesting medication to relax him." Purkey asked Vestring to refer him to Dr. Foster for medication. Dr. Foster prescribed Tofranil in "adequate dosage" for Mr. Purkey. Mr. Purkey asked Vestring, "If he told me about some unsolved crime what would happen?" After she explained the limits of confidentiality, he decided he wasn't ready to discuss it yet [29, pp. 2419 and 2434].

On January 14, 2001, Purkey complained "I am arbitrarily receiving different medications of different amounts at bed time. I am refusing all medications with the exception of my sleeping meds until this matter is straightened out." Records provided do not indicate what if any medications, other than Tofranil, Purkey received. On February 2, 2001, Purkey reported his medicine was working and he was sleeping better. The Mental Health Services progress notes indicate Dr. Foster wanted to "cut down or out his HS Med – is sleeping better now" [29, pp. 2420 and 2425].

On March 22, 2001, Purkey received a mental health evaluation. He was diagnosed:

|       |                                              |
|-------|----------------------------------------------|
| Axis I: | Attention-Deficit/Hyperactivity Disorder NOS |
| Axis II: | Borderline Personality Disorder  [29, p. 2352.] |

Mental Health follow-up on or about March 30, 2001, found Mr. Purkey presenting symptoms of anxiety and stress. He had been off medication for several weeks and was coping well on his own. He did not want medication at this time [29, pp. 2352-2353].

On May 31, 2001, Purkey consulted with Mental Health Services, which noted, "Patient has had no psychotropic medication for about three months. He is able to handle his anxieties and stress without medication" [29, p. 2345].

Purkey consulted with Beverly Vestring on July 3, 2001, and advised her that once per month visits were not enough for him. Vestring agreed to see him a minimum of twice per month and asked him to prepare a list of items that he wanted to address in a priority format [29, p. 2339].

Brian Feldhus, LMSW, LCMFT, examined Purkey on July 13, 2001, to develop an anger management plan to "examine underlying dynamics leading to criminal behavior and observe sources and utility of anger and establish plan to control and direct this anger." He subsequently

001026