<u>Test of Memory Malingering</u>:  Mr. Purkey achieved scores well within normal limits.  This suggests he made a reasonable effort to do well on this task.  Further evidence of validity was indicated when he performed within expected limits on most clinical measures of brain function, the exceptions being planning and sequencing, response inhibition, olfactory acuity, and sustained focused attention.

<u>Wechsler Adult Intelligence Scale-III & Wechsler Memory Scale-III</u>:  Mr. Purkey achieved Average or Low Average scores on the IQ Scales of the WAIS-III.  Scores achieved were VIQ 94 (conf. int. 89-99, PIQ 85 (conf. int. 79-93), FSIQ 90 (conf. int. 86-94). Mr. Purkey evidenced a significant weakness on Block Design, generally identified as a measure of spatial reasoning.  The significant difference between verbal and performance subtests is suggestive of brain based cognitive dysfunction.  WMS-III scores are essentially commensurate with what would be predicted by those achieved on the WAIS-III.

<u>Delis-Kaplan Executive Function System</u>:  is a battery of tests to assess the frontal system, of the brain and executive functions including flexibility thinking, problem solving, planning, impulse control, concept formation, abstract thinking, and creativity in both verbal and visual-spatial modalities.  The following tests were used:

<u>Trail Making</u>:  Timed scores were within normal limits, however Mr. Purkey made a "set-loss' error in Condition 4. While not definitively indicative of impairment, even one set loss error is quite unusual in subjects of his age.  This is consistent with difficulty maintaining cognitive set which may be frontal in origin.

<u>Verbal Fluency</u>:  When greater difficulty is exhibited on Category Fluency than on Letter Fluency, such as is the case with Mr. Purkey, relative dysfunction involving the left temporal regions of the brain is indicated.

<u>Design Fluency</u>:  Performance was fair and only slightly inconsistent across conditions.  Note should be taken of set-loss designs, however, which reflect impairment relative to both Mr. Purkey's own production rate and to

the performance of subjects in the standardization group. The significantly higher than average number of set-loss errors reflects significant frontal impairment.

Color-Word Interference: Performance on the primary measures of completion time is good across all conditions of this test. However, he evidenced multiple errors on both Inhibition and Inhibition/Switching conditions yielding scaled scores evidencing marked and borderline deficiencies respectively. This is consistent with dysfunction that is frontal in origin.

Sorting: Performance was good. He made two unconfirmed target sorts providing inaccurate descriptions of the algorithms reflected in two recognition items. These findings are highly unusual and reflect significant impairment, likely involving the frontal and left temporal regions.

Twenty Questions: Average or slightly better, reflecting abstract reasoning commensurate with Mr. Purkey's FSIQ.

Word Context: Average score reflecting abstract reasoning abilities commensurate with Mr. Purkey's FSIQ.

Tower Test: Average score. His rapid but haphazard approach to this test is underscored by the significantly deficient move accuracy ratio. This reflects both a lack of planning and lack of response inhibition that are likely frontal in origin.

Proverb Test: Achievement is in the lower Average range and essentially commensurate with his FSIQ. Significant differences between scores achieved on common versus uncommon is suggestive of relative deficiencies with higher levels of abstraction. While not indicative of severe impairment, these relative deficiencies are suggestive of frontal dysfunction.

Test of Variables of Attention: Mr. Purkey's error rates for both errors of omission, false negative errors reflecting inattention, and errors of commission, false positive errors reflecting impulsive responding, were very significantly elevated. This is consistent with frontal impairment.

001034

Smell Identification Test: Mr. Purkey correctly identified 29 of the 40 stimuli, a score consistent with moderate microsmia or olfactory impairment. While these scores are not definitely indicative of trauma related damage, they are not inconsistent with the same.

Dr. Leeson concluded from test results and interview:

It is clear, however, that any conceptualization of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element. Under stress, Mr. Purkey is likely to react quite impulsively and without the ability to modify his actions. Because of brain based disorder, in situations that may be unclear and include emotional arousal his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem. [39, p. 8.]

