Investigation confirmed that Mr. Purkey completed an application for employment at Roto Rooter on January 22, 1998 [60, p. 1252]. Roto Rooter hired Mr. Purkey on February 11, 1998, as a plumber. He was fired on March 22, 1998, after they found his Roto Rooter service truck abandoned near a building, with Mr. Purkey's uniforms, pager, and keys found inside [60, p. 1252].

Jeanette Purkey, wife of the defendant, disclosed to investigators that late in January or early February of 1998, her husband was acting extremely nervous and out of character. She described one incident when she attempted to place a telephone call from her home and the phone went dead. She went to the basement and found Mr. Purkey washing down the walls of the basement. According to Mrs. Purkey her husband "even washed down the rafters and that had caused the telephone and lights to short out" [61, p. 1155].

On October 10, 2001, Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long. A grand jury indicted him with a single count of interstate kidnapping resulting in death [62, p. 1].

Dr. Stephen E. Peterson interviewed Mr. Purkey, who disclosed details of the murder of Jennifer Long. Some of his disclosures were different from those presented to investigators. Dr. Peterson reported that Mr. Purkey admitted killing Jennifer Long but "believed she came to his house willingly so it wasn't kidnapping." Mr. Purkey said Jennifer Long wanted to leave and told him she would not tell anyone, but he remembered she knew where he lived. According to Mr. Purkey, he "reminded her that he could not go back to prison." Mr. Purkey described a struggle and "at one point he saw a knife in her hand." He told Dr. Peterson that he took the knife from Jennifer Long, cutting his hand in the process, and admitted stabbing her "15 times because there was blood everywhere and holes all through her" [40, p. 47].

I examined Mr. Purkey on September 15 and 16, 2003. As with Dr. Peterson, Mr. Purkey gave me a different accounting of the murder of Jennifer Long than he had given to investigators. Mr. Purkey said Ms. Long willingly accepted his invitation when he asked, "Would you like to go out and party?" According to Mr. Purkey, Ms. Long requested gin, "so we went to the liquor store and I got a half pint of gin" [Dietz exam, pp. 195-196]. Asked if Jennifer Long was happy to go to from Missouri to Kansas with him, Mr. Purkey said:

> She was happy? Did she protest? No, she didn't protest.
> No it's a . . . I asked her when I first picked her up if she

001057

wanted to go out and party, and she said yeah, and uh, after we got to talking and drinking I didn't know anyplace down there in Missouri to pick up any drugs and uh . . . Kansas to Missouri is like a hop and a skip. Uh . . . during our conversation she said she didn't have anything else to do that day. [Dietz exam, pp. 210-211.]

Contrary to what he told the FBI, Mr. Purkey told me he did not have a knife in his truck [Dietz exam, p. 197]. Because of a witness statement indicating that Mr. Purkey always kept a knife in his truck, I followed up on this question later in the interview with the following exchange:

PD:   Did you usually keep a knife in the truck?
WP:   No, never.
PD:   You never kept a knife in the truck?
WP:   Never kept a knife in the truck.
PD:   Are there any exceptions, any times you might've had a knife in the truck?
WP:   Is there any exceptions I may have? Yeah. When I picked up a hitchhiker one time and I uh...gave him a ride, he asked me if I would give him ten dollars for a good sized buck knife he had. Uh, I was working at CNJ then. I gave him a ride I don't know where, some cut off. I felt sorry for the dude. I gave him ten bucks for the buck knife. I didn't keep that buck knife there in my glove box.
PD:   What'd you do with it?
WP:   I don't know exactly. Uh, I don't know exactly. I don't even know what ended up happening to the buck knife. [Dietz exam, pp. 207-208.]

Mr. Purkey claimed that he gave a kidnapping story to the FBI because Mr. Tarpley advised him that "there's certain things that would make this a federal crime and wouldn't, and they indicated well did you kidnap her, force her across the state line" [Dietz exam, p. 197].

