Possession or use of intoxicants, assault of another inmate, disrespect, blackmail, assault and battery, and disruptive behavior.

Other prison records indicate Mr. Purkey was disciplined for possession of illegal drugs, attempted murder 2nd, and numerous other displays of a lack of respect for authority [64, pp. 1021-1022].

On June 8, 1982, an incident report stated Mr. Purkey assaulted another inmate by hitting him with a clinched fist to the right side of his mouth, right bridge of his nose and to the back of the inmate's head.  The inmate requested that no formal charge or prosecution of the defendant be pursued [73, pp. 1584-1587].

Mr. Purkey was the subject of a Kansas State Industrial Reformatory report of November 11, 1982.  It was reported that he struck another inmate with a piece of iron pipe hitting inmate Sylvester Jackson on the left side of his head.  He also struck out against Officer Avery with the pipe.  According to the report, Mr. Purkey stated, "I'm gonna kill that black son-of-a-bitch."  Records indicate Mr. Purkey was found guilty of Aggravated Battery and and Attempted 2nd Degree Murder [64, pp. 534-535].

On March 30, 1983, inmate Purkey's cell was searched and a hand-drawn map of part of the kitchen areas was recovered.  He received disciplinary detention, loss of good time, and Administrative Segregation [64, p. 1458, 1967].

Mr. Purkey tested positive for the presence of alcohol on June 28, 1983.  Purkey admitted to correctional officers having a glass of beer. He received disciplinary detention and loss of good time [64, pp. 528-530].

At a hearing on June 25, 1985, Mr. Purkey and two other inmates were found guilty of assault, battery, and blackmail against inmate Szcygiel. On July 12, 1985, Director Herb Maschner, Kansas Department of Corrections upheld the conviction of assault and battery against Mr. Purkey and the other two inmates.  However, he revoked Mr. Purkey's conviction of blackmail [64, pp. 1921-1924, 1898].

An Administrative Segregation report filed April 16, 1986, noted that Mr. Purkey "assaulted and committed battery on Inmate Pennell." Statements were taken from Inmate Pennell and witness Inmate Archer.  The report stated that other reports of assaults by Mr. Purkey

70

had been received but "none of the other inmates will make statements" [64, p. 1765].

A disciplinary hearing regarding Mr. Purkey was held November 6, 1987, reconvened, and concluded on November 30, 1987. At the hearing, Mr. Purkey admitted in his statement to [71, p. 978]

> Violations of Rule 4(i) – Assault (inmate), Rule 8 – Sexual Activity, and 7(G) – Possession, Manufacture or Use of Dangerous Contraband (intoxicants).

At these hearings, Mr. Purkey admitted hitting Inmate Hatfield "two or three times in the face" with his fist. His said he struck Inmate Hatfield to stop him from telling "the officers that he (Inmate Purkey) had raped him." Mr. Purkey stated he engaged in anal intercourse with Inmate Hatfield but said "it was a mutual thing." He denied using a knife against Inmate Hatfield, but admitted to drinking "three quarts of pruno" during the evening of the incident, October 31, 1987. The disciplinary committee recommended dismissal of Rule 8, and 7(G) but upheld Mr. Purkey's violation of Rule 4(i). It was further recommended that in addition to having Mr. Purkey serve 9 months in segregation, Mr. Purkey "be permanently restricted from occupying a double cell assignment for the remainder of his prison term" [71, pp. 978-930].

Sometime after November 1, 1987, Mr. Purkey was arraigned in Tillamook County on a charge of Sodomy in the First Degree under case #88-1084. The Tillamook County District Attorney's Office placed a detainer on Mr. Purkey. Records indicate that as of February 2, 1990, the detainer was still in place. Mr. Purkey had previously indicated to Superintendent Manfred Maass, Oregon State Penitentiary, that the Tillamook County District Attorney "will dismiss all charges regarding the incident at the Forest Camp" [71, pp. 1426 and 1424].

Mr. Purkey received a disciplinary hearing December 16, 1988, regarding his fighting with another inmate. During the hearing, Mr. Purkey admitted hitting Inmate Ross "in the face, three to five times with his fist." According to Mr. Purkey, his actions were in response to having been sprayed with a substance from a small bottle that made it difficult for him to breathe. Mr. Purkey confessed at the hearing to using crank the day before "by snorting." However, he stated "he was not hallucinating in the cell block." Mr. Purkey was found guilty of violating Rule 14 – Attempt (to violate Rule 4i – assault – inmate) and

received a recommendation of one month in segregation [71, pp. 987-988].

