[33, p. 1203].

- Mr. Purkey claimed on 5/5/00 that he had attempted suicide by ingesting three bottle of nitroglycerin after murdering Mrs. Bales [29, 2475].

- Mr. Purkey has admitted prior consuming crack cocaine and alcohol prior to raping and murdering Jennifer Long [57, pp. 1169-1172; Dietz exam, pp. 196-198].

(6)  Criterion A6:  Tend to be consistently and extremely irresponsible:

- He was employed at Wesley Hospital, Wichita, Kansas, as a housekeeping technician from 1/6/70 to 1/20/70.  It was reported that "he terminated his job as he did most jobs by simply not reporting for work" [33, p. 1197].

- After his parole in December of 1975, Mr. Purkey worked as a cook for three days in February of 1976.  During this period he also worked at a car wash and other short-term labor jobs.  He commented to evaluators about his brief employments that "outside jobs require entirely different work habits, and I didn't know what they were" [22, p. 4000].

- Roto Rooter hired Mr. Purkey as a plumber on 2/11/98, but he was fired on 3/22/98 after they found his Roto Rooter service truck parked near a building unlocked with the keys inside [60, p. 1252].

- Mr. Purkey advised me that there were points in his life when was not financially responsible.  I asked if he ever got behind on his rent or got evicted.  Mr. Purkey responded, "I've never been evicted.  I've moved."  He indicated he had moved while owing rent and had borrowed money and not paid it back [Dietz exam, p. 263].

(7)  Criterion A7:  Show little remorse for the consequences of their acts:

- On 11/16/76, the evaluation team at the Kansas State Reception and Diagnostic Center (KRDC) reported that an interview with Mr. Purkey revealed "not the least hint of remorse about his offense as he insists he was simply going to help a girlfriend collect a debt and they simply took a car because they needed

001075

transportation" [11, p. 521].

- Sayed S. Jehan, M.D., on 9/24/80 noted that Mr. Purkey "does not accept any responsibility for his legal problems and blames law enforcement authorities for his legal problems" [21, p. 4118].

- Mr. Purkey told investigators that he "realized he needed to get rid of the victim." He has acknowledged the motive that he did not want to return to prison and knew that if he let the victim go free, he would be arrested. His post-offense behavior did not express remorse for the murder of Jennifer Long; rather his actions of dismembering and burning the body and attempting to destroy and remove all physical evidence were directed at concealing what he had done [56, p. 1166-1168]. Only in later mental health interviews did Mr. Purkey claim remorse.

No significant brain injury

In 1969, an unidentified staff member at St. Francis hospital took a history from an unidentified informant who stated that after losing consciousness for two days in a car crash in 1967, the defendant's behavior had changed and he was impulsive, immature, and had periods of amnesia. The only examples cited were having broken into a house with a friend in an attempt to rape a girl, joyriding, and stealing a chicken despite having money. Since then, various examiners have wondered whether the defendant's multiple head injuries have had an effect on his behavior or temper.

Only Dr. Leeson (and, relying on him, Dr. Peterson) have concluded that brain dysfunction played any significant part in the defendant's behavior. Dr. Leeson summarized his findings rather specifically when he wrote:

> It is clear, however, that any conceptualization of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element. Under stress, Mr. Purkey is likely to react quite impulsively and without the ability to modify his actions. Because of brain based disorder, in situations that may be unclear and include emotional arousal his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem. [39, p. 8.]

001076

The objective effects mentioned in this passage would also be true in the absence of any frontal lobe dysfunction for an individual with antisocial personality disorder:  Under stress, Mr. Purkey is likely to react quite impulsively.  Because of antisocial personality disorder, in situations that may be unclear and include emotional arousal, his actions are not considered, tempered, or moderated.  Intoxication would certainly exacerbate this problem.

Nothing in the defendant's history or in my examination of him leads me to believe that he has any clinically significant brain dysfunction.  Most importantly, there is no indication that his brain function interferes with his capacity to appreciate the wrongfulness or his actions, conform his conduct to the requirements of the law, form the intent to commit specific intent crimes, premeditate, or deliberate.

