# DOCKET SHEET

Circuit Court, Clay County, Missouri

File No.   CV197-6789DR

| Nature of Action: | | KATHERINE LADESH | |
|---|---|---|---|
| | | Plaintiff/Petitioner | Att for Plaintiff or Petitioner |
| | | vs. | |
| | | MICHAEL ARMSTRONG | |
| | | Defendant/Respondent | Att. for Defendant or Respondent |

| Date | Orders of Court |
|---|---|
| 9-16-97 | Petition filed together with motion for temporary restraining order and motion for... |
| 9-16-97 | Now comes petitioner in person. Evidence heard. Ex Parte order of protection granted all as per order filed. Cause set for hearing on Sept. 30, 1997 @ 9 Am. |
| Sep 16 1997 | Petition filed. sms |
| Sep 16 1997 | Copy of Ex Parte Order of Protection given to sheriff of Clay County for service on respondent; copies hand-delivered to petitioner; copy faxed to Police Headquarters, Warrant Service Unit. sms |
| Sep 18 1997 | Request for service filed. sms |
| Sep 18 1997 | Copies of ex parte order delivered to petitioner for service. sms |
| Sep 26 1997 | Return of service on ex/parte order filed showing personal service on respondent on 09/25/1997. dmp |
| Sep 26 1997 | Return of service on ex/parte order filed showing personal service on respondent on 09/25/1997. dmp |
| Sep 29 1997 | Rspt files app for continuance. muc |
| SEP 30 1997 | Petitioner appears in person and by attorney ___John Chick___. Respondent appears in person and by attorney ___Julie Cooper___. Evidence heard. Findings and Recommendations all as per entry filed. Cause taken under consideration pending receipt of ___. No costs assessed. |
| Sep 30 1997 | Copy hand-delivered to petitioner and respondent. Copy faxed to Kansas City Police Department. lmw |
| Sep 30 1997 | Full order of protection terminates 09/29/1998. lmw |
| Sep 1 1998 | Petitioner files motion for renewal of full order of protection. bkd |
| 9-2-98 | Order re. hearing presently. |

Form 101  4/90

001440 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

# DOCKET SHEET

DIVISION 3                                    Circuit Court, Clay County, Missouri

File No.    CV 197-6789 DR

| Nature of Action: | # KATHERINE LADESH | |
|---|---|---|
| | Plaintiff/Petitioner | |
| | vs. | Att. for Plaintiff or Petitioner |
| | #1    MICHAEL ARMSTRONG | |
| | Defendant/Respondent | |
| | | Att. for Defendant or Respondent |

| Date | Orders of Court |
|---|---|
| Sep 2 1998 | Order to extend full Order per entry. JW/mc (09/16/1998 9:00 am) |
| Sep 3 1998 | Copy of Ex Parte Order of Protection given to sheriff of Clay County for service on respondent; copies hand-delivered to petitioner; copy faxed to Liberty Police Dept., copies mailed to Petitioner. ers |
| Sep 14 1998 | Ex parte order returned non-est. plh |
| 9/16/98 | Petitioner in person + by atty - order extended to Sept 30, 1998. |
| Sep 16 1998 | Copy of Ex Parte Order of Protection given to sheriff of Clay County for service on respondent; copies hand-delivered to petitioner; copy faxed to Gladstone Public Safety. sms |
| 9/30/98 | Full order extended to 9/30/99. |
| Sep 30 1998 | Copy hand-delivered to petitioner . Copy faxed to Police Headquarters, Warrant Servicew Unit; Copy of full order delivered to Clay County Sheriff for service on respondent. sms |
| Sep 30 1998 | Full order of protection terminates 09/30/1999. sms |
| Sep 30 1998 | Ex parte order returned non-est. nrs |
| Oct 27 1998 | Defendant by atty. Glenn Manis files motion to Set Aside Extended Full Order of Protection and notice calling up said motion for hearing on 11/10/1998 @ 9:00 am. nrs |
| 11/10/98 | Tain person ; with counsel. Rep by counsel. Motion to set aside or dismiss is argued and denied. cos PJ |
| Oct 22 1999 | Full order returned non-est. plh |

Form 101 4/90

WP002959

001441    Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41



IN THE CIRCUIT COURT OF **CLAY** , COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER | 024043J | | CERTIFIED COPY |
|---|---|---|---|---|
| [ ] CIRCUIT/NO. _____ | | | | STATE OF MISSOURI COUNTY OF CLAY. This is to certify that the foregoing is a true and correct copy of the documents on file in my office. |
| [ ] ASSOCIATE/NO. _____ | CASE NUMBER | CV197-6789DR | | Witness my hand and official seal this 30 day of ____ 1998 Clerk of Circuit Court, RITA FULLER By _____ D.C. |

**PETITIONER**

KATHERINE LADESH

RESPONDENT'S HOME ADDRESS: ▮▮▮▮▮▮

Liberty, Mo. 64068

D.O.B., AGE OR SOC. SEC. #          VS.

(DATE FILE STAMP)

**RESPONDENT**

MICHAEL ARMSTRONG

▮▮▮▮▮▮

RESPONDENT'S WORK ADDRESS:

RESPONDENT'S RELATIONSHIP TO PETITIONER
[ ] SPOUSE    [ ] EX-SPOUSE    [ ] RELATED BY BLOOD/MARRIAGE

SEX [ ] F  [X] M
D.O.B., AGE OR SOC. SEC. #  ▮▮▮▮▮▮    [X] OTHER  Stalking

APPEARANCES:  [ ] PETITIONER  [ ] PETITIONER'S ATTORNEY  [ ] RESPONDENT  [ ] RESPONDENT'S ATTORNEY  [ ] OTHER _____

## ADULT ABUSE
## FULL ORDER OF PROTECTION
### Also used for Consent Orders and Extensions of Full Orders of Protection

(Check Applicable Statement)

[ ] The petitioner has filed a petition requesting issuance of an order of protection and a notice was served together with a copy of the petition to the respondent at least three days prior to the hearing. The matter was heard and submitted to the Court, and upon due consideration of the matter, the Court finds pursuant to Section 455.040 RSMo that the petitioner has proved the allegations of abuse or stalking.

[X] The petitioner and respondent submit this Consent Judgment and request that the Court order the following:

——————————— ORDER (Only Those Provisions Checked Apply) ———————————

[X] This order replaces and supersedes the ex parte order of protection entered in this cause on (date) 9/16/97 . and serves as notice of termination of that order.

[ ] This order extends the full order of protection entered in this cause on (date) _____ and serves as notice of termination of that order.

[X] Respondent shall not stalk, abuse, threaten to abuse, molest or disturb the peace of petitioner wherever the petitioner may be.

[X] Respondent shall not enter or stay upon the premises of the dwelling of petitioner, located at _____ ▮▮▮▮▮▮ SCUS KCMO n WHETLEVEN SHE MAYSE

[ ] Respondent shall not transfer, encumber or otherwise dispose of the following property mutually owned or leased with petitioner: _____

[ ] Petitioner to be given temporary possession of the following personal property: _____

[ ] Respondent shall participate in the court approved counseling program for
[ ] batterers  [ ] substance abuse treatment  at _____ beginning _____ .

[ ] Custody of child(ren) is awarded as follows:
Child's Name          Person to Receive Custody

[ ] The following visitation schedule is established:

[ ] Respondent to pay child support as follows: $ _____ per child per _____ with first payment due (date) _____

OSCA (4-96) AA20  #119                                                    455.010-455 086, RSMo

WP902960
001442  Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

[ ] Respondent to pay maintenance to petitioner as follows: $ _____ per month/week
with first payment due (date) _____.

[ ] Petitioner/respondent shall execute an income assignment for:  [ ] child support  [ ] maintenance

[ ] Respondent to pay petitioner's rent or mortgage in the amount of $_____ per OCT 22 1999 to
_____ with first payment due (date) _____.

[ ] Respondent shall pay for housing or other services provided to the petitioner by a shelter for victims of domestic violence in
the amount of $_____ per _____ to _____
with first payment due (date)_____.

[ ] Petitioner/respondent shall pay to the petitioner/respondent the amount of $_____ for the cost of
maintaining or defending this action.

[ ] Petitioner/respondent shall pay to the petitioner/respondent attorney's fees in the amount of $_____.

[ ] Court costs are assessed to _____N/A_____.

THIS ORDER SHALL BE EFFECTIVE UNTIL (DATE) 9/29/98 _____, UNLESS SOONER TERMINATED OR EXTENDED.
VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE
OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

9/30/97
_____ DATE        SO ORDERED: _____
9/30/98 This order extended to 9/30/99.      JUDGE
CONSENT ORDERS ONLY

This consent is not to be taken as an admission by respondent that the allegations contained in the petition are true; however,
respondent consents to the above orders being issued.

_____              _____
PETITIONER'S SIGNATURE                RESPONDENT'S SIGNATURE

_____              _____
ATTORNEY FOR PETITIONER'S SIGNATURE   ATTORNEY FOR RESPONDENT'S SIGNATURE

## NOTICE TO THE PERSON OBLIGATED TO PAY SUPPORT OR MAINTENANCE
### (Pursuant to Section 452.350)

Effective January 1, 1994, for every order for child support or maintenance entered or modified by the court under the authority of
Chapter 452 or otherwise, income withholding under Section 452.350 RSMo shall be initiated on the effective date of the order
unless the court finds there is good reason not to require immediate income withholding or a written agreement between the parties
provides for an alternative arrangement.

## INSTRUCTIONS TO CLERK

1. A copy of the order of protection shall be issued to the petitioner, the respondent, and the law enforcement agency (police or
sheriff) in the city or county where the petitioner resides.
2. A copy of the order of protection shall be issued the same day the order is granted to the law enforcement agency responsible
for maintaining the Missouri Uniform Law Enforcement System (MULES).
3. A copy of the order of protection shall be _____ last known
address._____

| SHERIFF'S | I hereby certify that I attempted to serve the within Civil Process in the |
| I certify that I served a copy of this order | County of Clay, State of Missouri on the 20 day of Oct, |
| | 199 7 by searching diligently for and failing to find the within named |
| Served at (address)_____ | defendant(s) Michael Armstrong |
| | NON EST    Bob Poydster |
| on (date)_____ | Bryan M Sipp |  )_____ M. |
| SHERIFF'S FEES (if applicable) | FEE: 35 -   Served by |
| Service Fee  $_____ | | _____ per mile) |
| Non Est  $_____ | unable to locate | |
| | | SHERIFF |

WP902961
001443
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

KATHERINE LADESIT
_____
PETITIONER

VS.                                    No. _____

Michael Armstrong
_____
RESPONDENT

## ADULT/CHILD ABUSE SERVICE INFORMATION

RESPONDENTS WORK ADDRESS                    RESPONDENTS HOME ADDRESS

Unknown                                     ███████████████████████
_____                   _____
COMPANY NAME                                STREET ADDRESS

                                            Liberty, Mo.        64068
_____                   _____
STREET ADDRESS                              CITY      STATE       ZIP

                                            Clay               781 - 8315
_____                   _____
CITY      STATE      ZIP                    COUNTY             PHONE NUMBER

NATURE OF WORK: Unknown      WORK HOURS: _____ TO _____ WORK PHONE: _____

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

Unknown                                     Unknown
_____                   _____
PLACE OR NAME                               PLACE OR NAME

_____                   _____
STREET ADDRESS                              STREET ADDRESS

_____                   _____
CITY      STATE      ZIP                    CITY      STATE      ZIP

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT Approx: 5'2" to 6'5"   WEIGHT Approx: 150-170   COLOR OF HAIR lt. brown → gray   DOB ████████████

RACE W    SOCIAL SECURITY# ████████████    HAIR LENGTH/STYLE short balding on top

VISIBLE IDENTIFYING MARKS (e.g. tattoos, birthmarks, braces, beard, pierced ear, etc.)

often wears ball cap
_____

_____

NICKNAMES Mic

MAKE OF CAR: Ford   MODEL: Bronco   YEAR: 1988   COLOR: Gray   LICENSE#_____

ADDITIONAL INFORMATION Yes - prior SIS Assault
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124    5/90

WP202962
001444   Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

Date _Nov. 10, 1998_ Tape No. _?_ Circuit _1_ County _Clay_

Division _3 in Div 4_ Judge _L. Harman_ Length of time of recording ___ hrs. ___ min

Log made by _BD_

Actual time spent in courtroom for purpose of recording ___ hrs. ___ min.

Appointing Authority for Above (check one):

Circuit Clerk ☐   Associate Circuit Judge ☐   Probate Judge ☐   Other (Designate) _____

| CASE NUMBER | STYLE OF CASE/DESCRIPTION | INDEX NUMBER | IDENTIFICATION | PLAINTIFF ATTORNEY | DEFENDANT ATTORNEY |
|---|---|---|---|---|---|
| CV197-6789 | K. Ladish v Armstrong | 480 | J | John Chick | Glen Mannix |
| | | 496 | ΔA | | |
| | | 538 | TA, J, ΔA, J | ΔA, J motion denied | |
| | | 569 | TA, J | | |
| | | 594 | end | | |

Form # 523

REV 5-88

Case 2:19-cv-00414-JPH-DLP   Document 23-37   Filed 09/12/19   Page 6 of 344 PageID #: 4885

00144145 Produced by Clay County Microfilm Department on May 19, 2015 at 16:41

Case 2:19-cv-00414-JPH-DLP    Document 23-37    Filed 09/12/19    Page 7 of 344 PageID #: 4886

**Library References**

21 Missouri Practice, see §§ 2.8, 22.1 and 22.7.

## Notes of Decisions

Immediate and present danger, 2
Validity 1

### 1. Validity

Provisions in Adult Abuse Act permitting courts to issue ex parte orders of protection to exclude respondents from home or from contact with children for 15 day period did not deprive respondent of due process where Act was necessary to secure important governmental interests in protection of victims of abuse and prevention of further abuse, only time ex parte order could be issued was when there was immediate and present danger of abuse, nothing in Act suggested that respondent could not obtain hearing earlier than 15 days after order was granted, ex parte order was required to be served upon respondent, and only judge in his discretion could issue ex parte order. State ex rel. Williams v. Marsh (Sup. 1982) 626 S.W.2d 223.

### 2. Immediate and present danger

Wife's petition for order of protection sufficiently averred that violence had occurred and that she was in immediate fear of another incident for wife to be entitled to ex parte relief under the Adult Abuse Act, where wife alleged that husband knocked her down, bruised her back, and kicked her on specific date, that there was that kind of abuse in past, that she was afraid of him under certain conditions, and that she was filing for divorce and was afraid of what he might do. Parkhurst v. Parkhurst (App. E.D. 1990) 793 S.W.2d 634.

Evidence was sufficient to support trial court's determination that wife would be placed in immediate and present danger of abuse by husband if full order of protection expired, as was required for renewal of order. Jenkins v. Jenkins (App. W.D. 1990) 784 S.W.2d 640.

## 455.040. Hearing—duration of order—renewal—service of petition, notice and order on respondent—information to law enforcement agency

1. Not later than fifteen days after the filing of a petition under sections 455.010 to 455.085 a hearing shall be held unless the court deems, for good cause shown, that a continuance should be granted. At the hearing, if the petitioner has proved the allegation of abuse or stalking by a preponderance of the evidence, the court shall issue a full order of protection for a period of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year. Upon motion by the petitioner, and after a hearing by the court, the full order of protection may be renewed for a period of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year from the expiration date of the originally issued full order of protection. If for good cause a hearing cannot be held on the motion to renew the full order of protection prior to the expiration date of the originally issued full order of protection, an ex parte order of protection may be issued until a hearing is held on the motion. Upon motion by the petitioner, and after a hearing by the court, the second full order of protection may be renewed for an additional period of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year. For purposes of this subsection, a finding by the court of a subsequent act of abuse is not required for a renewal order of protection.

2. The court shall cause a copy of the petition and notice of the date set for the hearing on such petition and any ex parte order of protection to be

540

personally served up- by law or by any sl hearing. Such shall take priority over ser nature. The court s served upon or mail address. Failure to s respondent shall not protection.

3. A copy of any 455.085 shall be issu agency in the jurisdi issue a copy of any c responsible for maint any other comparabl granted. The law en shall enter informatio within twenty-four ho expiration or of termi local law enforcement for maintaining MUL The law enforcement enforcement system sh (L.1980, S.B. No. 524, p H.B. Nos. 476 & 194, § § C.)

The 1989 amendment, in ed "shall issue" for "may is sentence, substituted "the p either party" in the third "from the expiration date c sued full order of protection third sentence, and added tr sentences; in subsec. 2. ins process server as provided sheriff or police officer" in added the second sentence, sonally" preceding "served dent" in the third sentence; inserted the second and thirc ed "and to the law enforceme sible for maintaining MULES parable law enforcement syst the fourth sentence, and ad tence.

The 1993 amendment, in s "or stalking" in the second se a sixth sentence; and in sub fourth sentence.

Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

WP002964

**001446**

resent danger

order of protection suffi-
violence had occurred and
ediate fear of another inci-
entitled to ex parte relief
se Act, where wife alleged
ed her down, bruised her
on specific date, that there
use in past, that she was
certain conditions, and that
divorce and was afraid of
Parkhurst v. Parkhurst
S.W.2d 634.

fficient to support trial
that wife would be placed
resent danger of abuse by
of protection expired, as
ewal of order. Jenkins v.
)90) 784 S.W.2d 640.

e of petition, notice
o law enforcement

ition under sections
urt deems, for good
the hearing, if the
a preponderance of
for a period of time
er shall be valid for
r. Upon motion by
r of protection may
ate, except that the
ate days and not
ly issued full order
on the motion to
te of the originally
ion may be issued
titioner, and after
ay be renewed for
, except that the
hty days and not
ig by the court of
ler of protection.
f the date set for
protection to be

personally served upon the respondent by personal process server as provided by law or by any sheriff or police officer at least three days prior to such hearing. Such shall be served at the earliest time, and service of such shall take priority over service in other actions, except those of a similar emergency nature. The court shall cause a copy of any full order of protection to be served upon or mailed by certified mail to the respondent at his last known address. Failure to serve or mail a copy of the full order of protection to the respondent shall not affect the validity or enforceability of a full order of protection.

3. A copy of any order of protection granted under sections 455.010 to 455.085 shall be issued to the petitioner and to the local law enforcement agency in the jurisdiction where the petitioner resides. The clerk shall also issue a copy of any order of protection to the local law enforcement agency responsible for maintaining the Missouri uniform law enforcement system or any other comparable law enforcement system the same day the order is granted. The law enforcement agency responsible for maintaining MULES shall enter information contained in the order for purposes of verification within twenty-four hours from the time the order is granted. A notice of expiration or of termination of any order of protection shall be issued to the local law enforcement agency and to the law enforcement agency responsible for maintaining MULES or any other comparable law enforcement system. The law enforcement agency responsible for maintaining the applicable law enforcement system shall enter such information in the system.

(L.1980, S.B. No. 524, p. 442, § 7. Amended by L.1989, S.B. No. 420, § A; L.1993, H.B. Nos. 476 & 194, § A; L.1995, H.B. Nos. 232 & 485, § A; L.1996, S.B. No. 869, § C.)

## Historical and Statutory Notes

The 1989 amendment, in subsec. 1, substituted "shall issue" for "may issue" in the second sentence, substituted "the petitioner" for "by either party" in the third sentence, inserted "from the expiration date of the originally issued full order of protection" at the end of the third sentence, and added the fourth and fifth sentences, in subsec. 2, inserted "by personal process server as provided by law or by any sheriff or police officer" in the first sentence, added the second sentence, and deleted "personally" preceding "served upon the respondent" in the third sentence; and in subsec. 3, inserted the second and third sentences, inserted "and to the law enforcement agency responsible for maintaining MULES or any other comparable law enforcement system" at the end of the fourth sentence, and added the fifth sentence.

The 1993 amendment, in subsec. 1, inserted "or stalking" in the second sentence, and added a sixth sentence; and in subsec. 2, added the fourth sentence.

The 1995 amendment, in subsec. 2, substituted "three days" for "five days" in the first sentence, substituted "or mailed by certified mail to the respondent at his last known address" for "the respondent" in the third sentence, and substituted "serve or mail a copy of the full order of protection to the respondent shall not affect the validity or enforceability" for "do so shall not affect the validity" in the fourth sentence.

The 1996 amendment, in subsec. 1, in the second sentence, substituted "period of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year" for "definite period of time, not to exceed one hundred eighty days", in the third and fourth sentences, substituted "of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year" for "not to exceed one hundred eight days".

541

WP902965
001447
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| MISSOURI FORM #309 9-85 | **SUBPOENA**<br>**ORDER TO APPEAR/PRODUCE DOCUMENTS/GIVE DEPOSITIONS** | CASE NUMBER<br>CV197-6789 DR |
|---|---|---|

**IN THE CIRCUIT COURT OF**                     **CLAY COUNTY, DIVISION III**

*Katherine Ladish.*
*a/k/a Katherine Ladesh*

VS.                    Plaintiff(s)

*Michael Armstrong.*

Defendant(s)

STATE OF MISSOURI TO *Records custodian LINDA WILSON*
*Kansas City Missouri Police Dept.*
ADDRESS *1125 Locust*
*Kansas City, Mo 64106*

ATTORNEY OR PARTY REQUESTING *Glenn D. Manis*
ADDRESS *8476 NE Boone Ave # 104*
*Kansas City, Mo 64155*
TELEPHONE *816-436-7294*

PLAINTIFF'S ATTORNEY *John Chich*
ADDRESS *2801 Kendallwood Pkwy*
*Kansas City, Mo 64119*
TELEPHONE *816-455-2525*

DEFENDANT'S ATTORNEY *Glenn Manis*
ADDRESS *8476 NE Boone Ave # 104*
*Kansas City, Mo 64155*
TELEPHONE *816-436 7294*

THE STATE OF MISSOURI TO: *Records Custodian Kansas City Missouri Police Dept.*
*LINDA WILSON*

YOU ARE HEREBY COMMANDED:

☒ TO APPEAR AT *Division III Clay County Circuit Court 11 South Water Liberty, Mo*
ON *November 10* , 19 *98* AT *9:00* A.M.

☐ TO CONTACT (NAME) _____ AT (TELEPHONE) _____ WHO WILL ADVISE
OF TIME AND PLACE APPEARANCE IS REQUIRED.

☒ TO TESTIFY ON BEHALF OF: *Defendant*

☐ TO GIVE DEPOSITIONS

☒ TO BRING THE FOLLOWING: *All records or reports on complaints filed by Katherine Ladish, a/k/a Katherine Ladesh, a/k/a Kate Ladesh or Kate Ladish involving Michael Armstrong.*

*rec'd 11-10-98*

RITA FULLER
CLERK

By: *T. KCCl*
DEPUTY CLERK

*NOVEMBER 9, 1998*
DATE

(Witness Claim and Instructions On Reverse)

**RETURN**

I certify that I served this subpoena in *Kansas City   Jackson* County, MO by:
☒ delivering a copy to the person subpoenaed *Linda Wilson*
☐ reading a copy to the person subpoenaed
on this *Tenth* day of *November* 19 *98* .

*No fee tendered*

☐ I tendered legal fees for travel expenses per 491.130 RSMo. in the amount of $ _____
*agree to appear without payment. Sgt. Murphy*

*Glenn D Manis*

| FEES | _____ |
| MILEAGE | _____ |
| TOTAL $ | 0 |

*D. Manis*
PERSON SERVING SUBPOENA

WP902966
001448   Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| MISSOURI FORM #309 9-85 | SUBPOENA<br>ORDER TO APPEAR/PRODUCE DOCUMENTS/GIVE DEPOSITIONS | CASE NUMBER<br>CV197-6789 DR |
|---|---|---|

IN THE CIRCUIT COURT OF                                   CLAY COUNTY, DIVISION III

KATHERINE LADISH
A/K/A KATHERINE LADESH

VS.                        Plaintiff(s)

MICHAEL ARMSTRONG

                           Defendant(s)

STATE OF MISSOURI TO CHIEF ZEPHRY BINGHAM
City of Pleasant Valley Mo

ADDRESS 6801 SUBBIE
Pleasant Valley Mo.

ATTORNEY OR PARTY REQUESTING Glenn D. Manis
ADDRESS 8416 NE Boump Ave #104
Kansas City Mo. 64155
TELEPHONE 816-436-7294

PLAINTIFF'S ATTORNEY John Chick
ADDRESS 2691 Kendallwood Pkwy.
Kansas City, Mo. 64119
TELEPHONE 816-455-2525

DEFENDANT'S ATTORNEY Glenn Manis
ADDRESS 8416 NE Boump Ave #104
Kansas City Mo 64155
TELEPHONE 816-436-7294

THE STATE OF MISSOURI TO: CHIEF ZEPHRY BINGHAM

YOU ARE HEREBY COMMANDED:

☒ TO APPEAR AT Div. III Clay County Circuit Court, 11 S. Water Liberty, Mo
ON November 10, 19 98 AT 9:00 A.M.

☐ TO CONTACT (NAME) _____ AT (TELEPHONE) _____ WHO WILL ADVISE
OF TIME AND PLACE APPEARANCE IS REQUIRED.

☒ TO TESTIFY ON BEHALF OF: Defendant

☐ TO GIVE DEPOSITIONS

☒ TO BRING THE FOLLOWING: ALL RECORDS OR POLICE REPORTS OF ANY KIND
on complaints filed by KATHERINE LADISH or KATHERINE LADESH
involving Michael Armstrong.

Rec'd
11-10-95

NOVEMBER 9, 1998
DATE

                                        RITA FULLER
                                          CLERK

By: _____
                                    DEPUTY CLERK

(Witness Claim and Instructions On Reverse)

RETURN

I certify that I served this subpoena in Pleasant Valley, Clay _____ County, MO by:
☒ delivering a copy to the person subpoenaed
☐ reading a copy to the person subpoenaed
on this Ninth _____ day of November 19 98.

☐ Itendered legal fees for travel expenses per 491.130 RSMo. in the amount of $ 0 .

                                Glenn D. Manis

FEES _____
MILEAGE _____
TOTAL $ 0                        PERSON SERVING SUBPOENA

WP902967
001449 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| MISSOURI FORM #309 9-85 | SUBPOENA<br>ORDER TO APPEAR/PRODUCE DOCUMENTS/GIVE DEPOSITIONS | CASE NUMBER<br>CV197-6789 DR |
|---|---|---|

IN THE CIRCUIT COURT OF _____ CLAY COUNTY, DIVISION

_Katherine Ladish_
_a/k/a Katherine Ladesh_

VS.                    Plaintiff(s)

_Michael Armstrong_

                       Defendant(s)

| STATE OF MISSOURI TO _Shellie Gilmor or Capt. Jay Rogers Clay County Missouri Sheriff's Dept_ | PLAINTIFF'S ATTORNEY _John Chick_ |
|---|---|
| ADDRESS _11 S. Water Street Liberty, Mo 64068_ | ADDRESS _2601 Kendallwood Pkwy Kansas City, Mo 64119_<br>TELEPHONE _816-455-2525_ |
| ATTORNEY OR PARTY REQUESTING _Glenn Manis_ | DEFENDANT'S ATTORNEY _Glenn Manis_ |
| ADDRESS _8016 NE Boone Ave Kansas City Mo 64155_ | ADDRESS _8016 NE Boone Ave #104 Kansas City, Mo 64155_ |
| TELEPHONE _816-436-7294_ | TELEPHONE _816-436-7294_ |

THE STATE OF MISSOURI TO: _____

YOU ARE HEREBY COMMANDED:

☒ TO APPEAR AT _Division III Clay County Circuit Court, 11 S. Water, Liberty, Mo. 64068_
ON _November 10_ , 19 _98_ AT _9:00_ A.M.

☐ TO CONTACT (NAME) _____ AT (TELEPHONE) _____ WHO WILL ADVISE OF TIME AND PLACE APPEARANCE IS REQUIRED.

☒ TO TESTIFY ON BEHALF OF: _Defendant_

☐ TO GIVE DEPOSITIONS

☒ TO BRING THE FOLLOWING: _All records or reports on complaints filed by_
_Katherine Ladish, a/k/a Katherine Ladesh involving Michael Armstrong._

_Rec'd 11-10-98_

_RITA FULLER_
CLERK

NOVEMBER 9, 1998
DATE

By: _T. Rico_
DEPUTY CLERK

(Witness Claim and Instructions On Reverse)

**RETURN**

I certify that I served this subpoena in _Liberty, Clay_ _____ County, MO by:

☒ delivering a copy to the person subpoenaed
☐ reading a copy to the person subpoenaed
on this _Ninth_ day of _November_ 19 _98_ .

☒ Itendered legal fees for travel expenses per 491.130-RSMo. in the amount of $ __0__ .

FEES _____
MILEAGE _____
TOTAL $ _0_

_Glenn D. Manis_

PERSON SERVING SUBPOENA

WP002968
001450 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| MISSOURI FORM #309 9-85 | **SUBPOENA** | | CASE NUMBER |
|---|---|---|---|
| | **ORDER TO APPEAR/PRODUCE DOCUMENTS/GIVE DEPOSITIONS** | | CV197-6789 DR |

| IN THE CIRCUIT COURT OF | | CLAY COUNTY, DIVISION |
|---|---|---|

KATHERINE LADISH
ALSO KNOWN AS
KATHELINE LADESH.
VS.                    Plaintiff(s)

MICHAEL ARMSTRONG

Defendant(s)

**STATE OF MISSOURI TO** JANICE CARTER
CITY OF LIBERTY a MARK MISENHELTER
**ADDRESS** 101 E. KANSAS
Liberty, Mo 64068

**ATTORNEY OR PARTY REQUESTING** Glenn D. Manis
**ADDRESS** SUITE NE Boone Ave #104
Kansas City, Mo 64155
**TELEPHONE** 816-436-7294

**PLAINTIFF'S ATTORNEY** John Chick
**ADDRESS** 2601 Kendallwood Pkwy
Kansas City, Mo
**TELEPHONE** 816-455-2575

**DEFENDANT'S ATTORNEY** Glenn D. Manis
**ADDRESS** SUITE NE Boone Ave #104
Kansas City, Mo 64155
**TELEPHONE** 816-436-7294

THE STATE OF MISSOURI TO: City of Liberty, Police Records Custodian Janice Carter

YOU ARE HEREBY COMMANDED:

[X] TO APPEAR AT Division III Clay County Circuit Court 11 S. Water, Liberty Mo 64068
ON November 10, , 19 98 AT 9:00 A.M.

[ ] TO CONTACT (NAME) _____ AT (TELEPHONE) _____ WHO WILL ADVISE
OF TIME AND PLACE APPEARANCE IS REQUIRED.

[X] TO TESTIFY ON BEHALF OF: Defendant

[ ] TO GIVE DEPOSITIONS

[ ] TO BRING THE FOLLOWING: All Police Reports on Katheline Ladish or
Katherine Ladesh Regarding Michael Armstrong.

NOVEMBER 9, 1998
DATE

RITA FULLER
CLERK

By: _____ T. K.
DEPUTY CLERK

(Witness Claim and Instructions On Reverse)

**RETURN**

I certify that I served this subpoena in _____ County, MO by:

[ ] delivering a copy to the person subpoenaed
[ ] reading a copy to the person subpoenaed
on this _____ day of _____ 19 _____.

[ ] tendered legal fees for travel expenses per 491.130 RSMo in the amount of $ _____ .

FEES _____
MILEAGE _____
TOTAL $ _____

PERSON SERVING SUBPOENA

WP002960
0014451 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
LIBERTY, MISSOURI

KATHRINE LADISH, )
                 Petitioner, )      **Division Number THREE**
                )
v. )      **Case Number CV197-006789DR**
                )
MICHAEL ARMSTRONG, )
                 Respondent. )

## NOTICE TO CALL UP MOTION

**TO: JOHN CHICK, ATTORNEY FOR PETITIONER, ANITA BURNS.**

Your are hereby notified that on the 10th day of November, 1998, at 9:00, A.M. or

as soon thereafter as counsel can be heard, Respondent's attorney will call up for hearing

in Division Three of the Clay County Circuit Court of the State of Missouri at 11 S.

Water, Liberty, Missouri, Petitioner's Motion to Set Aside the Extended Full Order of

Protection.

GLENN D. MANIS, #24729
8416 NE Boone Ave., #104
Kansas City, Missouri 64155
816-436-7294

## Certificate of Mailing

I certify that I have mailed by ordinary mail of the United States Postal Service a
copy of this Notice to JOHN CHICK, Petitioner's Attorney at 2601 Kendallwood,
Parkway, Kansas City, Missouri 64110, this 27nd day of October, 1998.

GLENN D. MANIS

**FILED**

OCT 27 1998

TIME:

Clay County Circuit Court

001452 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

FILED

OCT 2 7 1998

TIME:

*Rita Fuller*
Clay County Circuit Court

**IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
AT LIBERTY, MISSOURI**

KATHERINE LADISH,                )
          Petitioner,      )      **Division Number THREE**
                                     )
vs.                              )      **Case Number   CV197-006789DR**
                                       )
MICHAEL ARMSTRONG,               )
          Respondent.      )

## MOTION TO SET ASIDE EXTENDED FULL ORDER OF PROTECTION

COMES NOW, MICHAEL ARMSTRONG, Respondent, by and through his

attorney, GLENN D. MANIS, and for his motion to set aside the Extended Full Order of

Protection against Respondent, states as follows:

1.     No service of process was made upon the Respondent notifying him of

        any hearing as exemplified by the return of the Sheriff's Officer showing

        the summons was returned non-est to the Court Clerk.

2.     Local custom, if not due process under the Constitution of the United

        States of America and the State of Missouri, requires the Respondent be

        notified in accordance with Section 455.040 et. al.al. R S.Mo., at least five

        days before a hearing, even though the Statute only requires three days

        notice.

3.     There is no jurisdiction to proceed without notice and if the Respondent

        had been given notice he would have presented a case of libel for false

        swearing to this Court against Kathrine Ladish, Petitioner, as the only

        police reports she filed in Kansas City according to the Kansas City police

        department is against her own husband and the damages he has done and

1

not against the Respondent. No formal police reports, as alleged by Petitioner, could be located against Respondent and only one telephone call made to the Pleasant Valley, Missouri was to inform them of an alleged incident but not to take any action.

4. The incidents alleged in her original motion did not occur. Even if they had, then no new incidents were cited. Therefore the only reason the Petitioner could want to extend the order of protection is to continue to harass Petitioner, since he has a petition on file against her for wrongful termination, age and sex discrimination, from before the filing of these allegations; and, to have it on his record so that when he attempts to carry out investigations it serves as a form of embarrassment with the police and jail officials.

WHEREFORE, the Respondent respectfully requests the Court to set aside the entry of the Order of this Court to Extend the Full Order of Protection against Respondent for another year and to terminate the Full Order of Protection against the Respondent.

Respectfully submitted:

GLENN D. MANIS, #24729
ATTORNEY FOR RESPONDENT
8416 NE BOONE AVE. #104
KANSAS CITY, MISSOURI 64155
816-436-7294

2

WP002972
001454 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

STATE OF MISSOURI )
                 ) ss.
COUNTY OF CLAY    )

## VERIFICATION

I, Michael Armstrong, hereby acknowledge that I have read the above Petition and the facts therein are true and accurate to the best of my knowledge and belief and I was not served with a copy of the motion or notice to appear in the circuit court nor was I present in the courtroom when this matter was called before the court and I believe it violated my constitutional right to have my position heard by the Court and further I believe the local petition used by the Court requires service be made upon me no later than five days before my motion is to be heard. Further, affiant saith not.

_____
Michael Armstrong, Respondent-Movant

Comes before me, a Notary Public, on the 27 day of Oct , 1998, Michael Armstrong, known to me to be the Respondent-affiant in the above pleading and he states he did read the above Petition and acknowledge that he is over eighteen years of age and under no mental disability or physical duress and that he has signed the verification as his own free act and deed.

_____
Notary Public

My Commission expires:

DONNA L. MATTHEWS
Notary Public - Notary Seal
STATE OF MISSOURI
Clay County
My Commission Expires: May 4, 1999

## CERTIFICATION OF MAILING

I hereby certify that I have by ordinary mail sent a copy of this Motion to Set Aside the Extended Full Order of Protection this 27th day of October, 1998 to: JOHN CHICK, ATTORNEY FOR PETITIONER, Katherine Ladish, 2601 Kendallwood Pkwy., Kansas City, Missouri 64119.

_____
GLENN D. MANIS,
ATTORNEY FOR RESPONDENT

3

WP002973
001455  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 024043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789DR |
|---|---|---|

MAKE RETURN ON REVERSE SIDE AND RETURN THIS WRIT TO CLAY COUNTY

**IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION THREE , IN LIBERTY, MO**

RESPONDENT INFORMATION

SERVICE ADDRESS

KATHERINE LADESH

Petitioner

RECEIVED

SEP 16 1998

CLAY COUNTY SHERIFF
LIBERTY, M

VS.

MICHAEL ARMSTRONG

Respondent

Liberty, Mo. 64068

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY
This is to certify that the foregoing is a true and correct copy of the documents on file in my office. Witness my hand and official seal this ___ day of_____ 1998
Clerk of Circuit Court, RITA FULLER

**RESPONDENT'S RELATIONSHIP TO PETITIONER**

☐ SPOUSE      ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE  [x] OTHER

THE STATE OF MISSOURI TO _____ MICHAEL ARMSTRONG _____, RESPONDENT:
The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on __9-30-97__. The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is held.

THEREFORE, IT IS ORDERED THAT the full order of protection that was issued against you on __9-30-97__, a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

IT IS FURTHER ORDERED THAT Petitioner's motion to renew the order of protection against you be set for hearing on __September 30, 1998__ at __9:00A__ M., in Division __Three__ of the Circuit Court of Clay County in Liberty, Missouri.

__September 16, 1998__
Date

/s/ W C Turnage /
Judge

## INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

Form 123   6/90

WP902974
**001456** Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

## SHERIFF'S RETURN OF SERVICE

I hereby certify that I served the within order and petition by delivering a c ~~...~~ ~~.. .. of the petition to the~~ Respondent.

Served in _____

**SHERIFF'S FEES**

SERVICE FEE  $ _____

MILEAGE      $ _____

TOTAL        $ _____

_____, 19___.

I hereby certify that I attempted to serve the within Civil Process in the County of Clay, State of Missouri on the ___ day of _____, 199__ by searching diligently for and failing to find the within named defendant(s) _Michal Ramsey_

NON EST

FEE: .35⁰⁰

Served by _Meg Cantor_

FF _____

~~DEPUTY~~ SHERIFF _____



F I L E D

SEP 30 1998

.TIME:

RITA FULLER, Clerk
Clay County Circuit Court

WP002975
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 0240043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789DR |
|---|---|---|

**IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION THREE , IN LIBERTY, MO**

KATHERINE LADESH

_____ Petitioner

VS.

MICHAEL ARMSTRONG

_____ Respondent

**RESPONDENT INFORMATION**

SERVICE ADDRESS

▆▆▆▆▆▆▆▆

Liberty, Mo. 64068

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY.
This is to certify that the foregoing is a true and correct copy of the documents on file in my office Witness my hand and official seal this _____ day of _____ 1998
Clerk of Circuit Court RITA FULLER)
By _____ D.C

**RESPONDENT'S RELATIONSHIP TO PETITIONER**

☐ SPOUSE          ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE  ☒ OTHER

THE STATE OF MISSOURI TO _____ MICHAEL ARMSTRONG _____, RESPONDENT:
The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on ___ 9-30-97 ___. The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo. an ex parte order of protection should issue until a hearing is held.

THEREFORE, IT IS ORDERED THAT the full order of protection that was issued against you on ___ 9-30-97 ___, a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

IT IS FURTHER ORDERED THAT Petitioner's motion to renew the order of protection against you be set for hearing on ___ September 30, 1998 ___ at ___ 9:00A M., in Division ___ Three ___ of the Circuit Court of Clay County in Liberty, Missouri.

___ September 16, 1998 ___
Date

/s/ WC Turnage
Judge

**INSTRUCTIONS TO CLERK**

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

Form 123   6/90

001458   Printed by Clay County Microfilm Department on May 19, 2015 at 16:41



IN THE CIRCUIT COURT OF **CLAY** COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER | 024043J | | |
|---|---|---|---|---|
| ☐ CIRCUIT/NO. _____ | CASE NUMBER | | | CERTIFIED COPY |
| ☐ ASSOCIATE/NO. _____ | | CV197-6789DR | STATE OF MISSOURI COUNTY OF CLAY, This is to certify that the foregoing is a true and |

PETITIONER

KATHERINE LADESH

correct copy of the documents on file in my office. Witness my hand and official seal this ___ day of ____ 1998
Clerk of Circuit Court, RITA FULLER
By_____ DC

VS.

D.O.B., AGE OR SOC. SEC. #

RESPONDENT'S HOME ADDRESS:

▇▇▇▇▇ Liberty, Mo. 64068

(DATE FILE STAMP)

RESPONDENT

MICHAEL ARMSTRONG

▇▇▇▇▇▇▇▇▇▇▇▇▇

SEX [ ] F [X] M
D.O.B., AGE OR SOC. SEC. # ▇▇▇▇▇

RESPONDENT'S WORK ADDRESS:

RESPONDENT'S RELATIONSHIP TO PETITIONER
[ ] SPOUSE  [ ] EX-SPOUSE  [ ] RELATED BY BLOOD/MARRIAGE
[X] OTHER ___ Stalking

APPEARANCES: [ ] PETITIONER [ ] PETITIONER'S ATTORNEY [ ] RESPONDENT [ ] RESPONDENT'S ATTORNEY [ ] OTHER _____

## ADULT ABUSE
## FULL ORDER OF PROTECTION
### Also used for Consent Orders and Extensions of Full Orders of Protection

(Check Applicable Statement)

[ ] The petitioner has filed a petition requesting issuance of an order of protection and a notice was served together with a copy of the petition to the respondent at least three days prior to the hearing. The matter was heard and submitted to the Court, and upon due consideration of the matter, the Court finds pursuant to Section 455.040 RSMo that the petitioner has proved the allegations of abuse or stalking.

[X] The petitioner and respondent submit this Consent Judgment and request that the Court order the following:

————————————— ORDER (Only Those Provisions Checked Apply) —————————————

[X] This order replaces and supersedes the ex parte order of protection entered in this cause on (date) **9/16/97**, and serves as notice of termination of that order.

[ ] This order extends the full order of protection entered in this cause on (date) _____ and serves as notice of termination of that order.

[X] Respondent shall not stalk, abuse, threaten to abuse, molest or disturb the peace of petitioner wherever the petitioner may be.

[X] Respondent shall not enter or stay upon the premises of the dwelling of petitioner, located at _____ ▇▇▇▇▇▇▇▇▇▇▇ KCMO or WHEREVER SHE MAY BE

[ ] Respondent shall not transfer, encumber or otherwise dispose of the following property mutually owned or leased with petitioner: _____

[ ] Petitioner to be given temporary possession of the following personal property: _____

[ ] Respondent shall participate in the court approved counseling program for
[ ] batterers [ ] substance abuse treatment at _____ beginning _____.

[ ] Custody of child(ren) is awarded as follows:
Child's Name                    Person to Receive Custody

[ ] The following visitation schedule is established:

[ ] Respondent to pay child support as follows: $_____ per child per _____ with first payment due (date)_____.

OSCA (4-96) AA20  #119

455.010-455.085, RSMo

Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

[ ] Respondent to pay maintenance to petitioner as follows: $ _____ per month/week with first payment due (date) _____.

[ ] Petitioner/respondent shall execute an income assignment for: [ ] child support          [ ] maintenance

[ ] Respondent to pay petitioner's rent or mortgage in the amount of $_____ per _____ to _____ with first payment due (date) _____.

[ ] Respondent shall pay for housing or other services provided to the petitioner by a shelter for victims of domestic violence in the amount of $_____ per _____ to _____ with first payment due (date)_____.

[ ] Petitioner/respondent shall pay to the petitioner/respondent the amount of $_____ for the cost of maintaining or defending this action.

[ ] Petitioner/respondent shall pay to the petitioner/respondent attorney's fees in the amount of $_____ .

[ ] Court costs are assessed to _____ N/A _____.

THIS ORDER SHALL BE EFFECTIVE UNTIL (DATE) 9/29/98 _____, UNLESS SOONER TERMINATED OR EXTENDED. VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

9/30/97
DATE                                    SO ORDERED: _____
                                                              JUDGE

CONSENT ORDERS ONLY

This consent is not to be taken as an admission by respondent that the allegations contained in the petition are true; however, respondent consents to the above orders being issued.

_____              _____
PETITIONER'S SIGNATURE                  RESPONDENT'S SIGNATURE

_____              _____
ATTORNEY FOR PETITIONER'S SIGNATURE      ATTORNEY FOR RESPONDENT'S SIGNATURE

**NOTICE TO THE PERSON OBLIGATED TO PAY SUPPORT OR MAINTENANCE**
**(Pursuant to Section 452.350)**

Effective January 1, 1994, for every order for child support or maintenance entered or modified by the court under the authority of Chapter 452 or otherwise, income withholding under Section 452.350 RSMo shall be initiated on the effective date of the order unless the court finds there is good reason not to require immediate income withholding or a written agreement between the parties provides for an alternative arrangement.

**INSTRUCTIONS TO CLERK**

1. A copy of the order of protection shall be issued to the petitioner, the respondent, and the law enforcement agency (police or sheriff) in the city or county where the petitioner resides.
2. A copy of the order of protection shall be issued the same day the order is granted to the law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).
3. A copy of the order of protection shall be served upon or mailed by certified mail to the respondent(s) at their last known address.

**SHERIFF'S OR SERVER'S RETURN (Not Required for Consent Order)**

I certify that I served a copy of this order by delivering a copy to the respondent.

Served at (address)_____

on (date)_____

**SHERIFF'S FEES (if applicable)**

Service Fee   $_____        Mileage   $_____   (_____ miles @ $_____ per mile)
Non Est       $_____        Total     $_____

_____
SHERIFF

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY,
This is to certify that the foregoing is a true and correct copy of the documents on file in my office. Witness my hand and official seal this ____ day of _____
Clerk of Circuit Court, RITA FULLER
By _____ D.C.

001460   Printed by Clay County Microfilm Department on May 19, 2015 at 16:41
WP902978

KATHERINE LADESH
PETITIONER

VS.                                    No. _____

Michael Armstrong
RESPONDENT

## ADULT/CHILD ABUSE SERVICE INFORMATION

RESPONDENTS WORK ADDRESS                    RESPONDENTS HOME ADDRESS

Unknown                          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
COMPANY NAME                              STREET ADDRESS

_____          Liberty, Mo.        64068
STREET ADDRESS                    CITY      STATE        ZIP

_____          Clay              781 - 8315
CITY     STATE     ZIP            COUNTY            PHONE NUMBER

NATURE OF WORK: Unknown     WORK HOURS: ____ TO ____ WORK PHONE: _____

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

Unknown                          Unknown
PLACE OR NAME                    PLACE OR NAME

_____          _____
STREET ADDRESS                   STREET ADDRESS

_____          _____
CITY     STATE     ZIP           CITY     STATE     ZIP

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT Approx: 5'2" to 6'5"  WEIGHT Approx: 150-170  COLOR OF HAIR It. brown w/ gray  DOB ▮▮▮▮▮▮

RACE W   SOCIAL SECURITY# ▮▮▮▮▮▮▮▮   HAIR LENGTH/STYLE short, balding on top

VISIBLE IDENTIFYING MARKS (e.g. tattoos, birthmarks, braces, beard, pierced ear, etc.)

often wears ball cap

_____

NICKNAMES  Mic

MAKE OF CAR: Ford   MODEL: Bronco   YEAR: 1988   COLOR: Gray   LICENSE# _____

ADDITIONAL INFORMATION  Yes - prior SIS Assault
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124   5/90

001461    WP902979
Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF   CLAY   COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER   024043 |
|---|---|
| [ ] CIRCUIT/NO. _____ | |
| [ ] ASSOCIATE/NO _____ | CASE NUMBER   CV197-6789DR |

PETITIONER

KATHERINE LADESH

VS.

D.O.B., AGE OR SOC. SEC. #

RESPONDENT

MICHAEL ARMSTRONG

11-5-45

SEX [ ] F [X] M   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
D.O.B., AGE OR SOC. SEC. #

RESPONDENT'S HOME ADDRESS:

846 York Place
Liberty, Mo. 64068

(DATE FILE STAMP)

RESPONDENT'S WORK ADDRESS:

RESPONDENT'S RELATIONSHIP TO PETITIONER
[ ] SPOUSE      [ ] EX-SPOUSE      [ ] RELATED BY BLOOD/MARRIAGE
[X] OTHER   Stalking

APPEARANCES:   [ ] PETITIONER   [ ] PETITIONER'S ATTORNEY   [ ] RESPONDENT   [ ] RESPONDENT'S ATTORNEY   [ ] OTHER _____

## ADULT ABUSE
## FULL ORDER OF PROTECTION
### Also used for Consent Orders and Extensions of Full Orders of Protection

(Check Applicable Statement)

[ ] The petitioner has filed a petition requesting issuance of an order of protection and a notice was served together with a copy of the petition to the respondent at least three days prior to the hearing. The matter was heard and submitted to the Court, and upon due consideration of the matter, the Court finds pursuant to Section 455.040 RSMo that the petitioner has proved the allegations of abuse or stalking.

[X] The petitioner and respondent submit this Consent Judgment and request that the Court order the following:

──────────── ORDER (Only Those Provisions Checked Apply) ──────────── 9/16/97

[X] This order replaces and supersedes the ex parte order of protection entered in this cause on (date) 9/16/97, and serves as notice of termination of that order.

[ ] This order extends the full order of protection entered in this cause on (date) _____ and serves as notice of termination of that order.

[X] Respondent shall not stalk, abuse, threaten to abuse, molest or disturb the peace of petitioner wherever the petitioner may be.

[X] R██████████████████████ the premises of the dwelling of petitioner, located at _____ CcMo   n WHETEVEN SHE MAISc

[ ] Respondent shall not transfer, encumber or otherwise dispose of the following property mutually owned or leased with petitioner: _____

[ ] Petitioner to be given temporary possession of the following personal property: _____

[ ] Respondent shall participate in the court approved counseling program for _____
[ ] batterers   [ ] substance abuse treatment   at _____ beginning _____

[ ] Custody of child(ren) is awarded as follows:
Child's Name                    Person to Receive Custody

[ ] The following visitation schedule is established:

[ ] Respondent to pay child support as follows: $ _____ per child per _____ with first payment due (date) _____

466,010-466 086, RSMo

OSCA (4-86) AA20   #119

Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

001462

[  ] Respondent to pay maintenance to petitioner as follows: $ _____ per month/week
with first payment due (date) _____ .

[  ] Petitioner/respondent shall execute an income assignment for:  [  ] child support        [  ] maintenance

[  ] Respondent to pay petitioner's rent or mortgage in the amount of $_____ per _____ to
_____ with first payment due (date) _____ .

[  ] Respondent shall pay for housing or other services provided to the petitioner by a shelter for victims of domestic violence in
the amount of $_____ per _____ to_____
with first payment due (date)_____ .

[  ] Petitioner/respondent shall pay to the petitioner/respondent the amount of $_____ for the cost of
maintaining or defending this action.

[  ] Petitioner/respondent shall pay to the petitioner/respondent attorney's fees in the amount of $_____ .

[  ] Court costs are assessed to _____ N/A _____ .

THIS ORDER SHALL BE EFFECTIVE UNTIL (DATE) 9/29/98 _____ , UNLESS SOONER TERMINATED OR EXTENDED.
VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE
OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

9/30/97
DATE

9/30/98 This order extended to 9/30/99 .

SO ORDERED: _____
CONSENT ORDERS ONLY                          JUDGE

This consent is not to be taken as an admission by respondent that the allegations contained in the petition are true; however,
respondent consents to the above orders being issued.

_____          _____
PETITIONER'S SIGNATURE                      RESPONDENT'S SIGNATURE

_____          _____
ATTORNEY FOR PETITIONER'S SIGNATURE          ATTORNEY FOR RESPONDENT'S SIGNATURE

**NOTICE TO THE PERSON OBLIGATED TO PAY SUPPORT OR MAINTENANCE**
(Pursuant to Section 452.350)

Effective January 1, 1994, for every order for child support or maintenance entered or modified by the court under the authority of
Chapter 452 or otherwise, income withholding under Section 452.350 RSMo shall be initiated on the effective date of the order
unless the court finds there is good reason not to require immediate income withholding or a written agreement between the parties
provides for an alternative arrangement.

**INSTRUCTIONS TO CLERK**

1. A copy of the order of protection shall be issued to the petitioner, the respondent, and the law enforcement agency (police or
sheriff) in the city or county where the petitioner resides.
2. A copy of the order of protection shall be issued the same day the order is granted to the law enforcement agency responsible
for maintaining the Missouri Uniform Law Enforcement System (MULES).
3. A copy of the order of protection shall be served upon or mailed by certified mail to the respondent(s) at their last known
address.

**SHERIFF'S OR SERVER'S RETURN (Not Required for Consent Order)**

I certify that I served a copy of this order by delivering a copy to the respondent.

Served at (address)_____

on (date)_____ at (time)_____ M.

**SHERIFF'S FEES (If applicable)**

Service Fee    $_____    Mileage    $_____ (_____ miles @ $_____ per mile)
Non Est        $_____    Total      $_____ _____
                                                          SHERIFF

WP902981
001463 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 024043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789DR |
|---|---|---|

### IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION THREE , IN LIBERTY, MO

| | RESPONDENT INFORMATION |
|---|---|
| KATHERINE LADESH Petitioner | SERVICE ADDRESS ▆▆▆▆▆▆ Liberty, Mo. 64068 |
| VS. | |
| MICHAEL ARMSTRONG Respondent ▆▆▆▆▆▆▆▆ | RESPONDENT'S RELATIONSHIP TO PETITIONER ☐ SPOUSE    ☐ EX-SPOUSE ☐ RELATED BY BLOOD/MARRIAGE ☒ OTHER |

**THE STATE OF MISSOURI TO** _____ MICHAEL ARMSTRONG _____, RESPONDENT: The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on ___ 9-30-97 ___. The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is held.

**THEREFORE, IT IS ORDERED THAT** the full order of protection that was issued against you on ___ 9-30-97 ___, a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

**IT IS FURTHER ORDERED THAT** Petitioner's motion to renew the order of protection against you be set for hearing on ___ September 30, 1998 ___ at 9:00A M., in Division ___ Three ___ of the Circuit Court of Clay County in Liberty, Missouri.

_____ September 16, 1998 _____
Date

_____ [signature] _____
Judge

### INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

Form 123    6/90

WP902982
**001464**
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 024043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789 DR |
|---|---|---|

IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION _____ , IN LIBERTY, MO

KATHERINE LADESH
_____
Petitioner

VS.

MICHAEL ARMSTRONG
_____
Respondent

**RESPONDENT INFORMATION**

SERVICE ADDRESS

████████████

LIBERTY, MO  64068

**RESPONDENT'S RELATIONSHIP TO PETITIONER**

☐ SPOUSE          ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE ☒ OTHER

THE STATE OF MISSOURI TO _____ MICHAEL ARMSTRONG _____, RESPONDENT:
The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on ____ 09-30-97 ____. The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is held.

THEREFORE, IT IS ORDERED THAT the full order of protection that was issued against you on ____ 09-30-97 ____, a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

IT IS FURTHER ORDERED THAT Petitioner's motion to renew the order of protection against you be set for hearing on ____ 7-16-98 ____ at 9:00 A.M., in Division ____ 3 ____ of the Circuit Court of Clay County in Liberty, Missouri.

____9/2/98____
Date

____James Welsh____
Judge

**INSTRUCTIONS TO CLERK**

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

Form 123   6/90

WP902923
001465  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

[ ] Respondent to pay maintenance to petitioner as follows: $ _____ per month/week
with first payment due (date) _____.

[ ] Petitioner/respondent shall execute an income assignment for: [ ] child support    [ ] maintenance

[ ] Respondent to pay petitioner's rent or mortgage in the amount of $_____ per _____ to
_____ with first payment due (date) _____.

[ ] Respondent shall pay for housing or other services provided to the petitioner by a shelter for victims of domestic violence in
the amount of $_____ per _____ to _____
with first payment due (date)_____.

[ ] Petitioner/respondent shall pay to the petitioner/respondent the amount of $_____ for the cost of
maintaining or defending this action.

[ ] Petitioner/respondent shall pay to the petitioner/respondent attorney's fees in the amount of $_____.

[ ] Court costs are assessed to _____ N/A _____.

THIS ORDER SHALL BE EFFECTIVE UNTIL (DATE) 9/29/98 _____, UNLESS SOONER TERMINATED OR EXTENDED.
VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE
OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

9/30/97 _____    SO ORDERED: _____
DATE                                                      JUDGE

CONSENT ORDERS ONLY

This consent is not to be taken as an admission by respondent that the allegations contained in the petition are true; however,
respondent consents to the above orders being issued.

_____          _____
PETITIONER'S SIGNATURE                                RESPONDENT'S SIGNATURE

_____          _____
ATTORNEY FOR PETITIONER'S SIGNATURE          ATTORNEY FOR RESPONDENT'S SIGNATURE

**NOTICE TO THE PERSON OBLIGATED TO PAY SUPPORT OR MAINTENANCE**
(Pursuant to Section 452.350)

Effective January 1, 1994, for every order for child support or maintenance entered or modified by the court under the authority of
Chapter 452 or otherwise, income withholding under Section 452.350 RSMo shall be initiated on the effective date of the order
unless the court finds there is good reason not to require immediate income withholding or a written agreement between the parties
provides for an alternative arrangement.

**INSTRUCTIONS TO CLERK**

1. A copy of the order of protection shall be issued to the petitioner, the respondent, and the law enforcement agency (police or
sheriff) in the city or county where the petitioner resides.
2. A copy of the order of protection shall be issued the same day the order is granted to the law enforcement agency responsible
for maintaining the Missouri Uniform Law Enforcement System (MULES).
3. A copy of the order of protection shall be served upon or mailed by certified mail to the respondent(s) at their last known
address.

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY, I certify that the foregoing is a true and
correct copy of the documents on file in my office
Witness my hand and official seal this 3rd
day of Sept 1998
Clerk of Circuit Court, RITA FULLER
By _____ D.C.
at (time) _____ M.

**SHERIFF'S OR SERVER'S RETURN (Not Required for Consent Orders)**

I certify that I served a copy of this order by delivering a copy to the respondent.

Served at (address)_____

on (date)_____

**SHERIFF'S FEES (if applicable)**

Service Fee  $_____    Mileage  $_____  (_____ miles @ $_____ per mile)
Non Est      $_____    Total    $_____

_____
SHERIFF

001466  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF    CLAY    COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER | 024043J |
|---|---|---|
| ☐ CIRCUIT/NO. _____ | | |
| ☐ ASSOCIATE/NO. _____ | CASE NUMBER | CV197-6789DR |

| PETITIONER | RESPONDENT'S HOME ADDRESS: |
|---|---|
| KATHERINE LADESH | ▓▓▓▓▓▓▓▓▓▓▓▓ |
| | Liberty, Mo. 64068 |
| D.O.B., AGE OR SOC. SEC. #          VS. | (DATE FILE STAMP) |

| RESPONDENT | RESPONDENT'S WORK ADDRESS: |
|---|---|
| MICHAEL ARMSTRONG | |
| ▓▓▓▓▓▓▓▓ | RESPONDENT'S RELATIONSHIP TO PETITIONER |
| | [ ] SPOUSE     [ ] EX-SPOUSE     [ ] RELATED BY BLOOD/MARRIAGE |
| SEX [ ] F  [X] M | [X] OTHER ____ Stalking |
| D.O.B., AGE OR SOC. SEC. # ▓▓▓▓▓▓ | |

APPEARANCES:  [ ] PETITIONER  [ ] PETITIONER'S ATTORNEY  [ ] RESPONDENT  [ ] RESPONDENT'S ATTORNEY  [ ] OTHER _____

## ADULT ABUSE
## FULL ORDER OF PROTECTION
### Also used for Consent Orders and Extensions of Full Orders of Protection

(Check Applicable Statement)

[ ] The petitioner has filed a petition requesting issuance of an order of protection and a notice was served together with a copy of the petition to the respondent at least three days prior to the hearing. The matter was heard and submitted to the Court, and upon due consideration of the matter, the Court finds pursuant to Section 455.040 RSMo that the petitioner has proved the allegations of abuse or stalking.

[✓] The petitioner and respondent submit this Consent Judgment and request that the Court order the following:

———————————— ORDER (Only Those Provisions Checked Apply) ————————————

[X] This order replaces and supersedes the ex parte order of protection entered in this cause on (date) 9/16/97 , and serves as notice of termination of that order.

[ ] This order extends the full order of protection entered in this cause on (date) _____ and serves as notice of termination of that order.

[X] Respondent shall not stalk, abuse, threaten to abuse, molest or disturb the peace of petitioner wherever the petitioner may be.

[X] Respondent shall not enter or stay upon the premises of the dwelling of petitioner, located at _____ KCMO    or WHEREVER SHE MAY BE

[ ] Respondent shall not transfer, encumber or otherwise dispose of the following property mutually owned or leased with petitioner: _____

[ ] Petitioner to be given temporary possession of the following personal property: _____

[ ] Respondent shall participate in the court approved counseling program for
    [ ] batterers   [ ] substance abuse treatment   at _____ beginning _____.

[ ] Custody of child(ren) is awarded as follows:
    Child's Name                          Person to Receive Custody

[ ] The following visitation schedule is established:

[ ] Respondent to pay child support as follows: $_____ per child per _____ with first payment due (date)_____.

OSCA (4-96) AA20  #119                                         455.010-455 085, RSMo

001467
WP902985
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 024043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789 DR |
|---|---|---|

### IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION          , IN LIBERTY, MO

KATHERINE LADESH
_____
                        Petitioner

VS.

MICHAEL ARMSTRONG
_____
                        Respondent

**RESPONDENT INFORMATION**

SERVICE ADDRESS

8████████████████████

LIBERTY, MO   64068

**RESPONDENT'S RELATIONSHIP TO PETITIONER**

☐ SPOUSE                              ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE  ☒ OTHER

---

THE STATE OF MISSOURI TO _____ MICHAEL ARMSTRONG _____, RESPONDENT:
The above-named Petitioner has filed a motion to renew the full order of protection that
was issued against you on _____ 09-30-97 _____. The Court has determined that a
hearing cannot be held on this motion before the order expires and that, pursuant to
Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is
held.

THEREFORE, IT IS ORDERED THAT the full order of protection that was issued against you
on _____ 09-30-97 _____, a copy of which is attached, shall remain in full force and
effect until the date of the hearing as set forth below.

IT IS FURTHER ORDERED THAT Petitioner's motion to renew the order of protection against
you be set for hearing on ___ 7-16-98 ___ at 9:00 P.M., in Division _3_
of the Circuit Court of Clay County in Liberty, Missouri.

_____          _____
            Date                                      Judge

---

### INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally
   served upon Respondent forthwith and not less than 5 days prior to the date of
   hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law
   enforcement agency (police or sheriff) in the city or county where Petitioner
   resides.

4. A copy of the ex parte order of protection shall be issued the same day the order
   is granted to the local law enforcement agency responsible for maintaining the
   Missouri Uniform Law Enforcement System (MULES).

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY.
This is to certify that the foregoing is a true and
correct copy of the documents on file in my office
Witness my hand and official seal this ___
day of _____ 1998
Clerk of Circuit Court, RITA FULLER
By _____

Form 123    6/90

001468  by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

KATHERINE LADESIH
PETITIONER

VS.                              No. _____

Michael Armstrong
RESPONDENT

## ADULT/CHILD ABUSE SERVICE INFORMATION

RESPONDENTS WORK ADDRESS                    RESPONDENTS HOME ADDRESS

Unknown
COMPANY NAME

_____          Liberty, Mo.          64068
STREET ADDRESS                     CITY        STATE        ZIP

_____          Clay          781 - 8315
CITY    STATE    ZIP               COUNTY        PHONE NUMBER

NATURE OF WORK: Unknown      WORK HOURS: ____ TO ____ WORK PHONE: _____

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

Unknown                            Unknown
PLACE OR NAME                      PLACE OR NAME

_____          _____
STREET ADDRESS                     STREET ADDRESS

_____          _____
CITY    STATE    ZIP               CITY    STATE    ZIP

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT Approx: 5'2" to 5'5"  WEIGHT Approx: 150-170  COLOR OF HAIR lt. brown gray  DOB ▮▮▮▮

RACE W    SOCIAL SECURITY# ▮▮▮▮▮    HAIR LENGTH/STYLE Short balding on top

VISIBLE IDENTIFYING MARKS (e.g. ta▮▮▮▮eard, pierced ear, etc.)

often wears ball cap

_____

NICKNAMES Mic

MAKE OF CAR: Ford   MODEL: Bronco   YEAR: 1988   COLOR: Gray   LICENSE# _____

ADDITIONAL INFORMATION Yes - prior SIS Assault
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124   5/90

WP902987
**001469** Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

WP002008 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

0014/0

# FILED

## SEP 14 1998

TIME:

RITA FULLER, Clerk
Clay County Circuit Court

I hereby certify that I attempted to serve the within Civil Process in the
County of Clay, State of Missouri on the 14 day of September,
199 8 by searching diligently for and failing to find the within named
defendant(s) MICHAEL ARMSTRONG

NON EST

FEE: 25.00

Served by _____ To Constner

Gamble To Constner

| STATE OF MISSOURI<br>ORI No. 024043J | ADULT ABUSE<br>ORDER EXTENDING FULL ORDER OF PROTECTION<br>(EX PARTE) | MAKE RETURN ON REVERSE SIDE AN.<br>RETURN THIS WRIT TO CLAY COUNTY | CASE NUMBER<br>CV197CLAY8898DR |
|---|---|---|---|

IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION ____ , IN LIBERTY, MO

| KATHERINE LADESH<br>_____<br>Petitioner<br><br>VS.<br><br>MICHAEL ARMSTRONG<br>_____<br>Respondent | RESPONDENT INFORMATION<br>SERVICE ADDRESS<br><br>LIBERTY, MO    **RECEIVED**<br><br>**SEP 0 3 1998**<br><br>**CLAY COUNTY SHERIFF**<br>**LIBERTY, MO** |
|---|---|

RESPONDENT'S RELATIONSHIP TO PETITIONER

☐ SPOUSE       ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE ☒ OTHER

THE STATE OF MISSOURI TO _____ MICHAEL ARMSTRONG _____ , RESPONDENT:
The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on _____ 09-30-97 _____ . The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is held.

THEREFORE, IT IS ORDERED THAT the full order of protection that was issued against you on _____ 09-30-97 _____ , a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

IT IS FURTHER ORDERED THAT Petitioner's motion to renew the order of protection against you be set for hearing on ____ 7-16-98 ____ at 9:00 A.M., in Division __3__ of the Circuit Court of Clay County in Liberty, Missouri.

_____      _____
Date                             Judge

### INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY,
This is to certify that the foregoing is a true and correct copy of the documents on file in my office
Witness my hand and official seal this ____
day of _____ Sept _____ 199_
Clerk of Circuit Court, RITA FULLER
By _____   D.C./Deputy

Form 123   6/90

001471
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

| STATE OF MISSOURI ORI No. 024043J | ADULT ABUSE ORDER EXTENDING FULL ORDER OF PROTECTION (EX PARTE) | CASE NUMBER CV197-6789DR |
| --- | --- | --- |

**IN THE CIRCUIT COURT OF CLAY COUNTY, DIVISION THREE , IN LIBERTY, MO**

KATHERINE LADESH
_____ Petitioner

VS.

MICHAEL ARMSTRONG
_____ Respondent

**RESPONDENT INFORMATION**

SERVICE ADDRESS

████████████████

Liberty, Mo. 64068

**RESPONDENT'S RELATIONSHIP TO PETITIONER**

☐ SPOUSE          ☐ EX-SPOUSE

☐ RELATED BY BLOOD/MARRIAGE [x] OTHER

---

**THE STATE OF MISSOURI TO** _____ MICHAEL ARMSTRONG _____ , **RESPONDENT:**
The above-named Petitioner has filed a motion to renew the full order of protection that was issued against you on ____9-30-97____ . The Court has determined that a hearing cannot be held on this motion before the order expires and that, pursuant to Section 455.040 RSMo, an ex parte order of protection should issue until a hearing is held.

**THEREFORE, IT IS ORDERED THAT** the full order of protection that was issued against you on ____9-30-97____ , a copy of which is attached, shall remain in full force and effect until the date of the hearing as set forth below.

**IT IS FURTHER ORDERED THAT** Petitioner's motion to renew the order of protection against you be set for hearing on __September 30, 1998__ at _9:00A_ M., in Division __Three__ of the Circuit Court of Clay County in Liberty, Missouri.

_____September 16, 1998_____
Date

_____
Judge

---

### INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally served upon Respondent forthwith and not less than 5 days prior to the date of hearing.

2. A copy of the ex parte order of protection shall be issued to the Petitioner.

3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where Petitioner resides.

4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

Form 123    6/90

WP802099

001472

Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF  **CLAY**  COUNTY, MISSOURI

**FILED**

| DIVISION | COURT ORI NO. | |
|---|---|---|
| ☐ CIRCUIT/NO. ____ | 024043J | |
| ☐ ASSOCIATE/NO. ____ | CASE NO. CV197-6789DR | |

TIME: **SEP 0 1 1998**  9:35

*Rita Fuller*

Clay County Circuit Court
(DATE FILE STAMP)

| PETITIONER | RESPONDENT'S HOME ADDRESS: |
|---|---|
| KATHERINE LADESH | ███████████ |
| D.O.B., AGE OR SOC. SEC. #: | VS. |

| RESPONDENT | RESPONDENT'S WORK ADDRESS: |
|---|---|
| MICHAEL ARMSTRONG | |

RESPONDENT'S RELATIONSHIP TO PETITIONER

[ ] SPOUSE  [ ] EX-SPOUSE  [ ] RELATED BY BLOOD/MARRIAGE
[X] OTHER  ·Stalking

SEX [ ] F  [X] M
D.O.B., AGE OR SOC. SEC. #: ███████

## ADULT ABUSE
## MOTION FOR RENEWAL OF FULL ORDER OF PROTECTION

The petitioner requests that the court renew the Full Order of Protection that was issued in this case on 9/30/97 and terminates on 9/29/98 for the reason that:

DATE                    DATE

[X] The allegations in the Petition for the Order of Protection still exist on this date.
[ ] The following incidents of abuse have occurred since the date the petition was filed:

_____

_____

[ ] Other reasons: _____

_____

Pursuant to 455.040 RSMo, the petitioner requests that the court renew the Full Order of Protection for such time as is necessary to protect the petitioner, at least 180 days, and not more than one year.

I swear the facts stated in the above motion are true according to my best knowledge and belief.

PETITIONER'S SIGNATURE

Subscribed and sworn to before me  *August 17, 1998*

DATE

My commission expires  *11-25-2000*    *Joyce M. Bryant*

NOTARY PUBLIC

CLERK

(Notary seal: JOYCE M BRYANT, NOTARY PUBLIC, STATE OF MISSOURI)

~~JUDGE~~

John E. Chick, Jr.    #23771

ATTORNEY'S NAME, MISSOURI BAR NO., IF APPLICABLE

2601 Kendallwood Parkway #103

ADDRESS

Kansas City, MO   64119

(816) 455-2525

TELEPHONE

OSCA (9-96) AA26  #121

455.040 RSMo

**001473**

WP902991  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41



# Office of the Clay County Circuit Clerk

**RITA FULLER, Circuit Clerk  Seventh Judicial Circuit**

Clay County Courthouse, 11 South Water, P.O. Box 218, Liberty, Missouri 64068          816/792-7704

## COMPUTER ENTRY INFORMATION SHEET

## CLAY COUNTY SHERIFF DEPARTMENT

**PETITIONER**

LAST NAME __Ladesh__    FIRST NAME __Katherine__    M.I. _____

RACE __W__    SEX __F__    DOB _____    AGE _____

SOCIAL SECURITY # _____    PHONE # _____

HOUSE # ██████    STREET ██████    APT # _____

CITY __Kansas City__    STATE __MO__    RELATIONSHIP _____

**RESPONDENT**

LAST NAME __Armstrong__    FIRST NAME __Michael__    M.I. _____

RACE __W__    SEX __M__    DOB ██████    AGE __53__

SOCIAL SECURITY # ██████    PHONE # _____

HOUSE # ██████    STREET ██████    APT # _____

CITY __Liberty__    STATE __MO__    RELATIONSHIP _____

Note: Attach FORM17 for Juvenile

Form153  8/95

**001474**
WP902992
Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

KATHERINE E. LADESH
_____
PETITIONER

VS.                                    No.  CV197-6789DR
_____

MICHAEL ARMSTRONG
_____
RESPONDENT

## ADULT/CHILD ABUSE SERVICE INFORMATION

RESPONDENTS WORK ADDRESS                    RESPONDENTS HOME ADDRESS

UNKNOWN
_____                     ████████████████
COMPANY NAME                                                  ADDRESS

_____                     Liberty      Missouri    64068
STREET ADDRESS                              CITY         STATE          ZIP

                                            Clay
CITY       STATE       ZIP                  COUNTY            PHONE NUMBER

NATURE OF WORK: _____  WORK HOURS: ____ TO ____  WORK PHONE: _____

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

PLACE OR NAME                               PLACE OR NAME

STREET ADDRESS                              STREET ADDRESS

CITY       STATE       ZIP        CITY      STATE          ZIP

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT 5' 6" WEIGHT 170  COLOR OF HAIR Brown  DOB _____

RACE W    SOCIAL SECURITY# ████████  HAIR LENGTH/STYLE short

VISIBLE IDENTIFYING MARKS (e.g. tattoos, birthmarks, braces, beard, pierced ear, etc.)

_____

_____

NICKNAMES "Mic" _____

MAKE OF CAR: Ford  MODEL: _____ YEAR: _____ COLOR: bl/gray LICENSE# _____

ADDITIONAL INFORMATION _____
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124   5/90

WP902993
001475  Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
AT LIBERTY, MISSOURI

**FILED**

SEP 2 9 1997

TIME:

*Rita Fuller*

Clay County Circuit Court

IN RE ADULT ABUSE            ]
EX PARTE ORDER OF PROTECTION ]
                             ]
KATHERINE LADESH,            ]
                             ]
                Petitioner,  ]
                             ]
        and                  ]        Case No.  CV197-6789DR
                             ]
MICHAEL ARMSTRONG,           ]        Div. III
                             ]
                Respondent.  ]

## APPLICATION FOR CONTINUANCE

COMES NOW Respondent, Michael Armstrong, and moves the Court to grant a continuance in the above styled case. In support of Respondent's application it is stated and alleged as follows:

1.    The Respondent was served on September 25, 1997 during a trial which lasted most of the day.

2.    The Respondent's attorney, Glenn Manis, attempted to change his schedule on Friday but could not and is engaged in trial in Division 8 of this Court.

3.    The Respondent retained Julie Cooper on Saturday September 27, 1997.

4.    Several persons need to be subpoenaed for trial and the petition states that several police reports were made apparently with several different police departments. These police reports were unavailable over the weekend.

WP002994
001476  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

5.     The Respondent needs at least a week to prepare for trial.

6.     This request for a continuance is not made for reasons of delay and the

Respondent has no objection to the continuance of the ex parte order of protection remaining

in force until the next setting.

7.     Counsel for the Petitioner, John Chick, has been contacted but has not

agreed to a continuance.

WHEREFORE the Respondent prays this court continue this matter for at least

one week and for suh other relief as is just and proper.

JULIE R. COOPER, #24552
6812 North Oak Trafficway, Suite 5
Gladstone, Missouri 64118-2587
(816) 436-3100 FAX (816) 436-8643
ATTORNEY FOR PETITIONER

MICHAEL ARMSTRONG

STATE OF MISSOURI     ]
                      ] ss.
COUNTY OF CLAY        ]

On this 29th day of September, 1997, before me, the undersigned
Notary Public in and for said state, personally appeared MICHAEL ARMSTRONG, known
to me to be the person who executed the foregoing Application for Continuance, swore to
me that the facts stated therein were true to the best of his knowledge and belief and that he
executed the same as his free act and deed.

2

WP002995
001477 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

_Janet K. Berls_
Notary Public

My Commission Expires:

JANET K BERLS
NOTARY PUBLIC STATE OF MISSOURI
CLAY COUNTY
MY COMMISSION EXP SEPT 27, 2000

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Application for Continuance was faxed to John Chick at 816-455-2528 on September 29, 1997.

_Julie R. Cooper_
JULIE R. COOPER

3

WP002996
0014478  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI RETURN ON REVERSE SIDE AND RETURN THIS WRIT TO CLAY COUNTY

| DIVISION | COURT ORI NUMBER | 024043J |
|---|---|---|
| ☐ CIRCUIT/NO. | | |
| ☐ ASSOCIATE/NO. | CASE NUMBER | CV197-6789DR |

CERTIFIED COPY
STATE OF MISSOURI COUNTY OF CLAY.
This is to certify that the foregoing is a true and correct copy of the documents on file in my office. Witness my hand and official seal this _____ day of _____ 19__
Clerk of Circuit Court RITA FULKER
By _____ D.C.
( DATE FILE STAMP )

| PETITIONER | RESPONDENT'S HOME ADDRESS |
|---|---|
| KATHERINE LADESH | |
| | Liberty, Mo. 64068 |
| D.O.B., AGE OR SOC. SEC. #   VS. | |

| RESPONDENT | RESPONDENT'S WORK ADDRESS: |
|---|---|
| MICHAEL ARMSTRONG | |

RESPONDENT'S RELATIONSHIP TO PETITIONER
[ ] SPOUSE    [ ] EX-SPOUSE    [ ] RELATED BY BLOOD/MARRIAGE
[X] OTHER ____ Stalking

SEX [ ] F [X] M
D.O.B., AGE OR SOC. SEC. #

## ADULT ABUSE
## EX PARTE ORDER OF PROTECTION

THE STATE OF MISSOURI TO ____ MICHAEL ARMSTRONG ____, RESPONDENT:

The petitioner has filed a verified petition requesting an order of protection, and pursuant to Sections 455.035 to 455.045 RSMo, the Court finds there is an immediate and present danger of abuse to petitioner, or petitioner has been a victim of stalking by respondent, and there is good cause to issue an order of protection. See reverse side for definitions of "abuse" and "stalking".

THEREFORE, THE COURT ORDERS, YOU ____ MICHAEL ARMSTRONG ____, THE RESPONDENT, NOT TO:

[X] Abuse, threaten to abuse, molest or disturb the peace of the petitioner; or _____
[X] Stalk the petitioner; or
[X] Enter or stay upon the premises of the dwelling of the petitioner, located at _____

WHEREVER SHE MAY BE _____

[ ] _____

IT IS FURTHER ORDERED that custody of the children be awarded, until further order of the Court, as follows:

| Child's Name | Person to Receive Custody |
|---|---|

RECEIVED
SEP 16 1997
CLAY COUNTY SHERIFF
LIBERTY, MO

VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

The hearing of this cause shall be in Division ___3___ of the Circuit Court of ____ Clay ____

County, in ____ Liberty ____ Missouri at 9:00 A. M. on Sept. 30 1997.
                                                          DATE

____ SEP 16 1997 ____                SO ORDERED: _____
DATE                                                      JUDGE

OSCA (4-96) AA10A  #118                                          455 035 - 455.045 RSMo

001479   Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

## NOTICE TO RESPONDENT

You are notified that under Section 455.050 RSMo if the court finds in favor of the petitioner or you default, the court may grant any of the following forms of relief to the petitioner:

1. Order the respondent not to stalk, abuse, threaten to abuse, molest or disturb the peace of the petitioner wherever the petitioner may be;
2. Order the respondent not to enter upon the premises of the dwelling of the petitioner;
3. Order the respondent not to transfer, encumber or otherwise dispose of the mutually owned or leased property;
4. Grant temporary possession of property as specified;
5. Order respondent to participate in court approved counseling for batterers and/or substance abuse treatment;
6. Award custody of minor children;
7. Establish a visitation schedule;
8. Award child support and/or maintenance to the petitioner;
9. Order the respondent to make an assignment of earnings or other income;
10. Order the respondent to pay petitioner's rent or mortgage;
11. Order the respondent to pay for housing or other services provided to the petitioner by a shelter;
12. Order the respondent to pay court costs;
13. Order the respondent to pay the petitioner for the cost of maintaining or defending the action;
14. Order the respondent to pay petitioner's attorney fees.

FILED
SEP 26 1997
TIME:
*Rita Fuller*
Clay County Circuit C...

## DEFINITION OF ABUSE

You are notified that under Section 455.010 RSMo the term "abuse" includes, but is not limited to:
1. the occurrence of, or
2. attempt to do, or
3. threats to do any of the following acts against the petitioner:
   (a) purposely or knowingly placing or attempting to place petitioner in fear of physicial harm;
   (b) purposely or knowingly causing physical harm to petitioner with or without a deadly weapon;
   (c) compelling petitioner by force or threat of force to engage in conduct from which the petitioner has a right to abstain or to abstain from conduct in which the petitioner has a right to engage;
   (d) engaging in a purposeful or knowing course of conduct involving more than one incident that alarms or causes distress to petitioner and serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress to the petitioner. Such conduct might include but is not limited to:
   a. Following petitioner about in a public place or places;
   b. Peering in the window or lingering outside the residence of the petitioner;
   (e) causing or attempting to cause petitioner to engage involuntarily in any sexual act by force, threat of force, or duress; or
   (f) holding, confining, detaining or abducting petitioner against the petitioner's will.

## DEFINITION OF STALKING

You are notified that under Section 455.010(10) RSMo, the term "stalking":
is when a person purposely and repeatedly harasses or follows with the intent of harassing another person. As used in this subdivision, "harass" means to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress. As used in this subdivision, "course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose.

## INSTRUCTIONS TO CLERK

1. The ex parte order of protection and a copy of the petition must be personally served upon respondent forthwith and not less than 3 days prior to the date of the hearing.
2. A copy of the ex parte order of protection shall be issued to the petitioner.
3. A copy of the ex parte order of protection shall be issued to the local law enforcement agency (police or sheriff) in the city or county where petitioner resides.
4. A copy of the ex parte order of protection shall be issued the same day the order is granted to the local law enforcement agency responsible for maintaining the Missouri Uniform Law Enforcement System (MULES).

## SHERIFF'S OR SERVER'S RETURN

I hereby certify that I served the within order and petition by delivering a copy of the order and a copy of the petition to the respondent.

Served at (address) *Clay Co Court House 115 Water St, Liberty, Mo* on (date) *9-25-97* at (time) *9:50 AM*.

### SHERIFF'S FEES (if applicable)

Service Fee $_____
Mileage $_____ (_____ miles @ $_____ per mile)
Total $ *35.00*

SHERIFF OR SERVER

WP902998
001480   Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

KATHERINE LADESIT
_____
PETITIONER

VS.

No. **RECEIVED**

SEP 16 1997

Michael Armstrong
_____
RESPONDENT

**CLAY COUNTY SHERIFF
LIBERTY, MO**

## ADULT/CHILD ABUSE SERVICE INFORMATION

RESPONDENTS WORK ADDRESS

Unknown
_____
COMPANY NAME

_____
STREET ADDRESS

_____
CITY        STATE        ZIP

NATURE OF WORK: Unknown     WORK HOURS: ____ TO ____ WORK PHONE: _____

RESPONDENTS HOME ADDRESS

_____
STREET ADDRESS

Liberty, Mo.        64068
_____
CITY        STATE        ZIP

Clay            781-8315
_____
COUNTY          PHONE NUMBER

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

Unknown
_____
PLACE OR NAME

_____
STREET ADDRESS

_____
CITY        STATE        ZIP

Unknown
_____
PLACE OR NAME

_____
STREET ADDRESS

_____
CITY        STATE        ZIP

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT Approx: 5'2" to 5'5"  WEIGHT Approx: 150-170  COLOR OF HAIR lt. brown gray  DOB ▮▮▮▮

RACE W     SOCIAL SECURITY# ▮▮▮▮     HAIR LENGTH/STYLE Short balding on top

VISIBLE IDENTIFYING MARKS (e.g. tattoos. birthmarks, braces. beard. pierced ear. etc.)

often wears ball cap    has a mustache

1988 Ford Bronco 2 Tone Gray

NICKNAMES Mic

MAKE OF CAR: Ford   MODEL: Bronco  YEAR: 1988  COLOR: Gray  LICENSE# _____

ADDITIONAL INFORMATION Yes - prior SIS Assault
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124    5/90

001481  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

**IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**SEVENTH JUDICIAL CIRCUIT**
Liberty, MO  64068

KATHERINE LADESH
_____
                    Plaintiff

vs.                                             Case No. CV197-6789

MICHAEL ARMSTRONG
_____
                    Defendant

## REQUEST FOR SERVICE

Pursuant to Supreme Court Rule 54.01, I hereby request that the summons issued in the

above case be returned to me to be served by someone over the age of eighteen and who is not a

party to this action.

9-18-97
_____                         _____
        Date                                            Plaintiff

Form 112  10/94                                 **FILED**

                                                TIME:   **SEP 18 1997**

                                                Clay County Circuit Court

001482    Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF    **CLAY**    COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER | 024043J | |
|---|---|---|---|
| ☐ CIRCUIT/NO. _____ | | | |
| ☐ ASSOCIATE/NO. _____ | CASE NUMBER | CV197-6789DR | |

| PETITIONER | RESPONDENT'S HOME ADDRESS | |
|---|---|---|
| KATHERINE LADESH | ██████████ | |
| | Liberty, Mo. 64068 | |
| D.O.B., AGE OR SOC. SEC. # | VS. | (DATE FILE STAMP) |

| RESPONDENT | RESPONDENT'S WORK ADDRESS: |
|---|---|
| MICHAEL ARMSTRONG | |
| ██████████ | RESPONDENT'S RELATIONSHIP TO PETITIONER |
| | [ ] SPOUSE    [ ] EX-SPOUSE    [ ] RELATED BY BLOOD/MARRIAGE |
| SEX [ ] F  [X] M | [X] OTHER ___Stalking___ |
| D.O.B., AGE OR SOC. SEC. # | |

## ADULT ABUSE
## EX PARTE ORDER OF PROTECTION

THE STATE OF MISSOURI TO _____MICHAEL ARMSTRONG_____, RESPONDENT:

The petitioner has filed a verified petition requesting an order of protection, and pursuant to Sections 455.035 to 455.045 RSMo, the Court finds there is an immediate and present danger of abuse to petitioner, or petitioner has been a victim of stalking by respondent, and there is good cause to issue an order of protection. See reverse side for definitions of "abuse" and "stalking".

THEREFORE, THE COURT ORDERS, YOU _____MICHAEL ARMSTRONG_____, THE RESPONDENT, NOT TO:

[X] Abuse, threaten to abuse, molest or disturb the peace of the petitioner; or _____
[X] Stalk the petitioner; or
[X] Enter or stay upon the premises of the dwelling of the petitioner, located at _____

WHEREVER SHE MAY BE _____

[ ] _____

_____

IT IS FURTHER ORDERED that custody of the children be awarded, until further order of the Court, as follows:

| Child's Name | Person to Receive Custody |
|---|---|
| | |

VIOLATION OF THIS ORDER MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR AS LONG AS FIVE YEARS AND BY A FINE OF AS MUCH AS FIVE THOUSAND DOLLARS.

IF SO ORDERED BY THE COURT, THE RESPONDENT IS FORBIDDEN TO ENTER OR STAY AT THE PETITIONER'S RESIDENCE.

The hearing of this cause shall be in Division ___3___ of the Circuit Court of ___Clay___

County, in ___Liberty___ Missouri at _9:00 A_ M. on _Sept. 30 1997_.
DATE

___NOV 8 SEP 1 6 1997___    SO ORDERED: _[signature]_
DATE                                              JUDGE

OSCA (4-96) AA10A #118                                              455 035 - 455.045 RSMo

Case 2:19-cv-00414-JPH-DLP   Document 23-37   Filed 09/12/19   Page 45 of 344   PageID #: 4924

## RECORDING LOG — UNCONTESTED MATTERS

Date Sept 16, 1997    Tape No. 1459   Circuit 7    County Clay

Division 3 in 5    Senior Judge R. K. Elliott    Length of time of recording _____ hrs. _____ min.

Log made by Ki

Appointing Authority for Above (check one).

Actual time spent in courtroom for purpose of recording. _____ hrs. _____ min.

Circuit Clerk ☑   Associate Circuit Judge ☐   Probate Judge ☐   Other (Designate) _____

| CASE NUMBER | STYLE OF CASE/DESCRIPTION | INDEX NUMBER | IDENTIFICATION | PLAINTIFF ATTORNEY | DEFENDANT ATTORNEY |
|---|---|---|---|---|---|
| CW197-6789DR | Ladesh vo. Armstrong (AA) | 681 | J | | ● |
| | | 688 | J T | | |
| | | 692 | Oath TT | | |
| | | 697 | J V.D TT | | |
| | | 882 | J — | | |
| | | 887 | J TT | | |
| | | 896 | End | | |
| | | | | | ● |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Form # 523      REV 5-88

WP903002

001484 Printed By Clay County Microfilm Department on May 19, 2015 at 16:41

# IN THE SUPREME COURT OF MISSOURI

## EN BANC

**August 27, 1997**

Pursuant to the provisions of Section 26(3) of Article V of the Constitution of Missouri, it is ordered that:

THE FOLLOWING JUDICIAL PERSONNEL:

**THE HONORABLE R KENNETH ELLIOTT  (13984), RETIRED**

BE ASSIGNED AS A SENIOR JUDGE WITH CONSENT TO THE FOLLOWING COURT OR DISTRICT:

**07th JUDICIAL CIRCUIT**

FOR THE PERIOD:

**MONDAY, SEPTEMBER 15, 1997  TO   FRIDAY, SEPTEMBER 19, 1997**
**CIRCUIT COURT OF CLAY COUNTY**

Jurisdiction of matters and cases undertaken during the period shall extend beyond the period for any actions necessary to complete the assignement, including after-trial proceedings.

_____
DUANE BENTON, CHIEF JUSTICE

STATE OF MISSOURI - SCT.:

I, THOMAS F. SIMON, Clerk of the Supreme Court of Missouri, do hereby certify that the foregoing is a true copy of the order of said court, entered on August 27, 1997 as fully as the same appears of record in my office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Supreme court.  Done at office in the city of Jefferson, State aforesaid, August 27, 1997.

Clerk

D.C.

TN#   4032

001485  Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF **CLAY** COUNTY, MISSOURI

| DIVISION | COURT ORI NUMBER | 024043J |
| --- | --- | --- |
| ☐ CIRCUIT/NO. ____ | | |
| ☐ ASSOCIATE/NO. ____ | CASE NUMBER | CV197-6789DR |

| PETITIONER | RESPONDENT'S HOME ADDRESS: |
| --- | --- |
| KATHERINE LADESH | ██████ |
| D.O.B., AGE OR SOC. SEC. # Age 39    VS. | Liberty, Mo 64068     [DATE FILE STAMP] |

| RESPONDENT | RESPONDENT'S WORK ADDRESS: |
| --- | --- |
| MICHAEL L. ARMSTRONG | Unknown |
| SEX [ ]F [X]M | |
| D.O.B., AGE OR SOC. SEC. # ██████ | |

**FILED**

SEP 16 1997

TIME: 11:50 am

_Peter Friller_

**ADULT ABUSE**
**PETITION FOR ORDER OF PROTECTION**

1. I am the petitioner and    [X] at least 18 years of age    [ ] under 18 but emancipated Clay County Circuit Co.

2. The respondent is    [X] at least 18 years of age    [ ] under 18 but emancipated

3. An act of abuse or stalking as stated below occurred at: (Address, City, County, State)
7-2-96 - Threat of harm at vally one Stop - 8906 Liberty Drive
9-15-96 - Threat of harm and damage to personal property

4. Respondent and I: (check one or more)
[ ] are spouses    [ ] are related by blood    [ ] were related by marriage
[ ] were spouses    [ ] have a child in common    [X] have no relationship other than respondent has stalked me
[ ] are or were residing together    [ ] are related by marriage

5. Respondent and I: (check one or more)
[ ] reside together
[ ] previously resided together at:
[X] never resided together

6. The residence in which I live is: (check one or more)
[ ] jointly owned, leased or rented and jointly occupied by respondent and me
[ ] owned, leased or rented by me
[ ] owned, leased or rented by me and someone other than respondent
[ ] owned, leased or rented by someone else but respondent is my spouse

7. The respondent has intentionally: (check at least one)
[ ] caused physical harm to me    [ ] sexually assaulted me
[ ] attempted to physically harm me    [ ] unlawfully imprisoned me
[X] placed me in apprehension of immediate physical harm    [ ] coerced me
[X] harassed me    [X] stalked me

Dec., 1995 - Respondent walked up to me at Wal-mart (Liberty) And said 'Fuck You' Police
7-2-96 Respondent Threatened me with bodily harm (report on file)
9-6-97 A large rock was thrown thru my front door and my

8. I am afraid of respondent and there is an immediate and present danger of abuse to or stalking of me because: (describe)

7. cont - neighbor saw a person with glasses in an old model, dark
color BLAZER or Bronco driving back And forth in
9-15-97 front of my house immediately prior to (Police report on)
cont.

OSCA (4-96) AA 40

001486    Printed by Clay County Microfilm Department on May 19, 2015 at 16:41
WP903004

Address (if other than Petitioner)     Relationship to Parties     Persons to Receive Custody

N/A

by (check one or both)     [ ] temporary order of custody     [ ] full order of custody

10. Indicate any court cases pending or orders entered by this Court or another Court regarding the above children and the parties (if none, so state).

N/A

11. Pursuant to Section 455.010 to Section 455.085 RSMo, I request that the court issue an order of protection, restraining respondent from: (check boxes that apply)

[X] abusing, threatening to abuse, molesting or disturbing my peace

[X] stalking me

[ ] entering the premises of my dwelling located at:

X Coming Anywhere onto my property or place of employmn.

12. I request that the respondent be ordered to: (check boxes that apply)

[ ] Pay child support because the respondent is able and I am in need of child support in the amount of $_____ per child, per week/month.

[ ] Pay maintenance because the respondent is able and I am in need of maintenance in the amount of $_____ per child, per week/month.

[ ] Pay my attorney fees.     [ ] Make an assignment of periodic earnings or other income.

[ ] Be permitted visitation as directed by the Court.     [ ] Be required to attend counseling.

[ ] Pay rent or mortgage in the amount of $_____ per _____     [ ] Pay for victim shelter services.

[ ] Be prohibited from transferring, encumbering, or disposing of owned or leased marital property or personal property of mine.

[ ] Provide me with the following personal property:

[X] Pay court costs.

I swear the facts stated in the above petition are true according to my best knowledge and belief.

_____
PETITIONER'S SIGNATURE/ADDRESS (UNLESS DISCLOSURE WAIVED)

_____

Subscribed and sworn to before me this ___16th___ day of ___Sept___, 1997

My commission expires: _____

_____
NOTARY PUBLIC          JUDGE          CLERK

_____
ATTORNEY'S NAME AND MISSOURI BAR NUMBER (IF APPLICABLE)

_____
ADDRESS

_____

_____

_____
TELEPHONE

Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

WP903005

001487

9-15-97  An unknown male called my office asked for me and identified himself to my secretary as 'Deputy Johnson' when I picked up the phone and said 'Hello' the man said the following:

I'm a friend of somebody and if Anita doesn't throw out the charges, what happened at your house a couple of weeks ago, won't be anything.

The unknown male then hung up on me. (Police incident report on file)

Note: Anita Burns, a close friend and work associate presently is the victim in a municipal criminal case pending against Respondent. He is alleged to have threatened to harm Ms. Burns.

Note: Mr Armstrong was fired by Ms Laursh on 9-5-95 at which time he threatened retaliation.

001488  Filmed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

KATHERINE LADESH
_____
PETITIONER

VS.

No. _____

Michael Armstrong
_____
RESPONDENT

## ADULT/CHILD ABUSE SERVICE INFORMATION

| RESPONDENTS WORK ADDRESS | RESPONDENTS HOME ADDRESS |
|---|---|
| Unknown | ████████████ |
| COMPANY NAME | STREET ADDRESS |
| | Liberty, Mo.    64068 |
| STREET ADDRESS | CITY    STATE    ZIP |
| | Clay    781 - 8315 |
| CITY    STATE    ZIP | COUNTY    PHONE NUMBER |

NATURE OF WORK: Unknown    WORK HOURS: ____ TO ____ WORK PHONE: _____

### OTHER LOCATIONS WHERE RESPONDENT MAY BE FOUND
(Do Not List Bars and Drinking Establishments)

| Unknown | Unknown |
|---|---|
| PLACE OR NAME | PLACE OR NAME |
| STREET ADDRESS | STREET ADDRESS |
| CITY    STATE    ZIP | CITY    STATE    ZIP |

### RESPONDENTS DESCRIPTION
(Attach Photo if Available)

RESPONDENTS HEIGHT Approx: 5'2" to 6'5"  WEIGHT Approx: 150-170  COLOR OF HAIR lt. brown to gray  DOB ████████████

RACE W    SOCIAL SECURITY# ████████    HAIR LENGTH/STYLE Short balding on top

VISIBLE IDENTIFYING MARKS (e.g. tattoos, birthmarks, braces, beard, pierced ear, etc.)

often wears ball cap
_____

NICKNAMES Mic

MAKE OF CAR: Ford  MODEL: Bronco  YEAR: 1988  COLOR: Gray  LICENSE# _____

ADDITIONAL INFORMATION Yes - prior SIS Assault
(e.g. DOES RESPONDENT HAVE A PRIOR CRIMINAL RECORD, CARRY A WEAPON, FIREARM, ETC.)

Form 124    5/90

WP903007
001489 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41



# Office of the Clay County Circuit Clerk

### RITA FULLER, Circuit Clerk  Seventh Judicial Circuit

Clay County Courthouse, 11 South Water, P.O. Box 218, Liberty, Missouri 64068          816/792-7704

## COMPUTER ENTRY INFORMATION SHEET

## CLAY COUNTY SHERIFF DEPARTMENT

**PETITIONER**

LAST NAME _LADESH_          FIRST NAME _KATHERINE_    M.I. _E_

RACE _W_          SEX _F_    DOB _████_          AGE _39_

SOCIAL SECURITY # _████_          PHONE # _SILENT_

HOUSE # _████_    STREET _████_          PT # _____

CITY _K.C.,_          STATE _MO_    RELATIONSHIP _____

**RESPONDENT**

LAST NAME _ARMSTRONG_    FIRST NAME _MICHAEL_    M.I. _L_

RACE _W_          SEX _M_    DOB _████_          AGE _52_

SOCIAL SECURITY # _████_          PHONE # _781-8315_

HOUSE # _████_    STREET _████_          APT # _____

CITY _LIBERTY_          STATE _MO_    RELATIONSHIP _____

Note: Attach FORM17 for Juvenile

Form153  8/95

001490  Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

# IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

Katherine Ladesh
_____ PETITIONER

VS

Michael Armstrong
_____ RESPONDENT

Case No. _____

Division No. _____

(N/A)

## FINANCIAL STATEMENT

1. **INCOME**

   A. **EMPLOYMENT (Company, Address, Phone No.):**

      1. Petitioner: _____

         _____

         Salary: $_____ per _____

      2. Respondent: _____

         _____

         Salary: $_____ per _____

   B. **WELFARE**        $_____

   C. **OTHER INCOME**   $_____

2. **ASSETS**

   A. **CASH**           $_____

   B. **BANK ACCOUNT**   $_____

   C. **HOME - IF OWNED**
      Owned by:
      _____ Petitioner
      _____ Respondent
      _____ Other

      Value         $_____

      Amount Owed   $_____

      People living in home:
      _____ Petitioner
      _____ Respondent
      _____ Children
      _____ Other(s)

Form 152   8/90                          Page 1

WP903009
001491 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

D. <u>VEHICLES (Cars, Etc.)</u>

Value $ _____

Amount Owed $ _____

3. <u>DEBTS</u>

A. <u>LOANS</u>

Balance $ _____

Monthly Payment $ _____

B. <u>CREDIT CARDS, ETC.</u>

Balance $ _____

Monthly Payment $ _____

4. <u>EXPENSES</u>

A. <u>RENT</u> ☐          <u>MORTGAGE</u> ☐

$ _____ per month

B. <u>UTILITIES (Gas, Water, Electricity, Telephone)</u>

$ _____ per month

C. <u>AUTOMOBILE (Gas, Maintenance, Payments)</u>

$ _____ per month

D. <u>FOOD, CLOTHING, MEDICAL, RECREATION, SCHOOL</u>

$ _____ per month

Children's Expenses

$ _____ per month

E. <u>OTHER</u>

$ _____ per month

_____          _____
DATE                                      PETITIONER

Subscribed and sworn to before me on _____, 19____

_____          _____
Deputy Clerk                              Notary Public

Form 152A   11/90                    Page 2

WP903010
001492 Printed by Clay County Microfilm Department on May 19, 2015 at 16:41

IN THE CIRCUIT COURT OF
CLAY COUNTY, MISSOURI
FAMILY COURT

In Re the Matter of:                      )
                                          )
Katherine Ladesh .                        )
                                          )
            Petitioner,                   )
                                          )    Case No. _____
and                                       )
                                          )
Michael Armstrong .                       )
                                          )
            Respondent.                   )

N/A

## SUPREME COURT RULE 55.05
## FAMILY COURT INFORMATION SHEET

Petitioner                              Respondent

Name _____       Name _____
Mailing Address _____       Mailing Address _____
City/State/Zip _____       City/State/Zip _____
SS# _____       SS# _____

*List all unemancipated children who are subjects of this proceeding:*

Name (Last, First, Middle)                    Birthdate        Social Security Number
_____     _____     _____
_____     _____     _____
_____     _____     _____
_____     _____     _____

Children reside with *(provide address and telephone number if different from above):*
_____

I CERTIFY THAT: _____ There are no other related cases
                _____ The following are the only cases pending or previously adjudicated in any
                      court related to dissolution of marriage, custody, visitation, paternity,
                      guardianship, adoption, child support, maintenance, abuse, neglect or
                      delinquent behavior (by the minor child(ren)), or adult abuse of or by any
                      parties to this action. I further state that the parties to this action have been
                      known by other names as stated below:

Indicate style of related case/case number/ court and whether the case is pending or closed:
_____          _____
_____          _____

List all other names by which parties have been known:
_____
_____

_____          _____
       Date                          Petitioner/Respondent

## EACH PARTY SHALL HAVE A CONTINUING DUTY TO UPDATE THE INFORMATION ON
## THIS SHEET AS NECESSARY UNTIL THIS MATTER HAS BEEN DISPOSED.
(Attach additional pages if necessary)
FORM 17                                                              12/94

WP0030011
001493 Filed by Clay County Microfilm Department on May 19, 2015 at 16:41

WP903012
**001494**

were obviously still there. We set up everything right here and we found the bones right in the, I will say in this picture, the very top left-hand area of the septic pond.

Q    Was that the same place the defendant had drawn the arrow --

A    Yes, sir, it was.

Q    -- indicating where he had thrown the ashes?

A    Yes.

Q    Just a few more questions. Agent Tarpley, during all of the conversations you had with the defendant in December and then later in April, of 98 and '99, in which he confessed on several occasions to you about the kidnapping, rape, murder and dismemberment of Jennifer Long, did he ever tell you that he didn't kidnap her?

A    No, he never told me that he didn't kidnap her.

Q    When is the first time you ever heard about that story?

A    Right before this trial.

MR. WHITWORTH:  No further questions, Your Honor.

MR. DUCHARDT:  May the court please.

THE COURT:  Mr. Duchardt.

CROSS-EXAMINATION BY MR. DUCHARDT:

Q    Good morning, sir.

A    Good morning.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/28/2001

Michael Speakman was contacted at the office of the United States Marshal's Service, Western District of Missouri. After being advised of the identities of the interviewing agents, he provided the following information:

Wesley Purkey was placed in cell number A104 with Speakman on a Tuesday, after being brought to Corrections Corporation of America (CCA). The following Sunday, Speakman received an edition of the Kansas City Star and noticed the front page contained an article which involved Wesley Purkey and the case pending against him. Speakman told Purkey about the article, and, in response he grabbed the newspaper, quickly read the article and shredded it. He then flushed it down the toilet and contacted the guards, asking them not to distribute the newspapers to the other inmates. The following day, Purkey was placed in a cell by himself, next door to Speakman.

Immediately after flushing the newspaper, Purkey initiated a conversation with him, indicating that, as a cell mate, he felt he owed him an explanation regarding the article and the murder of the girl. Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not "snatch" the girl from the street as Nelson did. Purkey described the initial contact with the girl as more like they were "partying," and that is was not at all forcible.

Speakman inquired as to why the case was being prosecuted in Missouri, if the murder occurred in Kansas. Purkey explained that the girl came from Missouri; however, he killed her in Leavenworth, Kansas.

Speakman also told Purkey he did not believe bones would burn until they reached a certain, very high temperature. Purkey disagreed and said that bones will burn just like firewood. Speakman asked if the skull burned also, however Purkey did not respond.

Purkey disagreed with some aspects of the article, one of which was that he threw the victim's ashes into a river. He maintained that was a lie or fabrication made up by law

---

Investigation on   11/02/2001   at Kansas City, Missouri

File # 7A-KC-80744 - 302-71                                   Date dictated   11/02/2001
       SA John A. Brunell (JAB/dk)
by    SA Dirk D. Tarpley

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; It and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-KC-80744

Continuation of FD-302 of _____Michael Speakman_____ , On 11/02/2001 , Page ___2___

enforcement officials.  He also told Speakman the FBI had tried to lure his wife to a hotel room to have an affair.

Purkey further explained to Speakman that the murder of the girl and the murder of an 80 year old woman, who Speakman thought was named "Bells," occurred because he was strung out on drugs, including methamphetamine, cocaine, and ritalin, which he was "shooting."  According to Speakman, Purkey said he, "beat the old lady over the head with a hammer for a crack rock."  He told Speakman that on three or four occasions, he told his parole officer that he wanted to get into some sort of drug treatment program.  According to Purkey, neither his parole officer or the Kansas Parole Board afforded him the opportunity for treatment.

He told Speakman that after the "Bells" murder, something awakened in him, which made him realize what he was doing.  He then turned himself in to the authorities for committing that homicide.  He felt the fact that he turned himself in to the authorities, would never be reported in the newspaper.

Purkey confided in Speakman that he planned to get evaluated in Springfield as to his mental health and was going to try to convince them he was in a black out when the murder occurred.  Speakman told Purkey if he was found to be bi-polar, there may be a possibility for him to not receive a sentencing enhancement.  He also told him that the tests they currently utilize are very thorough, and even if he attempted to manipulate the results, the tests would most likely, provide an accurate diagnosis.

According to Purkey, all law enforcement leads in this matter are based on what he told an inmate at the Hutchinson facility.  Purkey told Speakman this inmate was snatched in the middle of the night and has not been seen or heard from since.  Additionally, he contended law enforcement lied about him asking to be moved to a federal penitentiary in exchange for providing information regarding the murder.

In the days following the above conversation, Purkey was overheard talking to some of his family.  According to Speakman, Purkey is very apologetic to his family, and has told his daughter that he is sorry she has to live in the same town

OCT 24 2002 16:55

FD-302a (Rev. 10-6-95)

7A-KC-80744

Continuation of FD-302 of _____Michael Speakman_____ . On _11/02/2001__ . Page __3__

where this occurred.  He was also heard to tell her it is okay
with him if she wishes to change her last name.

According to Speakman, Purkey possesses a hatred of
women.  He described him as having some sort of "severe complex",
and is extremely negative acting toward females.  Speakman
described Purkey as appearing to be intelligent with "book
smarts;" however, he also seems to be two different people.  He
explained Purkey changes the topics of discussions and directions
very rapidly.  Furthermore, he reported Purkey becomes
immediately irate when he is called a "psychopath."  Purkey
seemingly fears that others will feel that he is some sort of
baby raper or has committed a crime comparable to that of Keith
Nelson.  Purkey has also confided he would "snatch" a plea for a
life sentence "in a minute", because he "knows they will kill
me."  In making this statement, Purkey was referring the judicial
system.

**Declaration of Stephen E. Peterson, M.D.**

I am a Board Certified Forensic and General psychiatrist, licensed in Kansas and Missouri. I was first retained to evaluate Wesley Purkey by Aline Pryor in late 1999. Ms. Pryor had been appointed to represent him on the Mary R. Bales case then pending in Wyandotte County, Kansas. I knew at that time that Mr. Purkey had also confessed to the rape and murder of Jennifer Long and would likely face a capital charge in the federal court system.

I evaluated Mr. Purkey for the Bales case in December 1999 and March 2000. I issued a report on April 19, 2000. In that report I discussed extensive loss of interpersonal boundaries, physical abuse within the family, tremendous family disruption, his extensive sexual abuse, and extreme abnormal sexual training of Wes Purkey. Some of the topics included that Mr. Purkey learned not to ask why men punched his mother in the face, why she had different men in her bedroom, learned to lie about whom his mother dated, never felt comfortable with his mother or his father, and felt his life had been truly disrupted since age 8 or 9 years old. Initially, he denied any sexual involvement with his mother, preferring to state it was his mother's girlfriend, then tearfully clarified that his mother began sexual contact with him when he was 9 or 10 years old and it did not end until he was 22 years old. He felt great shame and guilt for what happened. She bathed him, taught him how to perform oral sex on her, and seemed to feel lonely and unloved. He took on the belief that he was responsible for her sexual activity with him and eventually angrily tried to kill himself by cutting his wrist with a straight razor after a drunken sexual encounter with his mom. He endured beatings by his father and eventually hit his own father over the head with a whiskey bottle for abusing him and his mother. In addition, others within the family circle fondled Mr. Purkey when he was a preteen. These were other women. His mother taught him to anally stimulate himself and her as well as vaginally stimulate her. For a time, these became abnormal obsessive self-stimulation behaviors for him. He often tried to minimize his own horrible experiences, especially in group therapy while incarcerated, because other men reported much more severe traumas. In this way, he errantly discounted his own experiences, a common consequence of severe sexual abuse.

In late 2001, after Mr. Purkey was indicted in federal court and it was clear that the government would seek the death penalty, I was contacted in late December 2001 by Fred Duchardt, who had been appointed to represent him. The focus of the assessment for the new legal mater was to be structured around the previous assessment of Mary Bales. Of note, reports of his having been poisoned, prior head trauma, and "severe upbringing" were to be eventually revisited. Duplication of prior assessments was to be avoided. While I consulted with Mr. Duchardt and reviewed some information, I did not actually examine Mr. Purkey again until late 2002. During most of the defense team effort to represent Mr. Purkey, Mr. Duchardt and co-counsel, Laura O'Sullivan, had great difficulty effectively consistently communicating with Mr. Purkey. During large portions of pre-trial evaluation and preparation, Mr. Purkey was not effectively treated with proper psychiatric medications and needed to be. Substantial efforts were put forth by Mr. Duchardt and this writer to obtain effective psychiatric medication treatment for Mr. Purkey.

My last examination of Mr. Purkey prior to his capital trial was in December 2002, even

1

001499

though the trial did not occur until approximately a year later. My final report was submitted on August 13, 2003. In that report, I clearly referenced prior records that I had reviewed, including specific records from the Oregon Department of Corrections that referenced Mr. Purkey's report of being sexually abused between the ages of 6 and 10. I also included a finding of longstanding sexual abuse by his mother.

With respect to the sexual abuse, most of the information Mr. Purkey provided to me on this topic was done in connection with the Bales case. I was surprised when I looked back at my report in this case that I did not include more graphic narrative history regarding the sexual abuse. I certainly thought at the time and included in my discussion that the physical and sexual abuse of Mr. Purkey shaped his behavior very dramatically and contributed to the events of both offenses. In retrospect, I did not emphasize the pivotal role of sexual abuse enough with Mr. Purkey in this case where it was pertinent mitigation evidence. Even so, I believed I had made a strong case for emotional, sexual, and physical abuse as causative in shaping his extremely damaged psychological development.

I do not recall now why I did not specifically explain individual topics of emotional, physical, and sexual abuse more graphically in my report or testimony, except that Mr. Duchardt had asked me to not reduplicate information available from the Bales report. Normally, a comprehensive summary of social history and background interviews, along with all the prior records would have been be done by a mitigation specialist and provided to me and the other mental health experts to assist us in digesting such an enormous amount of information. That was not done in this case. Instead, I was provided with approximately 3,500 pages of records and only a brief index of those records.

I was not aware, that prior to trial, Mr. Duchardt informed the court he had been able to dispense with the hiring of a mitigation specialist, in part due to my work. I have worked with mitigation specialists previously in capital cases.

Mitigation specialists are typically social workers that are trained in interviewing people to obtain sensitive information and gather records and other information concerning a defendant's entire life history and background. Mitigation specialists conduct necessary interviews, review all of the records obtained, and then prepare a comprehensive well-documented psychosocial history that is then provided to other mental health experts, such as me, to assist us in conducting competent and reliable evaluations. In essence, all of this information can be mitigating in its own right, but it is also necessary for mental health experts to have full and complete information in order to ensure reliable diagnoses and information.

I did not perform the work of a mitigation specialist in Mr. Purkey's case and am not trained in the area of social work or this specialized field. I did not gather any records on my own. All of the records that I reviewed were provided to me by Ms. Pryor, Mr. Duma (who had replaced Ms. Pryor as court-appointed counsel in the Bales case), and Mr. Duchardt. All of the information concerning background interviews was also provided to me by Mr. Duchardt. I did not personally interview anyone other than Mr. Purkey.

2

I was aware prior to trial that Mr. Duchardt had retained other experts. I had been provided with reports from Dr. Leeson and Dr. Preston, but I did not talk with or consult with them. I did not consult with Dr. Cunningham or see his report, if one was written. This was unusual in my experience because normally when multiple mental health experts are retained, defense counsel will generally have them exchange reports and consult together at some point.

I believe it would have been very helpful to consult with the other experts in this case. For example, I am now aware that Mr. Purkey discussed with Dr. Cunningham the details of his sexual abuse and other traumatic exposures to sexual events during his childhood. As I did, Dr. Cunningham also clearly found that these events were significant in shaping Mr. Purkey's development and mental state. If we had discussed these matters beforehand, I likely would have highlighted this more in my report and preparation for my testimony.

Instead, when I testified during sentencing, I provided only general testimony about the extensive sexual abuse in the context that Mr. Purkey was severely sexually, physically, and emotionally abused in childhood so developed extremely abnormal psychosexual ideas. The only detail I included in my testimony was that Mr. Purkey had reported pervasive sexual abuse by his mother from age six to 14 and witnessed her sexual involvement with her boyfriends after his father left. I also mentioned his father's paying for prostitutes for him at a young age and how each of these things resulted in Mr. Purkey having substantial difficulties with emotional attachment to women. I also mentioned his prior diagnosis of psychosexual problems of identification. I did not include any of the raw details of what had happened to Mr. Purkey, such that the jury could really envision what had happened to Mr. Purkey as a child. During my testimony, I felt that I had made it clear that he had experienced a number of very severe childhood traumas that had a pervasive negative impact on his psychological development that was relevant to his degree of criminal responsibility.

Despite the reference in my own report to the Oregon Department of Corrections records in the Index and Review of Material sections, when I testified on cross-examination, I had forgotten about that report. Thus, I testified that the only prior report of sexual contact with his mother was her 1972 report that he raped her. I also testified that I was the only one Mr. Purkey told about sexual abuse in detail because I was the only one to ask. At that point, I was unaware of the details of Dr. Cunningham's assessment of Mr. Purkey. I was not aware then that Dr. Cunningham could also testify that Mr. Purkey had been exposed so such things as observing his mother having sexual intercourse with a man. In addition, as early as age eight, his mother began inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse.

I do not know why this lapse of memory occurred on my part at the time during cross-examination. Clearly, Mr. Purkey had previously reported sexual abuse to the psychologist he saw in

3

001501

the Oregon Department of Corrections and I had reviewed those documents as background for my own assessment of Mr. Purkey. I do not know why Mr. Duchardt did not object to the government's questions on this point or direct me to the records or my own report in redirect to clarify this point.

This is one specific example where I believe that the presence of a mitigation specialist in the defense team would have made a significant difference. In every other capital case for which I have been the defense expert, except for one, the defense retained a mitigation specialist. Had there been a mitigation specialist, the defense team would not have failed to bring the Oregon records in front of the jury. Nor would they have failed to contact Dr. Rex Newton. Because of the absence of a mitigation specialist, however, the government was able to impeach the reports of sexual abuse to me by implying that Mr. Purkey fabricated them to me in order to avoid the death penalty. This was clearly incorrect since he had reported it to Dr. Newton at the Oregon State Penitentiary in 1987. Nonetheless, the jury did not hear the truth on this point and I believe this was very damaging to Mr. Purkey's case.

The extensive sexual abuse that Wes Purkey suffered, with the subsequent prolonged intense loss of personal security and safety, helps clarify one of the very important life traumas that caused his psychological development to become extremely fragmented and intermixed with mood swings, extreme anxiety, severe substance abuse, and rage attacks. As a pre-adolescent, he would have been much more vulnerable to and shaped by his family environment due to his tender years. These extreme losses of interpersonal boundaries within his family lasted until he was 22 years old, thus encompassing nearly all of his tender developmental years and then were never effectively treated by any mental health practitioner. Very often as a consequence of such prolonged psychological traumas, there is a higher incidence of disordered behavior, acting-out behavior and criminal activity in persons, especially men, who have suffered extensive emotional, sexual, and physical abuse. Mr. Purkey's abuse experience started at such a young age by the hands of those he needed to protect him. He was powerless to protect himself and unable to prevent the tragic impact on his psyche as well as how he views the world. As recently as this month, October 2007, he still is virtually unable to discuss the details of the abuse. Such reluctance is extremely common for abused boys who grow into manhood. He feels as though, when he does talk about it, that he is betraying his mother. He feels that it does not alleviate his responsibility and he does not want to use the abuse as a crutch. He errantly feels he must protect his mother, and defend her from what she did. These feelings are indicative of a person who was sexually abused as a child. He seems to defend his mother, to protect the few good memories he actually has from his childhood. He expresses that telling people about his abuse is not very masculine. He has a hyper-masculine mindset, such that men are expected to be strong protectors of their families and themselves. Thus, to focus on being a sexual abuse victim is counterintuitive for his personality style and against his psychological defense mechanisms, which protect his view of himself and his mother. Despite this front of emotional competence, he still experiences nightmares of the abuse. Mostly what he can remember is the anger that he felt. As a child, he withdrew from normal personal contacts, as it was emotionally less frightening. The anger is most likely a combination of reaction to childhood powerlessness, loss of personal physical safety, and amorphous rage, as he incorrectly believes he should have been able to protect himself from his chaotic parental environment. Mr. Purkey's abuses and mental health problems are not resolved but

4

001502

he ineffectively acts the role of a fully capable adult. These are roles that he thinks important for a man to act, such as strong, tough, without need to share his feelings, and loyal even to his abusive mother. In therapy groups, he could not talk about his sexual abuse in front of other men. He was protecting himself, and he was playing a role. In therapy, he was trying to find out something about himself.

As a child, he could not confide in anyone about the abuse. But there were people who knew. His Aunt Carrie Burke was aware that something sexual was going on with him and his mother. His history reflects that others knew of the abuse or believed his maternal relationship was toxic. For example, in 1967 he was admitted to St. Francis. Hospital notes show that the hospital would not permit his mother to visit him. He reported that this was because his Aunt Carrie Burke, GaGa, told the hospital that his mother was sexually abusing him, that she had seen her molesting him, and had actually kicked her out of the house. His aunt had also seen Mr. Purkey's mother and father naked, physically fighting one another, and witnessed his mother with other men in front of him, naked and very sexual. Mr. Purkey reported that when he was young, the nuns at school frequently asked him what was wrong and what was going on at home. However, he never felt that he could open up to them.

Mr. Purkey was comfortable in opening up to Dr. Newton in the Oregon Department of Corrections. He was trying to improve himself then, and was involved in group therapy called the "State Raised" group. To become a member, a prisoner had to be incarcerated for at least 12 years. There were between 10 and 15 inmates involved in each therapy session. It was called State Raised because the group members were literally raised by the state in confinement. The focus was about prisoners trying to identify what they had felt throughout their lives and create ways to change their life direction. Dr. Newton also had individual therapy sessions with him and he was able to share with him some of the history of abuse.

Finally, I had consulted with Mr. Duchardt prior to trial concerning the possibility of my testifying in the guilt-or-innocence phase of the trial. I do not know why he chose not to call me during the trial. My opinion did not really support a defense to the charges. Even so, Mr. Purkey had told me on numerous occasions that he did not kidnap Ms. Long, which I believe was the focus of the defense during the trial. After Mr. Purkey testified during the trial, I do not recall Mr. Duchardt calling me again about the possibility of calling me to testify during the trial itself. Our discussions after that time were all related to sentencing issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This the 15TH day of October 2007.

_Stephen E. Peterson_

Stephen E. Peterson, M.D

5

Purkey - Cross                                              59

Q.   And do you remember the night before or that day writing out a handwritten statement that describes your involvement in this offense?

A.   That's correct.

Q.   And do you have Government's Exhibit "D" in front of you?

A.   That's correct.

Q.   Is that the document -- or a copy of the document you wrote out?

A.   Yes.

Q.   You signed that on the back page, is that right?

A.   That's correct.

Q.   Dated it 12/17/98?

A.   That's correct.

Q.   And then it was witnessed by Agent Tarpley and Detective Howard?

A.   That's correct.

Q.   And did you write that in your own handwriting?

A.   Yes, I did.

Q.   And did you tell the truth when you wrote this?

A.   Yes, I did.

Q.   And that is a confession to the kidnaping, rape and murder of this young lady, correct?

A.   That's correct.

Q.   And do you remember them when they met with you that day advising you of your Miranda rights orally?

001504

Q      And on line 19 I asked you the question --

MS. O'SULLIVAN:  Your Honor, may we approach.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MS. O'SULLIVAN:  Your Honor, this is just repetitive.  He's about to re-read a portion that he's already read.  We have been through this.  This is a collateral issue and, frankly, I think we have gone through it.

MR. WHITWORTH:  She brought it up on redirect and tried to water it down by saying he wasn't talking about -- he wasn't talking about the truth of the statement, he was trying to say that it was -- he was just talking about that he had written out his handwritten statement.  And, Judge, it's -- the question is did you tell the truth when you wrote this, and he answered yes, I did.  I have got a right to rehabilitate or respond to what she brought up.

MS. O'SULLIVAN:  And, Your Honor, I didn't ask him about that portion of this.  I read the following sentence, which is --

THE COURT:  You what?

MS. O'SULLIVAN:  I read the following question and the answer.  I did not read that portion.  He's already read that portion and I think it's beyond the scope of my cross and I think it's been -- we have --

1043

THE COURT:  I agree with you, but you became repetitive.  Now he gets the opportunity to be repetitive.  So you opened it up and he has this opportunity.  Objection overruled.

(THE PROCEEDINGS RETURNED TO OPEN COURT.)

Q     (By Mr. Whitworth)  Are you with me on line 19?

A     Uh-huh.

Q     And I asked you the question, "And did you tell the truth when you wrote this?"  And you responded, "Yes, I did."

A     That's what I responded.

MR. WHITWORTH:  That's all the questions I have, Your Honor.

MS. O'SULLIVAN:  No questions, Your Honor.

THE COURT:  All right.  Mr. Purkey, you can step down.

MR. DUCHARDT:  May we approach.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MR. DUCHARDT:  I'm not sure Dr. Preston is out in the hallway but --

THE COURT:  I think he is.  I see him.  Do you want to make your offer?

MR. DUCHARDT:  Yeah.

THE COURT:  Okay.  We'll let the jury go.

001506

how he was able to remember that he put it in her neck and in her face and in her chest. Is that a blackout? Come on, folks? Don't be fooled by this guy over here.

You know, on that cold January day, this defendant made a decision, and this is -- we're talking about personal responsibility. He made a decision to pick up this girl and take her back at knife point back to his house where he raped her, where he killed her, and then he took that chain saw and he defiled her body in that toolbox. Now, are you going to believe a guy like that? And you have to believe him to acquit him.

Now, let's talk about what evidence did we bring you to show that the defendant kidnapped. We were challenged on it. Mr. Duchardt challenged me. The only evidence of the kidnapping -- we don't haven't any evidence of kidnapping, no independent evidence. We brought you the best possible evidence you could have. We brought the defendant's own writing. He's the one that wrote kidnapping on this initial note on December 15th, 1998. We didn't write it. He did. We brought you the best possible evidence: His own handwritten confession where he admits in here that he kidnapped Jennifer Long at knife point over in Missouri. What could be better than that.

He signed the back, after he identified the victim, he signed the back right where it says kidnapping.

001507

1129

The guy even testified in federal court on October 25th, 2001, under oath, that everything that he had said about the kidnapping was the truth. Now, what could possibly be better evidence than that? All right. Do you follow me?

Now, what else did we bring you? We brought you some independent evidence. The defendant said I never kept a knife in my truck. Well, Donnie Skeen, his buddy from prison, said yeah, he did keep a knife in the truck. He did keep a knife in the truck, and his own stepson Jonathan Gutknecht said the defendant had a knife, a big knife about this long. That's independent evidence. He tried to deny that he kept the knife in there. Nonsense.

He thinks he's got a real slick move going on here because Jeanette came in and said her chicken boning knife turned up missing. Folks, that's a red herring, because, yeah, he may have used that chicken boning knife to stab her, stab her to death over and over and over. That boning knife, maybe that was sitting on his weight bench downstairs. But he could have used that other knife when he pulled it out of the glove box, like he said four times in December of 1998, he could have pulled that other knife out of his truck, like he said, and kidnapped her.

Does it make sense to you this story that he created here shortly before trial that this little girl, this 16-year-old girl, agreed to go with him over to Kansas

001508

1130

City, Kansas, to drive around with a prostitute to look for crack cocaine. That's ridiculous. And then she agreed to go with him up to his house in Lansing. She was looking forward to getting her driver's license that day. You think she would have gone over there voluntarily? Does that make sense? I submit to you that it doesn't.

Now, the defendant created this new story because he knew the only way he could get out of this is if he could try to convince a jury that there was no federal jurisdiction. But, you know, it's too late because he put everything on paper. He testified to it. He had already said it was kidnapping all along, and now he's thinking he can come in here and fool you. And he's saying, well, the government -- Mr. Duchardt said, well, the government knew that this wasn't a kidnapping all along because of Michael Speakman, the inmate who was a cellmate of the defendant.

Now, folks, you heard Michael Speakman testify, and you may not like him. I'm not asking you to like him. We don't get to pick our witnesses. He picked Michael Speakman when he talked to him. You know, Michael Speakman said the defendant told him that it wasn't really like a kidnapping, I thought she was a prostitute or something like that, you know.

You also remember Michael Speakman said the

001509

Does that make amends? Of course it doesn't. Is it the only thing he had left that he could do? Yes. And he did it. And if we were in state court in Kansas we would now be trying to figure out why it was that he blacked out in a rage, why it was that he couldn't stop the stabbing. But that's not where we are. We're here in federal court in Missouri because the government claims that Wes Purkey kidnapped Jennifer Long. And what I told you from day one, that isn't true.

It is ironic that both we and the government are absolutely dependent on one man's credibility and believability in this case, and that one man is Wes Purkey. Without Wes Purkey, the government would be able to prove absolutely nothing. Absolutely nothing.

What I have done on the Elmo, that thing over there, is highlighted the one instruction that is your verdict directing instruction, the things that you have to find beyond a reasonable doubt, and it's in your packet. All you have to do is look for it in there and look along with me when we talk about it. I'm not going to take out pieces. I'm not going to take out words from it. It is all important for you to understand. And what you are required to do as jurors in this federal case is to decide that all of those things are true beyond a reasonable doubt, or do the very difficult thing, but the right thing,

# Lindley Funeral Homes, Inc.

## Michael Lloyd Armstrong

( ███████████ - July 10, 2015 )

Michael Lloyd Armstrong Michael Lloyd Armstrong, age 69, a resident of Liberty, Missouri, passed away on Friday, July 10, 2015, at St. Luke's Hospice House, Kansas City, Missouri. Michael was born the son of Robert and Darlene (Brown) Armstrong on November 5, 1945, in St. Louis, Missouri. He served in the United States Navy from 1965 until 1966. He was united in marriage to Joan Lea Adey on August 8, 2014, in Platte City, Missouri. She survives of the home. Michael worked as a self-employed private investigator. He was a member of the VFW and was very passionate about the military. Michael loved the St. Louis Cardinals, hunting and shooting and was an avid golfer. He loved his family and had many friends. Survivors include two sons, Robbie Wildhaber and wife Toni of Fort Wayne, Indiana, and Dustin Wildhaber and wife Jessie of Jackson, Missouri; one daughter, Melanie Thomson and husband Greg of Liberty, Missouri; several grandchildren; one brother, Robert Armstrong of Liberty, Missouri; and one nephew, Bobby Armstrong and wife Danielle of St. Louis, Missouri. He was preceded in death by his parents, Robert and Darlene Armstrong. Funeral services will be held at the Lindley Pitts Funeral Home, Braymer, Missouri, on Tuesday, July 14, 2015, at 2:00 p.m. A scheduled family visitation will be held at the Lindley Pitts Funeral Home, Braymer, Missouri, on Tuesday, July 14, 2015, one hour prior to the service at 1:00 p.m. until 2:00 p.m. Friends may call at the Lindley Pitts Funeral Home, Braymer, Missouri, on Tuesday, July 14, 2015, from 8:00 a.m. until 2:00 p.m. Memorial contributions may be made to St. Luke's Hospice House and may be left at or mailed to Lindley Funeral Home, P.O. Box 47, Chillicothe, Missouri 64601. Online condolences may be made at www.lindleyfuneralhomes.com. Arrangements are under the direction of Lindley Pitts Funeral Home, Braymer, Missouri.

**001511**

Declaration of Angie C. Genail

I am Wesley I. Purkey's daughter.

I, now, live at  Basehor, Kansas.

On March 9, 2002, I lived at 539 Vilas, Leavenworth, Kansas. On that day, my wedding day, Fred A. Duchardt (my father's attorney) and Mic Armstrong (Mr. Duchardt's investigator) arrived unannounced at my home. With my home full of wedding guests, Mr. Duchardt and Mr. Armstrong set about talking to my mother, Claire Gaida. I explained to Mr. Duchardt and Mr. Armstrong that "this was not the time or the place" for them to investigate my father's case.

Mr. Duchardt and Mr. Armstrong tried to interview me in front of my guest, and I explained that that was not appropriate. I told them I would be more than happy to speak with them at length about my father, as I was, and remain, willing to do all that I can to help my father. Before leaving, Mr. Duchardt assured me that he would contact me about scheduling a thorough interview at an appropriate time. Mr. Duchardt never scheduled such an interview, though Mr. Armstrong did return to ask me about my father's relationship with Claire Gaida and Jeanette Wiley.

Shortly before trial began, Mr. Duchardt called me by phone and asked if I would be willing to testify during the "penalty phase" of my father's trial. Dad had voiced serious qualms about my doing this because he did not want to see me hurt; however, I assured Mr. Duchardt that I would testify for my father. Mr. Duchardt did not ask me about my relationship with my father, except to ask if dad was important to me; and, of course, he is very important to me. I love him very much.

Neither Mr. Duchardt, nor anyone else associated with him ever discussed with me the type of information that I might be able to offer during my testimony, and I certainly did not know what I would be able to say. Mr. Duchardt did not discuss my testimony or prepare me for it in any way.

Until now, for example, no one ever asked me about the many inspirational and encouraging poems, stories and letters that my father wrote for me. For example, he wrote the following poem for me:

001512

MORE PRECIOUS THAN GOLD IS

A MOTHER'S LOVE

Dedicated To My Daughter - Angie C.

Mother Of Three Beautiful Kids

Wesley I. Purkey

A Mother's Love Is Not Dependent,
On recognition, nor receiving appreciation,
But totally in stead on selfless giving, and
through benevolent acts from the heart.

When A Mother's Children suffers
life's trials and tribulations,
She is there to soothe the disappointments,
calm their fears, but as well,
to restore their hopes for another day.

Looking back, we all know,
that a Mother's love is steadfast and true,
Not because of anything we may do, but
because of the quite joy she finds in that love's fortitude.

When life has bruised and wounded us,
A Mother's Love is there to inspire us.
And' When We have fallen and failed,
The strength of our Mother's Love is there to pull us. through.

When all others have forsaked you,
And' Your friends have deserted you,
A Mother's Love is there to comfort and reasure you.
More Precious than gold is,
A Mother's Love,
As Her Stories Are Seldom Told.

I Love You Sweetheart - And those kids could not find a more wonderful Mom....

Your Dad!!!!

001513

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

This, the 22 day of March 2008

Angie C. Gentail

001514

# MARK D. CUNNINGHAM, PH.D.

Clinical & Forensic Psychology
*Diplomate in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958

12-19-02

Fred Duchardt, Esq.
Attorney at Law
110 East 6th Street
Kearny, MO  64060

Re: U.S. v Wesley Ira Purkey

Dear Mr. Duchardt:

Thank you for your assistance in arranging for my interviews of your client, Wesley
Purkey. I met with Mr. Purkey for approximately seven hours on 12-18 and over three
hours on 12-19. Additionally, I have reviewed a major portion of nine binders of records
regarding Mr. Purkey that you provided me. I will require additional extended interviews
of Mr. Purkey and hope to schedule these in early January. Please allow me summarize
emerging mitigation themes/hypotheses and associated investigation needs based on my
consultation to date.

## Emerging mitigation hypotheses:

Multi-generational family distress
Genetic predisposition to substance dependence
Genetic predisposition to mental illness
Fetal alcohol exposure
Parental alcoholism
Parental neglect and abandonment
Observed family violence
Physical and emotional abuse
Inadequate structure and guidance
Traumatic sexual exposure
Childhood speech impediment and social avoidance
Peer isolation and alienation
Corruptive influence of brother

001515

Mitigation themes and investigation needs
Cunningham, 12-20-02

Childhood onset psychological disorders
    Attention deficit disorder
    Learning difficulty
    Post traumatic stress disorder
    Conduct disorder
    Depressive disorder with suicide attempts
    Mixed personality disorder - borderline personality disorder with self-mutilation
        and affective instability; antisocial
Teen onset substance dependence
Confined in adult prison in early adolescence
Neuropsychological deficits
    FAS
    ADHD
    Learning difficulty
    Stuttering
    Behavior control problems/impulsivity/brake failure
    Multiple closed head injuries with extended loss of consciousness
    Chronic alcohol and stimulant dependence
    Poisoning
    Affective instability, impulsivity, behavioral reactivity
    Memory deficits
    Neuropsychological testing
Type II alcoholism
Stimulant induced psychosis
Systemic poisoning
Inadequate treatment interventions
Self-initiated confession; remorse
Potential for positive social contribution (Scared Straight/grievance/litigation)
Prison adjustment without serious violence

## Associated investigation requirements:

Interview of Russell Frank Purkey (paternal uncle; 1985 contact info: 220 N. Viceroy,
Azusa, CA 91702, 818 334 0708)
    - alcohol/drug abuse in extended family system
    - mental illness in extended family system
        psychosis
        depression
        bi-polar
        ADHS
        learning disability
        anger/reactivity
        relationship dysfunction
    - criminal history in extended family
    - history of parents of Russell and Jack
    - history of Jack Purkey

2

001516

**Mitigation themes and investigation needs**
**Cunningham, 12-20-02**

- personal alcohol/drug, psychological, criminal history

<u>Interview of Debbie Prothero</u> (paternal cousin; same DOB as Wes; married to Russell; four children: daughter of Margarita?)

- alcohol/drug abuse in extended family system
- mental illness in extended family system
  - psychosis
  - depression
  - bi-polar
  - ADHS
  - learning disability
  - anger/reactivity
  - relationship dysfunction
  - difficulties exhibited by her own mother
  - personal emotional problems
- criminal history in extended family
- grandparent and aunt/uncle family history
- circumstances of childhood household of Wes
- perspectives regarding Wes' parents
- contact information for other members of family

<u>Interview of Gary Purkey</u> (brother)
- circumstances of childhood household
  - chaotic setting
  - drinking
  - domestic violence (Jack Purkey, L.E. Carter, other boyfriends of
    Velma); injuries sustained by Velma
  - physical and emotional abuse
  - neglect
  - absence of structure or effective limits/discipline
  - observation of parental sexual activities
  - parental abandonment
- perspective regarding parents
- observation of mother's promiscuity
- early memories of mother's drinking (FAS)
- absence of values instruction from parents
- access to pornography in the childhood home
- Wes' childhood problems:
  - stuttering
  - learning problems
  - hyperactivity
  - impulsiveness
  - lack of friends in elementary school years
- bullying of Wes as children
- introduction of Wes to drugs and to shooting drugs – age of onset

3

001517

**Mitigation themes and investigation needs**
**Cunningham, 12-20-02**

- recall of Wes' 1976 heroin overdose and whether Wes experienced cardiac arrest in ambulance on way to hospital
- Wes' adult substance dependence
- Wes' adult relationship, psychological, cognitive problems
- time period that a friend named "Hup" resided with Gary, Hup's legal name, Hup's age, Hup's sexual orientation, contact information for Hup, any observation of inappropriate contact between Hup and Wes
- sexual interactions between Velma and Wes
- contact information for his father and relatives of father who would have observed Velma
- extended family history
- Gary's alcohol and drug history
- Gary's psychiatric history
- Gary's criminal history

Interview of Gary's biological father:

- information regarding Velma:
    biological father
    childhood history
    any childhood history of abuse/neglect
    extended family history
    drinking pattern
    drinking during pregnancies
    emotional problems
    reasons for divorce
- observations of Purkey household during childhood of Gary and Wes

Interview of Jeanette (wife):

- whether Wes described sexual abuse of mother to her and when this report occurred
- detail of regarding chronology and substances of Wes' alcohol/drug abuse
- description of any paranoia/delusions/hallucinations exhibited by Wes – particularly in response to stimulant abuse
- chronology of poisoning and Wes' psychological responses/reactions

Interview of Clair:

- history of relationship with Wes
- whether Wes described sexual abuse of mother to her and when this report occurred
- detail of regarding chronology and substances of Wes' alcohol/drug abuse
- description of any paranoia/delusions/hallucinations exhibited by Wes – particularly in response to stimulant abuse

4

001518

**Mitigation themes and investigation needs**
**Cunningham, 12-20-02**

- any changes in Wes' psychological responses/reactions during the time period of the poisoning

Interview of Wes' stepchildren (Terry, John, Israel):

- history of relationship with Wes and his parenting interactions with them
- observation of changes in his mental status – strange beliefs/behavior
- participation in poisoning dogs
- knowledge of Wes' drugs being doctored

Interview of Angie (daughter):

- history of relationship with Wes and his parenting interactions
- observation of changes in his mental status – strange beliefs/behavior
- perspectives regarding Claire
- personal substance abuse patterns
- personal history of emotional problems and treatment

Interview of Tina Milton (1976 robbery co-defendant):

- narrative description of what occurred and Wes' participation
- knowledge of Wes' drug dependence

Interview of inmate J.T. Lovin (Wes confronted him about talking trash re Jeanette at Elsworth prison, Lovin complained to I&I)

- account of interaction and any provocation he presented Wes
- consider obtaining an affidavit

Interview of black inmate Wes punched at Wyndotte County jail

- account of interaction and any provocation he presented Wes
- consider obtaining an affidavit

Interview of Mr. Kruger (welding instructor in Manpower Development Training Program at Lansing – still at Lansing)

- description of Wes as a student – attitude, performance, respect

Interviews of other corrections officers and mental health providers:

- prison work participation
- Scared Straight participation
- expressions of remorse regarding offense
- desire for treatment

5

001519

**Mitigation themes and investigation needs**
**Cunningham, 12-20-02**

Records to be retrieved:

- photographs of Wes in infancy and early childhood for evaluation for FAS and facial morphology
- Velma's psychiatric records
- Gary's psychiatric records
- criminal records of Jack, Velma, Gary
- birth certificates of Jack and Velma
- death certificates of Jack and Velma
- divorce documents associated with Velma
- litigation records associated with U.S. District Judge Rogers shutting down A&T units at Lansing secondary to conditions there
- disciplinary stats at CCA Leavenworth:
        average census
        number of disciplinary reports annually during the past two years
        annual number of write-ups for:
                assault-on-inmates
                assault-on-staff
                weapons contraband

References to be retrieved:

Biblical references regarding attempts to avoid apprehension for murder:

- Cain denied knowledge of Abel's location after killing him – "Am I my brother's keeper?" (Genesis 8:16)
- Moses killing an Egyptian and hiding him in the sand (Exodus 2:11-14; Acts 7:23-29)
- David (a man after God's own heart – I Samuel 13:14) gave a secret order (carried by Uriah) to set up Uriah to be killed in battle, to hide both this act and David's adultery with Bathsheba (2 Samuel 11)

(Note: God spared the lives of Cain, Moses, and David)

Literature regarding effects of Ritalin abuse.
Literature regarding neuro effects of rat poison.
Literature regarding amphetamine/cocaine/stimulant induced psychosis, and subsequent vulnerability to recurrence of paranoia/psychosis in response to single use (I have some of these references and will provide them. Additionally I will initiate a new search.)

6

001520

**Mitigation themes and investigation needs**
**Cunningham, 12-20-02**

Expert consultations:

- FAS expert
- Neurology consultation: (Jonathan Pincus, M.D.)
  PET/SPECT
  EEG
- Neuropsychologist
- Toxicologist
- Addictionologist regarding stimulant dependence (Alex Stalcup, M.D.)
- Type II alcoholism

My own interviewing of Mr. Purkey is incomplete. I anticipate returning to Kansas City to continuing my evaluation of him in early January. Please call if I can clarify any of the above. Thank you for your assistance.

Best regards,

Mark D. Cunningham, Ph.D.

7

001521

Dr. Preston was completely wrong about what happened. To disprove Dr. Preston, you would also have to somehow disprove all the other elements that I have seen.

Q    Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any -- there is very little, if anything, in the record to support that, correct?

A    Well, that's correct. There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's shoulder to see what he experienced, but we don't have that.

At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to walk.

Q    We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

001522

A    Yes.

Q    You're aware from the reports that -- the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her.  Have you seen that report?

A    I have seen the report.  I've also seen the medical report that the doctor gave the opinion than she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

Q    That wasn't in a medical report, was it, sir?  It was in the detective's report.  He wrote that down.

A    By the doctor to the detective.

Q    Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

A    I read that.  And the police could certainly have pressed charges without her.

Q    Now, Gary Purkey -- or Gary Hamilton, the defendant's brother, his last name is Hamilton, it's not Purkey.

A    Yes.  They're half brothers.

Q    He was raised in the same circumstances as the defendant for the most part, correct?  They are brothers. They had a rough childhood, alcoholic parents.  They both claim now that they were sexually abused by their mother, correct?

001523

upon in assessing what the defendant's childhood was like came from Mr. Purkey?

A    No, sir, I don't think that's a fair statement.  I talked to Mr. Purkey on a number of occasions and at length and took a history from him, but much of the history that I relied on about his childhood had to do with what was in the records, with what his aunt had described in her presentations to the mental health authorities, and correctional personnel, their descriptions historically, as well as records having to do with the outcomes and what happened with each of his parents.

The information that I got from Mr. Purkey was entirely consistent with those additional sources, but I would not say that I relied primarily on him at all.

Q    Now, I have reviewed the records too.  Would it be a fair statement to say that the information that came from the aunt, the record that you're talking about, is information where she described how the mother -- the mother was promiscuous, correct?

A    She described the alcoholism, promiscuity, chaotic nature of the home.  The records describe both his father and mother having abandoned him.  Father's whereabouts being unknown.

Q    But there was nothing in those records, sir, about the defendant seeing his mother's lovers come out of the

001524

bedroom without any clothes on.

A    No, sir, that came from Mr. Purkey.  The records describe that she was promiscuous and without regard to what the boys saw.  The specific description of what he saw came from the discussions that he had with me.  The record describes, though, provides a broader context to that same sort of action.

Q    And there was nothing in those records, sir, was there, that talked about the defendant saying that he -- or confirmation that he was having sex with his mother at age eight?  There's nothing in the records from back then that would confirm that, is there?

A    Not specifically.  There are descriptions about sexual issues that he has.  There are descriptions about being very anxious when the topic of his mother comes up.  Certainly the history that he displays is consistent with somebody who has been sexually traumatized.  But otherwise the records don't specifically recount that he made an outcry of sexual abuse to anyone else.

Q    Of course, the parents aren't here.  They're both dead, correct?

A    That's correct.

Q    And they can't defend themselves, right?

A    That's correct.

Q    And there is some indication that the defendant had a

serious problem with sexual identification.

A    That was described in his adolescence, yes, sir.

Q    Could that mean that he wasn't sure whether he liked men or women?

A    Potentially.  It's uncertain what that refers to or what that's a euphemism for in terms of what kind of sexual conflicts he's having.

Q    In fact, the defendant, at least during a good part of his childhood, his father worked at Boeing, correct?

A    That's correct.

Q    And he was attending private Catholic schools, correct?

A    Yes, sir, during elementary school years.

Q    Up through 8th grade?

A    I believe that he had transferred to public schools by then, but I think -- but through elementary school years, I think up to age 10 when his parents split up I think at least to that place, I'd have to look back to be sure, but my recollection is sort of late elementary school.

Q    And he played sports, correct?

A    I don't recall the specifics in the sports involvement.  My recollection is that the parents were not actively involved and supportive of the kids being involved in the larger community.  But I don't have a specific recollection of a record that points one way or the other

We brought in Dr. Park Dietz, we brought in Dr. Helen Mayberg, and Dr. Dan Martell, who are three of the finest forensic psychologists, psychiatrists in the United States, because we didn't want you to be misled by this defense. And I submit to you when they say no brain injury, they say no mental disease, that you can believe their testimony over the defense experts.

Dr. Peterson, who Dr. Dietz so aptly stated, his findings were a fairy tale. He couldn't even show me in the DSM-IV manual where he had come up with this diagnosis. And that's the Bible of forensic psychiatry. He said that medication could control and has controlled this defendant's behavior. Ten minutes after he says that, the defendant interrupts the proceedings in an angry outburst.

He said that he didn't find that he was suffering from antisocial personality disorder, like all the other psychiatrists and psychologists, including Dr. Dietz, had found for years and years and years. He found out something that included coming up with a prostitute and he couldn't control his emotions when he killed the victim. Now, come on, don't be fooled by this.

Dr. Preston, he's the brain expert, he said he took liberties with the contrast. That's the problem. That's why we brought you Dr. Helen Mayberg. The way he

001527

did it, you can't do it that way.  You just can't manipulate the machine.  Dr. Mayberg said she can make it look like anybody has a frontal lobe injury.

Now, use your common sense.  Dr. Leeson, he described the defendant's personality profile as a drug abuser, a rapist, assaultive, and antisocial personality disorder.  We agree with that.  Our guy said the same thing, Dr. Martell.

Now, the next group of mitigating factors have to do with the defendant's bad childhood.  Now, that's the old abuse excuse.  He had a bad childhood.  No doubt he did not have a good childhood.  I'm not disputing that.  But many people in this country grow up with alcoholic parents or are abused and they turn out fine.  His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed.  And this is about personal choices.  He chose not to make any changes in his life.  He just kept doing the same things, being violent, committing crimes.  He made those choices.

What about personal responsibility?  Aren't you tired of people having an excuse for everything?  This guy goes out and he beats -- he stabs this girl to death, beats an 80-year-old grandmother, and it's somebody else's fault.  It's his mom's fault, who is not here to defend herself.  Did you notice the picture they brought of mom,

001528

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )  No.  01-00308-01-CR-W-FJG
                                )
WESLEY I. PURKEY,               )
                                )
            Defendant.          )

SPECIAL VERDICT FORM

I.    AGE OF DEFENDANT

      Instructions: Answer "YES" or "NO."  Do you, the jury,
unanimously find that the government has established beyond a
reasonable doubt that:

      The defendant was eighteen years of age or older at the time
of the offense.

                          YES    ✓
                          NO    _____

_____
Foreperson

      Instructions: If you answered "NO" with respect to the
determination in this section, then stop your deliberations,
cross out Sections II, III, IV, V and VI of this form, and
proceed to Section VII.  Each juror should then carefully read
the statement in Section VII, and sign in the appropriate place
if the statement accurately reflects the manner in which he or

1

she reached his or her decision.  You should then advise the
court that you have reached a decision.

      If you answered "YES" with respect to the determination in
this Section I, proceed to Section II which follows.

II.   REQUISITE MENTAL STATE

      Instructions: For each of the following, answer "YES" or
"NO."

      1(A).  Do you, the jury, unanimously find that the
government has established beyond a reasonable doubt that the
defendant intentionally killed Jennifer Long.

                          YES    ✓
                          NO    _____

_____
Foreperson

      1(B).  Do you, the jury, unanimously find that the
government has established beyond a reasonable doubt that the
defendant intentionally inflicted serious bodily injury which
resulted in the death of Jennifer Long.

                          YES    ✓
                          NO    _____

_____
Foreperson

      Instructions: If you answered "NO" with respect to all of
the determinations in this section, then stop your deliberations,
cross out "Sections III, IV, V, and VI of this form, and proceed

2

001529

to Section VII. Each juror should carefully read the statement in Section VII and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to one or more of the determinations in this Section II, proceed to Section III which follows.

III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO."

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death and injury resulting in the death of Jennifer Long occurred during the commission and attempted commission of her kidnapping by Wesley Ira Purkey.

YES ✓
NO ____

Foreperson _____

2. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Wesley Ira Purkey killed the victim in an especially heinous, cruel, and depraved

3

manner in that the killing involved torture and serious physical abuse to Jennifer Long.

YES ✓
NO ____

Foreperson _____

3. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Jennifer Long, the victim, was particularly vulnerable due to her youthful age of 16 years.

YES ✓
NO ____

Foreperson _____

4. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant has previously been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use, attempted use, and threatened use of a firearm against another person. More specifically, the defendant was convicted in the State of

4

001530

Kansas of Aggravated Robbery and Aggravated Battery on April 23, 1981, in Case No. 80CR1701.

YES    ✓

NO    _____

_____
Foreperson

5.  Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant has previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute.  More specifically, the defendant was convicted of Murder, First Degree in the State of Kansas on April 28, 2000, and received a sentence of life imprisonment.

YES    ✓

NO    _____

_____
Foreperson

6.  Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant has previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction and attempted infliction of serious bodily injury and death upon another person.  More specifically, the defendant has previously been convicted of the following offenses:

5

(a)  Murder First Degree in the State of Kansas on April 28, 2000;

(b)  Kidnapping in the State of Kansas on April 23, 1981;

(c)  Aggravated Robbery in the State of Kansas on April 23, 1981; and

(d)  Aggravated Battery in the State of Kansas on April 23, 1981.

YES    ✓

NO    _____

_____
Foreperson

Instructions:  If you answered "NO" with respect to all of the Statutory Aggravating Factors in this Section III, then stop your deliberations, cross out Sections IV, V, and VI of this form, and proceed to Section VII of this form.  Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.

If you find the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to one or more of the factors in this Section III, proceed to Section IV which follows.

IV.  NONSTATUTORY AGGRAVATING FACTORS

Instructions:  For each of the following, answer "YES" or "NO."

6

001531

1. Future dangerousness of defendant. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant poses a future danger based upon the probability that he would commit criminal acts of violence that would constitute a continuing threat to society, as evidenced for example, by one or more of the following:

(a) Wesley Ira Purkey killed Mary Ruth Bales, an 80-year-old woman, by striking her repeatedly with a hammer;

(b) Wesley Ira Purkey has exhibited an allegiance to and belief in the principles of the Aryan Brotherhood, a violent White Supremist organization;

(c) Wesley Ira Purkey has displayed a complete lack of remorse for the killing of Jennifer Long;

(d) Wesley Ira Purkey has shown poor institutional adjustment while incarcerated in that he has committed numerous disciplinary violations including assaults and acts of violence;

(e) Wesley Ira Purkey has committed a sexual assault while incarcerated; and

(f) Wesley Ira Purkey has previously been convicted of Aggravated Escape From Custody in Case No. 78CR0733, in the District Court of Shawnee County, Kansas.

YES _____

NO ___✓___

Foreperson

2. Victim impact evidence. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the offense caused injury, loss and harm because of victim Jennifer Long's personal characteristics as an individual

7

human being and the impact of the death upon victim Jennifer Long's family.

YES ___✓___

NO _____

Foreperson

3. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she was dead.

YES ___✓___

NO _____

Foreperson

4. Substantial criminal history. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that Wesley Ira Purkey has a significant criminal history including felony convictions for murder, kidnapping, aggravated robbery, and aggravated battery, and this history is made even more egregious by the underlying facts upon which these convictions are based. Specifically, the defendant shot Gregg W. Carlberg on or about August 3, 1980.

YES ___✓___

NO _____

Foreperson

8

001532

V.   MITIGATING FACTORS

Instructions: For each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established. Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also find that factor to be mitigating:

1.  Mr. Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

Number of jurors who so find _____.

2.  Mr. Purkey committed the offense under severe mental or emotional disturbance.

Number of jurors who so find _____.

9

3.  With the use of proper medications, such as the medications which Mr. Purkey is currently taking, Mr. Purkey's mental illness and behaviors can be managed.

Number of jurors who so find _____.

4.  Mr. Purkey suffered brain injuries as a result of car accidents, drug abuse, or both.

Number of jurors who so find _____.

5.  Mr. Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents, Jack and Velma Purkey.

Number of jurors who so find _____.

6.  Mr. Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother, Velma Purkey.

Number of jurors who so find _____.

10

001533

7. Mr. Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents Jack and Velma Purkey.

Number of jurors who so find _____.

8. Mr. Purkey has never received treatment for the psychological and emotional damage which he suffered as a result of his parents' abuse of him.

Number of jurors who so find _____.

9. Mr. Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage which he suffered earlier in his life.

Number of jurors who so find _____.

10. Mr. Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition

11

inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary.

Number of jurors who so find _____.

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

Number of jurors who so find _____.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

Number of jurors who so find _____.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

Number of jurors who so find _____.

12

001534

14.  While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

Number of jurors who so find _____.

15.  While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

Number of jurors who so find _____.

16.  Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

Number of jurors who so find _____.

13

17.  Mr. Purkey should be sentenced to life imprisonment without release because Mr. Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Mr. Purkey provided all of the information which was required.

Number of jurors who so find _____.

18.  The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

Number of jurors who so find _____.

19.  By coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did.

Number of jurors who so find _____.

20.  Mr. Purkey has repeatedly expressed his remorse for what he has done.

14

001535

Number of jurors who so find _____.

21.  Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

Number of jurors who so find _____.

22.  Angie Purkey Genail loves her father Mr. Purkey very much.

Number of jurors who so find _____.

23.  If Mr. Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship.

Number of jurors who so find _____.

24.  Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

15

Number of jurors who so find _____.

25.  If Mr. Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren Mikey and Haley would continue to carry on a loving, nuturing grandfather/grandchild relationship.

Number of jurors who so find _____.

26.  Mr. Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release.

Number of jurors who so find _____.

27.  In the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Number of jurors who so find _____.

16

001536

VI.  DETERMINATION

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case:

A.  Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES  _____✓_____

NO  _____

If you answer "YES," the foreperson must sign here, and you must then proceed to Section VII.  If you answer "NO," the foreperson must sign, and you must then proceed to Section VI(B):

_____
Foreperson

Date: __Nov  19+L__, ____, 2003

B.  Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES  _____

NO  _____

17

If you answer "YES," the foreperson must sign here, and then you must proceed to Section VII.

_____
Foreperson

Date: _____, _____, 2003

18

001537

## VII. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____

_____
Foreperson

Date: NOVEMBER , 19th 2003

19

001538

(THE PROCEEDINGS CONTINUED IN THE PRESENCE OF THE JURY AS FOLLOWS:)

THE COURT: Good morning. As I indicated to you yesterday, the evidence is in and in just a moment I'll be reading some instructions to you that are very lengthy. I know before you had copies, and you will have copies to take with you to the jury room. We just don't have it all done at this point in time, and rather than wait I wanted to go ahead and get started. We may even get them before we finish all this, the arguments of counsel, but they will be coming to you.

I'm going to start with Instruction No. 28.

(Whereupon, the court read Instructions 28 through 39.)

MR. DUCHARDT: Before we begin, may we approach.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MR. DUCHARDT: Judge, I'm sorry that I had forgotten to remind you of this, but the court sustained the motion in limine that I filed regarding types of closing arguments that the government should not make, and I'm just reminding counsel of the court's ruling in that regard. The motion in limine regarding particular sorts of arguments that the court sustained, I'm just reminding about the court's ruling in that regard. And also about

001539

(Alternate jurors excused.)

THE COURT: And we do have the instructions as I promised for each one of you to take back to the jury room. And, Rhonda, you might want to help distribute the instructions to the jurors as they leave and go back in the jury room and begin their deliberations.

I'm not unmindful it's close to lunchtime and probably what I'll do is go ahead and give you a chance to get yourself organized and within the hour we'll make arrangements for lunch for you, as we did before.

I'll let you go to work. Thank you.

By the way, all the exhibits that have been received in this phase of the trial that have been received without any limitations will be provided to you once we have accumulated them. Okay.

(AT 11:30 AM, THE JURY RETIRES TO COMMENCE THEIR DELIBERATIONS.)

THE COURT: Okay. If you want to get the exhibits together so they'll be ready to go back.

* * * * * * *

(AT 1:15 P.M. THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:)

THE COURT: Do you want to make your offer of proof?

MR. WHITWORTH: The United States calls Dirk

(AT 4:15 P.M., THE JURY RETURNED INTO OPEN COURT AND THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:)

THE COURT:  Okay, ladies and gentlemen of the jury, upon my inquiry I learned that you want to recess for the day and return tomorrow to continue your deliberations.  Is that a fair statement?

THE JURY:  Yes.

THE COURT:  Then I will instruct you at this time, remind you that you're not to discuss the case with others, particularly now that you're engaged in deliberations, and when you gather again tomorrow you'll be able to discuss it among yourselves.  You're not to allow yourself to be exposed to any media coverage that may pertain to this matter for the reasons that I've stated for the last three plus weeks.  I won't go into any more detail.

I'll ask that you report back tomorrow at 8:30, and once everybody is assembled in the jury room Rhonda will -- are you going to leave the instructions in there, lock it up, or are you going to take them?

THE COURTROOM DEPUTY:  I will put them all in one area.

THE COURT:  Once everybody is there, then they'll be distributed among each of you and you can commence the continuation of your deliberation.

001541

Anyone have any questions? All right. Have a good evening. Thank you.

(Adjourned to Wednesday, November 19, 2003.)

WEDNESDAY, NOVEMBER 19, 2003

(At 2:44 P.M. THE FOLLOWING RECORD WAS MADE IN OPEN COURT:)

THE COURT: Okay. As everyones knows we have a verdict in this case and before I bring the jury in, I want to state to those who are present, particularly the family and interested parties, that I know this is an emotional time for you, but I need to ask that you be able to control your emotions, I don't want any outbursts from anybody in the gallery, and if you don't think you can, I'm going to ask that you leave so that does not occur.

And I'm going to ask the CSOs to assist me in this directive if we have that kind of problem.

All right, Rhonda.

(AT 2:45, THE JURY RETURNED INTO OPEN COURT WITH THEIR VERDICT AS FOLLOWS:)

THE COURT: Ladies and gentlemen of the jury, I have been advised that you have reached your verdict in this case; is that correct?

**001542**

remember right --

MR. DUCHARDT:  There is no instruction.

THE COURT:  The bottom line is they have indicated they weighed the factors and have come to the conclusion that they have come to.

MR. DUCHARDT:  I understand.

THE COURT:  I understand your point as well.

MR. GRAVES:  I thought that was in the instructions you gave them, but I may be mistaken.

MR. DUCHARDT:  It's an optional instruction to them that they may but do not have to, but that was not in the instructions.

THE COURT:  Well, as I said, the bottom line is they have done the weighing and they have come to the conclusion that they have come to, and I don't think that, while it would have been preferable to have them put something, yea or nay, in there, I don't think it's necessary.  But if the government wants, I'm willing to send them back and have them do that.

MR. WHITWORTH:  Absolutely no, we do not think that is necessary, Your Honor.  And as you noted, in their determination on page 17 of the verdict form that you just read, they indicated they had weighed aggravating and mitigating factors, because they signed it.

MR. DUCHARDT:  The court is waiving my objection

001543



## Supreme Court of Missouri
### en banc

July 8, 2016

In re:  Gary Eugene Brotherton,           )
                                          )   No. SC95767
          Petitioner.                     )   MBE No. 38990

<u>ORDER</u>

Petitioner, Gary Eugene Brotherton, having filed in this Court a motion to voluntarily surrender his license to practice law in this state; and

Petitioner having advised that he suffers from bipolar disorder and anxiety;

The Court having received the Chief Disciplinary Counsel's report and recommendation filed herein;

The Court, thus advised, now orders that the surrender of the license of Gary Eugene Brotherton is rejected.

It is further ordered that Petitioner is hereby suspended from the practice of law in this State.

It is further ordered that the said Gary Eugene Brotherton comply in all respects with Rule 5.27 – Procedure Following a Disbarment or Suspension Order.

Costs taxed to Petitioner.

Day - to - Day

_____
Patricia Breckenridge
Chief Justice

**001544**

**STATE OF MISSOURI – SCT.:**

I, BILL L. THOMPSON, Clerk of the Supreme Court of Missouri, do hereby certify that the foregoing is a true copy of the order of said court, entered on the 8th day of July, 2016, as fully as the same appears of record in my office.

IN TESTIMONY WHEREOF, *I have hereunto set my hand and affixed the seal of said Supreme Court. Done at office in the City of Jefferson, State aforesaid, this 8th day of July, 2016.*



_____, Clerk

_____, Deputy Clerk

**001545**

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

WESLEY IRA PURKEY,                    )
                                      )
                  Movant,             )
                                      )
        v.                            )          No. 06-8001-CV-W-FJG
                                      )
UNITED STATES OF AMERICA,             )
                                      )
                  Respondent.         )
_____  )

**MOTION UNDER 28 U.S.C. § 2255, TO VACATE, SET ASIDE,
OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Movant, Wesley Ira Purkey, by court-appointed counsel, pursuant to 28 U.S.C. § 2255, the

Fifth, Sixth and Eighth Amendments to the United States Constitution and the provisions of Rule

33 of the Federal Rules of Criminal Procedure requests this Court to grant him a new trial and to

vacate, set aside and/or correct his conviction and death sentence.[1]

*Procedural History*

1.      Purkey was indicted (01-00308) in the United States District Court, Western District of

Missouri, for kidnaping, rape, and murder, under 18 U.S.C. §§ 1201(a), (g), and 3559(d).

2.      He was convicted on November 5, 2003.  Following a jury trial on sentencing, which

concluded on November 19, 2003, he was formally sentenced by this Court on January 23, 2004.

3.      Purkey was sentenced to death.

_____

[1]In accordance with Rule 2 of the Rules Governing 2255 Proceedings, the Motion sets forth
only the facts and claims entitling Purkey to relief.  It does not contain legal argument or citation.
Purkey simultaneously files a motion seeking permission and a schedule by which to file a
Memorandum of Law in Support of the Motion.

1

001546

4.      His convictions were based on the finding that he had kidnaped Jennifer Long, a sixteen-year-old girl, in Kansas City, Missouri, and transported her across state lines to Lansing, Kansas, where she was forcibly raped and killed.

5.      Purkey pled not guilty to the crimes.

6.      His trial and sentencing were conducted by jury trial.

7.      He testified in a pretrial hearing in support of his motion to suppress his statements and related motions.  No. 4:01-cr-00308, Doc. #140 (October 25, 2002 Hearing) at 4-90.  He also testified during his trial denying that he had kidnaped Long, but admitting that he had raped and killed her.  Trial Transcript (hereinafter "Tr.") at 907-1043.  Purkey also addressed the Court before he was formally sentenced on January 23, 2004.  Doc. #535 (January 23, 2004 Hearing).

8.      Purkey appealed his conviction and his sentence.

9.      In the appeal to the United States Court of Appeals for the Eighth Circuit, Purkey asserted the following errors:

    (a)      Failure to Suppress Statements.
    (b)      Failure to Prohibit Seeking Death Penalty as Alternative Relief to Suppression of Statements.
    (c)      Failure to Dismiss Due to Destruction of Defense Evidence.
    (d)      Indictment Clause Violation.
    (e)      Risk of Execution of the Actually Innocent.
    (f)      Exclusion of Death-Scrupled Venirepersons.
    (g)      Prohibiting First Phase Presentation of Brain Injury Evidence.
    (h)      Refusal to Permit Testimony Pertaining to Purkey's Father Introducing Purkey to Use of Prostitutes At an Early Age.
    (i)      Refusal to Permit Poisoning Evidence in First Phase of Trial.
    (j)      Improperly Limiting Cross-Examination of Witness Michael Speakman.
    (k)      Permitting Testimony Regarding Bone and Hair Fragments.
    (l)      Failure to Order Mistrial Due to Improper Prosecutorial Behavior.
    (m)     Eliciting False Testimony.
    (n)      Failure by Government to Disclose Tarpley Rough Notes.
    (o)      Erroneous Verdict Directing Instruction.
    (p)      Refusal to Permit Poisoning Evidence in Trial Penalty Phase.

2

001547

(q)     Refusal to Permit Fetal Alcohol Exposure Evidence in Trial Penalty Phase.

(r)     Refusal to Permit Rebuttal Against Helen Mayberg Testimony in Penalty Phase.

(s)     Refusal to Permit Impeachment Of Park Dietz.

(t)     Permitting Aryan Brotherhood Testimony.

(u)     Permitting FBI Profiler Testimony.

(v)     Improperly Permitting Evidence Regarding Sexual Encounter With Gary Hatfield.

(w)     Refusal to Permit Testimony Regarding Accusations Against Gary Hatfield by Ronald Lones.

(x)     Improper Questioning Regarding Dr. Peterson's Opinions with Regard to the Death Penalty.

(y)     Baseless, Inflammatory Accusation of Threat Against Prosecutor.

(z)     Refusal to Grant Mr. Purkey Allocution by Refusal to Permit Purkey To Make Statement of Remorse to Jury Without Being Subject to Cross-Examination.

(aa)    Failure to Dismiss Duplicative Aggravating Factors.

(bb)    Erroneously Failing to Instruct the Jury That They Are Never Required to Return a Sentence of Death.

(cc)    Failure to Require Jury to Make Findings Regarding Mitigating Factors.

On November 7, 2005, the court affirmed the convictions and the sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Rehearing and rehearing *en banc* were denied on January 13, 2006.

A petition for writ of certiorari was filed in the United States Supreme Court raising the following questions:

> Whether the Eighth Circuit erred in holding – in acknowledged conflict with the Tenth Circuit, and even the conceded position of the government – that the District Court's removal of a potential juror for viewpoints regarding the death penalty, expressed solely in answers to limited questions posed in a questionnaire, is a question reviewed for abuse of discretion rather than *de novo?*
>
> Whether the Eighth Circuit erred in holding – in acknowledged conflict with four other Courts of Appeals – that the prosecution's use of duplicative aggravating factors in the penalty phase of petitioner's trial violates the Eighth Amendment?
>
> Whether the Eighth Circuit erred in sustaining the jury instructions regarding the jury's penalty phase consideration of mitigating and aggravating factors, instructions in which the interpretation of the law is in conflict with holdings of this Court as well as instructions used in the vast majority of Federal capital cases to date?

3

Certiorari was denied on October 16, 2006. *Purkey v. United States*, 127 S. Ct. 433 (2006) (No.

05-11528).

10.     Other than the direct appeals listed above, Purkey has not previously filed any other motions,

petitions, or applications concerning the judgment of conviction and sentence in any other court.

11.     Not applicable.

12.                                    *Grounds for Relief*

    **I.**     **Purkey was denied due process of law during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

    **(a)**     **Supporting Facts.**

        (1)     In December 1998, Purkey was confined in the Wyandotte County Detention

Center in Kansas City, Kansas, pending trial for the robbery and murder of Mary Ruth Bales.  He

had confessed to those crimes in a sworn statement given to Detective Bill Howard of the Kansas

City, Kansas, Police Department on October 30, 1998.

        (2)     On December 15, 1998, Purkey sent a note to Howard expressing his desire

to talk to a Federal Bureau of Investigations (hereinafter "FBI") Agent concerning a kidnaping and

murder.

        (3)     Howard went to the Detention Center that day and spoke to Purkey.

According to his pretrial testimony, Howard stated that Purkey wanted to talk to an FBI Agent to

confess to a federal crime because he knew he was facing a potential life sentence in the Kansas

Department of Corrections and he would rather serve a life sentence in the federal prison system.

4

001549

Howard then asked Purkey if he "wanted to go to Club Fed."  Doc. #136 (October 17, 2002 Hearing) at 100.

(4)      Although it was clear that "Club Fed" was a phrase used not by Purkey but by Detective Howard, government counsel declared in opening statements during trial that Purkey confessed because he wanted to serve his sentence in a federal penitentiary, which is called "Club Fed" due to better conditions than in state prisons.  Tr. 402.

(5)      During Detective Howard's testimony, government counsel continued to use the phrasing of "Club Fed" in questioning Howard concerning discussions with Purkey about the federal prison system.  Tr. 424.

(6)      Even during the testimony of FBI Agent Dirk Tarpley, who was not even present during this initial discussion with Purkey, government counsel continued to assert in questioning that Purkey "wanted to go serve his time at Club Fed."  Tr. 596, 601.

(7)      Finally, in closing arguments during the trial, government counsel again asserted that Purkey sought to go to "Club Fed," as if Purkey had been the one to use the language rather than it being the language used only by Detective Howard.  Tr. 1102.

(8)      Government counsel deliberately presented a false impression that "Club Fed" was a term used by Purkey and that it implied better prison conditions than in state prisons.  This deliberate misleading of the jury and creation of a false impression violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution.  This deliberate false impression also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

5

(b)      This ground was not asserted on direct appeal due to trial/appellate counsel's failure to object during trial and failure to assert this ground as plain error on appeal.

**II.      Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments due to counsel's failure to object to the government's deliberate misconduct during the trial in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed" and appellate counsel's failure to assert this ground on direct appeal.**

(a)      **Supporting Facts.**

(1)      The facts with respect to the government's misconduct are set forth in paragraphs 12(I)(a)(3)-(7) above.

(2)      Trial counsel's conduct was deficient in failing to object to the "Club Fed" references and the implication that this was Purkey's phrasing during government counsel's opening statement, examinations of Detective Howard and Agent Tarpley, and government counsel's closing argument during trial.

(3)      Counsel's conduct was not based on a reasonable strategic or tactical decision.

(4)      Purkey was prejudiced during sentencing by counsel's failures because government counsel was allowed to create an impression from the opening statements during the trial that the federal prison system had better conditions for inmates and that Purkey was relying on that "fact" when he confessed to Agent Tarpley.  Counsel's arguments to the contrary, after permitting the government to create these false impressions without objection, during trial and sentencing did not negate the reasonable probability that the jury would have reached a different conclusion in sentencing if defense counsel had properly objected during trial.

6

001551

(5)     Alternatively, appellate counsel were ineffective in failing to assert the government's misconduct as plain error on direct appeal.  Counsel's conduct was deficient, not based on reasonable strategy, and prejudicial.

(b)     This ground has not been previously asserted.

**III.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's unfulfilled and prejudicial promise to the jury during opening statements in the trial that Jennifer Long's friends and family would testify that there was no kidnaping.**

**(a)     Supporting Facts.**

(1)     In his initial statements to Agent Tarpley and Detective Howard, Purkey confessed to kidnaping Jennifer Long.

(2)     Long before trial, however, Purkey recanted his statement that he had kidnaped Long.

(3)     Purkey's defense during trial was essentially based on this recantation.  In other words, while Purkey did rape and kill Long as he had confessed and testified during trial, he did not kidnap her.  He had confessed to kidnaping in his initial statements only to confer federal jurisdiction based on his understanding that he would be sentenced to life imprisonment in exchange for his cooperation.

(4)     In counsel's opening statements during trial, counsel asserted this defense theory, but then followed with the groundless assertion that Long's family and friends would even testify that there was no kidnaping.  Tr. 413.

(5)     Counsel had no indication prior to trial and no good faith basis otherwise for believing that Long's family and friends would testify that there was no kidnaping.  Exhibit 1 (Declaration of Laura O'Sullivan).  Counsel's conduct was, thus, deficient.

7

(6)      Counsel's conduct was not based on a reasonable strategic or tactical decision.

(7)      Counsel's conduct was prejudicial during trial and sentencing because counsel's promise to the jury went unfulfilled during trial and sentencing when Long's family and friends did not give this testimony and, in fact, testified that Long had never been known to get in the car with a stranger.  Tr. 892-93.  The prejudice was heightened by the government's reminder to the jury in closing arguments that counsel's promise had gone unfulfilled.  Tr. 1097.

(b)      This ground has not been previously asserted.

**IV.      Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to prepare and present evidence to rebut the uncorroborated self-serving testimony of government witness Michael Speakman.**

**(a)      Supporting Facts.**

(1)      Several months prior to trial, the government notified defense counsel that Michael Speakman, a federal inmate, would be called to testify at trial and provided copies of FBI 302s summarizing his statements.  The government also provided notice that it had filed a Rule 35 Motion for Reduction of Speakman's federal sentence in exchange for his testimony against Purkey.

(2)      The 302 transcribed on November 28, 2001, Exhibit 2, and a letter Speakman had sent to government counsel, Exhibit 3, included information that he had been Purkey's cellmate at the Correctional Corporation of America (hereinafter "CCA") facility for a while and his allegations that Purkey repeatedly boasted about "killing people" while in confinement.

(3)      Sometime prior to trial, lead defense counsel prepared a "Consolidated Witness List" designating responsibility for preparation with respect to Speakman's testimony to co-counsel, Laura O'Sullivan.  Exhibit 4.  O'Sullivan was also tasked, at least as of that time, with preparation for the testimony of Melvin Lister, Sue Purdue, and Mary Williams.

8

(4)    O'Sullivan met with Purkey and discussed these witnesses several times in the two weeks prior to trial.  Purkey informed counsel then, as he had earlier, that Speakman's allegations were false.  He provided counsel with the names of other inmates, such as Cornelius Peoples and Xavier Lightfoot, officers and other CCA staff, such as Lister, Purdue, and Williams, and CCA volunteers, such as Sam Hoffmeier, who could and would testify, contrary to Speakman, that Purkey never talked about his crimes with other inmates let alone boast about them to inmates or officers.  Exhibit 5 (O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003).

(5)    Nonetheless counsel did not develop and present evidence from these witnesses.

(6)    During trial, Speakman testified, consistent with his pretrial allegations, that Purkey boasted that he was confined "for killing people."  Tr. 682.  Counsel presented no evidence during trial or sentencing to rebut this testimony.

(7)    Counsel's conduct was not based on a reasonable strategic or tactical decision.  Counsel could not make a reasonable decision not to present the testimony of these witnesses without ever having talked to them.

(8)    If counsel had adequately prepared and presented the evidence, both Cornelius Peoples (who had been Purkey's cellmate for a time and was otherwise housed near him when Speakman was around) and Melvin Lister (a staff member that worked in that unit while Speakman was housed there) would have rebutted Speakman's testimony.  Both would have testified that Purkey never talked about his crimes or his case and certainly never boasted or talked about "killing

9

001554

people," especially to Speakman because he was a well-known "jailhouse snitch."[2]  Sam Hoffmeier

also would have testified that Purkey never talked or bragged about his crimes.  Exhibit 25 (Sam

Hoffmeier Declaration).

(9)     Purkey was prejudiced during trial but especially during sentencing because

Speakman's testimony cast doubt on Purkey's credibility and the evidence and information that

Purkey was remorseful.  If the available evidence rebutting Speakman's testimony had been

presented there is a reasonable probability that at least one juror would have struck a different

balance in sentencing and the outcome would have been different.

(b)     This ground has not been previously asserted.

**V.      Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to obtain the services of a mitigation specialist or otherwise adequately investigate, prepare, and present mitigation evidence.**

**(a)     Supporting Facts.**

(1)     In counsel's initial *ex parte* request for investigative services submitted on

January 25, 2002, counsel sought authorization for funding for Michael Armstrong as

"investigator/mitigation specialist."   Counsel specifically sought the immediate services of

Armstrong:

a.      to ferret out information regarding mitigating circumstances which first can be presented to the Department of Justice, in an effort to try to persuade the government to not seek the death penalty, and second, if seeking the death penalty is authorized can be presented to a jury to persuade it against imposition of the death penalty, and

b.      to begin proper preparation of this case for trial.

---

[2]Declarations from these witnesses will be provided in conjunction with the Memorandum of Law.

001555

Doc. #35 (Request for Funds to Hire Investigator).

(2)    Only days later, on January 29, 2002, lead counsel submitted a proposed case budget to the court.  In the proposal, which his co-counsel never even saw, Exhibit 1, counsel estimated a total cost of $35,000 for Armstrong as investigator.  Counsel separately estimated a total cost of $45,000 for a "mitigation specialist."  In support of this request, counsel asserted:

> Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri.  Many times, the use of a mitigation specialist is a more cost-effective way of preparing the penalty phase case for the defense.

Exhibit 6 (Proposed Budget).

(3)    In the following months, with respect to possible mitigation issues, counsel and Armstrong interviewed only Purkey's wife (Jeanette Purkey), daughter (Angie Genail),[3] and ex-wife (Claire Gaida).

(4)    On April 11, 2002, counsel then filed a motion captioned as a request "for Funds To Obtain Psychiatric Expert Assistance for Development of Evidence Regarding Competence Issues."  In the opening paragraph, counsel sought funding for Stephen Peterson, M.D., "for purposes of development of evidence in support of issues of competence and mitigation."  Subsequently in the motion, counsel asserted anticipation that the government would seek to present "the non-statutory aggravating circumstance claim that Mr. Purkey would pose a future danger if he was incarcerated rather than put to death."  Counsel then asserted immediately after this:

---

[3]A declaration from Ms. Genail will also be submitted along with the Memorandum of Law. In addition to other information, Ms. Genail asserts that the first time counsel attempted to interview her, lead counsel showed up at her home unannounced on her wedding day and was attempting to interview guests.  She asked him to leave and to arrange an interview on a more appropriate occasion.

11

001556

In order to effectively prepare and present evidence at the second or punishment phase in this case, the services of a mitigation/sentencing specialist are necessary.

Later in the motion, counsel defined a "mitigation/sentencing specialist" as follows:

A mitigation/sentencing specialist is a person who, due to training and experience, is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment without parole as a viable alternative to a sentence of death.  Also, the mitigation/sentencing specialist is able to take the peculiar personal characteristics of the defendant, and determine whether such a defendant is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger.  Such information is necessary for the defense to present the sentence of life imprisonment without parole as such a viable alternative to the sentence of death, and to counter the government's case regarding future dangerousness. Such information is also necessary to counter any arguments which might be made by the government that a sentence of life imprisonment without parole cannot be safely and securely carried out.

Counsel then asserted that courts have uniformly recognized the need for a "mitigation/sentencing specialist" and cited a number of cases including his own case of German Sinisterra in which he had not retained a mitigation specialist.  Counsel also asserted that "mitigation specialists are maintained on staff" in a number of Missouri Public Defender Offices "and hired as a matter of course in all capital cases."  Counsel concluded with a request for $25,000 for Mark Cunningham, Ph.D. as such a "mitigation/sentencing specialist."  Exhibit 7 (Ex Parte Request #3 – Cunningham).

(5)    For the next six months, counsel and the investigator still interviewed no one with respect to mitigation other than the potential witnesses listed in paragraph (3) above, as well as Purkey's stepsons and other witnesses concerning Purkey's activities during the 18 months prior to his arrest including his drug usage and the potential poisoning of him.

(6)    The only other witnesses interviewed during this time period that could possibly provide evidence mitigating in its own right or as mitigating in response to potential

12

aggravation evidence by the government was one phone call from Duchardt with Purkey's brother, sister-in-law, and niece and O'Sullivan's interview of Purkey's defense counsel on a prior case the government would ultimately use as aggravation evidence.

(7)    Then, on October 15, 2002, counsel filed a "substitute" motion for the previous motion seeking funding for Dr. Cunningham. This substitute motion changed little except to change the caption of the motion to request "Funds to Obtain Mitigation/Sentencing Expert Assistance For Development of Evidence Regarding Competence Issues" and to reflect in the first paragraph that the request was for funding for Dr. Cunningham "for purposes of development of evidence in support of issues related to penalty phase defense of this case." Exhibit 7.

(8)    On November 11, 2002, counsel then provided records to defense experts, including Dr. Cunningham, over 3,500 pages of records. Counsel did little to summarize these records or to make them manageable for the experts. Instead, counsel provided them with only an 11 page index that he prepared. Exhibit 8 (Duchardt Summary of Records).

(9)    Around the same time period, lead counsel put together a "to do" list for the defense team. Again, aside from records collections, the only items even listed for interviews of people who could provide social history mitigating evidence or evidence mitigating to the extent it would rebut government aggravation evidence was preparation of evidence to rebut allegations of prior misconduct in prison and a single interview of Purkey's brother Gary, who lead counsel intended to interview in late 2002. While listing this single social history interview, counsel clearly already considered as the top two "mitigating circumstances not related to confessions": (1) "abandonment by parents in childhood"; and (2) "sexual abuse by mother." Exhibit 9 (To Do List).

13

(10)     After Dr. Cunningham's initial review of records and evaluation of Purkey, he sent a letter to Duchardt listing "emerging mitigation themes/hypotheses and associated investigation needs." As "emerging mitigation hypotheses," the items listed included the following:

Multigenerational family distress
Genetic predisposition to substance dependence
Genetic predisposition to mental illness
Fetal alcohol exposure
Parental alcoholism
Parental neglect and abandonment
Observed family violence
Physical and emotional abuse
Inadequate structure and violence
Corruptive influence of brother
Traumatic sexual exposure

Because Purkey's parents were dead, the only other available direct witness to corroborate Purkey's statements to Dr. Cunningham and to provide additional information concerning most of these items that addressed activities in the home in which he grew up was his brother Gary. Thus, Dr. Cunningham specifically listed him as a person that needed to be interviewed concerning specific listed areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother. Dr. Cunningham also listed the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports. In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey. Exhibit 10 (Letter from Dr. Cunningham to Duchardt dated December 19, 2002).

(11)     From that time until August 2003, still the only "mitigation" or background interviews conducted were of the potential witnesses listed in paragraphs (3) and (5) above, attempts

14

001559

to contact several previous co-defendants, and a single in-person interview of Purkey's brother Gary Hamilton.

(12)   Duchardt met with Hamilton in his home in Nebraska in March 2003. Duchardt apparently took no notes of the interview and did not prepare a file memo or otherwise document the substance of the interview for his own file or for the retained experts.  According to Hamilton, Duchardt took his teenage son to that interview.  Indeed, Duchardt's son was present during at least portions of the interview even though this was the only meeting with Hamilton. During that meeting, Duchardt apparently did not ask questions about the aberrant sexual interactions among family members, which, as stated by Dr. Cunningham, would be "a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred."  Exhibit 11 (Mark Cunningham, Ph.D., Declaration).

(13)   Other than this one background interview, Duchardt had only brief phone calls with Hamilton's daughter, Tanya, and Purkey's cousin, Debbie Prothero.  He also had several phone call interviews with Purkey's paternal aunt, Marguerite Hotchkiss.

(14)   No other interviews of potential background witnesses who knew Purkey prior to his 1997 parole were conducted other than witnesses that related to a prior conviction and an alleged sexual assault in the Oregon Department of Corrections in 1987.

(15)   Nonetheless, Duchardt informed the court in seeking additional authorization for funding for Armstrong and for the mental health experts that "the services of a mitigation specialist" had been "dispensed with" as unnecessary.

> Counsel had originally budgeted some $45,000.00 for the hiring of a mitigation specialist, the amount based upon prior experience in dealing with the payment of

15

costs for such a mitigation specialist.  Actually, Counsel later learned that, since the last time he had utilized a mitigation specialist, the costs for such a mitigation specialist had so substantially increased that the price tag for such a specialist would likely have been upwards of $80,000.00.  Mitigation Specialists have classically been utilized to assist Counsel with preparing a penalty phase presentation, and undersigned Counsel has had experience using mitigation specialists in some cases.  Counsel determined that the services of a mitigation specialist could be dispensed with, and budgetary savings realized, by reassigning to the investigator and to counsel the investigative work traditionally done by a mitigation specialist.  This approach has allowed the same quality of work to be done more efficiently, without needless duplication of efforts, and therefore without the $80,000.00 cost for a mitigation specialist.  However, this has significantly increased the workload of the investigator, and therefore the costs for the investigator, over that budgeted for initially.

Exhibit 12 (Supplemental Expert Request for Investigator).  Similar statements were included in the

supplemental funding motion for Dr. Peterson.

Thanks to the work that Dr. Peterson has done, and the testimony he will now be able to put forth, combined with anticipated testimony from a sentencing specialist who has also been retained, supported by done [sic] by Mr. Purkey's investigator and Counsel, Counsel for Mr. Purkey has been able to dispense with the hiring of a mitigation specialist. . . .  Dispensing with the $80,000.00 cost of a mitigation specialist has resulted in a significant overall savings in the budget, but has in no way adversely impacted the defense, since the duties which would have been assumed by the mitigation specialist have merely been shifted to others, including Dr. Peterson, all to better and more efficient effect for the defense.

Exhibit 13 (Supplemental Expert Request for Psychiatrist).  Virtually, the same portion quoted for

Dr. Peterson was included in the supplemental funding motion for Dr. Cunningham, but crediting

him also for assuming some of the duties of a mitigation specialist.  Exhibit 14 (Supplemental Expert

Request for Dr. Cunningham).

(16)    Counsel's conduct was deficient in a number of ways.  First, counsel was

ineffective in failing to retain a mitigation specialist because this person is an integral part of any

capital defense team.  As explicitly stated in the American Bar Association, Guidelines for the

16

Appointment and Performance of Defense Counsel in Capital Cases (Feb. 2007) (hereinafter

"Guidelines"):

> The defense team should consist of no fewer than two attorneys . . . an investigator,
> and a mitigation specialist.

Guideline 4.1(A)(1). Moreover, contrary to the definition of a "mitigation/sentencing specialist"

Duchardt provided to the court in seeking funding for Dr. Cunningham:

> Mitigation specialists possess clinical and information-gathering skills and training
> that most lawyers simply do not have. They have the time and the ability to elicit
> sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse)
> that the defendant may have never disclosed. They have the clinical skills to
> recognize such things as congenital, mental or neurological conditions, to understand
> how these conditions may have affected the defendant's development and behavior,
> and to identify the most appropriate experts to examine the defendant or testify on
> his behalf. . . .
>
> The mitigation specialist compiles a comprehensive and well-documented psycho-
> social history of the client based on an exhaustive investigation; analyzes the
> significance of the information in terms of impact on development, including effect
> on personality and behavior; finds mitigating themes in the client's life history;
> identifies the need for expert assistance; assists in locating appropriate experts;
> provides social history information to experts to enable them to conduct competent
> and reliable evaluations; and works with the defense team and experts to develop a
> comprehensive and cohesive case in mitigation.

Guideline 4.1 Commentary. Mitigation specialists typically have "graduate degrees, such as a Ph.D.

or masters degree in social work." Judicial Conference of the U.S., Subcomm. On Federal Death

Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations*

*Concerning the Cost and Quality of Defense Representation* at 24 (1998). Thus, including a

mitigation specialist and utilizing a team approach "combines the different skills, experience, and

perspectives of several disciplines" and allows counsel "to delegate many time-consuming tasks to

skilled assistants and focus on the legal issues in the case." Guideline 10.4 Commentary. Use of

a mitigation specialist independent of testifying experts also allows that person to serve "as part of

17

001562

the defense team covered by the attorney-client privilege and work product doctrine." *Id.* Finally, contrary to counsel's assertions that it was cost-effective to have counsel try to perform the function of a mitigation specialist, it is more *costly* to have counsel do the work.

> Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 10 (1998).

(17)    Here, counsel did not have the services of a mitigation specialist, who had clinical and information-gathering skills and training with "the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) . . . ." Contrary to his representations to the Court that this role was filled to some extent by Dr. Cunningham and Dr. Peterson, neither expert was qualified as a social worker or mitigation specialist or even attempted to fulfill this function. Dr. Cunningham interviewed only a few family members previously interviewed by counsel. Exhibit 11. Dr. Peterson interviewed no one other than Purkey. Exhibit 15 (Stephen Peterson, M.D., Declaration).

(18)    Duchardt was the only person in the defense team to interview Gary Hamilton, who was the only person that could corroborate much of the information Purkey provided about his background. And, this very sensitive interview was conducted in only one meeting with counsel's teenage son coming in and out of the room while counsel purportedly attempted to learn about the pervasive incest and frequent sexual assaults of the brothers by their mother. Counsel's actions were contrary to commonsense but also revealed a fundamental lack of understanding that

18

"[t]opics like childhood sexual abuse should . . . not be broached in an initial interview" and that "[o]btaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments" the witness may suffer. Guideline 10.7 Commentary.

(19)    Counsel's failure to retain a mitigation specialist also meant that there was no one in the defense team to compile "a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation," which should be provided to the mental health experts in the team to assist them. Instead, the experts were given basically only an index of thousands of pages of records in order to assist them in ferreting out relevant and significant information. Exhibit 11; Exhibit 15.

(20)    Counsel's conduct was also deficient in the failure to investigate Purkey's social history before March 1997 and beyond his immediate family members. The Guidelines specifically list the need to interview "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." *Id. See also* Exhibit 11; Exhibit 15.

(21)    Counsel also ignored the need to develop "[a] multi-generational investigation," which frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." *Id.*

(22)    Counsel did not have a reasonable tactical or strategic reason for the failure to retain a mitigation specialist or to otherwise adequately investigate Purkey's background. Even co-counsel at the time of trial, Laura O'Sullivan, believed that a mitigation investigator should be

19

retained.  Exhibit 1.  And, while counsel should certainly be cost-conscience, it is not a reasonable strategy to ignore a vital part of a capital defendant's trial and sentencing preparation simply to be more "cost effective" overall and in the mistaken belief that counsel can adequately perform these functions on his own.  Indeed, it is clear that counsel made no effort even to perform most of the functions a mitigation specialist would actually have performed for the defense team.

(23)    Purkey was prejudiced due to counsel's deficient conduct in a number of ways.  First, because of counsel's deficient conduct, particularly in the handling of the interview of Gary Hamilton, counsel failed to learn the excruciating details of the brutality of Purkey's father that included even slamming his wife's arm in a door repeatedly until her arm broke while his children watched.  Exhibit  16 (Gary Hamilton Declaration).  More importantly, counsel failed to learn that Gary had also been abused not just by his mother but also by his grandmother.  Exhibit  16.  As summarized by Dr. Cunningham, who obtained the details from Hamilton:

> Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years.  The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures.  Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling.  Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley).  Mr. Hamilton's descriptions represented critically important, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed interactions that constituted the primary relationships of Mr. Purkey's childhood.

Exhibit 11.

(24)    Purkey was also prejudiced by counsel's failure to interview other social history and background witnesses.  For example, counsel should have easily anticipated that the

20

government would allege that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty. Indeed, the government did make the allegation in cross-examining Dr. Peterson, the defense psychiatrist, that the abuse had never before been reported to anyone. Tr. 1817, 1824. Government counsel then argued that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68.

(25) If counsel had adequately prepared or had the assistance of a comprehensive history prepared by a mitigation specialist, counsel could have easily countered the allegation that Purkey had never before reported being sexually abused. Indeed, this information was apparent in Purkey's Oregon Department of Corrections records. Specifically, the records reflect that on November 25, 1986, Purkey completed a life history questionnaire in applying for counseling by Rex Newton, Ph.D. On the questionnaire he reported "anxiety or guilt feelings arising out of sex or masturbation" from "years ago." In response to "[a]ny relevant details regarding your first or subsequent sexual experiences" he wrote "being abused as a child." He also listed his "most significant memories and experiences" for ages "6-10" as "being sexually abused." Thus, it was clear from just this record, which had even been specifically noted by Dr. Peterson is his own report, that Purkey had previously reported the sexual abuse. Exhibit 17 (Portion of Oregon Department of Corrections Records). And, significantly, Purkey had reported it years before trial in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling. In short, Purkey was prejudiced by counsel's failure to establish this on the record in response to the government's cross of Dr. Peterson and argument on this issue.

21

001566

(26)    Purkey was also prejudiced by counsel's failure to interview Dr. Newton because he would have been a powerful mitigation witness in his own right. Dr. Newton would have been available to testify, based on many years of experience as a prison psychologist, that Purkey very much wanted to face his demons with therapy and that he was afraid of freedom because even a decade before his parole he knew that he was institutionalized. Dr. Newton also supported the finding that Purkey was a product of his childhood as "a throw away kid," who was abused, sexually and otherwise, by parents who never really parented him. Dr. Newton also would have confirmed that, even more than fifteen years prior to trial, Purkey was clearly not involved in racist prison gangs and was ashamed of his tattoos. Thus, Dr. Newton could also have helped counter the government's arguments of future dangerousness based on his alleged racial bias and involvement with prison gangs. Exhibit 18 (Rex Newton, Ph.D., Declaration).

(27)    Purkey was also prejudiced by counsel's failure to interview Peggy Marteney Noe and her daughter, Evette Marteney Noe, who will be referred to hear by their first names for simplicity's sake.[4]    Peggy was named in some of Purkey's Wichita Police Records that were obtained by trial counsel. Specifically, on April 4, 1974, when he had been taken into "protective custody" for public drunkenness and taken to the hospital, she was listed as his common law wife. Purkey has remained in contact with her over the years and could easily have provided contact information for her.

(28)    Peggy has known Purkey since the second grade and went to school with him. She knew he went to special classes everyday after school for his stuttering problem. She also knew

---

[4]Declarations from both of these witnesses will also be provided in conjunction with the Memorandum of Law.

22

even at the time that he was physically abused by his parents and that they were alcoholics. When Purkey was only 16 or 17 years old, he also admitted to Peggy that his mother was sexually abusing him and had been doing so for a long time. While it was difficult for him to talk about it and stuttered badly when he did, he admitted to Peggy that his mother forced him to have sex with her and made him do other things to her sexually to stimulate her. Peggy was also aware that after Purkey's grandmother died, his mother lived with her step-father "like husband and wife" and clearly had a sexual relationship. Peggy even observed Purkey's step-grandfather threaten him with a shotgun when Purkey confronted them asserting that their actions were wrong.

(29)    In addition to this information, Peggy has many very positive things to say about Purkey and has remained in contact with him over the years. Her daughter, Evette Noe, who was born in 1973, also has very good things to say about Purkey, including that he has been like a father to her. She has known him since she was a child when he helped to raise her. After he went to prison, she started writing to him when she was nine, and she still writes to him. Purkey gave her Duchardt's phone number prior to trial, and she tried to contact him a number of times prior to Purkey's capital trial. He never returned her calls.

(30)    Purkey was also prejudiced by counsel's failure to interview other background witnesses, such as Floyd Bose and his daughter, Dion Leiker, who were made known to trial counsel well prior to trial but never even contacted despite the significant mitigation evidence they could have provided. Exhibit 19 (Purkey Letter to Duchardt dated August 7, 2003). Specifically, Bose, a law enforcement officer for 24 years and former Sheriff in Smith Center, Kansas, would have testified that he met Purkey while Purkey was in prison in the early 1980's. Bose's son had been murdered and Purkey contacted the family to provide them with information he had learned that

23

gave the family closure in helping them to understand what had happened.  Bose also found Purkey to be very remorseful for his own crimes.  Exhibit 20 (Floyd Bose Declaration).  He remains in irregular contact with Purkey as does his daughter, Dion Leiker, who also served twelve years in law enforcement.  Leiker stayed in contact with Purkey after that time and describes him as a very compassionate person, who even helped her understand her grandson's problems after her grandson was sexually molested.  She also credits Purkey with saving her life in 1983 when he convinced her to escape an extremely violent marriage in which she was being abused weekly.  Exhibit 21 (Dion Leiker Declaration).

(31)    Prejudice is clear because Dr. Newton and Peggy Marteney not only could have provided substantial and credible mitigating information in their own right, but their testimony was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty.  He had reported it to a friend as a teenager and to a prison psychologist many years before.  These witnesses also would have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness.  Exhibit 11.

(32)    The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death, even though it found no mitigating circumstances at all.  *See* Ground XX, *infra.*  If all of the available mitigating evidence had been presented, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b)    This ground has not been previously asserted.

24

**VI.** **Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.**

**(a)** **Supporting Facts.**

(1) Bruce Leeson, Ph.D., testified in sentencing on the basis of neuropsychological testing of Purkey that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." Tr. 1616. He also was not aware of neurological examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. Tr. 1626-1631.

(2) Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and/or failing to adequately prepare him for cross-examination.

(3) Counsel's conduct was not based on a reasonable tactical or strategic decision.

(4) Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address these prior reports. If Dr. Leeson had been adequately prepared, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b) This ground has not been previously asserted.

25

VII.   **Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Stephen Peterson, M.D.**

(a)   **Supporting Facts.**

(1)   Dr. Peterson, a forensic psychiatrist, was retained by counsel as a defense expert. Dr. Peterson had previously been retained by Purkey's appointed counsel on the Bales murder case in Wyandotte County, Kansas. He prepared a report in that case detailing Purkey's report to him of having been sexually abused by his mother. Exhibit 22 (Peterson Report dated April 19, 2000). This report specifically included information about her sexually abusing him from as early as age 9, including forcing him to have sexual intercourse with her. She also had him to perform oral sex on her and taught him to anally and vaginally stimulate her.

(2)   Dr. Peterson examined Purkey with respect to the federal capital charge in late 2002. Dr. Peterson's last examination of Purkey prior to his capital trial was in December 2002, approximately a year before trial. His final report was submitted on August 13, 2003. In that report, he clearly referenced prior records that he had reviewed, including Dr. Newton's records from the Oregon Department of Corrections reflecting Purkey's reports to him of being sexually abused between the ages of 6 and 10. He also included a finding of longstanding sexual abuse by Purkey's mother, but did not include near as much detail on this as he had in his report in the Bales case. Exhibit 23 (Peterson Report dated August 13, 2003).

(3)   Prior to trial, Duchardt did not ask Dr. Peterson to include additional information on this topic in his report or prepare to testify to this in sentencing. Indeed, Duchardt did not advise him that Purkey had also provided details of the sexual abuse to Dr. Cunningham, Exhibit 11, and did not even provide Dr. Peterson with the opportunity to consult with Dr.

26

Cunningham.  Thus, Dr. Peterson did not focus in detail on this as a mitigation theme or, as he explains it now, "include the raw details of what had happened to Mr. Purkey, such that the jury could really envision what had happened to Mr.  Purkey as a child."  Exhibit 15.

(4)     Instead, Dr. Peterson testified generally about these topics.  He provided only general testimony that Mr. Purkey was "severely sexually and physically and emotionally abused in childhood" and he "developed abnormal psychosexual ideas."  Tr. 1748.  The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left.  Tr. 1750.  He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women.  Tr. 1750.  He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification."  Tr. 1752.

(5)     During cross-examination, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that he raped her.  Tr. 1817.  He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask.  Tr. 1824.  At the time, he was not aware, of course, that Purkey had provided some of this information to Peggy Marteney as a teenager or that he had also provided detailed information on this topic to Dr. Cunningham.

(6)     Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being sexually abused as a child.  Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports.

27

(7)    Counsel's conduct was deficient in failing to prepare Dr. Peterson to testify concerning the details of the sexual abuse he was aware of, failing to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of, failing to develop the additional information that Dr. Newton and Peggy Marteney could have provided, and failing to even correct the false perception created during cross-examination.

(8)    Counsel's conduct was not based on a reasonable strategic or tactical decision. Much of this was again the product of failing to obtain a mitigation specialist, who would at least have caught the fact that the abuse was reported to Dr. Newton years before. Exhibit 15. Even without that, however, counsel needed only to have referred Dr. Peterson to his own report to establish that Purkey had not just recently fabricated information about being sexually abused as a child.

(9)    Purkey was prejudiced because the jury was deprived of substantial mitigating evidence through Dr. Peterson specifically related to the horrific details of the sexual abuse that he endured and the effect it had upon his development and still had on him at the time of trial. The jury heard only generics instead of the nightmarish realities of what happened to him when he was just a defenseless, small boy, that would impact him for the rest of his life and did at the time of this crime as well as his prior crimes. Exhibit 15.

(10)    The prejudice is especially clear because Dr. Peterson was not adequately prepared beforehand and redirected even after the very damaging cross because government counsel was free to argue without objection or contradiction by defense counsel that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68.

28

(11)   The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death.  If all of the available mitigating evidence had been presented in a credible and corroborated fashion through Dr. Peterson, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b)   This ground has not been previously asserted.

**VIII.   Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.**

**(a)   Supporting Facts.**

(1)   Dr. Cunningham, a forensic psychologist, was retained by counsel as a defense expert or as a "mitigation/sentencing specialist" to rebut the government's allegations of future dangerousness and to address other matters.

(2)   In his interviews of Purkey, Dr. Cunningham was provided with details about the sexual abuse of Purkey by his mother.  Specifically, Dr. Cunningham had learned and was prepared to testify, based on information provided to him by Purkey, that Purkey had been exposed to such things as his parents having sexual intercourse with the door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee.  After his parents separated, he had also observed his mother having sexual intercourse with another man.

(3)   Dr. Cunningham was also prepared to testify about the details of the sexual abuse by Purkey's mother because he believed it was very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse."  He could have testified that, beginning as early as age eight, Purkey's

29

mother was inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse. Exhibit 11.

(4)    Dr. Cunningham had even prepared slides, which were discussed with Duchardt in preparation for his testimony, including these relevant slides. Exhibit 11. Dr. Cunningham understood, when he took the witness stand that he would be testifying about the details of "the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child." Exhibit 11. Nonetheless, counsel did not question him about the detail, even though Dr. Cunningham believed "this was a significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup." Exhibit 11.

(5)    Like Dr. Peterson, Dr. Cunningham testified only generically about Purkey's mother's promiscuous behavior. Tr. 1858. He also testified generically that she sexually abused him for years and he had also been abused by an older male several times. Tr. 1865.

(6)    Counsel's conduct was deficient in failing to adequately prepare Dr. Cunningham to testify concerning the details of the sexual abuse he was aware of, failing to develop the additional information that Dr. Newton and Peggy Marteney could have provided, and failing to even ask the questions of Dr. Cunningham to elicit the information he was prepared to testify to in accordance with the slides he had prepared. Exhibit 11.

30

(7)     Counsel's conduct was not based on a reasonable strategic or tactical decision. Dr. Cunningham's intent to testify to these details is clear from his slides.  Exhibit 11.  Thus, counsel apparently just failed to ask the appropriate questions, perhaps because of his failure to prepare or refer to notes while he examines witnesses in court.  Exhibit 1.

(8)     Purkey was prejudiced because the jury was deprived of substantial mitigating evidence through Dr. Cunningham specifically related to the horrific details of the sexual abuse that he endured and the effect it had upon his development and still had on him at the time of trial.  The jury heard only generics instead of the nightmarish realities of what happened to him when he was just a defenseless, small boy, that would impact him for the rest of his life and did at the time of this crime as well as his prior crimes.

(9)     The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death.  If all of the available mitigating evidence had been presented in a credible and corroborated fashion through Dr. Cunningham, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b)     This ground has not been previously asserted.

**IX.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the lay testimony of Gary Hamilton and Angie Genail in mitigation.**

**(a)     Supporting Facts.**

(1)     Setting aside the witnesses that counsel failed to interview and call to testify, counsel was ineffective in failing to adequately prepare and present the testimony of Gary Hamilton and Angie Genail.

31

(2)     The details of Gary Hamilton's possible testimony are included in his declaration.  Exhibit 16.  As noted previously, the details of Genail's possible testimony will be provided in a declaration to be submitted with the Memorandum of Law.

(3)     Counsel's conduct was deficient, not explained by reasonable strategy or tactics, and prejudicial.

(b)     This ground has not been previously asserted.

**X.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.**

(a)     **Supporting Facts.**

(1)     In sentencing, the very first witness called by the defense was Dr. William Grant, a Bureau of Prisons employee.  He testified concerning the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate.  Tr. 1410, 1415, 1417.  He then testified on cross-examination that while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable."  He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems."  Tr. 1416.

(2)     Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed."  On cross-examination, however, he acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated.  He also testified that Purkey was the only pretrial detainee there and he was sent

32

because he "was a management problem" and was "demanding."  Tr. 1656.  He also testified that

he had heard that Purkey has a long history of assaultive behavior in prison.  Tr. 1658.

(3)  Counsel's conduct was deficient, not explained by reasonable strategy or

tactics, and prejudicial.  Clearly this testimony was more aggravating than mitigating.

(b)  This ground has not been previously asserted.

**XI.  Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to advise him to testify in sentencing.**

**(a)  Supporting Facts.**

(1)  Purkey testified during trial but did not testify in sentencing before the jury.

Instead, counsel sought to present an allocution statement from him.  Doc. #475; Tr. 1838-39.  This

request was denied.

(2)  Counsel's conduct was deficient, not explained by reasonable strategy or

tactics, and prejudicial.  At minimum, Purkey sought to testify to express his remorse as he did in

his statement during the formal sentencing hearing before this Court.  Doc. #535 at 16.

(b)  This ground has not been previously asserted.

**XII.  Purkey was denied due process of law and his right to fair trial in violation of the Fifth and Sixth Amendments during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly telling the jury that Purkey had just walked into court and recanted the kidnaping of Ms. Long.**

**(a)  Supporting Facts.**

(1)  In December, 1998, Purkey told Agent Tarpley and Detective Howard that

he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas,

where he killed her.

33

(2)     In October, 2001, Purkey was indicted for the kidnaping, rape, and murder of Ms. Long.

(3)     On November 2, 2001, Michael Speakman spoke with the FBI, advising them that Purkey had said:

(i)     "[the] girl was with him partying"

(ii)     "[he] did not snatch [her]"

(iii)     "[it was] not forcible with girl"

Exhibit 24 (Brunell Rough Notes dated 11/02/01).  "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did.  Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible."  Exhibit 2 (Speakman 302, Transcribed 11/28/2001).

(4)     On August 13, 2003, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence during their 2002 discussions that he had not kidnaped Ms. Long.  Exhibit 15. On September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying about this recantation.  Doc. #337.  Although, its star witness – i.e., Michael Speakman – had reported this same recantation two years earlier, government counsel claimed, "the United States has learned for the first time that defendant is now claiming that the victim accompanied him voluntarily from Missouri to Kansas."  Doc #337, p. 2.

(5)     In October, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief.  Tr. 429-35, 490-92, 534, 538, 572, 956-60.  Government counsel elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long.  Tr. 566.

34

(6)     Purkey's defense, on the other hand, centered on his testimony that Ms. Long had voluntarily entered his truck and had voluntarily accompanied him from Missouri to his home in Lansing, Kansas to "party."  Tr. 927-40, 948, 955, 962.

(7)     Government counsel then told the jury that Purkey had just "change[d] his story" in order to avoid the death penalty – "he's trying to get out of it."  Tr. 1135.  Government counsel emphasized, "All the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her."  Tr. 1135.

(8)     Government counsel deliberately presented a false impression that Purkey had just walked into court and decided to recant the kidnaping as a means of saving his life.  Deliberately misleading the jury to create this false impression violated due process and deprived Purkey of his right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This deliberate misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

(b)     This ground was not asserted on direct appeal due to counsel's failure to object during trial and failure to assert this ground as plain error on appeal.

**XIII.   Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "[r]ight before this trial."**

**(a)     Supporting Facts.**

(1)     On November 2, 2001, Michael Speakman told Agent Brunell that Purkey had recanted the kidnaping to him.

(2)     On November 28, 2001, the FBI's first 302 on Speakman was transcribed. It was generated by Brunell and Tarpley and included the following:

35

Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not "snatch" the girl from the street as Nelson did. Purkey described the initial contact with the girl as more like they were "partying," and that is [sic] was not forcible.

(3)     Two years later, in October, 2003, Government counsel elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnapped Ms. Long.  Tr. 566.

(4)     As defense counsel readily admitted, Purkey's credibility was central to the case:  "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey."  Tr. 1104 (emphasis added).

(5)     A reasonably competent attorney would have impeached Agent Tarpley with the November 2001 302 bearing his name that clearly reports that Purkey was denying that he kidnapped Ms. Long *two years before this trial*.

(6)     Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(7)     Government counsel deliberately gave the jury the false impression that Purkey had just walked into court and decided to recant the kidnapping as a means of saving his life. Trial counsel had the information to attack Tarpley's credibility, and he sat silent.  Letting the jury form a belief that Purkey was lying, when it was really Tarpley who was lying sounded the death knell for Purkey.  Had counsel impeached Tarpley, there is a reasonable probability that the jury would have decided the case differently.

(b)     This ground has not been presented previously.

36

**XIV. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to correct the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnapping for the first time because counsel both knew that Purkey had disclaimed the kidnapping since their very first meetings with him two years before trial.**

**(a) Supporting Facts.**

(1) The facts with respect to the government's misconduct are set forth in paragraphs 12(XII)(a)(1)-(7) and 12(XIII)(a)(1)-(5) above.

(2) In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily. Duchardt was a necessary witness to rebut the false impression concocted by the government.

(3) In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily. O'Sullivan was a necessary witness to rebut the false impression concocted by the government.

(4) Trial counsel's conduct was deficient in failing to correct the government's implication that Purkey had not recanted the kidnapping until he came into court for his trial. Counsel had exculpatory material in the way of Purkey's immediate and persistent denial that he had kidnapped Ms. Long. Reasonably competent attorneys would have used that information to set the record straight for the jury.

(5) Counsel's conduct was not based on a reasonable strategic or tactical decision.

(6) Purkey was prejudiced by counsel's failures because government counsel was allowed to create the false impression that the centerpiece of Purkey's defense was fabricated "[r]ight before this trial." Counsel's *arguments* to the contrary did not negate the reasonable

37

probability that the jury would have reached a different decision had counsel properly corrected the government's gross misconduct.

(b)     This ground has not been previously asserted.

**XV.     Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments when counsel failed to object to the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnapping for the first time and when appellate counsel failed to assert this ground on direct appeal.**

**(a)     Supporting Facts**.

(1)     The facts with respect to the government's misconduct are set forth in paragraphs 12(XII)(a)(1)-(7) and 12(XIII)(a)(1)-(5) above.

(2)     Trial counsel's conduct was deficient in failing to object during government counsel's examination of Agent Tarpley and during his closing argument. During both, government counsel made the unfounded allegation that Purkey had just walked into court and recanted the kidnapping for the first time.

(3)     Counsel knew from day-1 that Purkey was denying any kidnapping:

(i)     In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily.

(ii)     In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily.

(iii)     In November 2001, Speakman claimed that Purkey had similarly recanted the kidnaping to him.

38

001583

The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnapping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman…. But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnapping. They knew about it.

Tr. 1106.

(4)    Nevertheless, counsel sat idle when the government was painting Purkey as a convenient liar because, as counsel will undoubtedly assert, the bottom line was that Purkey was changing his story from the confession and objecting would have led to an unnecessary squabble with the government. But counsel was already engaged in a squabble over the kidnapping – he had told the jury "from day one" that the kidnapping did not happen. *See, e.g.,* Tr. 408, 1104. As counsel readily admitted at trial, Purkey's credibility was central to the case: "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104 (emphasis added). Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(5)    Purkey was prejudiced by counsel's failures in that government counsel was given unbridled latitude to create the false impression with the jurors that Purkey's recantation had been recently fabricated for trial. Counsel's argument to the contrary, after letting the government create its false impression without objection, did not negate the reasonable probability that the jury would have reached a different conclusion if counsel had properly objected and resolved the matter during trial.

(6)    Alternatively, appellate counsel were ineffective in failing to assert the government's misconduct as plain error on direct appeal because the trial court was obliged to

39

intervene *sua sponte* to correct the government's misconduct.  Counsel's conduct was deficient, not based on reasonable strategy, and prejudicial.

(b)     This ground has not been previously asserted.

**XVI.   Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel tied Purkey's hands while testifying, telling him that he could not mention having told Dr. Peterson that he did not kidnap Ms. Long and that if he did, his entire testimony would be struck by the court.**

**(a)     Supporting Facts.**

(1)     In October, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief.  Tr. 429-35, 490-92, 534, 538, 572, 956-60.

(2)     Purkey's defense, on the other hand, centered on the fact that Ms. Long had voluntarily entered his truck and had voluntarily accompanied him from Missouri to his home in Lansing, Kansas to "party."  Tr. 927-40, 948, 955, 962, 1104.

(3)     In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(4)     In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(5)     Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnapped Ms. Long.

(6)     On September 25, 2003, the government moved *in limine* to preclude *Dr. Peterson* from testifying about this recantation. Doc. #337. The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the

40

same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3.  A month later, this Court sustained the government's motion.  Doc. #440.

(7)    On November 4, 2003, approximately an hour before calling him to the witness stand, trial counsel informed Purkey that he would be testifying.  During this last minute conversation, counsel warned Purkey not to mention having told Dr. Peterson that he did not kidnap Ms. Long because the court would strike his entire testimony if he did.

(8)    On cross-examination, the government attacked:  "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008.  With his hands tied, Purkey simply replied, "That's true." Tr. 1008.  Of course, it wasn't true.  Two years earlier, Speakman had reported that "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did.  Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible." Exhibit 2.  Nevertheless, Purkey understood that his *entire* testimony would be struck if he answered any other way.

(9)    Counsel imposed a gag-order on Purkey.  Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(10)    Purkey was prejudiced by counsel's deficient advice.  But for counsel's gag-order, Purkey would have testified that

(i)    he had denied the kidnapping from the time of the indictment;

(ii)    two years before trial, he had told both his attorneys (Duchardt and O'Sullivan) and his investigator (Michael Armstrong) that Ms. Long accompanied him to his home voluntarily;

41

001586

(iii)    nearly a year before trial, he had told Dr. Peterson that Ms. Long accompanied him to his home voluntarily.

(b)    This ground has not been previously asserted.

**XVII.    Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to call Dr. Stephen E. Peterson to testify that Purkey had denied kidnapping Ms. Long when he had interviewed Purkey in 2002.**

(a)    **Supporting Facts.**

(1)    Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnapped Ms. Long.

(2)    On September 25, 2003, the government moved *in limine* to preclude *Dr. Peterson* from testifying about this recantation. Doc. #337. The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3.

(3)    A month later, this Court sustained the government's motion. Doc. #440.

(4)    Once Purkey testified, however, Dr. Peterson was ready, willing and able to testify to rebut the government's allegation that Purkey had recently fabricated his testimony that he did not kidnap Ms. Long.

(5)    Dr. Peterson would have testified that through the course of four interviews between September, 2002 and December 2002, Purkey shared with him that Purkey had not kidnapped Ms. Long that she had joined him voluntarily.

(6)    Purkey was prejudiced by counsel's deficient performance in that government counsel was given unbridled latitude to create the false impression with the jurors that Purkey's

42

recantation had been recently fabricated for trial. As counsel readily admitted, Purkey's credibility

was central to the case: "It is ironic that both we and the government are *absolutely dependent on*

*one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104

(emphasis added). Had the jury heard from Dr. Peterson that Purkey had denied the kidnaping a

year before trial there is a reasonable probability that the jury would have reached a different

conclusion about Purkey's culpability.

(b)    This ground has not been previously asserted.

**XVIII Purkey was denied his right to due process of law when the court accepted the jury's verdict finding Purkey guilty of kidnapping resulting in death because no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

(a)    **Supporting Facts.**

(1)    In December, 1998, Purkey told Agent Tarpley and Detective Howard that

he had kidnapped Ms. Long in Missouri and forced her to accompany him to his home in Kansas,

where he killed her. He lied. He lied so that it would be a federal crime and he could get out of the

cesspool of the Kansas Department of Corrections.

(2)    Nearly three years later, in October, 2001, Purkey was indicted for the

kidnapping, rape, and murder of Ms. Long.

(3)    The government, however, had absolutely no evidence of a kidnapping *except*

Purkey's confession. Its entire case rested on that.

(4)    In October, 2001, Purkey had his first meeting with Duchardt, and Purkey

insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

43

(5)     In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(6)     On November 2, 2001, Michael Speakman spoke with the FBI, advising them that Purkey had said:

(i)      "[the] girl was with him partying"

(ii)      "[he] did not snatch [her]"

(iii)      "[it was] not forcible with girl"

Exhibit 24.  "Purkey explained [that] his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did.  Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible."  Exhibit 2.

(7)     Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnaped Ms. Long.

(8)     The "corroborating" evidence led inextricably to the inference that Ms. Long voluntarily accompanied Purkey to his Kansas home:

(i)      Purkey knew that Ms. Long drank gin and orange juice;

(ii)      Purkey knew that Ms. Long was having trouble in school;

(iii)      Ms. Long did not leave when she had the chance, e.g., when she used the rest room at the convenience store on Highway 7 and when Purkey had to stop at various stop lights along Highway 7.

(9)     Clinging to Purkey's confession, however, the government undertook simply to convince the jury that his recantation of the kidnapping had come, not two years before trial, but "[r]ight before this trial."  Tr. 566.

(10)    On October 10, 2003, Duchardt wrote to the government reminding it of Purkey's willingness to take a polygraph regarding the kidnaping.

(11)    But for the government's misleading tale of deceit, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long.

(b)     This ground was not asserted on direct appeal due to counsel's ineffectiveness.

**XIX.    Purkey was denied his right to effective assistance of counsel when appellate counsel failed to argue that no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

(a)     **Supporting Facts.**

(1)     The facts with respect to the insufficient evidence of kidnapping are set forth in paragraphs 12(XIX)(a)(1)-(6) above.

(2)     Counsel's conduct was deficient in failing to challenge the insufficient evidence of kidnapping in Purkey's direct appeal.

(3)     Counsel's conduct was not based on a reasonable strategic or tactical decision; indeed, there can be no reasonable strategy to omit a claim that would result in the discharge of one's client.

(4)     There is a reasonable probability that the court of appeals would have reversed Purkey's conviction and discharged him from his sentence had counsel challenged that there was not sufficient evidence to support the verdict.

(b)     This ground has not been previously asserted.

45

**XX.    Purkey was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence.**

**(a)    Supporting Facts.**

(1)    The verdict form required the jury – in accord with 18 U.S.C. 3593(d) and (e) – to account that it had indeed lawfully considered the evidence in mitigation presented by Purkey. Doc. #487.

(2)    The jury, however, left blank the entire section of the verdict form related to findings upon mitigation evidence.  Doc. #487.

(3)    The jury failed to *acknowledge,* let alone *consider* the following obvious evidence in mitigation:

* * *

11.    Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12.    As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13.    While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14.    While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15.    While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16.    Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

* * *

46

001591

18.     The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21.     Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22.     Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24.     Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27.     In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Doc. #484, pp. 33-36; Doc. #487, pp. 9-16.

(4)     The jury's failure to vote even on obvious mitigating evidence violated the

Due Process Clause of the Fifth Amendment and subjected Purkey to a death sentence based upon

arbitrary factors in derogation of the Eighth Amendment.

(b)     This ground was asserted on direct appeal and denied due to Circuit precedent.

47

001592

**XXI.   Purkey was denied due process of law and his right to a fair and impartial trial during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to the cumulative effect of government counsel's deliberate misconduct.**

(a)     **Supporting Facts.**

(1)     Each of the individual instances of government misconduct cited throughout this motion were material and require reversal without reference to any other claim.  In addition, however, the cumulative nature of the material prejudice requires reversal.

(2)     In considering the cumulative prejudice, this Court must also consider the prejudice due to the government's misconduct in withholding more than 80 pages of raw notes in discovery including the notes of the critical interview of Michael Speakman on November 2, 2001 addressed above.

(3)     The government also engaged in deliberate misconduct in displaying a picture of Purkey during direct examination of its very first witness during trial that called attention to Purkey's tattoos that included, among other things, a Nazi swastika and other arguably racist symbols. Tr. 419-20.  While defense counsel's objection was sustained, the pictures were displayed before the jury for at least a couple of minutes. Exhibit 1.  This was intentional misconduct because these pictures were not relevant to any issue in the trial.  This conduct was also material during the trial because it unfairly purported to reflect on Purkey's character and, thus, his credibility.

(4)     Government counsel also engaged in prejudicial misconduct in cross-examination of Purkey in asking if Long saw the "Nazi Swastika on your arms?"  Again, trial counsel's objection was sustained, but the damage had been done, such that this misconduct was prejudicial. Tr. 1010-11.

48

(5)    Government counsel engaged in misconduct in sentencing in cross-examining Dr. Peterson about whether he was "aware [that Purkey] threatened to run my head through yesterday in court." While trial counsel objected and the court sustained the objection, the damage was again already done.

(6)    Finally, government counsel engaged in misconduct during cross-examination of Dr. Peterson in asserting that there was no "prior report" of Purkey having been the victim of sexual abuse. Tr. 1817. Government counsel was in possession of the Oregon Department of Corrections Records reflecting Purkey's prior report of being sexually abused as a child. Government counsel was also in possession of Dr. Peterson's report specifically citing these records. Thus, government counsel knew that a false perception was being created by the implication that Purkey had just "made up" this report in order to escape the death penalty.

(7)    The government's deliberate misconduct violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

(b)    The grounds asserted in paragraph 12(XXI)(a)(2) & (6) was not asserted on direct appeal due to trial/appellate counsel's failure to request full discovery and failure to assert this ground as plain error on appeal. The grounds asserted in paragraphs 12(XXI)(a)(3)-(5) were asserted on direct appeal but found to be harmless. The prejudicial, harmful nature of these grounds is clear, however, when considered cumulatively with the government's other misconduct.

49

**XXII. Purkey was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to the cumulative effect of counsel's deficient conduct and the resulting prejudice.**

**(a)    Supporting Facts.**

(1)    Each of the individual instances of trial counsel's deficient conduct cited throughout this motion were prejudicial and require reversal without reference to any other claim. In addition, however, the cumulative nature of the prejudice requires reversal.

(2)    In considering the cumulative prejudice, this Court must also consider the prejudice due to trial counsel's failure to request in discovery the raw notes and draft 302's in discovery including the notes of the critical interview of Michael Speakman on November 2, 2001 addressed above.

(3)    With respect to prejudice in sentencing, this Court should also consider the prejudice due to this Court's error in excluding the testimony of Dr. Mark Cunningham regarding Purkey's fetal alcohol exposure and this Court's error in limiting the impeachment of Dr. Park Dietz concerning an error that the doctor made when testifying in the case of *Yates v. State,* 171 S.W.3d 215 (2005) in testifying that the facts of an episode of a television show on which he consulted, "Law & Order," were very similar to those in *Yates* when no such episode existed.

(4)    The prejudice from counsel's errors during trial require that Purkey's conviction be set aside.  Even assuming, however, that the resulting prejudice from counsel's errors during the trial does not require reversal, the prejudice from these errors and the court's errors in sentencing, requires that Purkey's death sentence be set aside.

(b)    The ground asserted in paragraph 12(XXII)(a)(2) was not asserted on direct appeal due to trial/appellate counsel's failure to request full discovery and failure to assert this ground as

50

plain error on appeal. The grounds asserted in paragraph 12(XXII)(a)(3) were asserted on direct appeal but found to be harmless. The prejudicial, harmful nature of these grounds is clear, however, when considered cumulatively with the errors of counsel, specifically those relating to the failure to adequately prepare and present the sentencing evidence.

### *Additional Procedural Information*

13.     As addressed previously, a number of the issues relating to government misconduct and the ineffective assistance of counsel have not previously been presented in this Court or the Court of Appeals due to trial counsel's ineffectiveness and because trial counsel also represented Purkey on direct appeal.

14.     Purkey does not have any other motion, petition, or appeal now pending in any court for the conviction and sentence in the Jennifer Long case.

15.     During all stages of the trial and appellate proceedings, Purkey was represented by Frederick A. Duchardt, Jr., P O Box 349, Kearney, MO 64060. During all stages of the trial and the filing of Purkey's opening brief in direct appeal, Purkey was represented by Laura E. O'Sullivan, District Defender, 100 S. Central, 2nd Floor, Clayton, MO 63105. Ms. O'Sullivan was replaced as Purkey's counsel on direct appeal by William C. Odle, Spencer Fane Britt & Browne LLP, 1000 Walnut Street, Suite 1400, Kansas City, MO 64106.

16.     Purkey was not sentenced on any other indictment in federal court.

17.     Purkey does currently have a sentence to serve for the robbery and murder of Mary Ruth Bales in Wyandotte County, Kansas.

18.     Purkey's motion is timely under the one-year statute of limitations as contained in 28 U.S.C. § 2255.

51

*Conclusion*

Based upon all of the above allegations and the entire record of this prosecution, Movant respectfully requests that the Court provide the following relief:

1.      That Movant be permitted to file a Memorandum of Law in Support of this Petition no later than December 15, 2007;[5]

2.      Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.      Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.      Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondent's Answer;

5.      Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the

---

[5]A separate motion requesting this relief is also being filed simultaneously with this Motion.

52

Respondent.  Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges.

7.      Permit oral argument as appropriate and required;

8.      Vacate Movant's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted; and

9.      Grant any other relief to which Movant may be entitled.

> Respectfully submitted,
>
> Teresa L. Norris, Esq.
> P.O. Box 11744
> Columbia, SC 29211
> (803) 765-1044  (Phone)
> (803) 765-1143  (Fax)
> teresa@blumelaw.com
>
> Gary E. Brotherton, Esq.
> 2101 Chapel Plaza Court, Suite 13
> Columbia, Missouri  65203
> (573) 875-1571  Phone
> (573) 875-1572  Fax
> GEBrotherton@LegalWritesLLC.com
>
> By:     /s/ Teresa L. Norris
>          Court-Appointed Counsel for Purkey

Dated: Columbia, SC
          October 16, 2007

53

## Verification

I, Teresa L. Norris, swear and affirm as follows:

I am an attorney admitted to practice before the courts of the State of South Carolina, the United States District Court, District of South Carolina, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court.

Mr. Purkey is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.  Because of the distance and difficulty involved in getting this motion to him for personal verification, he has authorized me to file the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure on his behalf.

I declare that the contents of the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure are true and correct to the best of my information and belief.

I declare under penalty of perjury that the foregoing is true and correct.


   /s/ Teresa L. Norris
   Teresa L. Norris, Esq.
   P.O. Box 11744
   Columbia, SC 29211
   (803) 765-1044  (Phone)
   (803) 765-1143  (Fax)
   teresa@blumelaw.com

October 16, 2007.

54

001599

## Certificate of Service

This will certify that, on today's date, this motion was served upon the United States by filing via CM/ECF.

/s/ Teresa L. Norris
Teresa L. Norris

Dated:  Columbia, SC
October 16, 2007

55

001600

**Attached Exhibits**

1) Laura O'Sullivan Declaration
2) Michael Speakman 302 (Nov. 28, 2001)
3) Michael Speakman Letter to USA (Nov. 25, 2002)
4) Consolidated Witness List
5) O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003
6) Proposed Budget
7) Ex Parte Request #3 – Cunningham
8) Duchardt Summary of Records
9) Duchardt To Do List
10) Letter from Dr. Cunningham to Duchardt dated December 19, 2002
11) Mark Cunningham, Ph.D., Declaration
12) Supplemental Expert Request for Investigator
13) Supplemental Expert Request for Psychiatrist
14) Supplemental Expert Request for Dr. Cunningham
15) Stephen Peterson, M.D., Declaration
16) Gary Hamilton Declaration
17) Portion of Oregon Department of Corrections Records
18) Rex Newton, M.D. Declaration
19) Purkey Letter to Duchardt dated August 7, 2003
20) Floyd Bose Declaration
21) Dion Leiker Declaration
22) Peterson Report dated April 19, 2000
23) Peterson Report dated August 13, 2003
24) Brunell Rough Notes dated 11/02/01
25) Sam Hoffmeier Declaration

56

IN THE UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY PURKEY                          )
        Movant                          )
                                       )
v.                                     )          Case # 06-8001-CV-W-FJG
                                       )
                                       )
UNITED STATES OF AMERICA               )
        Respondent                      )

## *STATEMENT OF FREDERICK A. DUCHARDT, JR.*

Now on this 9th day of May, 2008 comes Frederick A. Duchardt, Jr., and in

response to the Order of this Court (Doc. 62), and because no objections have been

interposed by Mr. Purkey or his Counsel, does make the following, responses to those

allegations of ineffective assistance of counsel made in the Petition, Suggestions and

supporting documents filed by Counsel for Mr. Purkey before this Court pursuant to

28 U.S.C 2255 (Doc. 47, 52).

### *General Information Pertaining to Appointment and Service of Defense Counsel and Defense Team of Experts*

1. My Qualifications and Duties

I was appointed by the Court as lead counsel for Mr. Purkey at trial and upon

appeal in the above captioned cause. I have been licensed to practice law in Missouri

and in the United States District Court for the Western District of Missouri since

1

001602

1980. At the time that I tried Mr. Purkey's case, I had previously been a State Public Defender for 15 years, and had after that been in the private practice of criminal defense law for eight years, and had handled, as lead counsel at trial, and to completion, three other Federal capital cases and four other Missouri state capital cases.

As lead counsel in this case, I was ultimately responsible for all decisions and actions made with respect to the defense of Mr. Purkey. Included in my duties were the seeking and obtaining members of the defense team to work on the case with me.

2. Matters Pertaining to the Appointment and Service of Laura O'Sullivan, and Division of Duties between the Attorneys

I asked Laura O'Sullivan to join me as cocounsel for Mr. Purkey. I first became familiar with Ms. O'Sullivan in the early to mid 1990's when she was a Missouri State Assistant Public Defender and I was a supervising attorney for the Public Defender System. At that time, I was impressed by the quality of Ms. O'Sullivan's work and her rapport with her clients. When I began my search for cocounsel for the Purkey case, I inquired of various Missouri Capital Public Defenders for recommendations, and Ms. O'Sullivan's name was universally mentioned. She had recently left the employ of the State Public Defender System, and had entered private practice. Also, I learned that, in the years since my departure from the Public Defender System, Ms. O'Sullivan had further distinguished herself in her Public Defender service, and was

2

extremely well-thought-of in terms of her legal acumen in general, and her trial skills in particular. I interviewed Ms. O'Sullivan, and when she agreed to participate in this case, I sought and obtained her appointment as cocounsel.

Because of my extensive experience with capital and mental health case practice, and because of Ms. O'Sullivan's relative lack of experience with those specialties, I expected to, and actually did, take on the lion's share of the duties related to those matters. Even before Ms. O'Sullivan's appointment, I began work on the budget for the case, drawing upon my experience. While I explained the budgeting process to Ms. O'Sullivan as a means to teach her about the process for the future, she at that early stage in the case had little to offer for development of the budget, and thus was unable to provide, and in fact did not provide, much input. As a consequence, I prepared the budget myself. Also, I did the vast majority of the motion practice in the case, since that was an area of strength and experience for me. Other areas of strength and experience for me, for which I took charge, were the jury selection process (the development and analysis of the jury questionnaire, and the development and conduct of voir dire), expert testimony, and opening statements and closing arguments for both phases of trial.

It was my intention, at the outset, that Ms. O'Sullivan have full involvement with all aspects of the case. At that point, I was open to the possibility that Ms.

3

001604

O'Sullivan might take on some of the tasks which I ultimately handled. To this end, I provided her with all of the discovery in the case, as well as copies of the pretrial motions which I was filing. I expected that she would immediately read and become fully familiar with all aspects of the case. I believed that, if things worked optimally, we could have two heads independently developing ideas, concepts and strategies about the case. I also expected that Ms. O'Sullivan, once she became familiar with case materials, would independently develop and implement lines of investigation in the case. Thus, in our case budget, I allotted ample resources for Ms. O'Sullivan to do this work, taking into account the voluminousness of the materials which had to be reviewed, and the octopus-like tentacles of the investigation work which would likely, and did in fact, develop.

Some difficulties emerged when Ms. O'Sullivan was slow to invest the necessary time to read and digest the voluminous case materials. During this early period, the fact that Ms. O'Sullivan was not up to speed on the case was obvious in many ways. In my discussions with her about the case, we would not be able to exchange ideas as equals. Instead, since she had not yet read the materials, I was having to spend our times together educating her about critical facts and issues of law concerning the case with which she was not yet familiar. This was about the same time that relations became strained between Ms. O'Sullivan and Mr. Purkey. Because he

4

was quite familiar with the law and with the facts pertinent to his case, Mr. Purkey, in his meetings with the attorneys, would regularly pose very complex questions and issues regarding his defense, and would expect intelligent answers to those questions. To be able to intelligently answer Mr. Purkey's questions, one had to be very conversant with the facts and the law pertaining to the case. At that time, Ms. O'Sullivan was not so conversant. Though I was not present during the one-on-one meetings between Ms. O'Sullivan and Mr. Purkey to know all that transpired, I did have feedback about those meetings from Ms. O'Sullivan and Mr. Purkey, and I knew what occurred in meetings in which all three of us would be present. From all of that, I intuited that Mr. Purkey was upset because, when Purkey would pose his questions about the case, Ms. O'Sullivan would sometimes give Mr. Purkey's inquiries short shrift, implying that the questions did not have merit, when the problem really was that Ms. O'Sullivan was not familiar enough with the case to fully and intelligently answer the questions.

Also, Ms. O'Sullivan would not independently identify and accomplish necessary case tasks. Rather, she would wait until I assigned her work to do on the case. Even when we would agree that Ms. O'Sullivan would take on certain case investigation tasks, which I expected would be addressed by her immediately, Ms. O'Sullivan would delay in getting to those tasks. This would result in my having to

5

001606

take back and accomplish those tasks myself in order to keep the case preparation progressing. It seemed to me that, because we were still so far off from trial, Ms. O'Sullivan was lulled into a false sense of security, not realizing that hard work was necessary, even at the early stages, to make sure that everything would be accomplished in the time allotted. I became very frustrated with Ms. O'Sullivan over these failures, and I made that frustration known to her.

These problems came to a head when Mr. Purkey sought to have Ms. O'Sullivan removed from the case. Ms. O'Sullivan offered to withdraw from the case, and accused that I was not sufficiently supporting her with Mr. Purkey. I told Ms. O'Sullivan that she could certainly withdraw if she wished. I also directly and firmly told Ms. O'Sullivan that the problems were of her own making. I explained my belief that the problems could be solved by her immediately investing the time necessary to get herself ready on this case, and by her treating Mr. Purkey with more respect. I expressed to Ms. O'Sullivan and Mr. Purkey my confidence that Ms. O'Sullivan had all of the tools to be a valuable member of the defense team. After that, Mr. Purkey withdrew his motion to have Ms. O'Sullivan replaced. Ms. O'Sullivan, for her part, indicated that she did not wish to withdraw, and never again expressed any interest in withdrawing. Ms. O'Sullivan also proceeded to get the materials read and digested. However, Ms. O'Sullivan never did become a self-starter when it came to the

6

identification and discharge of case tasks. I was unsure whether this lack of initiative was part of Ms. O'Sullivan's makeup or owed to her deferring too much to my greater experience in cases of this sort. Whatever the reason, in order for Ms. O'Sullivan to be productive, it was necessary that I conceptualize, develop and assign specific tasks for Ms. O'Sullivan to complete. When she was given discreet tasks and explanations, Ms. O'Sullivan excelled in getting that work done. Thus, that is the way that I managed Ms. O'Sullivan's efforts thereafter.

Though Mr. Purkey did agree to Ms. O'Sullivan continuing as cocounsel, and though he did develop what I felt was a very good relationship with Ms. O'Sullivan, Mr. Purkey made clear to me that he expected that I would personally handle the more difficult duties of the case, i.e. complex motion practice, jury selection, opening statements, closing arguments, and examination of critical witnesses, including experts. I concurred with Mr. Purkey's assessment that it would be best for me to handle all of those matters myself, and thus I handled those matters as the case progressed.

As I prepared for my portions of the case, I would regularly include Ms. O'Sullivan in the work that was being done, and explain to her my reasoning in approaching the case as I was. During these discussions, Ms. O'Sullivan never

offered any other or different ideas. I did not think that unusual since she had never before tried a case involving the death penalty or a mental defense.

Though Ms. O'Sullivan's role in the case was somewhat limited, in the fashions I have described, I believed that the work she did was quite fine, and that her work assisted in preparation for and presentation of the defense.

### 3. The qualifications and use of Michael Armstrong as case/mitigation investigator

I asked Michael (Mic) Armstrong to act as an investigator related to both phases of the case, and to help with duties often assigned to a person commonly referred to as a "mitigation specialist". I chose Mr. Armstrong for this dual role because of his extensive experience and training. During the years I was employed as a supervising Missouri Public Defender, Mr. Armstrong was my lead investigator. In the four capital cases I tried during that time, Mr. Armstrong had performed very successfully for me in the dual role of fact and mitigation investigator. Mr. Armstrong had also, during this time, availed himself of training opportunities which subsequently served him well in discharging both of these dual roles. Mr. Armstrong left the Public Defender System some time after I did, and then entered private investigation practice. In 2000, I was asked to handle the Federal Capital case of *United States v. Carl Haskell*, 00-395. In that case, I rekindled my professional relationship with Mr. Armstrong, again enlisting his services, this time in his private

8

investigator capacity. In that case, as in the previous state cases, Mr. Armstrong distinguished himself in both aspects of his dual investigator role, developing significant evidence for both phases of trial. Because of Mr. Armstrong's success in these five previous cases in the dual investigator role, I believed that he could successfully handle this dual role in the *Purkey* case. Prior to my asking for Mr. Armstrong's appointment, I discussed this dual role with Mr. Armstrong, and he agreed to take on the duties.

In the *Purkey* case, Mr. Armstrong performed every investigative task assigned to him, and found and interviewed every witness, for both phases of trial, whom he was asked to find. I also assigned Mr. Armstrong the lead in handling Mr. Purkey's rather bizarre immediate family. In this capacity, Mr. Armstrong is the one to be credited for getting Jeanette Purkey, Mr. Purkey's wife, to finally admit, after years of denial, that she had been poisoning Purkey in 1998 (Tr. 2237-2243). Mr. Armstrong's ability to accomplish this rather amazing feat owed to the relationship which Mr. Armstrong developed with the family over the many months prior to trial. Noteworthy as well is Mr. Armstrong's willingness to discharge every task assigned to him, no matter how unusual or difficult. For instance, even before Jeanette's admissions, Mr. Purkey strongly believed that his wife had a role, not only in poisoning him, but also in poisoning his dog. Mr. Purkey fervently believed that, if

9

001610

the body of the dog could be exhumed, it could be tested for the poison used to kill it, and thereby provide a lead regarding what poison might have been used on him. Mr. Armstrong fully investigated the matter to Mr. Purkey's satisfaction. For this and many other reasons, Mr. Armstrong earned Mr. Purkey's trust, and the two developed a strong relationship. Because Mr. Purkey is an intelligent man, but also suffers from mental illness, he can be a difficult person with whom to deal. The trusting relationship which Mr. Armstrong developed with Mr. Purkey, and the rapport that he had with Mr. Purkey as a result of that trust, well served our other defense efforts on Mr. Purkey's behalf.

4. The development and presentation of mental health evidence

Mr. Purkey had been prosecuted in Wyandotte County, Kansas State Court for the murder of Ruth Bales. That killing also occurred in 1998, a little more than a half a year after the killing which gave rise to the charges in this case. In the Bales case, the attorneys who had defended Mr. Purkey had employed Dr. Stephen Peterson, M.D., and Dr. Peterson had already conducted an extensive evaluation of Mr. Purkey even before Federal charges were brought. When I was appointed to this case, I obtained the Bales case file, and found Dr. Peterson's report. I was already well-familiar with Dr. Peterson's strong clinical and forensic credentials, and with the very good work he had done in other cases. I was also impressed with the thoroughness of

10

Dr. Peterson's report for the Bales case. Thus, I consulted with Dr. Peterson, and when he agreed to act as forensic psychiatrist in this case, I sought and obtained an Order appointing him in that capacity.

Early on, I learned that, in conducting his evaluation of Mr. Purkey in the Bales case, Dr. Peterson had not had all that he needed to thoroughly assess Mr. Purkey's condition. First, Dr. Peterson had not received all of Mr. Purkey's voluminous medical and incarceration records, and had received virtually none of the records pertaining to Mr. Purkey's family. Second, Dr. Peterson had not taken into account the substantial likelihood that Mr. Purkey had been poisoned by his wife. That was because, though Mr. Purkey had repeatedly told Dr. Peterson and his State Court Counsel about his beliefs that he had been poisoned by his wife, Dr. Peterson could not and did not take those allegations into account in his Bales case report since there was no other information available at that time to confirm Mr. Purkey's accusations. Finally, though there was ample record evidence that Mr. Purkey had suffered severe head injuries in episodes which occurred prior to 1998, there had not been, to that point, any neuropsychological or brain imaging testing conducted, and thus that information had never been provided to Dr. Peterson.

11

To address the records deficiencies, I took the steps to obtain and provide for Dr. Peterson all of the records. On the poisoning issue, I developed and presented to Dr. Peterson the confirmatory information about the matter.

I also enlisted the services of Dr. Bruce Leeson, Ph.D. to conduct neuropsych testing, and I had PET imaging done at KU Med Center by Dr. David Preston, M.D. Both Dr. Leeson and Dr. Preston opined that testing results demonstrated brain injuries suffered by Mr. Purkey. Neither Dr. Leeson nor Dr. Preston, from his results alone, could opine that Mr. Purkey suffered from a mental illness which constituted a first phase defense to the charge against Mr. Purkey. I provided the Preston and Leeson reports to Dr. Peterson for his consideration.

Dr. Peterson, for his part, ultimately concluded that, at the time of the offense charged in this case, Mr. Purkey suffered from mental diseases and defects. Dr. Peterson further concluded that, while Mr. Purkey's condition did not prevent him from appreciating the nature and quality or wrongfulness of his conduct, that condition did impact upon his ability to premeditate or deliberate.

Because of the limited findings of the experts, the government urged, and this Court ruled, that those findings were not relevant to the issues presented in the first

12

001613

phase of trial, but could be presented in the penalty phase. Thus, all of this evidence was presented during the penalty phase.[1]

### 5. The use of Dr. Mark Cunningham to present a summary of all mitigation themes

Early on in the case, I determined that, though we would likely be presenting expert testimony about Mr. Purkey's mental condition, we also needed expert testimony for two additional purposes. We needed an expert to counter the government's aggravating factor claims of future dangerousness. We also needed an expert to effectively categorize and summarize all aspects of the negative milieu which was Mr. Purkey's life. I believed that the best choice for the doing of this work was Dr. Mark Cunningham, Ph.D., and I enlisted Dr. Cunningham's services. Dr. Cunningham is one the foremost experts in the field of assessment of future dangerousness in an incarceration setting, having published extensively on the subject. I myself had used Dr. Cunningham as a sentencing specialist in a previous capital case. I was also familiar with Dr. Cunningham's strong ability to identify and describe for a jury mitigating matters related to the psychology, character and upbringing of the

---

[1] Until the government filed its motion, I held open with Dr. Peterson the possibility that he might be called at the first phase of trial. After the Court's ruling, I notified Dr. Peterson that he would only be used at the penalty phase. We did still argue at time of trial and upon appeal that Dr. Preston's results could be used to support our defense theories regarding Mr. Purkey's problematic thinking patterns. However, both this Court and the Eighth Circuit found that Dr. Preston's general findings were insufficient to be put to this more specific purpose.

client. I believed that, in the Purkey case, Dr. Cunningham could well discharge those duties too.

From the early stages of the case, Dr. Cunningham helped develop mitigation themes. I assisted Dr. Cunningham by obtaining records and expert reports for him, and by securing sufficient resources for him to do his work. Dr. Cunningham then developed his presentation, which was made during penalty phase.

### *Issue regarding failure to object to "Club Fed" evidence and argument*

It is urged that I was ineffective for failing to object to "Club Fed" references at the times they were made by the government in opening statement, witness examination, and closing argument (Doc. 47, p. 6). It is further urged that, having failed to make these objections at time of trial, I was also ineffective for failing to raise the matters, as instances of plain error, on direct appeal (Doc. 47, p. 7). It is argued that these references to "Club Fed" prejudiced Mr. Purkey by leading the jury to choose the death penalty for Purkey, and reject the supposedly leisurely life sentence which "Club Fed" would imply (Doc. 47, p. 5). It is also argued that, in making these references, the government was implying, contrary to the facts, that Purkey himself used the term (Doc. 47, p. 5). Though not particularly stated in those terms, the question raised seems to be whether this Court would have been required, under F.R.E. 403, to sustain an objection that the

14

probative value of use of the "Club Fed" terminology was outweighed by its improper prejudice.

I did not raise the suggested objections, and I did not raise the matter on appeal, because I did not believe objections would have been well-taken. The seminal testimony about the matter came from Detective Howard, and was as follows:

Q   Did you talk about the difference between federal and state penitentiaries?

A   Yes, we did.

Q   And how did that go?

A   Well, when he was persistent about going to a federal agency with this information, I asked him, "So you really want to go to Club Fed," and we talked about that for a minute, about how the federal penitentiary would be more comfortable surroundings for him, how he wouldn't have any enemies there, how the environment is a lot better to live out your life there. (Tr. 423-424)

In light of this, there was no question but that the term "Club Fed" had been used by Detective Howard in his discussion with Purkey as shorthand to describe what Mr. Purkey was seeking through his offer of his statements, that is a Federal prosecution and Federal sentence. It is also clear from the Howard testimony that, while the term "Club Fed" was not used by Mr. Purkey, but by Howard, use of the shorthand term by Howard allowed him and Purkey to understand one another

15

regarding the nature of Purkey's request. It was my judgment that, in light of these facts, this Court would not have sustained an objection to the "Club Fed" term, and such a ruling would have been readily upheld on appeal as within the Court's discretion.

What is more, it seemed to me then, and still seems to me now, that use of the shorthand "Club Fed" was no better or worse than use of the concept that term was being used to describe, that a Federal prison sentence was considered by Purkey to be more desirable than a State institution sentence because it would be, in the words used by Detective Howard, "more comfortable surroundings for him" where "the environment is a lot better to live out your life". Thus, even if the buzz words "Club Fed" were removed, to the extent that Mr. Purkey's desires for a Federal sentence would have still become a part of the record, the jury would have still been potentially led to the very same sorts of dangerous misconceptions about the favorable conditions of confinement in a Federal penitentiary.

Our problem was that all of this was a double-edged sword. While there might have been a danger that the jury would improperly use all of this in deciding a sentence for Purkey, there was a better chance that the whole discussion would help the jury better understand the thrust of the first phase defense, that Purkey was strongly motivated by better conditions in Federal prison to falsely accuse himself

16

of kidnapping in order to obtain a Federal, rather than a state, prosecution. In light of our defense, it was up to us to show the strength of Mr. Purkey's motivation in this regard. That was the defense edge of the federal sentence sword. Thus, even if the government had totally avoided mention of the matter, it would have been necessary for us to bring it up to support our defense. The evidence allowed me to argue the case for Mr. Purkey as I did (Tr. 1105).

The argument made about the term "Club Fed" also presupposes that use of the term would create juror misconceptions, which did not already exist, about conditions of life imprisonment confinement. From my prior experience in capital cases, and from my reading about studies of capital case juries, I was aware that jurors often have misconceptions regarding the supposedly soft conditions of life imprisonment confinement. Thus, even before mention of the term "Club Fed", it had been my intention that, should we reach a penalty phase, we would address any misconceptions by eliciting expert testimony about the actual conditions of Federal penitentiary confinement. This we actually did through the testimony of Dr. Cunningham and Mark Russell, Correctional Counselor at USP-Leavenworth (Tr. 1653-54, 1882-1904). I also addressed the "Club Fed" term directly in my argument (Tr. 1107).

As for the argument that the government attempted to ascribe the "Club Fed"

17

001618

words to Purkey, the only time that I believed this occurred was during the testimony of Agent Tarpley. When that happened, I confronted Tarpley with the facts, that he had heard the testimony of Howard, and that Howard had testified that Howard had been the one to use the term (Tr. 601-602). Other than that one instance, I did not believe at the time, and still do not believe now, that the plain English sense of the references can be read to attribute the use of the "Club Fed" words to Purkey. Rather, the term was used by the government as shorthand for what Purkey was requesting, in the same way that it was used, in the first instance, by Howard.

There are two cases cited in supposed support for the arguments made. However, those cases are easily distinguishable upon their facts. In *Wynters v. Poole*, 464 F.Supp.2d 167, 180 (W.D.N.Y. 2006), counsel was found ineffective for failure to object to a "trifecta" of improper references by the prosecution to the defendant's invocation of his right to silence, invocation of his right to counsel and refusal to take a polygraph exam, along with the prosecutors claim that each of these facts could be used by the jury to infer the defendant's guilt. In *Girtz v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007) the failure of defense counsel to object involved three direct and certain argument references to the defendant's failure to testify. These cases are easily distinguishable from this case since the failure to

18

001619

object here did not involve an obviously objectionable matter, such as a direct and certain reference to failure to testify.

### *Issue regarding opening statement references to testimony of Jennifer Long's family and friends*

It is alleged that, during my first phase opening statement, I made the claim "that [Jennifer] Long's family and friends would even testify that there was no kidnapping" (Doc. 47, p. 7, Doc. 52, p. 7). Citing to the affidavit of Laura O'Sullivan, it is further alleged that I had no good faith basis for making the opening statement representations which I made (Doc. 47, p. 7, doc. 52, p. 7). It is ultimately alleged that I was ineffective because the promises I made in opening statement supposedly went unfulfilled, and because Mr. Purkey was supposedly prejudiced thereby (Doc. 47, p. 8).

The critical flaw in this challenge is that it misrepresents what I said to the jury in opening statement. The portion of my opening statement to which reference is made is set forth in bold below, placed in context of the other, relevant portions of the opening:

> At that meeting in December, on December 16th of 1998, Wes explained what he wanted. He wanted a life imprisonment sentence without parole in a federal institution and he would tell them all they needed to know about what happened to a Missouri woman who he had killed, Jennifer Long. Wes expressed that idea of an agreement to the detective and to the agent. They then left him and went to a federal prosecutor and proposed that to the federal prosecutor. The federal prosecutor said go back and get more

19

001620

information. They did. They told Wes we have to have more information. What Wes was led to believe at that point was that if he gave that more information, he would be put in prison for the rest of his life in a federal institution. Not let go. Put into a federal prison for the rest of his life.

With that understanding in his mind, over the next several days Wes gave the agents all the information that they needed to be able to put together the case that you will hear in this room. Every bit of it. He told them about all of the details of what happened to Jennifer Long. He told them about all of the things that happened and where they could find what evidence that they will come forward with to you here. Every bit of that information authorities found because of the information that Wes Purkey gave them.

But Wes Purkey also indicated to them something that was untrue. All of that was true. He said something that was untrue. The untruth was the part to make it a federal crime, that he kidnapped her. He had not.

***What you will hear in the evidence from witnesses who are friends of Jennifer Long, from family members, and from the information that Wes Purkey gave to the police, is that there was no kidnapping.***

What you will also hear in the evidence will show you about a man whose thinking is not tracking correctly in so, so many ways, Wes Purkey's. You will hear evidence about brain injuries that Wes Purkey has suffered....

After you hear all of the evidence about Wes Purkey, about what he told to the police, about what happened on that day, you will know that if it wasn't Wes Purkey, what happened to Jennifer Long would never have come out and would never have been discovered by anyone. Because of the information that he brought forward, we now know what happened to Jennifer. We now know that Jennifer Long is dead and we now know all of these details.

We also know exactly that Wes Purkey did not, and you will hear the evidence, did not kidnap Jennifer Long. And you will hear from the evidence that Wes Purkey gave the information that he did, and particularly gave the information claiming that there was a kidnapping only to be able to come to the federal court to be prosecuted here.

With all of that information, after you have heard it all, all of this information, I will come back to you and ask you to consider all of this and I'll ask you to find Wes Purkey not guilty of the charges that are brought against him here in federal court of kidnapping.

Thank you. (Tr. 412-413, 415-416)

20

As the plain wording above demonstrates, never in my opening did I say "that [Jennifer] Long's family and friends would even testify that there was no kidnapping". Rather, the themes of our opening were the important themes of the defense: that Wes Purkey had truthfully accounted what happened to Jennifer Long's remains, that but for Wes Purkey's truthful accounts in those regards, no one would have ever known what happened to Jennifer, that Wes Purkey had fabricated the story about kidnapping to make the case a Federal case and thereby attain his desired Federal sentence of life, and that the evidence in the case, taken as a whole, demonstrated that no kidnapping had occurred, Wes' false representation in that regard notwithstanding.

For the most part, the trial testimony of Jennifer Long's parents, friends, and school officials was consistent with what they told us during our interviews, and supported our opening statement theme that there was no kidnapping. Their testimony demonstrated that Jennifer was using drugs and alcohol, was skipping school regularly, and was unaccounted for, wandering the streets, for considerable times on numerous days during school hours (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-891). There were also particular facts which provided significant support for our line of argument. For instance, Wes had accurate knowledge about the very kind of alcoholic drink that Jennifer preferred, gin and orange juice, which was confirmed by Jennifer's friend, Brooke Doolittle (Tr. 890, 928-929). Also, Brooke

21

confirmed that Jennifer not only was accustomed to using drugs, but also was accustomed to using drugs with people much older than her, particularly Jennifer's mother and father (Tr. 891). All of these facts painted the picture of Jennifer as a young woman who, as described in Wes Purkey's testimony, went willingly with Wes at the outset of their encounter in order to party by drinking and using drugs. Brooke did testify about one thing which she had not shared in pretrial interviews with Mr. Armstrong and Ms. O'Sullivan, an opinion that Jennifer would not get into a car with a stranger (Tr. 892). Even had we known, prior to trial, that Brooke would venture such untoward information, we would have likely still used her because of the critical other information which she provided. Also, such a self-serving observation seemed to go contrary to other evidence about Jennifer's activities. Moreover, this Court sustained objection to Brooke's opinion testimony, and instructed the jury to disregard it, and thus the impact of that was decreased (Tr. 892).

In its opening argument, the government made a point against me similar to the one now made in Mr. Purkey's petition (Tr. 1097). That argument by the government served as a springboard for the detailed closing argument explanation which I made regarding the evidentiary support for the notion that there was no kidnapping. That portion of my argument was as follows:

22

Wes Purkey came forward with the idea of the kidnapping and he persisted with the idea of the kidnapping even in Exhibit 8, his own handwritten confession. Why? Because he wanted to go to a federal institution. Club Fed, baloney. A penitentiary. There's no club there. Is it away from problems that he has in the Kansas institutions? You bet. Is he afraid concerning the Kansas institutions? Yes. Is he punished in a federal institution for life without parole, what he asked for? You bet. That's what he asked for. That's what he wanted. That's why he said it was a kidnapping. It's not true. And you know it. You know from the evidence it's not true.

Jennifer Long on January 22nd, 1998, was a young lady who was 16 and was out of school. She was out of school for one of many, many times while she was at East High School. The folks down at East High School who were in the office came in here and testified for you that she was not attending school regularly, and the records and her grades showed it. Her mother told you that she was not going home when she was skipping school. Mom was dropping her off. And we know what she was doing. She was going out the back door. She wouldn't have been walking home because it was too far to go. It was a lousy area to have to walk through, an industrial area, down 435 and up a hill to try to get into Independence, some three and a half miles away.

And mom would have known she was walking home when she was skipping school because the neighbors would have told her that, and the neighbors didn't tell her that. Jennifer Long is skipping school, and in the area. You know that. And that doesn't say that she was wrong for doing that. That doesn't say she's a bad person for doing it. It's a fact.

And what you know is that when she would go to lunch at school, that maybe she went to a convenience store that used to be here at the corner of Truman Road and Hardesty to pick up a Dr. Pepper. That's what her mom said. But there were other places along Truman Road and particularly there was the Robert's Market where Wes Purkey saw her.

Now, isn't it interesting that Wes Purkey knows critical facts about Jennifer Long that wouldn't have come when you're holding a knife on a person, but would have come up in casual conversations, like whether or not Jennifer Long likes to drink and what it is that she would drink if you got it for her. Gin and orange juice, that Wes Purkey told the officers from day one that she liked and that he bought for her and that she drank. Is that true? Yeah. How do you know? Brooke Doolittle, her friend, said she likes gin

23

and orange juice.  No question but that Wes Purkey knows that.

He knows that Jennifer is having trouble at school and getting into fights with some of the girls there.  Is that true?  Yeah.  How do you know that?  Because mom indicated to you that that's true.

What you also know is that Wes Purkey did smoke crack cocaine with Jennifer Long.  How do you know that?  Well, you know that because Jennifer Long smoked drugs.  She smoked dope at the time, smoked marijuana.  She did.  How do you know that?  Again, Brooke Doolittle was honest enough to come in here and tell you that she did.

You also know that Jennifer Long's drug problem and drug use was going on a lot more than the casual stuff that was trying to be portrayed to you in some of the testimony.  You know that she was using it frequently enough to use it not only with her friends but with her mom and her dad.  Jennifer Long's world was that drug use was okay.  Smoking dope was okay.  And smoking dope with people who are in their 40s is okay, because she did it, and she it.  And that is not trying to indict her.  That's a fact.

And so when the government says she would never get into a truck with a pretty nice-looking man in his 40s and smoke drugs, that's just flat wrong.  And you know why.  She was used to smoking drugs with older people, older than her, and she was out with nothing to do for one of many days during her time at East High School.

You have every reason in the world to think that she got into that truck voluntarily, talked with Wes, and gave him all of that information that she gave him about herself, drank, smoked, and went over into Kansas to Wes's house because she frankly didn't have anything better to do at 10 o'clock in the morning than that.  She did not have to be home until late in the afternoon.  The bus that would take her home would not get her there until the afternoon.  She had plenty of time to kill in what would have been a lot better way of doing it than on a January day walking the streets over around Truman Road.  And so you know good and well that she got into that truck of her own volition.

And you know that she rode in that truck over to Wes's home of her own volition without any difficulties, without any problems whatsoever.  You have additional information that tells you that had there been any problems between them, Jennifer could have gotten out at a number of different times.  The two stopped at a convenience store on Highway 7.  She goes to the rest room.  Could she have left then?  Of course.  She didn't.  There are seven stoplights along Highway 7.  Could she have gotten out

24

001625

anywhere along there? Absolutely. She didn't.

When Wes stopped the truck at 608 North Main, the gate doesn't work very well. Tarpley told you that. He couldn't get it open when he tried to get into there, when he went there. And the dog is in the back yard, has to be put up first. Wes has to get out, put the dog up, come back. Could Jennifer have just gotten out of the truck and walked away? She could. She didn't.

All of those things didn't happen because Jennifer was not kidnapped. Jennifer was not taken across state lines without her permission, and Wes did not have any intention to forcibly rape her at that time. Did it happen in the basement, in Kansas, later? Yes. And that's where this case should be if it's going to be anywhere. But he did not kidnap her. And you know it. By the facts that are all there, independent of anything that Wes has told you. You know those verifications. (Tr. 1108-1112)

Therefore, contrary to the misrepresentations advanced by the government in its argument, and by current Counsel for Mr. Purkey in the Petition filed on his behalf, we made good on all of the promises which we actually made to the jury in opening statement.

In their pleading on Mr. Purkey's behalf, current Counsel for Mr. Purkey cite a host of cases in purported supported for their proposition that the supposed unfulfilled promises made by me were so egregious and prejudicial as to constitute ineffective assistance of counsel (Doc. 52, p. 7-8). The problems with the line of argument are two-fold. First, as noted above, there were no unfulfilled promises to the jury in the Purkey case. Second, as will be detailed below, the cases cited are easily distinguishable on their facts, involving as they do disastrous situations which occurred in those cases, situations which did not occur in the Purkey case.

25

In ***United States ex rel Hampton v. Leibach***, 347 F.3d 219, 260 (7th Cir.

2003), ***People v. Briones***, 816 N.E.2d 1120, 1124-25 (Ill.App. 2004), and ***Ouber v.***

***Guarino***, 293 F.3d 19, 27-30 (1st Cir. 2002), prejudicial ineffective assistance was

found due to the defense making an opening statement promise that the defendant

would testify, and then failing to present that testimony.  Of course, in Purkey's

case, on the other hand, all of our promises were fulfilled, including the one to

present Purkey's own testimony.

In ***People v. Lewis***, 609 N.E.2d 673, 677 (Ill.App. 1992), ineffective

assistance was found due to the defense attorney's unfulfilled promise to present an

out-of-court statement of defendant, evidence which the defense attorney should

have known would be refused as inadmissible, self-serving hearsay.  In the Purkey

case, no similar situation occurred.

***Anderson v. Butler***, 858 F.2d 16, 17-18 (1st Cir. 1988), defense counsel was

found prejudicially ineffective for promising to present mental health experts in

opening, but then later determining to not call those experts in light of negative

information which the experts would reveal; the problem was that the negative

information should have been known by the defense lawyer prior to trial, and

should have caused the lawyer to not mention the evidence in opening.  Even at

that, this case was determined by two Circuit Judges over a vigorous dissent by

then Circuit Judge Steven Breyer. *Anderson v. Butler*, 19-21. In any event, there was no such misrepresentation made in Purkey's case about mental health evidence to be presented.

*State v. Moorman*, 358 S.E.2d 502, 510-511 (N.C. 1987) involved an ineffective assistance finding as a consequence of a defense opening statement representation, in a rape case, that evidence would be presented that defendant was physically and psychologically incapable of rape; in fact there was nothing from defendant or investigation which would have led counsel to reasonably believe that there would be evidence available to support either point. In Purkey, we made no such problematic representation.

*State v. Zimmerman*, 823 S.W.2d 220, 225-226 (Tenn.App. 1991) presents an ineffective assistance of counsel result owing to a conflict between defense lawyers during trial which resulted in one defense counsel making representations in opening that evidence of battered spouse syndrome would be presented via the defendant's own testimony and the testimony of a psychiatrist, and then the other defense counsel deciding to not present that evidence, but still arguing by referring in closing to facts "obviously intended to be, but never presented to the jury", with the attorney who had given opening statement not giving closing because he "couldn't face the jury". Fortunately, there was no such dramatic turn of events in

27

the Purkey case.

In *Montez v. State*, 824 S.W.2d 308, (Tex App. 1992), counsel was found ineffective due to faulty jury selection efforts, inadequate preparation, failure to conduct discovery, eliciting inadmissible and incriminating hearsay statements, making an opening statement in which he placed the burden of proof on the defense, and in making unspecified "extravagant promises" about evidence which was never shown to jury. Apparently, the case is cited in support of only the latter issue. The case is inapposite here since none of the accounted errors occurred here.

Finally, in *People v. Morgan*, 719 N.E.2d 681, 703-707 (Ill. 1999), the death sentence imposed at trial was reversed because of ineffectiveness of counsel in failing to develop and present mental health mitigating factor evidence. Since they make no reference to page number in their citation of this case, it is unclear to me why current Counsel for Mr. Purkey cite this case here, particularly since this case case was clearly not decided on alleged unfulfilled promises point made by counsel. It may have been their intention to cite this case, instead, in support of another of their issues raised later. If that is the case, then I note now, as I shall detail later, I believe that we presented all of the best mental health mitigation evidence available on Mr. Purkey's behalf.

What Counsel for Purkey have done is tease certain language from these

28

cases, ignoring the extreme facts in those cases which justified the language in those cases, and ignoring that the very different circumstances in this case would not allow application of that language to this case. The upshot of all of this is, despite the invective tone of the arguments advanced by Counsel for Purkey, there is no factual or legal support for the arguments themselves.

The arguments advanced by current Counsel for Purkey could be interpreted as a very valid point that it might have been better for the defense to avoid completely any argument that Jennifer was not kidnapped, thereby obviating the need for the defense to explain why Mr. Purkey told that untruth. However, it was my clear understanding that Mr. Purkey very much wanted the argument, that there was no kidnapping, to be made, and that Mr. Purkey would never have countenanced an approach to the defense which left out such an argument. Because of that, I developed the evidence and argument which I did, perceiving those to be the best way I could advance the argument.

### *Issue regarding avenues of impeachment against government witness Michael Speakman*

1. Summary of the allegations

In the Petition, it is generally alleged that the defense team was ineffective in its preparation to confront and cross-examine government witness Michael Speakman (Doc. 47, p. 7). However, the lone specific complaint made about the

29

cross-examination concerns what is described as a failure to present available evidence to rebut a single contention by Speakman, that Purkey had supposedly boasted to Speakman about being in jail for killing people (Doc. 47, p. 7-9). In the Petition, it is alleged that there were six witnesses who should have been called to rebut the Speakman claim: CCA inmates Cornelius Peoples and Xavier Lightfoot, CCA personnel Lister, Perdue (misspelled Purdue in the pleadings) and Williams, and lay person Sam Hoffmeier (Doc. 47, p. 8). Affidavits and arguments are provided regarding what Peoples, Lister and Hoffmeier would have said if called to witness (Doc. 47, Attachment 25; Doc. 52, p. Attachments 1 and 2). No explanation is provided as to what Lightfoot, Perdue or Williams would have said.

2. Preparation for Speakman cross was a team effort

Before addressing the individual points, it would be well to first note what seems to be an underlying, but incorrect, assumption. That assumption seems to be that, since Laura O'Sullivan was the attorney who handled the Speakman cross-examination, she was the only one who prepared for that cross-examination. Preparation for the Speakman cross-examination was actually a team effort, involving Laura, Mic Armstrong and me. Thus, while Laura, in her affidavit made in support of the Petition, has acknowledged that she personally did not do all of the preparation work for the Speakman cross, that simply means that certain of

30

those items of work were done, not by her, but by Mic or me.

3. Cornelius Peoples issues

Preparation for possible use of Cornelius Peoples was done by me. In light of information provided to me by Mr. Purkey, and in light of the fact that Peoples had been housed with Wes at CCA, we had contemplated the possibility of using Peoples to testify regarding this and other issues about which he had knowledge. In his affidavit, Mr. Peoples correctly indicates that I did not speak with him directly about his possible testimony. That was because, at the time, Mr. Peoples was represented by counsel on his own capital case, *United States v. Peoples*, WDMO Case Number 00-395-03-CR-W-FJG. On May 22, 2003, I contacted Peoples' attorney, Bill Odle, to determine whether Peoples would be willing to talk to me and to testify for us. Mr. Odle told me that Peoples was not going to talk to me, and was not going to testify. The reasoning was two-fold. First, Mr. Peoples was facing retrial in his own capital case, *United States v. Peoples*, Case Number 00-395. According to what Mr. Odle told me, he recommended to Mr. Peoples, and Mr. Peoples agreed, that should Peoples be called to witness on behalf of the defense in any case, he would invoke his Fifth Amendment privilege in order to protect himself from any cross-examination which could arguably be used to assist in his own prosecution. Second, Mr. Odle was attempting to work out a plea

31

agreement for Peoples in his own case. As a consequence, Odle was strongly recommending to Peoples, and Mr. Peoples was agreeing with the notion, that Peoples not involve himself in the defenses of others, lest such entanglements jeopardize his lawyer's ongoing negotiations with the prosecution. On the basis of these representations by Mr. Odle, I did not take steps to secure the presence of Peoples for trial. To the extent that Mr. Peoples' 2007 affidavit amounts to a claim that he would have assisted with the Purkey defense at the time of our trial, that representation is contrary to what Peoples was saying, as relayed by his attorney, at the time the Purkey case was pending.

Even if Peoples had been willing to cooperate, though I would have consulted with Mr. Purkey on the issue, I would have had substantial questions over whether to use Peoples at trial for any purpose about which I was aware, including those mentioned in People's 2007 affidavit. Mr. Peoples would have brought substantial baggage as a witness, starting with his own capital case charge, for which he had already been once convicted. In addition, Peoples had a serious prior conviction, an aggravated battery from Wyandotte County in 1991 for which he had served eight years of a 10-30 year sentence. Besides all of this, I was also very familiar with other bad acts information pertaining to Peoples. In sum, Peoples had the reputation as a cold-blooded killer, willing to do or say anything. I

32

001633

was familiar with this information because I had represented one of Peoples'

codefendants, Carl Haskell, and had received considerable information about

Peoples in the discovery and in our investigation in that case.  I was concerned

that, under the right circumstances, some of that negative information might also

come out on cross, further damaging whatever credibility Peoples might be deemed

to have.

There were also practical problems with using Peoples to indict Speakman in

the way suggested in the Petition.  Peoples would have to admit that he was not

present in the cell with Purkey and Speakman when the conversations between

those two allegedly occurred.  Thus, while Peoples might have been allowed to say

what he personally heard and did not hear Purkey say, he was in no position to say,

one way or the other, what was said between Speakman and Purkey.  What is

more, Peoples was himself in negotiations to become an informer.  As it turned

out, Peoples actually became an informer against his codefendant, Xavier

Lightfoot, and received a substantial reduction in sentence as a result.  See WDMO

Case # 00-395, Doc. 658, 660, 800.  Peoples then went on to inform in another

case, *United States v. Hargrove*, District of Kansas case number 03-20192-CM,

and received an additional reduction of sentence for that cooperation.  See WDMO

case number 00-395-03-CR-W-FJG, Doc. 812, 813, 814.  It is worth noting that, in

33

001634

the *Hargrove* case, Peoples played a role similar to that played by Speakman in the Purkey case. That is, Peoples claimed, over Hargrove's denials, that Hargrove had supposedly confessed his guilt during a private conversation in a CCA cell between Hargrove and Peoples. Peoples also informed on another coconspirator in his own case, one Anthony Hunter, concerning another double murder. That case never developed because Hunter, who also cooperated in the *Lightfoot* case, countered Peoples' accusation with the claim that Peoples was actually the murderer in that case. Ultimately, Peoples had to admit that he participated in the double murder at least to the point of helping to hide bodies.

I feared that, in light of Peoples' own efforts to become an informer, even genuine efforts by him to help in Purkey's case could have been turned around by any adroit prosecutor. At the very least, any testimony by Peoples critical of Speakman would likely have, at best, been cast by prosecutors as the pot calling the kettle black. I figured it likely that Peoples would also have to concede that, in light of his own experience as an informer, he knows there are instances in which defendants who persistently deny guilt sometimes slip and confess to cellmates.

Thus, to put things succinctly, Peoples was a marginal witness who refused to cooperate with us. Thus, I did not attempt to call him as a witness.

4. Xavier Lightfoot issues

As mentioned above, though Xavier Lightfoot's name is mentioned in the Petition, no explanation about Lightfoot's alleged knowledge is given, Lightfoot's name is not mentioned in the suggestions, and no affidavit from Lightfoot is provided.

Current counsel for Mr. Purkey may not be familiar enough with the record to know that, in late 2002, we actually did secure the testimony of Lightfoot on Purkey's behalf during pretrial proceedings. While I found that testimony very helpful in that context, the cross-examination of Lightfoot confirmed two things. First, it made clear to Lightfoot's counsel just how vulnerable he was when subjected to cross even on issues strictly related to Purkey's case, leading Lightfoot's counsel to strongly advise him not to repeat such efforts for Purkey. Second, it made clear for me just how strong were the avenues of impeachment against Lightfoot, and how bad all of that would sound in front of a jury. I do not recall ever hearing from Wes or Lightfoot about an ability on the part of Lightfoot to testify about Speakman. However, even if it could be said that Lightfoot would have had such information, my understanding from talking to Lightfoot's attorney after Lightfoot's pretrial hearing testimony for us was that Lightfoot would invoke his privilege if called again. And, even if Lightfoot would have been willing to testify, it was my opinion that, because Lightfoot's frailties for this purpose were

35

even more pronounced than those suffered by Peoples, it was an even worse idea to use Lightfoot for this purpose.

5. CCA witness issues

In order to explain why I did not use CCA witnesses for the purpose of rebutting the Speakman testimony, or for any other purpose for that matter, it is necessary for me to digress regarding the matter of Wes' various battles with CCA. Throughout the pendency of the case, Wes' relations with CCA were abysmal. Almost daily, Wes was at odds with one or another corrections officer. Wes filed several reams of paper worth of grievances over his conditions of confinement at CCA. I filed several motions with this Court on Wes' behalf complaining over conditions of confinement. CCA guards threw away Wes' case materials, and that formed the basis for one of our substantive motions in the case. Things got so bad between Wes and CCA that I assisted him with filing of a *Bivens* action. See District of Kansas Case Number 03-3157-CM. Ultimately, Wes was removed from CCA, prior to trial, after an incident in which Wes was accused of assault on a guard, though it was Wes who was seriously injured while cuffed, hands and feet.

In order to deal with this array of problems, as well as to prepare with respect to both phases of the case, I was regularly talking with all sorts of CCA corrections officers and supervisors. That included Melvin Lister, one of the

36

001637

names mentioned in the Petition. I also had Mic locate and interview Sue Perdue, a nurse who left the employ of CCA just prior to time of trial. I do not specifically recall speaking with a Mary Williams. As noted already above, Ms. Williams' name is mentioned in the Petition, but no description is given therein regarding her base of knowledge, no mention of her is made in subsequent suggestions, and no affidavit from her is provided.

Because I had widely spoken with CCA supervisors and staff, I knew that Mr. Lister was one of less than a handful of CCA workers who were willing to speak positively about Mr. Purkey. There were many, many others, including Ms. Perdue, who would relate strongly negative information about Purkey with little or no prompting.

I took the position, throughout the trial, that I was not going to open up the pandora's box of the problems at CCA if the government did not. I avoided this because I believed that, in a pitched battle, though we could certainly score some points in light of the cavalier way in which Purkey was treated at CCA, we would undoubtedly, on balance, end up on the losing end, particularly in light of an array of negative behaviors attributed to Purkey and the highly negative opinions of Purkey held by the bulk of the CCA personnel. Before, during and after trial, Wes accused me of having made a formal agreement with the government to avoid CCA

37

001638

issues at trial. Actually, what developed was not an agreement, but rather a stalemate. Government counsel also avoided introducing CCA matters in the first instance, seeing downsides to their side of the case. However, government counsel also made clear to me that, should I choose to make any CCA points, they were ready to present their counterpoint witnesses. The result was that, by and large, the significant bulk of the problems at CCA were never mentioned at trial.

I have no doubt that, had he been given the opportunity, Mr. Lister would have testified in much the fashion which was set forth in his affidavit. However, I knew for certain that the government could easily find many other corrections officers who would have been more than willing to come forward to confirm at least the tone, if not the precise language, about alleged rantings by Purkey, as described by Speakman. Especially since Mr. Lister, even if believed, could only account for Mr. Purkey's behavior for the forty hours per week during which he worked, I did not think that impeaching Speakman's account for that limited time was worth the likely counterpoint from other CCA workers, confirming Speakman's account for the remaining time. Thus, I believed at the time, and still believe now, that the smart move was to avoid using CCA workers to confirm either side, and instead let Speakman's and Purkey's accounts stand on their own.

6. Sam Hoffmeier

001639

I had several opportunities to interact with Sam Hoffmeier. Mr. Hoffmeier was a kind individual who had befriended and regularly visited Mr. Purkey. I knew that Mr. Hoffmeier's interactions with Mr. Purkey had all been positive, and I have no doubt that he would have testified as described in his affidavit had he been asked to do so. I did not call upon Mr. Hoffmeier for this purpose for two reasons. First, I did not believe that the information was very helpful, since it would be easy for the government to argue that none of Mr. Hoffmeier's dealings with Mr. Purkey were in the context as described by Speakman, that is Hoffmeier did not deal with Purkey in the segregation pod, and could not have been privy to Purkey's interactions in the pod with staff and inmates. Second, and more importantly, I believed that bringing up this testimony from Hoffmeier to counter Speakman would prompt the government to go to CCA corrections officers to find support for Speakman. Since I was loathe to create this result through resort to the relatively the more germane testimony of Mr. Lister, I most certainly did not want to create this result through the rather feeble testimony which could be offered by Mr. Hoffmeier.

7. The cited cases are readily distinguishable on their facts

On this issue, as they have on other issues, current Counsel for Mr. Purkey cite to a host of cases, urging that those cases, and certain salient language from

39

those cases, supposedly support their arguments about this Speakman impeachment issue. Unfortunately, when one troubles to look carefully at those cases, one instantly finds that all of the cases are readily distinguishable upon their very different, much more egregious, fact patterns.

In *Cargle v. Mullin*, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), counsel was found ineffective for failure to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made contrary statements to others, that the defendant, instead, had made only exculpatory statements. There was no comparable failure to investigate here.

In *Roberts v. State*, 602 S.E.2d 768, 771 (S.C. 2004), counsel was found ineffective for failure to discover and present evidence regarding the impossibility of an informer's account of defendant's supposed admissions; while the witness claimed at trial that he was able to have a private, in-prison conversation with the defendant because of the proximity of their cells, the distance between the cells was actually closer to 100 feet, necessitating any such conversation to have been conducted with shouts, with other inmates and guards necessarily overhearing the conversation; other inmates and guards were willing to swear that they never overheard any such conversation. There was no comparable failure to investigate

40

001641

here.

In *White v. Roper*, 416 F.3d 728, 731-732 (8th Cir. 2005), counsel was found ineffective for failure to interview, prepare and present readily available witnesses to support misidentification defense. There was no comparable failure here.

In *Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005), counsel was found ineffective for failure to interview, prepare and present testimony of defendant's children during penalty phase of trial. There was no comparable failure here.

In *Soffar v. Dretke*, 368 F.3d 441, 474-475 (5th Cir. 2004), a case in which the defendant had confessed and then recanted the confession, counsel was found ineffective for failure to interview the victim and bring out through the victim's testimony factual inconsistencies between the retracted confession and the victim's account of the crime. There was no comparable failure here.

In *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003), counsel was found ineffective for failing to conduct any independent investigation whatsoever. There was no comparable failure here.

In *Towns v. Smith*, 395 F.3d 251, 253-254 (6th Cir. 2005), wherein the prosecutor's case was based solely upon eyewitness identification, counsel was found ineffective for failure to interview and present as a witness the person from whom police had obtained murder weapon, who would have exonerated defendant,

41

001642

and would have instead implicated defendant's brothers who physically resembled him (thereby accounting for the misidentification of defendant by the eyewitness). There was no comparable failure here.

In *Hamblin v. Mitchell*, 354 F.3d 482, 490-491 (6th Cir. 2003), counsel was found ineffective due to failure to conduct any mitigation investigation, failure to obtain background records pertaining to the defendant, and interview of only one of 22 available family members. There were no comparable failures in this case.

In *Holsomback v. White*, 133 F.3d 1382, 1387 (11th Cir. 1998), counsel was found ineffective for failure to interview and call a doctor who would testify, in a case in which repeated sodomy against the victim was alleged, that the victim showed no physical signs of having been sodomized. There was no comparable failure here.

In *Ross v. State*, 954 So.2d 968, 1006 (Miss. 2007), counsel was found ineffective due to failure to develop and present readily available evidence regarding the defendant's history of mental health problems, including visual and auditory hallucinations, the defendant's history of being a physical and sexual abuse victim, and the defendant's history of having suffered other catastrophic personal tragedies. There was no comparable failure here.

In *Johns v. State*, 926 So.2d 188, 196 (Miss 2006), counsel was found

42

001643

ineffective for failure to interview, prepare and present alibi witnesses identified by
defendant and his family. There was no comparable failure here.

### *Issue regarding failure to hire "mitigation specialist"*

1. For a host of reasons, rather than hiring a forensic social worker, I used other
members of the defense team to develop and present our mitigation case

Mr. Purkey's current Counsel correctly note in their pleadings on his behalf
that I did not enlist the services of a forensic social worker, often referred to as a
"mitigation specialist", to assist in our presentation of the case even though I had
originally budgeted for the hiring of such a person (Doc. 47, p. 10-16). I have
already described, above, the defense team which I actually assembled, and how
the members of that team acted, in their various capacities, as mitigation
specialists. There were a host of case-related reasons why I believed that the hiring
of a forensic social worker was needless under the circumstances.

In my experience, a forensic social worker, specially trained in capital case
work, is oftentimes employed to assist with development of the case. The roles
often played by such a forensic social worker are

- the development of rapport with the client, family members and other
  potential mitigation witnesses as an adjunct for consequent development of
  mitigation evidence for trial,

- the accumulation and summarization of medical, psychological/psychiatric,

43

001644

schooling, work, incarceration and other records pertaining to the client and his family,

- the conceptualizing and crystallization of themes of mitigation defense, including the summarization of those themes in report form,

- the identification, interview and preparation of mitigation witnesses,

- the presentation of testimony, in hearsay fashion, about the information gathered by him/her and others from other persons and sources (such a presentation is regularly allowed because of the relaxed rules of admissibility which attend in the penalty phase of a capital case trial).

A forensic social worker is a particularly important part of a capital defense team in a case in which the lawyers, while fine practitioners in the normal criminal case, have no previous capital case experience, and thus no experience in development of capital case mitigation themes. However, the experienced capital case litigator, by training and experience, can and should be expected to develop case themes himself/herself. In fact, the Court pays appointed counsel a higher rate in a Federal capital case in deference to his/her training and experience in dealing with capital cases. I felt my prior capital case experience prepared me for the development of mitigation themes, and I relied on that experience to develop the themes in this case.

44

Also, in a case in which there are potential mental health issues, and the defense attorneys have no training and experience in the field, a forensic social worker could provide important help with those issues. Because my undergraduate and graduate school backgrounds are in medical biology and psychology, and because I had previously handled mental illness defenses, I did not require that sort of assistance.

It is sometimes argued that forensic social workers can be utilized to save costs in a case. Current Counsel for Mr. Purkey make just such an argument (Doc. 52, p. 19, fn 6). However, in my experience, the opposite is the case. At the time that Mr. Purkey's case was pending, appointed Federal capital case defense attorneys were being compensated at the rate of $125.00 per hour for in court and out-of-court time. At the same time, the hourly rates being charged by most experienced forensic social workers were ranging in the same vicinity, between $85.00 and $150.00 per hour. Thus, at the time that Mr. Purkey's case was pending, the mere expedient of expending forensic social worker time instead of a like amount of attorney time would yield little or no cost savings.

Moreover, in my experience, utilization of a forensic social worker is in most cases a redundant cost.

For the reasons which I have already described above, I believed at the time,

45

and still believe now, that, because of my training and experience in capital cases in general, and in mental health cases in particular, enlisting the services of a forensic social worker for development of mitigation themes and avenues of documentary and witness investigation was unnecessary. I planned to, and actually did, shoulder those duties myself. As for development of reports about mitigation themes, I had two of the best at work on that, Dr. Stephen Peterson, M.D. and Dr. Mark Cunningham, Ph.D. I believe that the thorough reports prepared by those experts served us well as means of discovery for the government and as roadmaps for the bulk of our mitigation presentation.[2]

As to the role of locator of mitigation case witnesses, it has been my experience that social workers invariably lack the skill set to ferret out people who, in cases like these, are almost always difficult to locate, and who, when found, are often situated in areas where the social worker fears to tread alone. That necessitates the social worker enlisting the services of the case investigator, to find the witnesses in the first instances, and then to accompany the social worker during the interviews. As I have already detailed above, in Mr. Purkey's case, I employed

---

[2] Because I have provided my file to current Counsel for Mr. Purkey, I am unable to provide the Court with copies of those reports. However, I am sure that copies of those reports could be provided by either of the parties, should the Court wish to review those to judge the accuracy of my description regarding the thoroughness of those reports.

46

001647

Mr. Armstrong, who has the skill set to, by himself, both locate and interview such witnesses.

As to the role of obtainer of records about the client, I have found that social workers simply cannot complete such work independently, and have to enlist the assistance of the attorneys to obtain subpoenas and other means to force production of such records. In Mr. Purkey's case, I personally handled the identifying and obtaining of all the thousands of pages of records about his and his family's background.

As to development of client, familial and witness rapport, it is my practice to develop that rapport myself. I believe that, since I shall be the one presenting such witnesses at trial, I am the one who needs to have that rapport from the outset. Thus, I anticipated that I would, and indeed did, play this role for Mr. Purkey, for his family and for other witnesses we presented.

It was my intention to have Mr. Purkey's background thoroughly explained by a forensic witness. However, I did not want a mere social worker to take on such a weighty role. Instead, I enlisted the services of Dr. Mark Cunningham, Ph.D. to do this work. Dr. Cunningham had played a similar role in another case for me, and in many other such cases across the country. At trial, Dr. Cunningham made a comprehensive presentation, acting as a summary witness to advance

47

001648

mitigation themes and debunk certain aggravating factors.[3]  This supplemented the

presentation made by Dr. Peterson and our other mental health experts.

Thus, to sum up, since I had already covered, in what I deemed to be a better

fashion, all of the duties which might have been assigned to a forensic social

worker, I decided to not needlessly expend funds for such a person.  Current

Counsel for Mr. Purkey correctly note that, in my pleadings for additional funds

for the experts we employed, I highlighted the savings we realized in not

needlessly employing a forensic social worker; but they go on to criticize that

critical work went undone because of that decision (Doc. 47, p. 19-20; Doc. 52, p.

18).  To the extent that it is implied that I was somehow afraid to ask for the tens of

thousands of dollars for a forensic social worker, such an implication seems rather

silly in light of my having asked for and received the hundreds of thousands of

dollars for our other experts.  There is no question in my mind that, had I made

application for funds for a forensic social worker, in addition to the funds for all of

---

[3]  Relying upon my original funding request for Dr. Cunningham, Mr. Purkey's
current Counsel allege that Dr. Cunningham was used by us only to counter the
government's aggravating factor allegation of Mr. Purkey's future dangerousness
(Doc. 52, p. 15).  I can only assume that, in making this argument, Counsel have
failed to read Dr. Cunningham's trial testimony.  I believe that a fair reading of Dr.
Cunningham's testimony demonstrates that, though he certainly brought forth the
anti-future-dangerous themes (Tr. 1880-1908), he also spent a considerable amount
of time on the wide range of our mitigation themes (Tr. 1855-1879).

001649

our other experts, that request would have been granted.  While I am aware that others have had difficulties related to budget requests, particularly in getting approval from the Chief Judge of the Eighth Circuit for such requests, I have never had such difficulty.  I attribute my success to the fact that I copiously justify the requests which I make.  In this instance, I simply could not justify spending money on a forensic social worker when I believed that all of the duties I would have given to such a person were being better handled by others.  Because of that fact, I was able to cite to my decision to not employ a forensic social worker as a means to explain additional costs being expended for other experts.

I suppose the real question is whether I was correct that the duties which a forensic social worker could have performed in this case were all done, and in better fashion, by other members of the defense team.  I believe that the facts demonstrate the correctness of my representation in that regard.

2. As indirectly acknowledged in the pleadings filed by Counsel for Mr. Purkey, our team assembled all available mitigation information, and three persons, Dr. Peterson, Dr. Cunningham and me, combed that information for the mitigation themes which we presented

As a result of our efforts on Mr. Purkey's behalf, scouring the country, we located and obtained thousands of pages of records pertaining to Mr. Purkey and his family.  I thoroughly read all of the records, and I had two professionals, psychiatrist, Dr. Stephen Peterson, M.D. and psychologist, Dr. Mark Cunningham,

Ph.D., do the same. Dr. Peterson and Dr. Cunningham produced comprehensive reports about their review. Out of this preparatory work sprung a mitigation case consisting of eighteen lay and expert witnesses whose combined presentations cover over 500 pages of transcript. As noted by current Counsel for Mr. Purkey (Doc. 52, p. 24), we chased every lead provided by Mr. Purkey, even those which might at first blush be considered odd, to wit Mr. Purkey's claims about his wife poisoning him. In hindsight, it could be argued that, even though our persistence in that regard eventually resulted in Jeanette Purkey admitting that she was poisoning Wes (Tr. 2237-2249), the efforts were ultimately fruitless since the evidence was ruled inadmissible, and that ruling was upheld on appeal. *United States v. Purkey*, 428 U.S. 738, 757 (8th Cir. 2005). However, it was our approach to follow any and all leads to develop any and all potentially mitigating evidence. Our efforts on the poisoning front were consistent with the approach.

It is urged by current Counsel for Mr. Purkey that I should have, in addition, employed a forensic social worker to also pour through the records, and prepare yet another report (Doc. 47, p. 17, 19; Doc. 52, p. 16-19). Current Counsel for Mr. Purkey have also provided opinions from Dr. Peterson and Dr. Cunningham that it might have been well to have had a forensic social worker do this work as well as them (Doc. 27, attachment 15, p. 2, attachment 11, p. 1). Current Counsel for Mr.

50

Purkey correctly indicate that I shared with this Court at the time that the case was pending my reasoning for not asking to expend funds for a forensic social worker (Doc. 27, p. 15-16). To reiterate, I chose to not expend the funds for a forensic social worker in this case because of my belief that the necessary work was better being done by others, and therefore obtaining a social worker would have constituted a needless additional expense. I wanted our experts and me to be directly familiar with all of the raw data rather than some summary of that data prepared by a forensic social worker. Though current Counsel for Mr. Purkey have indicted my approach in this regard, they do not identify in their pleadings a single mitigation theme which was missed as a result of this approach.

It is also implied in the argument made by current Counsel for Mr. Purkey that our efforts to develop certain avenues of mitigation evidence, for instance the poisoning, came at the expense of work on other avenues of mitigation evidence (Doc. 52, p. 25). However, current Counsel for Mr. Purkey do not support that inference, since they fail to advance even one new mitigation theme which they found and we supposedly missed. Instead, current Counsel for Mr. Purkey, relying heavily on the materials which we developed, complain only that we should have done a better job handling the witnesses we did call, and should have called several of the witnesses who were identified in our investigation, but whom we chose not

51

001652

to call (Doc. 52, p. 23-27). I shall explain below why we handled each of those situations as we did.

### 3. Gary Hamilton was developed as a powerful mitigation witness at trial despite his recalcitrance, even up to the eve of trial[4]

Current Counsel for Mr. Purkey urge that my handling of Wes' brother, Gary Hamilton, was substandard, complaining that I made too few contacts, that I was not "sensitive" in the contacts which I made, and that I did not develop all of the available information in the way in which a forensic social worker might have (Doc. 52, p. 23).

At the foundation of these complaints lies an assumption that Gary Hamilton, prior to trial, was the very cordial, compliant individual who readily met with current Counsel for Mr. Purkey, and cooperatively shared with them his information and insights. When I first encountered Gary, his attitude was, to say the least, different.

From the outset, I knew from government discovery about interviews which had been conducted with Gary. Those reports painted a picture of Gary as being so hostile and adverse to his brother Wes that it appeared likely that he was being groomed as a government witness against us. Those reports specifically indicated

---

[4] My answers here are also meant to respond to the accusations made at Doc. 47, p. 31-32 and Doc. 52, p. 33.

52

001653

that Gary described his brother Wes as self-centered, manipulative, aggressive and lacking conscience. Gary purportedly also told government interviewers that Wes had no excuse for ending up the way he did, since he and Wes were given everything they needed when growing up. It was also reported that Gary held ill-will against Wes because Gary believed that Wes had forced himself sexually on their mother.

During my initial phone conversations with Gary, he conveyed to me much the same hostility, repeating many of the same things he had told government agents. Gary also rebuffed my questions designed to try to begin identifying problems with their upbringing which could have led to Wes' problems. Despite the venom coming from Gary, I believed that I needed to try my best to win him over, despite the odds against us. Since I believed the information which Wes had given me about his wretched upbringing, I also believed that Gary, for one reason or another, was not being candid with me about what had happened during his and Wes' childhood. I was hopeful that, through some combination of approaches, we would break through Gary's apparent hatred of Wes so as to get at the truth. I believed that I had two strong reasons for hope in this regard. Those were Gary's wife Becky and his daughter Tonya Braymer. I had some conversations with Becky, and many more with Tonya. Both were extremely kind and supportive

during our conversations about Wes.  I asked that these two work on Gary, to help me get him to open up, and they indicated they would.

I also decided that, in order to possibly change the dynamic, I needed to broach Gary in his own surroundings.  Therefore, I made a trip to Gary's home on March 21, 2003, more than seven months before trial started.  Since Gary lived in far off Gibbon, Nebraska, I enlisted the help of my son to assist me with the long drive there.  When I arrived, my son remained in the car.  However, when I reached the door, Becky could see my son in the car, and wanted him to come in as well.  This actually helped my process in a couple of ways.  First, both Gary and Becky appeared to like my son very much, and talked freely and easily with him. My son's presence seemed in particular to put Gary at ease.  My feeling was that this cast me in the role as the father of a young adult, like Gary, rather than in my role as his brother's lawyer who wanted something from him.  Second, during the time that my son was in the apartment, he further assisted me in that he would interact with and occupy either Gary or Becky, allowing me to talk semi-privately with the other. My son also left for a time, leaving me alone with Gary and Becky for that stretch of time.

Throughout all of the meeting, Gary was more cordial than I had anticipated. However, Gary's developing good will toward me in no way changed his negative

54

001655

attitude toward his brother. All of the same invective against Wes came out in this context as well. Thanks to my son's presence, occupying Becky, I had several opportunities to address to Gary, out of the hearing of Becky or my son, about the issue of intrafamilial sex in general, and about Wes' contentions about their mother seeking sex from Wes in particular. Gary was adamant in professing his belief that Wes had raped their mother, saying his mother told him so. Gary was just as adamant in his conviction that his mother would have never had consensual sex with Wes. My impression was that Gary was very protective of his mother, and would have none of any conversation which portrayed the mother in any sort of a bad light.

On the whole, this meeting, which lasted better than three hours, broke the ice between Gary and me, but did not really change anything in terms of the still-negative substance of what Gary had to offer. Thereafter, I stayed in regular contact with Gary, Becky and Tonya. I also passed along to Gary, when I received it, police reports concerning the rape accusations which their mother made against Wes. It seemed to me, and I argued to Gary, that the reports made it pretty plain that their mother had concocted the story of rape against Wes.

Despite my efforts over the months prior to trial, Gary did not relent in my pretrial conversations with him. Nevertheless, I decided to keep up subtle pressure

55

on him, through my contacts with him and through the influence of Gary's wife

and daughter. I certainly held open the hope and possibility that Gary would

become a witness for us.

Then, as trial was beginning, Gary expressed his desire to attend Wes' trial.

In light of what I was told by Gary and Tonya, I believed that Tonya had much to

do with her Father's new-found attitude. I made the arrangements to have Gary,

Becky and Tonya appear for trial. When they arrived, Gary had a new revelation:

he had been sexually abused by his mother. Gary's willingness to now admit this

fact allowed him to understand and believe that the same had happened to Wes,

and that their mother had lied about Wes raping her. This was precisely the

breakthrough for which I had hoped. Before that, we had very little other than

Wes' claims about his mother's abuse, countered by the mother's own accusation

of rape against Wes. Gary's was a separate, independent verification of the

mother's sexual deviancy, thus confirming the likelihood that Wes' own

accusations against his mother were true.

Mr. Purkey's current Counsel argue that I should have learned from Gary

prior to trial, and should have elicited from Gary at time of trial, the account which

Gary has now given them containing more details about sexual deviancy within the

family. Unfortunately, Gary did not share with me all of these details as we

56

feverishly prepared him, at the last minute, for his testimony based upon his new revelations. Had Gary shared that information with me at that time, I would have presented much of that information at trial. I in no way fault Gary for not providing me that information at that time. Frankly, at that time, he may not have even remembered that detail.

Mr. Purkey's current Attorneys argue that Gary should have been worked with by a social worker in a different way so that this additional detail could have been identified and presented at time of trial (Doc. 52, p. 23). My belief at the time was that, had we been more aggressive with Gary, as suggested by Purkey's current Counsel, we would have driven Gary further into his negative shell. It is my belief that our approach allowed Gary to finally come to terms with his own sexual abuse in his own way and in his own time. Fortunately, Gary's own time left us just enough time to allow us to present very significant evidence at time of trial. Unfortunately, Gary's own time did not leave him enough time to reconstruct all of his own memories, and timely share them with us for trial.

If I correctly understand Mr. Purkey's current Counsel, they also argue, correctly, that I could have asked Gary to provide more intimate details about the sexual activities between him and his mother as a means to bolster Gary's and Wes' stories of sexual abuse. I chose at the time, and would choose again today, to

57

not ask this grown man to describe the sexual positions into which his mother placed him. I believed then, and I believe now, that providing the level of detail which we did struck a good balance between our need to give enough detail for the jury to clearly understand what happened to Gary while still holding back on the gory details, conveying thereby to the jury Gary's real sense of embarrassment and shame over the matter. I leave it to the Court to decide whether my approach, or the approach suggested by Purkey's current Counsel, would be the more wise.

### 4. The testimony of Angie Genail, Wes' daughter, was presented after significant preparation[5]

Though current Counsel for Mr. Purkey acknowledge that Purkey's daughter, Angie Genail, was called to witness at the penalty phase, they seem to complain that this testimony was presented after only brief and inconvenient prior interviews with her (Doc. 47, p. 11, fn. 3; Doc. 52, p. 26).

Counsel for Mr. Purkey do not explain how the testimony by Ms. Genail was in any way deficient. My recollection was that Ms. Genail's accounts about her and her children's relationships with Wes, and Ms. Genail's plea for her father's life, were all powerful. My recent re-reading of the testimony confirms in my mind those notions (Tr. 1541-1547).

---

[5] I mean for this to also be a response to the non-specific accusations made in Doc. 47 at page 32.

It should also be noted that I met with Angie in person on three different occasions to prepare her for her testimony, and presented all the good information which I believed was available from her.

5. After considerable effort, we were able to identify, develop and present significant family background evidence from Wes' paternal aunt, Marguerite Hotchkiss

As we developed our mitigation case for Mr. Purkey, we wanted to find persons who were present while Mr. Purkey was growing up, who could account, first hand, for the hard life he led. Unfortunately, most of those persons had died. The only two persons left were Wes' brother Gary and Wes' maternal aunt, Marguerite Hotchkiss. We developed Gary's testimony, as described above. Through a long and difficult process, we were finally able to locate and interview Ms. Hotchkiss, and ultimate present her testimony at trial.

The process of finding Ms. Hotchkiss began with her daughter, Wes' cousin, Debbie Prothero. From my first contact with Debbie, she made a few things abundantly clear: that she had little or no recollection of or prior relationship with Wes and that she was personally very much in favor of the death penalty.[6] Debbie

---

[6] In a footnote, Wes' current Counsel allege that Debbie and her husband would have willingly testified on Wes' behalf (Doc. 52, p. 27, fn 9). However, Counsel do not provide affidavits from Debbie or her husband, nor do they mention what Debbie or her husband could have or would have said had they been called to

59

001660

was very helpful in assisting me in tracking down her mother.  Ms. Hotchkiss was living variously in Hawaii and California, with occasional stops to visit Debbie in Springfield.  When I finally tracked down Ms. Hotchkiss for the first time, she was in California.  During that conversation, and the ones that followed, she provided me all of what she testified about at time of trial. She had no other knowledge about Wes, his dad, his mother, or that part of the family beyond the information which we presented at trial.

I then set about trying to persuade Ms. Hotchkiss to appear in person to testify at trial.  Ms. Hotchkiss was adamant that she could not do so.  The reasons were two-fold, related to her emotional problems over the case itself and her perceived difficulties related to travel.  In light of her ability to travel from California to Hawaii and back again, it seemed to me that Ms. Hotchkiss' problems were likely related much more to the first reason rather than the second.  Nevertheless, in light of her advanced age, I endeavored to arrange for a deposition

---

witness.  In her conversations with me, Debbie made clear that neither she nor her husband knew much of anything about Wes or his side of the family.  Moreover, in every conversation I had with Debbie, she made sure it was abundantly clear that she was very much in favor of the death penalty, and was in no way opposed to Wes receiving the death penalty in this case.  It seemed to me an obvious choice to not have Debbie or her husband witness in this case, and so I did not.  I see nothing in the information from Mr. Purkey's current Counsel to make me question that decision.

of Ms. Hotchkiss in order to secure in that way the important information about the case which she had to offer (Doc. 405). In the meantime, Ms. Hotchkiss traveled to Springfield. At that point, I hoped that, since she was now situated much closer, she would be willing to appear in person for trial. Unfortunately, she again balked for the same reasons as before. Fortunately, I was able to reach an agreement with prosecutors whereby we presented Ms. Hotchkiss' testimony via teleconference between the Courthouse in Springfield and the Courthouse in Kansas City (Tr. 1520).

In their pleadings on Mr. Purkey's behalf, his current Counsel complain that our preparation for and presentation of Ms. Hotchkiss' testimony were somehow inadequate (Doc. 52, p. 24). However, they provide no details regarding this perceived inadequacy. To the contrary, and as noted above, we went to great lengths to develop complete testimony from this witness who was difficult to locate and produce.

6. After weighing the alternatives, I decided not to secure the testimony of Oregon Department of Corrections Psychologist Dr. Rex Newton, Ph.D.

Vigorous complaint is made over our failure to secure the testimony of Dr. Rex Newton, Ph.D., one of Wes' treating psychologists during the time that Wes was incarcerated in the Oregon Department of Corrections (Doc 47, p. 22; Doc. 52, p. 25-26). It is correctly noted that, in our investigation, we secured Dr. Newton's

report, and we were therefore well-aware of his findings regarding Mr. Purkey; it was via resort to the records, which I and my team assembled prior to trial, that current Counsel for Mr. Purkey were able to locate and interview Dr. Newton (Doc. 47, p. 22; Doc. 52, p. 25-26). It is argued that Dr. Newton's findings and conclusions were so clearly positive and significant that my failure to develop and present Dr. Newton as a witness amounted to ineffectiveness of counsel (Doc. 47, p. 21-22; Doc. 52, p. 25-26).

Certainly, when taken out of context, Dr. Newton's findings and conclusions were very positive and very helpful. My fear was that, if we directly presented those findings and conclusions through Dr. Newton at time of trial, the government would have countered by providing surrounding context, which was very damaging. That context was also contained in others of the records which we obtained in our investigation, provided to the government in discovery, and ultimately provided to Purkey's current Counsel.

According to those records, during the late 1980's Mr. Purkey was being housed in the Oregon Department of Corrections, serving his Kansas State sentence. When he encountered Dr. Newton, Mr. Purkey was being housed in a lower security facility in Oregon, and was on good track for an earlier release. Mr. Purkey's work with Dr. Newton was part of his work on that good track.

62

Unfortunately, as often happened with Mr. Purkey, things got off track. All the while Mr. Purkey was working with Dr. Newton, he was also engaging in activities which were at best against the rules and at worst, arguably criminal. As a result of those activities, Mr. Purkey not only lost his bid for earlier release, he was transferred out of Oregon and back to Kansas to continue the service of his lengthy sentence for robbery and assault. Some, but certainly not all, of this information about Mr. Purkey's problematic behavior in Oregon was already before the jury through the testimony of witnesses like Gary Hatfield and William Porter. It was my belief that, by bringing in Dr. Newton, we would give the government a springboard, not only for presentation of a more complete litany of Mr. Purkey's untoward behavior in the Oregon Department of Corrections, but also to logical questioning of Mr. Purkey's sincerity with Dr. Newton in light of Purkey's concurrent, untoward behavior. To avoid this, I chose to not bring in Dr. Newton, but instead bring forth what I believed to be the functional equivalent of Dr. Newton, and in most cases a more updated version of that information, through various of our experts, particularly Dr. Peterson and Dr. Cunningham, and lay witnesses, particularly Dominic Geniuk (Tr. 1491-1500), Patrick Howe (Tr. 1485-1491), Michael Gibbons (Tr. 1502-1516), Robert Lopez (Tr. 1530-1540), and Mark Russell (Tr. 1651-1655).

001664

Counsel for Mr. Purkey find greatest fault over my failure to produce Dr. Newton to specifically say that Wes had told him, in the late 80's, about his mother sexually abusing him (Doc. 47, p. 21). This evidence, it is argued, would have countered what Purkey's current Counsel claim were government accusations "…that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty…" and "…that Purkey had never before reported being sexually abused…" (Doc. 47, p. 21). The fatal flaw in this logic is that the government never made such claims.

As current Counsel for Mr. Purkey note, there were two queries upon the matter put to defense psychiatrist, Dr. Stephen Peterson. The first of those, complete with the context prior to the citation by current Counsel for Purkey, was as follows:

> Q    Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any -- there is very little, if anything, in the record to support that, correct?
> A    Well, that's correct. There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's shoulder to see what he experienced, but we don't have that. At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to

64

walk.

Q    We're not talking about walking.  We're talking about a man who claims his mother had sex with him when he's a kid, right?

A    Yes.

Q    You're aware from the reports that -- the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her.  Have you seen that report?

A    I have seen the report.  I've also seen the medical report that the doctor gave the opinion than she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

Q    That wasn't in a medical report, was it, sir?  It was in the detective's report.  He wrote that down.

A    By the doctor to the detective.

Q    Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

A    I read that.  And the police could certainly have pressed charges without her.  (Tr. 1816-1817)

Certainly, by this inquiry, the government was attempting to question Purkey's claim of sexual abuse against his mother.  However, Dr. Peterson knowledgably deflected the accusation of rape against Purkey.  That is the portion of the exchange to which current Counsel for Purkey refers.  Current Counsel for Purkey does not note that Dr. Peterson also more generally deflected the government advances by specifically referencing Mr. Purkey's multiple prior accounts of the sexual abuse.  Thus, while not mentioning Dr. Newton by name, Dr. Peterson conveyed the gist of the information which Dr. Newton would have himself provided in this regard.

The other skirmish between government Counsel and Dr. Peterson over the

65

001666

matter was as follows:

> Q   (By Mr. Whitworth)  To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?
>
> A      To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.
>
> Q      To your knowledge.
>
> A      Yes. I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.
>
> Q      Yet Mr. Purkey told you that?
>
> A      Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed psychosexual history done by Dr. Fernando or even the social worker.
>
> Q      Thank you. That's all I have. (Tr. 1824-1825)

It is certainly true that, here, Dr. Peterson did not again include his earlier reference to Mr. Purkey's prior accounts of the sexual abuse to others, and particularly did not refer to Dr. Newton's discussions with Purkey about the sexual abuse. However, the thrust of the point being made by Dr. Peterson at this point, which was correct, was that no one before Peterson, particularly those who evaluated Mr. Purkey for his Kansas state charges, had conducted a thorough psychosexual evaluation of Mr. Purkey so as to ferret out all of the details of the abuse. That same criticism would apply to all prior evaluations of Mr. Purkey, including the work done by Dr. Newton. I could have come back to Dr. Peterson to countersink the point advanced by current Counsel for Mr. Purkey. However, I did not believe

66

001667

at the time that the government's questions gained any traction. I believe my notions in this regard were confirmed in light of the way the government ultimately argued its case.

In their arguments, government Counsel took their questioning of the sexual abuse no further, instead essentially conceding that Purkey had been abused. Current Counsel for Purkey cite to two arguments (Doc. 47, p. 21). I have re-read the entirety of the government's penalty phase argument, and have found one other reference.

The first of those, in context, was as follows:

> We brought in Dr. Park Dietz, we brought in Dr. Helen Mayberg, and Dr. Dan Martell, who are three of the finest forensic psychologists, psychiatrists in the United States, because we didn't want you to be misled by this defense. And I submit to you when they say no brain injury, they say no mental disease, that you can believe their testimony over the defense experts.
> Dr. Peterson, who Dr. Dietz so aptly stated, his findings were a fairy tale. He couldn't even show me in the DSM-IV manual where he had come up with this diagnosis. And that's the Bible of forensic psychiatry. He said that medication could control and has controlled this defendant's behavior. Ten minutes after he says that, the defendant interrupts the proceedings in an angry outburst. (Tr. 2267)

Contrary to the representations by current Counsel for Purkey (Doc. 47, p. 21), the government "fairy tale" argument was referring, not to Purkey's representations about his abuse, but rather to Dr. Peterson's overall diagnosis of Purkey. In fact, just a few lines later, as part of the "blame game" reference complained about by

current Counsel for Purkey (Doc. 47, p. 21), government Counsel actually

conceded the abuse took place. That entire line of argument was as follows:

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent, committing crimes. He made those choices. (Tr. 2268)

The closest the government got to the sexual abuse claims issue was later in their

argument, when government Counsel simply left to the jury determination about

the sexual abuse.

> They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions. (Tr. 2291-2292)

Current Counsel for Purkey fault me that I "...should have easily anticipated

that the government would allege that Purkey had recently fabricated the allegation

that he had been sexually abused by his mother in order to avoid the death penalty"

(Doc. 52, p. 21). Fatal to their point is that their "easily anticipated" argument

never occurred. To the contrary of their point, the most logical interpretation of the

government arguments would lead one to the conclusion that the government had

68

001669

given up challenging the abuse.

Even if the government's queries and arguments could have been seen to be asking the jury to doubt Purkey's account of sexual abuse, the government's attack would have to be seen as more global than that the fabrication was recent. If anything, the government would have to be seen as asking the jury to doubt Purkey's accounts of the abuse, whenever those accounts occurred. The trouble with our trying to support the fact of the sexual abuse by resorting to Dr. Newton, or to any of the others to whom Wes confided the abuse, is that, at bottom, the source of the information for all of these witnesses was Wes himself. That was why it was so important that Dr. Peterson referred in his testimony to the reports in the records from two persons directly familiar with the abuse, Wes' deceased Aunt and Wes' brother Gary (Tr. 1816). That was also why it was so great, even miraculous, that Gary experienced his change of heart when he did. That way, we had, from the only still-living relative, direct confirmation, independent from Wes, about the mother's sexual deviancy.

While we could not have anticipated arguments which the government never made, the government argument theme which we did anticipate, the theme which actually was resounded in the cited arguments and throughout the rest of government argument, was to the effect that Purkey refused to change despite

69

being given multiple opportunities to change (Tr. 2259, 2267-68, 2291-92). As I noted above, in my opinion, bringing forth Dr. Newton would have strongly supported that argument as an instance in which Purkey was receiving the help which he wanted, in this case psychological help, and repaid that assistance by continuing his criminal ways despite the help. Anticipating the argument which the government actually made, I decided that, rather than providing this golden opportunity for the government to make its point, I would instead bring Dr. Newton's findings in through Dr. Peterson and others.

7. After weighing the alternatives, I decided not to call Floyd Bose or Dion Leiker

As Mr. Purkey's current Counsel correctly allege, well prior to trial, Wes alerted me about his relationships with Dion Leiker and her father, Floyd Bose (Doc. 47, p. 23-24).[7] I had various opportunities to talk to Dion, though I never contacted Floyd. Through Wes and Dion, I learned about Wes' assistance to Floyd and Dion in their attempt to sort out the death in prison of Floyd's son, Dion's brother. I also obtained what records I could about the matter.

To briefly summarize what was a very complex story, when Floyd and Dion

---

[7] Current Counsel for Mr. Purkey reference a letter to me from Wes in August of 2003 (Doc. 47, p. 23; Doc. 47, attachment 9). Actually, my recollection is that Wes and I had talked many times about these folks, and long before Wes wrote that letter.

70

001671

were left with no real answers from authorities about the killing, Wes contacted them and detailed for them a conspiracy which involved inmates, prison officials and state officials. However, a formal investigation of the matter did not confirm Wes' account. Floyd and Dion strongly believe the information which Wes provided, and believe that a government cover-up accounts for the failure to confirm Wes' account.

I weighed whether to present this information, and I decided there were too many problems. I knew that the government would easily be able to counter Wes' account with the contrary results of the official investigation. But, I was much more concerned with the argument question which I feared the government would likely pose in light of Wes' knowledge base: if Wes' account was true, does not that knowledge base prove how intimately involved he was in prison crime and violence? We were battling already over the issue of Wes' future dangerousness. Had we presented this evidence, we could have argued that Wes, by bringing these facts to light, was disavowing violence, and trying to bring the truth to light. However, the government would have been free to argue that, even if Wes' account was true, all this proved was how closely connected to the violence Wes was. Moreover, the government could have also argued that, had Wes really not been part of this, he would have reported things earlier, in time to have saved the man's

71

life in the first place.

It was also my understanding that, in the years since Wes' revelations to Dion and Floyd, Wes had asked for and had received from them financial assistance. While I was not sure the government was aware of this, I knew that it would not be difficult for the government to obtain institutional financial records, or to simply ask the questions directly of Dion and Floyd. I was very concerned that the government would try to use this information in order to inaccurately portray Wes as giving the help he was to these people, including possibly false information, only as a means to get help from them.

On balance, I decided that the risks of the testimony outweighed the benefits of this and the other limited information which Dion and Floyd had, and thus I chose not to call these two witnesses.

### 8. My recollections regarding Peggy and Evette Noe

My recollections about Peggy and Evette Noe are not as clear as with other witnesses and instances. I shall do my best to account for my knowledge based upon the recollections which I have.

Current Counsel for Mr. Purkey allege that we did not have contact with Peggy and Evette, though we discovered their identities in our investigation (Doc. 47, p. 22-23). Actually, it is my recollection, not only that I was aware of the

72

referenced reports, but also that I did speak, prior to trial, certainly with Peggy, and possibly with Evette, though I cannot locate any documentation to confirm that recollection. In fact, I believe that Peggy's recollections, as accounted in the Petition (Doc. 47, p. 22), formed part of the basis for Dr. Peterson's testimony regarding Mr. Purkey's account to others regarding his sexual abuse, as noted above.

My recollection is in keeping with the allegations of the Petition about Wes never asking that I contact these women (Doc. 47, p. 22). My recollections are also that, since Wes did not advance these witnesses, I decided, independently from him, not to pursue using Peggy and Evette as witnesses, and that my reasoning was based on things contained in the materials we obtained, either about problems in the relationship between Wes and Peggy, or problems in Peggy's and Evette's backgrounds, or both. Because I have given to current Counsel for Mr. Purkey all of the file materials which I had about these women, I am unable to resort to those materials now to refresh my recollections about these latter matters. If the Court would deem it appropriate, I would be happy to obtain and review those materials to assist me in answering this matter further.

Current Counsel for Mr. Purkey also advance here, as they did with their arguments regarding Dr. Newton, their notions that I was ineffective in not using

73

Peggy Noe's testimony to counter the argument that Purkey had recently made up

the story about the sexual abuse in order to avoid the death penalty (Doc. 47, p.

24). As I already noted in above in my response regarding the Newton issues, the

government never made the argument, as claimed by current Counsel for Purkey,

and actually conceded Purkey's abuse in their argument. Moreover, as I also noted

above, even if the government's questioning and argument could be read as an

indictment of Purkey's credibility, that indictment was over the truth of the sexual

abuse accusations by Purkey generally, whenever they were made. Thus, the

Peggy Noe testimony, like the Dr. Newton testimony, was merely more of the

same, more of Wes' accusations against his mother. The only real counterpoint to

the government's point was Gary Hamilton's independent account of the mother's

sexual deviancy, which of course we presented.

9. Cited cases are, once again, inapplicable

To sum up, though they have not found one new piece of evidence that we

did not discover during our initial investigation, current Counsel for Mr. Purkey

contend that our investigation and preparation were inadequate because we did not

have a forensic social worker on our team. At various points in their suggestions,

current Counsel for Mr. Purkey cited to cases urging that those cases support their

arguments. In truth, if one looks at the cases, one notes the egregious omissions by

74

counsel in those cases, but can find no factual corollaries in this case.

Current Counsel for Purkey first attempt to liken the efforts made in this case to those made in three cases (Doc. 52, p. 12). However, none of those cases is even similar. In **Karis v. Calderon**, 283 F.3d 1117, 1134 (9th Cir. 2002), the defense made a 48 minute mitigation presentation, without touching on the defendant's substantial history of childhood and familial abuse. In **State v. Tokman**, 564 So.2d 1339, 1342-1343 (Miss. 1990), no evidence presentation was made in penalty phase after little or no investigation into the defendant's background. In **Wiggins v. Smith**, 539 U.S. 510, 515-517, 523-524 (2003), defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. In **Hamblin v. Mitchell**, 354 F.3d 482, 490-491 (6th Cir. 2003), there was a failure by defense counsel to conduct any mitigation investigation, a failure to obtain background records, and interview of only one of 22 available family members. Obviously, our efforts on Wes' behalf were considerably different that those made in these cases.

Current Counsel for Purkey urge that our decision to dispense with the hiring of a forensic social worker in this case is like unto failures to seek professional help in other cases they cite (Doc. 52, p. 18) Those cases are also

75

001676

easily distinguishable on their facts. In *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla.Crim.App. 2007), no substantive mitigation work was done until a week before trial, and the little work that was done consisted of interview of only a few family members for about two hours, and presentation of only 3 lay witnesses in a mitigation case comprising less than 15 pages of transcript. In *Rios v. Rocha*, 299 F.3d 796, 807-808 (9th Cir. 2002), there was a complete failure to interview witnesses, and a failure to request funds to employ investigator, all of which resulted in failure to develop an available misidentification defense. In *Garcia v. Portuondo*, 459 F.Supp.2d 267, 288 (S.D.N.Y. 2006), a retained attorney failed to conduct any investigation to support an available alibi defense, in part because he did not want to foot the costs of travel related to certain aspects of that investigation. In *Ex Parte Briggs*, 187 S.W.3d 458, 467 (Tex.Crim.App. 2005), because the defendant failed to pay necessary costs in advance, counsel refused to make any investigation about medical issues related to victim's cause of death, and did not consult experts on the issue, despite the fact that this was the only viable avenue of defense. None of these cases even remotely relate to the fact pattern here.

Current counsel for Mr. Purkey liken our approach to Gary Hamilton to the inadequate approaches take in certain other cases (Doc. 52, p. 23). The analogies

76

are inapt. In *Cargle v. Mullin*, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), defense counsel failed to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made statements to others that the defendant, instead, had made exculpatory statements. In *Ex parte Gonzales*, 204 S.W.3d 391, 393-394 (Tex.Crim.App. 2006), defense counsel failed to inquire of the defendant and his family members about the defendant's substantial history of childhood abuse, from which he developed, and continued to suffer from, post-traumatic stress disorder. No errors in any way similar to those in these cited cases occurred here.

Current counsel for Purkey complained that our pursuit of the poisoning defense, and our investigation related to Mr. Purkey's family members, made our work comparable to several cited cases (Doc. 52, p. 24). Again, the facts here bear no relation whatsoever to the startling deficiencies which occurred in the cited cases. Counsel again refer to *Wiggins v. Smith*, supra, in which defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. Also, they refer to *Harries v. Bell*, 417 F.3d 631, 638-639 (6th Cir. 2005), in which, due to client resistence, there was a failure to obtain records of mental health problems and a failure to obtain mental evaluations, despite counsel being alerted to those

issues during conversations with family members.

In discussing our efforts with respect to the Newton, Bose, Leiker and Noe information, current Counsel for Purkey attempt to liken our those efforts to those set forth in certain cases (Doc. 52, p. 24-27). They cite again to *Marquez-Burrola v. State*, supra, in which, as described above, no substantive mitigation work was done until a week before trial, consisting of interview of only a few family members for about two hours, and only 3 lay witnesses testified in a mitigation case comprising less than 15 pages of transcript. They also mention *Collier v. Turpin*, 177 F.3d 1184, 1200-1202 (11th Cir. 1999), in which the defense presented a mitigation case which lasted just a little more than one hour, and offered virtually nothing of the defendant's background except that he was a hard worker and had a good reputation in the community. There is also *State v. Williams*, 794 N.E.2d 27, 49-50 (Ohio 2003), wherein after the defendant assaulted his attorneys upon the jury's return of a guilty verdict, those attorneys conducted no preparation for penalty phase mitigation. Then there is *Powell v. Collins*, 332 F.3d 376, 398-399 (6th Cir. 2003), in which defense attorneys did not begin prep for penalty phase until after the guilty verdict, and presented only one witness, a psychologist who testified that the defendant had the capacity to commit aggravated murder and that, in his opinion, it was a good thing that the defendant was not bigger, stronger,

78

001679

heavier and smarter, as that would make him that much more dangerous. Next, there is ***Williams v. Anderson***, 460 F.3d 789, 797 (6th Cir. 2006), wherein the defense attorney did not do mitigation investigation, and presented only the defendant's testimony during penalty phase. Finally, there is ***Hovey v. Ayers***, 458 F.3d 892, 926 (9th Cir. 2006), in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert.

Put simply, none of these cases in any way resemble the facts in this case.

### *Issue regarding the preparation for and presentation of the testimony of Dr. Bruce Leeson, Ph.D.*

Current counsel for Mr. Purkey argue, that the credibility of defense expert, Dr. Bruce Leeson, was "severely challenged" in light of answers which he made to a few cross-examination questions posed to him, and that I was ineffective in not better preparing Dr. Leeson to answer those questions (Doc. 47, p. 25; Doc. 52, p. 27-29). I do not believe that the record of Dr. Leeson's testimony, taken as a whole, supports these concerns.

The only facts about Mr. Purkey which Dr. Leeson admitted not knowing prior to trial concerned Mr. Purkey having taken some psychology college correspondence courses and Mr. Purkey working as a jailhouse lawyer (Tr. 1616). On redirect examination, Dr. Leeson fully explained why it was not important for

79

001680

him to know those particular facts, since the capabilities which those accomplishments required were unrelated to the damaged areas of Mr. Purkey's brain, identified in Dr. Leeson's neuropsychological testing, which caused the problems for Mr. Purkey which Dr. Leeson was describing (Tr. 1646-1647). Dr. Leeson also addressed in redirect examination an issue raised in cross, explaining that what was learned in the sorts of psychology courses which Mr. Purkey took would in no way assist a person in faking neuropsychological testing results (Tr. 1647-1648).

Current Counsel for Mr. Purkey posit that Dr. Leeson's answers to questions regarding Mr. Purkey's prior treatment for head injuries somehow demonstrated his lack of mastery of the content of the reports concerning that treatment (Doc. 47, p. 25; Doc. 52, p. 28). Actually, if current Counsel for Mr. Purkey were themselves more familiar with those reports, they would realize that Dr. Leeson was fencing with opposing counsel, and answered as he did, not because he was unfamiliar with the reports, but because the queries made of him were, to some degree, misleading with regard to the operative facts in those records, and Dr. Leeson would not allow opposing counsel to misrepresent the presence of facts which were not present (Tr. 1626-1631). Opposing Counsel was certainly trying to posit that the results of testing conducted at the time of Mr. Purkey's injuries

80

001681

countered the claim of neurological damage, but Dr. Leeson would have none of that (Tr. 1629, 1630, 1631). On redirect examination, I gave Dr. Leeson even greater opportunity to make it abundantly clear that the testing methods at the times of the injuries were not sophisticated enough to rule out the sorts of neurological injuries which he detected in his testing (Tr. 1639-1642).

Having now re-read Dr. Leeson's testimony as a whole, its seems to me that he was wonderfully well familiar with all of the facts and the psychological literature bearing on the opinions which he rendered, and he adroitly countered all of the argumentative questions posed against him by government counsel.

Current Counsel for Mr. Purkey wish to liken what happened with Dr. Leeson to what happened in **Bean v. Calderon**, 163 F.3d 1073, 1079 (9th Cir. 1998). In that case, at the trial penalty phase, defense counsel enlisted experts at the last minute and provided only minimal records about the case; as a result, when called to witness at trial, the experts were not able to make definitive diagnoses, or opine about Bean's legal competency; on the other hand, at the habeas evidentiary hearing, after proper preparation, the doctors were able to testify that Bean was mentally retarded, suffered from brain damage and post-traumatic stress disorder, and could not have formed the requisite intent for the charged offenses; trial counsel were deemed ineffective for not properly preparing these experts for trial

81

in the fashion as ultimately presented at the habeas hearing.  ***Bean v. Calderon***, supra. On the contrary, in this case, all of the experts, including Dr. Leeson, had all of the records they needed to make their diagnoses, were prepared far in advance of trial, and testified directly as to their diagnoses, and the impact of the diagnosed conditions on Mr. Purkey.

Current Counsel for Mr. Purkey also cite again to ***Hovey v. Ayers***, supra the case  in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Of course, the facts there are far different from the facts here.  It should also be noted that, in citing to that case in their pleading, current Counsel for Mr. Purkey take odd literary license by quoting directly from the ***Hovey*** case, at page 929, but substituting the name "Dr. Leeson" for the name which actually appears in the text of that case, which is "Dr. Satten" (Doc. 52, p. 29).  I am unsure why current Counsel for Mr. Purkey would have so confusingly misquoted the ***Hovey*** case.  So the Court is not confused by this, I would clarify that Dr. Leeson had no connection with the ***Hovey*** case.

### Issue regarding the preparation for and presentation of the testimony of Dr. Stephen Peterson, M.D.

Upon this issue, current Counsel for Mr. Purkey ask this Court to find lacking my preparation for and presentation of the testimony of defense

82

001683

psychiatrist, Dr. Stephen Peterson, M.D. (Doc., 47, p. 27; Doc. 52, p. 30-31). The trouble is that the conclusions which they urge can be drawn only through the faulty mechanism of drastic misrepresentation of the facts.

Current Counsel for Mr. Purkey have reprised here their incorrect assertions, that Dr. Peterson supposedly did not testify about Mr. Purkey's previous reports to others about his sexual abuse, and that the government, as a supposed consequence, argued that Mr. Purkey had fabricated the claim of sexual abuse to avoid the death penalty (Doc. 47, p. 27-28; Doc. 52, p. 30-31). As I have already detailed above at pages 63-68, contrary to the claims of current Counsel for Purkey, not only did Dr. Peterson testify that Purkey had reported his sexual abuse to multiple persons on multiple previous occasions, but also the government never made the complained-of argument, but rather essentially conceded the abuse committed against Purkey.

It should be noted that, even though their claims are incorrect, current Counsel for Purkey persuaded Dr. Peterson to embrace and admit them as if they were true (Doc. 47, attachment 15, p. 3-4). I have spoken to Dr. Peterson, and have learned that current Counsel for Purkey were able to obtain these inaccurate admissions from him by misleading him, showing him only the limited parts of the record, as cited in their pleadings, and not providing Dr. Peterson with the whole

transcript of the case, and in particular not providing Dr. Peterson the portions of the transcript wherein he does refer to Mr. Purkey's other revelations about the sexual abuse and wherein the actual government arguments are revealed. I did not ask for Dr. Peterson to complete another affidavit in these regards, but I can if the Court wishes.

Citing only sparingly to the pertinent record, current Counsel for Mr. Purkey also complain that I did not have Dr. Peterson sufficiently detail the sexual abuse suffered by Mr. Purkey (Doc. 47, p. 27; Doc. 52, p. 30). Actually, we did bring out many details about the kinds of sexual abuse, more than noted by current Counsel for Mr. Purkey, as well as Dr. Peterson's explanation about the impact of the sexual abuse, and that can all be found at transcript pages 1750-1751. However, the thrust of the argument is that, if only I had elicited from Dr. Peterson even more salacious details which Purkey had accounted to Peterson about the abuse, that would have caused the jury to more readily believe the account.

In his providing of detail about the abuse at trial, I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games.

84

001685

I felt that Dr. Peterson, without leading from me, found that proper balance. I felt that had I prompted him into the sorts of lurid details suggested, I would have tipped over the balance, and would have taken away the clear impression left by Dr. Peterson about the shame associated with Wes' memories, and would have instead falsely portrayed those memories as erotic, prurient and titillating. Moreover, as I have indicated earlier, my reasoning was also that the mere expedient of accounting more words from Wes' mouth would not make his story as a whole more believable for the jury. That is why I had Dr. Peterson emphasize the independent confirmation of the abuse which was provided by Mr. Purkey's aunt and brother (Tr. 1816).

Current Counsel for Purkey posit that the government's "fairy tale" and "abuse excuse" arguments (Tr. 2267-2268) were somehow a consequence of Dr. Peterson not doing enough to support Wes' accusation of sexual abuse against his mother (Doc. 47, p. 27; Doc. 52, p. 32). However, as already described in detail at pages 67-68 above, this contention by current Counsel for Purkey founders on the fact that neither of these terms were ever used to describe Wes' sexual abuse allegations against his mother. The term "fairy tale" was first used by government expert, Dr. Park Dietz, to describe my request that he assume as true our expert's conclusions that PET testing showed brain damage (Tr. 2210-2212). Government

85

Counsel then used the "fairy tale" term to more broadly describe Dr. Peterson's ultimate conclusions about Mr. Purkey's inability to conform his conduct to the requirements of the law at the time of the offense (Tr. 2267). The "abuse excuse" argument referred generally to Wes' "bad childhood" (Tr. 2268). The contention, as made by current Counsel for Purkey, that the mere palliative of different answers from Peterson on the sexual abuse issues would have somehow preempted the government's arguments, and would have thereby somehow dissuaded the government from making these arguments, seems doubtful if not laughable.

The real problem faced by Dr. Peterson in advancing the conclusions which he did was that he was swimming upstream against a torrent of evaluation results from numerous mental health professionals made over the preceding thirty-some-odd years. As Dr. Dietz himself noted, in pronouncing his own antisocial personality disorder findings about Wes, that his conclusion was in no way novel, and simply mirrored the like conclusions reached consistently and persistently by the various mental health professionals who had evaluated Wes over the years (Tr. 2156).

Current Counsel for Purkey fail to note that, in confronting this phalanx of contrary opinions, Dr. Peterson used the sexual abuse as an important component, but only one component, in the complete story about the pervasive abuse and

trauma which Wes suffered during his early life. Dr. Peterson certainly described the sexual abuse, and the psychological impact wrought by that abuse (Tr. 1750-1752). Dr. Peterson even endeavored to explain how previous evaluators had done incomplete evaluations, and thus had missed this very significant piece to the puzzle (Tr. 1813-1815, 1824-1825). Dr. Peterson also described Wes' physical beatings at the hands of his parents, and the psychological impact of that (Tr. 1753-1755). As well, Dr. Peterson described the adverse impact wrought from Wes' parents and brother not only pervasively modeling drug and alcohol abuse behavior, but also introducing Wes to drugs and alcohol as an early teen, and encouraging Wes to abuse substances with them (Tr. 1756-1756). And, Dr. Peterson detailed the functional impacts of the significant accidental head injuries which Wes suffered (Tr. 1759-1760). Dr. Peterson's concluded that Wes, as a result of this wide-ranging set of problems, suffered from a complex set of mental illnesses, and that that complex set of mental illnesses, rather than antisocial personality disorder, explained Wes' problems in general, and his actions against Jennifer Long in particular (Tr. 1748-1749, 1766-1771, 1775-1776). However, Dr. Peterson had to admit that his diagnosis could not be nicely pigeon-holed into a distinct category found in the DSM-IV-TR (Diagnostic and Statistical Manual, Fourth Edition, Text Review) (Tr. 1793). That answer, and not his answers about

001688

sexual abuse, left Dr. Peterson open to precisely the argument against him made by the prosecution (Tr. 2267).

Current Counsel for Purkey refer to three cases, wishing to liken what happened here to what happened there (Doc. 52, p. 31). What happened in those cases was far different than what happened in this case.

Current Counsel for Purkey cite a third time to *Hovey v. Ayers*, supra the case in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Also cited is *Lewis v. Dretke*,[8] 355 F.3d 364, 366-367 (5th Cir. 2003), wherein counsel failed to submit any evidence about an abusive childhood when such evidence was readily available, and the only reason for the failure to develop and present the evidence was the failure to interview available, family member witnesses. Next is cited *Turpin v. Lipham*, 510 S.E.2d 32, 41-42 (Ga. 1998), wherein counsel failed to read, and failed to hire a mental health expert to evaluate, thousands of pages of records about defendant's institutionalization in mental hospitals, childrens' homes and treatment centers from age 9 to 10, failed to interview any of the doctors mentioned in the reports, and presented only three

---

[8] In their pleading, current Counsel for Purkey mistakenly refer to the party's name as "Drake" (Doc. 52, p. 31), whereas the correct spelling is "Dretke".

88

witnesses in penalty phase, two records custodians, who merely identified the records, and the defendant's wife, who simply made a plea for mercy. Finally cited is *Commonwealth v. Alvarez*, 740 N.E.2d 610, 617-618 (Mass. 2000), wherein a failure to obtain records of serious auto accident not only resulted in defense expert not having necessary support for his diagnosis, but also permitted the prosecution to incorrectly argue that the defendant's accounts about the seriousness of the accident were self-serving fabrications. There is nothing remotely similar about these situations in these cases and what occurred in this case.

### *Issue regarding the preparation for and presentation of the testimony of Dr. Mark Cunningham, Ph.D.*

Current Counsel for Mr. Purkey also ask this Court to find in my presentation about the maternal sexual abuse of Purkey through Dr. Mark Cunningham Ph.D. faults similar to those urged by them concerning my presentation of the same information through the Dr. Peterson testimony (Doc. 47, p. 29-31; Doc. 52, p. 32). Their criticisms here suffer problems very similar to those suffered by the complaints related to the Peterson testimony.

Once again, current Counsel for Mr. Purkey have not found it necessary to fully and accurately describe the trial testimony (Doc. 47, p. 29-30), and therefore have failed to note that the Cunningham testimony actually contains many of the details which they incorrectly contend are missing (Tr. 1862, 1864-1865).

89

However, it is certainly true for Dr. Cunningham, as it was with Dr. Peterson, that even more detail of the sexual abuse was available had I decided to ask for it. My approach to the Cunningham testimony was the same as with the Peterson testimony. I wanted the jury to have enough detail to fully grasp the impact of the sexual abuse without overwhelming the point with prurient detail. To me, that notion of balance was even more important in the Cunningham presentation because of the point, made by Dr. Cunningham, about the shame-induced reluctance of victims to detail their abuse (Tr. 1866-1867). It seemed to me that the sort of detail which Dr. Cunningham brought forth on his own was in keeping with the point about shame, and that my coming back to solicit even more Purkey-provided detail would have, if anything, undercut the point about shame-induced reluctance to share details. Moreover, with Dr. Cunningham, as I had with Dr. Peterson, I sought to support the abuse allegations, not with more questions about more words from Purkey, but rather with questions about the confirmation of the abuse provided by independent sources (Tr. 1865-1866). And, with Dr. Cunningham, as with Dr. Peterson, sexual abuse was but one of many trauma factors used to explain, as Dr. Cunningham put it, Mr. Purkey's "pervasive developmental poisoning" (Tr. 1854, 1857-1878).

Dr. Cunningham himself questions, and current Counsel for Purkey indict,

my decision to not have Cunningham use a powerpoint presentation which he had

prepared (Doc. 47, p. 30; Doc. 47, attachment 11, p. 3-4; Doc. 52, p. 32-33). I had

several reasons for making this decision.

First, I had it in mind to try to stop the use of a powerpoint presentation by

government expert Dietz. I had educated myself on Dietz's presentation strategies,

and I knew that Dietz depended greatly on his powerpoint presentations, and that

those powerpoint presentations contributed mightily to the effectiveness of the

Dietz presentations. I felt that, if I could strip Dietz of his powerpoint, I could

reduce his effectiveness. I developed objections to the Dietz powerpoint, and I was

ultimately successful in preventing his use of the powerpoint (Tr. 2137). I knew

that my arguments against Dietz's powerpoint would have been undercut if I had,

just days earlier, had Cunningham use a similar presentation. This strategy against

Dietz was a part of my reasoning in not letting Cunningham use his powerpoint.

Second, I was concerned that Dr. Cunningham's powerpoint could be used

as a tool for a potentially devastating cross-examination. By the time that Dr.

Cunningham testified in the Purkey case, he had previously testified in more than

75 other capital cases throughout the country (Tr. 1911-1912). I was aware that

prosecutors were collaborating on various ways to attack Dr. Cunningham, and

were particularly focusing on trying to use Cunningham's presentations in previous

cases to show what they would argue were rote repetitions of those presentations from one case to another. I personally had seen Dr. Cunningham's powerpoint presentations for various cases, including Purkey's and one other case which I handled, and I noted redundancies in certain of the powerpoint slides in those various presentations. While I could have asked that Dr. Cunningham remove the repetitive slides about which I was aware, I was concerned that, even with such a removal, in light of the sheer volume of the cases which Dr. Cunningham had previously handled, he could not possibly be able to assure that, even after the reduction I would propose, that there were not slides which remained in his powerpoint presentation for Purkey which were very similar to, if not exactly the same as, slides used in other cases. I believed that, if a confrontation with similar slides occurred, that would be devastating to Dr. Cunningham's otherwise very strong, case oriented presentation on Mr. Purkey's behalf.

Finally, I had had the opportunity to see Dr. Cunningham in situations in which he used his powerpoint and in situations in which he testified without the powerpoint. It was my perception that Cunningham was more effective without his powerpoint.

In light of the combination of these factors, I decided to have Dr. Cunningham provide his testimony without the powerpoint.

92

## *Issues regarding presentation of defense witnesses Grant and Russell*

In their pleadings filed on Mr. Purkey's behalf, current Counsel for him seriously question my judgment in calling as defense witnesses two BOP employees, Dr. William Grant, M.D. and Mark Russell (Doc. 47, p. 32-33; Doc. 52, p. 33-34).

As to the calling of Dr. Grant, the criticism is somewhat understandable. Our purpose in calling Dr. Grant was to have him testify that he had prescribed the psychoactive medications which Mr. Purkey was then taking, and believed them to be medically appropriate. In my conversations with Dr. Grant prior to his testimony, it was my understanding that he would say those things simply and straightforwardly. Direct examination was fairly straightforward, with the exception that Dr. Grant minimized the psychoactive effect of one of the agents he had prescribed, and indicated that he prescribed that agent because it "was not medically inappropriate" and because Purkey asked for it and was going on trial for his life (Tr. 1409-1410). Then, on cross, Dr. Grant allowed that "(t)he justification for Klonopin…came from another psychiatrist who was in private practice and consulting with the defense", but added that he didn't think that psychiatrist "supported the diagnosis very well in his reports" and that "he invoked anxiety where many of the rest of us would have invoked an attitude, belligerent,

93

001694

irritable attitude" (Tr. 1415-1416). I went back on redirect and clarified that Dr. Grant had not seen Dr. Peterson's 70 page report to know all of his reasons for his diagnosis, and that, regardless, he, Grant, was the one to prescribe the meds (Tr. 1417, 1420).

I did not anticipate, and it still amazes me, that a practicing physician would essential admit under oath, as did Dr. Grant, that he had abdicated his professional role in deciding the appropriateness of prescribing controlled substances, and thereby jeopardize his license to continue prescribing such medications.

While I would not agree that Dr. Grant's testimony was "more harmful than helpful", as argued by current Counsel for Mr. Purkey, if I had it to do over again, I would have brought out the point about Grant's prescription of the medications through Dr. Peterson, thereby avoiding the problematic testimony which Dr. Grant volunteered.

I find the criticisms about the Mark Russell testimony much less understandable. On behalf of Mr. Purkey, current Counsel for him have expressed serious concern over the possibility that use of the term "Club Fed" in the testimony would mislead a jury into believing that penitentiary conditions were somehow posh (Doc. 47, p. 5-7). But now, while acknowledging that Russell was obviously called in part to squelch the "Club Fed" notions, current Counsel for

94

001695

Purkey criticize that Russell did more harm than good (Doc. 47, p. 33).  I respectfully disagree.

Current Counsel for Mr. Purkey are certainly correct that I wanted to directly address, from whatever source, any juror false impressions about the conditions of Fedcral prison confinement.  I believed that this could be done best through two witnesses:  expert Dr. Mark Cunningham, Ph.D. and prison worker Mark Russell.  During my dealings with Mr. Russell in the months leading up to trial, I was able to discuss with him all aspects of the testimony which he would give, and he said everything at time of trial which we anticipated.  Not only did Mr. Russell directly debunk the whole "Club Fed" idea (Tr. 1654), he generally described the security conditions of the institution (Tr. 1659-1660), and specifically described Mr. Purkey's rather stark conditions of confinement, 23.5 hours a day in his cell, and in restraints whenever moved (Tr. 1653-1654).  Mr. Russell also added, in support of other points we were making, that Purkey had exhibited no assaultive behavior while at Leavenworth, and had requested to have his Aryan tattoos removed (Tr. 1654-1655).

Current Counsel for Purkey complain that, though Mr. Russell certainly debunked the "Club Fed" idea about prison conditions of confinement, he also said on cross-examination that Purkey was currently being held in a unit for inmates

95

001696

with problem behaviors (Doc. 47, p. 32). What current Counsel for Mr. Purkey fail to note was that Mr. Russell clarified that the unit was also for administrative cases, and that Mr. Purkey was being housed in that unit for the administrative reason that he was "pretrial" (Tr. 1655-1656). Current Counsel for Mr. Purkey further complain that, on cross, Mr. Russell acknowledged that Purkey had been "demanding" in that he wanted more access than the normal inmate to the law library and to a typewriter, and once asked for a hot lunch rather than a sack lunch (Tr. 1656-1657). What current Counsel for Mr. Purkey fail to note is that Mr. Russell clarified those matters favorably for Purkey, noting that Purkey's needs for library and typewriter time were greater since he was facing trial (Tr. 1657), and that Purkey's request regarding a hot lunch owed to the fact that, because he was in trial, he would normally miss the only hot meal which would be served to inmates on a given day (Tr. 1661). Current Counsel for Mr. Purkey also complain that Mr. Russell acknowledged on cross-examination that he had heard rumors that Purkey had a long history of assaultive behavior in custody (Tr. 1658). In a different case, under different circumstances, such a revelation would have been problematic. In this case, Mr. Russell's information was but a thimble of water from the ocean.

The government was claiming Mr. Purkey would be a future danger, in part because of his prior assaultive history in prison (Doc. 145, Doc. 484, p. 10). We

96

knew that the government was prepared to come forward with experts to detail Mr. Purkey's assaultive behavior history in prison to support the future dangerousness aggravating factor. When the government chose not to advance those witnesses in its penalty phase case-in-chief, we had a choice to make. Unfortunately for us, the government already had presented evidence, not only about the facts of this case, but also about Mr. Purkey's prior history of assaultive behavior outside of prison, and about the incident with Gary Hatfield at the prison camp in Oregon, to support its future dangerousness allegation (Tr. 1215-1338). Even without any evidence about institutional violence, the government was in a position to make a very creditable argument for future dangerousness. It is my experience that a capital case jury is much more inclined to give a death penalty to the extent that its members believe that the client will pose a danger to others in prison. Thus, I believed that, in order to have a chance to save Wes' life, we had to try to convince the jury that, within a secure Federal institution, and with his new medication regime, Wes could be managed in a way to not constitute a future danger. In order to do that, we had to take the lead on making that case, knowing that by doing so we were opening the door to Wes' institutional history, including his assaultive behavior within those institutions. Mr. Russell just happened to be the first witness in that regard, and what he provided on the topic was marginal compared with

97

001698

what would come out through Dr. Cunningham (Tr. 1898) and then through the government expert in rebuttal (Tr. 2052). Through Dr. Cunningham, we tackled the previous assaultive behavior head on, and tried to convince the jury that, in light of statistics and security of confinement in general, and in light of Mr. Purkey's advancing age, medication regime and recent behavior in particular, they could trust that future dangerousness in prison would not be a significant issue (Tr. 1880-1904).

My strategy might well be debated. But in that case, the argument would not be the one made against bringing in Russell to make one comment about rumors of assaultive behavior. Rather, the argument which should be made, but which is not made, would be against bringing in Cunningham to provide copious details about that behavior, thereby opening the door to the government's expert testimony. Regardless of which argument would be made against our approach, I felt that it was our only chance to confront the future dangerousness claim, and that we had to take that chance.

### *Issue about our decision to not have Purkey testify at penalty phase*

Complaint is made about our not having Purkey testify at penalty phase to express his remorse (Doc. 47, p. 33). Our reasoning behind this decision was as follows.

98

It was my plan to address Wes' remorse from the very beginning of trial. I spent much of the first day of trial beating the drum of Wes' remorse, first in my opening statement (Tr. 408), then in the testimony of Detective Bill Howard (Tr. 468-469, 477), and finally through the testimony of Agent Dirk Tarpley (Tr. 510-511, 583, 596). Then, in his testimony, Wes took the next step, to say that, even knowing he was facing the death penalty, he would still admit what he had done, because the closure his confession gave was all he had to give back to the family (Tr. 951, 971). The point about Wes' expressions of remorse were made so well that prosecutors even conceded Wes repeatedly said he was sorry, though they argued that the expressions of remorse were not genuine (Tr. 1097-1102).

Wes, Laura and I seriously discussed whether Wes should testify at penalty phase, simply to reiterate his previous apologies. We ultimately decided to not have Wes testify. Laura had developed a rather strong argument that Wes should be able to deliver such an apology as an allocution statement, without having to, once again, be subjected to cross-examination (Doc. 475). We advanced this argument with the Court, but the request for allocution before the jury, without cross-examination, was denied (Tr. 1838-1839, 1905). After that ruling, we knew that, if Wes went forward and testified, and submitted to cross-examination, that would have rendered moot our allocution argument, since any prejudice from the Court's ruling would have been

99

001700

obviated by Wes providing his statements of remorse in testimony. We also knew that Wes' previous apologies were all over the record of the case. Thus, the three of us together decided that Wes would not testify, and we would preserve the allocution issue for a possible appeal.

Wes worked in close conjunction with me in the choosing of the issues which we raised on appeal. We originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. One of the points in that original brief was the allocution issue. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. In the paring down process, we decided, with Wes' approval, that the allocution issue should be removed because, while it was a significant issue, it  was not as strong as the nineteen issues ultimately chosen for inclusion in the final brief.

If the Court would like, I can provide a copy of the allocution point which was contained in the original brief tendered to the Court of Appeals.

### _Issues pertaining to the Tarpley claim that he had only learned about Purkey's retraction about kidnapping just before trial_

100

001701

## 1. The events at trial

There are raised a bevy of issues which relate to one brief statement by Agent Dirk Tarpley. The incident involved a single question posed to Tarpley, near the end of his direct examination, about when he first learned that Purkey had changed his story about the kidnapping of Jennifer Long; Tarpley's answer was "right before this trial" (Tr. 566).

To me, then and now, the point was a non-starter. That Tarpley was unfamiliar with our defense positions was natural in that he was law enforcement. Once Wes was represented by counsel, Wes would not be communicating with Tarpley. Besides, Tarpley had already been duplicitous with Wes in their prior discussions, making it understandable that Wes would never again have civil contact with Tarpley. Moreover, there would be no reason for defense counsel to ever share matters about the defense with a law enforcement officer. If we were going to share with anyone, it would be counsel for the government. Plus, in the case of Purkey's own testimony, we had no duty to share any of that with the government until Purkey testified. We had actually shared things early by mentioning the matter in opening statements. Besides that, I knew that, if we needed to do so, we could pop this whole balloon by confronting Tarpley and government counsel with the words of their informer, Michael Speakman, who had

101

001702

told them two years earlier that Purkey was denying that a kidnapping had occurred.

For these reasons, I saw no reason to dignify such a frivolous point with a response. I figured I would approach things in one of two ways. If the matter was never raised again by the government, I would probably ignore the matter since it was likely that it would fade from the jury's memory, coming as it did so briefly and so early in trial. On the other hand, if the government raised the matter again, I would deal with it with the approaches which I noted above. Having made those judgments, I then went on to vigorously cross-examine Tarpley on what I believed to be the key issues: Tarpley's duplicity with Wes, and eventually the jury, about the agreement to secure Wes' statements, Wes' remorse over the killing of Jennifer Long, and the fact that Wes' statements formed the sole basis for discovery of the facts and evidence about Jennifer Long's death (Tr. 566-597). In handling things in this way, the one thing for which I had not accounted was how this single question and answer would impact upon Wes' psyche.

Not long after my cross of Tarpley was over, Wes was animated, wanting to know why I had not confronted Tarpley about calling Wes a liar. I first sorted out that Wes was upset about the single question and answer, and his somewhat peculiar interpretation of that question and answer. It was readily apparent that

Wes' mental illness was really having an impact here. I tried to explain to Wes my reasoning in handling the matter as I did. Wes would have none of it. To Wes, this was a matter of utmost concern and even honor, because Tarpley had disrespected him, had lied to do it, and had not immediately been held accountable.

My recollection is that, while my interchange with Wes occurred very soon after my cross of Tarpley, it was after Tarpley had left the witness stand. Thus, I could not just jump back in at that moment, and make the inquiries which Wes wanted made of Tarpley. I explained to Wes that, while my notion would be to let the matter die on the vine, because he was so concerned, I would make sure that Laura brought out through Michael Speakman that Speakman had told Tarpley, two years before the trial, that Purkey was denying the kidnapping. Laura elicited that very testimony from Speakman later that same day (Tr. 695-696). I believed that the Speakman testimony not only put the matter to rest, it also made Tarpley look very bad.

Nevertheless, Wes was not satisfied. He remained obsessed with the matter, and was willing to do anything to find other sources of evidence to confront Tarpley with his "lie". This included suggestions that Dr. Peterson, Laura and I witness about Wes denying the kidnapping to us. While I acknowledged to Wes

103

001704

that the three of us could be called to witness, particularly after Wes himself had testified, I deflected these requests by Wes by explaining to Wes that the Speakman testimony directly addressed the matter in a way which testimony from the lawyers and the psychiatrist could not. Whereas Speakman had communicated his information directly to Tarpley, none of the three of Dr. Peterson, Laura or I had ever communicated to Tarpley about what Wes had told us. Besides, Wes' discussions with Dr. Peterson about his denial of the kidnapping did not occur until 2002 and 2003, long after Tarpley learned of the matter from Speakman. I also explained the legal problems inherent in trying to make lawyers be witnesses in a case, and that while there are certain situations in which that step must be taken, this was not one of those situations.

I particularly did not want Dr. Peterson to get embroiled in this particular controversy, since I believed that such a use of Dr. Peterson would color jurors' perceptions of what he would say later. I knew that Dr. Peterson's testimony would be crucial in the penalty phase. The conclusions which Dr. Peterson would offer at the penalty phase were in no way dependent upon the truth or falsity of Wes' denial that there had been kidnapping. In fact, Dr. Peterson would not even testify unless the jury disbelieved Wes, and determined that there was a kidnapping. Had we done what Wes was suggesting, we would have brought Dr.

104

001705

Peterson in the first phase for the sole purpose to relate Wes' denial of the kidnapping. I believed that would have caused jurors to indelibly link Dr. Peterson, and therefore what he would say later, with the truthfulness of Wes' denial of the kidnapping. Thus, I wanted to make certain that Wes' obsession over the Tarpley "lie" did not have us tearing down the structure of our mitigation case.

I deemed myself fortunate that I was able to get Wes to grudgingly go along with my approach. I promised Wes I would argue, and then did argue, that the Speakman's testimony trumped Tarpley's testimonial claim (Tr. 1106, 1107). Though the Government Counsel had not mentioned the Tarpley issue in its opening argument, in closing argument Government Counsel did mention the claim that Purkey had come forward with his retraction of the kidnapping admissions just before trial, but also somewhat conceded how the Speakman revelations undercut that argument (Tr. 1129-1131).

2. The issue about my not confronting Tarpley with the 2001 Speakman revelations about Purkey's retraction of his kidnapping admissions

Argument is made that I was ineffective in not confronting Tarpley on cross with the fact that Michael Speakman had told Tarpley in 2001 that Purkey was denying that a kidnapping of Jennifer Long had occurred (Doc. 47, p. 35-36; Doc. 52, p. 41-45). This argument fails to account that, though Tarpley was not asked the

questions, the impeachment actually occurred later that same day when Speakman testified about the matter (Tr. 695-696). I already explained above my reasoning in not questioning Tarpley at the time about what I considered to be a marginal matter. Nevertheless, once the decision was made to confront the matter head on, the approach which we took was actually far preferable, since it did not give Tarpley the opportunity to concoct an explanation for his misstatement. Instead, Laura, was able to milk the point with Speakman that, way back in 2001, Tarpley was told by Speakman that Purkey was denying the kidnapping (Tr. 695-696). It should also be remembered that, since Tarpley sat at government counsel table throughout the trial, this confrontation of him through Speakman actually included him, helplessly sitting there as the confrontation occurred.

In the argument upon this point, there are cited a couple of cases in which available impeachment was clearly never made (Doc. 52, p. 42-44). The distinction here, of course, is that the impeachment was made, albeit not in the suggested fashion, but in arguably a better manner.

3. The issue about my not objecting to the Tarpley answer and the government argument about the matter

It is next urged that I should have objected to Tarpley's answer and the government's argument about that answer (Doc. 47, p. 38-40; Doc. 52, p. 50-54).

106

001707

However, no suggestion is ever made about what proper legal objection would have been well-taken as against either the inquiry or the argument.

As to the inquiry, since Tarpley's answer was inaccurate, the proper course was to correct the inaccuracy. That we did through the testimony of Speakman.

As to the argument, it should be noted that the government never mentioned the matter in its opening argument. I still believe that, had we not taken the government's bait, this issue would have faded away. Because of Mr. Purkey's obsession with the matter, and because of the way we ultimately addressed the matter in the evidence at Mr. Purkey's instance, I believed it was appropriate for us to argue the matter (Tr. 1106, 1107). Since we opened the matter in our argument, the government was clearly permitted to respond, and did actually respond, though pretty much conceding our point about the Speakman matter (Tr. 1129-1131).

Without any case law to support the actual point being made, reference is made in the pleadings to other, very different sorts of prosecutorial misconduct, and a request is made that this Court analogize the situation here to those very different actions by government counsel in the cited cases (Doc. 52, p. 51-54). Since the situation here is in no way analogous, the cited cases are inapt.

4. The issue about not presenting attorney testimony about the matter

107

001708

It is urged that I was ineffective in not offering testimony from me and Laura O'Sullivan about Purkey telling us, "from day-1", that there was no kidnapping (Doc. 47, p. 37-38; Doc. 52, p. 45-50). I have already explained above my reasoning for not wanting to use attorney testimony to address the matter. To reiterate, the point made in the testimony was that Tarpley was supposedly unaware of Purkey's retraction of his previous kidnapping admissions (Tr. 566). There was no purpose to be served by calling the lawyers as witnesses, other than feeding Mr. Purkey's obsession. Though the lawyers had talked with Purkey, and knew about Purkey's account of the crime, the lawyers had never discussed with Tarpley the substance of their discussions with Purkey, and thus could not address the issue raised by Tarpley in his testimony. On the other hand, the testimony from Speakman, which was presented, directly countered Tarpley's point.

Several instances are cited concerning lawyers becoming witnesses in cases to offer critical testimony (Doc. 52, p. 46-49). The distinction here is that the lawyers had no evidence of substance to offer so as to justify their taking on the roles as witnesses.

5. The issue about not raising the matter on appeal

It is also argued that we should have raised the matter on appeal (Doc. 47, p. 39-40; Doc. 52, p. 54-58). It is specifically argued that the situation here is analogous to

108

the failure to raise an appellate issue addressed in two Eighth Circuit cases, though the facts of those cases are not shared with the Court (Doc. 52, p. 58). The situations in those cases are not even arguably similar to what occurred in this case. In *United States v. Bigeleisen*, 625 F.2d 203, 208-210 (8th Cir. 1980), the Eighth Circuit found reversible the combination of errors of the government failing to correct a false statement made by its key witness about a crucial aspect of his plea agreement, and then making an argument, unsupported by the evidence, to support a weakness in that same witness' testimony. In *United States v. Foster*, 874 F.2d 491, 494-495(8th Cir. 1988), the Eighth Circuit reversed because of the government's failure to disclose that its informers, who each denied under oath having an agreement with the government, actually did in fact each have a promise from the government that he would not be prosecuted. There is nothing in the facts of the Purkey case remotely similar to the facts in these cited cases.

It should also be noted again that, on appeal, we originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes

approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. All of the nineteen point raised in that brief were far more meritorious that the frivolous issue urged here. Mr. Purkey never urged me to replace any of those nineteen issues with this issue. But, had Mr. Purkey so urged me, I would have strongly resisted such a mistaken course.

6. Matters related to Mr. Purkey's trial testimony

Laura O'Sullivan and I are also criticized for the way in which we prepared Mr. Purkey for his testimony at trial (Doc. 47, p. 40-42; Doc. 52, p. 58-63). It is alleged that Mr. Purkey was told for the first time on November 4, 2003 that he would need to testify because there was no other admissible fashion in which his recantation of the kidnapping could come before the jury (Doc. 42, p. 59). That statement is half true. It is certainly true that we knew, in light of F.R.E. 802, that it was only through Mr. Purkey's testimony that we could present, in admissible fashion, Mr. Purkey's recantation of his kidnapping admissions. It is certainly not true that we took the matter up for the first time during trial. We had initially broached that subject with Mr. Purkey months before trial. That is why, for the months immediately preceding Mr. Purkey's trial, Laura and I regularly met with Mr. Purkey, and worked with him, preparing him for his testimony. I personally spent many sessions with Wes preparing him for his testimony. As part of my preparation work with Wes, I went so far as to

110

prepare a videotape of the places where the various events of the crime occurred, so I could play those back for Wes to refresh his recollection about details for his testimony. I still have that videotape should the Court wish to review it. It is my recollection that I reviewed and approved the presentation scheme which Laura prepared. It is further my recollection that Laura spent several sessions with Wes, developing the presentation which they ultimately made before the jury. I believe the transcript of the questions and answers bears out the careful preparation which went into that presentation of Purkey's testimony.

For all the claims about lack of preparation, there are only two allegations of errors in the presentation of Purkey's testimony: the failure to sufficiently prepare Purkey to answer the question posed on cross about when he made his kidnapping admission retraction and the failure to ask Purkey about his prior denials of the kidnapping to the defense team.

The complained-about interchange between government Counsel and Purkey, in context, was as follows:

Q  Now, you testified in this courthouse on October 25th of 2002 at a hearing, correct?
A   Right.
Q    And do you remember that at that hearing -- the tabbed portion, sir. Do you remember being asked questions about your handwritten statement?
A   Correct.
Q   And on that day we were in front of Judge Hays, Sarah Hays down in the magistrate courtroom; do you remember that?

111

A   That's right.

Q   And that was after you had been charged in federal court with this crime, correct?

A   Right.

Q   And do you remember that I asked you some questions about this signed statement –

A   Yes.

Q   -- that you wrote out yourself.  Do you remember that?

A   Yes.

Q   And do you remember that you were under oath that day?

A   Yes.

Q   You swore to tell the truth, do you remember that?

A   Yes.

Q   Do you remember me asking you, "Is that the document or a copy of the document you wrote out" and you answered yes?

A   Yes.

Q   And then I asked you, "You signed that on the back page; is that right?" And you answered that's correct.  And then I asked you, "Dated it 12/17/98" and you replied that's correct.  And then I asked you, "And then it was witnessed by Agent Tarpley and Detective Howard," and you answered that's correct.  Right?

A   Right.

Q   And I asked you, "And did you write that in your own handwriting" and you said what, what was your response?

A   I don't know where you're --

Q   Look on line 17.

A   Is that on page 59?

Q   Yes, sir.

A   "And did you write that in your own handwriting?"  "Yes, I did," is the answer.

Q   And I asked you, "Did you tell the truth when you wrote this?"  And what was your answer?

A   "Yes, I did."

Q   And then I asked you, "And that is a confession to the kidnapping, rape and murder of this young lady, correct?" And you answered --

A   "hat's correct."

112

001713

> Q  Now, you said under oath before Judge Hays that you were verifying the statements in that document, that you had admitted and confessed to kidnapping, correct; that right?
> A  Correct.
> Q  You didn't change it and say I didn't kidnap her at that time, did you?
> A  No.
> Q  And you could have, right?
> A  Yes.
> Q  But you didn't do it.  And now here recently you have come up with this new story that you didn't kidnap her, right?
> A  That's true. (Tr. 1005-1008)

What is not explained in Mr. Purkey's Petition and Suggestions is that Mr. Purkey made his complained-about answer, not because of anything which Laura instructed him to do or not to do, but out of necessity.  Mr. Purkey had to make that answer, about the recency of his retraction about his admission of kidnapping, because he was confronted with statements made by him under oath, just a year before, confirming the truth of his original admissions about the kidnapping.  No amount of preparation could have or should have changed Mr. Purkey's answer to that final question in light of what went before.

After Mr. Purkey's testimony as a whole, and after the aforementioned testimony in particular, it is surely obvious to anyone, save maybe those responsible for drafting of Mr. Purkey's pleadings in this case, as to why we did not ask Mr. Purkey about statements made by him to members of the defense team.  In his testimony, Mr. Purkey had well described many things, including his retraction of his

113

001714

admissions about the kidnapping.  There was no purpose to be served by asking him about what statements he had made when, and to what members of the defense team.

Finally, Laura's and my preparation for Wes' testimony is likened to the 15 minutes of preparation for the defendant's testimony found wanting in *Commonwealth v. Wesley*, 2005 WL 3106479, *27-*29 (Pa.Com.Pl. 2005). The comparison is, to put it simply and civilly, inapt.

7. The issue about not using Dr. Peterson to witness about the matter

Complaint is also made that we did not call Dr. Peterson to witness in the first phase, after Mr. Purkey's testimony, in order for Peterson to say that Purkey had denied the kidnapping during Peterson's interviews with him, thereby supposedly countering the argument about recent fabrication of Purkey's denial of the kidnapping (Doc. 47, p. 42-43; Doc. 52, p. 63-66).

The trouble with the argument is that there was absolutely nothing which Dr. Peterson's testimony in this regard would have accomplished.  Mr. Purkey's discussions with Dr. Peterson did not occur until late 2002.  In the context of this case, that timeframe was recent, coming four years after Purkey's inculpatory statements, but just a year before trial.

Moreover, as I mentioned earlier, I would have moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission

114

001715

retraction, lest that involvement compromise his effectiveness during the penalty phase.

Rather than trying to make our point through such ineffectual and counterproductive means, I chose other avenues. As acknowledged ever so briefly in Mr. Purkey's pleading (Doc. 52, p. 64), rather than calling witnesses to merely say that Purkey had told them there was no kidnapping, I tried to bring forth evidence, independent of Purkey's statements, which would lead the jury to its own conclusion that there likely was no kidnapping (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-904). And, I made sure that Dirk Tarpley's specific testimonial misrepresentation was confronted with the testimony of Michael Speakman (Tr. 695-696).

### *Issue regarding supposed failure to raise insufficiency of the evidence*

It is alleged that I failed to raise the issue about evidence insufficiency. That is simply not true. I had done considerable pretrial research about sufficiency of evidence issues. As a result of that research, I believed, and shared with Wes my belief, that the government's evidence, consisting of Wes' 1998 admissions combined with a modicum of physical evidence, was more than sufficient to survive a motion for judgment of acquittal. Nevertheless, I raised the matter of evidence sufficiency in our motion for judgment of acquittal at the close of all of the evidence (Doc. 448) and again in our motion for new trial (Doc. 490, p. 29). On appeal, our defense team,

115

including Wes, used the motion for new trial as our rough outline for the potential issues to be raised on appeal. In our discussions about issues to raise on appeal, I shared with Wes again my research-based notions about the weakness of the evidence insufficiency claim. As a result, we decided to not include that issue among the twenty-nine points contained in the original brief tendered to the Court of Appeals. Putting it another way, we believed that all of the twenty-nine issues contained in that original brief were much stronger than the evidence sufficiency issue. As already mentioned above, the Court of Appeals rejected that original twenty-nine point brief, and we had to pare down even further, to nineteen issues in the brief which was ultimately accepted by the Court. Because we had to abandon ten issues which were even stronger than the evidence sufficiency issue, there is no way that we would have included the weaker evidence sufficiency issue in the brief upon which we ultimately relied for our appeal.

116

001717

## *Conclusion*

I believe that the foregoing answers the ineffective assistance of counsel allegations made in the pleadings in this case (Doc. 47; Doc. 52). If the Court wishes any further information from me, I am, of course, available. I do hereby swear that the foregoing is true and correct to the best of my knowledge and belief.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

Subscribed and sworn to before me this 9th day of May, 2008.

/s/Joanna M. Parrish
NOTARY PUBLIC

My commission expires   1/4/2011

117

1.  Name Jennifer ███████          Juror Number: __13__

2.  Age: 27

    State and City of Birth: __K.C., MO__

    Sex: M _____     F _X_     Race: White

3.  Address: ████████████████████████
    (City)          (State)          (Zip Code)

    County: Jackson   No. of Years at current residence: __2__

    Do you currently:  own _X_, rent _____,

    live in someone else's home? _____

    List first names of members of your household and their
    relationship to you.

    __Jeff ████ -husband__
    __Jacob ████ — son__
    _____

4.  If you have lived at your current residence less than five
    years, please list the city, state, and zip code of each
    previous residence at which you have lived during the last
    five years:

    | City | State | Zip Code |
    |------|-------|----------|
    | K.C. | MO | 64114 |

5.  How long have you lived in Missouri? __27 years__

6.  a. How much education do you have?

        Grade School or less _____
        Some high school _____
        High school graduate _____
        Technical or business school _____
        Some college _____
        Graduated from college with a degree in Civil engineering
        Major areas of study in college included: engineering

2

**001719**

WP_PC00000034

Postgraduate degree _____

Post graduate degree held in _____

b.    Are you presently a student?

Yes _____          No _____

(1)  If yes, describe course of study and
     anticipated date of completion: _____

     _____

7.  List each high school attended.

Name of High School                    City and State

___Center_____          K.C., MO_____

_____

8.  List any college or university you have attended.

Name of College/University             City and State

University of Missouri - Columbia      Columbia, MO

_____

9.  Have you earned any professional or vocational licenses or
    certificate?

Yes _____          No _X__

If yes, please state the type of license and year earned.

_____

_____

10.  Do you have any special training or skills?

Yes _____          No _X__

If yes, please list that special training or those skills
below.

_____

3

001720                              WP_PC00000035

11. What is your occupation? _Civil engineer_

Name of your employer: ███████████

Address of employer: ████████████████████████
                             (City)                          (State)

Length of employment: _5 years_

Present job description: (describe briefly): _____

_design water & wastewater systems_

12. Do you have any supervisory responsibilities at work?

Yes _____    No __X__

If yes, how many people are under your supervision?_____

13. If you are not currently employed outside the home, please check the category below that applies to your employment status.

_____ Homemaker

_____ Stay at home parent

_____ Retired

_____ Unemployed-looking for work

_____ Unemployed-not looking for work

_____ Student

_____ Disabled

_____ Other: Please explain _____.

14. Please list all jobs you have held in the past. Do not include your current employment if you are currently employed. (Please include a brief description of the tasks you performed in each job, how long you held the job, and your reason for leaving the job.)

| Name of Employer | Dates Worked | Duties | Why left job |
|---|---|---|---|
| Kellys Temp Service | Summers 94-98 | worked at different sprints | attending college |

4

**001721**

WP_PC00000036

15. What is/was your father's occupation?

_____ hairdresser _____

16. What is/was your mother's occupation?

_____ FAA employee _____

17. Are you: Married __X__    Single _____

Living with a significant other _____   Separated _____

Divorced _____   Widowed _____

18. How many times have you been married? _____ 1 _____

19. Spouse's or significant other's:

First name: Jeff ▮▮▮▮▮ _____

Occupation: Civil engineer _____

Prior Occupations: _____

20. Do you have children?   Yes __X__        No _____

If you have children, please list their sex and age for each
child.  If the child is over 18 years of age, please also
list his/her current occupation.

| Male/Female | Age | Occupation |
|---|---|---|
| Male | 2 months | |

If your children are school-age, do they attend:

_____   Public School

_____   Catholic School

_____   Other Religious Private School

_____   Other Private School

5

**001722**

WP_PC00000037

21. Do you have grandchildren?    Yes _____         No _X_

    If you do have grandchildren, please list the sex and age
    for each grandchild.  If the grandchild is over 18 years of
    age, please also list his/her current occupation.

    <u>Male/Female</u>              <u>Age</u>        <u>Occupation</u>

    _____

    _____

    _____

22. What are your hobbies and favorite kinds of recreations?

    _____Sewing , crafts_____

    _____

    _____

23. What three public figures, living or deceased, do you most
    admire?

    (1)  ____don't know much about public figures____

    (2)  ____I can't even name 3_____

    (3)  _____

24. Do you read books or listen to books on tape?

    read _____      listen on tape _____      both _____.

    How often do you read or listen to books:

    frequently _____    occasionally _____    hardly ever _X_

    What authors and types of books do you tend to read or
    listen to?

    _____murder mystery_____

    _____

    What was the last book you read/listened to? Its been to long
    to even remember

6

001723                    WP_PC00000038

26. Please list the three best books you have ever read or listened to.

(1) _I can't even think of 3 books I have_

(2) _ever read_

(3) _____

27. Please list the three best movies you have ever seen.

(1) _A Time To Kill_

(2) _Dirty Dancing_

(3) _Jennifer 8_

28. Do you enjoy movies?   Yes _X_      No _____

When you see movies, what kind of movies do you like?

_murder mystery_

What movie did you see last? _____

29. What television shows do you watch regularly? _____

_Surviour, friends_

30. How often do you watch the news on TV, and what news programs do you watch? _everyday 5 & 6 news_

31. What radio stations, or radio programs, or talk radio programs, do you listen to frequently? _retro 105.1 & country 104.3_

7

001724

32. What newspapers and magazines do you read?

_____ Country living _____

33. Do you use the Internet?

Yes ___X___    No _____

If "yes", for what purposes do you use the Internet?  Please
mark all that apply to you.

Obtain Information __X__         Shopping __X__

"chat-rooms" _____             "e-mail" __X__

Have a "web page" (please explain content) _____

_____

Other (please explain) _____

34. Do you have any bumper stickers on your car?

Yes _____        No __X__

If "yes" what do the bumper stickers say?

_____

_____

35. In a political sense, which of the following best describes
you?

_____     Liberal

__X__       Moderate

_____     Conservative

_____     Other:  (Please explain) _____

8

**001725**

WP_PC00000040

36. Have you read any books or articles recently about the death penalty?

Yes _____       No ✕

If your answer is "yes", please indicate the books or articles you have read.

_____

_____

Please describe what impact this reading had on you.

_____

_____

37. Have you seen any movies or television programs about the death penalty?

Yes ✕       No _____

If your answer is "yes," please indicate the movies or program

_____

_____

Please describe what impact this viewing had on you.

what little evidence it takes to actually convict someone

38. Please describe your feelings about the death penalty in your own words. Please describe how strong are those feelings and how long have you had them?

I am for the death penalty, but need strong evidence to make sure they are guilty, that's the way I have always felt.

9

**001726**                                    WP_PC00000041

_____

_____

39. Which of the following best describes your feelings about the death penalty? Please read all of the statements carefully, take some time to think, and then mark all of the choices which you believe describe your feelings.

a. I am opposed to the death penalty, and I will never vote to impose the death penalty in any case, no matter what the facts.

b. I am opposed to the death penalty, and I would have a difficult time voting to impose the death penalty.

c. I am opposed to the death penalty, but could vote to impose the death penalty if I believed that the death penalty was called for in light of the facts and the law in the case.

d. I have no definite opinions for or against the death penalty. I could vote to impose the death penalty, or I could vote to impose a sentence of life imprisonment without parole, whichever I believed was called for in light of the facts and the law in the case.

e. I am in favor of the death penalty, but I could vote for a sentence of life imprisonment without possibility of parole if I believed that sentence was called for in light of the facts and the law in the case.

f. I am strongly in favor of the death penalty, and I would have a difficult time voting for a life imprisonment without parole sentence.

g. I am strongly in favor of the death penalty, and I would vote for the death penalty in every case in which the person charged is eligible for a death sentence.

h. None of the statements above correctly describes my feelings about the death penalty.

10

**001727**                                          WP_PC00000042

40. Have you, any family members or any close friends ever been
employed in the medical field:

Yes _____    No _X__

If "yes", please give details: _____

_____

_____

41. Have you, any family members or any close friends ever been
employed in the mental health field:

Yes _____    No _X__

If "yes", please give details: _____

_____

_____

42. Have you, any family members or any close friends ever
undergone counseling, treatment or hospitalization for
psychiatric, emotional, family, behavioral or substance
abuse (alcohol/drug) problems:

Yes _____    No _X__

If "yes", please give details: _____

_____

_____

43. Are there guns in your home?  Yes _X__        No _____

If your answer is "yes" please indicate whether you or
another member of your household owns guns, how many guns
are owned, and what kinds of guns are owned (handgun, rifle,
shotgun, semi-automatic, etc.)

husbands owns rifles & shotguns used for hunting

about 5 of them total

11

001728                                    WP_PC00000043

44. Please describe your feelings about guns.

_X_ I believe there should be gun control.

_____ I am opposed to gun control of any kind.

_____ I believe that a gun owner should be allowed to carry the gun concealed with him/her for protection.

_____ Other, please explain _____

_____

45. Do you have a religious affiliation?  Yes _X_  No _____

If your answer is "yes", what is your religion?

_____ Methodist _____

Do you attend church regularly?  Yes _X_  No _____

If you hold any position or office in your church, please describe the position or office which you hold.

_____

Do you participate in a Bible study group?

Yes _____        No _X_

46. Does your spouse/significant other have a religious affiliation?

Yes _X_            No _____

If your answer is "yes", what is his/her religion?

_____ Methodist _____

Does he/she attend church regularly?  Yes _X_  No _____

If he/she holds any position or office in the church, please describe the position or office which he/she holds.

_____

12

001729                    WP_PC00000044

Does he/she participate in a Bible study group?

Yes _____        No ☒

47. Would anything about your beliefs make it difficult for you to sit in judgment of another person?

Yes _☒_        (No ☒)        Possibly _____

48. Do you belong to any group or organization that is active in trying to protect the rights of crime victims, or is active in law enforcement or crime prevention? (Examples - Mothers Against Drunk Driving, a neighborhood watch group)

Yes _____        No ☒

Please list the name of each such organization.

_____

_____

49. Do you belong to any group or organization that is active in rehabilitation of people with problems or active in helping people in trouble with the law? (Example - Alcoholics Anonymous, Narcotics Anonymous, support groups for persons with family members in prison such as the Seven Step Foundation?)

Yes _____        No ☒

Please list the name of each such organization.

_____

_____

50. Please list the names of all other organizations to which you belong, including labor unions, volunteer organizations, clubs, societies, fraternal organizations, and professional organizations (Examples - AFL-CIO, Teamsters, National Rifle Association (NRA), National Association for the Advancement of Colored People (NAACP), Kiwanis, Knights of Columbus, etc.)

_____ NONE _____

_____

_____

13

        WP_PC00000045

If you hold an office or official position in any of the organizations you listed above, please state the organization and the position which you hold:

Organization                          Position Held

_____

_____

_____

51.   Please list the names of all organizations to which your spouse/significant other belongs, including labor unions, volunteer organizations, clubs, societies, fraternal organizations, and professional organizations (Examples – AFL-CIO, Teamsters, National Rifle Association (NRA), National Association for the Advancement of Colored People (NAACP), Kiwanis, Knights of Columbus, etc.)

_____NONE_____

_____

_____

If your spouse holds an office or official position in any of the organizations you listed above, please state the organization and the position which your spouse holds.

Organization                          Position Held

_____

52.   Have you or your spouse or significant other served in the military? (This includes the National Guard)

You:  Yes _____   No __X__     Spouse: Yes _____   No __X__

Significant other: Yes _____   No _____

If your answer is "yes", please describe branch of service, dates of service, assignments, highest rank attained, medals or commendations, and nature of discharge, etc.:

_____

14

**001731**                                      WP_PC00000046

53.  Are you presently or have you ever been employed in law
     enforcement (including police, highway patrol, sheriff's
     office, military police, correctional officers, probation
     and parole officers, juvenile officers and security guards)?

     Yes _____     No __X__

     If yes, name agency or position: _____

54.  Is your spouse presently or has your spouse ever been
     employed in law enforcement (including police, highway
     patrol, sheriff's office, military police, correctional
     officers, probation and parole officers, juvenile officers
     and security guards)?

     Yes _____     No __X__

     If yes, name agency or position: _____

55.  Have you ever applied for a job with any law enforcement
     agency, or any other governmental agency, other than a job
     you have mentioned above?

     Yes __X__           No _____

     If yes, please indicate to which agency you applied, and
     when you applied.

     applied for government engineering position last year

56.  Have you ever had a good experience involving a law
     enforcement officer?

     Yes _____           No __X__

     If your answer is "yes", please describe that experience.
     If you have had more than one good experience, please
     describe each incident.

15

001732                                    WP_PC00000047

57.  Have you ever had a bad experience involving a law
enforcement officer?

Yes _____          No __X__

If your answer is "yes", please describe that experience.
If you have had more than one bad experience, please
describe each incident.

_____

_____

_____

_____

58.  Has a member of your family, or a close friend of yours,
ever had a good experience involving a law enforcement
officer?

Yes _____          No __X__

If your answer is "yes", please describe that experience.
If your family members/friends have had more than one good
experience, please describe each incident.

_____

_____

_____

59.  Has a member of your family, or a close friend of yours,
ever had a bad experience involving a law enforcement
officer?

Yes _____          No __X__

If your answer is "yes", please describe that experience.
If your family members/friends have had more than one bad
experience, please describe each incident.

_____

_____

_____

16

**001733**

WP_PC00000048

60.  In your opinion, how good of a job do you feel local law
enforcement is doing in your community (local police,
sheriff's department)?

_____ fairly good _____

_____

61.  In your opinion, how good of a job do you feel federal law
enforcement agencies like the Federal Bureau of
Investigation (FBI), the Bureau of Alcohol, Tobacco and
Firearm (ATF), and other federal law enforcement agencies
are doing?

_____ good, but I don't really know about _____
_____ what these agencies do so based on what I hear

62.  Have you ever had prior jury trial service?

Yes __X__        No _____

If your answer is "yes", please answer the following:

a. Which type of jury service was it?

Criminal __X__        Civil _____        Both _____

b. What Court(s)

Federal _____        State __X__        Both _____

c. If you have been a criminal case juror, for each such
case, please indicate the kind of case it was (murder,
stealing, assault, etc.), the place where the case occurred,
and the approximate date when the trial occurred.

Kind of Case        Where        Date

_____

_____

_____

_____

d. Did the jury reach a verdict in each case above?

17

**001734**

WP_PC00000049

Yes _____    No _____

e. Did the jury set punishment in each case above?

Yes _____    No _____

f. Were you ever the foreperson in any of the cases above?

Yes _____    No _____

g. Have you ever served on a grand jury?

Yes _____    No __X__

h. Have you ever served on a special or general court martial?

Yes _____    No __X__

i. Is there anything about your prior jury service that might affect your ability to be fair and impartial in this case?

Yes _____    No __X__

If yes, please explain: _____

_____

_____

63. Have you ever been sued, or had a lawsuit of any kind filed against you, by anyone in Court?

Yes _____    No __X__

If your answer is "yes", how many times have you been sued in Court? _____

Please list what each lawsuit was about, and what was the result of each lawsuit.

What Lawsuit was about            Result of Lawsuit

_____

_____

18

001735    WP_PC00000050

64. Have you ever filed a lawsuit in Court?

Yes _____    No ___X___

If your answer is "yes", how many times have you brought lawsuits in Court against other people? _____

Please list what each lawsuit was about, and what was the result of the lawsuit.

What Lawsuit Was About          Result of Lawsuit

_____

_____

65. Have you ever filed a claim under worker's comp. laws, an equal employment opportunity commission (EEOC) claim, a Social Security disability claim, or any sort of work-related grievance?

Yes _____        No ___X___

If your answer is "yes", for each such claim, please indicate the type of claim, when the claim was made, what the claim was about, and what was the result of the claim.

Type of Claim  Date     What Claim Was About  Result

_____

_____

66. Have you or a member of your family ever been involved in any controversy or litigation of any kind with the United States government?

Yes _____        No ___X___

If your answer is "yes", please indicate the details regarding that controversy or litigation.

_____

_____

Is there anything about that controversy or litigation which would influence your decision in any way in this case?

Yes _____        No _____

19

**001736**                                        WP_PC00000051

67.  Have you ever worked for a lawyer in a law office?

Yes _____        No _X_

If your answer is "yes", please list each for each such job when you worked at that job, for whom you worked (what lawyer or what firm), what kind of law firm practiced, and what your job duties were.

Date        Lawyer/Firm        Law Practiced        Your Duties

_____

_____

68.  Do you have any legal training or have you taken any law courses?

Yes _____        No _X_

If your answer is "yes", please list each training or course you have taken, and when you had that training, or took those courses.

Title of Class/Training                        Date

_____

_____

69.  Do you have any family members or close friends who are lawyers?

Yes _X_        No _____

If your answer is "yes", for each person, please list the name of this lawyer, what your relationship is to that person, and what kind of law that lawyer practices.

Name of lawyer        Relationship        Kind of Law practiced

Ray ████        brother-in-law        contract

_____

_____

20

**001737**                        WP_PC00000052

70.  Do you have any family members or close friends who are
     judges or retired judges?

     Yes _____          No __X__

     If your answer is "yes", for each judge, please list the
     name of the Judge, in what State that Judge works, and what
     your relationship is to that Judge.

     Name of Judge          State          Relationship

     _____

     _____

71.  Do you have any family members or close friends who work for
     a United States Attorney's Office or a State Prosecutor's
     Office?

     Yes _____          No __X__

     If your answer is "yes", for each such person, please list
     in what office the person works, and what your relationship
     is to that person.

     Office Worked In              Relationship

     _____

     _____

72.  Do you have any family members or close friends who work for
     a Public Defender's Office?

     Yes _____          No __X__

     If your answer is "yes", for each such person, please list
     in what office the person works, and what your relationship
     is to that person.

     Office Worked In              Relationship

     _____

     _____

     _____

21

**001738**                                          WP_PC00000053

73. Do you know anyone who works in a courthouse such a bailiff or clerk?

Yes _____          No __X__

If your answer is "yes", for each such person, please list in what office the person works, and what your relationship is to that person.

Office worked in                    Relationship

_____          _____

_____          _____

74. Have you ever pleaded guilty to or been convicted of a crime other than a simple traffic violation?

Yes _____     No __X__

a.   If "yes", what was the crime? _____

b.   Was it a felony or misdemeanor? _____

c.   What punishment did you receive (including probation)?

_____

d.   If a felony, were your civil rights restored?

Yes _____          No _____

75. Have you or a family member or relative or a close friend ever been arrested for or charged with an offense other than a simple traffic violation?  (Driving under the influence and driving while intoxicated or similar offenses must be included.)

Yes __X__  No _____

If "yes", please explain: _husband recieved DUI_

_____

76. Are there any criminal charges now pending against you?

Yes _____          No __X__

If "yes", please explain: _____

22

**001739**                    WP_PC00000054

77.  Do you know personally or have you ever known personally
     anyone who has been convicted of or pleaded guilty to a
     crime?

     Yes _____        No __X__

     If "yes", for each person, state that person's relationship
     to you and the name of the crime and sentence imposed,
     including probation:

     _____

     _____

     _____

     _____

78.  Do you have a family member or close personal friend who has
     in the past served, or is now serving, time in prison?

     Yes _____        No __X__

     If "yes", for each person, state that person's relationship
     to you and the name of the crime and sentence imposed:

     _____

     _____

     _____

79.  Have you ever visited a person in jail or in a penitentiary,
     or have you ever toured a jail or a penitentiary?

     Yes _____        No __X__

     What impressions did you receive from the visit or visits to
     jails or penitentiaries which you made?

     _____

     _____

     _____

     _____

23

001740                           WP_PC00000055

80. Have you read any books or articles recently about what life is like for a person doing time in prison?

Yes _____        No __X__

If your answer is "yes", please indicate the books or articles you have read.

_____

_____

_____

Please describe what impact this reading had on you.

_____

_____

_____

81. Have you seen any movies or television programs about what life is like for a person doing time in prison?

Yes __X__        No _____

If your answer is "yes," please indicate the movies or programs you have watched.

___what they have on 48 hours or 60 minutes___

_____

_____

Please describe what impact this viewing had on you.

___don't think much about it___

_____

_____

24

**001741**                    WP_PC00000056

82. Have you, your spouse, your significant other, a relative or a close friend ever been the victim of a crime?

Yes _X_   No _____

If your answer was yes please describe each such incident, giving the date, who was involved (you or relative/friend), and what kind of crime was involved.

| Date | Who Involved (You, Relative/Friend) | Kind of Crime |
|------|-------------------------------------|---------------|
| 91 | me | attempted rape, but I dropped the charges |

83. Have you ever been a witness to a crime?

Yes _____   No _X_

Have law enforcement officers ever asked you to assist with a criminal investigation?

Yes _X_   No _____

If your answer was "yes" to either of the previous two questions, please describe the incident, giving the approximate date, the kind of incident involved, and whether you were called to court as a witness.

| Date | Kind of Incident | Called as Witness? |
|------|------------------|--------------------|
| 91 | man who attacked me was going to court for other rapes | I was supenoed, but they never ended up using me |

25

001742   WP_PC00000057

84.  In your opinion, what are the most important causes of crime?

_____ bad parenting _____

85.  In your opinion, what things should be done to solve the problem of crime?

_____ Steeper punishments _____

86.  In your opinion, are there problems with the criminal justice system?

Yes  X          No  _____

If your answer is "yes", what are those problems as you see them?

_____ convicted wrong people for political reasons _____

If your answer was "yes" above, in your opinion, what should be done to solve the problems you have described?

_____ take more time to prove guilty or not _____

26

**001743**          WP_PC00000058

87. What is your general impression about criminal case prosecutors?

*don't really have one*

88. What is your general impression about criminal case defense attorneys?

*don't really have one*

89. Sometimes at trials, experts in science, medicine, or psychology/psychiatry are employed and paid by the prosecution and defense to give opinions and testify in this case. Choose all of the following statements which accurately describe how you would consider such expert testimony.

   A.   I would judge the testimony of an expert witnesses based upon education and experience of the expert, and the soundness of the reasons given for the expert's opinions, and not based upon which side calls the witness,

   B.   I would trust expert witnesses called by the prosecutors more than those called by the defense,

   C.   I would trust expert witnesses called by the defense more than those called by the prosecution,

   D.   I do not trust expert witnesses, and I would disregard anything such a witness would say,

   E.   Other (please explain) _____

27

**001744**                                    WP_PC00000059

90. In the last ten years, are there any court cases which you have followed with interest?

Yes _____          No __X__

If your answer is "yes", please indicate what cases you have followed, why you were interested in each such case, and whether you agreed or disagreed with the outcome in each such case.

_____

_____

_____

_____

_____

_____

**001745**                                                    WP_PC00000060

In the following questions, you will be told a few details about the case which the jury will be hearing. Particularly, you will be told about the nature of the charge made in this case. You must understand, that, under the law, the charge of an offense is not evidence, it is simply an accusation. Under the law, a person charged with an offense must be presumed to be innocent, even though a charge has been brought against him. More details about the case, and about the law applicable to the case, will be explained at the time of trial.

91.  In this case, Wesley Purkey is the defendant who is on trial. Mr. Purkey was born on February 6, 1952 in Wichita, Kansas, and was raised there. Do you know, or have you heard of, Wesley Purkey?

Yes _____          No __X__

If your answer is "yes," please describe how you know or have heard of Mr. Purkey

_____

_____

92.  In this case, it is charged that, on January 22, 1998, Wesley Purkey kidnaped Jennifer Long and took her from Kansas City, Missouri to Lansing, Kansas for the purpose of committing forcible rape, and that the actions of Wesley Purkey resulted in the death of Ms. Long. The government is seeking the death penalty against Mr. Purkey. There have been some reportings about this case in the newspaper and on radio and television. Do you have any knowledge about this case obtained from news reportings or from any other source?

Yes _____          No __X__

If your answer is "yes," please describe, in detail, what information you have learned about this case, and how you obtained that information

_____

_____

_____

_____

_____

29

93. During the trial in this case, the government may call a witness who has prior felony convictions and has entered into an agreement with the government to receive a benefit in return for providing testimony at trial. The agreement provides for a possible reduction of his prison sentence in exchange for his cooperation and testimony on behalf of the government. Choose all of the following statements which accurately describe how you would consider such testimony.

A. I would give the testimony of such a witness the weight I thought it deserved based upon the content of the testimony, the content of the agreement, and whether I believed the testimony had been influenced by the agreement;

B. I would automatically believe such testimony, regardless of the content of the agreement;

C. I would automatically disbelieve such testimony, regardless of its content, and I would disregard anything such a witness would say,

D. Other (please explain) _____

_____

_____

94. In this case Wesley Purkey is being represented by Frederick A. (Fred) Duchardt, Jr., of Kearney, Missouri, and Laura O'Sullivan of Kansas City, Missouri. Do you know either of these attorneys?

Yes _____        No __X__

If your answer is "yes," please describe how you know either Mr. Duchardt or Ms. O'Sullivan

_____

_____

_____

_____

30

001747                                      WP_PC00000062

95. The prosecutors in this case are United States Attorney Todd Graves and Asst. United States Attorney Matt Whitworth. Do you know or have you heard of either of these attorneys?

Yes _____          No __X__

If your answer is "yes," please describe how you know Mr. Graves or Mr. Whitworth.

_____

_____

96. Trial of this case is expected to last about four weeks. Do you have any of the following problems? (Please check all that apply to you)

_____  Hearing difficulties

_____  Vision problems

_____  Regular Doctor appointments

_____  Someone sick to care for

_____  Small children to care for

_____  An elder family member to care for

_____  Some other
you to serv
explain)

_____

_____

97. Do you have physical or medical problems which would make jury duty difficult for you?

Yes _____          No __X__

If "yes", please explain: _____

_____

_____

_____

98. Some people who are called for jury service would like to be
chosen to serve on a jury, while others would rather not be
chosen.  How do you feel?

_____X_____    I would like to serve

_____    I would rather not serve

_____    I have no opinion

_____    Other (Please explain):

_____

99. Did you have any problems reading and understanding this
questionnaire?

Yes _____        No __X__

If your answer is yes, please explain below

_____

_____

100. Is there anything else that you wish to bring to the
attention of the court or the attorneys in this case?

Yes _____        No __X__

If yes, please explain: _____

_____

_____

_____

_____

32

001749

WP_PC00000064

Use the space on this and the following pages if you need
additional space to answer any of the questions in this
questionnaire:

**001750**

WP_PC00000065

I do hereby certify that the answers which I have given in this
questionnaire are true and complete to the best of my knowledge
and belief.

_Jennifer_ ██████
(Signature)

9-18-03
(Date)

34
<span style="color:red">**001751**</span>

Again, good morning, ladies and gentlemen.  My name is Fernando Gaitan and I'm the judge who will preside over the criminal trial of this case which is captioned United States vs. Wesley Purkey.  You're here today to participate in the jury selection.  We intend to select a jury of twelve persons plus four alternate jurors.

The jury system is a vital and indispensable institution to the administration of justice in our country.  We want you to know that we understand that jury selection can sometimes be tedious and jury service can disrupt your daily lives.  I should remind you that along with the benefits of citizenship and liberty comes some burdens and responsibilities.

The presentation of the evidence in this case may last as long as three weeks, that is once the jury is selected.  Jury selection should be completed this week and the presentation of evidence may begin as early as Friday.  I will certainly do my best to see that the case moves along expeditiously.  If there are any reasons that you believe you cannot serve on this jury during this time period, please advise me during the small group questioning.  With the exception of service in the armed services and voting, there is no other duty of citizenship more important than your jury service.

I'm going to take a moment and read the

indictment in this case to you.

The Grand Jury charges, Count 1, that on or about January 22nd, 1998, in the Western District of Missouri, and elsewhere, Wesley Ira Purkey, the defendant, willfully, knowingly and unlawfully did transport in interstate commerce from Kansas City, Missouri, to Lansing, Kansas, Jennifer Long, the victim, who had been unlawfully seized, confined, kidnapped, abducted, carried away and held by Wesley Ira Purkey for the purpose of forcible rape of Jennifer Long, the actions of Wesley Purkey resulting in the death of Jennifer Long, all in violation of Title 18, U.S. Code, Section 1201(a)(g), and Section 3559(d).

The defendant has pleaded not guilty to this charge. The government, the prosecution, has the burden of proving a defendant's guilt with respect to the charge brought beyond a reasonable doubt. Indeed, the defendant is presumed to be innocent of the charge. He is not required to prove that he is innocent.

The charge alleged in the indictment accuses Mr. Purkey with killing Jennifer Long. This particular crime, if proved, carries a possible sentence of death. Such a charge is often referred to as a capital offense. The government has informed both this court and Mr. Purkey that if he is found guilty of this capital offense they will ask the jury to impose the death penalty.

001753

imprisonment or the death penalty in the case based upon the law and the instructions?

VENIREPERSON 10:  I believe I could follow the law given the instructions by the judge.  That's my duty, I think.

MR. DUCHARDT:  Okay.  Thanks.

Ms. Allen, hi.

VENIREPERSON 13:  Hi.

MR. DUCHARDT:  A completely different question.  You have a young son?

VENIREPERSON 13:  Yes.

MR. DUCHARDT:  Is that a problem for you at all potentially for serving on a jury for an extended period of time?

VENIREPERSON 13:  No, not at all.

MR. DUCHARDT:  Great.  I wanted to make sure because that's really neat.

Now, you have indicated that you could consider the death penalty in a case that you thought was appropriate.

VENIREPERSON 13:  Uh-huh.

MR. DUCHARDT:  We've done a lot of talking about this whole thing, aggravating and mitigating factors.  Do you think you've got a handle on what we're talking about on those things?

VENIREPERSON 13:  Yes.

MR. DUCHARDT:  Do you think you would be able to follow the law and consider all of those things in deciding the right punishment?

VENIREPERSON 13:  Yes.

MR. DUCHARDT:  And in a case even if it was proven that the person was guilty of a deliberate killing, do you think you'd be able to still consider the possibility of life imprisonment without parole?

VENIREPERSON 13:  Yes.

MR. DUCHARDT:  And obviously you have already indicated you could consider the death penalty?

VENIREPERSON 13:  Uh-huh, yes.

MR. DUCHARDT:  And pick the right sentence as you thought appropriate in that case?

VENIREPERSON 13:  Yes.

MR. DUCHARDT:  Thanks.

Ms. Smith, you couldn't have said it any better I don't think in your questionnaire, that you would want to look at all of the circumstances involved in the case and decide what the appropriate sentence was based on that.

VENIREPERSON 14:  Yes.

MR. DUCHARDT:  Do you want to say anything more?

VENIREPERSON 14:  No, just hear the circumstances and make the right decision.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case Number 01-308-01-CR-W-FJG |
| | ) | |
| | ) | |
| WESLEY PURKEY | ) | |
| Defendant | ) | |

### *JOINT PLEADING SUBMITTED BY COUNSEL FOR WESLEY PURKEY PERTAINING TO CHALLENGES FOR CAUSE TO THE VENIRE BASED UPON RESPONSES TO QUESTIONNAIRE*

Comes now defendant Wesley Purkey, by attorney, and based upon discussions had between Counsel for the Government and Counsel for Mr. Purkey, does hereby submit this pleading, on behalf of the government and Mr. Purkey, setting forth listings of those venirepersons challenged for cause by one or both of the parties, challenges based upon answers made to certain questions posed in the Court's questionnaire. First will be set forth those challenges for cause for which the parties agree that a sufficient record has been made in questionnaire answers to sustain the challenge. Second will be set forth those challenges made by the government to which Mr. Purkey objects. Third will be set forth those challenges made by Mr. Purkey to which the government objects. The parties will, in separate pleadings, provide suggestions in support of those challenges made the party, but objected to by the other party.

1

001756

### *Challenges for Cause and Hardship about which the Parties Agree that a Sufficient Record has been made, by Questionnaire Answers, to Sustain Challenges for Cause or Hardship*

The parties have agreed that, for the following venirepersons, each has set forth answers in his/her questionnaire which warrant this Court's sustaining a challenge for hardship or a challenge for cause based on the dictates of *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), or *Morgan v. Illinois*, 504 U.S. 719 (1991), or based upon familiarity with counsel for the parties, or based serious questions whether the venireperson could follow other aspects of the law as instructed upon by the Court.  The basis of the challenge, with reference to specific questionnaire answer numbers, is included parenthetically.

1    Kimberly Rodrick (hardship 3, 20, 96)

3    Brian VanStratten (other 35, 39, 81, 82, 85, 86 and others)

5    Billy Barker (*Morgan*, 39)

7    Scott McClure (familiarity with counsel)

11    Marcia Barker (*Witt*, 39)

12    Jan Castle (familiarity with counsel)

24    Chris Esposito (other 95, 100)

30    Cecil Ray Taylor (other 60, 61, 63, 64, 83, 86, 95)

41    Kimberly Hays (*Witt*, 39)

44    John Frey (*Morgan*, 39)

2

001757

60   Trudy McDaniel (*Morgan* and other, 38, 39, 88)

62   Karen Bixler (other 100)

66   James Blondin  (*Morgan*, 38, 39)

69   Amy Stoneking (hardship, 3, 95, 100)

72   John Pelletier (*Witt*, 39)

73   William Moore (*Morgan*, 39)

74   Carole McManus (*Morgan*, 38, 39)

82   Jacqueline McCain (hardship, 3, 95, 100)

87   Patricia Davison (hardship, 3, 95, 100)

101  Roscoe Coons (*Witt*, 39)

104  Michael Beckler (familiar with counsel)

109  Penny Meyer (*Witt*, 39)

118  Sandra Walls (*Witt*, 39)

120  Tim Conroy (*Morgan*, 38, 39)

127  Patrick Masten (*Morgan*, 39)

137  Julia King (*Morgan*, 38, 39)

138  Michael Morlan (hardship, 97)

140  Lora Corrigan (*Witt*, 39)

145  Lisa Louise Burton (*Morgan*, 38, 39)

152  Tommy Siever (*Morgan*, 38, 39)

155  Deanna Quinn (*Witt*, 39)

157  Dennis Bird (*Morgan*, 38, 39)

167  Zack Clark (*Morgan*, 38, 39, hardship, 95)

3

**001758**

175   Thelma Gutierrez (*Witt*, 38, 39)

186   Laura Crozier (*Witt*, 38, 39)

190   Ronald Wagner (*Morgan*, 38, 39)

194   Denise Snyder (*Witt*, 38, 39)

198   Angela Wengler (*Witt*, 39)

201   Deborah Arnone (*Morgan*, 39)

207   Richard Hernandez (*Witt*, 39)

210   Elizabeth Mayer (*Witt*, 39)

213   James Happy (*Morgan*, 39)

217   Gary Dupus (*Morgan*, 38, 39)

223   William Dameron (hardship, 96)

228   Lewis Parker (*Witt*, 39)

237   Margaret Troll (*Morgan*, 39)

245   Marshella Shelton (hardship 96, 97, 100)

246   Terry Leigh (*Morgan*, 39)

249   James Goins (familiar with counsel)

### *Government's Challenges due to Venireperson Positions on the Death Penalty to which Defendant Purkey Objects*

The government has notified Counsel for Purkey that it is challenging certain additional venirepersons, also in light of their positions regarding the death penalty stated in the questionnaire.  As concerns these additional challenges, Counsel for Purkey objects.  Thus, there is a dispute between the parties as concerns whether the answers given by the venirepersons

4

**001759**

disqualify them from service.  The parties will, under separate cover, state their respective positions regarding these persons. Those persons challenged by the government in this category are

  34    Jean Peck

  50    Leslie Herman

  79    Margaret Fox

126    William Hume

166    Michael Levitt

### *Purkey's Challenges due to Venireperson Positions on the Death Penalty to which the government Objects*

Counsel for Mr. Purkey has notified the government that Mr. Purkey is challenging certain additional venirepersons, in light of their questionnaire answers regarding positions on the death penalty.  As concerns these additional challenges, the government objects.  Thus, there is a dispute between the parties as concerns whether the answers given by the venirepersons disqualify them from service.  The parties will, under separate cover, state their respective positions regarding these persons. Those persons challenged by Mr. Purkey in these regards in this category are

  55    Andrea Miller

121    Patsy Burens

160    Doug Frederick

174    Patricia Cupp

179    Elizabeth Hollon

001760

231   Karen Hilton

### *Purkey's Challenges due to Venireperson Hardship to which the government Objects*

Counsel for Mr. Purkey has notified the government that Mr. Purkey is challenging certain additional venirepersons because of hardships complained about by those venirepersons.  As concerns these additional challenges, the government objects.  Thus, there is a dispute between the parties as concerns whether the answers given by the venirepersons are significant enough to excuse them from service.  The parties will, under separate cover, state their respective positions regarding these persons.  Those persons challenged by Mr. Purkey in these regards in this category are

9  Danielle Roach

108  Michael Cross

122  Jeff Florida

Respectfully submitted


/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.
Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th St.
Kearney Mo. 64060
Phone:  816-628-9095
Fax:    816-628-9046
ATTORNEY FOR DEFENDANT PURKEY

001761

### *CERTIFICATE OF SERVICE*

I certify that a copy of the foregoing Motion was served upon the following by hand-delivering a copy of same to each this 10th day of October, 2003

Matt Whitworth
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 E. 9th St., Fifth Floor
Kansas City, MO  64106


/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

7

**001762**

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 01-0308-01-CR-W-FJG |
| | ) |
| WESLEY IRA PURKEY, | ) |
| | ) |
| Defendant. | ) |

## ORDER

On October 10, 2003, the parties submitted to the Court a Joint Pleading Regarding the Challenges for Cause to the Venire Based Upon Responses to the Questionnaires.

The parties agree that the following venirepersons have set forth answers in his/her questionnaire which warrant the Court's sustaining a challenge for hardship or a challenge for cause based on the dictates of either Wainwright v. Witt, 469 U.S. 412, 423 (1985) or Morgan v. Illinois, 504 U.S. 719 (1991), or based upon the familiarity with counsel, or based upon serious questions whether the venireperson could follow other aspects of the law as instructed by the Court.  Therefore, the Court hereby **STRIKES** the following venirepersons: 1, 3, 5, 7, 11, 12, 24, 30, 41, 44, 60, 62, 66, 69, 72, 73, 74, 82, 87, 101, 104, 109, 118, 120, 127, 137, 138, 140, 145, 152, 155, 157, 167, 175, 186, 190, 194, 198, 201, 207, 210, 213, 217, 223, 228, 237, 245, 246 and 249.

As to the Government's Challenges, the Court hereby rules as follows:

Juror 34 - Jean Peck - Overruled

<span style="color:red">001763</span>

Juror 50 - Leslie Herman - Overruled

Juror 79 - Margaret Fox - Stricken

Juror 126 - William Hume - Stricken

Juror 166- Michael Levitt - Overruled

As to Defendant Purkey's Challenges Due to Venireperson Positions on the Death

Penalty to Which the Government Objects, the Court hereby rules as follows:

Juror 55 - Andrea Miller - Overruled

Juror 121- Patsy Burens - Overruled

Juror 160- Doug Frederick - Overruled

Juror 174- Patricia Cupp - Overruled

Juror 179 - Elizabeth Hollon - Stricken

Juror 231 - Karen Hilton - Stricken

As to Defendant Purkey's Challenges Due to Venireperson Hardship to Which the

Government Objects, the Court hereby rules as follows:

Juror 9 - Danielle Roach - Stricken

Juror 108 - Michael Cross- Overruled

Juror 122 - Jeff Florida - Overruled


Date: <u>October 16, 2003</u>        **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri        Fernando J. Gaitan, Jr.
        United States District Judge

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA    )
       Plaintiff    )
                    )
v.    )    Case Number 01-308-01-CR-W-FJG
                    )
                    )
WESLEY PURKEY    )
       Defendant    )

### *REQUEST AND PROPOSED PROCEDURE FOR ATTORNEY-CONDUCTED, SMALL GROUP VOIR DIRE UPON PENALTY PHASE ISSUES AND CERTAIN OTHER SELECTED MATTERS*

Comes now defendant Wesley Purkey, by attorney, and does request that, in addition to Court-conducted general voir dire of the venire, this Honorable Court permit attorney-conducted, small group voir dire upon penalty phase issues, as well as certain other sensitive matters.  In the remainder of this pleading, Counsel for Mr. Purkey will make specific suggestions for the conduct of such small group voir dire processes.  Counsel for Mr. Purkey would note that the procedures which he proposes are precisely the same as those which this Court employed in the case of ***United States v. Haskell, et al***, Case Number 00-395-01-CR-W-FJG, tried before this Court in 2002.

### 1. Small Group Voir Dire would be conducted on issues pertaining to publicity and penalty phase

Defendant Purkey suggests that small group voir dire sessions be conducted to address issues related to the penalty phase of trial, as well as to obtain details regarding publicity

1

**001765**

about the case which may have been viewed or listened to by any venireperson, and any other matters which, due to their personal/private nature, might need be taken up individually. The small groups would number 8-10 persons, seated in the jury box.  Questions regarding the penalty phase issues would be taken up collectively and individually, before other venirepersons in the small group.  Questions regarding details of publicity, or other private matters, would be taken up individually, at the end of the small group process, out of the hearing of other members of the group.  This would insure that other members of the panel would not hear any private or prejudicial matters which might be contained in individual answers to such questions.

**2. The Court will begin the questioning of each small group by advising the group about certain critical aspects of the law, and particularly that questioning about possible penalties does not assume Mr. Purkey's guilt**

Defendant Purkey suggests that, at the beginning of each small group voir dire session, the Court advise the small group as follows:

Before we start this small group questioning, I want to explain something to you.  By asking these questions about penalties, it may seem that we are getting the cart before the horse.  We do not mean to.  This trial has not yet even started.  Mr. Purkey is presumed to be innocent on all charges.  You have already said that you agree with the principle of the law that a person is presumed innocent.  A

2

**001766**

juror would consider punishment in a case only if the prosecution first proves its case against beyond a reasonable doubt.  That has not happened yet in this case, and may never happen.  The reason we ask you these questions at this time is because, in order to serve on a jury, each juror must be able to follow the law.  Each juror must be able to start with a presumption of innocence for Mr. Purkey, must be willing to make the prosecutors prove their case beyond a reasonable doubt, and if necessary must be able to consider all punishments available under the law. In the questionnaire, we have already asked you some questions about your feelings about the death penalty.  We now wish to ask you some additional questions about your feelings about possible punishments.

Let me now explain to you a few things about consideration of the death penalty under Federal law.  In order for a jury to even consider the death penalty for a person, that person must first be found guilty of a capital crime, by a jury, unanimously, and beyond a reasonable doubt.

In a Federal case, if the jury finds guilt, unanimously and beyond a reasonable doubt, of a Federal crime for which the death penalty is a possible sentence, another stage of the trial begins, the penalty stage.  At that stage, the

3

001767

jury is to decide between only two possible punishments, the death penalty and imprisonment for life without possibility of probation or parole. These two punishments are precisely as the terms indicate. The death penalty means that the person would be executed by the government for the offense. Imprisonment for life without possibility of probation or parole means that the person would be incarcerated in a Federal penitentiary for the rest of his or her life, and could not receive probation or parole. These are the only two possible punishments.

At that penalty stage of trial, evidence is presented by both the prosecution and defense. Once the evidence is presented by both sides, the jury would be instructed about the law.

The law requires first that prosecutors prove the existence of certain aggravating factors. Aggravating factors are circumstances which make the offense more severe or serious, and lead to a belief that a sentence of death may be justified. The prosecutors must prove the aggravating factors they present beyond a reasonable doubt. If the jury does not find the existence of required aggravating factors unanimously and beyond a reasonable doubt, the defendant must receive a life without parole sentence. If the jury does find the existence of the

4

001768

required aggravating factors beyond a reasonable doubt, it then is to consider evidence of mitigating factors, and weigh mitigating factors against aggravating factors.

Mitigating factors are circumstances concerning the offense, or concerning the character and background of the defendant, which make the matter less severe, or lead to a belief that life imprisonment without parole may be a more appropriate sentence.  To be considered in the weighing process, mitigating factors do not need to be proven beyond a reasonable doubt, and do not need to be found to exist by all jurors unanimously.  Any juror may consider a mitigating factor so long as that juror finds that the mitigating factor exists by a preponderance of the evidence.  To find that a factor is proven by a preponderance of the evidence, the juror must find that it is more likely true than not true that the factor exists.

The jury then weighs all of the aggravating factors found unanimously, beyond a reasonable doubt, to exist, against all of the mitigating factors found by any juror to exist by a preponderance of the evidence.  The jury then decides whether to impose a sentence of death, or a sentence of life imprisonment without probation or parole.

With that brief explanation of the law concerning the penalty phase process, you will now be asked questions about

5

your feelings regarding the death penalty.

### 3. The attorneys will then ask questions about penalty issues,the order in which the questioning is done to rotate between the government's attorney and counsel for Purkey

Defendant Purkey respectfully requests that, after the Court completes the explanation of the process, as noted under #2 above, this Court allow that the attorneys conduct the actual questioning of the small groups concerning views of the venirepersons on penalty matters.  Defendant Purkey believes that this procedure will be the most efficient way for the Court and the parties to inquire on these issues, making redundancy less likely.

Defendant Purkey also suggests that the first questioner role rotate, from small group to small group, between counsel for the government and counsel for defendant Purkey.  This would mean that government's counsel would begin questioning for groups 1, 3, 5, 7 ..., and counsel for Mr. Purkey would begin questioning for groups 2, 4, 6, 8 ....

### 4. Challenges for cause will be taken up as soon as questioning of the small group is completed

Mr. Purkey suggests that, as soon as questioning of a particular small group is completed, the parties be called upon to voice any challenges for cause they might have against any particular venireperson.  By adopting this procedure, arguments can be made while they are fresh in mind.  Also, a count can be

6

**001770**

kept so that small group voir dire can be stopped once the

necessary number of qualified jurors has been obtained.

Respectfully submitted


/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.
Mo.Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th Street
Kearney Mo. 64060
Phone:  816-628-9095
Fax:    816-628-9046
ATTORNEY FOR DEFENDANT PURKEY

### *Certificate of Service*

I hereby certify that a copy of the foregoing Motion was served
upon the following by mailing a copy of same to each this 4th day
of October, 2003

Matt Whitworth
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 E. 9th St., Fifth Floor
Kansas City, MO  64106

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

7

001771

VENIREPERSON 105:  (Nods.)

MR. WHITWORTH:   Keep an open mind?

VENIREPERSON 105:  Yes.

MR. WHITWORTH:  All right.  Thank you.

Ms. Moulin, you indicated that if it was a case involving a child, that you would almost always vote for the death penalty; is that right?

VENIREPERSON 103:  Correct.

MR. WHITWORTH:  Are you talking about a child, a small child?

VENIREPERSON 103:  Yes.

MR. WHITWORTH:  Would a teenager --

VENIREPERSON 103:  -- would be considered a child in my view.

MR. WHITWORTH:  A 16-year-old teenager?

VENIREPERSON 103:  Yes.  I have one.

MR. WHITWORTH:  You don't believe you could keep an open mind because of the nature of the age of the victim?

VENIREPERSON 103:  Well, depending on the crime.  I don't know if -- if it was a -- no.  I believe any adult who violates a child that way doesn't deserve to live.  That's my feeling.

MR. WHITWORTH:  Okay.  I appreciate your honesty.  Just hand it forward and I'll start with --

001772

don't know there will be any, the purpose being to make the decision or allow the decision to be based upon the evidence that's presented in the courtroom here where each side has an opportunity to challenge it, versus something that you may hear outside the courtroom. Please keep that in mind.

At this time we'll recess and I'll ask you to go back to the second floor. Thank you.

(Venirepersons 95, 96, 97, 98, 99, 100, 102, 103, 105, 106, 107 & 110 leave the courtroom.)

THE COURT: Okay.

MR. DUCHARDT: I think we are done.

THE COURT: It looks that way. Let me ask for strikes for cause.

MR. DUCHARDT: 103 and 107. I don't think we'll get to them anyway, but they both indicated an inability to follow the law and the instructions of the court.

MR. WHITWORTH: We agree on that, Your Honor.

THE COURT: Okay, 103 and 107. Is that it?

MR. DUCHARDT: Yes, sir.

THE COURT: Mr. Whitworth?

MR. WHITWORTH: That's it. We agreed on those.

THE COURT: We calculate I think we only needed five more anyway.

MR. DUCHARDT: And I actually had a lesser number

001773

## DECLARATION OF TERESA L. NORRIS

I, Teresa L. Norris, declare and state the following:

1. I am an attorney licensed to practice law in the State of South Carolina since November 1990. I am a member of the bars of the State of South Carolina, the United States Army Court of Criminal Appeals, the United States Court of Appeals for the Armed Forces, the United States District Court for the District of South Carolina, the United States District Court for the Eastern District of Texas, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court. I have been admitted pro hac vice in a number of other courts, including the United States District Court for the Western District of Missouri and the United States Court of Appeals for the Eighth Circuit. From April 1996 to April of 2006, I served as the acting director and then Director of the Center for Capital Litigation, a private, not-for-profit corporation located in Columbia, South Carolina, that provided legal services to indigent death-sentenced individuals. From April 2006 to November 2016, I was in private practice, which was composed almost exclusively of court-appointed representation of indigent death-sentenced inmates or trial defendants in which the prosecution was seeking imposition of the death penalty. Since November 1, 2016, I have been a Special Assistant Public Defender in Charleston County, South Carolina. Over the course of my legal career, I have represented approximately 40 persons charged or convicted of capital offenses during the trial, appellate, and post-conviction phases.

2. On December 18, 2006, Western District of Missouri District Court Judge Fernando J. Gaitan, Jr., appointed me and Gary E. Brotherton, an attorney licensed to practice law in the State of Missouri, to represent Wesley I. Purkey, an inmate under a sentence of death, in post-conviction proceedings pursuant to 28 U.S.C. § 2255. On October 16, 2007, we filed on Mr. Purkey's behalf a Motion to Vacate, Set Aside or Correct Sentence pursuant to § 2255, a motion



1

001774

which the district court denied without evidentiary hearing on September 29, 2009. On

November 16, 2011, we filed an appeal of the district court's order denying Mr. Purkey's § 2255

petition and on September 20, 2012, argued the appeal before a three-judge panel of the Eighth

Circuit Court of Appeals. On September 6, 2013, the Eighth Circuit affirmed the district court's

denial of Mr. Purkey's § 2255 petition. On December 6, 2013, the Eighth Circuit granted my

motion to withdraw from representing Mr. Purkey and allowed substitute counsel to enter their

appearances.

3. In general, when representing a death-sentenced individual in post-conviction

proceedings, I review what transpired in the trial and appeal courts in order to determine whether

there are viable claims that fundamental defects in the underlying proceedings render the

individual's death sentence unconstitutional. To comply with this duty, I am required to review

what transpired at each phase of the trial case by reading the transcripts of all court hearings,

reading pretrial motions and corresponding rulings, and by examining all evidence. I am

required to review all information related to jury selection, including juror questionnaires, the

transcripts of jury selection, and all records concerning the use of strikes for cause and

peremptory challenges. I also conduct an independent fact and mitigation investigation to

discover any inadequacies in trial counsel's investigation and to explore claims of actual

innocence. Once my review of the record and my investigation are complete, I write a motion to

vacate, set aside or correct the death sentence pursuant to § 2255, in which I raise all viable

claims usually in the context of the ineffectiveness of trial counsel or prosecutorial misconduct.

4. In Mr. Purkey's case, I examined the trial transcripts, the files from the clerk of

court's office, and the files from both of Mr. Purkey's trial counsel. I do not recall whether, as

part of this review, I reviewed the juror questionnaires. It has recently been brought to my

2

**001775**

attention that Juror # 13, a juror named Jennifer, disclosed on her questionnaire that she had been the victim of an attempted rape at age 16, a disclosure highly relevant to the issue of juror bias given that Mr. Purkey was accused of kidnapping a teenager named Jennifer, and then raping and killing her. Apparently Juror # 13 actually served on the jury after Mr. Purkey's trial counsel asked Juror # 13 no questions concerning this disclosure during *voir dire*, and made no effort to exclude Juror # 13 from serving on the jury by either moving to exclude Juror # 13 for cause or exercising a peremptory challenge. If I had discovered this during my review of the record or this had been brought to my attention during my representation of Mr. Purkey, I likely would have raised a claim in the § 2255 motion that Mr. Purkey's trial counsel was constitutionally ineffective for failing to exclude from the jury Juror # 13, a juror with an inherent bias given the facts of Mr. Purkey's case, and that Mr. Purkey was prejudiced by trial counsel's ineffectiveness.

5. In August 2007, I hired a mitigation investigator, Jennifer Merrigan, to conduct a thorough investigation of Mr. Purkey's life history. Ms. Merrigan was exceptionally qualified to act as a mitigation investigator because she had extensive mitigation investigation experience and training. Early in her investigation, it became apparent that there were problems with the trial team's mitigation investigation.

6. One significant problem was the trial team's failure to offer evidence to rebut the Government's penalty-phase argument that Mr. Purkey, in an effort to gain sympathy with the jury and avoid the death penalty, recently fabricated a claim that as a child, he had been sexually abused by his own mother. The trial team's failure was egregious, in my opinion, because there was evidence readily available to the trial team proving that long before Mr. Purkey was facing the death penalty, he disclosed to close friends and mental health professionals that he had been sexually abused by his mother. Much of Ms. Merrigan's mitigation investigation focused on

interviewing witnesses who all said that Mr. Purkey made such disclosures to them, including his brother, Gary Purkey, Mr. Purkey's childhood friend, Margaret ("Peggy") Noe, and his psychologist while incarcerated in Oregon, Dr. Newton.

7. Because our mitigation budget was limited by the district court, the mitigation investigation focused on these witnesses and the most obvious issue. In my opinion, the testimonies of these witnesses established that the Government's theory of recent fabrication was not true because Mr. Purkey made disclosures of sexual abuse long before he faced the death penalty. We allocated our limited resources in this way because this evidence supported a strong claim that trial counsel was constitutionally ineffective for failing to rebut the Government's erroneous recent fabrication argument with evidence readily available to them.

8. Another significant problem was that during the penalty phase, the trial team failed to present to the jury a comprehensive life history for Mr. Purkey by calling as witnesses those people who knew Mr. Purkey as a child, an adolescent, and as an adult. I wanted to locate and interview such witnesses in order to show that trial counsel was ineffective for failing to present a complete mitigation case, but I could not obtain funding from the district court to pay Ms. Merrigan to complete such an investigation. The district court restricted our mitigation investigation budget to $7,500 plus a little over $1,000 in travel expenses, and would not approve additional funding despite my request for additional funding. In fact, Ms. Merrigan's expenses for conducting even a limited mitigation investigation far exceeded the $7,500 allotted by the district court, and in order to pay for at least a portion of the work that had been done, I used $3,500 of my own money to pay Ms. Merrigan's remaining voucher. We were so short on both time and money that Ms. Merrigan had law students and her office staff assist with reviewing records in the case at no cost to the court. An investigator from the Federal Public Defender in

4

**001777**

Nashville was enlisted to obtain signed declarations from Peggy and Evette Noe, who both lived in Nashville at the time, because Ms. Merrigan had neither the time nor the money to do so.

9. After being contacted by Mr. Purkey's current counsel, I reviewed the investigation plan memo I prepared in 2007 after reviewing the files and records in Mr. Purkey's case. One of the witnesses I identified as an important witness to be interviewed as part of the comprehensive life history investigation was Lee Hatfield, a name that kept turning up in Mr. Purkey's old criminal records as being either involved or a witness. Hatfield was obviously someone who had known Mr. Purkey over a long period of time and could potentially offer important information about Mr. Purkey's background, but trial counsel never interviewed him. We should have interviewed Hatfield, especially since I had identified him as an important witness in my investigation plan, but, to my knowledge, we never did. I do not recall why we failed in this endeavor. Similarly, I identified at least one of Gary Hamilton's ex-girlfriend's from the 1970's as someone we needed to interview, but we never interviewed her, or his ex-wife from that time period either, to my knowledge. These were also witnesses who definitely should have been interviewed, but I do not recall why we did not interview them.

10. As part of my investigation, I interviewed lead trial counsel, Fred Duchardt, as well as his co-counsel, Laura O'Sullivan, and his investigator, Mic Armstrong. These were separate interviews. I interviewed Mr. Duchardt at his home located in rural Missouri, north of Kansas City. It was my impression from Mr. Duchardt that my interview of him on that day was my "one shot" to ask him questions. In other words, he made it clear that he would not consent to another interview prior to our filing of the 2255 motion, even if additional matters arose subsequent to the "one shot" interview that needed explanation.

**001778**

11. Mr. Duchardt was clearly distracted during my interview due to his contemporaneous involvement in preparing for trial in the Lisa Montgomery case, a federal death penalty case then-pending in the Western District of Missouri. During my interview of Mr. Duchardt, he repeatedly digressed from discussing Mr. Purkey's case by talking about his work preparing for the upcoming Montgomery trial, particularly his disdain for mitigation specialists. The thing that I recall most about Mr. Duchardt's discussion of the Montgomery case and what happened in this case is that he clearly thought mitigation specialists were worthless. In what Mr. Duchardt did say to me concerning Mr. Purkey's case, he was extremely arrogant and gave the definite impression that there could not possibly have been any failures on his part or in his team and if there were any failures it could only be due to failures or shortcomings of other members of his team rather than due to any decision or action he took.

12. My unfavorable impression of Mr. Duchardt after our meeting became even worse when he filed his affidavit in response to the § 2255 motion. The affidavit demonstrated that Mr. Duchardt was most interested in protecting himself rather than his client, which to me is evident in his unnecessary disclosures of client confidences and other factors. In my opinion, his behavior and statements were completely contrary to the ethical duties owed to Mr. Purkey as a former client. The affidavit went beyond the pale, worse than any I have ever seen from a trial lawyer, because not only did Mr. Duchardt unnecessarily disclose client confidences, he argued the Government's case by citing various cases purporting to defeat Mr. Purkey's claims. When Mr. Duchardt filed the affidavit, I was dumbfounded because in over 18 years of practicing law and specializing in capital post-conviction, I had never seen a lawyer file a document so adverse to a former client's interest. And to this day after more than 26 years practicing law, I haven't seen another example even close in comparison and hope I never do

**001779**

again. I know I am not alone in thinking this. I remember there was even a law review article later written about the affidavit and how ethically abhorrent it was.

13. Further, Mr. Duchardt gave me no true opportunity to voice an objection to his affidavit before it was provided to the Government. I don't recall specific times but the times were documented in our objections. In essence, though Mr. Duchardt claims to have given me notice prior to providing the affidavit to the Government, his notice to me consisted of forwarding the 117-page affidavit to me by email only about one hour before the affidavit was forwarded to the Government. It is fortuitous that I even saw it then because at that time I did not have a Blackberry or iPhone. I just happened to be sitting in front of my desk and email that afternoon. Shortly after I first saw the affidavit—I mean within brief minutes of just a first skim -- I conveyed to Mr. Duchardt that I vehemently objected to him providing the affidavit to the Government, only to then learn that my objection was too late because Mr. Duchardt had already sent the affidavit to the Government. Mr. Duchardt's form of "notice" could not be construed as meaningful even if it was actual notice of any kind. I interpreted his action as a way for him to be able to say that notice was given, without giving me any actual opportunity to lodge the objections he surely should have expected to come. After the affidavit was forwarded to the Government, I voiced strong objections to the affidavit to all parties based on ethical considerations. But of course, by that time the damage was done because the Government had the affidavit in its possession. Based on my objections, the Government agreed with me that the affidavit should be filed in the district court under seal, as it was.

14. I interviewed Michael Armstrong, the trial team fact and alleged mitigation investigator. At Mr. Armstrong's request, we met in the lobby of a hotel in the suburbs of Kansas City where neither of us was staying, which I thought was unusual. During our visit of

**001780**

one hour or so, Mr. Armstrong provided no helpful substantive information related to his investigation of Mr. Purkey's case. He mostly wanted to talk about the search for arsenic poisoning, and I vaguely remember him saying something about digging up a dead dog to try to prove that Mr. Purkey's ex-wife was poisoning him. However, the discussion did leave me with the impression that Mr. Armstrong and Mr. Duchardt had a long-term business relationship and that Mr. Duchardt was a steady stream of good revenue for Mr. Armstrong and that Mr. Armstrong would say nothing contrary to or negative about Mr. Duchardt.

15. I interviewed Laura O'Sullivan at her office in St. Louis and had a number of follow-up phone calls with her. She had returned to working for the state public defender office then. Ms. O'Sullivan was friendly and open in providing her files and the information she could. She provided a declaration to us for the § 2255 motion that I drafted and she revised as necessary after talking with us.

16. Gary Brotherton was my co-counsel on the § 2255 case. Mr. Brotherton was initially very attentive to Mr. Purkey and his case but as the case progressed, Mr. Brotherton became less involved with the case. Although Mr. Brotherton did not discuss details of his personal issues with me, I know that he was in the midst of a difficult divorce and professional breakup as well because his wife was also his business partner. He was having a difficult time personally and professionally as the case progressed. Mr. Brotherton also became less involved in the case because of Mr. Purkey's demands. While I don't recall all the details, the essence was that for a good while Mr. Purkey agreed to continue talking and working with me but refused to even talk to Mr. Brotherton. In short, toward the end of the case, I was essentially the only attorney working on the case because Mr. Brotherton and Mr. Purkey were no longer working together.

17. I found it difficult to work with Mr. Purkey. Mr. Purkey had entrenched opinions about what needed to be done on his case, and he was not willing to entertain my opinions if they were contrary to his rigid way of thinking. Mr. Purkey would become disproportionately angry over the most insignificant things and demand that I give my attention to that issue. For example, he mailed me a bag of stale potato chips he had been served with his prison meal and insisted that I fight that grievance battle for him. When I declined it became a huge issue for him as most things did. He was prone to outbursts of rage directed at me, but he would sometimes be very apologetic afterwards.

18. In preparing an investigation plan for the § 2255 case, I identified the need to obtain mental health experts, specifically a neurologist and an expert in fetal alcohol syndrome, but we never hired them due to lack of funding. We were able to get a little bit of money from the court for Dr. Peterson, the defense expert psychiatrist at trial, who was already familiar with Mr. Purkey's case. I also recall working with Dr. Cunningham, the defense psychologist from trial, in the 2255. However, our mitigation investigation got cut off at the pass by the court's limited budget, and I knew we would not be able to get more money for additional experts. Our decisions about Mr. Purkey's mental health were driven primarily by funding from the start. It was and is my opinion that Mr. Purkey has significant mental health issues. His complex mental health problems made it difficult for him to meaningfully participate in his defense. Mr. Purkey's competence became our main mental health concern, and Dr. Peterson evaluated Mr. Purkey and assisted us in trying to obtain appropriate psychiatric medication treatment for our client. Every day was an effort to keep Mr. Purkey from flying off in a completely different direction so that he could work with us productively enough to get the § 2255 petition filed and litigated without

001782

him constantly threatening to file motions to proceed pro se or to waive his litigation because he was upset about other things.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this 2nd day of August, 2017.

_____

Teresa L. Norris

001783