

# MISSOURI STATE PUBLIC DEFENDER
# OFFICE OF THE DIRECTOR

January 13, 2016

Mr. John Fox, MSW
Advancing Real Change, Inc.
500 S. Conkling Street
Baltimore, MD 21224

RE: Sunshine Law Request

Dear Mr. Fox:

In response to your January 6, 2016 request pursuant to Missouri's Sunshine Law, I am providing you the non-exempt information you requested, to wit, the names, positions, salaries and dates of service of Frederick A. Duchardt, Jr. and Michael Armstrong. The remaining information you requested is exempt under Sections 610.021(3) and (13) of the Revised Statutes of Missouri.

**Frederick A Duchardt, Jr.**
- Employment dates: 10/01/80-06/02/95
- Position(s)
  - Assistant Public Defender, Liberty - 10/1/80
  - Public Defender (District Defender), Liberty - 7/1/82
  - Regional Defender - 7/1/89
  - Assistant Public Defender (classification change due to elimination of all Regional Defender positions) - 7/1/94
- Final salary: $4473/month

**Michael Armstrong**
- Employment dates: 5/1/85 - 09/05/95
- Position: Investigator, Liberty
- Final salary: $2046/month

Please let me know if I can be of further assistance.

Sincerely,

Jacqueline Shipma
General Counsel and Records Custodian

cc:   Jane Duncan, Operations Director
      Gina Hall, Human Resources Manager

| | | |
|---|---|---|
| 1000 West Nifong | PHONE | (573) 526-5212 |
| Building 7, Suite 100 | FAX | (573) 777-9975 |
| Columbia, MO 65203 | E-MAIL | jacqueline.shipma@mspd.mo.gov |
| | WEB SITE | http://www.publicdefender.mo.gov |

WPD017960

001784

# DOCKET SHEET

Liberty Municipal    ~~Circuit~~ Court, Clay County, Missouri

MU197-431MO

File No.    G12210

| Nature of Action: | CITY OF LIBERTY, MO | *Bill Shull*<br>DONALD T. NORRIS |
| | **Plaintiff/Petitioner**<br>vs. | Att. for Plaintiff or Petitioner |
| | MICHAEL L. ARMSTRONG | *Glen Manis* |
| | **Defendant/Respondent** | Att. for Defendant or Respondent |

| Date | Orders of Court |
|------|-----------------|
| Mar 18 1997 | Cause assigned to Hon. J.P. Brown, Division Seven, per Local Rules. Cause set for hearing on April 11, 1997 at 9:00 a.m.  mld |
| 4 11 97 | City by attorney Shull. Defendant by attorney Manis. The Court disqualifies itself and transfers the matter to the P.J. for reassignment. JPB |
| 4-11-97 | Transferred to Division 2 by order of Presiding Judge LDH |
| APR 11 1997 | Comes π & Δ by attys. Parties agree that they will stipulate to the jurisdiction of the Circuit Ct + that cause should be tried on the record under Circuit Ct rules. Cause set for jury trial on 6/16/97 at 9:00 a.m. with agreement of attys. ct. order clerk to set up this cause as a Circuit Ct case. LMM |
| 6/12/97 | By agreement cause cont. for jury trial on 7/28/97 at 9:00 a.m. LMM |

Form 101  4/90

001785  Printed by Clay County Microfilm Department on May 19, 2015 at 16:09



# DOCKET SHEET

Circuit Court, Clay County, Missouri

File No.    MU 197-431 MO

| Nature of Action: | City of Liberty, Mo | |
|---|---|---|
| | **Plaintiff/Petitioner** vs. | Att. for Plaintiff or Petitioner |
| | Michael L. Armstrong | |
| | **Defendant/Respondent** | Att. for Defendant or Respondent |

| Date | Orders of Court |
|---|---|
| Jun 20 1997 | Plaintiff file s request for discovery. aif |
| Jul 2 1997 | Defendant file s motion to dismiss or in the alternative a motion to continue and notice to call up said motion on 07/09/1997 @ 9:00 am aif |
| Jul 2 1997 | Defendant file s motion for discovery, motion to quash request for discovery by plaintiff. aif |
| Jul 2 1997 | Defendant file s notice to call up their motion requesting discovery on 07/09/1997 @ 9:00 am. aif |
| JUL -9 1997 | Come D in person + with atty Manus + city by atty Shall. D with drawn his previous waivers of jurisdiction + request for jury trial. At request of D the ct will sit as the municipal judge of Liberty, thus closing this Circuit Ct file, Ct orders cause set for trial for the City of Liberty + parties agree that trial is to take place in Div. 2 of Clay Co. Circuit Ct. Cause set for trial as a municipal trial on 9/25/97 at 10:00 a.m. |
| Jul 9 1997 | Def. City of Liberty, file s suggestions in opposition to defense motions. aif |

Form 101 4/90

001786  Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

WP903014



# DOCKET SHEET

Circuit Court, Clay County, Missouri

File No.    MU 197-431 MO

| Nature of Action: | City of Liberty, Mo. | |
| --- | --- | --- |
| | **Plaintiff/Petitioner**<br>vs. | Att. for Plaintiff or Petitioner |
| | Michael L. ARmstrong | |
| | **Defendant/Respondent** | Att. for Defendant or Respondent |

| Date | Orders of Court |
| --- | --- |
| SEP 25 1997 | Came Δ in person + with atty Manw; + City of Liberty by atty Shull. ct. proceeds a Municipal Judge of Liberty ct makes findings on Uniform Traffic Ticket + entry thereon. This file is now closed. /MM |

Form 101 4/90

001787    Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

**IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**LIBERTY MUNICIPAL**

CITY OF LIBERTY,                    )
                                    )
                    Plaintiff,      )
                                    )  Case # MU197-000431
    vs.                             )
                                    )
MICHAEL L. ARMSTRONG,               )
                                    )
                    Defendant.      )

FILED

TIME:        JUL. 9 1997

*Rita Fuller*
Clay County Circuit Court

<u>SUGGESTIONS IN OPPOSITION TO DEFENSE MOTIONS</u>

**COMES NOW** the City of Liberty, by and through its attorney and does hereby respond as follows to the Motions recently filed by the Defendant in the above-captioned matter:

<u>Motion to Dismiss</u>

On or about July 1, 1997, the Defendant filed a Motion to Dismiss or, in the alternative, a Motion to Continue. The Plaintiff believes that both portions of said Motion should be denied.

The basis of the Motion to Dismiss is that the information filed by the City is "defective in that it does not set forth the facts constituting the claimed violation or state the time and place of the claimed violation". The Defendant cites no authority for its position other than a reference to Missouri Supreme Court Rule 37.32.

Furthermore, there is substantial case law to support the sufficiency of the information.

The Defendant is charges as follows:

1

WP003016
001788
Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

"Did unlawfully within the aforesaid city, county and state commit the following offense: Did assault the complainant by threatening to kill her while within the City of Liberty, Missouri."

The Information has been properly signed by the Special Prosecutor and also by the Complainant, Anita L. Burns, and the date, time and location are specifically set forth on the Information.

The Information clearly states the offense of "common assault" which is defined as any intentional unlawful offer of bodily injury to another. See State v. Higgins, 252 SW2d 641 (Mo. App. St. L. 1952). An assault may be committed without a striking or touching since Missouri law says that any "violent, menacing, turbulent and threatening actions or procedure" is sufficient to constitute the offense. State v. Hawkins, 418 SW2d 921 (Mo. S. Ct. en banc 1967). See also State v. Heitman, 613 SW2d 902 (Mo. App. 1981) where the Court found that "by common definition, the unlawful offer of bodily injury to another with the apparent present ability to accomplish the deed, if not prevent it, is an assault."

The Information alleges that the Defendant threatened to kill Ms. Anita Burns while within the City of Liberty, Missouri. That states the essential elements of the offense and whether the threat was credible, believed by Ms. Burns or whether the Defendant had the actual means to carry the assault out becomes a matter of proof for a jury.

2

WP902017
001789  Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

The Court is also reminded that a less strict standard is applied in judging the sufficiency of Informations charging violations of Municipal Ordinances than is applied in judging the sufficiency of Informations charging criminal offenses. City of Kansas City v. Johnson, 679 SW2d 328 (Mo. App. W.D. 1984); City of Kansas City v. LaRose, 524 SW2d 112, 116 (Mo. S. Ct. en banc 1975). So long as the Information provides a "plain, concise and definite written statement of the essential facts constituting the offense charged", the Information is generally considered sufficient. City of Kansas City v. Martin, 369 SW2d 602 (Mo. App. K.C. 1963).

Since the Information filed by the City of Liberty provides all of this information, and since the Defendant has been unable to suggest any prejudice or lack of information as a result of said Information, then the Defendant's Motion must be dismissed.

## Motion to Continue

The second part of the Defendant's Motion is a request that the case be continued on the grounds that a witness has left the jurisdiction of the Court and will not be available until September, 1997.

The argument is both legally improper as well as illogical. The Defendant suggests, for example, that he requested subpoenas on January 27, 1997 but that he was denied the subpoenas by the Court clerk. The allegations, of course, are without any factual basis or support and have not been submitted to the Court by way of Affidavit or verified statement.

3

WP003018
001790 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

Second, there has been no information or factual data provided to the Court as to the date of the witness's departure from the jurisdiction of the Court. Apparently the Defendant made one attempt to obtain subpoenas and then promptly dropped the issue without any further attempts.

Third, there is a very strong legal question as to whether the alleged witness would have been capable of complying with the subpoena since, under the provisions of the Soldiers and Sailors Civil Relief Act, he was on active duty and would have been required to comply with the Orders of his military commander concerning deployment.

Fourth, there has been no showing as to the essential nature of the witness's alleged testimony. In a highly conclusionary statement, the Defendant suggests that this witness would testify that the complaining witness had "reason to lie to tarnish the Defendant's reputation". Apparently the testimony would not go to the offense in issue and there have been no specific facts set forth as to what the witness's testimony would be.

Fifth, there are provisions by which the witness's testimony could have been preserved by way of deposition and the City, even now, has offered to consider an agreement concerning a telephonic deposition at Defendant's expense in order to preserve the testimony for eventual use at trial if it is deemed admissible. The Defendant, however, has elected not to take advantage of this and, therefore, has waived any complaint concerning the witness's

4

WP903049
001291 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

availability or lack of availability.

Finally, the Defendant again makes an allegation in his Motion to Continue that the witness will, at some time, return to the State of Missouri in September. Again, there are no facts to support this allegation, no Affidavits nor verified statement from the witness or his military commander indicating that this is where the witness will return or that the witness, in fact, intends to return to the State of Missouri.

### Defendant's Request for Admissions

The Defendant, as part of a discovery motion, has asked that the Court order the City of Liberty to respond to a "Request for Admissions" that was marked as Exhibit B to its Motion. There simply is no authority for the Defendant to require that the City submit to a Request for Admissions and the Court lacks jurisdiction to compel the same.

In any event, the Request for Admissions is totally improper and asks for numerous legal conclusions that are outside the normal and customary scope of such requests. For example, the Defendant has asked that the City admit that its evidence does not define assault, does not set forth the elements of assault, does not define the phrase "threaten to kill", etc. Furthermore, the requests are seeking the trial preparation materials of the City along with substantial information that is protected by the attorney/client privilege.

The Plaintiff would invite a review of the requests by the

5

WP003020
001792 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

Court in order to confirm the inappropriateness of the same in the present case.

### Motion for Discovery

The Defendant has served a "Motion for Discovery" on the City. Discovery, of course, in a Municipal Ordinance violation is permitted solely in the Court's discretion as justice might require. Missouri Supreme Court Rule 37.54. The City has no objection to providing a copy of the Investigative Report to the Defendant, but the request made by the Defendant goes far beyond the normal and customary discovery rules in even the most serious of criminal offenses. For example, the Defendant has requested all written or recorded statements of any and all persons who were interviewed during the course of the investigation, "all items or information which in any matter could be expected to aid Defendant in ascertaining the truth as to any matter affecting this cause" and "the names and addresses of all persons who may have knowledge of the facts of the case".

The City does not object to reasonable discovery and has, in fact, submitted a Motion for Discovery on the Defendant. The Defendant, however, has objected to the City's Motion and has asked for a Protective Order.

In order to resolve the discovery issues herein, the City would simply suggest that both the Defendant's Motion and the City's Motion for Discovery be denied and the parties proceed to trial based on no discovery.

6

WP903021
001793
Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

WHEREFORE, the City of Liberty would respectfully ask for an Order of this Court denying the Motions filed herein by the Defendant and for such other and further relief as this Court sees is just and proper.

William E. Shull, #22544
104 W. Kansas
Liberty, MO  64068
(816) 792-4242
Fax:  (816) 792-0888
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this ___9___ day of July, 1997 to:

GLEN MANIS,
8416 NE Boone Avenue
#104
Kansas City, MO  64155

Attorney for Defendant
_____
William E. Shull

7

001794 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

**IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

| | | |
|---|---|---|
| CITY OF LIBERTY, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. MU197-000435 |
| | ) | |
| | ) | |
| MICHAEL L. ARMSTRONG, | ) | |
| Defendant | ) | |

## NOTICE TO CALL UP MOTION REQUESTING DISCOVERY

TO: WILLIAM SHULL, ATTORNEY FOR THE PLAINTIFF, THE CITY OF LIBERTY, MISSOURI

You are hereby notified that on the ___9th___ day of ___July___, 1997, at 9:00 A.M. or as soon thereafter as counsel can be heard, Respondent will call up for hearing in Division II of the Clay County Circuit Court for the State of Missouri at 11 S. Water, Liberty, Missouri, Defendant's Motion for Discovery pursuant to Mo. S. Ct. Rule 37.54 and to deny the requested discovery of defendant for failing to obtain this Court's permission to seek discovery in this case.

GLENN D. MANIS, #24729
8416 N.E. BOONE AVE. #104
KANSAS CITY, MISSOURI 64155
816-436-7294

## CERTIFICATE OF SERVICE BY MAIL

I certify that I have delivered a copy of the above Notice to Call up the Motion to Dismiss or in the Alternative for a continuance, this 2nd day of July, 1997 to William Shull, Esq. at 104 W. Kansas St., Liberty, Missouri 64068

GLENN D. MANIS

FILED

JUL 02 1997

TIME:

Clay County Circuit Court

WP903023
001795  Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

# IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
## MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

CITY OF LIBERTY, )
          Plaintiff )
           )
vs. )    Case No.  MU197-000435
           )
           )
MICHAEL L. ARMSTRONG, )
          Defendant )

## NOTICE TO CALL UP MOTION REQUESTING DISCOVERY

TO: WILLIAM SHULL, ATTORNEY FOR THE PLAINTIFF, THE CITY OF LIBERTY, MISSOURI

You are hereby notified that on the _9th_ day of _July_, 1997, at 9:00 A.M. or as soon thereafter as counsel can be heard, Respondent will call up for hearing in Division II of the Clay County Circuit Court for the State of Missouri at 11 S. Water, Liberty, Missouri, Defendant's Motion for Discovery pursuant to Mo. S. Ct. Rule 37.54 and to deny the requested discovery of defendant for failing to obtain this Court's permission to seek discovery in this case.

_____
GLENN D. MANIS, #24729
8416 N.E. BOONE AVE. #104
KANSAS CITY, MISSOURI  64155
816-436-7294

## CERTIFICATE OF SERVICE BY MAIL

I certify that I have delivered a copy of the above Notice to Call up the Motion to Dismiss or in the Alternative for a continuance, this 2nd day of July, 1997 to William Shull, Esq. at 104 W. Kansas St., Liberty, Missouri  64068

_____
GLENN D. MANIS

**FILED**

JUL 02 1997
TIME:

_Peter Fuller_
Clay County Circuit Court

WP903024
001796 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
### MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

CITY OF LIBERTY,                      )
          Plaintiff       )
                          )
vs.                                   )     Case No.  MU197-000431
                          )
                          )
MICHAEL L. ARMSTRONG,                 )
          Defendant       )

### MOTION FOR DISCOVERY
### MOTION TO QUASH REQUEST FOR DISCOVERY BY PLAINTIFF

COMES NOW MICHAEL ARMSTRONG, individually and by and through his attorney and does hereby state as follows:

1.     The Defendant on January 27, 1997, while representing himself, at approximately 1356 hours did leave a request for discovery with the City of Liberty to be given to Donald Norris, City Prosecutor.

2.     Defendant was given a copy of the police report with blacked out sections and told that there was nothing else to be discovered.

3.     Defendant now believes that there may be additional evidence which has not been voluntarily provided to the defendant and requests the Court pursuant to Missouri Supreme Court Rule 37.54 which states, "Discovery shall be permitted solely in the judge's discretion as justice requires." to grant the defendant discovery pursuant to the request for discovery attached hereto and marked as Exhibit A and incorporated herein by reference.

**FILED**

JUL 0 2 1997
TIME:        4:30

*Rita Fuller*
Clay County Circuit Court

1

WP903025
001797 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

4.    Trial in this matter has been set for July 28, 1997, and the defendant requests the Court to require the answers to the Defendant's request for Discovery on or before July 18, 1997.

5.    The defendant needs to know if the Plaintiff now claims there are other alleged witnesses the plaintiff is going to put on the stand besides the complaining witness and the general nature of their testimony or if the plaintiff claims any other witnesses are now claiming they saw the Defendant at the alleged location of where the alleged threat took place or to the alleged incident since there were none marked on the police report or whether the police report constitutes the complete case of the plaintiff and without which the defendant will not adequately be able to prepare the best defense possible against the charges brought against him by the City of Liberty, Missouri on the complaint of Anita Burns.

6.    The City of Liberty, Missouri, has sent a Request for Discovery to the Defendant, without seeking permission from the Court pursuant to Rule 37.54 of Missouri Rules of Supreme Court and Defendant requests the Court for a protective order and to deny its request for discovery herein if the City seeks permission of the Court to proceed with its request for discovery until a reasonable time after a full and complete disclosure of discovery is granted to the Defendant.

7.    Further, the defendant requests the Court to Order the City of Liberty to answer the Request for Admissions attached hereto and marked as Exhibit B and incorporated herein by reference on or before July 18, 1997.

8.    Failure to obtain the requested discovery prejudices the substantial right of the defendant to properly prepare for and defend against the vague allegation of assault by the complaining witness against the defendant; as it is, the defendant is limited in time to complete any investigation.

WHEREFORE, the defendant respectfully prays that this Court grant the discovery requested herein within the time requested and to determine the city of Liberty,

2

WP903026
001798  Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

Missouri has not sought permission for any discovery and, therefore, the Defendant shall not have to respond to any request of discovery of the Plaintiff unless and until the Plaintiff seeks Court permission under Rule 37.54, and until permission is granted City to pursue discovery and then not until a reasonable time after discovery has been answered as prayed for herein to protect the defendant's right to due process and the right to prepare an adequate defense to any allegation of assault.

MICHAEL L. ARMSTRONG

GLENN D. MANIS, # 24729
ATTORNEY FOR DEFENDANT
8416 N.E. Boone Ave. #104
Kansas City, Mo. 64155
816-436-7294

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this 2nd day of July, 1997 to: William E. Shull, Special Prosecuting Attorney, 104 W. Kansas, Liberty, Mo. 64068.

3

WP903027
001799    Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
### MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

| | | |
|---|---|---|
| CITY OF LIBERTY, | | ) |
| | Plaintiff | ) |
| | | ) |
| vs. | | )     Case No. MU197-000435 |
| | | ) |
| | | ) |
| MICHAEL L. ARMSTRONG, | | ) |
| | Defendant | ) |

### REQUEST FOR DISCOVERY

COMES NOW the Defendant and requests the City of Liberty, Missouri disclose to the undersigned, Attorney for Defendant, all of the following material and information within the possession or control of, or available to, the City of Liberty, Missouri pursuant to Missouri Supreme Court Rule 37.54:

1.  The names and last known addresses of persons whom the City of Liberty intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part of all of their oral statements.

2.  The names and last known addresses and telephone numbers of all persons interviewed in the course of investigation of this charge and any information obtained from those persons in the course of this investigation.

3.  Any written or recorded statements and the substance of any oral statements made by the defendant, a list of all witnesses to the making of his statement, and a list of all witnesses to the acknowledgment of such statements, and the last known addresses and telephone numbers of such witnesses.

Exhibit A                  1

WP903028
001800 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

4.      Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

5.      Any books, papers, documents, photographs, video tapes, audio or visual tapes which the City of Liberty intends to introduce into evidence at hearing or trial, or which were obtained from or belong to the defendant.

6.      Any pictures, photographs, videos or audio tapes or other objects used for purpose of identification of suspects in connection with the offense charged.

7.      Any material or information which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment which the defendant might receive.

8.      Any record of any prior criminal convictions of persons the City of Liberty intends to call as witnesses at any hearing or the trial.

9.      Any photographic or electronic surveillance (including wiretapping) relating to the offense with which the defendant is charged, of the defendant, or of conversations to which the defendant was a party, or of his premises, this disclosure requested pursuant to the provisions of Supreme Court Rule 25.32, subparagraph (8).

10.     All items or information which in any manner could be expected to aid defendant in ascertaining the truth as to any matter affecting this cause.

11.     The names and addresses of all persons who may have knowledge of the facts of this case.

Respectfully submitted by:


GLENN D. MANIS, #24729
ATTORNEY FOR DEFENDANT
8416 N.E. Boone Ave. #104
Kansas City, Missouri  64155
816-436-7294

Exhibit A                                    2

WP003029
001801   Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this 2ⁿᵈ day of July, 1997 to:  William E. Shull, Special Prosecuting Attorney, or his office, at 104 W. Kansas, Liberty, Mo.  64068.

Exhibit A                                    3

001802 filed by Clay County Microfilm Department on May 19, 2015 at 16:09

## IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
### MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

CITY OF LIBERTY, )
               Plaintiff )
                )
vs.                 )     Case No.  MU197-000435
                )
                )
MICHAEL L. ARMSTRONG, )
               Defendant )

### REQUEST FOR ADMISSIONS

COMES NOW the Defendant and requests the plaintiff to admit to the truthfulness of the statements set forth herein pursuant to the Request for Discovery pursuant to Missouri Supreme Court Rule 37.54:

1.     That the plaintiff's witnesses to the event in question constitute Anita Burns, other than the defendant who claims the incident did not take place.

2.     That the plaintiff intends to call only Anita Burns as witness to the alleged events in her complaint number G12210 filed with the City of Liberty, Missouri.

3.     That the plaintiff knows of no other witnesses.

4.     That the police report of the alleged incident states that the complaining witness knows of no other witness to the alleged incident than the complaining witness and the defendant, who denies it ever occurred.

5.     That the complaining witness has not informed the City of any other witness than the complaining witness and the defendant, who denies that it ever occurred.

6.     That the City of Liberty does not normally file complaints of assault against person's in the City of Liberty unless there is a physical touching or contact between the parties.

Exhibit B                       1

WP003031
001803 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

7.    There was no physical contact or touching between the two parties alleged by the complaining witness.

8.    The City of Liberty, Missouri knows of no one who witnessed any physical touching between the complaining witness and the defendant, who claims the incident alleged did not occur.

9.    The City of Liberty, Missouri ordinance does not define assault.

10.    The City of Liberty, Missouri ordinance does not set forth the elements of assault.

11.    The City of Liberty, Missouri ordinance does not define the phrase "threaten to kill".

12.    The City of Liberty, Missouri ordinance does not define any word in the phrase "threaten to kill".

13.    The City of Liberty, Missouri, in filing the information is relying solely upon the representation of the complaining witness, Anita Burns.

Respectfully submitted:

GLENN D. MANIS, #24729
8416 N.E. Boone Ave. #104
Kansas City, Missouri  64155
816-436-7294

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this _2nd_ day of _July_, 1997 to:  William E. Shull, Special Prosecuting Attorney, 104 W. Kansas, Liberty, Mo.  64068.

WP903032
001804
Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

| | | |
|---|---|---|
| CITY OF LIBERTY, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. MU197-000435 |
| | ) | |
| | ) | |
| | ) | |
| MICHAEL L. ARMSTRONG, | ) | |
| Defendant | ) | |

### NOTICE TO CALL UP MOTION

TO:  WILLIAM SHULL, ATTORNEY FOR THE PLAINTIFF, THE CITY OF LIBERTY, MISSOURI

You are hereby notified that on the _9th_ day of _July_, 1997, at 9:00 A.M. or as soon thereafter as counsel can be heard, Respondent will call up for hearing in Division II of the Clay County Circuit Court for the State of Missouri at 11 S. Water, Liberty, Missouri, Defendant's Motion to Dismiss or in the alternative to continue this matter.

GLENN D. MANIS, #24729
8416 N.E. BOONE AVE. #104
KANSAS CITY, MISSOURI  64155
816-436-7294

### CERTIFICATE OF SERVICE BY MAIL

I certify that I have delivered a copy of the above Notice to Call up the Motion to Dismiss or in the Alternative for a continuance, this 1st day of July, 1997 to William Shull, Esq. at 104 W. Kansas St., Liberty, Missouri  64068

GLENN D. MANIS

FILED

JUL 01 1997

TIME:

Clay County Circuit Court

001805    Printed in Clay County Microfilm Department on May 19, 2015 at 16:09

## IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
MUNICIPAL DIVISION, CITY OF LIBERTY, MISSOURI

CITY OF LIBERTY,                   )
          Plaintiff    )
                     )
vs.                                )    Case No. MU197-000431
                     )
                     )
MICHAEL L. ARMSTRONG,              )
          Defendant   )

### MOTION TO DISMISS OR IN THE ALTERNATIVE
### A MOTION TO CONTINUE UNTIL THE DEFENDANT'S WITNESS CAN BE
### PRESENT FOR TRIAL

COMES NOW MICHAEL ARMSTRONG, individually and by and through his attorney and does hereby state as follows:

1.    The Defendant on January 27, 1997, while representing himself, at 1356 hours did request subpoenas to be issued by the City of Liberty, Missouri and was denied subpoenas, in particular one for Mr. Wildhaber, and was told he could not have any subpoenas issued, first because the clerk was not available and then upon his insistence that someone else provide him the subpoenas he was denied the subpoenas because he was not an attorney.

2.    Because defendant was denied the subpoenas, for whatever reason, he was not able to have Mr. Wildhaber served, before he had to report for duty in the military of the United States of America on deployment in Guam.

3.    This witness is a material and essential witness to the defense of this case to show why the complaining witness would have reason to lie to tarnish the defendant's reputation.

**FILED**

JUL 0 1 1997
TIME:    4:20

*Rita Fuller*
Clay County Circuit Court

001806 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09



4.      Since this witness left the jurisdiction of the State of Missouri for his duty station and is not expected to return from overseas until September, 1997, the issuance of subpoenas cannot correct the lack of due process the defendant received at the hands of the plaintiff, the City of Liberty, on January 27, 1997.

5.      This Court has set the trial for July 28, 1997, and the defendant has been denied his right to present the best defense possible by the City of Liberty.

6.      The Defendant has the right to a speedy trial; but the Defendant also has the right to present the best defense possible and the plaintiff's insistence that this matter proceed to trial before a material and essential witness can be properly subpoenaed into Court deprives the defendant to a fair trial on the issues and denies the defendant due process of the law.

7.      The complaint in information No. G12210 signed by Anita L. Burns, an attorney for the Public Defender's office, is defective in that it does not set forth the facts constituting the claimed violation or state the time and place of the claimed violation to properly charge the defendant with a violation of the municipal ordinance pursuant to Rule 37.32 and substantially prejudices the right of the defendant to properly prepare for and defend the general allegation of assault.

8.      The information No. G12210 as signed by the special prosecutor is defective and does not state plainly, concisely and definitely the essential facts constituting the ordinance violation charged nor state the time and place of the ordinance violation charged as definitely as can be done nor does it cite the chapter and section of the ordinance providing the penalty or punishment all as required by Rule 37.35, which prejudices the substantial right of the defendant to properly prepare for and defend against the vague allegation of assault by the complaining witness against the defendant.

WP903035
001807 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

WHEREFORE, the defendant respectfully prays that this Court finds that his rights to a fair trial and to adequately prepare for and defend any charge to be brought against him have been substantially prejudiced and that the Court find the complaint and information to be defective and therefore invalid and release this defendant from the charge brought against him in information number G12210 or to find the defendant's rights to present the best defense possible have been substantially prejudiced by the actions of the plaintiff in failing to issue the subpoena for Mr. Wildhaber prior to Mr. Wildhaber departure from the State of Missouri and such failure cannot be rectified prior to the time for trial requested by the plaintiff and therefore the defendant's right to due process has been denied and defendant requests the Court to dismiss the Complaint and Information against him or in the alternative to continue this matter until Mr. Wildhaber returns to the State of Missouri so that a subpoena can be properly served upon him to appear in this matter.

MICHAEL L. ARMSTRONG

GLENN D. MANIS, # 24729
ATTORNEY FOR DEFENDANT
8416 N.E. Boone Ave. #104
Kansas City, Mo. 64155
816-436-7294

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this /  day of July , 1997 to: William E. Shull, Special Prosecuting Attorney, 104 W. Kansas, Liberty, Mo. 64068.

WP903036
001808 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

FILED

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
LIBERTY MUNICIPAL

JUN 2 0 1997

TIME:

*Rita Fuller*

Clay County Circuit Court

CITY OF LIBERTY,                    )
                                    )
                Plaintiff,          )
                                    ) Case # MU197-000431
        vs.                         )
                                    )
MICHAEL L. ARMSTRONG,               )
                                    )
                Defendant.          )

## REQUEST FOR DISCOVERY

COMES NOW the City of Liberty, Missouri and requests the Defendant to disclose to the Prosecuting Attorney, Counsel for the City of Liberty, in the above-entitled cause, all of the following material and information within the possession or control of Defendant and his counsel:

1. Any reports or statements of experts made in connection with the captioned case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, which the Defendant intends to introduce into evidence at a hearing or trial, except that those portions of any of the above containing statements made by Defendant shall not be disclosed.

2. The names and last know addresses of persons, other than Defendant, whom Defendant intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements.

3. Those parts of any books, papers, documents, photographs or objects, except such as contain statements of the Defendant, which the Defendant intends to introduce in evidence at a hearing

1

WP903037
001809 Clay County Microfilm Department on May 19, 2015 at 16:09

or trial.

    4.    if the Defendant intends to rely on the defense of mental disease or defect excluding responsibility, disclosure of such intent shall be in the form of a written statement by counsel for the Defendant.

    5.    In the above entitled cause, the City charges the Defendant committed the crime set forth in the Information/Indictment herein and states that the said crime occurred at Hy-Vee, Liberty, Missouri at December 14, 1996 at approximately 4:20 p.m., and requests that, if Defendant intends to rely on the defense of alibi, Defendant disclose such intent and set forth therewith specific information as to the place at which the Defendant claims to have been at the time of the alleged offense, and the names and addresses of the witnesses by whom Defendant proposes to establish such alibi.

WILLIAM E. SHULL, #22544
104 W. Kansas
Liberty, MO  64068
(816) 792-4242
Fax:  (816) 792-0888

Special Prosecuting Attorney

2

001810    Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was delivered this ___ day of _____, 1997 to:  Glen Manis, 8416 NE Boone Avenue, #104, Kansas City, MO  64155, Attorney for Defendant.

_____
William E. Shull

3

001811    Filmed by Clay County Microfilm Department on May 19, 2015 at 16:09



# Office of the Clay County Circuit Clerk

### RITA FULLER, Circuit Clerk  Seventh Judicial Circuit.

---

Clay County Courthouse, 11 South Water, P.O. Box 218, Liberty, Missouri 64068                    816/792-7704

DATE:                               April 14, 1997

TO:                                 Glen Manis
                                    8416 N.E. Boone Street, Apt. 104
                                    Kansas City, Mo. 64155

In accordance with the following, please remit the additional

sum of _____$55.00_____ to cover the balance, noting the case

number on the additional deposit in the following case.

No.: ___MU197-431MO_____

___City of Liberty·_____  VS. ___Michael Armstrong_____

*Fee for certification to Circuit Court for jury trial

                                    Thank you

                                    RITA FULLER
                                    Clay County Circuit Clerk
                                    Seventh Judicial Circuit

Form 150   9/90

001812 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09
WP003040

March 18, 1997

Ms. Janet E. Gustin, Court Clerk
Liberty Municipal Court
Liberty City Hall
P.O. Box 159
Liberty, MO 64068

Re: City of Liberty vs. Michael L. Armstrong
Case No. G12210

Dear Janet:

In accordance with the request for reassignment, and per Local Rules the Hon. Jane Pansing Brown of Division Seven is assigned to hear this cause. The cause has been set for hearing at the Courthouse in Liberty in Division Seven (7) on Friday, April 11, 1997 at 9:00 a.m.

Please notify all parties concerned, especially the prosecutor, defendant and witnesses, of the time and place of hearing, and be present yourself with the original file and the city ordinances that pertain to the allegation. You should arrive at least one-half hour prior to time of hearing so the division clerk will be aware of your presence.

Please pick up the "dummy file" in the courtroom clerk's office, dispose of the copies in the file and take the docket sheet with you into the courtroom for the Judge's use, and thereafter, keep it with your records.

If you have any questions, please feel free to call at any time.

Sincerely,

Marilyn L. Dunn,
Executive Secretary

mld

WP903041
001813 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

IN THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI

LIBERTY MUNICIPAL DIVISION

City of Liberty, Mo. )
      Plantiff )
)
)
vs )    Case No.
)
)        G12210
)
Michael L. Armstrong )
846 York Place )
Liberty, Mo.  64068 )

## NOTICE OF DISQUALIFICATION

Take notice, that I, Thomas C. Capps, Municipal Judge of the City

of Liberty, Missouri, do hereby disqualify myself as Judge in this case.

Thomas C. Capps
Municipal Court Judge
City of Liberty, Missouri

001814 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09



### THE CITY OF
# LIBERTY
Dedicated to Community Excellence

Honorable Judge Larry Harmon
Attn: Marilyn Dunn Executive Secretary
Presiding Judge of Clay County
11 S. Water St
Liberty, Mo. 64068

March 6, 1997

City of Liberty vs Michael L. Armstrong (G12210 for assault)

In accordance with Supreme Court Rule 37.53, Judge Thomas Capps has served notice to disqualify himself to hear this case. I am sending this case for assignment to an Associate Judge for hearing. Thank you for your attention to this matter. Please notify the court of the new date and time.

Sincerely,

Janet E. Gustin
City of Liberty
Municipal Court

---

Liberty City Hall • P.O. Box 159 • Liberty, Missouri 64068 • (816) 781-7100 • FAX 792-6091

001815 Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

Case 2:19-cv-00414-JPH-DLP   Document 23-38   Filed 09/12/19   Page 33 of 314
PageID #: 5256

IN THE CIRCUIT COURT OF MISSOURI
LIBERTY MUNICIPAL DIVISION, COUNTY OF CLAY

THE UNDERSIGNED
COMPLAINS AND STATES THAT

INFORMATION NO. G   12210

| On or About | In Liberty, Missouri | At or Near | At About (Time) | Last Name | First | Middle |
|---|---|---|---|---|---|---|
| 12-14-96 | 1332 W. Kansas | 1620 | | Armstrong | Michael | L |

| Address | City and State | Age | DOB | Address | State of Birth | Race | Sex | Hgt | Wgt | Eyes | Hair |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Liberty, Mo | 51 | | | Mo | W | m | 5'6" | 150 | BRN | BRN |

| SSN | Employer |
|---|---|
| | unKnown |

DID UNLAWFULLY WITHIN THE AFORESAID CITY, COUNTY AND STATE COMMIT THE FOLLOWING OFFENSE

Did assault the complainant by threatening to kill her while within the City of Liberty, Missouri.

In Violation of the Revised Ordinances of Liberty, Missouri, 1993, As Amended Chapter  22  Section  3 

Above Complaint Is True As I Verily Believe

| COMPLAINANT | OFFICER: John Stephens | Serial No. 239 | Unit PTL | Pat. Area 1 & 4 |
|---|---|---|---|---|
| On information and upon official oath the prosecutor complains and informs the Court that these facts are true as he verily believes. William E Shull  Spec City Prosecutor | Filed | Searched By | | |

| Case Report Number 96-03218 | Date, Time & Location Of Arrest If Other Than Above: |
|---|---|

| Bond No. Cash | Bond Amount 250 | Property No. | Court Date 03-21-97 | Time 9:00 AM | Place 101 E Kansas St. | Without Admitting Guilt, I Promise to Appear in the Municipal Court of Liberty, Missouri, At the Time Indicated Hereon.  Defendant's Signature |
|---|---|---|---|---|---|---|

ALLIANCE PRINTING, INC. (816) 781-0725

Case 2:19-cv-00414-JPH-DLP   Document 23-38   Filed 09/12/19   Page 33 of 314
PageID #: 5256

WPP003044
0018416
Printed by Clay County Microfilm Department on May 19, 2015 at 16:09

## DECLARATION OF MICHAEL D. SPEAKMAN

I, Michael D. Speakman, declare and state the following:

1. My name is Michael D. Speakman. I am currently confined to the Missouri Department of Corrections. I am 47 years old. I provided sworn testimony during the criminal trial of *United States v. Wesley Purkey* in the Western District of Missouri, Case No. 01-CR-00308-FJG.

2. I met Purkey at the Corrections Corporation of America (CCA) in Leavenworth, Kansas. We were cell mates in the administrative segregation unit for what felt like about two to three months. It was a small unit with no more than eight to ten cells. There were about 16 inmates total on the unit at that time. The cells were shaped in an "L" facing an open area and the guard station. The cell doors were such that there were openings so people could talk and see into each other's cells. I got to know Purkey pretty well during that time.

3. At CCA, every day started at 5:30am with breakfast. Purkey and I woke up, ate, and drank our coffees while reading the paper. We had to share the paper. All meals were brought to the cell in segregation – there was no chow hall. The cell was real small. There was a concrete platform that I slept on and Purkey was on the bunk above me. I don't like to talk much. I mostly read books. When I got tired of just reading that's when Purkey and I talked. We didn't have other distractions. TV and radio weren't allowed in the segregation unit.

1 | P a g e

 (Initial)

001817

4. When I first met Purkey, I liked him. We had good conversations. It was nice. We talked about topics in the newspaper. We sometimes did the crossword together, too. We could be really good. Over time, though, it got real tiring to live with Purkey. Our conversations became more like a debate. Purkey felt like he needed to get his point across more and more. When this happened, Purkey's voice got louder and louder and his chest swelled out. He became stiff. It was like a fake aggression, like a peacock putting up its feathers.

5. Purkey always stuttered, but when he got mad it got worse and worse. Sometimes he stuttered so badly that it took him several seconds to get out a single word.

6. Some days Purkey was real quiet. He hardly talked. He might not even get out of his bunk on those days. He just stared at the ceiling or the wall all day long. In retrospect, it reminds me of my son, who is autistic. Purkey went into his own world some days. Other days he was much more active. It was a day-to-day thing with Purkey. When we did talk I enjoyed our conversations. Purkey could be real friendly. We had good conversations and got on well sometimes. We talked about all sorts of topics; often what was happening in the news. Other times it was like Purkey wasn't there. He was a different person.

7. Purkey spent a lot of time on his bunk looking at papers and reading. Purkey did sit-ups and pull-ups, too. He seemed to like doing those. About two days a week we got rec. Purkey went every time. The bathroom was in our cell, but the showers were at the end of the range. There was only one shower on the unit. At night, the correctional

2 | Page                                                          _MS_ (Initial)

**001818**

officers (COs) rolled the phone to each cell. The phone was on a dolly. We had to make our calls from inside our cells. There was no privacy.

8.  Purkey was very particular and organized. He kept all of his belongings either on his bunk or under his mattress. He didn't have much, just some cosmetics, a handful of commissary, his legal work, and maybe a couple of books. He was real particular about his legal paperwork. When he was finished reviewing it he always took his time to neatly stack it and neatly organize it before putting it under his mattress. He did it the same way every time.

9.  Purkey was very particular about the newspaper, too. In the morning the COs passed one newspaper around with breakfast. It had to be shared by everyone on the unit. When Purkey and I finished with it, Purkey always made sure to fold it with all the sections lined up so it looked nice and neat. He did it every time before passing it along to the next inmate.

10. Purkey was a light sleeper. He woke up at most noise. Whenever Purkey heard something he sat up and looked around. Sometimes I saw him; other times I felt his bunk shake. Purkey went back to sleep after a few minutes, but if there was more noise he woke back up.

11. Purkey didn't receive any medications while we were housed together in the administrative segregation unit. The staff brought medications right to the door of the cells on our unit. I never saw staff come to the door with medication for Purkey. It was impossible to miss because our cells were so small. If they had brought Purkey medications, I would have seen it.

3 | Page                                                                    _NS_ (Initial)

12. Purkey ranted and raved a lot. When he was set off, he just went on and on. It could happen at any time. I never knew when it was going to happen. It was nerve-wracking sometimes. His face changed. It was like he was a different person. Purkey just stood at the door yelling and hollering. It could last ten minutes, it could last a lot longer. The other Purkey was gone until the ranting ended. It stopped as abruptly as it started. Purkey withdrew. He looked around then climbed on his bunk and kept quiet. Sometimes he just stood at the door and stared out it blankly.

13. When Purkey saw that he was being treated differently than other inmates or his requests were ignored, or that the prison administrators were being nicer to other inmates than him, he got set off. There was one particular inmate, Keith Nelson, who the captains, lieutenants, and other prison administrators treated better than everyone. Nelson was a real maggot. Everyone had a problem with Nelson because he picked on others, including Purkey, and said stupid shit to everyone. The captains and lieutenants still treated him better than everyone else. That upset Purkey, that someone like Nelson was babied by the staff despite his behavior. Purkey often yelled out the range that Nelson wasn't special or any different than the rest of the inmates on the range.

14. Purkey lost it a lot over the phone. If it didn't arrive when it was supposed to, or when Purkey was told it was going to, he couldn't handle it. He started yelling down the range at the COs. One specific time Purkey was set off by bread he got. It was too hard and stale. He lost it. He thought he was being mistreated.

4 | P a g e                                                                    𝓜𝓢 (Initial)

**001820**

15. Purkey lost it on me a couple of times. While we celled together, I was always very direct with him. That always seemed to get Purkey's attention. It was like he woke up from his rant. He stopped, stared for a second or two, and then went back to sit on his bunk. Most times, after a few minutes, Purkey said "my bad" or "my fault" and that he didn't mean to yell. It was similar with the COs. When they walked past the cell after he calmed down Purkey talked with them, sometimes told them a joke, like he was trying to ease the tension.

16. To the best of my recollection, during my testimony, neither the prosecution nor the defense asked me about Purkey's behavior. Had they, I would have openly and honestly provided this information.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Signed on this _12th_ day of October~~June~~, 2016.


_____
Michael D. Speakman

(Initial)

**001821**

| Mission Date | Religious Name | Last Name | Death | Withdrew |
|---|---|---|---|---|
| 1954--1961 | Verona | Purcell | 25-Sep-83 | |
| 1955--1959 | Rita Francis | Wagg | | 06-May-69 |
| 1956--1961 | Nazarita | O'Connell | 03-Jul-90 | |
| 1956--1962 | Louisita | Callahan | | 07-Jun-67 |
| 1957--1959 | Rose Petrene | Teson | 05-Dec-84 | |
| 1957--1962 | St Gertrude | Sterk | 06-Oct-97 | |
| 1957--1964 | Vincelle | Allen | | 06-Feb-69 |
| 1958--1959 | Benoit | Utt | 30-Jan-62 | |
| 1958--1962 | Christette | Higgins | 02-May-01 | |
| 1959--1960 | Ann Corita | King | 20-Jul-07 | |
| 1959--1960 | St Marcella | Allie | | 30-Jun-70 |
| 1959--1963 | Olivette | Klimes | 17-Apr-01 | |
| 1959--1973 | Reginalda | Roszkowski | 16-Jun-74 | |
| 1960--1961 | Florentius | Quigley | 24-Dec-67 | |
| 1960--1963 | Adeltrude | Marx | 03-Sep-00 | |
| 1960--1963 | Ann Corita | King | 20-Jul-07 | |
| 1961--1964 | Gertrudis | McGlinn | 05-Jan-89 | |
| 1961--1965 | Serena | Sweeney | 27-May-99 | |
| 1961--1966 | Arthurine | Waterman | 14-Sep-95 | |
| 1962--1962 | Genesia | Hyde | 26-Apr-73 | |
| 1962--1963 | Geraldette | Armstrong | 26-Apr-05 | |
| 1962--1963 | St Timothy | Connolly | 04-Nov-85 | |
| 1962--1967 | Jane Cecile | Loftus | 08-Apr-91 | |
| 1963--1966 | Andrienne | Carolan | 24-Aug-99 | |
| 1963--1968 | Josephinus | Lynch | 29-Oct-02 | |
| 1963--1970 | Maxine | McCabe | 20-Aug-06 | |
| 1963--1972 | Celinia | Noonan | 24-May-05 | |
| 1964--1965 | Vernon | Weber | | 08-May-69 |
| 1964--1969 | Angelus | Parker | 18-Dec-96 | |
| 1965--1969 | John Mary | Feller | | 06-Jun-69 |

**001822**

## DECLARATION OF JENNIFER MERRIGAN

I, Jennifer Merrigan, declare and state the following:

1. My name is Jennifer Merrigan. I am 40 years old and a resident of Philadelphia County, Pennsylvania.

2. I am currently a Principal attorney at a non-profit law office, The Phillips Black Project. I co-direct a death penalty law clinic at Saint Louis University School of Law and a death penalty practicum at Washington University School of Law, both of which I co-founded. Prior to starting my own firm, I was an Assistant Federal Defender for the Office of the Federal Public Defender, United States District of Delaware from 2013-2014. Before that, I worked for nearly a decade at the Death Penalty Litigation Clinic, first as a staff attorney and then as the acting director. I joined DPLC after graduating from law school in 2004.

3. I was first appointed as the Mitigation Specialist to Wesley Purkey's case August 10, 2007, two months before his Motion pursuant to 28 U.S.C. § 2255 was to be filed on October 15, 2007. I was recommended to Teresa Norris and Gary Brotherton, Wes's habeas counsel at that time, by the Federal Capital Habeas Project (FCHP). Once appointed as the mitigation specialist, I remained on the case until the middle of December, 2007 although I did not perform any more work after the petition was filed.

4. At the time of my appointment I had worked on two (2) federal capital cases at the § 2255 stage of litigation. I was appointed as counsel to represent Shannon Agofsky, Eastern District of Texas, Beaumont division, and had assisted in the mitigation investigation of Norris Holder, Eastern District of Missouri. I had also been appointed as the mitigation specialist in capital proceedings pursuant to 28 U.S.C. § 2254 for James Harlow in the District of Wyoming and as counsel for Dennis Skillicorn in the Western District of Missouri. Additionally, I had conducted a mitigation investigation for the Department of Justice presentation in a federal pre-authorization case that was not capitally authorized and assisted in conducting mitigation investigations in two other § 2254 cases in my office.

5. Funding for mitigation investigation was a significant problem from the start of my involvement in the case. The Eighth Circuit Court of Appeals granted $7,500.00 in fees for my services, plus an approximate additional $1,300.00 for travel expenses. At one point we filed a supplementary budget motion to cover costs of an investigation trip and to cover cost overages, but it was denied by the court. Teresa Norris generously covered $3,500.00 of the additional travel expenses with her own money that the court did not. Beyond that, the Death Penalty Litigation Clinic ("DPLC"), the non-profit organization at which I worked at the time, had to cover the additional costs that exceeded the extremely restrictive budget approved by the court. Because of the short time frame from my appointment to filing the § 2255 petition, I was the only member of the team who conducted witness interviews. Neither Teresa nor Gary did.

1

JAM (Initial)

001823

6. In my experience, a § 2255 mitigation investigation requires hundreds of hours of work. Because it is the only extra-record post-conviction proceedings in a federal capital case, it requires extensive document and witness based investigation. In addition to investigating claims related to the trial itself such as juror issues and potential *Brady* claims, the § 2255 team must review the work of the trial team by conducting an independent investigation. Wes was approximately 55 years old when I started work on his case. He had spent the majority of his life in institutions. His records were voluminous. I was not able to review virtually any of his files. I could not and did not collect records and was therefore reliant on the same materials that trial counsel had access to at the time of trial. Many of the witnesses who needed to be interviewed were not interviewed because I did not have enough time. My rate for work in Wes's case was $75/hour, which was the lower end of the standard rate for a mitigation specialist with my experience and qualifications at the time. $7,500 covered only 100 hours, a far cry from what was needed to properly investigate Wes's case. Because the team had conducted no investigation, my mandate was to identify and interview as many witnesses as possible, in order to develop evidentiary support for the § 2255 Motion.

7. When I joined the case, I received the penalty phase transcripts and an outline of proposed mitigation claims for the § 2255 Motion. The § 2255 Motion itself was basically just an outline of claims and was written more like a § 2254 petition, in that it was a factual narrative. I recall being surprised that it included no law. This concerned me, since my understanding was that § 2255 Motions are not notice pleadings, but require allegations of specific facts as well as the legal basis for claims, and there was little time left before filing. From the trial transcript and petition outline, and a few other documents from the trial team, I pieced together an investigation plan. I was in touch with Teresa about the investigation, but having undertaken no investigation in the case, she could not offer much guidance about the witnesses.

8. My investigation plan was a triage of the case. I only had two months to review the trial transcript, a couple sets of records, meet with the client, conduct interviews and obtain declarations. As noted, the severely limited resources, both time and money, hindered my ability to conduct an investigation in keeping with the standards of care set out in the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases which, in section 10.7, require investigation of "anything in the life of a defendant which might mitigate against the appropriateness of the death penalty," and "requires extensive and generally unparalleled investigation into personal and family history." A basic life history investigation entails a multi-generational investigation that includes interviewing as many witnesses as can be identified and located. This would include all surviving family members, friends, classmates, teachers, coaches, church members including the clergy, professionals such as social workers, medical doctors, and psychologists, and any others who interacted with the client throughout his life. The multigenerational investigation also includes a dual track of records collection from any

2

JAM (Initial)

**001824**

institution in which the client, his family, and caretakers sought or were provide services. This includes records from schools, hospitals, prisons, mental health facilities, courts, prior counsel, social welfare programs, and many more agencies and organizations. I did essentially none of this. From the trial transcripts and my first interview with Wes, I made a cursory list of people I could try to interview in two months with $7,500.00. It was a small list that included Wes's daughter, brother, a close friend, possibly a former employer, and some people Wes interacted with in prison. I traveled to Kansas, , Oregon, and Wyoming.

9. One of the first interviews I conducted was with Wes's half-brother, Gary, with whom he was raised. Gary he was very forthcoming with me about his and Wes's childhood. Gary told me about rampant sexual abuse in their childhood home at the hands of their mother and grandmother. He was explicit. The level of detail and specificity he provided about the sexual abuse during our first meeting is still vivid in my mind. It started not long after their dad left them. Given my experience as a mitigation specialist, it was obvious to me at that time that if someone, anyone, from the trial team had spent time with Gary one-on-one, as I had, he would have opened up to them, too. Gary told me that Wes's trial attorney, Fred Duchardt, had visited him, but brought his young son to the interview, because they were going on vacation. Gary did not share the sexual abuse stories with Fred as Gary would never speak of those memories in front of a young child.

10. I was only able to see Gary one other time for him to sign his declaration. I did not have the chance to follow up with him on any of the information he provided in that initial interview. Given how much he knew about Wes's life – especially since their father and mother were long deceased and he had testified at trial – he was a critical witness able to provide necessary information about Wes's environment, his behavior before and after the many traumatic experiences Wes endured, and equally important information about what Wes was like as a caring brother and friend despite all the harm he had been done at the hands of his primary caretakers.

11. Learning about the extensive sexual abuse that Wes suffered during his formative years provided a different lens through which to view Wes's prior crimes. The times he was arrested for breaking and entering and found sleeping in houses was likely a product of his attempts to avoid further victimization—he simply had no safe place to go. It was clear to me that his drug use began as an effort at self-medication, to dull and mask the traumatic effects of the rape and molestation at the hands of his mother. I had previously researched the impact of sexual abuse upon adolescent and pre-adolescent boys. For pre-adolescent boys, early childhood sexual abuse has an added complexity: the feelings of shame and guilt become inexorably intertwined with the arousal, shaping their sexual identity. Being several years younger than Gary, Wes's sexual identity was likely shaped by the abuse as was his ability, to form healthy romantic relationships. Being older, Gary's sexuality was already formed, he was already having his own sexual experiences outside of the home, so he was affected differently by the abuse than Wes. If I had been able to conduct a more

3

JAM (Initial)

**001825**

complete mitigation investigation, the life history information I would have likely uncovered a different view of Wes's behavior throughout his life, one that closely linked his development and behavior to his significant trauma history. Unfortunately, I did not have adequate time or resources.

12. Wes's trauma history was also vividly displayed during my brief interactions with him. I visited Wes in person twice. On my first visit, I accompanied Gary Brotherton so that he could introduce me to Wes. Wes was agitated and angry at Gary for not having sent him a typewriter ribbon as promised.  Wes needed the ribbon to use the typewriter in the law library, but Wes's reaction was emotionally excessive and much more in line with the overreaction associated with people who have severe trauma history and other mental health issues. I will never forget how Gary sat passively while Wes manically yelled at him. Wes's speech was rapid and pressured. Gary had no ability to help Wes calm down or soothe himself. In fact, Gary made it worse by sitting silently and refusing to make eye contact with Wes. After a long while of screaming at Gary, Wes composed himself and then finally acknowledged me. It was a sudden switch in his demeanor. He was clam and composed when he spoke to me. After Wes was composed he provided the names of about half a dozen witnesses with whom he thought I should speak. Most of these witnesses were already known to trial counsel. Some had even testified during his trial. Although Wes did the best he could to provide information to me under the time restraints it wasn't possible for him to offer brand new information to me so soon. First, he couldn't know what would have been important to share. Second, I was essentially a stranger to him, which made it unlikely that Wes would disclose sensitive information to me.

13. It was clear to me that the team needed a mental health professional who was able to assist the team in navigating Wes's mental health issues. Although I never had a specific conversation with Teresa or Gary about hiring a specialized mental health professional, I do know that Teresa thought Wes needed an expert with experience working with male survivors of incest. I don't believe that Dr. Stephen Peterson had this experience, but Teresa had hired him before I joined the team. He was the same psychologist hired by Fred Duchardt at trial, which again struck me as problematic. In my experience, post-conviction cases require an independent expert to work with the team, at the very least to conduct an independent assessment of the work done at trial. I cannot tell if funding for Dr. Peterson was ever requested, but it was my sense that part of Teresa's reason for using him was due to funding problems and not because he was the correct expert for the case.

14. My second visit with Wes was to escort Dr. Peterson to assess him. On the morning of the visit, Dr. Peterson was two hours late coming down from his hotel room. I had to wait in the lobby. He told me that he had been on the phone with his wife and others because their house had flooded. When we finally arrived at the prison, Wes was livid. It was like he was out of his mind. Dr. Peterson didn't tell Wes why we were late. I eventually told Wes that it was because my glasses had broken that morning, which did happen. Wes accepted

4

it and moved on. He was calm after the initial frustrations and answered Dr. Peterson's questions. It was like night and day from the start to the finish of the visit.

15. At no point during the time I worked on Wes's case did I have a dedicated opportunity to visit Wes alone and focus on his life history. There was always another person present, or other topics to be covered with him that detracted from my ability to build the necessary rapport to conduct my mitigation investigation. For instance, Wes did not tell me that he had been sexually abused by a priest. I only met Wes twice, so I'm not at all surprised he didn't share this information with me. Wes's relationship was strained with Gary and Teresa, so I can understand that he would not have told them either. It takes consistent visits often over months or even years, for clients to disclose this type of trauma. Teresa, Gary, and I simply did not create the environment necessary for Wes to disclose such traumatic information.

16. Although I was not on the case for very long, I had the impression that by the time I joined the team Teresa and Gary Brotherton were struggling to maintain a working relationship with Wes.  They did not spend time with Wes, which I assumed was because of the funding issues. Even though Teresa was his lawyer and still involved, when I joined the team it seemed that she did not feel positively about Wes and that seemed to strain their relationship. Wes had a lot of mental health issues and I could see that working on his case was taxing under the best circumstances. In other cases I have worked on involving severe mental health issues, we have hired experts to assist us in building a relationship with our client. Given the funding issues in this case, that was not possible. Regardless, there appeared to be a real breakdown with the attorney-client relationship.

17. Gary Brotherton seemed overwhelmed. I had this feeling observing how he totally shut down when Wes was upset. I did not know what was happening for him personally, but he appeared to be struggling. By the time that I got involved, his relationship with Wes had really deteriorated.

18. During the two months I had to investigate the case, I also experienced a personal loss that that limited my time on the case. My grandfather died and I had to leave the field for a time to attend his funeral. That reduced even further the time I had to review files in the case, locate and interview witnesses.

19. I stopped working on Wes's case sometime after I had attempted to visit Wes's daughter Angie, to have her sign her declaration. When I spoke with Angie initially, she was eager to talk about her dad. He had always supported her, even from behind bars. She had wanted to tell trial counsel about that. However, trial counsel had sent his investigator to interview her at her wedding. He showed up at the wedding, unannounced. Of course Angie was not able to talk with him there. Trial counsel never made another attempt to see her. Around the time I was scheduled to return to Angie, she was the victim of a road rage incident in which she nearly lost her life. She was hospitalized for a significant length of

5

JAM (Initial)

001827

time and could not see me because of her injuries. Given everything that was happening in Angie's life she wasn't in a place to deal with meeting up to talk about her dad's life. I tried to explain to Wes why it was taking some time to get a declaration signed by Angie, but he immediately swung into manic anger. He was not able to understand what I was trying to explain to him and accused me of blaming Angie for not being available to meet. I left the case after that because there was no additional funding for mitigation investigation and my relationship with Wes didn't seem to be beneficial. In retrospect, I can see that the letter was probably also Wes's reaction to feeling powerless like any father. He wasn't able to protect or care for his only daughter in her time of need.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 11__ day of December, 2017.

_____
Jennifer Merrigan

6

JAM (Initial)

**001828**

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 06-8001-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**SUGGESTIONS AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION UNDER 28 U.S.C. § 2255, TO VACATE, SET ASIDE,
OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Movant, Wesley Ira Purkey, by court-appointed counsel, hereby submits this Memorandum

of Law in Support of the Motion Under 28 U.S.C. § 2255 to grant him a new trial and to vacate, set

aside and/or correct his conviction and death sentence.

**Argument**

**I.     Purkey was denied due process of law during trial and sentencing and his sentence was
based on an arbitrary factor in violation of the Eighth Amendment due to government
counsel's deliberate misconduct in repeatedly referring to Purkey's desire to serve a
life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

On December 15, 1998, after sending a note expressing his desire to talk to a Federal Bureau

of Investigations (hereinafter "FBI") Agent concerning a kidnaping and murder, Purkey talked to

Detective Bill Howard of the Kansas City, Kansas, Police Department.  After Purkey expressed that

he would like to confess to a kidnaping and murder, in part, because he was facing a life sentence

in Kansas and he would rather serve a life sentence in the federal prison system, Howard asked

Purkey if he "wanted to go to Club Fed."  Doc. #136 (October 17, 2002 Hearing) at 100.

1

During a pretrial suppression hearing, Howard testified that it was him (and not Purkey) that used the phrase "Club Fed." *Id.* Nonetheless, in opening statements during trial, government counsel asserted that Purkey confessed because he wanted to serve his sentence in a federal penitentiary, which is called "Club Fed" due to better conditions than in state prisons. Tr. 402. During Detective Howard's testimony, government counsel continued to use the phrasing of "Club Fed" in questioning Howard concerning discussions with Purkey about the federal prison system. Tr. 424. Even during the testimony of FBI Agent Dirk Tarpley, who was not even present during the December 15 discussion with Purkey, government counsel continued to assert in questioning that Purkey "wanted to go serve his time at Club Fed." Tr. 596, 601. Finally, in closing arguments during the trial, government counsel continued to assert that Purkey sought to go to "Club Fed," as if Purkey had been the one to use the language rather than it being the language used only by Detective Howard. Tr. 1102. This knowing attempt to create a wholly false impression violated Purkey's right to due process of law under the Fifth Amendment and violated the Eighth Amendment's requirement of a reliable basis for a sentence of death.

Prosecutors have an "overriding duty of candor to the court, and to seek justice rather than convictions." *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988). Indeed, they are representatives of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Thus, a prosecutor's primary obligation is neither to win cases nor to secure certain sentences, but to seek justice. *Id.* at 88. Accordingly, although prosecutors "may strike hard blows" in pursuit of justice, they are "not at liberty to strike foul ones." *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (quoting

2

*Berger*, 295 U.S. at 88); *Smith v. Grose*, 205 F.3d 1045, 1049 (8th Cir. 2000) (same); *United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (same).

The Due Process Clause prohibits the use of argument and testimony the prosecution knows or reasonably should know to be false or misleading. *Miller v. Pate*, 386 U.S. 1, 6-7 (1968); *Mooney v. Holohan*, 294 U.S. 103 (1935). Indeed, reversal is required when false evidence is presented regardless of whether the government deliberately elicits false evidence or whether "though not soliciting false evidence, [the prosecutor] allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979) ("It is immaterial whether or not the prosecution consciously solicited the false evidence"). Even the deliberate elicitation of evidence which merely creates a false impression falls within the ambit of *Mooney* and its progeny. *See, e.g., Alcorta v. Texas*, 355 U.S. 28 (1957) (finding due process violation where prosecution deliberately elicited testimony creating a false impression); *see also* Wayne R. LaFave *et al.*, CRIMINAL PROCEDURE § 24.3(d), at 496 (2d ed. 1999) ("Taken together, *Mooney* and its progeny establish a constitutional obligation of the prosecution as an entity *not to deceive the fact finder . . . .*") (emphasis added).

As the Eleventh Circuit Court of Appeals declared in reversing a capital case, "Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods." *Davis v. Zant*, 36 F.3d 1538, 1548 (11th Cir. 1994). When the prosecutor "intentionally paint[s] for the jury a distorted picture of the realities" of the evidence, reversal is required. *Id.* at 1549. This rule is mandated, because "[s]uch conduct perverts the adversarial system and endangers its ability to produce just results." *Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991). A conviction or death sentence by "a jury . . . laboring under a Government-sanctioned

3

false impression of material evidence," *Barham*, 595 F.2d at 242, cannot stand.  Reversal is required under this line of cases upon proof that false evidence was presented, the prosecution knew the evidence was false, and "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).  This standard for prejudice constitutes a lower threshold than that required to prove a *Brady* violation;[1] in fact, this standard is "equivalent" to the harmless error standard enunciated in *Chapman v. California*.[2] *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985).

Furthermore, improper questions by a prosecutor can prejudice a defendant, regardless of the actual testimony and other evidence elicited.  As the Court observed in *Berger*, 295 U.S. 78, 88, "improper suggestions [and] insinuations [by a prosecutor] . . . are apt to carry much weight against the accused when they should properly carry none."  Here, there is far more than a reasonable likelihood that government counsel's argument and elicitation of misleading testimony contributed to the jury's decision in sentencing and violated the Fifth and Eighth Amendments by injecting an arbitrary factor into the sentencing determination.

"Misleading prosecutorial comment which negatively impacts 'the need for reliable sentencing in capital cases,' offends the Eighth Amendment."  *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995) (citation omitted).  Specifically, a jury's discretion to impose a death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  The jury must make an "individualized determination" of the appropriate sentence based on "the character of the individual [defendant] and

---

[1]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[2]386 U.S. 18 (1967).

4

the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983).  In short, the Supreme Court has consistently held that a decision to sentence a defendant to death may not be based on considerations or arguments that are  "constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* at 885.

Here, government counsel created the false impression that Purkey referred to the federal penitentiary as "Club Fed" and that "Club Fed" had more lenient prison conditions that the Kansas Department of Corrections and other prison systems.  As a result, a juror concerned about lenient prison conditions in the federal system and whether that served as proper punishment would likely be inclined to vote for a sentence of death rather than life imprisonment.  A vote for death in order to avoid "lenient" prison conditions for the defendant is not a vote properly based on the nature of the crimes and the circumstances of the offenses, *see Woodson v. North Carolina,* 428 U.S. 280, 304 (1976), but is instead a vote based on an arbitrary and impermissible factor, which is impermissible. *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (quoting *Zant v. Stephens,* 462 U.S. 862, 884-85 (1983)) (capital sentencing decision "cannot be predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process'").

Thus, in addition to the violation of due process, government counsel's improper argument and questioning about "Club Fed" violated the Eighth Amendment's prohibition of a capital sentencing decision based on materially unreliable evidence.  The Supreme Court has held that the capital sentencing process must facilitate the responsible and reliable exercise of sentencing discretion, and that there is a "special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson*, 486 U.S. at 584 (quoting *Woodson*, 428 U.S.

5

at 305).  The Eighth Amendment's demand for reliability mandates that a conviction and death sentence based in whole or in part on false or misleading evidence cannot stand.

**II.**     **Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments due to counsel's numerous omissions and errors in the trial and sentencing.**

A claim of ineffective assistance of counsel must be examined under the standard established in *Strickland v. Washington,* 466 U.S. 668 (1984).  The *Strickland* standard is satisfied if a petitioner establishes both that his attorney's representation "fell below an objective standard of reasonableness," 466 U.S. at 688, and that the petitioner was "prejudiced" by his attorney's substandard performance, *id.* at 692.

In the § 2255 Motion in grounds II through X, Purkey asserted claims of ineffective assistance of counsel during the trial and sentencing.  Each of these claims will be set forth below in detail.

**A.**     **Failure to object to the government's misconduct during the trial in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

Trial counsel's conduct was deficient in failing to object to the "Club Fed" references and the implication that this was Purkey's phrasing during government counsel's opening statement, examinations of Detective Howard and Agent Tarpley, and government counsel's closing argument during trial.  While counsel ultimately attempted to mitigate the damage in his sentencing argument that federal prison was no "club fed", "there is no evidence that he made an intelligent, tactical decision not to object" to the government's improper argument.  *Wynters v. Poole*, 464 F. Supp. 2d 167, 180 (W.D.N.Y. 2006).

Purkey was prejudiced because trial counsel's "failure to object exacerbated the prejudicial effect of the prosecutor's statements." *Girts v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007).

**B.      Making an unfulfilled and prejudicial promise to the jury during opening statements in the trial that Jennifer Long's friends and family would testify that there was no kidnaping.**

During his opening statement during the trial, Purkey's counsel asserted, consistent with Purkey's testimony and the defense theory, that Jennifer Long had not been kidnaped. Counsel then asserted, without any good faith basis or basis in fact, that Long's family and friends would even testify that there was no kidnaping. Tr. 413.

Counsel's conduct was deficient because counsel promised the jury evidence that he could not and did not present. "[T]he foundation for this claim is the broken promise as opposed to the decision not to pursue a particular line of testimony." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 260 (7th Cir. 2003). Counsel's conduct had no basis in strategy because counsel had no indication prior to trial that Long's family and friends would testify that there was no kidnaping. Exhibit 1 (Declaration of Laura O'Sullivan).[3]

Counsel's conduct was prejudicial during trial and sentencing because counsel's promise to the jury went unfulfilled and, indeed, was contradicted by Long's family and friends who did not give the promised testimony. "[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening." *Id.* at 257 (quoting *Anderson v. Butler,* 858 F.2d 16, 17 (1st Cir.1988)). *See also People v. Briones*, 816 N.E.2d 1120 (Ill. App. Ct. 2004); *People v. Morgan*, 719 N.E.2d 681 (Ill. 1999); *People v. Lewis*, 609 N.E.2d 673 (Ill. App. Ct. 1992); *State v. Moorman*,

_____

[3]Exhibits 1 through 24 are attached to the § 2255 Motion. Exhibits 25 through 29 are attached to this pleading as Attachments 1 through 4.

7

358 S.E.2d 502 (N.C. 1987); *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991); *Montez v. State*, 824 S.W.2d 308 (Tex. Ct. App. 1992).

The prejudice was heightened because, not only did the witnesses fail to testify as promised, the testimony presented was to the opposite effect:  i.e., that Long had never been known to get in the car with a stranger.  Tr. 892-93.  The government also capitalized on counsel's deficient conduct by reminding the jury in closing arguments that counsel's promise had gone unfulfilled.  Tr. 1097. *See Ouber v. Guarino*, 293 F.3d 19, 28 (1st Cir. 2002) ("A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made").

> **C.    Failure to prepare and present evidence to rebut the uncorroborated self-serving testimony of government witness Michael Speakman.**

During trial, the government presented testimony from Inmate Michael Speakman, who had been Purkey's cellmate at the Correctional Corporation of America (hereinafter "CCA") facility for a while prior to trial.  He testified, consistent with his pretrial allegations, that Purkey boasted that he was confined "for killing people."  Tr. 682.  While counsel cross-examined Speakman concerning the government's Rule 35 Motion for Reduction in Sentence in exchange for his testimony and other matters, counsel presented no witnesses during trial or sentencing in rebuttal.

Counsel's conduct was deficient because counsel and Purkey had notice of Speakman's intended testimony.  Purkey had informed counsel prior to trial that Speakman's allegations were false and had provided counsel with the names of inmates, officers, and CCA volunteers that would impeach Speakman's testimony.  Exhibit 5 (O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003).  Specifically, Purkey informed counsel that Inmate Cornelius Peoples, Officer Melvin Lister, and CCA Volunteer Sam Hoffmeier could and would testify, contrary to Speakman,

that Purkey never talked about his crimes with other inmates let alone boast about them to inmates

or officers. Nonetheless counsel did not develop and present evidence from these witnesses.

Counsel's conduct was not based on a reasonable strategic or tactical decision. Counsel was

aware that Speakman had an obvious motive to testify against Purkey. Counsel was also clearly

aware of the suspect nature of jailhouse snitch testimony. As noted by the United States Court of

Appeals for the Second Circuit:

> As a general matter, we note that numerous scholars and criminal justice experts
> have found the testimony by "jail house snitches" to be highly unreliable. Several
> reports have found that jailhouse informants have a significant incentive to offer
> testimony against other defendants in order to curry favor with prosecutors and that
> the proffered testimony is oftentimes partially or completely fabricated. Thus, "the
> use of jailhouse informants to obtain convictions may be 'one of the most abused
> aspects of the criminal justice system.'"

*Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2nd Cir. 2004) (citations omitted). Nonetheless,

counsel did not investigate in order to present rebuttal evidence. This was clearly deficient conduct.

*See, e.g., Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) (counsel was in ineffective in capital trial

and sentencing for numerous reasons, including failing to adequately investigate and present

evidence to impeach an accomplice and a jailhouse snitch); *Roberts v. State*, 602 S.E.2d 768 (S.C.

2004) (counsel was ineffective in murder case for failing to adequately impeach a jailhouse snitch

to establish that it was impossible, due to the location of his cell and the defendant's, that the

defendant made any incriminating statements to him without it being heard by numerous other

inmates and staff).

No strategy could explain counsel's inaction because counsel could not make a reasonable

decision not to present the testimony of rebuttal witnesses without ever having talked to them. In

short, where counsel has failed to interview the potential witnesses, "the presumption of sound trial

9

strategy [in not calling the witnesses to testify] founders . . . on the rocks of ignorance." *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005). *See also Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005) (Counsel's failure to interview witnesses he believed to be hostile to the defendant was ineffective because "counsel's 'beliefs' are not a substitute for informed strategy"); *Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004) ("an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results"); *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (Counsel's belief that a witness would not be credible did not excuse counsel's failure to interview the witness because, "[i]n a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the [witness] is largely immaterial"); *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("C]ounsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called"); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003) ("[B]ecause counsel does not know what an investigation will reveal is no reason not to conduct the investigation. Counsel was obligated to find out the facts not to guess or assume or suppose some facts may be adverse"); *Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (Counsel "could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed); *Ross v. State*, 954 So. 2d 968, 1006 (Miss. 2007) ("[i]t is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover"); *Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("The decision not to interview witnesses, particularly your own, cannot be considered an effective strategic choice").

If counsel had adequately prepared and presented the evidence, both Cornelius Peoples, an inmate, and Melvin Lister, a correctional officer, would have rebutted Speakman's testimony. Both

would have testified that Purkey never talked about his crimes or his case and certainly never boasted or talked about "killing people," especially to Speakman because he was a well-known "jailhouse snitch." Exhibit 26 (Declaration of Cornelius Peoples); Exhibit 27 (Declaration of Melvin Lister). Sam Hoffmeier also would have testified that Purkey never talked or bragged about his crimes. Exhibit 25 (Sam Hoffmeier Declaration). "There is no plausible reason other than counsel's self-inflicted ignorance" for not presenting this available evidence. *Cargle*, 317 F.3d at 1214.

Purkey was prejudiced during trial but especially during sentencing because Speakman's testimony cast doubt on Purkey's credibility and the evidence and information that Purkey was remorseful. If the available evidence rebutting Speakman's testimony had been presented there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

> **D.     Failure to obtain the services of a mitigation specialist or to otherwise adequately investigate, prepare, and present mitigation evidence.**

The sentencing phase is "the most critical phase of a death penalty case," *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (quoting *Romano v. Gibson*, 278 F.3d 1156, 1180 (10th Cir. 2002)), because "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves,'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). The "fundamental issue," by definition, is only whether life imprisonment or death is the appropriate punishment. *Spaziano v. Florida*, 468 U.S. 447, 459 (1984).

"[B]ecause the defendant's guilt is often clear. . . 'avoiding execution [may be] the best and only realistic result possible.'" *Florida v. Nixon*, 125 S. Ct. 551, 562 (2004). As a practical matter, most defendants who are convicted of capital murder have "little or no chance of avoiding the death

001839

sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." *Romano*, 239 F.3d at 1180 (quoting Jonathon P. Tomes, *Damned If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 Am. J. Crim. L. 359, 364 (1997)).

The sentencing body's possession of the fullest information possible concerning the defendant's life and characteristics is, therefore, highly relevant, if not essential, to the selection of the appropriate sentence. *Lockett v. Ohio*, 438 U.S. 586 (1978). If the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). A jury can consider evidence in mitigation, however, only if defense counsel vigorously investigates and presents the available evidence. Here, counsel did not fulfill their obligations and Purkey was greatly prejudiced. *See, e.g., Karis v. Calderson*, 283 F.3d 1117, 1135 (9th Cir. 2002) ("the failure to present important mitigating evidence in the penalty phase can be as devastating as a failure to present proof of innocence in the guilt phase"); *Tokman v. State*, 564 So. 2d 1339, 1342 (Miss. 1990) ("It is critical that mitigating evidence be presented at capital sentencing proceedings"); *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla. Crim. App. 2007) ("[M]itigation evidence can, quite literally, make the difference between life and death in a capital case").

In assessing whether counsels' conduct was reasonable, the Supreme Court held in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

12

counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91; *see also Williams v. Taylor,* 529 U.S. 362, 396 (2000) (counsel's failure to discover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on the defendant's voluntary confessions because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background").

Subsequently, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court further examined the scope of the duty to investigate. The Court described the issue as "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*," 539 U.S. at 523 (emphasis in original), "under prevailing professional norms," *id.* (quoting *Strickland*, 466 U.S. at 688). The "prevailing professional norms" include both the American Bar Association ("ABA") Standards for Criminal Justice, as well as the ABA Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines"), which are "well-defined norms" for the conduct of counsel appointed in capital cases. *Wiggins*, 539 U.S. at 510.[4]

As the Court observed in *Wiggins*, a case that was tried in 1988, the 1989 ABA Guidelines "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989 Guideline 11.4.I(C) (emphasis added)).

---

[4]*See also Hamblin*, 354 F.3d at 487 (the ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational . . . . [t]hey are . . . longstanding norms. . . .").

Counsel's conduct in *Wiggins* fell short of the professional standards because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." 539 U.S. at 524. Counsel also "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* "The scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them. *Id.* at 525 (citation omitted).

> In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527. In *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct was deficient in this case in precisely the same fashion as in *Wiggins*.

As addressed in more detail in the § 2255 Motion, as early as January 2002, almost two years prior to trial, Purkey's lead counsel submitted a proposed budget to this Court, which included an estimate of costs for a "mitigation specialist." As counsel observed in that filing, "Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri." Exhibit 6 (Proposed Budget). Counsel's observation of the "routine" nature of appointment of mitigation specialists in capital cases was consistent with the revision of the ABA Guidelines in February 2003, which include specifically that a properly constituted capital defense

14

team should consist of "no fewer than two attorneys," "an investigator," and "a mitigation specialist." 2003 Guideline 4.1(A)(1). *See also* 2003 Guideline 10.4(C)(2).

Nonetheless, despite lead counsel's recognition that a mitigation specialist is routinely recognized as an integral part of a capital defense team, lead counsel did not actually seek the funding for or retain a mitigation specialist. Counsel's course did not change when co-counsel urged him to do so early in the case, when the ABA Guidelines were revised to specifically include these provisions in February 2003, or even in June 2003 when *Wiggins* was decided and co-counsel encouraged him again to obtain the services of a mitigation specialist for the trial then scheduled and conducted beginning with jury selection on October 28, 2003. Exhibit 1 (Declaration of Laura O'Sullivan).

Instead, on April 11, 2002, counsel submitted a funding request for Mark Cunningham, Ph.D. as "a mitigation/sentencing specialist," which counsel defined in the request as "a person who . . . is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment" and a person able to determine whether the defendant "is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger." Exhibit 7 (Ex Parte Request #3 – Cunningham).

Contrary to the definition of a "mitigation/sentencing specialist" that lead counsel provided to the court in seeking funding for Dr. Cunningham, "mitigation specialists," as that term is generally accepted, are not experts dealing solely in the area of future dangerousness and adaptability to confinement. It was generally accepted in the capital defense community, in general, and in the federal capital defense bar, in particular, even before 1998 that mitigation specialists

15

typically have "graduate degrees, such as a Ph.D. or masters degree in social work."  Judicial

Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services,

*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense*

*Representation* at 24 (1998).

Indeed, as is clear from *Wiggins*, development of a "social history report" by a "forensic

social worker" or similarly qualified person was routine as early as 1989 even in Maryland, 539 U.S.

at 524, which then and now has only very limited numbers of cases in which the government seeks

the death penalty as compared to many jurisdictions.[5]  Legal commentators writing on the subject

of capital defense also noted the need for a full life history through trained investigators well before

the 2003 Guideline revisions that were only "a codification of longstanding, common-sense

principles of representation understood by diligent, competent counsel in death penalty cases."

*Hamblin*, 354 F.3d at 487 ("The ABA standards are not aspirational . . . . [t]hey are . . . longstanding

norms. . . .").  *See, e.g.,* Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl

Pettry, *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 Geo. Mason U. Civ.

Rts. L.J. 199, 227-28 (2002).  The 1989 Guidelines even recognized the need, in preparing for

capital sentencing, for counsel to retain "trained investigators to interview witnesses and to assemble

demonstrative evidence."  1989 ABA Guideline 8.1 Commentary (quoting Goodpaster, *Effective*

*Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. Rev. 299, 344-45 (1983)).  State, federal, and

even military courts were also recognizing the need for trained mitigation investigators and

specialists long before Purkey's trial.  *See, e.g., United States v. Murphy*, 50 M.J. 4, 13 (C.A.A.F.

---

[5]According to the Death Penalty Information Center's website, Maryland has executed only five inmates since 1976 and currently only has eight inmates on death row.  *See* http://www.deathpenaltyinfo.org/state/.

1998) (in finding ineffective assistance of counsel in a capital case, the United States Court of Appeals for the Armed Forces relied, in part, on a "post-trial social history" compiled by a "forensic social worker"); *United States v. Curtis*, 46 M.J. 129 (C.A.A.F. 1997) (finding counsel ineffective in sentencing based, in part, on the post-trial work of a mitigation expert).

Given these circumstances, counsel knew or reasonably should have known at the time of his appointment that a social worker or at least someone with similar training or focus just on the life history and background was routine in capital cases and that a "mitigation specialist" is not a specialist simply in future dangerousness and adaptability to confinement. At minimum, by February 2003, counsel should have been aware that:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 Guideline 4.1 Commentary. Utilizing a mitigation specialist and utilizing a team approach "combines the different skills, experience, and perspectives of several disciplines" and allows counsel "to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case." 2003 Guideline 10.4 Commentary. Use of a mitigation specialist independent of

17

001845

testifying experts also allows that person to serve "as part of the defense team covered by the attorney-client privilege and work product doctrine." *Id.*

Despite the specialized training and skills of mitigation specialists and the wide recognition of the need for these services in a capital defense team, lead counsel chose not to retain a mitigation specialist. As counsel later informed the court in supplemental requests for funding for Michael Armstrong, an investigator, and for mental health experts, counsel chose to "dispense[] with" the requested mitigation specialist in order to obtain "budgetary savings." Exhibit 12 (Supplemental Expert Request for Investigator). *See also* Exhibit 13 (Supplemental Expert Request for Psychiatrist); Exhibit 14 (Supplemental Expert Request for Dr. Cunningham).

Counsel's choice to dispense with necessary services for budgetary reasons was unreasonable because counsel must "demand . . . all resources necessary." 2003 Guideline 10.4(D). While it is certainly laudable and necessary for court-appointed counsel to be cost-conscious, counsel cannot sacrifice the client's interests for budgetary reasons. "Defense counsel has a duty to take all necessary steps to ensure that available mitigating evidence is presented," including "seeking funds from the court and specifying why they were necessary." *Marquez-Burrola v. State*, 157 P.3d 749, 765 (Okla Crim. App. 2007). *See also Rios v. Rocha*, 299 F.3d 796, 803 (9th Cir. 2002) ("[R]eluctance to ask for public funds to hire his own investigator was not a proper reason for failing to pursue an initial investigation into potentially feasible defenses"); *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 288 (S.D.N.Y. 2006) ("Deciding that investigation is costly is not, as *Strickland* requires, equivalent to a reasonable and informed decision that investigation is unnecessary"); *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) ("Counsel is most assuredly not required to pay expert witness fees or the costs of investigation out of his own pocket, but a reasonably

18

competent attorney–regardless of whether he is retained or appointed–must seek to advance his client's best defense in a reasonably competent manner," including seeking necessary funding).[6]

Irrespective of whether a mitigation specialist should have been retained by counsel or not, the investigation actually conducted by counsel was inadequate despite counsel's assertion that "the same quality of work" was done for Purkey, even without a mitigation specialist. Exhibit 12 (Supplemental Expert Request for Investigator). *See also* Exhibit 13 (Supplemental Expert Request for Psychiatrist); Exhibit 14 (Supplemental Expert Request for Dr. Cunningham). "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *Wiggins*, 539 U.S. at 533. *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (there is no requirement that defense counsel "scour the globe on the off-chance something will turn up"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) (counsel need not have "a scorch-the-earth strategy"). Nonetheless, a decision not to investigate "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall*, 106 F.3d at 749-50.

---

[6]It should also be noted that it is doubtful that foregoing retainer of a mitigation specialist and increasing the workload of counsel and the mental health experts was *actually* cost-effective because the hourly rates for mitigation specialists are generally much cheaper than attorney rates and mental health expert rates.

> Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 10 (1998).

19

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).

> The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.

*Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

In *Wiggins*, as noted previously, the Supreme Court held that the ABA Guidelines reflect "well-defined norms" for capital defense counsel's performance. 539 U.S. at 524. The well-defined norms in capital cases even as early as 1989 required that counsel's investigation for sentencing "should begin immediately upon counsel's entry into the case." 1989 Guideline 11.4.1(D)(2)(C). *See also* 2003 Guideline 10.7 Commentary ("The mitigation investigation should begin as quickly as possible"). "[I]investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guideline 11.4.1(C).

More specifically, the mitigation investigation should include the gathering of records and conducting interviews on numerous topics, such as the defendant's history of mental illness, his

20

family and social history, including physical, sexual, or emotional abuse, and his prior correctional history  1989 Guideline 11.4.1(D)(2)(C);[7] 2003 Guideline 10.7 Commentary.  The investigation should include  "[a] multi-generational investigation" because it "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." 2003 ABA Guideline 10.7 Commentary.  Interviews should be conducted with the client, his family, and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others."  *Id.*

The Guidelines warn that, in conducting interviews of the client and others, some information "is very personal and may be extremely difficult for the client [or witness] to discuss." *Id.*  Specifically, in the context of describing the training and function of mitigation specialists, the Guidelines warn that the interviews must "elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse)." *Id.*[8]

---

[7]"Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences."  1989 ABA Guideline 11.4.1(D)(2)(C).

[8]Even before the 2003 revision to the Guidelines, authors experienced in capital litigation also warned of these common-sense principles.

> Interviews are sensitive because of cultural, psychological, and other barriers that must be overcome to ensure that family secrets are disclosed. . . .  Regardless of the culture, life-history investigation is invasive of privacy–seeking the darkest, most

(continued...)

21

001849

No one in the defense team performed even near these standards. As is detailed in the § 2255

Motion, during an entire year after appointment, counsel did not interview any possible mitigation

witnesses that could address any aspect of Purkey's life prior to his parole from prison in March

1997 other than his wife, ex-wife, daughter, and step-sons. Purkey's brother, Gary Hamilton, was

not interviewed until March 2003 other than a brief phone call with counsel.

Counsel knew at the time of that interview and included in his listing of mitigating

circumstances to be developed: (1) "abandonment by parents in childhood"; and (2) "sexual abuse

by mother." Exhibit 9 (To Do List). Dr. Cunningham, based on his initial review of records and

evaluation of Purkey, had also listed as "emerging mitigation hypotheses" the following:

Multigenerational family distress
Genetic predisposition to substance dependence
Genetic predisposition to mental illness
Fetal alcohol exposure
Parental alcoholism
Parental neglect and abandonment
Observed family violence
Physical and emotional abuse
Inadequate structure and violence
Corruptive influence of brother

---

[8](...continued)
shameful and intimate secrets of the client's family.

. . . .

Witnesses should always be interviewed in person. The information needed
in mitigation is simply not disclosed to strangers over the telephone. Full disclosure
comes only in person with great patience, no matter how skilled the interviewer.

Russell Stetler, Capital Cases, The Champion, National Association of Criminal Defense Lawyers, at 38-39 (Feb. 1999). *See also* Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl Pettry, Raising the Bar: Mitigation Specialists in Military Capital Litigation, 12 Geo. Mason U. Civ. Rts. L.J. 199, 214 (2002) ("To be successful in obtaining accurate and complete information, these interviews must be done in person, not by phone").

001850

Traumatic sexual exposure

Dr. Cunningham also specifically listed Hamilton as a person that needed to be interviewed concerning specific listed areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother. Dr. Cunningham also listed the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports. In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey. Exhibit 10 (Letter from Dr. Cunningham to Duchardt dated December 19, 2002).

Nonetheless, counsel conducted only a single interview of Hamilton in his home in Nebraska in March 2003. And, rather than being sensitive to the difficulty of the topics for the witness, counsel even took his teenage son to that interview. "Counsel thus essentially foreclosed any helpful disclosures from those most likely to know, first-hand, the pertinent facts." *Cargle v. Mullin*, 317 F.3d 1196, 1210 (10th Cir. 2003). According to Hamilton, counsel did not even ask questions about the aberrant sexual interactions among family members, which, as stated by Dr. Cunningham, would be "a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred." Exhibit 11 (Mark Cunningham, Ph.D., Declaration). *See Ex Parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) ("[A]n objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child").

23

Other than this single interview and those addressed above, which were focused more on Purkey's drug usage and allegations that he had been poisoned by his wife and others prior to these crimes, counsel did not conduct any other interviews concerning Purkey's social history and background other than brief phone calls with Hamilton's daughter, Purkey's cousin (Debbie Prothero), and Purkey's paternal aunt, Marguerite Hotchkiss. *See, e.g., Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005) (counsel ineffective in capital sentencing for limiting the background investigation to a few phone calls with family members and making limited records requests); *United States v. Murphy*, 50 M.J. 4 (C.A.A.F. 1998) (counsel's "attempt[] to develop an extenuation and mitigation case by correspondence and telephone" was inadequate).

Like counsel in *Wiggins*, Purkey's counsel's conduct was deficient because the evidence revealed that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." 539 U.S. at 526. "Counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. "The scope of their investigation was also unreasonable in light of what counsel actually discovered" and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525 (citation omitted).

Purkey was prejudiced by counsel's failure to adequately interview social history and background witnesses. For example, as is addressed in detail in the § 2255 Motion and its Exhibits, counsel could have easily countered the government's allegation that Purkey had recently fabricated–for the sole purpose of avoiding the death penalty–information that he had been sexually abused by his mother. Counsel could have and should have countered this information with

24

Purkey's prior prison records that reflected his report of the sexual abuse more than 15 years prior to trial, Exhibit 17 (Portion of Oregon Department of Corrections Records), and he did so in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling.

Counsel could also have presented the testimony of Dr. Rex Newton, the mental health expert employed by the Oregon Department of Corrections who counseled Purkey following his report of the childhood sexual abuse. Dr. Newton could have provided powerful mitigation from a clearly disinterested witness that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. Dr. Newton also would have provided disinterested and credible testimony that, contrary to the government's arguments and evidence and the tattoos on his body, Purkey was not involved in racist prison gangs and, indeed, was ashamed of his tattoos. Exhibit 18 (Rex Newton, Ph.D., Declaration).

If counsel had adequately investigated, counsel also could have presented the testimony of Margaret "Peggy" Noe and her daughter, Evette, in mitigation. Peggy was named in some of Purkey's Wichita Police Records that were obtained by trial counsel. Specifically, on April 4, 1974, when he had been taken into "protective custody" for public drunkenness and taken to the hospital, she was listed as his common law wife. Thus, she was obviously a person that should have been interviewed in a background and social history investigation. She could have been easily located because Purkey has remained in contact with her and her daughter over the years and could easily have provided contact information for her.

Margaret Noe would have testified that she has known Purkey since the second grade. She became close friends with him when they were both in their early 20's. Purkey confided in her then

25

001853

that his mother had sexually abused him for a long time. She also personally observed that Purkey's mother lived with her step-father essentially as husband and wife. Ms. Noe also could have testified that Purkey had once saved her life and that he took a special interest in her daughter. Exhibit 28 (Declaration of Margaret Noe). Evette Noe also would have testified that Purkey has always been like a father to her. He has always given her positive encouragement and emotional support to end an abusive marriage and negative behavior. Exhibit 29 (Declaration of Evette Noe).

Purkey was also prejudiced by counsel's failure to interview other background witnesses, such as Floyd Bose and his daughter, Dion Leiker. As detailed in the § 2255 Motion, both of these former law enforcement officers would have testified that Purkey assisted their family by providing them with information and closure following the murder of a family member. Leiker also would have testified that Purkey is compassionate. He provided emotional support and convinced her to escape an extremely violent marriage. He also helped her understand her grandson's problems after her grandson was sexually molested. Exhibit 21.

Although counsel did present mitigation evidence through retained mental health experts, Purkey was prejudiced by not having these disinterested, lay witnesses testify on his behalf. "The jury was called upon to determine whether a man whom they did not know would live or die." *Collier v. Turpin*, 177 F.3d 1184, 1204 (11th Cir. 1999). Counsel's duty was to "humanize the defendant for the jury, show his character in the best light available, and bring his good qualities to the fore." *State v. Williams*, 794 N.E.2d 27, 50 (Ohio 2003), *modified on reconsideration*, 814 N.E.2d 818 (Ohio 2004). The jury should have "heard first-hand accounts" and "personal testimony" from these witnesses in support of the expert testimony. *Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003). These witnesses could have given the jurors "*objective and specific* examples

26

of why [Purkey's] life should be spared" and could have provided the information that "illuminates the man whose life [was] in their hands." *Marquez-Burrola v. State*, 157 P.3d 749, 766-67 (Okla Crim. App. 2007). In short, these witnesses could have provided the testimony that "would have humanized" Purkey for the jury. *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006).

These witnesses not only could have provided substantial, credible, and humanizing mitigating information in their own right,[9] but their testimony would also have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness. In addition, the testimony of Margaret Noe and Dr. Newton was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty. In short, their testimony would have ""corroborated [Dr. Peterson's] testimony and bolstered the credibility of his response to the prosecution," who attacked him and Purkey by essentially asserting that Purkey had recently fabricated an allegation that his mother had sexually abused him. *Hovey v. Ayers*, 458 F.3d 892, 926 (9th Cir. 2006). With respect to Dr. Newton, in particular, his testimony "coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict." *Id.* at 927.

---

[9]In addition to the witnesses discussed above, if counsel had adequately investigated and presented the available evidence, Debbie Prothero, Purkey's cousin, and her husband, Russ Prothero, would have testified. While neither condones Purkey's crimes, both understand that he is, as Dr. Newton described, "a throw away" kid that never had a chance for a normal life given his dysfunctional parents and their emotional, physical, and sexual abuse of him. Nonetheless, they love Purkey and would have testified in his behalf.

27

001855

The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death, even though it found no mitigating circumstances at all. *See, e.g., Williams*, 794 N.E.2d at 54. If all of the available mitigating evidence had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537.

**E.     Failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.**

During sentencing, one of the expert witnesses presented by counsel was Bruce Leeson, Ph.D., who testified on the basis of neuropsychological testing that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." Tr. 1616. He also was not aware of neurological examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. Tr. 1626-31.

Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and failing to adequately prepare him for cross-examination. "[W]hen experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

> A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the experts do not request." Regardless of

28

001856

whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention of the experts."

*Hovey*, 458 F.3d at 925.

Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address the prior reports and other information.

> The clear implication of the prosecution's argument was that [Dr. Leeson] was uninformed about the subject of his diagnosis and that his conclusions stemmed from a general misunderstanding of the facts. Even if the background information did not change [his] diagnosis, he at least would have been able to testify more knowledgeably about the case and better weather the prosecution's attempts to discredit him. He would have been able to anticipate the prosecution's questions during cross-examination and explain [his opinions] . . . . Instead, [he] was caught by surprise, in an embarrassed and vulnerable situation. He was entirely discredited by his lack of critical information, information that lay in the hands of [Purkey's] counsel.

*Hovey*, 458 F.3d at 929. If Dr. Leeson had been adequately prepared and able to explain that his findings of neurological dysfunction, which were an integral part of the defense theme in mitigation, were not rebutted by the information the government used in cross-examination, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

29

> **F.    Failure to adequately prepare and present the expert testimony of Stephen Peterson, M.D.**

As is addressed in detail in the § 2255 Motion, Dr. Stephen Peterson, a forensic psychiatrist retained by counsel, testified in sentencing. He detailed Purkey's report of sexual abuse by his mother in his report prepared in April 2000 in connection with Purkey's prior murder conviction in Kansas. He also noted in his August 2003 report prepared in connection with this case that Purkey's prior report of the sexual abuse to Dr. Newton was documented in the Oregon Department of Corrections records.

During sentencing, Dr. Peterson testified only generally that Purkey was "severely sexually and physically and emotionally abused in childhood" and he "developed abnormal psychosexual ideas." Tr. 1748. The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left. Tr. 1750. He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women. Tr. 1750. He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification." Tr. 1752.

During cross-examination, however, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that Purkey allegedly raped her.[10] Tr. 1817. He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask. Tr. 1824. At the time, he was not aware, of course, that Purkey had

---

[10]Purkey was never charged with this alleged offense because law enforcement officers reported that Mrs. Purkey was intoxicated and appeared to have mental problems, the examining doctor found no evidence of sexual assault, and Mrs. Purkey's aunt, who lived in the home, reported that Purkey was not even present in the home at the time of the alleged rape.

30

provided some of this information to Margaret "Peggy" Noe 20 years before or that Purkey had also provided detailed information on this topic to Dr. Cunningham.

Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being sexually abused as a child. Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports.

Counsel's conduct was deficient in failing to prepare Dr. Peterson to testify concerning the details of the sexual abuse he was aware of, failing to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of, failing to develop the additional information that Dr. Newton and Peggy Noe could have provided, and failing to even correct the false perception created during cross-examination.

As addressed in more detail above, the prior records and information from Dr. Newton and Noe "would have strengthened" and "confirmed" Dr. Peterson's opinion that Purkey had, in fact, been sexually abused by his mother and that he was not simply fabricating an allegation in order to avoid the death penalty. *Hovey*, 458 F.3d at 926.

Dr. Peterson also should have been prepared and questioned on the stand by counsel concerning the details of the horrid abuse Purkey endured from his mother rather than just the "conclusional testimony" that Purkey was sexually abused. *Lewis v. Drake*, 355 F.3d 364, 368 (5th Cir. 2003). This was "wholly inadequate to present to the jury a true picture of the tortured childhood" Purkey experienced. *Id.* at 369. The mere label of "sexual abuse" tells the jury nothing about "a defendant's troubled childhood, [which] will present him in a more sympathetic light to a jury." *Turpin v. Lipham*, 510 S.E.2d 32, 41 (Ga. 1998).

31

The prejudice is especially clear "[w]here, as here, the very matter as to which defense counsel has been ineffective becomes one of the linchpins of the prosecutor's closing." *Commonwealth v. Alvarez*, 740 N.E.2d 610, 618 (Mass. 2000). Here, because Dr. Peterson was not adequately prepared beforehand or redirected even after the very damaging cross, government counsel was free to argue without objection or contradiction by defense counsel that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68. If counsel had performed adequately, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

**G.      Failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.**

As is addressed in detail in the § 2255 Motion, Dr. Cunningham, a forensic psychologist, was prepared to testify about the details of Purkey's sexual abuse by his mother. Specifically, he could have testified that, beginning as early as age eight, Purkey's mother was inappropriately touching his genitalia. After she separated from her husband, she would have Purkey sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. Ultimately, she engaged him in sexual intercourse. Exhibit 11.

Counsel's conduct was deficient in failing to elicit this testimony. Dr. Cunningham had prepared slides, discussed them with counsel, and was prepared to testify about the details of the sexual abuse of Purkey and his exposure to other sexual traumas as a child. Nonetheless, counsel did not question him about the detail. This was apparently simple oversight rather than any strategy.

32

Just as with Dr. Peterson, counsel's failure to adequately present the available evidence was prejudicial.

### H. Failure to adequately prepare and present the lay testimony of Gary Hamilton in mitigation.

Counsel's conduct was deficient in failing to prepare Purkey's brother, Gary Hamilton, for his testimony. If he had been adequately prepared, Hamilton would have testified that Purkey started abusing alcohol and drugs when he was just a child because he was emulating Hamilton. He would have testified in detail about the violence in the home with Purkey's father physically abusing Purkey's mother. Finally, he would have provided more information about his own sexual abuse by his mother and his grandmother and his mother's sexual abuse by her step-father even as an adult.

Purkey was prejudiced by the failure to adequately prepare Hamilton because his testimony only provided "skeletal testimony," *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003), and a "hollow shell" of the events of Purkey's childhoods, *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir. 1999).

> The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life. Had they been able to do so, . . . it is at least reasonably probable that the jury would have returned a sentence other than death.

*Id.* at 1204.

### I. Failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.

Counsel's inattention and lack of preparation for sentencing also manifested itself in counsel's presentation of "mitigation" witnesses that provided information that was more harmful than helpful to Purkey. Specifically, the very first witness called by the defense was Dr. William

33

Grant, a Bureau of Prisons employee. He testified concerning the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate. Tr. 1410, 1415, 1417. He then testified on cross-examination that while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable." He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems." Tr. 1416.

Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed." On cross-examination, however, Russell acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated. He also testified that Purkey was the only pretrial detainee there and he was sent because he "was a management problem" and was "demanding." Tr. 1656. He also testified that he had heard that Purkey has a long history of assaultive behavior in prison. Tr. 1658.

Counsel's conduct was deficient in failing to adequately interview these witnesses before putting them on the witness stand. "[C]ounsel could not have evaluated or weighed the risks and benefits of calling [these witnesses] . . . without so much as asking [them] what [they] would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). If counsel had done so, it would have been clear that their testimony was not "mitigating" and, in fact, was more harmful than helpful to Purkey. Their testimony was, in fact, prejudicial to Purkey.

001862

J.    Conclusion

While the Eighth Circuit has rejected consideration of "the cumulative effect of trial counsel's errors in determining *Strickland* prejudice," *Middleton v. Roper*, 455 F.3d 838, 850 (8th Cir. 2006), Purkey submits that this is an erroneous interpretation of *Strickland*, *Williams*, and *Wiggins*. A finding of prejudice under *Strickland* requires that a petitioner "show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 529 U.S. at 537.

The *Strickland* standard is the same as the standard used for judging the "materiality" of evidence unconstitutionally suppressed by the government. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (adopting the test enunciated in *Strickland* for resolving Sixth Amendment claims of ineffective assistance of counsel). Thus, the Supreme Court's analysis in *Kyles v. Whitley,* 514 U.S. 419, 434 (1995), of the proper application of the "materiality" standard is equally applicable to the "reasonable probability" analysis under *Strickland.*

Analysis in this appropriate light reveals that this Court must apply a cumulative prejudice analysis. *Kyles*, 514 U.S. at 436 (the prejudice must be "considered collectively, not item-by-item"). The United States Supreme Court's opinion in *Williams*, 529 U.S. at 399, also requires that the Court consider "the entire postconviction record . . . as a whole and cumulative of mitigation evidence presented originally" in conducting its prejudice analysis and finding counsel ineffective for failing to adequately prepare and present mitigation evidence. "[A]s a whole" implies a cumulative analysis. Likewise, in *Strickland*, the Court stated, "The defendant must show that there is a

35

001863

reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different."  466 U.S. at 694 (emphasis added).  If the Court did not intend a cumulative analysis it would have discussed the prejudice analysis in terms of "individual error" or error by error evaluation instead of formulating the prejudice test in light of counsel's "errors."

Finally, it should be noted that a majority of the Circuit Courts of Appeals have held that cumulative prejudice analysis is appropriate under *Strickland*.  *See Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000); *Martin v. Grosshans*, 424 F.3d. 588 (7th Cir. 2005); *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003).[11]

**XII.    Purkey was denied due process of law and his right to fair trial in violation of the Fifth and Sixth Amendments during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly telling the jury that Purkey had just walked into court and recanted the kidnaping of Ms. Long.[12]**

First, the government knew that in December, 1998, Purkey told Agent Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her.  But it knew more than that.  It also knew that in the month after it obtained the indictment against Purkey, he recanted the kidnaping to its star witness – Michael Speakman.  On November 2, 2001, Speakman spoke with the FBI, advising them that

---

[11]*See also United States ex rel. Madej v. Schomig*, 223 F. Supp. 2d  968 (N.D. Ill. 2002); *Miller v. Senkowski*, 268 F. Supp. 2d 296 (E.D.N.Y. 2003); *In re Gay*, 968 P.2d 476 (Cal. 1998); *Acker v. State*, 787 So.2d 77 (Fla. Dist. Ct. App. 2001); *People v. Briones*, 816 N.E.2d 1120 (Ill. App. Ct. 2004); *State v. Gondor*, 860 N.E.2d 77 (Ohio 2006); *Mata v. State*, 141 S.W.3d 858 (Tex. Ct. App. 2004); *State ex rel. Humphries v. McBride*, 647 S.E.2d 798 (W. Va. 2007); *State v. Thiel*, 665 N.W.2d 305 (Wis. 2003).

[12]The numbering of the arguments from this point match the numbering of the claims asserted in the § 2255 Motion.

Purkey had said: (I) "[the] girl was with him partying"; (ii) "[he] did not snatch [her]"; and (iii) "[it was] not forcible with girl."  Exhibit 24 (Brunell Rough Notes dated 11/02/01).

Almost six weeks after receiving Dr. Peterson's August 13, 2003 report, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during various interviews in 2002 that he had not kidnaped Ms. Long.  Doc. #337.  In that September 25, 2003, motion, the government asserted, "the United States has learned *for the first* time that the defendant is now claiming that the victim accompanied him voluntarily from Missouri to Kansas." Doc #337, p. 2 (emphasis added).  A month later, Purkey's confession served as the centerpiece for the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. To bolster that confession, AUSA Whitworth elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey had claim3d not to have kidnaped Ms. Long.  Tr. 566.  This strains credulity.  Tarpley was the Government's lead investigator and the Speakman 302 that described Purkey's recantation to Speakman appeared over Tarpley's name.  Exhibit 2.  Having planted this illicit seed through its lead investigator, the Government then exacerbated the lie by telling the jury that Purkey had just "change[d] his story" in order to avoid the death penalty – "he's trying to get out of it." Tr. 1135. AUSA Whitworth emphasized, "All the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her."  Tr. 1135.

To arrive at the truth, our system imposes on prosecutors the "duty to serve justice, not just win the case."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  AUSA Whitworth, then, was obliged to elicit and argue the truth. *Giglio v. United States,* 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).  Instead, he elicited false testimony that served only to mislead the jury on *the* critical question before it – Purkey's credibility as to whether he kidnaped Long.  Purkey must show

that such error deprived him of due process, i.e., that the prosecution knew or should have known

of the fallacy it created and that there is a reasonable likelihood that that fallacy *could have affected*

the jury's judgment. *See United States v. Martin*, 59 F.3d 767 (8th Cir. 1995) (citing *United States*

*v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992)).  It clearly did.

In *United States v. Bigeleisen*, 625 F.2d 203, 205 (8th Cir. 1980), the government's key

witness against Bigeleisen was John Paul Moore.  In exchange for Moore's cooperation, the

government agreed to contact the sentencing judge and the United States Parole Commission.  *Id.*

On direct, the following took place:

> Q.      Now, do you have an agreement with the government concerning your
>         cooperation at this time?
>
> A.      No, I do not.
>
> Q.      By that I mean, is there anything that you are supposed to get in relation to
>         testifying?
>
> A.      No, there is not.

*Id.* at 206.  The government did nothing to correct Moore's false testimony.  *Id.*  The government

then "argued that Moore decided to testify because Bigeleisen stopped giving him 'silence money.'"

*Id.* at 208.  Noting that "[w]hether he had an agreement regarding his testimony was central to the

jury's credibility evaluation," the Eighth Circuit reversed Bigeleisen's conviction and remanded for

a new trial.  *Id.*

In *United States v. Foster*, 874 F.2d 491 (8th Cir. 1988), the Eighth Circuit again addressed

this situation.  There, in exchange for their cooperation, Mattingly, Buckley, and Jackson were all

granted various forms of immunity before trial.  *Id.* at 494.  On direct examination, the prosecutor

asked Mattingly whether "any promises" had been made concerning whether she could be

38

prosecuted in Minnesota, and Mattingly responded: "Not to my knowledge." *Id.* The prosecutor made no attempt to correct Mattingly's faulty recollection, but did ask Mattingly whether she believed she would be prosecuted in Minnesota, and Mattingly said "No." *Id.* Similarly, the prosecutor asked Buckley on direct whether any promises had been made to him about whether or not he would be prosecuted in Minnesota, and Buckley responded, "There have been no promises at all." Again, the prosecutor made no attempt to refresh Buckley's faulty recollection that he had been promised use immunity in exchange for his cooperation. The promise not to prosecute Jackson in Minnesota was fully elicited. *Id.*

The Eighth Circuit noted that under *Giglio* "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Id.* at 495 (citations omitted). The Eighth Circuit reversed, observing,

> After reviewing the conflicting evidence presented to the jury in this case, we are unable to say that there was no reasonable likelihood that the false testimony could have affected the judgment of the jury. Buckley and Mattingly were critical witnesses in the government's case, and their testimony was directly contradicted by Foster. In a case resting essentially on the credibility of the witnesses, the failure to inform the jury of the promises made to the witnesses was prejudicial.

*Id.* at 495.

In *Davis v. Zant*, 36 F.3d 1538, 1549 (11th Cir. 1994), the defendant testified that his codefendant had "stepped forward and confessed to this crime about three months ago…." *Id.* at 1546. The prosecutor immediately objected, "That's not true and it's not evidence." *Id.* But the codefendant *had* confessed, and the prosecutor *knew* it six months before trial. *Id.* at 1547. Nonetheless, the prosecutor argued that the defense was a "last minute fabrication" that was "'thought up' during trial." *Id.* at 1547-1548. "[T]he prosecutor intentionally painted for the jury a distorted picture of the realities of this case in order to secure a conviction [and death sentence]."

39

*Id.* at 1549.  The Eleventh Circuit reversed Davis' conviction and death sentence because the prosecutor's "patently dishonest" tactics rendered Davis' trial fundamentally unfair.  *Id.* at 1551. Here, AUSA Whitworth knew well in advance of trial that Purkey had recanted his false-confession. Indeed, the Government's own star witness claimed to have heard Purkey talking about his case and saying that Ms. Long had gone with him voluntarily – to party, this is precisely what Dr. Peterson described in his August 13, 2003 report.  On November 2, 2001, Speakman told the FBI, including lead investigator Tarpley,

> Immediately after flushing the newspaper, Purkey initiated a conversation with him, indicating that, as a cell mate, he felt he owed him an explanation regarding the article and the murder of the girl.  Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that *Purkey did not "snatch" the girl from the street* as Nelson did.  Purkey described *the initial contact with the girl as more like they were "partying," and that is [sic] was not forcible*.

Exhibit 2 (Speakman 302, Transcribed 11/28/2001) (emphasis added).  Thus, since just a month after the Government obtained its indictment,[13] it knew that Purkey was recanting his statement that he had kidnaped Ms. Long.  Exhibiting temerity, however, AUSA Whitworth used his lead investigator to tell the jury that Mr. Purkey had just recanted "[r]ight before this trial."  (Tr. 566).  Such gross misconduct cannot be countenanced.  "A lie is a lie, no matter what its subject, and if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."  *Napue,* 360 U.S. at 269-270.

The entire focus of this case was Purkey's credibility with regard to whether he kidnaped Ms. Long or whether she went with him voluntarily.  It cannot be said that there is no reasonable likelihood the jury's decision was not impacted by the government's misleading and false argument. *See Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on Taliento's

---

[13]The grand jury returned the indictment on October 10, 2001.  Doc. #1.

testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Likewise, here, Purkey's credibility was the central factor in the case. The Government obtained the upper hand by lying to the jury. Death is different from any other sentence. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1977). It is the most solemn decision jurors must make, and, here, the Government lured the jurors to make their decision based upon false evidence. Purkey is entitled to a new trial.

**XIII.  Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "[r]ight before this trial."**

As addressed above, AUSA Whitworth argued and elicited from his lead investigator, Agent Tarpley, that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnapped Ms. Long:

A.      [Agent Tarpley]  No, he never told me that he didn't kidnap her.

Q.      [AUSA Whitworth]  When is the first time you ever heard about that story?

A.      *Right before this trial*.

Tr. 566 (emphasis added). Counsel was ineffective for failing to impeach Agent Tarpley.

The prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984) requires a defendant in Purkey's position to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). The United States Supreme Court has stressed that "the adjective

41

001869

["reasonable"] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court

observed:

> The question is not whether the defendant would more likely than not have received
> a different verdict with the evidence, but whether in its absence he received a fair
> trial, understood as a trial resulting in a verdict worthy of confidence.

*Id*.; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient

conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175

(1986) ("a defendant need not establish that the attorney's deficient performance more likely than

not altered the outcome in order to establish prejudice"). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of
> the evidence*. It is present when an evaluation of all of the evidence that should have
> been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added) (citation omitted).

Failing to impeach a key prosecution witness can constitute ineffective assistance of counsel.

*Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995). For example,

> At Driscoll's trial, the state offered the eyewitness testimony of two inmates, Joseph
> Vogelpohl and Edward Ruegg. First, Vogelpohl took the stand and told the jury that
> he saw Driscoll stab Officer Jackson in the upper left part of his chest. Vogelpohl
> also testified that after witnessing Driscoll stab Jackson, he returned to Driscoll's cell
> to continue watching television as he had been before the disturbance began.
> According to Vogelpohl, Driscoll returned to his cell a while later and, before
> changing his clothes, said to Vogelpohl: "Did I take him out, JoJo, or did I take him
> out." On cross-examination, Driscoll's lawyer questioned Vogelpohl about his prior
> convictions, about his intoxication level on the night in question, about the beatings
> he and other inmates received from corrections officers after the riot, and about
> whether he had discussed the case with other inmates. Driscoll's lawyer also raised
> some question as to whether Vogelpohl also possessed a knife. (internal citations to
> the record omitted).

*Id.* at 709-710. The Eighth Circuit affirmed the district court's issuance of a writ of *habeas corpus*,

concluding that there could be "no objectively reasonable basis on which competent defense counsel

could justify a decision not to impeach Vogelpohl. *Id.* at 710. "[C]ounsel's failure to impeach Vogelpohl was a breach with so much potential to infect other evidence that, without it, there is a reasonable probability that the jury would find reasonable doubt of Driscoll's guilt." *Id.*

Similarly, in *Harris v. Artuz*, 288 F. Supp. 2d 247, 259 (E.D.N.Y. 2003),[14] counsel rendered ineffective assistance when he failed to cross examine Deas and other witnesses concerning the alleged shooting of Deas's hand. Harris was convicted of murdering a man while allegedly trying to rob him of his coat. *Id.* at 251. He was also convicted of assault for *shooting* another man in the hand during the incident. *Id.* The evidence against him consisted primarily of the testimony of four eyewitnesses, one being the man who was purportedly shot in the hand. *Id.* Relevant medical records, however, showed the following:

- A "Triage Form" for Gregory Deas from Woodhull Medical and Mental Health Center indicating, under "chief complaint," that Deas was "assaulted 30 min ago hand stab wound of right hand." "Laceration" is circled on the form, with the location indicated as "R hand."

- An "Ambulance Call Report" for Gregory Deas in which the "chief complaint" indicates that Deas told personnel, "I was stabbed." The "presumptive diagnosis" is "stab R hand." Under "comments" is the statement that "pt. c/o stab wound to the hand."

- An "Emergency Department Nursing Flow Chart" stating that Gregory Deas was in the hospital "to get hand R stitched." Under "assessment intervention" is written "lac to R hand yesterday," and "2" lac. to "R palm." The chart also indicates that Deas had previously had surgery for a gunshot to the groin area.

- An Emergency Department form indicating as the "chief complaint" a "laceration to right hand." The treating physician's notes of the physical examination indicate "yesterday cut in Rt. Hand." The diagnosis is "Rt hand laceration." There is also a sketch of a hand with an indication of a V shape on the palm, with the two arms of the V labeled "2 cm" and "3 cm."

---

[14]Affirmed by *Harris v. Artuz*, 100 Fed. Appx. 56 (2nd Cir. 2004).

*Id.* at 258. "[T]hese records contradict the testimony of all four of the prosecution's eyewitnesses, strongly suggesting the possibility that the witnesses colluded in their testimony in an effort to frame petitioner for a crime that was committed by one of them." *Id.* at 251.

Failing to impeach these eyewitnesses cannot reasonably be dismissed as strategic – there was no downside to the impeachment. Defense counsel's theory of the case--that petitioner was misidentified by the four witnesses – would have been aided rather than impeded by the evidence undermining their veracity.

> To the contrary, counsel's failure to impeach the witnesses foreclosed a strong line of defense that could have been presented to the jury in tandem with the misidentification theory or, more likely, could have supplanted the weak claim of misidentification altogether. Defense counsel, because he failed to use the medical records available to him, was unable to argue to the jury that Deas or possibly another of the four eyewitnesses was in fact Acevedo's killer.

*Id.* at 259. Finding prejudice from this dereliction, the district court noted that "any reasonable juror would be forced to ponder how four friends managed to testify to the same, physically impossible details."

Similarly, here, counsel's failure to impeach Tarpley had no downside. Counsel had told the jury from the beginning that the case should not be in federal court because there was no kidnaping. *See* Tr. 408, 411, 413. Nonetheless, he let the Government portray this as a desperation defense concocted on the eve of trial. As defense counsel readily admitted, Purkey's credibility was central to the case: "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104 (emphasis added).

Any reasonably competent attorney would have impeached Tarpley with the November 2001 302 *bearing his name* that clearly reports that Purkey was denying that he kidnapped Ms. Long *two*

44

*years before trial*. Trial counsel had the information to attack Tarpley's testimony. Indeed, Purkey had recanted the kidnapping to both Duchardt and O'Sullivan, as well as Mic Armstrong (defense investigator) and Dr. Peterson (defense expert). Still, counsel stood silent. Letting the jury form a belief that Purkey was lying when it was really Tarpley who was lying sounded the death knell for Purkey. But for counsel's dereliction, there is a reasonable probability that the jury would have decided the case differently, and this Court should vacate Purkey's conviction and death sentence.

**XIV. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to correct the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnaping for the first time because counsel both knew that Purkey had disclaimed the kidnaping since their very first meetings with him two years before trial.**

As addressed above, in his initial statements to Tarpley and Howard, Purkey concocted the story about kidnaping Ms. Long in an effort to avoid serving life in the cesspool of Kansas prisons. It was nearly three years later before the government obtained an indictment against Purkey, and he immediately – in October, 2001 – denied the kidnaping to Duchardt. Again, in January, 2002, when Purkey had his initial meeting with O'Sullivan, he denied having kidnaped Ms. Long. Also, during his first interview with Mic Armstrong, he denied having kidnaped Ms. Long. And, when Purkey met with Dr. Peterson that autumn, he also recanted the kidnaping to him. Two months before trial, Dr. Peterson authored a report, noting Purkey's insistence that he had not kidnaped Ms. Long and Purkey's reason for fabricating the kidnaping. Exhibit 23.

As expected, when trial began on October 29, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. To fend off any defense that Purkey did not kidnap Ms. Long, government counsel elicited from Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have

001873

kidnaped Ms. Long.  Tr. 566.  Counsel knew this to be untrue.  Under these circumstances, reasonably competent counsel would have informed the court that, unless the government corrected its misstatement of fact, counsel would become a necessary witness, thus necessitating a mistrial.  Instead, counsel sat silent.

A lawyer cannot act as an "advocate *at a trial* in which the lawyer is likely to be a necessary witness."  Missouri Supreme Court Rules of Professional Conduct, Rule 4-3.7 (emphasis added).[15] "[This rule] has been interpreted to mean an attorney is a 'necessary witness' only if 'there are things to which he will be the only one available to testify.'" *Droste v. Julien*, 477 F.3d 1030, 1035 (8th Cir. 2007) (quoting *State ex rel. Wallace v. Munton*, 989 S.W.2d 641, 646 (Mo. App., S.D. 1999)).  Both Duchardt and O'Sullivan were necessary witnesses to rebut the government's specious assertion during summation that "[a]ll the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her."  Tr. 1135.  Duchardt could have testified that Purkey had immediately and consistently recanted the kidnaping to him, and the same is true of O'Sullivan.

*United States v. Givens*, 88 F.3d 608 (8th Cir. 1996) presented the defendant's attorney with a similar problem.  There, the defendants – Kenneth Givens, Robert Turner, and Guinn Kelly – were members of the St. Louis Police Department who also worked as security guards at a federal housing project. *Id.* at 610.  They were accused of inflating their hours so that it appeared that they worked more at that project than they had. *Id.*  At trial, one of the first witnesses called by the government was Captain Hagger, the defendants' supervisor at the police department. *Id.*  Hagger testified about

---

[15]This Court has adopted this Rule.  Rule 83.5(c)(2).

**001874**

the policies of the police department regarding their officers' employment in part-time jobs, and the defendants were interested in discrediting his testimony. *Id*.

While cross-examining Hagger, Givens's attorney, C. John Pleban, approached the bench and described for the court a conversation that he had with Hagger during which no one else was present. *Id*. Apparently, Hagger had told Pleban that he suggested to Givens that Givens resolve the problem of overstated hours on his time cards by working extra hours. *Id*. Under Pleban's cross-examination, however, Hagger denied making any such suggestion to Givens, and Pleban informed the court that if, on further cross-examination, Hagger denied the substance of their conversation, Pleban might have to testify to impeach Hagger. *Id*. Counsel for the other two defendants agreed that they too wanted to elicit this testimony for purposes of impeachment. *Id*. The court disqualified Pleban as Givens's attorney and declared a mistrial. *Id*. The Eighth Circuit noted, "While the district court conceivably could have made a finding of hardship that would have enabled Mr. Pleban to testify and represent Mr. Givens, we believe that the court chose the better path in disqualifying Mr. Pleban." *Id*. at 611.

In *United States v. Kliti*, 156 F.3d 150 (2nd Cir. 1998), Abdelgwad was a key government witness at trial and testified extensively about Kliti's involvement in the credit card and counterfeit check scheme. *Id*. at 155. During his cross-examination of Abdelgwad, Sarikas – Kliti's attorney – sought to ask about a conversation he had with Abdelgwad before trial. Outside the jury's presence, Sarikas told the court that Abdelgwad went to Sarikas's office to thank Sarikas for representing Abdelgwad during the bond hearing and told Sarikas and others "that Kliti had 'absolutely nothing to do with this [the charged offenses] and that he [Abdelgwad] would let the authorities know about that.'" *Id*. at 155.

47

Concerned that Sarikas would become an unsworn witness if he questioned Abdelgwad about this statement during cross-examination, the court engaged in the following colloquy aimed at letting Sarikas question Abdelgwad about the exculpatory statement, without having Sarikas become an unsworn witness:

THE COURT: I wonder whether or not this could be done and it would certainly eliminate some of the concerns I have, by asking the witness [Abdelgwad] whether or not in the presence of Mr. Hamid and certain other individuals that are not going to be named or you could name Mr. Kliti, but just not yourself that he made a certain statement.

[THE GOVERNMENT]: Without indicating –

THE COURT: Without indicating it was in counsel's office, without indicating counsel was present.

MR. SARIKAS: I would do that. What would happen, however, if he said no to that, would I have to more specifically refer?

THE COURT: No. You said you had Mr. Hamid available. On the other hand, I don't know Mr. Hamid can testify to it -- can he?

MR. SARIKAS: It really depends. I brought him [Hamid] here for two reasons.

THE COURT: Mr. Abdelgwad is not a defendant. My concern is did you say to me and you, of course, can't testify and you would become kind of an unsworn witness here. You ask the question, the jury thinks you're an honest sort, they're going to accept that it was said even though he denies it.

*Id.* at 155-156.

All parties then agreed that Sarikas could avoid the unsworn witness problem by cross-examining Abdelgwad without referring to where the statement was made or whether Sarikas was present. *Id.* at 156. Cross-examination resumed and Abdelgwad flatly denied making the exculpatory statement. *Id.* Sarikas did not press Abdelgwad further on this issue, pursuant to the agreement. *Id.* At that point, the only witness, other than Kliti, who could testify about the

48

001876

exculpatory statement, was a witness who asserted his Fifth Amendment privilege against self-incrimination and refused to testify. *Id.*

Sarikas was in a clear conflict because he was faced with the choice of (1) testifying on behalf of his client, which would result in his disqualification, or (2) not presenting evidence of the exculpatory statement. *Id.* Finding prejudice from Sarikas's failure to testify, the court pointed out that Abdelgwad's credibility was essential to Kliti's conviction. *Id.* at 157. Abdelgwad testified extensively about his and Kliti's participation in the scheme, and he was the only witness who provided direct evidence of Kliti's use of the counterfeit bank checks to pay the credit card companies as specified in the indictment. *Id.* Sarikas's testimony about the exculpatory statement would have been important impeachment evidence to attack Abdelgwad's credibility. *Id.*

As in *Givens* and *Kliti,* counsel should have apprised the court of the situation as soon as the government began asserting that Purkey had just walked into court and recanted the kidnaping for the first time.[16] Duchardt and O'Sullivan should have immediately approached the bench. At the bench, counsel should have outlined for the court that Purkey had immediately and persistently insisted to them that he had not kidnaped Ms. Long. Instead, counsel sat quietly and said nothing. Without impeaching Tarpley and without contradicting the government, counsel simply relied on argument.

> The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnaping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman…. But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnaping. They knew about it.

---

[16]Indeed, a reasonably competent attorney would have responded to the Government's motion *in limine* to emphasize that the Government had known about the recantation since Speakman provided his story to the FBI.

49

Tr. 1106.  Counsel's argument, of course, was not evidence for the jury to consider.  *See, e.g.,*

*United States v. Rusan*, 460 F.3d 989, 993 (8th Cir. 2006).  Purkey's veracity and credibility were

absolutely critical to his case.  The jury knew he lied at some point, and counsel's inaction created

a reasonable probability that the jury would decide Purkey was lying at trial not in his concocted

confession.  His conviction and sentence should be vacated.

**XV.    Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments when counsel failed to object to the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnaping for the first time and when appellate counsel failed to assert this ground on direct appeal.**

> **A.    Trial Counsel were Ineffective in Failing to Object to the Government's Deliberate Misconduct.**

As fully discussed in point XII, the government knew two years before trial that Purkey was

recanting the kidnaping.  Nonetheless, on September 25, 2003, the government moved *in limine* to

preclude Dr. Peterson from testifying that Purkey had told him during various interviews in 2002

that he had not kidnaped Ms. Long. Doc. #337.  In that motion, the government asserted, "the United

States has learned *for the first* time that defendant is now claiming that the victim accompanied him

voluntarily from Missouri to Kansas." Doc #337, p. 2 (emphasis added).  Despite having a plethora

of information to refute the government's claim, trial counsel did not respond to this false allegation.

Then right out of the blocks during trial, the government hit hard, eliciting from Agent

Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming

not to have kidnaped Ms. Long.  Tr. 566.  Again, trial counsel did not respond to the false allegation.

Government counsel then told the jury that Purkey had just "change[d] his story" in order to avoid

the death penalty – "he's trying to get out of it." Tr. 1135. Government counsel emphasized, "All

50

001878

the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her." Tr. 1135. And, again, trial counsel lodged no objection.

As argued in point XII, Purkey's conviction and sentence should be vacated due to the government's deliberate misconduct. Reversal is also required due to counsel's ineffectiveness in failing to object to the misconduct.

Duchardt and O'Sullivan had ample warning that the government would engage in this deceitful tactic with the jury from the government's motion *in limine* asserting that it had just learned of Purkey's recantation. Doc. #337. Though the government's assertion was absolutely false, Duchardt and O'Sullivan did nothing to correct it. Reasonably competent counsel would have filed suggestions in opposition to the government's motion to bring the lie to the court's attention, thus pre-empting any deception of the jury. But, of course, Duchardt and O'Sullivan did not respond to the government's motion and let sleeping dogs lie. "Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. *A failure to make such an objection can have devastating consequences for an individual defendant.*" *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (emphasis added) (writ of *habeas corpus* issued because throughout closing argument, the prosecutor commented on the credibility of witnesses and misrepresented the evidence).

Failing to object to prosecutorial misconduct can constitute ineffective assistance of counsel. *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996).

> The most compelling evidence of counsel's incompetence was her failure to object to very serious instances of prosecutorial misconduct. During the course of the trial, Gravley's counsel failed to object to, *inter alia*: (1) the initial introduction of Gravley's silence at his second interrogation; (2) Gravley's probation revocation hearing transcript, which dealt with an otherwise unrelated conviction for negligent vehicular homicide, being introduced as an exhibit; (3) the state's cross-examination

of Gravley about his post-arrest silence at his probation revocation hearing; (4) an erroneous jury instruction sought by the state that told the jury that it could consider Gravley's prior criminal record to explain what had taken place at trial; and (5) the state's final argument which invited the jury to consider constitutionally protected silence as evidence of Gravley's guilt and recent fabrication. Counsel's failure to recognize that the prosecution was continually making improper comments concerning Gravley's post-arrest silence was a critical error, *especially since Gravley's credibility was such an important issue in the case*.

*Id.* at 785-786 (emphasis added).

Here, nothing was more important to Purkey's case than his own credibility. *See, e.g.,* Tr. 1104 ("It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey") (emphasis added). The government sought the upper hand by misleading the jury to believe that Purkey's recantation of the kidnaping had come not two years before trial but *right before trial*. Counsel's only reaction to the government's blatant misconduct came in final argument:

> The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnaping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman…. But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnaping. They knew about it.

Tr. 1106.

This late argument by counsel did nothing to remove the taint conveyed by the government's deceptive tactic. Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). This is particularly true when a prosecutor misrepresents evidence. Juries are generally confident that a prosecuting attorney is faithfully observing his obligation as a

52

representative of a sovereignty. *Washington v. Hofbauer*, *supra* (citing *Berger v. United States*, 295 U.S. 78, 84 (1935)).

This Court must assess whether any given strategy not to object was constitutionally deficient. *Washington*, 228 F.3d at 704. In *Washington*, defense counsel explained his failure to object as part of a broader strategy to show that his client had such a bad character "that it was so bad that this young lady would have a real reason to make up something of this nature." *Id.* at 705, fn. 7. But,

> an objection would have prompted the judge to inform the jurors that, counter to the prosecutor's suggestion, they could not convict Washington because he was the "type" of person who would commit the alleged crime; we then would presume that the jury heeded that instruction in rendering its verdict. On the other hand, Keston's silence allowed the prosecutor's improper use of that evidence, as well as its improper suggestions to the jury of how to consider that evidence, to go uncorrected. For this reason, and because this was a close case riding on Washington's credibility..., Washington was prejudiced by his counsel's failure to object to the closing argument.

*Id*. at 705.

Similarly, here, this was a close case riding entirely on Purkey's credibility. Counsel's defense strategy was to refute the kidnaping element of the charge by attacking it head-on. *See, e.g.,* Tr. 408, 411, 413. Indeed, he called the defense investigator to help with that. Tr. 893-900. Objecting to the government's misconduct would have supported that theory. It is often asserted that a prompt objection would only highlight the damaging information and that a curative instruction would not unring the bell,[17] but "doubts over the effectiveness of objections and curative instructions would preclude ineffectiveness claims in every case such as this, no matter how

---

[17]Such was argued in *Washington*, but as the Sixth Circuit noted, "Under this analysis, if [counsel] truly worried that the impropriety was too great for an instruction to overcome, he should have objected and called for a mistrial, rather than chosen not to object at all." 228 F.3d at 706, n.10.

outrageous the prosecutorial misconduct might be." *Washington*, 228 F.3d at 706. The simple fact

is that there is no reasonable strategy for not objecting to correct the government's gross misconduct,

and counsel's failure to do so did irreparable harm to Purkey.

**B.      Appellate Counsel were Ineffective in Failing to Challenge the Government's Deliberate Misconduct on Appeal**

There is no constitutional right to an appeal; that right is statutorily created. *McKane v.*

*Durston*, 153 U.S. 684, 687 (1894). Where an appeal is granted by statute, equal protection and due

process converge to require the assistance of an effective attorney. *Smith v. Robbins,* 528 U.S. 259,

276 (2000). In the non-capital context, appellate counsel need not raise every non-frivolous claim

of error. *Evitts v. Lucey,* 469 U.S. 387, 394 (1985) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).

However,

> the penalty of death is qualitatively different from a sentence of imprisonment,
> however long. Death, in its finality, differs more from life imprisonment than a 100-
> year prison term differs from one of only a year or two. Because of that qualitative
> difference, there is a corresponding difference in the need for reliability in the
> determination that death is the appropriate punishment in a specific case.

*Strickland*, 466 U.S. at 715 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976))

(plurality). The ABA Guidelines take into account this need for heightened reliability in capital

cases in identifying what a reasonably competent appellate attorney must do in a capital case.

> Post-conviction counsel should seek to litigate all issues, whether or not previously
> presented, that are arguably meritorious under the standards applicable to high
> quality capital defense representation, including challenges to any overly restrictive
> procedural rules. Counsel should make every professionally appropriate effort to
> present issues in a manner that will preserve them for subsequent review.

In discussing the precise duties of appellate counsel in the post-conviction setting, the ABA

commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post-

54

001882

conviction counsel, in a manner that maximizes the client's ultimate chance of success." 2003

Guideline 10.15.1 Commentary:

> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. *"Winnowing" issues in a capital appeal can have fatal consequences.* Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. *When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.*

*Id.* (footnote omitted) (emphasis added).

Appellate counsel in capital cases must raise all arguable legal issues for the client; nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much more is required); *accord Thompson v. State* 492 N.E.2d 264, 278 (Ind. 1986) (appeal counsel simply listed possible errors for the court to independently review). Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in

001883

failing to raise *Apprendi*[18] error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction).

In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d at 657. Movant must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*, 466 U.S. at 687-88. As fully discussed, *supra*, the ABA Guidelines provide the best glimpse at what level of performance is required to meet the objective standard of reasonableness. One court has identified the following questions as relevant to the reasonableness inquiry:

(1)    Were the omitted issues "significant and obvious"?

(2)    Was there agreeably contrary authority on the omitted issues?

(3)    Were the omitted issues clearly stronger than those presented?

(4)    Were the omitted issues objected to at trial?

(5)    Were the trial court's rulings subject to deference on appeal?

(6)    Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7)    What was appellate counsel's level of experience and expertise?

(8)    Did the petitioner and appellate counsel meet and go over possible issues?

(9)    Is there evidence that counsel reviewed all the facts?

(10)   Were the omitted issues dealt with in other assignments of error?

---

[18]*Apprendi v. New Jersey*, 530 U.S. 466 (2000).

56

> (11)    Was the decision to omit an issue an unreasonable one which only an
> incompetent attorney would adopt?

*Whiting v. Burt,* 395 F.3d 602, 616 (6th Cir. 2005) (citing *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th

Cir. 1999)).

> But, what about prejudice?

> Although [analyzing for prejudice] necessarily involves an evaluation of the
> underlying claims, it does *not* require a decision on or a determination of these
> issues. All that is required is a determination that, based on the nature of the
> underlying claims, there is "a reasonable probability that, but for his counsel's
> [failings] . . ., [the defendant] would have prevailed on his appeal."

*Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004) (citing *Strickland, supra*); *accord Roe v. Delo*, 160

F.3d at 420.

Thus, "[Purkey] must show that there is 'a reasonable probability' – 'a probability sufficient

to undermine confidence in the outcome,' but less than a preponderance of the evidence – that his

appeal would have prevailed had counsel's performance satisfied constitutional requirements."

*United States v. Cross*, 308 F.3d 308, 315 (3rd Cir. 2002) (citing *Strickland*, 466 U.S. at 694-695)

("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even

if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the

outcome").

> The assessment of prejudice should proceed on the assumption that the decision
> maker is reasonably, conscientiously, and impartially applying the standards that
> govern the decision. It should not depend on the idiosyncracies (sic) of the particular
> decision maker, such as unusual propensities toward harshness or leniency. Although
> these factors may actually have entered into counsel's selection of strategies and, to
> that limited extent, may thus affect the performance inquiry, they are irrelevant to the
> prejudice inquiry.

*Strickland*, 466 U.S. at 695; *accord Roe v. Delo,* 160 F.3d at 420 ("Our review of these cases leaves

us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been

57

raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received constitutionally ineffective assistance of counsel").

A reasonably competent attorney would have presented this issue on appeal. Counsel was clearly aware of this issue – Purkey emphasized its importance at sentencing. *See* Transcript of Sentencing 3-5. As fully argued in point XII, the government's misconduct here was similar to that in *United States v. Bigeleisen*, 625 F.2d 203, 205 (8th Cir. 1980), and *United States v. Foster*, 874 F.2d 491 (8th Cir. 1988). There is a reasonable probability that had this misconduct been presented to the Eighth Circuit it would have reversed. The entire focus of this case was Purkey's credibility with regard to whether he had kidnaped Ms. Long or whether she went with him voluntarily. *See Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). At the very least, Purkey is entitled to a new appeal.

**XVI. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel tied Purkey's hands while testifying, telling him that he could not mention having told Dr. Peterson that he did not kidnap Ms. Long and that if he did, his entire testimony would be struck by the court.**

When trial began on October 29, 2003, Purkey's confession *was* the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. Without his confession, the government could not prove its case, and right out of the gate, Duchardt told the jury it would hear that Purkey did not kidnap Ms. Long.

58

**001886**

We're in federal court in Kansas City, Missouri and Wes Purkey is charged with having kidnapped Jennifer Long and having taken her by force to Kansas for the purpose of committing forcible rape. *That's not true. That didn't happen*.

Tr. 408 (emphasis added).

Did he kill her? The evidence will be yes. Did he kidnap her and take her there as the government has charged in this federal charge? No.

Tr. 411.

What you will hear in the evidence from witnesses who are friends of Jennifer Long, from family members, and from the information that Wes Purkey gave to the police, is that there was *no kidnaping*.

Tr. 413 (emphasis added). As addressed above, Duchardt's promise that Ms. Long's friends and family would refute the kidnaping obviously went unfulfilled. Interestingly, he did not promise the jury that it would hear *from Purkey* – just from Purkey's confession and Ms. Long's friends and family.

As it turned out, the jury did not hear Ms. Long's friends and family refute the kidnaping, and, on November 4, 2003, *immediately* before court reconvened to hear the defense case-in-chief, Duchardt informed Purkey that he would be testifying because the defense had nothing else on which to base its argument that there was no kidnaping. Oddly, O'Sullivan had absolutely no indication that she would be questioning Purkey until an hour before having to do so. Duchardt told her she would be conducting the direct examination of Purkey at the same he told Purkey he had to testify. O'Sullivan had *less than one hour* in which to prepare herself and her client. Understandably, that hour is something of a blur to O'Sullivan – "I recall preparing Mr. Purkey to testify during trial but I do not recall specifics of that." Exhibit 1 (emphasis added). During that hour, however, O'Sullivan warned Purkey not to mention that he told Dr. Peterson that he did not kidnap Ms. Long. *Cf.* Exhibit 1 ("I may have discussed with him not mentioning statements that he

59

made to Dr. Peterson during his direct testimony where the court had granted the government's motion *in limine*").[19]  Indeed, she told Purkey that if he mentioned his statements to Dr. Peterson, the court would strike his *entire* testimony.  Neither she, nor Duchardt prepared Purkey to face cross-examination.  He was left to flounder on his own.

When court convened, counsel made a record regarding Purkey's right to testify.  Tr. 887-888.  Duchardt asked whether he had discussed Purkey's *right* to testify with Purkey several times.  Tr. 887.  Purkey agreed, "I think the latest being about *15 minutes ago*."  Tr. 888 (emphasis added).  Purkey then said he had decided "to offer my testimony."  Tr. 888.

A similar situation arose in *Commonwealth v. Wesley*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 141 (Pa. C.P. 2005).  In *Wesley*, trial counsel met with Wesley "the day before trial, for approximately two hours in length."  *Id.* at 15.  "Despite the fact that the trial was set to commence in less than 24 hours, [Wesley] was not prepped to testify during that meeting."  *Id.*  Instead, counsel explained that, based on his years of experience, the trial would take two full days, and, since Wesley would testify last, counsel was confident Wesley would not testify on the first day.  *Id.* Counsel told Wesley that "they would prepare his testimony after the first day of trial."  *Id.*

Unfortunately for Wesley, the Commonwealth had rested with approximately 90 minutes remaining in the first day of trial.  *Id.* at 16.  Trial counsel asked for a side-bar in which he indicated he had two witnesses, including Wesley.  *Id.*  Counsel's explanation of his first witness' testimony

---

[19]On September 25, 2003, the government had moved *in limine* to preclude *Dr. Peterson* from testifying about Purkey's recantation. Doc. #337.  The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3. Right before trial, this Court sustained the government's motion.  Doc. #440.

prompted the Commonwealth to object that her proposed testimony was not irrelevant, and the court

agreed. *Id.* With only Wesley left to testify, counsel requested a recess:

> [Defense counsel]:   I think I asked for a recess.
>
> The Court:      No, not now.
>
> [Defense counsel]:   Then I need at least a half an hour with my client, because I really need to talk to him about some points and I -- I don't know. I thought this would go the full – I thought that my case would get going tomorrow. If I made a miscall, which obviously I did, it's my fault. I have him prepared to testify tomorrow morning….

*Id.* at 16-17. Interestingly, at the post-conviction hearing, counsel testified that Wesley "expected

and prepared to testify." *Id.* at 17. The court disagreed and granted Wesley a new trial, "15 minutes

of preparation is in no situation adequate to prepare a defendant to testify when on trial for rape,

sexual assault, burglary, and a myriad of other offenses." *Id.*

Likewise, here, it may well be that counsel and Purkey discussed his *right* to testify many

times throughout the proceedings; however, it is clear that counsel did not tell Purkey he had to

testify or prepare him to do so until an hour beforehand. An hour of preparation is in no way

adequate to prepare a defendant who is on trial for his life to testify. *Wesley, supra*.

What little "preparation" that was done was limited to telling Purkey what he could not say

lest his entire testimony be struck. Counsel may as well have told Purkey that he could not testify

at all. "A criminal defendant clearly cannot be compelled to remain silent by defense counsel."

*United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992); *see also Brooks v. Tennessee*, 406

U.S. 605 (1972) (whether to testify is not only an important tactical decision for a defendant, but

also a matter of constitutional right); *Harris v. New York*, 401 U.S. 222, 225 (1971) (criminal

defendant is privileged to testify in his own defense or to refuse to do so).

001889

It is important to remember that while defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense. *See Faretta v. California*, 422 U.S. 806, 820 (1975) ("The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant"); *Mulligan v. Kemp,* 771 F.2d 1436, 1441 (11th Cir. 1985) (Trial counsel "is still only an *assistant* to the defendant and not the master of the defense"). When an individual stands accused of criminal conduct, the choice to tell his side of the story has ramifications far beyond the more immediate goal of obtaining an acquittal. It is, after all, the *defendant's* day in court. The decision to testify in his own defense, like the decision to plead not-guilty and proceed to trial, provides the defendant with an opportunity directly to meet the charges against him. To tell a client it is his decision whether to testify but that if he does testify he cannot honestly and completely describe his defense is "to imprison a man in his privileges and call it the Constitution." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 280 (1942).

Here, O'Sullivan imprisoned Purkey. On direct examination, she elicited that Purkey had not kidnaped Ms. Long; that she had gone to his home voluntarily. Tr. 927-935. She did not, however, address what the State presented in its case-in-chief, namely that Purkey had waited to deny the kidnaping until "[r]ight before this trial." *See* Tr. 566. That left Purkey open to attack on cross-examination: "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008. Believing that his *entire* testimony would be struck if he documented his recantations, Purkey simply replied, "That's true." Tr. 1008. Of course, as addressed above, it was not true, and the government knew it wasn't true and so did counsel. Two years earlier, Speakman had reported that "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did. Purkey

62

001890

described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible." Exhibit 2.

"Proper planning prevents poor performance." *Wesley*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 1419 at 14-15. There was no proper planning here – indeed, news that O'Sullivan would be examining Purkey came as a complete shock to them both. There was absolutely no basis for O'Sullivan telling Purkey that any of his testimony, let alone his entire testimony, would be struck if he mentioned that he had recanted to Dr. Peterson. There was no reason that Purkey could not testify that he had denied the kidnaping from the time of the indictment to anyone who would listen – e.g., Duchardt, O'Sullivan, Armstrong and Dr. Peterson, and, indeed, Dr. Dietz. The entire basis for the government's motion *in limine* was that it needed a chance to cross-examine Purkey on his recantation not that his recantation was not admissible through himself. Doc. #337 at 3. The gag-order that counsel imposed on Purkey denied him a fair trial and was not the result of any reasonable strategic or tactical decision. This Court should vacate his conviction and death sentence.

## XVII. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to call Dr. Stephen E. Peterson to testify that Purkey had denied kidnaping Ms. Long when he had interviewed Purkey in 2002.

In December, 1998, Purkey told lead investigator Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her. But, as addressed above, following indictment, he recanted the kidnaping.

Purkey continued to deny the kidnaping throughout the course of his case. On August 13, 2003, Dr. Peterson authored his report, which detailed his work on Purkey's case. He had interviewed Purkey four different times in late-2002: September 19, 2002; October 10, 2002;

63

001891

November 6, 2002; and December 30, 2002. During those interviews, Purkey told Dr. Peterson that Ms. Long went with him voluntarily. Exhibit 23 at 45-46.

Because of Dr. Peterson's August 13th report, on September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during the various interviews that he had not kidnaped Long. Doc. #337. In that motion, the government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3.

Right before trial, this Court sustained the government's motion. Doc. #440. Trial began on October 29, 2003, and, immediately, government counsel elicited from it's lead investigator and member of the prosecution team that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long. Tr. 566. Then, during cross-examination of Purkey, government counsel asserted, "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008. Believing O'Sullivan that his *entire* testimony would be struck if he documented his recantations, Purkey simply replied, "That's true." Tr. 1008. Not only did defense counsel not correct this on re-direct, they did not rebut it by calling Dr. Peterson to testify. This failure amounted to ineffective assistance of counsel.

It is true that counsel's failure to call a witness "is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing." *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989). Oddly, here, however, counsel's defense strategy was to refute the kidnaping element of the charge by attacking it head-on. *See, e.g.,* Tr. 408, 411, 413. Indeed, he called the defense investigator to help with that. Tr. 893-900. And, as addressed above, he told Purkey an hour before

001892

calling him to the stand that he had to testify because the defense had no other means of refuting the kidnaping.  Calling Dr. Peterson to testify about Purkey's prior consistent statement in order to rehabilitate Purkey would have supported counsel's defense theory and bolstered Purkey's credibility which was central to his defense.

Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited.  *Tome v. United States*, 513 U.S. 150, 157 (1995). A trial witness's prior consistent out-of-court statement, however, is *not hearsay* if it is "offered to rebut an express or implied charge against the declarant of recent fabrication…." *United States v. Bercier*, 2007 U.S. App. LEXIS 25490 (8th Cir. 2007) (quoting FRE 801(d)(1)(B)). In *Tome*, resolving a conflict in the circuits, the Court held that, to be admissible as non-hearsay under Rule 801(d)(1)(B), a prior consistent statement must have been made "before the charged recent fabrication."  513 U.S. at 167.

In *United States v. Street*, 66 F.3d 969, 976 (8th Cir. 1995), Ranger Coe described Street[20] as having spoken many obscenities. On cross-examination, Street brought out that Coe had made no mention of such obscenities in his grand jury testimony.  *Id.*  In redirect-examination of Coe, the government introduced into evidence Coe's report, which was written shortly after the incident.  *Id.* at 977.  In it, Coe described Street's obscene statements in virtually the same terms that he testified to at trial.  *Id.*  On appeal, Street sought reversal, arguing that Coe's report constituted inadmissible hearsay.  *Id.*  The Eighth Circuit disagreed, "The statement was offered to rebut a charge of recent fabrication of testimony and was consistent with Coe's testimony at trial."  *Id.*

---

[20]Street was convicted of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with park rangers while they were engaged in or on account of the performance of their official duties.  18 U.S.C.S. § 111(a).

**001893**

Here, Dr. Peterson's testimony would have been admissible on this same ground. It would have described Purkey's prior consistent out-of-court statement, offered to rebut the government's unfounded charge that Purkey had fabricated his recantation "[r]ight before this trial." Dr. Peterson could have testified that Purkey told him a year before trial that: Purkey invited Ms. Long to party with him, thinking he was talking to a prostitute. Exhibit 23 at 45. "[She] wanted to go to Kansas City, Kansas with him." *Id.* at 46. He told the FBI that he kidnaped her, however, so that he would get a "federal crime of kidnaping." *Id.*

These prior consistent statements came long before the charged recent fabrication, and reasonably competent attorneys would have offered them. Nothing was more important to Purkey's case than his own credibility. *See, e.g.,* Tr. 1104 ("It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey.") (emphasis added). The government sought the upper hand by misleading the jury to believe that Purkey's recantation of the kidnaping had come not two years before trial but *right before trial*. And the simple fact is that there is no reasonable strategy for not calling Dr. Peterson, who was ready, willing and able to testify. Counsel's failure to do so did irreparable harm to Purkey. This Court should vacate Purkey's conviction and death sentence.

66

001894

**XVIII.**  **Purkey was denied his right to due process of law when the court accepted the jury's verdict finding Purkey guilty of kidnaping resulting in death because no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long from Missouri and forced her to go to his home in Kansas.**

As addressed above, in December, 1998, Purkey told Tarpley and Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas. He lied. He lied so that it would be a federal crime and he could get out of the cesspool of the Kansas Department of Corrections.  Nearly three years later, in October, 2001, Purkey was indicted for the kidnaping, rape, and murder of Ms. Long.  The government, however, had absolutely no evidence of a kidnaping *except* Purkey's confession.  Its entire case rested on that.

A defendant may not be convicted based solely on his own admissions.  *Opper v. United States,* 348 U.S. 84 (1954).  But the *Opper* Court rejected the traditional understanding of the *corpus delicti* rule, and held, instead, that the corroborating evidence need not prove the essential elements of the crime. *Id.* at 93.  Rather, the corroboration must prove that the confession itself was reliable, and must prove any elements of the crime to which the defendant did not confess. But the confession, if proven reliable, may serve as the only evidence reaching the *corpus delicti*. *See id.* at 93-94; *see also Smith v. United States*, 348 U.S. 147, 156 (1954) ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused").

*Opper*, then, imposes a "two-pronged" corroboration requirement on the government.  *United States v. Lopez-Alvarez,* 970 F.2d 583 (9th Cir. 1992).  While the Government need not introduce independent evidence of the *corpus delecti* in conformance with the traditional test, "it must introduce sufficient evidence to establish that the *criminal conduct at the core* of the offense has

67

occurred." *Id.* at 592 (emphasis added).  Additionally, the Government "must introduce independent evidence tending to establish the *trustworthiness of the admissions*, unless the confession is, by virtue of special circumstances, inherently reliable." *Id.* (emphasis added).

Here, the criminal conduct at the core of the offense was the alleged kidnaping of Ms. Long. Without a kidnaping, the government had absolutely no case.  Yet, the only evidence of a kidnaping is Purkey's confession, and no reasonable argument can be made that his confession was trustworthy.  Indeed, as addressed above, less than a month after it obtained its indictment, the government knew from its star witness, Michael Speakman, that Purkey denied kidnaping Ms. Long.

In *United States v. Norris*, 428 F.3d 907, 910 (9th Cir. 2005), officers went to Norris's home to ask him about allegations that he had sexually abused his niece.  "Norris informed the officers that he had no problem talking to them."  *Id.*

> Norris was calm and cooperative. He admitted having sexual contact with the victim on November 25, 2000. Norris stated that he put his penis between the little girl's legs, touching her vaginal area and rubbing back and forth. He went on to describe a similar incident of sexual contact with T.V. that occurred sometime during the summer of 2000. Norris stated that during the incident that occurred in the summer, he also used his hands to touch the victim's vaginal area.

*Id.* at 911.  Count two charged Norris with causing contact between his penis and T.V.'s vulva during the summer of 2000.  *Id.* at 914.  "However, the government produced no evidence to corroborate Norris's confession that the core of the act, Norris's touching of his niece's vulva with his penis during the summer of 2000, actually occurred."  *Id.* at 915.  On several occasions, when asked by the government how many times Norris touched her "private" with his "dick," the girl responded "once."  *Id.*  The only other evidence presented by the government that the sexual act alleged in count two actually occurred was the statement by the girl's mother that the girl stayed with Norris at times during the summer of 2000.  *Id.*  This evidence did not sufficiently corroborate

68

001896

Norris's confession regarding the sexual misconduct, and the court reversed Norris's conviction on count two. *Id.* at 915-916.

In *Gonzalez-Jasso v. Rogers*, 264 F.2d 584, 585 (D.C. Cir. 1959), Gonzalez-Jasso was born of Mexican parents in El Paso, Texas, and thereby became a dual national of the United States and Mexico. When he was eleven, he moved with his parents to Mexico. *Id.*  On three separate occasions, he sought to re-enter the United States from Mexico, and each time, he was examined under oath before a Board of Special Inquiry and admitted in response to questions that, on some undetermined date in 1944, he had voted in a Mexican election. *Id.*

In June, 1955, Gonzalez-Jasso entered the United States at El Paso, representing himself to be an American citizen. *Id.* at 586.  Alleging that Gonzalez-Jasso was not a citizen, but an alien without proper documentation, the government instituted deportation proceedings. *Id.*  At the deportation hearing, he acknowledged his prior admissions before the Boards of Special Inquiry, but testified that those admissions were untrue and that in fact he had not voted in the 1944 Mexican election or in any other Mexican election. *Id.*  He tried to explain his reasons for making the prior admissions and offered evidence that he had been ineligible to vote in the 1944 Mexican election. *Id.*  The Government offered no evidence other than the records of the Boards of Special Inquiry, and the Special Inquiry Officer found that Gonzalez-Jasso had lost his U.S. citizenship. *Id.*

> The only evidence to show that [Gonzalez-Jasso] voted in the Mexican elections came from his own lips, and was later *repudiated from the same source*. The earlier statements are of course receivable in evidence. But to establish a sound basis for expatriation, these statements must be satisfactorily corroborated, and the totality of the evidence must rise to the standard set by the Supreme Court.

*Id.* at 587 (emphasis added).  Rejecting the idea that his admissions were trustworthy simply because they had been made under oath, the court of appeals held that "there is no sufficient evidentiary basis

001897

for concluding that [Gonzalez-Jasso] voted in the 1944 Mexican elections and thereby expatriated himself.  *Id.*[21]

The same can be said here.  Here, the only evidence that Purkey kidnaped Ms. Long came from his own lips, and was later repudiated by that same source.  Indeed, here, the corroborating evidence led inextricably to the inference that Ms. Long voluntarily accompanied Purkey to his Kansas home.  Purkey fabricated this story to create a federal crime so that he would not spend the rest of his life in the Kansas state prison system.  Purkey knew that Ms. Long drank gin and orange juice; he knew that she was having trouble in school; and Ms. Long did not leave when she had the chance, e.g., when she used the rest room at the convenience store on Highway 7 and when Purkey had to stop at various stop lights along Highway 7.

The government clung to Purkey's confession because that's all it had.  Rather than offering substantial evidence to corroborate Purkey's false confession, the government simply undertook to convince the jury that Purkey's repudiation of the kidnaping was unbelievable.  It accomplished that feat by misleading the jury to believe that Purkey repudiated the kidnaping, not two years before trial, but "[r]ight before this trial." Tr. 566.

But for the government's misleading tale of deceit, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long.

**XIX.   Purkey was denied his right to effective assistance of counsel when appellate counsel failed to argue that no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

---

[21]Pointing to the rule announced in *Opper,* the court noted, "We need not go so far as to say that these rules, or any others in the field of criminal law, are directly applicable to cases like the present. But they provide a helpful analogy. If uncorroborated admissions are insufficient to convict a man of a crime, they should hardly suffice to deprive him of his citizenship."  *Id.*

70

001898

As fully discussed in point XV, appellate counsel must render effective assistance. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). *See Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute).

Appellate counsel has a duty to "proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chance of success." 2003 Guideline 10.15.1 Commentary. Here, counsel omitted the most significant issue that can be raised for a criminal defendant – the fact of his innocence of the crime charged. "[I]f the evidence introduced at trial was insufficient to sustain the conviction, trial counsel's failure to argue this issue on appeal necessarily amounted to ineffective assistance of counsel." *Commonwealth v. Cardenuto*, 548 N.E.2d 864, 867 (Mass. 1990); *accord Commonwealth v. Cormier*, 668 N.E.2d 1326, 1327 (Mass. App. Ct. 1996) ("the ineffectiveness of counsel in failing to argue the sufficiency of evidence on appeal necessarily also resulted in the failure to raise on appeal the double jeopardy argument that, if the evidence was insufficient to sustain the conviction, the defendant could not be retried").

As fully discussed in point XVIII, a defendant may not be convicted based solely on his own admissions. *Opper v. United States,* 348 U.S. 84 (1954). Purkey was, and reasonably competent attorneys would have challenged the validity of his conviction on appeal. *See United States v. Lopez-Alvarez,* 970 F.2d 583 (9th Cir. 1992).

In *Fagan v. Washington*, 942 F.2d 1155, 1156 (7th Cir. 1991), Fagan was shot in the back, but not seriously injured, by a member of a rival Chicago street gang. Two nights later Fagan met

71

with other members of his gang, and they decided to seek revenge. *Id.* Between six and thirteen

gang members, including Fagan and someone called "Dede," went to a game room where the rival

gang hung out. *Id.* A dozen or so people were standing on the sidewalk outside the game room.

*Id.* Most of the Disciples, including Fagan and Dede, walked past this other group and then, when

they were as much as forty-five feet away, Fagan and Dede turned and started shooting. Fagan

wielded a .22 caliber rifle and Dede carried a shotgun. *Id.* Both fired several shots before fleeing.

*Id*. When the melee was over, two people were wounded and one – Billy Green – was dead. Green

was found on the sidewalk in front of the game room.

> It was for the murder of Green, together with lesser crimes related to that murder,
> that Fagan was tried in a bench trial, convicted, and sentenced. But Green was killed
> not by a .22 caliber rifle or by a shotgun but by a single shot from a .38 caliber pistol
> that  someone – obviously not Fagan – pressed against his back before firing.

*Id.*

Under Illinois law, "a person is legally accountable for the conduct of another when . . .

either before or during the commission of an offense, and with the intent to promote or facilitate

such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning

or commission of the offense." *Id.* (citation omitted).

> Their common design embraced the killing of Billy Green on the sidewalk in front
> of the game room by any member of the group. But not by a nonmember. The
> judge did not mention or, as we read his words, even allude to that possibility.
> Instead he assumed, incorrectly in our view, that the bullet that killed Green must
> have come from a gun fired by one of the Black Gangster Disciples. He may have
> forgotten that he had excluded from evidence a bit of hearsay that another Black
> Gangster Disciple besides Fagan and Dede had been armed.

*Id.* at 1160. Fagan had a winning claim for his direct appeal, but his lawyer failed to raise it. *Id.* at

1157. No tactical reason – no reason other than oversight or incompetence – has been or can be

72

assigned for the lawyer's failure to raise the only substantial claim that Fagan had. *Id.* Fagan was entitled to his freedom, and so is Purkey.

Here, as addressed above, the only evidence that Purkey kidnaped Ms. Long came from his own lips, and was later repudiated by that same source. *See Gonzalez-Jasso v. Rogers*, 264 F.2d 584, 587 (D.C. Cir. 1959) ((The only evidence to show that [Gonzalez-Jasso] voted in the Mexican elections came from his own lips, and was later *repudiated from the same source*. The earlier statements are of course receivable in evidence. But to establish a sound basis for expatriation, these statements must be satisfactorily corroborated, and the totality of the evidence must rise to the standard set by the Supreme Court.").

But for the government's deceit in misleading the jury to believe that Purkey repudiated the kidnaping, not two years before trial, but "[r]ight before this trial," Tr. 566, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long. Nothing but oversight or incompetence can explain counsel's failure to challenge the sufficiency of the government's evidence on appeal. Had it been raised there is a reasonable probability that Purkey's conviction would have been vacated.

73

**XX.    Purkey was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence.**

The Federal Death Penalty Act of 1994 is a weighing statute. In deciding whether to recommend the death penalty the jury must weigh the aggravating circumstances and mitigating circumstances and it can only recommend the death penalty if the aggravating circumstances sufficiently outweigh the mitigating circumstances. *See United States v. Hammer*, 404 F. Supp. 2d 676, 801 (D. Pa. 2005). Under this sort of system, "the failure appropriately to consider mitigating circumstances can have an adverse affect on the weighing process and result in an inappropriate sentencing outcome." *Id.* Errors regarding either aggravating factors or mitigating factors "conceivably could distort the weighing process, thus calling into question the propriety of a death sentence." Lisa R. Duffet, Habeas Corpus and Actual Innocence of the Death Sentence After *Sawyer v. Whitley*: Another Nail Into the Coffin of State Capital Defendants, 44 Case W. Res. L. Rev. 121, 148 (1993).

Hammer argued that "the jury failure to find, consider and weigh undisputed or conceded mitigating factors is a circumstance that render's Hammer's sentence arbitrary." *Hammer*, 404 F. Supp. 2d at 690. There, the 2255 court made the following findings:

**DD. The Erroneous Findings Relating to Mitigating Circumstances.**

1697. During the Government's closing argument on July 21, 1998, the prosecutor stated that "Mr. Hammer has no cognitive disorders."

1698. No evidence was presented at the time of trial in 1998 directly rebutting Dr. Gelbort's testimony that Mr. Hammer suffered from cognitive disorders or deficits.

1699. Although the testimony of Dr. Gelbort relating to cognitive disorders or deficits was not rebutted by the Government, eleven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that he suffered from cognitive deficits.

74

1700. Although the evidence presented at the trial indicating that Mr. Hammer was sexually abused as a child was not rebutted by any evidence presented by the Government, six jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that as a child he was a victim of sexual abuse.

1701. Although the Government during its closing on July 21, 1998, conceded that Mr. Hammer had done certain good deeds in his life, seven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that even though incarcerated for most of his life he had managed to go some good things.

1702. During the penalty-phase proceeding on July 9, 1998, Dr. Mitchell was asked the following question:

> Based on your knowledge of Mr. Hammer to a reasonable degree of scientific certainty and psychological certainty, does he right now suffer from a major mental disease or defect as characterized in the DSM?

1703. Dr. Mitchell answered that question in the affirmative and stated that his diagnosis was major depressive disorder. Id.

1704. No evidence was presented at the time of trial rebutting Dr. Mitchell's testimony that Mr. Hammer suffered from a major mental disease or defect.

1705. Although no evidence was presented by the Government rebutting Dr. Mitchell's diagnosis, twelve jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that he suffers from a major mental disease or defect.

*Id.* at 790-791 (internal record citations omitted).  From this, the district court concluded that "The jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective."  *Id*. at 801.  Consequently, Hammer received a new trial.  *Id.*[22]

Purkey's case is even worse than Hammer's.  Here, the jury refused even to *acknowledge* the obvious mitigating factors.  The verdict form required the jury – in accord with 18 U.S.C. 3593(d) and (e) – to account that it had indeed lawfully considered the evidence in mitigation presented by Purkey.  Doc. #487.  The jury, however, left blank the entire section of the verdict form

---

[22]The government's appeal is pending before the Third Circuit in *United States v. Hammer*, No. 06-9001.

75

related to findings upon mitigation evidence. Doc. #487. It failed to *acknowledge,* let alone *consider*

the following obvious evidence in mitigation:

* * *

11.    Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12.    As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13.    While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14.    While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15.    While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16.    Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

* * *

18.    The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21.    Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22.    Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24.    Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship,

76

001904

> particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27.    In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Doc. #484, pp. 33-36; Doc. #487, pp. 9-16. The government offered nothing to rebut these patently obvious mitigating factors.

It is one thing for a jury to decide not to give much if any weight to the evidence in mitigation; it is quite another for a jury to decide not to acknowledge that evidence at all. The failure of Purkey's jury to vote even on obvious mitigating evidence violated the Due Process Clause of the Fifth Amendment and subjected Purkey to a death sentence based upon arbitrary factors in derogation of the Eighth Amendment. Like the *Hammer* court did, this Court should recognize that the failure to vote on obvious mitigating factors violates the Federal Death Penalty Act. This Court should then vacate Purkey's sentence of death and order a new sentencing trial.

**XXI.    Purkey was denied due process of law and his right to a fair and impartial trial during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to the cumulative effect of government counsel's deliberate misconduct.**

Repeated improper arguments and statements by the government during trial requires reversal when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The same standard applies when evidence is inappropriately placed before the jury. *Romano v. Oklahoma,* 512 U.S. 1, 12 (1994). *See also Middleton v. Roper*, 498 F.3d 812, 820 (8th Cir. 2007).

77

001905

In determining whether due process has been violated by the prosecutor's actions, the court must

(1) measure the type of prejudice that arose from the argument [and evidence]; (2) examine what defense counsel did . . . to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome . . . would have been different. . . .

*Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995). The court must also consider

(1) the cumulative effect of [the] misconduct; (2) the strength of the properly admitted evidence of [defendants'] guilt; and (3) the curative actions taken by the court.

*United States v. Hance*, 501 F.3d 900, 908 (8th Cir. 2007).

Each of the individual instances of government misconduct cited throughout the § 2255 motion and this memorandum were material and require reversal without reference to any other claim. In addition, however, the cumulative nature of the material prejudice from the government's misconduct, including from the misconduct cited during the direct appeal, requires reversal.

A prime example of the government's deliberate misconduct came early in the testimony of the very first witness, Bill Howard. Without warning to defense counsel, government counsel displayed a picture of Purkey naked from the waist up in order to call the jury's attention to his tattoos that included, among other things, a Nazi swastika and other arguably racist symbols. Tr. 419-20. While defense counsel's objection was sustained, the pictures were displayed before the jury for at least a couple of minutes, Exhibit 1, and no instruction was given to the jury. This was intentional misconduct because these pictures were not relevant to any issue in the trial. This conduct was also material during the trial because it unfairly purported to reflect on Purkey's character and, thus, his credibility.

78

Even after this Court sustained the objection to the pictures of the tattoos, government counsel returned to this improper theme in cross-examination of Purkey. Specifically, government counsel asked Purkey if Ms. Long saw the "Nazi Swastika on your arms?" Again, trial counsel's objection was sustained. This time the Court instructed the jury to "disregard the comment about the defendant's tattoos and swastika," but the damage had been done, such that this misconduct was still prejudicial. Tr. 1010-11.

When combined with the Government's repeated improper attacks on Purkey's credibility in falsely arguing that he had just recanted the kidnaping right before trial, it is clear that this misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *Darden*, 477 U.S. at 181. The only evidence of kidnaping was from Purkey's initial confession. Thus, his credibility was the primary issue at trial. Without these improper attacks on his credibility, there is a reasonable probability that the outcome would have been different and Purkey would have been acquitted.

Even assuming that Purkey was not prejudiced during trial, the prejudice was manifest in sentencing in violation of due process and in violation of the Eighth Amendment. "Misleading prosecutorial comment which negatively impacts, the need for reliable sentencing in capital cases offends the Eighth Amendment." *Miller*, 65 F.3d at 683 (citing *Caldwell v. Mississippi,* 472 U.S. 320 (1985)).

Here, in cross-examining Dr. Peterson in sentencing about whether he was "aware [that Purkey] threatened to run my head through yesterday in court," government counsel again engaged in misconduct. While trial counsel objected and the court sustained the objection, the damage was again already done and the jury was not even given an instruction to disregard the allegation.

79

Finally, government counsel engaged in misconduct during cross-examination of Dr. Peterson in asserting that there was no "prior report" of Purkey having been the victim of sexual abuse. Tr. 1817. Government counsel was in possession of the Oregon Department of Corrections Records reflecting Purkey's prior report of being sexually abused as a child. Government counsel was also in possession of Dr. Peterson's report specifically citing these records. Thus, government counsel knew that a false perception was being created by the implication that Purkey had just "made up" this report in order to escape the death penalty. Just as the prosecution had during trial, government counsel deliberately created a false impression in order to cast doubt on Purkey's credibility and to negate a significant portion of his mitigation.

The cumulative impact of the government's repeated deliberate misconduct violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

**XXII. Purkey was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to the cumulative effect of counsel's deficient conduct and the resulting prejudice.**

As is addressed in Point II above, Purkey submits that this Court must apply a cumulative prejudice analysis in reviewing the claims of ineffective assistance of counsel. *See Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000); *Martin v. Grosshans*, 424 F.3d. 588 (7th Cir. 2005); *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). *But see Middleton v. Roper*, 455 F.3d 838, 850 (8th Cir. 2006).

Each of the individual instances of trial counsel's deficient conduct cited throughout the § 2255 motion and this memorandum were prejudicial and require reversal without reference to any other claim. In addition, however, the cumulative nature of the prejudice requires reversal.

With respect to prejudice in sentencing, the jury was deprived of powerful mitigation evidence due to counsel's failure to adequately investigate, counsel's unreasonable advice to Purkey that he should not testify in sentencing concerning his background and his remorse,[23] and this Court's error in excluding the testimony of Dr. Mark Cunningham regarding Purkey's fetal alcohol exposure. The prejudice was enhanced by this Court's error in limiting counsel's ability to impeach the government's psychiatrist, Dr. Park Dietz, concerning an error that the doctor made when testifying in the case of *Yates v. State,* 171 S.W.3d 215 (2005) in testifying that the facts of an episode of a television show on which he consulted, "Law & Order," were very similar to those in *Yates* when no such episode existed.

The prejudice from counsel's errors during trial require that Purkey's conviction be set aside. Even assuming, however, that the resulting prejudice from counsel's errors during the trial does not require reversal, the prejudice from these errors and the court's errors in sentencing, requires that Purkey's death sentence be set aside.

---

[23]This issue was raised as Claim XI in the § 2255 Motion.

81

## *Conclusion*

Based upon all of the above argument and the entire record of this prosecution, Purkey

respectfully requests that the Court vacate his conviction and sentence.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com

Gary E. Brotherton, Esq.
2101 Chapel Plaza Court, Suite 13
Columbia, Missouri  65203
(573) 875-1571  Phone
(573) 875-1572  Fax
GEBrotherton@LegalWritesLLC.com

By:    /s/ Teresa L. Norris
       Court-Appointed Counsel for Purkey

Dated: Columbia, SC
      November 30, 2007

82

001910

## Certificate of Service

This will certify that, on today's date, this Memorandum of Law was served upon the United States by filing via CM/ECF.

/s/ Teresa L. Norris
Teresa L. Norris

Dated: Columbia, SC
November 30, 2007

83

001911

**Attached Exhibits**

1)    Exhibit 26 – Declaration of Cornelius Peoples
2)    Exhibit 27 – Declaration of Melvin Lister
3)    Exhibit 28 – Declaration of Margaret Noe
4)    Exhibit 29 – Declaration of Evette Noe

84

**001912**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY IRA PURKEY,                )
                                  )
              Movant,             )
                                  )
       v.                         )   Case No: 06-08001-CV-W-FJG
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Respondent.         )

MOTION OF THE UNITED STATES FOR AN ORDER REQUIRING TRIAL COUNSEL,
MR. FRED DUCHARDT, TO PREPARE AN AFFIDAVIT IN RESPONSE
TO PURKEY'S ALLEGATIONS OF INEFFECTIVE ASSISTANCE OF COUNSEL FILED
PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

The United States of America by John F. Wood, United States Attorney, and Matt J.

Whitworth, First Assistant United States Attorney, respectfully request the Court to enter an

order requiring trial counsel for Movant Wesley Ira Purkey to prepare an affidavit in response to

Purkey's allegations of ineffective assistance of counsel.

In support, counsel for the United States states as follows:

1.     On October 16, 2007, Movant Wesley Ira Purkey, by and through counsel, filed a

Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States Code,

Section 2255. The motion was 56 pages long and raised a multitude of issues including multiple

allegations of constitutionally ineffective assistance of counsel during pretrial preparation, during

the jury trial, and on appeal. In his motion, Purkey was highly critical of trial and appellate

counsel, Mr. Fred Duchardt, claiming that his representation of Purkey was constitutionally

inadequate.

2.        On November 30, 2007, Purkey, by and through counsel, filed additional Suggestions in Support of his Motion to Vacate, Set Aside, or Correct Sentence.  Purkey's Suggestions in Support are 84 pages long and again raise a multitude of allegations claiming constitutionally ineffective assistance of counsel by trial and appellate counsel Fred Duchardt.

3.        On December 19, 2007, counsel for the United States filed a motion for extension of time to file a response to Purkey's Motion to Vacate, Set Aside, or Correct Sentence.  The United States has requested an additional 60 days within which to respond to Purkey's motion.

4.        In his motion, Purkey alleges the following claims relating to allegations of ineffective assistance of counsel:

     a.        Purkey claims he was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments due to counsel's failure to object to the government's deliberate misconduct during the trial and repeatedly referring to Purkey's desire to serve a life sentence in the United States petitionary as a desire to go to "club fed" and appellate counsel's failure to assert this ground on direct appeal;

     b.        Purkey alleges he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's unfulfilled and prejudicial promise to the jury during opening statement in the trial that Jennifer Long's friends and family would testify that there was no kidnaping;

     c.        Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to prepare and present evidence to rebut the uncorroborated self-serving testimony of government witness Michael Speakman;

     d.        Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to obtain the services of a mitigation specialist or otherwise adequately investigate, prepare and present mitigation evidence;

     e.        Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.;

2

f.       Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the testimony of Steven Peterson, M.D.;

g.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.;

h.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the lay testimony of Gary Hamilton and Angie Genail in mitigation;

i.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial;

j.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to advise him to testify in sentencing;

k.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to impeach Agent Tarpley's testimony that he had heard of Purkey's recantation "right before this trial.";

l.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to correct the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnaping for the first time because counsel both knew that Purkey had disclaimed the kidnaping since their very first meetings with him two years before trial;

m.      Purkey claims he was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments when counsel failed to object to the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnapping for the first time when appellate counsel failed to assert this ground on direct appeal;

n.      Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel tied Purkey's hands while testifying, telling him that he could not mention having told Dr. Peterson that he did not kidnap Ms. Long and if he did, his entire testimony would be struck by the court;

3

001915

o.   Purkey claims he was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to call Dr. Stephen E. Peterson to testify that Purkey had denied kidnaping Ms. Long when he had interviewed Purkey in 2002;

p.   Purkey claims he was denied his right to effective assistance of counsel when appellate counsel failed to argue that no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long from Missouri and forced her to go to his home in Kansas; and

q.   Purkey was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to the cumulative effect of counsel's deficient conduct and the resulting prejudice.

5.   In addition to the above allegations of ineffective assistance, Laura O'Sullivan, co-counsel to Mr. Duchardt both before and during the jury trial of this case, has filed an affidavit in support of Purkey's motion in which she is quite critical of Mr. Duchardt's representation of Purkey.

6.   The United States will be able to draft a response to the majority of Purkey's claims.  However, in order to adequately respond to some of the allegations Purkey makes regarding ineffective assistance of counsel, the government needs an affidavit from trial counsel Mr. Fred Duchardt.  In particular, Mr. Duchardt's affidavit would be beneficial to the government in responding to Purkey's claims and to the Court in reaching a decision on the merits of Purkey's ineffective assistance of counsel allegations.  The United States believes that many of the allegations are, in all likelihood, the result of strategical decisions by counsel for which there are entirely reasonable explanations.

7.   The government has requested Mr. Duchardt to prepare an affidavit addressing the ineffective assistance of counsel issues.  However, on October 30, 2007, Mr. Duchardt provided counsel for the United States with a letter in which he declined to provide an affidavit responding

4

001916

to Purkey's allegations of ineffective assistance.  Mr. Duchardt indicated that before he could respond he would need to obtain an attorney-client waiver from Purkey or, in the alternative, if the Court ordered him to do so he would provide testimony or evidence in response to the allegations.  A copy of Mr. Duchardt's letter of 10-30-07 is attached as Exhibit A.

8.        Counsel for the United States does not believe that an affidavit in response to ineffective assistance claims would be a violation of the Missouri Supreme Court Rules of Professional Conduct.  However, Mr. Duchardt is adamant that he will not provide an affidavit absent a waiver or a court order.  In the *habeas* context, courts have implied a waiver of the attorney-client privilege when the petitioner "injects into [the] litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct."  *Johnson v. Alabama,* 256 F.3d 1156, 1178 (11th Cir. 2001).  But, this implied waiver has typically been the result of a petitioner's assertion of his own counsel's ineffectiveness. *See id.* " By alleging that his attorneys provided ineffective assistance of counsel in their choice of a defense strategy, [the petitioner] put at issue and thereby waived any privilege that might apply to the contents of his conversations with those attorneys to the extent those conversations bore on his attorneys strategic choices." *See also, Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974).  When a client calls into public question the competence of his attorney, the privilege is waived."  Implied waivers are consistently construed narrowly. *In re. Lott*, 424 F.3d 446 (6th Cir. 2005).  Courts "must impose a waiver no broader than needed to insure the fairness of the proceedings before it." *Bittaker*, 331 F.3d at 720 (*habeas* proceeding).  "A broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the

5

attorney-client and work product privileges are designed to promote." *Id.* at 722. *See, in re. Lott, supra.*

9.       The United States seeks a narrow waiver of the attorney-client privilege which would permit Mr. Duchardt to respond to the specific allegations of ineffective assistance by Purkey described above and further described in Purkey's motion and suggestions.

Based on the above reasons, the government respectfully requests this Court to order trial and appellate counsel, Mr. Fred Duchardt, to file a responsive affidavit to the specific allegations of ineffective assistance of counsel raised in Purkey's motion.

Respectfully submitted,

JOHN F. WOOD
United States Attorney

By      */s/ Matt J. Whitworth*

MATT J. WHITWORTH
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on January 3, 2008, to the CM-ECF system of the United States District Court for the Western District of Missouri and the undersigned hereby certifies that a copy of the foregoing was mailed to:

Gary E. Brotherton, Esq.
601 W. Nifong Boulevard
Building 1, Suite C
Columbia, Missouri 65203

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, South Carolina 29211

/s/ Matt J. Whitworth
MATT J. WHITWORTH
First Assistant United States Attorney

7

001919

## *FREDERICK A. DUCHARDT,  JR./ATTORNEY AT LAW*
## *P.O. BOX 349/KEARNEY MISSOURI 64060*
## *TELEPHONE 816-213-0782 FAX 816-635-5155*

October 30, 2007

Matt Whitworth
Deputy United States Attorney
400 E. 9th St., 5th Floor
Kansas City MO 64106

Dear Matt

I write to reply to your request that I provide to you a response to the 2255 petition filed by Wes Purkey.

Because I am not a party to the 2255 proceedings, and because of the confines of the attorney-client relationship which I have with Wes Purkey, I cannot respond to your request without direction from Wes and/or from the Court.  I have thus communicated with Wes and his attorneys regarding your request. If I receive permission from Wes, or if the Court orders me to do so, after hearing arguments by Wes' counsel, I shall provide whatever testimony or evidence which is deemed appropriate.

Meantime, I shall sit tight, and look forward to hearing from those of you involved in the case with further, more definitive, directions.

Yours truly

Frederick A. (Fred) Duchardt, Jr.

enclosures

1

001920

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY IRA PURKEY,                    )
                                      )
            Movant,                   )
                                      )
      v.                              )     Case No. 06-08001-CV-W-FJG
                                      )     Crim. No. 01-00308-01-CR-W-FJG
UNITED STATES OF AMERICA,             )
                                      )
            Respondent.               )

GOVERNMENT'S SUGGESTIONS IN OPPOSITION TO
MOTION UNDER 28 U.S.C. § 2255

      The respondent, the United States of America, appears by John F. Wood,

United States Attorney, and Matt J. Whitworth, First Assistant United States Attorney,

Western District of Missouri, and provides the following suggestions in opposition to

movant Wesley Ira Purkey's motion under 28 U.S.C. § 2255:

I.  **Background**

*A.    Procedural History*

      On October 10, 2001, a grand jury in the Western District of Missouri returned

a one-count indictment charging that on January 22, 1998, Wesley Ira Purkey,

kidnapped 16-year-old Jennifer Long and transported her from Kansas City, Missouri,

to Lansing, Kansas, for the purpose of forcible rape, resulting in the death of

Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d).   On

October 24, 2001, Purkey made his initial appearance before United States Magistrate

Judge Sarah W. Hays.  Purkey was arraigned on November 9, 2001, and entered a plea of not guilty to the indictment.

On November 7, 2002, a one-count superseding indictment was returned, charging the same crime as outlined in the initial indictment, but adding a "Notice of Special Findings" section, that included the intent factors and aggravating circumstances the grand jury found in support of the death penalty.

On November 21, 2002, the Government filed its "Notice of Intent to Seek the Death Penalty" against Purkey.

Purkey filed a multitude of pretrial motions, including a motion to suppress his confessions to law enforcement agents; a motion to prohibit the seeking of the death penalty as an alternative to the suppression of his statements; a motion to dismiss due to the destruction of defense evidence; a motion to prohibit the Government from seeking the death penalty due to the alleged unconstitutionality of provisions of the Federal Death Penalty Act; and a motion to strike duplicative aggravating factors.  All of these motions, as well as several others, were denied by this Court.

A jury was empaneled and trial commenced on October 28, 2003, before this Court.  On November 5, 2003, the jury found Purkey guilty of the kidnapping and murder of Jennifer Long.

The penalty phase of the trial began shortly thereafter.  On November 19, 2003, the jury unanimously concluded that the aggravating factors presented by the

-2-

001922

Government outweighed the mitigating factors submitted by Purkey and found that Purkey should be sentenced to death.

On January 23, 2004, following a denial of Purkey's motion for a new trial, this Court sentenced Purkey to death.

On February 2, 2004, Purkey filed his notice of appeal with the United States Court of Appeals for the Eighth Circuit. On November 7, 2005, the Eighth Circuit issued an opinion affirming Purkey's conviction and sentence in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005).

In his appeal to the Eighth Circuit, Purkey raised the following issues:

1.      Whether the district court correctly denied Purkey's motion to suppress his confessions where they were voluntarily made and he was never promised a life sentence.

2.      Whether the district court correctly denied Purkey's motion to prohibit the Government from seeking the death penalty as an alternative relief to the suppression of Purkey's statements where the confessions were voluntary and no promises were made that he would receive a life sentence in exchange for his confessions.

3.      Whether the district court correctly denied Purkey's motion to dismiss based on destruction of evidence where the testimony of the corrections officers were more credible than that of Purkey, there was no evidence to suggest the officers acted in bad faith or to suggest the notes possessed exculpatory value and despite the

-3-

destruction of the alleged notes Purkey was able to testify concerning his recollection of the interviews with investigators.

4.      Whether the district court properly denied Purkey's pretrial motion to prohibit the Government from seeking the death penalty due to Indictment Clause violations where the superseding indictment cured any defects and where the grand jury is not required to make findings on non-statutory aggravating factors or to make findings on the question of whether aggravating factors sufficiently outweigh mitigating factors.

5.      Whether the district court properly excluded jurors whose beliefs against capital punishment would have prevented or substantially impaired their ability to follow the law and the court's instructions.

6.      Whether the district court properly excluded the testimony of Dr. David Preston during the guilt phase of the trial where Dr. Preston was not qualified to testify as to Purkey's state of mind at the time of the offense or at the time of the confessions.

7.      Whether the district court correctly instructed the jury on the elements of the kidnapping statute where the instruction, in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.

8.      Whether the district court correctly denied Purkey's request for a mistrial where there was no prosecutorial misconduct and the district court's remedial actions cured any possible error.

9.      Whether the district court abused its discretion in refusing to allow Purkey to testify that his father had introduced him to prostitutes when he was a boy, where such testimony was irrelevant to the issue of whether Purkey had kidnapped the victim, Jennifer Long.

10.      Whether the district court properly excluded evidence of Government witness Michael Speakman's prior bad acts which did not result in a conviction and which did not, by their nature, tend to impugn his credibility.

11.      Whether the district court properly excluded the testimony of Jeanette Purkey regarding her alleged poisoning of Purkey where it was incompetent and unreliable and the testimony of Dr. Cunningham regarding Purkey's alleged fetal alcohol exposure where it was irrelevant, speculative and likely to mislead the jury.

12.      Whether the district court correctly denied Purkey's request for surrebuttal testimony in response to the testimony of Government expert Dr. Mayberg where the proffered testimony of defense expert Dr. Peterson offered nothing new and was merely cumulative.

13.      Whether the district court properly exercised its discretion when it limited impeachment of Dr. Park Dietz on a collateral issue involving an alleged mistake made by Dr. Dietz on a totally unrelated case.

14.      Whether the question regarding Dr. Peterson's opinion with regard to the death penalty was appropriate where the question was designed to show the possible bias of the witness.

-5-

15.   Whether the district court correctly refused to grant Purkey's request for allocution during the sentencing phase where a criminal defendant in a capital case has no due process right to make an unsworn statement before a jury that is not subject to cross-examination.

16.   Whether the district court properly denied Purkey's motion to strike aggravating circumstances as unconstitutionally duplicative where the factors were not duplicative and the court's instructions to the jury cured any risk that the weighing process would be skewed.

17.   Whether the district court's jury instructions requiring a sentence of death, if aggravating factors outweighed mitigating factors, were correct statements of law under the FDPA.

18.   Whether the district court correctly denied Purkey's request to require the jury to record its determinations regarding mitigating factors where the FDPA does not require a jury to make specific findings regarding mitigating factors.

19.   Whether the question concerning a threat made by Purkey during trial was proper, where it was asked in good faith and where the district court's remedial actions cured any possible error.

After his conviction and sentence were affirmative by the Eighth Circuit, Purkey next requested a review by the United States Supreme Court. On October 16, 2006, the Supreme Court denied Purkey's request for a writ of certiorari. *See Purkey v.*

-6-

*United States*, 127 S.Ct. 433 (2006).  On November 30, 2008, Purkey filed his current motion pursuant to 28 U.S.C. § 2255.

**B.**    ***Factual History – Guilt Phase Evidence***

    *1.*    *Disappearance of Jennifer Long*

On January 22, 1998, Jennifer R. Long, a 16-year-old sophomore at East High School in Kansas City, Missouri, attended her first two classes in the morning.  (Tr. 711, 858.)  Ms. Long apparently had a disagreement with some girls in her class and left school before the third hour. (Tr. 485, 930.)  Her mother, Glenda Lamont, reported her daughter missing to the Kansas City Police Department the same day.  (Tr. 864.)  Ms. Lamont and Ms. Long's father, William Long, searched desperately for their daughter for months, distributed missing person flyers, contacted her friends, but never saw their daughter after January 22, 1998.  (Tr. 848-49, 861, 864-67.)  Ms. Long's parents had no clue concerning the fate of their daughter until December 1998.  (Tr. 432.)

    *2.*    *Mary Ruth Bales Homicide*

Approximately nine months after Jennifer's disappearance, on October 27, 1998, Mary Ruth Bales, an 80-year-old Kansas City, Kansas, widow, called a plumbing company about a leaking pipe.  (Tr. 1215-18.)  The company sent Purkey, who had learned the plumbing trade while in prison.  (Tr. 914-15, 1218-19.)  Purkey went to Ms. Bales' home to diagnose the problem and agreed to make the necessary repairs.  (Tr. 1219-20.)   The next day, October 28, Purkey smoked crack cocaine with a

prostitute and then drove to the home of Ms. Bales with the prostitute in his work van.

While the prostitute waited outside the Bales residence, Purkey went inside intending

to rob Ms. Bales.  (Tr. 1222-28.)  After entering the residence, Purkey viciously

bludgeoned the 80-year-old grandmother to death with a claw hammer.  While Ms.

Bales lay dead in her bedroom, Purkey and the prostitute smoked crack cocaine and ate

food from Ms. Bales' kitchen.  (Tr. 1222-27.)  Purkey then left but later returned to

clean up the crime scene.  When he was apprehended by authorities, he confessed to

Ms. Bales' vicious murder.  (Tr. 1228-37.)[1]

Purkey pled guilty to the murder and aggravated robbery of Ms. Bales in

Wyandotte County, Kansas, district court on April 28, 2000.  (Tr. 985.)  Purkey

received a life sentence for this homicide and must serve at least 15 years before he will

be eligible for parole.  (Tr. 985.)

3.    *Purkey Contacts Authorities Concerning Jennifer's Disappearance*

On December 15, 1998, while awaiting trial on the Bales murder, Purkey sent

a letter to Detective Bill Howard of the Kansas City, Kansas Police Department stating

that he wished to discuss his involvement in the murder of a young woman he had

kidnapped from Missouri in January 1998, nine months before the murder of Ms. Bales.

(Tr. 421-22.)  After receiving the letter, Detective Howard met briefly with Purkey in

the Wyandotte County Jail.  Purkey informed Detective Howard he wanted to speak

---

[1]The jury did not hear the details of the Bales homicide until the sentencing
phase of the trial.

with an FBI agent. Purkey told Detective Howard that he wanted to confess because he was "pushing 50, that his life was pretty much over, that he didn't want to go back to the Kansas penitentiary system, and that he had a lot of enemies in the state pen and wanted to serve his time in the federal penitentiary." (Tr. 423.) Purkey thought the federal system would be more "comfortable." (Tr. 424.)

The next day, December 16, 1998, Purkey was interviewed by FBI Special Agent Dirk Tarpley and Detective Howard at the Wyandotte County Prosecuting Attorney's Office. Before the interview, Purkey was advised of his constitutional rights and signed a waiver form. (Tr. 426-27, 480-81.) Purkey signed the form and indicated he understood his rights. (Tr. 426-27.) Agent Tarpley informed Purkey that they could not discuss his involvement in the Bales murder because he was represented by counsel in that case. (Tr. 481.) Purkey agreed only to discuss the kidnapping and murder described in his letter of December 15. (Tr. 481.)

Purkey again told the investigators that he intended to plead guilty to the Bales homicide but feared spending the rest of his life in the Kansas Department of Corrections. Purkey explained that he had too many enemies in the state penitentiary. As a result, Purkey said he was willing to confess to the kidnapping, rape, and murder of a female from Missouri if he could serve his state time in a federal penitentiary. (Tr. 481-84.) During the initial interview, Agent Tarpley did not make any promises to Purkey concerning his sentence. (Tr. 482.) Purkey did not request a lawyer and there was no discussion concerning the death penalty. (Tr. 483.) Purkey wanted Agent

-9-

Tarpley to talk to the United States Attorney's Office but Agent Tarpley told him that he would not talk to the United States Attorney's Office until he knew what crime Purkey was confessing to in detail. Purkey then confessed and provided the details of the kidnapping, rape, murder, and dismemberment of 16-year-old Jennifer Long. (Tr. 484-88.)

Later that day, Agent Tarpley met with an AUSA from the District of Kansas to discuss the potential kidnapping case. Agent Tarpley testified there were no discussions concerning any potential sentence Purkey would receive and that the AUSA simply wanted more information and evidence to connect Purkey to the crime. (Tr. 489.)

Over the course of the next several days on December 17, 18 and 21, Purkey gave detailed confessions, including a handwritten confession on December 17. (Tr. 507, 555.) On each occasion Purkey met with investigators he was given *Miranda* warnings and acknowledged he understood his constitutional rights. Agent Tarpley testified Purkey wanted to spend his life sentence from the State of Kansas on the Bales murder in the federal penitentiary and that there were never any discussions at any time with Purkey concerning what his sentence would be for a kidnapping conviction. Purkey never was offered a life sentence in exchange for his confession to the kidnapping of Ms. Long. (Tr. 490, 567, 573, 597.)

Following Purkey's confession, investigators confirmed Ms. Long's disappearance on January 22, 1998. The victim's mother had reported her daughter

-10-

missing the same day.  Detective Howard obtained a photograph of the victim and prepared a photographic lineup.  Purkey was presented with the photographic lineup at the Wyandotte County Jail and immediately, without hesitation, identified Ms. Long as his victim.  (Tr. 432-35.)

    4.     *The Kidnapping, Rape, and Murder of Jennifer Long*

The investigation revealed that on January 22, 1998, Purkey had applied for a position as a plumber with the Roto Rooter plumbing company, located in Kansas City, Missouri.[2]  Purkey had an early morning interview and after a short tour of the facilities he left the building at approximately 8:45 a.m.  Purkey was driving a white 1988 or 1989 Ford Ranger pickup truck.  (Tr. 484-85.)  Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road.  (Tr. 925.)  Purkey then drove east on Truman Road and stopped at a grocery store for the purpose of purchasing some orange juice and gin to drink before heading back to his home in Lansing, Kansas.  (Tr. 485.)  At that point, Purkey observed a young white female whom he believed to be approximately 17 to 19 years of age.  During a conversation with the girl he learned that her name was Jennifer.  Purkey asked the girl if she wanted to get something to drink with him.  Jennifer then entered the pickup without, according to Purkey, any threats or force.  (Tr. 485.)

---

[2]Purkey's employment application was later recovered by investigators confirming that he applied for a job at Roto Rooter on January 22.  (Tr. 518; Gov. Exh. 31.)

-11-

001931

The two then drove to a liquor store a few miles away and purchased gin and orange juice. Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates. (Tr. 485.)

Purkey then informed Jennifer that he wanted to go to his home for a few minutes, which was in Kansas. Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off. At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer. Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck. (Tr. 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas. Purkey drove north on K-7 Highway to his home in Lansing. (Tr. 487, 493-94.) Upon arrival, Purkey parked in his garage, which was located behind his home. Purkey took Jennifer into his basement; she asked him to please take her back home. (Tr. 510.) Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor where he then raped her. (Tr. 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return. Jennifer told Purkey that she had been a virgin. This increased Purkey's fear. (Tr. 942.) Jennifer begged Purkey to let her leave. (Tr. 1017.) A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside of her body. (Tr. 942-43, 1017-18, 1024.) Following the murder, Purkey

-12-

put Jennifer into a large tool box designed to fit into the back of a pickup truck. (Tr. 1024-25.) Purkey changed his clothes and got rid of the victim's backpack. Purkey then drove to Snoopy's Bar in Lansing and had several drinks. (Tr. 1025-26.) Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.[3]

Purkey drove back to his home with the chainsaw and began the process of cleaning up the crime scene, wiping away the blood with water and bleach on multiple occasions. (Tr. 1026-27.) Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered the victim with the chainsaw while she was lying inside the tool box. (Tr. 1028-29.)[4] Purkey described in detail the dismemberment of the victim's body, indicating the chainsaw frequently became clogged with the flesh of the victim. (Tr. 1029.) Purkey put the body parts in plastic bags and mixed in leaves and debris from his back yard. (Tr. 1029-30.) Purkey burned the body parts in his fireplace. (Tr. 491-92, 1030.) Purkey also purchased two cords of wood and used diesel gasoline to accelerate the burning process. (Tr. 492, 646-47, 1030.)

---

[3]Investigators later recovered a copy of the receipt from Sears confirming Purkey had purchased the electric chainsaw on January 22, 1998. (Tr. 501, 1022, Gov. Exh. 24.)

[4]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe. Purkey gave the tool box to Mr. Howe following the murder. (Tr. 730-32, Gov. Exh. 30.) The box has several chainsaw cut marks in the bottom and on the sides. (Tr. 730, 810-18, 1029.)

-13-

001953

Purkey next cleaned up the chainsaw utilizing gasoline to remove the blood and human debris.  (Tr. 1032.)[5]  Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there.  (Tr. 648-49, 1030-31.)  Purkey also swept the ashes out of the fireplace after burning the victim's body parts.  The bones that did not burn up were crushed by Purkey with a hammer.  (Tr. 1033.)   The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998.  (Tr. 517, 1034.)

Purkey moved to Clearwater, a rural area south of Wichita, in March 1998, and rented a mobile home located on the property.  Purkey threw the bags with the ashes and bones of the victim into a septic pond located on the property.  During an interview with Agent Tarpley, Purkey drew a map with an arrow pointing to the area in the pond where he had thrown the bones of the victim.  (Tr. 543, 1034, Gov. Exh. 34B.)  The septic pond was later filled in with dirt by the owner of the property.  An FBI search team eventually excavated the pond, sifting approximately 80 tons of dirt, in an effort to locate the bones of Jennifer Long.  (Tr. 561-64.)  Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown the remains of the victim.  (Tr. 789.)  Human bones also were found in the sweepings from the ash pit of the fireplace at Purkey's former home.

---

[5]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley.  (Tr. 639-40, Gov. Exh. 26.)

-14-

001934

(Tr. 781-83.)  All of the bones recovered by the FBI appeared to have been burned. (Tr. 781-94.)  Purkey admitted the bones recovered from the septic pond were those of the victim.  (Tr. 1034.)

The FBI also recovered a burned ring from the ashes of the fireplace ash pit. The ring was shown to the father of the victim who told investigators it looked very similar to a ring his daughter wore on a chain around her neck.  (Tr. 846-47.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily.  (Tr. 934, 1014.)  Purkey's claim at trial was inconsistent with all of his previous statements to investigators in which he steadfastly insisted that he had kidnapped the victim.  By its verdict, the jury rejected Purkey's defense during the guilt phase of the trial returning a verdict of guilty on November 5, 2003.  The jury retired to deliberate at noon and delivered the guilty verdict at 2:40 p.m.  (Tr. 1138, 1141-42.)

## C.    *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase.  (Tr. 1210-1403.)  Purkey called 19 witnesses, including four doctors to testify concerning his alleged mental disorders.  (Tr. 1406-1955.)  In rebuttal, the Government called four expert witnesses, including three doctors, to rebut Purkey's diminished mental capacity and brain damage claims.  (Tr. 1962-2225.)

-15-

1.  *Purkey's Prior Criminal History*

Prior to Purkey's conviction for Jennifer's murder, he had spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for robbery, kidnapping, assault and firearms violations stemming from a 1981 crime spree; and the May 2000 conviction for the murder and robbery of Ms. Bales. (Tr. 975-86, 1211-14.) Purkey received a life sentence as part of his 1981 crime spree but was eventually paroled in March 1997 after serving approximately 16 ½ years on the life sentence.  (Tr. 985.)

2.  *Murder of Mary Ruth Bales*

As earlier stated, Purkey confessed to the beating death of Mary Ruth Bales, which occurred in October 1998, and later pled guilty; he was sentenced to a term of life imprisonment with eligibility for parole after 15 years. (Tr. 1238, 1243.) The jury heard testimony from Detective Howard concerning the gruesome beating of the 80-year-old victim.  She had defensive wounds on both of her hands, apparently trying to ward off the hammer blows from Purkey.  (Tr. 1236.)  She also had multiple wounds on her head.  Purkey caved in her cranium and her face utilizing the claw side of the hammer.  (Tr. 1237.)

-16-

### 3.    *Kidnapping and Shooting of Gregg Carlberg*

Gregg Carlberg testified that he was the victim of a kidnapping, aggravated battery, and aggravated assault by Purkey in 1980. Carlberg was kidnapped from a convenience store in the summer of 1980 in Wichita, Kansas. (Tr. 1245.) He then was driven to a wooded area by Purkey and an accomplice, robbed of $40, and subsequently shot in the head and shoulder while being forced to lie down in an abandoned bathtub in the woods. (Tr. 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (Tr. 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remains lodged in the back of his skull. (Tr. 1253-54.)

### 4.    *Aryan Brotherhood Membership*

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona prison in the early 1980s. (Tr. 1340-48, 1352-54, 1360.) Lucas also testified concerning the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. (Tr. 1361-67.)

### 5.    *Prison Sexual Assault of Gary Hatfield*

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified Purkey forcibly

-17-

sodomized him at knife point and then beat him in the kitchen of the prison camp where they were serving prison sentences.  (Tr. 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy allegation.  (Tr. 1315-17.)  He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees.  Purkey also was assaulted as a result of his cooperation by another inmate and suffered injuries.  Consequently, Porter decided to dismiss the sodomy charges against Purkey.  Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp.  In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault.  (Tr. 1318-29.)

### D.    *Mitigation Evidence*

Purkey called a large number of mitigation witnesses to testify during the sentencing phase of his trial.  Many of the witnesses testified about the difficult circumstances of Purkey's childhood and his neglectful, alcoholic mother, and abusive alcoholic father.  These witnesses included a prison psychiatrist, a criminal defense attorney who formerly represented Purkey, several former inmates who had previously been incarcerated with Purkey, a friend and pastor, a friend who was a tattoo artist, an administrator from the Hutchinson Correctional Facility who had supervised Purkey

-18-

while he was a custodian, a former parole officer from the State of Kansas, an aunt, a friend who was incarcerated with Purkey at the Hutchinson Correctional Center, Purkey's daughter, a brother, a prison minister, a clinical psychologist with the Missouri Department of Corrections, a correctional counselor from the United States Penitentiary at Leavenworth, a radiologist from Kansas University Medical Center, a forensic psychiatrist, and a clinical and forensic psychologist who testified as a mitigation specialist.

The first witness, Dr. William Grant, is a Bureau of Prisons psychiatrist. Dr. Grant testified that he had prescribed three medications to Purkey. Dr. Grant testified the medications were designed to address Purkey's depression, anxiety, and anger. (Tr. 1406-16.)

Dennis Messoline, a defense attorney who formerly represented Purkey against an allegation of a prison rape, testified on Purkey's behalf in an effort to discredit government witness Gary Hatfield. Hatfield accused Purkey of anally raping him at knife point while they were incarcerated together at a state prison camp in Oregon. Hatfield testified as an aggravation witness on behalf of the Government. Messoline testified that he was eventually able to have the rape charged dismissed. (Tr. 1422-48.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon was also called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was

-19-

001939

not a racist.  Vinson also testified that Purkey was not violent during his incarceration in Oregon.  (Tr. 1449-60.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon.  Purkey called Masterson to discredit Hatfield.  Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison.  Masterson also testified that he was the homosexual lover of Purkey for two and a half years.  (Tr. 1468-76.)

Linda Skeen, a friend of Purkey, testified that she was a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas.  Skeen testified that she was a friend of Purkey's while he was on parole in 1997 and 1998.  Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes".  (Tr. 1478-84.)

Patrick Howe, a friend of Purkey and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastika and Aryan Brotherhood tattoos.  Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. (Tr. 1485-90.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution.  Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight

-20-

001940

program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (Tr. 1491-98.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while Purkey was on parole he admitted to Gibbons that he was having a drug problem and sought to gain admission into a drug counseling program at the Kansas University Medical Center. (Tr. 1502-15.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father. She testified in detail about Purkey's neglectful and disadvantaged childhood. She further testified that when Purkey was five years old he could not speak words and would only grunt. She said that Purkey was a stutterer as he got older and that stuttering was a common trait of Purkey's family. Hotchkiss testified that Purkey's father, Jack, was an alcoholic, had suffered a head injury requiring a metal plate, suffered terrible headaches, and was always drunk. She also testified that Jack Purkey

-21-

001941

lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem. She further testified that Jack Purkey committed suicide in 1984. She further testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole. (Tr. 1520.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, also worked as a custodian with Purkey. Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility. He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison. Lopez also testified Purkey was not a racist and would help African-American inmates with legal work. He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison. Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much. (Tr. 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo. She testified Purkey's parents, Genails' grandparents, were alcoholics. She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child. She testified that she had a good and loving relationship with Purkey and he always had kept in contact

-22-

with her even though most of his adult life he had been incarcerated. She testified Purkey was a good grandfather to her son and that she would maintain a relationship with Purkey if he was given a life sentence. She testified that she loves her father and he is always supportive. (Tr. 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his step-father and Purkey's father. Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft and his step-father lived on skid row in Wichita after losing this job. He testified that Jack Purkey beat both he and Purkey and their mother frequently. He testified that Purkey's mother, Velma Purkey, would bring men home to have sex in front of both he and Purkey when they were children and in their teen years. He further testified their mother sexually abused them both. He also testified that both he and Wes had been diagnosed as bipolar. He testified that he also had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970s and had not been in trouble with the law since that time. He further testified that Purkey had volunteered to donate part of his liver to help his sick wife who had liver disease. (Tr. 1548-63.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison. He further testified in his belief that Purkey was a Christian and he was remorseful for his criminal conduct. (Tr. 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey and had

-23-

001943

administered neuropsychological tests to Purkey. Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior. He also testified that Purkey's IQ was 90. (Tr. 1577-1650.)

Purkey also called Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas. Mr. Russell testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations. He further testified that Purkey had submitted a request to have his tattoos removed. (Tr. 1651-63.)

Purkey also called as an expert witness Dr. David Preston. Dr. Preston is a radiologist from the Kansas University Medical Center specializing in nuclear medicine. Dr. Preston testified that he had taken brain scans of Purkey's brain utilizing brain imaging technology. He testified that the major deficit in Purkey's brain was in the temporal lobes, which affected Purkey's ability to control his emotions. He further testified that Purkey had short-term memory loss and damage to the hippocampus portion of his brain. Dr. Preston also testified that Purkey suffered from frontal lobe brain damage which affected his ability to plan ahead and control his emotions. He testified that Purkey probably suffered the brain injuries as a result of car accidents and drug abuse. (Tr. 1664-1734.)

-24-

Dr. Steve Peterson, a forensic psychiatrist, was also called as an expert witness on behalf of Purkey.  Dr. Peterson testified that Purkey had a long standing chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales.  Dr. Peterson testified that Purkey was severely sexually, physically, and emotionally abused during childhood.  As a result, Purkey developed abnormal psychosexual ideas.  Dr. Peterson testified that Purkey was extremely impulsive and anger ridden.  He concluded that Purkey had substantial problems with substance abuse beginning in his teens.  He also testified that Purkey was suffering from depression and was dysthymic.  He further testified that Purkey was suffering from a severe personality disorder with anti-social features, as well as obsessive compulsive and dependency features.  Dr. Peterson further described in detail three closed head injuries that Purkey had allegedly suffered in 1968, 1972, and 1974.  He also testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and into his teen years.  He described Purkey's parents as alcoholics and further informed the jury that Purkey's father had committed suicide.  In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of a severe psychiatric illness.  (Tr. 1738-1832)

Finally, Purkey called Dr. Mark Cunningham, a clinical and forensic psychologist who testified as a mitigation specialist on behalf of Purkey.  Dr. Cunningham performed a violence/risk assessment of Purkey.  He testified that he had reviewed a total of ten binders of information about Purkey's background.  These

-25-

reports consisted primarily of correctional records during Purkey's incarceration in both state and federal prisons. He testified that Purkey is a profoundly damaged person in both his neurological and neuro-developmental history.

Dr. Cunningham also described in great detail Purkey's abusive, neglectful, and alcoholic parents. He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He also testified about Purkey's car accidents and head injuries and the probable brain damage that resulted. He testified that in his opinion these injuries were consistent with frontal and temporal lobe brain damage.

Dr. Cunningham added that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother. He also testified that Purkey's mother sexually abused him as a child and as a teenager. Dr. Cunningham described for the jury Purkey's significant alcohol and drug addictions including an addiction to methamphetamine, cocaine, and his frequent needle injections of Ritalin.

Dr. Cunningham observed that there was an extremely high level of security at the Bureau of Prisons facility at ADX Florence in Colorado. Dr. Cunningham described it as a super max facility in which the likelihood of violence had been substantially reduced because of the high level of security. Dr. Cunningham also testified that because Purkey was taking appropriate medications to control his behavior, because of his age, and because of the high security precautions within the Bureau of Prisons he believed Purkey would not be a significant threat to others in the future within the confines of a prison. (Tr. 1840-1954.)

-26-

### E.    *Government's Rebuttal Evidence*

The Government called three witnesses to rebut the theory that Purkey suffered from diminished mental capacity as a result of frontal lobe damage to his brain. Dr. Dan Martell testified that he reviewed the tests administered to Purkey by Purkey's forensic psychologist, Dr. Leeson. The tests were given to measure possible frontal lobe malfunction or damage. Dr. Martell testified that Purkey scored within normal limits. Dr. Martell disagreed with the defense psychologist regarding whether Purkey's test results were indicative of an individual with frontal lobe brain damage. (Tr. 2120.) Dr. Martell testified Purkey's psychologist had blown minor things out of proportion when reviewing Purkey's test scores in order to suggest brain damage. Dr. Martell said this was unfair and incorrect. (Tr. 2121.)

Dr. Martell testified Purkey scored highest in the four following categories: (1) drug abusers; (2) anti-social personality disorder patients; (3) rapists; and (4) patients with assault histories. (Tr. 2127.)

Dr. Martell vigorously disagreed with Purkey's psychologist's opinion that the tests administered to Purkey supported the claim that Purkey suffered from frontal lobe damage. (Tr. 2127.)

To counter the testimony by defense psychiatrist Dr. Peterson that Purkey was suffering from a mental disease or defect and from frontal-lobe brain damage, the Government called Dr. Park Dietz. Dr. Dietz testified that he diagnosed Purkey with two problem areas. These findings were consistent with a multitude of previous

-27-

findings of psychiatrists and psychologists who had examined Purkey in the past. Dr. Dietz testified Purkey suffered from an anti-social personality disorder and polysubstance abuse. (Tr. 2156.) Dr. Dietz testified that he had not seen any evidence of schizophrenia or mania in Purkey. (Tr. 2162-63.) He further testified that Purkey displayed abundant evidence of all seven types of behavior that are features of anti-social personality disorder.

Dr. Dietz added that Purkey suffered from no mental disease or defect which could affect his capacity to appreciate the wrongfulness of his conduct. (Tr. 2170.) Dr. Dietz believed it was significant that Purkey had methodically taken elaborate steps to conceal his crime. (Tr. 2172.) Dr. Dietz concluded that he did not believe Purkey had any mental disease or defect which amounted to a severe mental or emotional disturbance and based on his observations did not believe Purkey's brain function interfered with his capacity to appreciate the wrongfulness of his actions. (Tr. 2175, 2177.)

Dr. Helen Mayberg, a neurologist, testified on behalf of the Government to rebut Purkey's claim that he was suffering from frontal lobe brain damage which caused an inability to conform his behavior to the requirements of society. Dr. Mayberg carefully reviewed Purkey's prior hospitalization records and testified she had not seen any evidence in any of the records of neurological damage to Purkey's brain. (Tr. 1992.) Dr. Mayberg reviewed hospital records from 1968 involving a traffic accident where Purkey was knocked unconscious. Dr. Mayberg testified the records revealed that

-28-

Purkey had a normal neurological exam and that no abnormalities were noted in the standard nurse charts. There was no call for additional doctors because of deterioration. There were no special tests or special monitoring conducted. Dr. Mayberg noted there were no invasive procedures conducted to look for bleeding in the brain. Dr. Mayberg testified Purkey's neurological findings were "absolutely stone cold normal." (Tr. 1994.)

Dr. Mayberg also reviewed the hospitalization records of Purkey following a 1972 incident in which Purkey was knocked out after being hit by a car. Again, the records reflected a normal neurological examination and that there were no indications Purkey had suffered any type of traumatic brain injury. (Tr. 1996.) Finally, Dr. Mayberg testified Purkey's actions following the murder of Jennifer Long, that is, the extensive cover-up and realization that he might be caught, were absolutely inconsistent with a dysfunctional frontal lobe. (Tr. 2003.)

By its verdict, the jury rejected the brain damage and diminished mental capacity defense of Purkey.

On November 18, 2003, the jury heard the court's instructions of law, closing arguments of counsel, and retired to deliberate at 11:30 a.m. (Tr. 2297.) The court excused the jury in the afternoon at 4:05 p.m. (Tr. 2308.) The jury returned the next day, November 19, at 8:30 a.m. and commenced deliberations. (Tr. 2309.) The jury was required to deliberate on six statutory and four non-statutory aggravating factors. The defense submitted and the court instructed on 27 mitigating factors. The jury

-29-

returned with a verdict at 2:45 p.m. the same day. (Tr. 2310.) By unanimous vote, the jury determined that a sentence of death should be imposed. (Tr. 2311.) In total, the jury deliberated for 11 hours and 10 minutes.

### F.   *Appeal*

Following the formal imposition of the death sentence Purkey filed a timely notice of appeal. In his brief filed in the Eighth Circuit, Purkey raised a total of 19 issues. On June 23, 2005, the Eighth Circuit heard oral arguments and the case was submitted for a decision. On November 7, 2005, the Eighth Circuit affirmed the conviction and sentence in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Purkey's motion for rehearing and rehearing en banc was denied on January 13, 2006. The United States Supreme Court denied Purkey's writ of certiorari on October 16, 2006. *See Purkey v. United States*, 127 S.Ct. 433 (2006).

## II.  Standard of Review

In his § 2255 motion, Purkey has raised numerous claims of ineffectiveness directed against the attorneys who represented him at trial and on appeal, as well as several trial errors that were not litigated on direct appeal.

With respect to his ineffective-assistance-of-counsel issues, the Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Counsel is constitutionally ineffective when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the efforts are so prejudicial that the adversarial balance between the defense

-30-

and prosecution is upset. *Id.* at 369. A court may exam the "prejudice" aspect of a claim without having to first determine whether the representation fell below the objective standard of reasonableness. *McCann v. Armontrout*, 973 F.2d 655, 660 (8th Cir. 1992) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

It is Purkey's burden to affirmatively prove the prejudice aspect of this claim. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992). The review of counsel's performance is deferential and the presumption is that counsel is competent and effective. *Smith v. Lockhart*, 921 F.2d 154, 156 (8th Cir. 1990). Finally, in order to demonstrate prejudice, Purkey "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Most of Purkey's claims of ineffectiveness are nothing more than an exercise in second-guessing the performance of trial counsel. In evaluating an attorney's performance, a court must begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because individual criminal defense attorneys might employ different trial strategies. *Strickland*, *id.* at 689. Courts should avoid "the distorting effects of hindsight" and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time. *Id.* at 689. The burden is on the petitioner to show that counsel's representation was not within the range of sound defense strategy. *Id.* at 690. To establish prejudice, Purkey must demonstrate only that "there is a reasonable

-31-

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, Purkey has clearly failed to make the required showing and his motion should be denied.

Courts normally will not entertain a § 2255 motion if the movant did not raise the claim pretrial, at trial, or on direct appeal. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002). In order to obtain § 2255 relief despite such procedural default, a movant must show both cause for his failure to assert the claim in earlier proceedings and actual prejudice from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). The showing of cause and prejudice, however, is not required if: (1) the movant seeks § 2255 relief based on facts not developed at trial that should be considered to avoid a fundamental miscarriage of justice as the conviction of an innocent person;[6] (2) the Government fails to object to the consideration of newly raised issues[7]; or (3) the § 2255 motion raises certain constitutional claims that may be adequately addressed only on collateral review.[8]

### III. Argument

*A.    Introduction*

In this case, Purkey's trial counsel presented a total of 22 witnesses, including Purkey. Eighteen of the witnesses testified as mitigation witnesses designed to

---

[6]*McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

[7]*West v. United States*, 994 F2d 510, 512 (8th Cir. 1993).

[8]*Massaro v. United States*, 538 U.S. 500, 509 (2003).

001952

persuade the jury not to impose the death penalty. Many of the witnesses testified concerning Purkey's difficult circumstances during childhood and during his developmental teen years. Defense counsel did an excellent job of convincingly demonstrating to the jury the physical, emotional, and sexual abuse Purkey experienced as a child and a teenager. Any suggestion that the skilled and experienced representation of lead defense counsel Fred Duchardt, Jr., was constitutionally ineffective either at trial or on appeal is without any basis in fact, and quite frankly, is completely without merit.

Mr. Duchardt is one of the most skilled and experienced criminal defense attorneys in the Midwest. In addition, Mr. Duchardt's reputation as a capital litigator for the defense is virtually without peer in this area. Mr. Duchardt has represented many individuals in the Western District of Missouri and in the District of Kansas and in every case has performed at a superior level. He also has substantial experience of capital cases in the State Courts in Missouri.

The problem that Purkey and present counsel refuse to acknowledge is that the facts of this case were so shocking that they would virtually guaranteed that a death penalty would be returned by any reasonable jury. The Government's evidence involved the kidnapping, rape, and murder of an innocent 16-year-old high school sophomore, coupled with the facts that Purkey purchased a chainsaw and dismembered her body and burned her body parts, thereafter disposing of her remains as if she were an item of trash, not to mention Purkey's incredibly violent past and 15 prior felony

-33-

convictions.  Any suggestion that Purkey received the death penalty because of an incomplete or inadequate representation by an attorney with the skill set of Mr. Duchardt defies logic and common sense.

Attached to this response is the 117-page affidavit of Fred Duchardt, Jr.[9]  A review of Mr. Duchardt's affidavit reveals substantial insight into his strategical decisions during the course of his representation of Purkey at trial and on appeal. When reviewed in its entirety the affidavit of Mr. Duchardt clearly defeats any claim by Purkey that he received constitutionally ineffective representation.  Purkey cannot meet his burden by demonstrating that Mr. Duchardt's representation fell below an objective standard of reasonableness and that the representation was so prejudicial that the adversarial balance between the defense and the prosecution was upset.  *Lockhart v. Fretwell*, *id.* at 369.  Purkey has also not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, *id.* at 694.

In addition, Purkey makes unnecessary and inappropriate personal attacks upon government counsel, accusing the undersigned and formed United States Attorney Todd Graves of "deliberate misconduct" (Purkey Memo. 1),[10] "deceit" (Purkey Memo. 73), engaging in a "misleading tale of deceit" (Purkey Memo. 70), and of "misleading

---

[9]The Government has incorporated the affidavit of Mr. Duchardt by reference and has attached it as Exhibit A.

[10]"Purkey Memo." refers to the document styled "Purkey's Suggestions Memorandum of Law in Support of Motion Under 28 U.S.C. § 2255."

-34-

the jury" (Purkey Memo. 73) during the presentation of evidence and during argument.

These allegations are without merit and should be denied. Finally, many of Purkey's

new claims could have been raised on direct appeal but were not and therefore have

been waived by Purkey. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002).

**B.**     ***"Club Fed" Evidence***

Purkey initially claims he was denied due process of law during the trial and at

sentencing because of government counsel's reference to evidence elicited during the

trial concerning Purkey's desire to serve a life sentence in the United States penitentiary

as a desire to go to "Club Fed." Purkey's assertion is completely without merit. The

prosecution has a right to introduce evidence concerning a defendant's post-defense

statements to members of law enforcement as admissions against interest. Fed. R.

Evid. 804(b)(3). During the testimony of Detective Howard of the Kansas City, Kansas

Police Department the following exchange occurred during the trial:

> Q. (Mr. Graves):    Did you talk about the difference between federal and state penitentiaries?
>
> A. (Det. Howard):    Yes, we did.
>
> Q:    And how did that go?
>
> A:    Well, when he was persistent about going to a federal agency with this information, I asked him, "So you really want to go to Club Fed?", and we talked about that for a minute, about how the federal penitentiary would be more comfortable surroundings for him, how he wouldn't have any enemies there, how the environment is a lot better to live out your life there.

(Tr. 423-24.)

-35-

Clearly, the above exchange reflects there was evidence that Purkey wanted to serve time in the federal prison system because he believed the conditions would be better than those in the Kansas prison system.  There was no attempt to mislead the jury that Purkey had used the term "Club Fed."  However, Purkey's desire to serve his time in the federal system was apparent.  Consequently, it was entirely proper for the Government to make reference to these facts during its closing argument to the jury. In addition, any objection by Mr. Duchardt to the admission of this evidence and the use of it during argument by government counsel would have been properly denied by the court.  Purkey's argument that government counsel engaged in "deliberate misconduct" is an overzealous and unnecessary accusation and is without merit in fact and law.

In addition, Mr. Duchardt's affidavit clearly sets forth the reasons he did not object to admission of the testimony.  Mr. Duchardt's response reflects his substantial experience and understanding of the Federal Rules of Evidence concerning the admissibility of this evidence. Mr. Duchardt's affidavit also demonstrates his common sense approach and strategical reasons in addressing this damaging evidence against his client.  (*See* Duchardt Aff. 14-19.)

Initially, the court should deny Purkey's new allegation that the "Club Fed" evidence and argument references were improper because Purkey did not raise the claim, at trial, or on direct appeal.  *Hines* 282 F.3d at 1005.  In order to obtain § 2255 relief despite such a procedural default, Purkey must demonstrate "actual prejudice"

from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). Purkey has not made the required showing and has thus waived this claim.

Even assuming, *arguendo,* the above-described "Club Fed" references did constitute improper conduct, it cannot be seriously contended that they warrant a reversal in light of the overwhelming evidence of guilt. Purkey confessed to the crime on multiple occasions during interviews with investigators and in a hand written statement he prepared in December 1998. Further, while Purkey changed his testimony at trial and denied he kidnapped the victim, he still testified that he brutally raped, stabbed, dismembered, and burned the body parts of the victim. When considering Purkey's brutal claw-hammer beating death of 80-year-old grandmother Mary Ruth Bales, his senseless and brutal kidnapping and shooting of Gregg Carlberg in the head during a robbery in 1980, his Aryan Brotherhood membership in prison, his sexual assault of inmate Gary Hatfield in prison in 1987 in Oregon, and his overwhelming and substantial prior history of criminal felony convictions, the few references to the term "Club Fed" no doubt played little, if any, role in the trial jury's decision to impose the death penalty on Purkey. Purkey's contention is without merit and the Government respectfully requests that it be denied.

### C.   *Allegations of Ineffective Assistance of Counsel*

#### 1.   *Failure to Object to "Club Fed" Testimony and Argument*

A review of Mr. Duchardt's affidavit reveals a well-reasoned and sound strategical decision in addressing the "Club Fed" testimony and argument. (*See*

-37-

Duchardt Aff. 14-19.) Mr. Duchardt's thorough understanding of the Federal Rules of
Evidence reveals his correct belief that the Court would have overruled any objection
to the testimony.  Detective Howard used the "Club Fed" terminology when
questioning Purkey during his initial interview.  During the interview, Purkey clearly
expressed his desire to serve a federal sentence in the custody of the Bureau of Prisons.
As Mr. Duchardt writes:

> Purkey was strongly motivated by better conditions in federal
> prison to falsely accuse himself of kidnapping in order to obtain a
> federal, rather than a state, prosecution.  In light of our defense, it was up
> to us to show the strength of Mr. Purkey's motivation in this regard.
> That was the defense edge of the federal sentence sword.  Thus, even if
> the government had totally avoided mention of the matter, it would have
> been necessary for us to bring it up to support our defense.  The evidence
> allowed me to argue the case for Mr. Purkey as I did.

(Duchardt Aff. 16-17.)  In addition, during cross examination of Agent Tarpley,
Mr. Duchardt made it very clear that Detective Howard had been the one to use the
term "Club Fed," not Purkey.  (Tr. 601-02.)

    2.    *Statements Made During Opening Statement by Mr. Duchardt That*
    *Jennifer Long's Friends and Family Would Testify That There Was No*
    *Kidnapping*

Again, Mr. Duchardt's explanation for his claims that Jennifer Long's family
and friends would testify that there was no kidnapping during opening statement reflect
a well-reasoned and logical explanation for his decision to make these statements to the
jury during opening statement.  (*See* Duchardt Aff. 19-29.)  As Mr. Duchardt points
out, "The critical flaw in this challenge is that it misrepresents what I said to the jury

001958

in opening statement." (Duchardt Aff. 19.)  Purkey's primary defense during the trial

was to try and convince the jury that he did not kidnap Jennifer Long and that she had

accompanied him voluntarily to his home in Lansing, Kansas.  Although the jury

ultimately rejected this defense, Mr. Duchardt's strategy was to portray Jennifer Long

as a somewhat troubled teenager who regularly used illegal narcotics and alcohol.  The

purpose behind Mr. Duchardt's remarks during opening statement was to inform the

jury that during the course of the trial he would call witnesses such as Ms. Long's

friends and family members, to support Purkey's contention that Ms. Long willingly

entered his vehicle and began partying with him on the morning of January 22, 1998.

Finally, Mr. Duchardt explains in his affidavit that

> it was my clear understanding that Mr. Purkey very much wanted
> the argument, that there was no kidnapping, to be made, and that Mr.
> Purkey would never have countenanced an approach to the defense
> which left out such an argument.  Because of that, I developed the
> evidence and argument which I did, perceiving those to be the best way
> I could advance the argument.

(Duchardt Aff. 29.)

> 3. *Failure to Prepare and Present Evidence to Rebut the Testimony of*
>    *Michael Speakman*

Mr. Duchardt's response to the allegations that he failed to prepare and present

evidence to rebut the testimony of government witness Michael Speakman contains a

very thorough explanation reflecting sound trial strategy.  (*See* Duchardt Aff. 29-43.)

Mr. Duchardt's affidavit reveals that he believed that use of the testimony of the

-39-

proposed rebuttal witnesses would have damaged Purkey even more than the testimony of Speakman alone.

Initially, Mr. Duchardt's affidavit demonstrates that a substantial amount of pretrial investigation was undertaken to try and develop effective witnesses to rebut the testimony of Speakman. The affidavit reflects that Laura O'Sullivan, Mic Armstrong, and Mr. Duchardt each participated in the pretrial investigation designed to discover witnesses who could rebut the testimony of Speakman. (Duchardt Aff. 30-31.)

It should also be noted that counsel for Purkey vigorously cross-examined Speakman in an effort to discredit his testimony. During cross-examination, counsel was able to establish for the jury that Speakman had eight prior felony convictions, was testifying pursuant to a cooperation agreement with the Government, and was hoping for a reduction in his 180-month prison sentence. (Tr. 668-71.) Purkey was also permitted to cross-examine Speakman concerning at least one of the fights he had while in custody at CCA because while he was in the segregation unit for fighting he had conversations with Purkey concerning his case. Counsel's vigorous cross-examination of Speakman most certainly protected Purkey's confrontation rights.

Purkey also exaggerates the damaging effect of Speakman's testimony. Post conviction counsel describes Speakman as the Government's "star witness." (Purkey Memo. 36.) While Speakman's testimony was helpful to the Government's case, in light of Purkey's multiple confessions to law enforcement authorities to the kidnapping, rape, and murder of 16-year-old Jennifer Long, and in light of the fact that Purkey

-40-

testified at trial and admitted he raped, murdered, and dismembered her body, it can hardly be seriously contended that Speakman's brief and limited testimony was devastating to Purkey.

Mr. Duchardt explains his decision not to call Cornelius Peoples, a convicted murderer. (Duchardt Aff. 31-34.) Mr. Duchardt explains that his reasoning was two-fold. First, Peoples was facing a retrial in his own capital murder case. Second, counsel for Peoples informed Mr. Duchardt that he had recommend to Peoples, and Peoples had agreed, that if he were called as a witness on behalf of Purkey in this case he would have invoked his Fifth Amendment privilege in order to protect himself from any cross-examination that could later be used against him during the prosecution of his case. In addition, Mr. Duchardt explains that counsel for Peoples was attempting to work out a plea agreement for Peoples in his own case. As a consequence, counsel for Peoples had strongly recommended to his client, and Peoples was agreeing with the advice, that he should not involve himself in the defense of others because it might jeopardize his ongoing negotiations with the prosecution.

Mr. Duchardt further explains:

Mr. Peoples would have brought substantial baggage as a witness, starting with his own capital case charge, for which he had already been once convicted. In addition, Peoples had a serious prior conviction, an aggravated battery from Wyandotte County in 1991 for which he had served eight years of a 10 to 30 year sentence. Besides all of this, I was also very familiar with other bad acts information pertaining to Peoples. In sum, Peoples had the reputation as a cold-blooded killer, willing to do or say anything. I was familiar with this information because I had represented one of Peoples' co-defendants, Carl Haskell, and had

-41-

received considerable information about Peoples in the discovery and in our investigation in that case. I was concerned that, under the right circumstances, some of that negative information might also come out on cross. Further damaging whatever credibility Peoples might be deemed to have.

(Duchardt Aff. 32-33.)

Finally, Mr. Duchardt provides a very logical explanation that Peoples had no way of knowing about conversations between Speakman and Purkey if he were not present. Mr. Duchardt's decision not to call Peoples as a witness is a sound strategical decision reflecting his substantial experience and common sense approach to capital defense.

Mr. Duchardt's decision not to call Xavier Lightfoot during trial also reflects sound strategy. Like Peoples, Lightfoot also was charged with capital murder and was awaiting trial. Lightfoot's counsel had advised him not to testify on behalf of Purkey because it could potentially be damaging to Lightfoot's defense at trial. Mr. Duchardt also explains that he did not believe that Lightfoot had any information that would be helpful to Purkey in attempting to damage the credibility of Speakman. Mr. Duchardt advises that he had been informed by counsel for Lightfoot that if Purkey attempted to call him at trial for testimony he would invoke his Fifth Amendment privilege. Consequently, like Peoples, Lightfoot was unavailable as a defense witness. Finally, because Mr. Duchardt was familiar with the horrific crime Lightfoot had committed, that is, arranging for the contract murder of a federal bank robbery witness, his testimony would likely have been more damaging to Purkey than helpful.

-42-

Mr. Duchardt also explains his decision not to call CCA employees to rebut the testimony of Speakman.  Mr. Duchardt explains that because of Purkey's behavior while in pretrial custody at CCA in Leavenworth, his relations with CCA personnel "were abysmal." "Almost daily, Wes was at odds with one or another corrections officer.  Wes filed several reams of paper worth of grievances over his conditions of confinement at CCA." (Duchardt Aff. 36.)  Mr. Duchardt further explains that Purkey was removed from CCA prior to trial because of an incident in which Purkey was accused of an assault on a guard.  Mr. Duchardt further writes that things got so bad between Purkey and CCA that he assisted Purkey in filing a lawsuit against CCA. Consequently, any attempt to call witnesses from CCA to try and damage the credibility of Speakman could easily have backfired at trial.

Mr. Duchardt explains that another concern he had in calling CCA employees on behalf of Purkey to rebut the testimony of Speakman related to his fear that if he called these employees it would open up an area of great concern for Mr. Duchardt. Mr. Duchardt did not want the jury to hear evidence concerning the substantial difficulty and problems Purkey had caused CCA during his pretrial incarceration. Purkey was clearly a very difficult inmate and Mr. Duchardt did not want the jury to hear this type of evidence because it would have ultimately reflected negatively on Purkey and would have assisted the Government in its contention that Purkey posed a future danger if given a life sentence without the possibility of release.  Again, Mr. Duchardt's explanation reflects a sound trial strategy.

-43-

Finally, Mr. Duchardt explains his decision not to call witness Sam Hoffmeier on behalf of Purkey to rebut the testimony of Speakman. First, Mr. Duchardt explains he did not believe Hoffmeier's information was very helpful. Hoffmeier did not deal with Purkey in the segregation pod and could not have been privy to Purkey's interactions in the pod with staff and inmates. In addition, Mr. Duchardt strongly asserts that he believed that bringing up the testimony from Hoffmeier to counter Speakman would prompt the Government to call CCA corrections officers to lend credibility to the testimony of Speakman.

### 4.    *Decision Not to Obtain the Services of a Mitigation Specialist*

(*See* Duchardt Aff. 43-79.) Mr. Duchardt explains in his affidavit in great detail the defense strategy during presentation of mitigation evidence at the trial. Purkey's present contention that the evidence presented in mitigation was deficient is completely without merit. Mr. Duchardt called a total of 18 witnesses on behalf of Purkey in mitigation during the penalty phase of the trial. The mitigation presentation was well-prepared and well reasoned, but because of the horrific nature of Purkey's crime and his past history of violence, the jury logically rejected the mitigation evidence and rendered a verdict of death. Mr. Duchardt's explanation is very thorough and no further argument is necessary.

It should be noted, however, that post-conviction counsel apparently did not thoroughly review the trial testimony of Dr. Cunningham and Dr. Peterson. Both witnesses testified extensively about Purkey's abusive childhood and teen years in

-44-

Wichita, Kansas.  Both described in great detail the physical and sexual abuse against Purkey by his alcoholic parents.  Consequently, the use of a mitigation specialist would have added nothing to the presentation in mitigation and would have merely been cumulative evidence.

5.    *Allegation of Failure to Prepare and Present the Testimony of Dr. Bruce Leeson*

(*See* Duchardt Aff. 79-82.)  Mr. Duchardt provides a well-reasoned response to Purkey's allegations that he inadequately prepared defense expert Dr. Leeson to testify at trial.  Purkey's contention that Dr. Leeson was inadequately prepared to testify because of the actions of Mr. Duchardt is without merit.  A review of Dr. Leeson's testimony reveals that he was fully prepared and made an effective presentation on behalf of Purkey at trial.  No further argument is necessary.

6.    *Allegation of Failure to Adaquetly Prepare and Present Testimony of Dr. Steven Peterson*

(*See* Duchardt Aff. 82-89.)  As Mr. Duchardt appropriately points out in his responsive affidavit, "The trouble is that the conclusions which they [post-conviction counsel] urge can be drawn only through the faulty mechanism of drastic misrepresentation of the facts." (Duchardt Aff. 83.)  Current counsel have asserted that Dr. Peterson did not testify about Purkey's previous reports to others about his sexual abuse, and that the Government as a consequence, argued that Purkey had fabricated the claim of sexual abuse to avoid the death penalty.  However, Dr. Peterson did testify that Purkey had reported his sexual abuse to multiple persons on multiple previous

-45-

occasions.  In addition, Mr. Duchardt is correct that the Government essentially conceded by the end of the trial that Purkey had been abused both physically and sexually.

It is also significant that Mr. Duchardt has made contact with Dr. Peterson and has learned that post-conviction counsel obtained inaccurate admissions from Dr. Peterson by apparently misleading him, showing him only the limited parts of the record, and not providing him with the complete transcript of the case.  Mr. Duchardt further points out that Dr. Peterson was not provided portions of the trial transcripts where he referred to Purkey's other revelations of sexual abuse.  Consequently, the present allegation that Dr. Peterson was inadequately prepared for testimony at trial is highly suspect.  Mr. Duchardt describes in great detail the significant amount of testimony from Dr. Peterson at trial relating to Purkey's sexual and physical abuse in childhood and as a teenager.  (*See* Duchardt Aff. 83-88.)  Dr. Peterson prepared an extremely thorough report and made a thorough presentation on behalf of Purkey at trial.  Consequently, Purkey's present contention is without merit and should be denied.

7.    *Allegation Regarding the Preparation and Presentation of the Testimony of Dr. Mark Cunningham*

(*See* Duchardt Aff. 89-92.)  As Mr. Duchardt correctly states in his affidavit, post-conviction counsel for Purkey have not fully and accurately described the trial testimony of Dr. Cunningham and have failed to note that Dr. Cunningham's testimony

-46-

001966

actually contains many of the details that they incorrectly contend are missing. (Duchardt Aff. 89.)

Mr. Duchardt's decision not to utilize a PowerPoint presentation prepared by Dr. Cunningham at trial reflects the analysis and sound decision making of a skilled trial lawyer. Mr. Duchardt's strategy was to try and prevent the Government from utilizing a PowerPoint presentation by Dr. Deitz in his presentation. It would have been illogical for Mr. Duchardt to utilize a PowerPoint presentation by Dr. Peterson and then to try and exclude Dr. Deitz' PowerPoint presentation during the Government's presentation of rebuttal evidence. Again, this decision reflects sound trial strategy.

8. *Allegations Relating to Failure to Adaquetly Prepare and Present Testimony of Gary Hamilton, Dr. William Grant, M.D., and Mark Russell*

(*See* Duchardt Aff. 52-58, 93-98.) Mr. Duchardt provides a detailed explanation of his decision making regarding the preparation and presentation of Gary Hamilton, the defendant's brother, Dr. William Grant, M.D., and Mark Russell of the Federal Bureau of Prisons. Contrary to the assertions of post-conviction counsel, these witnesses were clearly helpful to Mr. Purkey's case in mitigation.

Gary Hamilton provided independent corroboration of Purkey's allegations that he was sexually abused by his mother and sexually and physically abused by his father. Dr. Grant's testimony was helpful in the sense that it lent support to the defense argument that with proper medication Purkey would not pose a future danger to other

-47-

001967

inmates if given a sentence of life without possibility of release. Finally, Mark Russell testified concerning the very unpleasant circumstances of Purkey's confinement in administrative segregation, including being confined to his cell for 23½ hours per day. In addition, Russell testified that Purkey had exhibited no assaultive behavior while in custody at the United States Penitentiary at Leavenworth. He further testified that Purkey had requested to have his Aryan Brotherhood tattoos removed. Of course, the prosecution was able to make some points in its favor during cross-examination of each of the witnesses. However, a fair reading of the transcript of the testimony for the three witnesses will reveal that each witness contributed to the mitigation case in favor of Purkey in a substantial manner. Purkey's present claim that Mr. Duchardt did not adequately prepare and present testimony of these witnesses is without merit and should be denied.

9.   *Purkey Urges this Court to Reject the Eighth Circuit's Holding in* <u>Middleton v. Roper</u>*, 455 F.3d 838, 850 (8th Cir. 2006)*

Purkey's argument contradicts long established Eighth Circuit precedent. The Eighth Circuit has repeatedly recognized "A habeas petitioner cannot build a showing of prejudice on a series of error, none of which would by itself meet the prejudice test." *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002); *see, e.g., United States v. Robinson*, 301 F.3d 923, 925 n. 3 (8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v.*

-48-

001968

*Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation."). Here, Purkey has failed to demonstrate that any of the allegations of ineffective assistance described above were prejudicial. Assuming *arguendo,* that Purkey has established some minor deficiencies in the representation of Mr. Duchardt in his defense either at trial or on appeal, considered individually none of the alleged errors would by itself meet the prejudice test. In addition, Purkey's argument should be rejected because he advances an erroneous interpretation of Supreme Court precedent. Citing *Strickland* and its progeny, including *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000), Purkey contends this Court should consider the cumulative effect of Mr. Duchardt's alleged errors in determining whether prejudice resulted in accordance with the standards set forth in *Strickland*.

Neither *Wiggins* nor *Williams* stands for the proposition that the court should accumulate the prejudice from separate ineffective assistance claims in determining whether to grant habeas relief. Rather, both decisions involve only a *single* claim of ineffective assistance of counsel-namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase. *See Wiggins*, 539 U.S. at 514; *Williams*, 529 U.S. at 390.

In addition, as set forth above, Purkey's argument has been soundly rejected by the Eighth Circuit on multiple occasions. *Middleton*, 455 F.3d at 851; *Hall v. Lubers*,

-49-

296 F.3d at 692; *United States v. Robinson*, 301 F.3d at 925, n. 3; *Waynewright v. Lockhart*, 80 F.3d at 1233.

      10.     *Purkey's Recantation of Kidnapping Claim*

(*See* Duchardt Aff. 100-115.) Purkey next accuses the Government of engaging in "deliberate misconduct" when government counsel elicited from Agent Tarpley that "right before this trial" was the first time he had ever heard that Purkey had claimed not to have kidnapped Jennifer Long. (Tr. 566.) Purkey further alleges that government counsel engaged in misconduct when during closing argument the undersigned informed the jury that Purkey had "changed his story" in order to avoid the death penalty--"he's trying to get out of it." (Tr. 1135.) The undersigned further argued, "All the way up, all the way through this case up until recently it's been I kidnapped her, I kidnapped her, I kidnapped her." (Tr. 1135.)

Purkey further alleges that he was denied effective assistance of counsel when trial counsel for Purkey failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "right before this trial."

Finally, Purkey alleges he was denied effective assistance of counsel when on appeal appellate counsel failed to raise the issue concerning Agent Tarpley's and government counsel's contention that Purkey had recanted the kidnapping claim for the first time just a few months before trial. However, post-conviction counsel have accused government counsel of engaging in a "deceitful tactic," claiming that the

Government's assertion was "absolutely false," and accusing government counsel of "blatant misconduct."  (*See* Purkey Memo. 51-52.)

Unfortunately, the problem with this entire argument is that it reflects a fundamental misunderstanding of the facts which gave rise to the Government's position that Purkey had withdrawn his kidnapping claims shortly before trial.  In fact, government counsel learned for the first time that Purkey was recanting his kidnapping claims when it received Dr. Peterson's report dated August 13, 2003, shortly before trial.  Dr. Peterson had been retained by Purkey to testify on his behalf at trial as an expert.  Upon receipt of the report government counsel learned for the first time that Purkey was claiming that Jennifer Long had voluntarily accompanied him from Missouri to Kansas.

In his initial confessions to Detective Howard and Agent Tarpley in December 1998, Purkey told the investigators:

> After talking to her for a few minutes outside this grocery store, he asked her if she wanted to go party, if she liked to go get something to drink with him.
>
> Purkey said the female got into the pickup without any threats and then they proceeded to a liquor store a few miles away after the initial contact.
>
> After getting some of the gin and orange juice, he learned that she had been at school that morning and she was walking home from school as a result of having an argument with what he described as some black females at school.

(Tr. 485.)

Purkey further informed the investigators as follows:

Q (Mr. Whitworth): Go ahead.  What else did he say?

A (Agent Tarpley):  He said he needed to run home for a few minutes and she asked where home was and he said in Kansas.  She didn't want -- she wanted to be dropped off.  She didn't want to go.  He said at that point he reached over in the glove box and pulled out what he described as a boning knife from the glove box and he placed it under his right thigh and he made the statement that from that point on he had no intention of letting her out of the truck.

Q:    What else did he say?

A:    He said that he drove I-70 west out of Missouri and Kansas, took K-7 north, and that he pulled off on some road and that's where he– off of K-7 somewhere he raped Jennifer in the truck.

Special Agent Tarpley further testified:

Q (Mr. Whitworth): When did he tell you that he pulled a knife out?

A:    He told me that he pulled the knife out after she -- after he told her that he needed to go back home to get something, I believe, and she did not want -- when she learned where home was, she didn't want to go there with him and he said that's when I pulled the knife out and stuck it under my right thigh.

(Tr. 494.)

Purkey also wrote a written confession and provided it to investigators.  In that

confession, Purkey stated as follows:

Q (Mr. Whitworth): What did Mr. Purkey write in that statement?

A:    "After filling out a job application at Roto-Rooter early in the morning I left and started driving down Truman

-52-

001972

heading off of Troost.  About a mile or a little more off the Paseo on the south side of the street, I pulled into a store parking lot.  I seen a girl walking by the store and I stopped her and asked her what was happening.  She said nothing really.  Then I asked her if she knew which way Broadway was.  She said it's west of here.  I asked her if she wanted to go party, maybe get some, maybe sex, something to drink.

After she got in the truck, I [told] her my name and in turn she [told] me her name, Jennifer.  Making small talk she said she was on her way home, that she had just had some kind of problems with a couple of black girls.

We drove to a liquor store on Troost south of Truman and bought some gin and orange juice.  Then I said I need to run back to my place real quick and she asked me where that was at.  I explained it's about a 20 minute drive to Lansing and wouldn't take over an hour up and back.  She said I really don't want to go down there.  How about take me back where you picked me up from by this time we were headed west on I-70 off the Paseo and I was telling her it won't take long, just up and back, and at the same time I was reaching in the glove box grabbing a knife that I stuck up my right thigh.  We drove straight back to my house."

(Tr. 510.)

Neither Purkey nor the Government ever contended that 16-year-old Jennifer Long was grabbed off the street and kidnapped.  It is clear from Purkey's accounting from the beginning that Jennifer Long apparently voluntarily entered his pickup truck on the morning of January 22, 1998.  The kidnapping crime began when Purkey pulled out the knife in his pickup truck and decided he was not going to let Jennifer Long out of his truck.  His intent at that time was to take her against her will

to his home in Lansing, Kansas and commit an act of rape. Speakman's statements to

FBI agents on November 2, 2001 were *not* inconsistent with what Purkey alleged from

the very beginning in this case. In Speakman's report of the interview set forth as

Exhibit 3 in Purkey's addendum, it reads as follows:

> Purkey explained his case was different than the ongoing Keith Nelson
> and Pamela Butler incident, in that Purkey did not 'snatch' the girl from
> the street as Nelson did. Purkey described the *initial contact* with the girl
> as more like they were 'partying,' and that it was not at all forcible.

It is apparent from a review of Speakman's report of interview that Purkey's

accounting of his initial encounter with Jennifer Long was entirely consistent with the

detailed confessions he provided to Agent Tarpley and Detective Howard nearly three

years earlier at the Wyandotte County District Attorney's Office. The kidnapping

crime began once Purkey decided not to allow Jennifer Long out of his pickup truck

and pulled out the boning knife from his glove box in order to frighten Ms. Long into

not resisting. There was never a contention that Purkey "snatched" Jennifer Long off

the streets of Kansas City.

For the first time, when Purkey met with his psychiatrist, Dr. Peterson, and

described the events of January 22, 1998, he changed his story and claimed that he

never kidnapped Jennifer Long and that she had accompanied him voluntarily to his

home in Kansas. At page 46 of Dr. Peterson's report,[11] which was provided to

---

[11]A copy of Dr. Peterson's report can be found in Purkey's addendum as
Exhibit 24.

-54-

government counsel on August 13, 2003, shortly before trial, Dr. Peterson wrote as

follows:

> Jennifer wanted to go to Kansas City, Kansas with him. At that point, he had his work knife with him. This was a 3-inch blade pocket knife. He told the FBI that he held the knife to her to ensure that he got a 'federal crime of kidnapping'. His wife knows the truth that they drove around Leavenworth, Kansas and Jennifer didn't mind. They kept drinking and purchased more orange juice at the K-7 Town and Country. They went to the T&C lot together. They went in together and bought cigarettes. He smoked more of the crack. There was no sex between them and no 'partying' he was waiting for the alcohol to 'have its effects so they could go have a private party at his place.'

Purkey then describes in detail his recounting of a voluntary sexual encounter with

Jennifer Long at his home. (Purkey Adden. Exh. 24 at 47.)

Dr. Peterson further wrote at page 47 as follows:

> "Ultimately, he killed her at home. He believes she came to his house willingly so it wasn't kidnapping. He told the kidnapping story 'for the FBI so he could get into the federal system.'"

It is apparent from a review of the above trial testimony, from Agent Tarpley

recounting Purkey's detailed confessions in December 1998, a review of Speakman's

reported interview, and a review of Dr. Peterson's report, that in fact Purkey did change

his story when he recanted the kidnapping claim for the first time in his statements to

Dr. Peterson. The Government did not come into possession of the Peterson report

until shortly before trial, that is, on August 13, 2003. Clearly, the statements Purkey

made to Speakman in his cell at CCA at Leavenworth did not differ from his initial

accounts he made to investigators. A simple review of the report of the interview will

confirm that Purkey never told Speakman *he did not kidnap Jennifer Long*, as counsel incorrectly contend. Purkey merely claimed he did not "snatch" the girl from the street as Keith Nelson did. Purkey described the initial account with the girl as more like they were "partying" and that it was not at all forcible. The term "kidnapped" is never even discussed in his discussions with Speakman.

Consequently, when Purkey and post-conviction counsel claim that the Government "knew that in the month after it had obtained the indictment against Purkey, he recanted the kidnapping to its star witness – Michael Speakman," such an assertion is either a misrepresentation or most certainly an overzealous exaggeration of what Speakman told the FBI in November 2001. There was no discussion of the term kidnapping when Speakman spoke with Purkey. In addition, there apparently was no discussion about the knife that Purkey had used to frighten Jennifer Long when he decided to kidnap her and take her to his home in Lansing to rape and subsequently kill Ms. Long. This fundamental misunderstanding of the facts concerning the conversation between Speakman and Purkey and the subsequent statements by Speakman to the FBI clearly defeats any claim by Purkey that Agent Tarpley or government counsel acted inappropriately when they accurately and properly contended that Purkey changed his story about the kidnapping shortly before trial. Consequently, Purkey's motion should be denied on this basis.

Further, a review of Mr. Duchardt's affidavit reveals that he did not consider the statement by Agent Tarpley or the argument of government counsel to be particularly

significant.  A review of his affidavit reveals his strategy in addressing the testimony and argument.  While his explanation differs from that of government counsel, it does reflect a well-reasoned and common-sense approach to any possible concern.  Again, Purkey's position is not well taken.

Finally, Purkey's claim on this issue should be denied because he could have raised the issue on direct appeal but did not.  Thus, he has waived a claim on this issue. *See Hines*, 282 F.3d at 1005.

### 11.    *Allegation of Inadequate Preparation of Purkey's Trial Testimony*

(*See* Duchardt Aff. 110-114.)  It is clear from a review of Mr. Duchardt's affidavit that trial counsel spent a great deal of time preparing Purkey to testify at trial. Purkey's present contention that he was inadequately prepared is without merit and should be denied.

### 12.    *Allegation Regarding Failure to Raise Insufficiency of Evidence Claim*

(*See* Duchardt Aff. 115-16.) Purkey argues that trial and appellate counsel were ineffective for failing to raise an insufficiency-of-evidence claim at trial and on appeal. Purkey contends, "The government, however, had absolutely no evidence of a kidnapping except Purkey's confessions.  It's entire case rested on that."  Purkey further contends, "A defendant may not be convicted based solely on his own admissions." (Purkey Memo. 67.)

The problem with this argument is that the Government had a substantial amount of additional evidence in addition to Purkey's detailed confessions.  The charge in this

-57-

case was kidnapping resulting in death, in violation of 18 U.S.C. § 1201. In addition to Purkey's confessions, the Government introduced into evidence the chainsaw that Purkey used to dismember Ms. Long's body. The Government introduced a sales receipt from Sears dated January 22, 1998, the day of the crime. Purkey used a credit card to pay for the chainsaw at Sears in Lansing, Kansas. The Government also recovered the toolbox in which Purkey had dismembered the body of Jennifer Long. Inside the toolbox investigators found blood. In addition, there were cut marks in the toolbox consistent with the chainsaw that Purkey purchased at Sears.

The Government also introduced human bone fragments recovered from the fireplace ashes where Purkey said he burned the body parts of Ms. Long. The Government also recovered human bone fragments from a septic pond located near Wichita, Kansas where Purkey represented he had dumped some of the bone fragments of Ms. Long a few months after her murder. Purkey had drawn a map for investigators indicating exactly where he had dumped the bones. When the FBI excavated 50 tons of soil at the site of the septic pond several years later they found the human bone fragments in the same area where Purkey represented he had disposed of them.

Mr. Duchardt writes in his affidavit that he did not believe an appeal based on an insufficiency of the evidence claim would be well taken. He researched the issue and discussed it with Purkey prior to the submission of the appellate brief to the Eighth Circuit. Purkey apparently agreed with Mr. Duchardt that an insufficiency of evidence claim was not well founded and would fail. A simple review of the evidence developed

-58-

at trial by the Government will reveal that Purkey's present contention that a sufficiency of the evidence claim would have merit is, quite simply, not well taken. Finally, Purkey has waived an insufficiency of evidence claim because he could have raised it on direct appeal but failed to do so. *See Hines*, 282 F.3d at 1005.

## IV. Conclusion

The record fails to support Purkey's claims that his trial and appellate attorneys' performance was defective, or that their efforts were so prejudicial that the adversarial balance between the defense and prosecution was upset. Mr. Duchardt's affidavit clearly reveals that his representation was of the highest caliber and that his strategical decisions were sound and based upon his substantial experience as a capital litigator. Indeed, Mr. Duchardt's representation of Purkey in this horrific crime should be commended rather than criticized. Accordingly, Purkey's § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted,

JOHN F. WOOD
United States Attorney

By    */s/ Matt J. Whitworth*

MATT J. WHITWORTH
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Respondent*

-59-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on May 19, 2008, to the CM-ECF system of the United States District Court for the Western District of Missouri and the undersigned hereby certifies that a copy of the foregoing was mailed to:

Gary E. Brotherton, Esquire
601 West Nifong Boulevard
Building 1, Suite C
Columbia, Missouri  65203

Teresa L. Norris, Esquire
P.O. Box 11744
Columbia, South Carolina  29211

*/s/ Matt J. Whitworth*
Matt J. Whitworth
First Assistant United States Attorney

-60-

001980

IN THE UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY PURKEY                    )
         Movant           )
                                 )
v.                               )    Case # 06-8001-CV-W-FJG
                                 )
                                 )
UNITED STATES OF AMERICA         )
        Respondent       )

## *STATEMENT OF FREDERICK A. DUCHARDT, JR.*

Now on this 9th day of May, 2008 comes Frederick A. Duchardt, Jr., and in response to the Order of this Court (Doc. 62), and because no objections have been interposed by Mr. Purkey or his Counsel, does make the following, responses to those allegations of ineffective assistance of counsel made in the Petition, Suggestions and supporting documents filed by Counsel for Mr. Purkey before this Court pursuant to 28 U.S.C 2255 (Doc. 47, 52).

### *General Information Pertaining to Appointment and Service of Defense Counsel and Defense Team of Experts*

1. My Qualifications and Duties

I was appointed by the Court as lead counsel for Mr. Purkey at trial and upon appeal in the above captioned cause. I have been licensed to practice law in Missouri and in the United States District Court for the Western District of Missouri since

1

001981

1980. At the time that I tried Mr. Purkey's case, I had previously been a State Public Defender for 15 years, and had after that been in the private practice of criminal defense law for eight years, and had handled, as lead counsel at trial, and to completion, three other Federal capital cases and four other Missouri state capital cases.

As lead counsel in this case, I was ultimately responsible for all decisions and actions made with respect to the defense of Mr. Purkey. Included in my duties were the seeking and obtaining members of the defense team to work on the case with me.

## 2. Matters Pertaining to the Appointment and Service of Laura O'Sullivan, and Division of Duties between the Attorneys

I asked Laura O'Sullivan to join me as cocounsel for Mr. Purkey. I first became familiar with Ms. O'Sullivan in the early to mid 1990's when she was a Missouri State Assistant Public Defender and I was a supervising attorney for the Public Defender System. At that time, I was impressed by the quality of Ms. O'Sullivan's work and her rapport with her clients. When I began my search for cocounsel for the Purkey case, I inquired of various Missouri Capital Public Defenders for recommendations, and Ms. O'Sullivan's name was universally mentioned. She had recently left the employ of the State Public Defender System, and had entered private practice. Also, I learned that, in the years since my departure from the Public Defender System, Ms. O'Sullivan had further distinguished herself in her Public Defender service, and was

2

001982

extremely well-thought-of in terms of her legal acumen in general, and her trial skills in particular. I interviewed Ms. O'Sullivan, and when she agreed to participate in this case, I sought and obtained her appointment as cocounsel.

Because of my extensive experience with capital and mental health case practice, and because of Ms. O'Sullivan's relative lack of experience with those specialties, I expected to, and actually did, take on the lion's share of the duties related to those matters. Even before Ms. O'Sullivan's appointment, I began work on the budget for the case, drawing upon my experience. While I explained the budgeting process to Ms. O'Sullivan as a means to teach her about the process for the future, she at that early stage in the case had little to offer for development of the budget, and thus was unable to provide, and in fact did not provide, much input. As a consequence, I prepared the budget myself. Also, I did the vast majority of the motion practice in the case, since that was an area of strength and experience for me. Other areas of strength and experience for me, for which I took charge, were the jury selection process (the development and analysis of the jury questionnaire, and the development and conduct of voir dire), expert testimony, and opening statements and closing arguments for both phases of trial.

It was my intention, at the outset, that Ms. O'Sullivan have full involvement with all aspects of the case. At that point, I was open to the possibility that Ms.

3

001983

O'Sullivan might take on some of the tasks which I ultimately handled. To this end, I provided her with all of the discovery in the case, as well as copies of the pretrial motions which I was filing. I expected that she would immediately read and become fully familiar with all aspects of the case. I believed that, if things worked optimally, we could have two heads independently developing ideas, concepts and strategies about the case. I also expected that Ms. O'Sullivan, once she became familiar with case materials, would independently develop and implement lines of investigation in the case. Thus, in our case budget, I allotted ample resources for Ms. O'Sullivan to do this work, taking into account the voluminousness of the materials which had to be reviewed, and the octopus-like tentacles of the investigation work which would likely, and did in fact, develop.

Some difficulties emerged when Ms. O'Sullivan was slow to invest the necessary time to read and digest the voluminous case materials. During this early period, the fact that Ms. O'Sullivan was not up to speed on the case was obvious in many ways. In my discussions with her about the case, we would not be able to exchange ideas as equals. Instead, since she had not yet read the materials, I was having to spend our times together educating her about critical facts and issues of law concerning the case with which she was not yet familiar. This was about the same time that relations became strained between Ms. O'Sullivan and Mr. Purkey. Because he

4

001984

was quite familiar with the law and with the facts pertinent to his case, Mr. Purkey, in his meetings with the attorneys, would regularly pose very complex questions and issues regarding his defense, and would expect intelligent answers to those questions. To be able to intelligently answer Mr. Purkey's questions, one had to be very conversant with the facts and the law pertaining to the case. At that time, Ms. O'Sullivan was not so conversant. Though I was not present during the one-on-one meetings between Ms. O'Sullivan and Mr. Purkey to know all that transpired, I did have feedback about those meetings from Ms. O'Sullivan and Mr. Purkey, and I knew what occurred in meetings in which all three of us would be present. From all of that, I intuited that Mr. Purkey was upset because, when Purkey would pose his questions about the case, Ms. O'Sullivan would sometimes give Mr. Purkey's inquiries short shrift, implying that the questions did not have merit, when the problem really was that Ms. O'Sullivan was not familiar enough with the case to fully and intelligently answer the questions.

Also, Ms. O'Sullivan would not independently identify and accomplish necessary case tasks. Rather, she would wait until I assigned her work to do on the case. Even when we would agree that Ms. O'Sullivan would take on certain case investigation tasks, which I expected would be addressed by her immediately, Ms. O'Sullivan would delay in getting to those tasks. This would result in my having to

take back and accomplish those tasks myself in order to keep the case preparation progressing. It seemed to me that, because we were still so far off from trial, Ms. O'Sullivan was lulled into a false sense of security, not realizing that hard work was necessary, even at the early stages, to make sure that everything would be accomplished in the time allotted. I became very frustrated with Ms. O'Sullivan over these failures, and I made that frustration known to her.

These problems came to a head when Mr. Purkey sought to have Ms. O'Sullivan removed from the case. Ms. O'Sullivan offered to withdraw from the case, and accused that I was not sufficiently supporting her with Mr. Purkey. I told Ms. O'Sullivan that she could certainly withdraw if she wished. I also directly and firmly told Ms. O'Sullivan that the problems were of her own making. I explained my belief that the problems could be solved by her immediately investing the time necessary to get herself ready on this case, and by her treating Mr. Purkey with more respect. I expressed to Ms. O'Sullivan and Mr. Purkey my confidence that Ms. O'Sullivan had all of the tools to be a valuable member of the defense team. After that, Mr. Purkey withdrew his motion to have Ms. O'Sullivan replaced. Ms. O'Sullivan, for her part, indicated that she did not wish to withdraw, and never again expressed any interest in withdrawing. Ms. O'Sullivan also proceeded to get the materials read and digested. However, Ms. O'Sullivan never did become a self-starter when it came to the

6

identification and discharge of case tasks.  I was unsure whether this lack of initiative was part of Ms. O'Sullivan's makeup or owed to her deferring too much to my greater experience in cases of this sort.  Whatever the reason, in order for Ms. O'Sullivan to be productive, it was necessary that I conceptualize, develop and assign specific tasks for Ms. O'Sullivan to complete.  When she was given discreet tasks and explanations, Ms. O'Sullivan excelled in getting that work done.  Thus, that is the way that I managed Ms. O'Sullivan's efforts thereafter.

Though Mr. Purkey did agree to Ms. O'Sullivan continuing as cocounsel, and though he did develop what I felt was a very good relationship with Ms. O'Sullivan, Mr. Purkey made clear to me that he expected that I would personally handle the more difficult duties of the case, i.e. complex motion practice, jury selection, opening statements, closing arguments, and examination of critical witnesses, including experts. I concurred with Mr. Purkey's assessment that it would be best for me to handle all of those matters myself, and thus I handled those matters as the case progressed.

As I prepared for my portions of the case, I would regularly include Ms. O'Sullivan in the work that was being done, and explain to her my reasoning in approaching the case as I was.  During these discussions, Ms. O'Sullivan never

offered any other or different ideas. I did not think that unusual since she had never before tried a case involving the death penalty or a mental defense.

Though Ms. O'Sullivan's role in the case was somewhat limited, in the fashions I have described, I believed that the work she did was quite fine, and that her work assisted in preparation for and presentation of the defense.

3. The qualifications and use of Michael Armstrong as case/mitigation investigator

I asked Michael (Mic) Armstrong to act as an investigator related to both phases of the case, and to help with duties often assigned to a person commonly referred to as a "mitigation specialist". I chose Mr. Armstrong for this dual role because of his extensive experience and training. During the years I was employed as a supervising Missouri Public Defender, Mr. Armstrong was my lead investigator. In the four capital cases I tried during that time, Mr. Armstrong had performed very successfully for me in the dual role of fact and mitigation investigator. Mr. Armstrong had also, during this time, availed himself of training opportunities which subsequently served him well in discharging both of these dual roles. Mr. Armstrong left the Public Defender System some time after I did, and then entered private investigation practice. In 2000, I was asked to handle the Federal Capital case of *United States v. Carl Haskell*, 00-395. In that case, I rekindled my professional relationship with Mr. Armstrong, again enlisting his services, this time in his private

8

investigator capacity.  In that case, as in the previous state cases, Mr. Armstrong distinguished himself in both aspects of his dual investigator role, developing significant evidence for both phases of trial.  Because of Mr. Armstrong's success in these five previous cases in the dual investigator role, I believed that he could successfully handle this dual role in the *Purkey* case.  Prior to my asking for Mr. Armstrong's appointment, I discussed this dual role with Mr. Armstrong, and he agreed to take on the duties.

In the *Purkey* case, Mr. Armstrong performed every investigative task assigned to him, and found and interviewed every witness, for both phases of trial, whom he was asked to find.  I also assigned Mr. Armstrong the lead in handling Mr. Purkey's rather bizarre immediate family.  In this capacity, Mr. Armstrong is the one to be credited for getting Jeanette Purkey, Mr. Purkey's wife, to finally admit, after years of denial, that she had been poisoning Purkey in 1998 (Tr. 2237-2243).  Mr. Armstrong's ability to accomplish this rather amazing feat owed to the relationship which Mr. Armstrong developed with the family over the many months prior to trial. Noteworthy as well is Mr. Armstrong's willingness to discharge every task assigned to him, no matter how unusual or difficult.  For instance, even before Jeanette's admissions, Mr. Purkey strongly believed that his wife had a role, not only in poisoning him, but also in poisoning his dog.  Mr. Purkey fervently believed that, if

9

the body of the dog could be exhumed, it could be tested for the poison used to kill it, and thereby provide a lead regarding what poison might have been used on him. Mr. Armstrong fully investigated the matter to Mr. Purkey's satisfaction. For this and many other reasons, Mr. Armstrong earned Mr. Purkey's trust, and the two developed a strong relationship. Because Mr. Purkey is an intelligent man, but also suffers from mental illness, he can be a difficult person with whom to deal. The trusting relationship which Mr. Armstrong developed with Mr. Purkey, and the rapport that he had with Mr. Purkey as a result of that trust, well served our other defense efforts on Mr. Purkey's behalf.

4. The development and presentation of mental health evidence

Mr. Purkey had been prosecuted in Wyandotte County, Kansas State Court for the murder of Ruth Bales. That killing also occurred in 1998, a little more than a half a year after the killing which gave rise to the charges in this case. In the Bales case, the attorneys who had defended Mr. Purkey had employed Dr. Stephen Peterson, M.D., and Dr. Peterson had already conducted an extensive evaluation of Mr. Purkey even before Federal charges were brought. When I was appointed to this case, I obtained the Bales case file, and found Dr. Peterson's report. I was already well-familiar with Dr. Peterson's strong clinical and forensic credentials, and with the very good work he had done in other cases. I was also impressed with the thoroughness of

10

001990

Dr. Peterson's report for the Bales case. Thus, I consulted with Dr. Peterson, and when he agreed to act as forensic psychiatrist in this case, I sought and obtained an Order appointing him in that capacity.

Early on, I learned that, in conducting his evaluation of Mr. Purkey in the Bales case, Dr. Peterson had not had all that he needed to thoroughly assess Mr. Purkey's condition. First, Dr. Peterson had not received all of Mr. Purkey's voluminous medical and incarceration records, and had received virtually none of the records pertaining to Mr. Purkey's family. Second, Dr. Peterson had not taken into account the substantial likelihood that Mr. Purkey had been poisoned by his wife. That was because, though Mr. Purkey had repeatedly told Dr. Peterson and his State Court Counsel about his beliefs that he had been poisoned by his wife, Dr. Peterson could not and did not take those allegations into account in his Bales case report since there was no other information available at that time to confirm Mr. Purkey's accusations. Finally, though there was ample record evidence that Mr. Purkey had suffered severe head injuries in episodes which occurred prior to 1998, there had not been, to that point, any neuropsychological or brain imaging testing conducted, and thus that information had never been provided to Dr. Peterson.

11

001991

To address the records deficiencies, I took the steps to obtain and provide for Dr. Peterson all of the records. On the poisoning issue, I developed and presented to Dr. Peterson the confirmatory information about the matter.

I also enlisted the services of Dr. Bruce Leeson, Ph.D. to conduct neuropsych testing, and I had PET imaging done at KU Med Center by Dr. David Preston, M.D. Both Dr. Leeson and Dr. Preston opined that testing results demonstrated brain injuries suffered by Mr. Purkey. Neither Dr. Leeson nor Dr. Preston, from his results alone, could opine that Mr. Purkey suffered from a mental illness which constituted a first phase defense to the charge against Mr. Purkey. I provided the Preston and Leeson reports to Dr. Peterson for his consideration.

Dr. Peterson, for his part, ultimately concluded that, at the time of the offense charged in this case, Mr. Purkey suffered from mental diseases and defects. Dr. Peterson further concluded that, while Mr. Purkey's condition did not prevent him from appreciating the nature and quality or wrongfulness of his conduct, that condition did impact upon his ability to premeditate or deliberate.

Because of the limited findings of the experts, the government urged, and this Court ruled, that those findings were not relevant to the issues presented in the first

12

phase of trial, but could be presented in the penalty phase.  Thus, all of this evidence was presented during the penalty phase.[1]

5. The use of Dr. Mark Cunningham to present a summary of all mitigation themes

Early on in the case, I determined that, though we would likely be presenting expert testimony about Mr. Purkey's mental condition, we also needed expert testimony for two additional purposes.  We needed an expert to counter the government's aggravating factor claims of future dangerousness.  We also needed an expert to effectively categorize and summarize all aspects of the negative milieu which was Mr. Purkey's life.  I believed that the best choice for the doing of this work was Dr. Mark Cunningham, Ph.D., and I enlisted Dr. Cunningham's services.  Dr. Cunningham is one the foremost experts in the field of assessment of future dangerousness in an incarceration setting, having published extensively on the subject. I myself had used Dr. Cunningham as a sentencing specialist in a previous capital case. I was also familiar with Dr. Cunningham's strong ability to identify and describe for a jury mitigating matters related to the psychology, character and upbringing of the

_____

[1] Until the government filed its motion, I held open with Dr. Peterson the possibility that he might be called at the first phase of trial.  After the Court's ruling, I notified Dr. Peterson that he would only be used at the penalty phase.  We did still argue at time of trial and upon appeal that Dr. Preston's results could be used to support our defense theories regarding Mr. Purkey's problematic thinking patterns.  However, both this Court and the Eighth Circuit found that Dr. Preston's general findings were insufficient to be put to this more specific purpose.

001993

client. I believed that, in the Purkey case, Dr. Cunningham could well discharge those duties too.

From the early stages of the case, Dr. Cunningham helped develop mitigation themes. I assisted Dr. Cunningham by obtaining records and expert reports for him, and by securing sufficient resources for him to do his work. Dr. Cunningham then developed his presentation, which was made during penalty phase.

### *Issue regarding failure to object to "Club Fed" evidence and argument*

It is urged that I was ineffective for failing to object to "Club Fed" references at the times they were made by the government in opening statement, witness examination, and closing argument (Doc. 47, p. 6). It is further urged that, having failed to make these objections at time of trial, I was also ineffective for failing to raise the matters, as instances of plain error, on direct appeal (Doc. 47, p. 7). It is argued that these references to "Club Fed" prejudiced Mr. Purkey by leading the jury to choose the death penalty for Purkey, and reject the supposedly leisurely life sentence which "Club Fed" would imply (Doc. 47, p. 5). It is also argued that, in making these references, the government was implying, contrary to the facts, that Purkey himself used the term (Doc. 47, p. 5). Though not particularly stated in those terms, the question raised seems to be whether this Court would have been required, under F.R.E. 403, to sustain an objection that the

14

probative value of use of the "Club Fed" terminology was outweighed by its improper prejudice.

I did not raise the suggested objections, and I did not raise the matter on appeal, because I did not believe objections would have been well-taken. The seminal testimony about the matter came from Detective Howard, and was as follows:

Q    Did you talk about the difference between federal and state penitentiaries?

A    Yes, we did.

Q    And how did that go?

A    Well, when he was persistent about going to a federal agency with this information, I asked him, "So you really want to go to Club Fed," and we talked about that for a minute, about how the federal penitentiary would be more comfortable surroundings for him, how he wouldn't have any enemies there, how the environment is a lot better to live out your life there. (Tr. 423-424)

In light of this, there was no question but that the term "Club Fed" had been used by Detective Howard in his discussion with Purkey as shorthand to describe what Mr. Purkey was seeking through his offer of his statements, that is a Federal prosecution and Federal sentence. It is also clear from the Howard testimony that, while the term "Club Fed" was not used by Mr. Purkey, but by Howard, use of the shorthand term by Howard allowed him and Purkey to understand one another

15

regarding the nature of Purkey's request. It was my judgment that, in light of these facts, this Court would not have sustained an objection to the "Club Fed" term, and such a ruling would have been readily upheld on appeal as within the Court's discretion.

What is more, it seemed to me then, and still seems to me now, that use of the shorthand "Club Fed" was no better or worse than use of the concept that term was being used to describe, that a Federal prison sentence was considered by Purkey to be more desirable than a State institution sentence because it would be, in the words used by Detective Howard, "more comfortable surroundings for him" where "the environment is a lot better to live out your life". Thus, even if the buzz words "Club Fed" were removed, to the extent that Mr. Purkey's desires for a Federal sentence would have still become a part of the record, the jury would have still been potentially led to the very same sorts of dangerous misconceptions about the favorable conditions of confinement in a Federal penitentiary.

Our problem was that all of this was a double-edged sword. While there might have been a danger that the jury would improperly use all of this in deciding a sentence for Purkey, there was a better chance that the whole discussion would help the jury better understand the thrust of the first phase defense, that Purkey was strongly motivated by better conditions in Federal prison to falsely accuse himself

16

of kidnapping in order to obtain a Federal, rather than a state, prosecution. In light of our defense, it was up to us to show the strength of Mr. Purkey's motivation in this regard. That was the defense edge of the federal sentence sword. Thus, even if the government had totally avoided mention of the matter, it would have been necessary for us to bring it up to support our defense. The evidence allowed me to argue the case for Mr. Purkey as I did (Tr. 1105).

The argument made about the term "Club Fed" also presupposes that use of the term would create juror misconceptions, which did not already exist, about conditions of life imprisonment confinement. From my prior experience in capital cases, and from my reading about studies of capital case juries, I was aware that jurors often have misconceptions regarding the supposedly soft conditions of life imprisonment confinement. Thus, even before mention of the term "Club Fed", it had been my intention that, should we reach a penalty phase, we would address any misconceptions by eliciting expert testimony about the actual conditions of Federal penitentiary confinement. This we actually did through the testimony of Dr. Cunningham and Mark Russell, Correctional Counselor at USP-Leavenworth (Tr. 1653-54, 1882-1904). I also addressed the "Club Fed" term directly in my argument (Tr. 1107).

As for the argument that the government attempted to ascribe the "Club Fed"

001997

words to Purkey, the only time that I believed this occurred was during the testimony of Agent Tarpley. When that happened, I confronted Tarpley with the facts, that he had heard the testimony of Howard, and that Howard had testified that Howard had been the one to use the term (Tr. 601-602). Other than that one instance, I did not believe at the time, and still do not believe now, that the plain English sense of the references can be read to attribute the use of the "Club Fed" words to Purkey. Rather, the term was used by the government as shorthand for what Purkey was requesting, in the same way that it was used, in the first instance, by Howard.

There are two cases cited in supposed support for the arguments made. However, those cases are easily distinguishable upon their facts. In *Wynters v. Poole*, 464 F.Supp.2d 167, 180 (W.D.N.Y. 2006), counsel was found ineffective for failure to object to a "trifecta" of improper references by the prosecution to the defendant's invocation of his right to silence, invocation of his right to counsel and refusal to take a polygraph exam, along with the prosecutors claim that each of these facts could be used by the jury to infer the defendant's guilt. In *Girtz v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007) the failure of defense counsel to object involved three direct and certain argument references to the defendant's failure to testify. These cases are easily distinguishable from this case since the failure to

object here did not involve an obviously objectionable matter, such as a direct and

certain reference to failure to testify.

### *Issue regarding opening statement references to testimony of Jennifer Long's family and friends*

It is alleged that, during my first phase opening statement, I made the claim

"that [Jennifer] Long's family and friends would even testify that there was no

kidnapping" (Doc. 47, p. 7, Doc. 52, p. 7).   Citing to the affidavit of Laura

O'Sullivan, it is further alleged that I had no good faith basis for making the

opening statement representations which I made (Doc. 47, p. 7, doc. 52, p. 7).   It is

ultimately alleged that I was ineffective because the promises I made in opening

statement supposedly went unfulfilled, and because Mr. Purkey was supposedly

prejudiced thereby (Doc. 47, p. 8).

The critical flaw in this challenge is that it misrepresents what I said to the

jury in opening statement.   The portion of my opening statement to which

reference is made is set forth in bold below, placed in context of the other, relevant

portions of the opening:

> At that meeting in December, on December 16th of 1998, Wes
> explained what he wanted.  He wanted a life imprisonment sentence without
> parole in a federal institution and he would tell them all they needed to know
> about what happened to a Missouri woman who he had killed, Jennifer
> Long. Wes expressed that idea of an agreement to the detective and to the
> agent. They then left him and went to a federal prosecutor and proposed that
> to the federal prosecutor.  The federal prosecutor said go back and get more

19

001999

information. They did. They told Wes we have to have more information. What Wes was led to believe at that point was that if he gave that more information, he would be put in prison for the rest of his life in a federal institution. Not let go. Put into a federal prison for the rest of his life.

With that understanding in his mind, over the next several days Wes gave the agents all the information that they needed to be able to put together the case that you will hear in this room. Every bit of it. He told them about all of the details of what happened to Jennifer Long. He told them about all of the things that happened and where they could find what evidence that they will come forward with to you here. Every bit of that information authorities found because of the information that Wes Purkey gave them.

But Wes Purkey also indicated to them something that was untrue. All of that was true. He said something that was untrue. The untruth was the part to make it a federal crime, that he kidnapped her. He had not. ***What you will hear in the evidence from witnesses who are friends of Jennifer Long, from family members, and from the information that Wes Purkey gave to the police, is that there was no kidnapping.***

What you will also hear in the evidence will show you about a man whose thinking is not tracking correctly in so, so many ways, Wes Purkey's. You will hear evidence about brain injuries that Wes Purkey has suffered....

After you hear all of the evidence about Wes Purkey, about what he told to the police, about what happened on that day, you will know that if it wasn't Wes Purkey, what happened to Jennifer Long would never have come out and would never have been discovered by anyone. Because of the information that he brought forward, we now know what happened to Jennifer. We now know that Jennifer Long is dead and we now know all of these details.

We also know exactly that Wes Purkey did not, and you will hear the evidence, did not kidnap Jennifer Long. And you will hear from the evidence that Wes Purkey gave the information that he did, and particularly gave the information claiming that there was a kidnapping only to be able to come to the federal court to be prosecuted here.

With all of that information, after you have heard it all, all of this information, I will come back to you and ask you to consider all of this and I'll ask you to find Wes Purkey not guilty of the charges that are brought against him here in federal court of kidnapping.

Thank you. (Tr. 412-413, 415-416)

20

002000

As the plain wording above demonstrates, never in my opening did I say "that [Jennifer] Long's family and friends would even testify that there was no kidnapping". Rather, the themes of our opening were the important themes of the defense: that Wes Purkey had truthfully accounted what happened to Jennifer Long's remains, that but for Wes Purkey's truthful accounts in those regards, no one would have ever known what happened to Jennifer, that Wes Purkey had fabricated the story about kidnapping to make the case a Federal case and thereby attain his desired Federal sentence of life, and that the evidence in the case, taken as a whole, demonstrated that no kidnapping had occurred, Wes' false representation in that regard notwithstanding.

For the most part, the trial testimony of Jennifer Long's parents, friends, and school officials was consistent with what they told us during our interviews, and supported our opening statement theme that there was no kidnapping. Their testimony demonstrated that Jennifer was using drugs and alcohol, was skipping school regularly, and was unaccounted for, wandering the streets, for considerable times on numerous days during school hours (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-891). There were also particular facts which provided significant support for our line of argument. For instance, Wes had accurate knowledge about the very kind of alcoholic drink that Jennifer preferred, gin and orange juice, which was confirmed by Jennifer's friend, Brooke Doolittle (Tr. 890, 928-929). Also, Brooke

21

confirmed that Jennifer not only was accustomed to using drugs, but also was accustomed to using drugs with people much older than her, particularly Jennifer's mother and father (Tr. 891). All of these facts painted the picture of Jennifer as a young woman who, as described in Wes Purkey's testimony, went willingly with Wes at the outset of their encounter in order to party by drinking and using drugs. Brooke did testify about one thing which she had not shared in pretrial interviews with Mr. Armstrong and Ms. O'Sullivan, an opinion that Jennifer would not get into a car with a stranger (Tr. 892). Even had we known, prior to trial, that Brooke would venture such untoward information, we would have likely still used her because of the critical other information which she provided. Also, such a self-serving observation seemed to go contrary to other evidence about Jennifer's activities. Moreover, this Court sustained objection to Brooke's opinion testimony, and instructed the jury to disregard it, and thus the impact of that was decreased (Tr. 892).

In its opening argument, the government made a point against me similar to the one now made in Mr. Purkey's petition (Tr. 1097). That argument by the government served as a springboard for the detailed closing argument explanation which I made regarding the evidentiary support for the notion that there was no kidnapping. That portion of my argument was as follows:

22

Wes Purkey came forward with the idea of the kidnapping and he persisted with the idea of the kidnapping even in Exhibit 8, his own handwritten confession. Why? Because he wanted to go to a federal institution. Club Fed, baloney. A penitentiary. There's no club there. Is it away from problems that he has in the Kansas institutions? You bet. Is he afraid concerning the Kansas institutions? Yes. Is he punished in a federal institution for life without parole, what he asked for? You bet. That's what he asked for. That's what he wanted. That's why he said it was a kidnapping. It's not true. And you know it. You know from the evidence it's not true.

Jennifer Long on January 22nd, 1998, was a young lady who was 16 and was out of school. She was out of school for one of many, many times while she was at East High School. The folks down at East High School who were in the office came in here and testified for you that she was not attending school regularly, and the records and her grades showed it. Her mother told you that she was not going home when she was skipping school. Mom was dropping her off. And we know what she was doing. She was going out the back door. She wouldn't have been walking home because it was too far to go. It was a lousy area to have to walk through, an industrial area, down 435 and up a hill to try to get into Independence, some three and a half miles away.

And mom would have known she was walking home when she was skipping school because the neighbors would have told her that, and the neighbors didn't tell her that. Jennifer Long is skipping school, and in the area. You know that. And that doesn't say that she was wrong for doing that. That doesn't say she's a bad person for doing it. It's a fact.

And what you know is that when she would go to lunch at school, that maybe she went to a convenience store that used to be here at the corner of Truman Road and Hardesty to pick up a Dr. Pepper. That's what her mom said. But there were other places along Truman Road and particularly there was the Robert's Market where Wes Purkey saw her.

Now, isn't it interesting that Wes Purkey knows critical facts about Jennifer Long that wouldn't have come when you're holding a knife on a person, but would have come up in casual conversations, like whether or not Jennifer Long likes to drink and what it is that she would drink if you got it for her. Gin and orange juice, that Wes Purkey told the officers from day one that she liked and that he bought for her and that she drank. Is that true? Yeah. How do you know? Brooke Doolittle, her friend, said she likes gin

23

002003

and orange juice. No question but that Wes Purkey knows that.

He knows that Jennifer is having trouble at school and getting into fights with some of the girls there. Is that true? Yeah. How do you know that? Because mom indicated to you that that's true.

What you also know is that Wes Purkey did smoke crack cocaine with Jennifer Long. How do you know that? Well, you know that because Jennifer Long smoked drugs. She smoked dope at the time, smoked marijuana. She did. How do you know that? Again, Brooke Doolittle was honest enough to come in here and tell you that she did.

You also know that Jennifer Long's drug problem and drug use was going on a lot more than the casual stuff that was trying to be portrayed to you in some of the testimony. You know that she was using it frequently enough to use it not only with her friends but with her mom and her dad. Jennifer Long's world was that drug use was okay. Smoking dope was okay. And smoking dope with people who are in their 40s is okay, because she did it, and she it. And that is not trying to indict her. That's a fact.

And so when the government says she would never get into a truck with a pretty nice-looking man in his 40s and smoke drugs, that's just flat wrong. And you know why. She was used to smoking drugs with older people, older than her, and she was out with nothing to do for one of many days during her time at East High School.

You have every reason in the world to think that she got into that truck voluntarily, talked with Wes, and gave him all of that information that she gave him about herself, drank, smoked, and went over into Kansas to Wes's house because she frankly didn't have anything better to do at 10 o'clock in the morning than that. She did not have to be home until late in the afternoon. The bus that would take her home would not get her there until the afternoon. She had plenty of time to kill in what would have been a lot better way of doing it than on a January day walking the streets over around Truman Road. And so you know good and well that she got into that truck of her own volition.

And you know that she rode in that truck over to Wes's home of her own volition without any difficulties, without any problems whatsoever. You have additional information that tells you that had there been any problems between them, Jennifer could have gotten out at a number of different times. The two stopped at a convenience store on Highway 7. She goes to the rest room. Could she have left then? Of course. She didn't. There are seven stoplights along Highway 7. Could she have gotten out

24

anywhere along there?  Absolutely.  She didn't.

When Wes stopped the truck at 608 North Main, the gate doesn't work very well.  Tarpley told you that.  He couldn't get it open when he tried to get into there, when he went there.  And the dog is in the back yard, has to be put up first.  Wes has to get out, put the dog up, come back.  Could Jennifer have just gotten out of the truck and walked away?  She could.  She didn't.

All of those things didn't happen because Jennifer was not kidnapped. Jennifer was not taken across state lines without her permission, and Wes did not have any intention to forcibly rape her at that time.  Did it happen in the basement, in Kansas, later?  Yes.  And that's where this case should be if it's going to be anywhere.  But he did not kidnap her.  And you know it.  By the facts that are all there, independent of anything that Wes has told you. You know those verifications.  (Tr. 1108-1112)

Therefore, contrary to the misrepresentations advanced by the government in its argument, and by current Counsel for Mr. Purkey in the Petition filed on his behalf, we made good on all of the promises which we actually made to the jury in opening statement.

In their pleading on Mr. Purkey's behalf, current Counsel for Mr. Purkey cite a host of cases in purported supported for their proposition that the supposed unfulfilled promises made by me were so egregious and prejudicial as to constitute ineffective assistance of counsel (Doc. 52, p. 7-8).  The problems with the line of argument are two-fold.  First, as noted above, there were no unfulfilled promises to the jury in the Purkey case.  Second, as will be detailed below, the cases cited are easily distinguishable on their facts, involving as they do disastrous situations which occurred in those cases, situations which did not occur in the Purkey case.

25

002005

In *United States ex rel Hampton v. Leibach*, 347 F.3d 219, 260 (7th Cir. 2003), *People v. Briones*, 816 N.E.2d 1120, 1124-25 (Ill.App. 2004), and *Ouber v. Guarino*, 293 F.3d 19, 27-30 (1st Cir. 2002), prejudicial ineffective assistance was found due to the defense making an opening statement promise that the defendant would testify, and then failing to present that testimony. Of course, in Purkey's case, on the other hand, all of our promises were fulfilled, including the one to present Purkey's own testimony.

In *People v. Lewis*, 609 N.E.2d 673, 677 (Ill.App. 1992), ineffective assistance was found due to the defense attorney's unfulfilled promise to present an out-of-court statement of defendant, evidence which the defense attorney should have known would be refused as inadmissible, self-serving hearsay. In the Purkey case, no similar situation occurred.

*Anderson v. Butler*, 858 F.2d 16, 17-18 (1st Cir. 1988), defense counsel was found prejudicially ineffective for promising to present mental health experts in opening, but then later determining to not call those experts in light of negative information which the experts would reveal; the problem was that the negative information should have been known by the defense lawyer prior to trial, and should have caused the lawyer to not mention the evidence in opening. Even at that, this case was determined by two Circuit Judges over a vigorous dissent by

26

002006

then Circuit Judge Steven Breyer. *Anderson v. Butler*, 19-21. In any event, there was no such misrepresentation made in Purkey's case about mental health evidence to be presented.

*State v. Moorman*, 358 S.E.2d 502, 510-511 (N.C. 1987) involved an ineffective assistance finding as a consequence of a defense opening statement representation, in a rape case, that evidence would be presented that defendant was physically and psychologically incapable of rape; in fact there was nothing from defendant or investigation which would have led counsel to reasonably believe that there would be evidence available to support either point. In Purkey, we made no such problematic representation.

*State v. Zimmerman*, 823 S.W.2d 220, 225-226 (Tenn.App. 1991) presents an ineffective assistance of counsel result owing to a conflict between defense lawyers during trial which resulted in one defense counsel making representations in opening that evidence of battered spouse syndrome would be presented via the defendant's own testimony and the testimony of a psychiatrist, and then the other defense counsel deciding to not present that evidence, but still arguing by referring in closing to facts "obviously intended to be, but never presented to the jury", with the attorney who had given opening statement not giving closing because he "couldn't face the jury". Fortunately, there was no such dramatic turn of events in

27

002007

the Purkey case.

In *Montez v. State*, 824 S.W.2d 308, (Tex App. 1992), counsel was found ineffective due to faulty jury selection efforts, inadequate preparation, failure to conduct discovery, eliciting inadmissible and incriminating hearsay statements, making an opening statement in which he placed the burden of proof on the defense, and in making unspecified "extravagant promises" about evidence which was never shown to jury. Apparently, the case is cited in support of only the latter issue. The case is inapposite here since none of the accounted errors occurred here.

Finally, in *People v. Morgan*, 719 N.E.2d 681, 703-707 (Ill. 1999), the death sentence imposed at trial was reversed because of ineffectiveness of counsel in failing to develop and present mental health mitigating factor evidence. Since they make no reference to page number in their citation of this case, it is unclear to me why current Counsel for Mr. Purkey cite this case here, particularly since this case case was clearly not decided on alleged unfulfilled promises point made by counsel. It may have been their intention to cite this case, instead, in support of another of their issues raised later. If that is the case, then I note now, as I shall detail later, I believe that we presented all of the best mental health mitigation evidence available on Mr. Purkey's behalf.

What Counsel for Purkey have done is tease certain language from these

28

cases, ignoring the extreme facts in those cases which justified the language in those cases, and ignoring that the very different circumstances in this case would not allow application of that language to this case. The upshot of all of this is, despite the invective tone of the arguments advanced by Counsel for Purkey, there is no factual or legal support for the arguments themselves.

The arguments advanced by current Counsel for Purkey could be interpreted as a very valid point that it might have been better for the defense to avoid completely any argument that Jennifer was not kidnapped, thereby obviating the need for the defense to explain why Mr. Purkey told that untruth. However, it was my clear understanding that Mr. Purkey very much wanted the argument, that there was no kidnapping, to be made, and that Mr. Purkey would never have countenanced an approach to the defense which left out such an argument. Because of that, I developed the evidence and argument which I did, perceiving those to be the best way I could advance the argument.

### *Issue regarding avenues of impeachment against government witness Michael Speakman*

1. Summary of the allegations

In the Petition, it is generally alleged that the defense team was ineffective in its preparation to confront and cross-examine government witness Michael Speakman (Doc. 47, p. 7). However, the lone specific complaint made about the

cross-examination concerns what is described as a failure to present available evidence to rebut a single contention by Speakman, that Purkey had supposedly boasted to Speakman about being in jail for killing people (Doc. 47, p. 7-9). In the Petition, it is alleged that there were six witnesses who should have been called to rebut the Speakman claim: CCA inmates Cornelius Peoples and Xavier Lightfoot, CCA personnel Lister, Perdue (misspelled Purdue in the pleadings) and Williams, and lay person Sam Hoffmeier (Doc. 47, p. 8). Affidavits and arguments are provided regarding what Peoples, Lister and Hoffmeier would have said if called to witness (Doc. 47, Attachment 25; Doc. 52, p. Attachments 1 and 2). No explanation is provided as to what Lightfoot, Perdue or Williams would have said.

## 2. Preparation for Speakman cross was a team effort

Before addressing the individual points, it would be well to first note what seems to be an underlying, but incorrect, assumption. That assumption seems to be that, since Laura O'Sullivan was the attorney who handled the Speakman cross-examination, she was the only one who prepared for that cross-examination. Preparation for the Speakman cross-examination was actually a team effort, involving Laura, Mic Armstrong and me. Thus, while Laura, in her affidavit made in support of the Petition, has acknowledged that she personally did not do all of the preparation work for the Speakman cross, that simply means that certain of

those items of work were done, not by her, but by Mic or me.

3. Cornelius Peoples issues

Preparation for possible use of Cornelius Peoples was done by me.  In light

of information provided to me by Mr. Purkey, and in light of the fact that Peoples

had been housed with Wes at CCA, we had contemplated the possibility of using

Peoples to testify regarding this and other issues about which he had knowledge.

In his affidavit, Mr. Peoples correctly indicates that I did not speak with him

directly about his possible testimony.  That was because, at the time, Mr. Peoples

was represented by counsel on his own capital case, ***United States v. Peoples***,

WDMO Case Number 00-395-03-CR-W-FJG.  On May 22, 2003, I contacted

Peoples' attorney, Bill Odle, to determine whether Peoples would be willing to talk

to me and to testify for us.  Mr. Odle told me that Peoples was not going to talk to

me, and was not going to testify.  The reasoning was two-fold.  First, Mr. Peoples

was facing retrial in his own capital case, ***United States v. Peoples***, Case Number

00-395.  According to what Mr. Odle told me, he recommended to Mr. Peoples,

and Mr. Peoples agreed, that should Peoples be called to witness on behalf of the

defense in any case, he would invoke his Fifth Amendment privilege in order to

protect himself from any cross-examination which could arguably be used to assist

in his own prosecution.  Second, Mr. Odle was attempting to work out a plea

agreement for Peoples in his own case. As a consequence, Odle was strongly recommending to Peoples, and Mr. Peoples was agreeing with the notion, that Peoples not involve himself in the defenses of others, lest such entanglements jeopardize his lawyer's ongoing negotiations with the prosecution. On the basis of these representations by Mr. Odle, I did not take steps to secure the presence of Peoples for trial. To the extent that Mr. Peoples' 2007 affidavit amounts to a claim that he would have assisted with the Purkey defense at the time of our trial, that representation is contrary to what Peoples was saying, as relayed by his attorney, at the time the Purkey case was pending.

Even if Peoples had been willing to cooperate, though I would have consulted with Mr. Purkey on the issue, I would have had substantial questions over whether to use Peoples at trial for any purpose about which I was aware, including those mentioned in People's 2007 affidavit. Mr. Peoples would have brought substantial baggage as a witness, starting with his own capital case charge, for which he had already been once convicted. In addition, Peoples had a serious prior conviction, an aggravated battery from Wyandotte County in 1991 for which he had served eight years of a 10-30 year sentence. Besides all of this, I was also very familiar with other bad acts information pertaining to Peoples. In sum, Peoples had the reputation as a cold-blooded killer, willing to do or say anything. I

32

was familiar with this information because I had represented one of Peoples'

codefendants, Carl Haskell, and had received considerable information about

Peoples in the discovery and in our investigation in that case. I was concerned

that, under the right circumstances, some of that negative information might also

come out on cross, further damaging whatever credibility Peoples might be deemed

to have.

There were also practical problems with using Peoples to indict Speakman in

the way suggested in the Petition. Peoples would have to admit that he was not

present in the cell with Purkey and Speakman when the conversations between

those two allegedly occurred. Thus, while Peoples might have been allowed to say

what he personally heard and did not hear Purkey say, he was in no position to say,

one way or the other, what was said between Speakman and Purkey. What is

more, Peoples was himself in negotiations to become an informer. As it turned

out, Peoples actually became an informer against his codefendant, Xavier

Lightfoot, and received a substantial reduction in sentence as a result. See WDMO

Case # 00-395, Doc. 658, 660, 800. Peoples then went on to inform in another

case, **United States v. Hargrove**, District of Kansas case number 03-20192-CM,

and received an additional reduction of sentence for that cooperation. See WDMO

case number 00-395-03-CR-W-FJG, Doc. 812, 813, 814. It is worth noting that, in

002013

the *Hargrove* case, Peoples played a role similar to that played by Speakman in the Purkey case. That is, Peoples claimed, over Hargrove's denials, that Hargrove had supposedly confessed his guilt during a private conversation in a CCA cell between Hargrove and Peoples. Peoples also informed on another coconspirator in his own case, one Anthony Hunter, concerning another double murder. That case never developed because Hunter, who also cooperated in the *Lightfoot* case, countered Peoples' accusation with the claim that Peoples was actually the murderer in that case. Ultimately, Peoples had to admit that he participated in the double murder at least to the point of helping to hide bodies.

I feared that, in light of Peoples' own efforts to become an informer, even genuine efforts by him to help in Purkey's case could have been turned around by any adroit prosecutor. At the very least, any testimony by Peoples critical of Speakman would likely have, at best, been cast by prosecutors as the pot calling the kettle black. I figured it likely that Peoples would also have to concede that, in light of his own experience as an informer, he knows there are instances in which defendants who persistently deny guilt sometimes slip and confess to cellmates.

Thus, to put things succinctly, Peoples was a marginal witness who refused to cooperate with us. Thus, I did not attempt to call him as a witness.

4. Xavier Lightfoot issues

34

002014

As mentioned above, though Xavier Lightfoot's name is mentioned in the Petition, no explanation about Lightfoot's alleged knowledge is given, Lightfoot's name is not mentioned in the suggestions, and no affidavit from Lightfoot is provided.

Current counsel for Mr. Purkey may not be familiar enough with the record to know that, in late 2002, we actually did secure the testimony of Lightfoot on Purkey's behalf during pretrial proceedings. While I found that testimony very helpful in that context, the cross-examination of Lightfoot confirmed two things. First, it made clear to Lightfoot's counsel just how vulnerable he was when subjected to cross even on issues strictly related to Purkey's case, leading Lightfoot's counsel to strongly advise him not to repeat such efforts for Purkey. Second, it made clear for me just how strong were the avenues of impeachment against Lightfoot, and how bad all of that would sound in front of a jury. I do not recall ever hearing from Wes or Lightfoot about an ability on the part of Lightfoot to testify about Speakman. However, even if it could be said that Lightfoot would have had such information, my understanding from talking to Lightfoot's attorney after Lightfoot's pretrial hearing testimony for us was that Lightfoot would invoke his privilege if called again. And, even if Lightfoot would have been willing to testify, it was my opinion that, because Lightfoot's frailties for this purpose were

35

002015

even more pronounced than those suffered by Peoples, it was an even worse idea to use Lightfoot for this purpose.

5. CCA witness issues

In order to explain why I did not use CCA witnesses for the purpose of rebutting the Speakman testimony, or for any other purpose for that matter, it is necessary for me to digress regarding the matter of Wes' various battles with CCA. Throughout the pendency of the case, Wes' relations with CCA were abysmal. Almost daily, Wes was at odds with one or another corrections officer. Wes filed several reams of paper worth of grievances over his conditions of confinement at CCA. I filed several motions with this Court on Wes' behalf complaining over conditions of confinement. CCA guards threw away Wes' case materials, and that formed the basis for one of our substantive motions in the case. Things got so bad between Wes and CCA that I assisted him with filing of a *Bivens* action. See District of Kansas Case Number 03-3157-CM. Ultimately, Wes was removed from CCA, prior to trial, after an incident in which Wes was accused of assault on a guard, though it was Wes who was seriously injured while cuffed, hands and feet.

In order to deal with this array of problems, as well as to prepare with respect to both phases of the case, I was regularly talking with all sorts of CCA corrections officers and supervisors. That included Melvin Lister, one of the

36

002016

names mentioned in the Petition. I also had Mic locate and interview Sue Perdue, a nurse who left the employ of CCA just prior to time of trial. I do not specifically recall speaking with a Mary Williams. As noted already above, Ms. Williams' name is mentioned in the Petition, but no description is given therein regarding her base of knowledge, no mention of her is made in subsequent suggestions, and no affidavit from her is provided.

Because I had widely spoken with CCA supervisors and staff, I knew that Mr. Lister was one of less than a handful of CCA workers who were willing to speak positively about Mr. Purkey. There were many, many others, including Ms. Perdue, who would relate strongly negative information about Purkey with little or no prompting.

I took the position, throughout the trial, that I was not going to open up the pandora's box of the problems at CCA if the government did not. I avoided this because I believed that, in a pitched battle, though we could certainly score some points in light of the cavalier way in which Purkey was treated at CCA, we would undoubtedly, on balance, end up on the losing end, particularly in light of an array of negative behaviors attributed to Purkey and the highly negative opinions of Purkey held by the bulk of the CCA personnel. Before, during and after trial, Wes accused me of having made a formal agreement with the government to avoid CCA

37

issues at trial. Actually, what developed was not an agreement, but rather a stalemate. Government counsel also avoided introducing CCA matters in the first instance, seeing downsides to their side of the case. However, government counsel also made clear to me that, should I choose to make any CCA points, they were ready to present their counterpoint witnesses. The result was that, by and large, the significant bulk of the problems at CCA were never mentioned at trial.

I have no doubt that, had he been given the opportunity, Mr. Lister would have testified in much the fashion which was set forth in his affidavit. However, I knew for certain that the government could easily find many other corrections officers who would have been more than willing to come forward to confirm at least the tone, if not the precise language, about alleged rantings by Purkey, as described by Speakman. Especially since Mr. Lister, even if believed, could only account for Mr. Purkey's behavior for the forty hours per week during which he worked, I did not think that impeaching Speakman's account for that limited time was worth the likely counterpoint from other CCA workers, confirming Speakman's account for the remaining time. Thus, I believed at the time, and still believe now, that the smart move was to avoid using CCA workers to confirm either side, and instead let Speakman's and Purkey's accounts stand on their own.

6. Sam Hoffmeier

002018

I had several opportunities to interact with Sam Hoffmeier.  Mr. Hoffmeier was a kind individual who had befriended and regularly visited Mr. Purkey.  I knew that Mr. Hoffmeier's interactions with Mr. Purkey had all been positive, and I have no doubt that he would have testified as described in his affidavit had he been asked to do so.  I did not call upon Mr. Hoffmeier for this purpose for two reasons.  First, I did not believe that the information was very helpful, since it would be easy for the government to argue that none of Mr. Hoffmeier's dealings with Mr. Purkey were in the context as described by Speakman, that is Hoffmeier did not deal with Purkey in the segregation pod, and could not have been privy to Purkey's interactions in the pod with staff and inmates.  Second, and more importantly, I believed that bringing up this testimony from Hoffmeier to counter Speakman would prompt the government to go to CCA corrections officers to find support for Speakman.  Since I was loathe to create this result through resort to the relatively the more germane testimony of Mr. Lister, I most certainly did not want to create this result through the rather feeble testimony which could be offered by Mr. Hoffmeier.

7. The cited cases are readily distinguishable on their facts

On this issue, as they have on other issues, current Counsel for Mr. Purkey cite to a host of cases, urging that those cases, and certain salient language from

39

002019

those cases, supposedly support their arguments about this Speakman impeachment issue. Unfortunately, when one troubles to look carefully at those cases, one instantly finds that all of the cases are readily distinguishable upon their very different, much more egregious, fact patterns.

In ***Cargle v. Mullin***, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), counsel was found ineffective for failure to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made contrary statements to others, that the defendant, instead, had made only exculpatory statements. There was no comparable failure to investigate here.

In ***Roberts v. State***, 602 S.E.2d 768, 771 (S.C. 2004), counsel was found ineffective for failure to discover and present evidence regarding the impossibility of an informer's account of defendant's supposed admissions; while the witness claimed at trial that he was able to have a private, in-prison conversation with the defendant because of the proximity of their cells, the distance between the cells was actually closer to 100 feet, necessitating any such conversation to have been conducted with shouts, with other inmates and guards necessarily overhearing the conversation; other inmates and guards were willing to swear that they never overheard any such conversation. There was no comparable failure to investigate

here.

In *White v. Roper*, 416 F.3d 728, 731-732 (8th Cir. 2005), counsel was found ineffective for failure to interview, prepare and present readily available witnesses to support misidentification defense. There was no comparable failure here.

In *Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005), counsel was found ineffective for failure to interview, prepare and present testimony of defendant's children during penalty phase of trial. There was no comparable failure here.

In *Soffar v. Dretke*, 368 F.3d 441, 474-475 (5th Cir. 2004), a case in which the defendant had confessed and then recanted the confession, counsel was found ineffective for failure to interview the victim and bring out through the victim's testimony factual inconsistencies between the retracted confession and the victim's account of the crime. There was no comparable failure here.

In *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003), counsel was found ineffective for failing to conduct any independent investigation whatsoever. There was no comparable failure here.

In *Towns v. Smith*, 395 F.3d 251, 253-254 (6th Cir. 2005), wherein the prosecutor's case was based solely upon eyewitness identification, counsel was found ineffective for failure to interview and present as a witness the person from whom police had obtained murder weapon, who would have exonerated defendant,

41

002021

and would have instead implicated defendant's brothers who physically resembled him (thereby accounting for the misidentification of defendant by the eyewitness). There was no comparable failure here.

In *Hamblin v. Mitchell*, 354 F.3d 482, 490-491 (6th Cir. 2003), counsel was found ineffective due to failure to conduct any mitigation investigation, failure to obtain background records pertaining to the defendant, and interview of only one of 22 available family members.  There were no comparable failures in this case.

In *Holsomback v. White*, 133 F.3d 1382, 1387 (11th Cir. 1998), counsel was found ineffective for failure to interview and call a doctor who would testify, in a case in which repeated sodomy against the victim was alleged, that the victim showed no physical signs of having been sodomized.  There was no comparable failure here.

In *Ross v. State*, 954 So.2d 968, 1006 (Miss. 2007),  counsel was found ineffective due to failure to develop and present readily available evidence regarding the defendant's history of mental health problems, including visual and auditory hallucinations, the defendant's history of being a physical and sexual abuse victim, and the defendant's history of having suffered other catastrophic personal tragedies.  There was no comparable failure here.

In *Johns v. State*, 926 So.2d 188, 196 (Miss 2006), counsel was found

002022

ineffective for failure to interview, prepare and present alibi witnesses identified by defendant and his family. There was no comparable failure here.

### *Issue regarding failure to hire "mitigation specialist"*

<u>1. For a host of reasons, rather than hiring a forensic social worker, I used other members of the defense team to develop and present our mitigation case</u>

Mr. Purkey's current Counsel correctly note in their pleadings on his behalf that I did not enlist the services of a forensic social worker, often referred to as a "mitigation specialist", to assist in our presentation of the case even though I had originally budgeted for the hiring of such a person (Doc. 47, p. 10-16). I have already described, above, the defense team which I actually assembled, and how the members of that team acted, in their various capacities, as mitigation specialists. There were a host of case-related reasons why I believed that the hiring of a forensic social worker was needless under the circumstances.

In my experience, a forensic social worker, specially trained in capital case work, is oftentimes employed to assist with development of the case. The roles often played by such a forensic social worker are

- the development of rapport with the client, family members and other potential mitigation witnesses as an adjunct for consequent development of mitigation evidence for trial,

- the accumulation and summarization of medical, psychological/psychiatric,

43

002023

schooling, work, incarceration and other records pertaining to the client and his family,

- the conceptualizing and crystallization of themes of mitigation defense, including the summarization of those themes in report form,

- the identification, interview and preparation of mitigation witnesses,

- the presentation of testimony, in hearsay fashion, about the information gathered by him/her and others from other persons and sources (such a presentation is regularly allowed because of the relaxed rules of admissibility which attend in the penalty phase of a capital case trial).

A forensic social worker is a particularly important part of a capital defense team in a case in which the lawyers, while fine practitioners in the normal criminal case, have no previous capital case experience, and thus no experience in development of capital case mitigation themes. However, the experienced capital case litigator, by training and experience, can and should be expected to develop case themes himself/herself. In fact, the Court pays appointed counsel a higher rate in a Federal capital case in deference to his/her training and experience in dealing with capital cases. I felt my prior capital case experience prepared me for the development of mitigation themes, and I relied on that experience to develop the themes in this case.

44

002024

Also, in a case in which there are potential mental health issues, and the defense attorneys have no training and experience in the field, a forensic social worker could provide important help with those issues. Because my undergraduate and graduate school backgrounds are in medical biology and psychology, and because I had previously handled mental illness defenses, I did not require that sort of assistance.

It is sometimes argued that forensic social workers can be utilized to save costs in a case. Current Counsel for Mr. Purkey make just such an argument (Doc. 52, p. 19, fn 6). However, in my experience, the opposite is the case. At the time that Mr. Purkey's case was pending, appointed Federal capital case defense attorneys were being compensated at the rate of $125.00 per hour for in court and out-of-court time. At the same time, the hourly rates being charged by most experienced forensic social workers were ranging in the same vicinity, between $85.00 and $150.00 per hour. Thus, at the time that Mr. Purkey's case was pending, the mere expedient of expending forensic social worker time instead of a like amount of attorney time would yield little or no cost savings.

Moreover, in my experience, utilization of a forensic social worker is in most cases a redundant cost.

For the reasons which I have already described above, I believed at the time,

45

002025

and still believe now, that, because of my training and experience in capital cases in general, and in mental health cases in particular, enlisting the services of a forensic social worker for development of mitigation themes and avenues of documentary and witness investigation was unnecessary. I planned to, and actually did, shoulder those duties myself. As for development of reports about mitigation themes, I had two of the best at work on that, Dr. Stephen Peterson, M.D. and Dr. Mark Cunningham, Ph.D. I believe that the thorough reports prepared by those experts served us well as means of discovery for the government and as roadmaps for the bulk of our mitigation presentation.[2]

As to the role of locator of mitigation case witnesses, it has been my experience that social workers invariably lack the skill set to ferret out people who, in cases like these, are almost always difficult to locate, and who, when found, are often situated in areas where the social worker fears to tread alone. That necessitates the social worker enlisting the services of the case investigator, to find the witnesses in the first instances, and then to accompany the social worker during the interviews. As I have already detailed above, in Mr. Purkey's case, I employed

---

[2] Because I have provided my file to current Counsel for Mr. Purkey, I am unable to provide the Court with copies of those reports. However, I am sure that copies of those reports could be provided by either of the parties, should the Court wish to review those to judge the accuracy of my description regarding the thoroughness of those reports.

46

Mr. Armstrong, who has the skill set to, by himself, both locate and interview such witnesses.

As to the role of obtainer of records about the client, I have found that social workers simply cannot complete such work independently, and have to enlist the assistance of the attorneys to obtain subpoenas and other means to force production of such records. In Mr. Purkey's case, I personally handled the identifying and obtaining of all the thousands of pages of records about his and his family's background.

As to development of client, familial and witness rapport, it is my practice to develop that rapport myself. I believe that, since I shall be the one presenting such witnesses at trial, I am the one who needs to have that rapport from the outset. Thus, I anticipated that I would, and indeed did, play this role for Mr. Purkey, for his family and for other witnesses we presented.

It was my intention to have Mr. Purkey's background thoroughly explained by a forensic witness. However, I did not want a mere social worker to take on such a weighty role. Instead, I enlisted the services of Dr. Mark Cunningham, Ph.D. to do this work. Dr. Cunningham had played a similar role in another case for me, and in many other such cases across the country. At trial, Dr. Cunningham made a comprehensive presentation, acting as a summary witness to advance

47

002027

mitigation themes and debunk certain aggravating factors.[3]  This supplemented the presentation made by Dr. Peterson and our other mental health experts.

Thus, to sum up, since I had already covered, in what I deemed to be a better fashion, all of the duties which might have been assigned to a forensic social worker, I decided to not needlessly expend funds for such a person.  Current Counsel for Mr. Purkey correctly note that, in my pleadings for additional funds for the experts we employed, I highlighted the savings we realized in not needlessly employing a forensic social worker; but they go on to criticize that critical work went undone because of that decision (Doc. 47, p. 19-20; Doc. 52, p. 18).  To the extent that it is implied that I was somehow afraid to ask for the tens of thousands of dollars for a forensic social worker, such an implication seems rather silly in light of my having asked for and received the hundreds of thousands of dollars for our other experts.  There is no question in my mind that, had I made application for funds for a forensic social worker, in addition to the funds for all of

---

[3] Relying upon my original funding request for Dr. Cunningham, Mr. Purkey's current Counsel allege that Dr. Cunningham was used by us only to counter the government's aggravating factor allegation of Mr. Purkey's future dangerousness (Doc. 52, p. 15).  I can only assume that, in making this argument, Counsel have failed to read Dr. Cunningham's trial testimony.  I believe that a fair reading of Dr. Cunningham's testimony demonstrates that, though he certainly brought forth the anti-future-dangerous themes (Tr. 1880-1908), he also spent a considerable amount of time on the wide range of our mitigation themes (Tr. 1855-1879).

002028

our other experts, that request would have been granted. While I am aware that others have had difficulties related to budget requests, particularly in getting approval from the Chief Judge of the Eighth Circuit for such requests, I have never had such difficulty. I attribute my success to the fact that I copiously justify the requests which I make. In this instance, I simply could not justify spending money on a forensic social worker when I believed that all of the duties I would have given to such a person were being better handled by others. Because of that fact, I was able to cite to my decision to not employ a forensic social worker as a means to explain additional costs being expended for other experts.

I suppose the real question is whether I was correct that the duties which a forensic social worker could have performed in this case were all done, and in better fashion, by other members of the defense team. I believe that the facts demonstrate the correctness of my representation in that regard.

2. As indirectly acknowledged in the pleadings filed by Counsel for Mr. Purkey, our team assembled all available mitigation information, and three persons, Dr. Peterson, Dr. Cunningham and me, combed that information for the mitigation themes which we presented

As a result of our efforts on Mr. Purkey's behalf, scouring the country, we located and obtained thousands of pages of records pertaining to Mr. Purkey and his family. I thoroughly read all of the records, and I had two professionals, psychiatrist, Dr. Stephen Peterson, M.D. and psychologist, Dr. Mark Cunningham,

49

002029

Ph.D., do the same. Dr. Peterson and Dr. Cunningham produced comprehensive reports about their review. Out of this preparatory work sprung a mitigation case consisting of eighteen lay and expert witnesses whose combined presentations cover over 500 pages of transcript. As noted by current Counsel for Mr. Purkey (Doc. 52, p. 24), we chased every lead provided by Mr. Purkey, even those which might at first blush be considered odd, to wit Mr. Purkey's claims about his wife poisoning him. In hindsight, it could be argued that, even though our persistence in that regard eventually resulted in Jeanette Purkey admitting that she was poisoning Wes (Tr. 2237-2249), the efforts were ultimately fruitless since the evidence was ruled inadmissible, and that ruling was upheld on appeal. *United States v. Purkey*, 428 U.S. 738, 757 (8th Cir. 2005). However, it was our approach to follow any and all leads to develop any and all potentially mitigating evidence. Our efforts on the poisoning front were consistent with the approach.

It is urged by current Counsel for Mr. Purkey that I should have, in addition, employed a forensic social worker to also pour through the records, and prepare yet another report (Doc. 47, p. 17, 19; Doc. 52, p. 16-19). Current Counsel for Mr. Purkey have also provided opinions from Dr. Peterson and Dr. Cunningham that it might have been well to have had a forensic social worker do this work as well as them (Doc. 27, attachment 15, p. 2, attachment 11, p. 1). Current Counsel for Mr.

Purkey correctly indicate that I shared with this Court at the time that the case was pending my reasoning for not asking to expend funds for a forensic social worker (Doc. 27, p. 15-16). To reiterate, I chose to not expend the funds for a forensic social worker in this case because of my belief that the necessary work was better being done by others, and therefore obtaining a social worker would have constituted a needless additional expense. I wanted our experts and me to be directly familiar with all of the raw data rather than some summary of that data prepared by a forensic social worker. Though current Counsel for Mr. Purkey have indicted my approach in this regard, they do not identify in their pleadings a single mitigation theme which was missed as a result of this approach.

It is also implied in the argument made by current Counsel for Mr. Purkey that our efforts to develop certain avenues of mitigation evidence, for instance the poisoning, came at the expense of work on other avenues of mitigation evidence (Doc. 52, p. 25). However, current Counsel for Mr. Purkey do not support that inference, since they fail to advance even one new mitigation theme which they found and we supposedly missed. Instead, current Counsel for Mr. Purkey, relying heavily on the materials which we developed, complain only that we should have done a better job handling the witnesses we did call, and should have called several of the witnesses who were identified in our investigation, but whom we chose not

51

to call (Doc. 52, p. 23-27).  I shall explain below why we handled each of those situations as we did.

### 3. Gary Hamilton was developed as a powerful mitigation witness at trial despite his recalcitrance, even up to the eve of trial[4]

Current Counsel for Mr. Purkey urge that my handling of Wes' brother, Gary Hamilton, was substandard, complaining that I made too few contacts, that I was not "sensitive" in the contacts which I made, and that I did not develop all of the available information in the way in which a forensic social worker might have (Doc. 52, p. 23).

At the foundation of these complaints lies an assumption that Gary Hamilton, prior to trial, was the very cordial, compliant individual who readily met with current Counsel for Mr. Purkey, and cooperatively shared with them his information and insights.  When I first encountered Gary, his attitude was, to say the least, different.

From the outset, I knew from government discovery about interviews which had been conducted with Gary.  Those reports painted a picture of Gary as being so hostile and adverse to his brother Wes that it appeared likely that he was being groomed as a government witness against us.  Those reports specifically indicated

---

[4] My answers here are also meant to respond to the accusations made at Doc. 47, p. 31-32 and Doc. 52, p. 33.

52

002032

that Gary described his brother Wes as self-centered, manipulative, aggressive and lacking conscience. Gary purportedly also told government interviewers that Wes had no excuse for ending up the way he did, since he and Wes were given everything they needed when growing up. It was also reported that Gary held ill-will against Wes because Gary believed that Wes had forced himself sexually on their mother.

During my initial phone conversations with Gary, he conveyed to me much the same hostility, repeating many of the same things he had told government agents. Gary also rebuffed my questions designed to try to begin identifying problems with their upbringing which could have led to Wes' problems. Despite the venom coming from Gary, I believed that I needed to try my best to win him over, despite the odds against us. Since I believed the information which Wes had given me about his wretched upbringing, I also believed that Gary, for one reason or another, was not being candid with me about what had happened during his and Wes' childhood. I was hopeful that, through some combination of approaches, we would break through Gary's apparent hatred of Wes so as to get at the truth. I believed that I had two strong reasons for hope in this regard. Those were Gary's wife Becky and his daughter Tonya Braymer. I had some conversations with Becky, and many more with Tonya. Both were extremely kind and supportive

during our conversations about Wes. I asked that these two work on Gary, to help me get him to open up, and they indicated they would.

I also decided that, in order to possibly change the dynamic, I needed to broach Gary in his own surroundings. Therefore, I made a trip to Gary's home on March 21, 2003, more than seven months before trial started. Since Gary lived in far off Gibbon, Nebraska, I enlisted the help of my son to assist me with the long drive there. When I arrived, my son remained in the car. However, when I reached the door, Becky could see my son in the car, and wanted him to come in as well. This actually helped my process in a couple of ways. First, both Gary and Becky appeared to like my son very much, and talked freely and easily with him. My son's presence seemed in particular to put Gary at ease. My feeling was that this cast me in the role as the father of a young adult, like Gary, rather than in my role as his brother's lawyer who wanted something from him. Second, during the time that my son was in the apartment, he further assisted me in that he would interact with and occupy either Gary or Becky, allowing me to talk semi-privately with the other. My son also left for a time, leaving me alone with Gary and Becky for that stretch of time.

Throughout all of the meeting, Gary was more cordial than I had anticipated. However, Gary's developing good will toward me in no way changed his negative

002054

attitude toward his brother. All of the same invective against Wes came out in this context as well. Thanks to my son's presence, occupying Becky, I had several opportunities to address to Gary, out of the hearing of Becky or my son, about the issue of intrafamilial sex in general, and about Wes' contentions about their mother seeking sex from Wes in particular. Gary was adamant in professing his belief that Wes had raped their mother, saying his mother told him so. Gary was just as adamant in his conviction that his mother would have never had consensual sex with Wes. My impression was that Gary was very protective of his mother, and would have none of any conversation which portrayed the mother in any sort of a bad light.

On the whole, this meeting, which lasted better than three hours, broke the ice between Gary and me, but did not really change anything in terms of the still-negative substance of what Gary had to offer. Thereafter, I stayed in regular contact with Gary, Becky and Tonya. I also passed along to Gary, when I received it, police reports concerning the rape accusations which their mother made against Wes. It seemed to me, and I argued to Gary, that the reports made it pretty plain that their mother had concocted the story of rape against Wes.

Despite my efforts over the months prior to trial, Gary did not relent in my pretrial conversations with him. Nevertheless, I decided to keep up subtle pressure

55

002035

on him, through my contacts with him and through the influence of Gary's wife and daughter. I certainly held open the hope and possibility that Gary would become a witness for us.

Then, as trial was beginning, Gary expressed his desire to attend Wes' trial. In light of what I was told by Gary and Tonya, I believed that Tonya had much to do with her Father's new-found attitude. I made the arrangements to have Gary, Becky and Tonya appear for trial. When they arrived, Gary had a new revelation: he had been sexually abused by his mother. Gary's willingness to now admit this fact allowed him to understand and believe that the same had happened to Wes, and that their mother had lied about Wes raping her. This was precisely the breakthrough for which I had hoped. Before that, we had very little other than Wes' claims about his mother's abuse, countered by the mother's own accusation of rape against Wes. Gary's was a separate, independent verification of the mother's sexual deviancy, thus confirming the likelihood that Wes' own accusations against his mother were true.

Mr. Purkey's current Counsel argue that I should have learned from Gary prior to trial, and should have elicited from Gary at time of trial, the account which Gary has now given them containing more details about sexual deviancy within the family. Unfortunately, Gary did not share with me all of these details as we

56

feverishly prepared him, at the last minute, for his testimony based upon his new revelations. Had Gary shared that information with me at that time, I would have presented much of that information at trial. I in no way fault Gary for not providing me that information at that time. Frankly, at that time, he may not have even remembered that detail.

Mr. Purkey's current Attorneys argue that Gary should have been worked with by a social worker in a different way so that this additional detail could have been identified and presented at time of trial (Doc. 52, p. 23). My belief at the time was that, had we been more aggressive with Gary, as suggested by Purkey's current Counsel, we would have driven Gary further into his negative shell. It is my belief that our approach allowed Gary to finally come to terms with his own sexual abuse in his own way and in his own time. Fortunately, Gary's own time left us just enough time to allow us to present very significant evidence at time of trial. Unfortunately, Gary's own time did not leave him enough time to reconstruct all of his own memories, and timely share them with us for trial.

If I correctly understand Mr. Purkey's current Counsel, they also argue, correctly, that I could have asked Gary to provide more intimate details about the sexual activities between him and his mother as a means to bolster Gary's and Wes' stories of sexual abuse. I chose at the time, and would choose again today, to

57

002037

not ask this grown man to describe the sexual positions into which his mother

placed him.  I believed then, and I believe now, that providing the level of detail

which we did struck a good balance between our need to give enough detail for the

jury to clearly understand what happened to Gary while still holding back on the

gory details, conveying thereby to the jury Gary's real sense of embarrassment and

shame over the matter.  I leave it to the Court to decide whether my approach, or

the approach suggested by Purkey's current Counsel, would be the more wise.

4. The testimony of Angie Genail, Wes' daughter, was presented after significant
preparation[5]

Though current Counsel for Mr. Purkey acknowledge that Purkey's

daughter, Angie Genail, was called to witness at the penalty phase, they seem to

complain that this testimony was presented after only brief and inconvenient prior

interviews with her (Doc. 47, p. 11, fn. 3; Doc. 52, p. 26).

Counsel for Mr. Purkey do not explain how the testimony by Ms. Genail was

in any way deficient.  My recollection was that Ms. Genail's accounts about her

and her children's relationships with Wes, and Ms. Genail's plea for her father's

life, were all powerful.  My recent re-reading of the testimony confirms in my

mind those notions (Tr. 1541-1547).

_____

[5] I mean for this to also be a response to the non-specific accusations made in Doc.
47 at page 32.

58

002058

It should also be noted that I met with Angie in person on three different occasions to prepare her for her testimony, and presented all the good information which I believed was available from her.

**5. After considerable effort, we were able to identify, develop and present significant family background evidence from Wes' paternal aunt, Marguerite Hotchkiss**

As we developed our mitigation case for Mr. Purkey, we wanted to find persons who were present while Mr. Purkey was growing up, who could account, first hand, for the hard life he led. Unfortunately, most of those persons had died. The only two persons left were Wes' brother Gary and Wes' maternal aunt, Marguerite Hotchkiss. We developed Gary's testimony, as described above. Through a long and difficult process, we were finally able to locate and interview Ms. Hotchkiss, and ultimate present her testimony at trial.

The process of finding Ms. Hotchkiss began with her daughter, Wes' cousin, Debbie Prothero. From my first contact with Debbie, she made a few things abundantly clear: that she had little or no recollection of or prior relationship with Wes and that she was personally very much in favor of the death penalty.[6] Debbie

---

[6] In a footnote, Wes' current Counsel allege that Debbie and her husband would have willingly testified on Wes' behalf (Doc. 52, p. 27, fn 9). However, Counsel do not provide affidavits from Debbie or her husband, nor do they mention what Debbie or her husband could have or would have said had they been called to

002039

was very helpful in assisting me in tracking down her mother. Ms. Hotchkiss was

living variously in Hawaii and California, with occasional stops to visit Debbie in

Springfield. When I finally tracked down Ms. Hotchkiss for the first time, she was

in California. During that conversation, and the ones that followed, she provided

me all of what she testified about at time of trial. She had no other knowledge

about Wes, his dad, his mother, or that part of the family beyond the information

which we presented at trial.

I then set about trying to persuade Ms. Hotchkiss to appear in person to

testify at trial. Ms. Hotchkiss was adamant that she could not do so. The reasons

were two-fold, related to her emotional problems over the case itself and her

perceived difficulties related to travel. In light of her ability to travel from

California to Hawaii and back again, it seemed to me that Ms. Hotchkiss' problems

were likely related much more to the first reason rather than the second.

Nevertheless, in light of her advanced age, I endeavored to arrange for a deposition

---

witness. In her conversations with me, Debbie made clear that neither she nor her
husband knew much of anything about Wes or his side of the family. Moreover, in
every conversation I had with Debbie, she made sure it was abundantly clear that
she was very much in favor of the death penalty, and was in no way opposed to
Wes receiving the death penalty in this case. It seemed to me an obvious choice to
not have Debbie or her husband witness in this case, and so I did not. I see nothing
in the information from Mr. Purkey's current Counsel to make me question that
decision.

60

002040

of Ms. Hotchkiss in order to secure in that way the important information about the case which she had to offer (Doc. 405). In the meantime, Ms. Hotchkiss traveled to Springfield. At that point, I hoped that, since she was now situated much closer, she would be willing to appear in person for trial. Unfortunately, she again balked for the same reasons as before. Fortunately, I was able to reach an agreement with prosecutors whereby we presented Ms. Hotchkiss' testimony via teleconference between the Courthouse in Springfield and the Courthouse in Kansas City (Tr. 1520).

In their pleadings on Mr. Purkey's behalf, his current Counsel complain that our preparation for and presentation of Ms. Hotchkiss' testimony were somehow inadequate (Doc. 52, p. 24). However, they provide no details regarding this perceived inadequacy. To the contrary, and as noted above, we went to great lengths to develop complete testimony from this witness who was difficult to locate and produce.

6. After weighing the alternatives, I decided not to secure the testimony of Oregon Department of Corrections Psychologist Dr. Rex Newton, Ph.D.

Vigorous complaint is made over our failure to secure the testimony of Dr. Rex Newton, Ph.D., one of Wes' treating psychologists during the time that Wes was incarcerated in the Oregon Department of Corrections (Doc 47, p. 22; Doc. 52, p. 25-26). It is correctly noted that, in our investigation, we secured Dr. Newton's

61

report, and we were therefore well-aware of his findings regarding Mr. Purkey; it was via resort to the records, which I and my team assembled prior to trial, that current Counsel for Mr. Purkey were able to locate and interview Dr. Newton (Doc. 47, p. 22; Doc. 52, p. 25-26). It is argued that Dr. Newton's findings and conclusions were so clearly positive and significant that my failure to develop and present Dr. Newton as a witness amounted to ineffectiveness of counsel (Doc. 47, p. 21-22; Doc. 52, p. 25-26).

Certainly, when taken out of context, Dr. Newton's findings and conclusions were very positive and very helpful. My fear was that, if we directly presented those findings and conclusions through Dr. Newton at time of trial, the government would have countered by providing surrounding context, which was very damaging. That context was also contained in others of the records which we obtained in our investigation, provided to the government in discovery, and ultimately provided to Purkey's current Counsel.

According to those records, during the late 1980's Mr. Purkey was being housed in the Oregon Department of Corrections, serving his Kansas State sentence. When he encountered Dr. Newton, Mr. Purkey was being housed in a lower security facility in Oregon, and was on good track for an earlier release. Mr. Purkey's work with Dr. Newton was part of his work on that good track.

002042

Unfortunately, as often happened with Mr. Purkey, things got off track. All the while Mr. Purkey was working with Dr. Newton, he was also engaging in activities which were at best against the rules and at worst, arguably criminal. As a result of those activities, Mr. Purkey not only lost his bid for earlier release, he was transferred out of Oregon and back to Kansas to continue the service of his lengthy sentence for robbery and assault. Some, but certainly not all, of this information about Mr. Purkey's problematic behavior in Oregon was already before the jury through the testimony of witnesses like Gary Hatfield and William Porter. It was my belief that, by bringing in Dr. Newton, we would give the government a springboard, not only for presentation of a more complete litany of Mr. Purkey's untoward behavior in the Oregon Department of Corrections, but also to logical questioning of Mr. Purkey's sincerity with Dr. Newton in light of Purkey's concurrent, untoward behavior. To avoid this, I chose to not bring in Dr. Newton, but instead bring forth what I believed to be the functional equivalent of Dr. Newton, and in most cases a more updated version of that information, through various of our experts, particularly Dr. Peterson and Dr. Cunningham, and lay witnesses, particularly Dominic Geniuk (Tr. 1491-1500), Patrick Howe (Tr. 1485-1491), Michael Gibbons (Tr. 1502-1516), Robert Lopez (Tr. 1530-1540), and Mark Russell (Tr. 1651-1655).

002043

Counsel for Mr. Purkey find greatest fault over my failure to produce Dr.

Newton to specifically say that Wes had told him, in the late 80's, about his mother

sexually abusing him (Doc. 47, p. 21). This evidence, it is argued, would have

countered what Purkey's current Counsel claim were government accusations

"…that Purkey had recently fabricated the allegation that he had been sexually

abused by his mother in order to avoid the death penalty…" and "…that Purkey

had never before reported being sexually abused…" (Doc. 47, p. 21). The fatal

flaw in this logic is that the government never made such claims.

As current Counsel for Mr. Purkey note, there were two queries upon the

matter put to defense psychiatrist, Dr. Stephen Peterson. The first of those,

complete with the context prior to the citation by current Counsel for Purkey, was

as follows:

> Q      Doctor, going back to the defendant's childhood and the sexual
> abuse that he claims he suffered, again we have to rely on his word
> essentially, because there's not any -- there is very little, if anything, in the
> record to support that, correct?
> A      Well, that's correct. There are some elements to support it, such
> as the reports of his brother and his aunt and the people who talked with Mr.
> Purkey long before he was involved in any of these cases, about his
> development. So certainly it would have been nice to have a video camera
> on Mr. Purkey's shoulder to see what he experienced, but we don't have that.
> At the same time you can't really discount not knowing, or not having a
> camera there recording every event, because, for example, most children
> don't remember how they learned to walk, but most kids do walk. And so
> the fact that they don't remember or there's not a source of information that
> proves when they took their first step doesn't mean they didn't learn how to

002044

walk.

Q    We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

A    Yes.

Q    You're aware from the reports that -- the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her. Have you seen that report?

A    I have seen the report. I've also seen the medical report that the doctor gave the opinion than she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

Q    That wasn't in a medical report, was it, sir? It was in the detective's report. He wrote that down.

A    By the doctor to the detective.

Q    Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

A    I read that. And the police could certainly have pressed charges without her. (Tr. 1816-1817)

Certainly, by this inquiry, the government was attempting to question Purkey's

claim of sexual abuse against his mother. However, Dr. Peterson knowledgably

deflected the accusation of rape against Purkey. That is the portion of the

exchange to which current Counsel for Purkey refers. Current Counsel for Purkey

does not note that Dr. Peterson also more generally deflected the government

advances by specifically referencing Mr. Purkey's multiple prior accounts of the

sexual abuse. Thus, while not mentioning Dr. Newton by name, Dr. Peterson

conveyed the gist of the information which Dr. Newton would have himself

provided in this regard.

The other skirmish between government Counsel and Dr. Peterson over the

matter was as follows:

> Q   (By Mr. Whitworth)  To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?
> A      To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.
> Q      To your knowledge.
> A      Yes. I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.
> Q      Yet Mr. Purkey told you that?
> A      Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed psychosexual history done by Dr. Fernando or even the social worker.
> Q      Thank you.  That's all I have. (Tr. 1824-1825)

It is certainly true that, here, Dr. Peterson did not again include his earlier reference to Mr. Purkey's prior accounts of the sexual abuse to others, and particularly did not refer to Dr. Newton's discussions with Purkey about the sexual abuse. However, the thrust of the point being made by Dr. Peterson at this point, which was correct, was that no one before Peterson, particularly those who evaluated Mr. Purkey for his Kansas state charges, had conducted a thorough psychosexual evaluation of Mr. Purkey so as to ferret out all of the details of the abuse. That same criticism would apply to all prior evaluations of Mr. Purkey, including the work done by Dr. Newton. I could have come back to Dr. Peterson to countersink the point advanced by current Counsel for Mr. Purkey. However, I did not believe

66

002046

at the time that the government's questions gained any traction. I believe my notions in this regard were confirmed in light of the way the government ultimately argued its case.

In their arguments, government Counsel took their questioning of the sexual abuse no further, instead essentially conceding that Purkey had been abused. Current Counsel for Purkey cite to two arguments (Doc. 47, p. 21). I have re-read the entirety of the government's penalty phase argument, and have found one other reference.

The first of those, in context, was as follows:

> We brought in Dr. Park Dietz, we brought in Dr. Helen Mayberg, and Dr. Dan Martell, who are three of the finest forensic psychologists, psychiatrists in the United States, because we didn't want you to be misled by this defense. And I submit to you when they say no brain injury, they say no mental disease, that you can believe their testimony over the defense experts.
> Dr. Peterson, who Dr. Dietz so aptly stated, his findings were a fairy tale. He couldn't even show me in the DSM-IV manual where he had come up with this diagnosis. And that's the Bible of forensic psychiatry. He said that medication could control and has controlled this defendant's behavior. Ten minutes after he says that, the defendant interrupts the proceedings in an angry outburst. (Tr. 2267)

Contrary to the representations by current Counsel for Purkey (Doc. 47, p. 21), the government "fairy tale" argument was referring, not to Purkey's representations about his abuse, but rather to Dr. Peterson's overall diagnosis of Purkey. In fact, just a few lines later, as part of the "blame game" reference complained about by

67

002047

current Counsel for Purkey (Doc. 47, p. 21), government Counsel actually conceded the abuse took place. That entire line of argument was as follows:

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent, committing crimes. He made those choices. (Tr. 2268)

The closest the government got to the sexual abuse claims issue was later in their argument, when government Counsel simply left to the jury determination about the sexual abuse.

> They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions. (Tr. 2291-2292)

Current Counsel for Purkey fault me that I "…should have easily anticipated that the government would allege that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty" (Doc. 52, p. 21). Fatal to their point is that their "easily anticipated" argument never occurred. To the contrary of their point, the most logical interpretation of the government arguments would lead one to the conclusion that the government had

given up challenging the abuse.

Even if the government's queries and arguments could have been seen to be asking the jury to doubt Purkey's account of sexual abuse, the government's attack would have to be seen as more global than that the fabrication was recent. If anything, the government would have to be seen as asking the jury to doubt Purkey's accounts of the abuse, whenever those accounts occurred. The trouble with our trying to support the fact of the sexual abuse by resorting to Dr. Newton, or to any of the others to whom Wes confided the abuse, is that, at bottom, the source of the information for all of these witnesses was Wes himself. That was why it was so important that Dr. Peterson referred in his testimony to the reports in the records from two persons directly familiar with the abuse, Wes' deceased Aunt and Wes' brother Gary (Tr. 1816). That was also why it was so great, even miraculous, that Gary experienced his change of heart when he did. That way, we had, from the only still-living relative, direct confirmation, independent from Wes, about the mother's sexual deviancy.

While we could not have anticipated arguments which the government never made, the government argument theme which we did anticipate, the theme which actually was resounded in the cited arguments and throughout the rest of government argument, was to the effect that Purkey refused to change despite

002049

being given multiple opportunities to change (Tr. 2259, 2267-68, 2291-92).  As I noted above, in my opinion, bringing forth Dr. Newton would have strongly supported that argument as an instance in which Purkey was receiving the help which he wanted, in this case psychological help, and repaid that assistance by continuing his criminal ways despite the help.  Anticipating the argument which the government actually made, I decided that, rather than providing this golden opportunity for the government to make its point, I would instead bring Dr. Newton's findings in through Dr. Peterson and others.

7. After weighing the alternatives, I decided not to call Floyd Bose or Dion Leiker

As Mr. Purkey's current Counsel correctly allege, well prior to trial, Wes alerted me about his relationships with Dion Leiker and her father, Floyd Bose (Doc. 47, p. 23-24).[7]  I had various opportunities to talk to Dion, though I never contacted Floyd.  Through Wes and Dion, I learned about Wes' assistance to Floyd and Dion in their attempt to sort out the death in prison of Floyd's son, Dion's brother.  I also obtained what records I could about the matter.

To briefly summarize what was a very complex story, when Floyd and Dion

---

[7] Current Counsel for Mr. Purkey reference a letter to me from Wes in August of 2003 (Doc. 47, p. 23; Doc. 47, attachment 9).  Actually, my recollection is that Wes and I had talked many times about these folks, and long before Wes wrote that letter.

were left with no real answers from authorities about the killing, Wes contacted them and detailed for them a conspiracy which involved inmates, prison officials and state officials. However, a formal investigation of the matter did not confirm Wes' account. Floyd and Dion strongly believe the information which Wes provided, and believe that a government cover-up accounts for the failure to confirm Wes' account.

I weighed whether to present this information, and I decided there were too many problems. I knew that the government would easily be able to counter Wes' account with the contrary results of the official investigation. But, I was much more concerned with the argument question which I feared the government would likely pose in light of Wes' knowledge base: if Wes' account was true, does not that knowledge base prove how intimately involved he was in prison crime and violence? We were battling already over the issue of Wes' future dangerousness. Had we presented this evidence, we could have argued that Wes, by bringing these facts to light, was disavowing violence, and trying to bring the truth to light. However, the government would have been free to argue that, even if Wes' account was true, all this proved was how closely connected to the violence Wes was. Moreover, the government could have also argued that, had Wes really not been part of this, he would have reported things earlier, in time to have saved the man's

71

002051

life in the first place.

It was also my understanding that, in the years since Wes' revelations to Dion and Floyd, Wes had asked for and had received from them financial assistance. While I was not sure the government was aware of this, I knew that it would not be difficult for the government to obtain institutional financial records, or to simply ask the questions directly of Dion and Floyd. I was very concerned that the government would try to use this information in order to inaccurately portray Wes as giving the help he was to these people, including possibly false information, only as a means to get help from them.

On balance, I decided that the risks of the testimony outweighed the benefits of this and the other limited information which Dion and Floyd had, and thus I chose not to call these two witnesses.

## 8. My recollections regarding Peggy and Evette Noe

My recollections about Peggy and Evette Noe are not as clear as with other witnesses and instances. I shall do my best to account for my knowledge based upon the recollections which I have.

Current Counsel for Mr. Purkey allege that we did not have contact with Peggy and Evette, though we discovered their identities in our investigation (Doc. 47, p. 22-23). Actually, it is my recollection, not only that I was aware of the

referenced reports, but also that I did speak, prior to trial, certainly with Peggy, and possibly with Evette, though I cannot locate any documentation to confirm that recollection. In fact, I believe that Peggy's recollections, as accounted in the Petition (Doc. 47, p. 22), formed part of the basis for Dr. Peterson's testimony regarding Mr. Purkey's account to others regarding his sexual abuse, as noted above.

My recollection is in keeping with the allegations of the Petition about Wes never asking that I contact these women (Doc. 47, p. 22). My recollections are also that, since Wes did not advance these witnesses, I decided, independently from him, not to pursue using Peggy and Evette as witnesses, and that my reasoning was based on things contained in the materials we obtained, either about problems in the relationship between Wes and Peggy, or problems in Peggy's and Evette's backgrounds, or both. Because I have given to current Counsel for Mr. Purkey all of the file materials which I had about these women, I am unable to resort to those materials now to refresh my recollections about these latter matters. If the Court would deem it appropriate, I would be happy to obtain and review those materials to assist me in answering this matter further.

Current Counsel for Mr. Purkey also advance here, as they did with their arguments regarding Dr. Newton, their notions that I was ineffective in not using

Peggy Noe's testimony to counter the argument that Purkey had recently made up the story about the sexual abuse in order to avoid the death penalty (Doc. 47, p. 24). As I already noted in above in my response regarding the Newton issues, the government never made the argument, as claimed by current Counsel for Purkey, and actually conceded Purkey's abuse in their argument. Moreover, as I also noted above, even if the government's questioning and argument could be read as an indictment of Purkey's credibility, that indictment was over the truth of the sexual abuse accusations by Purkey generally, whenever they were made. Thus, the Peggy Noe testimony, like the Dr. Newton testimony, was merely more of the same, more of Wes' accusations against his mother. The only real counterpoint to the government's point was Gary Hamilton's independent account of the mother's sexual deviancy, which of course we presented.

### 9. Cited cases are, once again, inapplicable

To sum up, though they have not found one new piece of evidence that we did not discover during our initial investigation, current Counsel for Mr. Purkey contend that our investigation and preparation were inadequate because we did not have a forensic social worker on our team. At various points in their suggestions, current Counsel for Mr. Purkey cited to cases urging that those cases support their arguments. In truth, if one looks at the cases, one notes the egregious omissions by

74

counsel in those cases, but can find no factual corollaries in this case.

Current Counsel for Purkey first attempt to liken the efforts made in this case to those made in three cases (Doc. 52, p. 12). However, none of those cases is even similar. In *Karis v. Calderon*, 283 F.3d 1117, 1134 (9th Cir. 2002), the defense made a 48 minute mitigation presentation, without touching on the defendant's substantial history of childhood and familial abuse. In *State v. Tokman*, 564 So.2d 1339, 1342-1343 (Miss. 1990), no evidence presentation was made in penalty phase after little or no investigation into the defendant's background. In *Wiggins v. Smith*, 539 U.S. 510, 515-517, 523-524 (2003), defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. In *Hamblin v. Mitchell*, 354 F.3d 482, 490-491 (6th Cir. 2003), there was a failure by defense counsel to conduct any mitigation investigation, a failure to obtain background records, and interview of only one of 22 available family members. Obviously, our efforts on Wes' behalf were considerably different that those made in these cases.

Current Counsel for Purkey urge that our decision to dispense with the hiring of a forensic social worker in this case is like unto failures to seek professional help in other cases they cite (Doc. 52, p. 18) Those cases are also

75

easily distinguishable on their facts. In *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla.Crim.App. 2007), no substantive mitigation work was done until a week before trial, and the little work that was done consisted of interview of only a few family members for about two hours, and presentation of only 3 lay witnesses in a mitigation case comprising less than 15 pages of transcript. In *Rios v. Rocha*, 299 F.3d 796, 807-808 (9th Cir. 2002), there was a complete failure to interview witnesses, and a failure to request funds to employ investigator, all of which resulted in failure to develop an available misidentification defense. In *Garcia v. Portuondo*, 459 F.Supp.2d 267, 288 (S.D.N.Y. 2006), a retained attorney failed to conduct any investigation to support an available alibi defense, in part because he did not want to foot the costs of travel related to certain aspects of that investigation. In *Ex Parte Briggs*, 187 S.W.3d 458, 467 (Tex.Crim.App. 2005), because the defendant failed to pay necessary costs in advance, counsel refused to make any investigation about medical issues related to victim's cause of death, and did not consult experts on the issue, despite the fact that this was the only viable avenue of defense. None of these cases even remotely relate to the fact pattern here.

Current counsel for Mr. Purkey liken our approach to Gary Hamilton to the inadequate approaches take in certain other cases (Doc. 52, p. 23). The analogies

76

are inapt. In *Cargle v. Mullin*, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), defense counsel failed to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made statements to others that the defendant, instead, had made exculpatory statements. In *Ex parte Gonzales*, 204 S.W.3d 391, 393-394 (Tex.Crim.App. 2006), defense counsel failed to inquire of the defendant and his family members about the defendant's substantial history of childhood abuse, from which he developed, and continued to suffer from, post-traumatic stress disorder. No errors in any way similar to those in these cited cases occurred here.

Current counsel for Purkey complained that our pursuit of the poisoning defense, and our investigation related to Mr. Purkey's family members, made our work comparable to several cited cases (Doc. 52, p. 24). Again, the facts here bear no relation whatsoever to the startling deficiencies which occurred in the cited cases. Counsel again refer to *Wiggins v. Smith*, supra, in which defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. Also, they refer to *Harries v. Bell*, 417 F.3d 631, 638-639 (6th Cir. 2005), in which, due to client resistence, there was a failure to obtain records of mental health problems and a failure to obtain mental evaluations, despite counsel being alerted to those

issues during conversations with family members.

In discussing our efforts with respect to the Newton, Bose, Leiker and Noe information, current Counsel for Purkey attempt to liken our those efforts to those set forth in certain cases (Doc. 52, p. 24-27). They cite again to *Marquez-Burrola v. State*, supra, in which, as described above, no substantive mitigation work was done until a week before trial, consisting of interview of only a few family members for about two hours, and only 3 lay witnesses testified in a mitigation case comprising less than 15 pages of transcript. They also mention *Collier v. Turpin*, 177 F.3d 1184, 1200-1202 (11th Cir. 1999), in which the defense presented a mitigation case which lasted just a little more than one hour, and offered virtually nothing of the defendant's background except that he was a hard worker and had a good reputation in the community. There is also *State v. Williams*, 794 N.E.2d 27, 49-50 (Ohio 2003), wherein after the defendant assaulted his attorneys upon the jury's return of a guilty verdict, those attorneys conducted no preparation for penalty phase mitigation. Then there is *Powell v. Collins*, 332 F.3d 376, 398-399 (6th Cir. 2003), in which defense attorneys did not begin prep for penalty phase until after the guilty verdict, and presented only one witness, a psychologist who testified that the defendant had the capacity to commit aggravated murder and that, in his opinion, it was a good thing that the defendant was not bigger, stronger,

heavier and smarter, as that would make him that much more dangerous. Next, there is ***Williams v. Anderson***, 460 F.3d 789, 797 (6th Cir. 2006), wherein the defense attorney did not do mitigation investigation, and presented only the defendant's testimony during penalty phase. Finally, there is ***Hovey v. Ayers***, 458 F.3d 892, 926 (9th Cir. 2006), in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert.

Put simply, none of these cases in any way resemble the facts in this case.

### *Issue regarding the preparation for and presentation of the testimony of Dr. Bruce Leeson, Ph.D.*

Current counsel for Mr. Purkey argue, that the credibility of defense expert, Dr. Bruce Leeson, was "severely challenged" in light of answers which he made to a few cross-examination questions posed to him, and that I was ineffective in not better preparing Dr. Leeson to answer those questions (Doc. 47, p. 25; Doc. 52, p. 27-29). I do not believe that the record of Dr. Leeson's testimony, taken as a whole, supports these concerns.

The only facts about Mr. Purkey which Dr. Leeson admitted not knowing prior to trial concerned Mr. Purkey having taken some psychology college correspondence courses and Mr. Purkey working as a jailhouse lawyer (Tr. 1616). On redirect examination, Dr. Leeson fully explained why it was not important for

79

002059

him to know those particular facts, since the capabilities which those accomplishments required were unrelated to the damaged areas of Mr. Purkey's brain, identified in Dr. Leeson's neuropsychological testing, which caused the problems for Mr. Purkey which Dr. Leeson was describing (Tr. 1646-1647). Dr. Leeson also addressed in redirect examination an issue raised in cross, explaining that what was learned in the sorts of psychology courses which Mr. Purkey took would in no way assist a person in faking neuropsychological testing results (Tr. 1647-1648).

Current Counsel for Mr. Purkey posit that Dr. Leeson's answers to questions regarding Mr. Purkey's prior treatment for head injuries somehow demonstrated his lack of mastery of the content of the reports concerning that treatment (Doc. 47, p. 25; Doc. 52, p. 28). Actually, if current Counsel for Mr. Purkey were themselves more familiar with those reports, they would realize that Dr. Leeson was fencing with opposing counsel, and answered as he did, not because he was unfamiliar with the reports, but because the queries made of him were, to some degree, misleading with regard to the operative facts in those records, and Dr. Leeson would not allow opposing counsel to misrepresent the presence of facts which were not present (Tr. 1626-1631). Opposing Counsel was certainly trying to posit that the results of testing conducted at the time of Mr. Purkey's injuries

countered the claim of neurological damage, but Dr. Leeson would have none of that (Tr. 1629, 1630, 1631). On redirect examination, I gave Dr. Leeson even greater opportunity to make it abundantly clear that the testing methods at the times of the injuries were not sophisticated enough to rule out the sorts of neurological injuries which he detected in his testing (Tr. 1639-1642).

Having now re-read Dr. Leeson's testimony as a whole, its seems to me that he was wonderfully well familiar with all of the facts and the psychological literature bearing on the opinions which he rendered, and he adroitly countered all of the argumentative questions posed against him by government counsel.

Current Counsel for Mr. Purkey wish to liken what happened with Dr. Leeson to what happened in **Bean v. Calderon**, 163 F.3d 1073, 1079 (9th Cir. 1998). In that case, at the trial penalty phase, defense counsel enlisted experts at the last minute and provided only minimal records about the case; as a result, when called to witness at trial, the experts were not able to make definitive diagnoses, or opine about Bean's legal competency; on the other hand, at the habeas evidentiary hearing, after proper preparation, the doctors were able to testify that Bean was mentally retarded, suffered from brain damage and post-traumatic stress disorder, and could not have formed the requisite intent for the charged offenses; trial counsel were deemed ineffective for not properly preparing these experts for trial

81

in the fashion as ultimately presented at the habeas hearing. ***Bean v. Calderon***, supra. On the contrary, in this case, all of the experts, including Dr. Leeson, had all of the records they needed to make their diagnoses, were prepared far in advance of trial, and testified directly as to their diagnoses, and the impact of the diagnosed conditions on Mr. Purkey.

Current Counsel for Mr. Purkey also cite again to ***Hovey v. Ayers***, supra the case in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Of course, the facts there are far different from the facts here. It should also be noted that, in citing to that case in their pleading, current Counsel for Mr. Purkey take odd literary license by quoting directly from the ***Hovey*** case, at page 929, but substituting the name "Dr. Leeson" for the name which actually appears in the text of that case, which is "Dr. Satten" (Doc. 52, p. 29). I am unsure why current Counsel for Mr. Purkey would have so confusingly misquoted the ***Hovey*** case. So the Court is not confused by this, I would clarify that Dr. Leeson had no connection with the ***Hovey*** case.

### ***Issue regarding the preparation for and presentation of the testimony of Dr. Stephen Peterson, M.D.***

Upon this issue, current Counsel for Mr. Purkey ask this Court to find lacking my preparation for and presentation of the testimony of defense

82

002062

psychiatrist, Dr. Stephen Peterson, M.D. (Doc., 47, p. 27; Doc. 52, p. 30-31). The

trouble is that the conclusions which they urge can be drawn only through the

faulty mechanism of drastic misrepresentation of the facts.

Current Counsel for Mr. Purkey have reprised here their incorrect assertions,

that Dr. Peterson supposedly did not testify about Mr. Purkey's previous reports to

others about his sexual abuse, and that the government, as a supposed

consequence, argued that Mr. Purkey had fabricated the claim of sexual abuse to

avoid the death penalty (Doc. 47, p. 27-28; Doc. 52, p. 30-31). As I have already

detailed above at pages 63-68, contrary to the claims of current Counsel for

Purkey, not only did Dr. Peterson testify that Purkey had reported his sexual abuse

to multiple persons on multiple previous occasions, but also the government never

made the complained-of argument, but rather essentially conceded the abuse

committed against Purkey.

It should be noted that, even though their claims are incorrect, current

Counsel for Purkey persuaded Dr. Peterson to embrace and admit them as if they

were true (Doc. 47, attachment 15, p. 3-4). I have spoken to Dr. Peterson, and have

learned that current Counsel for Purkey were able to obtain these inaccurate

admissions from him by misleading him, showing him only the limited parts of the

record, as cited in their pleadings, and not providing Dr. Peterson with the whole

83

002063

transcript of the case, and in particular not providing Dr. Peterson the portions of the transcript wherein he does refer to Mr. Purkey's other revelations about the sexual abuse and wherein the actual government arguments are revealed. I did not ask for Dr. Peterson to complete another affidavit in these regards, but I can if the Court wishes.

Citing only sparingly to the pertinent record, current Counsel for Mr. Purkey also complain that I did not have Dr. Peterson sufficiently detail the sexual abuse suffered by Mr. Purkey (Doc. 47, p. 27; Doc. 52, p. 30). Actually, we did bring out many details about the kinds of sexual abuse, more than noted by current Counsel for Mr. Purkey, as well as Dr. Peterson's explanation about the impact of the sexual abuse, and that can all be found at transcript pages 1750-1751. However, the thrust of the argument is that, if only I had elicited from Dr. Peterson even more salacious details which Purkey had accounted to Peterson about the abuse, that would have caused the jury to more readily believe the account.

In his providing of detail about the abuse at trial, I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games.

84

I felt that Dr. Peterson, without leading from me, found that proper balance. I felt that had I prompted him into the sorts of lurid details suggested, I would have tipped over the balance, and would have taken away the clear impression left by Dr. Peterson about the shame associated with Wes' memories, and would have instead falsely portrayed those memories as erotic, prurient and titillating. Moreover, as I have indicated earlier, my reasoning was also that the mere expedient of accounting more words from Wes' mouth would not make his story as a whole more believable for the jury. That is why I had Dr. Peterson emphasize the independent confirmation of the abuse which was provided by Mr. Purkey's aunt and brother (Tr. 1816).

Current Counsel for Purkey posit that the government's "fairy tale" and "abuse excuse" arguments (Tr. 2267-2268) were somehow a consequence of Dr. Peterson not doing enough to support Wes' accusation of sexual abuse against his mother (Doc. 47, p. 27; Doc. 52, p. 32). However, as already described in detail at pages 67-68 above, this contention by current Counsel for Purkey founders on the fact that neither of these terms were ever used to describe Wes' sexual abuse allegations against his mother. The term "fairy tale" was first used by government expert, Dr. Park Dietz, to describe my request that he assume as true our expert's conclusions that PET testing showed brain damage (Tr. 2210-2212). Government

Counsel then used the "fairy tale" term to more broadly describe Dr. Peterson's ultimate conclusions about Mr. Purkey's inability to conform his conduct to the requirements of the law at the time of the offense (Tr. 2267). The "abuse excuse" argument referred generally to Wes' "bad childhood" (Tr. 2268). The contention, as made by current Counsel for Purkey, that the mere palliative of different answers from Peterson on the sexual abuse issues would have somehow preempted the government's arguments, and would have thereby somehow dissuaded the government from making these arguments, seems doubtful if not laughable.

The real problem faced by Dr. Peterson in advancing the conclusions which he did was that he was swimming upstream against a torrent of evaluation results from numerous mental health professionals made over the preceding thirty-some-odd years. As Dr. Dietz himself noted, in pronouncing his own antisocial personality disorder findings about Wes, that his conclusion was in no way novel, and simply mirrored the like conclusions reached consistently and persistently by the various mental health professionals who had evaluated Wes over the years (Tr. 2156).

Current Counsel for Purkey fail to note that, in confronting this phalanx of contrary opinions, Dr. Peterson used the sexual abuse as an important component, but only one component, in the complete story about the pervasive abuse and

86

trauma which Wes suffered during his early life. Dr. Peterson certainly described the sexual abuse, and the psychological impact wrought by that abuse (Tr. 1750-1752). Dr. Peterson even endeavored to explain how previous evaluators had done incomplete evaluations, and thus had missed this very significant piece to the puzzle (Tr. 1813-1815, 1824-1825). Dr. Peterson also described Wes' physical beatings at the hands of his parents, and the psychological impact of that (Tr. 1753-1755). As well, Dr. Peterson described the adverse impact wrought from Wes' parents and brother not only pervasively modeling drug and alcohol abuse behavior, but also introducing Wes to drugs and alcohol as an early teen, and encouraging Wes to abuse substances with them (Tr. 1756-1756). And, Dr. Peterson detailed the functional impacts of the significant accidental head injuries which Wes suffered (Tr. 1759-1760). Dr. Peterson's concluded that Wes, as a result of this wide-ranging set of problems, suffered from a complex set of mental illnesses, and that that complex set of mental illnesses, rather than antisocial personality disorder, explained Wes' problems in general, and his actions against Jennifer Long in particular (Tr. 1748-1749, 1766-1771, 1775-1776). However, Dr. Peterson had to admit that his diagnosis could not be nicely pigeon-holed into a distinct category found in the DSM-IV-TR (Diagnostic and Statistical Manual, Fourth Edition, Text Review) (Tr. 1793). That answer, and not his answers about

87

sexual abuse, left Dr. Peterson open to precisely the argument against him made by the prosecution (Tr. 2267).

Current Counsel for Purkey refer to three cases, wishing to liken what happened here to what happened there (Doc. 52, p. 31). What happened in those cases was far different than what happened in this case.

Current Counsel for Purkey cite a third time to *Hovey v. Ayers*, supra the case in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Also cited is *Lewis v. Dretke*,[8] 355 F.3d 364, 366-367 (5th Cir. 2003), wherein counsel failed to submit any evidence about an abusive childhood when such evidence was readily available, and the only reason for the failure to develop and present the evidence was the failure to interview available, family member witnesses. Next is cited *Turpin v. Lipham*, 510 S.E.2d 32, 41-42 (Ga. 1998), wherein counsel failed to read, and failed to hire a mental health expert to evaluate, thousands of pages of records about defendant's institutionalization in mental hospitals, childrens' homes and treatment centers from age 9 to 10, failed to interview any of the doctors mentioned in the reports, and presented only three

---

[8] In their pleading, current Counsel for Purkey mistakenly refer to the party's name as "Drake" (Doc. 52, p. 31), whereas the correct spelling is "Dretke".

witnesses in penalty phase, two records custodians, who merely identified the records, and the defendant's wife, who simply made a plea for mercy. Finally cited is *Commonwealth v. Alvarez*, 740 N.E.2d 610, 617-618 (Mass. 2000), wherein a failure to obtain records of serious auto accident not only resulted in defense expert not having necessary support for his diagnosis, but also permitted the prosecution to incorrectly argue that the defendant's accounts about the seriousness of the accident were self-serving fabrications. There is nothing remotely similar about these situations in these cases and what occurred in this case.

### *Issue regarding the preparation for and presentation of the testimony of Dr. Mark Cunningham, Ph.D.*

Current Counsel for Mr. Purkey also ask this Court to find in my presentation about the maternal sexual abuse of Purkey through Dr. Mark Cunningham Ph.D. faults similar to those urged by them concerning my presentation of the same information through the Dr. Peterson testimony (Doc. 47, p. 29-31; Doc. 52, p. 32). Their criticisms here suffer problems very similar to those suffered by the complaints related to the Peterson testimony.

Once again, current Counsel for Mr. Purkey have not found it necessary to fully and accurately describe the trial testimony (Doc. 47, p. 29-30), and therefore have failed to note that the Cunningham testimony actually contains many of the details which they incorrectly contend are missing (Tr. 1862, 1864-1865).

89

However, it is certainly true for Dr. Cunningham, as it was with Dr. Peterson, that even more detail of the sexual abuse was available had I decided to ask for it. My approach to the Cunningham testimony was the same as with the Peterson testimony. I wanted the jury to have enough detail to fully grasp the impact of the sexual abuse without overwhelming the point with prurient detail. To me, that notion of balance was even more important in the Cunningham presentation because of the point, made by Dr. Cunningham, about the shame-induced reluctance of victims to detail their abuse (Tr. 1866-1867). It seemed to me that the sort of detail which Dr. Cunningham brought forth on his own was in keeping with the point about shame, and that my coming back to solicit even more Purkey-provided detail would have, if anything, undercut the point about shame-induced reluctance to share details. Moreover, with Dr. Cunningham, as I had with Dr. Peterson, I sought to support the abuse allegations, not with more questions about more words from Purkey, but rather with questions about the confirmation of the abuse provided by independent sources (Tr. 1865-1866). And, with Dr. Cunningham, as with Dr. Peterson, sexual abuse was but one of many trauma factors used to explain, as Dr. Cunningham put it, Mr. Purkey's "pervasive developmental poisoning" (Tr. 1854, 1857-1878).

Dr. Cunningham himself questions, and current Counsel for Purkey indict,

90

002070

my decision to not have Cunningham use a powerpoint presentation which he had prepared (Doc. 47, p. 30; Doc. 47, attachment 11, p. 3-4; Doc. 52, p. 32-33). I had several reasons for making this decision.

First, I had it in mind to try to stop the use of a powerpoint presentation by government expert Dietz. I had educated myself on Dietz's presentation strategies, and I knew that Dietz depended greatly on his powerpoint presentations, and that those powerpoint presentations contributed mightily to the effectiveness of the Dietz presentations. I felt that, if I could strip Dietz of his powerpoint, I could reduce his effectiveness. I developed objections to the Dietz powerpoint, and I was ultimately successful in preventing his use of the powerpoint (Tr. 2137). I knew that my arguments against Dietz's powerpoint would have been undercut if I had, just days earlier, had Cunningham use a similar presentation. This strategy against Dietz was a part of my reasoning in not letting Cunningham use his powerpoint.

Second, I was concerned that Dr. Cunningham's powerpoint could be used as a tool for a potentially devastating cross-examination. By the time that Dr. Cunningham testified in the Purkey case, he had previously testified in more than 75 other capital cases throughout the country (Tr. 1911-1912). I was aware that prosecutors were collaborating on various ways to attack Dr. Cunningham, and were particularly focusing on trying to use Cunningham's presentations in previous

91

002071

cases to show what they would argue were rote repetitions of those presentations from one case to another. I personally had seen Dr. Cunningham's powerpoint presentations for various cases, including Purkey's and one other case which I handled, and I noted redundancies in certain of the powerpoint slides in those various presentations. While I could have asked that Dr. Cunningham remove the repetitive slides about which I was aware, I was concerned that, even with such a removal, in light of the sheer volume of the cases which Dr. Cunningham had previously handled, he could not possibly be able to assure that, even after the reduction I would propose, that there were not slides which remained in his powerpoint presentation for Purkey which were very similar to, if not exactly the same as, slides used in other cases. I believed that, if a confrontation with similar slides occurred, that would be devastating to Dr. Cunningham's otherwise very strong, case oriented presentation on Mr. Purkey's behalf.

Finally, I had had the opportunity to see Dr. Cunningham in situations in which he used his powerpoint and in situations in which he testified without the powerpoint. It was my perception that Cunningham was more effective without his powerpoint.

In light of the combination of these factors, I decided to have Dr. Cunningham provide his testimony without the powerpoint.

92

002072

***Issues regarding presentation of defense witnesses Grant and Russell***

In their pleadings filed on Mr. Purkey's behalf, current Counsel for him seriously question my judgment in calling as defense witnesses two BOP employees, Dr. William Grant, M.D. and Mark Russell (Doc. 47, p. 32-33; Doc. 52, p. 33-34).

As to the calling of Dr. Grant, the criticism is somewhat understandable. Our purpose in calling Dr. Grant was to have him testify that he had prescribed the psychoactive medications which Mr. Purkey was then taking, and believed them to be medically appropriate. In my conversations with Dr. Grant prior to his testimony, it was my understanding that he would say those things simply and straightforwardly. Direct examination was fairly straightforward, with the exception that Dr. Grant minimized the psychoactive effect of one of the agents he had prescribed, and indicated that he prescribed that agent because it "was not medically inappropriate" and because Purkey asked for it and was going on trial for his life (Tr. 1409-1410). Then, on cross, Dr. Grant allowed that "(t)he justification for Klonopin…came from another psychiatrist who was in private practice and consulting with the defense", but added that he didn't think that psychiatrist "supported the diagnosis very well in his reports" and that "he invoked anxiety where many of the rest of us would have invoked an attitude, belligerent,

93

002073

irritable attitude" (Tr. 1415-1416). I went back on redirect and clarified that Dr. Grant had not seen Dr. Peterson's 70 page report to know all of his reasons for his diagnosis, and that, regardless, he, Grant, was the one to prescribe the meds (Tr. 1417, 1420).

I did not anticipate, and it still amazes me, that a practicing physician would essential admit under oath, as did Dr. Grant, that he had abdicated his professional role in deciding the appropriateness of prescribing controlled substances, and thereby jeopardize his license to continue prescribing such medications.

While I would not agree that Dr. Grant's testimony was "more harmful than helpful", as argued by current Counsel for Mr. Purkey, if I had it to do over again, I would have brought out the point about Grant's prescription of the medications through Dr. Peterson, thereby avoiding the problematic testimony which Dr. Grant volunteered.

I find the criticisms about the Mark Russell testimony much less understandable. On behalf of Mr. Purkey, current Counsel for him have expressed serious concern over the possibility that use of the term "Club Fed" in the testimony would mislead a jury into believing that penitentiary conditions were somehow posh (Doc. 47, p. 5-7). But now, while acknowledging that Russell was obviously called in part to squelch the "Club Fed" notions, current Counsel for

002074

Purkey criticize that Russell did more harm than good (Doc. 47, p. 33). I respectfully disagree.

Current Counsel for Mr. Purkey are certainly correct that I wanted to directly address, from whatever source, any juror false impressions about the conditions of Fedcral prison confinement. I believed that this could be done best through two witnesses: expert Dr. Mark Cunningham, Ph.D. and prison worker Mark Russell. During my dealings with Mr. Russell in the months leading up to trial, I was able to discuss with him all aspects of the testimony which he would give, and he said everything at time of trial which we anticipated. Not only did Mr. Russell directly debunk the whole "Club Fed" idea (Tr. 1654), he generally described the security conditions of the institution (Tr. 1659-1660), and specifically described Mr. Purkey's rather stark conditions of confinement, 23.5 hours a day in his cell, and in restraints whenever moved (Tr. 1653-1654). Mr. Russell also added, in support of other points we were making, that Purkey had exhibited no assaultive behavior while at Leavenworth, and had requested to have his Aryan tattoos removed (Tr. 1654-1655).

Current Counsel for Purkey complain that, though Mr. Russell certainly debunked the "Club Fed" idea about prison conditions of confinement, he also said on cross-examination that Purkey was currently being held in a unit for inmates

95

002075

with problem behaviors (Doc. 47, p. 32). What current Counsel for Mr. Purkey fail to note was that Mr. Russell clarified that the unit was also for administrative cases, and that Mr. Purkey was being housed in that unit for the administrative reason that he was "pretrial" (Tr. 1655-1656). Current Counsel for Mr. Purkey further complain that, on cross, Mr. Russell acknowledged that Purkey had been "demanding" in that he wanted more access than the normal inmate to the law library and to a typewriter, and once asked for a hot lunch rather than a sack lunch (Tr. 1656-1657). What current Counsel for Mr. Purkey fail to note is that Mr. Russell clarified those matters favorably for Purkey, noting that Purkey's needs for library and typewriter time were greater since he was facing trial (Tr. 1657), and that Purkey's request regarding a hot lunch owed to the fact that, because he was in trial, he would normally miss the only hot meal which would be served to inmates on a given day (Tr. 1661). Current Counsel for Mr. Purkey also complain that Mr. Russell acknowledged on cross-examination that he had heard rumors that Purkey had a long history of assaultive behavior in custody (Tr. 1658). In a different case, under different circumstances, such a revelation would have been problematic. In this case, Mr. Russell's information was but a thimble of water from the ocean.

The government was claiming Mr. Purkey would be a future danger, in part because of his prior assaultive history in prison (Doc. 145, Doc. 484, p. 10). We

002076

knew that the government was prepared to come forward with experts to detail Mr. Purkey's assaultive behavior history in prison to support the future dangerousness aggravating factor. When the government chose not to advance those witnesses in its penalty phase case-in-chief, we had a choice to make. Unfortunately for us, the government already had presented evidence, not only about the facts of this case, but also about Mr. Purkey's prior history of assaultive behavior outside of prison, and about the incident with Gary Hatfield at the prison camp in Oregon, to support its future dangerousness allegation (Tr. 1215-1338). Even without any evidence about institutional violence, the government was in a position to make a very creditable argument for future dangerousness. It is my experience that a capital case jury is much more inclined to give a death penalty to the extent that its members believe that the client will pose a danger to others in prison. Thus, I believed that, in order to have a chance to save Wes' life, we had to try to convince the jury that, within a secure Federal institution, and with his new medication regime, Wes could be managed in a way to not constitute a future danger. In order to do that, we had to take the lead on making that case, knowing that by doing so we were opening the door to Wes' institutional history, including his assaultive behavior within those institutions. Mr. Russell just happened to be the first witness in that regard, and what he provided on the topic was marginal compared with

97

002077

what would come out through Dr. Cunningham (Tr. 1898) and then through the government expert in rebuttal (Tr. 2052). Through Dr. Cunningham, we tackled the previous assaultive behavior head on, and tried to convince the jury that, in light of statistics and security of confinement in general, and in light of Mr. Purkey's advancing age, medication regime and recent behavior in particular, they could trust that future dangerousness in prison would not be a significant issue (Tr. 1880-1904).

My strategy might well be debated. But in that case, the argument would not be the one made against bringing in Russell to make one comment about rumors of assaultive behavior. Rather, the argument which should be made, but which is not made, would be against bringing in Cunningham to provide copious details about that behavior, thereby opening the door to the government's expert testimony. Regardless of which argument would be made against our approach, I felt that it was our only chance to confront the future dangerousness claim, and that we had to take that chance.

### _Issue about our decision to not have Purkey testify at penalty phase_

Complaint is made about our not having Purkey testify at penalty phase to express his remorse (Doc. 47, p. 33). Our reasoning behind this decision was as follows.

002078

It was my plan to address Wes' remorse from the very beginning of trial. I spent much of the first day of trial beating the drum of Wes' remorse, first in my opening statement (Tr. 408), then in the testimony of Detective Bill Howard (Tr. 468-469, 477), and finally through the testimony of Agent Dirk Tarpley (Tr. 510-511, 583, 596). Then, in his testimony, Wes took the next step, to say that, even knowing he was facing the death penalty, he would still admit what he had done, because the closure his confession gave was all he had to give back to the family (Tr. 951, 971). The point about Wes' expressions of remorse were made so well that prosecutors even conceded Wes repeatedly said he was sorry, though they argued that the expressions of remorse were not genuine (Tr. 1097-1102).

Wes, Laura and I seriously discussed whether Wes should testify at penalty phase, simply to reiterate his previous apologies. We ultimately decided to not have Wes testify. Laura had developed a rather strong argument that Wes should be able to deliver such an apology as an allocution statement, without having to, once again, be subjected to cross-examination (Doc. 475). We advanced this argument with the Court, but the request for allocution before the jury, without cross-examination, was denied (Tr. 1838-1839, 1905). After that ruling, we knew that, if Wes went forward and testified, and submitted to cross-examination, that would have rendered moot our allocution argument, since any prejudice from the Court's ruling would have been

002079

obviated by Wes providing his statements of remorse in testimony. We also knew that Wes' previous apologies were all over the record of the case. Thus, the three of us together decided that Wes would not testify, and we would preserve the allocution issue for a possible appeal.

Wes worked in close conjunction with me in the choosing of the issues which we raised on appeal. We originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. One of the points in that original brief was the allocution issue. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. In the paring down process, we decided, with Wes' approval, that the allocution issue should be removed because, while it was a significant issue, it was not as strong as the nineteen issues ultimately chosen for inclusion in the final brief.

If the Court would like, I can provide a copy of the allocution point which was contained in the original brief tendered to the Court of Appeals.

**_Issues pertaining to the Tarpley claim that he had only learned about Purkey's retraction about kidnapping just before trial_**

100

## 1. The events at trial

There are raised a bevy of issues which relate to one brief statement by Agent Dirk Tarpley. The incident involved a single question posed to Tarpley, near the end of his direct examination, about when he first learned that Purkey had changed his story about the kidnapping of Jennifer Long; Tarpley's answer was "right before this trial" (Tr. 566).

To me, then and now, the point was a non-starter. That Tarpley was unfamiliar with our defense positions was natural in that he was law enforcement. Once Wes was represented by counsel, Wes would not be communicating with Tarpley. Besides, Tarpley had already been duplicitous with Wes in their prior discussions, making it understandable that Wes would never again have civil contact with Tarpley. Moreover, there would be no reason for defense counsel to ever share matters about the defense with a law enforcement officer. If we were going to share with anyone, it would be counsel for the government. Plus, in the case of Purkey's own testimony, we had no duty to share any of that with the government until Purkey testified. We had actually shared things early by mentioning the matter in opening statements. Besides that, I knew that, if we needed to do so, we could pop this whole balloon by confronting Tarpley and government counsel with the words of their informer, Michael Speakman, who had

101

002081

told them two years earlier that Purkey was denying that a kidnapping had occurred.

For these reasons, I saw no reason to dignify such a frivolous point with a response. I figured I would approach things in one of two ways. If the matter was never raised again by the government, I would probably ignore the matter since it was likely that it would fade from the jury's memory, coming as it did so briefly and so early in trial. On the other hand, if the government raised the matter again, I would deal with it with the approaches which I noted above. Having made those judgments, I then went on to vigorously cross-examine Tarpley on what I believed to be the key issues: Tarpley's duplicity with Wes, and eventually the jury, about the agreement to secure Wes' statements, Wes' remorse over the killing of Jennifer Long, and the fact that Wes' statements formed the sole basis for discovery of the facts and evidence about Jennifer Long's death (Tr. 566-597). In handling things in this way, the one thing for which I had not accounted was how this single question and answer would impact upon Wes' psyche.

Not long after my cross of Tarpley was over, Wes was animated, wanting to know why I had not confronted Tarpley about calling Wes a liar. I first sorted out that Wes was upset about the single question and answer, and his somewhat peculiar interpretation of that question and answer. It was readily apparent that

102

002082

Wes' mental illness was really having an impact here. I tried to explain to Wes my

reasoning in handling the matter as I did. Wes would have none of it. To Wes,

this was a matter of utmost concern and even honor, because Tarpley had

disrespected him, had lied to do it, and had not immediately been held accountable.

My recollection is that, while my interchange with Wes occurred very soon

after my cross of Tarpley, it was after Tarpley had left the witness stand. Thus, I

could not just jump back in at that moment, and make the inquiries which Wes

wanted made of Tarpley. I explained to Wes that, while my notion would be to let

the matter die on the vine, because he was so concerned, I would make sure that

Laura brought out through Michael Speakman that Speakman had told Tarpley,

two years before the trial, that Purkey was denying the kidnapping. Laura elicited

that very testimony from Speakman later that same day (Tr. 695-696). I believed

that the Speakman testimony not only put the matter to rest, it also made Tarpley

look very bad.

Nevertheless, Wes was not satisfied. He remained obsessed with the matter,

and was willing to do anything to find other sources of evidence to confront

Tarpley with his "lie". This included suggestions that Dr. Peterson, Laura and I

witness about Wes denying the kidnapping to us. While I acknowledged to Wes

103

002083

that the three of us could be called to witness, particularly after Wes himself had testified, I deflected these requests by Wes by explaining to Wes that the Speakman testimony directly addressed the matter in a way which testimony from the lawyers and the psychiatrist could not.  Whereas Speakman had communicated his information directly to Tarpley, none of the three of Dr. Peterson, Laura or I had ever communicated to Tarpley about what Wes had told us.  Besides, Wes' discussions with Dr. Peterson about his denial of the kidnapping did not occur until 2002 and 2003, long after Tarpley learned of the matter from Speakman.  I also explained the legal problems inherent in trying to make lawyers be witnesses in a case, and that while there are certain situations in which that step must be taken, this was not one of those situations.

I particularly did not want Dr. Peterson to get embroiled in this particular controversy, since I believed that such a use of Dr. Peterson would color jurors' perceptions of what he would say later.  I knew that Dr. Peterson's testimony would be crucial in the penalty phase.  The conclusions which Dr. Peterson would offer at the penalty phase were in no way dependent upon the truth or falsity of Wes' denial that there had been kidnapping.  In fact, Dr. Peterson would not even testify unless the jury disbelieved Wes, and determined that there was a kidnapping.  Had we done what Wes was suggesting, we would have brought Dr.

Peterson in the first phase for the sole purpose to relate Wes' denial of the kidnapping. I believed that would have caused jurors to indelibly link Dr. Peterson, and therefore what he would say later, with the truthfulness of Wes' denial of the kidnapping. Thus, I wanted to make certain that Wes' obsession over the Tarpley "lie" did not have us tearing down the structure of our mitigation case.

I deemed myself fortunate that I was able to get Wes to grudgingly go along with my approach. I promised Wes I would argue, and then did argue, that the Speakman's testimony trumped Tarpley's testimonial claim (Tr. 1106, 1107). Though the Government Counsel had not mentioned the Tarpley issue in its opening argument, in closing argument Government Counsel did mention the claim that Purkey had come forward with his retraction of the kidnapping admissions just before trial, but also somewhat conceded how the Speakman revelations undercut that argument (Tr. 1129-1131).

2. The issue about my not confronting Tarpley with the 2001 Speakman revelations about Purkey's retraction of his kidnapping admissions

Argument is made that I was ineffective in not confronting Tarpley on cross with the fact that Michael Speakman had told Tarpley in 2001 that Purkey was denying that a kidnapping of Jennifer Long had occurred (Doc. 47, p. 35-36; Doc. 52, p. 41-45). This argument fails to account that, though Tarpley was not asked the

105

questions, the impeachment actually occurred later that same day when Speakman testified about the matter (Tr. 695-696). I already explained above my reasoning in not questioning Tarpley at the time about what I considered to be a marginal matter. Nevertheless, once the decision was made to confront the matter head on, the approach which we took was actually far preferable, since it did not give Tarpley the opportunity to concoct an explanation for his misstatement. Instead, Laura, was able to milk the point with Speakman that, way back in 2001, Tarpley was told by Speakman that Purkey was denying the kidnapping (Tr. 695-696). It should also be remembered that, since Tarpley sat at government counsel table throughout the trial, this confrontation of him through Speakman actually included him, helplessly sitting there as the confrontation occurred.

In the argument upon this point, there are cited a couple of cases in which available impeachment was clearly never made (Doc. 52, p. 42-44). The distinction here, of course, is that the impeachment was made, albeit not in the suggested fashion, but in arguably a better manner.

### 3. The issue about my not objecting to the Tarpley answer and the government argument about the matter

It is next urged that I should have objected to Tarpley's answer and the government's argument about that answer (Doc. 47, p. 38-40; Doc. 52, p. 50-54).

106

However, no suggestion is ever made about what proper legal objection would have been well-taken as against either the inquiry or the argument.

As to the inquiry, since Tarpley's answer was inaccurate, the proper course was to correct the inaccuracy. That we did through the testimony of Speakman.

As to the argument, it should be noted that the government never mentioned the matter in its opening argument. I still believe that, had we not taken the government's bait, this issue would have faded away. Because of Mr. Purkey's obsession with the matter, and because of the way we ultimately addressed the matter in the evidence at Mr. Purkey's instance, I believed it was appropriate for us to argue the matter (Tr. 1106, 1107). Since we opened the matter in our argument, the government was clearly permitted to respond, and did actually respond, though pretty much conceding our point about the Speakman matter (Tr. 1129-1131).

Without any case law to support the actual point being made, reference is made in the pleadings to other, very different sorts of prosecutorial misconduct, and a request is made that this Court analogize the situation here to those very different actions by government counsel in the cited cases (Doc. 52, p. 51-54). Since the situation here is in no way analogous, the cited cases are inapt.

4. The issue about not presenting attorney testimony about the matter

It is urged that I was ineffective in not offering testimony from me and Laura O'Sullivan about Purkey telling us, "from day-1", that there was no kidnapping (Doc. 47, p. 37-38; Doc. 52, p. 45-50). I have already explained above my reasoning for not wanting to use attorney testimony to address the matter. To reiterate, the point made in the testimony was that Tarpley was supposedly unaware of Purkey's retraction of his previous kidnapping admissions (Tr. 566). There was no purpose to be served by calling the lawyers as witnesses, other than feeding Mr. Purkey's obsession. Though the lawyers had talked with Purkey, and knew about Purkey's account of the crime, the lawyers had never discussed with Tarpley the substance of their discussions with Purkey, and thus could not address the issue raised by Tarpley in his testimony. On the other hand, the testimony from Speakman, which was presented, directly countered Tarpley's point.

Several instances are cited concerning lawyers becoming witnesses in cases to offer critical testimony (Doc. 52, p. 46-49). The distinction here is that the lawyers had no evidence of substance to offer so as to justify their taking on the roles as witnesses.

## 5. The issue about not raising the matter on appeal

It is also argued that we should have raised the matter on appeal (Doc. 47, p. 39-40; Doc. 52, p. 54-58). It is specifically argued that the situation here is analogous to

the failure to raise an appellate issue addressed in two Eighth Circuit cases, though the facts of those cases are not shared with the Court (Doc. 52, p. 58). The situations in those cases are not even arguably similar to what occurred in this case. In ***United States v. Bigeleisen***, 625 F.2d 203, 208-210 (8th Cir. 1980), the Eighth Circuit found reversible the combination of errors of the government failing to correct a false statement made by its key witness about a crucial aspect of his plea agreement, and then making an argument, unsupported by the evidence, to support a weakness in that same witness' testimony. In ***United States v. Foster***, 874 F.2d 491, 494-495(8th Cir. 1988), the Eighth Circuit reversed because of the government's failure to disclose that its informers, who each denied under oath having an agreement with the government, actually did in fact each have a promise from the government that he would not be prosecuted. There is nothing in the facts of the Purkey case remotely similar to the facts in these cited cases.

It should also be noted again that, on appeal, we originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes

109

002089

approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. All of the nineteen point raised in that brief were far more meritorious that the frivolous issue urged here. Mr. Purkey never urged me to replace any of those nineteen issues with this issue. But, had Mr. Purkey so urged me, I would have strongly resisted such a mistaken course.

6. Matters related to Mr. Purkey's trial testimony

Laura O'Sullivan and I are also criticized for the way in which we prepared Mr. Purkey for his testimony at trial (Doc. 47, p. 40-42; Doc. 52, p. 58-63). It is alleged that Mr. Purkey was told for the first time on November 4, 2003 that he would need to testify because there was no other admissible fashion in which his recantation of the kidnapping could come before the jury (Doc. 42, p. 59). That statement is half true. It is certainly true that we knew, in light of F.R.E. 802, that it was only through Mr. Purkey's testimony that we could present, in admissible fashion, Mr. Purkey's recantation of his kidnapping admissions. It is certainly not true that we took the matter up for the first time during trial. We had initially broached that subject with Mr. Purkey months before trial. That is why, for the months immediately preceding Mr. Purkey's trial, Laura and I regularly met with Mr. Purkey, and worked with him, preparing him for his testimony. I personally spent many sessions with Wes preparing him for his testimony. As part of my preparation work with Wes, I went so far as to

110

002090

prepare a videotape of the places where the various events of the crime occurred, so I could play those back for Wes to refresh his recollection about details for his testimony. I still have that videotape should the Court wish to review it. It is my recollection that I reviewed and approved the presentation scheme which Laura prepared. It is further my recollection that Laura spent several sessions with Wes, developing the presentation which they ultimately made before the jury. I believe the transcript of the questions and answers bears out the careful preparation which went into that presentation of Purkey's testimony.

For all the claims about lack of preparation, there are only two allegations of errors in the presentation of Purkey's testimony: the failure to sufficiently prepare Purkey to answer the question posed on cross about when he made his kidnapping admission retraction and the failure to ask Purkey about his prior denials of the kidnapping to the defense team.

The complained-about interchange between government Counsel and Purkey, in context, was as follows:

Q  Now, you testified in this courthouse on October 25th of 2002 at a hearing, correct?
A  Right.
Q  And do you remember that at that hearing -- the tabbed portion, sir. Do you remember being asked questions about your handwritten statement?
A  Correct.
Q  And on that day we were in front of Judge Hays, Sarah Hays down in the magistrate courtroom; do you remember that?

111

002091

A    That's right.

Q    And that was after you had been charged in federal court with this crime, correct?

A    Right.

Q    And do you remember that I asked you some questions about this signed statement –

A    Yes.

Q    -- that you wrote out yourself.  Do you remember that?

A    Yes.

Q    And do you remember that you were under oath that day?

A    Yes.

Q    You swore to tell the truth, do you remember that?

A    Yes.

Q    Do you remember me asking you, "Is that the document or a copy of the document you wrote out" and you answered yes?

A    Yes.

Q    And then I asked you, "You signed that on the back page; is that right?" And you answered that's correct.  And then I asked you, "Dated it 12/17/98" and you replied that's correct.  And then I asked you, "And then it was witnessed by Agent Tarpley and Detective Howard," and you answered that's correct.  Right?

A    Right.

Q    And I asked you, "And did you write that in your own handwriting" and you said what, what was your response?

A    I don't know where you're --

Q    Look on line 17.

A    Is that on page 59?

Q    Yes, sir.

A    "And did you write that in your own handwriting?"  "Yes, I did," is the answer.

Q    And I asked you, "Did you tell the truth when you wrote this?"  And what was your answer?

A    "Yes, I did."

Q    And then I asked you, "And that is a confession to the kidnapping, rape and murder of this young lady, correct?" And you answered --

A    "hat's correct."

112

002092

Q    Now, you said under oath before Judge Hays that you were verifying the statements in that document, that you had admitted and confessed to kidnapping, correct;  that right?
A    Correct.
Q    You didn't change it and say I didn't kidnap her at that time, did you?
A    No.
Q    And you could have, right?
A    Yes.
Q    But you didn't do it.  And now here recently you have come up with this new story that you didn't kidnap her, right?
A    That's true. (Tr. 1005-1008)

What is not explained in Mr. Purkey's Petition and Suggestions is that Mr. Purkey made his complained-about answer, not because of anything which Laura instructed him to do or not to do, but out of necessity.  Mr. Purkey had to make that answer, about the recency of his retraction about his admission of kidnapping, because he was confronted with statements made by him under oath, just a year before, confirming the truth of his original admissions about the kidnapping.  No amount of preparation could have or should have changed Mr. Purkey's answer to that final question in light of what went before.

After Mr. Purkey's testimony as a whole, and after the aforementioned testimony in particular, it is surely obvious to anyone, save maybe those responsible for drafting of Mr. Purkey's pleadings in this case, as to why we did not ask Mr. Purkey about statements made by him to members of the defense team.  In his testimony, Mr. Purkey had well described many things, including his retraction of his

113

002093

admissions about the kidnapping. There was no purpose to be served by asking him about what statements he had made when, and to what members of the defense team.

Finally, Laura's and my preparation for Wes' testimony is likened to the 15 minutes of preparation for the defendant's testimony found wanting in *Commonwealth v. Wesley*, 2005 WL 3106479, *27-*29 (Pa.Com.Pl. 2005). The comparison is, to put it simply and civilly, inapt.

## 7. The issue about not using Dr. Peterson to witness about the matter

Complaint is also made that we did not call Dr. Peterson to witness in the first phase, after Mr. Purkey's testimony, in order for Peterson to say that Purkey had denied the kidnapping during Peterson's interviews with him, thereby supposedly countering the argument about recent fabrication of Purkey's denial of the kidnapping (Doc. 47, p. 42-43; Doc. 52, p. 63-66).

The trouble with the argument is that there was absolutely nothing which Dr. Peterson's testimony in this regard would have accomplished. Mr. Purkey's discussions with Dr. Peterson did not occur until late 2002. In the context of this case, that timeframe was recent, coming four years after Purkey's inculpatory statements, but just a year before trial.

Moreover, as I mentioned earlier, I would have moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission

114

002094

retraction, lest that involvement compromise his effectiveness during the penalty phase.

Rather than trying to make our point through such ineffectual and counterproductive means, I chose other avenues. As acknowledged ever so briefly in Mr. Purkey's pleading (Doc. 52, p. 64), rather than calling witnesses to merely say that Purkey had told them there was no kidnapping, I tried to bring forth evidence, independent of Purkey's statements, which would lead the jury to its own conclusion that there likely was no kidnapping (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-904). And, I made sure that Dirk Tarpley's specific testimonial misrepresentation was confronted with the testimony of Michael Speakman (Tr. 695-696).

### *Issue regarding supposed failure to raise insufficiency of the evidence*

It is alleged that I failed to raise the issue about evidence insufficiency. That is simply not true. I had done considerable pretrial research about sufficiency of evidence issues. As a result of that research, I believed, and shared with Wes my belief, that the government's evidence, consisting of Wes' 1998 admissions combined with a modicum of physical evidence, was more than sufficient to survive a motion for judgment of acquittal. Nevertheless, I raised the matter of evidence sufficiency in our motion for judgment of acquittal at the close of all of the evidence (Doc. 448) and again in our motion for new trial (Doc. 490, p. 29). On appeal, our defense team,

115

including Wes, used the motion for new trial as our rough outline for the potential issues to be raised on appeal. In our discussions about issues to raise on appeal, I shared with Wes again my research-based notions about the weakness of the evidence insufficiency claim. As a result, we decided to not include that issue among the twenty-nine points contained in the original brief tendered to the Court of Appeals. Putting it another way, we believed that all of the twenty-nine issues contained in that original brief were much stronger than the evidence sufficiency issue. As already mentioned above, the Court of Appeals rejected that original twenty-nine point brief, and we had to pare down even further, to nineteen issues in the brief which was ultimately accepted by the Court. Because we had to abandon ten issues which were even stronger than the evidence sufficiency issue, there is no way that we would have included the weaker evidence sufficiency issue in the brief upon which we ultimately relied for our appeal.

116

## *Conclusion*

I believe that the foregoing answers the ineffective assistance of counsel allegations made in the pleadings in this case (Doc. 47; Doc. 52). If the Court wishes any further information from me, I am, of course, available. I do hereby swear that the foregoing is true and correct to the best of my knowledge and belief.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

Subscribed and sworn to before me this 9th day of May, 2008.

/s/Joanna M. Parrish
NOTARY PUBLIC

My commission expires  1/4/2011

117

002097