

2009 WL 3160774
Only the Westlaw citation is currently available.
United States District Court,
W.D. Missouri,
Western Division.

**Wesley** Ira **PURKEY**, Movant,

v.

UNITED STATES of America, Respondent.

Civil No. 06–8001–CV–W–FJG.
Criminal Case No. 01–00308–01–CR–W–FJG.
Sept. 29, 2009.

**Attorneys and Law Firms**

Matt Jeffrey Whitworth, United States Attorney's Office, Kansas City, MO, for Respondent.

### ORDER

FERNANDO J. GAITAN, JR., Chief Judge.

***1** Currently pending before the Court is movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255 (Doc. # 47); Motion to Strike Statement of Frederick A. Duchardt, Jr. (Doc. # 83); Motion to Set Matter for an Evidentiary Hearing (Doc. # 84) and Motion for Leave to File Late Response to Motion to Strike Statement of Frederick A. Duchardt Jr. (Doc. # 87).

### I. BACKGROUND

Movant was indicted on October 10, 2001 for the kidnaping, rape and murder of Jennifer Long in violation of 18 U.S.C. § 1201(a), 1201(g) and 3559(d). On November 5, 2003, petitioner was convicted of these crimes. The penalty phase of the trial began on November 10, 2003 and concluded on November 19, 2003. The jury unanimously concluded that the aggravating factors outweighed the mitigating factors and determined that petitioner should be sentenced to death. On January 23, 2004, petitioner was sentenced to death. On February 2, 2004, movant filed his notice of appeal with the Eighth Circuit Court of Appeals. On November 7, 2005, the Eighth Circuit issued an opinion affirming his conviction and sentence. *See United States v. Purkey*, 428 F.3d 738 (8th Cir.2005). Rehearing and rehearing en banc were denied on January 13, 2006. Movant's petition for certiorari was denied by the United States Supreme Court on October 16, 2006. *Purkey v. United States,* 549 **U.S**. 975, 127 S.Ct. 433, 166 L.Ed.2d 307 (2006).

### II. STANDARD

28 U.S.C. § 2255(a) provides, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

The district court must hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "Accordingly, a claim may be dismissed without an evidentiary hearing if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw v. United States,* 24 F.3d 1040, 1043

002098

(8th Cir.1994) (citing *Larson v. United States,* 905 F.2d 218, 220–21 (8th Cir.1990), *cert. denied,* 507 **U.S**. 919, 113 S.Ct. 1278, 122 L.Ed.2d 672 (1993)).

## II. DISCUSSION

### A. Ineffectiveness of Counsel

To prevail on a claim of ineffective assistance of counsel, a movant must show that the attorney's performance fell below an objective standard of reasonableness and that the performance prejudiced the defense. *Strickland v. Washington,* 466 **U.S**. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The Court is to adopt an extremely deferential approach in evaluating counsel's performance. 466 **U.S**. at 689, 104 S.Ct. at 2065–66. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *See Michel v. Louisiana,* 350 **U.S**. 91,101, 76 S .Ct.158,164, 100 L.Ed.2d 83 (1955)." *Id*. Additionally, to establish prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 **U.S**. at 694, 104 S.Ct. at 2068. "Although the two prongs of the 'ineffective assistance' analysis are described as sequential, courts 'do not ... need to address the performance prong if petitioner does not affirmatively prove prejudice.' " *United States v. Vesey,* No. C06–0075–MWB, 2009 WL 1324076, \*5 (N.D.Iowa May 12, 2009) (citing *Boysiewick v. Schriro,* 179 F.3d 616, 620 (8th Cir.1999), *cert. denied,* 528 **U.S**. 1141, 120 S.Ct. 989, 145 L.Ed.2d 938 (2000)).

**\*2** In his § 2255 motion, movant makes seventeen allegations regarding the ineffectiveness of his trial and appellate counsel, Mr. Frederick Duchardt, Jr. These allegations focus on Mr. Duchardt's failure to object to certain statements made during the trial, failure to obtain the services of a mitigation expert or to adequately prepare a mitigation case, failure to adequately present expert testimony, failure to call certain witnesses and failure to impeach certain witnesses. In response to these allegations, Mr. Duchardt filed a 117 page affidavit, in which he goes into extensive detail to refute movant's claims. The Government argues that Mr. Duchardt's affidavit provides significant insight into why he made certain strategical decisions before and during the trial. Additionally, the Government notes that Mr. Duchardt called a total of twenty-two witnesses on movant's behalf. Eighteen of these witnesses testified as mitigation witnesses who testified concerning the sexual, physical and psychological abuse that movant suffered during his childhood and adolescence.

The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy. The Court finds that Mr. Duchardt's actions did not fall below an objective standard of reasonableness. Additionally, even if Mr. Duchardt's actions were considered to fall below the standard of reasonableness, movant has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 **U.S**. at 694.

Movant filed a Motion to Strike the Affidavit of Mr. Duchardt alleging that he violated his duty of confidentiality and his duty of loyalty. Movant also argues that he failed to give adequate notice of the contents of the Affidavit or to allow movant to object to portions of the affidavit, before it was provided to the Government. Movant argues that Mr. Duchardt divulged confidential information that he acquired in the course of his investigation that was otherwise generally unknown. Movant argues that no attorney could conclude that such disclosure was necessary in order to answer the limited allegations of ineffectiveness.

In *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir.1974), *cert. denied,* 419 **U.S**. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975), the Court stated:

> It has long been the law that a client may waive protection of the [attorney-client] privilege, either expressly or impliedly.... One of the

002099

circumstances which may support a conclusion of a waiver is an attack by the client upon his attorney's conduct which calls into question the substance of their communications. A client has a privilege to keep his conversations with his attorney confidential, but that privilege is waived when a client attacks his attorney's competence in giving legal advice, puts in issue that advice and ascribes a course of action to his attorney that raises the specter of ineffectiveness or incompetence.... Surely, a client is not free to make various allegations of misconduct and incompetence while the attorney's lips are sealed by invocation of the attorney-client privilege. Such an incongruous result would be inconsistent with the object and purpose of the attorney-client privilege and a patent perversion of the rule.

*3 *See also* *Stobaugh v. **U.S.**,* No. 06–3317–CV–S–RED, 2007 WL 628420, *1, n. 1 (W.D.Mo. Feb.27, 2007)*("Stobaugh waived the attorney-client privilege when he claimed that his attorney's advice constituted ineffective assistance of counsel."). In the instant case, the Government requested that the Court order Mr. Duchardt to file an Affidavit so that the Government could adequately respond to movant's motion. Mr. Duchardt declined to provide an affidavit unless he had an attorney-client waiver from movant or unless the Court ordered him to provide evidence in response to the allegations. In an Order dated February 1, 2008, this Court found that movant had waived his attorney-client privilege as to his ineffective assistance of counsel claims and directed Mr. Duchardt to prepare an affidavit in response to movant's allegations. The Court finds that Mr. Duchardt did not act improperly in filing the Affidavit nor did he violate his duty or loyalty or his duty of confidentiality, as the attorney-client privilege had been waived. Accordingly, movant's Motion to Strike the Statement of Frederick A. Duchardt, Jr. (Doc. # 83) is hereby **DENIED.**

**B. Violation of Due Process**

Movant argues that he was denied due process due to: 1) certain misconduct on the part of the Government; 2) because no reasonable juror could have found beyond a reasonable doubt that he kidnaped the victim and also because 3) he was sentenced based on arbitrary factors when the jury did not vote on mitigating evidence.

**1. Alleged Government Misconduct**

Movant claims that the Government created the false impression that movant referred to the federal penitentiary as "Club Fed" and that "Club Fed" had more lenient conditions than the Kansas Department of Corrections system. The Government argues that movant did not raise this claim either at trial or on appeal and that the claim is procedurally defaulted. In order to obtain relief, the Government argues that movant must show actual prejudice from this error. Additionally, the Government notes that the prosecution has the right to introduce evidence concerning a defendant's post-defense statements to members of law enforcement as admissions against interest. The Government argues that there was no attempt to mislead the jury that **Purkey** had used the term "Club Fed." The Court agrees and finds that there was no misconduct on the part of the Government by referencing the term "Club Fed."

Movant also argues that Government counsel created a false impression when he told the jury that movant had just walked into Court and recanted the kidnaping. Movant argues that this was false since he told Agent Tarpley and Detective Howard in December 1998 and told Michael Speakman and Dr. Peterson in 2003 that the victim had come with him voluntarily. However, on direct examination of Agent Tarpley, the Government asked if movant had just changed his story.

The Government argues that neither movant nor the Government ever contended that Jennifer Long was grabbed off the street and kidnaped. The kidnaping crime occurred later when movant pulled a knife out of his glove box and placed it under his right thigh and refused to let Ms. Long out of his truck. This is consistent with what movant said in his statements to Tarpley and Howard and Speakman. The confusion comes when movant met with his psychiatrist, Dr. Peterson and in describing the events of January 22, 1998, he changed his story and claimed that he never kidnaped Ms. Long.

002100

In his report, Dr. Peterson wrote, "Ultimately, he killed her at home. He believes she came to his house willingly so it wasn't kidnaping. He told the kidnaping story 'for the FBI so he could get into the federal system .' " The Government did not come into possession of Dr. Peterson's report until August 13, 2003, shortly before trial. Looking at the accounts from Tarpley, Howard and Speakman, it is apparent that movant did change his story when he spoke with Dr. Peterson. Therefore, the Court finds that there was no misconduct in Government counsel asking whether movant had changed his story.

### 2. Denied Due Process Because No Reasonable Juror Could Have Found Beyond A Reasonable Doubt That Movant Kidnaped Jennifer Long.

*4 Movant argues that the only evidence that he kidnaped Ms. Long came from his own mouth and he later repudiated the kidnaping. Movant argues that his confession to Tarpley and Howard was not trustworthy, and that less than a month after the indictment, the government knew from its star witness, Michael Speakman, that movant had denied kidnaping Ms. Long. Movant argues that the corroborating evidence led to the inference that Ms. Long voluntarily accompanied him to his home in Kansas, because there were multiple opportunities that she had to escape, but she did not. Movant argues that the Government relied on his confession because that is all it had. Movant argues that the Government mislead the jury by stating that he had repudiated the kidnaping not two years before trial, but right before trial. Without this misleading of the jury, movant argues that no reasonable juror could have found beyond a reasonable doubt that he kidnaped Ms. Long.

As discussed above, the Government did not know from Speakman's statements to the FBI that **Purkey** was recanting his claim that he kidnaped Ms. Long. The only thing that he told Speakman was that he had not snatched the girl from the street as Keith Nelson had done. Rather, **Purkey** described his initial contact with the girl as more like they were "partying" and that it was not forcible. This is consistent with what movant told Tarpley and Howard. The Court finds that the Government did not in any way mislead the jury. A reasonable juror could have disbelieved movant's argument and found beyond a reasonable doubt that he kidnaped Ms. Long.

### 3. Denied Due Process Because the Jury Did Not Vote On Mitigating Evidence.

Movant argues that the jury left blank the entire section of the verdict form related to findings upon mitigation evidence. He argues that it is one thing for a jury not to give much weight to mitigation evidence, but it quite another thing for a jury to decide not to acknowledge the evidence at all.

In *United States v. Paul,* 217 F.3d 989, 999–1000 (8th Cir.2000), the Court stated, "Neither the FDPA nor *Lockett [v. Ohio,* 438 **U.S**. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] and *Eddings [v. Oklahoma,* 455 **U.S**. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ] require a capital jury to give mitigating effect or weight to any particular evidence.... There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." In that case, six jury members refused to find the defendant's age to be a mitigating factor, even thought it was undisputed that the defendant was eighteen at the time of his offense. The Court has reviewed the Verdict Form completed in this case and finds no error in the fact that the jury failed to find any mitigating evidence in this case. Movant has not shown that the jurors were precluded from considering any mitigating evidence, they simply chose not to give any weight to that evidence, which under the law they are entitled to do.

### 4. Denial of Due Process Due to Cumulative Effect of Government Counsel's Misconduct.

*5 Movant argues that the cumulative nature of the prosecutorial misconduct requires reversal. In *United States v. Hance,* 501 F.3d 900 (8th Cir.2007), the Court stated:

'To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the

002101

defendant's rights in obtaining a fair trial." ... If we reach the second step, we consider: (1) the cumulative effect of such misconduct (2) the strength of the properly admitted evidence of [defendant's] guilt; and (3) the curative actions taken by the trial court.'

*Id.* at 908, (citing *United States v. Cannon,* 88 F.3d 1495, 1502 (8th Cir.1996)). The Court has examined the alleged prosecutorial errors and does not find any of them to be improper. Even if the remarks and/or actions were considered to be improper, they did not prejudice the defendant's right to a fair trial.

### C. Motion for An Evidentiary Hearing

Movant argues that he is entitled to a hearing because there are disputed issues of fact that cannot conclusively be resolved on the basis of the record alone and those facts if true, would entitle him to relief. Movant argues that many of the allegations of ineffectiveness relate to activity outside the courtroom and the record can shed no light on these allegations. Movant states that the Court cannot determine whether to believe his witnesses or Mr. Duchardt's denials without hearing from the witnesses themselves, as this is the only way to judge their credibility.

The Government argues that an evidentiary hearing is both unwarranted and unnecessary and that all of the issues raised by movant in his § 2255 motion are resolvable by reviewing the record. The Government states that Movant has not shown that Mr. Duchardt's representation fell below an objective standard of reasonableness. Nor has he demonstrated that there is a reasonable probability that but for Mr. Duchardt's errors, the result of the proceeding would have been different.

In reply, Movant cites to the Eighth Circuit decision in *Nelson v. United States,* No. 07–3071 (8th Cir. Oct. 27, 2008), in which the Court stated, "[o]ur cases teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record."

"A district court does not err in dismissing a movant's § 2255 Motion without a hearing if (1) the movant' 'allegations, accepted as true, would not entitle' the movant to relief, or '(2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.' " *Buster v. United States,* 447 F.3d 1130,1132 (8th Cir.2006) (citing *Sanders v. United States,* 341 F.3d 720, 722 (8th Cir.2003), *cert. denied,* 540 **U.S**. 1199, 124 S.Ct. 1460, 158 L.Ed.2d 116 (2004)). The Court finds that no hearing is necessary in this case, because even if movant's allegations are true, and Mr. Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, movant would not be entitled to relief. As noted above, of the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor. So, even if movant's counsel had called different or additional witnesses or introduced more or additional mental health or evidence relating to his abuse as a child and young adult, it is unlikely that the jury would have considered this mitigating evidence or that they would have sentenced movant to life in prison. Accordingly, because the Court finds that the disputed issues would not entitle movant to relief, the Court hereby **DENIES** the Motion for an Evidentiary Hearing (Doc. # 84).

### IV. CONCLUSION

*\*6* For the reasons stated above, the Court hereby **DENIES** movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255 (Doc. # 47); **DENIES** the Motion to Strike the Statement of Frederick A. Duchardt, Jr. (Doc. # 83); **DENIES** the Motion to Set Matter for an Evidentiary Hearing (Doc. # 84) and **DENIES AS MOOT** the Motion for Leave to File Late Response to Motion to Strike Statement of Frederick A. Duchardt Jr. (Doc. # 87).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3160774

002102

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw. © 2016 Thomson Reuters | Privacy Statement | Accessibility | Supplier Terms | Contact Us | 1-800-REF-ATTY () | **Improve Westlaw**

 THOMSON REUTERS

002103

## Teresa Norris

| | |
|---|---|
| **From:** | Teresa Norris |
| **Sent:** | Wednesday, May 07, 2008 1:51 PM |
| **To:** | 'Fred Duchardt'; 'Gary E. Brotherton' |
| **Subject:** | RE: Purkey Case Affidavit |

**Attachments:** Duchardt 5-7-08.pdf

Fred,

We do have objections to the scope as addressed in the attached letter.

