IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES of AMERICA,

        Plaintiff,

    v.

        Case No. 01-00308-01-CR-W-09

WESLEY PURKEY

        Defendant.

## MOTION TO FILE, UNDER SEAL, DEFENDANT'S EX PARTE REQUEST #3, MADE APRIL 11, 2002

Comes now Defendant, by attorney, and pursuant to 21 U.S.C. 848(q)(9) and (10), does hereby request that this Court permit him to file, under seal, his motion entitled "EX PARTE REQUEST #3", made April 11, 2002. The request to file this Motion under seal is made to protect matters of attorney work product revealed within said Motion.

Respectfully submitted

FREDERICK A. DUCHARDT, JR.
Mo.Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th Street
Kearney Mo. 64060
Phone:   816-628-9095
Fax:     816-628-9046
ATTORNEY FOR DEFENDANT HASKELL

DOCUMENT 126

002223

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 01-00308-01-CR-W-FJG |
| | ) |
| WESLEY PURKEY, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

The Request #3 for funds is sealed by order of this Court and shall not be opened except on further order of the Court.

SARAH W. HAYS
United States Magistrate Judge

Date: October 15, 2002

SEALED

002224

# 127

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES of AMERICA,

       Plaintiff,

v.

WESLEY PURKEY

       Defendant.

Case No. 01-00308-01-CR-W-2

### _DEFENDANT WESLEY PURKEY'S REQUEST EX PARTE AND UNDER SEAL #3 FOR FUNDS TO OBTAIN PSYCHIATRIC EXPERT ASSISTANCE FOR DEVELOPMENT OF EVIDENCE REGARDING COMPETENCE ISSUES_

Comes now Defendant Wesley Purkey, by attorney, Frederick A. Duchardt, Jr., and pursuant to 21 U.S.C. 848(q)(4)(B), 21 U.S.C. 848(q)(9) and 21 U.S.C. 848(q)(10)(B), hereby requests, _ex parte_ and under seal, that this Court approve funding for a psychiatric expert, Dr. Stephen Peterson, M.D., for purposes of development of evidence in support of issues of competence and mitigation.  The grounds for this Motion will be set forth in the subsequent numbered subparagraphs.

1. In the above captioned cause, Defendant Purkey is charged by indictment with the offense of causing the death of another after transporting that person in interstate commerce.  The United States Attorney for the Western District of Missouri has confirmed to Counsel for Mr. Purkey that he will seek Department of Justice authorization for the seeking of the death penalty against Mr. Purkey.

2. Defendant Wesley Purkey is indigent, without the means and funds to bear the cost of an effective defense for himself.  Defendant Purkey has already satisfied this Court of that fact, as this Court has appointed undersigned Counsel to represent him.  This Court has

also approved requests by Purkey for expenditure of other funds for preparation of evidence in Mr. Purkey's defense.

3. The United States Supreme Court has clearly indicated that, since the services of experts may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts per the dictates of 21 U.S.C. 848(q)(9). *McFarland v. Scott*, 114 S.Ct. 2568, 2572 (1994).

4. In light of initial investigation conducted by undersigned counsel for Wesley Purkey, and in light of representations made by government counsel to counsel for Mr. Purkey, it is anticipated that, among the aggravating circumstances which will be alleged against Mr. Purkey, the government will include the non-statutory aggravating circumstance claim that Mr. Purkey would pose a future danger if he was incarcerated rather than put to death.

5. In order to effectively prepare and present evidence at the second or punishment phase in this case, the services of a mitigation/sentencing specialist are necessary.

6. In a death penalty case, the scope of relevant issues may be quite broad in light of *Lockett v. Ohio*, 438 U.S. 586 (1978), which provides that the sentencer must be permitted to consider "any aspect" of the defendant's "background and character" which is offered in mitigation of punishment. There are also a number of cases in which lawyers have been found ineffective for failing to investigate penalty stage issues. *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994); *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995); *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1994). Counsel firmly believes that the services of a

mitigation/sentencing specialist are necessary for counsel to fulfill the obligation to provide Defendant Purkey with effective representation per the dictates of the applicable law outlined above.

7. Particularly, when the government makes allegations of future danger against a capital case defendant, the dictates of the 5th and 8th Amendments command that that defendant have a full and fair opportunity to aggressively respond to such allegations. *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *Simmons v. South Carolina*, 512 U.S. 154, 177 (1994).

8. A mitigation/sentencing specialist is a person who, due to training and experience, is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment without parole as a viable alternative to a sentence of death. Also, the mitigation/sentencing specialist is able to take the peculiar personal characteristics of the defendant, and determine whether such a defendant is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger. Such information is necessary for the defense to present the sentence of life imprisonment without parole as such a viable alternative to the sentence of death, and to counter the government's case regarding future dangerousness. Such information is also necessary to counter any arguments which might be made by the government that a sentence of life imprisonment without parole cannot be safely and securely carried out.

9.    Trial courts in state and federal capital cases arising under state or federal jurisdiction have uniformly recognized the need for effective defense counsel to employ the expertise provided by mitigation/sentencing specialists. Particularly, in this District, in the case of *United States v. Dennis B. Moore, Sr.*, supra, the Honorable D. Brook Bartlett approved full funding for Defendant Moore to hire such an expert, and for Defendant Kevin Wyrick to hire his own such expert. Likewise is the case of *United States v. German Sinisterra, et al*, 98-00311-02/03/04-CR-W-2. Therein, Defendants Sinisterra and Tello, upon request, were provided services of mitigation/sentencing specialists. In fact, Federal district courts have appointed such specialists to assist counsel in every case, to counsel's knowledge, where it was requested.[1] The same is true in state cases.[2]

---

[1]    See e.g., *United States v. Davis* (N.D. Ill. No. 89-CR-580); *United States v. Pretlow* (D.N.J. 90-CR-238); *United States v. Pitera* (E.D.N.Y. No. CR 90-024 (RR)); *United States v. Tipton* (E.D. Va. No. 3-92-CR-68); *United States v. Roane* (E.D. Va. No. 3-92-CR-68); *United States v. Thomas* (E.D. Va. No. 3-92-CR-68); *United States v. Green* (E.D. La. No. 92-46); *United States v. Molina* (E.D. Okl. No. 1:92-032-S); *United States v. McCullah* (E.D. Okl. No. 1:92-032-S); *United States v. Mathis* (M.D. Fla. No. 91-301-CR-T); *United States v. Williams* (M.D. Ga. No. 1:92-CR-142); *United States v. Jean Claude Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Frantz Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Reginald Brown* (E.D. Mich. No. CR-92-81127); *United States v. Michael Williams* (E.D. Mich. No. CR-92-81127); *United States v. Michael Murray* (M.D. Penn. No. 1-CR-92-200); *United States v. Darryl Johnson* (W.D.N.Y. No. 92-CR-474); *United States v. Edward Alexander Mack* (93-0252-CR-Ungaro Benages); *United States v. Moore* (E.D. Va. Cr. No. 2:93CR162); *United States v. Walker* (N.D.N.Y. No. 94-CR-328); *United States v Paul Hardy* (E.D. La. No. 94-381) and *United States v. McVeigh* (W.D. Okl. No. M-94-98-H).

[2]    In the Missouri State Public Defender System, as well as various other state public defender systems about which Counsel for Purkey is aware, mitigation specialists are maintained on staff, and used as a matter of course in all capital cases.

**002228**

10. Counsel for Defendant Purkey proposes to utilize the services of Dr. Mark Cunningham, Ph.D. in the capacity as mitigation/sentencing specialist in the above captioned cause for Purkey. Dr. Cunningham would be willing to serve as mitigation/sentencing specialist on behalf of Defendant Purkey. Dr. Cunningham and is uniquely qualified, by experience, background and expertise, to serve in this capacity. In fact, Dr. Cunningham has been qualified as an expert for this very purpose in a host of Federal and State Court cases. A copy of Dr. Cunningham's curriculum vitae is appended to this Motion. Dr. Cunningham charges for his services the sum of two hundred forty dollars ($240.00) per hour. It is estimated that the total cost for the services of Dr. Cunningham in this case will be approximately twenty-five thousand dollars ($25,000.00).

11. Pursuant to 21 U.S.C. 848(q)(9), a defendant like Purkey may make his request for such funds *ex parte* and under seal to the extent that he can show need for such confidentiality. *In re Pruett*, 133 F.3d 275, 279 (4th Cir. 1997). A defendant demonstrates a need for such confidentiality when he shows that, by merely making his request for assistance, he necessarily reveals strategy, work-product, and confidential attorney/client communications. *In re Pruett*, 279. Permitting the defendant to have such requests considered by the Court *ex parte* merely does the proper thing of placing the indigent litigant upon the same footing as the one able to afford payment of his/her own expenses. *In re Pruett*, 279; *United States v. Hang*, 75 F.3d 1275, 1281 (8th Cir. 1996).

12. There is need for such confidentiality in this instance because of the very nature of the type of expert being used and the information which will be generated. In the first place, requiring Defendant Purkey to make his request, upon the open record, for approval of funds for these services would necessarily force him to reveal to the other parties information about his confidential communications with his attorney, as well as information about his attorney's strategy and work-product.

13. Should Defendant Purkey intend to use Dr. Cunningham as a witness at time of trial, it would certainly be Defendant Purkey's intention to fairly disclose such information in a timely manner prior to trial. However, should this process not generate such testimony by Dr. Cunningham, the government and the other parties would have no lawful right to have any such information shared with it. Thus, in light of the sensitive and private nature of the information involved here, it is appropriate that this Court permit this request to be handled *ex parte* and under seal until such time, if any, that this information might become discoverable to the other parties involved. *In re Pruett*, supra; *United States v. Hang*, supra.

WHEREFORE, pursuant to 21 U.S.C. Section 848(q)(9) and (10), the Defendant Purkey prays that Honorable Court authorize, under seal, the employment of Dr. Mark Cunningham as mitigation/sentencing specialist for Defendant Purkey. Defendant Purkey additionally prays for any other and further relief which the Court may deem just and proper under the circumstances.

Respectfully submitted

FREDERICK A. DUCHARDT, JR.
Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th St.
Kearney Mo. 64060
Phone:   816-628-9095
Fax:     816-628-9046
ATTORNEY FOR DEFENDANT PURKEY

002231

04/03/02   11:08   ☎9156700566   Mark Cunningham   ⌀002

# MARK D. CUNNINGHAM, PH.D.

## CLINICAL & FORENSIC PSYCHOLOGY

*Diplomate in Forensic Psychology • American Board of Professional Psychology*

### CURRICULUM VITAE

## EDUCATIONAL BACKGROUND:

**Undergraduate:**   Abilene Christian University, Abilene, Texas
Bachelor of Arts, magna cum laude (May 1973)
Majors: Psychology, Mass Communications

**Graduate:**   Oklahoma State University, Stillwater, Oklahoma
Master of Science (December 1976)
Doctor of Philosophy (December 1977)
Specialty: Clinical Psychology (APA accredited)

**Internship:**   National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty: Clinical Psychology (APA accredited)

## BOARD CERTIFICATION:

Diplomate in Forensic Psychology (1995)
American Board of Professional Psychology

## PROFESSIONAL:

**1981 – Present**   Clinical and Forensic Psychologist, Private Practice
Abilene, Texas

Clinical Psychology services include the evaluation and treatment of psychological disorders. Forensic Psychology services include evaluation and consultation regarding child custody, personal injury, criminal competencies and responsibility, sentencing determinations, research literature, and other psycho-legal issues. I have provided forensic services in over 350 cases.

**1978 - 1981**   Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut

002232

## CURRICULUM VITAE (2)

### ACADEMIC APPOINTMENTS:

**1981 - 1983**    Assistant Professor: Psychology Department,
                   Hardin-Simmons University, Abilene, Texas

**1978 - 1980**    Instructor (part-time): Psychology Department,
                   Old Dominion University (U.S. Submarine Base Extension);
                   Mohegan Community College, Norwich, Connecticut

**1974 - 1977**    Teaching Assistant: Psychology Department
                   Oklahoma State University, Stillwater, Oklahoma

### PROFESSIONAL AFFILIATIONS:

Licensed Psychologist:

| | |
|---|---|
| Arkansas #98-17P | Colorado #2305 |
| Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 |
| New Mexico #0768 | Oregon #1333 |
| South Carolina #764 | Tennessee #2255 |
| Texas #2351 | |

Diplomate in Forensic Psychology, American Board of Professional
 Psychology
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)

Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology
American Psychological Association
Texas Psychological Association
Abilene Psychological Association (President, 1983-84, 1994-95)

### PROFESSIONAL AWARDS:

Navy Commendation Medal for meritorious service as a clinical
 psychologist, Naval Submarine Medical Center, 1978-1980

Al Brown Memorial Award for outstanding achievement, NIMH Sex
 Therapy Training Program, Yale University School of Medicine,
 1979-1981

**002233**

04/03/02    11:09    ☎9156700566    Mark Cunningham    ☒004

## CURRICULUM VITAE (3)

### RESEARCH AND PUBLICATIONS:

Cunningham, M.D. (1977). Preparent training: An examination of programmed text instruction in social learning theory and parenting applications. (Unpublished Master's thesis).

Marcy, M.R., Hopkins, J.B. & Cunningham, M.D. (1978). A behavioral treatment of nocturnal enuresis, U.S. Navy Medicine, 69, 26-28.

Cunningham, M.D. & Murphy, P.J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D. & Reidy, T.J. (1998). Antisocial personality disorder vs psychopathy as diagnostic tools. Prosecutor's Brief: California District Attorneys Association, 20, 9-11.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. & Vigen, M.P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

Reidy, T., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21,2, 8-9.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

002234

## CURRICULUM VITAE (4)

Cunningham, M.D. (in press). Capital sentencing [case report with teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook. New York: Oxford University Press.

Cunningham, M.D. (in press). Competence for execution [case report with teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook. New York: Oxford University Press.

Cunningham, M.D. & Goldstein, A.M. (in press). Sentencing Determinations in Death Penalty Cases. Chapter in A. Goldstein (Ed.), Forensic psychology (vol. 11) of 14. Weiner (Ed.), Comprehensive handbook of psychology, to be published by John Wiley & Sons.

Cunningham, M.D. & Reidy, T.J. (in press). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior.

Cunningham, M.D. & Vigen, M.P. (in press). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law.

**002235**

04/03/02   11:11   ☏9156700566   Mark Cunningham   ☒006

## Fee Schedule

Professional services are billed at $240 per hour for any activities related to the case. If held over from day to day waiting to testify, no billings accrue after court is adjourned for the day unless attorney conference services or additional testimony review and preparation occurs. Other billable charges and expenses include information management and/or specialized clerical services at $20.00; pass through research literature search and retrieval fees; mailing and shipping; photocopying at $0.10 per page; for travel outside of Abilene if required $.35 per mile for travel by private automobile, coach airfare if applicable (plus $33.00 per 500 miles for upgrade), mid-size rental car or taxi charges, parking fees, reasonable meals allowance, and, standard grade hotel accommodations.

**002236**

## Capital Case List: Sentencing Phase Testimony

**Federal Court:**

**U.S. v Louis Jones, Jr.** (1995), Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Trinity Ingle** (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Darryl Johnson** (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Aquilia Marcivicci Barnette** (1998), Criminal Docket 3:97CR23-P in the District Court of the United States of the Western District of North Carolina, Charlotte Divion. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v LaFawn Bobbitt** (1998), Criminal No. 3:97CLR169 in the District Court of the United States for the Eastern District of Virginia, Richmond Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Anthony Ayeni Jones** (1998), Cause No. CR-WMN-96-0458 in U.S. District Court for the District of Maryland, Nothern Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District Court for the Northern District of Alabama. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**Capital Cases**

**U.S. v Saheem Johnson and Raheem Johnson** (1998), Criminal No. 97-00241-A in U.S. District Court for the Eastern District of Virginia, Alexandria Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in U.S. District Court, Eastern District of Arkansas. Sentencing Phase: Mitigation - Testimony.

**U.S. v Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in U.S. District Court, Western District of Texas, Waco Division. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**U.S. v Willis Haynes** (2000), Criminal No. PJM 98 0520 in U.S. District Court for District of Maryland. Sentencing Phase: Mitigation – Testimony.

**U.S. v Daymon Smith** (2000), No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division. Sentencing Phase: Mitigation - Testimony.

**U.S. v Coleman Leake Johnson, Jr.** (2001), No. 3:00CR00026 in U.S. District Court, Western District of Virginia, Charlottesville Division. Sentencing Phase: Future Dangerousness – Testimony.

**U.S. v Bin Laden, et als., (Khalfan Khamis Mohamed)** (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York, Southern Division. Sentencing Phase: Future Dangerousness -Testimony.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in U.S. District Court, Western District of Missouri, Western Division. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**U.S. v Marvin Charles Gabrion, II** (2002), Cause No. 1:99-CR-76 in U.S. District Court, Western District of Michigan. Sentencing Phase: Future Dangerousness – Testimony.

**U.S. v Julius Omar Robinson** (2002), Cause No. 4:00-CR-260-Y in U. S. District Court for Northern District of Texas, Fort Worth Divisoin. Sentencing Phase: Future Dangerousness – Testimony.

**State Court:**

**State of Texas v Ronald Springer** (1995), Sentencing Phase: Future Dangerousness - Testimony.

**State of Texas v Michael Gonzales** (1995), Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

2

**002238**

**Capital Cases**

**State of Texas v Thomas Howard** (1996), Sentencing Phase: Future Dangerousness - Testimony.

**State of Texas v Robert Fratta** (1996), Sentencing Phase: Future Dangerousness - Testimony on Bill.

**State of Louisiana v Damon Thibodeaux** (1997), Cause No. 96-4522 in the 24th Judicial District Court in and for Parish of Jefferson. Sentencing Phase: Mitigation - Testimony.

**State of Oregon v Randy Lee Guzek** (1997), Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Texas v Justin Fuller** (1998), No. 241-8081497-97 in the 241st District Court, Tyler, Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Oregon v Billy Lee Oatney, Jr.** (1998), No. C962556CR in Washington County Circuit Court, Hillsboro, Oregon. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of New Jersey v James Minett** (1998), No. 96-05-00550 in Superior Court of New Jersey Law Division: Union County, New Jersey: Sentencing Phase: Mitigation - Testimony.

**State of Texas v Allen Bridgers** (1998), No. 114-81252-97 in the 114th District Court, Tyler, Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony at 705 Hearing.

**State of Louisiana v James Casey** (1998), No. 84,272 in 26th Judicial District Court, Bossier Parish, Louisiana. Sentencing Phase: Mitigation - Testimony.

**State of Texas v Julius Murphy** (1998), No. 97F0462-102 in the 102nd Judicial District Court of Bowie County. Sentencing Phase: Future Dangerousness - Testimony.

**State of Texas v Danny Thomas** (1998), Cause No. 346935 in 180th District Court of Harris Co., Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Illinois v Richard Morris** (1998), No. 96.CR123 in the Circuit Court of Cook County, Illinois. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Kansas v Virgil Bradford** (1999), No. 97 CR 114 in Dickinson, Kansas. Sentencing Phase: Future Dangerousness - Testimony.

**002239**

Capital Cases

**State of Tennessee v Ronald Rickman** (1999), No. B-59341 in Criminal Court of Tennessee for Thirtieth Judicial District at Memphis, Division X.   Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Tennessee v Richard Austin** (1999), Cause No. B 58357 in Shelby County, Tennessee. Sentencing Phase:  Future Dangerousness - Testimony.

**State of Illinois v Ralph Harris** (1999), Case No. 95-27598 in Circuit Court of Cook County, Illinois.  Sentencing Phase:  Future Dangerousness - Testimony.

**State of Oregon v David Allen Cook** (1999), Case No. 9610-37561 in Multnomah County Circuit Court, Oregon.  Sentencing Phase:  Mitigation and Future Dangerousness - Testimony.

**State of Texas v Larry Donnell Davis** (1999),  Cause No. 36-683-B in 181st District Court in and for Potter County, Texas.  Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Oregon v Jeffery Dana Sparks** (1999), Case No. CR98326 in Yamhill County Circuit Court.  Sentencing Phase:  Future Dangerousness - Testimony.

**State of Colorado v Lucas Salmon** (1999), Case No. 97 CR 1551 in District Court, El Paso County, Division I.  Sentencing Phase: Future Dangerousness - Testimony.

**State of Kansas v Gavin D. Scott** (1999), Case No. 96 CR 1748 in Eighteenth Judicial District, District Court, Sedgwick County, Kansas, Criminal Department, Division 4. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**South Carolina v Eugene Gary** (1999), 97-GS-40-24141 in General Sessions Circuit Court  in  Columbia,  South  Carolina.    Sentencing  Phase:  Mitigation  and  Future Dangerousness – Testimony.

**State of Texas v Francisco Garcia, Jr.** (1999), Cause No. B 12,033-9504  in 242nd District Court in and for Hale County, Texas.  Sentencing Phase: Future Dangerousness – Testimony.

**State of Louisiana v Erran Evans** (1999), Case No. 384890 Section H in Orleans Parish Criminal District Court. Sentencing Phase: Mitigation – Testimony.

**State of Tennessee v W. Glenn Rogers** (2000), No. 38939 in Circuit Court for Montgomery County, Tennessee, at Clarksville. Sentencing Phase: Future Dangerousness – Testimony.

**State of Texas v Michael Wayne Hall** (2000), No. 0685479A in District Court, 371st Judicial District, Tarrant County, Texas. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

4

Capital Cases

**State of Indiana v Jeremy Gross** (2000), No. 49G04-9808-CF-141115 in Marion Superior Court Criminal Division. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Texas v Larry Allen Hayes** (2000), No. 990805089CR in 410th District Court, Montgomery County, Texas. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of New Mexico v John Hovey** (2000), Cause No. VA98-179, Valencia County. Sentencing Phase: Mitigation -- Testimony.

**State of Louisiana v Donald S. Wright** (2000), Docket No. 63,758 in 26th Judicial Court, Parish of Webster. Sentencing Phase: Future Dangerousness - Testimony.

**State of Arkansas vs Kenneth Williams** (2000), Lincoln County Circuit Court No. LCR-99-147-3. Sentencing Phase: Mitigation - Testimony.

**Sate of Indiana, County of Marion v Jerry K. Thompson** (2000), Cause No. 49G03 9204 CFR 060651, Marion County Superior Court Criminal Division. Sentencing Phase: Future Dangerousness - Testimony.

**State of Idaho v Shawn Eric Smith** (2000), Case No. CR-98-553 in District Court of the Seventh Judicial District of the State of Idaho in and for County of Bonneville. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Oregon v David Lee Cox** (2000), #99C 46448 in Marion County District Court. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Nevada v Richard Powell** (2000). Case C148936 in District Court Clark County, Nevada. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Texas v Kevin Scott Varga** (2000), Cause No. 20,047 in District Court Hunt County, Texas. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Nevada v John Edward Butler** (2001), Cause No. C155791 in District Court, Clark County, Nevada. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of Kansas v Jeffery Hebert** (2001), Case No. 99 CR 102 in Clay County, Kansas. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

**State of South Carolina v Bobby Lee Holmes** (2001), #90-GS46-1196, 1198, and 1200 in County of York, General Session, 16th Court. Sentencing Phase: Mitigation and Future Dangerousness -- Testimony.

5

**002241**

**Capital Cases**

**State of Texas v Michael Adam Sigala** (2001), Cause No. 219-80429-01 in District Court of Collin County, Texas, 219th Judicial District. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of Texas v Ivan Cantu** (2001), Cause No. 380-80047-01 in 380th District Court of Collin County, Texas, 219th Judicial District. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of South Carolina v Michael James Laney** (2001), In Court of General Sessions, County of Greenvile. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of New Jersey v Jacinto Hightower** (2002), Indictment No. 85-09-0814-1 in Superior Court of New Jersey. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of Texas v James Edward Martinez** (2002), Cause No. 0784244D in 213th Judicial District Court, Tarrant County. Sentencing Phase: Future Dangerousness – Testimony.

**State of Texas v Joshua Maxwell** (2002), Cause No. 2001-CR-0031A in the District Court, 186th Judicial District, Bexar County, Texas. Sentencing Phase: Future Dangerousness.

**State of Texas v Reginald Perkins** (2002), Cause No. _____ in the District Court, 371st Judicial District, Tarrant County, Texas. Sentencing Phase: Future Dangerousness.

6

**002242**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES of AMERICA,

        Plaintiff,

v.

                                    Case No. 01-00308-01-CR-W-2

WESLEY PURKEY

        Defendant.

*DEFENDANT WESLEY PURKEY'S SUBSTITUTE REQUEST EX PARTE AND UNDER SEAL
#3
FOR FUNDS TO OBTAIN MITIGATION/SENTENCING EXPERT ASSISTANCE FOR
DEVELOPMENT OF EVIDENCE REGARDING COMPETENCE ISSUES*

Comes now Defendant Wesley Purkey, by attorney, Frederick A.
Duchardt, Jr., and pursuant to 21 U.S.C. 848(q)(4)(B), 21 U.S.C.
848(q)(9) and 21 U.S.C. 848(q)(10)(B), hereby requests, *ex parte* and
under seal, that this Court approve funding for a
mitigation/sentencing expert, Dr. Mark Cunningham, Ph.D., for purposes
of development of evidence in support of issues related to penalty
phase defense of this case.  The grounds for this Motion will be set
forth in the subsequent numbered subparagraphs.

1. In the above captioned cause, Defendant Purkey is charged by
indictment with the offense of causing the death of another after
transporting that person in interstate commerce.  The United States
Attorney for the Western District of Missouri has confirmed to Counsel
for Mr. Purkey that he will seek Department of Justice authorization
for the seeking of the death penalty against Mr. Purkey.

2. Defendant Wesley Purkey is indigent, without the means and
funds to bear the cost of an effective defense for himself.  Defendant

**002243**

Purkey has already satisfied this Court of that fact, as this Court has appointed undersigned Counsel to represent him. This Court has also approved requests by Purkey for expenditure of other funds for preparation of evidence in Mr. Purkey's defense.

3. The United States Supreme Court has clearly indicated that, since the services of experts may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts per the dictates of 21 U.S.C. 848(q)(9). *McFarland v. Scott*, 114 S.Ct. 2568, 2572 (1994).

4. In light of initial investigation conducted by undersigned counsel for Wesley Purkey, and in light of representations made by government counsel to counsel for Mr. Purkey, it is anticipated that, among the aggravating circumstances which will be alleged against Mr. Purkey, the government will include the non-statutory aggravating circumstance claim that Mr. Purkey would pose a future danger if he was incarcerated rather than put to death.

5. In order to effectively prepare and present evidence at the second or punishment phase in this case, the services of a mitigation/sentencing specialist are necessary.

6. In a death penalty case, the scope of relevant issues may be quite broad in light of *Lockett v. Ohio*, 438 U.S. 586 (1978), which provides that the sentencer must be permitted to consider "any aspect" of the defendant's "background and character" which is offered in mitigation of punishment. There also a number of cases in which lawyers have been found ineffective for failing to investigate penalty stage issues. *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994); *Antwine*

*v. Delo*, 54 F.3d 1357 (8th Cir. 1995); *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1994). Counsel firmly believes that the services of a mitigation/sentencing specialist are necessary for counsel to fulfill the obligation to provide Defendant Purkey with effective representation per the dictates of the applicable law outlined above.

7. Particularly, when the government makes allegations of future danger against a capital case defendant, the dictates of the 5th and 8th Amendments command that that defendant have a full and fair opportunity to aggressively respond to such allegations. *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *Simmons v. South Carolina*, 512 U.S. 154, 177 (1994).

8. A mitigation/sentencing specialist is a person who, due to training and experience, is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment without parole as a viable alternative to a sentence of death. Also, the mitigation/sentencing specialist is able to take the peculiar personal characteristics of the defendant, and determine whether such a defendant is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger. Such information is necessary for the defense to present the sentence of life imprisonment without parole as such a viable alternative to the sentence of death, and to counter the government's case regarding future dangerousness. Such information is also necessary to counter any arguments which might be

made by the government that a sentence of life imprisonment without parole cannot be safely and securely carried out.

9.    Trial courts in state and federal capital cases arising under state or federal jurisdiction have uniformly recognized the need for effective defense counsel to employ the expertise provided by mitigation/sentencing specialists.  Particularly, in this District, in the case of *United States v. Dennis B. Moore, Sr.*, supra, the Honorable D. Brook Bartlett approved full funding for Defendant Moore to hire such an expert, and for Defendant Kevin Wyrick to hire his own such expert.  Likewise is the case of *United States v. German Sinisterra, et al*, 98-00311-02/03/04-CR-W-2.  Therein, Defendants Sinisterra and Tello, upon request, were provided services of mitigation/sentencing specialists.  In fact, Federal district courts have appointed such specialists to assist counsel in every case, to

counsel's knowledge, where it was requested.[1]    The same is true in state cases.[2]

10. Counsel for Defendant Purkey proposes to utilize the services of Dr. Mark Cunningham, Ph.D. in the capacity as mitigation/sentencing specialist in the above captioned cause for Purkey. Dr. Cunningham would be willing to serve as mitigation/sentencing specialist on behalf of Defendant Purkey. Dr. Cunningham and is uniquely qualified, by experience, background and expertise, to serve in this capacity. In fact, Dr. Cunningham has been qualified as an expert for this very purpose in a host of Federal and State Court cases. A copy of Dr. Cunningham's curriculum vitae is appended to this Motion. Dr. Cunningham charges for his services the sum of two hundred forty dollars ($240.00) per hour. It is estimated that the total cost for

---

[1] See e.g., *United States v. Davis* (N.D. Ill. No. 89-CR-580); *United States v. Pretlow* (D.N.J. 90-CR-238); *United States v. Pitera* (E.D.N.Y. No. CR 90-024 (RR)); *United States v. Tipton* (E.D. Va. No. 3-92-CR-68); *United States v. Roane* (E.D. Va. No. 3-92-CR-68); *United States v. Thomas* (E.D. Va. No. 3-92-CR-68); *United States v. Green* (E.D. La. No. 92-46); *United States v. Molina* (E.D. Okl. No. 1:92-032-S); *United States v. McCullah* (E.D. Okl. No. 1:92-032-S); *United States v. Mathis* (M.D. Fla. No. 91-301-CR-T); *United States v. Williams* (M.D. Ga. No. 1:92-CR-142); *United States v. Jean Claude Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Frantz Oscar* (E.D. Va. 93-CR-131-Morgan); *United States v. Reginald Brown* (E.D. Mich. No. CR-92-81127); *United States v. Michael Williams* (E.D. Mich. No. CR-92-81127); *United States v. Michael Murray* (M.D. Penn. No. 1-CR-92-200); *United States v. Darryl Johnson* (W.D.N.Y. No. 92-CR-474); *United States v. Edward Alexander Mack* (93-0252-CR-Ungaro Benages); *United States v. Moore* (E.D. Va. Cr. No. 2:93CR162); *United States v. Walker* (N.D.N.Y. No. 94-CR-328); *United States v Paul Hardy* (E.D. La. No. 94-381) and *United States v. McVeigh* (W.D. Okl. No. M-94-98-H).

[2] In the Missouri State Public Defender System, as well as various other state public defender systems about which Counsel for Purkey is aware, mitigation specialists are maintained on staff, and used as a matter of course in all capital cases.

the services of Dr. Cunningham in this case will be approximately twenty-five thousand dollars ($25,000.00).

11. Pursuant to 21 U.S.C. 848(q)(9), a defendant like Purkey may make his request for such funds *ex parte* and under seal to the extent that he can show need for such confidentiality. *In re Pruett*, 133 F.3d 275, 279 (4th Cir. 1997). A defendant demonstrates a need for such confidentiality when he shows that, by merely making his request for assistance, he necessarily reveals strategy, work-product, and confidential attorney/client communications. *In re Pruett*, 279. Permitting the defendant to have such requests considered by the Court *ex parte* merely does the proper thing of placing the indigent litigant upon the same footing as the one able to afford payment of his/her own expenses. *In re Pruett*, 279; *United States v. Hang*, 75 F.3d 1275, 1281 (8th Cir. 1996).

12. There is need for such confidentiality in this instance because of the very nature of the type of expert being used and the information which will be generated. In the first place, requiring Defendant Purkey to make his request, upon the open record, for approval of funds for these services would necessarily force him to reveal to the other parties information about his confidential communications with his attorney, as well as information about his attorney's strategy and work-product.

13. Should Defendant Purkey intend to use Dr. Cunningham as a witness at time of trial, it would certainly be Defendant Purkey's intention to fairly disclose such information in a timely manner prior to trial. However, should this process not generate such testimony by

**002248**

Dr. Cunningham, the government and the other parties would have no lawful right to have any such information shared with it. Thus, in light of the sensitive and private nature of the information involved here, it is appropriate that this Court permit this request to be handled *ex parte* and under seal until such time, if any, that this information might become discoverable to the other parties involved. *In re Pruett*, supra; *United States v. Hang*, supra.

WHEREFORE, pursuant to 21 U.S.C. Section 848(q)(9) and (10), the Defendant Purkey prays that Honorable Court authorize, under seal, the employment of Dr. Mark Cunningham as mitigation/sentencing specialist for Defendant Purkey. Defendant Purkey additionally prays for any other and further relief which the Court may deem just and proper under the circumstances.

Respectfully submitted

FREDERICK A. DUCHARDT, JR.
Bar Enrollment Number 28868
P.O. Box 349, 110 E. 6th St.
Kearney Mo. 64060
Phone:    816-628-9095
Fax:      816-628-9046
ATTORNEY FOR DEFENDANT PURKEY

002249

04/03/02. 11:08    ☎9156700566    Mark Cunningham    ☒002

# MARK D. CUNNINGHAM, PH.D.

## CLINICAL & FORENSIC PSYCHOLOGY

*Diplomate in Forensic Psychology • American Board of Professional Psychology*

### CURRICULUM VITAE

## EDUCATIONAL BACKGROUND:

Undergraduate:    Abilene Christian University, Abilene, Texas
Bachelor of Arts, magna cum laude (May 1973)
Majors: Psychology, Mass Communications

Graduate:    Oklahoma State University, Stillwater, Oklahoma
Master of Science (December 1976)
Doctor of Philosophy (December 1977)
Specialty: Clinical Psychology (APA accredited)

Internship:    National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty: Clinical Psychology (APA accredited)

## BOARD CERTIFICATION:

Diplomate in Forensic Psychology (1995)
American Board of Professional Psychology

## PROFESSIONAL:

1981 – Present    Clinical and Forensic Psychologist, Private Practice
Abilene, Texas

Clinical Psychology services include the evaluation and treatment of psychological
disorders. Forensic Psychology services include evaluation and consultation
regarding child custody, personal injury, criminal competencies and responsibility,
sentencing determinations, research literature, and other psycho-legal issues. I have
provided forensic services in over 350 cases.

1978 - 1981    Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut

002250

04/03/02   11:09   ☎9156700566                              ☑003

## CURRICULUM VITAE (2)

### ACADEMIC APPOINTMENTS:

**1981 - 1983**   Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

**1978 - 1980**   Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

**1974 - 1977**   Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

### PROFESSIONAL AFFILIATIONS:

Licensed Psychologist:

| | |
|---|---|
| Arkansas #98-17P | Colorado #2305 |
| Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 |
| New Mexico #0768 | Oregon #1333 |
| South Carolina #764 | Tennessee #2255 |
| Texas #2351 | |

Diplomate in Forensic Psychology, American Board of Professional
Psychology
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)

Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology
American Psychological Association
Texas Psychological Association
Abilene Psychological Association (President, 1983-84, 1994-95)

### PROFESSIONAL AWARDS:

Navy Commendation Medal for meritorious service as a clinical
psychologist, Naval Submarine Medical Center, 1978-1980

Al Brown Memorial Award for outstanding achievement, NIMH Sex
Therapy Training Program, Yale University School of Medicine,
1979-1981

**002251**

04/03/02  11:09   ☎9156700566        Mark Cunningham                      ☑004

## CURRICULUM VITAE (3)

### RESEARCH AND PUBLICATIONS:

Cunningham, M.D. (1977). Preparent training: An examination of programmed text instruction in social learning theory and parenting applications. (Unpublished Master's thesis).

Marcy, M.R., Hopkins, J.B. & Cunningham, M.D. (1978). A behavioral treatment of nocturnal enuresis, U.S. Navy Medicine, 69, 26-28.

Cunningham, M.D. & Murphy, P.J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D. & Reidy, T.J. (1998). Antisocial personality disorder vs psychopathy as diagnostic tools. Prosecutor's Brief: California District Attorneys Association, 20, 9-11.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. & Vigen, M.P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

Reidy, T., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21,2, 8-9.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

**002252**

CURRICULUM VITAE (4)

Cunningham, M.D. (in press). Capital sentencing [case report with teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook. New York: Oxford University Press.

Cunningham, M.D. (in press). Competence for execution [case report with teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook. New York: Oxford University Press.

Cunningham, M.D. & Goldstein, A.M. (in press). Sentencing Determinations in Death Penalty Cases. Chapter in A. Goldstein (Ed.), Forensic psychology (vol. 11) of 14. Weiner (Ed.), Comprehensive handbook of psychology, to be published by John Wiley & Sons.

Cunningham, M.D. & Reidy, T.J. (in press). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior.

Cunningham, M.D. & Vigen, M.P. (in press). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law.

002253

## Fee Schedule

Professional services are billed at $240 per hour for any activities related to the case. If held over from day to day waiting to testify, no billings accrue after court is adjourned for the day unless attorney conference services or additional testimony review and preparation occurs. Other billable charges and expenses include information management and/or specialized clerical services at $20.00; pass through research literature search and retrieval fees; mailing and shipping; photocopying at $0.10 per page; for travel outside of Abilene if required $.35 per mile for travel by private automobile, coach airfare if applicable (plus $33.00 per 500 miles for upgrade), mid-size rental car or taxi charges, parking fees, reasonable meals allowance, and, standard grade hotel accommodations.

**002254**

## Capital Case List: Sentencing Phase Testimony

**Federal Court:**

**U.S. v Louis Jones, Jr.** (1995),  Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Trinity Ingle**  (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**U.S. v Darryl Johnson**  (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Aquilia Marcivicci Barnette**  (1998), Criminal Docket 3:97CR23-P in the District Court of the United States of the Western District of North Carolina, Charlotte Divion. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v LaFawn Bobbitt**  (1998), Criminal No. 3:97CLR169 in the District Court of the United States for the Eastern District of Virginia, Richmond Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Anthony Ayeni Jones** (1998), Cause No. CR-WMN-96-0458 in U.S. District Court for the District of Maryland, Nothern Division. Sentencing Phase: Future Dangerousness - Testimony.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District Court for the Northern District of Alabama. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**002255**

Capital Cases

U.S. v **Saheem Johnson and Raheem Johnson** (1998), Criminal No. 97-00241-A in U.S. District Court for the Eastern District of Virginia, Alexandria Division. Sentencing Phase: Future Dangerousness - Testimony.

U.S. v **Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in U.S. District Court, Eastern District of Arkansas. Sentencing Phase: Mitigation - Testimony.

U.S. v **Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in U.S. District Court, Western District of Texas, Waco Division. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

U.S. v **Willis Haynes** (2000), Criminal No. PJM 98 0520 in U.S. District Court for District of Maryland. Sentencing Phase: Mitigation – Testimony.

U.S. v **Daymon Smith** (2000), No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division. Sentencing Phase: Mitigation - Testimony.

U.S. v **Coleman Leake Johnson, Jr.** (2001), No. 3:00CR00026 in U.S. District Court, Western District of Virginia, Charlottesville Division. Sentencing Phase: Future Dangerousness – Testimony.

U.S. v **Bin Laden, et als., (Khalfan Khamis Mohamed)** (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York, Southern Division. Sentencing Phase: Future Dangerousness -Testimony.

U.S. v **Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in U.S. District Court, Western District of Missouri, Western Division. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

U.S. v **Marvin Charles Gabrion, II** (2002), Cause No. 1:99-CR-76 in U.S. District Court, Western District of Michigan. Sentencing Phase: Future Dangerousness – Testimony.

U.S. v **Julius Omar Robinson** (2002), Cause No. 4:00-CR-260-Y in U. S. District Court for Northern District of Texas, Fort Worth Divisoin. Sentencing Phase: Future Dangerousness – Testimony.

**State Court:**

State of Texas v **Ronald Springer** (1995), Sentencing Phase: Future Dangerousness - Testimony.

State of Texas v **Michael Gonzales** (1995), Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

2

**002256**

Capital Cases

**State of Texas v Thomas Howard** (1996), Sentencing Phase: Future Dangerousness - Testimony.

**State of Texas v Robert Fratta** (1996), Sentencing Phase: Future Dangerousness - Testimony on Bill.

**State of Louisiana v Damon Thibodeaux** (1997), Cause No. 96-4522 in the 24th Judicial District Court in and for Parish of Jefferson. Sentencing Phase: Mitigation - Testimony.

**State of Oregon v Randy Lee Guzek** (1997), Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Texas v Justin Fuller** (1998), No. 241-8081497-97 in the 241st District Court, Tyler, Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Oregon v Billy Lee Oatney, Jr.** (1998), No. C962556CR in Washington County Circuit Court, Hillsboro, Oregon. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of New Jersey v James Minett** (1998), No. 96-05-00550 in Superior Court of New Jersey Law Division: Union County, New Jersey: Sentencing Phase: Mitigation - Testimony.

**State of Texas v Allen Bridgers** (1998), No. 114-81252-97 in the 114th District Court, Tyler, Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony at 705 Hearing.

**State of Louisiana v James Casey** (1998), No. 84,272 in 26th Judicial District Court, Bossier Parish, Louisiana. Sentencing Phase: Mitigation - Testimony.

**State of Texas v Julius Murphy** (1998), No. 97F0462-102 in the 102nd Judicial District Court of Bowie County. Sentencing Phase: Future Dangerousness - Testimony.

**State of Texas v Danny Thomas** (1998), Cause No. 346935 in 180th District Court of Harris Co., Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Illinois v Richard Morris** (1998), No. 96.CR123 in the Circuit Court of Cook County, Illinois. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

**State of Kansas v Virgil Bradford** (1999), No. 97 CR 114 in Dickinson, Kansas. Sentencing Phase: Future Dangerousness - Testimony.

3

**002257**

Capital Cases

State of Tennessee v Ronald Rickman (1999), No. B-59341 in Criminal Court of Tennessee for Thirtieth Judicial District at Memphis, Division X. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

State of Tennessee v Richard Austin (1999), Cause No. B 58357 in Shelby County, Tennessee. Sentencing Phase: Future Dangerousness - Testimony.

State of Illinois v Ralph Harris (1999), Case No. 95-27598 in Circuit Court of Cook County, Illinois. Sentencing Phase: Future Dangerousness - Testimony.

State of Oregon v David Allen Cook (1999), Case No. 9610-37561 in Multnomah County Circuit Court, Oregon. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

State of Texas v Larry Donnell Davis (1999), Cause No. 36-683-B in 181st District Court in and for Potter County, Texas. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

State of Oregon v Jeffery Dana Sparks (1999), Case No. CR98326 in Yamhill County Circuit Court. Sentencing Phase: Future Dangerousness - Testimony.

State of Colorado v Lucas Salmon (1999), Case No. 97 CR 1551 in District Court, El Paso County, Division I. Sentencing Phase: Future Dangerousness - Testimony.

State of Kansas v Gavin D. Scott (1999), Case No. 96 CR 1748 in Eighteenth Judicial District, District Court, Sedgwick County, Kansas, Criminal Department, Division 4. Sentencing Phase: Mitigation and Future Dangerousness - Testimony.

South Carolina v Eugene Gary (1999), 97-GS-40-24141 in General Sessions Circuit Court in Columbia, South Carolina. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Texas v Francisco Garcia, Jr. (1999), Cause No. B 12,033-9504 in 242nd District Court in and for Hale County, Texas. Sentencing Phase: Future Dangerousness – Testimony.

State of Louisiana v Erran Evans (1999), Case No. 384890 Section H in Orleans Parish Criminal District Court. Sentencing Phase: Mitigation – Testimony.

State of Tennessee v W. Glenn Rogers (2000), No. 38939 in Circuit Court for Montgomery County, Tennessee, at Clarksville. Sentencing Phase: Future Dangerousness – Testimony.

State of Texas v Michael Wayne Hall (2000), No. 0685479A in District Court, 371st Judicial District, Tarrant County, Texas. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

4

**002258**

Capital Cases

State of Indiana v Jeremy Gross (2000), No. 49G04-9808-CF-141115 in Marion Superior Court Criminal Division. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Texas v Larry Allen Hayes (2000), No. 990805089CR in 410th District Court, Montgomery County, Texas. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of New Mexico v John Hovey (2000), Cause No. VA98-179, Valencia County. Sentencing Phase: Mitigation – Testimony.

State of Louisiana v Donald S. Wright (2000), Docket No. 63,758 in 26th Judicial Court, Parish of Webster. Sentencing Phase: Future Dangerousness - Testimony.

State of Arkansas vs Kenneth Williams (2000), Lincoln County Circuit Court No. LCR-99-147-3. Sentencing Phase: Mitigation - Testimony.

Sate of Indiana, County of Marion v Jerry K. Thompson (2000), Cause No. 49G03 9204 CFR 060651, Marion County Superior Court Criminal Division. Sentencing Phase: Future Dangerousness - Testimony.

State of Idaho v Shawn Eric Smith (2000), Case No. CR-98-553 in District Court of the Seventh Judicial District of the State of Idaho in and for County of Bonneville. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Oregon v David Lee Cox (2000), #99C 46448 in Marion County District Court. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Nevada v Richard Powell (2000). Case C148936 in District Court Clark County, Nevada. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Texas v Kevin Scott Varga (2000), Cause No. 20,047 in District Court Hunt County, Texas. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Nevada v John Edward Butler (2001), Cause No. C155791 in District Court, Clark County, Nevada. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of Kansas v Jeffery Hebert (2001), Case No. 99 CR 102 in Clay County, Kansas. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

State of South Carolina v Bobby Lee Holmes (2001), #90-GS46-1196, 1198, and 1200 in County of York, General Session, 16th Court. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

5

Capital Cases

**State of Texas v Michael Adam Sigala** (2001), Cause No. 219-80429-01 in District Court of Collin County, Texas, 219th Judicial District. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of Texas v Ivan Cantu** (2001), Cause No. 380-80047-01 in 380th District Court of Collin County, Texas, 219th Judicial District. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of South Carolina v Michael James Laney** (2001), In Court of General Sessions, County of Greenvile. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of New Jersey v Jacinto Hightower** (2002), Indictment No. 85-09-0814-1 in Superior Court of New Jersey. Sentencing Phase: Mitigation and Future Dangerousness – Testimony.

**State of Texas v James Edward Martinez** (2002), Cause No. 0784244D in 213th Judicial District Court, Tarrant County. Sentencing Phase: Future Dangerousness – Testimony.

**State of Texas v Joshua Maxwell** (2002), Cause No. 2001-CR-0031A in the District Court, 186th Judicial District, Bexar County, Texas. Sentencing Phase: Future Dangerousness.

**State of Texas v Reginald Perkins** (2002), Cause No.                    in the District Court, 371st Judicial District, Tarrant County, Texas. Sentencing Phase: Future Dangerousness.

**002260**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 39 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/26/2006    Page 1 of 24
PageID #: 5701

IN THE UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case # 98-311-02-CR-W-GAF |
| | ) | |
| | ) | |
| GERMAN SINISTERRA | ) | |
| Defendant | ) | |

### *STATEMENT OF FREDERICK A. DUCHARDT, JR.*

Now on this 26th day of November, 2006 comes Frederick A. Duchardt, Jr., and in light of the specific and particularized direction of the Court and counsel for the parties on October 6, 2006 and October 16, 2006, does make the following, limited responses to those allegations made in the amended petition for relief under 28 U.S.C 2255 filed by counsel for Mr. Sinisterra before this Court.

1. I was appointed by the Court as lead counsel for Mr. Sinisterra at trial and upon appeal in the above captioned cause. I have been licensed to practice law in Missouri and in the Western District of Missouri since 1980. At the time that I tried Mr. Sinisterra's case, I had previously handled, as lead counsel, and to completion, one other Federal capital case and four other Missouri state capital cases.

2. As lead counsel in this case, I was responsible for seeking and obtaining members of the defense team to work on the case with me.

1

**002261**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 40 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/26/2006    Page 2 of 24
PageID #: 5702

3. I asked Jennifer Herndon to join me as cocounsel for Mr. Sinisterra. I chose Ms. Herndon because of her capital case experience, which I knew at the time to be that, while she was with the Missouri Public Defender System, she had tried capital cases, and that while in private practice, she had been cocounsel in the Federal capital case of *United States v. Norris Holder*, tried in the Eastern District of Missouri, and had handled Federal capital habeas actions on behalf of petitioners, including the case of *Kenley v. Bowersox*, a matter on which I worked together with Ms. Herndon. When Ms. Herndon agreed to participate in this case, I sought and obtained her appointment as cocounsel.

4. I also asked Dan Grothaus to act as an investigator related to both phases of the case, and to help with duties often assigned to a person referred to as a "mitigation specialist". I chose Mr. Grothaus for this dual role because of his unique educational and experience background. Previous to his working as a private investigator for a number of years in Kansas City and in Houston, Texas, Mr. Grothaus had been an investigative journalist for a number of years with the Houston Chronicle. Mr. Grothaus' college course pursuits had also educationally trained him in various aspects of human relations. Mr. Grothaus' extensive connections with, and knowledge about, the Houston, Texas area was also a bonus, since many aspects of the case were connected with that area. I knew that Mr. Grothaus had not previously

002262

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 41 of 243
Case 4:04-cv-08003-GAF    Document 50-4    Filed 10/26/2006    Page 3 of 24
PageID #: 5703

acted specifically in the capacity as a "mitigation specialist". However, I believed that Mr. Grothaus' educational and experience background made him qualified, even more than those who often act as "mitigation specialists" to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the trial of this case. I discussed this dual role with Mr. Grothaus, and he agreed to take on the duties at the rate of forty-five dollars ($45.00) per hour.

5. I discussed my choice of Mr. Grothaus with Ms. Herndon. I explained to her that, at the time, there was a policy in the Western District of Missouri, initiated by Chief Judge D. Brook Bartlett, and enforced by Ann Busterud, CJA Clerk for the Western District of Missouri, that fact investigators for cases could not be paid any more than thirty-five dollars ($35.00) per hour. This limit owed to the notion that since, at the time, attorneys were paid only forty dollars ($40.00) per hour for their time, investigators should not be paid more. I explained to Ms. Herndon that, rather than battle against these notions, we would ask for more per hour for Mr. Grothaus because of his unique qualifications and unique role, also touting that using one expert for two investigative purposes would actually save money in the long run.

6. As the case developed, there was so much first phase case investigation work for Mr. Grothaus to do that I actually assigned him only a very few duties related to the penalty phase of the case, related to matters in the Houston, Texas area. Despite

002263

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 42 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/20/2006    Page 4 of 24
PageID #: 5704

this fact, I did not enlist another "mitigation specialist" to help with development of mitigation themes and evidence because that work was being done by me and by Ms. Herndon. We, of course, drew upon our previous experience in development of mitigation themes and evidence.

7. Several months before trial began (my best recollection is that this was in December of 1999 or January of 2000), Ms. Herndon called me on the telephone and indicated to me that, because she had another capital case which she was handling, which was also scheduled to begin trial near the time that this case was set (April of 2000), she did not feel that she could assist any further, at that time, in preparation for the trial, and suggested that I seek a continuance of the case, to permit her to remain on as cocounsel in this case, and handle her other case as well. I told Ms. Herndon that, in light of the nearly year and a half continuance which had been granted in the first place, in the setting the case for trial in April of 2000, and because there were still several months remaining prior to trial, and because there were other codefendants involved in the case, I believed that there was a good chance that a continuance would not be granted. I was also disinclined to continue the case because I believed our preparation for trial was in full swing. The government had refused open file discovery in the case. The government had even gone so far as to dismiss the severed case of codefendant Percy Smith so as to avoid going to trial on that case prior to our

002264

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 43 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/26/2006    Page 5 of 24
PageID #: 5705

trial date, thereby avoiding providing us, through that trial, disclosure of certain of its witnesses and evidence which it wished kept secret as long as possible. The Court was prepared to order full discovery disclosure in the near future, because of the impending trial date. A continuance would have meant that that disclosure would have been delayed. We were ready to have that protected information to carry forward with case investigation. In my estimation, a delay would have meant we would have had to gear up for the further investigation at a later time, and would have had to redo work which had recently been done. I also believed that, with the help of another counsel to do certain, distinct tasks, the matter could be fully prepared for trial by the trial date by me, even without Ms. Herndon's assistance. Even a new counsel, unfamiliar with all of the facts of the case, who nevertheless was a very good book lawyer, could have taken over fairly quickly some of the legal issues which I was handling related to challenges over the Vienna Convention and suppression. That would have freed up my time to handle the duties which Ms. Herndon was handling. I also told Ms. Herndon that, though we had originally planned that I would take the lead (meaning giving opening statement and closing argument, and taking the larger share of the witnesses) in the first phase of the case, and she would take the lead in the second phase of the case, if she wanted to remain with the case, I believed that I could do the "heavy lifting" in terms of being lead counsel as to both phases, especially

002265

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 44 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/26/2006    Page 6 of 24
PageID #: 5706

since that is the way that I had handled four of my five previous capital case trials. I also believed that I could take the lead in evidence preparation for both phases of the trial, and thereby do the "heavy lifting" as to that aspect of the case as well. Nevertheless, I suggested that Ms. Herndon bring her work conflict to the attention of the Court, and she did so. Shortly after Ms. Herndon contacted the Court, I spoke with Magistrate Judge Sarah Hays about the matter. Judge Hays indicated that, if Ms. Herndon actually sought leave of court to withdraw on the bases of her duties in her other case and her not being able to further participate in this case, the Court would likely grant that request to withdraw, and then provide me with another appointed counsel and any other assistance which I required in order to have the case prepared for trial as scheduled. Judge Hays indicated that I could instead file a motion for continuance if I wished, and of course the Court would entertain and fully consider any arguments which I made about the matter. However, Judge Hays also indicated that, in light of the considerable time left before trial, and the willingness of the Court to provide me services of other attorneys and experts, that would seem to address any problems which might be created by Ms. Herndon's departure, and obviate the need for a continuance. This all became a moot point when Ms. Herndon secured a continuance in her other case, and continued, without interruption, as cocounsel in this case.

**002266**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 45 of 243
Case 4:04-cv-08003-GAF    Document 50-4    Filed 10/26/2006    Page 7 of 24
PageID #: 5707

8. Even though Ms. Herndon continued on the case, and was going to be lead counsel with respect to the penalty phase, I not only took the lead with respect to jury selection and the first phase legal and factual issues. I also took the lead on developing mitigation evidence from the Houston, Texas area, particularly with the Sinisterra extended family there, and I also developed and presented legal arguments with respect to the penalty phase aspects of the Vienna Convention. Ms. Herndon took on responsibility for developing and presenting other penalty phase related motions. And, Ms. Herndon took the lead on developing mitigation evidence from Colombia.

9. Pretrial, I reviewed the penalty phase-related motions which Ms. Herndon developed and filed, and I did not participate directly in the work on those motions, since I believed that those motions were capably drafted and handled.

10. At the time of trial, I was not familiar with the arguments being made in other cases, based on *Apprendi*, regarding the Constitutional error in the failure of the government to include in its indictment allegations related to aggravating factors. I learned after trial that Ms. Herndon was familiar with this motion practice because her client, Norris Holder, was the codefendant of Billie Allen, whose counsel was one of the first to raise the *Apprendi* issue in a Federal capital case. For reasons which I do not know or understand, Ms. Herndon did not join

7

**002267**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 46 of 243
Case 4:04-cv-08003-GAF    Document 50    Filed 11/26/2006    Page 8 of 24
PageID #: 5708

Allen's motion in this regard on behalf of her client Holder, and therefore Holder

did not enjoy the vacation and reconsideration of his case which occurred for Allen

in *Allen v. United States*, 536 U.S. 963 (2002), as wrought by the holding of the

Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 589 (2002).  Ms. Herndon also

did not raise the issue on behalf of Mr. Sinisterra in this case, and therefore this

issue was also lost to us on direct appeal.  I had never before delegated to another

attorney the handling of any part of motion practice in a capital case of mine, and

have not done so since.  Since learning about the *Ring* issue, I have raised it and

modified it in connection with every capital case which I have handled.  I believe

that the failure to raise the issue in this case was erroneous, and I take

responsibility for that failure, since I was general lead counsel for the case.  In

calling this failure erroneous, I realize that the Eighth Circuit has ultimately

decided against granting relief for this failure in *United States v. Allen*, 406 F.3d

940 (8th Cir. 2005).  However, Mr. Allen's petition for certiorari with regard to the

Eighth Circuit holding is still pending under Supreme Court Case # 05-6764, and I

personally believe it likely that Mr. Allen should and will ultimately gain relief.

Should such a determination of the *Allen* case occur, that would mean that our

error in this case would be prejudicial.

　　11. At time of trial, I was aware that Ms. Herndon had chosen not to make a

**002268**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 47 of 243
Case 4:04-cv-08003-GAF    Document 50-4    Filed 11/26/2006    Page 9 of 24
PageID #: 5709

challenge to the FDPA on the basis of racial bias in the practices of the Federal

government in seeking of the death penalty.  I was aware that others were making

such challenges.  It is my recollection that, at the time of trial, there had not yet

been publication and dissemination of the report of the Department of Justice, as

cited in Mr. Sinisterra's 2255 amended petition, regarding the much larger

numbers of black Federal capital case defendants being prosecuted under the

FDPA.  Nevertheless, the information which was ultimately contained in the DOJ

report was anecdotally well known among Federal capital case practitioners,

including me, at the time that Mr. Sinisterra's case was working its way toward

trial.  However, I knew that challenges about racial bias in charging practices were

not gaining success because courts were refusing to infer racial discrimination

based upon the numbers for a host of reasons, among which was the strong

justification for death penalty prosecution in all of the Federal capital cases

pursued, based upon the aggravating facts in the cases which were being capitally

prosecuted.  In light of these considerations, I did not believe that such a motion

had any real chance for success, and thus I did not urge Ms. Herndon to prepare

such a motion, and I did not prepare such a motion myself.  The Supreme Court's

subsequent decision in *United States v. Bass*, 536 U.S. 862 (2002) has caused me

to believe that this issue is not one which can achieve success based upon the facts

002269

Case 2:19-cv-00414-JPH-DLP   Document 23-40   Filed 09/12/19   Page 48 of 243
Case 4:04-cv-03005-GAF   Document 56-3   Filed 11/20/2006   Page 10 of 24
PageID #: 5710

currently available.

12. In reviewing the 2255 amended petition, I do not note any objections to the way in which the Houston-based penalty phase evidence, handled by me, was prepared and presented, other than the comment that the penalty phase presentation, as a whole, was "disjointed". I made trips to Houston, Texas to prepare this evidence, and I worked with the witnesses I presented while I was in Houston, and while they were in Kansas City. While I certainly did not perceive the penalty phase evidence presented by me to be disjointed at the time, I leave it to others, particularly the Court, to determine the quality of that portion of the presentation.

13. In reviewing the 2255 amended petition, I do note strong objections to the penalty phase presentation with regard to information from Colombia about Mr. Sinisterra's background and upbringing. I have reviewed the details in the amended petition concerning Mr. Sinisterra's background, and I acknowledge that I was aware of all of this information prior to the start of trial. I also acknowledge that this information was only partially addressed in our penalty phase presentation. It had been our intention to present most of Mr. Sinisterra's youthful background information through the live testimony of his family members, most importantly through his mother. We intended to handle things in this way because

10

002270

Case 2:19-cv-00414-JRH-RLP Document 23-40 Filed 09/12/19 Page 49 of 243
Case 4:04-cv-03003-GAF Document 56 Filed 11/20/2006 Page 11 of 24
PageID #: 5711

there were no records about Mr. Sinisterra's childhood which were available from Colombian authorities. The only information came from Mr. Sinisterra's family members, mostly from his mother.  At this time, pre-9/11/2001, we believed that we would be able to prevail upon the Court, the Department of Justice and the Department of State to permit these witnesses to enter this country for the purpose of testifying.  We took all appropriate steps to assist the witnesses in timely applying for entry visas.   We believed that, if the entry visas were rejected, we would have a strong issue for appeal regarding denial of the right to present mitigation evidence.  We frankly believed that this issue was so strong that it would persuade government officials to grant the visas.  Unfortunately, despite these efforts, we learned, at the last minute, that these persons would not be granted entry visas.  Even more unfortunately, this Court, and then the Court of Appeals, did not find sufficient prejudice to warrant relief from the death sentence arising out of the failure to grant witness visas.  It should also be noted that, because of her severe heart condition which became more pronounced as trial approached, Mr. Sinisterra's mother was unable to travel, even if visas had been granted.  While she was in Colombia conducting penalty phase investigation, Ms. Herndon had taken the step of videotaping interviews with all of the witnesses. When it became clear that the witness visas would not be issued, Ms. Herndon

**002271**

Case 2:19-cv-00414-JPH-DLP   Document 23-40   Filed 09/12/19   Page 50 of 243
Case 4:04-cv-03005-GAF   Document 56   Filed 11/20/2006   Page 12 of 24
PageID #: 5712

suggested that we use the videotapes in lieu of the testimony of the witnesses. Ms.
Herndon indicated to me that she was having the tapes prepared for presentation,
and thus the tapes were not available for me to review prior to trial. Because of
this, I left it to Ms. Herndon to review and prepare the tapes for presentation. I had
urged Ms. Herndon to disclose copies of the tapes to the government as soon as we
knew that the tapes would have to be used in lieu of testimony, in other words just
before trial. I believed that the Court's reciprocal discovery order might well
require such disclosure. Ms. Herndon resisted the idea of such disclosure,
believing that, under statutory and case law, the government did not have any right
to discovery of mitigation evidence until time of the sentencing phase. I
acquiesced to Ms. Herndon on this question because her legal viewpoint was, and
still is, the predominant one held by the vast majority of Federal capital case
defense counsel nationally, and my viewpoint was, and still is, in the very small
minority. Unfortunately, at trial, the Court found that earlier disclosure of the tapes
should have been made, and remedied the disclosure failure by allowing an
instruction telling the jury that the tapes had been withheld from the government
until just before their presentation. Even more unfortunately, the Eighth Circuit
upheld this Court's position on appeal. To compound the difficulties wrought by
the adverse jury instruction, during the playing of these videotapes during trial, it

12

002272

Case 2:19-cv-00414-JRH-DRP Document 23-40 Filed 09/12/19 Page 51 of 243
Case 4:04-cv-03003-GAF Document 50-3 Filed 11/20/2006 Page 13 of 24
PageID #: 5713

became clear that the quality of many of these tapings were very poor. For all of the aforementioned reasons, I believe that the criticism that this portion of the presentation was "incomplete" and "disjointed" is more than fair. Again, because I was lead counsel for the case, I take responsibility for this deficiency. I had not before, and have not since, delegated to another attorney such a critical part of a penalty phase presentation.

14. In retrospect, I believe that we should have sought authorization for the taking of the Colombian witnesses' testimony by depositions pursuant to F.R.Cr.P. 15(a)(1). That would have permitted the presentation of all of the evidence, and would have eliminated the problems encountered with getting the witnesses live.

15. In the 2255 amended petition, and in Ms. Herndon's affidavit, an issue is raised, with respect to the presentation of the Colombian witness information, particularly over whether the employment of a "mitigation specialist" different from Mr. Grothaus could have also addressed the problem which arose. I believe what is actually being argued is that we should have engaged the services of a forensic social worker to present the Colombian witness information, either in addition to, or in lieu of, the testimony of those witnesses. In my experience, often in capital cases, such a forensic social worker synthesizes all of the background information about the client, and then testifies, in hearsay fashion, about the

002273

Case 2:19-cv-00414-JPH-DLP  Document 23-40  Filed 09/12/19  Page 52 of 243
Case 4:04-cv-03005-GAF  Document 50  Filed 11/20/2006  Page 14 of 24
PageID #: 5714

information gathered by him/her and others from other persons and sources.  Many

times, the "mitigation specialist" who is hired is also a forensic social worker, and

thus is qualified to play this role.  Such a presentation is regularly allowed because

of the relaxed rules of admissibility which attend in the penalty phase of a capital

case trial.  In some of my cases, I have used such a forensic social worker to make

such a presentation.  However, I have generally found such presentations about the

client's background are more effectively made if family members can be enlisted

to make the presentations directly, themselves, instead of second hand, through a

forensic social worker.  Before trial, I believed that the Houston and Colombian

presentations could be most effectively made by Mr. Sinisterra's wife and mother,

respectively, with supplementation from other family members.  Nevertheless, both

Ms. Herndon and I, prior to trial, attempted to also identify a forensic social worker

who had a background in the Spanish culture, and particularly a familiarity with

Colombia and its culture.  We both felt that such an expert could add something

more to our presentation.  However, we were unable to find such a person.

Without finding such an expert, we decided to proceed with presentation of the

facts through family members, as described above.  Ms. Herndon never suggested

that we enlist any other sort of forensic social worker prior to her trip to Colombia.

Instead, she identified a Colombian interpreter/guide whom she requested that we

14

**002274**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 53 of 243
Case 4:04-cv-03003-GAF    Document 56    Filed 11/20/2006    Page 15 of 24
PageID #: 5715

employ, and I obtained Court authorization for employment and payment of that person. I have no doubt that, had Ms. Herndon or I requested the services of a forensic social worker, I could have obtained Court approval for the expenditure of funds for such an expert. In retrospect, I believe we should hav employed such a forensic social worker because, had we had such a person on our defense team, that person could have stepped into the void left when the witness visas were disallowed, and could have presented the Colombia witness information in that fashion.

16. Since Ms. Herndon made our penalty phase closing argument, she was responsible for making, and was actually required by Court rule to make, objections to perceived improper arguments made by the prosecution. In the amended 2255 petition, certain arguments are cited as being improper, and requiring objection, for which none was forthcoming. With one of those contentions, as concerns the "Hitler" argument, I agree, and I argued the matter on appeal. Had I been the person to make objections, I would have objected to the argument, and in retrospect, I believe I should have made the objection in Ms. Herndon's stead. I did not make the objection at the time because I believed that Ms. Herndon might have had some tactical reason for not doing so. Actually, when we later discussed the matter, Ms. Herndon told me that she believed the objection should have been made, and had no excuse for not making the

002275

Case 2:19-cv-00414-JRH-BKE   Document 23-40   Filed 09/12/19   Page 54 of 243
Case 4:04-cv-03005-GAF   Document 56   Filed 11/20/2006   Page 16 of 24
PageID #: 5716

objection, As concerns the other arguments urged as improper, I would not have objected to any of those, as I did not believe them to be improper.

17. In the amended 2255 petition, it is contended that objection should have been made to penalty phase testimony offered by Dennis Conway. I believe that, had Mr. Conway's testimony been offered by the government in its penalty phase case in chief, the points made in the 2255 petition would be well taken. However, it is not accounted in the 2255 petition that Mr. Conway's testimony was offered in rebuttal to the testimony offered by defense witness, former Federal Parole Officer Joe Brandenburg. We offered the testimony of Mr. Brandenburg to counter the government's non-statutory aggravating factor of future dangerousness. Mr. Brandenburg was familiar with, and testified about, the general capabilities of the BOP to eliminate dangerousness from the prison population. I had used Mr. Brandenburg as an expert in a previous Federal capital case, and hoped that his presentation would be an effective one. Mr. Conway, as an FBI agent assigned to USP Leavenworth, offered the counterpoint to Mr. Brandenburg's testimony, positing that, at least in that penitentiary setting, crime and dangerousness was still at least a possibility. I did not object to the Conway testimony because I believed that objection to the Conway testimony would not have been well taken, since we had opened the issue with the Brandenburg testimony. It may well be argued that Mr. Conway's

002276

Case 2:19-cv-00414-JRH-RLP Document 23-40 Filed 09/12/19 Page 55 of 243
Case 4:04-cv-03003-GAF Document 50 Filed 11/20/2006 Page 17 of 24
PageID #: 5717

testimony was more persuasive than Mr. Brandenburg's, and that consequently I should not have opened the door to the Conway testimony by use of Brandenburg.

18. In the amended petition, criticism is made about the presentation made before the jury with respect to the findings of Dr. Warren Wheelock. I have reviewed the testimony offered from Dr. Wheelock during the trial, and I believe that the testimony accurately set forth Dr. Wheelock's conclusions.

19. In the amended petition, there seems to be criticism over my not enlisting the services of a mental health expert to call into question Mr. Sinisterra's mental capacity generally, and his capacity to substantially plan particularly. I did have Mr. Sinisterra evaluated before trial by Dr. Enrique dos Santos, M.D. Dr. dos Santos is a Spanish-speaking psychiatrist, and was at the time the Clinical Director of the Fulton State Hospital. Dr. dos Santos in his oral report to me, indicated finding no mental problems. In light of this finding, I did not pursue the matter further. I have reviewed the report of Dr. Llorente, appended to the amended pleading. Had I received such a report prior to trial in this case, I am not sure whether I would have used such testimony because of its lack of strength. Had we relied on such an expert, it would have permitted evaluation of Mr. Sinisterra by a mental health expert of the government's choosing. Being familiar with the sorts of experts regularly relied upon by the government, I believe that the evidence from such an expert would likely be

17

002277

Case 2:19-cv-00414-JRH-DEP   Document 23-40   Filed 09/12/19   Page 56 of 243
Case 4:04-cv-03003-GAF   Document 50-4   Filed 11/20/2006   Page 18 of 24
PageID #: 5718

quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions.

20. In the amended petition, dissatisfaction is expressed over my failure to elicit testimony from Mr. Sinisterra, his wife, his mother-in-law and others about Mr. Sinisterra's presence at Thanksgiving dinner in 1998, and his consequent inability to have been present in the parking lot outside the home of Amparo Molina during the so-called "murraco meeting". Mr. Sinisterra told me, at trial, that he was not present at this meeting, and he was at home with his family, and I fully believed him. I discussed this with Mr. Sinisterra's wife, Michelle Sinisterra, and his mother-in-law, Delores Rankin, and both remembered Thanksgiving, and Mr. Sinisterra's general presence at Ms. Rankin's home. However, when I probed, in a way I felt likely would occur in cross-examination, as to their ability to account for all of the time of the day, and precisely when dinner had occurred, neither woman could say that she could account for Mr. Sinisterra's presence so as to preclude the possibility that he left for a time (for example, to go across town, to be present outside during the "murraco meeting"). Thus, I believed that the testimony of these witnesses would have been easily undercut by what I believed to be a likely line of cross-examination. For several reasons, I was particularly reluctant to put forth Michelle Sinisterra as a witness in the first phase of trial unless that was absolutely necessary. While I did not

18

**002278**

Case 2:19-cv-00414-JPH-DLP   Document 23-40   Filed 09/12/19   Page 57 of 243
Case 4:04-cv-03003-GAF   Document 50-4   Filed 11/20/2006   Page 19 of 24
PageID #: 5719

believe that Michelle was in any way involved in drug trafficking, I believed that the government suspected that she was, at least indirectly.  I was concerned that the greater the role I gave Michelle in the first phase of trial, the greater the danger that Michelle would be charged.  Michelle was the sole caregiver and support for Mr. Sinisterra's children, Kayla and Kristopher.  Her prosecution would have thrown the situation for the children into chaos.  I believed that Mr. Sinisterra wanted to avoid such a calamity for his wife and children.  Moreover, I believed that, if Michelle testified in the first phase of the trial, the government would at the very least cross-examine her about her knowledge about her husband's involvement with drug dealings, most certainly her knowing that Mr. Sinisterra would contribute sums of money to the family, with no means for obtaining those funds other than through drug dealings.  I believed that such cross-examination would undercut Michelle's ability to later play her far more important role as advocate for life during the penalty phase. Finally, I questioned the significance of any alibi for the "murraco meeting" in light of the other evidence in the case.  The evidence, even if believed, was that Mr. Sinisterra was not participating in the "murraco meeting" but instead was outside, not privy to what was going on inside.  But even if Mr. Sinisterra could have been excluded from this aspect of substantial planning, other evidence implied he was part of the planning, including his travel from Houston to Kansas City, as well as whatever planning which

19

002279

Case 2:19-cv-00414-JPH-DLP   Document 23-40   Filed 09/12/19   Page 58 of 243
Case 4:04-cv-03005-GAF   Document 56   Filed 11/20/2006   Page 20 of 24
PageID #: 5720

was carried out in the Kansas City area prior to the killing. And, of course, there was testimony, including the confession from Mr. Sinisterra himself, about his roughing up and actually shooting Julian Colon. In this context, his presence or lack thereof outside the "murraco meeting" seemed to me, rightly or wrongly, to not be significant. For the combination of these reasons, Ms. Herndon and I decided that it was best to not debate the testimony about Mr. Sinisterra's presence in the parking lot outside the "murraco meeting", save for the gingerly made attempts at cross-examination noted in the amended petition. Once those efforts did not work, we dropped the matter. I spoke to Mr. Sinisterra, in English, about all of these reasons for the tack which we took in this regard. Despite this effort, and post-trial attempts at communication on the subject, I am virtually certain that Mr. Sinisterra, to this day, still DOES NOT understand the reasons and reasoning noted above, and wanted all possible arguments against his presence at the "murraco meeting" to have been made.

21. There is raised the question about my choice of means of communication with Mr. Sinisterra. It is noted that I had presented evidence and argument against Mr. Sinisterra being able to understand English, particularly the *Miranda* warnings given him. Lest there be any confusion, I not only argued these points, I firmly and personally believe that Mr. Sinisterra was and is incapable of understanding the English language *Miranda* warnings. From that premise, it is consequently argued in

20

002280

Case 2:19-cv-00414-JRH-RLP   Document 23-40   Filed 09/12/19   Page 59 of 243
Case 4:04-cv-03005-GAF   Document 56-3   Filed 11/20/2006   Page 21 of 24
PageID #: 5721

the amended petition that I should have known better than to try to communicate with Mr. Sinisterra in English in any fashion at any time.  Actually, over the years that I represented Mr. Sinisterra, I tried a variety of approaches toward communication.  Early in the case, I tried speaking with Mr. Sinisterra in English, and I also used interpreters, primarily one employed by us named Juanita Chavez.  I learned early on in the case that interpreters often were counterproductive against communication.  Most interpreters paraphrase in English and in Spanish, thereby putting their own interpretation, even spin, on what each party is saying.  I noticed this phenomenon when I detected that interpreters would wait until I finished several sentences before they would give a Spanish translation to Mr. Sinisterra.  What I learned is that what they were doing was wholly recreating what I was saying.  I noticed the same thing in their translations to me of what Mr. Sinisterra was saying.  With this going on, I could never trust that Mr. Sinisterra was actually hearing what I was saying, or visa versa.  We ultimately found so called "simultaneous interpreters" such as the interpreters whom we used at trial.  While they were a vast improvement over the others, there was still a gap in communication which I believed occurred, even with their help.  The approach toward communications with Mr. Sinisterra on which I finally settled was the one which Michelle Sinisterra described to me, and to the jury in her testimony.  Michelle did not know any Spanish, but carried on a marriage and acted as Mr.

21

**002281**

Case 2:19-cv-00414-JPH-DLP    Document 23-40    Filed 09/12/19    Page 60 of 243
Case 4:04-cv-03005-GAF    Document 56    Filed 11/20/2006    Page 22 of 24
PageID #: 5722

Sinisterra's interpreter with other English speakers. Michelle's approach involves talking slowly, being willing to repeat ideas and have those ideas explained back to assure accurate communication of an idea, and taking all the time necessary to get communication to happen. It also involves understanding that Mr. Sinisterra's way of speaking English would oftentimes involve his "speaking backward", as Michelle put it, using English in a form similar to that used in Spanish. In order to facilitate my communication in English with Mr. Sinisterra, I spent long periods of time in each session, and spent more sessions. That, of course, was a far different approach to speaking with Mr. Sinisterra, in English, than was used by those who interrogated him, and gave him *Miranda* warnings. Even with these efforts, I am sure that there were miscommunications, for instance my inability to explain, for clear understanding, the decision to not counter the "murraco meeting" claims, as described above..

22. In a similar vein, it is claimed that I did not adequately prepare Mr. Sinisterra for his testimony at trial, and as a consequence that the presentation was incomplete and left a bad impression of Mr. Sinisterra. It is implied, I believe, that the only preparations for Mr. Sinisterra's testimony occurred on or near the day of his testimony. That is incorrect. Actually, work on Mr. Sinisterra's testimony was done in my discussions with him over the months prior to trial. Particularly, because Mr.

002282

Case 2:19-cv-00414-JHH-DEP Document 23-40 Filed 09/12/19 Page 61 of 243
Case 4:04-cv-03003-GAF Document 50 Filed 11/20/2006 Page 23 of 24
PageID #: 5723

Sinisterra had testified during pretrial hearings, I had had the chance to observe certain things which he did, and was able to coach him about those things afterward. An example was Mr. Sinisterra's use of the Spanish word "*claro*" in answering in the affirmative. The interpreters would translate "*claro*" to mean "of course", rather than simply "yes". In the hearings, this answer, in my opinion, came off as smug, whereas Mr. Sinisterra was only trying to make an affirmative response using a word which he knew. To avoid this, I asked Mr. Sinisterra to, instead, use the Spanish word "*si*", which would be translated simply as "yes", and for the most part, Mr. Sinisterra did this at trial. As for the completeness of the content of Mr. Sinisterra's testimony, the only complaint in this regard which I have noted in the amended petition concerns my not eliciting from him testimony about his alibi for the "murraco meeting". Again, for the reasons mentioned above, that was a deliberate omission, not an oversight due to inadequate preparation. As for Mr. Sinisterra not coming off as well as possible in the testimony, I agree to some extent. Because Mr. Sinisterra was testifying through an interpreter, the interpreter, to some degree, became Mr. Sinisterra's persona. The interpreter was obviously well-educated, and well-spoken, and put Mr. Sinisterra's answers very correctly, but in an impersonal, detached way, without the nuances of emotion which a witness himself would put with his own words. Thus, the need to use an interpreter made Mr. Sinisterra come off as very intelligent, calculating,

23

**002283**

Case 2:19-cv-00414-JPH-DLP   Document 23-40   Filed 09/12/19   Page 62 of 243
Case 4:04-cv-08003-GAF   Document 50   Filed 11/20/2006   Page 24 of 24
PageID #: 5724

detached, and cold, none of which would be correct impressions of Mr. Sinisterra.  As odd as it may sound, if I had Mr. Sinisterra's trial testimony to do over again, I would not change the content of the questions or answers.  I would change only the use of the interpreter.  I would, instead, have Mr. Sinisterra do his best to answer the questions in English.   Then, the jury would hear Mr. Sinisterra's true words, voice and incapabilities, and that, I believe, would change the entire tone of the testimony

23. In the amended petition, there are also questions raised over the failure by me and Ms. Herndon, respectively, to object to testimony by Andres Borja Molina and Edward Ortiz regarding their alleged knowledge about what might be termed, generally, as Mr. Sinisterra's reputation for violence.  I researched the matter prior to trial, and I concluded from that research that objections to such testimony would have been fruitless.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

Subscribed and sworn to before me this 24th day of November, 2006.

/S/
NOTARY PUBLIC

My commission expires _____

002284

## AFFIDAVIT OF COUNSEL JENNIFER HERNDON

I, Jennifer Herndon, being duly sworn and of lawful age, state as follows:

1. I am a licensed attorney in the State of Missouri and a member of the Western District of Missouri bar. I was appointed by the court to represent German Sinisterra at trial in the capital murder case pending against him in the Western District of Missouri.

2. I represented Mr. Sinisterra during pretrial proceedings, trial, and on direct appeal to the Eighth Circuit Court of Appeals. Fred Duchardt also represented Mr. Sinisterra pursuant to the court's appointment. Mr. Duchardt served as lead counsel for Mr. Sinisterra.

3. I have been asked by Mr. Sinisterra's current counsel, representing him in his proceedings under §2255, to provide information as to certain events that occurred pretrial and during trial in Mr. Sinisterra's case.

**Mitigation Specialist**

4. At no time prior to or during the trial did we employ a mitigation specialist to work on Mr. Sinisterra's behalf. In my 10 years of death penalty practice, this is the only case where I have not worked with a mitigation specialist. From the beginning of the case, it was my plan and desire to employ a mitigation specialist. I searched for a Spanish speaking mitigation specialist because Mr. Sinisterra is Spanish speaking and many of his family members speak Spanish exclusively and understand no English.

5. At some point during my search for a qualified mitigation specialist, Mr. Duchardt indicated that he was seeking to have the fact investigator, Dan Grothaus, appointed as a fact and mitigation specialist. Mr. Duchardt indicated that the court would pay a higher hourly rate if Mr. Grothaus was considered a mitigation specialist. I have

**002285**

worked with Dan Grothaus on several occasions and believe that he is the best fact investigator one could ever find. However, due to the amount of work required in a capital trial no one, not even Mr. Grothaus, could adequately serve double duty as fact and mitigation investigator. Furthermore, Mr. Grothaus has no experience or training in the art of mitigation investigation, and is therefore not qualified to handle the complexities of preparing a mitigation case for a capital trial.

6. Mitigation investigation is very different from fact investigation, and requires a specialist who is trained in developing relationships with reluctant family members, convincing family and friends of the defendant to reveal closely held secrets, and identifying other experts (such as mental health professionals) that need to be brought in to work on the case. Mitigation specialists have both clinical training and experience and have usually obtained an advanced degree. Such training teaches the specialist specifically how to evaluate family systems and how to conduct interviews in a way that will reveal sensitive information. A detailed description of the duties of the mitigation specialist is contained in the attached affidavit of Caryn Tatelli, LCSW, a mitigation specialist that I have worked with in several cases.

7. Because time constraints and lack of qualification would preclude Mr. Grothaus from performing the functions of a mitigation specialist, I continued to search for a qualified mitigation specialist to work on Mr. Sinisterra's case. However, Mr. Duchardt insisted that Mr. Grothaus would be represented to the court as the mitigation specialist. During this portion of the pretrial preparation in Mr. Sinisterra's case, I was also preparing for trial the capital case of *United States v. David Martin*, pending in the Eastern District of Missouri. Because of my obligations in Mr. Martin's case, there were

2

002286

times that I could not give my full attention to Mr. Sinisterra. I approached Mr. Duchardt with this problem and stated that we needed a continuance of Mr. Sinisterra's trial so that I could adequately prepare for trial. Mr. Duchardt stated we did not need a continuance and that he could do the "heavy lifting" in the trial if I could merely just show up and sit at counsel table. Fortunately, Mr. Martin's case was eventually resolved without a trial and I was able to be an active participant in Mr. Sinisterra's trial. However, in retrospect, I believe my failure to more strenuously object to not having a mitigation specialist in Mr. Sinisterra's case was due simply to a lack of time to adequately deal with the situation.

8. I am aware that "part of the existing 'standard of care' in a federal death penalty case" includes the employment of a mitigation specialist. *See* Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation, p. 51 (May 1998) (This report is commonly referred to as the "Spencer Report"); American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guidelines 4.1(A)(1) and 10.4(C)(2)(a), (Feb 2003). I am also aware that the work of a mitigation specialist is not to be entrusted to a regular investigator. As the Spencer Report recognized, "[t]he work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." Spencer Report, pp. 24-25. "Mitigation specialists typically have graduate degrees . . . and have extensive training and experience in the defense of capital cases." *Ibid.* at 24. I sought to locate and employ someone that met these standards in Mr. Sinisterra's case.

3

**002287**

9. Mr. Grothaus did not attempt to perform the functions of a mitigation specialist in Mr. Sinisterra's case. I traveled to Mr. Sinisterra's home town of Buenaventura, Colombia alone to conduct family interviews. I also conducted mitigation interviews of family witnesses alone. I prepared a videotape of Mr. Sinisterra's young daughter, which was shown to the jury. All of these tasks are usually completed with the aid of a mitigation specialist, who has better expertise in conducting interviews, drawing conclusions, identifying necessary experts and developing mitigation themes. The times that I traveled to Houston, Texas to do investigation with Mr. Grothaus were spent conducting fact investigation.

10. Some specific examples of why a mitigation specialist was vital to this case are as follows. First, the bulk of the mitigation evidence on Mr. Sinisterra's behalf was presented by way of videotapes that I made of witness interviews in Buenaventura, Colombia. Many of the tapes were edited because the government objected to my narrative on the tape. As the trial court recognized, the videotapes were of poor quality due to the fact that there was no quite place to conduct interviews and the interviews were all translated from Spanish to English. While it would be impossible to capture the poverty and hopelessness in Mr. Sinisterra's hometown without bringing the jury there, one important function the mitigation specialist could have served was to testify to the jury about the demographics of Buenaventura, the lack of employment opportunities, and the difficulties of daily life Mr. Sinisterra's family endures. It is a common function for the mitigation specialist to testify when witnesses aren't available or are too impaired for whatever reason to testify. As Mr. Sinisterra's attorney, I was not available to testify. The testimony of a mitigation specialist who accompanied me to Colombia would have

4

002288

greatly bolstered the powerful evidence I found there. Instead, the presentation of this evidence in the form of videotapes prevented the evidence from having much persuasive value. The defense theory was that Mr. Sinisterra became involved in the charged drug conspiracy to obtain money to support his family in Colombia. The evidence available in Colombia would have shown the jury why Mr. Sinisterra resorted to such desperate measures to attempt to support his family.

11. Another important function that required a mitigation specialist in this case is gathering of social history records and compiling a chronology. Record gathering is very important because it provides unbiased factual support for what can be seen as self-serving statements by the defendant and his family. In Mr. Sinisterra's case, I gathered little if any records. Record gathering can be surprisingly time consuming. Often the mitigation specialist is told that records do not exist and is subsequently able to locate those records with a little persistence. The mitigation specialist is often forced to jump through many hoops to obtain records, including submitting specific release forms, talking to several different clerks on the phone, writing letters, obtaining subpoenas, and in general being persistent about seeing that the records are copied and mailed. I am not aware of what additional records exist on Mr. Sinisterra, but at the very least, a mitigation specialist could have attempted to secure supporting records.

12. A mitigation specialist could have also identified and located an expert to talk about the differences in American and Colombian culture. Mr. Sinisterra testified at trial that he lied to the police when he told them that he killed the victim. He stated that he lied to protect his family in Colombia from Hinestroza, an indicted coconspirator who had not been arrested at the time. He feared that Hinestroza would have his family killed

5

002289

if he told the police that it was Hinestroza, and not Mr. Sinisterra, that killed the victim. In investigating Mr. Sinisterra's case, I learned that fear of retribution against his family was a valid and realistic fear on Mr. Sinisterra's behalf and a much more common occurrence in Colombian culture than we see happen in America. Having an expert on Colombian culture to add credibility to Mr. Sinisterra's testimony was crucial. At the least, the jury may have believed that Mr. Sinisterra was not telling the whole truth to the police in an attempt to protect his family from Mr. Hinestroza.

13. I did the vast majority of the mitigation investigation and preparation of the mitigation case for trial. The only exception to this fact is that Mr. Duchardt worked with and called to testify Joe Brandenburg, an expert on bureau of prisons issues. I never talked with Mr. Brandenburg and was not aware of the specifics of his testimony prior to hearing him give such testimony in court. No one else participated in the preparation of the case or development of themes for the penalty phase. Typically, a mitigation specialist would develop themes based on the evidence she uncovered in her investigation. The defense team (including the mitigation specialist) would then turn those themes into specific mitigators we wanted to submit to the jury. The team would then discuss specifically what evidence and which witnesses should be presented to support each theme. The fact that this entire process was solely my responsibility resulted in a disorganized and less effective presentation of the evidence than would have been possible with the assistance of a mitigation specialist.

6

002290

## Language Barrier

14. Mr. Sinisterra's native language is Spanish. Mr. Sinisterra cannot read or write either English or Spanish. To the best of my recollection, he had been in the United States for 7-8 years when I began representing him. When I first met Mr. Sinisterra, he understood basic English but could not understand any legal terminology. I have a basic understanding of Spanish. While Mr. Sinisterra and I could carry on basic conversation, I was often unable to understand what he was saying because of his heavy accent. Many times, we would both have to repeat things several times or rephrase things to reach an understanding. I continue to communicate with Mr. Sinisterra by phone today. While we can carry on a conversation much easier today than when we first met, there are still times that we have misunderstandings or are unable to communicate. This is especially true when we go past basic conversation. I have never had a conversation with Mr. Sinisterra in which I used an interpreter.

15. I believe that the language barrier became a problem when it became time to discuss whether Mr. Sinisterra should testify at trial. Mr. Duchardt believed that he should testify, and I advised that I did not think he should testify. The only time this issue was discussed with the aid of an interpreter was in the Marshal's Office holding cell through the mess screen shortly before Mr. Sinisterra testified. By this time, Mr. Sinisterra had already decided to testify. The conversation through the interpreter, in Mr. Duchardt's words, was simply to make sure Mr. Sinisterra understood his rights. To my knowledge, this is the only time Mr. Duchardt used an interpreter to assist in a conversation with Mr. Sinisterra.

7

002291

16. When a client chooses to testify, several hours of preparation are necessary to ensure that he knows what questions will be asked and knows what to expect on cross examination. I don't know how much time Mr. Duchardt spent preparing Mr. Sinisterra for his testimony. I do know that all of this preparation was done without the aid of an interpreter. I did not spend any time preparing Mr. Sinisterra for his testimony, as I continued to believe that it was a bad idea for him to testify.

**Thanksgiving Meeting**

17. Part of the government's case consisted of evidence of a meeting at an apartment on Thanksgiving between many of the co-conspirators. At this meeting, a murder was allegedly discussed. There was some evidence that Mr. Sinisterra was present outside of the apartment around the time of this meeting. Mr. Sinisterra was adamant to me that he was not present at the apartment on this day. This evidence was a constant source of dismay for Mr. Sinisterra and he talked on several occasions about wanting to refute the evidence.

18. Mr. Sinisterra stated that his wife, Michelle, could testify that he was at home all day on Thanksgiving and could not have been at the apartment. Based on my conversation with Michelle Sinisterra, I believe that she would have testified to this fact. However, Mr. Duchardt and I chose not to call her as a witness during the guilt phase of the trial. I also recall that Mr. Sinisterra thought that his mother-in-law, and perhaps additional in-laws, could have supported his wife's testimony on this issue. We did not call any of these potential witnesses to testify on the issue.

8

002292

**Expert Testimony**

19. I was aware through the testimony of Dr. Warren Wheelock that Mr. Sinisterra has a low IQ. I do not know if Mr. Sinisterra is mentally retarded. This is an issue usually brought to my attention by the mitigation specialist in the case. I am aware that a person must meet three criteria to be classified as mentally retarded, and that mental retardation can only be diagnosed by an expert in that field. We never had any testing done to determine whether Mr. Sinisterra is mentally retarded or substantially impaired in his mental abilities in any way. I have no reason to believe that if we had done such testing it would not have been favorable to us. It is my experience that many people are able to develop enough "street smarts" to get by in life despite substantial mental impairments. The only way to determine or rule out retardation is to have expert testing done.

**_Ring_ Issue**

20. After trial, the Supreme Court decided the case of **_Ring v. Arizona_**, which held that aggravating circumstances are essential elements of the offense of capital murder and must therefore be pled in the indictment and proven to the jury beyond a reasonable doubt. The indictment in Mr. Sinisterra's case did not comply with the requirements of **_Ring_**. The aggravating circumstances were not pled in the indictment.

21. Furthermore, the presentation of the government's aggravating evidence was held to the admissibility standard found in 18 U.S.C. §3593(c), which provides that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials . . ." I believe that the Court's decision in **_Ring_**, and its more recent decision in **_Blakely v. Washington_**, make this portion of §3593(c)

9

002293

unconstitutional. Therefore, Mr. Sinisterra's constitutional rights were violated by the use of this relaxed standard for the admission of evidence at the penalty phase and by the faulty indictment.

22. Mr. Duchardt and I represented Mr. Sinisterra on his direct appeal to the Eighth Circuit Court of Appeals. The issues presented by the Supreme Court's decision in *Ring* were not raised on direct appeal, but should have been raised at that stage to preserve Mr. Sinisterra's rights.

> Audie M Carter
> Notary Public   Notary Seal
> State of Missouri
> County of St. Louis
> Expires August 20, 2008

Jennifer Herndon

Jennifer Herndon

Dated this 2nd day of December, 2004

I hereby certify that a person known to me as Jennifer Herndon appeared before me on this 2oo day of December, 2004, and personally executed the above affidavit.

Notary Public

My Commission Expires  8/20/2008

10

002294

*FILED UNDER SEAL*

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| Movant, | ) | |
| v. | ) | No. 06-8001-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| Respondent. | ) | |

## REPORT OF LAWRENCE J. FOX

### Introduction

I am a lawyer duly admitted to practice in the Supreme Court of the

Commonwealth of Pennsylvania, the Appellate Division, Second Department of the

Supreme Court of New York, the United States Supreme Court, and numerous federal

circuit courts of appeal and district courts. I am a partner and former managing partner of

Drinker Biddle & Reath LLP, a general practice law firm of approximately 650 lawyers

with a principal office in Philadelphia and branch offices in New Jersey, Pennsylvania,

New York, California, Delaware, the District of Columbia, Illinois and Wisconsin.

I have been asked to opine on the conduct of Frederick A. Duchardt, Jr. in

connection with the current proceedings involving his former client, Wesley Ira Purkey.

I have concluded to a reasonable degree of professional certainty that Mr. Duchardt

breached the fiduciary duties he owed his former client. Indeed, the violations of the

duty of care and the rules of professional conduct are unprecedented in my experience.

**002295**

I have regularly been consulted and testified about the ethics, professional responsibilities and standards of care of lawyers in various proceedings including cases of malpractice in both state and federal courts throughout the United States. I have spent my entire career as a trial lawyer, first at Community Action for Legal Services in New York City and, since 1972, at Drinker Biddle & Reath LLP. My specialties are general commercial litigation and the representation of, and consultation with, lawyers regarding their professional responsibilities.

I am the I. Grant Irey, Jr. Adjunct Professor of Law at the University of Pennsylvania Law School and a lecturer on law at Harvard Law School teaching legal ethics and professional responsibility. I was a visiting professor at Cornell University Law School. I have lectured on legal ethics at more than thirty-five law schools, participated in teaching the first year legal ethics course at the University of Pennsylvania Law School for nearly a decade, and was the Robert Anderson Fellow at the Yale Law School in 1997 addressing ethics issues.

I have produced and participated in more than one hundred fifty continuing legal education seminars, and I have written extensively in the field of lawyers' responsibilities. I am the author of Legal Tender: A Lawyer's Guide to Professional Dilemmas (ABA 1995); co-author (with Professor Susan Martyn) of Traversing the Ethical Minefield (2d ed., Aspen 2008), a casebook in professional responsibility, Red Flags: Legal Ethics for Lawyers (ALI-ABA 2005), Your Lawyer, A User's Guide (LexisNexis 2006) and How to Deal with Your Lawyer: Answers to Commonly Asked Questions (Oxford University Press–Oceana 2008); co-author (with Professors Susan Martyn and W. Bradley Wendell) of The Law Governing Lawyers: National Rules,

002296

Standards, Statutes, and State Lawyer Codes (Aspen 2008-09 ed.); and author of almost

100 articles on the topic of legal ethics and related topics and several chapters in books,

including a chapter on the topic of expert witnesses. I was the editor and contributing

author for Raise the Bar: Real World Solutions for a Troubled Profession (ABA 2007).

I am a former member and Chair of the American Bar Association ("ABA")

Standing Committee on Ethics and Professional Responsibility, and a former Chair of the

ABA Section of Litigation, the largest section of the ABA representing almost 60,000

trial lawyers. I was an advisor to the American Law Institute's twelve year project, The

Restatement of the Law Governing Lawyers. I am a Fellow of the American College of

Trial Lawyers, and I was a member of Ethics 2000, the ABA Commission established to

review and revise the Model Rules of Professional Conduct. My résumé is annexed

hereto.

### Background

Mr. Purkey was convicted of capital murder. Mr. Duchardt represented

Mr. Purkey at his initial trial and on his direct appeal. Now Mr. Purkey, represented by

new counsel, has filed a federal habeas corpus petition challenging the constitutionality

of his conviction raising, inter alia, ineffective assistance of counsel. With no actual

notice to Mr. Purkey or his present counsel of the contents of his statement, Mr. Duchardt

not only filed an affidavit adverse to the interests of his former client that clearly

disclosed confidential, attorney work product and attorney-client privileged information,

but also affirmatively helped the former client's current adversary in this proceeding.

There are so many ways in which this lawyer breached the fiduciaries duties of loyalty

and confidentiality vis á vis Mr. Purkey.

**The Systematic Violations**

Mr. Duchardt, in effect, has undertaken the role as co-counsel for the United States of America in this proceeding in violation of Missouri Rules of Professional Conduct, Rule 1.9 which specifically prohibits a lawyer from taking a position directly adverse to a former client in the same or a substantially related matter. That Mr. Duchardt would do this in the context of a capital case does not change the professional responsibility analysis, but does make the violation that much more deplorable. While Mr. Duchardt was ordered to "prepare an affidavit in response to Mr. Purkey's allegations of ineffective assistance of counsel," Doc. 62, at 4, Mr. Duchardt far exceeded the ethical boundaries by conducting interviews, gathering documents, distinguishing case law, disparaging witnesses, and writing an affidavit all designed to assure that his former client's claims will be rejected, a rejection which will result in the client's execution.

I know that petitioner's counsel will be providing the court with a full catalogue of Mr. Duchardt's transgressions. Thus, I address but two examples that I think demonstrate clearly how Mr. Duchardt violated his duties to his client. First, time and again, Mr. Duchardt's affidavit not only discloses privileged and confidential information, but also spends, page after page, paragraph after paragraph, distinguishing for the court the case law that Mr. Purkey's lawyers rely upon in seeking relief from the court. One cannot imagine a more dramatic demonstration that a lawyer has switched sides and gone way beyond defending himself to attacking his former client than the exercise in which Mr. Duchardt engages, disdainfully characterizing and disparaging the legal arguments of Mr. Purkey's present counsel. Both the vituperative words he uses

-4-

and the substance of his presentation are an assault on the fiduciary duty of loyalty embodied in Rule 1.9 that this lawyer owes his former client.

Second, as evidence of Mr. Duchardt's fatal bad faith, he shared not only confidential but privileged information with the Assistant United States Attorney ("AUSA") without any actual notice to the former client and client's present counsel. What is even worse, Mr. Duchardt did not simply forget to give notice which would represent merely actionable and disciplinable negligence. Rather, recognizing that he had a notice obligation, he then did everything he could to render it ineffective. Mr. Duchardt deliberately gave notice in a way that it would be received (a) by Mr. Purkey's lawyer with, at best, only a few hours to digest 117 pages and no time to take protective action, and (b) by the client – worse yet – through mail sent to the prison that he knew the client would not receive until, at a minimum, a week after the former counsel made his rule-defying disclosures to the court and government counsel.

### The Obligation to Give the Client Notice

No matter what possible claim of right Mr. Duchardt might mistakenly think he had to proceed in this fashion, Mr. Duchardt was required to give the former client meaningful notice with sufficient delay so that the former client could challenge Mr. Duchardt's claimed right to disclose any of this information – by way of persuasion or, if necessary, by an injunctive action. But Mr. Duchardt did none of that. Rather, fully aware that he was under that obligation, he made a mockery of the notice requirement, so that by the time Mr. Purkey and his present lawyer had any notice of his sinister conduct, the affidavit was already in the hands of the AUSA, ink put into the milk bottle, never

-5-

**002299**

able to be removed, damage to Mr. Purkey that can only be ameliorated by an after-the-fact petition for relief.

I understand Mr. Duchardt asserts that he had the right, under an exception to the applicable rule of professional conduct governing confidentiality, to disclose this information. Before addressing the lack of merit of that argument as matter of substantive law, one point is manifest. Mr. Duchardt was not entitled to act as party, judge and jury regarding that claim of right. Indeed, what Mr. Duchardt did to his former client was strip him of his entitlement, through present counsel, to secure an adjudication from a neutral judge of the dispute between lawyer and former client. Client betrayal does not get much more devastating than that.

### The Self-Defense Defense Does Not Apply

Turning to the substance, the flaws in Mr. Duchardt's claim of entitlement are multiple. First, Mr. Purkey had not asserted a claim against Mr. Duchardt. His petition, rather, alleged that his conviction should be overturned because of multiple constitutional violations including that he had been denied, in violation of the Fifth and Sixth Amendments, effective assistance of counsel. Mr. Duchardt was not a party to the habeas petition. Mr. Duchardt could not be bound by any result of that petition. There was no claim for Mr. Duchardt to defend and, therefore, the exception in Rule 1.6 for lawyer self-defense was simply not available to him. See, e.g. *Styles v. Mumbert,* 79 Cal.Rptr.3d 880, 884 (Cal.App. 2008) ("While he [the former lawyer] can reveal confidences to defend against a malpractice claim or fee dispute, this is not a malpractice action.").

Second, an ineffective assistance of counsel claim does not necessarily implicate the conduct of counsel. Ineffectiveness in a representation can arise entirely apart from

-6-

any fault on the part of the lawyer. Indeed in my experience, far too often ineffective claims implicate, at least as often as the lawyer's actual incompetence, the lack of resources available to and the overwork of the lawyers involved.

Third, the case law is clear and uniform. The filing of an ineffective assistance of counsel claim does not act as a wholesale waiver of the attorney-client privilege. Rather, it only waives the privilege with respect to his actual allegations in that respect. Recent cases demonstrate the point. See *Ex parte Gerald Patrick Lewis*, __So.2d__, No. CR-07-0022, 2008 WL 2854805 (Ala.Crim.App. July 25, 2008) (petitioner waives the attorney-client privilege "only with respect to matters relevant to his allegations"); *Waldrip v. Head,* 532 S.E. 2d 380 (Ga. 2000) ("we reject state's contention that the filing … is an absolute waiver that entitles it to the complete file of … counsel."). The only privileged matters that are waived are those that relate to the actual substance of the ineffectiveness claim.

Fourth, waiver of the privilege is not a waiver of confidentiality. It is one thing for the assertion of an ineffective assistance of counsel claim to be viewed as a basis on which lawyers can be compelled to testify under subpoena at a deposition or a hearing at which the former client's new counsel is free (and, moreover, obliged) to limit the scope of the possible waiver or, as in this case, by order of the court to address the relevant allegations. It is quite another for a former lawyer to take that opportunity to go to work surreptitiously for the other side, contact witnesses, and otherwise betray the lawyer's former client.

002301

**The Public Policy Implications**

If Mr. Duchardt is permitted to get away with his conduct in this matter, the public policy implications would be profound. After all, it is inherent in the habeas process, particularly when the case involves possible execution, that ineffective assistance of counsel be considered as a ground for relief and even if, after due consideration, the ineffective assistance claim seems like a long shot, it is a ground that must be asserted. But if every time that occurs, the denizen of death row must confront the probability that former counsel will be free to switch sides, disclose attorney-client secrets to the prosecution and violate the privileges and the client's right to confidentiality, then assist the prosecution in defending the claim with no opportunity beforehand for the beleaguered former client even to know that former counsel plans to provide such assistance, what view will clients have of the ethics of our profession? And if every client in need of the most serious representation of all -- facing the question of life or death -- must mistrust his or her lawyer from the outset of what is, after all, supposed to be a fiduciary relationship, how can we ever call lawyers the one true champions of their clients, protectors of their clients' secrets to their graves?

**Remedying the Violations**

As a result of this conduct three remedies must be provided. First, the affidavit must be stricken. The affidavit contains repeated examples of privileged communications, both attorney work product and attorney-client privilege. It also contains expansive examples of client confidential information. Mr. Purkey never waived any of those protections, and Mr. Duchardt disclosed them both without a satisfactory basis for doing so and without giving Mr. Purkey and his counsel a chance to

- 8 -
**002302**

object. Moreover, the affidavit contains legal arguments expressed in the most hostile terms, arguments that Mr. Duchardt was barred by his fiduciary obligations and the rules of professional conduct from ever making in the context of this habeas petition. The affidavit itself should play no role in these proceedings.

Second, Mr. Duchardt should be barred from ever testifying or otherwise participating in this proceeding. It is not enough for the affidavit to be stricken. Mr. Duchardt's conduct, which took place with the endorsement – if not the encouragement – of the respondent in this proceeding – should not be rewarded in any way. And if Mr. Duchardt were permitted to testify, then the striking of the offending affidavit would be no more than a meaningless gesture. Mr. Purkey should not face in the trial of this matter any testimony from his former lawyer, a lawyer who has demonstrated so little regard for the duties he owed and continues to owe his former client.

Third, the United States Attorney's Office for the Western District of Missouri should be disqualified from handling this matter, successor counsel should be appointed, and the USA's office should be barred from communicating with successor counsel. The lawyers representing the United States in this action have now learned confidential and privileged information of Mr. Purkey that they were no more entitled to receive than if they had rifled through the file cabinets of Mr. Purkey's lawyer or hacked into that lawyer's computer. Quite simply, without the informed consent of the affected client, adverse lawyers are not permitted to invade the privilege of the other side, even if the privileged information is provided to them on a silver platter. The only cure for this offense is for new lawyers to be appointed to represent the United States in this matter,

- 9 -

lawyers who are never told about or have access to either Mr. Duchardt or his offending affidavit.

## Conclusion

One must view with total dismay the conduct of Mr. Duchardt. If so many lapses from the standard of care had occurred in a garden variety, right angle collision case, one would be shocked at the attacks Mr. Duchardt makes on his former client's matter. But here, of course, the case is a capital one, and the consequences of these violations are so much more grave.

Lawrence J. Fox

Philadelphia, PA
September 15, 2008

- 10 -

INSTRUCTION NO. __34__

The mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are:

1. Mr. Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

2. Mr. Purkey committed the offense under severe mental or emotional disturbance.

3. With the use of proper medications, such as the medications which Mr. Purkey is currently taking, Mr. Purkey's mental illness and behaviors can be managed.

4. Mr. Purkey suffered brain injuries as a result of car accidents, drug abuse, or both.

5. Mr. Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents, Jack and Velma Purkey.

6. Mr. Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother, Velma Purkey.

7. Mr. Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents Jack and Velma Purkey.

8. Mr. Purkey has never received treatment for the

002305

psychological and emotional damage which he suffered as a result of his parents' abuse of him.

9. Mr. Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage which he suffered earlier in his life.

10. Mr. Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary.

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14. While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16. Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

17. Mr. Purkey should be sentenced to life imprisonment without release because Mr. Purkey was led to believe that he

002306

would receive that sentence if he provided information regarding the killing of Jennifer Long, and Mr. Purkey provided all of the information which was required.

18. The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

19. By coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did.

20. Mr. Purkey has repeatedly expressed his remorse for what he has done.

21. Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22. Angie Purkey Genail loves her father Mr. Purkey very much.

23. If Mr. Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship.

24. Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

002307

25. If Mr. Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren Mikey and Haley would continue to carry on a loving, nuturing grandfather/grandchild relationship.

26. Mr. Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release.

27. In the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

You are permitted to consider anything else about the commission of the crime or about defendant Wesley Purkey's background or character that would mitigate against imposition of the death penalty. If there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by a preponderance of the evidence, you are free to consider them in your deliberations.

In Part V on Pages 9-16 of the Special Verdict Form, you are to identify any mitigating factors that any one of you finds has been proved by a preponderance of the evidence.

002308

INSTRUCTION NO. 38

I have prepared a form entitled "Special Verdict Form" to assist you during your deliberations. You are required to record your decisions on this form.

Section I of the Special Verdict Form contains space to record your findings on defendant's age; Section II contains space to record your findings on the requisite mental state; Section III contains a space to record your findings on statutory aggravating factors; and Section IV contains space to record your findings on nonstatutory aggravating factors. Section V of the Special Verdict Form contains space to record your findings on mitigating factors.

You are each required to sign the Special Verdict Form.

**002309**

(Alternate jurors excused.)

THE COURT:  And we do have the instructions as I promised for each one of you to take back to the jury room.  And, Rhonda, you might want to help distribute the instructions to the jurors as they leave and go back in the jury room and begin their deliberations.

I'm not unmindful it's close to lunchtime and probably what I'll do is go ahead and give you a chance to get yourself organized and within the hour we'll make arrangements for lunch for you, as we did before.

I'll let you go to work.  Thank you.

By the way, all the exhibits that have been received in this phase of the trial that have been received without any limitations will be provided to you once we have accumulated them.  Okay.

(AT 11:30 AM, THE JURY RETIRES TO COMMENCE THEIR DELIBERATIONS.)

THE COURT:  Okay.  If you want to get the exhibits together so they'll be ready to go back.

* * * * * * *

(AT 1:15 P.M. THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:)

THE COURT:  Do you want to make your offer of proof?

MR. WHITWORTH:  The United States calls Dirk

002310

(AT 4:15 P.M., THE JURY RETURNED INTO OPEN COURT AND THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:)

THE COURT: Okay, ladies and gentlemen of the jury, upon my inquiry I learned that you want to recess for the day and return tomorrow to continue your deliberations. Is that a fair statement?

THE JURY: Yes.

THE COURT: Then I will instruct you at this time, remind you that you're not to discuss the case with others, particularly now that you're engaged in deliberations, and when you gather again tomorrow you'll be able to discuss it among yourselves. You're not to allow yourself to be exposed to any media coverage that may pertain to this matter for the reasons that I've stated for the last three plus weeks. I won't go into any more detail.

I'll ask that you report back tomorrow at 8:30, and once everybody is assembled in the jury room Rhonda will -- are you going to leave the instructions in there, lock it up, or are you going to take them?

THE COURTROOM DEPUTY: I will put them all in one area.

THE COURT: Once everybody is there, then they'll be distributed among each of you and you can commence the continuation of your deliberation.

2310

Anyone have any questions?  All right.  Have a good evening.  Thank you.

(Adjourned to Wednesday, November 19, 2003.)

WEDNESDAY, NOVEMBER 19, 2003

(At 2:44 P.M. THE FOLLOWING RECORD WAS MADE IN OPEN COURT:)

THE COURT:  Okay.  As everyones knows we have a verdict in this case and before I bring the jury in, I want to state to those who are present, particularly the family and interested parties, that I know this is an emotional time for you, but I need to ask that you be able to control your emotions, I don't want any outbursts from anybody in the gallery, and if you don't think you can, I'm going to ask that you leave so that does not occur.

And I'm going to ask the CSOs to assist me in this directive if we have that kind of problem.

All right, Rhonda.

(AT 2:45, THE JURY RETURNED INTO OPEN COURT WITH THEIR VERDICT AS FOLLOWS:)

THE COURT:  Ladies and gentlemen of the jury, I have been advised that you have reached your verdict in this case; is that correct?

**002312**

personal sentence or verdict in this case, and I'll start with Juror 49.

(Whereupon, upon being asked, each juror responded affirmatively.)

THE COURT:  I will welcome the opportunity if counsel wants to look or review the special verdict form at this time before I continue.

MR. DUCHARDT:  Yes, Your Honor.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MR. DUCHARDT:  May I make a record, Your Honor?

THE COURT:  You may.

MR. DUCHARDT:  I am concerned because there is no indication on any of the mitigating factors one way or another whether there was any finding made on those.  It doesn't indicate a number or anything.  They are all blank.  I guess one assumption could be made that none of the jurors found any of the mitigating factors.  But there's no indication that they made any findings one way or another.  So I'm going to object to the court accepting the verdict in the fashion that it is because it's unclear from the form of verdict if the jury made any finding whatsoever regarding mitigating factors.

MR. WHITWORTH:  I don't believe they have to -- they don't have to record their vote on there.  If I

## DECLARATION OF BRADLEY YOUNG

I, Bradley Young, declare and state the following:

1. My name is Bradley Young. I am a resident of Andrew County, Missouri. I am 52 years old. I served as a juror in the criminal trial of *United States v. Wesley Purkey*, Western District of Missouri Case No. 01-CR-00308-FJG.

2. I am making this declaration to ensure the accuracy of my conversation with the defense team of Purkey.

3. I had no opinions about this case going into the trial. I hadn't heard anything about the case before the trial started. I was surprised I was picked to be a juror. I didn't know anything about Purkey at the time. I remember during jury selection answering a lot of questions on paper. I was asked some questions in person, but not many. I answered everything truthfully and to the best of my ability.

4. There was no question about Purkey's guilt for me during deliberations. We discussed it some during the deliberations because we had to answer some questions, but most agreed that he was guilty. Purkey admitted he killed her.

5. I became certain that Purkey deserved to die once I heard about how he cut up Jennifer's body into pieces and burned it. Seeing the blood and chainsaw marks in the toolbox made me wonder what sort of person would do something like that. After seeing those pictures there was nothing that was presented to me that changed my mind. Purkey was detrimental to society and so he had to die to protect other people.

1                    (Initial)

**002314**

6. The decision about the death penalty would have been more difficult if he hadn't confessed to the killing or if the police's investigation had to piece things together. Since that wasn't the situation, nothing could change my mind about the death penalty. I cannot think of any mitigators that might have changed my mind, except ~~By~~ maybe if Purkey was mentally retarded, *and unable to function in society and tell right from wrong* ~~but even that wouldn't have mattered.~~ The defense at trial brought up that Purkey had problems in his brain, but there are so many people that are much more disabled than him who aren't a drain on society. It made me think that they were just trying to excuse his behavior with those arguments.

7. The penalty decision lasted longer than I thought it would. ~~There was a lot more conversation about the punishment than there was during the guilt decision.~~ When we voted we did anonymously with slips of paper. There were a couple of people adamantly against the death penalty, but for me, there was no question that Purkey should be sentenced to death. At first I didn't know who said no to the death penalty, but as we talked about it, it became clear that one of the females and the black guy were against it. They came around eventually even though I don't think we talked them into it.

8. During the penalty decision we talked about the aggravators and the mitigators. We read them aloud from the verdict form. I don't remember if I had my own copy or if we passed one copy around the table, but I'm pretty sure the foreman had one copy. I don't know why the mitigating factors section was not filled out. We talked about it,

2                                              _BU_ (Initial)

but I don't recall if we did or did not vote on the each mitigation factor. I remember using slips of paper to vote for or against the death penalty.

9. Even though I voted for death and that's what we ultimately decided, I didn't like making that final decision. As we were walking out to deliver the verdict what we were about to do hit us all. Some of us were crying. That was the longest drive home I have ever experienced.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 29 day of ~~July~~ September, 2016.

Bradley Young

3

(Initial)

002316

## DECLARATION OF ROBERT L. BARNES

I, Robert L. Barnes, declare and state the following:

1. I served as a juror in the criminal trial of *United States v. Wesley Purkey*, Western District of Missouri Case No. 01-CR-00308-FJG.

2. I was released after I was questioned in the jury selection process. I received notification in the mail that I was to serve on the jury in this case. When I reported to the courthouse the first day, we jurors were told at the start who was an alternate, and who was not.

3. During the trial, I felt RLB the defense lawyer was overwhelmed and did not present a persuasive defense. The lead defense lawyer did not impress me. He tried to act like a "good 'ol boy," but I did not buy it. There was a second defense lawyer. It was clear that the male lawyer was calling the shots. The defense argument, which I did not find persuasive, was that the young girl voluntarily went with the defendant. However, the defendant took her across state lines and kept her for a couple RLB of days. That made it a kidnapping. ~~It did not matter to me that she went with him freely or not.~~ RLB

4. The DA was more dominant. It seemed like he just overwhelmed the defense. The prosecutors were confident to the point of being brash

RLB (Initial)

002317

There were three, maybe four, people sitting at the DA's table during trial, including the DA and the Assistant DA. I believe they all worked for the DA.

5. A guard walked us out every day after court. We had our own parking area down the block. It wasn't in the regular garage outside the courthouse. It was a block or two away. I believe the judge was worried about us, and that was why we were escorted to and from the parking lot. I got the feeling from the judge that he was worried about the Aryan Brotherhood or the defendant's friends trying to hurt us. I just got that impression. Although I never felt threatened, it was on my mind.

6. When we started deliberating after the penalty phase, the foreman led the discussion. Each juror wrote "yea" or "nay" for death on a piece of paper. I voted for death up front. I knew as soon as I walked into the jury room. At first there were one or two votes for life. We talked about it and it was not long for everyone to vote death. One lady did not believe in the death penalty, but she voted for it in the end. I believed the verdict had to be unanimous. I do not remember the judge talking about what would happen if the verdict were not unanimous.

(Initial)

2

002318

7. During deliberations we discussed some of the mitigating factors. I'm not certain we went through all of them. The foreman kept the verdict form. The judge instructed us to complete the form, but I do not remember us voting on each mitigating factor one-by-one. I do remember discussing most of them on the form.

I declare ~~under penalty of perjury~~ that the foregoing is true and correct to the best of my knowledge. and recogkation.

Signed on this /9 day of January, 2016.

Robert L. Barnes

(Initial)

3

**002319**

## DECLARATION OF JENNIFER HERNANDEZ

I, Jennifer Hernandez, declare and state the following:

1. My name is Jennifer Hernandez. I am a resident of Buchanan County, Missouri. I am 38 years old. I am a first year law school student at the University of Missouri-Kansas City School of Law.

2. In November 2015 I volunteered to participate in juror interviews related to the criminal trial of *United States v. Wesley Purkey*, 01-CR-00308-FJG, a case out of the Western District of Missouri. I volunteered because I wanted the added experience of conducting interviews with jurors and am interested generally in the experiences of jurors who have deliberated in criminal cases.

3. One of the interviews I participated in was with former juror Jennifer ███ on November 21, 2015. At the time of trial, her name was Jennifer ███. As noted on her juror questionnaire, she was juror no. 13. She has since remarried and changed her last name. I accompanied Mr. John Fox, the defense team mitigation specialist who was in charge of conducting the interview. My role was to provide support to Mr. Fox.

4. We met with Ms. ███ at her home in ███y, Missouri. After receiving us at the front door, Ms. ███ invited Mr. Fox and me to sit with her at her dining room table. Ms. ███ has light brown hair and she wore glasses. She was dressed casually in a t-shirt and jeans. During the conversation several young boys, including Ms. ███ own, were running around the house. Ms. ███ explained to us that it was the start of her son's birthday party. Ms. ███ was very pleasant and conversational.



1
(Initial)

002320

conversational. She appeared to put real effort into recalling her memories of jury selection, trial and deliberations.

5. Towards the beginning of our interview Ms. ███████ explained her experiences with the jury selection process. She had been summoned to appear for jury selection in Mr. Purkey's case after having recently returned to work from maternity leave. She received notification in the mail to report to the courthouse downtown. The first day she answered questions in a big packet of papers, which felt like an exam. She had to return another day at which time she was questioned by the court and lawyers. Ms. ███████ recalled that she was only asked a couple of questions; how fair could she be as a juror and whether having a new baby would affect her ability to participate in the trial. Ms. ███████ recalled that she told the court and attorneys that she could be fair and that having a young child wouldn't be an issue.

6. Ms. ███████ was surprised to have been picked as a juror in this case. She believed that the defense would have tried to select jurors who could not understand things as well. She was well educated and had a good job and thought that meant she would be struck. Ms. ███████ stated that if the defense was going to try and pull a fast one on the jury they wouldn't have picked her. She did not make any similar statements about the Government's selection strategy.

7. Upon being provided a copy of her juror questionnaire by Mr. Fox, Ms. ███████ reviewed it. She confirmed that at the age of 16 she was the victim of an attempted rape as she had noted in the document. She and her family were living in southern Kansas City at the time. She remembered that someone showed up at her house with a

2

_____ (Initial)

002321

subpoena that required her to go to court. The person gave it to her mother because Ms. ███ was young at the time. Ms. ███ was not certain what happened after that, but she did not have to go to court to testify. That was what her mother had wanted. She didn't want Ms. ███ to have to go through a trial in which she would have to discuss what she experienced. Ms. ███ did not share the name of the defendant or describe her experiences. Ms. ███ recalled that she was not asked about her experiences as a victim of an attempted rape during jury selection for Mr. Purkey's trial.

8. Ms. ███ stated that Mr. Purkey creeped her out. She described watching him in court and noticing that he just stared constantly at all the jurors. There was no pattern, he just looked around at all of them. The defendant's constant looking at the jurors made Ms. ███ deeply uncomfortable. She was concerned that Mr. Purkey could learn her name or figure out where she lived. She was afraid of that happening.

9. Ms. ███ expressed confusion about the purpose of her presence on the jury during the guilt phase. She explained that since the defendant had admitted to killing the victim there was nothing else to determine. He confessed to the killing and according to Ms. ███ it seemed like the lawyers were over-complicating the issue of his guilt for the murder.

10. It was Ms. ███ understanding from the judge that if she and the other jurors thought the defendant was guilty of one action, he was guilty of them all. Ms. ███ used the phrase that with respect to Mr. Purkey's guilt, it was all or nothing. To Ms. ███ it was impossible to prove everything on the list, especially the kidnapping.

3

_JMH_ (Initial)

The defendant was clearly guilty of the murder, but Ms. ████ felt she had to say the defendant was guilty of the rape and kidnapping as well because he was guilty of the murder. Ms. ████ stated that she did not believe the rape and kidnapping had been proved beyond a reasonable doubt. She commented that those charges couldn't have been proved beyond a reasonable doubt because there was no other evidence than the defendant's confession and he did not confess to the rape or kidnapping.

11. Ms. ████ recalled that the deliberation of guilt was quick. The jurors discussed it, but it did not take long. Ms. ████ repeated throughout the interview that she believed the defendant was guilty of all the charges because he was guilty of the murder.

12. Ms. ████ recalled that the sentencing deliberation was more difficult for some jurors than others, but that she herself didn't have a hard time coming to a decision. She had been pretty certain she was going to vote for the death penalty once the jury decided the defendant was guilty. She was a hundred percent convinced about sentencing the defendant to death once the murder of the 80-year-old woman was introduced. At that point nothing else mattered to her.

13. At sentencing, Ms. ████ understood the judge's instructions to be that the jury's decision had to be unanimous, either for life or for death. The jurors discussed the aggravating factors and the mitigating factors. It was a big deal to Ms. ████ that the defendant killed the older woman.

14. Ms. ████ recalled that during the penalty deliberations she and the other jurors discussed the brain scans introduced by the defense, Mr. Purkey's apparent lack of

4                                                      ᴨᴀᴀ (Initial)

002323

emotion, which was never explained to them, and his injuries from a car accident. Ms. ████didn't see how the injuries were related to preventing Mr. Purkey from knowing what he was doing.

15. Ms. ████ remembered voting for the death penalty during deliberations. When the jury voted for a death sentence, each juror used a piece of paper instead of voting out loud. Ms. ████ recalled that at first the vote was not unanimous. They talked about Mr. Purkey some more. One of the male jurors was more vocal about sentencing Mr. Purkey to death than everyone else. When the jury voted a second time, the vote was unanimous for the death penalty. Ms. ████ did not recall if votes were taken for each of the mitigating factors.

16. In total Mr. Fox and I spent approximately 90 minutes speaking with Ms. ████. She provided us with her phone number and informed us that she would be moving to a new home soon. On March 5, 2016 Mr. Fox and I attempted to follow-up with Ms. ████ at her new home, also located in ████ Missouri. Ms. ████ answered the front door, but declined to speak to us. Shortly thereafter Ms. ████ communicated to Mr. Fox that she wished to no longer communicate directly with Mr. Purkey's defense team.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this _28_ day of April, 2016.

_____
Jennifer Hernandez

5

**002324**

_____ (Initial)

## DECLARATION OF STEVEN P. BARQUIST

I, Steven P. Barquist, declare and state the following:

1. My name is Steven P. Barquist. I am a resident of Clay County, Missouri. I am 62 years old. I served as a juror in the criminal trial of *United States v. Wesley Purkey*, Western District of Missouri Case No. 01-CR-00308-FJG.

2. At the beginning of the trial, the defense didn't seem to have any cohesion. It wasn't very focused. During the penalty phase, doctors and Mr. Purkey's brother testified for the defense. They didn't sway me because the testimony was about his childhood, and that's not an excuse. The doctors were not persuasive at all. I don't know if what they said was valid or not. I believed what they showed, but I did not believe it meant what they said it meant.

3. During deliberations for guilt, everyone was leaning towards a guilty verdict. The discussion was not organized; people just talked about what they wanted to. Some people talked more than others. The foreman liked to talk the most. He was a let's get it done and get out of here guy. He seemed like a boss or supervisor. The deliberation went pretty fast, ~~faster than I wanted it to.~~ SB

4. During the sentencing deliberation, we went through some of the questions quick, and others we got stuck on. While we discussed the mitigating factors, if everyone agreed that something was or was not mitigating then we moved on. If we did not agree unanimously, then we discussed it until it was unanimous. We got stuck on a few factors

_____ (initial)

1

**002325**

for a long time. When that happened, the foreman moved us along in the discussion. We sometimes circled back.

5. After we discussed all the mitigators, we voted on the sentence. It was clear to me that before finishing the discussion a few people wanted death for the defendant. I did not know until after we finished reading the verdict form. We voted with slips of paper so it was anonymous. At first, not everyone voted for capital punishment. We talked more and towards the end there was only one person in the room that wasn't for death. I don't know why they switched their vote

6. As the discussion went on, I told the other jurors that the twelve of us were the only people in the world that could sentence the defendant to death. Lots of people heard the evidence and sat in the courtroom, and hundreds of people could work to get him off later, but only the twelve of them could impose the death penalty. Imposing death was fair.

7. The trial felt like it took so long. There were a couple of days that seemed to go on forever. The first week was tough. It was an eye-opening, reality-pushing experience. I was trying to understand what was being presented and there were some horrible things presented. The victim was the same age as my daughter was at the time of trial. My daughter was 16 years old. I don't know if it affected me, but it could have. I often thought about my daughter during trial while I listened to evidence. I imagined what it would be like if my daughter was the victim. I thought about my daughter a lot.

(initial)

2

**002326**

8. I went back to court for the formal sentencing hearing. Since I had been involved for so long, I wanted to see it. I saw the girl's parents. They thanked me for my service and decision. I didn't feel comfortable talking to them so I just nodded and walked away. The foreman was also there, and maybe one other juror.

_____ (initial)

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this ___7___ day of ~~March~~ April, 2016.

_____
Steven P. Barquist

3

**002327**

INSTRUCTION NO. 31

If you unanimously find beyond a reasonable doubt that the defendant intentionally committed acts resulting in the death of Jennifer Long in the manner described in Instruction 30, you must then proceed to determine whether the government has proved beyond a reasonable doubt the existence of any of the following alleged statutory aggravating factors. If you unanimously make that finding in the affirmative as to the kidnapping resulting in the death of Jennifer Long, you should so indicate in Section III on the appropriate page of the Special Verdict Form and continue your deliberations. If you do not unanimously make that finding in the affirmative as to the kidnapping resulting in the death of Jennifer Long, you should so indicate on the appropriate page of the Special Verdict Form, and follow the directions on page 6. No further deliberations will be necessary.

The statutory aggravating factors alleged by the government are:

1. The death occurred during the commission of a kidnapping. The government must prove beyond a reasonable doubt that:

One, on or about January 22, 1998, the defendant unlawfully seized, confined, kidnapped, abducted, carried away or held Jennifer Long;

002328

Two, the defendant did so for the purpose of the forcible rape of Jennifer Long;

Three, the defendant willfully, knowingly, and unlawfully transported Jennifer Long across the state line from Missouri to Kansas; and

Four, Jennifer Long died as a result of defendant's actions.

2. Defendant committed the offense in an especially heinous or depraved manner in that it involved serious physical abuse to the victim, Jennifer Long, by kidnapping her, forcibly raping her, stabbing her to death with a knife, dismembering her body with a chainsaw, and burning her body parts. To establish that the defendant killed the victim in an especially heinous, or depraved manner, the government must prove that the killing involved serious physical abuse to the victim. You must not find this factor to exist unless you unanimously agree that serious physical abuse has been proved beyond a reasonable doubt. In other words, all twelve of you must agree that it involved serious physical abuse to the victim and was thus heinous or depraved.

"Heinous" means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of serious physical abuse of the victim as to set it apart from other killings.

002329

"Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by serious physical abuse of the victim.

"Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body. Serious physical abuse - unlike torture - may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse in addition to the killing.

Pertinent factors in determining whether a killing was especially heinous or depraved include: an infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; the needless mutilation of the victim's body; the senselessness of the killing; and the helplessness of the victim.

The word "especially" means highly or unusually great, distinctive, peculiar, particular, or significant, when compared to other killings.

3. Jennifer Long was particularly vulnerable due to her youthful age of 16 years.

To establish the existence of this factor, the government must prove that the victim was particularly vulnerable due to her

youth.  The words "particularly" and "vulnerable" should be given their plain, ordinary, everyday meaning.

"Particularly" means especially, significantly, unusually, or high in degree.  "Vulnerable" means subject to being attacked or injured by reason of some weakness.  Thus, to be "particularly vulnerable" means to be especially or significantly vulnerable, or vulnerable to an unusual or high degree.

"Youth" means that the victim was a child, a juvenile, a young person, or a minor, that is: any person who was, by reason of youthful immaturity or inexperience, significantly less able: (1) to avoid, resist, or withstand any attacks, persuasions, or temptations, or (2) to recognize, judge, or discern any dangers, risks, or threats.

4.  The defendant has been previously convicted of Aggravated Robbery and Aggravated Battery on April 23, 1981, Case No. 80CR1701, offenses punishable by a term of imprisonment of more than one year, involving the use, attempted use, or threatened use of a firearm against another person.  The term "firearm" means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive.

5.  The defendant has been previously convicted of Murder in the First Degree in the State of Kansas on April 28, 2000, a

INSTRUCTION NO. 32

If you have found the existence of one or more statutory aggravating factors unanimously and beyond a reasonable doubt, you must then consider whether the government has proved the existence of any nonstatutory aggravating factors. As in the case for statutory aggravating factors, you must unanimously agree that the government has proved beyond a reasonable doubt the existence of any of the alleged nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for the defendant in this case.

In addition to any statutory aggravating factors you have found, you are permitted to consider and discuss only the nonstatutory aggravating factors specifically claimed by the government and listed below. You must not consider any other facts in aggravation which you think of on your own.

The nonstatutory aggravating factors alleged by the government are:

1. Future dangerousness of defendant. The defendant poses a future danger based upon the probability that he would commit criminal acts of violence that would constitute a continuing threat to society, as evidenced for example, by one or more of the following:

   a.   Wesley Ira Purkey killed Mary Ruth Bales, an 80-year-old woman, by striking her repeatedly with a hammer;

002332

b.   Wesley Ira Purkey has exhibited an allegiance to and belief in the principles of the Aryan Brotherhood, a violent White Supremist organization;

c.   Wesley Ira Purkey has displayed a complete lack of remorse for the killing of Jennifer Long;

d.   Wesley Ira Purkey has shown poor institutional adjustment while incarcerated in that he has committed numerous disciplinary violations including assaults and acts of violence;

e.   Wesley Ira Purkey has committed a sexual assault while incarcerated; and

f.   Wesley Ira Purkey has previously been convicted of Aggravated Escape From Custody in Case No. 78CR0733, in the District Court of Shawnee County, Kansas.

2.   Victim impact evidence.  The offense caused injury, loss and harm because of victim Jennifer Long's personal characteristics as an individual human being and the impact of the death upon victim Jennifer Long's family.

3.   The defendant killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she was dead.

4.   Substantial criminal history.  Wesley Ira Purkey has a significant criminal history including felony convictions for murder, kidnapping, aggravated robbery, and aggravated battery, and this history is made even more egregious by the underlying facts upon which these convictions are based.  Specifically, the defendant shot Gregg W. Carlberg on or About August 3, 1980.

At this point you must record your findings regarding whether you unanimously find that the government has proven beyond a reasonable doubt the existence of any of these

002333

INSTRUCTION NO. 35

If you find unanimously and beyond a reasonable doubt that defendant was eighteen years of age or older when he committed the offenses; that he acted with the requisite intent; and that the government proved the existence of at least one statutory aggravating factor; and after you then determine whether the government proved the existence of the nonstatutory aggravating factors submitted to you, and whether the defendant proved the existence of any mitigating factors, you will then engage in a weighing process.  In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist - whether statutory or nonstatutory - and each of you must weigh any mitigating factors that you individually found to exist, and may weigh any mitigating factors that another of your fellow jurors found to exist.  In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy.  Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

Again, whether or not the circumstances in this case justify a sentence of death is a decision that the law leaves entirely to you.

The process of weighing aggravating and mitigating factors against each other in order to determine the proper punishment is not a mechanical process.  In other words, you should not simply

count the number of aggravating and mitigating factors and reach a decision based on which number is greater; you should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death. If one or more of you so find, you must return a sentence of life in prison without possibility of release. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death. You are to decide what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors which any of you found to exist to justify a sentence of death, and that therefore death is the appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed in Section VI on page 17 of the Special Verdict Form.

If you determine that death is not justified, you must complete Section VI of the Special Verdict Form, and you must then record your determination that defendant be sentenced to

life imprisonment without possibility of release in Section VI on

pages 17-18 of the Special Verdict Form.

**002336**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


UNITED STATES OF AMERICA,           )  Appeal No. 04-1337WM
                                    )
              Plaintiff,            )
                                    )  Case No.
         vs.                        )  01-00308-01-CR-W-FJG
                                    )
WESLEY IRA PURKEY,                  )
                                    )  JANUARY 23, 2004
              Defendant.            )


TRANSCRIPT OF SENTENCING HEARING


         On Friday, January 23, 2004, the above-entitled

cause came on before the Honorable Fernando J. Gaitan, Jr.,

U.S. District Judge, sitting in Kansas City, Missouri.



For the Plaintiff:        MR. TODD P. GRAVES
                          United States Attorney
                          MR. MATT J. WHITWORTH
                          Assistant United States Attorney
                          Charles Evans Whittaker Courthouse
                          400 East Ninth Street, Floor 5
                          Kansas City, Missouri 64106

For the Defendant:        MR. FREDERICK A. DUCHARDT
                          P.O. Box 349
                          110 East 6th Street
                          Kearney, Missouri 64060
                                and
                          MS. LAURA E. O'SULLIVAN
                          Hughes & O'Sullivan
                          324 East 11th Street
                          Kansas City, Missouri 64105


**002337**

2

FRIDAY, JANUARY 23, 2004

THE COURT:  Good morning.  Okay.  We're here for sentencing, the formal sentencing of Mr. Purkey today.  I note, Mr. Duchardt, you filed numerous motions on behalf of your client, post-trial motions, for which the court has ruled, and I don't see any further need to discuss those issues at this point, unless you have a reason that you would like to do so, and I'm happy to hear it.

MR. DUCHARDT:  Judge, no reason to do so.  What I tried to do in the pleadings is give the court all the arguments.  The court has given us the opportunity to respond to the government's reply as to those.  And all of that I endeavored to do in advance of this proceeding so that the court would have plenty of time to think about it.  And they are all re-raising issues that we already plowed the ground on.  I just wanted to give one last thought to the court, or actually several last thoughts to the court, in those regards.  And we appreciated the opportunity to do that, Your Honor.

We do vigorously still ask the court to rule in our favor and grant us a new trial on those issues.

I think that there are possibly some other issues regarding effectiveness of counsel, or more particularly I

002338

guess ineffectiveness of counsel, that Mr. Purkey is going to want to address himself to the court whenever that would

3

be convenient in these proceedings, Your Honor.  If now would be the time --

THE COURT:  Now would be sufficient.

MR. DUCHARDT:  Very good.  Can he address you seated, Your Honor, and let me get the microphone over here.

THE COURT:  Mr. Purkey, you can do it seated or you can come up to the podium.  Which way do you prefer to do it?

THE DEFENDANT:  Probably from here.

THE COURT:  Stand and raise your right hand and be sworn, if you would.  Stand, if you would.

(The defendant was duly sworn.)

THE DEFENDANT:  Let me find the paper real quick.  I have everything mixed up here.

The first issue is counsel's failure to object to the prosecutor knowingly eliciting false testimony of the government witnesses, which were Agent Tarpley and Detective Howard, pertaining to the kidnapping issue, whereas they testified that the day of trial was the first time they had ever heard of the defendant, of me, recanting

**002339**

the kidnapping issue.

My attorney, Mr. Duchardt, was well aware that that issue had been recanted months prior to this, and that the government had been served notice of that through a

4

letter of their own witness, Michael Speakman, as well as their psychiatric report from Dr. Dietz, I believe that's the proper pronouncing of his name, as well as from defense psychiatrist, Dr. Peterson.

Detective Howard and Agent Tarpley both were aware of the recanting of the kidnapping months prior to trial, and yet that perjured testimony was knowingly elicited by the government to influence the jury to believe that I stepped into court that day and decided at that particular moment to recant that charge.

My counsel failed to object to that, and of course, due to that failure to object, I did not preserve that issue per se under the applicable standard for appellate review.

My second issue is counsel's failure to bring the false testimony to the jury's attention through cross-examination in closing arguments.  He also had a chance at that particular time to bring to the attention of the jury that the government had knowingly elicited this

**002340**

false testimony in hopes to prejudice them against me in that I hadn't stepped in to trial on that particular day and made the recanting of the kidnapping.  This recanting had taken place -- well, it had taken place from the initial meeting of counsel and myself, as well as the government was aware through, again, Michael Speakman's

5

letter to them, which Detective Howard and Agent Tarpley had access to also, and through their own psychiatrist, and our psychiatrist also.

Issue No. 3 is the refusal to call certain witnesses at the penalty phase of the trial after counsel, defendant counsel and the government, had struck up a deal with each other that they would not call CCA employees to testify during the trial.  I was not made aware of this issue until after trial.  I was told that two employees of CCA would be called as rebuttal witnesses to Michael Speakman's testimony.  Those witnesses were never called due to that deal that was struck up between the government and my counsel.

Issue No. 4 is the refusal to subpoena certain documents to use during the penalty phase of the trial that would have supported that I was not a future risk, that my institutional record was excellent, that the government's

002341

allegations that I had had a recent UA of cocaine and marijuana had been dismissed in the district court, and that a lawsuit had been filed on the reprisal of that particular UA, that counsel failed to bring up.

Further, that that documentation had been lost. And further, that the documents had never been subpoenaed, although they were promised to be subpoenaed, and at trial counsel said, well, I just didn't feel that they was

6

needing them.

No. 5 is the refusal to call other witnesses during the penalty phase after telling defendant that they had been subpoenaed. One was a Sergeant Johnson from Hutchinson Correctional Facility, who was my boss for several months, and who would have testified he had absolutely no problems with me during the six- to nine-month period where I worked for him on a daily basis and he was in close contact with me at all times. I was told that he was being called as a witness. Up until the day that he was to testify, I was led to believe that he would testify, and of course he was never called.

Issue No. 6, the failure to properly prepare for questioning of prosecutional witness Jeanette Purkey, whereas counsel was mixed up and confused in the facts

002342

during the questioning of Ms. Purkey, that there was no preparation of a list of questions to ask Ms. Purkey, that he cut her off during certain segments of her testimony that would have led to other facts that would support the theory of defense, which this court had shot down, which involved involuntary intoxication prior to Jennifer's murder.

There's just a couple more here.

No. 7 is the refusal to have the hair analysis performed of evidence in defense counsel's possession, that

7

we have had in our possession for 28 months now, 27 months maybe, and that we've been -- so far I have been told we have been shopping around to find the proper testing analysis facility for testing that hair to substantiate our case that the supposed poisoning took place at the particular time of this crime.  That still has not been performed, and I was led to believe that it would be well prior to trial.

No. 8, defense counsel has spoken with me twice since trial, close to a half hour to 45 minutes during each phone conversation, from his office to the U.S.P., that we have not had any in-depth discussions of the appellate issues or the motions pending before this court, whereas I

002343

do not even have possession of the majority of the motions. I believe that I have a right to assist in my direct appeal and that these rights are being violated by my inopportunity to discuss them with counsel beyond any short and brief periods. The last three months, totally probably an hour and a half.

No. 9 is failure to produce documents to -- I can't even read my own handwriting here. Failure to produce documents to relate government's claim of defense drug use while incarcerated, which goes back to I believe issue No. 5. He said that I was -- received a disciplinary action for use of cocaine and marijuana, which I had that

8

case dismissed and that was dismissed in the district court, and counsel failed to support that through documentation that had either been lost or even objected to during that particular time by counsel, that that influenced the jury's mind during death penalty, well, he was using drugs then, he probably would be using drugs in the near future.

Issue No. 10, the refusal to recall rebuttal witnesses of the government witness Mike Speakman, after telling defendant that they would be subpoenaed. I was not told until after trial that these particular witnesses were

002344

not subpoenaed for two particular reasons.  The first I have mentioned, that a deal was struck between the government and defense counsel that CCA would not be brought into this trial, which I did not know throughout the trial.  And also that you had ruled that Mike Speakman's character could not be gone into through a rebuttal witness, and that the rebuttal witness would not have went into Mike Speakman's character.  The rebuttal witness would have went into my character, as he had worked in a permanent position in the segregation unit at CCA for over a 14-month period with me, that he had never heard me threaten or brag about any killing or murder or make threats toward any other inmates or guards, contrary to what Mike Speakman had testified to.  Those witnesses were

9

never called after guarantees that they would be.

No. 11, failure to impeach the government witness Howard who claimed he only started to tape confessions after this case took place.  Counsel was well aware that Detective Howard had tape recorded my confession in the Bales case as well as all witnesses involved in the Bales case, and that counsel failed to make proper objection that Howard -- to use these transcripts to impeach Howard in that testimony because it was not after this particular

**002345**

case took place that he started to tape record confessions, because he tape recorded my confession five years prior to it.  And counsel's failure to object to that and of course did not preserve that for appellate review and/or if they do choose to review it, then it will be reviewed under a higher standard.

No. 12 and last, failure of the court for an instruction to the jury on the withholding of the FBI notes of the defendant's confession.  I believe case law supports that when the government withholds documentation such as the FBI notes, that the government was well aware of the existence of those notes, that we had filed discovery months ago to obtain all documents in the possession of the government and that included the FBI notes which a blind man wearing sunglasses could see, and that this court should have gave an instruction to the jury pertaining to

10

that particular issue, and counsel failed to make that suggestion to the jury, or to the court, and to object to the not doing of so during trial.

That's all I have to say on those particular issues.  I do have one more matter I'd like to address.  I don't know if this is the particular time to do that or not.  If the court has some other --

002346

THE COURT:  What does it pertain to, Mr. Purkey?

THE DEFENDANT:  It pertains to Ms. Long and Mr. Long's family.

THE COURT:  I'll give you an opportunity later to speak to that.

THE DEFENDANT:  Okay.

THE COURT:  Mr. Duchardt, I don't think there's a need for you to respond to this, nor for the government, because I think many, if not most, of the issues that he has raised with regard to your ineffectiveness, alleged ineffectiveness, as counsel were raised by you either during the trial in your vigorous defense of the defendant or in the post-trial motions which you filed before this court, and many of your pursuits obviously were rejected by the court and for that I'm sure Mr. Purkey is not pleased, but it was the ruling of the court and is the ruling of the court.  So I'm going to deny -- Mr. Whitworth you wanted to say something?

11

MR. WHITWORTH:  Just two points.  One, Your Honor, there was no deal between Mr. Duchardt and myself not to call CCA witnesses.  I informed Mr. Duchardt that I did not intend to call CCA witnesses because I didn't think it was necessary and it would just make the trial longer.

**002347**

But there was never any deal between us not to call witnesses from CCA.

The second issue is that I'd like to say, Your Honor, regarding Mr. Duchardt's representation of Mr. Purkey, I thought it was of the highest order.  It was a difficult case to defend.  He just about wore me out with all the motions he filed.  I thought he was very thorough in his representation of the defendant and very vigorous in his defense.  So that's all I'll say to that.

THE COURT:  At any rate -- thank you, Mr. Whitworth.  The requests, which I will couch in the form of a motion by the defendant for a new trial based upon these reasons, which the court will deny, without prejudice to his right to raise those issues on appeal with the appellate court or later before this court on a 2255 motion.

MR. DUCHARDT:  We appreciate that, Your Honor.  I did think of one other thing, if I may, that I just wanted to clarify the record about.

After the jury left to begin its deliberations

12

during the penalty phase but before they returned their verdict, there was a record made before the court by the government by way of an offer of proof about the reasons

behind their having questioned one of our witnesses about threats that had been made to Mr. Whitworth. After that was over with, after the -- really even -- well, actually it was not after the jury deliberated because they deliberated so long we went ahead and had more opportunity after that, I was able to discuss with the marshals about what they had heard, being more close to Mr. Purkey. I'm not sure that a record has been made of that, but the statements that were made to me by the marshals as to what they had heard Mr. Purkey say was stop running your head, in other words, shut up, stop talking.

I know that the court had the opportunity, and I did, too, to listen to Donna's recording that she uses to help her make certain that the record is here, and while it's difficult to hear, it sounds like something similar to that, in other words, shut up, as opposed to I think the government's witnesses portrayed it as having I'm going to run you through or something like that.

I can make a different sort of offer at this time as in testimony, unless the government is willing to stipulate that my estimates are correct as to those. I want that matter before this court for the possible appeal

13

on that issue.

002349

I can call one of the marshals to testify, if that's necessary. And I would like to do so unless there can be an agreement that my characterization is correct as to what they indicated they heard.

THE COURT: Well, the best case scenario is you have a difference of opinion here and I think if you want -- I'll allow you to supplement the record, unless you have some objection, Mr. Whitworth --

MR. WHITWORTH: I was going to suggest by affidavit.

THE COURT: That's what I was going to say, by affidavit, to be a part of this record to take up to the appeal court.

MR. DUCHARDT: That would be fine, Judge, and if we can also possibly -- would it be appropriate for Donna to transcribe that portion of her tape, or to just get a portion of that and copy it so that it's available to -- I'm just trying to figure out what would be the better way. And I realize it's not exactly the record because I don't think she actually took that down, but it is information that I want to have available for the possible appeal so that the court will have everything that was available here.

THE COURT: If recollection serves me correctly,

14

we did discuss this, what was on her recording, as part of

the record when we were waiting while the jury was out.

MR. DUCHARDT:  And I wasn't sure exactly what --

because it's hard exactly to hear.

THE COURT:  And if you want to, you can make that

a part of your supplementation, you can get what Donna has

and make that a part of the supplementation in support of

your affidavit.

MR. DUCHARDT:  Super, Judge.  Thank you.

THE COURT:  Okay.  We are kind of off track here

a little bit, but I think we can get back on track.

MR. DUCHARDT:  Thank you for that additional time

to do those things.

THE COURT:  The record will reflect also that at

the completion of the trial when the jury returned its

verdict on November 19th, and the jury had of course two

options, either life in prison without the possibility of

parole, or death, and their decision was death.  The court

ordered a presentence investigation report be prepared and,

quite frankly, that was more a procedure that I guess the

Bureau of Prisons would like to have, and will not be

handled as normally handled by this court at sentencing.

And it's my understanding, Mr. Duchardt, that you

and your client are waiving the ten-day rule as it relates

**002351**

to receipt of the presentence report.

15

MR. DUCHARDT:  He's nodding, and that was my understanding as well.

THE COURT:  Mr. Purkey, is that correct?

THE DEFENDANT:  That is correct.

THE COURT:  So normally there would be some challenges to the findings of the report by one side or the other, but the record kind of speaks to the facts, and the jury's verdict really speaks to whose facts were believed.

MR. DUCHARDT:  And, Judge, also I would just mention that thanks to close work that I had with Mr. Sedler in terms of his preparation of the report, and our working back and forth, he has included in that report all of the concerns that I had raised to him.

So in terms of any objections that we had, they are accurately reflected in the report itself.  So all of that was taken care of in addition.

THE COURT:  Okay.  So before the court formally imposes the sentence of the jury, I always will ask if there are any people who want to be heard.  I don't know if the government has anybody who requested to speak to the court before sentencing.

MR. GRAVES:  No, we don't, Your Honor.

THE COURT:  And, Mr. Purkey, you said you wanted to speak to the court?

THE DEFENDANT:  Yes, sir.

16

THE COURT:  I'll give you that opportunity at this time.

THE DEFENDANT:  In spite of this court's nondiscretionary imposition of sentence, my coming forward five and a half years ago would not be changed.  I would hold that to Ms. Long and Mr. Long's family.  Not in any way, shape, or form do I take any credit for coming forward and giving them the bad news of their daughter's demise.  It is not conceivable that I could start to appreciate their pain and their suffering, their hurt, their loss.  What Ms. Long wrote in her brief typed to me while I was still in Hutchinson I have laid out on my table.  I read that just about every night.  And while Mr. Long, I watched him all through the trial, I heard him testify, I know that there are no words for him to express his hurt, his loss, and I'm very sorry.

THE COURT:  Okay.  Other than those issues that were cited by briefing of defense counsel, is there any legal reason that either side believes the court should not impose the sentence of the jury at this time?

**002353**

MR. DUCHARDT:  No further reasons, Your Honor.

MR. GRAVES:  No, Your Honor.

THE COURT:  Well, there's not much that can be said that hasn't already been said with regard to this atrocity, so I won't belabor that point.

17

I will restate what I have said earlier, though, that I think Mr. Purkey got a very vigorous and committed counsel in his representation here.  Both of them did a fine job with the difficult situation.  The jury heard the evidence over a long period of time and came to the conclusion that the defendant should be sentenced to death.  And it is the judgment of this court and the pronouncement of this court that the defendant be sentenced to death.

In furtherance of that sentence, the defendant will be committed to the custody of the Attorney General of the United States until the exhaustion of procedures for appeal and review of this sentence, and thereafter to the custody of the United States Marshal for the implementation of the death penalty.

I know that defense has raised some issues with regard to where Mr. Purkey should go pending review.  I have looked at those motions -- the motion and the response

**002354**

to the motion, and also the letter received from the Governor of the State of Kansas, and my inclination, my decision has been to do as I would do in any capital case, and I have done that now, committed the defendant to the custody of the Attorney General of the United States, and leave those arguments for the appellate court, Mr. Duchardt.

18

MR. DUCHARDT:  All right, Judge.  The court does understand, and Mr. Purkey does not waive -- and I tried to put that in very clear terms in the pleading that I submitted to the court yesterday.  It's our belief that the letter provided by the state of Kansas does not directly abandon -- they're trying to have things both ways.  They are trying to say they are abandoning jurisdiction so as to allow the federal government to take primary jurisdiction, but they are also saying that they're not abandoning that jurisdiction.

I think under the case law, and particularly under Kansas statutory law, that that is not an effective waiver of their jurisdiction, and I'm asking that the court direct that the Marshal Service offer Mr. Purkey back to the state of Kansas per the dictates of the writ of habeas corpus ad prosequendum by which Mr. Purkey is here and let

002355

them again refuse that, and that would be an effective completion of the writ of habeas corpus ad prosequendum. Otherwise, to the extent that the court is interpreting this as a waiver of their jurisdiction sufficiently to order Mr. Purkey directly into custody. I guess I understand where the court is coming from. I think again they're trying to have it both ways.

THE COURT: I understand what you're saying, but I tend to agree with the government, that the defendant

19

does not have a vested right here. The right rests with the jurisdictions and the jurisdictions can determine where he is to be pending these matters. I don't think Kansas is having it both ways. I think what they said is if something should happen and this judgment fails for some other reason, they have the right of detainer to take Mr. Purkey back into their jurisdiction. That's the way I read it, and I'll leave it to wiser men than myself.

MR. DUCHARDT: And probably wiser than me. I just don't think they can do it that way, Judge, in terms of our position. I just wanted to make certain that none of Mr. Purkey's rights for the law to be substantively applied in the fashion that it is supposed to be, and that's what his right is, he's not waiving any of his

002356

rights in that regard, Your Honor.

THE COURT:  I think Mr. Purkey's rights have been protected at a high level here.  Now his rights are in higher hands.  Okay.  Thank you.

MR. DUCHARDT:  Thank you, Judge.

* * * * * *

20

REPORTER'S CERTIFICATE

I, Donna M. Turner, Registered Merit Reporter, hereby certify that I am a duly appointed, qualified, and acting official court reporter for the Western District of Missouri; that the foregoing pages contain a true and correct transcript of the proceedings had in the

**002357**

within-entitled cause on the dates stated herein, and that

said transcript is a true transcription of my shorthand

notes taken therein and transcribed by computer.

_____RMR
Registered Merit Reporter

DATE: _____

**002358**



**Cheyenne Regional Medical Center**

214 E. 23rd Street
Cheyenne WY 82001-3748
Inpatient Record

PURKEY,GARY M
MRN: 0000345987
DOB: ████████ Sex: M
Adm: 2/5/2015, D/C: 2/18/2015

---

### ED Notes (continued)

**ED Notes by Stephen Neville, RN at 2/5/2015 10:14 AM (continued)**                                    Version 1 of 1

| | | |
|---|---|---|
| Author:  Stephen Neville, RN | Service:  (none) | Author Type:  Registered Nurse |
| Filed:  2/5/2015 10:15 AM | Note Time:  2/5/2015 10:14 AM | Status:  Signed |
| Editor:  Stephen Neville, RN (Registered Nurse) | | |

Pain assessed, discussed plan of care, discussed pending tasks. Will give Fentanyl when BP normalizes

Electronically Signed by Stephen Neville, RN on 2/5/2015 10:15 AM

**ED Notes by Stephen Neville, RN at 2/5/2015 9:55 AM**                                    Version 1 of 1

| | | |
|---|---|---|
| Author:  Stephen Neville, RN | Service:  (none) | Author Type:  Registered Nurse |
| Filed:  2/5/2015 9:57 AM | Note Time:  2/5/2015 9:55 AM | Status:  Signed |
| Editor:  Stephen Neville, RN (Registered Nurse) | | |

Pt states he cannot remember the last time he has had a BM. C/o abd pain for 3 day.

Electronically Signed by Stephen Neville, RN on 2/5/2015 9:57 AM

---

### Discharge Summaries - Encounter Notes

**Discharge Summaries by Take Pullos, MD at 2/18/2015  8:05 AM**                                    Version 1 of 1

| | | |
|---|---|---|
| Author:  Take Pullos, MD | Service:  (none) | Author Type:  Physician |
| Filed:  2/18/2015 8:12 AM | Note Time:  2/18/2015 8:05 AM | Status:  Signed |
| Editor:  Take Pullos, MD (Physician) | | |

### Physician Discharge Summary

**Patient ID:**
Gary M Purkey
0000345987
66 y.o.
████████

**Admit date**: 2/5/2015

**Discharge date and time**: No discharge date for patient encounter.

**Admitting Physician**: Take Pullos, MD

**Discharge Physician**: Take Pullos

**Admission Diagnoses**: Perforation bowel [569.83]

**Discharge Diagnoses:**
Patient Active Problem List
Diagnosis
- Bowel perforation
- Abdominal pain
- Elevated troponin
- Severe protein-calorie malnutrition
- Bandemia

**002359**



**Cheyenne Regional Medical Center**

214 E. 23rd Street
Cheyenne WY 82001-3748
Inpatient Record

PURKEY,GARY M
MRN: 0000345987
DOB: ▮▮▮▮▮▮ Sex: M
Adm: 2/5/2015, D/C: 2/18/2015

---

**Discharge Summaries - Encounter Notes (continued)**

**Discharge Summaries by Take Pullos, MD at 2/18/2015  8:05 AM (continued)**                                    Version 1 of 1

- Hyperglycemia
- Bacteremia
- Atrial fibrillation with RVR
- Hepatitis C, chronic
- Elevated LFTs
- Diabetes type 2, uncontrolled
- Normocytic anemia
- Systolic dysfunction, left ventricle
- Cardiomyopathy


**Admission Condition:** critical

**Discharged Condition:** good

**Indication for Admission:** Bowel perforation of long duration with septic shock

**Hospital Course:** The patient was admitted and resuscitated and then taken emergently to surgery. He remained critically ill on the vent post op with multiple issues as noted. He gradually improved and was transferred to the ward. He is now eating well and his temp is down. His wound which was left partially open due to gross contamination is healing slowly and his oral intake is improved. He is off antibiotics. He has chronic back pain which is adequately controlled now.

**Consults:** Intensivist, Hospitalist, Cardiology

**Discharge Exam:**
Abdomen is soft and non distended, He has good colostomy output. His wound is partially open and scabbed in areas with no evidence of cellulitis at present. No drainage is noted.

**Disposition:** Final discharge disposition not confirmed

**See med reconciliation list**

Activity: no heavy lifting for 6 weeks
Diet: Daibetic
Wound Care: as directed

Follow-up with Take Pullos
 in 2 weeks.

**Signed:**
Take Pullos
2/18/2015
8:05 AM


Electronically signed by Take Pullos, MD on 2/18/2015  8:12 AM

---

**002360**



**Cheyenne Regional Medical Center**

214 E. 23rd Street
Cheyenne WY 82001-3748
Inpatient Record

PURKEY,GARY M
MRN: 0000345987
DOB: ████████ Sex: M
Adm: 2/5/2015, D/C: 2/18/2015

---

## Discharge Summaries - Encounter Notes (continued)

### H&P - Encounter Notes

**H&P by Take Pullos, MD at 2/5/2015  4:07 PM**                                    Version 1 of 1

| | | |
|---|---|---|
| Author:  Take Pullos, MD | Service:  (none) | Author Type:  Physician |
| Filed:  2/5/2015  4:14 PM | Note Time:  2/5/2015  4:07 PM | Status:  Signed |
| Editor:  Take Pullos, MD (Physician) | | |

Gary M Purkey is an 66 y.o. male.with a history of abdominal pain on and off over 3 years. He states the pain gets bad at times and has been bad for 3 weeks and especially the last 3 days. He has had a previous large upper abdominal hernia repaired with mesh. He has been nauseated and vomiting. He has not bee able to eat for at least a couple of days. He seems SOB and in distress and only speaks a few words at a time.

**Past Medical History**

| Diagnosis | Date |
|---|---|
| • Bowel obstruction | |
| • Diabetes type 1, uncontrolled | |
| *per Dr Bush's records.  Patient states it is Diabetes type 2, insulin dependent. Per records from Dr Bush, lab dated 12/16/2014 his HgbA1C was 7.3* | |
| • Sleep apnea | |
| *does not wear the CPAP anymore* | |
| • Methamphetamine abuse | 2013 |
| *injected and smoked it* | |
| • Hepatitis C | |
| • Liver disease | |
| • Bipolar 2 disorder | |
| • MVA (motor vehicle accident) | 2005 |
| • Skin cancer | |
| • Peripheral neuropathy | |

Allergies:

**Allergies**

| Allergen | Reactions |
|---|---|
| • Asparaginase - E. Coli | Other (See Comments) |
| *Abdominal pain per records from Dr Trevor Bush.* | |
| • Aspirin | Other (See Comments) |
| *States it causes liver damage.* | |
| • Penicillins | Other (See Comments) |
| *As a child, unsure* | |

Principal Problem:
  Septic shock
Active Problems:
  Bowel perforation
  Abdominal pain
  AKI (acute kidney injury)
  Lactate blood increased
  Tachycardia
  Elevated troponin
  Hyponatremia

Blood pressure 97/65, pulse 107, temperature 97.4 °F (36.3 °C), temperature source Tympanic, resp. rate 30,

---

002361

**Cheyenne Regional Medical Center**

214 E. 23rd Street
Cheyenne WY 82001-3748
Inpatient Record

PURKEY,GARY M
MRN: 0000345987
DOB: ████████ Sex: M
Adm: 2/5/2015, D/C: 2/18/2015

---

### H&P - Encounter Notes (continued)

**H&P by Take Pullos, MD at 2/5/2015  4:07 PM (continued)**                    Version 1 of 1

height 6' 2" (1.88 m), weight 188 lb 15 oz (85.7 kg), SpO2 96.00%.

**Prescriptions prior to admission**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • amitriptyline (ELAVIL) 150 MG tablet | Take 150 mg by mouth nightly. | | |
| • INSULIN LISPRO (HUMALOG PEN SUBQ) | Inject into the skin daily as needed (with sliding scale). | | |
| • insulin NPH (HUMULIN,NOVOLIN) 100 unit/mL injection | Inject 18 Units into the skin every morning before breakfast. | | |
| • insulin NPH (HUMULIN,NOVOLIN) 100 unit/mL injection | Inject 42 Units into the skin every evening. | | |
| • ranitidine (ZANTAC) 150 MG tablet | Take 150 mg by mouth 2 (two) times daily. | | |

**Scheduled Meds:**

| | | | |
|---|---|---|---|
| • meropenem | 1 g | Intravenous | Q8HR |
| • pantoprazole | 40 mg | Intravenous | QAM AC |

**Continuous Infusions:**

| | |
|---|---|
| • sodium chloride | 500 mL/hr (02/05/15 1519) |
| • norepinephrine | 0.12 mcg/kg/min (02/05/15 1429) |

PRN Meds:.morphine, morphine

**Review of Systems**
Unable to perform ROS

**Physical Exam**
Nursing note and vitals reviewed.
Constitutional: He is oriented to person, place, and time. He appears well-developed. No distress.
**In acute distress**

HENT:
Head: Normocephalic and atraumatic.
Right Ear: External ear normal.
Left Ear: External ear normal.
Mouth/Throat: No oropharyngeal exudate.
Eyes: Conjunctivae are normal. Right eye exhibits no discharge. Left eye exhibits no discharge. No scleral icterus.
**Decrease vision left eye**

Neck: Normal range of motion. Neck supple. No JVD present. No tracheal deviation present. No thyromegaly present.
Cardiovascular: Regular rhythm, normal heart sounds and intact distal pulses.
Pulmonary/Chest: Breath sounds normal. No stridor. He is in respiratory distress. He has no wheezes. He has no rales. He exhibits no tenderness.
**tachypnic at 30**

---

002362



| | 214 E. 23rd Street | PURKEY,GARY M |
|---|---|---|
| Cheyenne Regional Medical Center | Cheyenne WY 82001-3748 | MRN: 0000345987 |
| | Inpatient Record | DOB:▮▮▮▮▮▮ Sex: M |
| | | Adm: 2/5/2015, D/C: 2/18/2015 |

---

### H&P - Encounter Notes (continued)

**H&P by Take Pullos, MD at 2/5/2015  4:07 PM (continued)**                                              Version 1 of 1

Abdominal: He exhibits distension. He exhibits no mass. There is tenderness **(diffusely)**. There is rebound and guarding.
Genitourinary: Penis normal.
**Foley placed**

Musculoskeletal: Normal range of motion. He exhibits no edema and no tenderness.
Lymphadenopathy:
  He has no cervical adenopathy.
Neurological: He is alert and oriented to person, place, and time. No cranial nerve deficit. He exhibits normal muscle tone. Coordination normal.
Skin: Skin is warm and dry. No rash noted. No erythema. There is pallor.
Psychiatric: He has a normal mood and affect. His behavior is normal. Judgment and thought content normal.

CT shows free air and dilated bowel with very thickened right colon

Assessment:
**Patient Active Problem List**
Diagnosis
 • Bowel perforation
 • Septic shock
 • Abdominal pain
 • AKI (acute kidney injury)
 • Lactate blood increased
 • Tachycardia
 • Elevated troponin
 • Hyponatremia

Plan:
Admit and stabilize with urgent exploratory laparotomy

**Procedure has been discussed with the patient including risks, benefits and alternatives. He states he understands and wishes to proceed. He has no further questions.**

Take Pullos, MD
2/5/2015

Electronically signed by Take Pullos, MD on 2/5/2015  4:14 PM

---

### Consults - Encounter Notes

**Consults by Manish Aggarwal, MD at 2/5/2015  2:12 PM**                                                Version 1 of 1

| Author: Manish Aggarwal, MD | Service: Pulmonology | Author Type: Physician |
|---|---|---|
| Filed: 2/5/2015 2:31 PM | Note Time: 2/5/2015 2:12 PM | Status: Signed |
| Editor: Manish Aggarwal, MD (Physician) | | |

---

**002363**

# Mary Lanning Memorial Hospital
Hastings, Nebraska

## Out Patient Admission

| | | | | 6209506 | | F/R |
|---|---|---|---|---|---|---|
| | | | | Patient Type | S.C. | Doctor Number |
| | | | | C | PAC | 001990 |

| Last Name | First Name | Middle Name | Phone | Admission Date | Time | Medical Record Unit Number |
|---|---|---|---|---|---|---|
| PURKEY, GARY M | | | 402-461-4906 | 01/29/1992 03:20PM | A.M. P.M. | 0118577 |

| Address | City | State | Zip | Sex/Mar. St. | Age | Date of Birth | Civil Status | Sex |
|---|---|---|---|---|---|---|---|---|
| ▮▮▮ | HASTINGS | NE | 68901 | | 43Y | ▮▮ | M S W D Sep / M | M |

| or Wife; Parent or Guardian | EMERGENCY CONTACT | Address if different than above | (EMERGENCY CONTACT) | Patient's Previous Name |
|---|---|---|---|---|
| REBECCA | W PURKEY, REBECCA | | | |

| Employer | Spouse Employer | EMG PHONE HOME: | Social Security No. |
|---|---|---|---|
| P/NONE | W/NONE | WORK: | ▮▮▮ |

| Insurance Coverage #2 | Policy Number | GROUP NO. | Subscriber's Name | Subscriber's Social Security No. |
|---|---|---|---|---|

| Insurance Coverage #1 | Policy Number | GROUP NO. | Subscriber's Name | Subscriber's Social Security No. | F.O. |
|---|---|---|---|---|---|
| ADAMS CTY MEDICAID | 50866267601 | | | | W |

| Attending Physician: ALBIN, ROGER | Brought By ☐ Police ☐ Friend | Admitting Diagnosis 1: URINARY RETENTION | Type of Service |
|---|---|---|---|
| REG PHYSICIAN: KAMY, FRANK | ☐ Family ☐ Ambulance ☐ Family | 2: CONSTIPATION | E/R |

**C.C.** If accident, state where, when and how injured; If illness describe:

Elavil 1800 mg/day
Amitriptyline 200 mg/day
librium 100mg/day
Pericolace Q10
® Lithium

Date of last tetanus immun.; Allergies PCN

Doctor Notified Time 3:35 A.M. P.M.

S- Unable to void x 3d but did slightly this AM → No stool x4d → UGI on 1/17/92 C/o # Constip even c̄ Golytely & Peri-Colace

Lg. doses of antidepressants (2gm/d.) Extremely dry mouth & hypo-active bowels c̄ freq. constip. as a result.

## Physician's Report

CONDITION ON ADMISSION: ☐ Good ☒ Fair ☐ Poor ☐ Shock ☐ Hemorrhage ☐ Coma ☐ Temp. 98⁹ (Oral/Rectal) P. 68 R. 16 B.P. 136/78 15:28

FINDINGS: O- Abd: Distended, Mild lower abd. tenderness, No rebound or guarding. No L/S r.
- Dry Mouth c̄ difficulty speaking as a result.
- Residual UA = 250cc

788.2 ✓
564.0 ✓
E939.0 ✓

DIAGNOSIS: ① Urinary retention 2° to antipressants
② Chronic constip " " " & retained Barium

TREATMENT (UA)
(Cath Residual) v.o Dr Albin/A. luna RN
(KUB) Residual Barium in Sigmoid/desc. colon.
- Urecholine 25mg ī QID X 2 wks. (#60) } Discussed c̄ Dr. Conant
- see Dr. Conant in 2 wks.
- Lactulose (Chronulac) 2 TBL. } Condition on Discharge: ☐ Good ☒ Fair ☐ Poor

Disposition Home

INSTRUCTIONS TO PATIENT: (- S.S. enema Now → mod. results.

### SEE INSTRUCTION SHEET(S)

| Physician's Signature | Patient's Signature | Date | Time Out |
|---|---|---|---|

Fees due to the physician for his services rendered in this emergency are not included in the total of charges paid to the Mary Lanning Memorial Hospital. Such charges are to be paid directly to the physician.

MEDICAL RECORDS 2-7

WP926911


**Mary Lanning**
Memorial Hospital
715 N. St. Joseph, Hastings, Nebraska 68901 (402)463-4521

# EMERGENCY ROOM NOTE

HOSPITAL REGULATION:
ALL POSITIVE AND
NEGATIVE FINDINGS
SHALL BE RECORDED

ORDER OF RECORDING

1. Chief Complaint

2. History of
   Present Illness

3. History of
   Past Illness

   Childhood

   Adult

   Operations

   Injuries

4. Family History

5. Social History

6. Systemic Review

   General

   Skin

   HEENT

   Neck

   Respiratory

   Cardiovascular

   Gastrointestinal

   Genitourinary

   Gynecological

   Locomotor

   Neuropsychiatric

7. Signature

A 46 year old male who comes in with a history of month-long cough, congestion, and bronchitis-type symptoms that he had been treated, he thinks, with Amoxicillin, Cephalexin, and currently is on Ceftin. He says he does feel sweaty at times but no recorded temperature or high fever. He has no known allergies. Numerous medications — Lithium 300 mg two tid, Zantac 150 mg bid, and Bethanechol, Amitriptyline 150 mg two at hs, Perphenazine two at hs 8 mg, Ceftin 250 mg bid, and insulin 24 regular and 26 NPH AM daily with 18 regular and 10 NPH in PM daily. He has checked his sugars and said they are running 88 or above.

## EXAMINATION

An alert, oriented male who doesn't appear to be in any acute distress. Lungs have a few fine rales. No real rhonchi or grossly abnormal lung sounds. Chest x-ray shows diffuse infiltrative type change, primarily on the left, some on the right also. Heart has a regular rate. No gallops or murmurs. Abdomen was normal. Extremities normal.

APPRAISAL: Probable Mycoplasma pneumonia

PLAN: I did draw a cold agglutinin titer which will be back tomorrow. I did get a CBC with white count being 15,000, five bands, 78 segs, 13 lymphs, three monos, and one eosinophil. Chest x-ray as noted. I did start him on EES 333 tid for ten days. See a doctor on Tuesday unless he gets worse and then he is to return sooner, especially if the temperature or other signs of increasing infectious problem. We will have him continue the Ceftin along with this.

Dennis D. Hatch, M.D.

DD: 8-28-94
DT: 8-29-94
daj

cc: Michael E. Johnson, M.D.

| NAME LAST | FIRST | MIDDLE | | HOSPITAL NO. |
|---|---|---|---|---|
| PURKEY, | GARY | M. | | 118577 |

| LOCATION IN HOSPITAL | ATTENDING PHYSICIAN |
|---|---|
| Outpatient | Dennis D. Hatch, M.D. |

## EMERGENCY ROOM NOTE

WP926973
**002365**

# LOGAN & PETERSON, PC

### FORENSIC, ADOLESCENT AND ADULT PSYCHIATRY

**WILLIAM S. LOGAN, MD**
**STEPHEN E. PETERSON, MD**

428 WEST 42ND STREET
KANSAS CITY, MISSOURI 64111
TELEPHONE: (816) 842-2500
FAX:          (816) 842-9980

231 S. BEMISTON, SUITE 800
CLAYTON, MISSOURI 63105
TELEPHONE: (314) 236-4914
FAX:          (314) 236-4990

3600 BURLINGAME, SUITE 1A
TOPEKA, KANSAS 66611

DIAGNOSTIC INTERVIEW REPORT

Wesley Ira Purkey

01-00308-01-CR-W-2

**INTRODUCTION AND PURPOSE:**
Mr. Wesley Ira Purkey ████████████ confessed to the January 22, 1998 kidnapping, rape, and murder of a young Missouri woman named Jennifer. He confessed to this while pretrial for the October 28, 1998 murder of Mary Ruth Bales in Kansas City, Kansas. Mr. Purkey confessed so that he would spend his sentence in a Federal Penitentiary. On December 16, 1998, Mr. Purkey made a statement to FBI Special Agent Dirk Tarpley and Kansas City, Kansas City Police Detective William Howard. At the time, Mr. Purkey gave a 6-page statement to Agent Tarpley.

Ultimately, Mr. Purkey was charged with Capital Murder for the death of 16-year-old Jennifer Long. On December 18, 2001, Mr. Purkeys' attorney, Fred Duchardt, Esq. contacted Logan & Peterson, PC for a psychiatric evaluation of Mr. Purkey. The evaluation was to focus on diagnostic assessment, Mr. Purkey's mental state at the time of the charged offense, and mitigation of penalty. Attorney Duchardt was well aware of a previous diagnostic interview of Mr. Purkey by this writer referencing the October 28, 1998 bludgeoning death of 80-year-old Mary Ruth Bales.

Soon after, Mr. Duchardt forwarded a series of records regarding Mr. Purkey. It should be noted that a substantial portion overlapping of psychiatric background history regarding Mr. Purkey had already been completed as part of the Diagnostic Interview Report for the Mary Ruth Bales matter (Kansas v Wesley Purkey; 98-CR-2202).

**DESCRIPTION OF THE EVALUATION:**
Mr. Purkey was psychiatrically evaluated at CCA, the Federal Contract facility in Leavenworth, Kansas. This took place in one-half of a visitation cubicle. Total face-to-face time was 8.83 hours. This was divided into 1.6 hours on September 19, 2002, 2.16 hours on October 10, 2002, 4.0 hours on November 6, 2002, and 1.5 hours on December 30, 2002.

Mr. Purkey was well acquainted with this writer, clearly understood the limitations or privacy in this psychiatric assessment during a Federal Capital criminal case. He freely offered his opinions and questions as necessary. He understood there would be no effort to trick, upset, confuse, or anger him. He also clearly understood that anything learned during the

Diagnostic Interview Report
Wesley Purkey
Page 2

assessment could be recorded in this report and certainly would be
communicated to his attorney.

Mr. Purkey experienced a considerable number of mood shifts during the four
assessment appointments.  Uniformly, he experienced "very high" anxiety
levels with obvious symptoms of psychomotor excitation, hypervigilance,
irritability, mood dyscontrol, and nervousness.

No additional psychological tests were completed about Mr. Purkey, as the
April 19, 2000 Diagnostic Interview Report had derived from interviews during
December 1999 and March 2000 were more contemporaneous to the events at hand.
In addition, Mr. Purkey completed some psychological testing at the United
States Medical Center for Federal Prisons in Springfield, Missouri and that
data was forwarded with Mr. Purkey's permission.

Given that the April 2000 diagnostic interview covered substantial social
history and diagnostic elements, that information will be summarized as part
of this assessment.  Duplication from that report will be avoided.

On October 28, 1998, Mr. Purkey was described as having a DSM-IV diagnosis of
Cocaine-induced Psychotic Disorder with Delusions; Dysthymic Disorder-Early
Onset; Polysubstance Dependence (psychostimulants, alcohol, and
hallucinogens); Personality Disorder Not Otherwise Specific (with antisocial,
obsessive-compulsive and paranoid features); reported history of closed-head
injury during high school with subsequent headache and blurred vision,
amphetamine-induced seizure in 1988, history of intravenous drug use since
age 16 (32 years), and history of drug-induced anxiety attacks.  After having
been released from the Kansas Penitentiary. Mr. Purkey found readjustment
extremely stressful.  He had spent more than a decade in prison.  In
September 1998, Mr. Purkey experienced a stimulant-induced anxiety disorder,
which he thought was a heart attack.  He sought treatment and was admitted to
the Kansas University Medical Center.  He continued to believe he was
poisoned but still used Ritalin and crack cocaine.  He did not perceive the
seriousness of his drug dependency.  In the few weeks before the Mary Bales'
homicide, Mr. Purkey's abuse of Ritalin and cocaine accelerated to the point
that he lost control of his drug use.  The intensity grew to the point that
he called the Kansas Bureau of Investigation to tell them he was not only
using illicit drugs, but also was being poisoned.  Clare Giada, his ex-wife,
reported that Wesley Purkey developed drug-induced delusions during their
stay in Wichita.  Mr. Purkey thought drugs were being sprayed from the
ceiling and that someone planted something in his chest.  Jeanette Purkey,
Mr. Purkey's wife, reported that Ritalin made Mr. Purkey hallucinate.

Mr. Purkey maintained his wife had been poisoning him.  Subsequently, during
this assessment, Jeanette Purkey admitted to poisoning Mr. Purkey.

In the prior assessment, on the day of the Bales' homicide, Mr. Purkey
reported he was "too damned high to be a plumber," felt spaced out, and
wanted to die.  After he was incarcerated, Mr. Purkey's drug-induced
difficulties resolved.  He still showed substantial risk for severe
decompensation into pre-psychotic irrational thinking or anger outbursts, as
evidenced by the MMPI-2 and PAI-2 as well as clinical interview.  His
normally high level of suspiciousness would go way out of control when he was
high on stimulant drugs such as cocaine.

Diagnostic Interview Report
Wesley Purkey
Page 3

The diagnosis of Dysthymia, Early Onset, was made after it was clear that
even though drug free, Mr. Purkey frequently felt dysphoric, was easily
irritated, repeatedly tended to snatch defeat from the jaws of victory, and
showed some paper-and-pencil psychological evidence of Dysthymia.  He
expressed an ongoing high level of anger, as well as a high level of anxiety.
In that prior assessment, he tended to eschew medication treatment in the
favor of attempting self-control.  Previously it had been shown that Mr.
Purkey had much better temper control when he was treated with Valium and
Tegretol, respectively a benzodiazepine antianxiety agent, and a mood
stabilizer.

Polysubstance Dependence is diagnosed when a person demonstrates a least a
12-month period of repeated substance use from at least three different drug
groups.  Mr. Purkey's primary drug of choice had been psychostimulants such
as cocaine or Ritalin (methylphenidate).  He had a very well documented and
severe intravenous drug habit with very serious alcohol dependency.  His drug
use also included hallucinogens, stimulants, and sedative-hypnotics.  Mr.
Purkey showed a strong biological predisposition and socialization toward
drug dependency.  For example, his parents were both severe alcohol abusers
and thus he inherited a genetic predisposition to serious alcohol dependency
and risk for illicit drug dependency.  His family environment fostered drug
dependency.  This included that his mother gave him sips of beer and other
alcohol from the time he was age 9 or 10 years old.  At age 13 he consumed
alcohol for the first time.  After age 14, his parents included him in adult
drinking parties and supplied him with beer.  During some of these alcohol
parties, his intoxicated father offered Wesley money for prostitutes even
though Mr. Purkey was only 14 or 15 years old.  This was an extremely
permissive and chaotic home life.

His intoxicated mother engaged him in sexual activity from his age 8 through
age 11.  By 1968 he was judged at St. Francis Hospital to have severe
psychosexual problems.  There was continued sexual activity with his mother
up through age 22.  Though by age 14 years old, Mr. Purkey knew his drinking
behavior could get him in trouble, other than a detoxification at age 14 when
he juvenile custody, he had no additional substance abuse treatment until
incarcerated.  In 1972 at the Kansas State Reception and Diagnostic Center
(KSRDC), he was described as having problems with alcohol.  In February 1976
he overdosed on Tranxene, a benzodiazepine sedative.  In 1982 at the KSRDC
records recorded that he had severe drug problems.  The MMPI then showed very
similar defects in judgment to the MMPI-2 used during the April 2000
assessment.

Mr. Purkey was introduced to intravenous drugs at a very early age by his
older brother who gave him his first Preludin injection.  Mr. Purkey was
quite down at the time and this was the first time he ever felt happy in his
childhood.  He later used intravenous drugs as a teenager even though they
induced paranoia and psychosis.  Similarly, he diverted Ritalin, which had
been intended for his two sons, to his own use.  By September 1998 he thought
he was being poisoned by family members and went to the hospital in a drug-
induced anxiety state.  He believed his family was poisoning his food and his
wife attested to it.  He also believed he was receiving shock treatments from
his family while he slept and that his wife was poisoning his cigarettes.

Mr. Purkey suffered aspects of several different personality disorders,
including Obsessive-Compulsive, Antisocial, and Dependent features.  These
described his very severe personality fragmentation, though no one

Diagnostic Interview Report
Wesley Purkey
Page 4

personality disorder fully described his difficulties.  Factors that
contributed to his suffering a personality disorder included that he clearly
described himself as having been the victim of physical abuse by both his
parents, the victim of emotional neglect by both parents, the victim of sex
abuse by his mother, a witness to promiscuous sexual activity of his mother
with numerous lovers, early introduction to alcohol by his mother's lovers,
very intense anger responses even with the slightest provocation,
preoccupation with rule adherence, inflexibility regarding ethics, inability
to refrain from illegal activity, participating in illegal acts out of shame
or desire for vengeance, considerable victim empathy after the fact,
alternating between identification with authority and rebelling against it,
and short-lived very intense mood swings.

These constituted obsessive-compulsive, antisocial, and dependent personality
features.  Obsessive-compulsive features included that Mr. Purkey rigidly
adheres to a course of action he believed to be true.  He frequently produced
pages and pages of neatly written treatises on aspects of his case.  Though
he had not been trained in law, he believed his knowledge regarding legal
matters superseded those of his attorney.  When the attorney did not comply
with his wishes, Mr. Purkey flew into an intense short-lived rage totally
consistent with Intermittent Explosive Disorder.  Intermittent Explosive
Disorder was not diagnosed because of his overriding symptoms more consistent
with personality disorder of longstanding nature.  Antisocial personality
features included that he had difficulty conforming to social norms since age
15.  However, his upbringing was derived from being awash in abusive
interactions, alcohol use, and very porous adult-child boundaries.  Thus, the
conditions were perfect for him to adopt abnormal behavior patterns.  Next,
he participated in drug use and stealing in early childhood in part due to
the influence of his older brother who was also heavily addicted to
intravenous drugs.  Mr. Purkey demonstrated consistent adult behavior of
being unable to refrain from illegal acts, thus spending considerable time
incarcerated.  In contrast to an antisocial stance, Mr. Purkey demonstrated
considerable victim empathy and openness to interpersonal change.  He wanted
to somehow right the wrongs of his life through betterment while
incarcerated.  Mr. Purkey frequently expressed in the previous assessment
that when he was taken from his parents' custody and placed with a maternal
aunt, he felt his aunt's support, love, support, and non-punitive
interventions.  Her efforts were wonderful, but "probably too late for him."
His concern for his wife's welfare, his boys' welfare, and remorse for having
killed Ms. Bales and Ms. Jennifer Long was inconsistent with antisocial
personality.

Mr. Purkey demonstrated ongoing developmental evidence of dependent
personality features.  These included his belief that his parents never
provided adequate nurturance, that his parents were emotionally and
physically unavailable, and that his sense of deep-seated anger derives from
this.  These were all separate from his sexual contact with his mother.

Mr. Purkey remained at extremely high risk for substance-induced medical
difficulty.  He was also at high risk for anxiety symptoms and physical
acting out.

At the time of the Mary Bales' homicide, it was reasoned that Mr. Purkey was
dealing with such distress at trying to adjust from incarceration to a life
of freedom that he was severely impaired.  This included substantial marital
and sexual difficulty due to his drug use and substantial marital and sexual

Diagnostic Interview Report
Wesley Purkey
Page 5

difficulty due to the requirement of interacting with others.  Mr. Purkey
turned to drugs, alcohol, and prostitutes as a way to manage his mounting
anxiety.  He imposed high expectations for his success.  Prostitution allowed
him to maintain a scripted interaction, which was sexually fulfilling and
temporarily reduced his anxiety.  Mr. Purkey indulged in oral sex in exchange
for drugs, and was having tremendous difficulty with a normal commitment to
his wife.  At that time, he had never been treated for his childhood
experiences of physical, emotional, and sexual abuse.  Such experiences can
saddle young children with tremendous anxiety and severe anger control
problems.  Chronological history very clearly indicated that Mr. Purkey was
vulnerable to pre-psychotic and psychotic decompensation with intense
outbursts of anger.  These outbursts could be short lived, unpredictable, and
more likely if he were intoxicated on alcohol or other drugs.  These were
behaviors well modeled by both his parents for his entire formative years.

There was no indication that Mr. Purkey presented malingered symptoms or
defensively under reported symptoms.  In the 1999/2000 evaluation, Mr.
Purkey's considerable victim empathy, sadness for his own family, and
assumption of responsibility for his own actions was evident.  At the same
time, Mr. Purkey demonstrated significant improvement in his anger control
when treated with Tegretol and Valium.  This suggested some biologic basis
for his loss of anger control over and above cocaine-induced intoxication.
There was significant history of closed-head injury and potential for brain
damaged.  In 1999/2000, no records had demonstrated that.  If there had been
some evidence of closed-head injury over and above the headaches and
dizziness demonstrated after a high school car accident and drug-induced
seizures, those could have left him with irreversible personality changes.

With his background in mind, Mr. Purkey's mental functioning at the time of
the Jennifer Long homicide was evaluated.  Substantial records are
integrated.  All records were reviewed.

As a part of his assessment, Bruce A. Leeson, PhD, completed a
neuropsychological assessment of Mr. Purkey.  Dr. Leeson produced a report on
January 5, 2003 after evaluating Mr. Purkey in April 2002 and December 2002.
Dr. Leeson listed 16 sources as background for the neuropsychological
assessment.

INDEX OF MATERIAL:
A.    Medical records -
1.    March 1, 1968 St. Joseph Hospital and Rehabilitation Center record of
      treatment (urethral discharge).
2.    March 8, 1968 St. Joseph Hospital and Rehabilitation Center record of
      treatment (car wreck).
3.    April 29, 1968 St. Joseph Hospital and Rehabilitation Center record of
      treatment (car wreck).
4.    May 19, 1968 St. Joseph Hospital and Rehabilitation Center record of
      treatment (cut finger).
5.    June 4, 1970 St. Joseph Hospital and Rehabilitation Center record of
      treatment (left hand).
6.    August 31, 1972 St. Joseph Hospital and Rehabilitation Center record of
      treatment (multiple lacerations).
7.    February 15, 1976 Wesley Medical Center outpatient record, History-
      Physical Exam-Progress Notes (reported overdose).
8.    May 30, 1976 St. Hospital and Rehabilitation Center record of treatment
      (involved in fight).

002370

Diagnostic Interview Report
Wesley Purkey
Page 6

9. August 31, 1982 Institute of Logopedics Case History and handwritten letters by Wesley Purkey.
10. May 2, 1998 Via Christi Regional Medical Center Mental Status Review.
11. May 3, 1998 Via Christi Regional Medical Center, Wichita, Kansas History and Physical completed by Ralph Bharati, MD (people spraying him).
12. September 13, 1998 University of Kansas Hospital Record of Admission.
13. September 13, 1998 University of Kansas Emergency Treatment Record ("speed overdose").
14. September 13-14, 1998 University of Kansas Case Summary completed by David Meyers, MD AND Joseph Santiago, MD.
15. September ?, 1998 University of Kansas handwritten evaluation completed by Michael Leeson, MD, PhD.
16. September 14, 1998 University of Kansas Cardiovascular Stress Test Report completed by Julian J. Nunez, MD and David B. Wilson, MD.
17. September 16, 1998 Providence Medical Center Emergency Department Record face sheet and supplement report completed by Glen D. George, MD. (drug abuse).
18. December 19, 1998 Kansas City, Kansas Police Department (KCKS PD) Investigate Addendum/Clearance completed by Det. W.L. Howard, Jr. (photo line-up interview)
19. January 8, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley and Det. William L. Howard, Jr.
20. January 12, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley.
21. January 20, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley.
22. April 10, 2002 Bill Hedrick, Warden, Federal Bureau of Prisons letter to The Honorable Sarah W. Hays.
23. August 16, 2002 Constance Reese, Warden, Federal Bureau of Prisons letter to The Honorable Sarah W. Hays.

B. **Oregon State Hospital, Mental Health Division medical and psychiatric records -**
1. November 26, 1986 Application and questionnaire for CITS completed by Wesley Purkey.
2. December 30, 1986 Assessment Summary.
3. November 27, 1986 Identification Sheet and questionnaire for CITS interview completed by Wesley Purkey.
4. Drug Use Inventory
5. December 7, 1987 narrative by Rex Newton.
6. December 19, 1988 Handwritten discharge from CITS.
7. December 30, 1988 CITS termination form completed by Mr. Purkey.
8. April 27, 1989 Thomas Lester, Unit Director, letter to John Caywood.

C. **Federal Bureau of Investigation records -**
1. December 16, 1998 Interrogation: Advice of Rights signed by Wesley Purkey.
2. December 16, 1998 Interrogation report completed by SA Tarpley and Det. Howard.
3. December 17, 1998 Handwritten record of the crime completed by Wesley Purkey.
4. December 17, 1998 Typewritten report of Wesley Purkey's handwritten record.
5. December 19, 1998 Investigative Addendum/Clearance report.
6. January 20, 1999 report by SA Tarpley.

**002371**

Diagnostic Interview Report
Wesley Purkey
Page 7

7.    Magazine articles discussing death and death row.
8.    April 22, 1999 Wesley Purkey letter to Det. Howard.
9.    May 14, ??? Wesley Purkey letter to "Howard."
10.   August 16, 2001 report by SA John Brunelli.
11.   September 26, 2001 (0829 hours) Telephone conversation between Det.
      Howard and Wesley Purkey.
12.   September 27, 2001 (1430 hours) Telephone conversation between Det.
      Howard and Wesley Purkey.


D.    **United States District Court Transcripts of Hearings –**
1.    October 25, 2002 Transcript of court hearings.


E.    **Medical records –**
1.    March 8, 1968 St. Joseph Hospital and Rehabilitation Center Face Sheet
      (lacerations, cerebral concussion).
2.    March 8, 1968 St. Joseph Hospital and Rehabilitation Center History and
      Physical completed by L.A. O'Donnell, MD.
3.    August 31, 1972 St. Joseph Hospital and Rehabilitation Center Face
      Sheet (head injury & lacerations).
4.    August 31 to September 3, 1972 St. Joseph Hospital and Rehabilitation
      Center progress notes by L.A. O'Donnell, nursing notes, laboratories,
      etc.
5.    February 15, 1976 Wesley Medical Center Face Sheet (overdose).
6.    February 15-17, 1976 Wesley Medical Center Discharge Summary completed
      by R.D. Murray, MD.
7.    August 31, 1982 Institute of Logopedics Speech-Language Services
      document completed by Wesley Purkey.
8.    May 2, 1998 Via Christi Regional Medical Center Face Sheet (Psychosis
      NOS).
9.    May 2, 1998 Via Christi Mental Status Review (checkoff).
10.   May 3, 1998 Via Christi Regional Medical Center History and Physical by
      Ralph Bharati, MD.
11.   September 13, 1998 University of Kansas Medical Center Face Sheet
      (speed overdose).
12.   Undated (9/3/98) Handwritten report by Michael Leeson, MD, PhD
      (paranoia).


F.    **Law enforcement –**
1.    January 20, 1999 Federal Bureau of Investigation report completed by SA
      Dirk D. Tarpley.
2.    February 25 to March 1, 2002 Forensic Report by Christina A. Pietz,
      PhD., ABPP.
3.    April 10, 2002 Bill Hedrick, Warden letter to The Honorable Sarah W.
      Hays.
4.    August 13, 2002 Forensic Evaluation completed by Christine Scronce,
      PhD.
5.    August 16, 2002 Constance Reese, Warden letter to The Honorable Sarah
      Hays.
6.    October 20, 2002 Linda McCandless, DO letter to The Honorable Sarah
      Hays.


G.    **Miscellaneous –**
1.    November 14, 2002 Dr. McCandless letter regarding medicine changes at
      CCA.
2.    November 15, 2002 Kansas City Star article; FBI finds bone fragments in
      search for Kansas City girl's body.

Diagnostic Interview Report
Wesley Purkey
Page 8

3.   April 18, 2003 USDOF-BOP May 29, 2002 MMPI-2 extended score report, raw
     data, and computer-generated report.
4.   June 18, 2003 USP Leavenworth Pharmacy Profile.
5.   March 21, 2002 Forensic report by Christina Pietz, PhD of USMCFP-
     Springfield, Missouri.
6.   August 13, 2002 Forensic evaluation by Christine Scronce PhD of FMC-
     Rochester, Minnesota.

H.   **Court documents -**
1.   October 10, 2001 Indictment # 01-00308-01-C-W-2, USA v Wesley Ira
     Purkey.

**SELECTED REVIEW OF MATERIAL:**
The following selections are drawn from the review of material.  These
entries serve one source of reported background information.

**1966 -**

December 30, 1966 St. Francis Hospital Brain Scan indicated no evidence of
brain tumor or other abnormality.

?/11/1966 St. Francis progress note added Wesley would be dismissed.
Diagnosis was Passive-aggressive Personality, Severe.  Prognosis was poor and
treatment was none.

Undated history added that Wesley's behavior changed after the car accident.
He had periods of amnesia.  He was impulsive and immature.  He was very
careless as if he wanted to be apprehended.  Mother always objected to
psychiatric care.  Mother was very neglecting and ill person emotionally.
Great-aunt took guardianship of Wesley against his mother's wishes to get him
into treatment.  After release, outpatient treatment would be tried.

December 30, 1966 St. Francis Hospital electroencephalography (EEG)
impression was borderline for the age suggestive of possible mild depression
of cortical activity in left frontal and temporal regions.  Repeat tracing
would be helpful for clarification.  January 9, 1967 EEG was within normal
limits for age.  Previously seen slowing of activity in the frontal and
anterior temporal regions was not present.

**1967 -**

February 14, 1967 St. Francis Consultation Record added that Wesley's aunt
and Wesley seemed mystified why he was in the hospital and was slated to go
to Larned.  Mrs. Burke said he was following her orders.  Dr. Newsome didn't
think Larned had a program for Wesley.  Would suggest to juvenile court that
Wesley stay at Lake Afton.

1967 St. Francis Physicians Orders added that Wesley's mother was not to
visit until cleared.  On ?/9/67, "mother may not visit."  January 1967
Nurse's Notes added that Wesley's mother visited and he agreed to have his
hair cut.  Mother says he "will do anything she asks."  January 6, 1967 Aunt
is visiting, Wesley hit fist on wall because of family situation.  January 6,
mother can't understand why she wasn't allowed to talk to Wesley.  "He even
promised me he would cut his hair."

**1968 -**

Diagnostic Interview Report
Wesley Purkey
Page 9


March 8-15, 1968 St. Joseph Hospital face sheet was for multiple lacerations,
acute cerebral concussion, acute toxic state, and etiology unknown.  16 or
17-year-old Wesley was admitted after an auto accident.  Eyes were remarkable
in that am sense an anisocoria was found, with right pupil being larger than
the left.  Entrance diagnosis was acute cerebral concussion. Progress note
added left pupil smaller than right-both react to light.  Orders noted,
unable to void.  Wesley complained of severe headache, mostly occipital.
3/9/68 note added right pupil slightly larger than left, both react.
April 29, 1968 St. Joseph radiology report noted skull examination in the PA
occipital and each lateral projection failed to reveal evidence of fracture
of other abnormality of the cranial all or intracranial structures.  There
was no evidence of increased intracranial pressure.  Sella was normal.

November 17-21, 1968 St. Francis face sheet admit diagnosis was for
aggressive behavior.  Diagnosis was Passive-aggressive Personality.  The
Short-Stay Record added that Wesley was admitted per his aunt's request.  He
had been drinking and fighting.  He had problems with authorities.  His
behavior was well controlled without medication.  He was released to
November 21.

November 17, 1968 diagnosis:  rule out Schizophrenia latent, final diagnosis
Personality disorder Antisocial…

1969 –

January 1969 (estimated) St. Francis progress note recoded Wesley was acting
out and getting in trouble with the law.  He was impulsive.  He as admitted
for evaluation.  He was diagnosed as Adjustment Reaction/Adolescent.  He
would be in psychotherapy with Dr. Murphy.  January 17 note added Wesley was
angry at first but more acceptable after talking and understanding need for
controls and structure. February 5, Wesley wanted to test his impulses over
the weekend.  He acted out on visit home.  Denied drinking.  Was angry with
roommate and irritable.  Would not discuss weekend visit. Wesley got drunk on
the weekend.  He showed good motivation but poor impulse control.  Nurse's
note added that alcohol was smelled on Wesley's breath.  Phisohex was used to
clean wounds on his arms.  He ripped of 4 x 4s, was loud, agitated, and
angry.  Wesley got in a fight, and probably cut his hand when he broke his
girlfriend's car window.  Wesley fought with a 60-year-old neighbor.  He went
into the house to get a knife but didn't get a chance to use it.  His aunt
said she had to give him his whiskey to get him back in the car.  Later,
Wesley was angry and banging his fist against the wall and shouting because
she couldn't make a phone call. He seemed hyperactive and restless.  January
10, 1970 nurse note added that his aunt said Wesley went home from work and
insisted he didn't have to go back to the hospital.

1970 –

October 28, 1970 Kansas Penitentiary report noted Wesley was involved in a
car accident in 1968.  He had deep lacerations on right upper front of his
neck and head concussion.  He was unconscious more than four or five hours
and hospitalized for 12 days.

1971 –

Diagnostic Interview Report
Wesley Purkey
Page 10

May 5, 1971 KRDC evaluation noted that Wesley made a satisfactory adjustment
until age 14.  He began presenting inappropriate and illegal behavior and had
a rather extensive juvenile record by age 18.

1972 -

June 12, 1972 Parole Board Report by Mohammed BenAmmar, noted that KRDC
evaluated Wesley Purkey as Schizoaffective psychosis superimposed on an
antisocial personality.  He was recommended to therapy, voluntary requested
therapy, and attended regularly since October 1971.  Wesley was gaining
insight and projected his future realistically.  He was improving in his
ability to relate to people.  His "possibility to be adjusted to society
seems to be fair."  He had less possibility to be involved in antisocial
behavior.

August 31, 1972 St. Joseph Hospital and Rehabilitation Center

face sheet was for multiple lacerations, face and forehead, acute cerebral
concussion.  L.A. O'Donnell, Sr., MD noted Wesley was admitted following an
auto accident.  Eighteen-year-old Wesley was in this hospital several years
earlier after an auto accident.  He was repairing his car, which was hit from
behind.  History added that Wesley lost consciousness for 1 or 2 minutes at
the accident scene.  Dr. L.A. O'Donnell noted that a psychologic consult was
requested.

September 3, 1972 Dr. O'Donnell note added Wesley took "French Leave" of the
hospital.  He would be referred to a psychiatrist.  Wesley needed psychiatric
treatment much and had needed it for some time.  September 9, 1972 Dr.
O'Donnell progress note added Wesley "has had a severe emotional unstable
background, both genetic and environmental and I think he is heading for
trouble."

September 1972 Dr. O'Donnell progress note noted right eye appears dilated.
Both pupils react to light but are unequal.

1974 -

January 10, 1974 Jose Sintos, MD, KSIR noted that Wesley should be placed in
Medical Lay-In until his court hearing.  The doctor reasoned, "The tremendous
anxiety generated by the nearness of an outdate is prompting a depressive
condition which could easily precipitate tragic events if he is left alone in
the general population."

January 10, 1974 (12:45 pm) Wesley was in extreme anxiety.  He cursed an
officer and was written up.

February 15, 1974 DOC Psychological Summary by Steve Schlageck, MS noted that
23-year-old Wesley as serving a term of 10-21 for burglary.  He was impulsive
and dependent.  He used peer judgment to make decisions.  He showed disregard
for social rules.  Testing also indicated signs of organic deterioration.  He
had little insight.  He did not learn anything during a three-month stay at
Larned in 1973.  Acting out was his prominent defense mechanism.  He might
continue to use alcohol and drugs.  He was seen as a passive dependent
personality with features of alcohol dependency.

Diagnostic Interview Report
Wesley Purkey
Page 11

April 10, 1974 KSIR Special Progress Report noted Wesley had referred himself
for individual counseling.  He was seen off and on from October 16, 1971 to
February 22, 1972.  The September 1971 Board advised him to seek group
therapy.  No vacancies were available so individual therapy was started.
KRDC evaluation in May 1971 diagnosed Schizoaffective Psychosis superimposed
on an antisocial personality.  His affect tended to be flat but he exhibited
no overt psychiatric symptoms.  Dr. Paul Murphy was willing to see Wesley
when he was paroled.  He had been seen by Mr. BenAmmar in individual therapy
since March 22, 1972.

August 30, 1974 KSIR note indicated Wesley had even in several car accidents.
Had several abrasions, hospitalized five days for concussion.

September 26, 1974 KSRDC Medical Summary noted that 22-year-old Wesley denied
severe head injuries or loss of consciousness.  Counseling report noted that
Wesley showed slight improvement in overall intellectual functioning.
Drinking was the only thing that had interfered with his work outside prison.
He was out for three months.

October 16, 1974 KSRDC psychiatric exam was by Richard Gellar, MD.  General
impression was that though calm and soft spoken, Mr. Purkey's childhood
deprivation and continuing need for nurturance were quite apparent.  He was
appropriately oriented, affect was appropriate.  Diagnostically, Wesley could
best be described as have an "antisocial personality disorder."  He could not
function in society without structure and recognized this.  "There must be
some reason why I do dumb things…."

October 16, 1974 KRDC psychiatric evaluation added that 22-year-old Wesley
was calm and exhibited a consistent detachment.  When emotionally laden
material was discussed, he appeared uncomfortable and uneasy.  He tried to
conceal inner anxiety.  When confronted or if he perceived he was not going
to get what he wanted, he instantly became tearful, hostile, and angry.  He
admitted slapping his wife "a couple times."  He admitted overdosing five or
six times but had no conscious thought to commit suicide.

1975 –

October 2, 1975 Hutchinson note added that Wesley got into a fistfight with
another inmate.  He had been in counseling with Chaplain Boyle.

1976 –

February 15, 1976 Wesley Medical Center progress noted no history of trauma.

February 17-25, 1976 Wesley Medical Center Discharge Summary added that 23-
year-old Wesley was admitted after an overdose.  His wife believed he drank
alcohol and took Tranxene 5 tablets and Tylenol #3 amount unknown.  Past
history included car accident six years ago.  Nursing note on 2/17 added that
Wesley stated, "Look, there are 15 mice up there (pointing at ceiling) or
maybe they are bus."  He didn't appear alarmed about the hallucination.
Wesley appeared confused at times and hallucinated.

October 21, 1976 note by Robert Wang, MD noted that Wesley had three head
injuries in 1968, 1972, and 1976.  The first in 1968 was a two-week
hospitalization.  January 1976 lasted three days at St. Joseph Hospital in
Wichita. He didn't list the third injury.  He drank beer occasionally, was a

Diagnostic Interview Report
Wesley Purkey
Page 12

drug addict, and used mostly heroin for seven years.  He suffered chronic headache and runny nose.  He had a fracture of his left cheekbone.  In 1968 he had a head injury, fractured cheek and was unconscious for five days at St. Joseph Hospital.  Neurological tests were within normal limits.  He had chronic headaches.

November 16, 1976 KRDC psychiatric evaluation added that 24-year-old Wesley gave the impression of being a detached, distant individual who spoke in a very casual manner about his present and past offenses.  There not a hint of remorse.

1979 -

In February 1979, Wesley reported feeling anxious, depressed, frustrated, and was unable to sleep.  He cut himself twice, but denied he wanted to kill himself, he "wanted to be heard."  At that time he was on Valium and Sinequan.  He was transferred to Larned.  When released from KSP July 15, 1980 with a two-year parole, Wesley did not enter the halfway house program as directed.  He went to Wichita and immediately began to steal to support himself and quickly returned to drug use.

Wesley indicated he did not intend to kill the man in the woods.  He had never seen the man before.  He thought perhaps he was shooting himself at the same time he was shooting the man.  Psychiatric examination noted that Wesley whispered in an entirely different conversation from what he is talking aloud.  His vocabulary was limited but intellectually he appeared average or a little above.  Wesley came across as quite blasé even when talking about the stupidity of his crime.  His emotional stance was not in keeping with his present predicament and the long sentence ahead of him.  He stated very coldly how he had learned of his past hate toward authority.

Wesley presented in a self-recriminatory way and expressed an "autocritical" attitude.  However, this attitude was not accompanied by sadness or depression.  He might be quite manipulative and try to appease for secondary gains.

May 3, 1979 DOC note added that Wesley was admitted to the infirmary lock room after self-inflicted lacerations to his left wrist and forearm with possible tendon involvement.

May 19, 1979 Kansas DOC Psychiatric Consultation by R. Hemaya, MD noted Wesley felt pretty good.  He had cut himself in April.  He felt depressed but now felt his head was clear.  He denied suicidal ideation presently.  Three factors contributed to cutting himself, "getting attention, experiencing bitterness, and harming or killing himself."  He felt he could keep himself together now.  He was taking Sinequan.  Counseling with Dr. Hemaya was recommended, as was observation by the mental health team.  Wesley wanted to be transferred to north wing of A&T.

1981 -

May 18, 1981 KRDC Medical Summary noted that 29-year-old Wesley Purkey had polio with a crippling effect when he was 6 or 7 years old.  He had no permanent disability from the polio.  He had head injuries with loss of consciousness several times, the last time for an hour or so.  He never had a skull fracture.  He was hospitalized at St. Francis Hospital in Wichita for

Diagnostic Interview Report
Wesley Purkey
Page 13

pneumonia.  He was at Wesley Medical Center in Wichita for heroin overdose.
He was hospitalized at KSP after a knife fight.


**1982 -**

May 15, 1982 KRDC clinical evaluation added that Wesley was evaluated at the
Wichita Psychiatric Center during eighth grade.  Evaluation revealed he
experienced a serious personality disorder centered on psychosexual problems
of identification.  He subsequently was in therapy with Dr. Newsom and Dr.
Murphy.

May 19, 1982 KRDC Psychological Report added that Wesley was out of jail
approximately three weeks after being paroled in July 1980.  He used drugs
heavily during that time.  The MMPI suggested he might be highly rebellious,
non-conforming, and unreliable.  He might be moody and resentful, give a good
first impression, and give evidence of great insight.  He might tend to be
touchy and overly responsive to the opinions of others.

June 1, 1982 memo by noted Wesley bumped his head and was taken by ambulance
to the hospital while in jail. June 2, 1998 Wesley said, "Hey, fat son of a
bitch give me your breakfast, you're getting out and don't need it" to an
inmate.  Wesley then struck the inmate with a clenched fist three times and
then kicked him on the shoulder.  Inmates Penland and Rice were in fear of
their safety from Wesley.  June 5, 1982 note indicated Wesley was not to be
moved without extreme caution and lots of chains.

1982 Institute of Logopedics request for evaluation was by Purkey (no date).

He had been hospitalized after a car wreck, was in St. John's Hospital in
1969 for 10 or 12 days.

August 11, 1982 Disciplinary Report noted that Wesley was agitated,
belligerent and hostile because he had to follow the rules.

August 13, 1982 DOC memo indicated Wesley became increasingly hostile during
a staff interview.  He was returned to his cell and then threw his lighter
such that it smashed in several pieces.  Due to his volatile status he would
best be placed in segregation.

August 13, 1982 DOC memo indicated Wesley became increasingly hostile during
a staff interview.  He was returned to his cell and then threw his lighter
such that it smashed in several pieces.  Due to his volatile status he would
best be placed in segregation.

November 16, 1982 Kansas DOC Disciplinary Report noted that Wesley was
working behind the meal line and struck another inmate, Sylvester Jackson, on
the left side of his head with a piece of iron pipe.  Wesley then jumped over
the counter and ran for the door to the kitchen.  He struck Officer Avery
before being stopped.  Wesley was heard to remark, "I'm gonna kill that black
son-of-a bitch."  Mr. Jackson had threatened that he was going to kill Mr.
Purkey.  Mr. Purkey indicated he had had several run-ins with Mr. Jackson and
some of his friends.  Mr. Purkey knew they would kill him if he didn't act
first.

November 16, 1982 Disciplinary Report stated Wesley struck another inmate
with an iron pipe and then ran to the kitchen door.

002378

Diagnostic Interview Report
Wesley Purkey
Page 14

November 18, 1982 Disposition of Disciplinary Case noted that Wesley another inmate had threatened Wesley. Wesley knew he would be killed if he didn't kill the other man.

**1983 –**

January 6, 1983 Iowa State Penitentiary Pre-sentence Investigation

Mr. Purkey's mother became neglectful of Gary and Wesley. The grandmother described the home situation and Wesley's mother in the following terms: "All she thought about was alcohol and men. There was always drinking and fighting in their home. She would leave for 5 or 6 days at a time."

In 1968 Wesley was involved in an automobile accident where he sustained a head injury. He was treated at St. Francis Hospital and St. John's Hospital in Wichita. He recovered from all injuries. In 8th grade he was referred for evaluation because of truancy and anti-social behavior at school. He complained of headaches and dizziness for which no organic basis could be found. December 29, 1966 St. Francis Hospital diagnostic workup revealed physical and neurological exams were within limits. Psychological evaluation revealed Wesley was experiencing a serious personality disorder centered on psychosexual problems of identification. He was recommended to the Boys Industrial School, but was never sent. He was in psychotherapy with Dr. C.F. Newsome and Dr. Paul Murphy until arrest in 1970.

August 19, 1983 Division of Adult Corrections health care report noted a history of 1977 head injury with loss of consciousness for 1.5 days. Wesley complained of headache.

December 7, 1983 health note noted "97" head injury, Wichita, short stay. Wesley was nervous.

**1984 –**

February 13, 1984 prison report indicated Wesley had come out of his sick cell and demanded eating utensils. He wanted a "fucking knife and fork." He was advised that in sick cell he could only have a spoon whereupon he stated, "fuck you" and returned to his cell. He was written up for leaving the sick cell.

Wesley denied saying fuck you to anyone. He wanted to know why he was in segregation status and felt he was having pre-hearing punishment. The committee found Wesley guilty of verbal abuse, disruptive conduct, and disobeying an order. Two days solitary was recommended.

November 1984 Disciplinary Report added that Wesley and others had threatened and physically assaulted another inmate. They wanted that inmate to give them $200.00.

Diagnostic Interview Report
Wesley Purkey
Page 15

1985 –

February 24, 1985, Wesley was disrespectful and mouthy. May 13, 1985 Wesley got in the officer's "face" when ordered to do something.  August 12, 1985 Wesley threw his food on the floor because he didn't have enough potatoes.

1986 –

January 30, 1986 KDOC memorandum details Mr. Purkey's many placements in various prison facilities.

April 16, 1986 DOC Disciplinary Report added that Wesley attacked another inmate.  The inmate had a bruised right eye.

April 15, 1986 DOC Seg note added that Wesley assaulted and committed battery on another inmate.  It was suspected Wesley had attacked other inmates but they would not make statements.

July 1, 1986 Wesley "Form 9" typewritten note indicated he felt justified in showing anger.  He was constantly confronted with lies.  "Your god damn right I'm mad and I've vented this anger in the only way possible, after trying to bring a remedy to the situation in a productive manner."

November 27, 1986 CITS application noted that Wesley was serving time for Aggravated Robbery, 15 years to life; Aggravated Kidnapping, 15 years to life; and Aggravated Battery, 5 years to life.  He began serving his sentence in July 1976.  He was arrested for the first time at age 14.

November 27, 1986 CITS questionnaire by 34-year-old Wesley Purkey reported that he was divorced.  He felt insecure and had doubts about his future.  His problems were moderately to very severely upsetting.  Wesley's father committed suicide at age 59.  His mother died of cancer at age 55.  During childhood he was both happy and unhappy, had school and family problems, had legal problems, and abused alcohol.  He had been hospitalized at St. Francis Hospital in Wichita, Kansas as a teenager.  He denied ever attempting suicide.  His older brother had problems with the law.

Behaviors that applied to Wesley included impulsive reactions, nervous tics, sleep disturbance, and outbursts of temper.  He was proud of writing articles, his physical endurance, and being realistic.  Feelings that applied to Wesley included angry, annoyed, guilty, happy, conflicted, regretful, hopeful, lonely, and tense.  One of his main fears was failure and having to return to prison.  He was most likely to lose control of his feelings when under stress or feeling threatened.  He was sad that his parents had died so "early on."  If he got angry with someone, "It must be your fault."  Physical sensations that applied were headaches, dizziness, tension, unable to relax, back pain, rapid heartbeat, and visual disturbances.

A pleasant sensation for Wesley was his grandparents' home.  He had unpleasant childhood images, and images of seduction.  He pictured himself as not coping and hurting others.  Additional check-off questions added that Wesley did not believe he was a victim of circumstance, he deserved to be happy, did not have to make other people happy, and believed there was a right and wrong way to do things.  He needed to come to terms with himself. He could help himself by changing negative perceptions.

002380

Diagnostic Interview Report
Wesley Purkey
Page 16


December 30, 1986 Oregon State Hospital Assessment Summary added that Wesley
had been locked up for 12 years without a break. He believed he might be
released in the next three to four years and wanted counseling to adjust his
thinking and attitudes. He was open, cooperative, and somewhat tense. He
began using drugs at age 14 and by age 19 was addicted to heroin. He drank
because, "I drank to block out things." Heroin was his primary drug choice
followed by Percodan. Wesley's mother and father were alcoholics. They
divorced when Wesley was 10 or 11 years old and an aunt raised him. He had
sporadic contact with his mother and almost no contact with his father while
growing up. His parents were both dead. He completed 9th grade and was now
going to college at OSP. He liked to write and read history.

Wesley was oriented times three, short and long-term memory were intact. He
had average intelligence and adequate social skills. He had a stuttering
problem. He had been locked up for 12 years in a Kansas prison. He was
transferred to break up a racial clique (Aryan Brotherhood) he was involved
in. He wanted to change so he could "…make it when I get out."

Thirty-four-year-old Wesley Purkey had a character disorder and had spent his
entire adult life behind bars. He "seemed" to have a great deal of anger and
problems with authority issues.

Undated Oregon State Hospital check-off questionnaire for C.I.T.S. interview
was completed by Wesley Purkey. His wife's personality was good, loving, and
patient. Being sensitive, reasonable, polite and sexual were areas in which
they were compatible. Wesley's ego was an area of incompatibility. He got
along with his in-laws, and had two children who had no special problems.
Sex was not discussed in his familial home and he learned about sex through
magazines. He experienced anxiety or guilty "years ago" regarding
masturbation and sex. He was abused as a child. People hurt Wesley if they
did not trust him. A mother should be protective, sensitive, mature, and
practical. A father should be responsible and objective. A true friend
should be level. Wesley's wife would describe him as trying to hard to prove
himself, and not being responsible. He was troubled by rejections from his
family, "although it's justified!" Wesley didn't "care for" marijuana.

He had had several head injuries and several car accidents. Wesley's most
significant memories or experiences included ages 6-10 being sexually abused,
ages 11-15 trying to escape from home, ages 16-20 entering prison, 21-25,
sent to prison for a crime he did not commit, ages 26-30 being paroled with a
very vindictive attitude and returning to prison within more years than he
could deal with, ages 31-35, he had a desire to understand himself. Staff
noted that problem areas for Wesley Purkey included being institutionalized,
having a criminal personality, and having a character disorder.

1987 –

November 6, 1987 Oregon State Penitentiary Discipline report noted Wesley
Purkey admitted he hit Inmate Hatfield two or three times with his fist. He
hit Hatfield because Hatfield was going to say that Purkey had raped him.
They did engage in anal intercourse and Purkey said it was a "mutual thing."
Purkey denied using a knife. He admitted that he drank three quarts of Pruno
the evening of October 31, 1987. Purkey said he had been locked up for years
and the sexual activity "just happened." Wesley Purkey would be permanently
restricted from occupying a double cell for the remainder of his prison term.

Diagnostic Interview Report
Wesley Purkey
Page 17

December 7, 1987 Narrative by Rex Newton noted that he met with Wesley Purkey who was very angry, frustrated, confused, and scared. Wesley was angry with Mr. Newton because had not gotten him into Correctional Institution Treatment Services (CITS) counseling last summer as he had said he would do. Wesley had been in prison 13 years and was afraid of his eventually freedom in approximately three years. Mr. Newton thought Wesley did "fall through the CITS cracks". Mr. Newton would begin seeing Wesley monthly and then refer him to a CITS med therapist and eventually to Cornerstone.

**1988 –**

August 16, 1988 Oregon letter to Kansas DOC added that Wesley reported used a knife to threaten an inmate during an assault at Forest Camp.

December 13, 1988 Oregon State Discipline report noted that Mr. Purkey said there was liquid that had a foul smell coming out of his cell. Purkey said someone outside his cell was spraying him so he couldn't breathe. Mr. Purkey continued throwing the liquid from 3:00 am to 7:00 am after being advised to stop.

December 16, 1988 Oregon State Discipline report noted that Mr. Purkey said inmates had been spraying him with liquid from a small bottle. He found it very difficult to breath as a result of the spray and was concerned for his safety. He acknowledged snorting crack the previous day, but denied hallucinations. Mr. Purkey asked Inmate Ross "what the fuck he did." At that point, Mr. Purkey hit Mr. Ross in the face three to five times with his fist. Mr. Purkey would serve one-month segregation.

December 19, 1988 Oregon State CITS handwritten discharge summary noted that Wesley attended approximately three or four groups before choosing to discontinue. He went to Forest Camp and hopes to go to Cornerstone. He did not wish to participate in anything CITS had to offer.

December 30, 1988 Oregon State CITS termination summary by Mr. Purkey added that he understood himself much better after attending group therapy. His tensions and anxieties were greatly reduced.

**1989 –**

March 22, 1989 letter from Oregon to Kansas DOC noted that Mr. Purkey was in minimum custody until an incident at Forest Camp. He received a major disciplinary report and would be prosecuted for Sodomy. Other disciplinary reports since returning from Forest Camp included disobedience of an order, assault, possession of narcotics, etc.

April 27, 1989 Thomas Lester, Unit Director letter to John Caywood added that Wesley did not attend group callouts and was dropped from the group callout list on May 2, 1988.

October 13, 1989 Oregon State Discipline report noted that Mr. Purkey violated a rule. He said, "You fuck everything up bitch," to an officer and at another officer, "Fuck Andrews!" Said language was abusive and hostile.

002382

Diagnostic Interview Report
Wesley Purkey
Page 18

1990 -

February 2, 1990 Oregon letter to DOC noted Wesley assaulted another inmate
while at Forest Camp.  He would be prosecuted for Sodomy in the First Degree.

June 24, 1990 Oregon State report noted Mr. Purkey denied disobeying an
order.  He had injected amphetamines into both arms during a 15-hour period.
He later received a "hot shot" and could not recall being given an order.
One of his close friends had left prison and other inmates wanted him to have
some fun over that departure.

Mr. Purkey was examined in the infirmary.  Fresh needle marks were observed,
he was red faced, agitated, had rapid speech, unsteady balance, and
pinpointed pupils.  He admitted "shooting crank" and "seeing colors."

On August 2, 1990 Mr. Purkey stated to Nurse Barnet, "Fuck you little cunt."

August 9, 1990 Oregon State Medical Progress Note added Mr. Purkey saw no
reason for a sack lunch.  Says he is borderline diabetic.  He became very
angry.

August 29, 1990 Oregon State report added Mr. Purkey stated, "Fuck you, dump
your own mop bucket…" when ordered to dump the bucket.  He was apparently
upset about a transfer that had not taken place.

September 9, 1990 Oregon State note added that Mr. Purkey was upset that two
letters had been returned.  He was not satisfied with why they were returned
and stated, "Fuck you Reyes, I want to see the Watch Commander."

1991 -

March 5, 1991 DOC Seg Report added that Wesley was charged with threatening
and intimidating another inmate.

March 25, 1991 DOC memo indicated Wesley was at risk to act out and use
substances.  He should remain at a facility fully equipped to deal with any
acting out.

May 25, 1991 DOC memo added that Wesley was removed from medium security.
His poor conduct record, substance abuse, and violent tendencies required
transfer to a more secure facility.

1992 -

March 18, 1992 MHS psychological evaluation added that the MMPI was invalid.
No conclusions could be drawn.  He had two class 1 Disciplinary Reports in
the past year for disobeying orders.

March 18, 1992 MMPI noted that Wesley's parents were both alcoholic.  His
father committed suicide.  The great-aunt who raised him died on the day he
was paroled in July of 1980. Wesley committed burglaries with his wife and
she was incarcerated in the LCF East Unit.  Wesley wanted to study hotel
management when he got out.  He had an AA sponsor and was part of a
stuttering group.  He received two Class I Disciplinary Reports the past year
and was guilty of both.

Diagnostic Interview Report
Wesley Purkey
Page 19

MMPI results showed a person who appeared to be very low in anxiety and had
good ego strength.  He also appeared to be in a defensive posture. There was
a very high elevation on a psychopathic deviate scale.  The high elevations
might suggest the classical picture of the psychopath.  Poor social judgment,
inability to profit from experience, antisocial behavior, and conflict with
authority figures might be indicated.  Wesley painted an ambiguous picture.
His intellectual ability and level of education could mitigate his antisocial
tendencies.  On the other hand, he recently had two disciplinary reports.

1993 –

August 3, 1993 DOC Physician Orders added that Wesley was stressed at work
and home.  He still talked to mental health and wanted to sign a refusal for
Actifed.

December 9, 1993 MHS report noted the focus of treatment was on deviant
behavior cycles and their underlying dynamics.  Special focus should be on
anger and impulse control.  He began group in a very sarcastic, angry
fashion, then lowered his guard.  He began to make good progress.  He
completed 30 hours of group.  He had a chronic history of substance abuse,
anger, and shame.

1994 –

July 20, 1994 Lansing MHS report used the MMPI and MCMI in addition to other
psychological tests.  Forty-two-year-old Wesley Purkey was serving a life
sentence.  This was his third incarceration and he had spent 18 years in
prison.  Family background history was totally dysfunctional.  There were
frequent divorces, promiscuity and alcoholism.  Characteristics in Wesley's
childhood included rejection, abandonment, inconsistency, and intimidation.
His first serious offense was at age 19 and he had been incarcerated most of
the time since that.  At the beginning of this incarceration, Wesley received
many disciplinary orders for violent behavior, disrespect, disobeying orders,
and drugs.  He was in Protective Custody a long time after being involved in
drug trafficking, which resulted in his being stabbed by another inmate.  He
had completed several vocational programs and had positive response from
supervisors.

Mental health history noted that Wesley was in psychotherapy for several
months as a teenager due to severe personality disturbances.  In his late 20s
he made two suicide attempts evaluated as "a call for help."

Mr. Purkey participated well in the evaluation.  He did not present symptoms
of psychosis or significant personality disorder.  Tests did not indicate
organic brain dysfunction.  He was in the average range of intelligence.
Personality tests indicate quite stable personality traits.  MMPI results
showed he was amoral, hedonistic, egocentric, bright, and manipulative.  His
relationships with others were superficial and based on anger.  He had
problems with authority.  MCMI strongly indicated a narcissistic component.
Both tests indicated tendency for substance abuse and addiction.  He also
presented strong indicators of maturity, psychological health, good ability
to cope with stress, and adjustment to difficult situations.  Summary
included that Wesley did not present symptoms of a major psychiatric process,
nor suicidal tendencies.  Test results indicated strong traits of antisocial
personality that were outweighed by maturity and integrity of his

Diagnostic Interview Report
Wesley Purkey
Page 20

personality.  Czeslaw Doktor, MA believed Mr. Purkey did not present indicators preventing him from obtaining minimum custody.

1995 -

October 15, 1995 DOC Disciplinary Report added that Wesley's drug screen tested positive for THC and cocaine.

1996 -

October 14, 1996 DOC memo added that Wesley was granted minimum custody by exception.  He was then found guilty of using stimulants and it was overturned in 1996 and expunged from his record.  His supervisor said he did excellent work.  Wesley wanted minimum custody again.

1998 -

May 2, 1998 Via Christi Regional Medical Center History and Physical added that 45-year-old Wesley Purkey was fine until four or five days ago when he started to act paranoid.  He thought someone was trying to poison him.  He woke his wife saying while asleep he was sprayed with a poisonous mist several times and his blood had poison in it.  He thought his house was wired and they could see his wife, children, and himself all the time.  His wife called the police three times the evening before due to his paranoid behavior.  He was extremely anxious and suspicious.  Because he slept with a drug dealer's wife, that dealer was going to have him killed.  They had been married 11 years and his wife stated he was not on any drugs.  Wesley said he used crank a week ago.  His urine was positive for methamphetamine.  He was brought to the hospital because he was getting out of control with agitation, anxiety, and paranoid behavior.

Mental Status noted Wesley's thoughts were organized.  Paranoid delusions were present, as well as visual and somatic hallucinations.  During the interview, Wesley suddenly got up and left the room saying they are "spraying me with their mist."  He had benign homicidal and suicidal ideation.  He was extremely fearful of being murdered.  Impression was Psychosis, NOS, Rule Out Substance Abuse Psychosis, Crack Cocaine.  He would be admitted.

May 3, 1998 Via Christi Problem Update (handwritten) added Wesley was discharged alert and oriented.  There was no thought distortion.  His wife and ex-wife both came for discharge and both were supportive.  He was encouraged to attend AA/NA.

September 13-14, 1998 University of Kansas Hospital Discharge Summary noted that 46-year-old Wesley Purkey was admitted for having a history of IV drug abuse, Polysubstance Abuse, and multiple tattoos after shooting intravenous (40 mg) of crushed Ritalin and an unknown amphetamine.  UA was negative.  He experienced approximately 2 to 2.5 hour of left upper chest pressure with tingling in the left arm with anxiety and dyspnea cardiac stress that was normal.   Final diagnosis was atypical chest pain, likely secondary to drug-induced anxiety, and cellulites of bilateral forearms.

Undated KU Hospital handwritten consultation noted Wesley requested help with "addiction issues."  He had been off drugs for 10 years but used three times in the past six months.  He used "speed" (Ritalin).  He noted irritability and anger and believed they predated resumption of speed.  He noted anhedonia

Diagnostic Interview Report
Wesley Purkey
Page 21

when "using" not otherwise.  Recent use interfered with work.  He was
cooperative and recognized his problems.

December 16, 1998 FBI report noted that Wesley Purkey was interviewed at the
Wyandotte County Prosecutors Office.  He was currently incarcerated as a
result of the October 28, 1998 murder of Mary Ruth Bales.  It was made clear
to Mr. Purkey that the sole purpose of this interview was to discuss the
possible kidnapping, rape, and homicide of a Missouri woman referred to in
Mr. Purkey's letter received by Det. Howard and forwarded to Special Agent
Tarpley.  Mr. Purkey stated he would be willing to confess to the Missouri
case if he would be allowed to spend his jail sentence in the Federal
Penitentiary.

Mr. Purkey stated that sometime in January or February 1998 he applied for a
job at Roto Rooter in Kansas City, Missouri.  After filling out the
application and being given a short tour of the facilities at about 8:45 am,
he drove to the area of Troost Street.  He stopped at a grocery store to buy
orange juice and gin before going home.  While at the grocery store, he
started a conversation with a white female whom he described as age 17-19,
approximately 5'6" to 5'7", 140 pounds, chunky, dark brown hair, and wearing
a brown jacket, plaid shirt, and blue jeans.  Wesley learned the woman's name
was Jennifer.  Wesley asked Jennifer if she would like to "party."  Jennifer
agreed and they drove to a liquor store for more gin.  Jennifer said she had
been walking home from school after an argument with some black females at
her school.

After obtaining the alcohol, Wesley mentioned he needed to go home to
Lansing, Kansas for a few minutes.  Jennifer did not want to go.  At this
point, Wesley placed a boning knife from the glove compartment on his right
thigh on the front seat.  Although he did not verbally threaten Jennifer, he
did say, "Bullshit, you're coming with me."  He had no intention of letting
Jennifer out of his truck.

Mr. Purkey drove to Kansas via I-70 and took K-7 Highway to Lansing.  He
pulled off various side roads along K-9 north and it was there that he raped
Jennifer.  After raping Jennifer, Wesley stated he stabbed and killed her.
After she was dead, he placed her on the floorboard and drove around for
about 30 minutes trying to figure out how to conceal his crime.  While
driving on the back roads, he came upon a large wooden box along the side of
the road.  He cut the front seat cover and wrapped Jennifer's body in it.  He
then placed the body in the wooden box and put debris on top of the body for
concealment.

While in "shock", Wesley drove to Snoopy's Bar in Leavenworth, Kansas.  He
stayed there from around 11:00 am to 1:00 pm.  He then drove to his home
where he stayed until his wife got home from work around 5:00 pm.

Responding to further questioning, Wesley stated he waited a day or two
before returning to the body disposal site.  He then proceeded to an unknown
location to dispose of the body.

At this point in the interview, Mr. Purkey refused to cooperate further until
he received assurances from the United States Attorney in Kansas that the
case would be prosecuted through Federal Court.  The interview was
discontinued and Mr. Purkey was returned to the Wyandotte County Jail.

Diagnostic Interview Report
Wesley Purkey
Page 22

Upon locating the wooden box, Wesley spread a large blue tarp on the ground, removed Jennifer's body from the box, and placed her body on the tarp. He secured the tarp with twine and placed the body in the back of his pickup.

On December 16, 1998 Kurt J. Shernuk, Assistant United States Attorney for Kansas indicated his office would be willing to prosecute the case. Mr. Purkey would be required to fully cooperate with authorities.

On December 16, 1998, SA Tarpley and Det. Howard contacted Mr. Purkey at the Wyandotte County Jail. While enroute to the crime scene area, Mr. Purkey indicated no physical remains would be found and that he took extraordinary care to dispose of Jennifer's body. He then stated, "What I'm about to tell you is probably the most hideous thing that you guys ever heard of."

Wesley Purkey used his Sears charge card to buy a chainsaw two or three days after killing Jennifer. He cut Jennifer's body up and placed the body parts in large black plastic trash bags. Shortly after dismembering Jennifer's body, Wesley washed down his basement and the chainsaw using bleach and water to remove any signs of blood. Over the course of two or three weeks, he purchased two cords of wood and burned Jennifer's remains, bag by bag, at his residence.

After burning Jennifer's body in the fireplace, which took several days, he swept the fireplace. He put the ashes and bones in a plastic bad and eventually dumped them in a pond located on leased property near Wichita, Kansas in Clearwater, Kansas. Mr. Purkey and his family moved to Clearwater in May or June 1998. After about three months in Clearwater, the family returned to Kansas City where Wesley worked for Reddi Rooter Plumbing.

December 17, 1998 (10:00 am) FBI report was completed by SA Tarpley and Det. Howard. As a result of an interview, Wesley Purkey provided a three-page, handwritten note outlining his involvement in Jennifer's death. The following contents of that document by Mr. Purkey are as follows.

"After filling out a job application at Roto Rooter, Wesley drove down Truman heading east off Troost. He stopped at a store where he saw a girl walking by the store. He stopped her and began a conversation. He asked her if she knew which way Broadway was. He then asked if she wanted to get something to drink. After getting in the truck, Wesley learned Jennifer's name. She indicated she was on her way home after having some kind of problem with a couple of black girls.

They drove to a liquor store and bought gin and orange juice. Wesley then said he needed to "run back to my place real quick." He explained it was about a 20-minute drive to Lansing. Jennifer indicated, "I really don't want to go down there, how bout you take me back where you picked me up from." By this time they were going west on I-70 and Wesley said, "It won't take long just up and back." As he said that, he reached into the glove box and grabbed a knife that he stuck along his right thigh. He then drove straight to his house.

After arriving at his house, Wesley drove into the garage and using the automatic door closer, closed the garage door. They went into the back room in the basement where he his weights were. There was also one couch and a plastic black truck toolbox. They had sex "back there one time." They got dressed and Jennifer asked Wesley to please take her back. After getting

002387

Diagnostic Interview Report
Wesley Purkey
Page 23

back in the pickup, they sat for a few minutes.  Wesley then "raped and killed Jennifer in mine and my wife's house—may God forgive me—no one else will."  He then wrapped Jennifer's body in the seat cover and put her in the plastic toolbox.  He then sat next to the box and told her, "I was so fucking sorry?  I know what I did is so terribly wrong…killing and hurting this young girl in mine and my wife's home…why!…What I am doing now is ripping my insides out, but I know it is right…Jennifer's family needs to know I wish I had her to give her back to them…"

Wesley indicated that he didn't know what to do next and then remembered a man he was in prison talking about using a chainsaw on a body and then throwing the body parts in the river.  He went to Sears the next day and purchased an electric chainsaw.  He began putting body parts in double large trash bags with partial leaves in them.  The bags were "stacked against the far wall and I placed a blue tarp over them until I could figure out what to do with them."  "Probably two or three days later," Wesley picked up a large plywood box.  He put it along the north-front side of the fence in his back yard.  He placed all the bags in that box.  He then cleaned out the black plastic toolbox, emptied it, and gave it away.  Over the next couple of weeks, he gathered cut wood, approximately two cords, stacked it in the basement and on top of the box.  He threw away a plastic bag with a bra, panties, and socks at a curb on Michaels Road.  He wasn't sure when he burned Jennifer's jeans, jacket, and shirt.  He burned the bags over a week's period and the remaining ash was collected in three or four trash bags and put back in the box.  Most of the teeth and partial jawbone were thrown out on County Road 5 and Michaels Road.  The trash bags were dumped in a lagoon in Wichita or Clearwater.

After returning to the pickup, Jennifer pleaded with Wesley to take her back to Missouri.  She said she would not be able to find his house and would not tell anyone what had happened.  Wesley then realized he "needed to get rid of the victim."  He did not want to return to prison.  While Jennifer was in the cab of the truck leaning against the passenger door, he got the knife from underneath his right thigh and stabbed her one time in the chest just below the breast bone and held it there for several minutes.  Mr. Purkey stated, "It's not like in the movies, they don't die right away.  It took her some time before she died."

Realizing Jennifer had died, Wesley put Jennifer on the garage floor.  Seeing blood on the seat cover, he removed it, put Jennifer it the seat cover, and returned her body to the basement.  He placed Jennifer's body in the black plastic toolbox and then cleaned up blood in the basement.  He even removed the baseboard molding on the paneled walls to conceal what had happened.

Wesley then drove to Snoopy's Bar, drank for several hours, and then returned home to meet his wife.  After buying the chainsaw, Wesley cut up the body and placed body parts in double-lined large plastic black trash bags.  He estimated it took 9 to 10 bags.  He placed the bags on shelving in the basement.  After placing all the body parts in bags, Wesley cleaned the basement.  He indicated that several times while dismembering the body, he had to stop and clean the saw.  It took approximately three to four hours to dismember Jennifer's body.

Several days later, Wesley stole a large wooden box from Studdards Moving and Storage.  He placed it in his back yard and placed the bags in the box.  Due to the cold temperatures, there was no odor present from the body parts.

Diagnostic Interview Report
Wesley Purkey
Page 24

Over a period of time he proceeded to burn the body parts in the fireplace after his wife left for work. He threw the knife out along the roadside on his way to Wichita.

December 19, 1998 FBI Investigative Addendum/Clearance report added that Wesley Purkey identified Jennifer without hesitation from a photograph. Wesley was very uncomfortable viewing the photograph and said he had a profound respect for Jennifer. He could not believe he had committed such a vicious act. He believed he might recall more information about Jennifer as time passed and would be willing to submit to hypnosis to recall details.

1999 –

Wesley completed an Undated Family Background Form. "On a service call for my company-using crack cocaine in the customer's home-I killed her." His mother physically abused Wesley when he was a child. Their relationship was poor. He had physically and mentally abused his spouse. He had been in frequent trouble since age 16. He left school because of peer influences and total lack of interest.

January 20, 1999 FBI narrative added that Wesley sat in the parking lot at Roto Rooter and smoked crack for five or six minutes before driving toward Troost Avenue.

April 22, 1999 Wesley Purkey letter to Det. Howard discussed drug lacking and "literal attempted murder" by his ex-wife and wife. He was more than willing to take a polygraph test and wondered if they would be willing to take one too.

May 14 Wesley Purkey letter to "Howard" addressed that Wesley was willing to be totally honest regarding the chainsaw. The ordeal needed closure for everyone and he was "ready to give closure."

2000 –

January 3, 2000 Physician Orders noted Wesley was having problems controlling his anger and was restless and had sleep difficulties. He was having flashbacks about killing a woman with a hammer. He declined meds, would ask for help if needed. September 2000 note added Wesley needed counseling after his crime. He didn't want to take meds. August 2, 2000 Physician Orders added that Wesley was very hateful and agitated. He beat on the cabinet in his cell and was very angry. He wanted immediate attention. August 2, 2000 note added Wesley was very agitated and said he had been sprayed for three days. He would be referred to mental health. May 31, 2000 note added that Wesley felt mad, angry and left without. He wanted Motrin for shoulder pain.

February 14, 2000 PHS Physician Orders was for Vistaril 75 mg at hs. Diagnosis was Adjustment Disorder NOS. Vistaril was now at 50 mg po hs.

March 30, 2000 Fourth Amended Complaint charging Wesley with killing Mary Ann Bales.

May 4, 2000 Health Screening form noted Wesley said he was treated for a mental condition—sleep. He denied suicidal or homicidal ideation. He took Zantac qhs. Inmate medication record recorded Zantac 150 mg bid.

002389

Diagnostic Interview Report
Wesley Purkey
Page 25

May 12, 2000 DOC Disciplinary Report noted Wesley struck an inmate and knocked him to the floor.

May 18, 2000 KDOC Evaluation and Classification Report added that 48-year-old Wesley Purkey's affect was appropriate. He was mildly depressed and anxious about returning to prison. He denied suicidal or homicidal ideation. He had had aggressive outbursts that resulted in violence and death, particularly while under the influence of drugs. He was oriented to person, place, and time and did not show signs of a formal thought disorder. Speech was clear and goal directed. Attention and concentration were appropriate. Recent and remote memories were intact. Judgment appeared impaired and egocentric.

He reported multiple head traumas, none resulting in any aftereffects. The MMPI-2 was valid. Elevated scores likely reflected chronic pathology and some acute exacerbation. He was likely to present himself as outgoing and confident. He might appear superficially charming and fun to know. He would likely be manipulative and controlling in relationships. He could be very demanding and resent demands made on him. He would have very limited close relationships. Rules should not necessarily apply to him. He might feel he should be given anything he wants and resented limits placed on him. His response to conflicts might be violent.

He was likely a sensation seeker and might feel easily bored and frustrated. He might not anticipate consequences to his actions or understand how they might affect others. Project drawings were suggestive of impulsivity, immaturity, and limited interest in social interaction. His Bender scores were suggestive of possible organic dysfunction, likely secondary to chronic substance abuse.

He stated he committed the murder while he was high on crack cocaine. He did not feel he had received adequate mental health treatment, even though he had made numerous requests. He had insight into his problems but downplayed his actions and blamed substance abuse. He was currently in segregation due to a fight in the RDU. He would likely try to manipulate the system to get what he wanted. He could be aggressive if he felt others bothered him.

Diagnosis was Polysubstance Dependence with physiological dependence, in a controlled environment and Antisocial Personality Disorder. He was not interested in counseling at the present time.

May 19, 2000 Inmate Transfer File review diagnosed Polysubstance Dependence and Adjustment Disorder without mixed features and Antisocial Personality Disorder. September 22, 2000 reassessment diagnosis was Adjustment Disorder with Mixed Emotional Features and PTSD by Dr. Foster on November 3, 2000.

August 2, 2000 Mental Health Services (MHS) referral form added that Wesley was having paranoid delusions. "They have been spraying chemicals into my cell." He was anxious and complained of chest pain. He had no symptoms of delusional disorder or history of psychosis. He had mixed anxiety, depressed mood and insomnia.

September 27, 2000 therapy note noted that Wesley said Ms. Bales was a nice lady and didn't deserve to be beaten to death with a hammer. He had a mental evaluation from Menninger that staff didn't have. He would start anger management. Wesley wanted to know why he did what he did.

002390

Diagnostic Interview Report
Wesley Purkey
Page 26

October 4, 2000 therapy note added that Wesley was having major problems with anger. Saw the back of a man's head that reminded him of the man who started him on cocaine. "There's that piece of shit." He wanted to hurt the man. It was not the man and Wesley was then upset with himself to allowing the rage to take over. He still didn't know why he murdered Ms. Bales. It was very stressful for him to discuss his rage and what it results in.

December 23, 2000 Physician Orders added Wesley was very agitated. He needed to talk to someone. On December 9, 2000 Wesley stated, "I need nerve pills."

December 29, 2000 MHS note added that Wesley's thoughts were very fast. He was very easily angered and unable to control emotions. Crisis level would be continued. Wesley threw a cup lid out of the cell when staff stepped away. On December 27, 2000, Wesley was "pissed…I don't trust MH either." He was angry that Ms. Hanson could not see him that day. December 5, 2000 therapy note added that Wesley was frustrated and angry trying to stand up for what he felt he needed in mental health. October 9, 2000 referral form referred to "irrational rage, refer to SOAP note of October 4, 2000.

2001 –

February 9, 2001 Physician Orders added Wesley wanted to try going without meds. He would ask for help if he started having problems.

February 9, 2001 MHS progress notes added that the doctor wanted to cut his medication. Wesley was working with children in the jail program and doing well. Violent movies made him dream about his crime. Diagnosis was Polysubstance Dependence, Adjustment Disorder with Mixed Emotional Features and Antisocial Personality Disorder.

August 16, 2001 FBI report by SA John Brunell indicated Wesley was given a letter written by Glenda Lamont, Jennifer's mother. Wesley indicated he would read the letter later. It "haunts him every night" and he would live with what he did until he died.

August 18, 2001 MHS therapist report noted that Wesley had been surprised over the weekend. He had been sent to shakedown and told to sit in a particular seat. He later learned that the FBI had brought Jennifer Long's mother to the prison. When he sat where he was told to, she could see him. Wesley possibly wanted to discuss another case, but was discouraged since the therapist would have to report what he said. He did stated, "I'm not going to say that I am not sorry for this woman." (Jennifer's mother). His demeanor indicated he knew more than he was willing to tell. He would not confess to a murder if it carried the death penalty. June 6, 2001 therapist note added that Wesley requested to be seen by for mental health. His perception was that he had been put off because he was serving a life sentence. He should be seen. May 31 note added that Wesley was handling anxiety and stress without medication. March 22 Wesley now understood the therapist's position about not discussing the other "case." He tried to assess how he left every including himself down.

Wesley's primary problem was explosive anger leading to legal ramifications as well as a springboard for substance abuse. Interventions included use of cognitive, RET, and didactic therapy modalities to foster understanding and prosocial change. Axis I was Attention-Deficit/Hyperactivity Disorder. Axis II: Borderline Personality Disorder.

002391

Diagnostic Interview Report
Wesley Purkey
Page 27

September 26, 2001 Telephone conversation between Det. Howard and Wesley
Purkey noted that Wesley had told Det. Howard that his ex-wife substituted
his drugs.  Wesley stated that the man his ex-wife was living with was now in
a "vegetarian coma" because of drugs being switched on him.  Wesley could not
understand why no drug were found in his system when he was hospitalized at
KU.  He had been doing amphetamines "for days."

September 27, 2001 FBI telephone conversation between Det. Howard and Wesley
Purkey added that Wesley was not willing to return and be interviewed at the
Wyandotte County Jail.  He was not going to make another confession.  The one
he gave was given under false pretense.

October 23, 2001 initial assessment form noted Wesley was emotionally stable
and had no indication of mental illness.

November 2, 2001 through February 1, 2002 CCA Segregation Hearing Reports
noted that Wesley was a chronic behavior problem, was aggressive, and was a
threat to others.  June 24, 2002 Wesley was presented a safety risk to staff.
He was violent and had emotional outbursts toward staff.

November 4, 2001 CCA Disciplinary Report added that Wesley became angry when
told he would not be handcuffed in the front.  He had fallen and hurt his
back and requested to be handcuffed in front.  He yelled obscenities and
caused a scene in segregation.

2002-

January 21, 2002 CCA Disciplinary Report noted that Wesley became angry and
banged on the control room window.

January 25, 2002 a grievance was filed against Wesley for verbal aggression
toward staff that attempted to deliver a written response from a previous
grievance.

February 5, 2002 Facility Emergency Flow Sheet noted that Wesley refused
assessment and told the nurse to "get the hell out of here…I don't need a
fucking nurse."

February 4, 2002 grievance addressed that Wesley refused dental treatment and
called the dentist a fucking liar.

February 4, 2002 grievance noted that when Wesley complained about medication
taken from two containers the nurse said, "Oh well, fuck it, I'll just throw
out your medication if you don't take it, take me to court, you like doing
that anyway."

February 6, 2002 Incident Statement noted that Mr. Purkey was in the
administration office to discuss his grievances.  He became more and more
agitated and eventually asked to be returned to his cell.

February 2, 2002 CCA Disciplinary Report was by Officer Nydia Bell.  Wesley
had been verbally abusive and shouted profanity at her.

February 5, 2002 CCA Disciplinary Report added that Wesley was enraged over
board results.  He threw an ink pen and hit George Westbrook in the face.  He

Diagnostic Interview Report
Wesley Purkey
Page 28

yelled and called Mr. Westbrook dirty names, saying over and over that Mr.
Westbrook had "set him up."

February 17, 2002 HSC clinic note reported that Wesley refused to sign a
release for medical and dental records from his previous facility.  He also
refused to sign a refusal form.

March 2i, 2002 Forensic evaluation by Dr. Pietz diagnosed Polysubstance
dependence and Antisocial Personality.  She found no mental illness.

April 1, 2002 Wesley Purkey written note stated he was having problems
getting his medication.  When he complained he was not refusing his
medications.

April 3, 2002 Prisoner Information Request written by Wesley added that the
CCA medical staff were incompetent and to stay away from him.

April 4, 2002 HSC clinic note added that when the nurse tried to give Wesley
his medicine, he was verbally abusive, and refused the medication.

April 8, 2002 Incident Statement added that during pill call Wesley and the
nurse got in a conversation that escalated to an argument.

April 8, 2002 letter by Wesley detailed that he had broken a tooth, wanted
dental care, and did not get that care.  He requested a soft diet but was
refused.  He had problems eating and was experiencing severe pain.

April 15, 2002 CCA Disciplinary Report added that Wesley broke escort and
stepped toward the dentist.  He yelled loudly at Dr. Nowlen.

April 15, 2002 CCA note added that Wesley was seen throwing coffee and
hitting another inmate.

April 15, 2002 CCA note added that all movement of Mr. Purkey would be
videotaped, per Warden Lawrence.  Wesley refused food because his tooth hurt.
May 8, 2002, Wesley began eating again most of the time.  On February 9,
2002, Wesley refused his Depakote.

April 16, 2002 Wesley Purkey letter to Warden Lawrence.  Wesley apologized
for the incident at the infirmary.  He had started back on medication and had
a "hell of an adjustment 10-day period or so."  Mood swings was a side effect
of the Tegretol and BuSpar.  He did not step toward Dr. Nowlen.

April 18, 2002 report by Mr. Duchardt added that Wesley had not been
receiving medications correctly since being at CCA.  Because of that his
condition had worsened substantially.  Medication had been started again.
Wesley stopped medication again because he broke a tooth, was in pain and
could not eat.  The psychiatric medication irritated his empty stomach.  His
condition deteriorated again.

Wesley also resisted dental treatment while being handcuffed behind his back
in the dental chair because of pain.  If CCA staff had permitted treatment
earlier, the situation would have been better.  Wesley's condition was
continuing to deteriorate to the degree he could not assist counsel.

002393

Diagnostic Interview Report
Wesley Purkey
Page 29

April 19, 2002 HSC psychiatric note added that Wesley apologized for his behavior at the last visit. Since medication was restarted he still had mood swings, occasional confusion, and a "tint" sensation with his glasses. There was a history of closed head injury in high school.

April 21, 2002 CCA note indicated Wesley did miss his medication on April 5, 6, and 7 through no fault of his own.

April 22, 2002 security scale noted Wesley had two homicide charges. He became very violent for no reason. He was dangerous.

May 3, 2002 HSC clinic note added that Wesley became angry and requested to be taken back to segregation. (Didn't want to be handcuffed behind his back during dental treatment.)

May 8, 2002 Warden/Administrator's answer to Wesley added that Wesley's abuse of the grievance system had placed a burden on staff. Wesley wrote grievances against anyone who did not comply with his demands.

Undated grievance form noted that all of Wesley's grievances had been filed. Copies were not made until grievances were answered and returned.

May 10, 2002 Incident Statement noted Wesley refused to attend a psychiatric appointment.

June 17, 2002 CCA data form noted Wesley had numerous Aryan brotherhood-specific tattoos. June 18, 2002 form added that he had a history of sexually aggressive behavior.

June 20, 2002 Intake Health Screening added that Wesley had past and current mental health problems. He took medication and had taken medication in the past. He wanted to talk to mental health staff.

July 10, 2002 Wesley's grievance added that he believed Officer Wellingham was basically harassing him. He had made threats against Wesley to other prisoners. Wesley was in fear of his safety.

August 13, 2002 Forensic evaluation by Dr. Scronce diagnosed Polysubstance Dependence and Antisocial Personality Disorder. Mr. Purkey's psychiatric medications were those for persons with impulsivity and aggression, not antisocial behavior. He tended to lose focus when he became angry. He was very difficult to engage when angry about other matters. Dr. Scronce viewed these as maladaptive personality style rather than mental illness.

August 26, 2002 Purkey grievance added that he was still fighting the issues of dirty and cracked food trays. He had gotten sick from eating food on a tray. Answer to the grievance noted that Wesley was disrespectful to the officer when they discussed the dirty trays.

September 2002 grievances and responses noted that dirty food trays were being used in the segregation unit. Wesley complained about this several times. Officer Ray's answer to Wesley included that he appreciated Wesley's efforts regarding the never-ending occurrence of cracked trays. He thanked Wesley for his persistence.

002394

Diagnostic Interview Report
Wesley Purkey
Page 30

Undated grievance by Wesley added that he believed Officer Wellingham had told other inmates that Wesley killed and raped two women. Wesley thought this put his life in danger and that Officer Wellingham maliciously did it.

Testimony by Dr. Shine stated that patients with Bipolar Disorder could become irritable or manic. Medications like Tegretol can help the irritability, agitation, or racing thoughts. (P 11)

Dr. Shine believed that the way Wesley talked to nursing staff indicated he was quite stable. (P 16) He had periods of anger, especially at some staff that didn't meet his requests right away.

Christine Scrone, PhD had two interviews with Wesley. In the first he was very angry about a visit he was trying to arrange with his wife. He wasn't sure the visit would be approved so was very angry and upset. (P 20) Dr. Scronce indicated prominent irritability and mood lability could be symptoms of a mood disorder such as Bipolar Disorder. (P 23) Wesley was taking Tegretol when she saw him. She did see some of the irritability in Wesley.

October 10, 2002 Linda McCandless, DO letter to The Honorable Sarah Hays noted that Wesley refused to be seen for psychiatric follow-up visits. During an April 3, 2002 visit, Wesley became angry necessitating termination of the interview. At that time, his mediation was Tegretol 200 mg 3 times daily and BuSpar 15 mg 3 times day. On a second visit April 19, 2002, Wesley apologized for his behavior and indicated his mood swings had lessened. He believed this was due to medication. He complained of "occasional confusion" and "tint" sensations with his glasses and having some nausea. He was more appropriate during this visit and smiling and personable.

Mr. Purkey's final visit with Dr. McCandless was May 3, 2002. Upon arrival, he made reference to being handcuffed. He also complained of being videotaped during transportation to Dr. McCandless' office. He was told he would not be videotaped during the session. He became angry and requested to be returned to the segregation unit. He stated, "I want it to be known that the psychiatrist wants this to be taped." He was again informed there was no taping being done.

Since May 3, 2002, Wesley refused follow-up appointments. Dr. McCandless continued to monitor his medication levels, but had informed him October 9, 2002 that she would begin to taper his medication with the plan to discontinue it. She would not continue to see Wesley without monitoring his ongoing treatment. It would be left to Mr. Purkey to decide if he wanted to continue medication by seeing Dr. McCandless.

October 25, 2002 United States District Court Transcript of Hearing on Motion to Suppress interviewed the following people:
Dr. Kent Eiler Nowlen, Dentist, Pages 3 through 12
Linda McCandless, MD, Psychiatrist at CCA Pages 12 through 18
Martio Willingham, Corrections Officer at CCA Pages 19 through 40
Andre Ford, Chief of Security Leavenworth Pages 40 through 60
Tyrone Morning, Corrections Officer at CCA Pages 60 through 65
Stacy Appleby, Transportation Supervisor at CCA Pates 65 through 71
James Dixon, Corrections Officer at CCA Pages 71 through 83
Bruce Roberts, Classification Coordinator Officer Pages 83 through 95
William Howard, Jr., Detective, KCMO PD, Pages 95 through 180
Dirk D. Tarpley, FBI agent, Pages 180 through 211

Diagnostic Interview Report
Wesley Purkey
Page 31

(Continuation) Wesley Purkey, Defendant, Pages 4 through 91

October 25, 2002 United States District Court Transcript of Hearing on Motion
to Suppress added that Dr. Kent Eiler Nowlen, dentist, believed Wesley Purkey
did not need a dental appliance in order to eat properly.

Dr. Linda McCandless provided medications for Mr. Purkey. She was not going
to discontinue certain medications he was currently receiving. She had
received Stephen Peterson, MD's letter and had not had time to review it.
She was not sure Mr. Purkey was more anxious, but had been angry on 2 of 3
occasions when they met. She would evaluate Dr. Peterson's medication
suggestions when she next saw Mr. Purkey.

Officer Marteto Willingham helped with the major move on the Segregation Unit
on May 14. He denied seeing any torn up documents from Mr. Purkey's cell.
No items were ever thrown out when a move was completed. Mr. Purkey had two
lock boxes in his cell. Officer Ford could not recall whether he personally
moved things out of Mr. Purkey's cell on May 14. Mr. Purkey kept legal
papers in the lock boxes, which he padlocked. Officer Ford had looked inside
the boxes when checking for contraband and found none. Mr. Purkey was very
neat and would never leave his cell without locking his lockbox.

Security Chief Andre Ford believed that Mr. Purkey was out of the institution
on May 18. The officer that supposedly was working when the incident
occurred was not at work that day. He believed it was not possible that the
incident could have happened and the accusations were unfounded. Mr. Ford
reviewed nearly all grievance forms. They were dated and given a number. No
date or number was on the grievance form so CCA might have never received the
grievance form.

Officer Tyrone Morning had working in the Segregation Unit about four or five
months. He knew Wesley Purkey. Wesley was not allowed to have padlocks to
lock the gray boxes where he kept legal papers. Officer Morning had never
worked a shift with Officer Willingham.

Officer Stacy Appleby had been Transportation Supervisor since February 2002.
She had participated in a videotaping of Wesley Purkey but could not recall
the dates. She didn't recall an incident of taping when Wesley's cell had
been moved from one place to another. She had never been present when Wesley
had difficulties with Officer Willingham. She knew Wesley made complaints
that he lost legal materials.

Officer James Dixon had been employed 11 months at CCA. Officer Dixon did
not work on May 14, 2002. He knew there were verbal conflicts between Wesley
and Officer Willingham. Officer Dixon wrote an incident report referencing
verbal confrontation between Wesley and Officer Willingham. Officer Dixon
knew nothing about a plastic bag with legal material in it. He was not aware
of Officer Willingham purposely throwing away Wesley's legal documents.

Bruce Roberts was the Classification Coordinator Officer and had been at CCA
about 10 years. He was not directly involved in incidents involving Wesley
and threats or comments that Officer Willingham made again him. Officer
Roberts had to restrain Wesley in his office when Wesley threw an ink pen and
struck him in the face. Wesley had been in his office numerous times for
discipline reports. He remembered Wesley asking him about some torn up legal
papers. There was no record of the papers Wesley talked about.

Diagnostic Interview Report
Wesley Purkey
Page 32

William Howard, Jr. was a detective for the Kansas City, Missouri Police
Department. He had been employed since October 1982. He first came in
contact with Wesley Purkey in 1998 during the investigation of the homicide
of Mary Ruth Bales. While housed at Wyandotte County Jail, Mr. Purkey at
times confided in Det. Howard through an Inmate Contact Form. On December
15, 1998 Mr. Purkey indicated through a note that he wanted to talk to Det.
Howard about a kidnapping and homicide. The note gave Wesley Purkey's "name
and current address. Victim was a 17-19 year old, kidnapped in Missouri,
brought back to Kansas, murdered, body never found, probably listed as
missing." Mr. Purkey indicated he wanted to talk to an FBI agent and wanted
to serve time in a federal facility rather than a state facility. On
December 16, 1998 Mr. Purkey was taken to the District Attorney's office to
meet with FBI Agent Tarpley. Mr. Purkey signed a Miranda Waiver. It was
established early on that the Mary Bales case would not be discussed.
However, Mr. Purkey indicated he intended to plead guilty in that case and
wanted to confess to the kidnap, rape, and murder of a Missouri woman. No
guarantees were made to Mr. Purkey that he would receive a life sentence in
exchange for a confession. On December 17, 1998, Mr. Purkey without
hesitation identified Jennifer Long from a photograph. Mr. Purkey expressed
remorse for killing Jennifer Long and was having trouble dealing with what he
had done.

At no time did Det. Howard discuss the death penalty or what sentence Mr.
Purkey might receive. Mr. Purkey indicated that he deserved the death
penalty. Sometime in April 1999, Mr. Purkey sent a communication form to
Det. Howard. Mr. Purkey was very very angry with Agent Tarpley. He would
not have talked to Agent Tarpley or Det. Howard if he had known "the feds had
the death penalty." Mr. Purkey sent additional forms to Det. Howard on April
22 and May 14, 1999. In the May 14, 1999 communication, Mr. Purkey discussed
how he disposed of Jennifer Long's body. Det. Howard again met with Mr.
Purkey on August 14, 2001 at the Hutchinson Correctional Facility. Det.
Howard had a letter from Glenda Lamont, Jennifer's mother. A brief meeting
was held and Mr. Purkey left abruptly and was very angry. On September 26,
2001 Mr. Purkey had a phone conversation with Det. Howard in which he
indicated he had read the Lamont letter and wanted to help the family.
However, he then indicated he would not say anything else. Det. Howard
indicated to Mr. Purkey that he in fact had no control over what would
happen. Mr. Purkey should talk to Agent John Brunell. Wesley sometimes had
to be settled down. "If you get Wes in the right frame of mine, he will talk
to you…but when he's agitated, he goes off on a tangent."

Det. Howard's final contact with Mr. Purkey was on September 27, 2001. In
that phone contact, Mr. Purkey indicated that he would not do anything
further to help find evidence of Jennifer's death. At no time during any of
their conversations did Mr. Purkey ever indicate he wanted to talk to an
attorney. Det. Howard believed Mr. Purkey's primary goal was to convince
Det. Howard and Agent Tarpley that he had killed Jennifer Long. His stated
goal appeared to be that he wanted to be housed in the Federal Penitentiary.
He didn't like the Wyandotte County Jail, and was afraid of the Lansing
Penitentiary. There were "gang bangers and he was too old for that crap."
Mr. Purkey had too many enemies at Lansing and did not want to return there.

Cross Examination of Det. Howard noted that in their last conversation, Mr.
Purkey confirmed that everything he told Det. Howard was the truth. There
was a lot of corroborating evidence to support Mr. Purkey's claim that he

002397

Diagnostic Interview Report
Wesley Purkey
Page 33

killed Jennifer Long.  Mr. Purkey mentioned that drugs were the reason for the things he had done.  He suspected his ex-wife might have "laced him with drugs at one time."  Det. Howard had no control over what happened to Mr. Purkey.  Mr. Purkey felt "tricked" by Agent Tarpley.

During recross examination, Det. Howard again indicated that at no time did he or Agent Tarpley make promises to Mr. Purkey that he would be sent to a federal institution.  They made no guarantees of any kind regarding sentencing, the death penalty, or where he might be housed.  Mr. Purkey would have to convince the U.S. Attorney that he was telling the truth since Jennifer's Long's body could not be found.

Dirk D. Tarpley had been an FBI agent 12 years.  On December 16, 1998, Agent Tarpley met with Nick Tomasic and Det. Howard at the Wyandotte County District Attorney's office.  Following that meeting, a meeting was held with Mr. Purkey and Det. Howard.  Mr. Purkey signed the Miranda Waiver.

Initially, Mr. Purkey was evasive but wanted to know if a federal crime had been committed if the FBI would be willing to take it.  Mr. Purkey did not like the DOC of Kansas and wanted to serve his time in a federal facility.  There was no discussion of what sentence he would receive or about the death penalty if he confessed to a crime.  Mr. Purkey did not seem confused when told Agent Tarpley could not make any promises.

Mr. Purkey told Agent Tarpley about Jennifer Long.  On December 17, 1998 Mr. Purkey gave Agent Tarpley his handwritten confession to the murder of Jennifer Long. He did not invoke his right to remain silent.  On another occasion Mr. Purkey was very angry and told Agent Tarpley that someone had told him he could get the death sentence.  Agent Tarpley said that was possible.  After that, Mr. Purkey refused to enter a room after he saw Agent Tarpley.  Agent Tarpley agreed with Det. Howard's testimony.  Agent Tarpley did not name specific attorneys at any time when talking to Mr. Purkey.  Agent Tarpley thought Mr. Purkey was willing to discuss the Long case if he could serve time in a Federal Penitentiary.

Mr. Purkey remembered the general terms of the conversations with Det. Howard and Agent Tarpley.  He took notes but they were destroyed at Wyandotte County Jail when he was away from his cell.  The notes were in a plastic bag sealed with masking tape.  While outside in the exercise area, Mr. Purkey could see into his cell.  He saw Officer Willingham remove the plastic trash bag containing his torn-up notes and other legal papers.  That bag was considered trash and was taken away.  Mr. Purkey stated filed a grievance even though CCA had no record of that grievance.  Mr. Purkey filed a second grievance when he returned from Rochester.

Wesley Purkey's understanding in December 1998 was that for his full truthfulness he would be given a life sentence without parole in the federal system.  Agent Tarpley never told Wesley that he could not make any promises or deals.  The interviews were not videotaped.  Det. Howard and Wesley did talk about religion.  After the Bales case had been completed, Wesley was taken to a conference room to meet with Det. Howard and Agent Tarpley.  Wesley had not requested the meeting.  Wesley indicated they should talk to his attorney. Wesley stated Agent Tarpley said, "…An attorney would just fuck things up."  Mr. Purkey did not believe there was a typical standard for the grievance process.  Sometimes the grievances had no numbers.  Mr. Purkey agreed that he did not want to go back to the Kansas penal system.  That was

Diagnostic Interview Report
Wesley Purkey
Page 34

one reason he decided to talk about Jennifer Long.  He also wanted to let her
family know what had happened.  Mr. Purkey understood his constitutional
rights when he talked to Det. Howard and Agent Tarpley.

Mr. Purkey did not tell Agent Tarpley that he wanted to serve his time in the
federal prison system.  What he wanted was that in exchange for information
pertaining to the Long case he would agree to a life sentence from the
federal courts and then to serve time in the federal system.  Mr. Purkey
recalled driving to Lansing with Det. Howard and Agent Tarpley.  He
remembered driving around Lansing and going past his former home.  Mr. Purkey
indicated that Det. Howard became upset, "I'm tired of this shit…"  It was
fair to say the officers did not believe Mr. Purkey was being truthful with
them.

Mr. Purkey believed they discussed the agreement again before giving Agent
Tarpley his handwritten confession.  He told the truth in that document.  He
was confessing to the kidnapping, rape, and murder of Jennifer Long.  Mr.
Whitworth believed the notes were crucial to Wesley's defense, he had good
recall, and was not was not being unfairly prejudiced.

Mr. Purkey didn't have his notes and couldn't remember specific dates and
details.  However, it was his understanding that he had an agreement with the
officers and with Agent Tarpley that if he confessed to the homicide he would
get a life sentence without parole in federal custody.  Some lawyer told Mr.
Purkey the feds had a death penalty after he had confessed.  There had been
no discussion of the death penalty.

November 4, 2002 Incident Statement added that Wesley fell in the shower.
When the officer tried to remove his handcuffs, Wesley fell to the floor.
November 6, 2002 statement added that a Deputy Marshall said Wesley was
planning to slip in the shower so he could sue the marshals and CCA.  It was
interesting that Wesley had fallen twice in the shower over the weekend.

Undated Leavenworth County memo added that Wesley had not given any
indication of having any behavioral problems at the Leavenworth County Jail.

**BACKGROUND INFORMATION FROM INTERVIEW OF THE PATIENT:**
**Introduction –**
Mr. Purkey was again advised of the lack of privacy in this assessment.  He
understood there would be no tricks played on him by this writer during this
assessment.  The entire process of the evaluation was re-explained so he was
comfortable participating.  It would not be videotaped or audiotaped.  To his
best recollection, none of his interactions at MCFP-Springfield, FMC-
Rochester, or with the police were ever videotaped.

Through this first appointment, Mr. Purkey showed substantial stuttering.  He
was quite embarrassed about this.

Mr. Purkey was asked what was left over from the prior evaluation and he
still had questions about one proverb.  Again, the answer was not given out.

**Past medical history –**
At the first appointment, Mr. Purkey was being treated with BuSpar and
Tegretol.  The Tegretol/BuSpar combination decreased his anxiety level by
decreasing his highs, but did not control anxiety like Klonopin had.  At one
point he traded BuSpar for Klonopin.  This gave him the first good night's

Diagnostic Interview Report
Wesley Purkey
Page 35

sleep he had had in a considerable period of time.  After that night's sleep, he was finally able to focus on his legal work, did not experience fatigue, and did not feel hung over.  Subsequently, without Klonopin, he attended a court hearing and "was about to blow a fuse."  The court hearing was to be stopped because Mr. Purkey was unable to control his own behavior and "didn't want to be that way."  That his wife did not show up for the visitation is what set him off.

Mr. Purkey was quite angry with Dr. McCandless the CCA psychiatrist.  He felt angry about the medication and that he was not receiving any Klonopin.  He thought one-half pill of Zoloft per day was not enough. He felt so distraught that he was "beating his head on the walls" and focused on Dr. McCandless.

He had images of chainsaws and beating a woman to death.  He was urged to not focus on Dr. McCandless, to focus on his case, and to exercise as a way to find calm until his medicine could be readjusted.  Mr. Purkey then provided a handwritten note of his thoughts.  He had written this down to counter FMC-Rochester's assertion he had no rapid thoughts.  He wrote this pad of thoughts in one to two days after they "threw out his paperwork."  Mr. Purkey was quite distraught.

December 30, 2002 meeting with Mr. Purkey took place after he was placed on 0.5 mg of Klonopin twice per day and 50 mg of Zoloft.  Klonopin hadn't helped at all because the dose wasn't high enough.  He wanted his attorney to make the doctor give him increased medicine.  He wanted to go to court to show the doctor was "a cunt under film."  He was furiously tired of being jerked around.  Mr. Purkey then offered that in order to give himself some respite from his anger and anxiety, he would save three days of Klonopin and take 3 mg at a time.  This helped him focus, be able to lie down, and sleep.  It even kept him from grinding his teeth.

Mr. Purkey then offered that he was very tired and had not slept well for three days.  He felt so anxious that he couldn't think, he had rapid thoughts, and felt like he was in a zoo.  The Klonopin effect only lasted 12 to 15 hours but during that time he could focus and remain calm.

Even though he was still on the Zoloft, it didn't impact his level of anxiety.  He had managed to lose about 12 pounds.

He reiterated that on that third day when he took 3.0 mg of Klonopin he would have relief of anxiety, from the noise, and from his racing thoughts.  The racing thoughts concluded swirling cacophony of his trial, his case, his life, life without parole versus the death penalty, having been poisoned, and being in the zoo.  The only thing that helped without medicine was to listen to his headphones and let his thoughts blur into the songs.  He was not about to exercise stating, "Yoga wouldn't save him from the death sentence."  Again, Mr. Purkey launched into a litany of anger over attorneys, court process, and many things he thought were done wrong.

He wanted to go over the records and possibly demonstrate his need for additional medicine such as Klonopin.  He really believed that Klonopin worked well.  Mr. Purkey was advised that it would be difficult to obtain Klonopin, as it was not on the penitentiary formulary.  Even so, Mr. Purkey still wanted it.  He had great difficulty speaking with the female jail psychiatrist at CCA because he thought she was providing inconsistent care.

Diagnostic Interview Report
Wesley Purkey
Page 36

Presently, Mr. Purkey was refusing to have his appointments with the CCA psychiatrist videotaped. Thus, he believed she was just now "rubberstamping CCA tactics." The only way Mr. Purkey would allow himself to be seen by the CCA psychiatrist was if his attorney was present.

His dosage of BuSpar had been 15 mg PO 3 times per day. It did not provide any significant anxiety relief. Tegretol was 200 mg PO 3 times per day.

Tegretol and BuSpar had been started together so he really had a difficult time separating their effects. He thought their combination resulted in more stable moods and less fluctuation. However, the intensity of his moods was the same.

Mr. Purkey was not having any side effects from the Tegretol. His last level was a month earlier. When he missed 3 or 4 doses of Tegretol he experienced headaches, confusion, perception of color changes, and vivid racing bizarre pictures in his mind. For example, he might see distorted faces or horse races, etc. He suppressed those by lying down and concentrating on music in his headphones. During those times, he was unable to focus on anything else. Thus, he believed that Tegretol was providing some help.

Separate from the spikes of anxiety he felt around court dates, Mr. Purkey experienced mood swings. He tried not to act out on them or use them as an excuse to show anger. However, Klonopin had helped him focus and deal with these frustrations much better than BuSpar. Without Klonopin, Mr. Purkey finds himself quite internally aggressive. When any of the CCA guards cross him or do something he perceives as unfair, his immediate response is, "Come on, suit up, let's go." That is, he finds his anger almost impossible to control.

Mr. Purkey believed he was in better health because he quit smoking on October 13, 2001. He had no access when at Federal Medical Center-Rochester, so stopped smoking a pack per week. He had no access or interest in tobacco in any form.

There was nothing new in his review of systems. He had no seizures. He was experiencing pulsating frontal headaches. These were brought on by stress when he "can't calm down." He actually felt his blood pressure rising during these times. The only thing that took his mind off those headaches was to focus on and listen carefully to rock and roll music of the 70s to 90s. He did not listen to "Heavy Metal." He occasionally listened to jazz. The music allowed him to consciously choose to focus on relaxing.

**Present functioning -**
Mr. Purkey the precipitously clinched his hands and stated, "My parents didn't give a fuck…I feel my bad behavior is so deep even though I know it is childish." He knows it is childish to "break up what he has paid for" meaning his property in prison, but he does it anyway when he feels overwhelmed.

Mr. Purkey believed that he had long-term memory problems. These were worsened. He thinks that was due to his past and allows him to try and put it in a better perspective. He has accepted responsibility for his actions and was aware of behaviors that led to creating his personality style.

002401

Diagnostic Interview Report
Wesley Purkey
Page 37

Mr. Purkey believed he was not a bad person but that he did bad things and that no one had looked into the effect of his penitentiary experiences. Previously he had recounted seeing much violence and denigration.

At one point, he recalled having participated in a Hutchinson Correctional Facility jail program like "Scared Straight." He could relate to the troubled young men who attended. They had problems with drugs, with their parents, and that no one was there to nurture them. The experience made him feel he could help them "not go where he had gone." This gave him hope. That was in great contrast to his experience at the Wyandotte County Jail where his circumstances were so bad that he cried out, "Oh God, stop this heart now." He believes it has made him stronger to face those circumstances.

Mr. Purkey offered that this writer was the first to put his life in perspective versus the treatment at Springfield and Rochester, Minnesota. He especially chafed at Dr. Pietz' comments at USMCFP that no matter what happened in his life "it still didn't change what you did." She was so antagonistic toward him that she spoke to him through the solid door food hole. In fact she screamed, "You are here because you raped and killed women." Dr. Pietz also said Mr. Purkey tried to manipulate his report with a tiny pencil. In reaction, Mr. Purkey refused to take the MMPI with a small pencil because of Dr. Pietz' attitude toward him. All these problems with her took place even though he was taking BuSpar and Tegretol.

Mr. Purkey was certain his case would go to trial. He felt heartened that the subject of poisoning was no longer taboo. He had uncovered actual evidence to back up his assertions that he had been poisoned. First, his wife was more talkative and admitted that she had tried to poison him. Second, his wife reportedly still possessed his ponytail, which had been cut off after the charged offense. Again, Mr. Purkey wanted that checked because he still believed his wife's poisoning of him had relevance to the present crime.

Mr. Purkey was feeling better because he found that he had mood shift triggers that came in two forms. The first was when he just woke up and there was a different activity on the day such as facility change or a family event. This was an internal thing. Externally, he might wake up "so fucking mad and can't do it that he becomes irrational." He finds he cannot stop this onset of irrational behavior and then fights to "get a grip." Sometimes it takes him three and a half or four days to get back together. Mr. Purkey was never certain what made him feel better. He did not feel the BuSpar was helping enough. He thought the Tegretol was probably helping.

He was greatly disturbed because his 24-year-old daughter was angry with him, so was not letting him see his 6-week-old granddaughter. This made Mr. Purkey feel so anxious that he became non-functional. He also then recalled that this kind of anger "in the system" is acceptable especially in the "cesspool of the penitentiary." He doesn't want that kind of anger that had kept him alive before when he was in the penitentiary. For example, he was so debilitated by the disagreement with his daughter that his thoughts spun around and he then saw bright and black flashes in front of his eyes. It helped him to think it through by writing his daughter. In this writing he shared that they were both hurting. He would attempt to reconcile whether or not his daughter would write back.

Diagnostic Interview Report
Wesley Purkey
Page 38

Mr. Purkey explained that his 24-year-old daughter Angie lives 1.5 miles from
CCA prison.  Angie's husband was jailed at nights due to marijuana possession
and a DUI subsequently followed by three urinalyses positive for illicit
drugs.  Mr. Purkey believed his daughter was physically safe with her husband
because he was a hard workingman.

Mr. Purkey was emotionally prepared for the hearing on October 17, 2002, but
he still found it difficult to prepare for the encounters in the courtroom.
He was especially anguished by the thought that the victim's family would
stare at him.  This was the hardest thing for him because he understood their
grief, bitterness, and pain.  He also melded some of the victim's experiences
with his awareness that Angie, his daughter, was ashamed by his actions and
that he was in prison.

Mr. Purkey very much wanted to show the remorse he felt so the victim's
families could see it.  He vacillated between an intense desire to "fight for
his own life" and not plead guilty to the death penalty.  He had felt this
ambivalence for a very long time.  He then observed that before he had these
cases, he had never done any murders and yet he had done many things he
wished he hadn't.  His feeling of shame for having done wrong had been with
him since he was a youngster with his mother.  For example, she never let any
children come over to their house.  Since 11 or 12 years old, he was unsure
how to proceed in life.  He never stopped to think about how to relate to
others back then.  He knows his self-worth was very low and he tried to hide
it.  That was one thing that caused him to act so badly.  He felt bereft, as
there was no one there to help him.  There was no one to take the place of
his parents and help him.

Mr. Purkey admitted to longstanding suicidal ideation and frequent thoughts
of self-harm.  He found himself frequently self-destructive.  When he was
younger, he would steal even though he had money with the hope to "get away
from his home," meaning his mom.  He did not want to get away from his aunt
or brother.  Mr. Purkey believed his older brother "guided him down the hill"
by beating him and introducing him to drugs.

Mr. Purkey was never secure in his entire life.  Only drugs gave him a sense
of security, especially when he took his mother's Valium.  The Valium reduced
his tension, anxiety, and fearfulness.  Mr. Purkey is not sure he ever felt
secure at any time in his life, except when he was married, at the end of one
Kansas prison sentence, and with his Master Plumbing skills.  Even so, when
he feels increased internal pressure, he tends to feel distress or self-
destructive.  When asked if he ever had any relative security, meaning
something that gave him a sense of purpose, Mr. Purkey commented that he
liked to work toward goals, to stay organized, and that he liked to stay
married.  He had been married three times, twice to the same woman.  Even so,
he "became comfortable with chaos" so that when there was comfort and
relaxation it meant something was wrong.

Mr. Purkey still did not yet know how to handle his internal anxiety.  He was
practicing to control it, but still had trouble.

On October 10, 2002, he had several observations about himself that he wished
to share.  The first regarded a 1982 Ft. Grant County Jail Arizona blackout
(Bates #001583).  He had a blackout while in the chow line.  He is not sure
what happened but he had been there on transfer from Florence, Arizona, a

Diagnostic Interview Report
Wesley Purkey
Page 39

State prison.  This was the time when he had his initiation into the Aryan Brotherhood as a matter of physical safety.

Next, he referred to behavioral changes after a 1957 Chevy motor vehicle accident when he was treated at St. Francis Hospital (Bates #000287).  He is not sure if he had treatment but referred to the doctor's name J.L. Ibarra.

Next, he recalled the July 10, 1988 Kansas State Reception and Diagnostic Center completed by Dr. Targownik (Bates #001545).  Mr. Purkey recalled Dr. Targownik's compassion and his anti-prison stance.  Mr. Purkey found Dr. Targownik sincere, especially since he revealed he had been a Nazi Concentration Camp survivor.  Mr. Purkey felt that Dr. Targownik's favorable attitude toward him made him feel respected.

**Self-assessment of strengths and weaknesses –**
Mr. Purkey thought his best qualities were his tenacity, resilience, compassion, and willingness to grow.  He thought he could recognize his mistakes and that he would attempt to overcome his mistakes despite how he died.

He endorsed areas of self-improvement as his false pride, that he manipulates others to boost his self-esteem due to his internal sense of insecurity, and his harshness.  He tended to be overly sensitive to others and highly self-critical.  He tended to let other people make their mistakes and then capitalize on them.  He also tended to project blame onto others.  He tended to misperceive others and feel others were maliciously acting toward him even when they were not.  For example, he writes his wife and then tears the letter up because he projects his feelings into her.  He then calms himself down and rewrites the letter in a more reality-based manner.

Mr. Purkey now believes he is sincerely motivated to make his life better. Yet, he still over-reacts and "gets angry when others don't acknowledge his effort."  He often sees his own over-reaction that arises from feeing insecure.  He then "emotionally beats himself to death."  At times, he can stop his over-reaction with self-talk until he falls asleep.  Unfortunately, it is very easy for him to slip back into an anger response when "he feels he is being fucked by CCA."   Then, he can't focus on what he needs to deal with such as his criminal defense.

He was unsure what to do about his wife, Jeanette, because she wanted him pleased and happy.  Now he "sucks up to her a whole bunch."  This was when he caught her using his drug supply and he wanted her to stop.  It had angered him that she did not appreciate how he was providing for the family and felt he deserved those drugs rather than her.  She apparently felt trapped and wouldn't use it much.  He wanted his wife to see that he had been locked up and very depressed.  This was all before the present charged offense.  Mr. Purkey could not understand why she didn't need to use drugs like he did. She used cocaine and he sent money to help her.

When Mr. Purkey was asked about the robberies he committed, he had no idea why he really did them.  Some were planned, but most were impulsive.  He was not sure of his motivations but just found it too easy to give into "ignorance."

002404

Diagnostic Interview Report
Wesley Purkey
Page 40

**Preparation for October 17, 2002 –**
Mr. Purkey thought the October 17, 2002 hearing was quite critical. He
believed he had uncovered lies by the FBI and he needed to do well in the
Motion hearing. He wanted to convince the judge about the abuses he
experienced at CCA. He was certain the cops at CCA intimidated him with
their 300-pound size and by the words that he was not a "16 year old girl or
an 80 year old woman."

At the hearing, Mr. Purkey testified for three and one-half hours. He thinks
he did pretty well even when AUSA attempted to get him mad. Mr. Purkey stuck
to the truth and told it all without losing control. He certainly did not
fabricate evidence, wanted good documents, and was fully aware that "one lie
would negate all his other cases" against the federal government. He was
even able to use exhibits he had prepared at the county jail, which he had
previously forgotten.

**LCF experiences –**
Mr. Purkey offered that he saw 10 to 15 murders when he was incarcerated at
Lansing Correctional Facility. He "can't just let go of them." He changed
his behavior since having been at Lansing and on the advice of this writer to
"use the pen and paper to handle problems." He thought that was an
appropriate alternative to physical acting out or violence. He feels he
would not go back to violence as a problem-solving technique because "that
part of his life is over." He still noticed that occasionally his self-talk
becomes crazy and he whips himself into frenzy. Also while on the streets,
he tended to stir up his wife when he was agitated.

The judge listened to all the information and did not provide a ruling on
that day. Mr. Purkey remembered his ideas about The Green River killer,
which he had passed on to Dr. Bill Howard.

After Mr. Purkey told this writer about the dismemberment, he began to
experience nightmares. The nightmares were specifically about the
dismemberment process.

**Present relationship with his attorney –**
Mr. Purkey trusts his attorney, Fred Duchardt but finds that Mr. Duchardt is
"not perfect." Fred listens to him and that helps a great deal, although
they occasionally "bump heads." Mr. Duchardt's assistant, Laura O'Sullivan,
periodically visits and they have resolved Mr. Purkey's difficulty with her,
frequently stating that she has to "speak with Fred" when Mr. Purkey asks
questions. As early as September 2002, Mr. Purkey believed his conditions of
confinement at CCA were highly unsatisfactory and were causing him
difficulty-paying attention to his criminal case.

Mr. Purkey had filed a Motion to dismiss his case because CCA took a bag of
his legal work and put it in the trash. He also had dental problems that the
CCA staff was "ignoring." Mr. Purkey wanted a Motion to Dismiss applied
because CCA had destroyed evidence. Mr. Purkey indicated that he was
physically threatened by one of the guards. Mr. Purkey also felt that he
was being retaliated against for the Motion to Dismiss because he was held in
Administrative Seg, which required 23 hours in his cell and one hour out.

When he was at the Medical Center for Federal Prisoners in Springfield
undergoing the evaluation by Dr. Pietz, he was kept in the 10D Unit. He felt

Diagnostic Interview Report
Wesley Purkey
Page 41

he "shouldn't have been there" meaning in that particular unit.  However, he was much more comfortable with the Federal system as he knew it much better.

Mr. Purkey had great difficulty with Laura O'Sullivan appearing with Fred. He preferred Fred's style and that Fred helped him stay stable. He wanted to stay on medicines because he needed the medicines for anxiety.  He broke form and used this writer's first name in a desperate attempt to express how much he needed antianxiety treatment.  He again stated, "I have been a Valium addict" because I was so anxious.  He did to want Klonopin to get high but "just wants relief, sleep, the ability to concentrate, and the ability to function."  Mr. Purkey had taken notes from the FBI, CCA, and Purkey transcripts to give to his attorney.  He believed his compassion for others would be readily evident to those who saw him at the hearing.

**EVENTS OF THE CURRENT LEGAL SITUATION:**
After release, he felt trapped because he wanted to be by himself all the time.  He had great trouble because he "came right out of the joint" to have to take care of three boys and a daughter.  He found comfort in first "working his ass off" and was happy to come home to a dog and play ball. However, when bills came he felt stressed and tried to adjust to the life changes.  He could not stop worrying because living in the penitentiary had been so simple.

Mr. Purkey was then asked to see if he could understand a pattern of anxiety behavior that made the penitentiary "simplicity" seem to appealing.

Mr. Purkey commented that on the day of Mary Bales' murder he was going to sign a bank note for a new home.  He had an excellent job and $10,000.00 to $12,000.00 of tools in his van.  Yet, he did not feel he fit in due to his background.  On the day of Jennifer's murder, there were no big worries as he had applied for a new job and was "just strolling along."  He could not come up with any real reason but his daughter said, "his selfishness caused two deaths."  He thought she was angry for not being there after he left Lansing in the 1980s.

He knows that when he left Lansing he could have stayed off drugs but "didn't know how to deal with" life outside the penitentiary.  His first job as with Clarks Mechanical as an Industrial Plumber but he was fired as he "needed to learn more."  This made him feel increasingly insecure because while in Lansing he had hoped to have a "cakewalk."  After Clarks Mechanical, he worked at C.J. Plumbing, which was a "better job due to more money."  He lowered expectations of himself and felt more comfortable in part because C.J.'s wife was a Larned Correctional facility counselor.

Mr. Purkey felt bad for overselling his abilities to Clark Mechanical. However, he ultimately worked at Reddi Rooter where he could call for help so he didn't feel so pressured.  He knew that at Clark he was overselling and that was "fucked up because he was compensating for his insecurity and handicap."  He perceived his stuttering as a handicap.  He didn't stutter when angry or slowly started speaking.  He thinks he always stuttered, especially after his mother threw whiskey in is face and yelled, "Shut the fuck up."  He also stuttered after she "beat him down."  Just talking allows him to stutter less.  He was immensely conscious of his stuttering.  He liked to use bridge words to make the stuttering less prominent.  When he was in the Oregon penitentiary he worked very hard to develop bridge words and use them.  However, those lists were torn up and that was frustrating.  He finds

002406

Diagnostic Interview Report
Wesley Purkey
Page 42

it easy to normally onset words with a breath but people misinterpret him when he does that. His stuttering is worse when he is sad, blue, or fatigued. He also does better if he knows a subject well and has practiced with the words. If angry, tired and knows a subject poorly, he tends to stutter a lot. He truly wished he didn't stutter and is constantly embarrassed by it.

After January 22, 1998, he worked at Roto Rooter. Before Roto Rooter he worked at C.J. Plumbing, leaving because he did not get a raise of $2.00 per hour. He was last at C.J. Plumbing about the same time of year. Then he went into self-employment working for $12 to $15.00 an hour and "having lots of work." He needed insurance for his family and wanted "secure work." He did the self-employed plumbing for about three months under no business name. He also did plumbing and siding in Lansing. He was actually doing quite well except that he felt stressed about any amount of money he made. He seemed happier to be making less money because there were fewer bills. He loved his wife. He never was able to overcome the sexual difficulties he felt with his wife because she "didn't meet his needs due to the after-baby body changes." He found sexual intercourse with her less appealing because her vagina was not tight enough. He couldn't broach the subject with her but they tried anal sex as a way to give him a greater sense of tightness. He was unable to communicate this to her about his changed relationship toward her. He knew something was wrong and because of that their sexual relationship basically just stopped. They tried other techniques to increase the stimulation and she learned to focus on oral sexual stimulation of him. This was more pleasing. However, he felt bad because it did not satisfy her sexually.

After he had been out of prison for about three months, meaning approximately June 1998, Mr. Purkey got caught with his wife's girlfriend, Beth. This was when his sexual relationship with his wife was very poor. He felt a lot of frustration, often going to bars for quickies with dancers, or using prostitutes on Central Avenue. Depending on the level of frustration, he sought outside sex up to two or three times per week. It became a regular activity of his and he would make excuses to get cigarettes or lunch, or even help the women get to drug therapy. He never felt good about going out on his wife so he used the money he made to buy Jeanette nice things and new furniture. At times, some of these girls called his home and he would make it sound like they were calling about plumbing jobs. There were times when he would come home with his wedding ring off and he would make some sort of excuse.

Beginning in about March 1998 they moved to Wichita, Kansas for four months. They went there because his ex-wife, Clare, convinced him to come see his daughter whom he hadn't seen for about 15 years. Jeanette didn't confront him about this. While there, Mr. Purkey fought with his wife so he could leave and arrange for sexual liaisons. In reality, he wanted her to comfort him so he would not leave. He felt a tremendous need to be wanted and loved and cherished. During their disagreements she would feel affronted and not stop him from leaving.

His wife had been proud of him because they were "making a go of it." He would use her encouragement to feel proud of his own efforts. He always felt "destined to fail," meaning, "Every time I was doing well I would mess it up." In contrast, he liked service work. He had trouble staying with each employer out of "fear that he would be discovered." His fear was that they would discover he "had a lot to learn."

Diagnostic Interview Report
Wesley Purkey
Page 43

The emotional pressure mounted so that he used alcohol and drugs again.  He
would go to bars with other women than Jeanette, as she hated them.  From the
first time he used drugs he "let loose to forget about everything else."
This meant he wanted to forget about his three kids, that his daughter needed
her dad, and his "numerous failures."  He just went into a "partying mode" so
he used cocaine, methamphetamine, and had sex with women.  Prostitutes were
the best partners because there was no emotional commitment.  ***

Before that three-month period, he never used any prostitutes before then.
He carefully kept his drug use from his wife but used "all he could get."  He
did not have to pay for illicit drugs because Clare, his ex-wife, had a
boyfriend who provided cocaine, marijuana, and methamphetamine.  He used
methamphetamine in joints.  He often would get too drunk and too wasted but
never propositioned Beth, a friend of Jeanette's, in the bar.  Around that
time, Beth made herself available for sex but he did not partake it.  He
wished that Jeanette would have reacted to Beth's sexual advances but
Jeanette said nothing.  This meant to Mr. Purkey that his wife gave assent to
him being sexually involved with Beth.  He really expected his wife to "slap
him down."  Clare would have done that.  Unfortunately, because she didn't,
he interpreted her silence as "not no is yes."  Thus, he and Beth were "going
to have fun."  They frequently had sex as their only contact.  There was much
teasing and sex in the bar bathroom.  This was pretty good sex.  He liked the
sex with Beth because it was "something new" as she had no kids and he felt
energized by his sexual thoughts about her.

In one instance, they were at a party and he "rubbed on Beth at the pool."
Others noticed but nothing was said.  After the party was over he was pretty
"hazy" because he was drunk and did not realize how he got home.  However,
when he got home Beth was on the couch, Clare was on the opposite couch, and
Jeanette was in the bedroom.  He immediately approached Beth sexually and she
responded.  He did not recall waking up on the couch but is certain he had
good vaginal sex with her and they exchanged oral sex on each other.  Mr.
Purkey felt the next day he had been watched.  The next day Beth called and
told Jeanette, his present wife, about the previous night that sex never
happened.  However, Mr. Purkey labored under the "biggest guilt trip in the
world."  He decided he would never do that again ever, would begin AA, would
deal with his shame, and would deal with his guilt.  He went to AA that
night.  It really helped to stop all drugs and alcohol.

Later, Jeanette revealed that she had watched him have sex with Beth.  He
responded by trying to give her material things and using sex to make up for
his lapse.  The sex was not good because she was not inattentive to him.
Thereafter, his relationship with Jeanette greatly deteriorated.  He loved
her and couldn't divorce her.  He just "kept going," and used prostitutes to
relieve his sexual tension.  He really felt the sex with prostitutes was good
because it was "no commitment, and a new thrill."  He preferred one named
Liz.  He did not know why sex was so comforting.

Mr. Purkey stayed off all alcohol and drugs until he went to a party about
one month before January 1998.  He used cocaine for the first time in October
1997 but the high was different than with methamphetamine.  He preferred meth
because he could work while high but the crack cocaine just "whacked him
out."  He also did not like that cocaine gave him increased sexual desire but
deprived him of an erection.

Diagnostic Interview Report
Wesley Purkey
Page 44

From June 1997 through October 1997, his relationship with Jeanette was "just a show." They did not hug or love each other any more. This was all from his end because she tried to increase the sexual adventurousness. He knows he still loved her but kept his sexual frustration under wraps. She tended to blame herself for his lack of sexual satisfaction and he denied that there was anything wrong. Even so, he kept up the show of getting her Teddy Bears, taking her flowers, and going out to romantic dinners. During that period they only had sex one time when they were in Wichita.

In October 1997, he worked at a Union company earning $26.00 per hour. He quit because he hated the pipe fitting union because he wasn't going to be a "pipe monkey." He earned many bonuses when he was at Lee's Summit working 12 to 14 hours per day, even a few hours on weekends. They loved the money.

Before Wichita, Kansas, he quit a job with the promise of a better track by being his own boss. He worked fewer hours to live in the Oak and Sage area apartments. He also worked part-time for himself but began to use alcohol and drugs again. He "cleaned himself up for the piss test" at Roto Rooter. He didn't like working for himself because the hours were too long, he had no leisure time, he was too tired, and he was too cold. Working for himself always made him feel like he had to "catch up on other things" because work absorbed too much of his life. Jeanette's mother and father encouraged him by saying, "Look at what you got in such a short time." They tended to use her against him. His wife didn't realize that he was also going to "T&A bars" and clubs and drinking because he "just wanted to leave everyone." He would occasionally come home mad and they would engage in sex. This was not particularly satisfying sex, but anything was better than nothing and he thought she enjoyed it. Mr. Purkey was certain that despite her desire to please him, his wife never understood his sexual needs. During the holidays at the end of 1997, they got into the spirit of buying nice gifts and shopping together. They kind of showed each other love by what they bought. However, the debt made him worry and "work more." He was proud of the money but he was too tired. He earned extra money at $10.00 to $12.00 an hour so he could buy his own tools.

Even today when he is with her, Mr. Purkey still loves his wife. He was never able to tell her that she just can't satisfy him sexually but "it is not her fault." He found it easier to "take the guilt than to hurt her by honesty." He did not want to hurt her because she had been "hurt all of her life." Mr. Purkey recounted that Clare's father had raped her, and guys and "fucked her and left her."

He did not want his boys to have a dad like "I hadn't." The boys knew nothing of the relationships he had with outside women. His son, John, is about 18. His other son, Izzy, is not biologically his as Jeanette was pregnant with him when they met. Mr. Purkey believed they did many things together and he taught them many things.

There were many problems during Thanksgiving, Christmas, and New Years, but they were only with Clare and her daughter. The principal arguments were about going to Wichita. Jeanette argued with him because she felt if they went to Wichita "she'd lose him." There were no separations from Jeanette at the time but he did see other women from his jobs. Tearfully, Mr. Purkey recounted that with those women he drank beer or smoked a joint, danced, and regardless of what happened he would not stay with them. Then, he would find a prostitute to get sexual relief without any kind of emotional attachment.

002409

Diagnostic Interview Report
Wesley Purkey
Page 45

Sometime in December 1997 or January 1998, Jeanette challenged him because he was working a lot. Her girlfriend then moved into their basement and paid $250.00 per month. At this time, Mr. Purkey felt drained, achy, confused, and nearly paranoid. He thinks perhaps he was working too many hours. He accused Jeanette of causing fights over everything. He accused her of not wanting to move to Wichita and for looking for a way out of moving to Wichita, but he felt like he couldn't leave his boys. Tearfully, Mr. Purkey recounted that he felt closer to them than he did to Jeanette. At that point, John's dad wanted to re-enter his life. It seemed like his ex-wife cared more about the boys than their own "flesh and blood" in Wichita. He felt manipulated by Clare who arranged to have her boys around him during the holidays. He knew he loved the boys more than Jeanette and left her out of the "daily stuff."

Mr. Purkey's paranoia was increasing because he was using drugs in order to be able to work. He hid his meth use from Jeanette. He used drugs and hid it from his boss so he could catch up with his deadlines. He became very irritable with his sons. He would scream at traffic problems. He decided to go to Roto Rooter to decease his stress. He also thought Roto Rooter would give him his own truck. He wanted to go to Roto Rooter in order to avoid interacting with other people because he "needed to be by himself." He wanted to work and not make small talk with anyone. He did well, but would occasionally get lost.

At one point, he used the Roto Rooter truck when he and Jeanette were looking at a new place in Wichita. His boss thought he had "took off" and took the Roto Rooter van even though Mr. Purkey did not think he was doing anything wrong. Mr. Purkey felt affronted that his "place was invaded" and the boss had let his dogs lose. This was not long after Jennifer was killed.

Jennifer was killed on January 22, 1998. This was the day that he passed his urinalysis and put in his application at Roto Rooter. He had been using marijuana so he was quite paranoid. He smoked a small joint before writing up the application. When he applied for Roto Rooter he toured the plant and found it fascinating because he liked the equipment. He easily passed the checkout at Roto Rooter. However, he felt depressed and stressed because this new job meant, "here we go again," that he was far from home and "should have been happy." He knows that on the application there was a box for "convictions and felonies' and he answered "no." He was somewhat comforted by the knowledge that once hired on at Roto Rooter he could train with a partner and looked forward to that.

On the day of Jennifer's death, he left Roto Rooter in his own truck. He was headed toward a second hand shop to buy a rocking chair. Along some street he picked up Jennifer whom he had not known before. He wanted one-half rock of cocaine and then went looking for it in different car lots because there was nothing to do. He was looking for a big Chevy pickup. She looked like a streetwalker to him, meaning a prostitute. When he picked her up he had already smoked one rock and pulled up asking her the best way to Broadway. He asked her to go "party." To him this meant a date with a prostitute. After he picked her up, he got something to drink and Gin for her. They drove along Truman Road. He drank Jack Daniels. She wanted orange juice so he stopped at doughnut shop for orange juice to give her and Coke for him.

Jennifer then offered she had been in a fight with two black girls at her high school. He commented that he thought she was a streetwalker because she

Diagnostic Interview Report
Wesley Purkey
Page 46

did not have a book bag. He also thought she was 19 years old. He still wanted to smoke crack and told her he wanted to go to Kansas City, Kansas so she said, "sure." They were looking for a house to buy crack but found none. They then went to a gas station where he paid a guy $50.00 for three rocks.

Jennifer wanted to go to Kansas City, Kansas with him. At that point, he had his work knife with him. This was a 3-inch blade pocketknife. He told the FBI that he held the knife to her to insure that he got a "federal crime of kidnapping." His wife knows the truth that they drove around Leavenworth, Kansas and Jennifer didn't mind. They kept drinking and purchased more orange juice at the K-7 Town & County. They went in to the T&C lot together. They went in together and bought cigarettes. He smoked more of the crack. There was no sex between them and no "partying." He was waiting for the alcohol to "have its effect so they could have a private party at his place."

Mr. Purkey thought of having sex immediately with Jennifer when he picked her up. Her story about school didn't matter at all. He might have been less interested in her because she was not a prostitute. All he remembers is that they were getting high and nervous. When they went to his house his wife was gone. He did not rape her at a car wash because it was too cold.

Jeanette was working at the Airport Ramada. She was in housekeeping.

When Mr. Purkey drove to his home he parked in the garage. Jennifer used the bathroom and he used the bathroom. He put 98.9 on the radio, put pillows on the floor, and told her to sit next to him. He kissed her but she was not "sure it was right" because he was so much older than her. Mr. Purkey did not want to have sex with Jennifer in his bedroom because that was his first house with his wife.

He turned the Playboy Channel on to "put her in the mood for sex." Unfortunately, he felt she wasn't really interested in that.

The fireplace was not lit. Jennifer was willing and got some lotion for lubrication because she said she was a virgin. Mr. Purkey liked that story because he "hadn't met many of those." He took her shirt and shoes off. She declined his encouragement her to touch his penis and he said that was "okay." At that point, she was wearing shoes, socks, pants, and panties. He could tell she was sexually experienced, found the interaction nice, and felt lonely. They kissed and caressed each other but she declined his putting his hands between her legs because she "didn't feel right due to their ages." He asked her to try it, continued, and used two fingers in her vagina, then felt she was a virgin. This made him embarrassed because of his desire for her, but she wanted him to quit. He climbed onto her and she said she did not want to have sex. He lifted her legs and was "too aroused to stop" and had vaginal sex while she was not willing. Even though his clothes were on, he remembered that the crack had increased his sexual desire. Afterward, Jennifer said she would not say anything if he would just release her. He did not think releasing her was good, but allowed her to put her clothes back on, remarking at how pretty she was.

They only had intercourse once. He felt she "could have enjoyed it" if she had wanted to. He seemed to feel he developed much more of a relationship with her and knew she was a good person. He felt guilty, thinking to himself, "This ain't the kind of girl you use." Mr. Purkey felt Jennifer was

002411

Diagnostic Interview Report
Wesley Purkey
Page 47

a "good girl." He saw her mother and felt sadness and did not feel good about what he did.

Ultimately, he killed her at home. He believed she came to his house willingly so it wasn't kidnapping. He told the kidnapping story "for the FBI so he could get into the federal system."

This was another situation in which "not no is yes."

Ultimately, Mr. Purkey "winged his story" to the FBI. He burned her body in the fireplace. He did not keep anything of Jennifer's. He tired to show respect after having done this to her by "holding her, caressing her, apologizing, and finding a place to put her to rest." He did not want her to be found in "a barrel", a reference to John Robinson's actions.

After the sex, Jennifer wanted to go home. He took her to the sally port in the garage, which was a room in the basement. The room had a couch, weight bench, and chairs. This was a place he tattooed on weekends. He talked with her and grabbed her by the hand. She wanted to go home and he reminded her that he could go to prison. She said she would not tell anyone. However, Mr. Purkey remembered that she knew where he lived. She that stated she couldn't find the place. She became very scared and said she wouldn't tell on him. In this interaction Jennifer said, "What will we do?" She tried to reassure him but he held on to her arm too tightly for her to feel comfortable. She pulled away and said she was going home but tripped on the weight bench. He grabbed her and in the process the weight bench flipped on to them.

At that point he saw a knife "in her hand." He took it from her, cutting his hand in the process. She asked him to please not hurt her and to let her go home. He thinks he stabbed her 15 times because there was "blood everywhere and holes all through her." While he stabbed her he kept hearing "the pops of the holes." He knows that knife stabbings ripped her throat, cheek, and arms. He could hear her gushing air. While he was stabbing her he kept thinking he didn't want this to happen. He did not want her to get away and that was why he was killing her. He knew he did not have to kill her if she hadn't wanted to get away.

Once Jennifer was dead, he caressed her, pushed her hair back, and cleaned up her bloody face. He thinks he sat with her for 15 minutes and knew she was dead. There was blood on the walls, floor, the couch, and cabinets. He "got rid of all of it." On that day all he did was hide her body. Then he took care to hide any of the traces of evidence. That is, he washed down the area. He put her in a toolbox, which was in that room. This toolbox was one he had stored clothes in. He put her in it with her clothes on.

Jeanette arrived home about 5:30 or 6:00 pm. They watched the Playboy movie and then had sex after that. About an hour later he began to clean up the basement. Soon, the boys arrived home from school. He cleaned up "for that day." Later, he washed the other room, burned the shelves, and thought about what to do with Jennifer's body in the box. He thinks that when he put her in the box she "sighed a few times." He did not stab her anymore but checked her pulse and heart, knowing that she was dead.

He put her in the toolbox knowing there was nothing to stop the smell. He wasn't that concerned because it was cold. He took no special means to keep

Diagnostic Interview Report
Wesley Purkey
Page 48

her body cold.  He started dismembering her the next day with his electric chain saw in the garage.  Her body never came out of the toolbox.

After he dismembered her, her body parts were put in bags and he put her back in the box.  He put leaves on the box.

Next, he took out the wood shelves and told his wife that he was going to tear out the shelves to make the room better for a girl who would move in. He washed the walls 10 to 12 times, cleaned to the drain every time, and made sure the drain was well rinsed.  His wife didn't question this because she knew he was a "clean freak."  He didn't know it, but he used so much water that he knocked out the phone line, not discovering it until 10 days later. He moved the body parts several times.  The first time was with his son, John.  He told John they had trash to move to a Missouri site.  He put the bags in a wooden box from an old construction site.  Jennifer's body was in five or six bags at the time.  He took the bags to a dumpster but got them back the next day as he was concerned they might be discovered.  When they went back to get the bags, John saw a trail of blood.

At that point, Mr. Purkey bought several cords of wood and had to reopen these bags as the parts of her body were too large to burn.  He cut the parts into smaller parts so they could be burned.

Mr. Purkey watched the burning process and "felt terrible."  It made him feel horrible to have to break up her skull, to break up her long bones, to take her teeth out, and to make sure that he cleaned everything up.  He only worked certain hours but sometimes his boys were home.

He felt terrible because he knew she wouldn't have been dead except for the situation he caused.

Mr. Purkey dismantled the chain saw and cleaned it up.  He cut other people's wood for "weeks" and used diesel fuel to clean up the chain saw so there would be no trace of Jennifer on it.

When Mr. Purkey used the chainsaw he just tried to cut things up by size but found it very hard to cut up the tissue.  He really did not know what he was doing.  He had not read any Bob Berdella books. This was no fantasy of his, to cut Jennifer's body up, and did not give him any sexual excitement.  He undressed Jennifer's body before he dismembered her body and burned part of the clothes.  He did not burn her panties, bra, or socks.  He told the FBI where they were.  He also told the FBI the location of her jaw and teeth along Highway 5.  He even attempted to show the FBI where he had done that. On the one hand, this was horrible.  He found the intestines were hard to cut.  Her hair bound up the saw.  He held her heart and looked at it because he had never seen a human heart.  He didn't care to see the sex organs and it didn't matter anyway because he had cut straight up the pelvis.

He had many fires in his fireplace.  After burning some of Jennifer's body, he would sweep out the fireplace, wet-dry vac the fireplace, Clorox the fireplace, and dumped the ashes.

Mr. Purkey deposited bags of ashes from the wood and Jennifer's body in the farm pond.  He thinks there could have been small bones in there but he didn't really check.

002413

Diagnostic Interview Report
Wesley Purkey
Page 49

The first night after Jennifer was dead; he cut his hair to change his appearance. He told his wife that his job required it. This is the 10-inch ponytail she has and he is sure that it will show what drugs she poisoned him with.

He did not read any Ed Gein books. However, he was fascinated with the appearance of Jennifer's brain.

Mr. Purkey did not have any flashbacks afterward. He had no idea about her jewelry. His relationship with Jeanette was the same, although he felt more stressed. He cleaned up the open basement area and then rented it. He even washed his weights down to make sure there was no blood on them.

During this time, he felt suicidal because he felt "totally worthless." He knew his life was over whether he was caught or not. He increased the intensity of his drinking and his dope. He almost "over amped" several times when he used "10 Ritalin in a spoon." He did not entertain any homicide and suicide ideas. He would never hurt his boys or his daughter.

He had one flashback about Jennifer. That was when he was with Ms. Bales. When he killed Ms. Bales, he saw Jennifer's head caved in. That was very upsetting, so he covered Ms. Bales' head up with a cloth. To this day, he cannot figure out why he killed Jennifer because a rape conviction would have only given him five additional years.

Mr. Purkey stated there were no other bodies.

As he expressed himself, he cried freely. He then offered he was still quite angry with his parents because "they needed this done to them." He was very embittered that they are free even though they caused this in him. Just explaining what happened caused him to feel somewhat more relieved.

Once his catharsis was finished, Mr. Purkey related how bad he felt about what he did to Jennifer.

After Mr. Purkey told this writer about the dismemberment, he began to experience nightmares. The nightmares were specifically about the dismemberment process.

He recounted again how he looked at her heart and it had two holes in the mid-sternal area. He actually saved the heart at least for a time, and there were things he wouldn't tell this writer because of his death warrant. Even so, the entire set of events swirled through his mind especially since he "never wanted it to take place anyway."

Mr. Purkey clarified that when Jennifer ran he chased her down in an instinctive way. Instinctively the knife came up and he used it in a rage. He felt himself "going off" and he couldn't stop stabbing her but he did not intend to kill her.

Jennifer didn't say anything and he didn't say anything. He really wanted to go back and change his life, especially since he turned 51 years old. He tried to express that he was dealing with his life struggles. He felt like he lived in two or three worlds. These included life in the penitentiary, his past, his wrong thinking, and his bad marriage. He wished he could have admitted to his wife that he needed prostitutes.

002414

Diagnostic Interview Report
Wesley Purkey
Page 50

Mr. Purkey clarified that he used a whore to get two rocks for himself and one rock for Jennifer. Neither had sex with the whore, but Jennifer was in the truck during the whole time.

When Mr. Purkey made a statement to the FBI he told them on the second day of interrogation that he wanted an attorney. He told the agents that he would make a deal with them that he would "not come out of the federal system." He was certain in a "LWOP deal" in exchange for telling the FBI agents where Jennifer's remains were. He only gave information about the events because he believed he had a "life sentence" and "could get down the road." Before the last appointment, Mr. Purkey had read the book by John McCain entitled *Faith of My Father*. This gave him some coping mechanisms because he strongly identified with John McCain's "real suffering, real principles and real values." The readings made Mr. Purkey wish he had parents like that, who communicated and gave love. He was especially inspired by John McCain's refusal to leave the Vietnamese prison unless all other prisoners of war came with him.

SUMMARY OF PSYCHOLOGIC TESTING:
**January 5, 2003 Psychological Assessment completed by Bruce A. Leeson, PhD -** This testing was completed in April 2002 and December 2002. Mr. Purkey was found to be "totally cooperative." Dr. Leeson indicated that he reviewed 16 sources of information and provided six salient elements of history as they pertained to head injury and neuropsychological focus of his assessment.

The salient records included a March 8, 1968 St. Joseph's Hospital admission in Wichita, Kansas for a motor vehicle accident. Mr. Purkey was diagnosed with cerebral concussion and spent approximately one week in Intensive Care following the accident. He also had multiple lacerations of the left face, anterior neck, and shoulder. Thereafter, Mr. Purkey was troubled by headaches, episodic dizziness, and blurred vision for eight months. He also had social difficulties in school. Second, on April 29, 1968, Mr. Purkey was again treated at St. Joseph's Hospital in Wichita, Kansas for contusions and multiple facial abrasions related to a motor vehicle accident. X-rays did not show fracture of the skull or spine and there was no indication of a neurological workup. Third, Mr. Purkey was admitted to St. Joseph's Hospital in Wichita on August 31, 1972 after his car had been rear-ended while he was working on the engine under the hood. Mr. Purkey reportedly lost consciousness for several minutes. Admitting diagnosis was multiple lacerations of the face and forehead, as well as acute cerebral concussion. Discharge diagnosis added "plus emotional instability and behavior problems, partly genetic and partly environmental." Fourth, Mr. Purkey was treated at St. Joseph's Hospital in Wichita on March 28, 1976 for a facial contusion. He likely had a green-stick fracture of the left cheekbone. The attending physician noted that following a car accident a few years earlier; Mr. Purkey's behavior had changed. This included onset of impulsiveness, immaturity, and "doing things very carelessly as if he wants to be apprehended." Last, Mr. Purkey had been knocked unconscious during a fight on a basketball court in the Oregon Department of Corrections.

Dr. Leeson summarized his findings. These included the PAI-2, which showed some inconsistent responses to similar items. However, Mr. Purkey answered in a reasonably forthright manner and did not attempt to present an untoward impression. Mr. Purkey was described as suffering from a history of severe substance abuse, prominent stress, prominent anxiety, and mild to moderate

002415

Diagnostic Interview Report
Wesley Purkey
Page 51

depression.  He endorsed items that suggested he was pessimistic, dwelled on thoughts of worthlessness, dwelled on thoughts of hopelessness, and dwelled on thoughts of personal failure.  He had a significantly higher than average risk for suicide.

On a test of memory malingering, Mr. Purkey was not malingering and had put forth a reasonable effort on that task.  Mr. Purkey "performed within expected limits on most measures of clinical brain function with the exception of planning and sequencing, response inhibition, olfactory acuity, and sustained focused attention."

Intelligence and memory testing by WAIS-III and Wechsler Memory Scale-III, noted that Mr. Purkey scored average or low average on IQ scores.  His full scale IQ was 90, with a performance of 85, and verbal of 94.  He showed relative strengths in verbal subtests and vocabulary subtests with significant weaknesses in comprehension, social judgment, and abstract reasoning.  He showed significant weakness on block design, a measure of spatial reasoning.  Dr. Leeson reasoned that the difference between performance and verbal IQs was enough to suggest brain-based cognitive dysfunction.  Mr. Purkey's Wechsler Memory Scales were in line with the WAIS-III, meaning that he functioned in the low average to average range.

Dr. Leeson performed a series of executive function tests.  He listed the tests and their significance.  Mr. Purkey showed some evidence of frontal brain impairment on the basis of the results of the Trail Making, Design Fluency, Color-Word Interference, Sorting, Tower Test, Proverb Test, and Test of Variables of Attention.  Mr. Purkey had some temporal lobe region dysfunction on the basis of verbal fluency and sorting results.  He showed average or slightly better than average abstract reasoning on 20 questions and average functioning in word context.  Mr. Purkey also reportedly had difficulty with olfactory impairment (the capacity to smell, possibly suggesting damage to the underside of the frontal lobes, the ventral surface of the frontal lobes).

Dr. Leeson conceptualized that a description of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element.  When distressed, Mr. Purkey was likely to act quite impulsively and without the ability to modify his actions.  In Dr. Leeson's view, Mr. Purkey had a brain-based disorder so that in situations where expectations were unclear and there was emotional arousal, his actions may not be considered, tempered, or moderated.  Intoxication would exacerbate his problems.

Dr. Leeson added that Mr. Purkey had significant anxiety and moderate depressive symptoms at the time of the assessment.  He was being treated with BuSpar at the time but produced a valid assessment.  His success as a plumber was somewhat surprising to Dr. Leeson given Mr. Purkey's difficulties with spatial reasoning.  Dr. Leeson reasoned that Mr. Purkey might have sustained a degree of right parietal lobe damage that he overcame by compensation.

Dr. Leeson reasoned that the aggregated results showed a "subtle but consistent pattern of deficits that are likely reflective of frontal lobe dysfunction."  There was no clear frontal lobe syndrome, but Mr. Purkey evidenced factors often seen with this difficulty.  Mr. Purkey also showed the inability to complete some timed tests.  Dr. Leeson advanced that when aroused by task challenge or time constraints, "Mr. Purkey's behavior is likely to become disorganized, inefficient, and inflexible."  Dr. Leeson

Diagnostic Interview Report
Wesley Purkey
Page 52

could not determine when Mr. Purkey sustained frontal lobe trauma.  The 1968
motor vehicle accident represented a leading hypothesis, especially in view
of a physician's later reference to Mr. Purkey's maladaptive behavior.  Mr.
Purkey's rich history of polysubstance abuse was "significantly linked to
head injury, although directionality cannot be inferred…"

It is clear from Dr. Leeson's report that the majority of his assessment took
place during April 2002.  This was only about a month before the MMPI-2 was
administered to Mr. Purkey at the US Medical Center for Federal Prisoners in
Springfield, Missouri.

**MMPI-2 May 29, 2002 –**
This answer set was re-run at Logan & Peterson, PC.  Mr. Purkey produced a
valid MMPI-2.  He cooperated, admitting to a number of psychological problems
in a frank and open manner.  Such persons with this profile tend to be blunt
and may openly complain to others about their psychological problems.  Such
persons tend to be quite self-critical and may appear to have inadequate
psychological defense mechanisms.  He may be seeking psychological help due
to feeling that things were out of control and unmanageable.

Symptomatically, Mr. Purkey produced a 46/64 profile with very high
definition.  These were likely to be accurate portrayals of his personality
and symptoms.  Persons with this profile tend to be chronically maladjusted.
Behaviors like that include immaturity, self-indulgence, manipulating others
for their own ends, obnoxious, hostile, aggressive, and rebellion.  Despite
difficulties with others, such persons tend to refuse to accept
responsibility for their problems.  Such persons may have exaggerated or
grandiose ideas of capacity and personal worth.  Such persons are likely to
be hedonistic and may overuse alcohol or drugs.  Such persons tend to be
"quite impulsive and may act out against others without considering the
consequences."  Suspiciousness, aloofness, and inapproachability are common.
Paranoia and externalizing blame are likely present.  There may have been
past attempts at suicide.  A high degree of anger is also endorsed.  A high
potential for explosive behavior at times is possible.  The world is viewed
as threatening and such persons believe they have been unjustly blamed for
others' problems.  This person may feel he is getting a raw deal out of life
and may have an inability to control anger.  Verbal or physical attack is
possible when the person is angry.  This 46/64 profile is very rare,
occurring in less than 1 percent of the MMPI-2 normative sample of men.  The
46/64 profile was one of the more common 2 point codes in prison settings.
This was a very stable profile.

Interpersonally, the MMPI-2 suggested that Mr. Purkey had difficult
interpersonal relationships.  He could be resentful and quite uncompromising.
He may have manipulative and self-serving behavior that causes great
difficulty for people close to him.  He may go into  rages because of his
poor impulse control and low frustration tolerance.  He tends to blame others
for his problems that he has helped create.  His petulant and demanding
behavior may place a great deal of strain on his marriage.  He may be
threatening or physically abusive when he feels frustrated.  His marriage was
likely quite problematic.  He reported a number of marital problems possibly
important to understanding his current psychological difficulties.
Interpersonally, he viewed his home life as unpleasant and lacking in both
love and understanding.  He felt intensely angry, hostile, and resentful of
others.  He would likely like to get back at them.  He was competitive,
uncooperative, and likely to be very critical of others.

Diagnostic Interview Report
Wesley Purkey
Page 53

Diagnostically, the MMPI-2 suggested that Mr. Purkey was suffering from a personality disorder. Probably this took the form of paranoid personality or passive-aggressive personality. He had symptoms of a paranoid disorder. He also had many characteristics of a substance abuser. He acknowledged these problems. His typology was not consistent with those of typical convicted felons.

From a treatment standpoint, Mr. Purkey was unlikely to seek psychological treatment on his own. He tended to resist psychological interpretation, could argue with others, and could rationalize or blame others for his problems. He acknowledged his problem with alcohol or drugs.

Visual inspection of the MMPI-2 results in comparison to John R. Grahams *MMPI-2; Assessing Personality and Psychopathology*, 3rd Edition, added some additional elements. First, validity scales suggested that Mr. Purkey may have some very deviant social or religious convictions or may manifest clinically severe neurotic or psychotic disorders. He may have presented himself in an unfavorable light. This could have been a plea for help or may be confusion resulting from organic or functional difficulties. Such persons tend to be ineffective in dealing with problems of their daily lives, and have little insight into their own motives and behavior. Generally these persons are socially conforming, inhibited, and have a slow personal tempo. However, their outlook on life is characteristically cynical, skeptical, caustic, and disbelieving. They tend to be quite suspicious about the motivations of others. The 46/64 code type noted that such persons tend to be immature, narcissistic, and self-indulgent. These are passive-dependent persons who make excessive demands on others for attention and sympathy. However, they resent even the most mild demands made on them by others. Men with this code type tend not to get along well with others in social situations, and are especially uncomfortable around members of the opposite sex. Such persons avoid deep emotional involvement. Poor work histories, marital problems, repressed hostility, and anger are very common. Sarcasm, irritability, sullenness, argumentativeness, and generally obnoxious behavior are also possible. Such persons especially resent authority. Such persons tend to deny psychological problems, rationalize and transfer blame, and accept little or no responsibility for their own behavior. These persons are somewhat unrealistic and grandiose in their self-appraisal. They tend to deny serious emotional problems, so they are generally not receptive to traditional counseling or psychotherapy. Among psychiatric patients, passive-aggressive personality, Paranoid Schizophrenia, and Pre-psychotic or Psychotic Disorder is likely. Alcohol abuse and difficulties with the law are common. Vague emotional and physical complaints are common. Such persons frequently feel nervous, depressed, indecisive, and insecure.

**DIAGNOSTIC FORMULATION:**
More than sufficient information was gathered to provide a psychiatric diagnosis of Mr. Purkey. This diagnostic formulation is derived from the prior psychiatric assessment, update of his functioning, discussion of the events of the charged offense, review of extensive institutional records, review of law enforcement reports, review of paper-and-pencil psychological testing from USMCFP-Springfield, and neuropsychological testing by Bruce Leeson, PhD. Mr. Purkey's general psychiatric functioning has not appreciably changed over the interval from the prior assessment. A biopsychosocial model is utilized with Mr. Purkey. This means his present functioning is discussed under three broad areas. These are the biological,

002418

Diagnostic Interview Report
Wesley Purkey
Page 54

psychological, and socialization influences on his capacity, thinking, and behavior.

Biological elements are commonly thought of as developmental abnormalities, traumatic exposures, toxic exposures, and intoxications that cause either permanent or temporary functional abnormalities in brain functioning. Psychological contributors are crucial developmental experiences during childhood, young adulthood, and adulthood that impact Mr. Purkey's formation of his personality structure. These can be both positive and negative experiences, and either transient or permanent. Socialization contributions are generally thought of as situational elements that contribute to a person's behavior for a specific instance or set of circumstances. These will be described and then summarized according to DSM-IV-TR diagnostic format. The DSM-IV-TR is the current model for a psychiatric diagnosis. As with any complex human behavior and the evolving nature of the DSM-IV-TR, not all behaviors fit neatly into diagnostic categories.

Biologically, Wesley Ira Purkey was born with a strong predisposition to substance abuse and dependence. Both his parents were addicted to alcohol, demonstrated many maladaptive behaviors in their use of alcohol. His first degree relative, his brother, also had substantial alcohol and drug abuse difficulties. These maladaptive behaviors included encouraging Wesley Purkey to drink alcohol and use drugs in his pre-teen and teen years. He was also included in adult parties while he was still very much an impressionable minor and of tender years.

Second, biologically, Mr. Purkey suffered several head injuries as described in clinical records and by Dr. Leeson. At least two of these included lengthy periods of unconsciousness and sequela of headaches for several months. These head injuries likely caused frontal lobe and temporal lobe brain damage as described in Dr. Lesson's January 5, 2003 report. Notably, serial records from St. Joseph's Hospital in Wichita, Kansas noted that from August 1972 through May 1976, Mr. Purkey underwent a behavioral change as a consequence of a car accident. In addition, the paper-and-pencil MMPI-2 completed on May 29, 2002 by Mr. Purkey suggested that organic impairment and pre-psychotic disorders are likely.

While there are no evident obvious seizures, Mr. Purkey demonstrated paradoxical rage attacks, not inconsistent with a history of temporal lobe and frontal lobe dysfunction. The temporal lobes are thought to be the seat of emotional control, while the frontal lobes the seat of judgment, impulse control, and the ability to modulate hedonism. Mr. Purkey's repeated history of overwhelming rage attacks, seeking pleasure through illicit drug use, and frequent inability to refrain from becoming angry even when he knows better, is consistent with frontal lobe brain damage. Such behavior is also complicated by severe personality fragmentation.

Third, Mr. Purkey had had a 30-or-more-year history of intravenous drug abuse, using all manner of injectable drugs, and use of all manner of ingestible drugs. As late as September 1998, he had bilateral forearm cellulitis from injecting crushed Ritalin. His very lengthy use of drug puts him at high risk for blood born diseases, exposure to over-dose levels of psychostimulants which can result in multi-infract dementia, toxic adulterants, infectious injections, and carrier compounds not meant to be injected. Along the same lines, Mr. Purkey engaged with numerous prostitutes of unknown cleanliness, thereby exposing himself to many possible sources of

Diagnostic Interview Report
Wesley Purkey
Page 55

sexually transmitted diseases such as Hepatitis C.    He had some documented
sexual encounters in prison, also exposing him to potential infectious
agents.

Fourth, Mr. Purkey has been in a number of fights which could have caused
concussions.   The most recent was just before transfer to USP Leavenworth in
June 2003.   Prior to transport, officers slammed his face against something
so hard that he suffered facial lacerations, requiring up to 20 stitches.
Such an impact might be forceful enough to cause injury of his brain by
bouncing it off the front and back of the inside of his skull.   No medical
reports are available about that. The mechanics of this injury could cause
further damage of the frontal and temporal lobes, as well as potentially at
the occipital lobes.

Psychological contributions to his current behavior include that he perceived
his family as sexually, physically, and emotionally abusive.   He previously
described physical beatings by is parents, intense wholly inappropriate early
exposure to adult situations such as being recommended to prostitutes by his
father, and longstanding reported sexual abuse by his mother.   He also
reported physical beatings by his older brother who also introduced Wesley to
illicit substances.   Mr. Purkey always felt bad about himself, never felt
good about his accomplishments, and found the only relief from intense
childhood distress, probably due to Post-traumatic Stress Disorder, only by
injection of intravenous narcotics.   Other than that, he never experienced
any happy childhood memories.   When he was ultimately placed with his
maternal aunt, he loved the nurturing environment, valued her efforts on his
behalf, and yet felt it was already too late for him even in his early teen
years.

Mr. Purkey harbors deep bitterness toward his parents.   He strongly believes
a substantial portion of his behavioral dyscontrol arises from the intense
abuse experience he received at their hands.   While he was frequently angry
and at times suicidal about this, Mr. Purkey more intensely carries a deep
burden of feeling unworthy.   He feels unworthy of success and frequently
defeats potential successes either through anger outburst, drug use,
dangerous sexual liaison, or inability to overcome his internal
disintegration.   A good example of his deep self-doubt is that he never feels
he ever measures up to anyone's expectations, frequently buoys himself up by
boosting his skills to others, and then fears discovery that he might be a
fraud of some kind.   This cycle of failure, intense self-doubt, deep anxiety,
depression, and anger control problems are not uncommon in persons who have
been victims of childhood Post-traumatic Stress Disorder.

Second, Mr. Purkey has a deep sense of needing to be wanted, desired, and
taken care of.   When his needs for affection and nurturance are not met, he
can fly into a rage, not unlike an infantile rage, then have extreme
difficulty calming himself.   Many times during these rages, he cannot recall
what his motivations are except that he has lashed out instinctively.   At
times it seems he cannot stop the rage response until it has run its course,
dissipated his pent-up feelings, and left him feeling transiently powerful.
According to his self-report and direct observation, Mr. Purkey seems to have
much better control over his rage attacks when he is on a therapeutic dose of
Tegretol and an adequate dose of antianxiety such as Valium or Klonopin.   He
managed much psychological distress as a young man by stealing his mother's
Valium.   Over the course of the present assessment, Mr. Purkey showed
substantially increased emotional control when he was on between 2 and 3 mg

Diagnostic Interview Report
Wesley Purkey
Page 56

of Klonopin per day. He was much more able to focus on preparing his defense, avoid extreme overly-emotional responses to interactions with others, and be less dependent on intense focused relaxation techniques to control his nearly continuous, almost overwhelming anxiety.

Third, Mr. Purkey's early experience of sexual victimization by his mother and abnormal exposure to prostitutes at the encouragement of his father, predisposed him to develop an abnormal attitude toward his own sexuality. This was not biologically determined by a psychologically mediated behavior largely ingrained due to the early trauma. As an adult, Mr. Purkey has come to value frequent sexual release as the only reliable soothing experience in his life. There was a ritualized, scripted, anonymity to most experiences as indicated by his love for his wife, but preference for anonymous sex with prostitutes. This likely represents an important control of intimacy issue for him, which he must have never learned as a child. He clearly separates affection from sexual release, frequently engaging many women in potentially self-destructive manners, even taunting his wife when feeling that she could not provide the specific sexual sensation he needed. While this had specific socialization elements to it, the beginnings of his sexual difficulties arose from childhood victimization and excessive stimulation.

Fourth, in the death of Jennifer Long, Mr. Purkey was experiencing intense emotional distress. This included marital distress due to sexual dissatisfaction, intense guilt about not making enough money, intense guilt about making money but not being good enough as a plumber, intense guilt about needing anonymous sex which he kept from his wife, excessive alcohol intake, and intense crack cocaine use. It may have been that Jennifer Long personified the fantasy of the skilled prostitute because he had such intense distress over his difficulties adjusting to life on parole. When it became increasingly clear that she could not comply with his sexual ritual, his fantasy for at least temporary relief from his intense distress was destroyed. Thus, he attempted to alter her behavior to make her comply with his perceived notion of what a "virgin" prostitute should do, and how a prostitute should comply with his wishes. Recall that he said "she could have enjoyed it" that is the rape. Jennifer was unable to do that and a rage attack began to build. He realized the potential for continued freedom was completely over, by his own misjudgment of her as a prostitute. Most likely, the rage began as humiliation at his own poor judgment. Thus, he never initially intended to kill, dismember, burn, and dispose of Jennifer Long's body. They arose as a natural consequence of his desperation to salvage something of a normal life, using his most reliably defense mechanism, that of acting out. However, he was too damaged, impaired, and untreated to refrain from killing and disposing of Jennifer Long.

Socially, Mr. Purkey has always tried to perceive himself as a good person who has done bad things, but still deserves forgiveness. His rendition of his family life strongly suggests that he never felt valued, never felt he had been given the benefit of the doubt, and never really felt his parents nurtured him. He developed a pattern of seeking comforting sexual releases, however short lived, usually with women, and striving for the financial American dream through hard work. He always found himself caught up in self-defeating behaviors. These self-defeating behaviors were pervasive whether it was not sharing critical disagreements with his wife, Jeanette, or engaging with other women who could not do anything other than damage his relationship with Jeanette, or engaging with other women who could not do anything other than cause him more suffering. A classic example of that is

002421

Diagnostic Interview Report
Wesley Purkey
Page 57

his sexual involvements with friends of his wife, allowing himself to be manipulated by his ex-wife Clare, seeking sexual fulfillment in numerous prostitutes, and seeking to redress any wrongs to Jeanette with sham sexual interest, as well as lavish gifts. He had tremendous capacity for hard work, though it is unclear how well he could sustain working for any employer due to his difficulties with authority figures and his intense self-criticism. He constantly had difficulty prioritizing what needed to be done so that he was either over-worked or financially over-stretched, or over-tired, or feeling unappreciated, or over-burdened by trying to right the wrongs to his children and significant others. Thus, Mr. Purkey really never had any reasonable unfettered access to just feeling good about himself. He had to be somehow sexually related to a woman, be high, be drunk, be successful, be nurtured or he would be stuck having to face what he thought was his own tragic life. It is not surprising that he found intense comfort at the experiences of Senator John McCain who reportedly vividly described intense seeking to do right, intense individual suffering, intense suffering within a group, and perseverance through to success at the end.

These biological, psychological and social impacts on Mr. Purkey's behavior are presently active, were active at the time of the Mary Bales homicide in October 1998, were active in January 1998 during the Jennifer Long homicide, and were active in Mr. Purkey throughout both his formative and adult years. He is still in need of intense psychiatric treatment with medications. Despite his deep psychological fragmentation, he periodically can reflect on and gain new understandings in his behavior. During the present evaluation, Mr. Purkey expressed real remorse for his killing of Jennifer Long. He also expressed great empathy for those he also hurt such as his wife and the Long family.

Using the current diagnostic model, the DSM-IV-TR, the following diagnosis describes Mr. Purkey's functioning at the time of the charged offense, January 1998, and at present.

Axis I:     Cocaine Abuse with Hypersexuality (January 1998 at the time of the Jennifer Long murder).
            Alcohol Abuse (January 1998, at the time of the Jennifer Long murder).
            Dysthymia-Early Onset.
            Polysubstance Dependence, Severe (Psychostimulants, Alcohol, and Hallucinogens).
            Partner Relational Problem (Extreme marital distress with severe marital-sexual disharmony, extremely poor communication, verbal and physical abuse of his spouse, and financial distress).

Axis II:    Personality Disorder Not Otherwise Specified (with borderline, antisocial, obsessive-compulsive, and paranoid features).

Axis III:   Documented history of closed-head injuries (March 1968, August 1972, May 1974, and 1977); mild frontal and temporal neuropsychological brain dysfunction as assessed by Dr. Leeson and reported January 2003; amphetamine-induced seizure in 1988; 32-year history of intravenous drug use; drug induced psychosis in May 1998; history of drug-induced anxiety attacks (September 1998); and unconfirmed reports of poisoning by his ex-wife.

Diagnostic Interview Report
Wesley Purkey
Page 58

At the time of the offense, Mr. Purkey was suffering from cocaine and alcohol abuse. He consumed three rocks of cocaine before the kidnapping, rape, and killing of Jennifer Long. He had been a chronic cocaine user and reported a hypersexual response to the euphoria caused by the rock cocaine. In addition, he drank an unknown quantity of distilled liquor. This would have disinhibited his sexual and violent impulses. Together, the hypersexuality and disinhibition readily contributed to the loss of impulse control at the time of Jennifer Long's killing. The effects of these two drugs have long abated.

Mr. Purkey has a very strong history of polysubstance dependence, starting in pre-teen years and continuing up through his recent adult years. He has intense severe dependency on hallucinogens (marijuana), psychostimulants such as methamphetamine or cocaine, narcotic pain medicines, and alcohol. He has used these drugs to modulate his very dysphoric mood. He traces this dysphoria and Dysthymic Disorder all the way back to early childhood. He has never experienced a time in his life when he actually felt relieved, happy, and relaxed with himself, except when high on drugs.

In 1972, an SRDC evaluation said alcohol use could cause him problems. In February 1976, he overdosed on Tranxene, a sedative. In 1982, SRDC recorded that he had severe drug problems.

At the time of the charged offense, there was no clear indication he was suffering from substance-induced psychosis though he has had periods of substance-induced seizures, drug-induced anxiety, drug-induced delusions, and severe drug seeking behavior. Examples of the drug-induced delusions included that between January and October 1998, he believed he received shock treatments when he slept, that drugs were being sprayed from the ceiling, that something was planted in his chest, and that someone was poisoning his cigarettes. Presently, Mr. Purkey is clinging very tightly to the belief that part of his loss of behavioral control was due to being poisoned by his ex-wife, Clare Giada. Though there has been no objective support for this, his wife, Jeanette, reportedly confirmed that there was an attempt to give him poison.

When intoxicated on psychostimulants, Mr. Purkey was at high risk for pre-psychotic decompensation especially when in distress. Previous psychological testing during December 1999, March 2000, and May 2002, showed that Mr. Purkey had high risk for psychotic decompensation (MMPI-2 in March 2000 and May 2002), risk for intense suspiciousness (PAI-2 in December 1999), and high risk for surprise violence especially under the influence of cocaine or other drugs.

Mr. Purkey has given substantial clinical evidence of very poor control of his aggressive responses. He has very severe problems conforming to expected rules, especially male authority. At present, Mr. Purkey is illicit drug free but still has been at high risk for violent loss of control.

Dysthymia Early Onset is diagnosed when a person shows depressed mood, irritability, and some symptoms of depression without Major Depressive Disorder. Mr. Purkey continues to demonstrate considerable evidence of early onset, meaning before age 21, Dysthymia. He frequently feels dysphoric, is easily irritable, tends to become overwhelmed with distress and defeats positive interventions, consistently shows evidence on the MMPI-2 and PAI-2 Dysthymia, and expresses a high level of ongoing anger. He demonstrates some

Diagnostic Interview Report
Wesley Purkey
Page 59

short-lived symptoms of Major Depression, including suicidal thoughts, which are somewhat, mollified by mood stabilizing and antianxiety medications. His treatment history with antidepressants has shown less clear efficacy. The MMPI-2 from that era showed very similar defects in judgment to the recent two MMPI-2 exams, meaning in 2000 and 2002.

Personality disorders are applied to specific personality functioning when there is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. The pattern must be manifested in at least two of the following that include cognition, affectivity, interpersonal functioning, and impulse control. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. This enduring pattern leads to clinically significant distress or impairment. The pattern is stable and of long duration with its onset traceable to adolescence or early adulthood. The enduring pattern cannot be accounted for as a manifestation of another mental disorder and not the effects of a substance.

As in April 2000, Mr. Purkey presented a constellation of life experiences, severe maladaptive responses, and personality fragmentation that overlap at least three areas of personality disorder. These were previously described as having been the victim of physical abuse by both parents, emotional neglect by both parents, sexual abuse by his mother, witness to promiscuous sexual activity by his mother, early introduction to alcohol by some of his mother's lovers, early introduction to alcohol by his father, very intense anger response with even the slightest provocation, preoccupation with adherence to rules, inflexibility regarding ethics, the ability to refrain from illegal activity, sexualization of affection, participating in illegal acts out of some aspect of shame or vengeance, considerable victim empathy, alternating between strong identity with authority and actively rebelling against it, and numerous short-term mood swings.

These were previously described as obsessive-compulsive, antisocial, and dependent personality features. Mr. Purkey was showing more borderline features in January 1998. These included his intense efforts to avoid real or imagined abandonment, a pattern of unstable intense interpersonal relationships which alternate between extreme idealization and devaluation, intense identity disturbance, potentially self-damaging impulsivity, recurrent suicidal behavior or gestures, affective (emotional) instability with marked reactivity of mood, chronic feelings of emptiness (dysphoria), inappropriate or intense anger, and transient stress-related paranoia or severe dissociation. At the present time, this is his predominant personality disorder, however, his behavior, thinking, affectivity, and identity strongly overlapped the other personality disorders, which have been previously described. These include obsessive-compulsive features in that Mr. Purkey rigidly adheres to a course of action he believes to be true, he produced numerous pages of neatly written obsessively reasoned treatises. He was obsessively devoted to the productivity of work to the exclusion of all leisure activities except sexuality. He had few friends. He had inflexible ideas about matters of morality, such as his right to sexual pleasure. He also showed a stubborn rigidity that frequently put him at odds with authority figures, attempts to calm himself, and with those who cared for him. At times he had rage attacks not inconsistent with Intermittent Explosive Disorder. Mr. Purkey demonstrated substantial antisocial personality features. These included a pattern of disregard for the violation of the rights of others occurring since age 15. As previously

Diagnostic Interview Report
Wesley Purkey
Page 60

discussed, he had considerable problems conforming to social norms since age 15. He was awash in porous adult-child boundaries as well as alcohol, drug use, sexual abuse by his mother, fostering the use of prostitution by his father, physical abuse by his brother, without safe haven. It is not surprising that he adopted abnormal behavior patterns. Next, he participated in stealing and drug use early on in childhood, ultimately becoming heavily addicted to intravenous drugs. He spent considerable time of his adult life being unable to refrain from using illegal drugs, unable to refrain from illegal acts, spending considerable time incarcerated, and feeling intensely uncomfortable in any situation other than the penitentiary environment. In contrast, he also demonstrated substantial victim empathy and openness to interpersonal change, somewhat inconsistent with pure antisocial thinking. Also uncharacteristic for an antisocial personality organization, he expressed intense remorse for the dire situation of his wife, his boys' welfare, remorse for having killed Mary Ruth Bales, and remorse for having killed Jennifer Long.

He has had severe problems complying with rules and regulations as applied to him, especially when he is in distress through depression, overwhelming anxiety, or mood instability. Some of this difficulty may be mediated by the consequences of severe abuse combined with frontal and temporal lobe brain damage. This would also reduce the likelihood of purely antisocial behavior, and put it more in the category of personality changes due to brain damage.

Mr. Purkey demonstrates substantial dependency personality features in that he has tremendous needs to be taken care of by those around him. Of the dependent personality features, he had substantial difficulty disagreeing with his wife or explaining his need for different sexual stimulation lest she disapprove of him. He also put in great amounts of energy ensuring himself that he had a stable of women for which he could readily obtain sexual satisfaction. He tended to prefer the anonymity of sex with prostitutes or the excitement of self-destructive sex with either his ex-wife or his wife's girlfriend. He also felt extreme anxiety when faced with having to take care of his family and his marriage and himself outside the situation of incarceration

As the consequences of his severe personality fragmentation, he suffered severe psychosexual immaturity. This was first described in 1982 at the Wichita Psychiatric Center. Mr. Purkey effectively confused emotional sustenance, security, and safety with sexual release or orgasm. Of the few joys in his life besides his children, he became highly reliant on sexual release as his way to buffer his constantly harsh self-judgment and belief that he was inherently worthless. These are not separated as a paraphilia because the behavior derives from maladaptive anxiety responses to his childhood experiences, which may have included consequences of the multiple traumas.

Axis III diagnoses are physical difficulties which impact the primary psychiatric condition on Axis I. They can also contribute to complications of Axis II personality disorders. In this instance, Mr. Purkey now has adequate demonstration of having suffered closed-head injuries as a teenager with the  altering his behavior as observed by St. Joseph's Hospital in Wichita during 1972 to 1976.

The present assessment strongly indicates neuropsychological evidence of mild frontal and mild temporal brain damage. It was Dr. Leeson's

Diagnostic Interview Report
Wesley Purkey
Page 61

neuropsychological opinion that these most likely derived from the traumatic events, which he listed in his report. Certainly, the neuropsychological evidence confirms Mr. Purkey's clinical presentation of dysphoria, marked spikes of anxiety, near inability to control his rage attacks, rigid obsessive almost ritualized violent responses, and a ritualized sexual release pattern. The functional impairment captured by the neuropsychological testing done by Dr. Leeson confirms clinical history of impulse control problems, anger control problems, psychological rigidity, consistent behavioral control problems, and vulnerability to substance abuse. It may ultimately be shown that his ponytail has evidence of poisoning or at least evidence of marijuana and cocaine abuse. Regardless, Mr. Purkey shows an interpersonal rigidity with strong need for a well defined structure, highly consistent with having suffered brain damage.

## DISCUSSION:

The following discussion derives from the diagnostic assessment and formulation.

1.    **Mental state at the time of the charged offense –**
At the time of the Jennifer Long murder, Mr. Purkey was suffering mental disease from untreated severe psychiatric difficulties and intense emotional distress, which significantly reduced his mental capacity. This reduced mental capacity greatly contributed to Mr. Purkey's actions during the commission of the charged offense (Diminished Capacity), by depriving him of normal impulse control.

This reduced mental capacity arose from untreated psychiatric illness (a.k.a. mental disease), which resulted in severely maladaptive behavior, and was further complicated by untreated severe substance dependency. Diagnostically, this maladaptive behavior is a combination of untreated Dysthymia, Severe Personality Disorder, Severe Partner Relational Problems, Mild frontal and temporal Neuropsychological Deficits, all further complicated by impaired reasoning when intoxicated. Even without any intoxication, Mr. Purkey's mental capacity remains impaired on a day-to-day basis. During the present assessment, he showed some improvement in day-to-day functioning only when substantially medicated with appropriately dosed psychiatric medications.

During the time of the charged offense, he felt tremendous pressure to succeed, felt near inability to succeed at the level he set for himself, and suffered constant worries that he was somehow failing to live up to what was expected of him. He suffered extreme marital distress by his numerous sexual indiscretions with prostitutes, with his ex-wife, and with at least one friend of his wife. He also had intense sexual conflict because he could not adequately describe his sexual needs nor explain to his wife the psychological meaning of sexual release for him. He actively hid his sexual behavior and drug use but felt ashamed. He constantly felt overwhelmed and not measuring up for which he maladaptively sought sex, alcohol, and drugs to mollify his feelings of inadequacy. He was locked into a pattern of rigid sexual acting out to contain his intense anxiety over finances, marital infidelity, and how to function outside the penitentiary.

At the time of the charged offense, Mr. Purkey was not being adequately treated with antidepressant, mood stabilizing, and antianxiety agents. He was lurching from one activity to another, hoping no one would really

Diagnostic Interview Report
Wesley Purkey
Page 62

track down how badly he perceived that he was doing.  At the time he
kidnapped Jennifer Long, he had just completed the application process for
Roto Rooter in the Kansas City area.  He actively smoked crack cocaine,
used, marijuana, and drank alcohol.  These served as a strong
disinhibition for his hypersexual impulses.

After he killed Jennifer Long, he obsessively hid the evidence with the
modicum of hope that he could preserve his freedom.  However, at the same
time he felt tremendous guilt for his actions, even to this day.  He is
troubled by nightmares and guilt for killing Ms. Long.

At the time of the charged offense, he experienced a kind of instinctive
hunting response to Jennifer Long's attempting to run away.  He unleashed
a tremendous amount of anger in the numerous knife blows.  Mr. Purkey
chose not to share some things about this experience, but this strongly
suggests that he unleashed unwarranted pent-up anger on this young woman.
The anger was very highly influenced by his intoxicated state, his extreme
psychological distress, and his fear that he would never measure up in any
context.  He ultimately recovered enough to hide his actions from his
wife, his sons, and dispose of Jennifer Long's remains in a nearly
undetectable way.  Due to the desires of self-preservation through
avoiding the death penalty, a desire to give the Long family some rest at
the loss of their daughter, and a desire to clear his mind, Mr. Purkey
readily confessed.  Subsequent to his confession, even though there had
been several with slightly different emphasis, large portions of his
descriptions remain consistent.  Subsequently he suffered nightmares,
anxiety, and depression as he faces the reality behind his words of
remorse for Jennifer Long's killing.  This is not an untypical response.

Though Mr. Purkey has severe personality disorder, he did not demonstrate
any malingering or deceptiveness regarding the events of the charged
offense.  Rather, he seemed to find catharsis in telling his story.
Probably he hoped to put some of this to rest for himself and for the
family of Jennifer Long.  He still is having substantial impulse control
problems, nearly overwhelming anxiety, and moderate depression.  Generally
he has found some relief when more properly treated with mood stabilizing,
antidepressants, and antianxiety medications.

2.    Mitigation of penalty –
A number of factors strongly suggest potential of mitigation for Mr.
Purkey.  These include the following in no order of priority.

> a. At the time Mr. Purkey killed Jennifer Long, he was intoxicated
> on crack cocaine and distilled liquor.  It is well documented
> that this combination has caused him to have very poor anger
> control and control over his hypersexuality.

> b. Mr. Purkey was not a casual substance abuser.  He had more than
> 32 years of severe polysubstance dependence that had never been
> effectively treated.  He was unable to refrain from using illicit
> substances and frequently used them to the point of total loss of
> mental control.  That is, he had become violently angry,
> delusional, paranoid, unconscious, and severely self-destructive
> when intoxicated, especially with crack cocaine.  His
> polysubstance abuse arose directly from severe childhood
> emotional deprivation, physical abuse, and sexual abuse, all of

Diagnostic Interview Report
Wesley Purkey
Page 63

which had gone untreated in his adult life.  He unconsciously relied on an extremely poor coping mechanism that was to act out physically or sexually when in distress, especially if intoxicated.

c. Mr. Purkey suffered severe psychosexual maldevelopment, which directly contributed to the killing of Jennifer Long.  This maldevelopment took the form of intense need for anonymous sexual release through intercourse with prostitutes.  Mr. Purkey mistook Jennifer Long for a prostitute.  When he realized she was not going to be able to fulfill his pathological sexual need, he gave into a violent response toward the failed fantasy.  He had learned to believe that he was a failure because of his childhood experiences.  During childhood his parents, especially his mother, subjected him to rampant multiple-year sexual abuse beginning before he was a pre-teen.  She exposed him to her many sexual liaisons with numerous suitors.  This warped his idea of intimacy, relatedness to others, and the normal purposes of sexuality in relationships.  For him, sexual climax was the only reliable good thing in his life.  He frequently turned to that in times of immense emotional distress throughout his life.  Mr. Purkey's father furthered the abnormal sexual development by fostering use of prostitutes, beginning when Mr. Purkey was age 14 years old.  Mr. Purkey never developed a normal capacity to relate emotionally to women.  In his relationships with his wives and girlfriends, there were prominent co-mingling of verbal abuse, physical abuse, and sexual apology.  That is, sex could right all wrongs, or at least make them feel less intense for a short period of time.  Mr. Purkey's need for sexual release continued during long periods of incarceration.

Thus, Mr. Purkey developed a cycle of anxiety or anger resulting in rising emotional tension that he could not express.  When his inner discomfort became over pressurized, Mr. Purkey either acted out violently or found a way for sexual release.  The sexual release gave him a short period of sense of well being.  However, this was soon over shadowed by recurrent worries, anxiety or depression and feelings that he would never measure up no matter how hard he tried.  This closed the circle and created a cycle of acting out.

It is not surprising that in the emotional intensity of his complex and difficult reorientation to parole, he sought sexual release but it resulted in guilt-laden violence and hiding his deeds.  The neuropsychological data suggests that some of this rigidity and inability to refrain arouse from the consequences of brain damage.

d. Mr. Purkey showed mild frontal lobe and temporal lobe brain damage.  The frontal lobes are responsible for control of impulses, judgment, and ability to defer gratification.  The temporal lobes are considered the seat of emotion and modulate emotional control.  Persons with temporal lobe damage even if it is mild, frequently have substantial problems controlling impulses.  Those difficulties are substantial blocks to normal behavior even in the absence of Mr. Purkey's polysubstance abuse,

Diagnostic Interview Report
Wesley Purkey
Page 64

intoxicated state, and childhood victimization. Combining all of those with intense marital distress and guilt over failing, or perceiving he failed his wife by his numerous trysts, would be immensely stressful on an injured brain. Separate from Dr. Leeson's findings, are six reports that Mr. Purkey suffered brain damage during his developmental years. Those episodes of brain damage an 11-year period from 1966 through 1977. These are tabulated as follows:

i. 1966 - behavioral change after car accident.
ii. March 1968 - acute cerebral contusion with anisocoria and occipital headache. (Anisocoria results form trauma to the iris or the optic nerve.)
iii. January 1969 - impulsive, hyperactive, restless.
iv. August 1972 - facial lacerations with acute cerebral contusion, unconscious 1 to 2 minutes.
v. February 1974 - DOC impulsive and dependent; organic deterioration; best defense is acting out.
vi. 1977 - DOC closed-head injury with loss of consciousness for one and a half days.
vii. July 1994 - Lansing Correctional Facility no organic brain damage.

These medical records demonstrate that Mr. Purkey has an organic basis, that is a basis of brain damage, for at least some of his loss of emotional control when aroused. By arousal, it is meant that Mr. Purkey becomes overwhelmed and cannot function normally when he is in emotional distress. The cause of the distress can be internally generated, from complicated interactions with others, from not getting his way, from getting his way when he wanted someone to control him and they didn't, from intoxication, from shame, and from anger. Mr. Purkey has been well described as having rage responses wherein he loses control of his ability to behave any other way until he discharges his intense feelings. Then, he comes to awareness of what he did and feels remorse if he wronged someone. Mr. Purkey demonstrates much better emotional control when he is on a therapeutic dose of Tegretol and an adequate dose of Klonopin. Respectively, these are a mood stabilizing agent and an antianxiety agent. He even described color hue changes when he inadvertently was deprived of his Tegretol dose, suggesting that Tegretol was correcting a brain function abnormality. Similarly, adequate doses of benzodiazepines such as Klonopin, gave him much greater control over his anger response, especially if it arose from a sense of shame or humiliation. Thus, from a multifactoral origin, Mr. Purkey most likely experiences periodic intense losses of emotional control, either violently or sexually, as a result of abnormal brain functioning. These episodes are worsened when he feels a built up of internal distress, such as on January 22, 1998, regardless of the cause.

e. The events of Jennifer Long's killing took place while Mr. Purkey was making an unsuccessful attempt to adjust to life on parole. Recall that he had spent the majority of his adult years incarcerated. His first serious incarceration was from 19 years old until his mid forties. Before that, he knew the traumas of

Diagnostic Interview Report
Wesley Purkey
Page 65

his parents and then was arrested for the first time by 14 years old. Thus he never developed a normal social pattern. He largely knew how to manage himself in a highly controlled environment where violence management was often the only order of the day. Though he wanted to succeed, his intensely low self-esteem, severe self-denigration, described by one as "auto criticism" prevented him from making a smooth adjustment to parole. He had very few untested tools to make the adjustment as his primary adolescent to adult socialization had taken place in prison. He felt traumatized by the violence he encountered in prison, an additional stressor. In a fashion very consistent with Borderline Personality Disorder, Mr. Purkey saw that he could better himself, started to make a go with full time employment and a healthy relationship with his wife, but fell into old psychopathologic patterns. These patterns were the self-defeating behaviors resulting from his untreated childhood abuse experiences, untreated very severe substance abuse, abnormal prison socialization, and intense internal criticism that he really didn't belong outside of prison. It is not that he felt he deserved to remain incarcerated all his life, but that life as a free man was psychologically too complicated given the emotional damage he had suffered. He simply could not muster the internal resources on his own to manage the basic tasks of life outside the penitentiary. A good example of his inability to manage the pressures was that he tried to juggle a new job, relationship with his wife, relationships with his children, an intrusive relationship with his ex-wife, relationship with a girlfriend, use of numerous prostitutes, financial resources that hadn't been required of him for more than 20 years, taking on a house payment, buying furniture, assuming the role of a parent, and dealing with all of his childhood traumas completely alone. Note that it is particularly telling that Mr. Purkey wanted to secure a sentence in the Federal Penitentiary because that is the social system he understood and had adapted to.

f. Even now, he is deeply troubled by his behavior. He finds the rage attacks dysphoric. He want to better himself. He wants to express the great sadness that he feels for his actions toward Jennifer Long and others. He wants to find internal peace. Even his battle for an adequate dose of Klonopin has the character of an injured man seeking what he needs to manage himself. Thus, despite considerable antisocial behavior at times, Wesley Purkey labors under the severe impairment of chronic mental disease.

Stephen E. Peterson, MD
Diplomate, American Board of Psychiatry and Neurology 1992
ABPN Subspecialty in Forensic Psychiatry 1994, Recertified March 2003

Date Signed: _8/18/03_
SEP/ns

002430

Record Form No. 1
Revised 9-64

**SENTENCE DATA SHEET**

Kansas Penal System

| | | | | |
|---|---|---|---|---|
| INSTITUTION NAME | PURKEY, Wesley I. | Race | white | DOB |
| TRUE NAME | PURKEY, Wesley Ira | Alias | | |

| | | | |
|---|---|---|---|
| Sentence begins | 7-29-70 A/C JC | Jail Credit | 32 days (cs #6635) |
| Minimum date | 11-4-80 adj | Residence | Wichita, Ks. |
| Parole elig. | *5-2-75 PV | Place of birth | Wichita, Ks. |
| See BPP | *March 75 (Aug 74 PV Bd) | Marital status | Married (Catholic) |
| Cond. release | 10-1-81 adj | Occupation | Welder |
| Maximum date | 11-4-91 adj | Co-defendants | Greg ? |

*Controlled by cs #10018, Sent begins 7-2-74

| Institution | KSIR | KRDC | KSIR | KRDC | KSIR | KSIR | KSIR FBI | 257 115 H |
|---|---|---|---|---|---|---|---|---|
| Register No. | | | | 3 | | | 2 SSN | |
| Date Received | 10-12-70 | 10-22-70 fr KSIR | 3-11-71 fr KRDC via Court | 4-1-71 fr KSIR | 5-27-71 fr KRDC | 5-25-73 ret'd PV | 8-2-74 IL PV W/NC | |

## SENTENCE RECORD

| Date | County | Case No. | Term | Run | Crime |
|---|---|---|---|---|---|
| 9-1-70 | Sedgwick | CR 6635 | 10-21 yrs | | Burglary 1st |
| 7-2-74 | Sedgwick | CR 10018 | 1-10 & *1-10 yrs | cc | Burglary, Theft Omitted 3/6/75 |
| | | | | | |
| | | | | | |
| | | | | | |

TOTAL CONTROLLING SENTENCE          *1 yr & 10-21 yrs.

Data Verified: BBC
Date: 8-9-74

## PREVIOUS COMMITMENTS & ESCAPES

| Date | Institution | Escape |
|---|---|---|
| | NO PRIOR | |
| | | |
| | | |
| | | |
| | | |

## DETAINERS

| Date | Wanted by | Withdrawn |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| | Date | Action | Date | Action |
|---|---|---|---|---|
| GOOD TIME CHANGES | 9-71to7-72 1 mo 3 da GT earned 6-75/11-75 | | | |

Controls min, CR and Max only

## RELEASES

| | | Date | Method |
|---|---|---|---|
| **PAROLE OR CLEMENCY ACTION** | | 7-18-72 | Parole |
| Date | Action | 1-28-74 | Parole |
| 11-75 | Interviewed-No chng in orig order | 12-8-75 | Parole |

## WARRANT

| Date | Withdrawn | Date Returned |
|---|---|---|
| 5-2-73 | Arr: 5-14-73 | 5-25-73 |
| 5-9-74 | | 8-2-74 |
| 10-7-76 | | 10-11-76 |

TRANSFER --- Larned, etc.

| Yr | 0 | Mo | 0 | Da | 12 | Yr | Mo | Da | To | Ret |
|---|---|---|---|---|---|---|---|---|---|---|
| Yr | 0 | Mo | 2 | Da | 23 | Yr | Mo | Da | To | Ret |
| Yr | 0 | Mo | | Da | | Yr | Mo | Da | To | Ret |

controls min, CR and max only
9-75-Par to PLCMNT, 12-8-75, PO Wichita

(Use other side for additional data)

002431

***Consulting and Forensic Associates, PC***
**Bruce A. Leeson, PhD**

## Psychological Assessment

**Name: PURKEY, Wesley**                                  **Federal Reg. No.:** ████████

**DOB:** ████████                                         **Date of Report: January 5, 2003**

**Identification and Referral:** Wesley Purkey is a 50 year-old, Caucasian male. He was referred for evaluation by the United States District Court for the Western District of Missouri, Western Division where Mr. Purkey stands charged with Kidnapping, Rape, and Murder. This evaluation was requested by Mr. Purkey's attorney, Fred Duchardt, Jr., Attorney at Law, who requests an evaluation of Mr. Purkey's neuropsychological functioning.

**Evaluation Procedures:** The purpose of the evaluation was explained to Mr. Purkey. He was informed that the confidential relationship usually expected between a client and a psychologist did not exist. He was informed the information gained from the assessment process was not confidential and would be used to prepare a report to be submitted to his attorney and subsequently to the court. Further, he was informed that the examiner might be called to testify regarding the results of the assessment. Mr. Purkey acknowledged that he understood these conditions.

In the process of this evaluation, the following documents were reviewed:

1. The Court Order requesting this evaluation.
2. The Indictment charging Mr. Purkey with the instant offenses.
3. Investigative reports and materials pertaining to the instant offenses.
4. Forensic Evaluation by Christine Scronce, Ph.D., U.S. Medical Center for Federal Prisoners (USMCFP), Rochester, Minnesota, dated August 13, 2002.
5. Forensic report by Christina Pietz, Ph.D., ABPP, USMCFP Springfield, Missouri, dated March 21, 2002.
6. Records from Prison Health Services, Inc., dated 2000-2001.
7. Kansas Department of Corrections Evaluation and Classification Report, dated May 18, 2000.
8. Presentence Investigation Report from State of Kansas, dated April 19, 2000.
9. Psychiatric report by Stephen E. Peterson, M.D., dated April 19, 2000.
10. Records from Providence Medical Center, Kansas City, Kansas, dated September 16, 1998.
11. Records from University of Kansas Hospital, Kansas City, Kansas, dated September 13 & 14, 1998.
12. Records from Via Christi Regional Medical Center, Wichita, Kansas, dated May 2 & 3, 1998.
13. Records from the Institute of Logopedics, Wichita, Kansas, dated August 18 to October 13, 1982.

**002432**

Purkey, Wesley

14. Kansas State Reception and Diagnostic Center reports, dated April 26, May 5 & 11, 1971, September 24 & 26, 1974, November 9 & 16, 1976, and May 15, 18, & 19, 1981.
15. Medical records from Wesley Medical Center, Wichita, Kansas, dated August 29, 1969 and February 15-17, 1976.
16. Records from Heartsprings, Wichita, Kansas, dated August 4, 1960.

Mr. Purkey was seen at the Leavenworth Detention Facility, Leavenworth, Kansas. He was administered the Wechsler Adult Intelligence Scale, Third edition, the Wechsler Memory Scale, Third edition, the Test of Variables of Attention, the Delis-Kaplan Executive Function System and the Personality Assessment Inventory on April 22, 2002. He was interviewed and administered the Test of Memory Malingering on April 23, 2002. He was interviewed further and administered the Smell Identification Test on December 9, 2002. Mr. Purkey was totally cooperative with this examiner on every occasion.

**Salient History**
Mr. Purkey's history is clearly documented in multiple reports already available to the Court. History will not be recounted here except as pertains to head injury and the neuropsychological focus of this assessment.

March 8, 1968, Mr. Purkey was admitted to St. Joseph's Hospital and Rehabilitation center in Wichita, Kansas following a motor vehicle accident. He had multiple lacerations of the left face, anterior neck and shoulder. He was diagnosed with a cerebral concussion. He spent approximately a week in the intensive care unit following this accident. Mr. Purkey reported that he was troubled by headaches, episodic dizziness, and blurred vision for months following this incident. Further, he indicated that he began experiencing academic and social difficulties in school.

April 29, 1968, Mr. Purkey was treated in the emergency room of St. Joseph's Hospital and Rehabilitation center in Wichita, Kansas for multiple facial abrasions and contusions following a motor vehicle accident. X-Rays of the skull and spine did not evidence fracture. There was no indication of a neurological work-up.

August 31, 1972, Mr. Purkey was admitted to St. Joseph's Hospital and Rehabilitation center in Wichita, Kansas after a car was rear ended while he was working on the engine under the hood. The investigating officer reported Mr. Purkey lost consciousness for several minutes. Admitting diagnosis was "Multiple lacerations, face and forehead.....Acute cerebral concussion." Discharge diagnosis was the same with the addition of "plus emotional instability and behavior problem, partly genetic and partly environmental."

May 28, 1976, Mr. Purkey was treated at St. Joseph's Hospital and Rehabilitation center in Wichita, Kansas for a "facial contusion," and likely had a "green-stick," type fracture of the left cheekbone. At least as significant as the facial injury, is the history reported by the attending physician. Notes in the history section of the admitting work up reflect that, following a car accident a few years previous, Mr. Purkey's behavior changed. He was described as having

2

<span style="color:red">002433</span>

Purkey, Wesley

become "impulsive," and "immature," and "doing things very carelessly as if he wants to be apprehended."

In addition to the preceding documented instances of head injury with diagnosed or likely concussion, Mr. Purkey reports being knocked unconscious in a fight on a basketball court in the Oregon Department of Corrections.

## PSYCHOMETRICS

### Personality Assessment Inventory
The PAI is an objective measure of personality and behavioral variables associated with a broad range of clinical disorders and personality traits. It was standardized with 3297 clinical and non-clinical individuals.

Mr. Purkey completed all items and attended appropriately to item content. There was some inconsistency in responses to similar items. The scores scales reflecting response style fall in the normal range, suggesting that Mr. Purkey answered in a reasonably forthright manner and did not attempt to present an impression that was either more negative or more positive than the clinical picture would warrant

The PAI clinical profile is marked by significant elevations, indicating the presence of clinical features that are likely to be sources of difficulty for Mr. Purkey. The configuration of the clinical scales suggests a person with a history of severe substance abuse problems who is experiencing prominent stress, anxiety, and mild to moderate depressive symptoms. He has endorsed items suggesting he appears to be pessimistic and dwells on thoughts of worthlessness, hopelessness, and personal failure. He has endorsed items in a manner that consistent with significantly higher than average risk for suicide.

### Test of Memory Malingering
The TOMM is a test that by design looks difficult and in actuality is relatively simple for the average adult. Poor performance is often associated with malingering, that is with a deliberate attempt to present as impaired. Mr. Purkey achieved scores well within normal limits. This suggests he made a reasonable effort to do well on this task. This is consistent with the hypothesis that the results of this battery are representative of his actual abilities. Further evidence of the validity of this assessment is the fact that he performed within expected limits on most clinical measures of brain function, the exceptions being planning and sequencing, response inhibition, olfactory acuity, and sustained focused attention.

### Wechsler Adult Intelligence Scale-III & Wechsler Memory Scale-III
Mr. Purkey achieved Average or Low Average scores on the IQ Scales of the WAIS-III. There was a statistically significant difference between verbal and performance measures. Scores achieved were VIQ 94 (conf. int. 89-99), PIQ 85 (conf. int. 79-93), FSIQ 90 (conf. int. 86-94). On the verbal subtests Mr. Purkey evidenced significant strength, relative to the mean on the scale scores of the verbal subtests, on Vocabulary, that subtest with the highest correlation with overall intellective function, and a significant weakness on Comprehension, generally identified as a measure of social judgment and abstract reasoning. Relative to the mean he achieved on the

3

<span style="color:red">**002434**</span>

Purkey, Wesley

performance subtests Mr. Purkey evidenced a significant weakness on Block Design, generally identified as a measure of spatial reasoning.

The significant difference between verbal and performance subtests is suggestive of brain based cognitive dysfunction.

Scores achieved by Mr. Purkey on the WMS-III are essentially commensurate with what would be predicted by those achieved on the WAIS-III. All Primary Index scores were within the Average range with the exception of Visual Delayed memory which was Low Average.

**Delis-Kaplan Executive Function System**
Integral to this assessment is the issue of Mr. Purkey's ability to effectively plan, moderate, and organize his behavior. These are termed, "Executive Functions." A broad definition of executive functions is offered by Hall (1998).

> Executive functions comprise a neuropsychological system that translates awareness into action and consists of those abilities that allow the person to engage in purposeful, autonomous, self-serving, and prosocial activities... Deficits of executive dysfunction affect a broad set of behaviors. Disorders of executive functions, when they arise, typically produce deficits in either drive (e.g., inertia, apathy, labile behavior) or sequencing functions (e.g., perseveration, disorganization, impaired problem-solving ability.)... The ability of the executive system to integrate, select, modify, and eventually produce novel behaviors represents the highest form of human intellectual activity.

Executive functions include the following abilities: Formulating goals and consideration of long term consequences; Generation of multiple response alternatives; Selection and initiation of goal-directed behaviors; Correction and modification of behaviors as contingencies change; and Freedom from distractibility. (Jeffrey & Snyder, 1998).

The *Delis-Kaplan Executive Function System* (Delis, 2001) (D-KEFS) is a battery of tests to assess the frontal system, of the brain and executive functions including flexibility of thinking, problem solving, planning, impulse control, concept formation, abstract thinking, and creativity in both verbal and visual-spatial modalities.

The D-KEFS is normed on a national standardization sample of over 1,700 subjects and scores are age-normed for accurate assessment of functioning. It provides a much more specific assessment of frontal lobe functions than the WAIS-III, WMS-III, and general neuropsychological batteries. Scores are reported as standard scaled scores with a mean of ten and standard deviation of three. Scores of eleven or greater represent better than average functioning. Conversely, scores less than ten represent lower than average functioning. Complete results are included in appendix A.

Specific tests used in the battery used in the assessment of Mr. Purkey are as follow:

| Test | Key Executive Functions Assessed |
| --- | --- |
| Trail Making | Flexibility of thinking, capacity to shift cognitive set |
| Verbal Fluency | Fluent verbal processing skills, capacity to shift cognitive set |

4

002435

Purkey, Wesley

| | |
|---|---|
| Design Fluency | Fluent spatial processing skills, capacity to shift cognitive set |
| Color-Word Interference | Verbal inhibition and impulse control |
| Card Sorting | Problem solving, verbal & spatial concept formation, flexibility |
| 20 Questions | Verbal and spatial abstract thinking, impulsivity |
| Word Context | Verbal abstract thinking |
| Tower Test | Planning, spatial reasoning, impulsivity |
| Proverbs | Metaphorical thinking, generating vs. comprehending abstraction |

Results of the D-KFES tests administered are as follow:

## Trail Making
Timed scores were within normal limits, however, Mr. Purkey made a "set-loss" error in Condition 4. That is, he failed to switch between stimulus types in one instance. While not definitively indicative of impairment, even one set loss error is quite unusual in subjects his age. This is consistent with difficulty maintaining cognitive set which may be frontal in origin.

## Verbal Fluency
Letter and Category Fluency both require adequate fundamental verbal skills and rapid retrieval of lexical items. Most subjects find it more difficult to generate items beginning with the same letter than to generate examples of high-frequency semantic categories. In the absence of specific dysfunction, however, a subject would be expected to receive the same scaled score for both conditions. When greater difficulty is exhibited on Category Fluency than on Letter Fluency, such as is the case with Mr. Purkey, relative dysfunction involving the left temporal regions of the brain is indicated.

## Design Fluency
Mr. Purkey's performance on the primary measure, number of correct designs produced, was fair and only slightly inconsistent across conditions. Note should be taken of set-loss designs, however, which reflect impairment relative to both Mr. Purkey's own production rate and to the performance of subjects in the standardization group. The significantly higher than average number of set-loss errors reflects significant frontal impairment.

## Color-Word Interference
Mr. Purkey's performance on the primary measures of completion time is good across all conditions of this test. Further, he made no errors in either color naming or word reading (even severely impaired subjects rarely do). However, he evidenced multiple errors on both Inhibition and Inhibition/Switching conditions yielding scaled scores evidencing marked and borderline deficiencies respectively. This is consistent with dysfunction that is frontal in origin.

## Sorting
Mr. Purkey's performance on the primary measures, number of correct sorts completed and described, was good. He completed and attempted to label a nontarget sort. Nontarget sorts are probably not conclusively pathognomonic but are quite infrequent. It should be noted that he also made two unconfirmed target sorts. He provided inaccurate descriptions of the algorithms reflected in two recognition items. These findings are highly unusual and reflect significant impairment, likely involving the frontal and left temporal regions.

5

**002436**

Purkey, Wesley

**Twenty Questions**
Scaled scores on all measures were Average or slightly better, reflecting abstract reasoning abilities essentially commensurate with Mr. Purkey's FSIQ.

**Word Context**
Mr. Purkey scored Average on the primary measure of number of consecutively correct answers, reflecting abstract reasoning abilities essentially commensurate with his FSIQ.

**Tower Test**
Mr. Purkey achieved a primary measure score, which reflects number of items successfully completed, of Average. Ratio scores reflecting response times evidence that Mr. Purkey tended to respond with less reflection, both at the beginning of the problem and between moves, than the average subject. His rapid but totally haphazard approach to this test is underscored by the significantly deficient move accuracy ratio. This reflects both a lack of planning and lack of response inhibition that are likely frontal in origin.

**Proverb Test**
The Total Achievement score achieved by Mr. Purkey is in the lower Average range and essentially commensurate with his FSIQ. The significant difference between scores achieved on common versus uncommon is suggestive of relative deficiencies with higher levels of abstraction. Mr. Purkey's identification of concrete and phonemic choices in the multiple choice phase of the test underscores these relative deficiencies. While not indicative of severe impairment, these relative deficiencies are suggestive of frontal dysfunction.

**Test of Variables of Attention**
The TOVA is a continuous performance test that assesses impulsivity and sustained focused attention. Mr. Purkey's error rates for both errors of omission, false negative errors reflecting inattention, and errors of commission, false positive errors reflecting impulsive responding, were very significantly elevated. Notably, his error rate increased throughout the duration of the test, as did his self reported frustration with his inability to complete the task correctly. This is consistent with frontal impairment.

**Smell Identification Test**
The Smell Identification Test is a well standardized assessment of olfactory discrimination. Mr. Purkey was able to correctly identify 29 of the 40 stimuli, a score consistent with moderate microsmia or olfactory impairment. Because of their location along the ventral surface of the frontal lobes, the olfactory nerves are sometimes injured in events resulting in frontal lobe damage. While these results are not definitely indicative of trauma related damage, they are not inconsistent with the same.

6

002437

Purkey, Wesley

## DISCUSSION

Mr. Wesley Purkey was fully cooperative with the assessment procedure. Specific indicators of response set on the Personality Assessment Inventory suggest he answered PAI items in a reasonably forthright manner and did not attempt to present an impression that was either more negative or more positive than the clinical picture would warrant. He achieved scores within normal limits on the Test of Memory Malingering suggesting he was motivated to perform well and exerted reasonable efforts to succeed. He performed within expected limits on most measures of brain function, with notable exceptions. He seemed quite frustrated with his inability to avoid making false positive errors on the Test of Variables of Attention and even expressed this in session when the Smell Identification Test was administered months after the rest of the assessment battery. These observations are consistent with the hypothesis that the results of this assessment are representative of his actual abilities. At the time of the assessment, Mr. Purkey endorsed suggesting he was experiencing significant anxiety and mild to moderate depressive symptoms. In the opinion of this examiner, the degree of affective disturbance was not so extreme that it would have represented a significant confound in Purkey's test performance. He was prescribed and taking Buspar at the time of the assessment; at therapeutic levels Buspar is not identified as having effects that would normally interfere with neuropsychological test performance. Consultation with two different psychiatrists suggests that the effect of Buspar on neuropsychological test performance, if any, would be to improve the results by mitigating extreme anxiety. In the opinion of this examiner, this is a valid assessment of Mr. Purkey's intellectual and neuropsychological functioning at the time of the assessment.

Overall, Mr. Purkey achieved scores on most the intellectual function measures that were in the Average to Low Average range. His highest score on the Verbal subtests was on Vocabulary, sometimes believed to be reflective of overall intellectual ability. His subtest score on Comprehension, reflecting social judgment and abstract reasoning, was significantly lower. The difference between Verbal and Performance IQs is suggestive of brain damage. His relatively low score on the Block Design subtest, a measure of spatial reasoning, is further suggestive of right parietal dysfunction. This finding is somewhat surprising in an individual with a successful employment history as a plumber since plumbing is an endeavor that draws heavily on spatial reasoning skills. This might allow the inference that while Mr. Purkey has sustained a degree of damage to the right parietal lobe, over time he has learned to compensate so that he can read blueprints and solve the other sorts of spatial problems a plumber would encounter. Thus, the suggestion that right parietal damage may exist is most salient to the degree that it suggests a history of head injury rather than being reflected in overt behavior.

The aggregated results on the tests comprising the Delis-Kaplan Executive Function System are likely to be more salient to Mr. Purkey's on going behavior. He has demonstrated a subtle but consistent pattern of deficits that are likely reflective of frontal lobe dysfunction. . While there is no clearly identified Frontal Lobe Syndrome that is universally present in subjects who have had traumatic brain injury effecting the frontal lobes, individuals with known deficits often evidence many of the same difficulties. Mr. Purkey evidenced reasonable facility with the abstract reasoning functions tapped by the 20 Questions and Word Context tests. It is interesting to note that these tests are not timed; the subject is under no externally obvious time constraints.

7

Purkey, Wesley

In several timed tests (Trail Making, Design Fluency, Color-Word Interference,) however, Mr. Purkey failed to maintain the cognitive set necessary to complete the items without error. The absence of planning and reflection and gross inefficiency evidenced in the Tower Test reflect significant dysfunction despite completion of the tasks within the allotted time limit. His error rate on the TOVA is consistent with the identified "Go-NoGo" deficits in the report by Malloy and others (1993) in a published case study of a subject with an identified dysinhibition syndrome. Although the contingencies in the psychological assessment setting are relatively benign, it is clear that when aroused by task challenge or time constraints, Mr. Purkey's behavior is likely to become disorganized, inefficient, and inflexible.

It cannot be determined when Mr. Purkey sustained the trauma resulting in frontal lobe damage. The 1968 motor vehicle accident would represent a leading hypothesis, especially in light of a physician's later reference to the event being a marker for subsequent social difficulties Mr. Purkey began to experience. Subsequent instances of head injury and concussion may have exacerbated the damage, but not necessarily (Macciocchi, 2001, Barth, 2002). Further, although not delineated here, Mr. Purkey has a rich history of polysubstance abuse, especially of stimulants. Substance abuse is significantly linked to head injury, although directionality cannot be inferred (Sparadeo, 1990).

It is clear, however, that any conceptualization of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element. Under stress, Mr. Purkey is likely to react quite impulsively and without the ability to modify his actions. Because of a brain based disorder, in situations that may be unclear and include emotional arousal his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem.


Bruce A. Leeson, PhD
Licensed Psychologist

8

**002439**

Purkey, Wesley

## References

Barth, Jeffery T. (2001) Neuropsychology for the Non-neuropsychologist. Presentation to the Kansas Psychological Association, September 13-14. Olathe, Kansas.

Dellis, D.C., Kaplan, E., Kramer, J.H. (2001) *Examiner's Manual, Delis-Kaplan Executive Function System.* San Antonio, TX. The Psychological Corporation.

Hall, Harold V. (1998). Criminal-Forensic Neuropsychology of Disorders of Executive Functions. In H. V. Hall, & R. J. Sbordone, (Eds.), *Disorders of Executive Functions: Civil and Criminal Law Applications* (pg. 38). Boca Raton, FL: St. Lucie Press.

Macciocchi, Stephen N.; Barth, Jeffrey T.; Littlefield, Lauren; Cantu, Robert C. (2001). Multiple concussions and neuropsychological functioning in collegiate football players. *Journal of Athletic Training.* Vol 36(3) 303-306.

Malloy, P., Bihrle, A., Duffy, J., Cimino, C. (1993). The Orbital Frontal Syndrome. *Archives of Clinical Neuropsychiatry,* Vol. 8, pp. 185-201

Rechinskas, R.A.; Francis, Joseph P.; Barth, Jeffrey T. (1997). Mild head injury in sports. *Appplied Neuropsychology.* Vol 4(1), pp. 43-49.

Snyder, Peter J. & Nussbaum, Paul D. (1998). *Clinical Neuropsychology.* Washington, DC. American Psychological Association.

Sparadeo, Francis R.; Strauss, David; Barth, Jeffrey T. (1990). The incidence, impact, and treatment of substance abuse in head trauma rehabilitation. *Journal of Head Trauma Rehabilitation.* Vol 5(3) pp.1-8.

9

indictment in this case to you.

The Grand Jury charges, Count 1, that on or about January 22nd, 1998, in the Western District of Missouri, and elsewhere, Wesley Ira Purkey, the defendant, willfully, knowingly and unlawfully did transport in interstate commerce from Kansas City, Missouri, to Lansing, Kansas, Jennifer Long, the victim, who had been unlawfully seized, confined, kidnapped, abducted, carried away and held by Wesley Ira Purkey for the purpose of forcible rape of Jennifer Long, the actions of Wesley Purkey resulting in the death of Jennifer Long, all in violation of Title 18, U.S. Code, Section 1201(a)(g), and Section 3559(d).

The defendant has pleaded not guilty to this charge. The government, the prosecution, has the burden of proving a defendant's guilt with respect to the charge brought beyond a reasonable doubt. Indeed, the defendant is presumed to be innocent of the charge. He is not required to prove that he is innocent.

The charge alleged in the indictment accuses Mr. Purkey with killing Jennifer Long. This particular crime, if proved, carries a possible sentence of death. Such a charge is often referred to as a capital offense. The government has informed both this court and Mr. Purkey that if he is found guilty of this capital offense they will ask the jury to impose the death penalty.

002441

In a few minutes I'm going to ask the assembled panel here a series of questions. These questions will be propounded to you as a group. After the group voir dire is completed, the attorneys and I will speak to you in smaller groups and ask you additional questions.

Because of this capital charge, the trial of this case will potentially involve two stages. During the initial stage the jury's sole task will be to determine whether or not the government has proved the defendant guilty beyond a reasonable doubt of the charge brought against him. During this initial stage of the trial the possibility of punishment must not enter into your deliberations at all.

If, at the conclusion of the first stage, the jury reports that it does not find Mr. Purkey guilty beyond a reasonable doubt of the charge outlined in the indictment, that will be the end of your responsibilities.

On the other hand, if at the conclusion of the first stage the jury reports that it finds the defendant guilty beyond a reasonable doubt of this capital charge, we would proceed to a second stage, a sentencing hearing addressing whether or not the death penalty should be imposed.

During the second stage hearing, the government would have the opportunity to introduce evidence of certain

things referred to in the law as aggravating factors. These aggravating factors will be presented by the government in an effort to convince you that the death penalty would be appropriate in this case.

The defendant would then have the opportunity at the second stage hearing to demonstrate to you the existence of what is referred to as mitigating factors. Mitigating factors are circumstances about the crime or the defendant's background or character that would suggest that the death penalty is not appropriate in a particular defendant's case.

Before a jury could vote to impose the death penalty it would have to be unanimously persuaded that at least one of the specific aggravating factors that I will identify for you in my instructions have been proved beyond a reasonable doubt.

Further, before a jury could vote to impose the death penalty, it would have to be unanimously persuaded that those aggravating factors outweighed any mitigating factors that one or more jurors found existed.

Even if the jury did not find any mitigating factors in a given case, it would still have to be unanimously persuaded that the aggravating factors were themselves sufficient to justify a death sentence. Absent such unanimous agreement, a jury could not impose death

002443

upon a defendant.

Let me note two more points for you. First, although the death penalty cannot be imposed by a jury absent some of the unanimous findings that I have just discussed, I want to emphasize that even if a jury makes such findings it is never required to impose a sentence of death upon a defendant.

Second, if the jury were to find unanimously that the death penalty should be imposed upon a defendant, this court could not change your decision.

Obviously what I have just stated is only an overview of the law applicable to a jury's consideration of the death penalty. My comments should not be taken by you as any suggestion that this case will require a sentencing hearing because I emphasize again the defendant, as he sits here, is presumed innocent of the charge brought against him. I go over the law in this regard only to help you to begin to think about the issue. When I speak to you in small groups I will be asking you questions to determine if you can be fair to both sides and fairly and impartially consider whether or not the death penalty should be imposed in this case.

Before we go further I'd like to introduce you to the parties seated at counsel table and I'll start with the counsel table representing the government in this case,

002444

and I don't know who is going first, Mr. Graves or Mr. Whitworth. I ask one of you to introduce everybody else.

MR. GRAVES: My name is Todd Graves. I'm the United States Attorney for the Western District of Missouri. Matt Whitworth is Deputy United States Attorney for the Western District. Janice Sheridan is a paralegal in our office. Bill Howard is a detective with the Kansas City, Kansas, Police Department. And Dirk Tarpley is a special agent with the FBI.

THE COURT: Thank you, Mr. Graves.

I'll ask, before you sit down so everybody gets a good look at these individuals, does anybody believe they recognize or know any of these individuals? I take it by your silence that you do not. Thank you, gentlemen and lady.

Next I'll ask Mr. Duchardt representing the defense in this case if you would introduce yourself and those seated at counsel table.

MR. DUCHARDT: Thank you, Judge.

Good morning. I'm Fred Duchardt. I have only two folks to introduce you to. Wes Purkey, and Laura O'Sullivan.

THE COURT: I'll ask as I have before if any of you know any of them? I take it by your silence that you do not.

**002445**

Thank you, Mr. Duchardt.

I have introduced myself.  To my right is the court reporter, Donna Turner, and to our left is the courtroom deputy clerk, Rhonda Enss, and I'll ask if any of you know any of us.  Again, I take it by your silence that you do not.

MR. DUCHARDT:  Judge --

THE COURT:  Oh, I'm sorry.

VENIREPERSON 10:  I don't know you personally.

THE COURT:  Give me your name.  I didn't say this before.  If you have an affirmative response I need to ask that you stand -- raise your hand and then once you are called upon, stand and state your response.

VENIREPERSON 10:  My name is Juanita Ross, and I believe your wife is principal --

THE COURT:  Correct.

VENIREPERSON 10:  -- at Hickman Mills District.

THE COURT:  Correct.  And you know her?

VENIREPERSON 10:  Of her.  And of you.

THE COURT:  Okay.  Well, you won't hold that against her, will you?

VENIREPERSON 10:  No.

THE COURT:  Is there anything about your knowledge about either of us that would prevent you from being fair and impartial to the parties in this case?

VENIREPERSON 10:  I don't think so.

THE COURT:  Thank you.

And I think I saw someone else.  Yes, would you stand and give us your name?

VENIREPERSON 31:  My name is Arlen Milne, M-i-l-n-e.  I live in Platte County and Mr. Graves used to be prosecuting attorney up there.  I don't really know him personally.

THE COURT:  You just know of him being the prosecutor there?

VENIREPERSON 31:  Yes.

THE COURT:  Is there anything about your knowledge of Mr. Graves in that position or in his current position that would preclude you from being fair not only to the government in this case but to the defense?

VENIREPERSON 31:  No, I don't believe so.

THE COURT:  You believe you could be fair?

VENIREPERSON 31:  Yes.

THE COURT:  Thank you.

VENIREPERSON 2:  My name is Cathy Phillips.  My little brother is Robert Taylor and I think he's friends with Justin, but I have never seen him before.

MR. WHITWORTH:  That's my son, Your Honor.  Went to high school together.

THE COURT:  Phillips, is that correct?

002447

VENIREPERSON 2:  Uh-huh.

THE COURT:  Is there any reason because of that knowledge or association of your son and Mr. Whitworth's son that would prevent you from being fair to both the government and defense in this case?

VENIREPERSON 2:  No.  It's my brother.  Not my son.

THE COURT:  Brother.  I'm sorry.  I'm sorry. Thank you.

Anyone else?  I don't have good peripheral vision so if you raise your hand, you have to stick it up nice and high so I can see it.  Okay.  I'll move on.

Although each question is propounded to you as a group, you're each to consider the question as it relates to you individually and respond accordingly.  Now, I'm going to frame these questions so that normally the answer would be no.  If your answer is no you don't have to say anything, just stay seated and be silent.  Your silence will indicate a no.

However, if your answer is anything other than no, you should raise your hand as I just indicated, give your name and we'll identify you and get your response. I ask you not to be hesitant or to be shy.  I know these situations or circumstances may be somewhat intimidating, but it's important that you answer these questions honestly

and openly.  The parties in the case are entitled to a jury which is fair and impartial, and we can only accomplish that if you answer these questions honestly.

Okay.  Now, I'm going to go through a series of questions that hopefully we can employ the format that I just outlined for you, and some of them may not sound like they ought to be asked, but they still need to be asked.

Are there any among you who is not a citizen of the United States of America?  I take it by your silence that you all are.

One of the principles in a case like this, a criminal case in the federal court is I need to make sure you understand your responsibilities.  Here a jury determines facts and the court will instruct you on the law to be applied to those facts.  You are bound by the court's instructions and cannot substitute your own notions of what the law ought to be.  You are to judge this case solely on the evidence before you and not allow fear of later criticism to affect your verdicts, or your verdict.

Is there anyone who believes they would be unable to follow this principle law?  I take it by your silence that you all can.

The law does not compel a defendant to testify and no presumption of guilt may be drawn from the fact a defendant does not testify.  The law does not require a

002449

defendant to call any witnesses or produce any evidence. Anyone unable to accept that principle of law? I take it by your silence that you all can.

You're not to be governed by sympathy, prejudice or public opinion. Rather, both sides want and should receive a fair and impartial consideration of the evidence. Anyone believe they would be unable to do that? I take it by your silence that you can.

Would any member of this jury panel's judgment be affected by the race, religion, gender, or nationality of any witness or the defendant? I take it by your silence it would not.

As you have been told, the government must prove aggravating factors beyond a reasonable doubt. Is there anyone who would hold the government to proof beyond all doubt? I take it by your silence that you would not.

You must base your decision solely on the evidence presented at trial. Evidence will be presented in the form of testimony from witnesses, exhibits that may be admitted or stipulations between the parties. Is there anyone who would not be able to confine their consideration to those considerations of the evidence, exhibits, stipulations? I take it by your silence that you all can.

I just asked Rhonda to make sure that everyone had received a copy of the proposed witnesses who will be

002450

testifying in this case. I'll ask if you'll take some time now and review that list. There are a large number of names on the list, and rather than call them out I'll ask that you review it and I'll give you a moment and then I'll check and see if everyone has had the opportunity to do so. Then I'll ask my questions. Does anyone not have the witness list? I take it by your silence that you all do.

Once you have gone through the list if you'd just hold your head up, and I'll get a count to see where I am.

Anybody who has not completed review of the witness list? Please raise your hand if you're not. I want you to take a good look at the list. It would appear that everyone has had a chance to review the list. Okay. I'll ask if anyone believes they know or recognize any individual who is proposed to be a witness in this case? Okay. I see two hands.

Okay. We'll start with the lady in the second row. Yes, ma'am, if you'd stand and give us your name.

VENIREPERSON 50: Leslie Herman.

THE COURT: Leslie --

VENIREPERSON 50: Herman.

THE COURT: Who do you know?

VENIREPERSON 50: Well, I recognize the name Linda Whitaker from many years ago. I don't know if it's the same person that I was socially introduced to. At that

002451

time I thought she was an attorney with Hallmark or some such, but I don't know if it's the same person.

THE COURT: Judith Whitaker I believe is an attorney with Hallmark.

VENIREPERSON 50: Okay, that would be it.

THE COURT: Yes, ma'am. Would you stand and give us your name?

VENIREPERSON 55: My name is Andrea Miller and I live in Greenwood and I recognize the name Brooke Doolittle. I don't know her, but I have heard or read about the name.

THE COURT: Okay. Thank you.

Anyone else? Okay.

As you might imagine from the list of witnesses there will be a number of witnesses who are law enforcement individuals and I need to know if there are any of you who would treat them any differently than you would any other witness. In other words, that you judge their credibility based upon their testimony and not be biased either in favor of or against law enforcement, a law enforcement witness. Anyone feel that way, that they could not treat a law enforcement -- your name please?

VENIREPERSON 58: Joyce Smith.

THE COURT: Okay. Anyone else? You can be seated, ma'am. Thank you.

002452

Okay.  I want to read an instruction to you and then we'll be breaking up into our smaller groups.  This is an instruction regarding conduct of jurors.

You as jurors must obey the following rules. First, you do not talk among yourselves about this case or about anyone involved with it until the end of the case when you go to the jury room to decide your verdict.  You do not talk with anyone else about this case or about anyone involved with it until the trial has ended and you have been discharged as jurors.

When you are outside the courtroom, do not let anyone talk to you or tell you anything about the case or about anyone involved with the case until the trial has ended and your verdict has been accepted by me.  If someone should try to talk to you about the case during the trial please report that to me.

During the trial, you should not talk with or speak to any of the parties, lawyers or witnesses involved in this case.  You should not even pass the time of day with any of them.  It is important not only that you do justice in this case, but that you also give the appearance of doing justice.  If a person from one side of the lawsuit sees you talking to a person from the other side, even if it's simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused.

**002453**

If any lawyer, party or witness does not speak to you when you pass in the hall, ride the elevator or the like, it is because they are not supposed to talk or visit with you.

Do not read any news stories or articles about the case or anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. In fact, until the trial is over I suggest that you avoid reading any newspapers or news journals at all or avoid listening to any TV or radio newscasts at all. I don't know whether there might be coverage on these issues, but I'm telling you this out of an abundance of caution.

Okay, I'm going to recess. Now, some of you will remain in the courtroom, some of you will be seated in the jury box, I mean in the jury deliberation room because you'll be the next group to be interviewed, and the rest of you will be escorted down to the second floor, so I'll turn it over to Rhonda.

THE COURTROOM DEPUTY: Okay, Jurors No. 2 through No. 17, if you remain in your seats, please.

* * * * * * *

(SMALL GROUP VOIR DIRE OF VENIREPERSONS 2, 4, 6, 8, 10, 13, 14, 15, 17.)

THE COURT: Okay. I have to lean forward a

yes.

Q    You say the government reneged on its deal, right?

A    Yes, sir.

Q    Now, all throughout December in the four times you met with the agents you said you had kidnapped Jennifer Long, right?

A    Right.

Q    You wrote it down on paper in the note you sent and in the written confession that you wrote out yourself, that you had kidnapped Jennifer Long?

A    Right.

Q    And you even testified under oath in court on October 25th, 2002, that that was true, that you had kidnapped Jennifer Long, right?

A    Right.

Q    And now you want this jury to believe that you never kidnapped her; is that your testimony?

A    That is my testimony.

MR. WHITWORTH:  No further questions.

REDIRECT EXAMINATION BY MS. O'SULLIVAN:

Q    Mr. Purkey, in October of 2002, the testimony that Mr. Whitworth was asking you about, you weren't asked whether or not -- let me put it to you this way:  The question was whether that was a confession to kidnapping, rape and murder of the young lady, right?

A    That's right.

Q    And in that written statement, that is what that written statement said, right?

A    That's true.

Q    And basically most of the questions you were talking about had to do with the deal that you had with the police; is that fair?

A    That's a fair statement.

Q    And there's no doubt that you lied to the police when you said that you kidnapped Jennifer Long, right?

A    No doubt at all.

Q    And you don't deny lying to them about that portion of what happened, on several occasions, right?

A    Yes.

Q    Because what would happen -- what was your understanding of what would happen if you told the truth and told them that there was no kidnapping?

A    If I did that, it would have turned into a state jurisdictional case.

Q    And that would have been what state?

A    Kansas.

Q    Now, the other -- in your statement Mr. Whitworth asked you whether or not you had indicated that you had stabbed Jennifer in a truck, in the garage, in your home.

A    Right.

correct, childhood sexual trauma?

A    That's too vague a phrase for me to respond to, but I can tell you exactly what was in the record.

Q    All right, sir.

A    There is one record from the time he was an adolescent indicating that there had been promiscuous behavior by his mother who was -- had brought at least three men home and was openly engaging in sex in the home with the boys. There was another record that said that someone else had found some psychosexual problem that was never identified, and the report that supposedly said that was never received.  And I think up until he's facing capital murder charges, that's all that was in the record.

Q    All right, sir.  Now, are you also familiar with the fact that Wes's brother Gary has also testified about his own abuse by his mother?

A    So I have been told, yes.

Q    Now, what you testified to the jury is, though, that this is an account that really comes from only these sources; is that correct?

A    That's right, those are the only sources I'm aware of.

Q    Okay.  Is that necessarily unusual in the case of a man having been sexually abused by his mother, not coming forward about the issue until directly asked about it?

A    It's such a rare event that I don't think anyone could

002457

say what's usual or not.  But looking by analogy, it's true that it's not common for males to volunteer stories of their sexual abuse unless there's something good that will come of it for them.

Q    Okay.  Now, in your testimony, were you indicating that you were relying upon Mr. Purkey's account of this sexual abuse or not relying on it?

A    All I can do is report it and indicate that that's where it came from.  It's not for me to judge his credibility and it's not for me to find the facts.  That's for the fact-finder.

Q    Sure, and I understand that, but certainly you take the facts and use them to reach the conclusions which you do.  Did you use Mr. Purkey's representations that he had been sexually abused by his mother in order to reach any of the conclusions which you did, or did you not?

A    Sure, I used them to -- first, I used it to reach the conclusion that he might have been sexually abused by his mother, just as he says.  Second --

Q    Can I stop you there for just a second, if you don't mind.  I take it by saying might as opposed to many of the things that you said more as a fact, that you *are* saying that in your opinion there's a possibility that that's also not true, as opposed to some of the other things that you more indicated as a fact.  Am I --

002458

A    For the reason I gave earlier.  If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute.  This I think is a matter in dispute that's not for me to be the fact-finder about.  The jury has to do that.

Q    Okay.  Now, though, isn't it the case that Mr. Purkey was also the only source for your finding that he had committed acts of delinquency prior to the age of 15?

A    No.  Some of that comes from records as well, but there were some delinquent acts for which he was my only source.  And I rely on that in a different way because that's an admission against interest.  That is, when somebody makes a statement that hurts their interests, it has a different degree of reliability than someone who makes a self-serving statement that promotes their interest.

Q    For a person in prison to say you have been sexually abused by your mother is certainly not a statement in your interest, is it?

A    It is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation.

Q    How about the account by his brother that he, too, was sexually abused, I take it you don't trust that statement, or you do trust that statement?

002459

Purkey - Cross                                                62

remember what happened that week.  He said he remembers meeting with the agents that week and all of this testimony goes to his recollection.  He's got a recollection of what happened that week.  And I'm trying to make a record to demonstrate that the defendant does have good recall and so, it's not credible to believe that these notes would have been so crucial to his defense that he can't -- that he's unfairly prejudiced.

MR. DUCHARDT:  Let me explain my concern, Judge, and maybe we can end run my concerns with a concession by the Government.  What I don't want to hear come time of trial, if, for the sake of argument, that the Court would overrule our motions and that Judge Gaitan would affirm that ruling, is that Mr. Purkey has separately in these proceedings affirmed the content of the admissions that are purportedly in these documents at a separate hearing that was conducted at this time.  If that is not the Government's intentions, I won't have a problem with Mr. Whitworth asking any of these questions of Mr. Purkey.

MR. WHITWORTH:  Judge, I think it is our intention to use it later if we can.

MR. DUCHARDT:  And that's why I've got the problem.

MR. WHITWORTH:  Well, Judge, once the witness --

THE COURT:  Well, but let me just ask you, Mr. Duchardt.  I think, you know, originally, I guess I was

002460

Purkey - Cross                                                  63

assuming that the testimony was being offered for a different purpose.  You're the one raising the issue that these documents are material because your client has no recollection of -- or not a specific recollection of these events.  I mean how do you respond to Mr. Whitworth indicating he's entitled now to probe his recollection?

MR. DUCHARDT:  The problem is is that the recollection concerns these precise statements that were made and notes that were taken by Mr. Purkey pertaining to the specific representations that were made to him by Tarpley, and this occurred in the conversations that Mr. Whitworth has already talked about, during the 16th particularly.  And those -- that's basically the record that I made with Mr. Purkey was -- concerned what was said by him, what was said by the detective and the FBI agent on the 16th, and that he had made those notes, that he did not recall specifically what he had said at those particular times, and that he had wrote down notes in those regards to assist him in his recollection. That's number one, Judge.  Number two is what Mr. Whitworth is probing are general notions about what had happened, as opposed to asking what specific words were used by this particular person at this particular time.  With all due respect, I think what's happening is that, what the Government wishes to do, is have Mr. Purkey reaffirm the statements that were made to the officers for potential use

002461

Purkey - Cross                                                    64

at time of trial. I am objecting to that and I am specifically directing Mr. Purkey not to answer because, quite honestly, that's the only purpose behind this questioning. It does not test Mr. Purkey's recollection of specific statements that were made to him and statements that were made by him, which is the point of this. Mr. Purkey has already testified to the general tenor of his understanding of a promise that was made to him. What the question was directed to, and that's the point of the Motion to Dismiss, it's up to this Court to decide whether a promise was made or not. And it's important for the Court to know, as best as you can, precisely what the words were used by each of the parties. We are not in a position to give Mr. Purkey's account of that right now because his past recollections recorded in those regards have been torn up at one place where he was and thrown away at CCA. That's the point that we've made. That's what I've tried to carry the burden on. And the questions that Mr. Whitworth is asking are not challenging Mr. Purkey's ability to recall specific words that were said to him. He's asking him about things that he did and very general recollections which we're not challenging.

          MR. WHITWORTH: Your Honor, I think it's important for this Court and for any reviewing court, which will, no doubt, occur in the future of this case or a very good

002462

Purkey - Cross                                           71

A.   I don't remember that.

Q.   You don't remember that.  You remember when he showed you the photo array, did you remember identifying an individual in that photo array?

MR. DUCHARDT:  Your Honor, I'm going to object to that question as going beyond the scope of direct examination, not properly testing the issues that were raised in direct examination, and not focusing on the -- it's basically beyond the scope of the direct examination.  And therefore, is asking for Mr. Purkey to make separate admissions for which he -- basically, violate his right to be free from compulsory self-incrimination in violation of the Fifth Amendment of the Constitution of the United States.

THE COURT:  All right.  Overruled.  And it just -- all the parties need to understand the testimony I'm taking is for purposes of this proceeding.  What happens down the line to that testimony is, I think, totally outside this Court's purview and some other court then, would have to decide how that testimony can be used.

MR. DUCHARDT:  Well, and, Judge, so that you understand what my position is, too, and I haven't really stated it clearly, so let me put in this part of it.  This is making Mr. Purkey choose between exercising his right to complain about the violation that occurred back in 1998 and then concomitantly suffer needlessly, with all due respect to

002463

Purkey - Redirect                                89

MR. DUCHARDT:  Your Honor, for purposes of the record, I'd offer Defendant's Exhibits #11, #12 and #13.

MR. WHITWORTH:  No objection.

THE COURT:  All right.  #11, #12 and #13 will be admitted.

MR. DUCHARDT:  And I have just a couple of questions for Mr. Purkey.

THE COURT:  Yes.

MR. DUCHARDT:  I was just -- I didn't to --

THE COURT:  No, that's fine.

MR. DUCHARDT:  -- want to interrupt counsel.

REDIRECT EXAMINATION

BY MR. DUCHARDT:

Q.  Mr. Purkey, when you were advised of your right to remain silent and have counsel in that form that was signed by you on December the 16th, you did not ask for counsel at that time, is that correct, sir?

A.  That's correct.

Q.  Why?

A.  Because I thought the -- there was no need to have counsel because the United States Attorney had approved the proposal made and that Mr. Tarpley was there to make good on that proposal.

Q.  Because you thought you had an agreement?

A.  Right.

002464

Purkey - Recross                                                90

Q.  Okay.  Is that the similar reason why you did not invoke your right to counsel then, the next day, December the 17th, and instead brought in a handwritten document that you've already identified?

A.  Correct.

Q.  Okay, sir.

MR. DUCHARDT:  I have no further questions, Your Honor.

RECROSS EXAMINATION

BY MR. WHITWORTH:

Q.  When you confessed to the Mary Ruth Bales homicide, you did so in that case without counsel, correct?

A.  Correct.

MR. DUCHARDT:  I'm sorry, Your Honor.  Hold on a second.  Your Honor, I'm going to have to object.  That's beyond the scope of redirect examination.

THE COURT:  Overruled.

BY MR. WHITWORTH:

Q.  You didn't have counsel, is that correct?

A.  Correct.

Q.  You didn't have a deal up front, correct?

A.  No.

Q.  And you did it freely and voluntarily, correct?

A.  Correct.

MR. WHITWORTH:  That's all I have.

002465