### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

| | |
|---|---|
| **WESLEY IRA PURKEY**, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 2:19-cv-00414-JPH-DLP |
| | ) |
| **WARDEN OF USP TERRE HAUTE,** | ) |
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Respondents. | ) |

### RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

Wesley Purkey's § 2241 habeas petition raises the wrong claims, before the wrong court, and at the wrong time. This Court should dismiss it with prejudice.

Purkey cannot file a petition under § 2241 unless he shows that § 2255 is inadequate or ineffective, and he has failed to do so. For three claims, he argues that ineffectiveness of § 2255 counsel renders § 2255 inadequate or ineffective, but no court has ever accepted this argument, and this Court should not be the first. For one claim, he argues that his trial counsel committed fraud on the court in the Western District of Missouri, but that claim must be raised in that court. For his remaining four claims, he gives no explanation for why § 2255 is inadequate or ineffective. For these reasons, the Court should dismiss his claims with prejudice.

Further, every claim his petition contains is barred because it either was or could have been presented during his trial, his initial § 2255 motion, or appellate proceedings on both. If Purkey had a procedural recourse, it would be in the Western District of Missouri,

the court of his conviction, and only if he could show extraordinary circumstances justifying the decade of delay between his § 2255 motion and this filing. Because Purkey has failed to overcome these procedural bars to his petition, this Court should dismiss it with prejudice.

Purkey's claims also fail on the merits. His trial counsel was not ineffective: he was not deficient in failing to object to a juror when Eighth Circuit law on juror bias was unsettled; he presented adequate mitigation evidence; and there is no basis for concluding that he instructed Purkey to perjure himself. Further, trial counsel did not perpetrate a fraud on the court with his § 2255 affidavit, which in any case the Eighth Circuit disregarded in ruling on his § 2255 claim. There is no possibility that the jury misunderstood the mitigating factor instructions; a sentencing jury need not find the weighing consideration beyond a reasonable doubt; the death penalty does not facially violate the Eighth Amendment; and this Court should not extend the *Atkins* bar on capital punishment of the intellectually disabled to those with mental illnesses.

Purkey's claims all lack merit, but the Court need not resolve them to resolve this case. Purkey has no basis to revive these claims here and now, most of which he raised and all of which he could have raised at trial or in his § 2255 motion in his court of conviction a decade and more ago. Congress limited second and successive § 2255 motions in the Anti-Terrorism and Effective Death Penalty Act of 1996 to stop petitions like this one. The Court should dismiss it with prejudice.

## Table of Contents

**Page**

I.    Background........................................................................................ 4

    A.    Procedural History.................................................................... 4

    B.    Jury Trial and Appeal .............................................................. 5

    C.    Section 2255 Motion and Appeal............................................ 28

    D.    The Present § 2241 Petition ................................................... 33

II.   Section 2241 Does Not Permit Purkey to Avoid the § 2255(h) Limits
    on Second and Successive Motions........................................... 34

    A.    Purkey Has Not Shown that § 2255 is Inadequate or Ineffective under
        Existing Precedent.................................................................. 37

    B.    This Court Should Not Extend *Ramirez*, *Martinez*, and *Trevino* to
        § 2241 .................................................................................. 42

    C.    Purkey Cannot Rely on § 2241 to Escape the Law of the Circuit of
        Conviction ............................................................................. 47

III.  Purkey's Claims Are Procedurally Barred and Otherwise Lack Merit.................. 50

    A.    Claim 1 - Trial Counsel Was Not Ineffective for Failing to Strike a Juror
        with the Same Name as the Victim .......................................... 50

    B.    Claim 2 – Trial Counsel Investigated and Presented Abundant Mitigation
        Evidence, so That the Proffered "New" Evidence is Cumulative............... 62

    C.    Claim 3 – Trial Counsel's Affidavit Contained No Lies but in Any Case
        Was Disregarded by the Eighth Circuit in Its Review of Purkey's § 2255
        Motion .................................................................................. 79

    D.    Claim 4 – There Is No Possibility that the Jury Misunderstood the
        Instructions Regarding Mitigating Factors................................. 87

    E.    Claim 5 - *Hurst v. Florida* Provides No Support to Purkey's Claim and a
        Capital Sentencing Jury Does Not Need to Find That Aggravating Factors
        Outweigh Mitigating Factors Beyond a Reasonable Doubt........................ 96

F.   Claim 6 - Imposition of the Death Penalty Under the Federal Death Penalty Act is Not Cruel and Unusual Punishment.................................................. 102

G.   Claim 7 - The Categorical Exemption from Capital Punishment Does Not Extend Beyond Intellectual Disability as Held in *Atkins v. Virginia*........ 106

H.   Claim 8 – Trial Counsel Was Not Ineffective in Filing A Motion to Suppress, or in Dealing With Collateral Issues Related to the Suppression Motion ............................................................................................... 116

IV.   Purkey is Not Entitled to a Stay .......................................................... 124

A.   Purkey Has No Possibility of Success on the Merits of His Claims......... 124

B.   The Irreparable Harm Prong Must Be Considered in Context.................. 124

C.   Purkey Has Not Diligently Pursued His Claims ..................................... 125

D.   Public Interest Weighs in Favor of Enforcing the Law............................ 126

V.   Conclusion....................................................................................... 127

## I.
## Background

### A.    *Procedural History*

On November 5, 2003, a jury in the Western District of Missouri convicted Wesley Purkey of the kidnaping, rape, and the murder of Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g), and 3559(d).  After a seven-day penalty phase, which encompassed the testimony of 13 government witnesses who testified in support of 10 aggravating factors, and 18 defense witnesses who testified in support of 27 mitigating factors, the jury found 9 aggravating factors, no mitigating factors, and recommended a sentence of death. On January 23, 2004, following a denial of Purkey's motion for a new trial, the district court sentenced him to death.  The Eighth Circuit affirmed his conviction and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied*, 549 U.S. 975 (2006).

Purkey then filed a motion under 28 U.S.C. § 2255, which the trial court denied. The Eighth Circuit affirmed the district court's denial of Purkey's § 2255 petition.  *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied*, 135 S.Ct. 355 (2014).

On July 25, 2019, the United States Department of Justice set an execution date for Purkey for December 13, 2019.  On August 22, 2019, Purkey filed a petition for clemency with the Office of the Pardon Attorney, United States Department of Justice.

Purkey has now filed a petition under 28 U.S.C. § 2241, raising many of the same claims he raised on appeal and in his § 2255 motion.  He has also filed a motion for a stay of his execution.  His claims, made sixteen years after his trial, are procedurally barred and substantively without merit.  This Court should deny his petition without a hearing.

### B.   *Jury Trial and Appeal*

#### 1.   *Guilt Phase Evidence*

Wesley Purkey was tried and convicted of kidnaping, raping, and murdering 16-year-old Jennifer Long.  On December 15, 1998, while in the Wyandotte County jail awaiting trial for the robbery and first-degree murder of 80-year-old Mary Ruth Bales, Purkey contacted law enforcement and offered to speak about a murder and kidnaping that had occurred earlier that year.  Purkey said he wanted to spend his time in a federal prison, rather than a state prison.  After giving an account of the kidnaping, rape, and murder of the victim, later identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted.

Frederick Duchardt was appointed to represent Purkey at trial.  Laura O'Sullivan served as second-chair.  (T. Tr. Vol. I at 1.)[1]

At trial, the Government established that on January 22, 1998, Purkey applied for a position as a plumber with the Roto-Rooter plumbing company, located in Kansas City, Missouri.  Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road.  (T. Tr. Vol. VII at 925.)  Purkey planned to go buy something to drink before heading back to his home in Lansing, Kansas.  (T. Tr. Vol. IV at 485.)  At that point, Purkey saw a young woman whom he believed to be approximately 17 to 19 years of age.  During a conversation with the girl he learned that her name was Jennifer.  (Dkt. 48-1.)  Purkey asked the girl if she wanted to get

---

[1]"T. Tr." refers to the trial transcripts by volume and page number, which were filed with this Court as docket entries 28 through 45.

something to drink with him.  Jennifer entered the pickup without any threats or force, according to Purkey.  (T. Tr. Vol. IV at 485.)  The two then drove to a liquor store a few miles away and purchased gin and orange juice.  Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates.  (T. Tr. Vol. IV at 485.)

Purkey then informed Jennifer that he wanted to go to his home, which was in Kansas, for a few minutes.  Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off.  At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer.  Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck.  (T. Tr. Vol. IV at 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas, to his home in Lansing.  (T. Tr. Vol. IV at 487, 493-94.)  Upon arrival, Purkey took Jennifer into his basement; she asked him to please take her back home.  (T. Tr. Vol. IV at 510.)  Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor, where he then raped her.  (T. Tr. Vol. VII at 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return.  Jennifer told Purkey that she had been a virgin. Purkey became fearful.  (T. Tr. Vol. VII at 942.)  Jennifer begged Purkey to let her leave. (T. Tr.  Vol. VII at 1017.)  A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside her body.  (T. Tr. Vol. VII at 942-43, 1017-18, 1024.)

Following the murder, Purkey put Jennifer into a large tool box designed to fit into the back of a pickup truck.  (T. Tr. Vol. VII at 1024-25.)  Purkey changed his clothes and got rid of Jennifer's backpack.  Purkey then drove to Snoopy's Bar in Lansing and had several drinks.  (T. Tr. Vol. VII at 1025-26.)  Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.[2]

Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered Jennifer Long with the chainsaw while she was lying inside the tool box.  (T. Tr. Vol. VII at 1028-29.)[3]  Purkey put her body parts in plastic bags and mixed in leaves and debris from his back yard.  (T. Tr. Vol. VII at 1029-30.)  Purkey purchased two cords of wood to burn her body parts in his fireplace, using diesel fuel to accelerate the burning process.  (T. Tr. Vol. IV at 492; T. Tr. Vol. V at 646-47; T. Tr. Vol. VII at 1030.)

Purkey next cleaned up the chainsaw using gasoline to remove the blood and human debris.  (T. Tr. Vol. VII at 1032.)[4]  Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there.  (T. Tr. Vol. V

---

[2]Investigators later recovered a copy of the receipt from Sears confirming Purkey purchased the electric chainsaw on January 22, 1998.  (T. Tr. Vol. IV at 501; Vol. VII at 1022.)

[3]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe.  Purkey gave the tool box to Howe following the murder.  (T. Tr. Vol. VI at 730-32.)  The box has several chainsaw cut marks in the bottom and on the sides.  (T. Tr. Vol. VI at 730, 810-18; Vol. VII at 1029.)

[4]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley.  (T. Tr. Vol. 5, 639-40.)

at 648-49; Vol. VII at 1030-31.)  Purkey also swept the ashes out of the fireplace after burning Jennifer's body parts.  Purkey used a hammer to crush the bones that did not burn up.  (T. Tr. Vol. VII at 1033.)  The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998.  (T. Tr. Vol. IV at 517; T. Tr. Vol. VII at 1034.)

Purkey threw the bags with Jennifer's ashes and bones into a septic pond located on the property in Clearwater.  Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown Jennifer's remains.  (T. Tr. Vol. VI at 789.)  Human bones were also found in the sweepings from the ash pit of the fireplace at Purkey's former home.  (T. Tr. Vol. VI at 781-83.)  All of the bones recovered by the FBI appeared to have been burned.  (T. Tr. Vol. VI at 781-94.)  Purkey admitted the bones recovered from the septic pond were those of Jennifer Long.  (T. Tr. Vol. VII at 1034.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily.  (T. Tr. Vol. VII at 934, 1014.)  Purkey's testimony at trial was inconsistent with all four of his previous statements to investigators in which he steadfastly insisted that he had kidnaped Jennifer Long.  Significantly, Purkey's testimony also contradicted his own prior sworn testimony in the same case, while represented by the same attorneys as at trial, in a suppression hearing held October 25, 2002.  (Supp. Tr. at 59, Dkt. 26; T. Tr. Vol. VII at 1002-08, 1041-43.)  The jury rejected Purkey's testimony and defense, returning a guilty verdict on November 5, 2003.

2.      *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase in support of its submission of six statutory and four non-statutory aggravating factors. (T. Tr. Vols. IX-XI at 1210-1403.) Purkey called 18 witnesses in support of his submission of 27 mitigating factors, including four doctors that testified concerning his alleged mental disorders. (T. Tr. Vols. XI-XV at 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, in response to Purkey's diminished mental capacity and brain damage claims. (T. Tr. Vols. XVI-XVII at 1962-2225.)

a.      *Aggravation Evidence*

The Government submitted six statutory aggravating factors to the jury, and the jury found all six, namely, that: (1) the death of Jennifer Long occurred during the commission and attempted commission of her kidnaping; (2) Purkey killed Jennifer Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) the victim was particularly vulnerable due to her youthful age of 16 years; (4) Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year involving the use, attempted use, and threatened use of a firearm against another person; (5) Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person. (Dkt. 23-37 at 91-92.)

-10-

The Government submitted four non-statutory aggravating factors to the jury, of which the jury found three: (1) the Government established loss and harm because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family; (2) Purkey had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) Purkey had a substantial criminal history. The Government also submitted a non-statutory aggravating factor that the jury did not find – the future dangerousness of Purkey. (Dkt. 23-37 at 92-93)

Before Purkey murdered Jennifer Long and Mary Ruth Bales, he spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including: a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for aggravated robbery, kidnaping, aggravated battery, and firearms violations stemming from a 1980 crime spree which included two home invasion robberies plus the kidnaping and aggravated battery of Gregg Carlberg described below; and Purkey's May 2000 convictions for the first-degree murder and aggravated robbery of Bales. (T. Tr. Vol. VII at 975-86; T. Tr. Vol. IX at 1211-14; T. Tr. Vol. XVII at 2166.) Purkey received a life sentence as part of his 1980 crime spree but was paroled in March 1997 after serving approximately 16½ years on the life sentence. (T. Tr. Vol. VII at 985.)

Evidence in the Government's aggravation case established that on October 27, 1998, approximately nine months after kidnaping, raping, murdering, and dismembering

-11-

Jennifer Long, Purkey went to the Kansas City, Kansas, home of Mary Ruth Bales, an 80-year-old widow who walked using a cane.  (Dkt. 48-2.)  Bales had called Reddi-Root'r about a leaking pipe.  Purkey, who had been working at Reddi-Root'r for about ten weeks, agreed to make the necessary repairs for Bales.

The next day, October 28, 1998, Purkey smoked crack cocaine with a prostitute and then drove to the home of Bales with the prostitute in his work van.  While the prostitute waited outside, Purkey went into Bales' bedroom, and when Bales asked him what he was doing there, he viciously bludgeoned the 80-year-old grandmother to death with a claw hammer.  Using the claw side of the hammer, Purkey caved in Bales' cranium and face.  She had defensive wounds on both of her hands, apparently having tried to ward off the hammer blows from Purkey.  (T. Tr. Vol. IX at 1236.)  While Bales lay dead in her bedroom, Purkey stole $200 from her purse, after which he and the prostitute smoked some more crack cocaine and ate food from Bales's kitchen.  Purkey planned to burn down Bales's house to eliminate evidence, but before he could, he was arrested for these crimes and confessed.

He was charged with first-degree murder and aggravated robbery in Wyandotte County, Kansas, District Court and pled guilty as charged on April 28, 2000.  Purkey was sentenced to a term of life imprisonment with eligibility for parole after 15 years.  (T. Tr. Vol. IX at 1215-43.)

As additional aggravation evidence, Gregg Carlberg testified that he was the victim of a kidnaping, aggravated battery, and aggravated assault by Purkey in 1980.  Purkey kidnapped Carlberg from a convenience store in the summer of 1980 in Wichita, Kansas.

-12-

(T. Tr. Vol. X at 1245.) Purkey and an accomplice put Carlberg into the trunk of a car, drove him to a wooded area, robbed of him $40, and later shot him in the head and shoulder while forcing him to lie down in an abandoned bathtub in the woods even though he did not resist the robbery. (T. Tr. Vol. X at 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (T. Tr. Vol. X at 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remained lodged in the back of his skull. (T. Tr. Vol. X at 1253-54.)

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona, prison in the early 1980's. (Dkt. 48-3, 48-4; T. Tr. Vol. X at 1340-48, 1352-54, 1360.) Lucas also explained the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. Purkey had a large "Aryan Brotherhood" tattoo on his back, a Nazi swastika surrounded by "Aryan Pride" on his arm, another swastika tattoo on his right forearm, and a tattoo of a Ku Klux Klansman with a shotgun and a noose. (T. Tr. Vol. X at 1361-66.)

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified that Purkey forcibly sodomized him at knife-point and then beat him in the kitchen of the prison camp where they were serving prison sentences. (T. Tr. Vol. X at 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy case. (T. Tr. Vol. X at 1315-17.) He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees. Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp. In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault. (T. Tr. Vol. X at 1318-29.)

The parents of Jennifer Long as well as one of her close personal friends testified, explaining what her loss meant to their lives and how it affected their families. (T. Tr. Vol. XI at 1396-1406.)

### b.    Mitigation Evidence

Purkey called 18 witnesses to support the 27 mitigating factors he submitted to the jury. His mitigation case lasted approximately three days and consumed more than 500 pages of trial transcript. (T. Tr. Vols. XI-XV at 1406-1955.) The 27 mitigating factors Purkey submitted to the jury were:  (1) Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired; (2) Purkey committed the offense under severe mental or emotional disturbance; (3) With proper medications, such as the medications that Purkey is currently taking, Purkey's mental illness and behaviors can be managed; (4) Purkey suffered brain injuries as a result of car accidents, drug abuse, or both; (5) Purkey suffered significant

-14-

psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage that he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage that he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) as a child, Purkey suffered from slow speech development, and for his entire life, Purkey has suffered from the disability of stuttering; (13) while incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; (14) while incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college course work; (15) while incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; (16) Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure; (17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the

-15-

information which was required; (18) the disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; (19) by coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Purkey has shown remorse for what he did; (20) Purkey has repeatedly expressed his remorse for what he has done; (21) Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nurturance, and emotional support, even while he has been incarcerated; (22) Angie Purkey Genail loves her father very much; (23) if Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship; (24) Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions; (25) if Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren, Mikey and Haley, would continue to carry on a loving, nurturing grandfather/grandchild relationship; (26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; and (27) for the last three years, Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.  (Dkt. 23-37 at 94-97)

-16-

Dr. William Grant, a Bureau of Prisons psychiatrist, testified that he had prescribed three medications for Purkey that were designed to address Purkey's depression, anxiety, anger, and aggression. Dr. Grant testified that he used the best medications that were available. (T. Tr. Vol. XI at 1406-16.)

Dennis Messoline, an Oregon attorney who represented Purkey in the Gary Hatfield sodomy case, testified that he had planned to assert a consent defense and had filed a motion with the court seeking permission to elicit Hatfield's prior sexual history at trial before the case was eventually dismissed. (T. Tr. Vol. XI at 1422-48.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon, was called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was not a racist. Vinson also testified that Purkey was not violent during his incarceration in Oregon. (T. Tr. Vol. XI at 1449-64.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon. Purkey also offered Masterson's testimony to discredit Hatfield. Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison. Masterson also testified that he was the homosexual lover of Purkey for two and a half years. (T. Tr. Vol. XI at 1468-76.)

Linda Skeen, a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas, testified that she became a friend of Purkey's while he was on parole in 1997 and 1998.

-17-

Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes." (T. Tr. Vol. XI at 1478-84.)

Patrick Howe, a friend of Purkey's and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastikas and Aryan Brotherhood tattoos. Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. Howe also testified that Purkey was friendly to people of other races in prison. (T. Tr. Vol. XI at 1485-91.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution. Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (T. Tr. Vol. XI at 1491-1501.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while

-18-

Purkey was on parole he tested positive for alcohol, and although he denied using cocaine, he sought to gain admission into a drug counseling program at the Kansas University Medical Center.  (T. Tr. Vol. XI at 1502-17.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father.  She testified in detail about Purkey's neglectful and disadvantaged childhood.  She further testified that when Purkey was five years old, he could not speak words and would only grunt.  She said that Purkey was a stutterer as he got older and that stuttering was a common trait in Purkey's family.  Hotchkiss testified that Purkey's father, Jack, had suffered a head injury requiring a metal plate to be inserted in his head, that he had terrible headaches, and that he was an alcoholic who was always drunk.  She also testified that Jack Purkey lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem.  She further testified that Jack Purkey committed suicide in 1984.  She testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole.  (T. Tr. Vol. XII at 1520-29.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, worked as a custodian with Purkey.  Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility.  He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison.  Lopez also testified Purkey was not a racist and would help African-American inmates with legal

work.  He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison.  Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much.  (T. Tr. Vol. XII at 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo.  She testified Purkey's parents were alcoholics.  She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child.  She testified that she had a good and loving relationship with Purkey and he had always kept in contact with her even though most of his adult life was spent in prison.  She testified that Purkey was a good grandfather to her son, was supportive to her, that she loved him, and that she would maintain a relationship with Purkey if he was given a life sentence.  (T. Tr. Vol. XII at 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his stepfather and Purkey's father.  Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft, after which he lived on skid row in Wichita.  He testified that Jack Purkey beat Purkey, himself (Gary), and their mother frequently.  He testified that Purkey's mother, Velma Purkey, was also an alcoholic and would bring men home to have sex in front of both him and Purkey when they were children and in their teen years.  He testified those men beat both him and Purkey.  Hamilton further testified his mother sexually abused him, but Hamilton did not know if she had also sexually abused Purkey.  He also testified that both he and Purkey had been diagnosed as bipolar.  He testified that he had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970's

-20-

and had not been in trouble with the law since that time.  He further testified that Purkey had volunteered to donate part of his liver to help Hamilton's sick wife who had liver disease.  On cross-examination, Hamilton admitted that Purkey had been an aggressive, self-centered, and manipulating con man.  (T. Tr. Vol. XII at 1548-64.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison.  He further testified that in his belief, Purkey was a Christian and was remorseful for his criminal conduct.  (T. Tr. Vol. XII at 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey and had administered neuropsychological tests to Purkey.  Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment, which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior.  On cross-examination, Dr. Leeson said that Purkey had scored well on intelligence tests, and that Purkey's test results correlated with classification profiles for drug abuse, assault, rape, and antisocial personality disorder.  (T. Tr. Vols. XII-XIII at 1577-1650.)

Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas, testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations.  He further testified that Purkey had submitted a request to have his tattoos surgically removed or covered.  (T. Tr. Vol. XIII at 1651-63.)

Dr. David Preston, a physician, testified that according to Positron Emission Tomography (PET) tests he performed on Purkey's brain, Purkey had frontal and temporal lobe brain damage. He testified that frontal lobe damage could lead to poor planning and poor judgment by a person. Dr. Preston testified the damage could have been caused by car accidents Purkey had been in and could have been exacerbated by Purkey's drug and alcohol abuse. (T. Tr. Vol. XIII at 1664-1736.)

Dr. Stephen Peterson, a forensic psychiatrist, was another expert witness who testified on Purkey's behalf. Dr. Peterson said that he testifies as an expert witness about 10 to 20 times per year, usually for the defense, and has previously testified in capital cases. Dr. Peterson testified he had received and reviewed a stack of Purkey's records from trial counsel that was about three feet, three inches high.

Dr. Peterson opined that Purkey had a longstanding chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales. He testified that Purkey suffered severe sexual, physical, and emotional abuse during childhood. He testified that Purkey was extremely impulsive and angry, and concluded that Purkey had substantial problems with substance abuse beginning in his teens, "that persons such as Mr. Purkey, who have had severe untreated traumas, very frequently then impair themselves with severe substance abuse." (T. Tr. Vol. XIV at 1770.)

He testified that Purkey suffered from depression and was dysthymic, and had a severe personality disorder with anti-social features, obsessive-compulsive, and dependency features. (T. Tr. Vol. XIV at 1738-58.)

-22-

Dr. Peterson further described in detail three closed-head injuries that Purkey allegedly suffered in 1968, 1972, and 1974. He testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and teenager. He described Purkey's parents as alcoholics and told the jury that Purkey's father had committed suicide. In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of severe psychiatric illness. Dr. Peterson testified that "generally children who have been sexually or physically or emotionally abused, if they receive adequate treatment, get some healing and get some control over things, which Mr. Purkey never had." (T. Tr. Vol. XIV at 1749-85.)

On cross-examination, Dr. Peterson admitted that Purkey had most if not all of the characteristics of antisocial personality disorder, and that 12 or 13 psychologists/psychiatrists had concluded that Purkey was a sociopath and/or had antisocial personality disorder. (T. Tr. Vol. XIV at 1785-1832.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified as a mitigation specialist on behalf of Purkey. Dr. Cunningham testified that he had reviewed a total of ten binders of information from Purkey's incarcerations from prisons in Kansas, Iowa, Arizona, Oregon, and USP Leavenworth, that he reviewed medical and psychiatric records of Purkey's parents, Jack and Velma Purkey, and that he reviewed all Purkey's medical records, prison discipline records, psychiatric records, and school records. Dr. Cunningham also reviewed transcripts of prior hearings and the reports of all the medical experts for both the defense and prosecution, as well as interview summaries of

Purkey's friends and family.  Finally, Dr. Cunningham interviewed Purkey himself a number of times.  (T. Tr. Vol. XV at 1840-56.)

Dr. Cunningham testified that Purkey was a profoundly damaged person in both his neurological and neuro-developmental history and diagnosed Purkey as having neurobehavioral disinhibition.  He described in great detail Purkey's abusive, neglectful, and alcoholic parents.  He testified that because both of Purkey's parents were alcoholics, Purkey had a genetic predisposition to alcoholism.  He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He testified that Purkey as a child was "traumatized by watching his father beat his mother up, by awakening to the chaos of their coming in drunk and yelling and screaming and that sort of thing, by those violent exchanges between his parents sometimes having a sexual component to them as his mother is thrown naked out into the hall."  (T. Tr. Vol. XV at 1862.)

Dr. Cunningham also testified that Purkey had been in car accidents resulting in probable brain damage, consistent with frontal and temporal lobe brain damage.  (T. Tr. Vol. XV at 1840-72.)

Dr. Cunningham testified that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother.  He also testified that Purkey's mother sexually abused him as a child and as a teenager, and described the abuse.  He said Purkey was made to penetrate his mother with a hairbrush and have intercourse with his mother. Dr. Cunningham described reports from Purkey's aunt and brother as corroboration of the sexual abuse.  Dr. Cunningham further testified that Purkey was sexually abused by an

older male friend of his brother when he was about 12 or 13 years old on one or two occasions. He also described Purkey's significant alcohol and drug addictions, including addiction to methamphetamine, cocaine, and Ritalin. (T. Tr. Vol. XV at 1864-79.)

Dr. Cunningham testified that homicide rates in federal prison were lower than those in American cities, and that there was an extremely high level of security at the Federal Bureau of Prisons facility at ADX Florence, Colorado. He described it as a super-max facility in which the likelihood of violence had been substantially reduced from rates in federal penitentiaries generally, because of the high level of security. Dr. Cunningham also testified that in his opinion, because Purkey was taking appropriate medications to control his behavior, because of his age (then 51 years old), and because of the high security precautions within the Bureau of Prisons, he believed that Purkey would not be a significant threat to others in the future. (T. Tr. Vol. XV at 1879-1908.)

Dr. Cunningham admitted on cross-examination that there was a very high probability that Purkey would assault someone again, "80, 90 percent or more." (T. Tr. Vol. XV at 1914.) He acknowledged Purkey had numerous disciplinary infractions in prison, including assaulting numerous other inmates. (T. Tr. Vol. XV at 1924-28.) He also admitted that for a good part of Purkey's childhood, Purkey's father worked at Boeing and Purkey attended private Catholic schools. (T. Tr. Vol. XV at 1935.)

        *c.*      *Additional Evidence Duchardt Sought to Introduce in Mitigation.*

Trial counsel sought to introduce even more mitigation evidence, but was prohibited by the district court. Duchardt proffered evidence that Purkey's wife, Jeannette Purkey, had poisoned him, under the theory that Purkey was operating under the influence of poison

when he murdered Jennifer Long and Mary Ruth Bales, but the district court ruled the evidence was not releveant. (T. Tr. Vol. XVII at 2237-49; *United States v. Purkey*, 428 F.3d 738, 757 (8th Cir. 2005).)

Duchardt also sought to have Dr. Cunningham testify that Purkey suffered from fetal alcohol exposure, but district court prohibited the evidence, ruling that there was no specific evidence that Purkey's mother drank while she was pregnant with Purkey. (T. Tr. Vol. XV at 1855-56.)

Finally, the district court denied Duchardt's request to allow Dr. Peterson testify in surrebuttal in response to testimony by a Government expert that Purkey had not suffered significant brain injuries and that Purkey's actions as a "jailhouse lawyer" were inconsistent with the sort of brain damage claimed by defense experts.

### d. Rebuttal Evidence

The Government called four witnesses in rebuttal. Helen Mayberg, M.D., a neurologist, testified that Purkey's brain scans were normal. She also testified that she reviewed Purkey's medical records and he had normal neurological exams after his three car accidents. She further testified that Purkey's actions before, during, and after the murders of Jennifer Long and Mary Ruth Bales, particularly his efforts at concealment, were inconsistent with the kind of brain damage described by defense experts. (T. Tr. Vol. XVI at 1962-2045.)

FBI Supervisory Special Agent James McNamara testified as to Purkey's future dangerousness and described Purkey as manipulative. McNamara noted for the jury that in 1981, a doctor in the Kansas prison system filed a report stating that Purkey was quite

manipulative and would appease an interviewer for secondary gains.  In 2000, 19 years later, another doctor at the Kansas Department of Corrections stated that Purkey would try to manipulate the system to get what he wanted.  (T. Tr. Vol. XVII at 2052-2110.)

David Martell, Ph.D., an expert in mental disorders, testified that Purkey's test data was entirely within normal limits, and that Dr. Leeson had found minor errors in testing which he blew out of proportion to come to a different conclusion.  Dr. Martell testified that Purkey had one area of legitimate impairment – he had a problem with attention.  Dr. Martell also testified that Purkey's personality test results corresponded with those of drug abusers, rapists, those with assault histories, and those with antisocial personality disorder.  (T. Tr. Vol. XVII at 2112-35.)

Park Dietz, M.D., Ph.D., testified that he examined Purkey's police, prison, and medical records, as well as those of defense experts.  Dr. Dietz diagnosed Purkey with antisocial personality disorder and polysubstance abuse.  Dr. Dietz testified that to be diagnosed with antisocial personality disorder, a person must exhibit three of seven specified kinds of bad behavior:  1) failure to conform to social norms with respect to lawful behavior; 2) deceitfulness and manipulation; 3) impulsivity; 4) irritability and aggressiveness; 5) reckless disregard for the safety of self or others; 6) irresponsibility; and 7) a lack of remorse.  With "respect to the seven particular kinds of behavior that are features of anti-social personality disorder, I think Mr. Purkey has abundant evidence of all of them so I don't think there is any ambiguity of the diagnosis."  (T. Tr. Vol. XVII at 2170.)

Dr. Dietz further testified that Purkey had no mental disease either at the time of trial or at the time he murdered Jennifer Long, as evidenced by Purkey's extensive efforts to cover up the crime. Dr. Dietz testified that Purkey's actions showed he knew his behavior was wrong, in that he concealed Long's body in a trunk, he dismembered her body, he burned dismembered body parts in the fireplace using diesel fuel as an accelerant and wood as fuel, he removed the ashes from the fireplace with a wet/dry vacuum and shovel, he crushed unburned bond fragments, he cleaned the crime scene with bleach and water, even the rafters, and he cleaned the chain saw with bleach and water. Then to further remove evidence of Long, Purkey used the chain saw to cut wood, and disposed of Long's bones and ashes in plastic bags in a septic pond. He even washed his truck that she'd been in and washed the garage floor with bleach and water. All Purkey's actions were taken to prevent people from detecting what he did so that he would not be sent back to prison, and all those actions reflect that he knew what he did was wrong. Dr. Dietz testified Purkey's thoughts and actions were "ordinary, rational planning to evade detection for a crime." (T. Tr. Vol. XVII at 2170-73.)

Dr. Dietz testified he did consider Purkey's bad childhood, that it harmed his emotional development in ways that are poorly understood. (T. Tr. Vol. XVII at 2174.)

The jurors unanimously found nine aggravating factors, no mitigating factors, and unanimously recommended that Purkey be sentenced to death. (T. Tr. Vol. XVIII at 2311.)

### 3.   *Appeal of the Conviction and Sentence*

Purkey, through trial counsel, appealed his conviction and sentence. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Among his claims, Purkey argued the

district court erred by not requiring the jury to complete the mitigating factors portion of the verdict form. The verdict form asked the jury to record the number of jurors who found each mitigating factor to exist, and the jury returned the form blank regarding all 27 mitigating factors. *Id.* at 763. The Eighth Circuit reviewed *de novo* the district court's refusal to order the jury to complete the mitigation portion of the verdict form. *Id.* The court held that the Federal Death Penalty Act, "Section 3593(d) specifically requires the jury to 'return special findings identifying any aggravating factor[s] . . . found to exist,' without any mention of identifying such mitigating factors, and so requires no special findings with respect to the latter." *Id.* (quoting *United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000)).

The court noted that a jury's identification of proven mitigating factors facilitates appellate review, especially in evaluating effect of an error on the sentence the jury recommended. *Id.* "Nevertheless, the jury's failure to identify proven mitigating factors is entirely proper under the FDPA, and therefore the district court did not err by accepting the jury's verdict form." *Id.*

The Eighth Circuit denied all Purkey's claims and affirmed his conviction and sentence. *Id.* at 764.

## C.     *Section 2255 Motion and Appeal*

On October 16, 2007, Purkey moved for a writ of habeas corpus under 28 U.S.C. § 2255. He asserted 22 grounds for relief, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at trial and sentencing. (Dkt. 48-6.) On November 30, 2007, Purkey filed a memorandum of law in support of his § 2255

motion. (Dkt. 48-7.) Also in support of the motion, Purkey submitted a proffer of "new" mitigating evidence including affidavits from several family members, friends, and expert witnesses who testified at trial. *Purkey v. United States*, 729 F.3d 860, 861 (8th Cir. 2013). The "new' evidence related to Purkey's alleged mental issues, his abuse as a child, his drug and alcohol abuse, his family's love for him, and his good works in prison. *Id.*

Pursuant to the district court's order, trial counsel Fred Duchardt prepared an affidavit detailing his investigation, representation, and trial strategy with Purkey. The district court denied relief without a hearing, concluding that the proffered new evidence, taken as true, provided no basis for finding prejudice. (Dkt. 48-8.)

Purkey's § 2255 counsel then filed a motion to alter or amend the judgment. (Dkt. 48-9.) The district court denied the motion to alter or amend the judgment, finding that "even if Purkey's allegations are true, he would not be entitled to relief." (Dkt. 48-10,)

Purkey sought a certificate of appealability (COA) from the district court (Dkt. 48-11), which was denied, (Dkt. 48-12.)

Purkey then applied for a COA with the Eighth Circuit on the following issues:

1) Whether counsel was ineffective for failing to hire a mitigation specialist;

2) Whether counsel was ineffective for failure to investigate mitigation witnesses;

3) Whether counsel was ineffective for failing to properly prepare and present the testimony of Drs. Stephen Peterson, Mark Cunningham, and Bruce Leeson;

4) Whether counsel was ineffective for failing to investigate and prepare the testimony of Dr. William Grant and Mark Russell, which led to them being prejudicial;

-30-

5) Whether the district court erred in entering an order that was conclusory and insufficient for appellate review;

6) Whether the district court erred in denying the § 2255 motion without a hearing;

7) Whether counsel's affidavit should have been stricken, with four sub-parts; and

8) Whether counsel rendered ineffective assistance in not calling Dr. Peterson in the guilt phase of the trial to rebut a claim of recent fabrication.

(Dkt. 48-13.)

The Eighth Circuit granted Purkey's application for a COA in part, allowing Purkey to challenge three aspects of trial counsel's performance:  (1) his alleged failure to adequately prepare and present the testimony of Drs. Stephen Peterson, Mark Cunningham, and Bruce Leeson; (2) his alleged failure to adequately investigate and prepare Dr. William Grant and Mark Russell, which resulted in their testimony being more prejudicial than beneficial; and (3) his alleged failure to adequately investigate and present other mitigating evidence.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)

The court also granted a COA to determine whether the district court abused its discretion in denying Purkey's request for an evidentiary hearing.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)  The court did not grant a COA on the issue of whether trial counsel was ineffective for failing to hire a mitigation specialist, nor on the issue of whether trial counsel was ineffective in the guilt phase of trial for not calling Dr. Stephen Peterson to testify that Purkey had recanted kidnaping Jennifer Long some time before trial.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)

Purkey briefed two issues for which he was not granted a COA: the adequacy of the district court's order denying Purkey's § 2255 motion, and whether trial counsel's affidavit prepared in response to the 2255 motion should have been stricken.

The Eighth Circuit found that trial counsel had presented a "lengthy and detailed mitigation case on behalf of Purkey, with testimony from eighteen witnesses spanning more than two days." *Purkey*, 729 F.3d at 863. The court detailed the mitigation evidence, finding that "the jury listened to witnesses testify that Purkey is a positive influence in their lives and that society would be better off if he were to receive a life sentence rather than a death sentence. The jury also heard, in significant detail, that Purkey's parents abused him sexually throughout his childhood, causing him to develop abnormal sexual tendencies." *Id.* at 864.

The court then examined Purkey's proffered new evidence. Several witnesses testified that trial counsel's techniques were ineffective. Gary Hamilton, Purkey's brother, said he withheld evidence because Duchardt's son was present during their interview. *Id.* Hamilton recounted an incident in which their father slammed their mother's arm in a door until it broke, indicating he would have told the jury about that if the investigation had been more thorough. *Id.* Similarly, Purkey's daughter criticized Duchardt because he first contacted her on her wedding day and failed to follow up when she asked to reschedule. *Id.* If better prepared, she would have testified about poems, songs, and stories Purkey wrote for her. *Id.* Purkey's aunt testified she felt unprepared and awkward testifying via teleconference. *Id.* Had Duchardt adequately prepared her, she would have testified that

-32-

Purkey's childhood home was unkempt and reeked of liquor and cigarettes, and that Purkey's mother was a "party girl" with poor parenting skills. *Id.*

Section 2255 counsel also presented affidavits of several individuals who did not testify at trial, either because Duchardt did not contact them or because he chose not to use them. *Id.* at 865. Purkey's cousin and two childhood friends reiterated that Purkey grew up in an abusive home but was nevertheless a positive influence in their lives. Family friends and a volunteer prison minister offered positive testimony about Purkey. Dr. Rex Newton, a prison psychologist who knew Purkey in 1987, believed, based on Purkey's behavior in prison, that he was sexually abused as a child. *Id.*

Purkey complained that Duchardt failed to adequately prepare and present the testimony of Dr. Peterson, Dr. Cunningham, and Dr. Leeson. He claimed that Drs. Peterson and Cunningham should have testified in greater detail about Purkey's sexual abuse. *Id.* Purkey also argued that two mitigation witnesses, Dr. William Grant and Mark Russell, were more prejudicial than helpful because Duchardt didn't adequately prepare them. *Id.* Dr. Grant acknowledged on cross-examination that Purkey was belligerent and irritable, and Russell revealed on cross-examination that Purkey was housed in a special unit due to his history of behavioral problems. *Id.*

The Eighth Circuit held that all of Purkey's proffered evidence in the § 2255 petition did nothing to establish prejudice because it was entirely cumulative. *Id.* at 866. The court held that Purkey's proffered new evidence added nothing of substance. *Id.* The court further held that "the examples of 'prejudicial' mitigation testimony [we]re insignificant compared to the rest of the extensive case in mitigation." *Id.*

Significantly, the court held that even assuming Duchardt's performance was constitutionally defective, Purkey suffered no prejudice.  Because the court concluded that Purkey failed to establish prejudice, the court did not consider any of the contents of Duchardt's affidavit.  *Id.* at 866 n.2.

The court then recounted the Government's extremely strong case in aggravation, including his murder of Long, his murder of Bales, his crimes against Carlberg, his rape of Hatfield, his membership in the Aryan Brotherhood prison gang, and his "thirteen prior felony convictions, including:  first-degree burglary in 1970; robbery and theft in 1976; aggravated escape from custody in 1978; and multiple counts of aggravated robbery, kidnaping, aggravated battery, and firearms violations in 1981."  *Id.* at 866-68.  The court reviewed the issue of prejudice *de novo*, and held:

> In light of the heinous abduction, rape and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison, we conclude that it is not substantially likely that the jury would have returned a different sentence had Purkey's proffered evidence been presented to it.

*Id.* at 868.

The Eighth Circuit therefore affirmed the district court's denial of Purkey's motion under 28 U.S.C. § 2255.  *Id.* at 869.

### D.    *The Present § 2241 Petition*

Purkey has now filed a petition pursuant to 28 U.S.C. § 2241, raising eight claims: 1) trial counsel was ineffective for not striking a juror; 2) trial counsel was ineffective for

failing to investigate and present mitigation evidence; 3) trial counsel lied in the affidavit he presented responding to Purkey's § 2255 motion; 4) the jury did not complete the verdict forms properly regarding Purkey's mitigation factors; 5) the federal death penalty act is unconstitutional; 6) the death penalty is unconstitutional; 7) the death penalty is unconstitutional as applied those with severe mental illness; and 8) trial counsel was ineffective in allowing Purkey to commit perjury in a suppression hearing.

In Purkey's latest filing, he again claims his trial counsel was ineffective, and in an attempt to circumvent the ban on successive motions pursuant to 28 U.S.C. § 2255, he claims his post-conviction counsel were also ineffective.  Purkey again challenges his trial counsel's affidavit and the jury verdict forms.  Thus, Purkey's current counsel raise many of the same claims of the ineffectiveness of trial counsel that the allegedly ineffective post-conviction counsel raised.  None of Purkey's claims, past, present, or both, provide grounds for a new trial or new sentencing.

**II.**
**Section 2241 Does Not Permit Purkey to Avoid**
**the § 2255(h) Limits on Second and Successive Motions.**

In Claims 1, 2 and 8, Purkey argues that his § 2255 counsel ineffectively failed to argue that his trial counsel ineffectively failed to argue his claims, and that § 2241 permits him to raise this recursive ineffectiveness now, more than a decade after the last ineffectiveness of which he complains; and here, in a different district and circuit than that of his conviction. For his remaining five claims, Purkey merely assumes that he can bring them here and now. He is incorrect on both fronts. Section 2241 is not M.C. Escher's never-

ending staircase. It does not permit Purkey's claims, and this Court should dismiss them with prejudice.

"As a general matter, § 2255 provides the exclusive means for a federal prisoner to collaterally attack his conviction or sentence," *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019), and he must do so in the district of his conviction—in this case, the Western District of Missouri.[5] *Chazen v. Marske*, __ F.3d __, No. 18-3268, 2019 WL 4254295, at *3 (7th Cir. Sept. 9, 2019). "Section 2255 is by far the primary route for federal prisoners to challenge the lawfulness of their convictions and sentences." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018).

Section 2255(h), however, "sharply limits the ability of a prisoner to bring a second or successive motion under that section." *Id.* A prospective second or successive movant must show either (1) newly discovered evidence that by clear and convincing evidence shows that no reasonable factfinder would have found the movant guilty of the offense, or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. 28 U.S.C. § 2255(h). Purkey filed an unsuccessful § 2255 motion in 2007 and concedes that he cannot satisfy either condition to file a second. (Purkey Pet. at 6.)[6]

---

[5]Purkey filed an initial motion under § 2255 in the Western District of Missouri that the court denied. (Dkt. 48-8.)

