# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

**WESLEY IRA PURKEY**,                )
                                       )
                   Petitioner,         )
                                       )       CIVIL ACTION
         vs.                           )
                                       )       Case No.: 2:19-cv-414
**WARDEN OF USP TERRE HAUTE**,         )
**UNITED STATES OF AMERICA**           )       DEATH PENALTY CASE
                                       )       EXECUTION SCHEDULED
                                       )       FOR DECEMBER 13, 2019
                   Respondents.        )
_____

## REPLY TO GOVERNMENT'S RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR STAY OF EXECUTION
_____

Rebecca E. Woodman                    Michelle M. Law
Attorney at Law, L.C.                 Assistant Federal Public Defender
1263 W. 72nd Ter.                     Western District of Missouri
Kansas City, Missouri 64114           901 Saint Louis Street, Suite 801
Telephone:  (785) 979-3672            Springfield, Missouri 65806
Email: rewlaw@outlook.com             Telephone: (417) 873-9022
                                      Facsimile:  (417) 873-9038
                                      Email: michelle_law@fd.org


Dated: October 28, 2019


*Counsel for Petitioner*

# TABLE OF CONTENTS

I.    This Court, and only this Court, is the proper venue for this case....................1

    A.    Seventh Circuit law is binding on this Court's determination of
          whether the savings clause provides an available remedy.......................2

    B.    Remedy by motion under § 2255 is inadequate or ineffective to
          test the legality of Mr. Purkey's conviction or sentence .........................2

    C.    Initial-review post-conviction counsel's failure to present the
          defaulted ineffective assistance of trial counsel claims does not
          preclude the invocation of the savings clause .............................................9

    D.    The Seventh's Circuit decision in *Lombardo* does not diminish this
          Court's obligation to follow existing Seventh Circuit precedent
          establishing that the nature of § 2255 post-conviction review
          involves the precise circumstances requiring the application of the
          *Martinez-Trevino* doctrine ...........................................................................12

    E.    United States Supreme Court law controls the merits of Mr.
          Purkey's ineffective assistance of counsel claims ...................................15

II.   Trial counsel and § 2255 counsel were constitutionally ineffective
      for failing to challenge Juror 13, whose name is Jennifer, and who was
      selected to serve on Mr. Purkey's jury despite, and without any questioning
      about, her disclosure on her juror questionnaire that she was the victim of an
      attempted rape when she was 16 years old, where the underlying facts
      of the crime charged against Mr. Purkey alleged that he raped a
      16-year-old girl named Jennifer (CLAIM 1).........................................................16

III.  Trial counsel was constitutionally ineffective in failing to investigate,
      develop and present readily available, compelling mitigating evidence
      to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth,
      and Fourteenth Amendments (CLAIM 2)...............................................................29

    A.    Trial counsels' failure to conduct an adequate mitigation
          investigation is directly attributable to the substitution of a
          uniquely unqualified investigator in place of a qualified
          mitigation specialist as part of the defense team.....................................30

i

B.     Trial counsel was ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction ..................... 32

C.     Trial counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime ......................................................... 45

IV.   Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief (CLAIM 3) .............. 51

V.    Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment (CLAIM 4) ........................... 61

VI.   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death (CLAIM 5) ...................................................................... 64

VII.  Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true ...................................... 65

VIII. Mr. Purkey is entitled to a stay of execution ........................................................ 69

REQUEST FOR RELIEF ........................................................................................... 71

CERTIFICATE OF SERVICE ................................................................................. 73

**I.     This Court, and only this Court, is the proper venue for this case.**

In an apparent attempt to persuade this Court that Mr. Purkey has an

illegitimate reason for bringing his claims in this Court as opposed in his district of

conviction, Respondent suggests that seeking relief in this Court is improper. R. 49

at 35, 48-49. However, Respondent concedes that Mr. Purkey cannot satisfy the

requirements for filing a second or successive motion in his district of conviction.

*Id.* at 36, 49. Respondent further recognizes that under 28 U.S. § 2255(e), when

remedy by motion under § 2255 is inadequate or ineffective to the test the legality

of a prisoner's detention, the prisoner may seek relief under § 2241. *Id.* at 37.

Respondent's argument is meritless. Mr. Purkey's request for relief under §§

2255(e) and 2241 is due only to the inadequacy and ineffectiveness of § 2255 to

address his defaulted claims. In these circumstances, Mr. Purkey has no choice but

to file his petition in this Court: "The venue requirement in § 2241 is different from

the venue requirement in § 2255: while an action under the latter must be brought

in the district of conviction, a petition under § 2241 *must* be brought in the district

of incarceration." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (emphasis

added); *see also Rumsfeld v. Padilla*, 542 U.S. 426 (2004) (noting that there is only

one proper respondent to a habeas petition: the person who has custody over the

petitioner); *Webster v. Daniels*, 784 F.3d 1123, 1144 (7th Cir. 2015) (en banc)

(explaining that *Rumsfeld* held that the one and only proper venue for a § 2241

petition is the petitioner's district of incarceration). As Mr. Purkey has turned to §

2241 only as a result of the inadequacy and ineffectiveness of § 2255 to address his

substantial but defaulted claims, and because § 2241 requires Mr. Purkey to file his

petition in the district of incarceration, this Court should reject any contention

suggesting that Mr. Purkey improperly sought relief in this Court.

**A. Seventh Circuit law is binding on this Court's determination of whether the savings clause provides an available remedy.**

Respondent does not dispute that this Court must apply Seventh Circuit law

to determine whether the savings clause provides an available remedy to Mr.

Purkey. Mr. Purkey agrees that that this Court must apply Seventh Circuit law to

determine whether the savings clause provides an available remedy to Mr. Purkey.

Because this Court lies in the Seventh Circuit, decisions of the Seventh Circuit are

binding on this Court. *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

**B. Remedy by motion under § 2255 is inadequate or ineffective to test the legality of Mr. Purkey's conviction or sentence.**

As mentioned above, Respondent concedes that remedy by motion under §

2255 does not provide an avenue for relief for Mr. Purkey's claims, including his

defaulted ineffective assistance of trial counsel claims that no court has ever

reviewed. R. 49 at 36, 49. Thus, the parties agree that Mr. Purkey cannot assert

these defaulted claims under § 2255.

Despite this concession, Respondent nonetheless contends that Mr. Purkey has not shown that § 2255 is inadequate or ineffective under existing precedent. R. 49 at 37. Respondent recognizes that the Seventh Circuit has identified at least three kinds of circumstances in which § 2255 is "inadequate and ineffective" to test the legality of a petitioner's detention: (1) claims asserting that changes in statutory interpretation render the prisoner's conviction or sentence unlawful, (2) claims in which § 2255 does not now and has never provided an adequate avenue for testing the petitioner's present challenge to the legality of his sentence, and (3) claims involving newly discovered evidence demonstrating that a petitioner is categorically and constitutionally ineligible for the death penalty. R. 49 at 38-42. Respondent then posits that because the claims in the present case are not factually similar enough to claims in prior cases establishing the inadequacy or ineffectiveness of § 2255, (in that the claims do not involve a retroactive case of statutory interpretation or newly discovered evidence of intellectual disability or could have been raised before), Mr. Purkey has not met his burden of showing that remedy by motion under § 2255 is inadequate or ineffective to test the legality of Mr. Purkey's detention. *Id.*

Respondent's argument lacks merit. Mr. Purkey's burden does not require identifying a prior case presenting the *exact* circumstances present in this case. Rather, Mr. Purkey's burden simply involves identifying the applicable rule of law

and showing how the circumstances of this case satisfy the criteria of that rule. Because Mr. Purkey has done so, he has met his burden, and he is entitled to invoke the savings clause.

The Seventh Circuit has interpreted § 2255(e)'s "inadequate or ineffective" language and identified a rule for establishing the inadequacy or ineffectiveness of § 2255—whether section 2255 allows the petitioner "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Webster*, 784 F.3d at 1136 (*quoting In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)). Based on its review of Seventh Circuit precedent regarding § 2255's savings clause, the *Webster* court found that "that there must be some kind of structural problem with section 2255 before section 2241 becomes available." *Id*. "In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Id*.

Here, structural problems with § 2255 prevent Mr. Purkey from presenting his defaulted ineffective assistance of trial counsel claims. Although these claims challenge the fundamental legality of his conviction or sentence, they do not fit within § 2255's criteria for a second or successive petition. Mr. Purkey therefore cannot obtain a judicial determination of them via a § 2255 motion. Thus, as in each of the cases cited by Respondent as examples of situations in which § 2255 is

inadequate or ineffective, *Webster* and *Garza* and *Davenport*, the operation of the successive petition rules absolutely prevent Mr. Purkey from now having an opportunity to raise these challenges to the legality of his sentence.

Mr. Purkey's case shares another characteristic of each of these cases: an intervening decision recognizing a right that did not exist at the time of the AEDPA's enactment (as well as the petitioner's initial 2255 proceedings).[1] In this case, the intervening decisions include several United States Supreme Court cases and Seventh Circuit cases involving the *Martinez-Trevino* doctrine:

(1) the Supreme Court decision in *Martinez* establishing that where initial-review collateral proceedings provide the first occasion for a petitioner to raise an ineffective assistance of trial counsel claim, courts must hear substantial—though procedurally defaulted—constitutional claims of ineffective assistance of trial counsel if the petitioner can establish that counsel in the initial-review collateral proceeding caused the default by providing ineffective assistance, *Martinez v. Ryan*, 566 U.S. 1, 9-10, 17 (2012);

---

[1] In *Davenport*, the United States Supreme definitively ruled that the conduct for which the petitioner was convicted and imprisoned was not an offense under the relevant statute, and the remedy under § 2255 was "inadequate or ineffective" to test the legality of the petitioner's detention in light of the new Supreme Court ruling. *Davenport*, 147 F.3d at 610; *see also Webster*, 784 F.3d at 1138 (recognizing the import of the intervening decision addressed in *Davenport*). In *Garza*, the Inter-American Commission on Human Rights ruled that the introduction of evidence of uncharged murders in Mexico violated the petitioner's rights under the American Declaration of the Rights and Duties of Man, and the

(2)    the Supreme Court decision in *Trevino* holding that, under the

principles of *Martinez*, courts can excuse procedural default even in a

jurisdiction that does not require ineffective assistance claims to be raised on

initial collateral review, *Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013);

(3)    decisions of the Seventh Circuit recognizing that the structure of §

2255 places a federal petitioner in the same situation analyzed in *Trevino*,

*Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015) (("[T]he federal

courts have no established procedure . . . to develop ineffective assistance

claims for direct appeal," so "the situation of a federal petitioner is the same

as the one the Court described in *Trevino*."); *id.* at 854 (same); *Brown v.

Brown*, 847 F.3d 502, 509-10 (7th Cir. 2017) (noting that the *Martinez-

Trevino* doctrine applies to federal prisoners who bring motions for post-

conviction relief under § 2255); *Adams v. United States*, 911 F.3d 397, 411

(7th Cir. 2018) (concluding that the district court erred in finding that a

petitioner has no ability to challenge the effectiveness of his § 2255

counsel); and

(4)    the Seventh Circuit's recognition that *Martinez* and *Trevino* have

expanded a federal petitioner's ability to challenge the effectiveness of

§ 2255 counsel and the Seventh Circuit's application of the *Martinez-

Trevino* doctrine to 2255 cases, *see*, *e.g.*, *Ramirez*, 799 F.3d at 848

(concluding that in *Martinez* and *Trevino*, "the Court significantly changed its approach to claims of ineffective assistance of counsel at initial-review collateral proceedings."); *Adams*, 911 F.3d at 411 (concluding that the district court erred in finding that a petitioner has no ability to challenge the effectiveness of his § 2255 counsel and explaining that *Martinez* and *Trevino* "have changed how courts should view claims of ineffective assistance of counsel at initial-review collateral proceedings.").