Stephen E. Peterson, M.D., completed a report regarding the defendant at the request of Mr. Purkey's attorney, Fred Duchardt, Jr., on August 13, 2003. His evaluation of Mr. Purkey focused on diagnostic assessment, Mr. Purkey's mental state at the time of the charged offense, and mitigation of penalty [40, p. 1].

Dr. Peterson reported interviewing Mr. Purkey 8.83 hours, divided into 1.6 hours on September 19, 2002, 2.16 hours on October 10, 2002, 4.0 hours on November 6, 2002, and 1.5 hours on December 30, 2002. No additional psychological testing was administered by Dr. Peterson. His evaluation chronicled his review of Mr. Purkey's medical, psychological, incarceration, and investigative records [40, p. 1].

Dr. Peterson reported that when he saw Mr. Purkey, the defendant was being treated with BuSpar and Tegretol. This combination apparently did not control anxiety as Klonopin had and resulted in Mr. Purkey trading BuSpar for Klonopin. According to Dr. Peterson, Mr. Purkey attended a court hearing without the benefit of Klonopin and "was about to blow a fuse." Dr. Peterson's December 30, 2002, interview of Mr. Purkey took place after he was placed on .5 mg of Klonopin twice per day and 50 mg of Zoloft. According to Dr. Peterson, the dosage of Klonopin was not high enough for Mr. Purkey, resulting in his saving three days of Klonopin and taking 3 mg at a time. Dr. Peterson said this helped the defendant focus and sleep. Mr. Purkey also told Dr. Peterson with the 3 mg of Klonopin he found

relief from anxiety, from noise, and from his racing thoughts [40, pp. 34 and 35].

Dr. Peterson noted that Mr. Purkey was having no side effects from the Tegretol. However, when he missed 3 or 4 doses of Tegretol he "experienced headaches, confusion, perception of color changes, and vivid racing bizarre pictures in his mind." Without Klonopin, Dr. Peterson reported Mr. Purkey finds himself quite internally aggressive. Dr. Peterson noted that Mr. Purkey had experienced no seizures but indicated the presence of pulsating frontal headaches brought on by stress when he "can't calm down." Mr. Purkey told Dr. Peterson of his long-term memory problems due to "his past and allows him to try and put it in a better perspective." According to Dr. Peterson, "he has accepted responsibility for his actions and was aware of behaviors that led to creating his personality style" [40, p. 36].

During Dr. Peterson's October 10, 2002, interview, Mr. Purkey told him of a situation in 1982 at the Arizona Ft. Grant County Jail when he suffered a "blackout while in the chow line." Mr. Purkey was not sure what happened and no further details were provided [40, p. 38].

Mr. Purkey told Dr. Peterson that he witnessed 10 to 15 murders when he was incarcerated at Lansing Correctional Facility stating, "I can't just let go of them." On the advice of Dr. Peterson, Mr. Purkey has used "the pen and paper to handle problems." Purkey told Dr. Peterson that he feels he "would not go back to violence as a problem-solving technique because that part of my life is over" [40, p. 40].

After discussing the dismemberment (Jennifer Long), Dr. Peterson reported, Mr. Purkey began to experience nightmares specifically about the dismemberment process [40, p. 40].

Mr. Purkey told Dr. Peterson that he used cocaine for the first time in October of 1997. He described the high as different then what he experienced with methamphetamines. The crack cocaine just "whacked him out" while methamphetamine would allow him to work while high. Mr. Purkey said cocaine increased his sexual desire but deprived him of an erection [40, p. 43].

Mr. Purkey described the incident involving the murder of Jennifer Long on January 22, 1998, to Dr. Peterson. He admitted smoking a "small joint before completing his application with Roto Rooter" on January 22, 1998. Prior to picking up Jennifer Long, the defendant told Dr. Peterson, he had already smoked one rock of crack cocaine.

After picking up Jennifer Long, he purchased Gin for her and "he drank Jack Daniels." According to Mr. Purkey, they drove to a gas station where he paid "$50 for three rocks." Mr. Purkey said he told the FBI that he used a knife against Jennifer Long to insure the "federal crime of kidnapping" but professed to Dr. Peterson that she wanted to go to Kansas City, Kansas, with him [40, pp. 45-46].