After riding around and talking, Mr. Purkey informed Ms. Long, "Do you care if I go down to KCK real quick . . . I'm gonna go down there and pick up some smoke." He said he located a prostitute who rode with him and Jennifer Long to purchase "three rocks." After purchasing the crack cocaine and dropping off the prostitute, Mr. Purkey said he took a "hit off the pipe and asked her if she'd like to

have one." According to the defendant, Ms. Long "ended up taking a hit" of the crack cocaine [Dietz, exam, pp. 196-197].

Prior to driving to his home, Mr. Purkey recounted stopping at a gas station, possibly a Phillips 66, to purchase more orange juice. He said Ms. Long "come in there with me and she used the bathroom there and uh . . . I told her we didn't have very far to go to the house [Dietz exam, p. 213].

Upon arrival at his home, Mr. Purkey said they went upstairs to the living room area, where he turned on a radio to a rock station and his television to a prepaid Playboy channel. Mr. Purkey said, "We were drinking and sitting on the floor, finished smoking that rock, I got to rubbing on her and we made out some." He acknowledged that Ms. Long had one "toke" in the truck and one at his house. According to Mr. Purkey, the crack cocaine "seemed to stimulate her" [Dietz exam, p. 214]. Mr. Purkey said that Ms. Long told him she was a virgin and asked him to stop as he was pulling off her panties. He also said, "I was putting my fingers in her." Over her objections, Mr. Purkey stated, "I spread her legs apart and we had sex. She starts crying" [Dietz exam, pp. 197, 215]. Mr. Purkey stated that he did not use a condom and ejaculated while having sex with Jennifer Long [Dietz exam, p. 217].

After having had sex with Ms. Long, Mr. Purkey stated, "we're sitting there still naked, drunk or half way drunk. And uh, she asked me, "How was I?" He said they got dressed and went downstairs to a basement room off of his two-car garage. He described the room as an area for storage and where he maintained his weights for working out [Dietz exam, pp. 197-198].

Mr. Purkey recounted his conversation with Ms. Long in the basement room:

> And I said, "I'm sorry Jennifer for what I did." You know? She said, "I just want to go home. Just let me go home. I need to go home." I said, "Are you going home to tell your mom what happened . . . I hope you don't do that." [Dietz exam, pp. 198-199.]

Mr. Purkey said he was holding onto Jennifer Long's arm when she broke his grip, and as he reached for the back of her leg, she fell over his weight bench. As she turned around, Mr. Purkey said, "she's holding a knife." According to the defendant, he used this knife (a 6-

001059

inch blade, straight-edged boning knife with a wood handle) the night before to cut electrical tape to wrap around his weight-lifting bar [Dietz exam, pp. 199-200, 208]. Mr. Purkey described the interaction with Jennifer Long that resulted in her death:

> I grab the knife with this hand. She pulls back with it and cut my hand. And she's screaming. I yanked the knife out of her hand and she's pushing me over, and the same time she's pushing me over to get me off of her, I'm stabbing her. She pushed me down and gets back up, I'm pulling on her leg or an arm or grabbing her skirt or something, and I'm still stabbing her. I don't know how many times I stabbed her. A whole bunch. . . . I sat there holding the knife, broke. [Dietz exam, pp. 199-200.]

After stabbing Jennifer Long to death, Mr. Purkey said:

> I'm sitting on the floor, blood's everywhere, blood's in her hair, blood's just covering. She's laying across my legs. I'm not touching her as far as a sexual manner. Caressing her hair. Wishing I could undo what had been done. [Dietz exam, p. 224.]

Mr. Purkey admitted to using underhand thrusts to kill Ms. Long (known as the knife fighter's grip), but denied having received prison instruction on that use of edged weapons [Dietz exam, pp. 221-222].

Mr. Purkey said he placed the body of Jennifer Long in a black tool box located in the basement room. He turned his attention to cleaning the room. He said,

> I got to—got the hose out, and I started washing the place down. Most of it. There was blood under the wood, under the wooden shelves. We had plastic bags, we had stuff in the plastic bags . . . wiped them down the best I could. The walls, the floor. Only had one drain, and it's out there in the garage. So I had to wash it all out there in that drain. Used bleach on walls, thought I took I don't know how long, couple hours minimum. [Dietz exam, pp. 200-201.]