On December 24, 1988, Mr. Purkey received results from a drug urinalysis examination. He tested positive for the presence of amphetamines [71, p. 998].

A disciplinary hearing was held on June 27, 1990, during which Mr. Purkey admitted to violating Rule 7(c) – Possession, Manufacture or Use of Dangerous Contraband (narcotics/narcotics paraphernalia), and Rule 14 – Attempt to violate Rule 7(c). He denied violation of Rule 10 – Disobedience of an Order. Mr. Purkey admitted using amphetamines on or about June 23, 1990, by "injecting it into both of his arms, while inside E block." Further, he admitted "injecting himself three times during a 15 hour period." He said he received a "hot shot" consisting of four injections of amphetamines. Mr. Purkey admitted to Officer Kent "shooting crank" and "seeing colors." Mr. Purkey failed to comply with an order to submit a urine specimen for analysis. The defendant was found guilty of violating Rule 7(c) and Rule 10. He received 3 months segregation, loss of exercise privileges, and was fined $200 [71, pp. 1007-1008].

Lansing Correctional Facility records indicate that Mr. Purkey tested positive for the use of stimulants on October 16, 1995. The drug screen revealed a positive test for "THC and Cocaine." A confirmation test also revealed the same results [64, p. 1655].

An incident report dated May 12, 2000, noted that "Inmate Purkey assaulted Inmate Coleman by hitting him in the mouth hard enough to knock him to the floor." The incident was witnessed by supervisor Burdick and occurred while both were in line to receive medication. Mr. Purkey was sent to Administrative Segregation [64, pp. A1-7].

## DIAGNOSIS

<u>Mental Disease or Defect</u>

Although Mr. Purkey has received a variety of diagnoses over the years, the only diagnosis suggestive of a true mental disease or defect was the purported May 1971 diagnosis of schizoaffective psychosis. Notes subsequent to that diagnosis [6, p. 824; 7, p. 825] state that Mr. Purkey was evaluated at "KRDC in May/71" and was diagnosed as a "Schizo-affective psychosis superimposed on an anti-social personality," but the document originally offering this diagnosis has

72

not been provided and no data supporting this diagnosis appear anywhere in the record.

In a 1976 evaluation interview, Mr. Purkey admitted having auditory and visual hallucinations in the past related to his use of amphetamines, but he denied their presence at other times [11, p. 521]. On a number of occasions he complained of being sprayed with poison in association with self-injection of stimulants (July 1988, May 1998, December 1998) or anxiety attacks (August 2000), and his wife confirmed that when he was regularly abusing drugs he accused her and her sons of poisoning him with insecticides. On a few occasions when he made similar complaints, it was unclear whether he had recently injected stimulants [29, pp. 2442-2443; 43, p. 965], but he made it abundantly clear that he had ready access to drugs of abuse during incarceration in a variety of facilities.

Mr. Purkey's claims of being poisoned are further complicated by the contradictory statements of his wife, Jeanette Purkey, who testified that she knew nothing of her husband being poisoned [77] but gave a statement and affidavit to a defense investigator in which she confessed to repeatedly putting mouse poison in the water he used to dissolve Ritalin for injections [78, 79]. The possibility that he was actually administered poison (supposedly to convince him to stop injecting drugs) renders his claim during my examination [Dietz exam, pp. 146-165, 168-174; 249] that he was poisoned less unreasonable.

Based on the absence of any documentation of delusions, hallucinations, or formal thought disorder other than in association with his voluntary intoxication, I conclude that Mr. Purkey suffers from no mental disease or defect. His ready access to drugs in penal settings precludes any effort to determine that he has ever had psychotic symptoms after prolonged abstinence from drugs.

Polysubstance Abuse

Mr. Purkey has consistently described himself as a long-time abuser of a variety of illegal drugs, accompanied by other drug-seeking behaviors. Precise delineation of his level of dependence is difficult because of his imprecision about timing and access. He has abused alcohol, narcotics, and stimulants to a degree and with effects that justify dependency diagnoses for these three classes of substances, but it is unclear whether he had the overlapping periods of dependency necessary for a diagnosis of polysubstance dependency.