Sexual Deviation

I make no diagnosis of sexual deviation because of the paucity of available evidence.  The description of his alleged rape of Gary Lee Hatfield at forest camp, Tillamook, Oregon, on 10/31/87 [76] is consistent with the behavior of a man with sexual sadism, but Mr. Purkey refused to discuss this incident.  Further evidence regarding this issue could be obtained through interviews of Mr. Purkey's sexual partners.  This issue is important in connection with the rape and murder of Ms. Long, as it could provide additional evidence of Mr. Purkey's motives for the murder.  His dismemberment of the body, his inconsistent stories about the murder, and his lack of credibility make it impossible to determine whether Ms. Long was tortured prior to death.

Mental Capacity

It is my opinion with reasonable medical certainty that Mr. Purkey suffers from no serious mental disease, no mental disease or defect, and no significant brain dysfunction that compromises his capacity to appreciate the wrongfulness or his conduct, conform his conduct to the requirements of the law, form the intent to commit specific intent crimes, premeditate, or deliberate.

Mitigation

The defendant's childhood was marked by parental fighting and separation, neglect by his alcoholic and promiscuous mother, humiliation for his stuttering, corporal punishment by both parents,

and inappropriate sexual behavior on the part of his mother. At a minimum, the defendant's mother made her promiscuity with other men apparent to her son; this is corroborated by Mrs. Burke. At a maximum the defendant's mother sexually abused her son, dressing seductively, teaching him to rub her and perform cunnilingus on her, fellating him, and eventually have intercourse with him on many occasions spanning years. Mr. Purkey also claimed that his father bought him oral sex with prostitutes when he was aged 10 or 11, and that he and his father would share prostitutes. No witnesses corroborate the defendant's accounts of maternal or paternal sexual abuse. The only document I found mentioning any sexual issue in childhood was Dr. Targownik's reference [22, p. 3999] to a December 29, 1966, diagnostic work-up of Mr. Purkey at the St. Francis Hospital in which psychological evaluation was said to state that "Mr. Purkey was experiencing a serious personality disorder centered on psychosexual problems of identification." Neither the underlying data that led to this assessment nor the evaluation itself was received. According to the defendant, he was physically abused by both parents and witnessed his father beat his mother. His parents died while he was in his early 20s, his mother from pancreatic cancer and his father by suicide.

Based on the foregoing, I conclude that Mr. Purkey was the victim of some level of neglect, psychological abuse, and physical abuse during childhood, and may also have been a victim of sexual abuse (though to date I must rely on his word for the latter).

As noted above, I do not find any mental disease or defect that could provide mitigation of sentence, but he has consistently maintained that he smoked crack cocaine and drank alcohol prior to his rape and murder of Ms. Long. If this is true, then voluntary intoxication may have played a part in his crimes. By his account, such voluntary intoxication did not prevent him from appreciating the wrongfulness of his actions, and his behavior in rapidly attempting to conceal the crime also indicates that he knew what he had done was wrong.

As to whether a combination of voluntary intoxication and frontal lobe impairment caused him to lack substantial capacity to conform his conduct to the requirements of the law, there are two times requiring analysis. The first is when he raped Ms. Long, and his account is merely that his arousal was at that time so intense that he ignored her refusal to have sex. The poor judgment he exercised at that moment is consistent with his lifelong pattern of poor judgment and self-indulgence at the expense of others. The second is when he began

001078

stabbing Ms. Long (and apparently continued to so longer than necessary to insure her death).  If one credits his claim that she was the first to pull a knife on him, this moment needs to be understood as his reaction to the self-defense efforts of a frightened, young, rape victim whom he was falsely imprisoning.  Already motivated to silence her from sending him back to prison, he was no doubt enraged by any defiance she may have shown him.  This rage seems to me the most plausible explanation for his overkill.

I reserve the right to modify these opinions in light of additional information that may be forthcoming and to amend this report in light of such new information.  In the event I am called to testify at trial, I may prepare a PowerPoint exhibit of points made in this report for use as demonstrative evidence.

_____

Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
UCLA School of Medicine

001079

001080