Teresa L. Norris
Blume Weyble & Norris, LLC
P.O. Box 11744
Columbia, SC 29211
803 (765) 1044
803 (765) 1143 Fax

**From:** Fred Duchardt [mailto:fduchardt@hughes.net]
**Sent:** Wednesday, May 07, 2008 11:40 AM
**To:** 'Gary E. Brotherton'; Teresa Norris
**Subject:** Purkey Case Affidavit

Good morning Gary and Teresa

I have appended to this memo a copy of the affidavit which I have completed in the Purkey case. Though you have not raised any objections to this point about my preparing this, I am providing it to you, ahead of my providing it to the government, in case you believe that objections to its release should be made. I intend to provide this to the government this afternoon unless I hear from you before then.

Fred

000867

5/19/2008

**002104**

# BLUME WEYBLE & NORRIS, LLC

## ATTORNEYS AT LAW

JOHN H. BLUME
KEIR M. WEYBLE
TERESA L. NORRIS
DAVID I. BRUCK *Of Counsel*

1247 SUMTER STREET, SECOND FLOOR
COLUMBIA, SOUTH CAROLINA 29201
MAILING ADDRESS:
POST OFFICE BOX 11744
COLUMBIA, SC 29211
PHONE: (803) 765-1044
FAX: (803) 765-1143

May 7, 2008

**Via Email**

Frederick A. Duchardt, Jr.
P.O. Box 349
Kearney Missouri 64060

Re:    *Wesley Purkey v. USA (Proposed Affidavit)*

Dear Mr. Duchardt:

Thank you for providing the 117-page "Statement" that you emailed mid-day today with notice that it will be provided to the government this afternoon if you did not hear from us first.

Please be advised that, to the extent, your statement addresses factual matters concerning your actions and strategies and those of the defense team, I believe it is within the bounds of matters to which the attorney-client privilege has been waived due to allegations in the petition and briefing.

Beyond that, it is my opinion (and Mr. Brotherton agrees) that your statement crosses the bounds of appropriately making factual statements in rebuttal of claims made to affirmatively making legal arguments against Mr. Purkey to whom you still have ethical obligations. Specifically, to the extent you make legal arguments about cases to which we have cited and arguments made and make legal arguments to rebut Wes' claims, your statement reads like a brief submitted by the government and I believe is inappropriate and crosses ethical boundaries.

Likewise, to the extent you include on pages 83-84 that you talked to Dr. Peterson and learned that we allegedly misled him and offer to get an affidavit from him this is completely inappropriate and you have recast yourself from witness to affirmative agent against Wes. Beyond that, while we could engage in debate about who is being misleading since I talked with Dr. Peterson today about the circumstances of your call (including the fact that he told you he was away from his office and had not recently reviewed the records, which is conspicuously absent in your statement), the point is simply that I believe again that this crosses ethical boundaries.

000868

002105

Frederick A. Duchardt
May 7, 2008
Page 2

Please do not hesitate to contact me if you have any questions in this matter or if I can provide you with any additional information.

Sincerely,

Teresa L. Norris

cc:    Gary Brotherton (by email)
       Wesley Purkey (by U.S. mail)

000869

002106

9/09/2008

**From:**   "Fred Duchardt" <fduchardt@hughes.net>
**To:**     "'Whitworth, Matt \(USAMOW\)'" <Matt.Whitworth@usdoj.gov>
**Cc:**     "'Teresa Norris'" <teresa@blumelaw.com>, "'Gary E. Brotherton'" <gebrotherton@legalwritesllc.com>
**Sent:**   6/02/2008   6:56PM
**Subject:** RE: Purkey: Notice of Objections

Matt

These folks are certainly, once again, a day late and a dollar short.

As you well know, I gave them every opportunity to object, in the first
place to keep the Judge from entering his order. I truly do not understand
why any 2255 attorney would agree to this process of preparation of an
affidavit. I guess that they did not think through what would naturally
happen in light of the broad order entered by Judge Gaitan. I also know
that it is a tremendous pain in the behind for the former defense counsel to
have to make proper response as ordered by Judge Gaitan.

I would also note that they have misrepresented their communications with
me. I met with them for hours, provided them my file, and answered all of
their questions. I also told them at the time that if they wanted any more
of my time, they would have to get me before September or after October, in
light of the demands of the Montgomery trial. Naturally, they waited until
the last minute, and called just before their pleading was due, right in the
middle of Montgomery, and asked for time. I reminded them of what I had
told them before, explained the situation, that Montgomery was up and
running as I predicted, and refused the request that I take time away from
that for them, despite my earlier warning. Also, I have never received any
letter regarding objections to my affidavit. What I did receive was a brief
acknowledgment of receipt of the affidavit. I shall forward a copy of that.

Fred

From: Whitworth, Matt (USAMOW) [mailto:Matt.Whitworth@usdoj.gov]
Sent: Monday, June 02, 2008 5:29 PM
To: Fred Duchardt
Subject: FW: Purkey: Notice of Objections

030870

**002107**

9/09/2008

Teresa Norris tells me they have no objection if I send a copy of this
sealed pleading for your review.    I will keep you advised of developments.

From: Gary Brotherton [mailto:gebrotherton@legalwritesllc.com]
Sent: Thursday, May 29, 2008 1:59 PM
To: Teresa Norris
Cc: Whitworth, Matt (USAMOW)
Subject: Purkey: Notice of Objections

Attached please find the Notice of Objections that I just filed under seal.

Gary E. Brotherton

Attorney & Counselor at Law

Legal Writes, LLC -- http://www.legalwritesllc.com

Stonebridge Office Park

601 W. Nifong Blvd.

Building 1, Suite C

Columbia, Missouri 65203

(573)875-1571 Phone

(888)875-1571 Toll free

(573)875-1572 Fax

Email GEBrotherton@legalwritesllc.com

Warning: Email is very convenient, but it is not secure. Do not include any
confidential information

Page 2

000871

**002108**

000872

9/09/2008

in an email to Legal Writes, LLC. Communicating by email, also will not establish an attorney/client

relationship. We must discuss confidential matters on the telephone or through regular U. S. Mail.

000872

002109

9/09/2008

**From:**    "Teresa Norris" <teresa@blumelaw.com>
**To:**      "Fred Duchardt" <fduchardt@hughes.net>, "Gary E. Brotherton" <gebrotherton@legalwritesllc.com>
**Sent:**    5/07/2008  12:51PM
**Subject:** RE: Purkey Case Affidavit

<BODY lang=EN-US vLink=purple link=blue><DIV class=Section1>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">Fred,<?xml:namespace prefix = o ns =
"urn:schemas-microsoft-com:office:office" /><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial"><o:p> </o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">We do have objections to the scope as addressed in the attached
letter.<o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial"><o:p> </o:p></SPAN></FONT></P>
<DIV>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">Teresa L. Norris</SPAN></FONT><FONT color=navy><SPAN
style="COLOR: navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">Blume Weyble &amp; Norris, LLC</SPAN></FONT><FONT
color=navy><SPAN style="COLOR: navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><?xml:namespace prefix = st1 ns =
"urn:schemas-microsoft-com:office:smarttags" /><st1:address w:st="on"><st1:Street w:st="on"><FONT
face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR: navy; FONT-FAMILY:
Arial">P.O. Box</SPAN></FONT></st1:Street><FONT face=Arial color=navy size=2><SPAN
style="FONT-SIZE: 10pt; COLOR: navy; FONT-FAMILY: Arial">
11744</SPAN></FONT></st1:address><FONT color=navy><SPAN style="COLOR:
navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><st1:place w:st="on"><st1:City w:st="on"><FONT face=Arial color=navy
size=2><SPAN style="FONT-SIZE: 10pt; COLOR: navy; FONT-FAMILY:
Arial">Columbia</SPAN></FONT></st1:City><FONT face=Arial color=navy size=2><SPAN
style="FONT-SIZE: 10pt; COLOR: navy; FONT-FAMILY: Arial">, <st1:State w:st="on">SC</st1:State>
<st1:PostalCode w:st="on">29211</st1:PostalCode></SPAN></FONT></st1:place><FONT
color=navy><SPAN style="COLOR: navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">803 (765) 1044</SPAN></FONT><FONT color=navy><SPAN
style="COLOR: navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial color=navy size=2><SPAN style="FONT-SIZE: 10pt; COLOR:
navy; FONT-FAMILY: Arial">803 (765) 1143 Fax</SPAN></FONT><FONT color=navy><SPAN
style="COLOR: navy"><o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face="Times New Roman" color=navy size=4><SPAN style="FONT-SIZE:
14pt; COLOR: navy"> </SPAN></FONT><o:p></o:p></P></DIV>
<DIV>
<DIV class=MsoNormal style="TEXT-ALIGN: center" align=center><FONT face="Times New Roman"
size=3><SPAN style="FONT-SIZE: 12pt">
<HR tabIndex=-1 align=center width="100%" SIZE=2>
</SPAN></FONT></DIV>

Page  1

000873

**002110**

9/09/2008

<P class=MsoNormal><B><FONT face=Tahoma size=2><SPAN style="FONT-WEIGHT: bold; FONT-SIZE: 10pt; FONT-FAMILY: Tahoma">From:</SPAN></FONT></B><FONT face=Tahoma size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Tahoma"> Fred Duchardt [mailto:fduchardt@hughes.net] <BR><B><SPAN style="FONT-WEIGHT: bold">Sent:</SPAN></B> Wednesday, May 07, 2008 11:40 AM<BR><B><SPAN style="FONT-WEIGHT: bold">To:</SPAN></B> 'Gary E. Brotherton'; <st1:PersonName w:st="on">Teresa Norris</st1:PersonName><BR><B><SPAN style="FONT-WEIGHT: bold">Subject:</SPAN></B> Purkey Case Affidavit</SPAN></FONT><FONT size=3><SPAN style="FONT-SIZE: 12pt"><o:p></o:p></SPAN></FONT></P></DIV>
<P class=MsoNormal><FONT face="Times New Roman" size=4><SPAN style="FONT-SIZE: 14pt"><o:p> </o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Arial">Good morning Gary and Teresa<o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Arial"><o:p> </o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Arial">I have appended to this memo a copy of the affidavit which I have completed in the Purkey case.  Though you have not raised any objections to this point about my preparing this, I am providing it to you, ahead of my providing it to the government, in case you believe that objections to its release should be made.  I intend to provide this to the government this afternoon unless I hear from you before then.<o:p></o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Arial"><o:p> </o:p></SPAN></FONT></P>
<P class=MsoNormal><FONT face=Arial size=2><SPAN style="FONT-SIZE: 10pt; FONT-FAMILY: Arial">Fred<o:p></o:p></SPAN></FONT></P></DIV></BODY>

030874

002111

5-14-08; 7:38AM;SCU/CUBAN UNIT                                    ;812 236 3315         #  10/01

FAX-to-MR. BROtheRton

# FREDERICK A. DUCHARDT, JR./ATTORNEY AT LAW
## P.O. BOX 216/TRIMBLE MISSOURI 64492
## TELEPHONE 816-213-0782 FAX 816-635-5155

May 8, 2008

Wesley Purkey, Inmate #14679-045
USP-Terre Haute
P.O. Box 12015
Terre Haute IN 47801

Dear Wes

On the CCA case front, please find enclosed defendants' motion to
dismiss and suggestions, and our response.

On the 2255 case front, please find, per your request, a copy of
the affidavit which I prepared for the Court.

Finally, I have noticed that you are having problems with my new
address.  Please note in the letterhead that, not only has the
P.O. box number changed, but also the name of the town and the
zip.

Yours truly

Frederick A. (Fred) Duchardt, Jr.

enclosures

1

000875

002112

## DECLARATION OF LAURA O'SULLIVAN

I, Laura O'Sullivan, being duly sworn and of lawful age, state as follows:

1.      I am a licensed attorney in the State of Missouri since 1991.  Since January, 1994, with the exception of a three and a half year period, I have been employed with the Missouri State Public Defender (MSPD) system in various offices.  I am currently the District Defender in the St. Louis County trial office.

2.      I left the MSPD in October 2001 and went into private practice.  I was appointed to represent Wesley Ira Purkey shortly after that time.  I was not on the federal court appointments list, but Fred Duchardt, Purkey's lead counsel, asked that I be appointed.  I met Mr. Duchardt years earlier in the MSPD system. An attorney at the Federal Public Defender Office suggested that he contact me to work with him in this case.  I agreed to the appointment and completed the paperwork then to be placed on the federal appointments list.

3.      Mr. Duchardt was the lead counsel on the case.  From the beginning, I was not given any clear area of the case designated to me, except that I had an understanding that Mr. Duchardt expected me to gather a lot of Mr. Purkey's background records.  Other than that, I was given specific tasks to do as they arose and would complete them.

4.      We did not meet in person on a weekly or monthly basis throughout the case; most of our discussions were by phone.  I had no involvement in many of the issues and decisions made in the case. While Mr. Duchardt discussed some issues with me, there were other issues that we did not discuss.  For example, I was not consulted or involved in the preparation and submission of the Proposed Budget to the Court. I did not even see the Proposed Budget before it was submitted.  I do not recall seeing this Proposed Budget until just recently when 2255 counsel provided it to me.  I

1

002113

also had virtually no involvement with the mental health experts retained, except that I did discuss at least general issues with Dr. Peterson when we were having difficulties communicating with Mr. Purkey.

5.    There were several times in the case that I discussed with Mr. Duchardt the possibility of me moving to withdraw from the case.  The first time, I believe, was around August 2002 when Mr. Purkey had filed a pro se motion to relieve me.  The second time was around May 2003.  Both times, I considered the possibility of withdrawing because I was concerned with the lack of communication from Mr. Duchardt.  There were things he was doing in the case that I was not aware of, records that he had received that I did not have copies of, and things of that nature.  I was also concerned in my discussions with Mr. Purkey that Mr. Duchardt was making statements to him that had the effect of undermining my abilities to effectively communicate with Mr. Purkey and provide effective assistance to him.

6.    With respect to the May 2003 discussions, I was also concerned because we were fast-approaching the trial date and there were no clearly defined expectations of what Mr. Duchardt expected me to do.  Up until that time, it would often happen that he would ask me to do something and expect it to be done in a matter of days.  I believed that in order for me to be effective my role should be more clearly defined.  After that, Mr. Duchardt did at least designate specific witnesses and areas for me to address during trial and sentencing, such as the allegation that Mr. Purkey had sexually assaulted another inmate while in the Oregon Department of Corrections.

7.    With respect to specific areas of concern in the 2255 proceedings, my recollections are as follows.

2

002114

**Mitigation Specialist and Investigation**

8.    At no time prior to or during the trial did we employ a mitigation specialist to work on Mr. Purkey's behalf. I recall discussing the possibility of retaining a mitigation specialist with Mr. Duchardt early in the case. I had not previously worked on a capital case, but I was aware from my years of work in the MSPD that it was routine in capital cases to hire a mitigation specialist as part of the capital defense team.

9.    It was my understanding then and now that the mitigation specialist's role is to investigate the client's entire background gathering records and interviewing people that have known the client from birth. I was also aware that sometimes a mitigation specialist will also focus on records and information prior to the client's birth since there may be genetic, hereditary issues or, as in Mr. Purkey's case, allegations of fetal alcohol exposure due to his mother's drinking while pregnant with him.

10.   I was concerned about our ability to adequately do this work without the assistance of a mitigation specialist because I certainly have no training in social work or this type of investigation. As far as I know, neither did Mr. Duchardt or Michael Armstrong, the investigator we retained. Nonetheless, it was clear from the beginning that Mr. Duchardt did not intend to retain a mitigation specialist.

11.   I again expressed my opinion that a mitigation specialist should be hired after a United States Supreme Court decision on the topic was decided. I believe the case that prompted me to raise the issue again was *Wiggins v. Smith*, 539 U.S. 510 (2003), which was decided in June 2003 while Mr. Purkey's case was still pretrial.

12.   With respect to the actual investigation we conducted, I collected many of the records related

3

002115

to Mr. Purkey. I do not recall collecting records on anyone else, except that we did obtain some medical records related to his parents.