[6]"Purkey Pet." refers to Purkey's amended petition for writ of habeas corpus. (Dkt. 23.)

Purkey attempts to avoid the bar on second and successive motions under § 2255 by raising his claims here, in a petition under § 2241. The Court should reject his claims for three reasons: (A) § 2241 is not available because he has not shown that § 2255 is "inadequate or ineffective" under existing precedent; (B) this Court should not be the first to find § 2255 "inadequate or ineffective" by applying distinguisable prior cases from § 2254 and Rule 60(b); and (C) Purkey's procedural avenues to bring his claims, if they exist at all, exist only in the district court for the Western District of Missouri, his court of conviction.

### A.    *Purkey Has Not Shown that § 2255 is Inadequate or Ineffective under Existing Precedent.*

"Section 2255(e) steers almost all prisoner challenges to their convictions and sentences toward § 2255"—including its limits on second and successive petitions—"but it recognizes an exception." *Shepherd*, 911 F.3d at 862. "A habeas corpus petition under § 2241 may be allowed if the prisoner can show 'that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.'" *Id.*; *see* 28 U.S.C. § 2255(e). "This generally requires 'a structural problem in § 2255 that forecloses *even one* round of effective collateral review, unrelated to the petitioner's own mistakes." *Camacho v. English*, 827 F.3d 811, 813 (7th Cir. 2017) (emphasis added) (quoting *Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016)). A prisoner challenging his conviction or sentence under § 2241 bears the burden to show that § 2255 is inadequate or ineffective. *McCarthan v. Dir. Of Goodwill Industries-Suncoast, Inc.*, 851 F.3d 1076, 1081 (11th Cir. 2017) (en

-37-

banc); *Prost v. Anderson*, 636 F.3d 578, 584 (10th Cir. 2011); *Lopez-Lopez v. Sanders*, 590 F.3d 905, 907 (8th Cir. 2010); *Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir. 2001).

A prisoner cannot show that § 2255 is "inadequate or ineffective" just because § 2225(h) bars his second or successive claim; "otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Webster v. Daniels*, 784 F.3d 1123, 1137 (7th Cir. 2015) (en banc) (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)); *cf. In re Davenport*, 147 F.3d 605, 610 (7th Cir. 1998) ("Society, however, is unwilling to expend indefinitely large judicial resources on repeated testing of the accuracy of a determination of guilt.").

The Seventh Circuit has found § 2255 inadequate or ineffective only in limited circumstances. *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at *3 (S.D. Ind. Sept. 20, 2019). The claims in Purkey's petition do not qualify under any of them.

*First*, *In re Davenport* held that § 2255(e) permits certain § 2241 claims that changes in interpretation of statutes render the prisoner's conviction or sentence unlawful. 147 F.3d at 610-12. For these claims, the court "established a three-part test to determine whether a petitioner satisfies § 2255(e)'s savings clause." *Chazen*, __ F.3d at __, 2019 WL 4254295, at *3. "To pursue relief under § 2241, a petitioner must establish that '(1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice.'" *Id.* (quoting *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019)); *accord Davis v. Cross*, 863 F.3d 962, 964 (7th

Cir. 2017) (describing the three parts as "requirements"); *In re Davenport*, 147 F.3d at 610-12. A miscarriage of justice can include the conviction of an innocent defendant or the imposition of an illegal sentence. *Prevatte v. Merlak*, 865 F.3d 894, 897, 899 (7th Cir. 2017) (petitioner failed to show a miscarriage of justice in *Burrage* claim because trial evidence showed pipe bomb was the but-for cause of the death and petitioner deserved enhanced sentence).

The Government's position is that a prisoner who has already unsuccessfully sought relief under § 2255 cannot establish his eligibility to file a habeas petition under the saving clause to assert a statutory challenge to his conviction or his sentence on a ground that was cognizable in his initial § 2255 motion. Application of the saving clause in that circumstance would circumvent Congress's express limitation under § 2255(h) of second or successive motions to cases involving newly discovered evidence or new rules of constitutional law made retroactive on collateral review by the Supreme Court. *See McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1079 (11th Cir. 2017) (en banc), *cert. denied,* 138 S.Ct. 502 (Dec. 4, 2017), and *Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011) (Gorsuch, J.), *cert. denied*, 565 U.S. 1111 (2012). The Seventh Circuit held otherwise in *In re Davenport*, and the majority of other circuits agreed.[7] The

---

[7]*See United States v. Barrett*, 178 F.3d 34 (1st Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000); *Triestman v. United States*, 124 F.3d 361 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245 (3d Cir. 1997); *In re Jones*, 226 F.3d 328 (4th Cir. 2000); *Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042 (9th Cir. 2011); *In re Smith*, 285 F.3d 6 (D.C. Cir. 2002).

Government respectfully submits, however, that the Tenth and Eleventh Circuits have the better view of the relevant statutory provisions.

Nonetheless, the Government is not seeking reconsideration of *Davenport* at this time, because even under *Davenport*, Purkey is not entitled to relief. He has not satisfied the three requirements of *Davenport*.  In none of his eight claims does he identify a retroactive case of statutory interpretation that renders his conduct noncriminal or his sentence unlawful.

*Second*, *Garza* permitted a prisoner to raise under § 2241 a claim that his death sentence should be vacated because the Inter-American Commission on Human Rights found that his rights were violated. 253 F.3d at 920-21. The court permitted the claim (though rejecting it on the merits) because § 2255 "does not now and has never provided an adequate avenue for testing Garza's present challenge to the legality of his sentence." 253 F.3d at 923.

Unlike in *Garza*, however, Purkey either could have or did raise all of his current claims at trial, on direct appeal, or in his initial § 2255. Where he offers an excuse for failing to do so, it is not that § 2255 would not have permitted the claims, but that his counsel failed to raise them. But for the reasons discussed at length below, ineffective assistance of post-conviction counsel does not render § 2255 inadequate or ineffective.

*Third*, Purkey incorrectly cites *Webster v. Daniels* for the proposition that the Seventh Circuit permits a § 2241 petition where "the operation of the successive petition rules absolutely prevent a petitioner from having a meaningful opportunity to raise a

-40-

challenge to the legality of his sentence." (Purkey Pet. at 8 (citing *Webster*, 784 F.3d at 1136-37).)

*Webster* stands for a more limited proposition than Purkey asserts: there, unlike here, the petitioner sought to present "newly discovered evidence that would demonstrate that he is categorically and constitutionally ineligible for the death penalty" under *Atkins v. Virginia*, 536 U.S. 304 (2002). 784 F.3d at 1125. Noting that *Atkins* had not been decided when Congress amended § 2255, the Seventh Circuit concluded that "the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute." *Id.* at 1138, 1140 n.9 ("Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense."). The *Webster* court was careful to limit that narrow set further to those cases where the "newly discovered evidence" existed *before* the time of trial and escaped diligent efforts of counsel to discover it. *Id.* at 1140 & n.9 (noting that "the evidence sought to be presented must have existed at the time of the original proceedings," "the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it," and "the evidence must show that the petitioner is constitutionally ineligible for the penalty he received.").

Unlike in *Webster*, Purkey does not claim that he has newly discovered evidence that predates his trial and demonstrates that he is "so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall* [*v. Florida*, 572 U.S. 701 (2014)]." 784 F.3d at 1146; *see Fulks*, 2019 WL 4600210, at *13 ("In short, the

-41-

Seventh Circuit made clear that simply arguing that new evidence shows one's sentence is unconstitutional is not enough to meet the Savings Clause."). *Webster* is a limited departure from the *Davenport* line of cases that does not apply to Purkey.

Because Purkey has failed to satisfy any existing application of the saving clause, this Court cannot grant Purkey relief and should dismiss his petition with prejudice. *See Prevatte*, 865 F.3d at 901 (holding that dismissal of a § 2241 petition for failure to satisfy § 2255(e) is not jurisdictional and therefore with prejudice); *but see Garza*, 253 F.3d at 920-21 (discussing § 2255(e) as "jurisdictional").

### B.   *This Court Should Not Extend* **Ramirez, Martinez,** *and* **Trevino** *to § 2241.*

To avoid this conclusion for Claims 1, 2, and 8, Purkey asks this Court to find a new lacuna in § 2255: he argues that § 2255(e) permits him to use § 2241 to now raise claims that his § 2255 counsel and trial counsel were both ineffective—claims that he describes as "challenges to the legality of his sentence." (Purkey Pet. at 9.) Purkey relies on *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), to extend *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), from state prisoners seeking federal habeas under 28 U.S.C. § 2254 to federal prisoners seeking federal habeas under 28 U.S.C. § 2255. (Purkey Pet. at 10-11.) He then, without any authority, asks this Court to further extend *Ramirez* from a Rule 60(b) motion to reopen a § 2255 motion before the same district court to a § 2241 petition in not only a different district, but in an entirely different circuit. No court has ever made this leap, and this Court should not be the first.

Generally speaking, ineffectiveness of post-conviction counsel does not excuse procedural default because the attorney's actions are chargeable to the client. *Coleman v.*

-42-

*Thompson*, 501 U.S. 722, 752-53 (1991). Following *Coleman*, *Martinez* considered a state prisoner's § 2254 claim that his trial counsel was ineffective. 566 U.S. at 7. He had failed to raise the claim in state habeas proceedings, but held that ineffectiveness of his state habeas counsel excused his procedural default. *Id.* As an equitable exception to *Coleman*, *Martinez* held that, where the state required prisoners to raise ineffective-trial-counsel claims in habeas proceedings, ineffectiveness of state habeas counsel could excuse procedural default. *Id.* at 9-11, 18. *Trevino* extended the rule of *Martinez* to state regimes where the structure and design of a state system make it "virtually impossible" for a defendant to present his ineffective-trial-counsel claim on direct review. 569 U.S. at 423-29. Relying on *Martinez* and *Trevino*, *Ramirez* held that a federal prisoner's claim that his § 2255 counsel ineffectively missing an appeal deadline presented a circumstance that justified relief from the § 2255 judgment under Rule 60(b)(6). 799 F.3d at 849; *see Crutchfield v. Dennison*, 910 F.3d 968, 975 (7th Cir. 2018).

Purkey's attempt to extend *Martinez*, *Trevino*, and *Ramirez* to his case lacks merit. The Seventh Circuit has refused to extend *Ramirez*—even to other doctrines that require a similar showing of "extraordinary circumstances," and even where refusing to extend *Ramirez* would result in a bar to initial review of an ineffective-assistance-of-trial-counsel claim. *Lombardo v. United States*, 860 F.3d 547, 558-59 (7th Cir. 2017), *cert. denied*, 138 S.Ct. 1032 (2018). Lombardo's § 2255 counsel miscalculated the statute of limitations and filed an untimely § 2255 raising multiple claims of ineffective assistance of trial counsel. Lombardo then argued that his § 2255 counsel's ineffectiveness was an extraordinary circumstance justifying equitable tolling of the statute of limitations. 860 F.3d at 551.

The court refused to extend *Ramirez* to the equitable tolling doctrine in part because "*Ramirez* rested not on a miscalculation of a deadline, but on a finding that Ramirez's counsel abandoned him." *Id.* at 559. "[N]otwithstanding its discussion of *Martinez* and *Trevino* and its embracing of the principles underlying those cases, *Ramirez*'s holding is best construed as resting on abandonment under *Maples* [*v. Thomas*, 565 U.S. 266 (2012)] and *Holland* [*v. Florida*, 560 U.S. 631 (2010)]." *Id.* at 559 & n.8. As a result, Lombardo's claim failed because he could "not make the showing of abandonment or egregious attorney misconduct required of those cases." *Id.* at 559; *see Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018) (distinguishing *Ramirez* because Ramirez was raising a *procedural* defect—abandonment of § 2255 counsel after judgment—where Adams sought only to relitigate his § 2255).

The Seventh Circuit also refused to extend *Ramirez* because it would "greatly erode the statute of limitations." *Lombardo*, 860 F.3d at 559-60. Because most § 2255 filers are pro se, they would no longer have to show any actual extraordinary circumstances to excuse their untimely filing. *Id.* at 560.

*Lombardo* undermines Purkey's claim in five ways. First, it shows that *Ramirez* (and *Martinez* and *Trevino*) do not stand for the proposition that equity requires sweeping away all procedural bars so that every ineffective assistance claim can be heard. Second, it shows that the *Ramirez* will not be extended where it would undermine congressionally enacted limits on § 2255 motions—for example, where it would undermine the § 2255(h) limits on second and successive petitions. Third, it creates an untenable conflict with Purkey's position: a defendant (like Lombardo) whose counsel ineffectively fails to file a

-44-

§ 2255 petition at all forever loses his opportunity to assert any claims, but a defendant (like Purkey) whose counsel merely omits claims from a timely § 2255 motion that later § 2241 counsel believes should have been brought may get a third bite at the apple. Fourth, it shows that *Ramirez* applies not to mine-run negligence or even ineffectiveness but only to full abandonment, and Purkey makes no attempt to show abandonment here. Fifth, it shows that the holding of *Ramirez* is limited to its facts: it does not even extend to every doctrine where "extraordinary circumstances" is the test, and it should not be pushed further afield to the question of whether § 2255 is "inadequate or ineffective"—a question with a separate test based on separate grounds, as discussed above.

*Ramirez* is inapposite for another reason: Ramirez was not attempting to present new claims under § 2241, but was instead attempting to overcome his § 2255 attorney's abandonment of his claims and failure to seek a certificate of appealability. 799 F.3d at 847, 850. *Ramirez*'s decision to permit the movant to reopen his § 2255 using Rule 60(b) in the court of conviction expressly relied on its conclusion that his claim was not a disguised second or successive motion under § 2255:

> We are satisfied that Ramirez's motion was not a disguised second or successive motion under section 2255, and thus may be evaluated on its own merit. Ramirez is not trying to present a new reason why he should be relieved of either his conviction or his sentence, as provided in § 28 U.S.C. § 2255(a). He is instead trying to reopen his existing section 2255 proceeding and overcome a procedural bar to its adjudication.

799 F.3d at 850. Unlike Ramirez, however, Purkey both attempts to raise new claims that have never before been litigated at any stage and also to relitigate claims that he lost in his initial § 2255. Furthermore, his habeas counsel did not abandon him but instead extensively

-45-

litigated a request for a certificate of appealability in both the district court and the Eighth Circuit.[8] *Cf. Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018) ("Roundtree litigated and lost in the Eighth Circuit. The Supreme Court of the United States, not another court of appeals, is the right forum for his argument that the Eighth Circuit erred.").

*Martinez* and *Trevino* are also inapposite because Purkey is a federal prisoner.[9] *Martinez* and *Trevino* held that ineffectiveness of state post-conviction counsel can excuse procedural default and permit a federal court to hear a defaulted § 2254 claim. But whether a state prisoner has shown "cause" for his procedural default is a different question than whether a federal prisoner has shown that § 2255 is inadequate or ineffective to permit him to bring what is essentially a second or successive § 2255 claim. As discussed above, the Seventh Circuit has specifically and narrowly defined what it means to be "inadequate or ineffective," and it has never included claims that § 2255 counsel was ineffective.

---

[8]In Eighth Circuit Case No. 10-3462, habeas counsel filed a 78-page initial request on November 4, 2010 and a 137-page application on April 7, 2011. The Eighth Circuit granted the request in part, granting a certificate of appealability as to some of Purkey's claims, and set a briefing schedule on June 10, 2011. Habeas counsel filed a brief on November 16, 2011, that included legal argument to two claims for which a certificate of appealability was not issued, and following a response, filed Purkey's reply brief on May 5, 2012. The Eighth Circuit held argument on September 20, 2012, and ultimately affirmed the judgment. 729 F.3d at 860-69. Habeas counsel filed a request for rehearing and filed a petition for a writ of certiorari, which were denied. *Purkey v. United States*, 135 S.Ct. 355 (2014).

[9]Some courts have refused to apply *Martinez* and *Trevino* to federal prisoners at all, contra *Ramirez*. *See Toohey v. Wilson*, No. 3:17-cv-422, 2018 WL 3130411, at *2 n.6 (E.D. Va. June 26, 2018); *Villarreal v. Beasley*, 2:17-cv-00118, 2017 WL 7053973 (E.D. Ark. Aug. 31, 2017), *report and recommendation adopted by* 2018 WL 575783 (E.D. Ark. Jan. 26, 2018); *United States v. Sheppard*, No. 10-cr-119, 2017 WL 1128247, at *1-2 (W.D. Pa. Mar. 23, 2017), *aff'd* 742 Fed.Appx. 599 (3d Cir. 2018); *Garcon v. Cruz*, No. 6:14-cv-72, 2014 WL 819467, at *5 (D.S.C. Feb. 28, 2014), *aff'd* 581 Fed.Appx. 193 (4th Cir. 2014).

It is in part for these reasons that courts have repeatedly rejected invitations to extend the holdings of *Martinez*, *Trevino*, and *Rarmirez* to § 2241 and the § 2255(e) saving clause. *See*, *e.g.*, *Jackson v. Shartle*, 535 Fed.Appx. 87, 89 n.5 (3d Cir. Aug. 20, 2013); *Kapenekas v. Snyder-Norris*, No. 16-6310, 2017 WL 3725355 (6th Cir. Apr. 10, 2017) ("[T]hose cases deal solely with the procedural default of ineffective-assistance-of-counsel claims in state habeas corpus proceedings; they have no bearing whatsoever on the § 2255(e) savings clause." (quotation omitted)). As one court explained its reasoning for rejecting the claim that Purkey makes here:

> Simply stated, *Martinez* and *Trevino* were based on the narrow ground of procedural default in the context of a § 2254 petition. The reasoning of these cases has never been extended by any court to a § 2241 petition. . . . Such a conclusion would effectively eviscerate the escape hatch; it would also undermine the bar on successive § 2255 petitioners because a petitioner could resort to a § 2241 by simply claiming ineffective assistance of counsel—again, either for the first time or based on some new ground."

*Rojas v. Unknown Party*, No. 16-cv-00509, 2017 WL 4286186, at *5-6 & n.6 (D. Ariz. May 16, 2017), *report and recommendation adopted by* 2017 WL 4238735 (D. Ariz. Sept. 25, 2017).

*Ramirez*, *Martinez*, and *Trevino* do not permit a prisoner to use § 2241 to assert serial claims of ineffective assistance of counsel. This Court should dismiss his petition with prejudice.

### C.   *Purkey Cannot Rely on § 2241 to Escape the Law of the Circuit of Conviction.*

By placing his weight on *Ramirez*, Purkey reveals his motivation for bringing these claims here under § 2241, rather than in his district of conviction as a motion under Rule

60(b) or a successive motion under § 2255.[10] *Ramirez* permitted a defendant to reopen his § 2255 under Rule 60(b) because his counsel abandoned him following adverse judgment on his unsuccessful § 2255 motion, denying him the chance to appeal. Prior to *Ramirez*, however, the Eighth Circuit held that a prisoner's Rule 60(b) motion claiming ineffective assistance of both § 2255 counsel and trial counsel was a second or successive § 2255 motion in disguise. *United States v. Lee*, 792 F.3d 1021, 1023-24 (8th Cir. 2015); *see also Boyd v. United States*, 304 F.3d 813, 814 (8th Cir. 2002) (per curiam) (holding that district courts should scrutinize purported Rule 60(b) motions and dismiss or transfer to the Court of Appeals those that are unauthorized second or successive § 2255 motions).[11] Had Purkey attempted to raise his claims as Ramirez did, he would fail because  district court in the Eighth Circuit would, consistent with *Lee*, treat his motion as an unauthorized second or successive motion under § 2255 and dismiss it.  And rightly so, as Purkey concedes that he cannot satisfy the § 2255(h) requirements to file a second or successive motion.

---

[10]Purkey's justification for this Court's jurisdiction over his third claim demonstrates the awkwardness of his choice of forum. He claims that this Court may grant him relief using its equitable power to vacate a judgment because of fraud on the court. (Purkey Pet. at 140.) He fails to note that such a motion must be brought in the court that entered the judgment in the first place—the Western District of Missouri. *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969).

[11]Like Purkey, Boyd attempted to use § 2241 to raise claims in a district court in the Seventh Circuit that he had previously litigated and lost in both the district court and the Court of Appeals for the Eighth Circuit. *Boyd v. Cross*, No. 13-3337, 2014 U.S. App. LEXIS 25119, at *3-4 (7th Cir. Jan. 13, 2014) ("In this petition Boyd argues the same claim that we repeatedly have told him is unavailing."). The Seventh Circuit rejected Boyd's attempt and sanctioned him for repeatedly raising the same frivolous claims. *Id.*

Even if Purkey had raised his Rule 60(b) motion in the district of his conviction, he has failed to demonstrate the "extraordinary circumstances" necessary to explain the years of delay between his initial § 2255 and his most recent motion under § 2241. *See Williams v. Kelley*, 858 F.3d 464, 471 (8th Cir. 2017) (finding no extraordinary circumstances where prisoner was not diligent in pursuing evidence of claims and presented it "mere days" before his scheduled execution); *cf. Morales v. Bezy*, 499 F.3d 668, 672 (7th Cir. 2007) ("A prisoner cannot be permitted to lever his way into section 2241 by *making* his section 2255 remedy inadequate, here by failing to appeal from the denial of his section 2255 motion.").

Despite the weight of authority against doing so, were this Court to reach the merits of Purkey's claims, it should apply Eighth Circuit law to decide them. Though the Seventh Circuit has not definitively addressed this choice-of-law question, *Chazen*, __ F.3d at __, 2019 WL 4254295, at *12 (Barrett, J., concurring), some district courts have, *Cano v. Warden USP-Terre Haute*, No. 17-cv-441, 2018 WL 3389746, at *3 (S.D. Ind. July 12, 2018) (joining other district courts that "have concluded that they should apply the law of the circuit of conviction in reviewing a sentence or conviction under section 2241, in part to avoid inconsistent results with motions under § 2255, which apply the law of the circuit where the petitioner was convicted"), and the Seventh Circuit has applied the law of the circuit of conviction to resolve one § 2241 claim. *Light v. Caraway*, 761 F.3d 809, 816 (7th Cir. 2014) (following Eighth Circuit and declining to create circuit split).