Prior to the *Martinez* and *Trevino* decisions and the Seventh Circuit decisions recognizing that the *Martinez-Trevino* doctrine applies to § 2255 cases, Mr. Purkey did not have any right to obtain a judicial determination of claims that his initial post-conviction counsel failed to raise in his initial § 2255 proceeding. Now he does have that right. Under the *Martinez-Trevino* doctrine, § 2255 counsel's failure to present substantial claims of ineffective assistance of trial counsel does not bar Mr. Purkey from now presenting them. *See Ramirez*, 799 F.3d at 848; *Adams*, 911 F.3d at 411.

This right is not inconsequential or trivial. *Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added). It stems from the constitutional right to counsel, which "is the foundation for our adversary system." *Id*. "The right to the effective assistance of counsel at trial is a bedrock

principle in our justice system." *Id.* Violations of this right impermissibly affect the reliability of judicial proceedings. *Strickland*, 466 U.S. at 696 (explaining that "guiding inquiry" in effective assistance of counsel cases is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

However, like the inadequacy and ineffectiveness of § 2255 demonstrated in *Davenport*, *Garza*, and *Webster*, the structure of § 2255 absolutely prevents Mr. Purkey from testing the legality of his detention in light of his unadjudicated ineffective-assistance-of-trial-counsel claims. Because the ineffective assistance of initial-review post-conviction counsel prevented resolution of these claims during the initial-review post-conviction proceedings and because Mr. Purkey now (for the first time) has a right to judicial review of these claims, Mr. Purkey has not had "a *reasonable* opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Webster*, 784 F.3d at 1136 (emphasis added). Moreover, particularly because no court has ever heard these claims and the claims center on the reliability of his conviction or sentence, Mr. Purkey has not had "a reasonable opportunity to obtain a *reliable* judicial determination of the fundamental legality of his conviction and sentence." *Id.* (emphasis added). Thus, § 2255 is inadequate or ineffective to test the legality of

Mr. Purkey's detention, and the savings clause of § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims.

### C. Initial-review post-conviction counsel's failure to present the defaulted ineffective assistance of trial counsel claims does not preclude the invocation of the savings clause.

Respondent argues that the fact that Mr. Purkey—if he had been represented by effective counsel during his initial post-conviction review proceedings—could have raised the defaulted ineffective assistance of trial counsel claims in his initial post-conviction review proceedings now prohibits Mr. Purkey's invocation of the savings clause. R. 49 at 40. Respondent further contends that *Martinez* and *Trevino* are inapposite because Purkey is a federal prisoner and not a state prisoner. R. 49 at 46.

The problem with these arguments is two-fold: (1) the very purpose of the application of the *Martinez-Trevino* doctrine is to adjudicate ineffective assistance of trial counsel claims that erroneously were omitted from initial post-conviction review due to the ineffectiveness of initial post-conviction counsel, and (2) the Seventh Circuit applies the *Martinez-Trevino* doctrine to § 2255 cases (involving federal prisoners).

First, if the Supreme Court were not concerned about a prisoner's ability to test the reliability of his conviction or sentence in light of erroneously omitted claims asserting a violation of the right to counsel, then the Court would have

decided *Martinez* and *Trevino* in the opposite way. Instead, the court recognized the importance of both (1) the right to counsel and (2) a prisoner's opportunity for adjudication of previously omitted right-to-counsel claims. *Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added). Because the right to counsel is the foundation of our adversary system and violations of that right undermine the reliability of convictions or sentences obtained in violation of that right, the Court determined that courts must not bar substantial—but defaulted—claims alleging abridgment of the right to counsel. *Id.* at 12, 17. Otherwise, the Court explained, initial-review collateral counsel's failure to raise such a claim would "deprive a defendant of any review of that claim at all." *Trevino*, 569 U.S. at 423.

Second, the Seventh Circuit applies the *Martinez-Trevino* doctrine to all federal prisoners who bring motions for post-conviction relief under § 2255. In *Ramirez*, the court stated:

> The question is whether [*Martinez* and *Trevino*] apply to some or all federal prisoners who bring motions for postconviction relief under section 2255. We already have answered this in the affirmative, in *Choice Hotels Intern., Inc. v. Grover,* 792 F.3d 753 (7th Cir.2015), where we wrote that "[a]lthough *Maples* and *Holland* [*v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) ] were capital cases, we do not doubt that their holdings apply to all collateral litigation under 28 U.S.C. § 2254 or § 2255." *Id.* at 755. A closer look

at the issue convinces us that this position was correct.

*Ramirez*, 799 F.3d at 852. In so holding, the court specifically rejected the

Government's argument contending that the *Martinez-Trevino* doctrine applies

only to state prisoners and not federal prisoners:

> Neither *Martinez* nor *Trevino* suggested that, for these purposes, the difference between sections 2254 and 2255 was material. What does matter is the way in which ineffective assistance of counsel claims must be presented in the particular procedural system. This varies among the states, and between the states and the federal system, but we already have explained why in the great majority of federal cases, ineffectiveness claims must await the first round of collateral review. Moreover, if review were to be more restricted on either the state or the federal side, federalism concerns suggest that it would be the state side. Most of the rules that govern petitions under section 2254 are mirrored in section 2255, including importantly the procedure for handling second or successive petitions. We can think of no reason why *Martinez* and *Trevino* should be read in the way the government advocates.

*Id.* at 854.

Subsequently, in *Brown*, the Seventh Circuit noted that it applies "the

*Martinez-Trevino* doctrine to federal prisoners who bring motions for post-

conviction relief under § 2255." *Brown*, 847 F.3d at 509-10. In *Adams*, the Seventh

Circuit found that the district court erred in concluding that a petitioner has no

ability to challenge the effectiveness of his § 2255 counsel and explained that

*Martinez* and *Trevino* "have changed how courts should view claims of ineffective

assistance of counsel at initial-review collateral proceedings." *Adams*, 911 F.3d at

411. Because the Seventh Circuit applies the *Martinez-Trevino* doctrine to § 2255

proceedings, and because the *Martinez-Trevino* doctrine specifically authorizes consideration of claims that initial post-conviction should have raised but did not due to ineffectiveness, neither the fact that Mr. Purkey is a federal prisoner nor the fact that the defaulted post-conviction claims were not presented during the initial-review § 2255 proceedings precludes the invocation of the savings clause. On the contrary, the fact that the claims previously were not presented but should have been justifies the invocation of the savings clause to now allow Mr. Purkey a reasonable opportunity to obtain a judicial determination of the fundamental legality of his conviction and sentence. *See Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added); *Trevino*, 569 U.S. at 423 (justifying judicial review of defaulted claims of ineffective assistance of trial counsel because initial-review post-conviction counsel's failure to raise such a claim would have "deprive[d] a defendant of any review of that claim at all.").

Under the above authorities, Respondent's argument has no merit. The savings clause of § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims.

> **D.    The Seventh's Circuit decision in *Lombardo* does not diminish this Court's obligation to follow existing Seventh Circuit precedent establishing that the nature of § 2255 post-conviction review involves the precise circumstances requiring the application of the *Martinez-Trevino* doctrine.**

Respondent contends that this Court should not apply the *Martinez-Trevino* doctrine in this case because the Seventh Circuit has not "extended" the doctrine to equitable tolling cases. R. 49 at 43. Respondent relies on *Lombardo v. United States*, 860 F.3d 547 (7th Cir. 2017), as support for this position. R. 49 at 43-45.

Respondent's position lacks merit because it overlooks a critical difference between the application of the *Martinez-Trevino* doctrine to defaulted post-conviction claims versus its application to equitable tolling cases. In the equitable tolling context, both the Supreme Court and the Seventh Circuit have held that that the specific type of error at issue in *Lombardo*—Lombardo's attorney's miscalculation of the statute of limitations deadline—does not justify equitable tolling relief. *Lombardo*, 860 F.3d at 557 (explaining that the petitioner's argument "runs headlong" into Supreme Court precedent holding "that attorney negligence, such as miscalculating a filing deadline, does not constitute an extraordinary circumstance for the purposes of equitable tolling."); *id.* at 558 (explaining that the Seventh Circuit already has squarely addressed this precise scenario and "held that errors identical to that of Lombardo's counsel do not constitute extraordinary circumstances, even when the petitioners wished to assert ineffective-assistance-of-trial-counsel claims in the first instance."). This difference explains why Seventh Circuit was free to apply the *Martinez-Trevino* doctrine in *Ramirez* but not in *Lombardo*: "*Ramirez* did not have to contend with the longstanding precedent in

the equitable tolling context holding that this sort of error by counsel does not

justify equitable tolling." *Lombardo*, 860 F.3d at 559.

Here, unlike *Lombardo*, there is no longstanding Supreme Court or Seventh

Circuit precedent establishing that the *Martinez-Trevino* doctrine does not apply to

§ 2255 counsel's failure to raise substantial post-conviction claims. On the

contrary, the precedent establishes that the nature of § 2255 review presents the

precise circumstances requiring the application of the doctrine. As the Seventh

Circuit has explained, in light of *Martinez* and *Trevino*, what "matter[s] is the way

in which ineffective assistance of counsel claims must be presented in the

particular procedural system." *Ramirez*, 799 F.3d at 853. The Seventh Circuit

further concluded that, in the federal system, the way such claims must be

presented requires the application of the doctrine:

> Because the federal courts have no established procedure . . . to
> develop ineffective assistance claims for direct appeal, the situation of
> a federal petitioner is the same as the one the Court described in
> *Trevino*: as a practical matter, the first opportunity to present a claim
> of ineffective assistance of trial or direct appellate counsel is almost
> always on collateral review, in a motion under section 2255.

*Id.*; *see also Brown*, 847 F.3d at 509-10 (affirming that the Seventh Circuit applies

the *Martinez-Trevino* doctrine to federal prisoners because the procedural system

of § 2255 review presents the same situation that the Supreme Court analyzed in

*Trevino*).

14

Thus, unlike the equitable tolling context of *Lombardo*, longstanding precedent does not preclude the application of the *Martinez-Trevino* doctrine to the defaulted claims in this case. Rather, existing precedent requires application of the doctrine. This Court must follow that precedent. *Glaser*, 14 F.3d at 1216 (explaining that decisions of the Seventh Circuit are binding on district courts of the Seventh Circuit).

### E.   United States Supreme Court law controls the merits of Mr. Purkey's ineffective assistance of counsel claims.

Respondent contends that if this Court reaches the merits of Mr. Purkey's defaulted claims, this Court should apply the law of the circuit of conviction instead of the circuit of incarceration. R. 49 at 49. If this Court applies Seventh Circuit law, Respondent warns, this Court will "reward and encourage the kind of forum shopping that § 2255 was designed to prohibit." R. 49 at 50. Respondent further cautions that this Court's decision applying Seventh Circuit law to the merits of Mr. Purkey's claims may permit Mr. Purkey or a future prisoner to exploit a circuit split. See *id.*

Mr. Purkey's position is that, due to the nature of Mr. Purkey's defaulted claims, this Court need not decide whether Eighth Circuit or Seventh Circuit law is controlling. The claims at issue are ineffective assistance of trial counsel claims. In *Strickland*, the United States Supreme Court established the governing standard for ineffective assistance of counsel claims. *Wiggins v. Smith*, 539 U.S. 510, 521

(2003) ("We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984)."). *Strickland* also established that these principles apply in federal collateral proceedings. *Wright v. West*, 505 U.S. 277, 302 (1992). Given that the United States Supreme Court has established the governing standards for ineffective assistance of counsel claims in *Strickland* and its progeny, and given that the decisions of the United States Supreme Court are binding on all lower courts, *Strickland* and its progeny provide the controlling law for these claims. Thus, this Court need not answer the choice of law question Respondent posits.

Moreover, by recognizing that United States Supreme Court law controls the merits of the defaulted claims, this Court will avoid the forum shopping concerns the Respondent raises. Similarly, this Court's recognition that United States Supreme Court controls will remove any potential of Mr. Purkey (or any future prisoner relying on this Court's decision) exploiting a circuit split.