Mr. Purkey told Dr. Peterson he took Jennifer Long to his home where the two engaged in sexual intercourse "only once." At times Mr. Purkey advised Jennifer Long was willing, saying "Jennifer was willing and got some lotion for lubrication because she was a virgin." Later in his discussion, he said, he lifted her legs and was "too aroused to stop and had vaginal sex while she was not willing" [40, p. 46].

Dr. Peterson reported that Mr. Purkey admitted killing Jennifer Long but "believed she came to his house willingly so it wasn't kidnapping." Dr. Peterson noted "this was another situation in which not no is yes." Mr. Purkey said Jennifer Long wanted to leave and told him she would not tell anyone, but he remembered she knew where he lived. According to Mr. Purkey, he "reminded her that he could not go back to prison." Mr. Purkey described a struggle and "at one point he saw a knife in her hand." He told Dr. Peterson that he took the knife from Jennifer Long, cutting his hand in the process, and admitted stabbing her "15 times because there was blood everywhere and holes all through her" [40, p. 47].

After the homicide, Mr. Purkey told Dr. Peterson "there was blood on the walls, floor, the couch, and cabinets." He "got rid of all of it" and stated that he took care to hide any of the trace evidence. He admitted to Dr. Peterson dismembering her body the next day with his electric chain saw from his garage. Her body parts were placed in bags and placed in a toolbox. He told Dr. Peterson that he washed the walls 10 to 12 times and made sure the drain was well rinsed. After purchasing several cords of wood, he further dismembered Jennifer Long so "they could be burned." After burning some of her body he stated he would sweep out the fireplace, wet-vac the fireplace, Clorox the fireplace, and dump the ashes. He deposited the bags of ashes from the wood and Jennifer's body in the farm pond [40, pp. 47-48].

Mr. Purkey related to Dr. Peterson "how bad he felt about what he did to Jennifer." After describing what he had done, he told Dr. Peterson that he began to experience nightmares. He told Dr. Peterson that he "actually saved the heart at least for a time, and there were things he wouldn't tell this writer because of his death warrant" [40, p. 49].

001037

Dr. Peterson formulated his diagnostic opinion utilizing a biopsychosocial model and discussed Mr. Purkey's "functioning under the areas of biological, psychological, and socialization influences on his capacity, thinking, and behavior" [40, pp. 53 and 54].

Biologically, he reported Mr. Purkey was born with a strong predisposition to substance abuse and dependence. He cited the defendant's parent's addiction to alcohol, the fallout of maladaptive alcohol-related behavior, and Mr. Purkey's half-brother Gary's alcohol and drug abuse [40, p. 54].

Dr. Peterson included as his second biological element, Mr. Purkey's head injuries, at least two of which were said to have resulted in periods of unconsciousness. He noted "while there are no evident obvious seizures, Mr. Purkey demonstrated paradoxical [sic] rage attacks, not inconsistent with a history of temporal lobe and frontal lobe dysfunction" [40, p. 54].

A third element noted by Dr. Peterson related to Mr. Purkey's "30-or-more-year history of intravenous drug abuse, using all manner of injectable drugs, and use of all manner of ingestible drugs." He noted Mr. Purkey's bilateral forearm cellulitis from injecting crushed Ritalin. He also reported Mr. Purkey's exposure to sexually transmitted diseases as a result of his sexual contacts with prostitutes and sexual encounters in prison [40, pp. 54-55].

The final biological element was a number of fights that could have caused concussions including a June 2003 incident during transport where officers "slammed his face against something so hard that he suffered facial lacerations, requiring up to 20 stitches."

One psychological contribution to his current behavior is that "he perceived his family as sexually, physically, and emotionally abusive." Dr. Peterson reported that Mr. Purkey harbors deep bitterness toward his parents and believes "a substantial portion of his behavior dyscontrol arises from the intense abuse experience he received at their hands" [40, p. 55].

A second psychological contribution, according to Dr. Peterson, relates to Mr. Purkey having a "deep sense of needing to be wanted, desired, and taken care of." According to Dr. Peterson, when his needs for affection and nurturance are not met, "he can fly into a rage, not unlike an infantile rage, then have extreme difficulty calming himself."

45