After cleaning the room, Mr. Purkey said he "went down to Snoopy's and got drunk." After leaving Snoopy's bar, Mr. Purkey stated, he returned home. Upon his return, his wife and boys were at the

001060

residence. According to the defendant, "nothing happened that night" [Dietz exam, p. 201].

Within a day of two of killing Jennifer Long, Mr. Purkey purchased a chainsaw from Sears. He said he could not recall exactly when

> I started to dismember the body because it was days afterwards, probably three or four days that I didn't know what to do with it. First time I ever killed someone so—so I wasn't real proficient in what to do. So I eventually got the chainsaw and dismembered the body and finally, uh, ultimately burned it in the fireplace. [Dietz exam, p. 202.]

Mr. Purkey recounted discarding Jennifer Long's socks, panties, bra, and shirt in a clear plastic bag. He said he threw the bag out of his truck window behind a building located somewhere off Michaels Road. He described the area as having high grass and trees. A few days later, he said "I took the seat cover off [the truck] because of the hair samples and all that" [Dietz exam, pp. 203, 220].

When describing his initial approach of Jennifer Long, he said he thought she was a prostitute. He concluded this by observing her "walking down the street that time of day. She kept turning her head toward the street as most prostitutes do to check traffic." He said she was wearing jeans, flannel shirt, little jacket and a pair of tennis shoes. Mr. Purkey stated he was wearing blue jeans, long sleeve shirt, and a jean jacket [Dietz exam, pp. 205-206]. Although he had never mentioned it in his prior statements, he acknowledged that she was carrying a book bag when he saw her and picked her up. He denied recollection of what he had done with the bag [Dietz exam, pp. 202-203].

According to Mr. Purkey, "I thought we were going to have sex when I first picked her up." He told the FBI that he knew when she got into the truck, she wasn't going to be getting out. However, he said this wasn't true. When asked when he first realized he was going to kill her, he responded, "I didn't." He stated ". . . what I told the FBI was, uh, what they needed to hear is what I told them." He admitted not being truthful when telling the FBI that he stabbed Jennifer Long in his truck [Dietz exam, pp. 219-220].

Mr. Purkey stated that he removed the heart of Jennifer Long but denied holding on to it for any period of time (in contrast to Dr.

001061

Peterson's report).  He said "I burned it."  He also denied maintaining any of her body parts [Dietz exam, pp. 229-230].

Mr. Purkey discussed burning the body of Jennifer Long over a three or four day period.  He said

> . . . burning the body didn't all take place at the same time.  But within a totality of the cremation it took a good three or four day period.  If they were consecutively or not, it still took a three or four day period.  [Dietz exam, p. 233]

After burning Jennifer's remains, Mr. Purkey said, he used a wet-dry vac and a fireplace shovel to fill "three good-sized bags with ash."  Mr. Purkey stated he disposed of the bags of ash in Clearwater, Kansas, at a "lagoon" "where the trailer we were buying from my friend" is located [Dietz exam, p. 234].

Mr. Purkey said he confessed to the Jennifer Long murder

> . . . for two reasons.  I told you the first yesterday which was for a selfish reason [to serve a life sentence in a Federal prison].  And the second was to let the parents know that their little girl is never coming home.  [Dietz exam, p. 235]

The defendant also said he confessed "to be done with it.  It needs to be dealt with" [Dietz exam, p. 235].

## INCARCERATIONS

Mr. Purkey has spent most of his adult life in prison.  He has been incarcerated at the Kansas State Industrial Reformatory, Hutchinson; Kansas State Reception and Diagnostic Center, Topeka; Arizona Department of Corrections; Iowa Department of Corrections; Oregon State Penitentiary; and the Kansas State Penitentiary, Leavenworth, Kansas [64, pp. 975-976, 1021].

During his incarcerations, Mr. Purkey's behavior has resulted in numerous disciplinary infractions with reported multiple violations of rules prohibiting [64, p. 976]

001062