His accounts of drug use have not been entirely consistent, but include statements that he began to use alcohol at age 8 and was drinking daily by age 14; that he began sniffing glue, taking Quaaludes, and smoking marijuana at age 14; that at age 14 he began using "crystal, Desoxin, preludes [?], Quaaludes, Nembutals, congratols [?], Seconals, heroin, and opium" [Dietz exam, p. 32]; that he began IV drug usage at age 14 or 15; that he was a heroin addict by age 19; that he was addicted to methadone while incarcerated in Arizona; that he regularly used methampetamines while incarcerated in Oregon; that while out of prison and prior to his arrest in October 1998 he was injecting methamphetamine and Ritalin intravenously every day and smoking crack cocaine [38, p. 3]. He was treated for side effects of massive doses of IV Ritalin on 9/13/98. In March 1999, he gave a history of extensive abuse of Ritalin, methamphetamine, crack, and cocaine, though he later told Dr. Peterson that he used cocaine for the first time in October of 1997 [40, p. 43].

The defendant's extensive, continued use of alcohol and drugs makes it impossible to determine whether he may also suffer from a dysthymic disorder (chronic depression). An interval of verified abstinence would be necessary to adequately evaluate the presence of any mood disorder, and even then the effects of chronic drug use and incarceration would confound diagnostic efforts.

Antisocial Personality Disorder

Mr. Purdey had the onset of a conduct disorder before age 14 as evidenced by his stealing cars [Dietz exam, p. 34] and starting fights [Dietz exam, p. 35], truancy from school [Dietz exam, p. 37], and group sex with intoxicated girls [Dietz exam, p. 54].

With respect to the adult criteria for antisocial personality disorder, the defendant's history is replete with evidence of at least seven of the features:

(1) Criterion A1:  Failure to conform to social norms with respect to lawful behavior:

- Mr. Purkey reported to Dr. Christina Pietz his initial consumption of alcohol began at age 8. By age 14, he said, he consumed alcohol daily. At the age of 17, Mr. Purkey considered himself an alcoholic. He admitted illicit drug usage to Dr. Pietz beginning at age 14. He said he sniffed glue on a regular basis and also used Quaaludes and marijuana [37, p. 5].

- Mr. Purkey said his initiation into the drug world came through his brother, Gary at age 14.  He claimed the introduction included "crystal, Desoxin, preludes [?], Quaaludes, Nembutals, congratols [?], Seconals, heroin, and opium" [Dietz exam, p. 32].

- Mr. Purkey discussed his criminal activity at age fourteen or fifteen stating [Dietz exam, p. 56]

  > Uh, broke into a canteen lodge and stole cases of cigarettes, cases of candy bars and sold them to bars.  Broke into the back of restaurants and stole steaks and sold most of them to bars too, the T-bones, the ribeyes.  It was fairly easy, no alarms. Sometimes doing some drug store burglaries also with some friends of his, I was mainly just a look out guy.  But they were getting class As and of course back then they kept a lot of class As within shelves of drug stores in comparison to today.

- In 1970, Mr. Purkey was charged with Burglary and Larceny on March 2 – case dismissed; Burglary and Attempted Rape – commitment issued on April 9; Kidnapping and Attempted Rape on June 29 – no disposition listed; and First Degree Burglary – conviction on October 12 [63, p. 562].

- On December 15, 1972, Mr. Purkey pled guilty to Joyriding and was sentenced to 30 days and fined $50 [33, p. 1199].

- Mr. Purkey's parole was revoked in March of 1973, and he was returned to institution and paroled in January of 1974.  On July 2, 1974, he was sentenced following conviction of one count of Burglary and one count of Theft.  He received a controlling term of 1 to 10 years, however, his total controlling sentence was 10 to 21 years as his parole was revoked on a prior offense of Burglary [64, p. 975].

- On September 27, 1976, the defendant was sentenced with a controlling term of 1 to 20 years.  He had pled guilty to charges of Robbery and Theft and parole violations.  He received a parole release from the Kansas State Penitentiary on July 15, 1980 [64, 975].

75

001068