13. Specifically, as it relates to other family members or background witnesses, I was present for interviews of Jeanette Purkey, Claire Gaida, Angie Genail, and other witnesses in the Wichita area who could address Mr. Purkey's behavior during the eighteen months or so when he was out of confinement. I was not involved in interviewing Mr. Purkey's brother Gary or any other family member. I also do not recall discussing with Mr. Duchardt whether these types of background people should be interviewed or records obtained for them as well as Mr. Purkey.

14. On the few occasions when Mr. Duchardt and I were both present for interviews, I do not recall Mr. Duchardt taking any notes. When we had meetings together or during trial, he would always use his computer. I do not recall him having any written notes or printed outlines before him when he examined witnesses during trial.

15. The only background witnesses that I recall discussing with Mr. Duchardt or interviewing myself that were from the time period prior to March 1997 when Mr. Purkey had been paroled were witnesses related to allegations of misconduct in confinement that we knew the government would offer in aggravation. I also recall some investigations relating to Mr. Purkey's prior conviction that involved a shooting and at least attempting to get information concerning Mr. Purkey's prior treatment for his stuttering problem as a child and an adult.

16. With respect to the mitigation, we were looking to present everything we could for Mr. Purkey and there was no decision, at least on my part, to avoid good character evidence if it was available from credible witnesses. I do not recall being aware of possible witnesses here, other than I do recall Betty Morago generally as a "pen pal" type person that wrote to Mr. Purkey while he was in

4

confinement. I recall speaking to her on several occasions and recall her being at some of the court proceedings.

17.    I do not recall ever hearing the names of Dion Bose, Floyd Bose, or Dr. Rex Newton as possible mitigation witnesses or in any other aspect of Mr. Purkey's trial proceedings.

**Other Issues.**

18.    **"Club Fed"** - I recall the phrase "club fed" being used during Mr. Purkey's trial but it was never my impression that it was being used in a way that implied that was a phrase Mr. Purkey had used. In addition, Mr. Duchardt was the attorney examining the agents that had taken Mr. Purkey's statements so if this issue needed to be addressed it would have been done by him.

19.    **Jennifer Long's Friends and Family** - Prior to trial, I recall that Mr. Duchardt and I had interviewed Jennifer Long's mother and I believe Mic Armstrong had interviewed some of her friends. We knew that they would testify about Ms. Long drinking alcohol and skipping school and those types of things, but had no indication that they would say anything else favorable to the defense.

20.    **Michael Speakman Rebuttal** - I recall Michael Speakman's testimony. I do not recall hearing about possible inmate or officer rebuttal witnesses on this issue and do not believe I was involved in interviewing these folks or making any determination of whether rebuttal evidence would be offered to Mr. Speakman's allegations that Mr. Purkey boasted of "killing people" while in confinement at CCA.

21.    **Mr. Purkey Testimony in Sentencing** - I recall discussing with Mr. Purkey the possibility of him testifying during sentencing. He had testified during trial and we felt it would be better for him to make an allocution statement rather than be subject to cross-examination because we believed

5

002117

cross would go badly since he had denied the kidnapping in his earlier testimony and the jury had clearly rejected that testimony in convicting him. Mr. Purkey also liked the idea of preserving the allocution issue for appeal so he chose not to testify.

22. **Sexual Abuse** - I do not recall specifics but recall that Mr. Purkey had, prior to being charged in this case, reported to someone that he had been sexually abused. I do not recall the name of Dr. Rex Newton from the Oregon Department of Corrections. I can state only that I went to Oregon with Mic Armstrong shortly before trial to interview witnesses and gather records concerning the prior alleged sexual assault of Gary Hatfield. We did not interview or attempt to interview any prison mental health people during the trip and were focused only on rebutting the alleged sexual assault evidence.

23. I knew at the time of Dr. Peterson's testimony that there were prior records reflecting that Mr. Purkey had reported being sexually abused as a child long before the charges in this case arose. I do not recall whether I told Mr. Duchardt this during Dr. Peterson's testimony. I also do not recall whether Mr. Duchardt asked me if I had any input in possible direct or redirect examination questions for Dr. Peterson while he was on the witness stand. Mr. Duchardt would sometimes ask me, or in more cases, ask Mr. Purkey for follow-up but this was more often during the testimony of lay witnesses. With respect to the mental health experts, I had very little involvement with them or that aspect of the case other than I recall generally discussing with Mr. Duchardt whether Dr. Peterson would be called to testify during the trial phase.

24. **Preparation of Sentencing Witnesses** - I was not involved in the interviewing or preparation of any of the witnesses presented during sentencing other than those that I examined. I do recall some discussions with Mr. Purkey's daughter, but I do not believe that was in preparation for her

6

testimony.

25.   **Kidnapping/Recantation Issue** - I recall that Mr. Purkey had confessed to kidnapping in his original statements to the FBI. Mr. Duchardt was responsible for examination of the government witnesses on this point and for any necessary objections during their testimony.

26.   I recall preparing Mr. Purkey to testify during trial but I do not recall specifics of that. I generally would not tell a defendant that they could not mention in their testimony the fact that they had told another person the same information before. I may have discussed with him not mentioning statements that he made to Dr. Peterson during his direct testimony where the court had granted the government's motion in limine to exclude Dr. Peterson's testimony that Mr. Purkey had recanted the kidnapping during his evaluations. I do not recall any discussions following Mr. Purkey's testimony about whether this issue should be readdressed with the court or whether Dr. Peterson should be called to testify that Mr. Purkey had recanted the kidnapping to him.

27.   **Tattoo Issue** - I recall the government putting up a picture showing Mr. Purkey's tattoos during direct examination of the first witness during the trial. We had seen this picture, but it was our understanding that no attempt would be made to present these pictures to the jury until sentencing when the court had already ruled, over our objection, that this evidence would be relevant. When the picture was displayed, Mr. Duchardt was not initially paying attention until Mr. Purkey and I were both telling him that an objection should be made. We then went to the bench and the court sustained the objection, but, as I recall, the picture continued to be displayed for at least a couple of minutes before it was brought down. There was a large screen in the courtroom but there were also smaller screens in the jury box where the picture was displayed.

28.   **Jury Vote on Mitigating Factors** - I recall that the jury did not mark anything on the verdict

7

002119

form with respect to mitigating factors.  I also recall that an objection was made and that this issue

was raised on direct appeal, but I do not recall on what specific bases this was asserted as an issue.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Laura O'Sullivan

8

## FREDERICK A. DUCHARDT, JR./ATTORNEY AT LAW
## P.O. BOX 349, 110 E. 6TH STREET/KEARNEY MISSOURI 64060
## TELEPHONE 816-628-9095 FAX 816-628-9046

January 29, 2002

The Honorable Fernando Gaitan
The Honorable Sarah Hays
Charles Evans Whittaker Federal Courthouse
400 E. 9th St.
Kansas City MO 64106

Dear Judge Gaitan and Judge Hays

Per request by Judge Hays, I have prepared a preliminary budget for providing Wesley Purkey's defense in the case of **United States v. Purkey**, 01-00308-01-CR-W-2. I submit this budget with a set of provisos.

First, I submit this budget on behalf of both appointed counsel in this case, me and Laura O'Sullivan. Thus, this budget proposal is meant to cover all attorney and other costs which will be associated with providing the defense for Mr. Purkey.

Second, I rely in large measure upon my experience in providing defense services to other capital case clients, and the necessary costs which are attendant thereto. The estimates which I make here are consistent with the actual expenditures made by my defense team on behalf of Defendant Dennis B. Moore, Sr. in **United States v. Moore, et al**, 94-00194-01-CR-W-9, a capital case tried before Judge D. Brook Bartlett in 1996, and on behalf of Defendant German Sinisterra in **United States v. Sinisterra, et al**, 98-00311-CR-2-W-2,4.

Third, I ask that some understanding and leeway be given by this Court as concerns the firmness of this budget. I certainly have made the best, most educated estimates I can. And, I am confident in the numbers, particularly in light of my experience in the **Moore** and **Sinisterra** cases, noted above, and the success with estimates there. However, the **Moore** and **Sinisterra** case also taught that, try as one might, he/she cannot make perfect estimates, particularly upon each and every CJA billing category. In the **Moore** and **Sinisterra** cases, allowances were made for this, by permitting counsel to shift funds between line items in the budget. That way, an underestimation in one category could be made up by an overestimation in another category, without changing the overall budget. I would ask that similar leeway be permitted in this case.

Finally, I note that, in this budget, I have shared with the Court much in terms of strategy for the defense of Mr. Purkey. In billings which the defense team will make through the course of disposition of

1

002121

this case, we on Mr. Purkey's defense team will, of necessity, reveal much more in terms of confidential work product and trial strategy. In prior cases, Ann Busterud has taken steps to safeguard this sensitive information from dissemination to the public in general, and the government prosecutors in particular. I specifically ask that confidentiality concerning these budgetary submissions continue throughout the pendancy of this case. To me that means, until the case is finally resolved, keeping the budget and billing information strictly between the client's defense team, the Court, and Ann and the others in the billing process. I trust that the Court will find it appropriate to deal with the budgeting and billing information in the same confidential manner as this case proceeds to trial.

I now shall break down and detail, by CJA categories, the time and expense estimates for defense services for Mr. Purkey. To hopefully make this presentation more easily understandable, I shall present tables of time and cost estimates at the start, and then I shall present supporting factual discussion thereafter.

### IN COURT TIME

| PROCEEDING | ONE ATTY TIME | TWO ATTY TIME | COST @ $125/HR |
|---|---|---|---|
| PRETRIAL | 50 | 100 | 12500 |
| JURY SELECTION | 40 | 80 | 10000 |
| TRIAL 1ST PHASE | 80 | 160 | 20000 |
| PENALTY PHASE | 40 | 80 | 10000 |
| SENTENCING | 4 | 8 | 1000 |
| **TOTALS** | 214 | 428 | 53500 |

**Overview**-The government has provided considerable discovery about this case. From that discovery, we know that the government's theory at trial will be that Purkey kidnapped, raped and killed the victim, and then cut up the body with a chainsaw, and burned the parts in the fireplace at his home. In light of the nature of the crime, and particularly the destruction of the body, the government's case, that is proof of the crime, is made much more complex. The government's evidence against Purkey will start with a large group of statements from Purkey. The government will likely attempt to buttress the information from the statements with a wide array of testimonial, documentary, physical and scientific evidence.

**Pretrial Hearings**--The following is the wide array of pretrial issues requiring resolution about which we know right now. The time estimate made in this category is based upon the notion that these matters will have to be resolved.

2

002122

- <u>Discovery</u>--For the first time in my memory, I do not anticipate a protracted battle over discovery taking up much of the pretrial time between Court and Counsel. Unfortunately, this does not mean that the government has formally opened its file. Rather, it means that, despite a closed file policy, the government has given over what appears to be most of its discovery, and certainly discovery which permits significant defense pretrial preparation. However, the government apparently does have a limited amount of evidence (I speculate in the form of some sort of informant or informants) which it does not intend to release without order of the Court. Thus, some limited discovery motion practice will be required.
- <u>Statement and other Suppression</u>--Motion practice is already ongoing regarding suppression of Purkey's statements, as well as over "fruit of the poisonous tree" from those statements constituting most all of the rest of the government's evidence.
- <u>Conditions of Pretrial Detention</u>--On Mr. Purkey behalf, we are in the midst of litigating over a constellation of difficulties which Mr. Purkey is having with his conditions of detention at CCA. There is considerable reason to believe that these matters will be ongoing.
- ***Daubert*** <u>Issues</u>--From the discovery thus far, it seems there may be certain scientific evidence offered. There will be substantial questions about the admissibility of most of that evidence which will have to be resolved pretrial.
- <u>Other Crimes Evidence</u>--It is anticipated that the government may try to bolster its case using evidence from another murder committed by Purkey. Motions *in limine* regarding other crimes evidence will have to be resolved, particularly in light of the powerful prejudice of such evidence.
- <u>Purkey's Mental Competence</u>--The further we get into this case, the clearer things become that issues regarding Purkey's competence, now and at the time of the alleged offense, will have to be resolved.
- <u>Jury Selection</u>--I intend to ask that the Court follow the practice employed in all death cases which have been tried to date in this District, and utilize a juror questionnaire. A questionnaire saves time for all in the long run, by garnering a substantial amount of valuable information in an efficient way. In order to make a questionnaire work, the Court and the parties must invest time in going through the provided information. This and other work regarding jury selection can and should be resolved in pretrial hearings.
- <u>Death Penalty Issues</u>--Since the government indicates it intends to seek the death penalty, a host of additional substantive and procedural issues regarding the death penalty will be raised, and must be evaluated by the Court.

3

002123

*Individual and Group Voir Dire, and the Jury Selection Process*-Because the **Moore**, **Lightfoot**, **Sinisterra** and **Nelson** cases have been tried in this District, we have excellent measures of how much time will be required to conduct a jury selection process which conforms with Federal Statutory and Constitutional law dictates.  Though I understand that the **Nelson** process was shorter, the other cases, particularly those in which I took part, generally took the better part of a week for conducting the group and individual voir dire processes, as well as the actual jury selection process.  Based mostly upon those experiences, I estimate requiring 40 hours to conduct the jury selection process.

*Trial*-It is very difficult to know, at this point, how long trial will take.  Depending upon how the Court rules upon evidence admissibility issues, particularly as concerns other crimes evidence, I would estimate that the government's case could take anywhere from a minimum of four days, to a maximum of ten days, to present.  It is even more difficult to tell how long the defense will take.  I have asked for funding for mental health and medical experts to conduct necessary testing of Mr. Purkey.  Depending upon the results of those evaluations, there may be substantial evidence requiring several days to present.  From all of this I am making a very rough estimate of ten days being required to try the first phase of this trial.

*Penalty Phase*---It is likely that, if the government or defense evidence is deemed inappropriate for the first phase of trial, it may well be admissible at the penalty phase.  Should that happen, there will likely be a defense response to the govenrment's evidence and visa versa.  These and other anticipated prosecution and defense penalty phase evidentiary sources make it likely that the government and defense will require two to three days each to put on the respective penalty phase cases.  The estimated time is based upon these thoughts.

*Sentencing*-The time allotted here is for evidence and argument upon any posttrial motions and upon sentencing issues.

4

002124

*OUT OF COURT TIME*

| ACTIVITY | TOTAL ATTORNEY HOURS | COST @ $125/HR. |
|---|---|---|
| CLIENT CONFERENCES | 220 | 27500 |
| WITNESS INTERVIEWS | 120 | 15000 |
| INVESTIGATOR/EXPERT CONFERENCES | 120 | 15000 |
| REVIEW COURT RECORDS | 250 | 31250 |
| REVIEW EVIDENCE | 500 | 62500 |
| CONSULT RESOURCE CENTER | 25 | 3125 |
| LEGAL RESEARCH/WRITING | 700 | 87500 |
| TRAVEL | 300 | 37500 |
| OTHER | 400 | 50000 |
| **TOTALS** | 2635 | 329375 |

**Client Conferences**--Mr. Purkey is easily one of the most challenging clients I have ever encountered. Many other lawyers have succumbed to the difficulties of dealing with Mr. Purkey. For example, in Mr. Purkey's recent case in Kansas City, Kansas, the Court found it necessary to change defense lawyers three different times before the case reached disposition. I understand similar problems have occurred in other cases involving Mr. Purkey. Part of the problem comes from Mr. Purkey's mental health problems. Over the years, Mr. Purkey has been diagnosed with an array of significant psychiatric problems, and he obviously suffers with those problems, to this date, in any of his interpersonal dealings. But Mr. Purkey's problems are not that simple. Mr. Purkey is also very familiar with the workings of the justice system. Not only has Mr. Purkey dealt with the criminal justice system, he has, while incarcerated in various jails and penitentiaries, brought a significant number of civil suits involving conditions of confinement. Because of this background, Mr. Purkey cannot and will not merely defer to advice of counsel. All of this means that more time than normal needs to be spent dealing with Mr. Purkey related to normal case proceedings. In addition, part of our agreement with the government regarding the early discovery they are giving involves our assurance that we shall not leave copies of the government-provided materials with Mr. Purkey, but share those materials with him only in our presence. We have needed to share much of this information directly with Mr. Purkey, not only to keep him abreast concerning the case, but also to gain his assistance in preparing the defense. In addition, as we anticipated, we have needed to spend a considerable amount of time with Mr. Purkey in order to properly ferret out

5

002125

applicable mitigation issues for a possible penalty phase. We figure needing to continue these same efforts throughout, and the time estimate takes this into account.