Had Purkey's counsel performed as effectively as he insists that they should have, all of his claims would have been decided under Eighth Circuit law. There is no reason to

treat his claims differently merely because his counsel's alleged ineffectiveness led to this Court, rather than a district court in the Western District of Missouri, deciding his claims. To apply this Circuit's law would be to reward and encourage the kind of forum shopping that § 2255 was designed to prohibit. *Chazen*, __ F.3d at __, 2019 WL 4254295, at *11-12 (Barrett, J., concurring). As the Seventh Circuit has explained in a slightly different context, a prisoner may not use § 2241 to exploit a circuit split. *See In re Davenport*, 147 F.3d at 612 (holding that the "change in law" necessary to support § 2241 cannot result from the different in venue between the district of incarceration and the district of conviction). If this Court does reach the merits, it should apply Eighth Circuit law and, as discussed further below, deny Purkey's petition.

### III.
### Purkey's Claims Are Procedurally Barred and Otherwise Lack Merit.

**A.    *Claim 1 - Trial Counsel Was Not Ineffective for Failing to Strike a Juror with the Same Name as the Victim.***

Purkey's first claim, that his counsel was ineffective for not moving to strike Juror 13 for cause because of answers she provided on her juror questionnaire, is not properly brought under 28 U.S.C. § 2241. This claim does not challenge the execution of Purkey's sentence, but rather is an ineffective-assistance-of-counsel claim challenging his conviction that must be brought under 28 U.S.C. § 2255. For the reasons, discussed above, however, this claim cannot be brought now because he has not shown that § 2255 is inadequate or ineffective.

Even were this Court to consider his claim of ineffective assistance, it fails because the performance of Purkey's trial counsel was not constitutionally suspect, and Purkey

-50-

suffered no prejudice. While Purkey claims that Juror 13's disclosure that she was the victim of a prior, attempted sexual assault was sufficient to imply disqualifying bias, Eighth Circuit law does not clearly allow for juror disqualification on the ground of implied bias alone, and likely requires a showing of actual bias, which the record refutes as to Juror 13. Because the law was, at best, not settled, Purkey's counsel was not deficient in deciding not to raise an implied bias challenge, especially where Juror 13 also disclosed possible sympathy to his primary defense at trial.

### 1.    *Claim 1 is Procedurally Barred.*

For the first time in this § 2241 petition, Purkey argues that his trial counsel ineffectively failed to challenge a juror and that his § 2255 counsel ineffectively failed to raise this claim in his 2007 § 2255 motion.

For the reasons discussed above, Purkey's claim is procedurally barred because he has not shown that § 2255 is inadequate or ineffective. His claim does not fit under any of the three circumstances where the Seventh Circuit has recognized § 2255 as inadequate or ineffective: *Davenport*'s three-element test for new rules of statutory interpretation; *Garza*'s reliance on an intervening international tribunal; or *Webster*'s limited exception for newly discovered, but pre-existing, evidence that renders capital punishment categorically unconstitutional. This Court should not extend *Ramirez* to create a new exception for ineffective assistance of post-conviction counsel. Because Purkey's claim does not satisfy § 2255(e), this Court need not resolve the merits and should dismiss the claim with prejudice.

-51-

2.    *Purkey Fails to Show Ineffective Assistance of Counsel with Regard to Juror 13.*

Because Purkey bears the burden to prove ineffective assistance whenever that claim is properly raised, *Tucker v. United States*, 889 F.3d 881, 884 (7th Cir. 2018), if this Court considers the merits of this claim, Purkey bears the burden to prove that his counsel provided ineffective assistance.  He does not carry that burden.

Claims alleging ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'"  *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)).  This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, while at the same time refraining from engaging in hindsight or second guessing of trial counsel's strategic decisions.  Assuming the performance was deficient, the prejudice prong requires proof that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.

*Nave*, 62 F.3d at 1035 (cleaned up).

As shown below, Purkey's claim fails both prongs.

          a.      *Duchardt's Performance Fell Well Within the Range of Professionally Competent Assistance Because There Were Trial Strategy Reasons to Seat Juror 13 and the Ability to Strike on Implied Bias Alone Is Not Settled in the Eighth Circuit.*

This Court begins with a presumption that Duchardt "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland,* 466 U.S. at 690, which places the burden on Purkey to show that Duchardt's performance "fell below an objective standard of reasonableness" based on prevailing norms of professional conduct, *id.* at 688. Purkey fails to make that showing because Eighth Circuit law, the law Duchardt was practicing under at trial, did not recognize the type of implied bias claim Purkey now raises and because there were tactical considerations that justified Duchardt's decisions on voir dire.

*First*, Purkey's counsel's performance could not be defective because the law did not support, or at best was unsettled, the objection Purkey's alleges he should have raised. Purkey was tried in the Eighth Circuit, meaning the reasonableness of his attorney's conduct would be judged by Eighth Circuit law, but that court has specifically noted that "[o]ur case law is inconsistent as to whether juror bias *may ever* be presumed." *Sanders v. Norris*, 529 F.3d 787, 791 (8th Cir. 2008) (emphasis added). In the Eighth Circuit, "when faced with conflicting panel opinions, the earliest opinion must be followed" *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc), and that court's earlier line of cases holds that to show prejudice, Purkey must show that Juror 13 was actually biased against him. *See Goeders v. Hundley*, 59 F.3d 73, 75-76 (8th Cir. 1995) (citing *Smith v. Phillips*, 455 U.S. 209, 215 (1981); *United States v. Kelton*, 518 F.2d 531, 531 (8th Cir.

-53-

1975) (per curium) (noting that "this circuit has rejected the per se theory of implied bias in favor of a requirement that actual prejudice be demonstrated" (quotation omitted)).

If bias can never be presumed, Purkey's claim must fail, especially in light of Juror 13's unequivocal answers during voir dire, discussed below, that she could follow the law and pick the appropriate sentence. *See Sanders*, 529 F.3d at 792. In fact, questioning Juror 13 to establish an implied bias would have been poor trial strategy as the Eighth Circuit did not recognize that as a grounds for disqualification, but such questions would have highlighted the topic of sexual assault in the minds of other jurors.

Even if Eighth Circuit law was unclear on the requirement to prove actual bias, "[a] failure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally competent assistance' sufficient to satisfy the Sixth Amendment." *New v. United States,* 652 F.3d 949, 952 (8th Cir. 2011) (citing *Strickland,* 466 U.S. at 690); *see also Fields v. United States,* 201 F.3d 1025, 1027–28 (8th Cir. 2000) (holding attorney who did not object to a jury instruction acted within the range of professional competence because there was no Eighth Circuit or Supreme Court authority on the issue and because the two circuits that had addressed the issue had reached opposite conclusions); *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir.1999) (holding that "failing to anticipate a change in the law . . . does not constitute ineffective assistance").

If counsel is not required "to raise arguments that anticipate changes in the law or raise unsettled issues of law, then it cannot be considered professionally unreasonable for counsel to fail to object to the correct application of settled law within our circuit."

-54-

*Hamberg v. United States*, 675 F.3d 1170, 1173 (8th Cir. 2012). Thus, under Eighth Circuit law, the performance of Purkey's counsel could not have been deficient.

*Second*, while "an attorney's failure to question jurors regarding possible bias can potentially constitute deficient performance . . . trial strategy can also justify an attorney's decision not to seek an assurance of impartiality from a juror, even after a juror has made statements implying possible bias." *United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011) (citations omitted); *see also Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) ("Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel."). "Even when jurors have gone so far as to make a statement of implied bias and no clear assurance of impartiality was subsequently obtained, . . . a strategy of silence by counsel could be reasonable." *Lathrop*, 634 F.3d at 938 (citing *Cage v. McCaughtry*, 305 F.3d 625, 627 (7th Cir. 2002)). "So long as counsel's reasons for not questioning further were not 'so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel,' his performance will not qualify as deficient." *Id.* (quoting *Cage*, 305 F.3d at 627.)

Purkey's claim is predicated on his mere speculation that because Duchardt did not ask Juror 13 any follow-up questions regarding her reported assault, he "missed Juror 13's disclosure completely." (Purkey Pet. at 101.) Reading Juror 13's questionnaire, however, it is just as easy to speculate that Duchardt wanted her on the jury. A significant portion of Purkey's mitigation case was that he was abused by both of his parents, and Juror 13 stated in her questionnaire that the most important cause of crime was "bad parenting." (Dkt. 23-37 at 304.) That statement alone, which showed a significant sensitivity to

Purkey's planned defense, made it entirely reasonable for Purkey's counsel to view Juror 13 favorably.  Moreover, while Purkey presented a defense at the guilt phase that he did not kidnap Jennifer Long, he never contested sexually assaulting or murdering her. That is, Juror 13's claimed similarity of experience to the crime was to a portion of the evidence that Purkey did not contest.  Rather, in her questionnaire she showed a significant sympathy for Purkey's defense that abuse by his parents sufficiently mitigated his conduct to avoid the death penalty.  Taken as a whole, it is entirely reasonable for Duchardt to have viewed Juror 13 as favorable to Purkey's case.

Purkey notes that during voir dire, Duchardt asked Juror 13 about the effect having a young child would have on her participation, and she confirmed that she could be present for the entire trial.  (T. Tr. Vol. I at 55.)  Duchardt's questions on that topic do not show a lack of familiarity with her questionnaire as Purkey implies.  Rather, those questions can reasonably be viewed as Duhardt's attempt to ensure a juror he found favorable would be available throughout the trial.

More importantly, Duchardt's questioning of Juror 13 did not end with her availability.  In her questionnaire, Juror 13 stated that she could vote for the death penalty but noted that she would "need strong evidence to make sure they are guilty," that she could vote for a sentence of life without parole if called for by the facts in the case, and that the problems in the criminal justice system could be solved by "tak[ing] more time to prove guilty or not."  (Dkt. 23-37 at 287-88, 304.)  Consistent with these statements, during voir dire Juror 13 not only confirmed for Government counsel that she could vote for a sentence

-56-

of death (Tr. Tr. Vol I at 38), but also confirmed for Purkey's counsel her openness to

imposing a life sentence:

> MR. DUCHARDT: . . . Now, you have indicated that you could consider the death penalty in a case that you thought was appropriate.
>
> VENIREPERSON 13: Uh-huh.
>
> MR. DUCHARDT: We've done a lot of talking about this whole thing, aggravating and mitigating factors. Do you think you've got a handle on what we're talking about on those things?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: Do you think you would be able to follow the law and consider all of those things in deciding the right punishment?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: And in a case even if it was proven that the person was guilty of a deliberate killing, do you think you'd be able to still consider the possibility of life imprisonment without parole?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: And obviously you have already indicated you could consider the death penalty?
>
> VENIREPERSON 13: Uh-huh, yes.
>
> MR. DUCHARDT: And pick the right sentence as you thought appropriate in that case?
>
> VENIREPERSON 13: Yes.

(Tr. Tr. Vol I at 55-56.)  Duchardt's questioning showed both his knowledge of Juror 13's

questionnaire, beyond knowing that she recently had a child, and Juror 13's lack of actual

bias in the case.

Purkey's sole attempt to provide any factual basis for his claim that Duchardt was

not aware of Juror 13's answers in her jury questionnaire comes from his references to the

-57-

affidavit of his other trial counsel Laura O'Sullivan. (Purkey Pet. at 102-03.) O'Sullivan states that "I had no knowledge until I was shown the questionnaire by Mr. Purkey's current counsel that Juror #13 . . . was the victim of an attempted rape when she was fifteen years old." (Dkt. 23-36 at 5.) Tellingly, O'Sullivan does not state what portions of the jury questionnaire Purkey's post-conviction counsel showed her or whether she knew what Juror 13 said about bad parenting causing crime.

This should be expected, because in their respective affidavits, O'Sullivan and Duchardt disagree greatly over O'Sullivan's investment in the facts of the case but agree completely that Duchardt handled jury selection, including the jury questionnaire and voir dire. (Dkt. 23-37 at 165, 169; Dkt. 23-36 at 5-6.) O'Sullivan executed her affidavit in 2017, and her long-after-the-fact, admittedly ill-informed, and motivationally suspect statements about what she would have done have no relevance to whether Duchardt's decision not to question Juror 13 about answers in her jury questionnaire fell within reasonable professional judgment.

Purkey's attempts to show that Duchardt must not have been familiar with Juror 13's questionnaire because he succeeded in striking jurors for cause further misses the mark. (*See* Purkey Pet. at 103-04 & n.12.) Purkey correctly notes that based on their questionnaires alone, the parties agreed that some jurors could be stricken for cause, but ignores that those jurors were stricken for either hardship or actual bias "based on the dictates of *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), or *Morgan v. Illinois*, 504 U.S. 719 (1991), or based on familiarity with counsel for the parties, or based on serious questions whether the venireperson could follow other aspects of the law as instructed by

-58-

the Court." (Dkt. 23-37 at 318.) The jurors that Purkey notes were stricken "based in part on their answers to questions 82 and 83" (Purkey Pet. at 103 n.12), were actually stricken by consent of the parties based on their answers to a number of questions. (Dkt. 23-37 at 318) (Juror 3 "other 35, 39, 81, 82, 85, 86 and others"; Juror 30 "other 60, 61, 63, 64, 83, 86, 95".) Purkey does not show any instance where the court struck a juror on implied bias alone.

Duchardt's motions to strike show just how thoroughly he reviewed the jury questionnaires, and rather than demonstrate his ignorance of Juror 13's answers, those motions also show the upmost competence by which he completed that task. (*See* Dkt. 23-37 at 317.) As there were strategic reasons to include Juror 13, and no legal basis for exclusion outside of actual bias, which Juror 13 did not exhibit, Duchardt's decision to not ask specific voir dire questions based on Juror 13's questionnaire answers was not constitutionally ineffective.

> b. *Purkey Cannot Show Prejudice Where Juror 13 Was Not Presumed Biased and Demonstrated No Actual Bias.*

At most, the Eighth Circuit notes the possibility of relief based on an implied bias claim, absent a showing of actual bias, only in "extreme cases." *United States v. Tucker*, 2423 F.3d 499, 509 (8th Cir. 2001) ("But without resolving whether or not presumed bias can support a grant of a new trial in our circuit, we observe that the idea of presumed bias is reserved for extreme cases, such as when a juror is a close relative of a party or victim in the case.") The *Tucker* court, citing the concurrence in *Phillips*, noted that such "extreme situations" would include "a revelation that a juror is an actual employee of the prosecuting

-59-

agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* (quoting *Smith v. Phillips,* 455 U.S. 209, 222 (1982) (J. O'Connor concurring)); *see also United States v. Needham*, 852 F.3d 830, 840 (8th Cir. 2017). Juror 13 presented none of those extreme situations, and the alleged similarity between her questionnaire disclosure and the facts of the case alone does not create disqualifying bias, especially where the juror affirmed her ability to follow the facts and law of the case.

Underplaying how extreme the situation must be to disqualify a juror on implied bias alone, Purkey claims that Juror 13's questionnaire answers alone would have justified striking her for cause due to the "implied bias . . . found on the basis of similarities between the juror's own experiences and the facts giving rise to trial." (Purkey Pet. at 100.) Although the Eighth Circuit recognized in *Sanders* that other circuits "have implied bias in circumstances that have potential for substantial emotional involvement," 529 F.3d at 793, that court has never explicitly adopted that rule.

Even when citing to those circuits that have implied bias based on the similarity of experience, Purkey fails to cite a single case where a court found error in seating a juror who was unrelated to a party or victim fully disclosed the ground for any alleged bias before or during voir dire and also unequivocally stated her ability to impartially decide the case based on the facts and the evidence. *See*, *e.g.*, *English v. Berghuis*, 900 F.3d 804, 817-18 (6th Cir. 2018) (juror deliberately omitted material information); *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (reversing where "juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such

-60-

assurances"); *Burton v. Johnson*, 948 F.2d 1150, 1158-59 (10th Cir. 1991) (juror was dishonest in failing to disclose past abuse when asked during voir dire); *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) (jurors were tellers at different branch of bank robbed); *see also Logan v. Lockhardt*, 994 F.2d 1324, 1327 (8th Cir. 1993) (holding that juror that stated that defense counsel had "'to show [ ] that . . . he's innocent'" should not have been stricken for implied bias because she "went on to say that she has no bias in the matter").

Adding speculation to speculation, Purkey merely assumes that Juror 13's statement that she was the victim of "attempted rape, but I dropped the charges" when she was a teenager bears any resemblance to his kidnapping, rape, and murder of Jennifer Long. There are no details of Juror 13's alleged assault in the questionnaire and that assault may have been significantly different from his crimes.  As the Tenth Circuit observed in *Gonzales v. Thomas*, "to hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims, but also our entire jury system, which is built upon the assumption that jurors will honestly try to live up to the sanctity of their oath."  99 F.3d 978, 989-90 (10th Cir. 1996) (quotation and alteration omitted) (holding juror that suffered a prior rape was not disqualified as impliedly bias in rape case because experience was different); *see also United States v. Thompson*, 450 F.3d 840, 843 (8th Cir. 2006) (holding no error in bank robbery trial for refusing to strike juror who was a bank teller in a different state for cause for implied bias because "the fact that someone holds a position similar to that of a key witness is not a basis for excluding her where there is no indication of bias").

Purkey cannot show prejudice for failing to strike Juror 13 for implied bias because he cannot make a claim of implied bias. Juror 13 answered the questions put to her, both in the questionnaire and in voir dire, honestly and stated she could decide the case based on the facts and the law. There is no ground to assume she lacked the ability to be impartial, and therefore, Purkey has no ground for relief.

Had Purkey brought this claim through the proper process, a motion under § 2255, in the proper venue, the Western District of Missouri, at most he would have received an evidentiary hearing before any other relief. But because he fails to meet his factual burden on either prong of *Strickland*, and because his claim fails as a matter of law, he would not have been granted even that. *See Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) ("No hearing is required, however, where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.").

**B.     Claim 2 – _Trial Counsel Investigated and Presented Abundant Mitigation Evidence, so That the Proffered "New" Evidence is Cumulative._**

As in his § 2255 motion, Purkey again claims his trial counsel was ineffective in investigating and presenting mitigation evidence at the penalty phase of his trial. Purkey separates this claim into three parts:  A) trial counsel was ineffective for not hiring a designated "mitigation specialist" to lead the defense team investigation into Purkey's background; B) trial counsel failed to investigate, develop, and present Purkey's full trauma history to the jury; and C) trial counsel failed to investigate, discover, and present expert mental health evidence of Purkey's PTSD.  (Purkey Pet. at 106-38.)

### 1.    *Claim 2 Is Procedurally Barred.*

Purkey's second claim is barred for two reasons.

*First*, Purkey's claim is barred because he already litigated and lost it in his initial § 2255. 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at *1 (S.D. Ind. Sept. 22, 2014) ("[The prisoner's] habeas challenge was presented and rejected in his 28 U.S.C. § 2255 action.  It is not available for further review here."). A federal prisoner may "seek habeas corpus only if he has had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first § 2255 motion." *Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016); *see also Adams v. United States*, 911 F.3d 397, 410 (7th Cir. 2018) (court will not hear second post-conviction motion attacking merits of issues already decided).

Section 2255 counsel raised this same claim in the § 2255 motion and in their motion for certificate of appealability to the district court.  (Dkt. 48-6 at 10-33; Dkt. 48-11 at 84-87.)  Section 2255 counsel again raised the same claims in their application for COA to the Eighth Circuit.  (Dkt. 48-13 at 8-77.)  The Eighth Circuit declined to issue a COA on the claim that trial counsel was ineffective for failing to hire a "mitigation specialist." (Dkt. 48-14; *Purkey v. United States*, 729 F.3d 860, 862 (8th Cir. 2013).)  The Eighth Circuit heard and decided on the merits the claims of failure to present abuse and mental health evidence in mitigation, holding "[t]he aggravating evidence is too overwhelming and the 'new' mitigating evidence too redundant for us to conclude that even 'one juror

would have struck a different balance.'" *Purkey*, 729 F.3d at 868 (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the savings clause of § 2255(e). Purkey attempts to salvage his claims by arguing his § 2255 attorneys were ineffective. But no court has ever held that ineffectiveness of § 2255 counsel renders § 2255 inadequate and ineffective.

Purkey cites *Ramirez* and *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), in support of his position that ineffective assistance of § 2255 counsel allows him to relitigate the issue of trial counsel's alleged ineffective assistance for failing to properly investigate mitigation evidence.

This Court should not extend *Ramirez* to § 2255 proceedings, because *Ramirez* applies only where post-conviction counsel abandoned the prisoner.[12] *Lombardo v. United States*, 860 F.3d at 559 & n.9. Purkey's counsel did not abandon him. Section 2255 counsel filed a 55-page motion, supplemented with 89-page suggestions and memorandum in support, raising 22 claims. (Dkt. 48-6, 48-7.) Section 2255 counsel supported those claims with 31 declarations or affidavits. After losing at the district court level, § 2255 counsel filed a motion to alter or amend the judgement. (Dkt. 48-9.) When that was denied (Dkt. 48-10), § 2255 counsel sought a COA from the district court (Dkt. 48-11), and then filed a

---

[12] *Brown* merely applies the doctrine of *Martinez* and *Trevino* to Indiana state habeas proceedings. 847 F.3d at 517. It adds nothing to Purkey's claim to apply that doctrine to the saving clause of § 2255(e).