**II.** **Trial counsel and § 2255 counsel were constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer (CLAIM 1)**

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring his new claims in this Petition, and those arguments are incorporated but need not

be repeated here. *See* Section I. Under applicable *Martinez/Trevino* doctrine, a defaulted claim of ineffective assistance of trial counsel can be brought if the claim is substantial and the default was due to the ineffective assistance of initial-review postconviction counsel. A "substantial" ineffective assistance claim is one that has "some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's claim that trial counsel was constitutionally ineffective for failing to question Juror 13 regarding actual bias and failing to move to strike her for cause based on implied bias. Section 2255 counsel themselves admit that they completely missed Juror 13's disclosure of being an attempted rape victim at age 16, and therefore, "as an equitable matter," the initial-review postconviction proceeding was "not . . . sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. Thus, § 2255 counsel's own ineffectiveness establishes cause for the default, allowing for full merits review of Mr. Purkey's substantial claim of ineffective assistance of trial counsel.

Among the most essential responsibilities of defense counsel is to protect his or her client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense. *See Miller v. Francis*, 269 F.3d 609 (6th Cir. 2001). The primary purpose of *voir dire* is to make possible the empaneling of an impartial jury through *questions* that permit the

*intelligent exercise of challenges* by counsel.  *See Rosales-Lopez v. United States*, 451 U.S. 182 (1981)(*voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored)(emphasis added) *and United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)(citing *Swain v. Alabama*, 380 U.S. 202 (1965), the principle way in which the Sixth Amendment right to an impartial jury is guaranteed is through the system of challenges exercised during *voir dire* of prospective jurors).  Mr. Purkey argues that trial counsels' *voir dire* performance was constitutionally ineffective resulting in the abrogation of Mr. Purkey's Sixth Amendment right to a fair and impartial jury, based on the undisputed fact that trial counsel asked Juror 13 not one single question regarding her questionnaire disclosure that at age 16, she was the victim of an attempted rape, even though the facts of Mr. Purkey's case included the rape of a 16 year-old girl.  Trial counsels' abject failure to question Juror 13 regarding her questionnaire disclosure of being the victim of attempted rape, resulted in a situation where the answer to the question of whether she was actually bias *in light of her personal experience as a crime victim* was unknown, thus proscribing the intelligent exercise of challenges by trial counsel.

In response to Mr. Purkey's claim that trial counsel was constitutionally ineffective for failing to question Juror 13 regarding actual bias in light of her questionnaire disclosure that mirrored the facts of Mr. Purkey's case, and failure to

move to strike her for cause based on implied bias, Respondent makes three main arguments.  First, Respondent argues trial counsel was not constitutionally ineffective because strategic reasons existed for trial counsel's failure to question Juror 13 about her questionnaire disclosure, and that in any event, trial counsel obtained Juror 13 general assurance of impartiality. Second, Respondent argues that trial counsels' *voir dire* performance cannot be constitutionally inadequate because at the time of Mr. Purkey's trial, Eighth Circuit law regarding juror implied bias was unsettled, and trial counsel's decisions made in the context of unsettled law can never be professionally unreasonable.  Third, Respondent argues that Mr. Purkey's claim should fail because he was not prejudiced by trial counsels' failure to question Juror 13 about her attempted rape experience. Respondent does not address post-conviction counsels' failure to raise claims related to Juror 13 bias in Mr. Purkey's § 2255 petition filed in the Western District of Missouri other than to argue that Mr. Purkey is procedurally defaulted because post-conviction counsel failed to raise a claim concerning the issue.

Although Respondent argues that the law regarding juror *implied bias* was unsettled in the Eighth Circuit at the time of Mr. Purkey's trial, the failure to question a juror regarding *actual bias* was at the time of Mr. Purkey's trial, and is today, ineffective assistance of counsel absent the showing of sound trial strategy. *United States v. Lathrop*, 634 F.3d 931, 937 -38 (7th Cir. 2011); *Cage v.*

*McCaughtry*, 305 F.3d 625, 627 (7th Cir. 2002); and *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992)(cases cited by Respondent, Dkt 49, p. 55). Respondent, accuses Mr. Purkey of speculation for concluding that trial counsel missed Juror 13 questionnaire disclosure, but nevertheless engages in speculation to argue that trial counsel had strategic reasons for not asking a single question of Juror 13 regarding her disclosure, and argues that in any event, Mr. Purkey's claim must fail because Juror 13 affirmed through general questioning that she could be fair and impartial.  Dkt. 49, p. 55, 57.  Respondent's proffered strategic reasons, in addition to being speculative, are not objectively reasonable as is required to survive an ineffective assistance of counsel claim.  *See Strickland* at 681.  Further, Juror 13's general assurances of impartiality were not made in the context required to assure impartiality, because trial counsel did not ask Juror 13 whether she could be fair and impartial *despite* her experience that mirrored the facts of Mr. Purkey's case.

Despite the strong presumption that defense counsel's decisions are guided by sound trial strategy, it is not sufficient for counsel to merely articulate a reason for an act or omission alleged to constitute ineffective assistance of counsel – the trial strategy itself must be objectively reasonable.  *See Strickland* at 681.  The word "strategy" is not a trial lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness – the strategy must be within the range of logical

choices an ordinarily competent attorney would assess as reasonable to achieve a specific goal.  *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001).

Mr. Purkey argues that trail counsel missed Juror 13's disclosure and consequently, trial counsel could not form a sound trial strategy for bypassing questions regarding actual bias at the time of trial.  Respondent is dismissive of Mr. Purkey's argument that trial counsel must have completely missed Juror 13 disclosure, and therefore did not ask questions regarding actual bias, calling this conclusion "mere speculation."  Dkt. 49, p. 55. Mr. Purkey's argument is not speculative, however, because one of Mr. Purkey's trial lawyers admits that the issue was missed, and the trial record supports this conclusion.

In her declaration dated May 3, 2017, Laura O'Sullivan, one of Mr. Purkey's trial lawyers, concedes that Juror 13's disclosure was missed because she and co-counsel Fred Duchardt "looked over" the jury questionnaires together at his office, and Juror 13's disclosure was never mentioned.  See generally Dkt. 23-36, p. 1 - 7. She states that "she would have remembered this information about Juror 13 is she had seen it, given how similar the disclosure was to the facts of Mr. Purkey's case. She doesn't believe Fred Duchardt noticed it because "he never mentioned it, nor did he raise it during voir dire."  Further, according to Ms. O'Sullivan, if she had known about Juror 13 disclosure, she would have wanted to make sure that Juror 13 did not sit on the jury, and she believes the trial judge may have agreed and

would have sustained a challenge for cause given the facts of Mr. Purkey's case.
The fact that it wasn't brought to the trial judge's attention by any party, further
substantiates Mr. Purkey's claim that trial counsel missed Juror 13's disclosure.

Respondent criticizes Ms. O'Sullivan's declaration regarding Juror 13,
calling her declaration statement "long-after-the-fact," "ill-informed" and
"motivationally suspect."  Dkt. 49, p. 58. Ms. O'Sullivan's declaration regarding
Juror 13's disclosure, is however, nothing more than an admission that based on
what she now knows, a mistake was made at the time of trial by not pursuing
disqualification of Juror 13 based on her questionnaire disclosure, and that she was
unaware of the mistake until Juror 13's disclosure was more recently brought to
her attention.  The fact that Ms. O'Sullivan's statement was first made long after
trial is merely proof that those involved in Mr. Purkey's trial and 2255 proceedings
did not notice the issue.  Her statement is more informed now that it has ever been
because she now knows of Juror 13's disclosure.  And perhaps most importantly,
her motivation is not suspect because she is admitting a mistake, not trying to
cover it up.

But as Respondent dismisses Mr. Purkey's substantiated conclusion that trial
counsel missed Juror 13's disclosure, it engages in speculation to proffer a reason
for why trial counsel might want Juror 13 to serve on the jury.   Respondent
speculates that trial counsel wanted Juror 13 on the jury," because she disclosed

that the most important cause of crime was "bad parenting" a sentiment they argue is consistent with Mr. Purkey's mitigation claim of parental abuse, which was his "defense." Dkt. 49, p. 55. This response mischaracterizes mitigation evidence as a trial defense, and ignores that Mr. Purkey has a Sixth Amendment right to a fair and impartial jury during both the guilt and penalty phase of a capital trial. But most importantly, Respondent does not explain why their proffered justification might outweigh the risk associated with actual bias, a risk never ascertained because Juror 13 was never asked about bias associated with her real-life experience as attempted rape victim at age 16.

Respondent also argues that trial counsel may not have questioned Juror 13 because he did not want to emphasize the sexual abuse aspect of the case. This head-in-the-sand theory fails for three reasons. First, it is simply not logical that trial counsel could do anything to avoid the obvious sexual assault aspect of the case – it simply could not be downplayed. Second, trial counsel had no reservations about discussing child sexual assault with Venireperson 103, a venireperson he questioned in front of other venirepersons and ultimately moved to strike based on her strongly held feeling that any adult who violates a child does not deserve to live. Dkt. 23, p. 110. Third, and perhaps most significantly, if trial counsel truly wanted to avoid emphasizing the sexual assault aspects of the case by questioning Juror 13 about her experience in front the entire panel, he had the

opportunity to employ individual *voir dire* to question Juror 13 pursuant to a

procedure he advocated in a pretrial motion entitled "Request and Proposed

Procedure for Attorney-Conducted, Small Group Voir Dire Upon Penalty Phase

Issues and Certain Other Selected Matters." Dkt. 23, p. 109 - 110.  In the request,

trial counsel wrote:

> Questions regarding details of publicity, or other private matters,
> would be taken up individually, at the end of the small group process,
> out of the hearing of other members of the group.  This would insure
> that other members of the panel would not hear any private or
> prejudicial matters which might be contained in individual answers to
> such questions.

Dkt. 23-37, p. 327.  In the pretrial motion, trial counsel noted that this proposed

procedure was "precisely the same as those which this Court employed in the case

of *United States v. Haskell*, et al, Case Number 00-395-01-CR-W-FJG, tried before

this very court in 2002," thus establishing that the option for individual *voir dire*

for private or sensitive matters was a standard of practice in death penalty jury

selection.  Dkt. 23-37, p. 326.

Trial counsel's failure to utilize this standard of practice to question Juror 13

outside the presence of the venirepanel further substantiates that trial counsel

overlooked Juror 13's questionnaire disclosure – otherwise, why wouldn't he have

utilized the very process he advocated?  Strategically, there was nothing to lose by

utilizing individual *voir dire* to question Juror 13 about actual bias in light of her

childhood experience, and no proffered strategic reason for not asking her about

actual bias can overcome this fact. Trial counsel's failure to follow this practice

standard is further evidence of his constitutional ineffectiveness.

Respondent also argues that trial counsel's failure to question Juror 13 about

her attempted rape questionnaire disclosure is inconsequential because trial counsel

obtained general assurances of impartiality through his questions. Dkt. 49, p. 56 –

57. Once again, Respondent's argument misses the mark because Juror 13 general

assurances give little insight to whether she could be fair and impartial *despite* her

childhood experience that mirrors the facts of Mr. Purkey's case. The requirement

of an impartial jury is met only when the prospective juror has given final,

unequivocal assurances deemed credible by the judge, that for the purposes of

deciding the case, she can set aside any opinion she might hold, relinquish her

prior beliefs, or lay aside her biases *or her prejudicial personal experiences*.

*United States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2015)(emphasis added). Trial

counsel obtained no such assurances from Juror 13 because he did not ask a single

question about how her attempted rape experience might affect her impartiality,

despite having a risk-free method to do so.

Respondent also argues that trial counsels' *voir dire* performance cannot be

constitutionally inadequate because at the time of Mr. Purkey's trial, Eighth Circuit

law regarding juror implied bias was unsettled, and trial counsel's decisions made

in the context of unsettled law can never be professionally unreasonable. Dkt. 49,

p. 53.  Respondent further argues that because Eighth Circuit panel decisions were in conflict, earlier precedent must be followed and earlier panel decisions proscribe the doctrine of implied bias. Dkt. 49, p. 53 -54.