**Witness Interviews**-Since the government seeks the death penalty in this case, we on the defense team must, in essence, prepare for prosecution witnesses, and prepare our own witnesses, for two trials. There is the first phase trial upon the issue of guilt, and then the penalty phase trial. And, if the government is successful in its efforts to rely upon other crimes evidence, there will be preparation for at least one additional case. From what we know about discovery, all of these "trials" will involve different groups of witnesses upon vastly different themes. To prepare, there will be a tremendous number of people who must be interviewed and prepared for their testimony. An effort toward attorney time saving will be made as soon as approval is made for our requested investigator. Nevertheless, the time allotted will be necessary for the attorneys to do what they need to do to prepare for the testimony of all of these various witnesses at trial.

**Conferences with Experts and Investigators**--This bodes to be an experts-intensive case. The time here is set aside for work to be done by the attorneys directly with the investigator, mental health experts, medical experts, DNA experts, the mitigation specialist and the sentencing specialist.

**Obtain and Review Court Records**--In this line, I have allotted time for review of the pleadings filed by the government, and of the Findings and Orders which each of you will render upon the various motions which will be filed in this case. Such thorough review will be necessary, of course, for proper preparation of any necessary responses to the pleadings, Findings and Orders. I have also set aside time for proper work to be done with any jury questionnaires which the Court may permit to be used. As noted already above, questionnaires have been used successfully in the other capital cases tried in this District, and I fully intend to ask that the court use one here. If questionnaires are used, that use will be successful only if the parties invest the pretrial time necessary to read, assimilate and collate the information contained in the questionnaires. We have tried to allot sufficient time to do all of these things effectively. Finally, I have allotted time for review of the records from the prior court proceedings over the years involving Mr. Purkey.

**Obtain and Review Documents and Evidence**--This category first accounts for the time necessary to review any discovery provided by the government. Next, there are literally thousands of pages of materials related to Mr. Purkey's incarceration, medical and mental health history which must be reviewed.

**Consultation with Resource Center**--Kevin McNally of Kentucky, David Bruck of South Carolina and Dick Burr of Houston, Texas are employed by the Washington D.C. Administrative Office of the Federal Courts in order to provide a nationwide clearinghouse for valuable information

6

002126

for counsel appointed in Federal Death Penalty cases.  My experience has shown that, on occasion, upon certain limited matters, reference to these resource persons can be extremely time efficient.  I have set aside time for this case in a similar amount to that which I allotted in the aforementioned *Moore* and *Sinisterra* cases.

**Legal Research and Writing**--Extensive pleading and briefing has already been done on suppression and conditions of pretrial detention issues.  Also, there will be pleading and briefing related to the jury questionnaire, jury selection, jury instruction, penalty phase and a veritable host of other issues.  The amount of time now set forth is our best estimate of what we will need to properly research and brief these areas.

**Travel**--Our estimate here accounted for a group of factors.  First, since Mr. Purkey is incarcerated at CCA in Leavenworth pending trial, travel time has been, and will continue to be, necessary for visits with him.  Second, it may be necessary for Counsel to travel to Washington, D.C. to argue, before the Department of Justice, that the death penalty not be sought in this case.  Third, there has been, and will continue to be, significant travel around the Kansas City metropolitan area for investigation upon issues related to the government's case, as well as for necessary court appearances.  Finally, our investigation has uncovered a host of out-of-town matters and witnesses requiring attorney and investigator travel, particularly in the central Kansas and Wichita areas.

**Other**--We use this as a catch-all category to hold a variety of necessary, but otherwise undesignated activities.  Work connected with this budget-creation process is accounted for here.  Preparation for our presentation to the Department of Justice has been accounted for here.  Time necessary for out-of-the-Courtroom conferences with the Judges and other counsel involved in the case is set forth here.  Time for trial preparation tasks is also set forth, that being time for such tasks as creating of outlines for salient parts of the trial, drafting of presentations for parts of the trial like voir dire, opening statement, witness examination, closing argument, etc., assembling of evidence in a coherent fashion for presentation at trial, creation of demonstrative evidence exhibits, and so on.  I also include such trial tasks as overnight review of the day's evidence and incorporation of that information into the tasks for the next day and the rest of the trial.  I have drawn my estimates here heavily from past experience, particularly in the *Moore* and *Sinisterra* cases.

7

002127

### ATTORNEY EXPENSES

| EXPENSE CATEGORY | AMOUNT REQUESTED |
|---|---|
| MILEAGE | 6000 |
| PARKING | 150 |
| MEALS | 500 |
| LODGING | 1000 |
| COPYING | 3000 |
| POSTAGE | 500 |
| TOLL CALLS | 1000 |
| FAX | 200 |
| OTHER | 2000 |
| TOTAL ATTORNEY EXPENSES | 14350 |

**Mileage**--Under this category, I have accounted for all transportation expenses. I have accounted for expenditures for the trip to Washington. I have accounted for the expense of car travel to and from Leavenworth for the client conferences already made, and still to come. I have also accounted for travel to and from local and out-of-town investigative sites. And, I have accounted for travel to and from Court.

**Parking**-Accounted for here, mostly, are downtown Kansas City parking fees and parking fees associated with the out-of-town travel noted above.

**Meals**-Costs of meals are estimated at $25 per day for trips to Washington and to outstate Kansas.

**Lodging**-Hotel costs for Washington D.C., and the out-of-town investigative sites are included herein.

**Copying**--My estimate here, at 10 cents per page, is my best guess how much money it will take to do necessary duplication of discovery and Court filings. The cost estimate here also takes into account the need to pay the fees for other private and public agencies to retrieve and copy their files related to Mr. Purkey's background.

**Postage**--For the most part, postage will be used to provide necessary copies of pleadings to other counsel.

**Toll Calls**-The costs here will come largely from collect calls from Mr. Purkey. There will also be out-of-state investigative calls.

8

002128

**Telegram/Fax**-Fax communication of pleadings and the like will be necessary to supplement mail correspondence. That is accounted for here.

**Other**-We anticipate under this category expenses for preparation of exhibits and other demonstrative evidence.

### *PROFESSIONAL EXPENSES*

| *PROFESSIONAL EXPENSE* | *ESTIMATED COST* |
|---|---|
| *INVESTIGATOR* | 35000 |
| *PSYCHIATRIST* | 15000 |
| *NEUROPSYCHOLOGIST* | 6500 |
| *NEUROLOGIST* | 3000 |
| *POISONS TESTING* | 620 |
| *DNA EXPERT* | 2500 |
| *JURY CONSULTANT* | 10000 |
| *MITIGATION SPECIALIST* | 45000 |
| *SENTENCING SPECIALIST* | 7500 |
| ***TOTAL PROFESSIONAL EXPENSES*** | 125120 |

**Investigator**-Under separate Motion, I have made specific request, and justification, for an investigator, Michael Armstrong. Therein, I have designated the specifics in terms of the tasks anticipated for Mr. Armstrong to complete. The amount requested for an investigator is consistent with amounts approved in other capital cases which have been tried in the District.

**Mental Health Specialist**-Via a motion to the Court, I have requested appointment of Dr. Stephen Peterson, M.D. as our mental health specialist. In the motion, and in a followup letter, I have noted Dr. Peterson's qualifications, and the areas in which Dr. Peterson will examine and consult. In the followup letter, I have also provided Dr. Peterson's own estimate, in a range, of costs for his services. The amount requested under this category is based upon my best estimate in light of my knowledge about the case, my experience with costs of this sort, and Dr. Peterson's cost estimates.

**Neuropsychologist and Neurologist**--In light of Mr. Purkey's history of mental health problems and head injuries, Dr. Peterson has recommended that the services of a neuropsychologist and neurologist be enlisted. It will be necessary for a neuropsychologist to conduct neuropsychological testing, and likely also for a neurologist to

9

002129

conduct neurological testing, to determine whether Mr. Purkey's problems have identifiable organic origins. Under separate cover, I have initially made the request for the neuropsychologist, Dr. Bruce Leeson, Ph.D. Depending upon the results obtained by Dr. Leeson, we may well also need to enlist the services of Dr. Bernard Abrams, M.D., though I shall not formally make that request until we know that is needed. The estimates are consistent with my experience in dealing with such experts in the past, as well as estimates of costs provided by these experts.

**Poisons testing**--Mr. Purkey has filed a request in this regard. Therein, he has noted that, since 1998, Mr. Purkey has persistently alleged that he has suffered heavy metal poisoning at the hands of family members. There are recognized to be profound psychiatric consequences resultant from that sort of poisoning. If such poisoning has occurred, it can be detected by analysis of certain samples from Mr. Purkey, including hair and blood samples. Such samples were taken from Mr. Purkey in 1998, and still exist, available for testing. And, of course, such samples can be drawn from Mr. Purkey now. The amount requested under this line is the cost for testing the samples from Mr. Purkey at the Great Plains Laboratory.

**Blood Expert Regarding DNA and Luminol Results**--This is a request for cost for reviewing results, consultation, and possible testimony regarding government DNA and luminol testing. For a variety of reasons, we believe the government's findings and conclusions are flawed, and we require the services of this expert to flesh this matter out. A separate request has been made for this expert, Jami Harman of Genetic Technologies, and the request is consistent with the costs estimate provided by Ms. Harman.

**Jury Consultant**-We wish to retain a jury consultant to assist with the jury selection process. In all candor with the Court, the costs for such a consultant were approved in the **Moore** and **Lightfoot** cases, but not in the **Sinisterra** case. We have received a proposal from a group in Lawrence, Kansas to served in this capacity for fees totaling approximately $10,000.00.

**Mitigation Specialist**--Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri. Many times, the use of a mitigation specialist is a more cost-effective way of preparing the penalty phase case for the defense. I have not yet chosen a mitigation specialist, but the amount requested in this line is in keeping with the amounts which have been approved for mitigation specialists in the other cases tried in the Western District to date. It is also consistent with estimates which I have received from mitigation specialists with whom I have consulted to date.

**Sentencing Specialist**-In the capital cases tried in this District to date, funds in an amount similar to that requested here have regularly

10

been approved for such specialists. The role of the sentencing specialist is to provide for the jury, during the penalty phase of the trial, necessary information related to sentencing not otherwise related by other witnesses. Such a specialist can be used, for example, to address claims by the government that the defendant poses a future danger. Again here, I have not yet identified the specific person whom I intend to employ. But, the requested amount is in keeping with what those in the field estimate would be the costs for such services, as well as with my experience in employing such specialists in other cases.

### *CONCLUSION*

I thank both of you for your interest in, and concern with, the defense of Mr. Purkey's case, as well as adequate funding for same. If you have any questions about any of these matters, please let me know, and I shall do my best to answer those questions.


Yours truly


Frederick A. (Fred) Duchardt, Jr.

cc:  Ann Busterud


11

002131

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES of AMERICA,

        Plaintiff,

    v.

WESLEY PURKEY

        Defendant.

Case No. 01-00308-01-CR-W-FJG

**_DEFENDANT WESLEY PURKEY'S MOTION TO SUPPLEMENT REQUEST EX PARTE
AND UNDER SEAL #1
FOR FUNDS TO OBTAIN PSYCHIATRIC EXPERT ASSISTANCE FOR DEVELOPMENT
OF EVIDENCE REGARDING COMPETENCE ISSUES_**

Comes now Defendant Wesley Purkey, by attorney, Frederick A. Duchardt, Jr., and pursuant to 21 U.S.C. 848(q)(4)(B), 21 U.S.C. 848(q)(9) and 21 U.S.C. 848(q)(10)(B), hereby requests, *ex parte* and under seal, that this Court approve supplemental funding for a psychiatric expert, Dr. Stephen Peterson, M.D., for purposes of further development of evidence in support of issues of competence and mitigation. The grounds for this supplementary request will be set forth in the subsequent numbered subparagraphs.

1. On January 3, 2002, this Court granted leave of Court for the filing, under seal, of Mr. Purkey's request for appointment of Dr. Stephen Peterson, M.D. to conduct an evaluation of Mr. Purkey (Doc. 24).

1

**002132**

7. Dr. Peterson has now completed all of these varigated tasks, and has produced several reports regarding medication treatment recommendations for Mr. Purkey, and has produced a nearly 70 page report concerning competence issues. As a result of the foregoing, the $15,000.00 in funding authorized for Dr. Peterson has been exhausted.

8. In light of findings made by Dr. Peterson, it is anticipated that Dr. Peterson likely will be relied upon by the defense at time of trial, during both phases of trial.

9. Thanks to the work that Dr. Peterson has done, and the testimony he will now be able to put forth, combined with anticipated testimony from a sentencing specialist who has also been retained, supported by done by Mr. Purkey's investigator and Counsel, Counsel for Mr. Purkey has been able to dispense with the hiring of a mitigation specialist. Mitigation Specialists have classically been utilized to assist Counsel with preparing a penalty phase presentation, and undersigned Counsel has had experience using mitigation specialists in some cases. Counsel had originally budgeted some $45,000.00 for the hiring of a mitigation specialist, the amount based upon prior experience in dealing with the payment of costs for such a mitigation specialist. Actually, Counsel later learned that, since the last time he had utilized a mitigation specialist, the costs for such a mitigation specialist had so substantially increased that the price tag for such a specialist would likely have been upwards of

3

002133

$80,000.00. Again, as it turned out, in light of the critical aspects of this case, the development and presentation of the issues of mitigation could be well addressed while dispensing with the additional cost of a mitigation specialist. Dispensing with the $80,000.00 cost of a mitigation specialist has resulted in a significant overall savings in the budget, but has in no way adversely impacted the defense, since the duties which would have been assumed by the mitigation specialist have merely been shifted to others, including Dr. Peterson, all to better and more efficient effect for the defense.

10. Counsel requests that this Court approve additional funding in the amount of $10,000.00, thereby budgeting a total of $25,000.00 for the services of Dr. Peterson. This estimate is based upon 43 hours of time, at $225.00 per hour, plus travel expenses. The time estimate is based upon Counsel's belief that Dr. Peterson will be called upon to testify at both phases of trial, and will likely spend up to 2 days testifying at each phase, and will need time allotted for one additional consultation with Mr. Purkey, preparation-for-trial-consultations with Counsel for Mr. Purkey, and travel time.

11. The United States Supreme Court has clearly indicated that, since the services of experts may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts per the

4

002134

dictates of 21 U.S.C. 848(q)(9). **McFarland v. Scott**, 114 S.Ct. 2568, 2572 (1994).

12. Should this Court not grant the relief sought in this Motion, such would violate Defendant's rights, to enjoy due process of law and equal protection of the law, to present evidence, and to be free from cruel and unusual punishment, protected by the 5th, 6th and 8th Amendments to the Constitution of the United States.

13. Pursuant to 21 U.S.C. 848(q)(9), a defendant like Purkey may make his request for such funds *ex parte* and under seal to the extent that he can show need for such confidentiality. **In re Pruett**, 133 F.3d 275, 279 (4th Cir. 1997). A defendant demonstrates a need for such confidentiality when he shows that, by merely making his request for assistance, he necessarily reveals strategy, work-product, and confidential attorney/client communications. **In re Pruett**, 279. Permitting the defendant to have such requests considered by the Court *ex parte* merely does the proper thing of placing the indigent litigant upon the same footing as the one able to afford payment of his/her own expenses. **In re Pruett**, 279; **United States v. Hang**, 75 F.3d 1275, 1281 (8th Cir. 1996).