134-page application for a COA with the Eighth Circuit. (Dkt. 48-13.) Section 2255 counsel filed a 135-page brief with the Eighth Circuit, a 12-page reply brief, and after losing in the Eighth Circuit, an application for a writ of certiorari with the U.S. Supreme Court. *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

Purkey argues that even though § 2255 counsel hired a mitigation specialist, they did not spend enough money on the specialist and therefore were ineffective. (Purkey Pet. at 123.) The Eighth Circuit did not even deem the original § 2255 claim that trial counsel did not hire a mitigation specialist worthy of review. (Dkt. 48-14; *Purkey*, 729 F.3d at 862.) As detailed above, the court denied the claims of failure to investigate and present even more mitigation evidence. Purkey should not be allowed to relitigate the alleged ineffectiveness of trial counsel by bootstrapping the alleged ineffectiveness of § 2255 counsel.

In contrast to post-conviction counsel in *Brown*, who raised one post-conviction claim, Purkey's § 2255 counsel raised 22 claims and submitted 31 affidavits. In contrast to post-conviction counsel in *Ramirez*, who failed to even notify Ramirez that his motion had been denied, Purkey's § 2255 counsel filed two applications for certificates of appealability, a 135-page brief on appeal, a petition for rehearing, and an application for a writ of certiorari with the United States Supreme Court. Purkey cannot show that § 2255 counsel was inadequate or ineffective in his case.

2.      *Claim 2 Fails on the Merits.*

      a.      *Trial Counsel's Decision to Not Hire a Mitigation Specialist Was Not Ineffective Assistance.*

Purkey elevates form over substance in arguing once again that his trial counsel should have hired a social worker with the title "mitigation specialist."  In support of his position that a failure to hire a social worker mitigation specialist is ineffective assistance of counsel, Purkey cites American Bar Association Guidelines and a law review article. However, the Eighth Circuit has held that if trial counsel conducted a proper mitigation investigation, the need for a mitigation specialist is obviated.  *United States v. Sinisterra*, 600 F.3d 900, 909 (8th Cir. 2010).

Purkey's current counsel, in again claiming that trial counsel should have hired a mitigation specialist, argues that the investigator trial counsel hired, Michael Armstrong, was unqualified. (Purkey Pet. at 111.)  In support of this claim, Purkey argues the irrelevant facts that Armstrong was fired from a previous job and that former co-workers filed orders of protection against him.  (Purkey Pet. at 113-15.)

      b.      *Trial Counsel Presented Abundant Evidence of Purkey's Alleged Abuse as a Child.*

In an attempt to argue prejudice from the failure to hire a mitigation specialist, Purkey states, "trial counsel failed to investigate beyond obtaining limited records and talking to a few people from Mr. Purkey's life."  (Purkey Pet. at 117.)  However, trial counsel introduced testimony from 18 witnesses.  And trial counsel provided his experts with voluminous records and interview summaries.

-66-

Trial counsel presented five witnesses who testified to Purkey's abuse as a child: Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child. Trial counsel submitted to the jury mitigation factors 5-10, which all involved Purkey's abuse as a child, cited at length by Purkey in his current claim. Mitigation Factor 12, that Purkey stuttered as a child, also involves the same claim Purkey cites in his current petition.

Purkey fails to show any prejudice from the allegedly ineffective investigator. Purkey claims the way in which Armstrong and Duchardt interviewed witnesses was not proper. Purkey alleges Armstrong was "real aggressive" in contacting one of Purkey's ex-wives, Jeannette Purkey Broyles. Purkey claims that had Duchardt and Armstrong listened better to Broyles, they would have learned that she "witnessed multiple episodes consistent with Mr. Purkey's trauma exposure during the time she and Mr. Purkey were married." (Purkey Pet. at 117.) Purkey then cites to Broyles declaration as proffered evidence. In her declaration, Broyles said Purkey called his father a son-of-a-bitch. He twice crawled into spaces and said, "don't hurt me." He was paranoid, used drugs, and caused her to lose everything. She fed him rat poison so he'd have to go to the hospital and get help. She said she loved him, but he caused a lot of pain for her boys. As noted above, trial counsel did attempt to present the poisoning evidence. It is unclear how the proffered evidence that Purkey cursed about his father, crawled into spaces, used drugs, and caused pain to her sons would have improved the mitigation case.

Likewise, Purkey currently claims that a former inmate housed with him, Michael Speakman, could have provided helpful evidence, such as that Purkey was a light sleeper,

-67-

and that he ranted and raved a lot. (Purkey Pet. at 118-19.) Speakman testified in the guilt phase of the trial that Purkey got angry at a visitation, and yelled that he was a real "m'f'r," and that he was in prison for killing people. (T. Tr. Vol. V at 681-82.) Speakman's testimony confirmed what the judge and jury saw firsthand, as they witnessed Purkey's angry outbursts during the trial. (T. Tr. Vol. XIV at 1798-180; T. Tr. Vol. XV at 1931; T. Tr. Vol. XVI at 1956-62; T. Tr. Vol. XVIII at 2298-2301.) It is unclear how Speakman's newly proffered evidence that Purkey was a light sleeper and that he ranted and raved a lot would have improved the mitigation case.

As § 2255 counsel did, Purkey again claims trial counsel should have interviewed Angie Genail and Gary Hamilton better. Purkey fails to delineate what information Genail and Hamilton would have offered had they been interviewed in a more sensitive manner.

Trial counsel did interview Broyles, Speakman, Genail, and Hamilton. Information from those interviews was elicited at trial and continues to be used today by Purkey. As noted in detail above, trial counsel presented multiple witnesses who testified about Purkey's alleged mental illnesses and alleged good character. Dr. William Grant, Dr. Bruce Leeson, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified that Purkey had mental issues. Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good character traits.

Purkey claims that both trial counsel and § 2255 counsel failed to uncover and present Purkey's family history of alcoholism, and emotional, physical, and sexual abuse

-68-

that led to his PTSD, substance abuse, and propensity for violence. (Purkey Pet. at 125.)

However, mitigation factors 5-12, submitted by trial counsel, belie Purkey's latest claim.

> (5) Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage that he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage that he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) As a child, Purkey suffered from slow speech development, and for his entire life, Purkey has suffered from the disability of stuttering.

Trial counsel presented five witnesses who testified to Purkey's abuse as a child to support his four experts who attempted to provide a better explanation of his vicious murders than Purkey's anti-social personality disorder, or sociopathy.

Purkey presents nothing new that would change the mitigation case. He presents a few classmates who said that some of the nuns who taught them were mean. Purkey has now apparently recently recovered memories that he was also abused by a priest. At trial, Purkey accused practically everyone he ever knew growing up – his father, his mother, his mother's boyfriends, his brother, his brother's friend, and his grandmother – of abuse[13]

---

[13]Gary Hamilton, Purkey's brother and the only relative accused of abusing Purkey who was alive at time of trial, did not admit at trial, nor in either of his declarations (Dkt. 23-7 at 23; Dkt. 23-10 at 1) to abusing Purkey.

But not until he was on death row did Purkey mention being abused by a (deceased) priest. It is unclear how this extraordinarily late, suspect disclosure, could be trial counsel's fault.

In *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010), the Eighth Circuit examined Supreme Court law regarding claims of counsel's failure to investigate mitigation evidence. Worthington was sentenced to death in the Circuit Court of St. Charles County, Missouri, after he pled guilty to one count of first-degree murder, one count of first-degree burglary, and one count of forcible rape. *Id.* at 491. Following unsuccessful state appeals and post-conviction motions, Worthington filed a petition for writ of habeas corpus with the federal district court, alleging seven grounds for relief. *Id.*

In his mitigation investigation, Worthington's trial counsel contacted only two of the defendant's relatives, and despite having the names of other family members and acquaintances, he did not contact them or travel to Peoria, Illinois, Worthington's hometown, to investigate or interview witnesses. *Id.* at 500. Trial counsel consulted with two mental health experts, after which he elected to not present psychological mitigation evidence. *Id.* at 501.

The federal district court found that trial counsel had failed to adequately investigate Worthington's social and medical history, including his family's background, and failed to pursue psychological mitigation evidence, and ordered that Worthington either be sentenced to life in prison without the possibility of parole or be given a new penalty phase hearing. *Id.* at 494. The district court rejected Worthington's argument that his trial counsel was ineffective for failing to investigate and present further mitigation evidence,

-70-

in particular, that counsel did not present the testimony of Worthington's parents as to his troubled upbringing. Worthington cross-appealed this decision. *Id.* at 503.

The Eighth Circuit reversed the district court's finding of ineffective assistance, holding that counsel had obtained the services of a qualified expert on the issue of the defendant's sanity and had conducted a reasonable investigation into psychological mitigating evidence. *Id.* at 502-03. On the cross-appeal, the Eighth Circuit affirmed the district court's finding that counsel made a reasonable decision to not call Worthington's parents to testify. *Id.* at 505-06.

The opinion examined three Supreme Court cases cited by Worthington in which trial counsel was found ineffective for failing to investigate. The first was *Williams v. Taylor*, 529 U.S. 362 (2000), in which trial counsel did not begin to prepare for the penalty phase until a week before the trial, failed to introduce evidence of Williams's exemplary prison behavior or his borderline mental retardation, and neglected to uncover records describing his "nightmarish" childhood. *Id.* at 395.

In the second case, *Wiggins v. Smith*, 539 U.S. 510 (2003), trial counsel was found to have unreasonably limited his investigation when he abandoned any form of mitigation based on personal history after having acquired only the presentence investigation report and city social service records documenting Wiggins's placements in the state foster care system. *Id.* at 523.

The third case examined was *Rompilla v. Beard*, 545 U.S. 374 (2005), in which the petitioner argued trial counsel was ineffective for failing to obtain his school records, juvenile records, evidence of alcohol dependence, and the court file of his prior conviction.

-71-

*Id.* at 382-83.  The Court held trial counsel was deficient for failing to examine the easily obtained court file of Rompilla's prior conviction, which the prosecution had provided notice of its intent to introduce at sentencing.  *Id.* at 389-90.  This failure was found to be prejudicial, as entries in the file "would have destroyed the benign conception of Rompilla's upbringing and mental capacity" that trial counsel had supposed.  *Id.* at 391.

The Eighth Circuit found Worthington's trial counsel's investigation was reasonable in contrast with the three above-mentioned Supreme Court cases:

> Cases in which the Supreme Court has held counsel's failure to investigate to be constitutionally ineffective involved a level of deficiency absent from the present case.  Counsel in *Williams* neglected to prepare for the penalty phase until one week before the hearing and erroneously believed that state law barred access to their client's records.  Counsel in *Wiggins* based their decision not to present any mitigating evidence solely on one page in a presentence investigation report and a collection of social service records that documented their client's placement history in the foster care system.  And counsel in *Rompilla* failed to examine a readily available court file that they knew the prosecution planned to introduce as evidence of aggravating factors.

*Id.* at 502.

The court held that counsel reasonably decided not to further investigate or present expert psychological evidence at the penalty phase: "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."  *Id.* at 502-03 (quoting *Rompilla*, 545 U.S. at 390); *see also Strickland*, 466 U.S. at 689.  The court found that Worthington's counsel presented a meaningful mitigation case that focused on Worthington's abusive background and persuaded the sentencing court to find as mitigating factors his dysfunctional family life, his abuse and neglect as a child, and his

-72-

history of drug abuse, and therefore reversed the district court's grant of habeas relief. *Id.* at 503.

With regard to Worthington's cross-appeal of the denial of his claim that counsel should have presented the testimony of Worthington's parents, the court affirmed the district court's finding that the testimony was cumulative: "[t]he additional testimony 'did not cover any new subject matter and was not substantially more persuasive' than that actually presented, and 'would barely have altered the sentencing profile presented' during the penalty phase. *Id.* at 506 (internal citations omitted) (quoting *Eley v. Bagley*, 604 F.3d 958, 969 (6th Cir. 2010), and *Strickland*, 466 U.S. at 700).

Purkey's claim that his trial counsel's investigation was deficient is far weaker than Worthington's was. Instead, Purkey's claims exactly fit the scenario in which his proposed new evidence "would barely have altered the sentencing profile presented during the penalty phase."

Purkey asks this Court to find his trial counsel ineffective because he did not "scour the globe on the off-chance something will turn up." *Rompilla*, 545 U.S. at 383. Yet even with the benefit of hindsight and 16 years of additional investigation, Purkey proposes at best a new label of mitigation (PTSD) that Duchardt should have pursued in an area that was pursued – mental health. This claim is without merit and should be denied.

        *c.*    *Trial Counsel Hired and Presented Four Experts on Purkey's Mental Issues, Three of Whom Testified to Trauma Purkey Suffered as a Child.*

Purkey claims his trial counsel was ineffective in failing to investigate and present mental health evidence of Purkey's new diagnosis of complex PTSD. (Purkey Pet. at 126.)

-73-

Section 2255 counsel similarly claimed trial counsel was ineffective for failing to prepare and present the expert testimony of Drs. Leeson, Peterson, and Cunningham. (Dkt. 48-6 at 25-31.)  As noted above, these claims were denied by the district court and Eighth Circuit.

Purkey acquired an expert in 2016, Dr. Frederic Sautter, who diagnosed him with complex PTSD, concluding he "experienced high levels of posttraumatic stress and depression and became highly intoxicated before the homicide that his thinking became very disorganized" and "[t]hese problems apparently left him unable to control his aggressive behavior with Ms. Long ensuring that his conflict with her would lead to a tragic outcome." (Dkt. 23-9 at 10.)

Purkey claims that trial counsel failed to investigate Purkey's comprehensive and psycho-social history, including Purkey's multi-generational family history or the extent of his childhood adversity and traumatic life events, which then could not be provided to defense mental health experts.  (Purkey Pet. at 137-38.)  Purkey now embraces a PTSD diagnosis as key to his defense.  (Purkey Pet. at 136.)

However, just like current counsel, trial counsel also acquired experts and provided them with abundant records of Purkey's childhood, who opined that Purkey was not responsible for the murder of Jennifer Long due to mental problems.  Dr. Stephen Peterson reviewed background documentation about Purkey's physical, medical, and mental health that measured "about three feet and three inches worth of records for this case."  (T. Tr. Vol. XIV at 1744.)  Dr. Peterson testified at trial in the penalty phase that, "Mr. Purkey did not have the capacity to form the intent to kill Jennifer Long.  That this was a nearly reflexive response based on his very severe psychiatric illness, and that prevented him from

thinking about what was happening until after it was over . . . . So after having been severely and sexually abused by his parents, beaten by them and not really learning the ways normal people interact, was then socialized in the penitentiary environment where effectively much of the day many men basically survive by managing their own violence and managing the violence around them."  (Tr. Vol. XIV at 1775-77.)

Defense experts at trial used the abundant family and childhood history provided by trial counsel to conclude Purkey was either not responsible for his crimes or had diminished capacity due to childhood trauma.  Dr. Peterson used the words "trauma" or "traumatic" approximately 26 times in his testimony about Purkey's mental condition.  (T. Tr. Vol. XIV at 1749, 1750, 1751, 1754, 1757, 1762, 1763, 1765, 1770, 1778, 1794, 1808, 1813, 1814, 1815, 1823.)  For one example, on cross-examination Dr. Peterson testified, "in my opinion, he's not malingering the consequences of his sexual trauma and physical trauma and emotional trauma as a child.  It has festered for many years."  (T. Tr. Vol. XIV at 1823.)

Similar to Purkey's current expert Dr. Sautter, Dr. Peterson was critical of prior psychological exams concluding Purkey had anti-social personality disorder, because they did not perform a "psychosexual history of Mr. Purkey, and the records don't indicate that they actually did, so they can't really answer the question of something other than antisocial because they didn't really ask."  (T. Tr. Vol. XIV at 1823.)

Likewise, trial counsel hired Dr. Mark Cunningham, who reviewed ten binders of information from Purkey's incarcerations, medical and psychiatric records of Purkey's parents, and all Purkey's medical records, psychiatric records, and school records, reports

-75-

of medical experts for both the defense and prosecution, and interview summaries of Purkey's friends and family.  Dr. Cunningham used the words "trauma" or "traumatic" approximately 16 times in his testimony about Purkey's mental condition.  (T. Tr. Vol. XV at 1862, 1863, 1864, 1865, 1871, 1873, 1874, 1878, 1934, 1936.)   For example, Dr. Cunningham testified that Purkey suffered "sexually damaging exposures and trauma of a number of different sorts."  (T. Tr. Vol. XV at 1864.)  And in testimony that sounds very much like Dr. Sautter's report, Dr. Cunningham testified, "That's a part of the algebra of violence, that it's often compromised brain functioning and substance dependence and traumatic history and unstructured community.  It's all of those things that result or help produce a violent outcome."  (T. Tr. Vol. XV at 1871.)

Similarly, trial counsel hired Dr. Bruce Leeson, who conducted neuropsychological testing of Purkey, including a battery of nine tests, which he described in detail to the jury. (Tr Vol.. 12, 1579-1605.) Like another expert hired by Purkey's current counsel, Dr. Leeson testified that Purkey had frontal lobe damage:  "the frontal lobes do not work the way they should to inhibit responses."  (T. Tr. Vol. XII at 1611.)  He also testified that Purkey's test results correlated with "major depression" and "post traumatic stress disorder."  (T. Tr. Vol. XIII at 1644.)

Finally, trial counsel hired Dr. David Preston, who performed Positron Emission Tomography (PET) tests on Purkey and testified that Purkey had frontal and temporal lobe brain damage.  He testified that frontal lobe damage would cause poor planning and poor judgment in a person, and that drug use would exacerbate the problems.  (T. Tr. Vol. XIII at 1667-93.)

The Eighth Circuit recently affirmed the denial of post-conviction relief in a capital case with very similar claims. *Anderson v. Kelly*, – F.3d – No. 17-2456, 2019 WL 4280360 (8th Cir. Sept. 11, 2019.)  Anderson was convicted of capital murder and sentenced to death in Arkansas. *Anderson* at *5-6.  His appeal and post-conviction motion were denied at the state level. *Id.* at *6.  He then filed a motion for federal habeas corpus relief in the United States District Court for the Eastern District of Arkansas.  His petition was denied, and the Eighth Circuit granted a certificate of appealability. *Id.*  Anderson claimed his trial counsel was ineffective because she "unreasonably failed to identify PTSD" despite "ample evidence" of childhood abuse. *Id.*

Anderson's post-conviction counsel presented an expert witness who diagnosed him with PTSD. *Id.*  The Eighth Circuit reviewed the claim on the merits, and held that Anderson's trial counsel's performance did not fall below an objective standard of reasonableness, and even if it did, Anderson could not prove prejudice. *Id.*  The court found that trial counsel had explored and presented evidence of childhood abuse and its effect on Anderson, who was 19 years old when he murdered an 87-year-old woman in her yard.  An expert testified at trial that Anderson was abused as a child, that there was alcoholism in his family, and that Anderson was depressed. *Id.*

Anderson claimed trial counsel should have pursued a PTSD diagnosis, because a psychologist they consulted sent them articles on PTSD.  The court held that counsel was not required to "scour the globe on the off chance something will turn up." *Id.* (quoting *Rompilla*, 545 U.S. at 383).  The court further found that even if counsel were ineffective, Anderson did not show prejudice. *Id.* at *8.  The court found it was not reasonably probable

that the jury would have reached a different conclusion even if they had been presented with a PTSD diagnosis. *Id.* The court noted that many of the mitigating factors the jury found related to Anderson's childhood, for example, that he grew up in an abusive, neglectful household, that he witnessed his mother's boyfriend verbally and physically abuse his mother, and that he had a family history of alcoholism. *Id.* The Eighth Circuit agreed with the district court "that Anderson's counsel may have missed the label . . . but they told the story." *Id.*; *see also Ward v. Neal*, 835 F.3d 698, 704 (7th Cir. 2018) (counsel not ineffective for failing to present more mitigation evidence where aggravating circumstances were strong.)

Purkey's trial counsel likewise told the story, presenting multiple witnesses that Purkey had been abused as a child, that he had endured trauma, and that he had mental conditions because of the abuse and trauma. However, Purkey's claim of prejudice is far weaker than Anderson's, given that Purkey was 46 at the time he killed Jennifer Long and Mary Ruth Bales, whereas Anderson was 19 at the time he committed murder.

Purkey's current counsel, his § 2255 counsel, and his trial counsel all face the same intractable problem. Purkey's extraordinarily violent murders and his planned, elaborate concealments do not fit with his claims of frontal lobe impairment or mental disease relieving him of responsibility for his crimes. Any unbiased person, including all the jurors and judges who have examined the evidence put forth by Purkey, could only reasonably conclude that any abuse he suffered as a child does not excuse or mitigate the murders he committed, and concealed or attempted to conceal, as a 46-year-old man. The label matters

not, whether it is depressive disorder, neurobehavioral disinhibition, substance abuse disorder, or PTSD.

While Purkey claims both trial and § 2255 counsel were ineffective for failing to hire or spend enough money on a mitigation specialist, he alleges no area of mitigation that was not presented at trial. Just as Purkey's § 2255 counsel did not present one new area of mitigation evidence despite years of additional investigation and the benefit of hindsight, Purkey's current counsel, with even more years of investigation and more hindsight, presents no new area of mitigation evidence. This claim should be denied, as it was previously.

**C.    Claim 3 – _Trial Counsel's Affidavit Contained No Lies but in Any Case Was Disregarded by the Eighth Circuit in Its Review of Purkey's § 2255 Motion._**

Duchardt prepared an affidavit pursuant to the district court's order. Section 2255 counsel moved to strike the affidavit, which the district court denied. Section 2255 counsel then appealed that denial to the Eighth Circuit, which ultimately found no prejudice even assuming trial counsel was ineffective and so disregarded the affidavit. *Purkey*, 729 F.3d at 866 n.2. Purkey's third challenge to the affidavit is procedurally barred, without merit, and moot, and should be denied.

*1.    Claim 3 Is Procedurally Barred.*

Purkey's third claim is procedurally barred for two reasons, and cannot be litigated in this Court for a third.