Prior to Mr. Purkey's trial, however, the Eighth Circuit held "that for habeas corpus purposes, bias may be found either by an express admission, or by proof of specific facts which show a close connection to the facts that bias is presumed. *Fuller v. Bowersox*, 202 F.3d 1053, 1056-58 (8th Cir. 2000).  Although in *Fuller*, the Eighth Circuit denied relief on the juror bias issue, it did not discount it out of hand, as Respondent asks this Court to do.  Instead, the Eighth Circuit analyzed the situation to decide the issue, and relied on decisions from other circuit courts to define the boundaries of implied bias, including the Seventh Circuit's decision in *Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992), a case not adopting a *per se* rule that courts presume bias when a juror is a victim, but holding that in rare circumstances, implied bias can be found.  *See also Smith v. Phillips*, 455 U.S. 209, 222 (1982)(O'Connor, J., concurring)(even without a showing of actual bias, prejudice may be implied in certain egregious situations).

Given how closely Juror 13's childhood experience mirrors the facts Mr. Purkey's case, Juror 13's service is an egregious situation where her bias should be presumed.  *See Gonzales v. Thomas*, 99 F.3d 989 (10th Cir. 1996)("the crux of implied bias analysis . . . is found in the examination of the similarities between the

juror's experiences and the incident giving rise to trial); *see also e.g. United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977)(bank teller presumed biased in bank robbery case) *and United States v. Torres*, 128 F.3d 38 (2nd Cir. 1997)(prospective juror's own experience with the crime of structuring rendered her unable to serve on jury because she "would be unable to divorce her consideration" of the structuring case "from her own structuring experience"). Juror 13 responded on her questionnaire that she had been the victim of an attempted rape in 1991, a year in which she was about 16 years old, the same age as the victim in Mr. Purkey's case. Dkt. 23-37, p. 303. Juror 13's experience was also connected to a court proceeding where she assisted law enforcement with the investigation of her attempted rape, and she was a prosecution witness. Dkt. 23-37, p. 303 (writing the "man who attacked me was going to court for other rapes," and "I was supenoed [sic], but they never ended up using me."). Juror 13's experience is an extreme situation where her life experience mirrors the facts of the case to the extent that it is unlikely that she could remain impartial during deliberations under the circumstances. *See Sanders v. Norris*, 529 F.3d 787, 792 (8th Cir. 2008)(explaining that Eighth Circuit law allows finding of implied bias in certain egregious situations, and that a significant number of circuits have adopted the doctrine of implied bias in extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain

impartial during deliberations).  In circumstances such as these, where Juror 13's personal experience is so similar to the victim's experience, the law should err on the side of caution to find bias.  *See e.g. United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000)(writing "the concept of implied bias in well-established in the law," examining issue in context of a juror being employed by the same office as the prosecuting attorneys trying the case, and explaining that a juror who belongs to a class presumed biased "may well be objective in fact, but the relationship is so close that the law errs on the side of caution").

Ultimately, however, if this Court is unwilling to impute bias, due process requires that at the very least, a hearing be held to determine whether Juror 13 was actually biased.  *See Smith v. Phillips*, 455 U.S. 209, 216 - 18 (1982)(writing that juror bias determinations may be properly made at a post-trial hearing); *see also Gonzales v. Thomas*, 99 F.3d 978, 985 (10th Cir. 1996)(the normal avenue of relief available to a party asserting juror bias is a post-trial hearing at which actual or, in exception circumstances, implied bias may be demonstrated).  Mr. Purkey has been deprived of a hearing on this issue because his 2255 counsel missed Juror 13's questionnaire disclosure.

Finally, Respondent argues that in any event, Mr. Purkey has not demonstrated prejudice from Juror 13's service on the jury.  The presence of a biased juror, however, is a fundamental structural defect and is outside the gamut

of harmless error analysis. *Johnson v. Armontrout*, 961 F.2d 748, 756 (8th Cir.

1992)(citing *Arizona v. Fulminate*, 499 U.S. 279 (1991)).

### III. Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments (CLAIM 2)

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring

his new claims in this Petition, and those arguments are incorporated but need not

be repeated here. *See* Section I. Under applicable *Martinez/Trevino* doctrine, a

defaulted claim of ineffective assistance of trial counsel can be brought if the claim

is substantial and the default was due to the ineffective assistance of initial-review

postconviction counsel. A "substantial" ineffective assistance claim is one that has

"some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537

U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's claim that trial

counsel failed to investigate and present readily available, compelling evidence of

Mr. Purkey's extraordinary and profound trauma history and its lifelong effects on

his mental health and behavior that would have given the jurors a compelling

picture of Mr. Purkey's life history and an accurate explanation of his constellation

of symptoms that would have resulted in at least one juror voting to spare his life.

Section 2255 counsel themselves failed to investigate and present this compelling

evidence, and therefore, "as an equitable matter," the initial-review postconviction

proceeding was "not . . . sufficient to ensure that proper consideration was given to

a substantial claim." *Id*. at 1318. Thus, § 2255 counsel's own ineffectiveness

establishes cause for the default, allowing for full merits review of Mr. Purkey's

substantial claim of ineffective assistance of trial counsel.

**A. The failure of trial and § 2255 counsel to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team**.

Respondent sidesteps this aspect of Mr. Purkey's claim by mischaracterizing

it as one alleging an abstract failure to hire a "social worker" with the title

"mitigation specialist." Rsp. at 66. That is essentially what § 2255 counsel argued.

Dkt. 23-28 at 56-64. Mr. Purkey's argument here is not abstract at all, but specific

to his case: Mr. Duchardt's decision to substitute Mic Armstrong in the role of a

qualified mitigation specialist directly contributed to trial counsel's ineffective

assistance in failing to investigate and present the full picture of Mr. Purkey's life

to the jury in his case because, in fact, Mr. Armstrong was uniquely unqualified to

conduct mitigation investigation. Section 2255 counsel never presented these facts

because they did not investigate whether Mr. Armstrong was qualified as a

mitigation investigator. Consequently, § 2255 counsel could show no prejudice

resulting from Mr. Duchardt's failure to obtain a mitigation specialist, nor could

they rebut Mr. Duchardt's affidavit claiming that Mr. Armstrong was qualified to

serve in the dual role of fact and mitigation investigator, which the evidence now

exposes as false and amounting to a fraud on the court. *See* Dkt. 23 at 146 (Claim 3).

Perhaps stemming from its mischaracterization of Mr. Purkey's argument, Respondent chooses to ignore the facts about Mr. Armstrong's gross lack of qualifications by dismissing them as "irrelevant." Rsp. at 66. On the contrary, it is highly relevant to Mr. Purkey's substantial ineffective assistance of counsel claim that Mr. Armstrong was fired from the Liberty office of the Missouri State Public Defender (MSPD) for incompetence in his job as a fact investigator only a few months after Mr. Duchardt left his own employment with the MSPD; that Mr. Duchardt originally hired Mr. Armstrong when he supervised the Liberty office, and protected Armstrong's position there for ten years despite ongoing complaints about his incompetence as an investigator from lawyers who worked directly with Armstrong in the Liberty office; that Mr. Armstrong was never a mitigation investigator either by training or experience; that Mr. Armstrong claimed in a lawsuit against MSPD for wrongful termination that he had an arrangement with Mr. Duchardt to give up his business in exchange for lifetime employment at MSPD, describing his arrangement with Mr. Duchardt as "an express contract"; that in his private practice Mr. Duchardt continued to hire Mr. Armstrong as an investigator on MSDP contract cases, and had to be told by MSPD to stop using Armstrong as an investigator on public defender cases because of his termination

31

from MSPD. Dkt. 23-36 at 205, 208, 273-274. These facts are highly relevant to Mr. Purkey's claim because Mr. Duchardt had knowledge of them, yet he held Mr. Armstrong out to the trial court as a qualified fact investigator *and* mitigation investigator in Mr. Purkey's federal death penalty case in order to obtain funding for Mr. Armstrong, when, in reality, Armstrong was neither.

As Mr. Purkey argues in his Petition, *see* Dkt. 23 at 153, the actions of Mr. Duchardt in hiring a wholly unqualified friend to play the role of mitigation specialist in Mr. Purkey's federal capital trial violated the most basic standards of competent capital representation, and was objectively unreasonable. *See Strickland v. Washington*, 466 U.S. at 688. It also prejudiced Mr. Purkey by bringing into Mr. Purkey's death penalty case the same investigative incompetence that Mr. Armstrong had shown in his work for MSPD, directly contributing to the failure to conduct a constitutionally-requisite mitigation investigation that, properly investigated, would have produced a wealth of readily available mitigating evidence that would have caused at least one juror to vote for life. *See Wiggins v. Smith*, 539 U.S. at 537; *Rompilla v. Beard*, 545 U.S. 374 (2005).

**B. Trial counsel and § 2255 counsel were ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction.**

Respondent claims -- in the face of the vast, comprehensive new evidence detailing Mr. Purkey's multi-generational family history of trauma exposure and susceptibility to mental illness and neurogenerative disease, and Mr. Purkey's own extraordinary trauma history from childhood to adulthood and its long-term consequences and effects on Mr. Purkey's mental health and behavior presented in his Petition -- that the new evidence "would barely have altered the sentencing profile" and thus is merely cumulative of the evidence presented by trial counsel at the penalty phase. Rsp. at 70, 73. Respondent relies heavily on the facts of *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010), to argue that Mr. Purkey's claim should be denied.

However, a determination of counsel's effectiveness must be grounded in the specific circumstances of the case. *Strickland*, 466 U.S. at 688. The issue before the Court in this case is whether the substantial newly discovered evidence in mitigation presented in Mr. Purkey's Petition (which Respondent goes to great lengths to avoid discussing) that both trial counsel and § 2255 counsel failed to investigate, even though it was readily available to them, establishes ineffective assistance of counsel under clearly established law of the Supreme Court. *See, e.g.*, *Strickland*, 466 U.S. 668; *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S. 374; *Sears v. Upton*, 130 S.Ct. 3259 (2010), *Porter v. McCollum*, 558 U.S. 30 (2009).

On the merits, Respondent points to the number of witnesses called by trial counsel at the penalty phase and the list of mitigating factors presented to the jury, and contends that this shows trial counsel presented "abundant evidence of Purkey's alleged abuse as a child." Dkt. 49 at 66-67. Respondent also brags that the defense "mitigation case lasted approximately three days and consumed more than 500 pages of trial transcript." Dkt. 49 at 14. However, as Respondent points out, Dkt. 49. at 67, only five of the eighteen witnesses called by trial counsel at the penalty phase even mentioned Mr. Purkey's family history, let alone any abuse he suffered, and two of those were expert witnesses Dr. Peterson and Dr. Cunningham, who were primarily focused, respectively, on providing opinions related to a mental disease or defect negating intent, and future dangerousness. The remaining lay witnesses at the penalty phase were called to provide testimony to rebut the government's statutory and non-statutory aggravating circumstances, and some of the testimony turned out to be quite damaging to Mr. Purkey on cross-examination.[2]

The record demonstrates how woefully unprepared trial counsel was in presenting even those witnesses. Mr. Duchardt notified the trial court just prior to

---

[2] For example, Mr. Duchardt called Dr. William Grant, a psychiatrist at the Federal Bureau of Prisons Medical Center in Springfield, Missouri, to testify about medications Mr. Purkey had been taking during trial, including Klonopin. Dkt. 38-1 at 28. On cross-examination, Dr. Grant testifed that the justification for Klonopin came from Dr. Peterson, not him, and stated "I think [Dr. Peterson] invoked anxiety where many of the rest of us would have invoked an attitude, belligerent, irritable attitude." Dkt. 38-1 at 37. Dr. Grant agreed with government counsel that Klonopin was being given to Mr. Purkey because of a "real anger problem." Dkt. 38-1 at 37.

the defense case-in-chief at the penalty phase that three of its witnesses for the

penalty phase had just been endorsed, and one of those witnesses, a minister at

Hutchinson State Correctional Facility, was found by the defense "literally now."

Dkt. 38-1 at 15-16. Mr. Purkey's aunt, Marguerite Hotchkiss, testified she did not

even know about the crime for which Mr. Purkey was on trial "until just a few days

ago." Dkt. 39-1 at 22. Mr. Duchardt told the trial court "[w]e have also been

throughout this process attempting to locate witnesses for this stage of the

hearing," and that "[w]e have done our best to try to put on the best case for Mr.