14. The foregoing explanation plainly reveals substantially Counsel's work product, attorney-client communications and trial strategy. Having to reveal all of this to the prosecution at this time would work a substantial unfairness to the defense.

5

002135

WHEREFORE, Wesley Purkey prays this Honorable Court to make and enter its Order, under seal, authorizing an increase of $10,000.00 in the budget for Dr. Stephen Peterson, M.D., for a total of $25,000.00, for purposes of providing Defendant Purkey psychiatric expert assistance in the above captioned cause, and as detailed above.

Respectfully submitted

FREDERICK A. DUCHARDT, JR.
Mo. Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th St.
Kearney Mo. 64060
Phone:    816-628-9095
Fax:      816-628-9046
ATTORNEY FOR WESLEY PURKEY

6

**002136**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )       Criminal Case No.
v.                             )       01-00308-01-CR-W-FJG
                               )
WESLEY IRA PURKEY,             )
                               )
            Defendant.         )

## MOTION

Motion to Supplement Request Ex Parte and Under Seal #3.

/s/ *SARAH W. HAYS*
SARAH W. HAYS
U.S. Magistrate Judge

Kansas City, Missouri
October 2, 2003

SEALED

002137

#359

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA,<br><br>      Plaintiff,<br><br>    v.<br><br><br>WESLEY PURKEY<br><br>      Defendant. | )<br>)<br>)<br>)<br>)   Case No. 01-00308-01-CR-W-FJG<br>)<br>)<br>)<br>)<br>)<br>) |

## *DEFENDANT WESLEY PURKEY'S MOTION TO SUPPLEMENT REQUEST EX PARTE AND UNDER SEAL #3 FOR FUNDS TO OBTAIN MITIGATION/SENTENCING EXPERT ASSISTANCE*

Comes now Defendant Wesley Purkey, by attorney, Frederick A. Duchardt, Jr., and pursuant to 21 U.S.C. 848(q)(4)(B), 21 U.S.C. 848(q)(9) and 21 U.S.C. 848(q)(10)(B), hereby requests, *ex parte* and under seal, that this Court approve supplemental funding for a mitigation/sentencing expert, Dr. Mark Cunningham, Ph.D., for purposes of further development of evidence in support of issues related to the penalty phase defense for this case. The grounds for this supplementary request will be set forth in the subsequent numbered subparagraphs.

1. On October 28, 2002, this Court granted leave of Court for the filing, under seal, of Mr. Purkey's request for appointment of Dr. Mark Cunningham, Ph.D. to conduct an evaluation and prepare expert testimony addressing the government's allegations of future dangerousness against Mr. Purkey, as well as other sentencing issues related to the case (Doc. 139).

1

002138

2. On that same date, October 28, 2002, this Court granted Mr. Purkey's request for funding for Dr. Cunningham's evaluation and other work, up to the sum of $25,000.00 (Doc. 139).

3. At the time that this request was made, trial was tentatively scheduled to begin in March of 2003, Mr. Purkey was being housed at the CCA Leavenworth Detention Center, Mr. Purkey was not receiving medication for his mental condition, and about 3,000 pages of materials had been obtained pertaining to issues of future dangerousness regarding Mr. Purkey. Dr. Cunningham endeavored to prepare for his testimony on the March trial date based upon the information then available, and the funds requested would have been adequate for that purpose.

4. Since that time, Mr. Purkey has been transferred to USP-Leavenworth, and has been placed on an adequate medication. In addition, some 3,000 additional pages of information related to sentencing issues have been unearthed, and provided to Dr. Cunningham for his review. These changes were not, and could not have been, anticipated at the time the original cost estimates were created.

5. Finally, due to the severity of Mr. Purkey's mental condition, prior to his stabilization with medication, the process of Dr. Cunningham's original evaluation itself has taken longer than originally anticipated.

6. Thanks to the work that Dr. Cunningham has done, and the testimony he will now be able to put forth, combined with

2

002139

anticipated testimony from a mental health experts who have also been retained, supported by done by Mr. Purkey's investigator and Counsel, Counsel for Mr. Purkey has been able to dispense with the hiring of a mitigation specialist. Mitigation Specialists have classically been utilized to assist Counsel with preparing a penalty phase presentation, and undersigned Counsel has had experience using mitigation specialists in some cases. Counsel had originally budgeted some $45,000.00 for the hiring of a mitigation specialist, the amount based upon prior experience in dealing with the payment of costs for such a mitigation specialist. Actually, Counsel later learned that, since the last time he had utilized a mitigation specialist, the costs for such a mitigation specialist had so substantially increased that the price tag for such a specialist would likely have been upwards of $80,000.00. Again, as it turned out, in light of the critical aspects of this case, the development and presentation of the issues of mitigation could be well addressed while dispensing with the additional cost of a mitigation specialist. Dispensing with the $80,000.00 cost of a mitigation specialist has resulted in a significant overall savings in the budget, but has in no way adversely impacted the defense, since the duties which would have been assumed by the mitigation specialist have merely been shifted to others, including Dr. Cunningham, all to better and more efficient effect for the defense.

7. After consultation with Dr. Cunningham, Counsel has

3

**002140**

determined that, in order to complete pretrial preparation work, to prepare a report of findings and conclusions, to prepare for trial testimony, and to testify at time of trial, Dr. Cunningham will require additional funding in the amount of $4,000.00, thereby budgeting a total of $29,000.00 for the services of Dr. Peterson.

8. The United States Supreme Court has clearly indicated that, since the services of experts may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts per the dictates of 21 U.S.C. 848(q)(9). *McFarland v. Scott*, 114 S.Ct. 2568, 2572 (1994).

9. Should this Court not grant the relief sought in this Motion, such would violate Defendant's rights, to enjoy due process of law and equal protection of the law, to present evidence, and to be free from cruel and unusual punishment, protected by the 5th, 6th and 8th Amendments to the Constitution of the United States.

10. Pursuant to 21 U.S.C. 848(q)(9), a defendant like Purkey may make his request for such funds *ex parte* and under seal to the extent that he can show need for such confidentiality. *In re Pruett*, 133 F.3d 275, 279 (4th Cir. 1997). A defendant demonstrates a need for such confidentiality when he shows that, by merely making his request for assistance, he necessarily reveals strategy, work-product, and confidential attorney/client communications. *In re Pruett*, 279. Permitting the defendant to have such requests considered by the Court *ex parte* merely does the proper thing of

4

**002141**

placing the indigent litigant upon the same footing as the one able to afford payment of his/her own expenses. *In re Pruett*, 279; *United States v. Hang*, 75 F.3d 1275, 1281 (8th Cir. 1996).

11. The foregoing explanation plainly reveals substantially Counsel's work product, attorney-client communications and trial strategy. Having to reveal all of this to the prosecution at this time would work a substantial unfairness to the defense.

WHEREFORE, Wesley Purkey prays this Honorable Court to make and enter its Order, under seal, authorizing an increase of $4,000.00 in the budget for Dr. Mark Cunningham, Ph.D., for a total of $29,000.00, for purposes of providing Defendant Purkey sentencing expert assistance in the above captioned cause, and as detailed above.

Respectfully submitted

FREDERICK A. DUCHARDT, JR.
Mo. Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th St.
Kearney Mo. 64060
Phone:   816-628-9095
Fax:     816-628-9046
ATTORNEY FOR WESLEY PURKEY

5

002142

## *FREDERICK A. DUCHARDT, JR./ATTORNEY AT LAW*
## *P.O. BOX 349, 110 E. 6TH STREET/KEARNEY MISSOURI 64060*
## *TELEPHONE 816-628-9095 FAX 816-628-9046*

August 21, 2003

Matt Whitworth, Assistant United States Attorney
United States Attorney's Office
400 E. 9th St., Fifth Floor
Kansas City, MO   64106

Re:  ***United States v. Purkey***, 01-308-01-CR-W-FJG, Disclosure of
Mental Health Expert Reports and CV's by Dr. Stephen Peterson,
M.D. and Dr. Bruce Leeson, Ph.D., Notice of Intent to Present MRI
results, Notice of Intent to Present testimony of Dr. Mark
Cunningham, Ph.D.

Dear Matt

Please find enclosed with this letter the reports completed by
Dr. Stephen Peterson and Dr. Bruce Leeson.  Please also find
enclosed Dr. Peterson's CV.  I have mislaid Dr. Leeson's CV, and
thus have not included that with this packet.  I have requested
another from him, should have it the end of this week, and shall
forward that to you early next week.  I believe that these
reports meet and far exceed the requirements for disclosure under
rules and under subparagraph IV(B)(2) of Judge Hay's Scheduling
and Trial Order.  I would note particularly that Dr. Peterson's
report includes his opinions relevant for both phases of trial.

I would note that we are in the process of obtaining Magnetic
Resonance Imaging of Mr. Purkey's brain.  As soon as we have that
additional information, it will be provided.

Also, we anticipate that, should a penalty phase be necessary,
and should you persist in your stated intention to allege future
dangerousness, we may offer in rebuttal the testimony of Dr. Mark
Cunningham, Ph.D.  I have enclosed a copy of Dr. Cunningham's CV
for your information.  I also anticipate providing to you a copy
of Dr. Cunningham's report once that is completed, likely
sometime in late September, after the government has completed
its disclosure regarding allegations of future dangerousness.
Because Dr. Cunningham's testimony is being offered in rebuttal
to the government's allegation, and not to advance a position for
the defense, the defense probably has no obligation to provide
disclosure.  However, out of a sense of fairness, I do disclose

1

002143

to you this information regarding Dr. Cunningham, and shall disclose Dr. Cunningham's report after the government has completed its discovery on the issue of future dangerousness.

Please let me know if you have any questions regarding any of these matters.

Yours truly


Frederick A. (Fred) Duchardt, Jr.

enclosures

2

**002144**

# FREDERICK A. DUCHARDT, JR./ATTORNEY AT LAW
# P.O. BOX 349, 110 E. 6TH STREET/KEARNEY MISSOURI 64060
# TELEPHONE 816-628-9095 FAX 816-628-9046

## Fax Memorandum

TO:  Matt Whitworth

FROM:  Fred Duchardt

RE:  *United States v. Purkey*, 01-308-01-CR-W-FJG, Leeson CV, Motion
Pertaining to Hatfield Situation

DATE:  August 22, 2003

Please find appended to this memo Dr. Leeson's CV, as well as a full
copy of the motion pertaining to the Hatfield future dangerousness
issue, including attachments.

**002145**

## Declaration of Mark D. Cunningham, Ph.D., ABPP

I am a clinical and forensic psychologist, licensed as a psychologist in the States of Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Louisiana, New Mexico, New York, Oklahoma, Oregon, South Carolina, Tennessee, and Texas. I am over age 21. I have personal knowledge of the facts contained in this affidavit and am competent to testify about them.

I was retained by Fred Duchardt, Esq. to evaluate Wesley Purkey regarding capital sentencing determinations and subsequently to testify in Mr. Purkey's capital sentencing.

While I am an expert in psychology and capital sentencing determinations including mitigation and "future dangerousness" (i.e., violence risk assessment at capital sentencing), I am not a "mitigation specialist" as that label is generally understood by experts in capital cases.

"Mitigation specialists" are typically social workers who are trained in interviewing people to obtain sensitive information and trained in gathering records and other information concerning a defendant's entire life history and background. Mitigation specialists identify family members and other third parties having knowledge of a capital defendant's background, obtain the contact information for these individuals, conduct interviews of these persons, obtain comprehensive records created in the defendant's life, and review all of the records obtained. The mitigation specialist organizes and provides these records to other mental health experts such as myself. The mitigation specialist also prepare a comprehensive and well-documented psycho-social history based on these records and interviews that is provided to other mental health experts, such as myself, in order to assist us in conducting competent and reliable evaluations. In essence, all of this information is gathered because it can be mitigating in its own right, but it is also necessary for mental health experts to have an extensive fund of information in order to ensure reliable evaluations and findings.

I did not perform the work of a mitigation specialist in Mr. Purkey's case. Regarding some capabilities of a competent mitigation specialist, such as locating persons or tracking down records, I lack the requisite knowledge or experience. I did not gather any records on my own. All of the records that I reviewed were provided to me by Mr. Duchardt. I evaluated Mr. Purkey and as part of that evaluation and to further inform his social history also interviewed his wife, his stepsons, his daughter, his cousin (Debbie Prothero), and his paternal aunt (Marguerite Hotchkiss). I did not, however, undertake a comprehensive investigation to identify, locate, and interview persons having knowledge of Mr. Purkey's background. I did not have contact information for and did not interview Gary Hamilton or any other potential mitigation witnesses having knowledge of Mr. Purkey's background.

After my initial evaluations of Mr. Purkey on December 18 and 19, 2002, I wrote to Mr. Duchardt listing "emerging mitigation themes/hypotheses and associated investigation needs." I was concerned with a number of issues, but several of those related to Mr. Purkey's self-reported traumatic sexual exposure and sexual abuse. Because Mr. Purkey's parents and other close relatives who were around during his childhood were dead, the only available witness to corroborate Mr.

1

Purkey's statements to me on these topics was his brother Gary. Thus, I also listed him as a person to be interviewed. I also suggested the need to interview others that Mr. Purkey had confided in concerning the sexual abuse by his mother and other perverse family interactions. I was concerned not only with the details provided, but also believed that it was important to establish that Mr. Purkey had reported the abuse previously and was not just fabricating a "new" allegation in order to try to avoid the death penalty.

Because information from Mr. Purkey's older brother, Gary, continued to be important in providing corroboration of Mr. Purkey's self-report of being sexually abused by his mother, as well as to inform other perverse family interactions, I requested the telephone number of Gary Hamilton from federal habeas counsel, and subsequently conducted a telephone interview of Gary Hamilton on this date. Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years. The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures. Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling. Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley). Mr. Hamilton's descriptions represented critically important information, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed interactions that constituted the primary relationships of Mr. Purkey's childhood.

Mr. Hamilton reported that he was interviewed by Mr. Duchardt, but was not queried regarding aberrant sexual interactions among family members. Such inquiries are a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred.

I had also been provided with numerous records, including Mr. Purkey's Oregon Department of Correction Records, but I had not been provided with a comprehensive social history and records summary that would normally be done by a mitigation specialist. I had only been provided with essentially an index of almost 3,500 pages of records. Among the Oregon records, there is a note that Mr. Purkey had previously reported sex abuse to Rex Newton, M.D., as early as 1986 or 1987. Dr. Newton should have also been interviewed in the course of the mitigation investigation.

Relevant to my evaluation of Mr. Purkey's likelihood of violence if serving a life-without-possibility of release in the Bureau of Prisons, I was also concerned with any information regarding Mr. Purkey's positive growth and rehabilitation from any relevant background source but particularly from credible witnesses. In this regard, aside from Dr. Newton, I do not recall anyone ever mentioning to me the names of Floyd Bose or Dion Lieker.

I have now been provided with the draft declarations prepared for each of these potential

2

witnesses and believe that this information would have been very helpful to Mr. Purkey had it been presented to his sentencing jury and provided to me.

In particular, the information from Dr. Newton, a mental health expert is significant because it shows that Mr. Purkey was attempting to better himself and to rehabilitate himself many years prior to his capital charges when he had no arguable motive of simply trying to "fool" anyone and Dr. Newton clearly, as a prison employee, had not been retained to assist Mr. Purkey in any pending charges. Dr. Newton also could have provided substantial support for the fact that Mr. Purkey was clearly not an active member of any prison gangs and was deeply ashamed of the racist tattoos associated with that gang.

The information from Floyd Bose and Dion Leiker also is significant. As former law enforcement officers and people assisted by Mr. Purkey without any personal motivation to help himself, the information they provide clearly shows that Mr. Purkey has some redeeming value as a human being.

Even without this information, I believe my testimony for Mr. Purkey could have been much stronger in sentencing. I had prepared slides of areas that I believed should be addressed in my testimony. Although I do not recall specific discussions with Mr. Duchardt, my file contains a marked copy of the slides where I crossed off some information and some slides clearly as an indication that I would not address that area in my testimony. Seven pages of those slides are attached.