*First*, as he did in his motion for a certificate of appealability from his § 2255 motion, and on the appeal of the district court's denial of his § 2255 motion, Purkey challenges his trial counsel's affidavit. Purkey adds a twist to this claim, by arguing that his trial counsel lied in his affidavit, whereas he previously argued that his trial counsel violated the attorney-client privilege. Nevertheless, the issue of Duchardt's affidavit has been litigated and held to be moot by the Eighth Circuit, and cannot be raised again here. 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at *1 (S.D. Ind. Sept. 22, 2014); *see also Adams v. United States*, 911 F.3d 397, 410 (7th Cir. 2018) (court will not hear second post-conviction motion attacking merits of issues already decided).

To recount, Purkey's § 2255 counsel moved to strike Duchardt's affidavit in the § 2255 proceedings. The district court denied the motion to strike at the same time it denied the § 2255 motion. (Dkt. 48-8 at 11.)

Purkey's § 2255 counsel then moved before the district court for a COA on that issue and several others. (Dkt. 48-11.) Purkey challenged the affidavit on three grounds: 1) Duchardt included more attorney-client privileged information than was necessary; 2) Purkey was not allowed an opportunity to see the affidavit before it was disclosed to the Government; and 3) Duchardt conducted independent legal research and analysis in seeking to disprove Purkey's legal arguments. (Dkt. 48-11 at 15-17.) Section 2255 counsel also sought a COA on the district court's denial of a hearing, arguing that the 31 declarations they submitted with the § 2255 motion created factual disputes requiring a hearing. (Dkt. 48-11 at 8-14.)

The district court denied a COA on all issues.  (Dkt. 48-12.)  On the issue of striking Duchardt's affidavit, the court ruled, "Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey."  (Dkt. 48-12 at 15.)  On its denial of a hearing, the court ruled that it was "capable, without a hearing, of weighing the mitigation case which was presented against the mitigation case which could have been presented . . . the additional evidence which Purkey argues should have been presented would have been . . . largely cumulative," and therefore denied a certificate of appealability on that issue.  (Dkt. 48-12 at 13.)

Purkey then sought a COA from the Eighth Circuit, arguing the district court erred by not striking Duchardt's affidavit.  (Dkt. 48-13 at 107-29.)  The Eighth Circuit did not include this claim in its order of certificate of appealability.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862).  The Government moved to strike the claim from the brief, as outside the scope of the COA.  *Purkey*, 729 F.3d at 866 n.2.  However, Purkey argued that the question of the affidavit was intertwined with issues identified in the COA.  *Id.*  The court ultimately held that because Purkey failed to "establish prejudice without reaching the only matter addressed in the affidavit – whether Duchardt's performance fell below an objective standard or reasonableness – we need not consider any of the contents of Duchardt's affidavit."  *Id.*  Accordingly, the court denied as moot the Government's motion to strike.  *Id.*

-81-

Purkey thus achieved what he seeks on this claim, that is, Duchardt's affidavit was not considered.

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e). Purkey attempts to salvage his claims by arguing his § 2255 counsel were ineffective. But no court has ever held that ineffectiveness of § 2255 counsel renders § 2255 inadequate and ineffective.

This Court should not extend *Ramirez* to § 2255 proceedings, because *Ramirez* applies only where post-conviction counsel abandoned the prisoner.[14] *Lombardo v. United States*, 860 F.3d at 559 & n.9. Purkey's counsel did not abandon him. Section 2255 counsel filed a 55-page motion, supplemented with 89-page suggestions and memo in support, raising 22 claims. (Dkt. 48-6, 48-7.) Section 2255 counsel supported those claims with 31 declarations or affidavits. After losing at the district court level, § 2255 counsel filed a motion to alter or amend the judgement. (Dkt. 48-9.) When that was denied (Dkt. 48-10), § 2255 counsel sought a COA from the district court (Dkt. 48-11), and then filed a 134-page application for a COA with the Eighth Circuit. (Dkt. 48-13.) Section 2255 counsel filed a 135-page brief with the Eighth Circuit, a 12-page reply brief, and after losing in the Eighth Circuit, an application for a writ of certiorari with the U.S. Supreme Court. *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

---

[14] *Brown* merely applies the doctrine of *Martinez* and *Trevino* to Indiana state habeas proceedings. 847 F.3d at 517. It adds nothing to Purkey's claim to apply that doctrine to the saving clause of § 2255(e).

Section 2255 counsel challenged Duchardt's affidavit on multiple occasions, and prevailed in that the Eighth Circuit did not consider the affidavit in making its ruling. Purkey should not be allowed to relitigate the issue of Duchardt's affidavit here.

*Third*, Purkey's argument that a court has equitable jurisdiction to vacate a judgment based on fraud on the court does not permit this Court to rule on his claim, because such claims must be raised in the court that rendered the judgment in the first place—in this case, the Western District of Missouri. *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969).

    2.    *Claim 3 Fails on the Merits Because Purkey Has Not Shown Duchardt Made Any Misrepresentations.*

Assuming for the sake of argument that Purkey's renewed challenge to Duchardt's affidavit should be considered, he is far from showing Duchardt misrepresented anything in the affidavit.  Purkey claims three falsehoods by Duchardt.

In the first claim, Purkey argues that Duchardt lied in the affidavit by saying "no objections have been interposed by Mr. Purkey or his Counsel" to the affidavit itself. Purkey argues that § 2255 counsel objected soon after receiving the affidavit via email and responded with an email to Duchardt so that statement was a lie.  (Purkey Pet. at 143-44.) First, at the time that statement in the affidavit was written, counsel had apparently not yet objected.  Second, although § 2255 counsel may have emailed Duchardt, nothing shows that he received or read the email before he sent the affidavit to government counsel.  Third, as noted above, there was no prejudice from this statement.  Purkey's § 2255 counsel did challenge the affidavit with the district court and the Eighth Circuit.  Purkey's current

counsel makes the conclusory claim that the "later objections by § 2255 counsel in moving to strike the statement" were more difficult to sustain. (Purkey Pet. at 144.) No facts or law are offered in support of this conclusion.

Purkey's second example of Duchardt supposedly misrepresenting facts relates to a disagreement between Duchardt and Purkey's other trial counsel, Laura O'Sullivan. Duchardt stated in his affidavit that O'Sullivan "had never before tried a case involving the death penalty or a mental defense." As proof that this statement was a lie, Purkey cites a trial O'Sullivan participated in that involving frontal lobe damage and some cases O'Sullivan pled or handled involving competency or mental issues. First, if Duchardt was wrong, he was not far off the mark. O'Sullivan admittedly had no death penalty trial experience, and only one or two trials with any mental health issue. Second, for this statement to be a lie rather than a mistake, Purkey must show that Duchardt knew about O'Sullivan's experience in her trials with frontal lobe damage and battered woman's syndrome. Purkey states the opposite, that Duchardt did not know about O'Sullivan's experience: "Duchardt never even bothered to ask Ms. O'Sullivan about her prior experience with cases involving mental health issues." (Purkey Pet. at 146.)

Purkey accuses Duchardt of a third lie—that the investigator Mic Armstrong was qualified to be a fact and mitigation investigator. Duchardt's affidavit states, "I asked Michael (Mic) Armstrong to act as an investigator related to both phases of the case, and to help with duties often assigned to a person commonly referred to as a 'mitigation specialist'. I chose Mr. Armstrong for this dual role because of his extensive experience and training." (Dkt. 23-37 at 170.)

Purkey argues the claims regarding Armstrong's qualifications were shown to be false because initially Duchardt submitted a budget to the court requesting separate funding for an investigator and a mitigation specialist. Duchardt requested funds to pay Armstrong an initial payment of $2,500 as an investigator. Purkey then recounts that Duchardt submitted a supplemental request for money stating that he "determined that the cost of a mitigation specialist had increased and he determined that budgetary savings could be realized by "reassigning to the investigator (Armstrong) and to counsel (Duchardt) the investigative work traditionally done by a mitigation specialist." (Purkey Pet. at 148.)

The budget requests therefore mirror Duchardt's affidavit, that is, Duchardt wanted Armstrong to perform investigation for both the guilt and penalty phases of the trial, and he did not want to use money in his budget to hire a "mitigation specialist." Purkey claims Duchardt did not set forth Armstrong's qualifications, and states that Armstrong "was uniquely *unqualified*." However, Purkey's current opinion of Armstrong is no proof that Duchardt has ever shared that opinion, much less in 2002 when he submitted budget requests to the court, nor in 2008 when Duchardt wrote his affidavit.

Notwithstanding the similarity between the budget requests and the affidavit, Purkey argues Duchardt lied to the court in the affidavit. Purkey speculates only two possibilities, both of which he argues would be a "fraud on the court." First, that Duchardt from the beginning intended for Armstrong to serve as both fact and mitigation investigator, but lied to the court that he would hire a mitigation specialist in order to get more money for Armstrong, knowing Armstrong to be unqualified. Second, that Duchardt lied in the affidavit that he intended from the beginning to have Armstrong serve the dual

role of fact and mitigation investigator to deceive the court that Armstrong was a qualified mitigation specialist.  (Purkey Pet. at 149-50.)

Purkey does not come close to proving that Duchardt knowingly lied in either his affidavit or his budget requests.  Duchardt could have believed Armstrong would be a qualified fact and mitigation investigator.  Purkey claims Duchardt knew Armstrong to be unqualified.  However, Purkey does not show that Duchardt knew or believed any such thing.  The fact that Armstrong left a prior job under bad circumstances doesn't prove that Duchardt knew or believed him to be unqualified.  After all, Purkey's current counsel presents only one side of what would no doubt be a contested issue – the circumstances under which Armstrong left the public defender's office.  Duchardt did work with Armstrong on multiple cases and had extensive personal experience with Armstrong and even at the time he wrote his affidavit in 2008, believed Armstrong to have performed well in this case.  Duchardt recounted that it was Armstrong's persistence that obtained the admission from Jeannette Purkey that she poisoned Purkey.  (Dkt. 23-37 at 171-72.)  Purkey's current counsel uses the poisoning  information as mitigation in their § 2241 motion.  (Purkey Pet. at 77.)

Despite Purkey's argument that only two interpretations are possible, there are many, many interpretations, including difference of opinion, mistake of fact, misinterpretation of meaning, or condensing the timeline.

For example, when Duchardt recounted in his affidavit that he asked Armstrong to serve as both fact and mitigation investigator, he did not state when that conversation occurred.  It could have been early in the case, or it could have been later as the case

progressed and Duchardt determined to dispense with a traditional "mitigation specialist." Another possibility is that when Duchardt stated in his affidavit that he asked Armstrong to serve the dual role of fact and mitigation investigator, Duchardt still intended to hire a mitigation specialist and have Armstrong work with and for the mitigation specialist. Another possibility is that Duchardt felt hiring a mitigation specialist was unlikely, but left open the possibility of hiring one for budget purposes and decided as the case progressed that the expense was not worth it.

Finally, even assuming for the sake of argument that there were lies in the affidavit, which Purkey has far from proved, he cannot show any linkage to the outcome of his § 2255 motion, given that the Eighth Circuit explicitly disregarded Duchardt's affidavit. *Purkey*, 729 F.3d at 866 n.2.

Purkey makes this and other salacious claims in the hope that one of them will catch the attention of a judge. His claims are barred and provide no ground for relief.

**D.**     **Claim 4 –** *There Is No Possibility that the Jury Misunderstood the Instructions Regarding Mitigating Factors.*

Purkey argues that there is a "substantial possibility" that the jury mistakenly believed that jurors could not consider mitigating factors unless the jury first unanimously found those factors to exist. (Purkey Pet. at 155.) Purkey contends that the jury's confusion is shown by the fact that the jury left blank a part of the verdict form that included spaces to record the number of jurors that found any of a list of 27 proposed mitigating factors. (Purkey Pet. at 157-58.) This is not the first time Purkey has advanced this argument, which has been rejected before and is now barred. Moreover, Purkey's argument fails on

the merits, because the jury was correctly and clearly instructed that jurors could consider mitigating factors that any one juror found to be established.

### 1. *Claim 4 Is Procedurally Barred.*

Purkey claim is barred for three independent reasons.

*First*, Purkey's claim is barred because he previously raised it on direct appeal in the Eighth Circuit. Under the law of the case doctrine, a prisoner may not "relitigate in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004); *see also Johnson v. Warden*, No. 18-cv-1415-SLD, 2019 WL 2717764, at *2 (C.D. Ill. June 28, 2019) (applying the law of the case doctrine to a § 2241 petition). On direct appeal, Purkey argued that "because the District Court did not require Purkey's jury to return findings regarding pled and proven mitigating factors, it failed to require the jury to fully consider and give Constitutional effect to Purkey's evidence and arguments in mitigation of punishment." Reply Bfr. at 24, *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) (No. 04-1337), 2005 WL 5627242. Purkey cited to *Mills v. Maryland*, 486 U.S. 367 (1988), which is the very case upon which he relies most heavily in his current Petition. *See id.* The Eighth Circuit rejected Purkey's argument and held that the Federal Death Penalty Act does not require the jury to specifically identify any mitigating factors that one or more jurors found to exist. *See Purkey*, 428 F.3d at 763. Purkey is raising here the same argument he raised and lost on direct appeal, and it is therefore barred. Purkey has not attempted to argue that any exceptions to the law of the case doctrine apply, nor could he succeed in doing so. *See White*, 371 F.3d at 902 (identifying three exceptions).

-88-

*Second*, Purkey's claim is also barred because he also previously raised it in his § 2255 motion in the Western District of Missouri. *See* 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at *1 (S.D. Ind. Sept. 22, 2014) ("[The prisoner's] habeas challenge was presented and rejected in his 28 U.S.C. § 2255 action. It is not available for further review here."). In his § 2255 motion, Purkey argued that he "was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence." (Dkt. 48-7 at 74.) The district court rejected this argument because Purkey had "not shown that the jurors were precluded from considering any mitigating evidence, they simply chose not to give any weight to that evidence, which under the law they are entitled to do." (Dkt. 48-10 at 9). Purkey is raising here the same argument he raised and lost in his § 2255 motion, and it is therefore barred.

*Third*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e). His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim based on a Supreme Court case decided in 1988 that could have been, and in fact was, raised in both his direct appeal and his § 2255 motion and is now barred from relitigation.

2.      *The Jury Was Clearly and Correctly Instructed on Mitigation Factors.*

Purkey's fourth claim also fails on the merits.  The jury was explicitly and clearly instructed that it was not required to reach unanimous agreement as to mitigating factors.  Instruction 33 provided as follows:

> Unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require unanimous agreement with regard to mitigating factors.  *Any* juror persuaded of the existence of a mitigating factor *must* consider it in this case.  Further *any* juror *may* consider a mitigating factor found by another juror, even if he or she did not find that factor to be mitigating.

(Dkt. 48-5 at 11.)

The jury was also told in Instruction 33 that it could, but was not required to, report on the verdict form the number of jurors that found particular mitigating factors:

> In Part V of the Special Verdict Form relating to mitigating factors, you are asked, but not required to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

(Dkt. 48-5 at 11-12.)

The verdict form itself further emphasized that the jury was not required to reach unanimous agreement as to mitigating factors.  Part V of the verdict form provided as follows:

> Instructions:  For each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.
>
> A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

> Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also find that factor to be mitigating.

(Dkt. 23-37 at 94.)

In sum, the jury was clearly instructed that unanimous agreement was not required for it to consider mitigating factors. It was also clearly instructed that it could—but was not required to—record on the verdict form the total number of jurors that found a particular mitigating factor established by a preponderance of the evidence. Given these instructions, there is no chance that the jury mistakenly believed it was required to reach unanimous agreement before it could consider mitigating factors. *See Penry v. Johnson*, 532 U.S. 782, 789 (2001) ("We generally presume that jurors follow their instructions."); *United States v. Warner*, 498 F.3d 666, 683 (7th Cir. 2007) ("There is a general presumption that juries follow their instructions," and "[t]his presumption is only overcome if there is an overwhelming possibility that [the] jury was unable to follow the instructions.") (quotation omitted); *United States v. Harper*, 466 F.3d 634, 647 (8th Cir. 2006) ("[O]ur theory of trial by jury is dependant upon the ability of jurors to follow instructions.").

As the district court concluded when denying Purkey's motion for a certificate of appealability from the denial of his § 2255 motion, "by leaving all of the spaces blank, the logical conclusion is that none of the jurors found the existence of *any* of the mitigating factors." (Dkt. 48-12 at 12); *see also United States v. Mikhel*, 889 F.3d 1003, 1065 (9th Cir. 2018), *petition for cert. filed* (U.S. Feb. 4, 2019) (No. 18-7835) ("'There is no constitutional requirement that the jury find a mitigating factor even when it is supported

-91-

by uncontradicted evidence.'") (quoting *United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003)).  An alternative logical conclusion is that the jury simply decided not to enter on the form the number of jurors who had found mitigating factors, which the jury had been instructed was not required.  Either way, these explanations are much more plausible than unfounded speculation that the jury misunderstood its clear instructions.

Purkey's reliance on *Mills v. Maryland*, 486 U.S. 367 (1988), is misplaced.  In *Mills*, the jury verdict form provided that "[b]ased on the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked 'no' has not been proven by A PREPONDERANCE OF THE EVIDENCE."  *Id.* at 387.  The Supreme Court concluded that "there [was] a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."  *Id.* at 384.  Here, by contrast, the verdict form explicitly provided that "[a] finding with respect to a mitigating factor may be made by one or more of the members of the jury," and the jury was specifically instructed that "the law does not require unanimous agreement with regard to mitigating factors."  No reasonable juror could have misinterpreted these instructions to preclude a juror from considering a mitigating factor unless all the jurors agreed on it.

Indeed, the jury instruction on mitigation in Purkey's case was specifically designed to comply with the Supreme Court's holding in *Mills*.  Instruction 33 was drawn verbatim

-92-

from the Eighth Circuit Model Jury Instruction on mitigation. *Compare* Instr. No. 33 *with Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit*, Instr. No. 12.09, 643 (2003 ed.). The Committee Comments to the Model Jury Instruction cite *Mills* as one of the cases upon which the model instruction was based. *See id.*, Comm. Cmt.. Purkey cannot plausibly contend the jury instructions ran afoul of *Mills* because they were specifically designed to (and did) comport with *Mills*.

The juror declarations appended to Purkey's petition lend no support to his position that the jury was confused.[15] As an initial matter, Federal Rule of Evidence 606(b) prohibits consideration of these declarations. This rule provides that "[d]uring an inquiry into the validity of a verdict or indictment," "[t]he court may not receive a juror's affidavit or evidence of a juror's statement regarding" "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning the verdict or indictment." In particular, Rule 606(b) bars evidence that a juror misunderstood or failed to follow an instruction. *See Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 416 (8th Cir. 2016) (holding that Rule 606(b) barred juror testimony that they relied upon stricken evidence in violation of a curative instruction); *Peterson v. Fabian*, 491 F.3d 816, 829 (8th Cir. 2007) (indicating that Rule 606(b) would bar evidence indicating the juror may not have applied a presumption of innocence); *United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995) (holding that

---

[15]One of the "juror declarations" is not actually a declaration by a juror, but rather a declaration prepared by a law student who participated in an interview with a juror in November 2015 and then prepared a declaration purporting to summarize that interview in April 2016. (*See* Dkt. 23-40 at 98.) This declaration is therefore double-hearsay.

Rule 606(b) barred "post-verdict comments by jurors expressing confusion concerning" an instruction); *United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (observing that "Rule 606(b) has consistently been used to bar testimony when the jury misunderstood instructions"); *Karl v. Burlington Northern R. Co.*, 880 F.2d 68, 75 (8th Cir. 1989) (holding that Rule 606(b) bars "evidence of the jury's misinterpretation of its instructions"); *see also* Victor J. Gold, *Federal Practice and Procedure* § 6074 (2d ed. 2019). Although Rule 606(b) has three exceptions, none applies here.[16]

Purkey argues that Rule 606(b)(1) should not apply in a criminal capital case, but he has no support for this argument. To the contrary, Rule 606(b)(1) is routinely applied to exclude juror testimony or affidavits in post-conviction proceedings in capital cases. *See, e.g.*, *Fullwood v. Lee*, 290 F.3d 663, 680 (4th Cir. 2002) (applying Rule 606(b) to bar portion of juror affidavit in capital habeas proceeding); *United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998), *aff'd*, 527 U.S. 373 ("Noting that the Eighth Amendment requires a 'greater degree of reliability when the death sentence is imposed,' we are convinced that Rule 606(b) does not harm but helps guarantee the reliability of jury determinations in death penalty cases.") (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)); *Silagy v. Peters*, 905 F.2d 986, 1008-09 (7th Cir. 1990) (applying Rule 606(b) to bar juror testimony in capital habeas proceeding); *Leisure v. Bowersox*, 990 F. Supp. 769, 787 (E.D. Mo. 1998) (holding that Rule 606(b) barred consideration of a juror affidavit in capital habeas

---

[16]The exceptions are that "[a] juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

proceeding); *Bannister v. Armontrout*, 807 F. Supp. 516, 543-44 (W.D. Mo. 1991) (holding that Rule 606(b) barred consideration of an affidavit containing jurors' statements in capital habeas proceeding).  The Supreme Court's decision in *Pena-Rodriquez v. Colorodo*, 137 S.Ct. 855 (2017), does not shift the law in Purkey's favor, first because it applies very narrowly to evidence of juror racial bias—which the Court described as "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice," *id.* at 868—and second because it does not apply retroactively.  *See Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018).