Purkey and we're continuing to try to find people and will continue until this case

is over with, and even beyond, to find all of the best witnesses we can." Dkt. 38-1

at 14, 16. Given the paucity of family and social history witnesses that trial counsel

actually presented at the penalty trial, Mr. Duchardt's statement was a startling if

inadvertent confirmation that the defense investigation was not only unreasonably

limited, but that they waited far too long, in some cases literally until the eve of the

penalty trial, to conduct what appears to have been a rather cursory investigation.

*See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002) ("In assessing counsel's

performance, we look to such factors as what counsel did to prepare for sentencing,

what mitigating evidence he had accumulated, what additional 'leads' he had, and

what results he might reasonably have expected from these leads").

The direct testimony of the family witnesses called by trial counsel -- Mr. Purkey's aunt Marguerite Hotchkiss, his daughter Angie Genail, and his step-brother Gary Hamilton (Purkey) -- comprises a total of twenty-one pages of transcript. Dkt. 39-1 at (transcript cites). Trial counsel elicited testimony from these three witnesses that briefly mentioned the following: at five years old Wes could not speak but would "just point to things and grunt", Dkt. 39-1 at 16; Wes stuttered, as did his father Jack Purkey and several of his father's siblings, Dkt. 39-1 at 17; Wes's mother "threw drinks in his face" once when he was stuttering, Dkt. 39-1 at 38; Wes's mother and father were alcoholics, Dkt. 39-1 at 38, 43, 44; Wes, his half-brother Gary, and their mother were frequently beaten by Jack Purkey, mostly when he was drunk, Dkt. 39-1 at 43-47; Gary was taken by his mother to bars as a young boy, where she would sexually abuse him in the bathroom, Dkt. 39-1 at 43-47; Jack Purkey suffered headaches because of a metal plate in his head, could not hold down a job, and ultimately committed suicide, Dkt. 39-1 at 16-20. The substance of their testimony was skeletal and conclusory at best, and did not even begin to present the true picture of Mr. Purkey's horrific childhood and the relentless trauma he suffered that is contained in Mr. Purkey's Petition and that would have been beneficial to the jury. Dkt. 23 at 19-88. *See Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) ("skeletal" testimony from family witness was "wholly inadequate to present to the jury a true picture of the tortured childhood

experienced by Lewis") (citing *Wiggins*); *Ainsworth v. Woodford*, 268 F.3d 868,

874 (9th Cir.) (jurors saw "only glimmers of [the defendant's] history, and received

no evidence about its significance vis-a-vis mitigating circumstances") (citations

omitted)).

Mr. Duchardt hired Dr. Peterson and Dr. Cunningham as experts to opine on

matters other than mitigating evidence. The focus of Dr. Peterson's testimony was

on the question of whether Mr. Purkey suffered from a mental disease or defect

that rendered him incapable of forming the intent to kill Jennifer Long, which was

a preliminary question the jury had to decide before it could proceed to a

consideration of aggravating and mitigating factors. Dkt. 23-37 at 90; Dkt. 41-1 at

21. Dr. Peterson testified that Mr. Purkey suffered from a mental disease or defect

at the time of the homicides of both Jennifer Long and Mary Bales. Dkt. 41-1 at

21-22.

In making his diagnosis of a mental disease or defect, Dr. Peterson

conducted no new psychological testing. Instead, he relied on his report written

three years earlier in the Mary Bales case (at the behest of other counsel), and a

competency evaluation of Mr. Purkey conducted at the United States Medical

Center in Springfield, Missouri. Dkt. 23-13 at 1-53; Dkt. 23-40 at 145. Though

during his testimony Dr. Peterson agreed with Mr. Duchardt that defense counsel

had provided him with "interview materials from those who knew about Mr.

Purkey's development and those who were involved in his life, either when he was a child, when he was an adult, or presently[,]" Dkt. 41-1 at 20, Peterson's report noted that the only additional information he was given consisted of some medical records of Mr. Purkey, much of which overlapped information that had already been compiled in the Bales matter. Dkt. 23-40 at 144. He also interviewed Mr. Purkey. Dkt. 23-40 at 144.

The record flatly contradicts Respondent's assertion that Dr. Peterson utilized "abundant family and childhood history provided by trial counsel" in forming his opinion. *See* Dkt. 49 at 75. While Dr. Peterson did recount aspects of Mr. Purkey's history of abuse in his childhood, and sexual abuse by Mr. Purkey's mother in particular, that evidence came from Mr. Purkey's self-report to Dr. Peterson, not from any investigation by defense counsel. Dkt. 41-1 at 24. This left Dr. Peterson forced to admit on cross-examination that he found no corroboration of the sexual abuse in the records he reviewed. Dkt. 41-1 at 82.

Moreover, Dr. Peterson discussed Mr. Purkey's trauma history in the context of reaching his conclusion that, because of his mental disease or defect, "Mr. Purkey did not have the capacity to form the intent to kill Jennifer Long." Dkt. 41-1 at 49-50. The only question trial counsel asked of Dr. Peterson remotely related to mitigation was whether he believed, "to a medical degree of certainty, that at the time of the killing of Jennifer Long that Wesley Purkey was suffering from a

severe mental or emotional disturbance[,]" and Peterson testified that he did. Dkt. 41-1 at 58-59.

Respondent asserts that Dr. Cunningham testified as a "mitigation specialist." Dkt. 49 at 23. He did not. Dr. Cunningham was hired by Mr. Duchardt to do a risk assessment for future dangerousness, which is his specialty, and his testimony was focused on rebutting that non-statutory aggravating circumstance. Dkt. 23-39 at 46-47; Dkt. 42-1 at 58-59. Though Mr. Duchardt later sought to abdicate responsibility for mitigation to Dr. Cunningham in his affidavit in the § 2255 proceedings, Dkt. 23-37 at 175-176, Dr. Cunningham flatly denied that he performed the work of a mitigation specialist in Mr. Purkey's case, and averred that he lacked the requisite knowledge, experience, and training of a mitigation specialist. Dkt. 23-39 at 49. He undertook no "comprehensive investigation to identify, locate, and interview persons having knowledge of Mr. Purkey's background." *Id*.

The various "mitigation themes/hypotheses and associated investigation needs" listed in the letter Dr. Cunningham wrote to Mr. Duchardt prior to trial identified "red flags" for investigation and follow-up. Dkt. 23 at 126-127; Dkt. 23-37 at 76-82. They were not mitigating evidence, but instead constituted suggested areas of potential mitigation. Had trial counsel conducted the investigation that Dr. Cunningham advised was necessary, they would have uncovered a vast trove of

readily available, non-cumulative information that would have painted a complete
and compelling picture of Mr. Purkey's extended family and social history, and
extraordinary trauma history that he presents here. Instead of investigating and
substantiating these themes, trial counsel merely had Cunningham recite them
during his testimony, without any evidence to support them, and without any
broader context in which the jury could place them, especially given that Dr.
Cunningham was testifying in rebuttal to future dangerousness, not in mitigation.
Such an investigation does not amount to "scouring the globe on the off-chance
something will turn up." Dkt. 49 at 73 (citing *Rompilla*, 545 U.S. at 383). It is
reasonable and necessary investigation of readily available mitigation evidence
based on identifiable red flags that counsel had a duty to pursue, and they failed to
do so. *Rompilla*, 545 U.S. at 391 .

Respondent places great weight on the list of mitigating factors provided to
the jury as evidence that an "abundance" of mitigating evidence was presented.
Dkt. 49 at 69. The list of mitigating factors given to the jurors, that only parrots the
glimmers of information provided to them and the uninvestigated "themes"
identified by Dr. Cunningham, hardly matters when counsel failed to investigate
and develop the background material and did not present the jury with the
information they needed to make an informed, reliable determination of whether
the death penalty should be imposed. *Ainsworth v. Woodford*, 268 F.3d 868, 877

(9th Cir. 2001). *See Strickland*, at 466 U.S. at 695; *Woodson v. North Carolina*, 428 U.S. 280, 305 (1978) (because of the qualitative difference between life imprisonment and death, "there is a corresponding difference in the need for reliability in the determination that death is an appropriate punishment"). Moreover, if, as Respondent argues, and as the § 2255 court concluded, the blank special verdict form on the mitigating factors means that no mitigating factors were found by the jury, then Respondent is hardly in a position to argue that the mitigating evidence trial counsel placed before the jury was "abundant." *See Hall v. Washington*, 106 F.3d 742, 752 (1997) (where no mitigating factors are found, "it is logically impossible for the new evidence to be 'cumulative' to something in the earlier record").

Respondent casually dismisses aspects of the new mitigation Mr. Purkey presents in his Petition and, viewing each in isolation, asserts that it adds "nothing new" to the mitigation that was presented by trial counsel. Dkt. 49 at 69. But each aspect of this new mitigating evidence provides concrete examples of Mr. Purkey's trauma experiences, symptoms and behavior exhibited across the span of his life that jurors could understand and visualize and that are characteristic of his lifelong complex PTSD.

For example, the new evidence of Mr. Purkey's childhood experience at St. Joseph's Catholic School ("St. Joe's") -- which neither trial counsel nor § 2255

counsel obtained -- is far more significant than the "nuns who were . . . mean" characterization by Respondent. Dkt. 49 at 69. Mr. Purkey's childhood classmates at St. Joe's, who were interviewed by current counsel, consistently describe the medieval-like oppression and violence that took place at the school, and how Wes was a particular target for abuse by the nuns because of his stuttering.

In one instance, even after Wes had been subjected to corporal punishment upon being accused by the nuns of starting a rumor that their BVM (Blessed Virgin Mary) Order actually stood for "Black Veiled Monster," Wes was made to stand in front of the whole school following the morning Mass and tell the students what BVM stood for. The nuns knew Wes had a stutter, and that he would struggle to enunciate the words, so it was nothing more than pointless retribution and humiliation. Wes's classmate Don Aaron recalls how painful it was to watch: "Bl Bl Bl Blessed V V V Virgin . . . The longer it went the more Wes stuttered." Dkt. 23-13 at 93. Another nun who taught Wes's class in seventh grade also singled Wes out for his stuttering. His classmate James Haggard recalls how the nun refused to believe Wes could not control his stuttering, and she called on Wes to stand at his desk and read out loud to the class more than other students. Wes, who struggled with reading to begin with, would get embarrassed and start stuttering, but his embarrassment made the stuttering worse. Wes was made to continue standing and reading even as his stuttering got worse and worse. Dkt. 23-13 at 88.

Wes was a different kind of target for the parish priest at St. Joe's, who sexually abused him over a three-year period after Wes became an alter server at St. Joe's Catholic Church. Dkt. 23-14 at 23. Rather than the "recovered memory" that Respondent appears to ridicule, Dkt. 49 at 69, Wes disclosed the abuse to his spiritual advisor, who took the time to talk to Wes about this sensitive topic after reading an autobiographical poem he had written in the past. Dkt. 23-14 at 23. Dr. Sautter describes this sexual molestation by a priest as one that elicited the most intense emotions from Wes. Dkt. 23-8 at 2; Dkt. 23-9 at 2.

The evidence of Mr. Purkey's experiences at St. Joe's adds much to illustrate the full scope of his childhood trauma and its effects on him. Instead of finding a welcome respite and refuge from the relentless violence and abuse he faced at home, St. Joe's only compounded his trauma, from which he had no escape, safety, or security. It was at this point that Wes began to turn to alcohol and drugs. *See* Dkt. 23 at 47.