Some of the slides crossed off related to Mr. Purkey's family history of dysfunction. I do not recall why Mr. Duchardt chose not to present this evidence except as it related to Mr. Purkey's parents.

Some of the slides that were not crossed off, which meant that I understood I would be testifying to those matters, related to the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child.

Specifically, I was prepared to testify, based on information provided to me by Mr. Purkey, that he had been exposed to such things as his parents having sexual intercourse with the door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee. After his parents separated, he had also observed his mother having sexual intercourse with another man.

I was also prepared to testify about the details of the sexual abuse by Mr. Purkey's mother because I believe it is very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse." Mr. Purkey had reported, beginning as early as age eight, his mother was inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on

3

her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse.

Mr. Purkey reported that he had also been sexually abused at age eleven by "Hup," an older male who was a friend of his brother and was staying in the home for a time. Several times Mr. Purkey was awakened by Hup performing fellatio on him.

I do not recall why Mr. Duchardt did utilize the exhibits and the detailed testimony that I had prepared as opposed to just generally mentioning that Mr. Purkey had been sexually abused by his mother for years and abused once or twice by this older male friend of his brother. I believe this was a significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup.

I was aware that Mr. Duchardt retained other mental health experts and their reports were provided to me. I had no interaction and no consultations with the other defense experts, however, which is unusual in my experience in capital cases. It is also outside the norm not to have a mitigation specialist included in a capital defense team.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Mark D. Cunningham, Ph.D., ABPP

October 14, 2007.

4

## What's the Relevance of a Family's History or Legacy over Generations?

- The child is predisposed through heredity

- Family behavior patterns and effects are multi-generational
    - scripts
    - modeling
    - sequential damage



---

## Family Dysfunction from Generation to Generation

### Paternal family
- Grandfather was episodic drinker, chronic marital conflict, emotionally neglectful of children.
- Aunts and uncles engaged in fist fights between including knocking each other through walls and windows.
- Uncle got drunk and sexually abused his sister. Abused his children. Was mean and sarcastic.
- Aunt impregnated by married man, married him and physically abused. Was involved in witchcraft and the occult.
- Another aunt was controlling and a bully, easily offended, appropriated estate.
- Another aunt was prone to phobias and obsessions.

---

### Paternal family (continued)
- First cousin died of a drug overdose.
- Another first cousin committed suicide.
- Another first cousin was a prostitute.
- Another first cousin was an alcoholic.
- Another first cousin was a loner, couldn't hold a job, took tranquilizers.
- Another first cousin sexually abused his sister.

### Immediate family
- Father had a metal plate in his head. Alcoholic. Chronic marital conflict, violence, and separations. Abandoned Wes in teens. Committed suicide by gunshot to head.
- Mother promiscuous, emotionally disturbed alcoholic. Multiple psychiatric admissions for alcoholism, depression, personality disorder. Sexually abused Wes.
- Brother drug dependent. Multiple prison sentences.

002150

Wes Purkey:
## Pervasive Developmental Poisoning

### Neurological
- Probable fetal alcohol exposure
- Delayed speech development and speech disorder
- Attention Deficit Hyperactivity Disorder
- Childhood trauma
- Head injuries
- Toxic exposures from chronic drug abuse
- Brain damage demonstrated by PET and MRI scans
- Neuropsychological deficits

### Family
- Multi-generational family dysfunction
- Genetic predisposition to alcohol and drug dependence
- ~~Genetic predisposition to psychological disorder~~ *PARENTS ONLY*

---

Wes Purkey:
Pervasive Developmental Poisoning (2)

### Parental

---

Wes Purkey:
Pervasive Developmental Poisoning (2)

### Parental
- **Parental alcoholism and chaotic household**

---

## Parental Alcoholism and Chaotic Household

- Records reflect father began drinking excessively in late teens, mother from her twenties.
- Both parents drank at home on a daily basis.
- When parents went out they both came home drunk.
- Father hid bottles in the basement and the trunk of his car.
- Mother cried or yelled when drunk – her emotional response to intoxications was unpredictable
- Both parents were explosively violent -- you never knew what was going to happen, what would set them off.
- Home life was total anarchy.
- Father was eventually homeless. Mother became near non-functional.
- Both parents had multiple hospital admissions for alcohol-related problems in later adulthood.

## Effects of Alcoholism and Drug Abuse by Parent Figures

- Prenatal alcohol/drug exposure
- Inherited substance dependence vulnerability
- Modeled substance abuse
- Psychological injury
    - emotional detachment of parents
    - neglect by parents
    - increased risk of physical and emotional abuse
    - inconsistency and unpredictability
    - demands for premature responsibility
    - loss of childhood

- Broad social and psychological risk factor:
    - relationship problems
    - self-control and behavior disorders
    - feelings of defectiveness
    - psychological disorders
    - criminal behavior

---

Wes Purkey:
Pervasive Developmental Poisoning (2)

### Parental
- Parental alcoholism and chaotic household
- **Observed domestic violence**

---

## Observed Domestic Violence

- Parents chronically engaged in yelling arguments

- Father regularly beat mother. She hit back, but was ineffectual — and resulted in the beating escalating.

- In their drunken fights parents threw things at each other, broke lamps and ashtrays.

- Father threw mother naked from the bedroom and into the hall — then followed her and continued beating her.

- Following the divorce, some of mother's boyfriends would beat her up while drunk.

- Mother had black eyes, busted lips, bruises.
- Wes attempted to intervene to protect his mother from father and boyfriends — once hit his father over the head with a liquor bottle when father had mother on the floor and was slapping her.

---

## Effects of Observed Domestic Violence

- Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment.

American Psychological Association Presidential Task Force on Violence and the Family (1996)

## Outcomes in Family Violence

Rochester Youth Development Study
- 1000 children followed from 7th and 8th grade
- Interviews of children and caretakers every 6 months
- Three types of family violence exposure studied
  - Spouse abuse
  - Abuse of children
  - Climate of violence and hostility

- **Rates of serious youth violence:**

  | If no family violence | = | 38% |
  | If one type of violence | = | 60% |
  | If two types of violence | = | 73% |
  | If three types of violence | = | 78% |

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

---

## Wes Purkey:
### Pervasive Developmental Poisoning (2)

**Parental**
- Parental alcoholism and chaotic household
- Observed domestic violence
- **Parental neglect**

---

## Emotionally Neglected by Parents

- No provision for structure and consistency in the home.

- No values instruction or guidance – punishment was inconsistent and unrelated to severity of offense.

---

## Effects of Insufficient Parental Structure and Guidance

- Healthy child development requires structure, limit setting and guidance through discipline. This fundamental tenet is supported by research.

- In the absence of parental limit setting there is grave risk to psychological health and positive socialization.

- Children need order and external structures to develop internal structures and capacity for self-guidance.

- When guidance is not provided self-control does not develop and aggression can unfold.

- Children whose families fail to provide adequate supervision are more likely to exhibit delinquent behavior.

- **Quite simply, lack of parental structure and discipline contributes to aggressiveness and predisposes to violence in the community.**

Cantelon, S.L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.
Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.
Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.
Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

## Emotionally Neglected by Parents

- No provision for structure and consistency in the home.

- No values instruction or guidance -- punishment was inconsistent and unrelated to severity of offense.

- Little to no affection except on occasion when drunk -- then mom might precipitously shift from abusive to lovey-dovey.

- Almost no family or parent-child activities or recreations.

- No family meals except at grandmother's at Thanksgiving.

- Functionally abandoned by father at age 10 when parents divorced.

- Mother abandoned Wes to his aunt and the state in his early adolescence.

## Impact of Child Neglect

*More psychologically damaging than physical abuse*

- No stability or security in parental attachment
- No stability or security in daily life or practical care
- Basic physical and emotional needs go unmet

- Distorted primary structure - cognitive, perceptual, emotional, interpersonal
- Terror of world that is out of control
- Damaged capacity and skills to relate to others
- Identity of being incompetent and unlovable
- Absence of external controls leads to poor internal controls

- Markedly increased risk for psychological disorder
- Markedly increased risk for behavior problems in childhood, violent and criminal behavior in adolescence and adulthood

## Wes Purkey:
## Pervasive Developmental Poisoning (2)

### Parental
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- **Physical and emotional abuse**

## Physically and Emotionally Abused by Parents

- Father beat Wes and Gary with a belt on their lower back, buttocks, and legs -- left welts.

- Father hit the boy with his open hand to whatever part of their body he could reach.

- Mother slapped his face routinely -- hard enough to leave a hand print.

- Mother and father ridiculed Wes' stuttering -- mother threw glass of gin in Wes' face at family holiday meal for stuttering.

- When intoxicated mother spoke in a profane and obscene fashion.

- Slapped around by L. E. Carter, one of mother's boyfriends, after Wes intervened in Carter beating Velma.

002154

Wes Purkey:
Pervasive Developmental Poisoning (2)

**Parental**
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- Physical and emotional abuse
- **Abused and corrupted by older brother**

---

*Sponsor: U.S. Department of Justice*
Impact of Abuse and Neglect
on Criminality

- 877 cases of substantiated abuse and/or neglect
- Matched controls
- 15-24 years of follow-up

➢ 4.8 times more likely to be arrested as juveniles

➢ 2 times more likely to be arrested as adults

➢ 3.1 times more likely to be arrested for violent crime as adults

English, D.J., Widom, C.S., & Brandford, C. (2001). Childhood victimization and delinquency, adult criminality, and violent criminal behavior: A replication and extension, final report. National Institute of Justice, U.S. Department of Justice. NCJ 192291

---

Abused and Corrupted by
Older Brother

- Gary provoked fist fights with Wes on a near daily basis at times.
- Wes was both younger and smaller and always came out on the short end.
- Gary slapped Wes around.
- Abuse continued until Wes was 17.

- Introduced to shooting drugs by Gary

---

Wes Purkey:
Pervasive Developmental Poisoning (2)

**Parental**
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- Physical and emotional abuse
- Abused and corrupted by older brother
- **Traumatic sexual exposures**
- **Sexual abuse**

## Types of Sexually Traumatic Experience or Abuse

✓ Direct physical sexual abuse

   Observed sexual abuse or assault

✓ Premature sexualization

✓ Perverse family sexuality

✓ Exposure to graphic sexual behavior

✓ Experienced as a minor by Wes

---

## Sexually Traumatic Experience

**Exposure to graphic sexual behavior**
**Perverse family sexuality**

*When drunk parents were less discrete:*
- Mom ran around in a negligee
- Left the door half-way open when having intercourse
- Saw father sitting on the side of the bed naked with mother naked beside him
- Saw father walk to bathroom naked with a partial erection immediately after intercourse

*After divorce mother brought men home to one bedroom residence:*
- Awakened to noises of them having sex
- Observed mom having intercourse on fold-out sofa
- Mom sitting on man's lap in kitchen the next morning or in negligee

---

## Sexually Traumatic Experience (2)

**Premature sexualization**
- When Wes was a teen his Father involved him in receiving fellatio from prostitutes.

**Sexual abuse by mother**
*Occurred only when she was intoxicated:*
- Began around age 8 in bath with mom and her focusing on washing his genitals.
- After divorce mother had Wes sleep with her — engaged him in manually stimulating her and penetrating her with hair brush handle.
- Had Wes rub her breasts and genitals with lotion.
- Instructed him to perform cunnilingus on her.
- Mother manually stimulated him to orgasm.
- After he reached puberty, mother initiated intercourse with him. Occurred sporadically depending on her access to him.
- Last intercourse around age 21-22 when both drunk

---

## Sexually Traumatic Experience (3)

**Other sexual abuse**
- When age 11 a male friend "Hup" of older brother stayed in the home for several months. Wes awakened to discover Hup performing fellatio on him. Recurred several times. Hup was approximately 5 years older.

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958

## CURRICULUM VITAE

### EDUCATION:

**Undergraduate:**    Abilene Christian University, Abilene, Texas
Bachelor of Arts, magna cum laude (May 1973)
Majors: Psychology, Mass Communications

**Graduate:**    Oklahoma State University, Stillwater, Oklahoma
Master of Science  (December 1976)
Doctor of Philosophy (December 1977)
Specialty:  Clinical Psychology  (APA accredited)

**Internship:**    National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty:  Clinical Psychology  (APA accredited)

### BOARD CERTIFICATION:

Board Certified in Forensic Psychology (1995), American Board of Professional
Psychology (ABPP)

### PROFESSIONAL:

**1981 – 2002**   Clinical and Forensic Psychologist, Private practice
Abilene, Texas
**2002 – date**   Clinical and Forensic Psychologist, Private practice
Lewisville (Dallas), Texas

Clinical Psychology services include the evaluation and treatment of psychological
disorders.  Forensic Psychology services include evaluation and consultation
regarding child custody, personal injury, criminal competencies and responsibility,
sentencing determinations, research literature, and other psycho-legal issues. I have
provided forensic services in over 450 cases.

**1978 – 1981**   Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut

**002157**

WP_PC000011044

# CURRICULUM VITAE (2)

## ACADEMIC APPOINTMENTS:

**1981 - 1983**    Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

**1978 - 1980**    Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

**1974 - 1977**    Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

## PROFESSIONAL LICENSES:

Licensed Psychologist:

| | | |
|---|---|---|
| Arkansas #98-17P | Colorado #2305 | Idaho #PSY-379 |
| Illinois #071-006010 | Indiana #20041376 | Louisiana #794 |
| New Mexico #0768 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #2351 | |

## PROFESSIONAL AFFILIATIONS:

Board Certified in Forensic Psychology, American Board of Professional Psychology
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)

Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
Abilene Psychological Association, 1981-2002 (President, 1983-84, 1994-95)

## EDITORIAL:

Ad hoc reviewer: Behavioral Sciences & the Law
Assessment

**002158**

WP_PC000011045

## CURRICULUM VITAE (3)

### PROFESSIONAL AWARDS:

Navy Commendation Medal - for meritorious service as a clinical psychologist, Naval Submarine Medical Center, 1978-1980

Al Brown Memorial Award - for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

### SCHOLARLY PUBLICATIONS:

*Chapters in edited books:*

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

*Papers in peer-reviewed journals:*

Cunningham, M.D. & Murphy, P.J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. & Vigen, M.P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

**002159**

WP_PC000011046

## CURRICULUM VITAE (4)

Reidy, T., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M.D. & Vigen, M.P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law, 20, 191-210.

Shuman, D.W., Cunningham, M.D., Connell, M.A, & Reid, W.H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. Professional Psychology: Research and Practice, 34, 233-239.


*Invited case reports and teaching points:*

Cunningham, M.D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M.D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (96-114). New York: Oxford University Press.

Cunningham, M.D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (171-173). New York: Oxford University Press.

Cunningham, M.D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (114-115). New York: Oxford University Press.

WP_PC000011047

# CURRICULUM VITAE (5)

*Articles in professional periodicals:*

Marcy, M.R., Hopkins, J.B. & Cunningham, M.D. (1978).  A behavioral treatment of nocturnal enuresis, <u>U.S. Navy Medicine, 69,</u> 26-28.

Cunningham, M.D. & Reidy, T.J. (1998).  Antisocial personality disorder vs psychopathy as diagnostic tools. <u>Prosecutor's Brief: California District Attorneys Association,</u> <u>20,</u> 9-11.

Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. <u>American Psychology and Law Society News, 21, 2,</u> 8-9.

002161

WP_PC000011048

Risk Assessment

•Now Dr. Cunningham, I want to turn your attention to another issue, and that is the likelihood that Wes would make a positive, non-violent adjustment to federal prison.

•Is there scientific methodology and research data for assessing the likelihood that Wes will or will not commit an act of serious violence across a capital life prison term?

•Has that methodology and research been subjected to peer review?

•Does much of the research data comes from the United States Justice Department or other credible sources such as state correctional agencies?

•Are this methodology and associated research findings and statistical data generally accepted by informed forensic psychologists?