Even if it were proper to consider the juror declarations, they do not support Purkey's position.  Purkey's assertion that the declarations show the jury "understood they had to reach unanimous agreement on each of the [mitigating] factors," (Purkey Pet. at 158), is a mischaracterization—none of the declarations actually says this or indicates that the jury misunderstood the instructions regarding consideration of mitigating factors.  (Dkt. 23-40 at 92-105.)   Instead, the declarations demonstrate that although the jury considered and discussed the proposed mitigating factors, it was not persuaded by them and concluded that the death penalty was appropriate in light of the severity of Purkey's crimes.  (Dkt. 23-40 at 92) ("I became certain that Purkey deserved to die once I heard about how he cut up Jennifer's body into pieces and burned it. . . . After seeing those pictures there was nothing that was presented to me that changed my mind."); (Dkt. 23-40 at 96) ("I voted for death up front.  I knew as soon as I walked into the jury room."); (Dkt. 23-40 at 101) ("She was a hundred percent convinced about sentencing the defendant to

death once the murder of the 80-year-old woman was introduced.  At that point nothing else mattered to her."); (Dkt. 23-40 at 104) ("Imposing death was fair.").

The jury's decision is hardly surprising "[i]n light of the heinous abduction, rape, and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison."  *Purkey v. United States*, 729 F.3d 860, 868 (8th Cir. 2013).  In short, the jury voted for the death penalty, not because they misunderstood their clear instructions regarding mitigating factors, but because they were not persuaded by the proposed mitigating factors and determined that the death penalty was appropriate due to the heinous nature of Purkey's crimes.

E.    *Claim 5 -* **Hurst v. Florida** *Provides No Support to Purkey's Claim and a Capital Sentencing Jury Does Not Need to Find That Aggravating Factors Outweigh Mitigating Factors Beyond a Reasonable Doubt.*

*Hurst v. Florida* provides no support for Purkey's claim.  A capital sentencing jury is not required to weigh the aggravating factors and the mitigating factors using the beyond a reasonable doubt standard.  Every appellate court to consider the issue has rejected Purkey's argument.  As an initial matter, however, Purkey's weighing argument is procedurally barred because, at a minimum, he cannot re-litigate issues brought on direct appeal in a collateral attack.

1.    *Claim 5 Is Procedurally Barred.*

Purkey's claim is barred for two independent reasons.

-96-

*First*, Purkey's claim is barred because he previously raised a similar claim—that the weighing consideration is an elemental fact that must be presented to the grand jury—on direct appeal in the Eighth Circuit.  Under the law of the case doctrine, a prisoner may not "relitigate in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004); *see also Johnson v. Warden*, No. 18-cv-1415-SLD, 2019 WL 2717764, at *2 (C.D. Ill. June 28, 2019) (applying the law of the case doctrine to a § 2241 petition).

The Eighth Circuit rejected the essence of this claim in this very case.  *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).  It reaffirmed its long standing holding that a sentencing jury need only be informed that "the jury must unanimously find that the statutory and non-statutory aggravating factors 'sufficiently outweigh' the mitigating factors." *Purkey*, 428 F.3d at 761 (citing *United States v. Nelson*, 347 F. 3d 701, 712 (8th Cir. 2003)); *United States v. Ortiz*, 315 F. 3d 873, 900-01 (8th Cir. 2002).  In fact, the court's analysis in *Purkey* also showed why the subsequent Supreme Court decision in *Hurst* did not affect the validity of the decision.  This is so because the Court found that the "weighing process mandated by 18 U.S.C. § 3593(e)" is not "an elemental fact for which a grand jury must find probable cause." *Purkey*, 428 F.3d at 750.

This precise issue, and procedural posture, was raised and rejected in *Runyon v. United States*, 228 F. Supp. 3d 569, 588 (E.D. Va. 2017).  In *Runyon*, the petitioner was tried and convicted of a capital murder under the FDPA.  He was sentenced to death, and on direct appeal complained that the jury was improperly charged that they must find that the aggravating factors "sufficiently outweigh" all the mitigating factors to justify a

sentence of death, as opposed to a beyond a reasonable doubt standard. *United States v. Runyon*, 707 F. 3d 475, 516 (4th Cir. 2013). Subsequently, on habeas appeal, the petitioner again argued that the jury instructions "unconstitutionally lowered the government's burden of proof" by providing that the jury must agree that the aggravating factors must "sufficiently outweigh" any mitigating factors instead of using a beyond a reasonable doubt standard. *Runyon*, 228 F. Supp. 3d at 633. The petitioner in *Runyon* argued that *Hurst v. Florida*, 136 S. Ct. 616 (2016), created an intervening change in the controlling law that would allow him to re-litigate his claim. The court rejected that argument and found the claim procedurally barred and substantively meritless, holding:

> the court finds that *Hurst* does not represent an intervening change in the law, with respect to the issue the Petitioner raised on appeal, and it does not affect the Fourth Circuit's earlier finding that the FDPA requires only that the jury decide "whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist," and that this court's instructions during the penalty phase were proper. *Runyon*, 707 F.3d at 516 (quoting 18 U.S.C. § 3593(e)). The Fourth Circuit found no error here. *Id*. at 516.

> For the above reasons, the Petitioner is barred from relitigating this claim, and Claim Ten is DENIED.

*Id.* at 634. Accordingly, Purkey's claim is procedurally barred and should be denied.

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e). His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international

-98-

tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation.

> 2.  *No Appellate Court Has Held That a Capital Sentencing Jury Needs to Find That Aggravating Factors Outweigh Mitigating Factors Beyond a Reasonable Doubt.*

Purkey's claim is also meritless and has been rejected by every appellate court to consider the issue.

For the jury to impose a sentence of death, the FDPA requires the United States to prove that "the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e). *See United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013) (the BRD weighing argument is meritless).

Each of the seven circuit courts of appeals to have addressed this issue has concluded that the Sixth Amendment's requirement that findings of fact be made beyond a reasonable doubt does not apply to the FDPA's weighing determination. *United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013); *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008); *cf. United States*

*v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (weighing consideration not an "elemental fact" that must be presented to a grand jury.

The Sixth Circuit explained that the FDPA's weighing process does not require a finding of fact. *Gabrion*, 719 F.3d at 533. Thus, the jury need not be instructed on the beyond a reasonable doubt standard as if it was making a finding of fact. *Id.* In rejecting the defendant's beyond a reasonable doubt weighing argument, the Sixth Circuit stated "Every circuit to have addressed the argument that Gabrion makes here—six circuits so far—has rejected it. Today we become the seventh. Gabrion's argument is meritless." *Id.*, at 532 (citations omitted). The First Circuit also held in *Sampson* that the "requisite weighing constitutes a process, not a fact to be found." 486 F.3d at 32 ("The outcome of the weighing process is not an objective truth that is susceptible to further proof by either party. Hence, the weighing of aggravators and mitigators does not need to be 'found.'").

Purkey seeks to do an end run around this circuit court consensus by claiming that *Hurst v. Florida* changed the analysis. Purkey is wrong and ignores the plain language of the circuit court opinions. It is clear from those analyses that the decisions were based upon the determination, under *Apprendi v. New Jersey*, that a federal capital sentencing jury's weighing decision does not involve an element that raises the statutory maximum penalty. *See Gabrion*, 719 F.3d at 531; *Sampson*, 486 F.3d at 32.

Every court to consider the issue, post *Hurst*, has also agreed that the Constitution does not require a capital sentencing jury to weigh their sentencing decision beyond a reasonable doubt. *See United States v. Christensen*, No. 17-cr-20037-JES-JEH, 2019 WL 1976442 (C.D. Ill. May 3, 2019) ("This Court agrees, and does not read *Hurst* to require

-100-

instruction that the jury make a finding about the relative weight of the aggravating and mitigating factors beyond a reasonable doubt"); *United States v. Roof*, 225 F. Supp. 3d 413, 419 (D.S.C. 2016) ("Nothing in *Hurst* invites this Court to reconsider [the Fourth Circuit jurisprudence that the weighing process does not need to be conducted beyond a reasonable doubt]); *United States v. Con-Ui*, No. 3:13-CR-123, 2017 WL 1393485 (M.D. PA Apr. 18, 2017) ("Nothing in *Hurst* aims to invalidate my previous findings, informed by *Apprendi* and recognized by courts across the nation, that the FDPA's weighing process is not a 'fact' to be 'found' by the jury but a deeply personal decision based on private beliefs, values, and experiences whereby juries, guided by mercy, make a reasoned and subjective moral judgment about the appropriate sentence"); *Runyon*, 228 F. Supp. 3d at 588; *United States v. Ofomata*, No. 17-201, 2019 WL 527696 (E.D. LA Feb. 11, 2019) ("The Court has already noted that nothing in *Hurst* indicates that the Supreme Court intended to alter the law as it is set forth in *Apprendi* and *Ring*"); *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 3102003, at *4 (D. Mass. Jun. 2, 2016) ("the Court is not persuaded that the Constitution mandates application of the reasonable doubt standard of proof to the jury's weighing of aggravating and mitigating factors under the FDPA"). *See also Ybarra v. Filson*, 869 F.3d 1016, 1030-31 (9th Cir. 2017) (expressing extreme skepticism at the defendant's argument that, under *Hurst*, the weighing process in Nevada's capital sentencing scheme is like an element of a capital offense). Accordingly, Purkey's petition should be denied.

**F.**    ***Claim 6 - <u>Imposition of the Death Penalty Under the Federal Death Penalty Act is Not Cruel and Unusual Punishment.</u>***

Purkey raises in his § 2241 petition a facial challenge to the constitutionality of the federal death penalty, on the ground that it is cruel and unusual punishment prohibited by the Eighth Amendment.  As an initial matter, this claim is procedurally barred.  On the merits, Purkey's claim asks this Court to overrule the Supreme Court, which it cannot do.  Indeed, the Supreme Court re-affirmed the constitutionality of the death penalty less than six months ago.  *See Bucklew v. Precyth*, 139 S.Ct. 1112, 1122 (2019) ("The Constitution allows capital punishment.").  Claim 6 must be denied.

      **1.**    <u>*Claim 6 Is Procedurally Barred.*</u>

This claim is procedurally barred because Purkey has identified no reason that would enable him to fit within the savings clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: it is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment.  Rather, it is a claim that could have been raised in his direct appeal and is now barred.

      **2.**    <u>*Capital Punishment Is Constitutional.*</u>

This Court is bound to follow Supreme Court precedent holding that capital punishment is constitutional.  *See Bucklew*, 139 S. Ct. at 1122 ("The Constitution allows

capital punishment."); *Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quotation and punctuation omitted)); *United States v. Christensen*, Case No. 17-cr-20037-JES-JEH, 2019 WL 651501, at *3 (C.D. Ill. Feb. 15, 2019) ("Because *Gregg* and its progeny squarely foreclose Defendant's constitutional challenge to the death penalty, his Motion is denied.").

The death penalty is not categorically disproportionate or excessive under the Eighth Amendment.  *See Bucklew*, 139 S. Ct. at 1122 ("[T]he Fifth Amendment, added to the Constitution at the same time as the Eighth, expressly contemplates that a defendant may be tried for a 'capital' crime and 'deprived of life' as a penalty, so long as proper procedures are followed.  And the First Congress, which proposed both Amendments, made a number of crimes punishable by death.").  Controlling precedent aside, Purkey's disproportionality argument ignores the severity of his crimes, the lives he quite literally destroyed, and the irreversible impact of his conduct on Jennifer Long's mother, her father, and her community.  (T. Tr. Vol. XI at 1402-06.)  As the Supreme Court reminds us, "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to [her] family."  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  It is important not to lose sight of the fact that Purkey actively schemed to spend life in federal prison, so anything short of the death penalty

could hardly be viewed as punishment.  The Government submits, and twelve of Purkey's peers agreed, that any sentence other than death would be disproportionate.

The death penalty is not per se unreliable.  (Purkey Pet. at 182-83.)  *See Kansas v. March*, 548 U.S. 163, 198-99 (2006) (Scalia, J., concurring).  There is no conceivable issue with the reliability of the death penalty in this case.  Purkey does not dispute that he murdered Jennifer Long,[17] and none of his arguments raised here or elsewhere cast legitimate doubt on his guilt of the crime of conviction.

The death penalty is not per se arbitrary, as Purkey contends.  (Purkey Pet. at 183.) *See Gregg*, 428 U.S. at 195 ("[T]he concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."). There was nothing arbitrary about the process by which Purkey himself was convicted and sentenced.  Moreover, "[a]nytime a decisionmaker has discretion, facially similar cases are going to turn out differently because every case is unique. . . . The fact that the government

---

[17]Purkey testified at trial:

Q    So you raped her?

A    I raped her.

            *        *        *

A    . . . I yanked the knife out of her hand and the next thing I know is her and I was laying on the floor ten or twelve feet from the weight bench. I stabbed her several times and she's dead and I'm sitting there on the floor with her.

(T. Tr. Vol. VII at 68, 71.)

is selective in seeking the death penalty and juries are even more careful in applying it isn't an argument against it." *United States v. Briseño*, No. 2:11-cr-00077-PPS, 2015 WL 163526, at *4 (N.D. Ind. Jan. 12, 2015).

Finally, Purkey's argument that the "death penalty causes excessive delays and results in cruel conditions of confinement" (Purkey Pet. at 191) is meritless. *See Thompson v. Secretary for Dept. of Corr.*, 517 F.3d 1279, 1283 (11th Cir. 2008) ("Petitioner can identify no case in which the Supreme Court has held that prolonged confinement on death row violates a prisoner's constitutional rights."). The delays inherent in executing capital sentences are typically directly attributable to the processes initiated by capital defendants themselves. *See United States v. Fell*, 224 F. Supp. 3d 327, 344 (D. Vt. 2016) ("It is fair to say that the delay is generally the result of searching examination of the cases on appeal and, especially, on collateral review"). Purkey's description of the conditions of confinement at USP-Terre Haute (Purkey Pet. at 191-92) is difficult to reconcile with his account of his own experiences, which include regular meetings with a Buddhist monk, phone calls with his daughter, making gifts for his grandchildren, "practicing Zen, corresponding with his family and pen pals, or practicing Spanish." (Purkey Pet. at 78-81.)

In sum, Purkey's facial challenge to the constitutionality of the death penalty cannot overcome controlling precedent and must be denied.

**G.     Claim 7 - *The Categorical Exemption from Capital Punishment Does Not Extend Beyond Intellectual Disability as Held in* Atkins v. Virginia.**

Mirroring arguments made, and rejected, in other federal death penalty habeas petitions, Purkey claims for the first time that mental illness categorically exempts him from capital punishment.  As an initial matter, the claim is procedurally defaulted because Purkey did not raise it at trial or on appeal.  In addition, this identical claim has been rejected by every court to consider the claim.

*1.     Claim 7 Is Procedurally Barred.*

This claim is procedurally defaulted because Purkey has identified no reason that would enable him to fit within the saving clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation.

Furthermore, even assuming he could demonstrate that § 2255 is inadequate or ineffective, Purkey has never raised this claim before and would be required to show "cause" and "prejudice" so as to excuse the default. *United States v. Frady*, 456 U.S. 152, 170 (1982).  The cause and prejudice standard requires Purkey to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by

each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Id.* at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1993); *Frady*, 456 U.S. at 166. The only other exception—actual innocence—does not apply to this claim because it does not purport to establish that he is innocent of the crime.

This precise issue, and procedural posture, was also raised and rejected in *Runyon v. United States*, 228 F. Supp. 3d at 648. *See also Gabrion*, No. 1:15-cv-447, 2018 WL 4786310, at *97 (W.D. Mich. Oct. 4, 2018) ("Gabrion's claim is both meritless and procedurally defaulted"). In *Runyon*, the petitioner was tried and convicted of a capital murder under the FDPA. He was sentenced to death, and on collateral appeal claimed that he was severely mentally ill, and that sentencing him to death violated the Eighth Amendment's ban on cruel and unusual punishment. *Id.* He claimed, as does Purkey, that his attorneys were ineffective for not raising the claim, and that such ineffectiveness is its own constitutional claim, as well as cause to excuse procedural default. The court disagreed, holding:

> As the court finds the claim to extend *Roper* and *Atkins* has no merit, the Petitioner has failed to show a reasonable probability of success had counsel presented this argument at trial or on appeal. Further, appellate counsel was not deficient, as this argument is not stronger than any brought on appeal, and trial counsel was not deficient for choosing to forego a claim that is not based on any existing constitutional grounds. Accordingly, the Petitioner is unable to show ineffective assistance of counsel, and this claim is both procedurally defaulted and without merit. Claim Fourteen is DENIED.

*Id.* at 649. The claim should also be denied as procedurally barred.

-107-

Purkey's claim is also *Teague* barred.  Collateral relief is limited to claims based on established law. *Teague*, 489 U.S. at 310.  A petitioner cannot receive habeas relief "unless reasonable jurists hearing the claim at the time the conviction became final would have felt compelled by existing precedent to rule in his favor." *Graham*, 506 U.S. at 467 (internal quotation marks omitted); *see also Saffle*, 494 U.S. at 487 (holding the Court generally would "neither announce nor apply" a new rule on collateral review).  In view of *Teague* and its progeny, lower courts may not grant collateral relief based on their own newly-announced rules. *See Caspari v. Bohlen*, 510 U.S. 383, 390-396 (1994); *see also Petrovich v. Leonardo*, 229 F.3d 384, 387 (2d Cir. 2000) (holding *Teague* bars this Court from "announc[ing] a new rule [that is] not dictated by precedent"); *Lackey v. Scott*, 28 F.3d 486, 490 (5th Cir. 1994) (holding "acceptance of [the petitioner's] claim would require this Court to announce a new rule of constitutional law . . . . foreclosed [under *Teague*]"). The Teague bar applies unless the new rule substantively limits criminal liability or falls within a small set of "watershed" doctrines that implicate the fundamental fairness of a criminal proceeding. *Cousins*, 455 F.3d at 1126 n.6 (citing *Schriro v. Summerlin*, 542 U.S. 348 (2004)).

Purkey's *Atkins* extension claim is also not properly brought under 28 U.S.C. § 2241 pursuant to this Court's recent decision in *Fulks v. Krueger*, No. 2:15-cv-00033-JRS-MJD, 2019 WL 4600210 (S.D. Ind. Sep. 20, 2019).  In *Fulks*, this Court found that the petitioner's claim that his alleged mental illness is "functionally equivalent to one who is intellectually disabled and the corresponding argument that *Atkins* should be extended to cover such persons" was not properly brought under § 2241.  This Court first found that because the

petitioner was "challenging the constitutionality of his sentence" under the Eighth Amendment, his claim "falls within § 2255(a), [and] he must meet the requirements of the Savings Clause to proceed under § 2241." *Fulks*, 2019 WL 4600210, at *9.  This Court ultimately held that "Mr. Fulks does not point to any federal court that found the Savings Clause met in a remotely analogous case. . . .  Accordingly, Mr. Fulks' claims are barred by the Savings Clause, and the Court cannot reach the merits of them in this § 2241 proceeding." *Id*. at *16.  The *Atkins* extension claim *Fulks* made, and which was rejected by this Court, is identical to Purkey's request here and this Court should likewise also reject application of 28 U.S.C. § 2241 as a vehicle to have his claim heard.

### 2. *Claim 7 Is Contrary to Firmly Established Law.*

Purkey cites no law that supports his claim that the "Eighth Amendment categorically prohibits a death sentence for people who, like Mr. Mr. [sic] Purkey, suffer from severe mental illness." (Purkey Pet. at 193.)  Rather, as his sole legal support to extend the categorical exemptions enunciated in *Atkins* and *Roper*, Purkey cites to *State v. Kahler*, 410 P.3d 105, 128 (Kan. 2018).  *Kahler*, however, specifically rejected the arguments Purkey now makes.  *See Kahler*, 410. P.3d at 128 (quoting *State v. Kleypas*, 382 P. 3d 373 (Kan. 2016) ("We, therefore, deny his Eighth Amendment categorical proportionality challenge and conclude the Eighth Amendment does not categorically prohibit the execution of offenders who are severely mentally ill at the time of their crimes").  In addition to attempting to use contrary authority in support of his petition, Purkey also relies upon American Bar Association Reports as well as other social science papers which have been uniformly rejected by federal courts.

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental illness as a *per se* bar to execution. *See Mays v. Stephens,* 757 F.3d 211, 219 (5th Cir. 2014) (holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme Court's exemptions from execution for the mentally retarded and minors, but that "it has not yet ruled out the execution of persons who kill under a mental illness"); *Runyon v. United States,* 228 F. Supp. 3d 569, 649 (E.D. Va. 2017); *Gabrion v. United States*, No. 1:15-cv-447, 2018 WL 4786310 (W.D. Mich. Oct. 4, 2018). In addition, many state high courts have also acknowledged the lack of a bar against imposing the death penalty on the severely mentally ill, and absent meeting the criteria for insanity, courts generally have permitted application of the death penalty against defendants with serious mental illness. *See Runyon*, 228 F. Supp. 3d at 649 (collecting cases). Indeed, in *Atkins*, the Supreme Court expressly limited its holding to the mentally retarded. *Atkins*, 536 U.S. at 320 ("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue to face the threat of execution.").

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate from capital punishment those with mental illness for the first time by this Court. *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, *23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded

persons and minors to person with mental health issues based on 'evolving standards of decency'" ).  Indeed, Purkey points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution.  *See id.* ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent." (internal quotations omitted)); *Roper*, 543 U.S. at 563 (holding same).

The clearest and most reliable objective evidence of contemporary values is the laws enacted by the country's legislatures.  *Atkins*, 536 U.S. at 312.  For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending.  *Id.* at 315.  Here, however, Purkey has not cited, and the Government has not found, a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, of course, those who satisfy the time-tested defense of insanity.  Although the government is aware that bills have been proposed in several jurisdictions establishing a categorical exemption, no such legislation has actually been passed into law.  Even the death penalty abolitionist organization the Death Penalty Information Center (DPIC) candidly acknowledges that there "is no categorical ban on the execution of people with mental illness." *See* https://deathpenaltyinfo.org/policy-issues/mental-illness, last accessed Sept. 13, 2019.