Similarly, Respondent dismisses Mr. Purkey's ex-wife Jeanette's declaration containing vivid descriptions of his behavior that, when viewed in the context of his extreme trauma history, provide an understanding of that behavior as important symptoms indicative of his complex PTSD. *See* Dkt. 23-21 at 8 (describing "flashbacks" of trauma experiences). The new evidence from Michael Speakman also describes in graphic detail the behaviors of Wes while they shared a prison

cell that, seen in the context of Mr. Purkey's full trauma history, also provides

visible, concrete evidence symptomatic of his complex PTSD. Mr. Speakman not

only observed Mr. Purkey's stuttering, but he observed Mr. Purkey's startled

reactions to noise during sleep, that Mr. Purkey "got set off" when he perceived he

was being mistreated or being treated unfairly by prison administrators, and that

when that happened "[i]t was like he was a different person." The behavior would

stop as abruptly as it started. Other times, Mr. Purkey would hardly talk, and would

stare at the ceiling all day long, which Mr. Speakman says "reminds me of my son,

who is autistic." Dkt. 23-38 at 35-38. *See* Dkt. 23-9 at 3 (including, among PTSD

symptoms, "flashbacks of trauma"; "high levels of emotional stress and

physiological reactivity when exposed to trauma-reminders"; "avoidance of trauma

reminders and emotional numbing"; "presence of insomnia, irritability,

concentration problems, hyper-vigilance in addition to hyper-startle responses to

trauma-related cues").

The new evidence presented by Mr. Purkey in his Petition, never heard by

his jury, adds considerable weight to the totality of mitigating evidence. *See*

*Walbey v. Quarterman*, 309 Fed.Appx. 795, 804 (5th Cir. 2009) (unpublished) (the

mitigating evidence omitted by trial counsel "overwhelms the 'scant' evidence,

'bereft in scope and detail,' that was presented"). Had this previously undiscovered

evidence been presented to Mr. Purkey's jury, it "might well have influenced the

jury's appraisal of [the defendant's] culpability." *Williams v. Taylor*, 529 U.S. at 398. *See also Porter v. McCollum*, 558 U.S. 30, 41 (2009) (when assessing reasonable probability of a different result in context of mitigation, a court should "consider 'the totality of the available mitigation evidence -- both adduced at trial, and the evidence adduced in the habeas proceeding' -- and reweigh[] it against the evidence in aggravation") (quoting *Williams*, 529 U.S. at 397-398)).

**C. Trial counsel and § 2255 counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime.**

At the outset, Mr. Purkey is not claiming in his Petition that he is not responsible for the murder of Jennifer Long, as Respondent repeatedly suggests. *See* Dkt. 49 at 74, 78. Respondent's argument appears to be that, because evidence of Mr. Purkey's abusive childhood came in through the testimony of experts Dr. Peterson and Dr. Cunnigham, it doesn't matter if trial counsel missed the mental health "label" because they "told the story," and whatever the mental health "label," the crime Mr. Purkey committed "do[es] not fit with claims of frontal lobe impairment or mental disease relieving him of responsibility for his crimes." Dkt. 49 at 75-76, 78.

What Mr. Purkey argues is that, because trial counsel failed to conduct a thorough investigation of Mr. Purkey's life history that would have revealed the extent of his lifelong trauma, and failed to learn about the constellation of Mr.

45

Purkey's behavioral and psychological symptoms that are the long-term consequences of those experiences, trial counsel also failed to identify and engage appropriate mental health experts to reliably evaluate his trauma symptomology and explain its impact on Mr. Purkey's development, personality and behavior throughout his life and leading up to and including the crime. *See Pruitt v. Neal*, 788 F.3d 248, 275 (7th Cir. 2015) ("[T]rial counsel did not conduct a thorough investigation into Pruitt's mental health and therefore did not make 'an informed choice' about what mental health evidence to present at sentencing"). Trial counsel thus missed both the label and the story.

Mr. Purkey's trial counsel *did* focus their expert mental health testimony on the question of whether a mental disease or defect negated the intent to commit the crime. As Mr. Purkey has previously pointed out, that question is not directed at mitigation, but rather to the preliminary findings the jury was required to make about whether Mr. Purkey had the requisite mental state for the crime before even considering aggravating and mitigating circumstances in order to decide between life and death. Dkt. 23-37 at 90. The question of whether Mr. Purkey had a mental disease or defect that negated intent is a very different question than the moral choice between life or death that the jury is required to make based on an individualized consideration of mitigating circumstances. *See Penry v. Lynaugh*,

492 U.S. 302, 319, 321 (1989) (the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's mitigating evidence).

As a consequence of their uninformed decisions, trial counsel's mental health experts failed to accurately assess Mr. Purkey's underlying symptoms of PTSD, and thus could not adequately explain his traumatic exposure and describe his ongoing symptoms and behavior that could strengthen the complete mitigation story, had it been presented by counsel. *See Stephens v. McBride*, 489 F.3d 883 (7th Cir. 2007) ("Competent evidence of Stephens' mental illness would have strengthened the general mitigation evidence presented by defense counsel concerning Stevens' difficult background by focusing the jury on the concrete results of years of abuse on Stevens' psyche").

None of the mental health experts presented by trial counsel had expertise in PTSD. While Dr. Leeson testified at one point that his testing showed that Mr. Purkey's results correlated with several groups, including the "post traumatic stress disorder group," Dkt. 40-1 at 43, Dr. Leeson did not test Mr. Purkey for PTSD, and there was no follow up by trial counsel. Dr. Leeson also testified that Mr. Purkey scored high in the antisocial personality group. Dkt. 40-1 at 37.

Dr. Peterson's expert opinion, which was weakly premised on his primary diagnosis of a personality disorder not otherwise specified, came unraveled during cross-examination when he agreed with the government's characterization of Mr.

Purkey as having antisocial personality disorder, which is not a mental disease or defect, and moreover, is an aggravating, not mitigating, diagnosis. *See Walbey v. Quarterman*, 309 Fed.Appx. at 804. *See also* Dr. Kathleen Wayland and Sean D. O'Brien, *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guideline Approach to Prejudicial Psychiatric Labels*, 42 HOFSTRA L. REV. 519, 565 (2013) ("Evidence that the defendant had ASPD or psychopathy . . . fails the most basic tests of scientific knowledge. The myriad scientific, reliability, and ethical concerns about labeling a person antisocial, psychopathic, and evil cloaked as psychiatric findings should result in this evidence being excluded from the highly-charged adversarial atmosphere of capital trials"); John F. Edens, Donna M. DesForges, Crissie Fernandez and Caroline A. Palac, *Effects of Psychopathy and Violence Risk Testimony on Mock Juror Perceptions of Dangerousness in a Capital Murder Trial*, Psychology, Crime & Law 10(4) 393-412 (2004) (research indicates jurors cannot set aside terms such as "psychopathy" or "antisocial personality disorder" and fairly evaluate the evidence).

In addition, to the extent Dr. Peterson's testimony contained relevant mitigating evidence, the focus of his expert testimony on Mr. Purkey's capacity to form the requisite intent for the murder of Jennifer Long suggested that the evidence had to have a "nexus" to the crime in order for the jury to consider it. Dkt. 41-1 at 49-50, 58-59. Respondent suggests the same when it argues that "any abuse

[Mr. Purkey] suffered as a child does not excuse or mitigate the murders he committed[.]" Dkt. 49 at 78. Such a limitation on mitigation is unconstitutional. *Tennard v. Dretke*, 542 U.S. 274 (2004) (evidence of mental impairment is inherently mitigating, regardless of whether defendant has established a nexus between his mental capacity and the crime).

Under these circumstances, whatever "glimmers" of mitigation were contained in Dr. Peterson's testimony, there remained no reliable vehicle for the jury to give meaningful consideration and effect to the testimony *as mitigation* once the jury rejected the mental disease or defect defense and answered "yes" to the preliminary question of whether Mr. Purkey had the requisite intent. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) ("a 'constitutional defect' has occurred not only when a jury is precluded from even considering certain types of mitigating evidence,' but also when 'the defendant's evidence [i]s placed before the sentencer but the sentencer has no reliable mean[s] of giving mitigating effect to that evidence'") (quoting *Graham v. Collins*, 506 U.S. 461, 475 (1993)). Respondent's argument that Mr. Purkey can suffer no prejudice from the omission of the new mitigation evidence from his trial because it does not relieve him from responsibility for his crimes is without simply without merit, and unconstitutional.

As Dr. Sautter explains, the kind of high levels of traumatic stress Mr. Purkey experienced growing up actually damages the developing brain, and "the

impact of these potential abnormalities would be expected to interact with any possible traumatic brain injuries suffered by Mr. Purkey to decrease his ability to control his emotional behaviors and posttraumatic stress." App. 82 at 705. Had evidence of Mr. Purkey's frontal lobe damage been presented to the jury in this light and had counsel explained to the jury in a meaningful way that his brain damage from prior head injuries interacted with the damage resulting from his trauma history and complex PTSD to affect Mr. Purkey's behaviors over time, general mitigating evidence of Mr. Purkey's extraordinary trauma history would have been strengthened. *Stephens v. McBride*, 489 F.3d 883 (7th Cir. 2007). Because of trial counsel's failure to conduct a constitutionally adequate mitigation investigation, Dr. Leeson's conclusions about Mr. Purkey's frontal lobe damage from his prior head injuries, and the brain imaging presented by Dr. Preston, were without context. They merely showed that Mr. Purkey had brain damage, and thus likely carried little to no weight with the jury as mitigation. Without the full story of Mr. Purkey's family and social history, and the extraordinary trauma Mr. Purkey suffered growing up, trial counsel did not, and could not, make "an informed choice" about what mental health evidence to present at sentencing. *Pruitt v. Neal*, 788 F.3d at 275.

Prejudice is shown from counsel's failure to investigate and present mitigating evidence where the undiscovered mitigating evidence "might well have

influenced the jury's appraisal of [the defendant's] moral culpability." *Wiggins*, 539

U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). This inquiry is not

foreclosed even if trial counsel presented *some* mitigating evidence to the jury.

*Sears v. Upton*, 130 S.Ct. at 3266; *Porter v. McCollum*, 558 U.S. at 40-44. *See also*

*Walbey v. Quarterman*, 309 Fed.Appx at 802 ("*Williams* stands for the proposition

that counsel can be prejudicially ineffective even if some of the available

mitigation evidence is presented and even is there is psychiatric testimony").

Taking into consideration, as this Court must, the totality of the available

mitigation evidence both old and new, and reweighing it against the evidence in

aggravation, *Porter v. McCollum*, 558 U.S. at 41 (2009) (citing *Williams*, 529 U.S.

at 397-398), "there is a reasonable probability that at least one juror would have

struck a different balance of aggravating and mitigating circumstances." *Wiggins*,

539 U.S. at 537.

**IV.   Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief (CLAIM 3)**

Instead of addressing the claim presented, Respondent argues that the issue

is moot because the Eighth Circuit did not rely on Mr. Duchardt's affidavit in

finding no prejudice on the ineffective assistance of counsel claims that Mr.

Purkey's § 2255 counsel raised. Dkt. 49 at 79. The problem with Respondent's argument is two-fold. First, the Eighth Circuit's finding of no prejudice with respect to § 2255 counsel's claims was a consequence of § 2255 counsel's own failure to investigate and present the wealth of mitigating evidence that Mr. Purkey presents in this Petition. *See* Claim 2. Section 2255 counsel did not raise, and the Eighth Circuit did not consider, the claim presented here. Second, the district court substantially relied on Mr. Duchardt's affidavit in denying Mr. Purkey's § 2255 motion without an evidentiary hearing. Dkt. 23-39 at 2. The deliberate falsehoods made in the affidavit were clearly intended to deceive the district court and obtain a judgment against his former client on the ineffective assistance of counsel claims that were raised by Mr. Purkey's § 2255 counsel, which is the essence of fraud on the court. *In re Bressman*, 874 F.3d 142, 152 (3rd Cir. 2017). That claim is not moot.