•Are you familiar with this scientifically sound methodology and research? In fact, aren't some of your peer-reviewed publications regarding this very subject?

002162

WP_PC000011049    1

## Risk Components

### Will there be violence?

1. What probability?

2. Of what form of violence?

3. At what time period?

4. In what context?

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

In evaluating the likelihood that Wes will or will not engage in violence in prison, are there some essential questions to ask?

What are these?

002163

WP_PC000011050    2

## Risk Components

**Will there be violence?**
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

**Will this driver have an accident?**
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what locale?

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Are these questions unique to violence risk assessment?

How does the automobile insurance industry use these questions?

002164

> ## Risk Assessment Techniques
>
> *More Scientific*
>
> 1. **Group statistical**
>    (insurance company method)
>
> 2. **Pattern**
>    (using patterns of how the individual behaved in the past to estimate behavior in similar situations)
>
> 3. **Intensive clinical evaluation**
>    (inferring violence risk from personality characteristics -- notoriously unreliable in forecasting long-term violence)
>
> 4. **Hypothetical inference**
>    (seeing animals in the stars)
>
> *Less Scientific*
>
> Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), Crime and justice: An annual review of research (Vol. 6) (pp.1-50). Chicago: University of Chicago Press.
> Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Are some risk assessment techniques more scientific or more reliable than others?

Please explain these different ways of doing a violence risk assessment

How would you go about using the insurance company method?

The greater reliability of pattern and group statistical approaches - is this just your pet theory or is this assessment the conclusion of researchers in your field?

**002165**

WP_PC000011052    4

## Group Statistical Steps

1. Identify general characteristics

2. Review experience

3. Establish an outcome rate

4. Adjust the rate for context

5. Adjust the rate for individual differences

6. Adjust the rate for preventive measures

7. Compare to other outcome rates

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Monahan, J. (1981). Predicting violent behavior: An assessment of clinical techniques. Beverly Hills: Sage.

What are the steps in using the group statistical or insurance company method?

WP_PC000011053    5

## Outcome Rates Relevant to Likelihood of Violence in Prison

1.  Capital offenders and murderers in the general prison population

2.  Assaults by inmates in Federal prisons

3.  Homicide of inmates or staff in state and Federal prison

4.  Disciplinary infractions of short-term and long-term inmates

5.  Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

What outcome rates or group statistics are relevant to a violence risk assessment of Wes across a life term in the federal Bureau of Prisons?

002167

> ## Why capital offender violence rates apply to capital inmates in BOP
>
> - Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.
>
> - Prison facilities and procedures have broad similarity.
>
> - Consistency of findings
>     diverse geographic regions
>     diverse time periods
>     diverse prison settings
>     diverse capital statutes
>     diverse capital offense characteristics
>
> - Peer reviewed acceptance of broad applications
>
> Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Dr. Cunningham, many of your statistics are drawn from research on inmates outside of the federal Bureau of Prisons - If they aren't from BOP, then how are they relevant to Wes Purkey?

As you have followed this research literature – has there ever been a peer reviewed assertion that these base rates from other prisons were not relevant to capital defendants in federal prison?

**002168**

WP_PC000011055        7



What is the first study that provides base rates about the follow-up of capital offenders?

Who were the Furman commutees?

What did this study do? Is this what is called a natural experiment? What is a natural experiment?

Let me see if I understand, there were 533 inmates on death row in 1972? They had their death sentences removed and were placed in the general prison population? Then after 15 years their disciplinary records were reviewed?

How many of these commuted capital offenders did not exhibit serious violations in the general prison population?

What other findings were there?

**002169**



Was being sentenced to death a life changing experience?

**Death Row Commutees**
N = 47
32 years old
followed 1973-1988 (10yrs)

**Life Sentence Inmates**
N = 156 (128 murd., 28rapists)
30 years old
followed 1973-1988 (11yrs)

No prison homicides        No prison homicides

*Serious Infractions*

75%        70%

*Aggravated Assault / Fighting with Weapon*

93%        90%

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). The Rope, the chair, & the needle: Capital punishment in Texas, 1923-1990. Austin: University of Texas Press

Dr. Cunningham, isn't it possible that the reason that most of these former death row inmates were not violent is prison is because they had been sentenced to death and that got their attention in a big way – like a life changing experience?

Who was in this study?

Why were rapists included among the life-sentenced inmates?

How did they compare?

**002170**



**Indiana Commuted Capital Offenders**

- 39 inmates commuted since 1972
- March 1999 review of general population disciplinary records

Never in admin seg

No homicide, assault, fight

Reidy, T.J., Cunningham, M.D., & Sorensen, J. (2001) From death to life: Disciplinary behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Has these finding been confirmed in more recent research?

*Interrupt*

**You collected this research yourself?**

Please describe.

WP_PC000011058    *10*



Dr. Cunningham, have there been any studies on how the violence rates of capital inmates compare to non-capital inmates?

What was this study measuring?

What did that include?

What groups were compared?

(*interrupt*)

What is the number in parenthesis?    Thanks, please continue.

What were the results?

So, if I'm reading this graph correctly - the capital offenders rather than being more likely to commit serious violence in prison had only a fraction of the rate of violence of those inmates around them?

**002172**

*More about the capital inmates in this study*

## Most adjusted positively

➢ 2/3 of both groups have never been in solitary confinement (punishment for serious disciplinary infractions).

➢ 90% of both the former death row inmates and the life sentence inmates held trustee status.

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23 (3), 449-468

How did most of the capital inmates in this study adjust to prison?

What is a trustee? What is the risk assessment significance of being a trustee?

**002173**

WP_PC000011060    *12*



*Prison violence rates:*
Other studies of murderers who are
sentenced to life in prison

*Disciplinary records review 1977-1992*
(Missouri state prisons)

93   death row inmates
323   life-without-parole inmates
232   life-with-parole inmates
648   total

**Three groups similar in assaultive rule violations**

*Cumulative prevalence across 15 years:*

1/3  minor assaults    2/3 more serious assaults

1.2% inmate homicide

78.2%  no assaults

Sorensen, J. & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-
sentenced and life-without-parole inmates. Criminal Justice and Behavior, 23, 542-552.

Dr. Cunningham, isn't a defendant who is sentenced to life just bound to be
violent in prison because he has nothing to lose?

Have there been any studies that speak to that question?

Who did this study compare?

Were the life-with-parole inmates less violent than the other two groups?

How many of these inmates were violent?

002174



Prison Behavior 1924-1972:
Commuted Texas Capital Offenders

- 100 death row inmates commuted
- Pre-Furman: 1924-1972
- Averaged 12 years in general prison population
- 80 committed no violent infractions

violent offenses
20%

0 inmate/officer violence

no violent
offenses
80%

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). The rope, the chair, & the needle: Capital punishment in Texas, 1923-1990. Austin: University of Texas Press.

Dr. Cunningham, if given a capital life term, Wes will still be in prison 30 - even 40 - years from now if he lives that long, how do we know that these numbers will remain predictive over time?

Isn't that almost exactly the same results as the Missouri study that compared the LWOP, Life with, and death row inmates?

**002175**

WP_PC000011062    *14*



BOP Assaultive Infractions
## Capital Defendants Convicted and Sentenced to Life

- 1995-1998
- 25 capital inmates reported
  - 2 inmates - aggravated assaults (8%)
  - 2 inmates - simple assaults (8%)
  - 1 inmate - weapons contraband charges (4%)

- 11 inmates had no disciplinary write-ups of any sort

Source of data: Correspondence of Miles Harer, BOP, 12-14-98

Dr. Cunningham, has there been any follow-up of federal capital offenders who the jury sentenced to life without parole rather than death?

Where did this data come from?

What were the findings?

Did this follow-up include the "Poison Clan" of four drug dealers convicted of multiple murderers in Richmond?

What was their conduct in prison?

WP_PC000011063    15

## Incarcerated Murderers

Study of 6,390 murderers:

- Admitted to prison between 1990-1998
- Frequency of serious violent offenses in prison reviewed
- Likelihood of a murderer exhibiting a serious act of prison violence across a 40-year capital life term extrapolated.

**Findings:**

**Overall risk 16.4%**

*Incremental increases or decreases in risk relative to the overall risk rate:*

| | |
|---|---|
| • Robbery/burglary in capital offense | +7.4% |
| • Multiple murder victims in capital offense | + 5.6% |
| • Attempted murder/assault in capital offense | + 4.0% |
| • Prison gang membership | +10.4% |
| • Prior prison term (unless non-violent record) | + 5.3% |
| • Age less than 21 | + 5.5% |
| • Age 26-30 | - 7.2% |
| • Age 31-35 | -12.3% |
| • Age over 35 | -14.4% |

**Risk of aggravated assault on a correctional officer = 1%**
**Risk of inmate-on-inmate homicide = .2% (2 per thousand)**

Sorensen, J. & Pilgrim, R. (2000). An actuarial risk assessment of violence posed by capital murder defendants. Journal of Criminal Law and Criminology, 90, 1251-1270.

Dr. Cunningham, have there any large research studies that looked at inmates convicted of murder to see how they behave in prison?

Please describe this study.

In a few minutes are you going to demonstrate how this study, and these different factors, would apply to Wes's risk of violence in prison?

WP_PC000011064    *16*

*17*

---

### The Relationship of Offense History to Prison Adjustment

- Past violence in the community is not strongly or consistently associated with prison violence.

- Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

- Severity of offense is not a good predictor of prison adjustment.

Alexander, J. & Austin, J. (1992). Handbook for Evaluating Objective Prison Classification Systems. San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.
National Institute of Corrections, U.S. Department of Justice. (1992) Jail Classification System Development: A Review of the Literature, revised edition.

---

Dr. Cunningham, from these studies it sounds like you have a hard time predicting who are going to be troublemakers in prison by the seriousness of the offense that sent them to prison?

What do the research summaries sponsored by the Justice Department have to say about the connection between a history of violence in the community and the likelihood of violence in prison?

**002178**

AVERAGE NUMBER OF PRISON RULE
VIOLATIONS PER INMATE PER YEAR BY
OFFENSE, 1986

| ADMISSION OFFENSE | AVERAGE ANNUAL # OF INFRACTIONS PER INMATE |
|---|---|
| TOTAL | 1.5 |
| VIOLENT OFFENSES | 1.4 |
| HOMICIDE | 0.9 |
| MANSLAUGHTER | 0.8 |
| ASSAULT | 1.5 |
| ROBBERY | 1.9 |
| RAPE | 1.1 |
| PROPERTY OFFENSES | 1.8 |
| DRUG OFFENSES | 0.9 |
| PUBLIC ORDER | 1.1 |

SOURCE: BUREAU OF JUSTICE STATISTICS-SPECIAL REPORT 1989

Has there been any research that looks at who gets into trouble in prison based on the offense that sent them there?

Who compiled these statistics?

There are a lot of numbers up there, can you break out these results for me, what comparison is important here?

So the property offenders are twice as likely to get write-ups as the homicide offenders?

**002179**

WP_PC000011066

18



Dr. Cunningham, how do you account for the rates of lethal violence in prison being so low – particularly with so many violent felons being concentrated there?

**002180**



**002181**



*Violence*

Have you prepared a model that demonstrates how factors that resulted in someone being violent in the community aren't the same in prison?

Please describe this model.

WP_PC000011069     *21*



How could we expect these elements to be different in prison?

002183



One of the 4 risk component questions you identified as we began talking about this area was "of what severity" – how does that affect the level of risk?

Is there research on prison inmates that demonstrates that as the violence is more severe, it is less likely to occur?

Please explain this graph

In any given year, what percentage of federal inmates assault a staff member or another inmate?

**002184**

## Rates of Inmate and Staff Homicide

**Inmate-on-inmate homicide**
    Federal  =  7   per 100,000 inmates
    State      = 5.6 per 100,000 inmates

**Inmate-on-staff homicide**
    Federal         = 1 per 500,000 inmates
    State            = 1 per 1,000,000 inmates

**Comparison** (Murder & Non-negligent homicide - 2000):
    United States              =    6.3 per 100,000
    Kansas                         =    6.6 per 100,000
    Kansas City                  =    23.2 per 100,000

Maguire, K. & Pastore, A.L.,eds. (1996, 1997). Sourcebook of Criminal Justice
Statistics – 1995, 1996. U.S. Department of Justice, Bureau of Justice Statistics.
Washington,D.C.

•What about the possibility of Wes killing someone in prison, are there any group base rates that assist us in determining that possibility?

•First, in terms of one inmate killing another – how often does that happen?

•Can you put those rates in some kind of perspective?

•So the rate of homicide is lower in prison than in the general community?

•What about an inmate killing a staff member – how often does that occur?

**002185**



So how did they compare?

Dr. Cunningham, in this study, the short-term inmates who were younger than 22 when they came into prison averaged 3 and a half write-ups per year?

Now it looks like that the older you are, the less likely you are to commit disciplinary infractions in prison?

WP_PC000011073    25



Figure 5. Incidence of prison infractions in NY, 1975, by age. (From Hirsch & Gottfredson, 1984, copyright 1984 by The University of Chicago Press) used by permission of the publisher)

Graph reproduced in:

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Is there other research demonstrates better prison adjustment as inmates get older?

What is this page taken from?



Figure 5. Incidence of prison infractions in NY, 1975, by age. (From Hirschi & Gottfredson, 1983, copyright 1983 by The University of Chicago Press; used by permission of the publisher.)

*Graph reproduced in:*

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

Where would Wes be on this graph?



Is there any national research that demonstrates the effects of aging on prison misconduct?

Dr. Cunningham, have you ever heard the saying: "You can prove anything with statistics"?  Where did these statistics come from?



Where would Wes be on this graph as he ages in prison?

WP_PC000011077    29

30

## Summary of Prison Violence Base Rate Findings

- Capital inmates have low rates of violence in the general prison population

- Seriousness of offense does not predict prison violence.

- Infraction rates are progressively lower as an inmate ages.

Anchoring Group Rates (Across capital life sentence):

- Assault                =        20 - 30%
- Repetitive assault    =           10%
- Aggravated assault on staff =    1%
- Homicide of inmate =        .2 - 1%
- Homicide of staff   =  1 per 500,000 annual (BOP)

Can you summarize this these base rate findings regarding prison violence?

WP_PC000011078    30



Relative to these group base rates, what factors would we use to individualize these numbers to Wes?

*Interrupt*

What do you mean – relative to group rates?

What factors would increase his risk as compared to the group rates you just described?

What factors would decrease his risk as compared to the group rates?

**002192**

Individualized Actuarial Likelihood of Wes
Purkey Exhibiting Serious Violence in Prison

- 6,390 murderers convicted 1989-1999
- Followed an average of 4.55 years
- Rates of serious violence* extrapolated for life
  sentence

| | |
|---|---|
| 16.4 | Base rate of serious violence |
| [ 7.4] | *Robbery* |
| [ 5.6] | *Multiple murder victims* |
| 5.3 | Prior prison term |
| [10.4] | *Prison gang membership* |
| - 14.4 | Age 35+ years |

7.3%  Overall risk rate

*Homicide, attempted homicide, assault with a weapon, fight with
a weapon, sexual assault, robbery on inmate. Aggravated
assault on correctional officer.

Sorensen J.R. & Pilgrim, R.L. (2000). Actuarial assessments of future dangerousness
in the punishment phase of capital trials. Journal of Criminal Law &
Criminology, 90, 1251-1270.

Are there any studies that provide a basis for individualizing the assessment on
strictly statistical factors?

Please describe the basis of this study?

Please describe the findings, individualizing them to Wes Purkey.

So if we do this strictly by the numbers, there is an 85.5% likelihood of Wes
adapting to prison without serious violence?

002193

> Individualized Actuarial Likelihood of
> Wes Purkey
> Exhibiting Serious Violence in Prison:
>
> *Lifetime risk*
>
> - Any serious violence = 7.3%
>
> - Aggravated assault on staff  < 1%
>
> - Homicide of inmate  = .2 %
>
> *Annual risk*
>
> - Homicide of prison staff = 1 per 500,000

How do the percentages of his risk change depending what violence we are concerned with?