Courts considering the issue have also uniformly rejected Purkey's claim for a new constitutional rule categorically exempting the mentally ill from capital punishment.  The

wave of post-*Atkins* authority from state courts demonstrates that the national consensus is against an absolute bar to capital punishment for the mentally ill. *See State v. Kahler,* 410 P.3d 105, 128 (Kan. 2018); *People v. Hajek*, 324 P.3d 88, 173-74 (Cal. 2014) (holding serious mental illness does not necessarily negate moral responsibility for killing and declining "to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence" ); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity. . . .  and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), abrogated in part on other grounds by *Darling v. State*,

45 So.3d 444 (Fla. 2010); *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations");  *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).  The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the times of their crimes. *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E. 2d 454 (Ind. 2005).

Purkey's attempt to create a new categorical exemption for mental illness for the first time on habeas appeal also mirrors tactics that have been raised by other capital habeas petitioners, and been rejected by federal courts. *See Gabrion*, No. 1:15-cv-447, 2018 WL 4786310 (W.D. Mich. Oct. 4, 2018); *Runyon*, 228 F. Supp. 3d at 649; *Anderson v. Kelley*, __ F.3d __, No. 17-2456, 2019 WL 4280360, at *9 (8th Cir. Sept. 11, 2019); *see also United States v. Madison*, 337 F. Supp. 3d 1186, 1199 (M.D. Fla. Oct. 10, 2018) ("The

Court is bound to apply the law as written, and currently, the Eighth Amendment does not exclude individuals with severe mental illnesses and serious brain damage from the death penalty. The motion is denied.").

In *Gabrion*, the petitioner argued for the first time on collateral appeal that he was seriously mentally ill and, therefore, categorically exempt from a capital sentence. He argued that the logic of *Atkins v. Virginia* and *Roper v. Simmons* "should be extended to offenders who are 'mentally ill' or 'severely mentally ill.'" *Gabrion*, 2018 WL 4786310, at *95. The District Court rejected the argument, holding:

> Gabrion's argument falters on many levels. First, he has not offered any evidence of a consensus against the execution of criminally responsible individuals who may suffer from mental illness, "as expressed . . . by the enactments of legislatures that have addressed the question." *See id*. He does not point to any state laws that exclude such individuals from the death penalty. Instead, he cites a resolution by the American Bar Association (ABA) . . .
>
>             \*             \*             \*
>
> Furthermore, in the Court's own judgment, the death penalty is not automatically an excessive punishment for all criminally responsible people who have some form of mental illness. Here, the Court "considers whether the challenged sentencing practice serves legitimate penological goals." *Graham v. Florida*, 560 U.S. 48, 67, 130 S.Ct. 2011, 176 L. Ed. 2d 825 (2010). Retribution and deterrence are legitimate goals for the death penalty.
>
>             \*             \*             \*
>
> The Government also asserts that this claim is procedurally defaulted because Gabrion did not raise it at trial or on appeal, and he has not alleged "cause" and "prejudice" to excuse his default. *See United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L. Ed. 2d 816 (1982). Gabrion does not respond to this assertion in his reply, and does not contend that he qualifies for the "actual innocence" exception to procedural default. Accordingly, Gabrion's claim is both meritless and procedurally defaulted.

*Id.* at 96-97.  Accordingly, Purkey's petition should be denied as meritless and procedurally barred.  *See also Runyon*, 228 F. Supp. 3d at 649 ("After evaluating the decisions by both federal and state courts that have chosen not to extend *Roper* and *Atkins*, this court finds it inappropriate to extend the holdings or the reasoning in *Atkins* and *Roper* to defendants with severe mental illness, absent Supreme Court authority.").

Most recently, in *Anderson v. Kelley,* the Eighth Circuit rejected the habeas petitioner's attempt to create a new categorical exemption to the death penalty for defendants with serious mental illness.  The court also rejected the petitioner's attempt to excuse his procedural default by claiming that the claim was "novel."  The Eighth Circuit found that the "tools were available to the petitioner to construct the legal argument" at the time of his original appeal.  *Anderson*, 2019 WL 4280360, at *28.  The court found that the tools to claim a mental illness categorical exemption were available to petitioner after the Supreme Court's decision in *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Atkins v. Virginia*, 536 U.S. 304 (2002), were announced.  The Government notes that Purkey's trial was not commenced until well after the *Atkins* decision, and almost two decades after the Supreme Court's *Ford* decision.

### 3.    *Other Remedies Were Available.*

Of course, individuals with severe mental illness are not without recourse. Congress has clearly defined and federal courts have for years applied a defense for the legally insane. "It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C.

§ 17(a).  Mental disease or defect does not otherwise constitute a defense. *Id*. A defendant bears the burden of proving the defense of insanity by clear and convincing evidence. 18 U.S.C. § 17(b). Should a capital defendant satisfy the elements of the insanity defense, that defendant may not only avoid capital punishment, but criminal responsibility altogether. *See* 18 U.S.C. § 4242. Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.

Furthermore, Purkey was able to present mental health information in mitigation at his capital trial, and the jury was able to consider such information.  The jury was able to consider Purkey's mitigation claim that he "committed the offense under severe mental or emotional disturbance."  (Dkt. 23-37 at 94.)  The jury was able to consider his claim that he "suffered brain injuries as a result of car accidents, drug abuse, or both." *Id*.  The jury was able to consider his claim that he "suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents, Jack and Velma Purkey."  *Id*.  The jury was able to consider his claim that he "suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother Velma Purkey."  *Id*.  Consequently, his petition should be denied.

**H.      Claim 8 – *Trial Counsel Was Not Ineffective in Filing A Motion to Suppress, or in Dealing With Collateral Issues Related to the Suppression Motion.***

Claim 8 of Purkey's § 2241 petition raises the argument that one of his trial attorneys, Fred Duchardt, instructed Purkey to "lie" during the suppression hearing and admit that he had forcibly abducted the victim, Jennifer Long, across state lines, and then failed to file a motion in limine to prevent the Government's use of that testimony at trial

to impeach Purkey's assertion that Long willingly accompanied him to his home in Lansing, Kansas. (Purkey Pet. at 202-20.) Not only is this claim barred but the record is also devoid of any evidence to support it.

1.      *Claim 8 is Procedurally Barred.*

As the Government has repeatedly emphasized throughout this response, this is a claim of ineffectiveness of trial counsel that could and should have been raised in Purkey's motion under 28 U.S.C. § 2255. Since it was not, it cannot be raised for the first time in a petition under 28 U.S.C. § 2241. Although it is clear that these allegations, even if true, would not justify a successive motion under § 2255(h), Purkey's inability to meet the gatekeeping requirements of this subsection does not make the remedy afforded by § 2255 "inadequate or ineffective" within the meaning of § 2255(e).

2.      *There is No Evidence to Support this Claim.*

Even if this claim had been presented in Purkey's § 2255 motion, it would not entitle him to relief, and for a variety of reasons. First of all, the record is devoid of any evidence that Duchardt instructed Purkey to lie at the suppression hearing or coached him to "falsely" admit that he had forcibly kidnapped Long, thereby sabotaging the only viable defense that Purkey had to the federal kidnapping charge. In fact, the record of the suppression hearing showed that Duchardt was completely blindsided by Purkey's admission, and immediately went into full damage-control mode, objecting to the Government's questions and incorrectly suggesting to the court that the Government could not use that admission to impeach his client's testimony at trial. (Dkt. 23-40 at 238-40.)

-117-

In addition to claiming or hypothesizing – without any support in the record – that Duchardt foolishly instructed his client to commit perjury at the suppression hearing, Purkey also asserts in his petition that Duchardt exacerbated his duplicity by failing to file a motion in limine to prevent the Government from using Purkey's admission to impeach his testimony at trial. As Purkey correctly notes in his petition, after Purkey repeatedly testified at trial that the 16-year-old Long willingly accompanied him from Kansas City, Missouri, to his home in Lansing, Kansas, the Government impeached him with his suppression-hearing testimony, where he testified to the contrary, and referred to that admission during its closing argument. (Dkt. 23-37 at 66; 23-37 at 69-70; 23-40 at 233.)

But contrary to what Purkey speculates in his petition, nothing in the record supports his preposterous suggestion that Duchardt instructed Purkey to "lie" at the suppression hearing, and foolishly affirm the statements he made to an FBI agent and a detective with the Wyandotte County, Kansas Sheriff's Department, in which he admitted forcibly transporting the victim from Missouri to Kansas. Such a tactic, as Purkey acknowledges, would have wholly undermined his defense that Long willingly accompanied him to his home in Lansing, Kansas.

Purkey speculates that Duchardt might have told Purkey to lie in the misguided hope that the Government would follow through with its supposed promise not to seek the death penalty in Purkey's case—a promise the Government denied throughout the entire case, including during the suppression hearing. (Purkey Pet. at 217-18.) But since it is clear from the record that Duchardt realized that an admission by Purkey that he forcibly transported Long to his Kansas residence could be used to impeach Purkey's trial

-118-

testimony, and since he also was aware that there was no reasonable probability that the Government would take the death penalty off the table, Purkey's claim that he lied at the suppression hearing because of Duchardt's advice – at least as he purportedly "understood" it (Purkey Pet. at 211)[18]—is simply preposterous, and is contradicted by the record.

It should suffice to say that, except for Purkey's belated claims, made for the first time in his § 2241 petition, that he "understood" Duchardt's advice was to lie at the suppression hearing, the record is devoid of any evidence to support this ridiculous, self-contradictory claim.  And the burden of proof in an action under § 2241 is on Purkey.  *See Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009).  As previously noted, the only reasonable inference from the record is that Duchardt was completely blindsided when Purkey admitted, during the suppression hearing, that he had forcibly abducted Long across state lines, and did his best to try to salvage the situation.  However, once the cat was out of the bag, there was little he could do to "rehabilitate" Purkey except to get him to reaffirm at trial that Long had willingly accompanied him to his home in Lansing.

As Purkey candidly concedes in his petition (Purkey Pet. at 208-09), his co-counsel, Laura O'Sullivan, did her best to rehabilitate Purkey on redirect examination, when she got Purkey to suggest that he was merely acknowledging what he had said to police in his earlier statements, and did not mean to admit at the suppression hearing that he had actually

---

[18]Purkey asseverates in his petition that he "understood Mr. Duchardt to mean that the best chance of securing a life-sentence plea offer was to be cooperative and persist in original statements made to law enforcement that he kidnapped Jennifer Long" without actually quoting or even paraphrasing what Duchardt supposedly said to him. (Purkey Pet. at 211.)

kidnapped Long.  (Dkt. 23-40 at 233-34.)  In fact, she asked him on redirect examination, "And there's no doubt that you lied to the police when you said that you kidnapped Jennifer Long, right?" – to which Purkey unhesitatingly answered, "No doubt at all."  (Dkt. 23-40 at 234.)

Although Purkey repeatedly complains that his trial attorneys were ineffective in failing to do a better job of rehabilitating him, it is clear that they did the best they could under extremely difficult circumstances.  Purkey faults them for not allowing him to explain why, during his suppression testimony, he attested to the truth of his admissions to kidnapping Long, but it is not clear from the record what that explanation would have been.  As the Government has previously emphasized, Purkey's proposed explanation—that Duchardt told him to lie—makes no sense whatsoever and is contradicted by the record.

Quite simply, the record is clear that Purkey caught his attorneys off guard at the suppression hearing by admitting the obvious truth—that he had kidnapped Jennifer Long—and once that admission was on the record, the defense was stuck with it.  Although Purkey, citing *United States v. Simmons*, 390 U.S. 377 (1968), argues that his attorneys were ineffective in failing to seek to exclude his suppression-hearing admissions at trial, *Simmons* merely holds that the Government cannot use a defendant's suppression-hearing testimony in the prosecution's case-in-chief; it does not preclude the use of such testimony to *impeach* a defendant's trial testimony.  *Simmons*, 390 U.S. at 394 (holding "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial *on the issue of guilt*") (emphasis supplied).

-120-

In *United States v. Salvucci*, 448 U.S. 83, 93-94 (1980), the Supreme Court reserved the question whether *Simmons*, which was decided 12 years earlier, precludes the use of a defendant's testimony at a suppression hearing to *impeach* his testimony at trial.  The Court noted, however, that a number of courts to consider the question had held that such testimony is admissible as evidence of impeachment.  *Id.* at 94 & n.8 (citing *Gray v. State*, 403 A.2d 853, 858 (Ct. Spec. App. 1979) (noting that nothing in *Simmons* precludes use of defendant's testimony at suppression hearing for purpose of impeachment at trial); *People v. Sturgis*, 317 N.E.2d 545, 547-48 (1974) (same); *People v. Douglas*, 136 Cal. Rptr. 358, 363 (Cal. 1977) (defendant's testimony at suppression  hearing was admissible for impeachment purposes because defendant took the stand in his trial and testified in a manner inconsistent with his pretrial testimony)).  *See generally Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury."); *United States v. Kahan*, 415 U.S. 239, 243 (1974) ("the protective shield of *Simmons* is not to be converted into a license for false representations").

Although neither the Supreme Court nor the Seventh or the Eighth Circuits has definitively ruled on this issue, every federal circuit to have considered this question has held that a defendant's testimony at a suppression hearing may be used to impeach his testimony at trial.  *United States v. Smith*, 940 F.2d 710, 713 (1st Cir. 1991); *United States v. Jaswal*, 47 F.3d 539, 543-44 (2d Cir. 1995); *United States v. Beltran-Gutierrez*, 19 F.3d 1287, 1289-91 (9th Cir. 1994); *United States v. Quesada-Rosadal*, 685 F.2d 1281, 1283

(11th Cir. 1982) (same); *see also United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001) (suggesting same).

In his petition, Purkey attempts to analogize his situation to that of *Armstrong v. Kemna*, 534 F.3d 857, 865 (8th Cir. 2008), where a defendant's attorney was found to have been ineffective for failing to subpoena three key out-of-state defense witnesses, simply because he was unfamiliar with the statute that governed the procedure for securing the attendance of those witnesses. (Purkey Pet. at 216.) However, in this case, it is clear that Purkey's attorneys understood that case law from both federal and state courts allowed the Government to use Purkey's suppression-hearing statements to impeach his trial testimony. Thus, making such an objection would have been an exercise in futility.

It is not ineffectiveness of counsel for an attorney to refrain from making a meritless objection or argument. *See Lafler v. Cooper*, 566 U.S. 156, 167 (2012) ("Because the objection upon which his ineffective-assistance-of-counsel claim was premised was meritless, [petitioner] could not demonstrate an error entitling him to relief."); *see also Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.")

In this case, the defense's initial strategy was to attempt to suppress Purkey's statements to authorities by showing that they were obtained in reliance upon an unkept promise not to seek the death penalty. To make that case, they needed Purkey to testify at the suppression hearing. It is clear that his attorneys—particularly Duchardt—were taken by surprise when Purkey unexpectedly acknowledged that the entirety of his prior statements were truthful, since they reasonably expected that he would deny forcibly

kidnapping Long.  However, once he blurted out what the jury ultimately determined was the truth, Purkey's attorneys' hands were tied.  Although they did the best they could to rehabilitate him, and to ensure that the jury knew that Purkey still was maintaining that he had not kidnapped Long, once Purkey testified otherwise at the suppression hearing, they faced an uphill battle.  And they certainly had no legal basis for preventing the Government from impeaching Purkey with his suppression-hearing admissions, notwithstanding *Simmons*.

Purkey argues that, had his attorneys not mishandled the issue, there was a reasonable probability that the jury might have found that he did not kidnap Long.  However, he admitted to authorities that he had kidnapped her, and it was abundantly clear from the record that he retracted that admission only to avoid the possibility of receiving the death penalty.  In other words, even if Purkey's attorneys could or should have done more to "rehabilitate" him on this issue, there is no reasonable probability that the jury would have acquitted him on the utterly implausible theory that Long had voluntarily accompanied him to his Kansas residence.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal prosecution if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

Purkey cannot overcome the "strong presumption" that his attorneys' conduct fell within the wide range of reasonable professional assistance, or that his attorneys' handling of this issue "might not be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted).  Accordingly, this claim would not have entitled Purkey to relief even if it had been raised in his § 2255 motion.

## IV.
## Purkey is Not Entitled to a Stay

**A.**     *Purkey Has No Possibility of Success on the Merits of His Claims.*

As demonstrated above, Purkey cannot overcome the procedural bars to his claims, and even if he could, his claims are utterly without merit.  He argues the *Martinez-Trevino* doctrine is the "something more" he needs in order to proceed with his petition.  As shown above, the doctrine does not apply to his case.

**B.**     *The Irreparable Harm Prong Must Be Considered in Context.*

Purkey cites to the Seventh Circuit's decision in *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995), for the proposition that "[t]here can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury."  *Williams* does contain that language, but also qualifies the "irreparable "harm" prong by continuing:

> Nevertheless, as Justice White, writing for the Court in *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983), made clear, "stays of execution are not automatic pending the filing and consideration of a petition for a writ of certiorari."  It is necessary that the applicant establish that there is a reasonable probability that four members of the Court will vote to grant certiorari and that five members of the Court will vote to reverse the judgment of the Court of Appeals. *Id.*  In a second or successive habeas appeal, we must be especially circumspect in assessing the merits of the applicant's case. We must determine that there are "substantial grounds" upon which relief may be granted.

*Williams*, 50 F.3d at 1360.  Following its analysis, including the irreparable harm prong, the Seventh Circuit denied the petitioner's motion for a stay of execution. *Id.* at 1361.

Significantly, courts of appeals have rejected the argument that the equities favor a stay because a defendant will suffer irreparable harm if executed, whereas the state will only suffer a minimal inconvenience.  *See Bowles v. Desantis*, 934 F.3d 1230 (11th Cir.

2019).  Those courts have recognized that the state, the victim, and the victim's family also have an important interest in the timely enforcement of the defendant's sentence.  *Id.* (citing *Brooks v. Warden*, 810 F. 3d 812, 825 (11th Cir. 2016)); s*ee also Moran v. Burbine*, 475 U.S. 412, 426 (1986) (courts must recognize "society's compelling interest in finding, convicting, and punishing those who violate the law"); *Timberlake v. Buss*, No. 1:06-cv-1859-RLY-WTL, 2007 WL 1280664, at *9 (S.D. Ind. May 1, 2007) (same).  In fact, as a district court in the Southern District of Indiana has noted, the Supreme Court has emphasized "two critical factors in evaluating whether a stay of execution should issue: (1) whether the inmate has delayed unnecessarily in bringing the claim; and (2) whether the inmate shows a significant probability of success on the merits."  *Timberlake*, 2007 WL 1280664, at *5.  *See also Gomez v. United States Dist. Ct.*, 503 U.S. 653, 654 (1992) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief.").

## C.    *Purkey Has Not Diligently Pursued His Claims.*

Purkey states he has moved diligently in pursuing his claims.  But he waited until the Department of Justice set an execution date to file this petition.  Although the Eighth Circuit affirmed the denial of his § 2255 motion in 2013, Purkey apparently began his second post-conviction investigation in 2016, as shown by his appendices.  Purkey has submitted as appendices to his current motion declarations that were prepared in 2007 and 2008 and were attached to his original § 2255 motion and supplement.  (Dkt. 23-7 at 32; 23-10 at 1; 23-12 at 1; 23-13 at 65; 23-13 at 67; 23-13 at 69; 23-37 at 60; 23-37 at 73; 23-39 at 16; 23-39 at 49.)  Other declarations were signed in 2016.  (Dkt. 23-13 at 54; 23-13

at 58; 23-13 at 80, 86, 91; 23-20 at 33; 23-38 at 34; 23-40 at 92, 95, 98, 103.)  Purkey was examined by two doctors in 2016 who wrote their reports later.  (Dkt. 23-8 at 1; 23-16 at 84.)  Some declarations were signed in 2017.  (Dkt. 23-7 at 23; 23-10 at 9; 23-13 at 74; 23-14 at 26; 23-14 at 29; 23-21 at 6; 23-36 at 1; 23-37 at 335; 23-38 at 40.)  Two declarations were signed in 2018 (Dkt. 23-36 at 23; 23-36 at 28) and one in 2019 (Dkt. 23-5 at 22.)

Purkey thus conducted the majority of his second post-conviction investigation in 2016 and 2017 which was still years after his § 2255 motion was denied, and then waited even longer - until an execution date was set, before filing this petition.  Had Purkey believed there was any merit to his claims, he would have filed them sooner and not used this petition as a delaying tactic.  The balance of harm is thus not in Purkey's favor.  *See Nelson v. Campbell*, 541 U.S. 637, 649 (2004).

### D.      *Public Interest Weighs in Favor of Enforcing the Law.*

As argued earlier in this response, all of Purkey's claims are procedurally barred and substantively lack merit.  Most of Purkey's claims have been litigated and affirmed on appeal.  There is no public interest in continuing to delay the execution of Purkey's sentence in order to relitigate the same claims.  The State has a "strong interest in proceeding with its judgment."  *Id.* (quoting *Gomez v. United States District Court for the Northern District of California*, 503 U.S. 653, 654 (1992)).

# V.
## Conclusion

For the foregoing reasons, Purkey's petition for habeas corpus and motion for stay

should be denied with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   */s/Brian P. Casey*
KATHLEEN D. MAHONEY
BRIAN P. CASEY
Special Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri  64106
Telephone:  (816) 426-3122
Fax:  (816) 426-3126
E-mail:  Kate.Mahoney@usdoj.gov
            Brian.Casey@usdoj.gov

*Attorneys for Respondent*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was electronically filed and provided to all counsel of record this 27th day of September 2019.

Rebecca E. Woodman
6155 Oak Street, Suite C
Kansas City, Missouri  64113

Michelle M. Law, Assistant Federal Public Defender
901 St. Louis Street, Suite 801
Springfield, Missouri  65806

*/s/ Brian P. Casey*
Brian P. Casey
Special Assistant United States Attorney