Federal courts have inherent equitable power to remedy a fraud on the court. *In re Bressman*, 874 F.3d at 149 (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 248-249 (1944)). Respondent, citing *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969), argues that a fraud on the court claim "must be raised in the court that rendered the judgment in the first place -- in this case, the Western District of Missouri." Dkt. 49 at 83. However, *Taft* only held that a motion under Rule 60(b) to set aside a judgment for fraud on the court had to be

brought in the court that rendered the original judgment. However, in *Hadden v. Rumsey Products*, 196 F.2d 92 (2nd Cir. 1952), it was held that a New York court had jurisdiction over an independent action to obtain equitable relief from an Ohio judgment that plaintiff was attempting to register and enforce against defendants in New York where they resided. Here, given the fact that Mr. Purkey is incarcerated in the Southern District of Indiana, and defendants, also residents of the Southern District of Indiana, are seeking to enforce a judgment against Mr. Purkey from the Western District of Missouri by executing him, this Court has jurisdiction over Mr. Purkey's equitable action to obtain relief from the judgment for Mr. Duchardt's fraud on the court.

Moreover, to the extent that Mr. Purkey's claim can be deemed defaulted because it was not raised in his § 2255 proceedings, the default is due to the ineffective assistance of his § 2255 counsel. Under the *Martinez/Trevino* doctrine, itself an equitable remedy, and applicable here for the reasons set forth in Section I, § 2255 counsel's ineffective assistance establishes cause for the default. Fraud on the court by Mr. Purkey's own trial counsel, intended to interfere with the administration of justice in his § 2255 proceedings, is an egregious breach of duty to his former client and should be construed as equivalent to *per se* ineffective assistance of counsel, especially when Mr. Duchardt's fraud extended back to his budget requests to the trial court. *See* Dkt. 23 at 153-154. Duchardt's fraud on the

53

court thus undermines the fairness and reliability of the proceedings both at Mr. Purkey's trial and on his § 2255 motion. *See Strickland*, 466 U.S. at 687. There can be no question that this claim is a substantial one that deserves encouragement to proceed further. *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

Respondent fares no better on the merits. For instance, Respondent argues that Mr. Duchardt's statement in his affidavit that § 2255 counsel had interposed no objection was not a lie because "at the time the statement was written, counsel had apparently not objected." Dkt. 49 at 83. This is an absurd argument in light of the fact that Mr. Duchardt sent a draft of his statement to § 2255 counsel before sending it to government counsel *asking if they had any objection*. Counsel *did* object, and communicated that objection by email to Mr. Duchardt. Dkt. 23-39 at 7. There is no evidence whatever, and Mr. Duchardt never claimed, that he did not receive counsel's email, and Duchardt had plenty of opportunity to correct his affidavit before it was submitted the district court in the § 2255 proceedings.

Respondent further argues "nothing shows that [Mr. Duchardt] received or read the email before he sent the affidavit to government counsel." Dkt. 49 at 83. Even if that was true, it does not help Respondent because it only shows that Mr. Duchardt did not bother to wait for a response from § 2255 counsel before sending his affidavit to government counsel, and that his giving § 2255 counsel an

opportunity to object was thus nothing more than a sham. Indeed, § 2255 counsel

Teresa Norris interpreted Mr. Duchardt's manner of giving "notice" of his affidavit

to her "as a way for him to be able to say that notice was given, without giving me

any actual opportunity to lodge the objections he surely should have expected to

come." Dkt. 23-37 at 341. It was only fortuitous that Ms. Norris happened to be

sitting in front of her computer and email when Duchardt sent the affidavit to her,

and "[s]hortly after I first saw the affidavit -- I mean within brief minutes of just a

first skim -- I conveyed to Mr. Duchardt that I vehemently objected to him

providing the affidavit to the Government, only to then learn that my objection was

too late because Mr. Duchardt had already sent the affidavit to the Government."

Dkt. 23-37 at 341.

Regarding Mr. Duchardt's statement in his affidavit that Laura O'Sullivan

"had never before tried a case involving the death penalty *or* a mental defense,"

Dkt. 23-37 at 170 (emphasis added), Respondent argues that "if Duchardt was

wrong, he was not far off the mark." Dkt. 49 at 84. Respondent's argument

provides no defense to a statement that emphatically asserted Ms. O'Sullivan "had

never tried a case involving . . . a mental defense." *Id*. That statement was plainly

false. Respondent then argues that, "for this statement to be a lie rather than a

mistake, Purkey must show that Duchardt knew about O'Sullivan's experience in

her trials with frontal lobe damage and battered women's syndrome." Dkt. 49 at 84.

But Respondent's argument only confirms Mr. Duchardt's fraud on the court. Mr. Duchardt swore to the truth of the statement, and thus it matters not whether he was lying or mistaken when he made the statement because, as Mr. Purkey argues in his Petition, Mr. Duchardt was either acting in willful ignorance of the truth or in willful disregard of the truth. Dkt. 23 at 152. In either case, the clear intent of the false statement was the same: to deceive the district court into discrediting Ms. O'Sullivan's declaration submitted as evidence in support of the § 2255 petition and crediting his own statements.

Respondent's answer to Mr. Duchardt's false and misleading statements about Mic Armstrong's qualifications as a mitigation investigator is to misconstrue those statements to support its argument. For example, Respondent suggests that "when Duchardt recounted in his affidavit that he asked Armstrong to serve as both fact and mitigation investigator, he did not state when that conversation occurred" and "[i]t could have been early in the case, or it could have been later as the case progressed and Duchardt determined to dispense with a traditional 'mitigation specialist.'" Dkt. 49. at 86-87. But Mr. Duchardt's affidavit does not suggest that he at some unspecified point asked Armstrong to serve the dual role of both fact and mitigation investigator; on the contrary, his affidavit states that he chose Armstrong to serve in the dual role from the beginning of the case "because of his experience and training." Dkt. 23-37 at 170.

Moreover, there is no evidence whatever to support Respondent's further suggestion that, at the time Duchardt made the statement, he "still intended to hire a mitigation specialist and have Armstrong work with and for the mitigation specialist." Dkt. 49. at 87. Indeed, it is clear from the evidence that Mr. Duchardt had *no* intention of hiring a mitigation specialist, because he wanted Mic to serve in a dual role from the beginning of the case. The budget requests do not "mirror" Mr. Duchardt's affidavit as Respondent insists. Indeed, they squarely contradict each other: Mr. Duchardt swore in his affidavit that he intended from the beginning of the case for Armstrong to serve in the dual role of both fact and mitigation investigator, but his budget requests to the trial court portrayed the opposite. Mr. Duchardt submitted separate budget requests for Mr. Armstrong, who had already been brought on to Mr. Purkey's case as an investigator, and a mitigation specialist, who had yet to be hired. Dt. 23-39 at 32. It was only four months after his initial budget request that Mr. Duchardt represented to the court that he had "learned" that the cost of a mitigation specialist had doubled, and he requested additional funding for Armstrong to serve in the dual role of investigator and mitigation specialist under the guise of "budgetary savings." Dkt. 23-36 at 13-14. In that request, Mr. Duchardt asserted that his original request for funding for Mr. Armstrong as an investigator was "based on the assumption that a mitigation specialist would be hired." Dkt. 23-36 at 13. Under these facts, either Mr. Duchardt's affidavit stating

that he intended from the beginning of the case for Mr. Armstrong to serve in that dual role was *true* -- in which case the budget requests were intended to manipulate the trial court to secure additional funds for Armstrong to serve in that dual role; or, his affidavit stating that he intended from the beginning of the case for Mr. Armstrong to serve in that dual role was *false* -- in which case the statement was made to deceive the § 2255 court into accepting as fact that Mr. Armstrong was qualified as a mitigation specialist when he was not.

Respondent then argues that there is no evidence to show that Mr. Duchardt knew Armstrong to be unqualified, and "the fact that Armstrong left a prior job under bad circumstances doesn't prove that Duchardt knew or believed him to be unqualified." Dkt. 49 at 86. Yet it was Mr. Duchardt who originally hired and supervised Armstrong at the MSPD. The "bad circumstances" under which Armstrong was ultimately fired from MSPD were because Mr. Armstrong was incompetent as an investigator. Those circumstances are not at all "contested." *See* Dkt. 49 at 86. Mr. Armstrong even claimed in his lawsuit against MSPD for wrongful termination, later dismissed in January 2001 for lack of prosecution, that he had "an express contract" with Mr. Duchardt for essentially lifetime employment at MSPD. Dkt. 23-36 at 205, 208, 273-274. Contrary to Mr. Duchardt's assertions in his affidavit that Armstrong had "performed very successfully" in the dual role of both fact investigator and mitigation specialist at

MSPD, Mr. Armstrong was never trained as a mitigation specialist at MSPD, nor did he ever serve in that capacity when he was employed there. Dkt. 23-36 at 25-26. The evidence further belies Mr. Duchardt's claim in his affidavit that Mr. Armstrong had served in that dual role "successfully" in the state cases he took in his private practice. Those state cases were contracted through MSPD, and Mr. Duchardt was expressly told by MSPD to stop using Mr. Armstrong as an investigator because of his termination, and Mr. Duchardt did so. Dkt. 23-36 at 205, 208, 273-274.

Respondent relies on Mr. Purkey's ex-wife Jeanette's admission of poisoning Mr. Purkey as evidence that Mr. Armstrong "performed well" in Mr. Purkey's case, and that "Mr. Purkey's current counsel uses the poisoning information as mitigation in their § 2241 motion." Dkt. 49 at 86. The fact that Mr. Purkey's wife was poisoning Mr. Purkey is no doubt an important one in the totality of Mr. Purkey's bio-psycho-social history. But the poisoning was never presented by trial counsel as mitigating evidence. Instead, Mr. Duchardt sought admission of the poisoning evidence at the guilt phase of Mr. Purkey's trial, which was denied by the trial court as irrelevant to the homicide of Jennifer Long. (Trial Tr. Vol. V at 657; Vol. IX at 1176). Prior to the penalty phase, Mr. Duchardt argued the evidence was relevant to the Bales homicide, ostensibly to rebut the government's reliance on the

homicide as an aggravating circumstance. The trial court again ruled the evidence inadmissible. (Trial Tr. Vol. IX at 1176).

Moreover, when § 2255 counsel interviewed Mr. Armstrong, "he provided no helpful substantive information related to his investigation in Mr. Purkey's case." Dkt. 23-37 at 342. Instead, it was apparent that Mr. Armstrong was obsessed with the poisoning issue, and Teresa Norris recalls that Armstrong said something about "digging up a dead dog to try to prove that Mr. Purkey's ex-wife was poisoning him." Dkt. 23-37 at 342. This is hardly illustrative of Mr. Armstrong having "performed well" in Mr. Purkey's case, especially when the evidence was deemed inadmissible for the purposes sought by trial counsel, and trial counsel then wholly ignored its value as mitigating evidence.

Mr. Duchardt submitted his affidavit as an officer of the court and as Mr. Purkey's former trial lawyer. The materially false and misleading statements contained in his affidavit could have had no other purpose than to deceive the court and thereby interfere with the court's impartial adjudication of Mr. Purkey's claims of ineffective assistance of counsel raised in his § 2255 motion. *See Bressman*, 874 F.3d at 152. As an attorney and officer of the court, Mr. Duchardt's fraudulent conduct had "a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers." *Id.* *See also Hazel-Atlas*, 322 U.S. at 246.

60

**V.    Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment (CLAIM 4)**

Contrary to Respondent's argument, Mr. Purkey's claim is not the same as that raised either in his direct appeal or by § 2255 counsel. Mr. Purkey is not arguing here is not about the trial court "not requir[ing] Purkey's jury to return findings regarding pled and proven mitigating factors" as was argued on direct appeal, Dkt. 49 at 88,    nor is he arguing that his jury "did not vote on obvious mitigating evidence" as was argued in the § 2255 motion. Dkt. 49 at 89. What Mr. Purkey is arguing that there is an unconstitutional *risk* that the jurors understood their instructions in a way that rendered them unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death. *See* Dkt. 23 at 161-167. That a strong possibility this unconstitutional risk was realized is borne out by the new evidence from the jurors themselves.