Dr. Cunningham, how would probabilities of Wes seriously injuring someone change if the solitary confinement and shackle movement that he has been maintained at the USP special confinement unit over the past few month was continued or if he were placed in a super-maximum facility such as ADX Florence?

What is the estimate of that risk?

002194

WP_PC000011081     33

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary  Marion (high security)

U.S. Penitentiary (high security)
administrative detention / administrative safe

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

• Dr. Cunningham, have you reviewed the BOP classification manual? Does this manual clearly identify the lowest level of custody a capital offender would be eligible for?

• What is that level?  (Security Designation and Custody Classification Manual 5100.07)

002195

WP_PC000011082    *34*

" A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Pubic Safety Factor] has been waived."

*Security Designation and Custody Classification Manual (5100.07, p. 4)*

Dr. Cunningham, is there an instruction that specifies that capital offenders will be held at least at a U.S. Penitentiary level?

What does that instruction say?

002196

WP_PC000011083    *35*

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary  Marion (high security)

U.S. Penitentiary (high security)
      administrative detention / administrative safe

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

•Additionally, are you familiar with the testimony of BOP personnel in other capital cases? Has that testimony addressed the classification of federal capital inmates who are not sentenced to death?

•Are you familiar with what level of custody the 25 other life-without-parole capital inmates as of 1998 -  described in information provided by the Bureau of Prisons and the U.S. Department of Justice. described earlier were placed in?

•What levels of custody are available in BOP?

•Why is level of custody important?

•At what level are convicted capital offenders placed?

•What levels are above U.S. Penitentiary (high security)?

**002197**



Cell at USP Florence

Source: Bureau of Prisons, Department of Justice

Can you describe a typical U.S. Penitentiary cell so that the jury will have some understanding of the practical realities of this classification?

Are inmates in U.S. Penitentiaries locked down in their cells most of the day?

What activities do they engage in?



**ADX Florence**
## Super Maximum Custody

- single cell, bar door and steel door
- window faces inner recreation yard
- poured reinforced concrete fixtures
- 23 hour a day lockdown
- meals in cell

- double escort with baton, cuffed behind back, feet shackled
- 1-2 fifteen minute phone calls monthly, (monitored)
- no contact visits, glass has high hammer rating, (monitored)
- mail x-rayed, opened, read

What is ADX Florence?

Have you been to this facility?

How does this facility compare to a U.S. Penitentiary

What are some of the security procedures at ADX?

*Interrupt:*

What is the significance of having 2 doors?

What is the significance of the "poured" bed, stool, and desk?

What's been done in the design of the cell to reduce the likelihood of fashioning weapons?

**002199**



Do you have a sketch that provides another view to assist in the orientation of the jury to these cells?

Please describe this drawing.



Do you have outlines that depict units as a whole at ADX – and would show the individual cells in relation to these?

What are some of the important features of this schematic?

WP_PC000011088    40



Do you have photographs depicting a typical cell at ADX?

What is this view?

Is that the one piece sink, toilet, and water fountain?

I don't see a seat or lid on the toilet?

**002202**



Please describe the view of this photograph.

*Interrupt:* So we are still at the back of the cell looking toward the two door, we've just moved over a little.

The shelf and desk are also poured into the wall?

How do inmates get educational or rehabilitation programming?

What is that just above the television?



Dr. Cunningham, please describe this view of a cell.

What can you see from the window?

The bed is also poured into the wall and floor?

How does the shower work?

WP_PC000011091    *43*



What does this photograph depict?

So we are still standing at the door of the cell and looking toward the back?

What is the groove for under the top edge of the bed?

**002205**

## Administrative Maximum Penitentiary

Florence, Colorado    6-19-98

### General Information

| | |
|---|---|
| •Current Population | 417 (379 on 6-15-01) |
| •Rated Capacity | 490 |
| •Percent Under Capacity | 15% |
| •Housing Units | 9 |

•General Population (3), Intermediate, Transitional, Pre-Transfer, Control, Special Housing, High Security

### Sentence Imposed

| | |
|---|---|
| •21 Years to Life (1997) | 46.0% |
| •Life Sentences (1997) | 25.0% |
| •Average Sentence | 36.3 Years |

### Reason for Referral

| | |
|---|---|
| •Inmate murder/attempt | 22.3% |
| •Assaults on inmates | 20.0% |
| •Assaults on staff | 17.1% |
| •Greater security - increased monitoring needs / concerns | 12.9% |
| •Escape behavior | 9.2% |
| •Rioting | 4.6% |
| •Court Commitment | 4.1% |

Can you give us a breakdown of who is in ADX?

Based on the data last provided to you by BOP, what was the population?

What length of federal sentence are the inmates in ADX facing?

Why were they sent to ADX?

002206

ADX Florence
Unit Operations

**General Population Units**

restraints and two officer escorts when removed from cells
12 hours weekly of out of cell exercise in small groups
meals in cell, shower in cell
*12 month minimum*

**Intermediate Unit**

restraints and two officer escorts when removed from cells
several hours daily out of cell on ranges
meals in common area on range
out of cell exercise in large outside rec. yard / gymnasium
*7 month minimum*

**Transitional Unit**

escorted off unit unrestrained in small groups to
programming areas
*5 month minimum*

**Pre-Transfer Unit**

unrestrained when out of cells and when escorted
employed in UNICOR for half the day
meals in institutional dining hall
*12 month minimum*

You indicate different units at ADX, could you explain those and some of the security procedures associated with them?

**002207**

WP_PC000011094    *46*

## Assaults in ADX Florence

| Offense | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| *Assaults* | | | | | | | |
| On Inmate w/ weap | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| On Inmate | 5 | 3 | 4 | 3 | 2 | 2 | 2 |
| On Staff w/ weap | 1 | 0 | 2 | 2 | 3 | 0 | 3 |
| On Staff | 25 | 12 | 18 | 13 | 23 | 11 | 39 |
| Total | 27 | 16 | 24 | 18 | 28 | 13 | 44 |
| *Homicides* | | | | | | | |
| Homicide of inmate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide of staff | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Escapes* | | | | | | | |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ave daily census | 342 | 377 | 410 | 371 | 342 | 372 | 412 |

Given that ADX Florence houses the "worst of the worst," what is the rate of assaults by inmates at ADX?

Please explain this chart.

Dr. Cunningham, has there ever been an assault on an ADX correctional staff member that required outside medical treatment?

**002208**

WP_PC000011095    47

## ADX Control Unit

- in cell 23 hours a day

- sliding outer steel door, sliding inner bar door

- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved

- triple escort when out of cell

- 7 hours out-of-cell solitary exercise weekly

- meals taken in cell

- *duration:*
  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution (CFR 541.50)*

What is the Control Unit?

What are the security procedures there?

WP_PC000011096     48

---

December 1994 to June 2001
## Assaults on Staff in ADX Control Unit

**14 minor assaults on staff:**
- 9 throwing unknown liquid/feces or spitting in face of officer
- 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
- 1 pulling away and then throwing ice tray full of water and carton of milk at officer
- 1 throwing head back against officer's face
- 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's hand
- 1 grabbing officer's shirt and pulling him into the bars

**3 attempted/threatened minor assaults on staff:**
- 2 attempting or threatening to throw liquid
- 1 attempted head-butt

**10 of the above 17 involved a single inmate**
**6 total inmates involved**

---

Since ADX opened in 1994, what assaults on staff have occurred on the Control Unit?

002210

WP_PC000011097    49



Are there even more secure confinement options at ADX than the Control Unit?

Please explain these cells.

WP_PC000011098    50



**002212**

WP_PC000011099     *51*

Conclude
Risk Assessment

002213

WP_PC000011100    52



002214



WP_PC000011102    54





WP_PC000011104    56



WP_PC000011105     *57*

10/24/2003  08:23    9724590958              MARK CUNNINGHAM              PAGE  02

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology

*Board Certified in Forensic Psychology – American Board of Professional Psychology*

417 Oak Bend, Suite 260    Lewisville, Texas

972 459 0658    Fax:  972 459 0958

10-23-03

Mr. Fred Duchardt, Esq.
Attorney at Law
110 E. 6ᵗʰ Street
Kearney, MO 64060

Via email: duchardt.allwynacres@worldnet.att.net

**Re:**  *U.S. v Wesley Ira Purkey*

Dear Mr. Duchardt:

You have requested that I summarize testimony that I would anticipate providing at the sentencing phase of Mr. Purkey's capital trial (should he be convicted) regarding: 1. various mitigating factors present in Mr. Purkey's background and their effects; and, 2. the likelihood that Mr. Purkey would engage in serious violence during a natural life term in the federal Bureau of Prisons. The findings that follow regarding these issues may be modified as I am continuing to seek additional third party data, as well as reviewing records, statistical data, and research studies.

Based on the information regarding Mr. Purkey's bio-psycho-social history obtained to date from my interviews with him, third party interviews, and review of records; as well as scholarly research literature and government publications, I anticipate that I will discuss risk and protective factors for delinquent, criminal, and violent outcomes as identified in research sponsored and published by the U.S. Department of Justice (DOJ) and other scholarly sources. More specifically, DOJ has sponsored and published a number of research studies regarding the precursors of serious and chronic delinquency in childhood, adolescence, and early adulthood which illuminate the beginnings of Mr. Purkey's adult criminal trajectory. Mr. Purkey exhibits numerous risk factors from this body of research and accordingly I anticipate particularizing several of the DOJ studies to him.

I further anticipate that my testimony will include detailed discussion of the underlying history as well as the potential and disproportionately observed separate and combined adverse developmental impacts of:

**002219**

WP_PC000011106

10/24/2003  08:23    9724590958                MARK CUNNINGHAM                    PAGE  03

U.S. vs. Purkey
Mark D. Cunningham, Ph.D., ABPP

### Neurological
- Probable fetal alcohol exposure
- Delayed speech development and speech disorder
- Attention Deficit Hyperactivity Disorder
- Childhood trauma
- Head injuries
- Toxic exposures from chronic drug abuse and domestic poisoning
- Brain damage demonstrated by PET and MRI scans
- Neuropsychological deficits

### Family
- Multi-generational family dysfunction
- Genetic predisposition to alcohol and drug dependence
- Genetic predisposition to psychological disorder

### Parental
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- Physical and emotional abuse
- Traumatic sexual exposures
- Sexual abuse
- Abused and corrupted by older brother
- Inadequate structure and supervision

### Social
- Peer isolation
- Institutionalization during adolescence and early adulthood
- Violent victimization in prison
- Observed violence and traumatic losses

### Psychological
- Teen onset alcohol and drug abuse and dependence
- Polysubstance dependence with stimulant induced psychosis
- Probable substance intoxication at the time of the offense
- Psychological disorders
- Inadequate interventions

These factors are catastrophically cumulative for Mr. Purkey's risk of criminal and criminally violent outcome in the community. It is also noted that Mr. Purkey made efforts to foster pro-social relationships in his parenting, and initiated other constructive behaviors in the community and in prison.

In testifying regarding the reliable assessment of violence risk, I will describe that behavior pattern (in a similar setting) and group statistical approaches are most reliable in assessing likelihood of violent behavior in a prison context. Behavior pattern analysis that

2

**002220**

WP_PC000011107

Oct.26. 2003  5:40PM  FRED DUCHARDT                 No.0594   P. 2

U.S. vs. Purkey
Mark D. Cunningham, Ph.D., ABPP

is specific to context is critically important because prison represents a fundamentally different context from the community – and prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction. Review of Mr. Purkey's extended prison incarceration history reveals many disciplinary write-ups, and further reflects that he has been both the victim (stabbing) and perpetrator in incidents of prison violence. The most serious of these instances occurred over 20 years ago - involving Mr. Purkey's assault of another inmate with a weapon in 1982. According to the 1982 disciplinary proceeding reports summarizing the testimony of other inmates, Mr. Purkey apparently engaged in a preemptory attack in response to repeated threats the victim had made to kill Mr. Purkey. This is a threat that would have had some salience for Mr. Purkey given his own stabbing victimization by fellow inmates in 1978 and 1979, and by observation and awareness of other serious inmate-on-inmate attacks. Even though in prison during most of his adulthood, Mr. Purkey has not seriously assaulted a correctional staff member.

Much of Mr. Purkey's prison misconduct appears to have been secondary to mood lability and psychological instability. It is notable that his adjustment in the structure of prison has been significantly better than his adjustment in the free community. It is also notable in this regard that he is now being maintained on medications which assist in stabilizing his mood and improving impulse control.

Until his current incarceration, Mr. Purkey's institutional history has reflected continuing alcohol and/or drug abuse even while incarcerated. Such ongoing chronic abuse, particularly of illicit stimulants, is a risk factor for prison misconduct and violence. Mr. Purkey's abuse of illicit substances appears to have been controlled in Kansas DOC, CCA, and at present in USP Leavenworth by his own resolve and close institutional supervision. Such abuse would be easily detectable by routine urine testing in BOP – allowing rehabilitation or increased security to be quickly brought to bear. Mr. Purkey acknowledges that he was formerly a member of a prison gang. He reports that he repudiated this affiliation many years ago. This report is given some credence by correctional records detailing his request to have gang-related tattoos removed.

Group statistical analysis reveals that rates of disciplinary infractions and violence in prison are negatively correlated with age, even when the offense of conviction was committed at an older age. Long-term inmates have lower rates of disciplinary infractions than short-term inmates. Further, multiple group statistical studies indicate that the majority of individuals convicted of capital murder do not represent a disproportionate risk of violence while confined in prison. There is research on the prison adjustment of commuted capital offenders that is informative in evaluating Mr. Purkey's risk of committing serious violence in prison. Research data on the limited follow-up of federal capital defendants sentenced to life indicates that the majority of these inmates have not been involved in serious violence in BOP. The majority of inmates in comparison offender groups most similar to Mr. Purkey (inmates over age 35, convicted of capital offenses, convicted of federal capital offenses, facing long-term sentences) have not engaged in serious institutional violence.

3

002221

WP_PC000011108

10/24/2003  08:23    9724590958                    MARK CUNNINGHAM                    PAGE  05

U.S. vs. Purkey
Mark D. Cunningham, Ph.D., ABPP

Utilizing studies of death-commuted and life-sentenced capital offenders as anchors regarding the probability of a serious act of prison violence from a capital offender, there is a 20-30% likelihood of a capital offender committing an act of assautive violence at some time across his capital prison term. There is an approximately 8-10% likelihood that a capital offender would present a more chronic violence problem. Applying group statistical data from an exceptionally large (N=6,390) recent study of assaultive conduct by convicted murderers in state prison, an offender matching the offense characteristics, demographic features, and incarceration history of Mr. Purkey would have the following probabilities of serious institutional violence across a capital life term: 7.3% any serious assault, less than 1% aggravated assault on staff, and less than .2% homicide of an inmate. These risk estimates include consideration of a risk enhancing factor of prior prison incarceration, as well as the risk reducing factor of being over age 35 at entrance to the federal Bureau of Prisons. If contrary to his assertion, Mr. Purkey remained a member of a prison gang, his risk rate for any serious assault would increase to 17.7% (just over the 16.4% rate of the entire sample of convicted murderers). The likelihood of homicide of a BOP staff member is 1 per 500,000 inmates annually.

In further particularizing a risk estimate of serious institutional violence by Mr. Purkey relative to the group rates, his psychological instability and substance dependence vulnerability are viewed as modestly outweighing his age, resulting in a risk rate somewhat above the capital inmate rate. This risk would be reduced by medication maintenance. As risk of violence is always a function of context, the above estimates of the risk of serious violence could be markedly reduced by ultra-secure confinement such as his current assignment in a special housing unit in USP Leavenworth, or that available in ADX Florence. Security measures at this level of custody are quite effective, as demonstrated by the associated low rates of violence in a federal super-maximum confinement context.

I anticipate that these findings will be expanded and/or revised as additional history, data, and research are obtained and reviewed. Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

4

002222

WP_PC000011109