The jurors were instructed in the Special Verdict Form to record their findings as to each of the mitigating circumstances, and they failed to follow those instructions. Dkt. 23-37 at 94; Dkt. 23-40 at 87. Respondent argues that there is "no chance that the jury mistakenly believed that it was required to reach unanimous agreement before it could consider mitigating factors." Dkt. 49 at 91. But the juror declarations show that there was every chance the jurors were under

61

the mistaken belief that they had to reach unanimous agreement on mitigating factors. One juror said they "talked about" the mitigating factors section, but he did not know why the section was not filled out, and did not recall whether they took a vote on each mitigating factor. Dkt. 23-40 at 93-94. Similarly, another juror stated that "[t]he judge instructed us to complete the form, but I do not remember us voting on each factor one-by-one" and "[t]he foreman kept the verdict form." Dkt. 23-40 at 97. Another juror stated she "understood the judge's instructions to be that the jury's decision *had to be unanimous, either for life or for death*" and did not recall if votes were taken for each of the mitigating factors. Dkt. 23-40 at 101 (emphasis added). Yet another juror stated that, "[w]hile we discussed the mitigating factors, *if everyone agreed* that something was or was not mitigating then we moved on[. . .] *[i]f we did not agree unanimously, then we discussed it until it was unanimous*." Dkt. 23-40 at 103 (emphasis added).

Based on this new evidence, there is not just a possibility, but a substantial *probability* that jurors understood from the instructions that they had to unanimously agree as to the existence of a particular mitigating factor in order to consider it, and that the blank spaces on the special verdict form represented a failure to reach unanimous agreement on the existence of the mitigating factors. The genuine risk of such a result is unacceptable under the Eighth Amendment.

*Mills v. Maryland*, 486 U.S. 367, 375 (1988) (citing *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Andres v. United States*, 333 U.S. 740, 752 (1948)).

Respondent contends that the juror declarations instead "demonstrate that although the jury considered and discussed the proposed mitigating factors, it was not persuaded by them and concluded that the death penalty was appropriate in light of the severity of Purkey's crimes." Dkt. 49 at 95. However, the quotations from the juror declarations that Respondent relies on to support their proposition only show that several jurors made up their minds to impose the death penalty at the guilt phase, in the case of one juror (*see* Dkt. 23-40 at 92), or before deliberations even began at the penalty phase (*see* Dkt. 23-40 at 96, 101), and thus failed to follow their instructions.

In the absence of this new evidence that was pre-existing but discovered only after the denial of his § 2255 motion, and which shows that Mr. Purkey's death sentence was obtained in violation of his constitutional rights, Mr. Purkey has never been allowed a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his sentence. Therefore, § 2241 is an available remedy to raise this challenge. *See Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (*en banc*); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). *See also Webster*, 784 F.3d at 1137 ((Court must "take into account that a core purpose of habeas corpus is to

prevent a custodian from inflicting an unconstitutional sentence . . . there is no reason to assume that our procedural system is powerless to act in such a case . . . [t]o hold otherwise would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment").

For these reasons, and for the reasons set forth in his Petition, *see* Am.Pet. at 155-161, Mr. Purkey is entitled to habeas relief.

## VI.   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death (CLAIM 6)

Respondent alleges that Mr. Purkey's claim is barred because "it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation." Dkt. 49 at 99. But *Hurst v. Florida* was not decided until 2016, long after Mr. Purkey's § 2255 proceedings were over. *Hurst*, 136 S.Ct. 616 (2016). *Hurst* constitutes new law affecting the legality of Mr. Purkey's death sentence, and the issue could not have been raised earlier at his trial, on direct appeal, or in his § 2255 motion. Because § 2255 is inadequate and ineffective to test the legality of his sentence, the savings clause under § 2255(e) permits Mr. Purkey to bring his claim in his § 2241 petition to challenge the legality of his sentence. *See Webster v. Daniels*, 784 F.3d at 1139 (Court must "take into account that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence . . . there is no reason to assume that our procedural

system is powerless to act in such a case . . . [t]o hold otherwise would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment"); *Garza v. Lappin*, 253 F.3d 918  (intervening decision of international tribunal after petitioner exhausted both his direct appeals and his opportunity for relief under § 2255 sufficient to invoke § 2255(e)'s savings clause and permit him to bring a petition under § 2241).

**VII.** **Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true (CLAIM 8)**

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring his new claims in this Petition, and those arguments are incorporated but need not be repeated here. *See* Section I. Under applicable *Martinez/Trevino* doctrine, a defaulted claim of ineffective assistance of trial counsel can be brought if the claim is substantial and the default was due to the ineffective assistance of initial-review postconviction counsel. A "substantial" ineffective assistance claim is one that has "some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's arguments in Claim Eight.  Section 2255 counsel themselves failed to raise this claim, and

therefore, "as an equitable matter," the initial-review postconviction proceeding was "not . . . sufficient to ensure that proper consideration was given to a substantial claim." *Id*. at 1318. Thus, § 2255 counsel's own ineffectiveness establishes cause for the default, allowing for full merits review of Mr. Purkey's substantial claim of ineffective assistance of trial counsel.

Respondent argues that the "record is devoid" of any evidence supporting Mr. Purkey's claim that trial counsel was constitutionally ineffective in his advice to him prior to the suppression hearing to persist in the statement originally made to law enforcement in order to preserve the chance of a life sentence plea offer from the Government.  Dkt. 49, p. 117.  But privileged attorney/client communications are not made part of the trial record, and it is therefore, nonsensical to argue that Mr. Purkey's argument fails because there is nothing in the record to support it.  What transpired in conversations between Mr. Purkey and his trial attorneys is known only to them, and Mr. Purkey is firm in his position that trial counsel gave him this advice.

Respondent contends that Mr. Purkey's claim is implausible because a life-sentence plea offer was never contemplated by the Government.  Dkt. 49, p. 118 – 119.  Mr. Purkey insists, however, that his trial lawyer held out hope that the Government would extend a life-sentence plea offer.  Consistent with this belief, prior to Mr. Purkey's motion to suppress testimony, trial counsel encouraged Mr.

Purkey to stay consistent with his earlier statements, because in doing so, he would uphold his side of a life-sentence bargain he insists was made with law enforcement, thus improving the chances for a life-sentence plea offer.  Mr. Purkey would not know that a life-sentence plea offer was implausible unless the implausibility of such a plea offer was communicated to him by his trial attorneys.

Respondent further argues that the record reveals that Mr. Purkey's trial attorney was "blindsided" by Mr. Purkey's suppression testimony admission, and that he went into full "damage control" mode after the admission was made.  Dkt. 49, p. 117.   Contrary to Respondent's assertions, what the record reveals instead is that Mr. Duchardt failed to object to the very question that elicited the incriminating response, and failed on redirect examination to rehabilitate Mr. Purkey by giving him a chance to explain his direct examination admission even though trial counsel was well aware that Mr. Purkey had recanted the admission to kidnapping from the inception of representation.  Dkt. 23, p. 212.  Trial counsel compounded these errors by failing to file a motion in *limine* to prevent the use of Mr. Purkey's suppression hearing testimony at trial, and when the Government impeached Mr. Purkey's trial testimony with the suppression hearing admission, by failing to ask Mr. Purkey to explain the inconsistent statements on redirect examination. Dkt. 23, p. 213, 228.

Respondent argues that trial counsel was not ineffective because there was no legal basis to file a motion in *limine* to exclude the suppression hearing admission because the law in most federal circuits permitted the use of a defendant's suppression hearing statements for impeachment purposes at trial, though Respondent concedes that Seventh and Eighth Circuit law was silent regarding the issue at the time of Mr. Purkey's trial.  Dkt. 49, p. 120 – 121.  Even if this excuses trial counsel's failure to file a motion in *limine* regarding use of the statement for impeachment, which Mr. Purkey does not concede, it does not excuse trial counsel's failure to file a motion in *limine* to prevent that Government from arguing the truth of the inconsistent statement, or his failure to object when the Government went beyond impeachment, and argued the truth of the suppression hearing statement during closing arguments.  *See United States v. Simmons*, 390 U.S. 377, 394 (1968)(holding "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial *on the issue of guilt*")(emphasis included by Repondent, Dkt. 49, p. 120).

Respondent argues that trial counsel was completely taken by surprise by Mr. Purkey's suppression hearing admission, but this is pure speculation as trial counsel made no statement on the record about being surprised by Mr. Purkey's admission.  The more important question, however, is not whether trial counsel

was surprised by the admission, but why Mr. Purkey would make such an admission in light of his firmly established recantation.  Trial counsel never gave Mr. Purkey the chance to answer this question, because they did not ask him to explain the inconsistency.  If Mr. Purkey had been asked, the record would be clear about the true reason for his suppression hearing admission:  that the suppression hearing admission was a direct result of the advice given to him by trial counsel in the context of creating the best possible case posture for a life-sentence plea offer. Mr. Purkey therefore persists in his claim that trial counsel was constitutionally ineffective for the reasons given in Claim 8 of the Petition.

## VIII.  Mr. Purkey is entitled to a stay

Contrary to Respondent's contention, Mr. Purkey is entitled to a stay of execution pursuant to *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

As to *Hill's* first factor, as detailed in his § 2241 Petition and Reply, this Court has jurisdiction, pursuant to *Martinez/Trevino*. Critically, Respondent concedes that his claims are procedurally defaulted. Mr. Purkey's claims raise substantial claims of ineffective assistance of law affecting his fundamental rights, which have never been reviewed by any court. *See* Motion for Stay of Execution, Dkt. 4, at 5-8.

With regard to *Hill's* second factor, balancing of harms, Respondent's argument is flawed.  While Respondent is correct that the victims have an

"important interest in the timely enforcement of the defendant's sentence," (Dkt. 49 at 125), that does not outweigh the harm suffered by Mr. Purkey, who would be put to death before his substantial claims are adjudicated.

Third, contrary to Respondent's argument, counsel for Mr. Purkey have been diligent. As Respondent acknowledges, counsel have been reinvestigating this case since 2016. *See* Dkt. 49 at 125 -126. This fact supports, not refutes, counsel's diligence. Respondent's claim of "strategy" inexplicably assumes that counsel was waiting for an execution date before filing the § 2241 Petition. There is no basis in fact for this presumption. Counsel had no indication that Respondent would begin setting execution dates, let alone one for Mr. Purkey. Neither the length of time Mr. Purkey has been on federal death row, nor the span since the denial of certiorari from his federal habeas would have indicated to his counsel that he would be first in line for execution. Respondent should not doubly benefit from its own arbitrary selection of prisoners for execution.

Respondent's accusation of strategic delay ignores the reality of this case. There are many factors that resulted in a lengthier investigation: Mr. Purkey's mental impairments, historical limitations in funding and resources, counsel's access to their client, and caseload of counsel. Despite these factors, counsel diligently investigated Mr. Purkey's case, developed critical evidentiary support, identified appropriate mental health experts and worked to bring them up to speed

in the case, and, finally, drafted and filed a Petition dense with compelling factual and legal support.

Finally, Respondent's arguments about public interest are without merit. As an initial matter, the public's interest should be viewed through the lens of Respondent's arbitrary setting of execution dates. The public does not benefit because justice is short circuited to make way for governmental arbitrariness. Nor does the public benefit from the execution of an unconstitutional death sentence. Here, where the majority of the delay has been caused by the government, they should not now be permitted to argue about the harm of delay. It is disingenuous for Respondent to argue that a factor it long ignored should now support denying a stay to enable counsel to litigate substantial constitutional issues on behalf of their client.  The most compelling public interest is ensuring the constitutional rights of its citizens, which includes the rights of the accused. *See* Dkt. 4 at 11-12.

## REQUEST FOR RELIEF

For all of the foregoing reasons set forth herein, and in the Petition, Dkt. 23, and based upon the full record of this matter, Petitioner reiterates his requests that the Court provide the following relief:

1.    That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

2.     That leave to amend this Petition, if necessary, be granted;

3.      That Respondents be Ordered to respond to this Petition;

4.      That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

5.      That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

6.      That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

/s/Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
michelle_law@fd.org

Counsel for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2019, the foregoing Reply to the Government's Response to Petition for Writ of Habeas Corpus and Motion for Stay Petition for Writ of Habeas Corpus was filed electronically with the Clerk of the Court via CM/ECF to be served on the parties authorized to be noticed.

/s/Rebecca E. Woodman
Counsel for Petitioner